1  DANIEL E. LUNGREN
   Attorney General
2  GEORGE WILLIAMSON
   Chief Assistant Attorney General
3  RONALD A. BASS
   Senior Assistant Attorney General
4  RONALD E. NIVER
   Supervising Deputy Attorney General
5  DAVID H. ROSE
   Deputy Attorney General
6  State Bar No. 112008
    50 Fremont St., Room 300
7  San Francisco, CA  94105
   Telephone:  (415) 356-6236
8      Fax:  (415) 356-6190
   Attorneys for Respondent
9

**F I L E D**

JUL 3 0 1997

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT,
NORTHERN DISTRICT OF CALIFORNIA

10          IN THE UNITED STATES DISTRICT COURT

11        FOR THE NORTHERN DISTRICT OF CALIFORNIA

12

13

14  **CURTIS F. PRICE,**

                            Petitioner,    | **CAPITAL CASE**

15
        v.                                 | C 93-0277 CAL
16
    **ARTHUR CALDERON, Warden of San Quentin**  | EXHIBIT B (RESPONDENT'S
17  **State Prison,,**                          | BRIEF) IN SUPPORT OF
                                             | RESPONDENT'S MOTION TO
18                          Respondent.       | DISMISS FOR FAILURE TO
                                             | EXHAUST CLAIMS IN STATE
19                                           | COURT

20

21

22

23

24

25

26

27

JUL 3 0 1997

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA



# IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

**THE PEOPLE OF THE STATE OF CALIFORNIA,**

Plaintiff and Respondent,

v.

**CURTIS FLOYD PRICE,**

Defendant and Appellant.

S004719

Humboldt County Superior Court No. 9898
The Honorable John E. Buffington, Judge

## RESPONDENT'S BRIEF

JOHN K. VAN DE KAMP
Attorney General of the State of California

RICHARD B. IGLEHART
Chief Assistant Attorney General

JOHN H. SUGIYAMA
Senior Assistant Attorney General

RONALD E. NIVER
Supervising Deputy Attorney General

DAVID H. ROSE
Deputy Attorney General

  350 McAllister Street, Room 6000
  San Francisco, California 94102
  Telephone: (415) 557-9412

Attorneys for Respondent

## Table of Contents

**Page**

STATEMENT OF THE CASE                                                    1

STATEMENT OF FACTS                                                       2

    A.   Introduction                                       2

    B.   The Aryan Brotherhood                              3

    C.   The Conspiracy                                     4

    D.   Appellant is Released from Prison, September 1982 through January 1983                                             5

    E.   Liquor Store Robberies                             6

        1.   Village Liquors                            6

        2.   Liquor Still                               7

    F.   The Triplex Theater Casing                         7

    G.   The Moore Home Burglary                            8

    H.   The McKinleyville Sighting                         9

    I.   Appellant Returns to Los Angeles, January 23-5, 1983    10

    J.   The Barnes Murder                                  11

    K.   Appellant Flees Southern California February 13-14     12

    L.   The Elizabeth Hickey Murder                        12

    M.   The Hickey/Petry Relationship                      14

    N.   Petry's Alibi, February 19, Midnight to 8:15 a.m.      19

    O.   Dr. Blinder                                        21

    P.   Appellant's Movements February 17-20, 1983         21

    Q.   Robbery of the Triplex Theater February 19, 1983      23

## Table of Contents, cont'd

R. Pat's Market Robbery ....................................................... 24

S. Appellant's Post February 20 Activity ............................... 24

T. Arrest and Post-Arrest Gathering of Evidence ................ 25

U. Numerous Searches Are Executed ................................... 27

V. Search of the Storage Locker ........................................... 28

W. Thompson and Smith Agree to Testify for the Prosecution ........................................................................ 29

X. Defense Rebuttal of AB Testimony ................................. 32

PENALTY PHASE .................................................................. 35

APPELLANT'S CONTENTIONS ............................................ 41

RESPONDENT'S ARGUMENT .............................................. 44

ARGUMENT ............................................................................ 46

I. VENUE AND VICINAGE WERE PROPERLY LAID IN HUMBOLDT COUNTY ............................................ 46

A. Venue ................................................................... 46

1. Venue for Murder .................................... 46

2. Venue for Conspiracy ............................. 47

B. Vicinage ............................................................... 47

C. Absence of Findings .......................................... 50

1. Findings on Venue for Conspiracy ........ 51

2. Findings on Venue for Murder .............. 54

3. Findings on Vicinage for Murder .......... 55

D. Conclusion .......................................................... 55

## Table of Contents, cont'd

II.   APPELLANT'S MOTION FOR SEVERANCE WAS PROPERLY DENIED DUE TO THE CROSS-ADMISSIBILITY OF THE EVIDENCE AND OTHER FACTORS IN THE RECORD                57

    A.  Conspiracy                58

    B.  Conclusion                63

III.  THE CHANGE OF VENUE MOTIONS WERE PROPERLY DENIED                64

IV.   THE TRIAL COURT'S RULING ON SANCTIONS WAS TEMPERATE AND JUSTIFIED                71

    A.  No Contempt Citation was Made                71

    B.  Counsels' Rights Were Protected                72

    C.  No Prejudice is Shown                74

    D.  Substantively, the Court's Rulings were Correct                74

V.    USE OF THE NAME ARYAN BROTHERHOOD WAS PROPER                79

    A.  Name Proved Existence                79

    B.  Character of Name was Probative                80

    C.  Sanitization                80

    D.  Prejudice Dispelled                81

VI.   THE PLEADING OF THE CONSPIRACY COUNT WAS COMPLETELY ADEQUATE                83

VII.  THE JURY SELECTION PROCESS WAS PROPER                86

    A.  Exclusion of Jurors                86

        1.  Kenneth Price                86

    B.  Challenges for Cause                93

        1.  Legal Principles                93

**Table of Contents, cont'd**

|   |   |   |
|---|---|---|
| 2. | Denial of Defense *Witherspoon/Witt* Challenges | 96 |
| 3. | Contested Denials of Defense Challenges (Non-Witherspoon/Witt | 104 |
| 4. | Contested Sustained Prosecution Challenges | 109 |
| C. | Conclusion | 111 |

**VIII. THE COURT'S ORDER THAT APPELLANT BE SHACKLED IN COURT WAS FULLY JUSTIFIED BY THE RECORD AND WAS HANDED DOWN ONLY AFTER DILIGENT EFFORTS AT MITIGATION BY THE TRIAL COURT** — 112

| A. | Factual Background | 112 |
| B. | Legal Analysis | 124 |
| C. | Prejudice | 129 |

**IX. APPELLANT'S ABSENCE FROM HIS TRIAL WAS IN CONFORMITY WITH STATE AND FEDERAL LAW** — 132

| A. | Factual Background | 132 |
| B. | Legal Analysis | 136 |
| 1. | Voluntary Absence | 137 |
| 2. | Disruption of the Courtroom | 140 |
| 3. | Concluding Points | 142 |

**X. APPELLANT ESTABLISHES NO ERROR OR PREJUDICE FROM HIS ABSENCE FROM SEVERAL OTHER HEARINGS** — 143

| A. | July 31, 1985 | 143 |
| B. | August 5, 1985 | 147 |
| C. | Hearings on Complaints About Counsel | 147 |
| D. | March 20 and 24, 1986 and June 26, 1986 | 152 |

**Table of Contents, cont'd**

XI.   THE OFFICERS HAD SUFFICIENT PROBABLE
      CAUSE TO ARREST APPELLANT                                154

      A.   Facts                                               154

      B.   Argument                                            155

           1.   Did Detective Douglas Have Personal Knowledge
                of Facts Establishing Probable Cause?          156

           2.   The Officers' Subjective Belief on the Issue of
                Probable Cause is Irrelevant                   157

           3.   Did Probable Cause Exist?                      157

                a.  Appellant's Criminal History              159

                b.  The McKinleyville Sighting                160

                c.  The Composites                            160

                d.  Demeanor of Suspect                       160

                e.  The Photo Lineup Identification           160

XII.  THE COURT PROPERLY HANDLED THE THIRD
      PARTY CULPABILITY EVIDENCE                               164

      A.   Petry's Prior Writings                              164

      B.   The Interview Tapes                                 167

      C.   The Preliminary Examination Transcripts            168

      D.   The Trial Court Properly Handled the Expert Witness
           Testimony of Dr. Blinder                           169

      E.   The Trial Court Properly Excluded the Hickey State
           of Mind Evidence                                   171

      F.   The Videotape of Hickey's Children's Room was
           Properly Excluded                                  174

      G.   The Polygraph Evidence was Properly Excluded       176

## Table of Contents, cont'd

XIII.   THE TRIAL COURT'S FURTHER EVIDENTIARY RULINGS EXCLUDING DEFENSE EVIDENCE WERE CORRECT ... 180

    A.   Appellant Next Protests the Exclusion of the Testimony of Dr. Richard Korn as an Expert on California Prison Gangs ... 180

    B.   The Motion for a View of the Scene was Properly Denied ... 183

    C.   There Was No Improper Limitation of Cross Examination of Clifford Smith ... 184

    D.   Stephen Barnes' Prior Statement ... 185

XIV.   THE TRIAL COURT'S EVIDENTIARY RULINGS WERE CONSISTENTLY SOUND AND EVEN-HANDED ... 187

    A.   The October Arrest of O'Rourke in Lakewood ... 187

    B.   The January 23, 1983, Contact in McKinleyville ... 189

    C.   Appellant's Prior Admission of AB Membership ... 192

    D.   Clifford Smith's Claim of Having Taken a Polygraph Test ... 193

    E.   The Jury was Not Told That Appellant had Refused to Provide a Blood Sample ... 195

    F.   Impeachment of Becky Williams by Her Previous Silence was Correct ... 196

    G.   The Trial Court Properly Handled Evidence of Appellant's Admission of the Length of His Prison Sentence ... 197

    H.   Evidence that Appellant's Mother's Neighbor was Hostile to Police was Correctly Received and was Minor ... 198

    I.   AB Votes Involving Other Parts of the Country were Relevant and Probative ... 199

## Table of Contents, cont'd

J.   Various Items of Physical Evidence were Admitted in Legitimate Exercise of the Court's Discretion Under Section 352   200

K.   Impeachment of John Stinson   201

L.   The Letter Signed by Stinson and Griffin was Admitted Properly   203

M.   The Impeachment of Robert Rowland was Correct   205

N.   The Prosecution Comment on Defense Failure to Call its Ballistics Expert was Proper   208

XV.   THE PHOTOS OF THE BODIES OF RICHARD BARNES AND ELIZABETH HICKEY WERE ADMISSIBLE AS STRONGLY PROBATIVE OF IMPORTANT FACTUAL ISSUES IN THIS CASE   210

XVI.   THE COURT'S INSTRUCTIONS ON ACCOMPLICE LIABILITY WERE WHOLLY CORRECT   213

A.   Natural and Probable Consequences   213

B.   Myers was not an Accomplice as a Matter of Law   216

C.   Sufficient Evidence Corroborated Myers, Thompson and Smith's Stories   216

XVII.   THE INSTRUCTIONS ON THE IMMUNIZED WITNESSES WERE CORRECT   221

XVIII.   APPELLANT'S ALLEGATIONS OF PROSECUTORIAL MISCONDUCT ARE INCORRECT OR INSIGNIFICANT   224

A.   Introduction   224

B.   Voir Dire   224

1.   Appellant Waived Any Claim of Prosecutorial Misconduct During Voir Dire   225

2.   Appellant Names Only One Incident Which Could Have Affected Any Sitting Juror   225

3.   Had Defense Counsel Believe   226

vii

## Table of Contents, cont'd

|   |   |   |   |
|---|---|---|---|
| | 4. | Substantive Complaints | 226 |
| C. | | Prosecutorial Misconduct at the Guilt Phase | 228 |
| | 1. | The Prosecutor's Behavior was Proper | 228 |
| | 2. | Appellant's Arguments About Misconduct Concerning Appellant or His Counsel | 236 |
| | 3. | The Prosecutor Properly Handled the Defense Experts | 244 |
| | 4. | Additional Unfounded Assertions With Regard to the Prosecutor's Actions | 248 |
| | 5. | Appellant Closes His Evidentiary Phase Misconduct Section With Two Thoroughly Minor Points | 252 |
| D. | | Guilt Phase Argument | 254 |
| E. | | Conclusion | 255 |

| | | |
|---|---|---|
| XIX. | MORE THAN SUFFICIENT EVIDENCE SUPPORTED THE BURGLARY CONVICTION. | 256 |
| XX. | THE RECEIVING STOLEN PROPERLY CONVICTION WAS AMPLY SUPPORTED AND MAY STAND | 260 |
| XXI. | THE LACK OF INSTRUCTION ON VOLUNTARY MANSLAUGHTER IN THE HICKEY MURDER WAS CORRECT | 262 |
| XXII. | NO INDIVIDUAL OR CUMULATIVE ERROR HARMED THE RELIABILITY OF THE JURY VERDICTS, ESPECIALLY GIVEN THE VOLUMINOUSNESS AND THE CONCLUSIVENESS OF THE EVIDENCE | 265 |

| | | |
|---|---|---|
| A. | Length of Deliberations | 265 |
| B. | Prejudicial Aspects of the Case in General | 265 |
| C. | "Closeness" of the Hickey Homicide Case | 266 |
| D. | The Triplex Robbery | 272 |

**Table of Contents, cont'd**

|  |  |  |
|---|---|---|
| | E. The Barnes Murder | 274 |
| | F. Appellant's Failure to Testify | 278 |
| XXIII. | NO JURY COERCION IS SHOWN | 285 |
| XXIV. | CERTAIN INQUIRIES BY THE JURY AS TO THE SOURCE OF THE PROSECUTOR'S QUESTIONS WERE CORRECTLY ANSWERED BY THE TRIAL COURT | 290 |
| | A. Introduction | 290 |
| | B. Facts | 290 |
| | C. Argument | 296 |
| XXV. | SEVERAL QUESTIONED PIECES OF EVIDENCE IN AGGRAVATION WERE HANDLED CORRECTLY BY THE TRIAL COURT | 299 |
| XXVI. | THE TRIAL COURT'S EVIDENTIARY RULINGS ON CROSS EXAMINATION AND REBUTTAL WERE REASONABLE | 302 |
| XXVII. | APPELLANT'S ALLEGATIONS OF PROSECUTORIAL MISCONDUCT ARE IN THE MAIN BASELESS, AND, AS A WHOLE, INSIGNIFICANT | 312 |
| XXVIII. | THE COURT PROPERLY EXCLUDED CERTAIN JAIL HOUSE WRITINGS OF APPELLANT AS MORE PREJUDICIAL THAN PROBATIVE, AND AS BEING CUMULATIVE TO THE LARGE MASS OF WRITINGS BY APPELLANT ALREADY IN EVIDENCE | 329 |
| XXIX. | EXCLUSION OF CERTAIN DEFENSE EVIDENCE IN MITIGATION WAS PROPER | 333 |
| XXX. | APPELLANT'S ARGUMENTS ABOUT LINGERING DOUBT ARE UNSUPPORTED BY CALIFORNIA LAW | 336 |
| | A. There is No Requirement in California Law for Instruction on Lingering Doubt | 336 |

## Table of Contents, cont'd

B.   No Instruction on Lingering Doubt or on Redeliberation From Scratch is Required When An Alternate Juror is Substituted at The Commencement of Penalty Phase Deliberations ... 337

XXXI.   INSTRUCTIONS ON EVIDENCE OF OTHER CRIMINAL ACTIVITY BY APPELLANT WERE CORRECT ... 339

XXXII.   APPELLANT PINPOINTS NO CONSTITUTIONAL FLAWS IN THE CALIFORNIA CAPITAL SENTENCING PROCEDURES ... 342

XXXIII.   APPELLANT'S CUMULATIVE ERROR ARGUMENT IS UNPERSUASIVE ... 344

XXXIV.   THE DETERMINATE TERM ... 345

CONCLUSION ... 347

# Table of Authorities

**Page**

## Cases

*Arden* v. *State Bar*
(1987) 43 Cal.3d 713                                     176

*Bauguess* v. *Paine*
(1978) 22 Cal.3d 626                                     73

*Berkemer* v. *McCarty*
(1984) 466 U.S. 923                                      157

*Booth* v. *Maryland*
(1987) 482 U.S. 496                                      343

*Brown* v. *McCuan*
(1942) 56 Cal.App.2d 35                                  244

*Diaz* v. *United States*
(1912) 223 U.S. 442                                      137

*Drope* v. *Missouri*
(1975) 420 U.S. 162                                      138

*Fabricant* v. *Superior Court*
(1980) 104 Cal.App.3d 905                                72

*Fain* v. *Superior Court*
(1970) 2 Cal.3d 46                                       68

*Feagles* v. *Superior Court*
(1970) 11 Cal.App.3d 735                                 83

*Franklyn* v. *Lynaugh*
(1988) ___ U.S. ___                                     336

*Frazier* v. *Superior Court*
(1971) 5 Cal.3d 287                                      70

*Guam* v. *Ichiyasu*
(9th Cir. 1988) 838 F.2d 353                             160

*Hall* v. *Wainwright*
(11th Cir. 1984) 733 F.2d 766                            .137

## Table of Authorities, cont'd

*Hernandez* v. *Municipal Court*
(1989) 49 Cal.3d 713 — 49

*Hopt* v. *Utah*
(1884) 110 U.S. 574 — 137

*Illinois* v. *Allen*
(1970) 397 U.S. 337 — 139

*Illinois* v. *Gates*
(1983) 462 U.S. 213 — 161

*In Re Arguello*
(1969) 71 Cal.2d 1316 — 92

*In re Blaze*
(1969) 271 Cal.App.2d 210 — 73

*In re Buckley*
(1973) 10 Cal.3d 237 — 73

*In re Ciraolo*
(1969) 70 Cal.2d 389 — 76

*In re Estrada*
(1966) 63 Cal.2d 740 — 299

*In re Hallinan*
(1969) 71 Cal.2d 1179 — 72

*In re James D.*
(1981) 116 Cal.App.3d 810 — 156

*In re Lance W.*
(1985) 37 Cal.3d 873 — 177

*In re Marriage of Flaherty*
(1982) 31 Cal.3d 637 — 72

*In re Martin*
(1977) 71 Cal.App.3d 472 — 73

*Kennedy* v. *Cardwell*
(6th Cir. 1973) 487 F.2d 101 — 124

*Lowenfield* v. *Phelps*
(1988) ___ U.S. ___ — 342

**Table of Authorities, cont'd**

*Luce* v. *U.S.*
(1984) 469 U.S. 38                                                                130

*O'Hare* v. *Superior Court*
(1987) 43 Cal.3d 86                                                               47

*Peede* v. *State*
(Fla 1985) 474 So.2d 808
*cert. den.* 477 U.S. 909                                                         139

*Penry* v. *Lynaugh*
(1989) ___ U.S. ___                                                              336

*People* v. *Adams*
(1975) 53 Cal.App.3d 109                                                         176

*People* v. *Adcox*
(1988) 47 Cal.3d 207                                                             64

*People* v. *Allen*
(1986) 42 Cal.3d 1222                                                            124

*People* v. *Andrews*
(1989) 49 Cal.3d 200                                                             223

*People* v. *Archerd*
(1970) 3 Cal.3d 615                                                              62

*People* v. *Balderas*
(1985) 41 Cal.3d 144                                                             52

*People* v. *Bandhauer*
(1970) 1 Cal.3d 609                                                              324

*People* v. *Barney*
(1983) 143 Cal.App.3d 490                                                        48

*People* v. *Barranday*
(1971) 20 Cal.App.3d 16                                                          163

*People* v. *Bean*
(1988) 46 Cal.3d 919                                                             57

*People* v. *Bell*
(1989) 49 Cal.3d 502                                                             53

**Table of Authorities, cont'd**

*People* v. *Belmontes*
(1988) 45 Cal.3d 744                                    343

*People* v. *Biggs*
(1937) 9 Cal.2d 508                                     91

*People* v. *Bismillah*
(1989) 208 Cal.App.3d 80                               48

*People* v. *Bittaker*
(1989) 48 Cal.3d 1046                                  96

*People* v. *Blackwell*
(1987) 191 Cal.App.3d 925                             91

*People* v. *Bonin*
(1988) 46 Cal.3d 659                                   65

*People* v. *Bowker*
(1988) 203 Cal.App.3d 385                            170

*People* v. *Box*
(1984) 152 Cal.App.3d 461                            95

*People* v. *Brew*
(1984) 161 Cal.App.3d 1102                          168

*People* v. *Brown*
(1988) 46 Cal.3d 432                                 337

*People* v. *Buono*
(1961) 191 Cal.App.2d 203                            46

*People* v. *Burgess*
(1988) 206 Cal.App.3d 762                            90

*People* v. *Carrera*
(1889) 49 Cal.3d 291                                 222

*People* v. *Cavenaugh*
(1955) 44 Cal.2d 252                                  54

*People* v. *Coleman*
(1985) 38 Cal.3d 69                                  183

*People* v. *Coleman*
(1988) 46 Cal.3d 749                                  86

Table of Authorities, cont'd

*People* v. *Coleman*
(1989) 48 Cal.3d 112                                65

*People* v. *Collins*
(1976) 17 Cal.3d 687                               337

*People* v. *Collins*
(1986) 42 Cal.3d 378                               130

*People* v. *Cooks*
(1983) 141 Cal.App.3d 224                         219

*People* v. *Davenport*
(1985) 41 Cal.3d 247                              340

*People* v. *De La Plane*
(1979) 88 Cal.App.3d 223                          175

*People* v. *Diaz*
(1984) 152 Cal.App.3d 926                          91

*People* v. *Duran*
(1976) 16 Cal.3d 282                              122

*People* v. *Dyer*
(1988) 45 Cal.3d 26                                91

*People* v. *Eddahbi*
(1988) 199 Cal.App.3d 1135                        346

*People* v. *Fair*
(1988) 203 Cal.App.3d 1303                        170

*People* v. *Farmer*
(1989) 47 Cal.3d 888                              222

*People* v. *Fields*
(1983) 35 Cal.3d 329                              336

*People* v. *Fields*
(1984) 159 Cal.App.3d 555                         160

*People* v. *Flores*
(1974) 12 Cal.3d 85                               160

*People* v. *Floyd*
(1987) 43 Cal.3d 333                              168

## Table of Authorities, cont'd

*People* v. *Fosselman*
(1983) 33 Cal.3d 572       77

*People* v. *Frausto*
(1982) 135 Cal.App.3d 129       59

*People* v. *Frazier*
(9th Cir. 1985) 772 F.2d 1449       290

*People* v. *Frierson*
(1979) 25 Cal.3d 142       342

*People* v. *Fujita*
(1974) 43 Cal.App.3d 454       167

*People* v. *Garcia*
(1984) 160 Cal.App.3d 82       236

*People* v. *Gardner*
(1975) 52 Cal.App.3d 559       308

*People* v. *Garrison*
(1989) 47 Cal.3d 746       146

*People* v. *Gates*
(1987) 43 Cal.3d 1168       314

*People* v. *Gomez*
(1953) 41 Cal.2d 150       69

*People* v. *Grant*
(1988) 45 Cal.3d 829       145

*People* v. *Guzman*
(1988) 45 Cal.3d 915       47

*People* v. *Hall*
(1988) 199 Cal.App.3d 914       345

*People* v. *Hamilton*
(1963) 60 Cal.2d 105       92

*People* v. *Hamilton*
(1985) 41 Cal.3d 408       124

**Table of Authorities, cont'd**

*People* v. *Hannon*
(1977) 19 Cal.3d 588                                     196

*People* v. *Harris*
(1981) 28 Cal.3d 935                                      64

*People* v. *Harris*
(1981) 29 Cal.3d 935                                     153

*People* v. *Harris*
(1984) 36 Cal.3d 36                                      330

*People* v. *Heishman*
(1988) 45 Cal.3d 145                                     327

*People* v. *Hernandez*
(1979) 94 Cal.App.3d 715                                 93

*People* v. *Hernandez*
(1988) 447 Cal.3d 315                                    338

*People* v. *Hogan*
(1982) 31 Cal.3d 815                                     168

*People* v. *Hovey*
(1988) 44 Cal.3d 543                                     257

*People* v. *Jackson*
(1980) 28 Cal.3d 264                                     153

*People* v. *Jackson*
(1985) 168 Cal.App.3d 700                                 91

*People* v. *Jacla*
(1978) 77 Cal.App.3d 878                                 123

*People* v. *Jaramillo*
(1976) 16 Cal.3d 752                                     260

*People* v. *Jennings*
(1988) 46 Cal.3d 963                                     340

*People* v. *Jiminez*
(1978) 21 Cal.3d 595                                     168

*People* v. *Johnson*
(1989) 47 Cal.3d 1194                                    227

<u>Table of Authorities, cont'd</u>

*People* v. *Jones*
(1964) 228 Cal.App.2d 74                                    47

*People* v. *Jones*
(1985) 164 Cal.App.3d 1173                                  153

*People* v. *Kaiser*
(1980) 113 Cal.App.3d 754                                   150

*People* v. *Keenan*
(1988) 46 Cal.3d 478                                        107

*People* v. *Kegler*
(1987) 197 Cal.App.3d 72                                    177

*People* v. *Kellett*
(1982) 134 Cal.App.3d 949                                   47

*People* v. *Kelly*
(1986) 185 Cal.App.3d 118                                   91

*People* v. *Keltie*
(1983) 148 Cal.App.3d 773                                   163

*People* v. *Lang*
(12-7-89) 89 C.D.O.S. 8898                                  146

*People* v. *Lavergne*
(1971) 4 Cal.3d 735                                         207

*People* v. *Lee*
(1987) 43 Cal.3d 666                                        54

*People* v. *Lescallet*
(1981) 123 Cal.App.3d 487                                   204

*People* v. *Lewis*
(1987) 191 Cal.App.3d 1288                                  204

*People* v. *Leyba*
(1981) 29 Cal.3d 591                                        156

*People* v. *Lindsey*
(1978) 84 Cal.App.3d 851                                    150

**Table of Authorities, cont'd**

*People* v. *Loudermilk*
(1987) 195 Cal.App.3d 996                    157

*People* v. *Lucky*
(1988) 45 Cal.3d 259                         324

*People* v. *Malone*
(1988) 47 Cal.3d 1                            52

*People* v. *Martin*
(1983) 150 Cal.App.3d 148                     52

*People* v. *McDonald*
(1984) 37 Cal.3d 351                         170

*People* v. *Miller*
(1989) 208 Cal.App.3d 1311                   176

*People* v. *Milner*
(1988) 45 Cal.3d 227                         210

*People* v. *Milton*
(1988) 44 Cal.3d 713                         340

*People* v. *Miranda*
(1987) 44 Cal.3d 57                          313

*People* v. *Moore*
(1986) 185 Cal.App.3d 1005                    63

*People* v. *Mooring*
(1982) 129 Cal.App.3d 453                    183

*People* v. *Morris*
(1988) 46 Cal.3d 1                           342

*People* v. *Osegueda*
(1984) 163 Cal.App.3d Supp. 25              256

*People* v. *Paul*
(1978) 78 Cal.App.3d 32                       84

*People* v. *Peete*
(1946) 28 Cal.2d 306                          62

*People* v. *Peggese*
(1980) 102 Cal.App.3d 415                    183

Table of Authorities, cont'd

*People* v. *Poggi*
(1988) 45 Cal.3d 306                                          57

*People* v. *Pope*
(1979) 23 Cal.3d 412                                          74

*People* v. *Powell*
(1891) 87 Cal. 348                                            49

*People* v. *Powell*
(1967) 67 Cal.2d 32                                           46

*People* v. *Powell*
(1974) 40 Cal.App.3d 107                                      48

*People* v. *Quicke*
(1964) 61 Cal.2d 155                                          257

*People* v. *Ramirez*
(1983) 34 Cal.3d 541                                          156

*People* v. *Ramirez*
(1987) 189 Cal.App.3d 603                                     84

*People* v. *Ramos*
(1980) 106 Cal.App.3d 591                                     346

*People* v. *Ratliff*
(1987) 189 Cal.App.3d 696                                     196

*People* v. *Rede*
(1986) 176 Cal.App.3d 1005                                    163

*People* v. *Redmond*
(1969) 71 Cal.2d 745                                          256

*People* v. *Redmond*
(1981) 29 Cal.3d 904                                          195

*People* v. *Reynolds*
(1984) 152 Cal.App.3d 42                                      181

*People* v. *Rich*
(1988) 45 Cal.3d 1036                                         129

**Table of Authorities, cont'd**

*People* v. *Robertson*
(1989) 48 Cal.3d 18                                     137

*People* v. *Rodriguez*
(1986) 42 Cal.3d 730                                    287

*People* v. *Rohaus*
(1975) 15 Cal.3d 540                                    169

*People* v. *Ruiz*
(1988) 44 Cal.3d 589                                     57

*People* v. *Sedeno*
(1974) 10 Cal.3d 703                                    263

*People* v. *Seldomridge*
(1984) 154 Cal.App.3d 362                               178

*People* v. *Sheldon*
(1989) 48 Cal.3d 935                                    287

*People* v. *Smallwood*
(1986) 42 Cal.3d 415                                     57

*People* v. *Stankewitz*
(1982) 32 Cal.3d 80                                     151

*People* v. *Stewart*
(1983) 145 Cal.App.3d 967                               168

*People* v. *Stewart*
(1986) 185 Cal.App.3d 197                               260

*People* v. *Sweet*
(1989) 207 Cal.App.3d 78                                 91

*People* v. *Terry*
(1964) 61 Cal.2d 137                                    336

*People* v. *Thomas*
(1986) 41 Cal.3d 837                                     83

*People* v. *Thomas*
(1987) 43 Cal.3d 818                                     83

*People* v. *Thompkins*
(1987) 195 Cal.App.3d 244                               262

## Table of Authorities, cont'd

*People* v. *Thompson*
(1988) 45 Cal.3d 86 174

*People* v. *Valencia*
(1980) 112 Cal.App.3d 939 83

*People* v. *Walker*
(1976) 18 Cal.3d 232 150

*People* v. *White*
(1968) 69 Cal.2d 751 324

*People* v. *Wickersham*
(1982) 32 Cal.3d 307 142

*People* v. *Wilkes*
(1955) 44 Cal.2d 679 93

*People* v. *Willabee*
(1985) 164 Cal.App.3d 1054 308

*People* v. *Williams*
(1981) 29 Cal.3d 392 227

*People* v. *Williams*
(1988) 199 Cal.App.3d 469 86

*People* v. *Wright*
(1982) 30 Cal.3d 705 346

*People* v. *Wymberly*
(1976) 16 Cal.3d 557 160

*People* v. *Ghent*
(1987) 43 Cal.3d 739 300

*People* v. *Heishman*
(1988) 45 Cal.3d 147 299

*People* v. *Laws*
(1981) 120 Cal.App.3d 1022 297

*People* v. *Martin*
(1980) 101 Cal.App.3d 1000 297

**Table of Authorities, cont'd**

*People* v. *Melton*
(1988) 44 Cal.3d 713                                    300

*People* v. *Thompson*
(1988) 45 Cal.3d 86 124                          •       300

*Rose* v. *Clark*
(1986) 478 U.S. 570                                      50
*Ross* v. *Oklahoma*
(1988) 487 U.S. ___                                      93

*Scott* v. *United States*
(1978) 436 U.S. 128                                     157

*Smith* v. *Superior Court*
(1968) 68 Cal.2d 547                                     72

*Strickland* v. *Washington*
(1989) 466 U.S. 668                                      55

*Texas* v. *Brown*
(1983) 460 U.S. 730                                     161

*United States* v. *Abel*
(1984) 469 U.S. 45                                       79

*United States* v. *Hearst*
(9th Cir. 1977) 563 F.2d 1331                           322

*United States* v. *Honneus*
(1st Cir. 1974) 508 F.2d 566                             54

*United States* v. *Moeckly*
(8th Cir. 1985) 769 F.2d 453                             54

*United States* v. *Moses*
(9th Cir. 1986) 796 F.2d 281                            160

*United States* v. *Murray*
(9th Cir. 1985) 751 F.2d 1528                           161

*United States* v. *Pinion*
(9th Cir. 1986) 800 F.2d 976                            156

*United States* v. *Sommerstedt*
(9th Cir. 1985) 752 F.2d 1494                           287

## Table of Authorities, cont'd

*United States* v. *Washington*
(D.C. Cir. 1983) 705 F.2d 489                                    142

*United States* v. *West*
(9th Cir. 1987) 826 F.2d 909                                    322

*United States* v. *Young*
(1985) 470 U.S. 1                                              224

*Vukman* v. *Superior Court*
(1981) 116 Cal.App.3d 341                                      162

*Williams* v. *Superior Court*
(1984) 36 Cal.3d 441                                            57

*Wilson* v. *McCarthy*
(9th Cir. 1985) 770 F.2d 1482                                  129

*Witherspoon* v. *Superior Court*
(1982) 133 Cal.App.3d 24                                       176


## Constitutional Provisions


California Constitution
   Art. I, § 28                                             196


## Statutes


Stats. 1983, chap. 203, § 2, p. 668                            176

Code of Civil Procedure
   § 128.5                                                    71
   § 223                                                     228

Evidence Code
   § 351.1                                                   176
   § 664                                                      73
   § 780(i)                                                  308
   § 800 et seq.                                             170
   § 1101                                                    189
   § 1250                                                    171
   § 1291                                                    168
   § 1291(a)(1)                                              185

**Table of Authorities, cont'd**

Health and Safety Code
§ 11361.7 ......... 299

Penal Code
§ 182/211 ......... 1
§ 187 ......... 1
§ 190.2(a)(3) ......... 1
§ 190.2(a)(17) ......... 342
§ 190.3(a) ......... 342
§ 190.3(b) ......... 300
§ 190.3(c) ......... 300
§ 211 ......... 1
§ 459 ......... 1
§ 487(c) ......... 1
§ 496 ......... 1
§ 654 ......... 346
§ 667.5 ......... 345
§ 667.5(a) ......... 2
§ 667(a) ......... 2
§ 781 ......... 46
§ 790 ......... 46
§ 960 ......... 83
§ 977 ......... 144
§ 995 ......... 2
§ 1043 ......... 139
§ 1043(a)(1) ......... 133
§ 1089 ......... 91
§ 1118.1 ......... 84
§ 1137 ......... 167
§ 1203.06(a)(1) ......... 2
§ 1324 ......... 223
§ 1382 ......... 76
§ 1538.5 ......... 2
§ 12022.5 ......... 2

**Table of Authorities, cont'd**

<u>Other Authorities</u>

3A Wright, Federal Practice and Procedure
(2d ed. 1982) § 723 at 18                                    139

California Rules of Court
    Rule 421(a)(1)                                       345
    Rule 421(a)(2)                                       345
    Rule 421(a)(6)                                       345
    Rule 421(a)(8)                                       345
    Rule 421(a)(10)                                      345
    Rule 421(b)(1)                                       345
    Rule 421(b)(2)                                       345

CALJIC
    No. 2.00                                             237
    No. 2.11.5                                           221
    No. 2.27                                             163

Federal Rules of Criminal Procedure
    Rule 43                                              138

Jefferson, *California Evidence Bench Book*
(2nd ed. 1982) 816-17, § 28.18                              308

LaFave, *Search and Seizure*
(2d ed. 1987) § 3.2c at p. 579-81                           159

Witkin and Epstein, *California Criminal Law*
(2d ed. 1989) pp. 3556, § 2905                              245

Witkin, *California Evidence*
(2nd Ed. 1966) § 341 at p. 300                              99

Witkin, *California Procedure*
(3d Ed.) Vol. 9, §§ 301-304, pp. 313-316                    142

IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

---

**THE PEOPLE OF THE STATE OF CALIFORNIA,**

Plaintiff and Respondent,

v.

**CURTIS FLOYD PRICE,**

Defendant and Appellant.

S004719

---

## STATEMENT OF THE CASE

On June 25, 1984, an information was filed in Humboldt County Superior Court accusing appellant of the robbery of James Philips, doing business as Village Liquors, (Count I, Pen. Code § 211); robbery of Garland Garrisi doing business as The Liquor Still (Count II, Pen. Code § 211); robbery of Frederick Rohn (Count III, Pen. Code § 211); robbery of Clint Brill (Count IV, Pen. Code § 211); robbery of Mark Silverman doing business as Tri-Plex Theater (Count V, Pen. Code § 211); robbery of Daniel Pizzuto doing business as Pat's Market (Count VI, Pen. Code § 211); burglary (Count VII, Pen. Code § 459); receiving stolen property (weapons of Richard Moore) (Count VIII, Pen. Code § 496); murder of Elizabeth Hickey (Count IX, Pen. Code § 187); burglary of the residence of Elizabeth Hickey (Count X, Pen. Code § 459); robbery of Elizabeth Hickey (Count XI, Pen. Code § 211); murder of Richard Barnes (Count XII, Pen. Code § 187); conspiracy, with thirteen overt acts (Count XII, Pen. Code § 182/211, 487(c), 187).

Three special circumstances were charged: murder during the burglary of the residence of Elizabeth Hickey (Pen. Code § 190.2(a)(17)); murder during the robbery of Elizabeth Hickey (Pen. Code § 190.2(a)(17)); and the multiple murder of Richard Barnes and Elizabeth Hickey (Pen. Code § 190.2(a)(3)).

1

It was also alleged that appellant used a pistol in Counts I through VI within the meaning of Penal Code sections 12022.5 and 1203.06(a)(1). Also alleged were two prior convictions of serious felonies (Pen. Code § 667(a)). Finally, the information alleged that appellant had served two prior prison terms (Pen. Code § 667.5(a)). (CT 3072.)

On August 31, 1984, Count VII, burglary of the Richard Moore residence, and the robbery special circumstance, were dismissed under Penal Code section 995. (CT 3439.)

On September 4, 1984, appellant's motion for suppression of evidence (Pen. Code § 1538.5) was denied. (CT 3392; see also CT 9627-8.)

On November 5, 1984, appellant's motions to sever and for change of venue were denied. (CT 3629.)

Jury selection began on June 17, 1985 and concluded on October 30, 1985. (CT 5982, 6055, 8496.)

On May 9, 1986, the jury found appellant guilty of the Triplex Theater robbery (Count V), receiving stolen property (Count VII), murder of Elizabeth Hickey (Count VIII), burglary of the residence of Elizabeth Hickey (Count IX), murder of Richard Barnes (Count XI), and conspiracy (Count XII). The jury found the burglary special circumstance and the multiple murder special circumstance to be true. Appellant was acquitted of the robbery of Pat's Market (Count VI). The jury was unable to agree to a verdict on Counts I through IV, which involved the robberies of The Liquor Still and the Village Liquor stores. (CT 10229 et seq.)

On July 8, 1986, after the penalty phase trial, the jury returned a verdict of death. (CT 10790.)

On July 8, 1986, the court denied appellant's motion for modification of the verdict. (CT 10811.)


## STATEMENT OF FACTS


### A.  Introduction

Appellant was convicted of the execution murder of Richard Barnes, the burglary and bludgeoning death of Elizabeth Hickey, as well

as conspiracy to rob and murder, and other crimes. Of the voluminous record in this case, we believe the following is a fair summary. Comprehensively detailed statements of evidence on particular points are included as necessary in arguments concerning those points, *infra*.[1]

## B. The Aryan Brotherhood

Michael Thompson and Clifford Smith testified they were longtime members of the "Aryan Brotherhood." Their testimony, along with the testimony of certain defense witnesses, established the following facts.

The "Aryan Brotherhood" (AB) was started in the mid 60's in California state prisons by a group of white inmates who wished to protect themselves against organized Black and Latino gangs, and to control the white inmate population. (RT 14609, 16738.) The primary functions of the Aryan Brotherhood thereafter were racial fighting and in-prison drug trading. (RT 16748; see letter from Robert Griffin and John Stinson describing these gang activities; CCT 714.) After about 1981, AB members refused to admit to the gang's existence, partly for secrecy, and partly because prison authorities treated gang members more restrictively. (RT 10785.) Generally, killing an AB target was required to gain admittance to the gang. (RT 16749.) Refusing an AB assignment led to execution by AB members. Showing disrespect to an AB member also raised the specter of execution, as did refusing to give AB members access to another inmate's information. This latter rule meant that AB members had access to all information in the files of the prison authorities. (RT 16777, 16780-1.) Those who testified against the AB were subject to similar grave penalties. (RT 18658, 14637-43.)

In the Summer of 1982 in the Palm Hall cell block of Chino State Prison, a group of AB members advanced a reorganization plan. These members included Michael Thompson, Clifford Smith, Richard Terflinger, Robert (Blinkey) Griffin, and others, who proposed a nine member ruling council. This council was to be part of a move to discourage drug taking and racial violence, and to reorganize the AB into

---

1. "RT" designates the Reporter's Transcript; "CT" the Clerk's Transcript; and "CCT" the Supplemental "Corrected Clerk's Transcript."

3

a "community based" criminal organization, like the Mafia, capable of making a profit from drugs, murder and extortion. (RT 16750 et seq., 14627.) AB members throughout the California and Federal prison systems voted on the reorganization plan by several methods. "Runners," generally girlfriends of AB members, relayed messages from one prison to another. (RT 16744, 16784-5.) Alternatively, a crime could be committed at one prison, and the AB defendant in that crime could then use the subpoena power to summon other influential AB members for in-person meetings. (RT 14633.) After such group meetings at Chino in 1982, a ruling council which varied from 6 to 12 members was selected. (RT 14629-33, 16746-7.)

AB "runners" transported drugs or messages into the prison with relative ease. Contact visits were routine, and items could be wrapped in cellophane and passed mouth to mouth, or transferred from rectum to rectum. (RT 13931, 14696, 14973, 20166, 19674, 19018, 18854, 18647-8.)

Previous sworn testimony by appellant was admitted in which appellant stated he was an AB member. (RT 17280-1.)

## C. The Conspiracy

One of the first tasks of the newly organized council was to deal with former member Steven Barnes, who had been testifying against several AB members, including Robert Griffin. (RT 14651, 18658, 18811.) As Barnes was unreachable in protective custody, the killing of his wife and family was discussed. (RT 16797-8, 14652, 14671.) Appellant was chosen to carry out this first execution of innocent non-AB members, because he was considered capable of the job, and because his impending release would be, through a technicality, without parole supervision. This latter fact would allow appellant free movement throughout the state. (RT 14656, 16753.) The plan was for appellant to procure weapons in the northern part of the state, travel south to kill Barnes' family, then to return north to continue procuring weapons, and holding himself ready for further assignments. (RT 16805-6.) The intent was less to stop Steven Barnes' testimony than to make an example of him. To this end, an obvious execution style killing was vital. (RT 16803-4, 16815.)

4

In the Summer of 1982 appellant was in prison in Montana. His presence in Chino was procured under the guise of a subpoena to testify in an AB member's pending trial. (CCT 495-8, RT 14650-1.) Michael Thompson, Robert Griffin and Wendall Norris offered appellant the assignment in Chino. Appellant was honored by the offer and quickly accepted. (RT 16812-4.) Attendance records confirm that Thompson, Smith and appellant were at Palm Hall together at least from September 1, 1982 through appellant's release on September 14, 1982 (CCT 559-60), and that Thompson, Smith and Norris were housed in adjacent cells. (CCT 554-60.)

## D. Appellant is Released from Prison, September 1982 through January 1983

When first released from prison, appellant stayed in Southern California. He associated with an AB member Joseph O'Rourke, perhaps doing maintenance work. (RT 13977.) Appellant met various AB "runners," i.e., girlfriends of specific AB members, some at parties and some through other runners. Appellant met and got rides around Southern California with Tami Shinn, a runner for Robert Griffin. Appellant stayed for a time with runners Michele Scarborough and Janet Myers. (RT 13089, 13093.)

Appellant's mother testified he returned to Eureka from Los Angeles at the end of October 1982, and stayed in a bedroom with its own outside door off the garage of her home. (RT 16503.) Appellant then moved into a trailer behind the house of his brother Alan Fletcher and Fletcher's wife Cheri in nearby McKinleyville. (RT 16505.) Appellant borrowed $20 from Alan three or four times during this period and paid no rent on the trailer. Appellant worked off some of the debt doing odd jobs, and agreed to pay back $100 if he got a job. (RT 17222.)

After three weeks, appellant and Alan had a misunderstanding which left bruised feelings, and appellant agreed to move out. (RT 17220-3.) Prior to trial, Fletcher told police that he in fact asked appellant to leave. (RT 17701.) Fletcher later claimed he gave appellant a nearly brand new Sampo radio as a reconciliation gift in early January. (RT 13401, 17226.) Appellant returned to his mother's

house in early December, where he stayed until mid-January.  (RT 16505.)

## E.  Liquor Store Robberies

On January 15, 1983, two liquor stores in the Eureka- Arcata area were robbed by a single white male wearing a gray hooded sweatshirt.  The jury hung on all four counts alleging robbery of the two stores, an employee and a customer.  (RT 21040-1.)

### 1.  Village Liquors

At 8:30 p.m., James Phillips, owner of Village Liquors, saw a man enter his store with the hood of a gray sweat shirt up, and a green bandanna over his face.  (RT 10299-307, 10316.)  The robber forced Phillips and an employee, Eric Sobel, to lie down behind the counter.  (RT 10306-8.)  When the robber could not open the cash register, Phillips got up and opened it.  The robber got away with $70 to $80.  (RT 10308-11.)

Phillips could not pick anyone out of a live lineup, but called police back the next day and said the eyes of subject 3, who was appellant, had stuck in his mind.  A different subject's voice sounded similar to the robber.  (RT 10450.)  Sobel thought appellant's voice was similar.  (RT 12722.)

Both Sobel and Phillips thought People's Exhibit 6B was very similar to the small shiny metal plated pistol used by the robber.[2]  Both also identified a gray hooded sweatshirt and green floral pattern bandanna, as being like the ones worn by the robber.  These latter two items were seized from appellant's bedroom in his mother's house.  (see RT 17301.)  At the time, Phillips identified the robber's eyes as brown; he acknowledged at trial appellant's eyes were blue.  (RT 10318, 10434.)  Although Phillips could not recall that the robber was wearing gloves, no

---

2.  People's 6B was a chrome plated Smith and Wesson revolver found in a search of the home of murder victim Elizabeth Hickey, at the head of her bed.  (RT 12793.)

fingerprints of appellant were found on the surfaces Phillips recalled he had touched.  (RT 15749-52.)


### 2.   Liquor Still

At 10:10 p.m. the same night of January 15, 1983, a robber wearing a gray hooded sweatshirt and a green bandanna entered the "Liquor Still" store.   (RT 10531, 10482.)   After getting customer Frederick Rohn's wallet and $400 from the cash register, the robber herded clerk Garland Garisi, Rohn and another customer, Clinton Brill, into a back room and forced them to lie down.  All three witnesses recalled the gray sweatshirt and the green bandanna, although opinions varied whether the bandanna was a solid color.  (RT 10482, 11355.) The other customer, Clinton Brill, was an athlete and shoe salesman, and as he lay on the floor he noted that the robber's shoes had three white stripes and one red one, which distinguished genuine Adidas shoes. A pair of shoes found in appellant's bedroom were identical to the robber's shoes.  (RT 17301-3.)  All three believed the gun was a metal plated hammerless or hammer obscured pistol again closely resembling People's No. 6B.  (RT 10484-5, 10535, 10539, 11360.)  Again, although no gloves were noted, none of appellant's fingerprints were found.  (RT 17472-89.)

As the robber left the Liquor Still store, he encountered Edgar Burk and Burk's girlfriend on Burk's motorcycle.  (RT 15561.)   The robber unsuccessfully attempted to rob Burk and to take his motorcycle, but instead fled on foot.  (RT 15562-7.)   Sometime later, Burk was himself arrested for assault with a deadly weapon, and saw appellant five to ten times in jail.  Burk became convinced appellant was the robber but did not inform authorities for a year, due to his fear he might himself do something wrong and be sent to the same jail in which he knew appellant remained.  (RT 15606-7.)


### F.   The Triplex Theater Casing

The Triplex Theater in Eureka was robbed by a lone gunman on Saturday night February 19, 1983.  One month earlier, on January 16,

1983, the evening after the liquor store robberies, Tyche Gage was working behind a concession counter at the theater. (RT 10877-80.) At around 9:30 p.m. her attention was attracted by a man in the lobby who stood out because he wore sunglasses indoors, as well as a large coat, cap and gloves, and because he just stood around watching. Gage also noted that the man had long thin blond hair. (RT 10888.) The man at various times went into the movie, returned to the lobby, and bought a coke at the concession stand, avoiding touching anything when he removed his gloves. (RT 10880-2.) When an armed guard arrived to collect the theater's receipts, Gage told him about the man, and she was advised to call the police. However, by the time the police arrived the man was gone. (RT 10885.)

Gage later picked appellant out of a photo lineup as the casing suspect. (RT 10894.) The description of the February 19 robber and the January 16 suspect matched closely. The theater manager Mark Silverman and other employees who were present on both occasions testified that the robber was the same man. (RT 11213, 11284.)


## G.   The Moore Home Burglary

One of the two murders in this case involved Elizabeth Hickey, who was a resident of Eureka. Her mother and stepfather, Dorothy and Richard Moore, also lived in Eureka. On Saturday January 22, 1983, the elder Moores had gone to Red Bluff for the weekend. Their son, William Eaton, went to the home about noon to attend to the Moores' dogs. Richard Moore testified that the only dog at the house was outside, but William Eaton recalled he entered the house, with his own key, and fed three dogs inside. (RT 10830, 10846.) Eaton opened a louvered kitchen window to air the room out and left. (RT 10831, 10850.) The next morning, before noon, Sunday, January 23, Eaton returned and noticed the bottom four or five louver panes were missing from the kitchen window. Eaton searched the house but could find no sign of the louvers, nor any disturbance in the house. Nothing seemed to be missing, including television, stereo, and cameras. (RT 10833-5.) Eaton called the police and told them of the incident and that nothing was missing. (RT 10836.)

That night, Eaton realized he had not checked his father's guns, which were kept in a bedroom closet. When Eaton checked, all of the guns were missing from the closet, and a revolver was missing from a dresser drawer.[3/]   The missing guns were: a Winchester model 12 featherweight shotgun; a high standard 20 gauge automatic shotgun; a Charles Daly 12 gauge over/under shotgun; a Mauser 300 deluxe 30.06 bolt action rifle; a Winchester 22 caliber model 77 semi-automatic clip rifle; and a RG Industries revolver with ivory handles. (RT 11592-5, 11601.)   The revolver was never recovered by police. (RT 11600, 11595.)

After he returned home, Moore also noted a shoe print on a parked car about a yard away from the kitchen window. The impression was washed away by rain before police could take a picture of it. (RT 11762-4, 11599.)

## H.   The McKinleyville Sighting

On Sunday January 23, 1983 at about 4:30 p.m., Humboldt County Deputy Sheriff Richard Walton was on patrol in a marked car. (RT 11514-6.)   He spotted a brown Mercury, later identified as appellant's mother's car, parked in the lot of a vacant building at the edge of the business district. (RT 11522.)   Walton made a loop of the business district, picking up Sherry Mori, a civilian "ride-along" who had an interest in criminology, and when he returned discovered that the Mercury had not moved. (RT 11523.)   Deputy Walton pulled in behind the car and activated his red light. Appellant exited the car, met Deputy Walton halfway and showed his driver's license.   (RT 11524-6.) Appellant stated he was parked there because the wind was blowing too hard for him to drive. Deputy Walton had noticed no difficulty with wind. (RT 11529.)   The deputy saw some potato chips and binoculars on the front seat of appellant's car.   (RT 11529.)   Photographs introduced later showed appellant's car was facing a "mini mart" gas station. (RT 11562-3.)   Six weeks later, appellant told Eureka Police

---

3. Richard Moore later identified guns recovered from appellant's storage locker in Reno as four of the six guns taken from his home, see *infra*. He believed a sawed off shotgun found in appellant's mother's garage was his Winchester featherweight, but the gun was too mutilated for him to be certain. (RT 11605.)

Officer Pat Freese that he had stopped to look at the scenery. (RT 16009.)

## I.  Appellant Returns to Los Angeles, January 23-5, 1983

Appellant's Southern California acquaintance, Michele Scarborough, recalled appellant travelled to Los Angeles, arriving the morning of Monday January 24 at 7:00 a.m. He had called the previous evening to arrange to be picked up at the bus station at that time. (RT 10390-1.) Appellant's mother was not as sure of the date, and in fact, receipts showed that appellant had signed a gas charge slip on January 24 in Eureka. (RT 19744-6.) Appellant stayed with Michele Scarborough in Santa Ana for a week, until her roommate complained, and appellant then moved to the apartment of Janet Myers in Claremont. (RT 13093-4.) Myers was an AB runner like Michele Scarborough, as well as a prostitute, active heroin user and convicted felon. (RT 13815, 13818-9.) Myers recalled seeing appellant with a blue airline bag with weapons in it. (RT 13796-7.) Myers saw appellant cleaning one of the weapons, a sawed off shotgun which resembled the shotgun stolen from Richard Moore and later found in appellant's mother's garage. (RT 13787, 11605.) She also saw appellant with a "western style" revolver. (RT 13796.)

One evening between February 7 and February 11, Myers drove appellant around Los Angeles. Appellant had a paper with addresses on it and told Myers where to go. (RT 13798-9.) Appellant directed Myers to take him to an address on Alessandro Street near Lower Azusa Road in Temple City. (RT 14801-2.) Myers was familiar with the area from having lived there. (RT 13846.) At about 10:00 p.m. appellant got out and looked around a yellow corner house for about three to five minutes. Appellant later told Myers that one of the houses they stopped at was that of Richard Barnes, and that he was also looking for the house of Tommy Lamb. (RT 13829.) Myers knew Steven Barnes was in the penitentiary. (RT 13802.)

On the evening of February 12 at 11:00 p.m. appellant left Myers' home with Tami Shinn in Shinn's car. (RT 13811-2.) Richard Barnes was killed in the next several hours. Appellant charged gas in Pomona on February 12, and in Anaheim on February 13. (RT 19405-

10

6.) Both cities were less than 15 miles from the Barnes home. The car listed as used by appellant on the February 12 charge form was registered only a couple miles from the Barnes home. (RT 19741.) Myers was not aware of the killing until months later. (RT 13836.)

Appellant returned to Myers' home about 6:30 to 7:00 a.m. the next morning looking tired. (RT 13812, see 13925.) Appellant left her house for the last time at about 1:00 p.m. on Sunday the 13th, telling Myers to tell appellant's friends in the penitentiary that everything had gone all right. (RT 13813.) Myers later gave the message to Clifford Smith and Robert Griffin when she next visited Chino with Tami Shinn. (RT 13830-1.)

## J.   The Barnes Murder

On the evening of Friday-Saturday, February 12-13, 1983, at about midnight, a neighbor heard three shots from the small yellow house of Richard Barnes at 4802 Alessandro in Temple City near Los Angeles. (RT 11840, 11648.) The next morning, a friend found Richard Barnes' body resting calmly face down on his bed. Nothing in the neat, sparsely furnished house was disturbed. Only Barnes' wallet and a doll of Barnes' favorite cartoon character Felix the Cat were missing. (RT 11883.) Barnes' car keys, a metal safe box and a shot gun in his car were undisturbed. (RT 11795.)

Barnes had been shot three times in the back of the head with a .22 caliber pistol. The star-like tearing of the skin and the stippling showed that each wound was a contact wound. (RT 11666-75.) This was the style experienced police officers recognized as a self-proclaimed execution style killing. (RT 11770, see 16204, 16801-4.)

Barnes' son Steven was a prison inmate and member of the Aryan Brotherhood. (RT 11748.) When Richard Barnes heard about his son testifying against gang members he stated "that boy is going to get me killed," and he bought the shotgun for protection. (RT 12195.) Barnes' other son Paul was a member of the Vagos motorcycle gang. When Paul heard of the murder, he said it was Steven's fault for testifying, and sent friends to look after the safety of his mother. (RT 12216.)

11

Richard Barnes' wife Alice got along well with the victim, but they lived apart because of Barnes' chronic drinking. Alice heard about a sale of a .22 caliber pistol between two friends of Barnes, Regalato and Baca, the day after the murder. Admitting she was grasping at straws, Alice got hold of the gun, but police ballistics experts eliminated it as a possible murder weapon. (RT 12224, 12104-5.)

## K.  Appellant Flees Southern California February 13-14

Appellant arrived in Auburn before noon on February 13 or February 14 (more likely Monday the 14th) and was picked up at the bus station by Rebecca Williams. (RT 19170-1.) Appellant told Williams that he had been on the bus all night. Appellant had met Williams on February 5 when appellant, Michele Scarborough and a friend had driven to Auburn to visit prisoners at Folsom. (RT 19167.) Appellant stayed with Williams for several days.

Because Elizabeth Hickey was murdered on Friday, February 18, and the Triplex theater was robbed on Saturday, February 19, appellant's movements in the next several days were crucial. Williams claimed that on Thursday, February 17, appellant asked directions to Clear Lake, borrowed her car, and drove off, returning early on the morning of Friday, February 18. (RT 19270-4.) Friday morning they went grocery shopping. Williams noted some long bundles in the rear of her car which had not previously been there. (RT 19272.) Appellant left in the car around noon on Friday the 19th.

## L.  The Elizabeth Hickey Murder

Sometime during the night of Friday-Saturday February 18-19, 1983, Elizabeth Hickey was murdered in the apartment she shared with her live-in boyfriend, Berly Petry, at 209 West Simpson Street in Eureka. (Hereafter we will refer to the Hickey murder as occurring on Friday night, though in fact it occurred after midnight on Saturday morning.) Hickey was found the next morning lying on her back on her bed in an upstairs bedroom. One leg hung over the bed onto the floor. Hickey had received about 15 blows to the head, causing about six depressed

12

skull fractures. Most of the latter were near the base of the skull (RT 13008), but the bridge of the nose, the left eye and the left side of the victim's scalp were badly fractured. (RT 13011.) The instrument used was probably a one-half to three-quarter inch in diameter smooth metal rod like a crowbar. (RT 13013.) Scallop shaped bruises on each shoulder indicated Hickey was held down by the palms of someone's hands. (RT 13015.) "Defensive" wounds were also present on the back of both hands. (RT 13027.) In addition, two small knife wounds were present in Hickey's chest near her sternum. The wounds were one inch long by two inches deep, and the lack of bleeding indicated that they had been made after death. (RT 13025.) A knife was found in the crook of Hickey's arm which could have made the wounds. (RT 12792, 13026.)

Blood staining patterns on the bed indicated Hickey's body had been moved. It was likely that blows were administered, the body moved from its back to its left side, and then more blows administered. (RT 13026, 13027-8.) Unconsciousness likely would have followed any of the head blows, and death came within minutes. (RT 13064, 13014, 13033.) Hickey's blood registered no drugs or alcohol. (RT 13032.)

Hickey's live-in boyfriend Berly Petry discovered Hickey's body when he returned home from his normal 12:00 p.m. to 8:00 a.m. shift as a security guard at the Arcata Redwood Lumberyard. (RT 13326.) Petry parked his extremely noisy unmufflered Volkswagen "Bug" in front of the house which, as always, drew the attention of neighbors. (RT 12596, 13292-3.) As Petry entered the house he found a pair of children's jeans with something red on them outside the front door. (RT 13328, 13747, 12903, see CCT 1875 et seq.) The downstairs phone was off the hook, and the upstairs bedroom door was slightly open. He entered, saw Hickey lying on the bed, and asked if she was all right. When he touched her he found the body was warm and stiff. (RT 13341.) The locks on two closets were broken open and the wood jambs shattered, and the locks on two storage trunks in the bedroom, one each of Hickey's and Petry's, were pried off. Hickey and Petry had kept their numerous guns and rifles in the closets. After checking the two children, who were in the room next door, Petry ran to a nearby store and called police. (RT 13314.) Police arrived at the home before Petry returned. (RT 13344.) Eureka police officer Ronald Waters saw Petry walking back from the store, out of breath, his face flushed. (RT 15085.) Petry's neighbor from across the street Tina Ransbottom had seen and

heard Petry initially return from work, and later saw Petry sitting on the curb in front of his house with his head in his hands. (RT 12596.)

Petry listed the items missing from the bedroom, including from the closets and trunks, after the murder. Petry's weapons: a Colt AR-15 rifle, a Browning 12 gauge pump shotgun, an AR-7 breakdown survival rifle, a 1022 Ruger rifle, a .357 magnum rifle, a Colt trooper revolver, a Ruger semi-automatic .22 pistol, and a Thompson replica .45 semi-automatic rifle. The barrel of the AR-7 had been left behind in the back of a closet. (RT 12821, 13293 et seq., 13351 et seq.) Hickey's weapons: a Ruger mini-14 rifle, a Winchester pump shotgun, and a .357 magnum Ruger. (RT 13294 et seq.; 13362-3; 14122.) Also missing was a Sampo radio identical to one appellant's mother, Mrs. Lloyd later found in appellant's room and turned over to the police, and which Alan Fletcher claimed was a gift from him to appellant. (RT 13401.) Also, a note was found reading "Call Curt at [Rebecca Williams'phone number] about money for guns." (RT 13228-9.)

Petry was taken to police headquarters and questioned extensively. Transcripts of about eight hours of the interviews were admitted in evidence. (RT 13489 et seq.; CCT 1875 et seq.)

## M.  The Hickey/Petry Relationship

A massive body of evidence was admitted detailing the unusual relationship between Hickey and Petry. Berly Petry had met Elizabeth Hickey 3 to 5 years previously in Lakeport near Clear Lake when he had worked on a construction job next to Hickey's residence. Petry recalled that Hickey was 21 and that he was 27 at the time, although evidence showed that Hickey was probably a year and a half younger than that. (RT 13284, 13286.) Hickey had left her first husband, and her second child was born after Hickey and Petry had moved in together in Lakeport. (RT 13285.) Petry, Hickey and Hickey's two children moved to the West Simpson Street apartment in Eureka in August 1980. Previously, they stayed at the home of Hickey's parents, the Moores, for about a week. (RT 13287.) Mr. Moore was of the opinion that Petry was of subnormal intelligence, frankly calling him "a dumb shit." (RT 11632.) Petry did not know about Mr. Moore's guns at the time.

14

Petry's work on the graveyard shift as a security guard at the Arcata Redwood Lumberyard entailed patrolling a 45 minute route around the yard each hour, on a golf cart type scooter. (RT 13288-9, 17585.) Petry carried a clock with him. A key was chained at each of 33 stations, and when Petry punched the clock with each key, a notation of the time would appear on a tape inside the clock. (RT 17576-8, 13316.) In addition, Petry was required to call in every hour to the security firm headquarters and make and log calls from other security officers. Petry took advantage of these trips to the office to call Hickey, whose faithfulness he had reason to distrust. He would call her every hour on the hour, when he returned to the security office between his rounds. (RT 13324-6.) Hickey would normally answer until 3:00 or 4:00 a.m., and thereafter when there was no answer or the phone line was busy Petry assumed Hickey was asleep and that she had perhaps taken the phone off the hook. (RT 13326.)

Hickey's unfaithfulness to Petry was fully documented. Aware that Petry called hourly, Hickey habitually took a cab to a local bar after Petry left home, and then took another cab home to receive his hourly phone calls. (RT 12538-40, 12556.) Testimony and cab records were entered which showed Hickey often repeated this maneuver two or three times per night. (RT 12541, 12556.)

Nevertheless, Petry was aware of Hickey's infidelities. At least twice, a year before the killing, Petry was treated for venereal disease after receiving the disease from Hickey. (RT 17670.) Petry testified Hickey was the first and only woman with whom he had ever been sexually intimate. (RT 13302, 13304-5, 17666.) On at least one other occasion, Petry had returned home and found Hickey in bed with another man. Petry never found out the other man's name, and merely left the room to allow the man to get dressed and leave. (RT 13302-4.) Petry admitted his distress at these humiliations although he claimed the relationship had been improving since December 1982. (RT 13305.) Nevertheless, Petry sometimes put a piece of bark up against the front door when he left. When the bark was knocked over, he knew Hickey had gone to a bar the previous night. (CCT 1907.)

Writings of Petry illustrating his unhappiness were entered. Defense counsel read the jury the following letter from Petry to Hickey:

"But now I tell you the truth, that my heart, my soul, and my mind, for my love for you is gone, sensiously. For you took

this magnitude of personal love from me when you chose to go
and hear sensious sounds and get written words [(letters)] from
and with other men, when I look at your naked body now with
a sad and broken heart, for I have known for a long time."
(RT 13653.)

Petry also wrote Hickey a letter stating "I've gotten kicked, hit, bitten,
and bitched at." (RT 13663.)

A diagram by Petry was admitted which apparently was Petry's
schematic description of Hickey's life, including references to "pimps",
"bars", "tricks" and other symbols of prostitution and unfaithfulness.
Another writing included the statement that Petry was Hickey's "guardian
disciplinarian." (RT 13742.) Also, as noted, the transcript of the eight
hours of the police interviews was entered into evidence. In addition,
several short stories written by Petry were admitted into evidence to
show that Petry was at least marginally literate and intelligent. This
supported the defense argument that Petry was attempting to give the
jury a false impression of low intelligence to cover for the fact he
claimed he could not remember much of the details of his and Hickey's
relationship.

Evidence of possible physical abuse of Hickey by Petry was
entered. Zelna Hunsinger testified she and Hickey were friends for
about eight months. (RT 18067.) Hunsinger saw Hickey late at night
in bars about once a week. (RT 18068.) Sometimes Hickey would
leave and then return to the bar. (RT 18098, 18069.) Hunsinger had
been to Hickey's home twice. Hunsinger owned a rootbeer brown
colored car, but she drove to Hickey's house in her boyfriend's MG two
or three times. (RT 18093, 18070-71.) Hunsinger believed Hickey
carried a .38 caliber pistol all the time. (RT 18071-2.) Hickey showed
Hunsinger the weapons in the locked closet in Hickey's apartment. (RT
18072.) Once Hickey came to Hunsinger's home in the afternoon,
scared. (RT 18070-72.) Other times Hunsinger saw Hickey with black
eyes and bruises on her face and arms. (RT 18070-3.) Hickey once told
her mother that Petry had hit her and blackened her eye (RT 15276),
although Mrs. Moore thought Hickey and Petry's relationship had
stabilized in the past year. Hickey hadn't talked of leaving Petry since
the previous December. (RT 15246.)

Cab driver David Allen Boulton took Hickey home after
midnight once or twice a week for two to three months before her

death. (RT 18120-21.) One evening at about 9:00 p.m., Hickey argued with a man in Boulton's cab about whether Hickey should go home or stay at the bar. (RT 18131.) The man had told Boulton he was a security guard. (RT 18149.) The man began hitting her in the head and shoulders. (RT 18129.) Boulton pulled the cab over and told the man to stop, which he did, slumping in his seat. (RT 18129-30.) Boulton testified that Hickey later told him that the man had been "packing a piece." (RT 18150.) Cab receipts showed that the only trip to Hickey's apartment in Boulton's cab with a second passenger occurred after midnight, when Petry would have been working. (RT 18146-7, see CCT 1119 et seq.)

The checker at the local grocery store, Susan Ielmorini, recalled seeing Hickey with black eyes and bruises several times in the six months before her death. (RT 18446.) Ielmorini also recalled seeing Hickey in bars, where she sometimes left and returned fifteen minutes later. (RT 18441-42.)

A local bartender, Leroy Davis, recalled Hickey had to be home for the phone calls every hour. (RT 19377-78.) He drove her home after 2:00 a.m. a number of times and four or five times went inside. (RT 18379.) Twice Hickey showed Davis her gun collection in the bedroom closet. (RT 19380, 19390.)

Davis recalled that Petry came into the bar twice. Once, in early 1982, a year before the murder, Petry entered after midnight and argued with Hickey until Davis told Petry to leave. (RT 19380-2, 19387.) Another time, Davis told Petry that the man Hickey was with was Davis' cousin, so as to avoid trouble. (RT 19380-3.) Petry looked upset but left quietly. (19380-3.) Davis thought he may have seen appellant at the bar with Hickey. (RT 19388.)

Lynne Harden, a rear neighbor of Hickey's and Petry's recalled hearing angry voices from the apartment once or twice a week. (RT 12709.) Once, Harden saw Petry throw a bowl of cereal at Hickey during an argument. (RT 12705.) Harden recalled that the two children were always filthy but seemed happy. (RT 12710-2.)

Vernon Antonsen and Carol Smith were Petry and Hickey's next door neighbors on West Simpson Street. Antonsen recalled that the day after they moved in, Petry informed Antonsen that he did not want to be friends with him. (RT 12394.) Hickey came over the next day and was more neighborly. (RT 12395.) Smith and Antonsen agreed that

17

Petry habitually left in his extremely noisy car around 11:45 p.m. and returned at 8:15 a.m. (RT 12386-87, 12428.) Hickey would leave the house shortly after Petry went to work, and would return with different men. (RT 12390, 12429.) She would do this as many as three nights a week, and would come home as often as twice a night. (RT 12396.) Antonsen estimated that over one hundred different men had gone into the victim's apartment. (RT 12422, 12433.) Both often heard the phone ringing next door during the night; however, neither heard any unusual noises on the night of the murder. (RT 12398, 12430, 12391.)

Taxi dispatcher Gary Jascar testified that records showed that Hickey called a cab at 12:15 a.m. on February 19 to go from her apartment to a local bar, and that she returned by cab at 12:45 a.m. (RT 12540.) The cab driver for both trips was Aaron Krohn. Both Jascar and Krohn testified to Hickey's habitual trips from the apartment to the bar and back, sometimes more than once a night, several nights a week. The trips were steady in number for the months Krohn had known Hickey. (RT 15185-6, 15190-2.) Hickey virtually never had a companion in the cab. (RT 12539, 15188.) She told Jascar that her boyfriend worked nights and called her every hour on the hour. (12556.) Jascar noted that a one-way trip to the local Greyhound station on January 23 at 8:15 p.m. was listed as being with either a package or a passenger. (RT 12564.) January 23 was the night after the Moore burglary.

Finally, the neighbor from across the street, Tina Ransbottom, dropped a small bombshell at trial. Although she had told police she had seen Hickey parked with a man in a "rootbeer" brown car, police had not pursued the point. In her testimony, Ransbottom mentioned for the first time that the driver of the brown car parked oddly down the street from Hickey's apartment. (RT 12614-5.) She saw him about 5 times in the weeks before Hickey's murder. (RT 12602.) Twice she saw the man with Hickey in the car. Once the man started to get out of the car, then saw Ransbottom walking by and got back until she passed. (RT 12634.) Ransbottom also saw the same man and car parked in Eureka about a week after the murder. (RT 12615, 12632.)

Ransbottom's description of the man in the brown car fit appellant, and the trial court ordered an 8 photo lineup prepared. (RT 12636-40.) Ransbottom had seen none of the photos previously. (RT 12661.) Ransbottom was shown the lineup and picked appellant's photo

18

as the man she saw with Hickey. (RT 12653, 12661-3, 12669.) She had no doubt of her identification, and noted that she was a photographer of people by profession. (RT 12698.)

Ransbottom also testified that the "ride along" in Deputy Walton's car during the January 1983 sighting of appellant in McKinleyville was her sister. (RT 12698.)

## N. Petry's Alibi, February 19, Midnight to 8:15 a.m.

Petry testified he left for work as usual at about 11:30 p.m. on Friday night February 18. (RT 13291, 13311, see transcript of interviews CCT 1875 et seq.) He wore his uniform of dark blue coat, light blue shirt and pants, although he did not wear the uniform's pants that night. (CCT 1911.) Hickey chatted with Petry while Petry ate his pre-work meal that she had prepared, and Petry hugged and kissed Hickey goodby. (CCT 1913.) Petry drove to work and called Hickey at 12:00 midnight to make sure she was all right, and at home. (CCT 1914.) During their 1:00 a.m. phone call, Hickey stated that someone had knocked at the door. However, when Petry called at 2:00 a.m., Hickey stated she was upstairs preparing for bed and all was well. (CCT 1915-6.) At 3:00 a.m. the phone rang without answer, and at 4:00 the line was busy. Petry assumed Hickey was asleep, talking to a friend or perhaps had gone out. (CCT 1915, 1917, 1922.) The line remained busy each time Petry called the rest of the morning.

At work, Petry's duties were routine until about 5:30 a.m. His written log for the morning showed that every hour on the hour he logged in the three phone calls which he made to security guards at other locations. (CCT 476.) The log showed the three telephone calls between 6:00 and 6:05 a.m. The Arcata Redwood security guards served as a central communications source to oversee the safety of these other guards. Petry's supervisor testified he would have known if Petry had not been present for the 6:00 a.m. set of calls. (RT 19710-1.)

Petry's supervisors also examined the "Detex" tape in the portable time clock Petry punched as he made his rounds of the lumber yard. The only gap on the tape occurred between 5:35 and 6:15 a.m. (RT 17583.) Such gaps were normal. Petry explained this gap at trial, as he did initially at the February 19 interviews, and as he did in the

original log, as resulting from "gate duty," in which Petry stood by the electric front gate of the lumber yard, opening it with his key when employees arrived. (RT 13321.) Appellant's supervisor confirmed such duty was normal. (RT 19711, CCT 478-9.) Petry's log showed two employees arrived to work a power planer between 5:30 and 6:00 a.m. A company bookkeeper produced records of some of the planers employed by the lumber yard on February 19, 1983. The record showed Donald Mills punched in between 5:30 and 6:00 a.m. (CCT 674.)

Finally, for no discernable reason, a great deal of time was spent investigating Petry's claim, supported by his log, that a boiler broke down at 6:20 a.m. (CCT 478, RT 13321.) The issue was minor in that no gap was present in the "Detex" tape after 6:15. (RT 17613.) In any event, it was established that such breakdowns in the boilers were routine. (RT 18010-3.) Petry's testimony was consistent with the log, and the interview tapes. He called one of the men in charge of the boilers, Don Goddard, but Goddard's wife informed Petry that Goddard had just left for the yard. (RT 13323, CCT 478, 1917-8.) Petry met Goddard and told him about the boiler. Goddard went straight to attend to it.

Three years later Goddard's wife did not remember whether Petry called her on February 19, 1983, although she testified such calls were routine. (RT 17985-7.) Neither did Goddard have a memory of the morning. Goddard admitted he punched in on Saturday morning approximately 30 minutes later than he had the previous four days, and admitted this could indicate he went directly to fix the boiler on arrival. Goddard did think, however, that he would have written in the time he spent fixing the boiler on his card. (RT 18016, 28.) Charts were produced of the boiler's temperature. It was acknowledged that determining exact times from the charts was difficult as they were not designed for that purpose. (RT 18027.) Goddard believed that there was a dip in boiler temperature some time on the morning of the 19th, but he could not pinpoint it closer than to within a couple of hours of 8:00 a.m. (RT 19024, 18031.)

### O.   Dr. Blinder

Appellant called psychiatrist Martin Blinder, an experienced couples therapist and expert psychiatric witness.  (RT 18356.)  Dr. Blinder had interviewed numerous murder defendants, many of whom had killed loved ones. (RT 18362.)  Dr. Blinder was paid $100.00 per hour by the defense for his testimony, and was examined from a typed list of questions prepared by him and read by defense counsel.  (RT 18387.)  Dr. Blinder described "domestic homicide syndrome," which he claimed involved an interlocking, neurotic dependency by a passive and an aggressive mate.  The aggressive partner would try to control the passive one, who would want to go out drinking and socializing.  The aggressive partner would have difficulty expressing his anger and could eventually explode, even though he seemed meek at other times. (18367.)  Dr. Blinder believed mutilation of a victim's face was a strong indication of a personal relationship between the killer and the victim.  Dr. Blinder was shown a photo of the victim's face and described the physical mutilation as "not very much."  (RT 18390-91.)

### P.   Appellant's Movements February 17-20, 1983

Appellant's father Gaylord Lloyd testified that appellant arrived in Reno at Lloyd's mobile home between 9:00 and 11:00 a.m., Friday the 18th (recall Williams testified appellant left Auburn after noon) the morning before Hickey was murdered.  Mr. Lloyd admitted that when originally interviewed by the police he did not remember what day appellant arrived, but did know appellant arrived the day after Mr. Lloyd's friend and neighbor James Victory left town.  After talking with Victory, Mr. Lloyd testified he believed appellant arrived Friday the 18th. (RT 14328, 33.)  Because appellant arrived after Victory left, Mr. Lloyd let appellant stay in Victory's trailer for the night on Friday night; appellant stored his clothes there.  (RT 14318.)

Appellant's arrival in Reno was crucial because appellant had with him the two bundles which later were found in the Reno storage locker, one of which contained the guns taken in the Moore burglary, and the other the guns found to be missing from the apartment of Elizabeth Hickey after her murder.  Appellant initially

21

stored these bundles in his father's trailer. (RT 14306.) Appellant told his father the bundles were guns, and that they might have been stolen some time ago. (RT 14308.)

Resolution of the issue on when appellant arrived in Reno came from Mr. Lloyd's friend James Victory, who had no bias in the case and testified that appellant seemed "like a very nice guy." (RT 14412.) Victory recalled the week as follows: on Thursday the 17th, Victory and his companion Ida Murphy bought a used couch, and paid by check. (RT 14390.) The couch would not fit in Victory's small car, so he made arrangements to return the next day, Friday the 18th, to pick up the couch. This Victory did. (RT 14414, 14420-1.) Around noon of Friday the 18th, when the mail arrived, Victory received a letter stating his sister in Ohio was ill. Victory and Murphy resolved to take the next bus but on examining the schedule discovered that that bus would arrive late at night, inconveniencing Victory's relatives. (Victory exhibited some confusion as to whether the bus would have arrived in the early morning hours on Monday or Sunday.) Instead, Victory and Murphy spent the early evening of Friday night-Saturday morning, February 18-19, at Murphy's trailer, and left for the bus station around 2:30 a.m. Saturday morning the 19th. (RT 14391-2.) Before he left, Victory checked his own trailer and found all was normal. Appellant was not sleeping in it, nor were any of appellant's clothes or personal goods present to support the accuracy of appellant's father's story of appellant's arrival the previous morning.

Victory backed up his version of the week's events with the cancelled check by which he paid the used furniture store for the couch. The check was dated, in line with Victory's testimony, February 17, 1983. (RT 14407.) The testimony tended to establish that Victory did not leave until Friday night, and appellant did not arrive in Reno until Saturday morning, 8 to 10 hours after Hickey was murdered.

Appellant's mother testified that the drive from Eureka to Auburn to Reno routinely took her around ten hours. (RT 16722.) Appellant's mother also testified that she did not see appellant in Eureka during the month of February. However, she had earlier told police officer Dennis Parker that she recalled the three day holiday weekend of February 18 through 21, and that appellant was at her house. Appellant went out on Saturday evening the 19th, then returned between 9:00 and 11:00 p.m. Appellant had breakfast and dinner at home on Sunday the

20th. (RT 17748-9.) Rebecca Williams testified that she got a call from appellant on late Saturday night the 19th. She thought she heard slot machines in the background.

Appellant charged gas at Upper Lake and Auburn on February 18. (RT 19407.) He charged gas in Redding on February 19. (RT 19738.) He charged gas a total of 44 times between November 9, 1982 and February 18, 1983, but none on or after February 19, 1983, the date of the Triplex robbery. (RT 19403-4.)

Q. <u>Robbery of the Triplex Theater February 19, 1983</u>

On February 19, 1983, Deborah Eiers was working the concession counter of the Triplex Theater in Eureka. (RT 10970-2.) A man wearing a long blond feminine wig and dark glasses stayed in the lobby pacing and smoking while the movie was playing. (RT 10974.) Eiers called other employees who agreed that this was the same individual who had "cased" the theater a month previously. (RT 10975.)

At 9:30 p.m. Manager Mark Silverman collected all the receipts and took them to count in the theater office. (RT 11214-6.) Silverman emerged for a drink an hour later, and was accosted by the robber, who put a gun to Silverman's side and ordered him back into the office. (RT 11217.) Silverman recognized the robber from the previous month. (RT 11213.) The robber ordered employee Pam Scheffler to put the receipts, which totalled about $7,000, into a bag, which she did. (RT 11231.) The robber then said "Let's go to the safe," and the three walked behind the concession counter. (RT 11231.) Eiers accidently backed into the robber, who smiled. After getting money from the safe, the robber ordered all three employees and nearby projectionist Dennis Dahl outside. (RT 11233.) The robber asked for keys to Silverman's car, and when Silverman stated he did not have them, the robber ran away. (RT 11234.)

Silverman testified that he picked appellant's picture out of a photo lineup, stating appellant had "very similar facial bone structures." (RT 11235.) Eiers picked appellant in the photo lineup, although she was not positive of her I.D. (RT 10992-3.) Ticket seller Marcie Conn said appellant's picture was the most similar to the robber. (RT 11124.) Dahl testified similarly. (RT 11291.) Scheffler also picked appellant,

stating his mustache and lower face appeared familiar. (RT 12458.) All of the witnesses felt the wig later seized from a black suitcase in appellant's mother's garage resembled the length and color of the robber's wig, although by trial the wig was somewhat dirtier and messier than when the robber had used it. (RT 11025-6, 11132, 11244, 11292, 12456.)

Both Silverman and Dennis Dahl identified a snubnosed brown handled Charter Arms pistol found on top of the wig in the suitcase in appellant's mother's garage as being indistinguishable from the brown snubnosed gun used by the robber. (RT 11220, 11287-8.) Eiers recalled the gun as short barrelled, like the People's exhibit (RT 10982-3), and Scheffler recalled the brown handles on the gun in evidence. (RT 12456.)

### R.  Pat's Market Robbery

We briefly review the evidence of the Pat's market robbery of which appellant was acquitted. (RT 21046.)

Daniel Pizzuto testified that a man with stringy brown hair and moustache robbed him at gunpoint while he worked in Pat's market in Eureka on February 22, 1989. (RT 12497.) The robber was nervous and wielded a large cowboy type gun. (RT 12501-3.) The robber got $140.00. (RT 12494.) Pizzuto picked appellant out of a live line-up, but was only 90% certain of the identification. (RT 12513.)

### S.  Appellant's Post February 20 Activity

Appellant stayed with Rebecca Williams for the next week. Appellant took Williams' car for repairs in Auburn. Mario Del Valle examined the receipt from his company for the repair work and based on the number of the receipt and appellant's signature concluded that appellant picked the car up between 3:00 and 5:00 p.m. on Tuesday, the 22nd. (The Pat's Market robbery took place at 8:30 p.m. Tuesday, the 22nd in Eureka, about eight hours away from Auburn by normal driving. (RT 12487, 16722.)) Del Valle acknowledged that the receipt showed that the work was done for Rebecca Williams, and that appellant could have signed the slip on Monday the 21st when he dropped the car off.

Appellant also bought another part for Rebecca Williams' car elsewhere in Auburn on February 22nd. (RT 17379.)

On Thursday, the 24th, appellant picked out a white 1965 Chevrolet Impala at Consumer's Auto Market in Sacramento. (RT 17615-17618, 17622-17623.) Appellant returned and bought the Chevrolet on Friday for $1,602 in cash. (RT 17620.) Appellant brought the car back on Saturday the 26th to have a stereo installed.

On Friday the 25th at 9:30 p.m. appellant was involved in a car accident in Rebecca Williams' car on Highway 49 near Auburn. (RT 15881-15882.) Appellant backed up into the car of Patricia Pierman when both were stopped at a red light. Pierman blew her horn but appellant continued to back up until his car hit hers. (RT 15884.)

Appellant said he had no insurance and offered to pay Pierman. They decided on $100. Pierman's companion Judy Cummins watched as appellant went into his trunk to get the money. Cummins noted the trunk was very neat. (RT 15911.) In a brief case-sized box, Cummins saw a large amount of money organized in neat stacks. (RT 15906.)

On Sunday February 28th appellant rented a storage space at Valley Road Mini Storage in Reno. (RT 14310, 14322, 15835.) The facility had an electrically operated front security gate. (RT 15836.) Appellant paid for six months in advance at $25 a month. The owner, Ginger Summers, identified appellant's picture and signature on the rental agreement. (RT 15838, 15846.)

## T.   Arrest and Post-Arrest Gathering of Evidence

On March 3, 1983, parole agent Dick Wild noticed appellant in downtown Eureka. He called Detective David Douglas, who, through his conversations with his partner Detective Pat Freese, knew that appellant was a suspect in the Triplex robbery. (RT 14423-4.) Detective Douglas could not locate Detective Freese, so he met Wild, and the two caught up with appellant in a Social Security office. (RT 14424-7.) Detective Douglas approached appellant. Although initially cooperative, appellant refused to give Douglas his address, and became tense, clenched his fists and raised his voice. At this point, Detective Douglas handcuffed appellant and took him to the station. (RT 14429-31.) Once there, Douglas walked away to call Detective Freese. When Detective Douglas

returned, another Detective was holding appellant on the ground. The handcuffed appellant had tried to remove something from his back and the Detective had tackled him. Detective Douglas frisked appellant again and found a plastic container with four marijuana cigarettes tucked into the back of appellant's pants. (RT 14496.)

Appellant's brother, Alan Fletcher, phoned appellant in jail that day, March 3. Appellant asked Fletcher to look around in his room at his mother's place and clean it up. (RT 17229.) Fletcher went to the room with his mother and wife. Fletcher testified he disposed of a baggie of marijuana; his wife disposed of papers with addresses of relatives. (RT 17230.)

Appellant also asked Fletcher to dispose of the black suitcase from his mother's garage. When Fletcher later told appellant he had not done so, appellant was concerned and told him to go back and look for it again. (RT 17236-7.)

Appellant's mother later, on March 17, told police in front of Alan Fletcher that she had removed a Sampo radio from appellant's room, purportedly for her own personal use. Fletcher said nothing about the radio at that time. (RT 17370-7.) He only later related his claim that he gave appellant the radio as a gift. (RT 17315, 17320-1.)

On March 17, appellant's mother, Mrs. Lloyd, visited appellant in jail and took shorthand notes of instructions from appellant. Although Mrs. Lloyd was reluctant to translate these notes at trial, she did testify that the following phrases were included: "Brand business . . . object, removal of contents of main storage space, Reno, Nevada. . . ." (RT 16556.) The note also contained references to guns, ammunition and marijuana. Previously, Mrs. Lloyd had translated the notes for Eureka Police Officer Dwayne Frederickson. Officer Frederickson recalled that, among other things, Mrs. Lloyd stated the notes read "Guns and ammo are to be disposed of so they will never be found." (RT 17369.) (See also RT 17193.) Also entered into evidence was a note which was written by Mrs. Lloyd and held up to appellant as a reply at this conversation. The note read: "I know more than you think I do. But I mean about everything, especially regarding your organization. . . I know you have to do certain things, provide for people. . . if I get caught or somehow they find out, I'll go to prison." (RT 16572-4.) Mrs. Lloyd's note also asked "How are you going to account for the money when you go to use it?" (RT 16574.) Mrs. Lloyd testified that she was referring

to the fact that appellant's friends might give him money for an attorney. (RT 16574.)

## U.  Numerous Searches Are Executed

After appellant's arrest, his 1965 White Chevrolet Impala was found nearby.  It was later searched by warrant.  The following items were recovered: a Charter Arms .22 caliber AR-7 rifle manual with a wood chip inside;[4] a blue-green watch cap; a Gerber knife with the name "Liz" printed on it in nail polish, found wedged into the back seat; sunglasses; several maps in a rubber band and one loose map of Los Angeles, including the Temple City area; an address book including notations for the Sybil Brand Institute, a woman's prison, and various phone numbers including ones for "Michelle," "Tami" and "Becky." (RT 15444-8.) Also found was a set of directions to La Puente Avenue and a notation "Michelle, 4:30 p.m." (RT 15444.) The notation "Elizabeth, weapons, corner of Simpson and Pine," along with Hickey's phone number was in one of the address books.  (RT 15436-7.)

On March 5, appellant's room in his mother's house was searched by warrant.  Officers recovered a green bandanna; a grey zipper fronted hooded sweatshirt, which had a slit cut through the inside of the right pocket giving direct access to the inner clothing; a blue lady's glove with a small blood stain on the tip of the middle finger; a watch cap; and the pair of running shoes with three white stripes and a thin red stripe.  The so called "movie time" note, reproduced on the next page, was also found in appellant's room during this search.  (RT 17301, 17304-7, CCT 590.)

Also found in the room was an address book with numerous addresses of reputed AB members, and their runners and families. Additional lists of addresses were found.  On a separate sheet police found a note which stated "Nate, 4802 Alesandro in Temple City, California," followed by a phone number and the words "send subpoena to him." (RT 17356-7, CCT 595.) The address was that of Richard Barnes.  "Nate" was Steven Barnes' nickname.  A slip of paper with the

---

4. An expert witness could not match the wood chip with the splintered doorways to Hickey's closet.  (RT 15324, 15483.)

address for "Steve Barnes (stepfather" (sic) was found in appellant's wallet. (RT 15336, CCT 507.) A Tupperware container in the room contained $400 in twenty-dollar bills. (RT 17315.)

On April 5, 1983, the black suitcase from Mrs. Lloyd's garage and a wallet were searched by warrant. The suitcase contained a lunch box. Inside the lunchbox were found a long blond wig and a Charter Arms .38 caliber handgun with a brownish finish. (RT 17343, 17345, 17347-8.) (The wig was identified by numerous Triplex Theater employees as being similar to the one worn by the robber. The snubnosed, brown-finished, Charter Arms pistol was described by at least two Triplex employees as being indistinguishable from the gun used by the robber. (RT 11220, 11288.)) Also in the suitcase were a pair of dark glasses, a pair of latex gloves, a pair of black leather gloves, some loose .22 caliber rounds of ammunition, and two gun cleaning kits. Also included were cosmetic spirit gum, a container of liquid latex, Stine's derma wax, nose putty, light creole make-up, and a container of adhesive and tape remover. (RT 17348-50.) Two make-up experts were later called to show how these items of make-up could be used to simulate wrinkles, facial hair or other facial blemishes. (RT 19174, 17430-3.) Additional items recovered included more .22 caliber ammunition, twelve gauge buckshot rounds for a shotgun, and a pair of binoculars. (RT 17348-51.)


## V.  Search of the Storage Locker

On March 28, 1983, officers searched appellant's rented storage locker in Reno, Nevada under authority of warrant. (RT 14105-6.) When they opened the locker, the officers saw two large bundles, one leaning against each of the back corners of the locker. (RT 14116.)

One bundle was wrapped in a white mattress pad. It contained guns from the Moore burglary identified as his by Richard Moore (RT 14259), including both rifles and two of the missing shotguns. (RT 11592-11595.) (The RG Industries revolver was never found. That revolver was one of four makes of .22 caliber weapon which could have fired the bullets that killed Richard Barnes. (RT 12100.)) The Winchester model 1200 feather weight shotgun had been found with its

28

barrel and stock sawed off in the black suitcase in appellant's mother's garage. (RT 17343, 11604.)

The other bundle in the storage locker was wrapped in a floral pattern bordered sheet and a sleeping bag. Contained in the second bundle were guns from the Hickey/Petry apartment, as identified by Petry. These weapons included the Colt AR-15, the Browning 12 gauge pump shotgun, the AR-7, (the barrel of which was left in the closet at the Hickey apartment) the Ruger semi-automatic .22 caliber pistol, the replica Thompson submachine gun; the Ruger mini 14 rifle, and the Winchester pump shotgun. (RT 13351-13353, 13358-13363, 13372, 13293-13294.) Petry also identified the floral border bed sheet and a pillow case as having come from his apartment. (RT 13374, 14117.)

Most of the guns were loaded. (RT 14284.) Also found was a large quantity of ammunition, around 1,000 rounds (14261), including four magazines for the Ruger pistol, and boxes and loose ammunition of the following calibers: .20 gauge; 30.06 gauge; .357 magnum; .357; .38 special; .44 magnum; and .223. (RT 14133.)


W.    Thompson and Smith Agree to Testify for the Prosecution

Michael Thompson was an admitted Aryan Brotherhood member who had agreed to "roll out" of the AB and testify for the prosecution. Thompson was sent to prison in 1975 on two convictions of first degree murder. (RT 16732.) He admitted to well over a dozen subsequent murders in state prison. (RT 16749.) Thompson had been housed in a high-security portion of the prison for ten years with restricted visits and exercise. (RT 16766.) Nevertheless, he was elected a member of the AB ruling council and participated in the decision to kill Stephen Barnes' family and the assignment of the mission to appellant. (RT 16771, 16777.) He opposed that decision to kill innocent outsiders, because they were not aware of the "ramifications" of the AB rule structure. Admitting it sounded "outlandish" Thompson stated he simply drew the line at killing innocent outsiders, as a matter of "ideology." However, he went along with the group's decision. (RT 16812.)

Thompson could keep in touch with appellant through fellow AB member and inmate John Stinson, who was visited by Janet Myers.

(RT 16819-21.) Thompson wrote a letter to appellant after appellant's arrest stating that the arrest was unfair, because Thompson knew the authorities would monitor the letter. (RT 16917.) A letter was produced which was written from Humboldt County jail by appellant to Thompson, postmarked August 20, 1983. This was called a "hit or miss" letter because it had a secret message on it, written in urine, which became visible when a flame was held under it. The secret message was "need contact, witness problems, could walk." (RT 18545.) A questioned document examiner, Terrence Pascoe, opined that the writing style in the letter was probably appellant's, but that the secret writing appeared different, and on the whole was probably not appellant's. Pascoe conceded that the secret writing, done in capitals with a stick dipped in urine might be expected to vary from normal writing. (RT 18552 et seq.) Thompson told authorities of this letter, and of using urine to communicate secretly, soon after he "rolled out." When his personal property was released a couple of months later, Thompson turned the letter over to authorities. (RT 17065, et seq.)

In early September 1983, Michael Thompson informed a lieutenant at San Quentin that he wished to leave the AB and that he had knowledge of the Barnes killing. Los Angeles County Deputy Sheriff Robert Ross and two other officers immediately flew to San Quentin to interview Thompson. (RT 11750.) After speaking to Thompson, the officers spoke to Janet Myers, but she was not helpful. (RT 11752.) Later, in October, Michael Thompson and Janet Myers were brought together in a police substation in Southern California and allowed to talk for several hours. (RT 11753, 17833.) Myers recalled Thompson did not threaten her, but that she was told that Thompson and Smith had considered killing her for her knowledge of the Barnes murder, and that she was doing herself and her family a disservice by doing favors for AB members. (RT 13840, 17833.) Thompson also said that Myers would be surprised at what authorities could do for her if she cooperated. (RT 13842.) In fact, after she cooperated, Myers' prison sentence was shortened by about two months, and authorities paid to move her to Northern California. However, she left that protected home after two days, and authorities made no further attempts to help her. (RT 14008-13.) At the time she testified, Myers was out on bail on several offenses. (RT 13988.)

30

Thompson admitted he had routinely perjured himself in court to help AB members. He also claimed that telling less than the whole truth to give a misleading impression was not improper. (RT 16901-2.) Thompson's family had received some financial help and relocation aid since Thompson's decision to testify. (RT 16902.) Thompson's own personal situation presently was that he was locked down 24 hours a day 7 days a week. (RT 17020-2.)

Thompson testified that he did not receive and would not accept any promises from the authorities in return for his testimony, except for a guarantee of his security and his family's. (RT 17016.) In fact, Thompson still agreed with all the tenets of the Aryan Brotherhood, except the one policy of killing innocent family members. Thompson had recently been denied parole. Hearings were set at either one or three year intervals. Thompson's next hearing had been set for three years hence. (RT 16792.)

Clifford Smith had been in state prison since 1977 for various violent crimes including murder. (RT 14604.) Smith joined the Aryan Brotherhood in 1978. (RT 14610.) He participated in two gang stabbings to secure his membership. (RT 14611-14614.) His sponsor was an AB member named "Butch" Pappan. (RT 14624.) Smith participated in the effort to centralize the gang's authority into a counsel of 12. (RT 14627-14628.) He then participated in subpoenaing appellant and assigning him the Barnes execution. (RT 14650-14651.) After Thompson left the AB state agents began talking to Smith's mother seeking information. His mother's attitude was such that at one point she spit on one of the agents. Smith knew he would fall under suspicion if it became known police were talking to his relatives. However, Smith was wearying of the AB and knew that his AB activities had prolonged his prison sentence to the point where he was now not eligible for parole until the year 2007. (RT 14645.) Smith decided he had nothing left to give the AB, and that testifying would burn his bridges to the gang. (RT 14700.) He agreed with authorities to testify in return for the safety of himself and his mother, and for immunity in federal and state court for all his testimony. (RT 14855-14856, 14775.) A few of the crimes Smith admitted on the stand included the killing of AB member Steven (Loser) Clark by stabbing him 37 times, motivated by Clark's having called Smith a "punk," or homosexual, in front of Smith's daughter. (RT 14842, 14875.) Smith testified to profound

31

satisfaction from this revenge. Smith also stabbed his sponsor and friend "Butch" Pappan when Pappan would not be controlled by the gang. (RT 14847.) Smith cut the throat of an inmate named Maddox while Thompson held the victim's hands. (RT 14848.) Smith also ordered the stabbing of an inmate named Basey. (RT 14855.) Smith and Thompson were known as "Blinky's (i.e., Robert Griffin's) executioners. (RT 15026.) Before he left the AB Smith wrote letters to the defense falsely stating that he had been offered incentives to lie for the prosecution. He would have repeated such lies in court had he not turned on the AB. (RT 14779.) Smith had been lying in court for ten years to advance AB interests; this trial was the first time he had testified truthfully. (RT 14781.)

## X.   Defense Rebuttal of AB Testimony

The defense put on three prison inmates reputed by the prosecution witnesses to be AB members. The three were Wendall Norris, John Stinson and Robert Rowland. Although all three denied the existence of an AB as an organized criminal gang, numerous portions of their testimony strongly supported the prosecution witnesses.

John Stinson had resided in San Quentin since 1982, and had known Thompson since 1975. (RT 18596-7.) Stinson was a convicted murderer and robber. (RT 18600-1.) Stinson stated that the AB was just a tag the prison administration put on prisoners to segregate them, but it did not actually exist. (RT 18604, 18631, 18627.) His Nazi and KKK tatoos were unrelated to the AB. (RT 18632.) Stinson successfully fought the AB administrative classification. (RT 18608.) He never participated in discussions about organizing the gang or killing Steven Barnes. Stinson knew Steven Barnes was a "snitch" and snitches are sometimes killed in prison. (RT 18658-61.) Stinson said he was a close friend of appellant, and testified out of a sense of duty to tell the truth. Stinson would never aid the prosecution in any way. (RT 18654, 18661.)

At one time, Stinson became upset with Michael Thompson and Steven Clark because he thought they had given authorities information. He was then in jail in Los Angeles, and he subpoenaed Clark and Thompson ostensibly to testify, but actually in order to kill

them. Once there, however, they talked things out. (RT 18705, 18711.) Stinson knew that Janet Myers regularly visited Clifford Smith, and that Tami Shinn visited Robert Griffin. Stinson was familiar with "runners" who ran messages between inmates. (RT 18639, 18645.)

Stinson recalled one time on a prison bus he had spotted a man he knew as a "stool pigeon." He mentioned this to Michael Thompson, who was also present, and Thompson and Stinson administered a beating to the man. (RT 18677.)

A letter was introduced. Robert Griffin had written and signed the first page and an half, and John Stinson had written and signed the last half page. Stinson admitted authorship of the letter. (RT 18716.) The letter was a detailed explanation to an inmate in another prison of why the "Brand" (or AB) had to "hit" Steven (Loser) Clark. (RT 18712, see CCT 714.) The letter also contained a detailed discussion of AB strategy in the continuing "war" between it and Black and Hispanic gangs. (RT 18714-5.)

Stinson at one point stated that the only reason he was in security housing in San Quentin was because of the false AB label placed on him by the administration. The prosecution rebutted the claim by introducing evidence that Stinson's security rating stemmed from his being present during two in-prison stabbings, receiving a hacksaw blade from Steven Barnes, and having been found with a six-inch knife in his shoe. (RT 18686-18689.)

Wendall Norris admitted the existence of the AB, but stated it was an organized culture group meant to compete with black culture groups. (RT 18804.) Although the AB had been at war with black gangs for ten years, white people had begun to stand up for themselves, and now the situation had gotten better. (RT 18879, 18892.) Norris himself had a Swastika tatoo intended to incense Blacks. (RT 18877.) Norris testified that the AB was a way of life, that it had a creed written by Robert Griffin which Norris has memorized, and that he had always claimed to be an AB member. (RT 18880, 18865.)

AB members stood up for their brothers. (RT 18880.) Griffin was one of the finest people Norris knew, and appellant was his "brother" as was Clifford Smith. (RT 18855, 18887.)

Thompson had discussed the reorganization of the AB with Norris, but Norris did not approve. (RT 18791.) Others, such as Smith, had expressed approval of the plan. (RT 18900.)

Norris knew that Steven Barnes was testifying against AB members, but he did not decide to retaliate against Barnes or Barnes' wife. (RT 18811, 18832.) However, Norris acknowledged that snitches like Barnes are despicable, and are as bad as child molesters who are usually killed in prison. (RT 18875-6.)

Norris had originally liked Thompson, and had talked about an escape with him. (RT 18827.) Norris claimed he had had a falling out with Thompson in late 1982, but he admitted he had put a shamrock tatoo on Thompson's hand as late as December of 1982. Many of the men identified by authorities as AB members, men with whom Norris associated, had shamrock tatoos, which represented the AB. (RT 18878.) Putting such a shamrock tatoo on Thompson's hand was an act of extreme gravity to Norris. (RT 18881, 18903.)

Norris also repeated the story, now repudiated by Thompson and Smith, that Smith's stabbing of Steven (Loser) Clark 37 times was "in self-defense." (RT 18857-8.)

Robert Rowland was a state prison inmate convicted of armed robbery and forcible oral copulation in county jail. (RT 18980-5 through 18981.) Rowland was not aware of an AB. Just before Thompson "rolled out," he gave Rowland a prison made "zip gun" and a round of ammunition. (RT 18980-1.) Thompson then informed on Rowland and the gun was seized. (RT 18745, 18980-3.) Smith had testified that the gun was to be used by Rowland to execute a black gang member. (RT 19679-80.) Rowland denied knowing of the existence of the AB, and claimed he was only holding the gun for Thompson because Thompson had asked him to, and Thompson was influential on the yard. (RT 19003, 18980-2.)

Rowland denied he could have hidden the gun better, and denied he ever hid anything in his rectum. (RT 18988.) The prosecutor rebutted that claim with evidence that Rowland was found with a knife secreted in his rectum on March 25, 1986. (RT 20166.) Rowland was also found with a handcuff key hidden inside an unopened cigar (RT 19800), and was found with a hacksaw blade in his mouth on the way to court to testify in the case below. (RT 19859.)

## PENALTY PHASE

Evidence about appellant's background was received.    When he was about 18, appellant joined the Marines. Although he intended to make it a career, he was expelled before his enlistment was up.  He claimed he persuaded a review panel to reconsider his explusion, but the panel was overruled.  (RT 22527-8, 22303.)

On December 26, 1967 appellant was convicted of possessing marijuana and of escape from Tehama County Jail.   (RT 21547.) Appellant stated he has always pleaded guilty to charges of which he was in fact guilty.  (RT 22415, 22549.)

In late 1971 appellant was released from San Quentin on an early release program, so he could enter the College of the Redwoods. (RT 22418.)  Instead, within a month, appellant broke his parole and went to Montana, where he attempted to hold up a small grocery store at gunpoint.  (RT 22414, 22419-20.)  When the proprietor of the store refused to give him money, appellant escaped and was chased at high speeds by local police, who finally apprehended appellant after he had driven into a field and a shot was fired by authorities.  (RT 22420.) Appellant's counsel for the offense made a deal, and appellant received only a six month sentence in an in-custody drug program.  (RT 22319.) Appellant did not like the program or his fellow inmates, some of whom were criminally insane, so appellant walked away from the program. (RT 22322, 22423-4.)  Appellant returned to Humboldt County where he robbed a store in September 1971, and on the proceeds went to Florida.

Appellant was re-arrested in Florida after a traffic accident and was transported back to Montana.   (RT 22322.)   Appellant had a handcuff key with him.   (RT 22423.)   On December 29, 1971 in Montana, Sheriff's Captain Gerald O'Bresley and Deputy Sheriff William Farago were in the front seat of a car transporting appellant and another prisoner, who were in back.  (RT 21574, 21609.)  Appellant unlocked his handcuffs with his key, reached over the front seat and grabbed Farago's gun.  (RT 21577, 21610-1.)  Appellant pointed the gun at Farago's head and told the driver, O'Bresley, that if O'Bresley tried anything appellant would blow Farago's head off.  (RT 21577.)

Appellant let the other prisoner escape, then locked O'Bresley and Farago in the trunk of the patrol car in the subfreezing weather. (RT 21581, 21575.)  Appellant then drove the patrol car up to a jeep

35

parked by a hunter at the side of the road. (RT 21549.) The driver, John Digalis, got out of the jeep and walked back to the patrol car, where appellant pointed a revolver at him and walked him back into the jeep. Appellant got in and told Digalis to drive to Idaho. (RT 21553.) The two officers were left in the trunk, and were found and released after about 45 minutes by a passing motorist. (RT 21583.)

Digalis and appellant were eventually spotted by alerted police officers and flagged down. Appellant pointed the gun at Digalis' head and told him not to move or he would kill him. (RT 21556.) As a sheriff's officer approached, Digalis felt appellant tense up, and yelled to the officer to stay away or appellant would kill him. (RT 21556.) Appellant then ordered Digalis to drive, but officers immediately shot out a tire. Many more police officers arrived, and after a stand off, appellant surrendered. (RT. 21558-60.) Appellant testified he now believed that the hostages he took felt bad during their ordeal. (RT 22405.)

Appellant spent time in several prisons, including Idaho and Montana state prisons, San Quentin, and Leavenworth. At the latter institution appellant was found with a three inch metal cylinder in his rectum. (RT 22426.) Appellant claimed the reason for his transfers was that he knew facts about misconduct by prison guards. (RT 22330-3.)

While appellant was in San Quentin, on May 29, 1978, prison guard Rodney Perryman heard a commotion in a cell block and saw two inmates struggling. (RT 21807, 21812.) Perryman approached and saw appellant with his arms around an inmate named Leroy Banks. (RT 21822.) As Perryman approached, appellant released Banks and dropped a knife. (RT 21823.) Both inmates were covered with blood. Banks died of multiple stab wounds. (RT 21829, 21807.) Appellant did not live in the section of the prison where he was found with Banks, but could have gotten in while a guard was not looking. (RT 21828.)

Inmate Ricky Carpenter did live in Banks' section. He testified that appellant was an AB member and that Carpenter was an AB "associate." (RT 22620-1.) Appellant wanted to kill Banks because Banks, a Black Guerrilla Family (B.G.F.) member, had been disrespectful to an AB member, Donny Parish. Appellant waited in Carpenter's cell for about 45 minutes. When Banks eventually walked by, appellant stabbed him 10 or 15 times in the chest. (RT 22628.) Carpenter admitted he had never testified to these facts before, explaining he had

recently become a Christian. (RT 22657.) Carpenter was presently on parole and though he denied drug use, his parole agent testified that Carpenter had recently failed tests for narcotics. (RT 22810-8.) Carpenter received immunity for his testimony and his family was relocated for their safety at a cost of about $800. (RT 22621, 22634.)

Appellant testified at length about the AB. He stated prison life became unbearable in the mid 70's when black nationalists and black Muslims began attacking and killing white inmates for purely racial motives. (RT 22304 et seq.) The AB arose to stand up for white pride and to physically defend whites from attack. (RT 22311.) After a lengthy "war," conditions began to improve for whites when blacks realized the AB would retaliate in kind for attacks. (RT 22338.) Appellant testified he had an AB tatoo put on his chest. (RT 22315.) Even at trial, appellant pointed out that thinking about the AB brought a smile to his face. (RT 23312.)

These tense conditions in prison explained why appellant made sure he had access to a knife at all times, such as one found in a radio in his cell. (RT 22343, 21790-3.) Appellant was also found at other times with a nail file and a sharpened screwdriver, although he claimed the latter was planted in his property. (RT 21790-3, 22339.) Appellant also described a series of fights he had with another inmate which were stopped when officials shot him with bird shot, which accounted for the BB's in his legs. (RT 22344-6.)

Appellant stated he did not appear at the guilt phase because of the bad impression he would have made on the jury had he been forced to wear the single chain around his waist as ordered by the trial court. Appellant acknowledged the lengthy hearings on his behavior in jail which led to the chaining order, but he maintained that no just cause had been shown, and that the trial court was just a third member of the prosecution team. (RT 22347-8, 22458.) Appellant believed Deputy Walton, Tina Ransbottom, Smith, Thompson and others had perjured themselves on the stand. (RT 22414.) The trial court noted appellant was wearing the single waist chain under his coat during the penalty phase. (RT 21697.)

Much evidence was entered as to reasons underlying the trial court's shackling order.[5] Appellant admitted his long history of escapes and the numerous times he was caught with handcuff keys and weapons in prison and jail. (RT 22450-2 through 22459.) The prosecution introduced evidence to prove that on at least two occasions appellant had punched jail guards (RT 21700, 21741), and that on a third occasion he had violently resisted being taken to court, and had hit and bitten the guards who tried to restrain him. (RT 21720, 21641 et seq.) Appellant had also threatened several officers, stating to one that he would visit him when he was released. (RT 21707, 21725, 21730-1.) Other incidents of appellant's destruction of jail property were shown. (RT 21683.)

Nutritionist Pat Manuel testified that appellant refused to eat meat in Humboldt County jail, and that the jail food was monotonous and of only minimal nutritional value. (RT 21899, 21883.) Manuel believed the diet could have contributed to a lack of clarity of thinking in appellant, but she had seen appellant only once, in October of 1985. (RT 21822, 21888.)

Counselor Helen Vatcher found that confinement caused appellant's pride to suffer. She believed appellant was under stress; at one point they had cried together. (RT 21932-5, 21934.) Psychiatrist Fred Rosenthal believed appellant's confinement caused sensory deprivation. (RT 22132-8.) Such deprivation could cause anxiety, depression and hostility. (RT 22137.) Dr. Rosenthal thought appellant was, however, displaying strong self control. (RT 22267.)

Appellant's mother Beverly Lloyd testified that when appellant was about five years old she married a man who beat her. This marriage lasted for about three years. She then left that man and later married Gaylord Lloyd. (RT 22230-2.)

Appellant's brother Alan Fletcher, a college instructor, testified he loved appellant and that he believed appellant had matured. The two had grown up together until appellant was approximately ten years old and included the time with the abusive stepfather. (RT 22000-1.) Alan Fletcher also recalled the incident in December 1982 when appellant broke up some bottles in Fletcher's garage, and kicked in the door and a partition in Fletcher's mobile home in McKinleyville. (RT

---

5. In Argument VIII we set out in detail the history of appellant's problems with the Humboldt County Jail.

22006-7.)  Appellant later apologized and the two made up.  (RT 22007-8.)

Appellant's sister Sheila Yates loved appellant and believed her children would suffer if he were executed.  (RT 22009-12.)

Pat Sewell met appellant while visiting another inmate at Montana State Prison.  Appellant was active in constructive prison social groups such as the band staff.  (RT 21949-51.)  Sewell considered appellant a "special" friend.  Fred Perry was an inmate in the old Montana State Prison with appellant.  Perry described very harsh conditions in the prison, including lack of ventilation and running water.  (RT 22093.5.)  Perry and appellant were moved together from the Montana State Prison to Idaho State Prison and later to federal prisons.  (RT 22120.)  The move from Montana occurred very shortly after a fire in the prison library and also after appellant was shot, allegedly with a prison made gun.  (RT 22120-1 through 22122, 22123-4.)  Perry stated appellant was one of his four friends in the world and that there was nothing he would not do to save him.  (RT 22129.)

Former San Quentin inmate Joseph O'Rourke testified he presently ran a marine maintenance business.  (RT 22180-4, 22190-3.)  Appellant worked for O'Rourke for a month after being released from prison in September 1982, until O'Rourke was arrested.  Appellant was a good employee.  (RT 22182-5, 22212.)  O'Rourke testified that an inmate's associates in prison were dictated by race and by prison authorities.  (RT 22192 et seq.)  O'Rourke described racial "wars" in San Quentin with daily stabbings.  (RT 22188, 22190-7.)  When asked if he or appellant was an AB member O'Rourke replied "I won't answer questions like that."  (RT 22202-3.)  O'Rourke had previously called his maintenance business Leprechaun Marine, and he had several shamrock tatoos on his body.  (RT 22211.)  O'Rourke recalled that he had been arrested in October of 1982 with a sawed off shotgun after police officers got a man named Kendricks to call him.  Police claimed Kendricks asked O'Rourke on the phone to bring him a "tool."  (RT 22215-8.)

Several officers of the Humboldt County Jail and a San Quentin correctional officer testified that they had found appellant cooperative and respectful, and that they had no problems with violence in their daily contacts with appellant.  These included Forest Schafer (RT 21910-2 et seq.), Frank Burkhart (RT 21984-88), John Lewis (RT 22171-22176), and Rogers Larry (RT 22060-1 through 22060-3).

Appellant provided much insight into the crimes of which he currently stood convicted. First, as to the Barnes murder, appellant did not deny Janet Myers' good faith. He openly admitted that Myers drove him around the Temple City area a few nights before the Barnes murder. He admitted that at one point he got out of the car and walked up to a house. Appellant explained that this house was Tommy Lamb's, that he spoke with Lamb's sister at the door, found Lamb was not in, and left. (RT 27465 et seq.) Appellant brought in a picture of the Lamb house, explained it was a yellow house in a cul-de-sac next to a hedge, and that such facts matched Myers' description of the Barnes house. Appellant concluded that Myers was simply mistaken about the Barnes house, to which they did not travel. (RT 22581 et seq.)

Appellant also testified as to the Hickey homicide. He stated he was simply "incapable" of killing someone in the manner Hickey was killed. (RT 22280-1.) Appellant claimed that he had gone to Redding two days before Hickey was killed (Thursday the 17th) to meet a friend of Hickey's named "Kenny," who would deliver Hickey and Petry's guns to him to sell on consignment. The highway between Eureka and Redding proved impassable, and appellant phoned Hickey, who told him to meet Kenny on Friday in Lakeport instead. (RT 23460.) Appellant stated he slept in his car in Redding the night of the 17th through 18th, charged gas there on Friday morning, went to Lakeport, got the guns and returned to Auburn.

The prosecutor brought out that this scenario was contradictory to appellant's own sworn offer of proof, which was offered during the guilt phase when appellant decided not to testify. (See CT 10167, 10171.) That offer of proof contained a statement "N. That I received those guns in Upper Lake, California, two days before Elizabeth Hickey was murdered." The prosecutor explored the discrepancy between the written offer which stated the guns were obtained in Upper Lake on Thursday and appellant's direct testimony which stated they were obtained in Lakeport on Friday. Appellant maintained he did not believe the stories were inconsistent. (RT 22541-2.)

## APPELLANT'S CONTENTIONS

1.    Trying Mr. Price in Humboldt County for a Los Angeles homicide violated state and federal constitutional and California statutory rights; even if Humboldt County had jurisdiction to try that offense, the jury was not adequately instructed in regard to the determination of the facts necessary to provide Humboldt County jurisdiction over the Barnes murder or the conspiracy charge, nor did the jury make the necessary findings.

2.    The trial court erroneously denied the motion to sever the Elizabeth Hickey murder and burglary charges from the Barnes murder and conspiracy charges, resulting in a deprivation of fundamental due process as guaranteed by the state and federal constitutions.

3.    The trial court violated appellant's state and federal constitutional rights to a fair trial and an impartial jury by erroneously denying the motion for a change of venue.

4.    By threatening defense counsel with contempt and then unjustifiably refusing to resolve the matter until after trial, the court impermissibly interfered with appellant's state and federal constitutional right to the effective assistance of counsel.

5.    The trial court error in denying the defense motion to prohibit references to the name "Aryan Brotherhood" rendered the trial fundamentally unfair and deprived appellant of his state and federal constitutional rights to an impartial jury and to due process of law.

6.    The conspiracy count must be reversed because the evidence failed to support the allegations in the pleading, and because no overt acts were properly pled.

7.    Various federal constitutional and state statutory and constitutional errors occurred regarding the excusal or failure to excuse certain prospective or seated jurors.

8.    The trial court abused its discretion and violated appellant's state and federal constitutional rights in ordering that he be shackled throughout the trial proceedings.

9.    The trial court erred in allowing Curtis Price to waive his presence during the guilt phase of the trial because presence cannot be waived in a capital case.

10.    The trial court also erred in proceeding in the absence of Mr. Price at a number of other proceedings in which substantial rights

41

were at issue and there was no waiver, or there was a waiver that was not truly voluntary.

11. Because there was no probable cause to support Price's arrest, all fruits of the arrest should have been suppressed.

12. Although the defense was allowed to present some third party evidence indicating that Berlie Petry may have been the person who killed Elizabeth Hickey, a number of evidentiary restrictions prevented the defense from making as effective a showing as should have been permitted.

13. Other erroneous evidentiary rulings resulted in the improper exclusion of defense evidence that should have been admitted.

14. A series of erroneous evidentiary rulings resulted in the admission of improper prosecution evidence.

15. The trial court erroneously admitted gruesome photos of each homicide victim even though they had no conceivable probative value.

16. The Barnes murder and conspiracy counts must be reversed because of a series of errors related to the need for corroboration of accomplice testimony.

17. Legitimate attempts to attack the credibility of immunized witnesses were unfairly thwarted by the trial court's instructions to disregard the reasons why other persons were not charged, by reading an immunity agreement that stated that the court had found immunity to be in the public interest, and by the instruction that the testimony of a single witness could prove any fact.

18. Throughout the guilt phase of the trial, acts of misconduct by the prosecutors were so pervasive as to make a fair trial impossible.

19. Because the evidence was not sufficient to establish that Hickey's killer had an intent to steal at the time he entered her residence, the burglary conviction cannot be upheld consistently with federal due process requirements; also, the error requires reversal of the conviction for murder of Hickey and reversal of both special circumstance allegations.

20. The conviction for receiving stolen property must be reversed because it is not supported by sufficient evidence, it is inconsistent with the prosecution theory that Curtis Price was the thief, and because of instructional error.

21. The trial court erred in failing to instruct sua sponte on manslaughter as a lesser offense included within the Elizabeth Hickey murder count.

22. Individually and/or collectively, the errors that occurred during trial were prejudicial.

23. After the jury reported a deadlock during the penalty phase deliberations, the trial court's reaction resulted in a coerced penalty verdict.

24. The trial court seriously misinformed the deliberation jurors when they made inquiries regarding matters not in evidence, and the revelation of the crucial misunderstanding by the jurors demonstrates that the guilt verdicts were tainted as well as the penalty verdict.

25. Several forms of improper aggravating evidence were erroneously admitted or argued.

26. Through cross-examination of defense witnesses and the introduction of rebuttal evidence, the People were erroneously allowed to present improper matters to the jury.

27. Numerous instances of prosecutorial misconduct occurred during the penalty phase.

28. Erroneous evidentiary rulings unfairly restricted the defense in cross-examination and in the presentation of evidence during the penalty phase in violation of state and federal law.

29. In violation of the Federal Constitution, the defense was improperly precluded from presenting some evidence in mitigation that should have been received.

30. The trial court should have instructed sua sponte on the concept that a residual doubt of guilt could be a factor in mitigation of the penalty.

31. The trial court erroneously left the jury with no option other than to conclude that the Banks homicide was first degree murder if it was a crime at all, and the error was exacerbated by allowing the jury to find first degree murder based on a inapplicable felony-murder theory.

32. A variety of additional errors and flaws in the California capital sentencing procedures also mandate reversal of the death judgment.

33. Guilty phase errors that do not require reversal of the conviction must also be considered in the penalty phase.

34. Various errors occurred in the non-capital portions of the sentencing.

## RESPONDENT'S ARGUMENT

1. Venue and vicinage were properly laid in Humboldt County.

2. Appellant's motion for severance was properly denied due to the cross-admissibility of the evidence and other factors in the record.

3. The change of venue motions were properly denied.

4. The trial court's ruling on sanctions was temperate and justified.

5. Use of the name Aryan Brotherhood was proper.

6. The pleading of the conspiracy count was completely adequate.

7. The jury selection process was proper.

8. The court's order that appellant be shackled in court was fully justified by the record and was handed down only after diligent efforts at mitigation by the trial court.

9. Appellant's absence from his trial was in conformity with state and federal law.

10. Appellant establishes no error or prejudice from his absence from several other hearings.

11. The officers had sufficient probable cause to arrest appellant.

12. The court properly handled the third party culpability evidence.

13. The trial court's further evidentiary rulings excluding defense evidence were correct.

14. The trial court's evidentiary rulings were consistently sound and even-handed.

15. The photos of the bodies of Richard Barnes and Elizabeth Hickey were admissible as strongly probative of important factual issues in this case.

16. The court's instructions on accomplice liability were wholly correct.

17. The instructions on the immunized witnesses were correct.

18. Appellant's allegations of prosecutorial misconduct are incorrect or insignificant.

19. More than sufficient evidence supported the burglary conviction..

20. The receiving stolen properly conviction was amply supported and may stand.

21. The lack of instruction on voluntary manslaughter in the Hickey murder was correct.

22. No individual or cumulative error harmed the reliability of the jury verdicts, especially given the voluminousness and the conclusiveness of the evidence.

23. No jury coercion is shown.

24. Certain inquiries by the jury as to the source of the prosecutor's questions were correctly answered by the trial court.

25. Several questioned pieces of evidence in aggravation were handled correctly by the trial court.

26. The trial court's evidentiary rulings on cross examination and rebuttal were reasonable.

27. Appellant's allegations of prosecutorial misconduct are in the main baseless, and, as a whole, insignificant.

28. The court properly excluded certain jail house writings of appellant as more prejudicial than probative, and as being cumulative to the large mass of writings by appellant already in evidence.

29. Exclusion of certain defense evidence in mitigation was proper.

30. Appellant's arguments about lingering doubt are unsupported by California law.

31. Instructions on evidence of other criminal activity by appellant were correct.

32. Appellant pinpoints no constitutional flaws in the California capital sentencing procedures.

33. Appellant's cumulative error argument is unpersuasive.

34. The determinate term.

# ARGUMENT

## I.

## VENUE AND VICINAGE WERE PROPERLY LAID IN HUMBOLDT COUNTY

Appellant's first contention is that it was improper to try him in Humboldt County for the conspiracy and for the Los Angeles murder of Richard Barnes. Appellant asserts violations on both venue and vicinage grounds. We depart from appellant's organization and deal with the venue issues first, and then the vicinage issues.

### A. Venue

#### 1. Venue for Murder

Venue to try the Los Angeles murder of Richard Barnes in Humboldt County is easily established under settled law. Section 790[6] is not the exclusive venue statute for murder; it is supplemented by section 781.[7] (*People* v. *Powell* (1967) 67 Cal.2d 32, 62-63.) Appellant does not seriously contest this rule. And, under the latter section, the county where the crime "occurred" is interpreted as any county where acts in preparation, commission, or concealment of the crime were done, even if those acts do not amount to elements of the crime. (*People* v.

---

6. § 790. "The jurisdiction of a criminal action for murder or manslaughter is in the county where the fatal injury was inflicted or in the county in which the party injured died or in the county in which his body was found; provided, that if the defendant is indicted in the county in which the fatal injury was inflicted, at any time before his trial in another county, the sheriff of such other county must, if the defendant be in custody, deliver him upon demand to the sheriff of the county in which the fatal injury was inflicted. When the fatal injury is inflicted and the injured person died or his body was found within five hundred yards of the boundary of two or more counties, jurisdiction is in either county."

7. § 781. "When a public offense is committed in part in one jurisdictional territory and in part in another, or the acts or effects thereof constituting or requisite to the consummation of the offense occur in two or more jurisdictional territories, the jurisdiction of such offense is in any competent court within either jurisdictional territory."

46

*Buono* (1961) 191 Cal.App.2d 203, 224; *People* v. *Kellett* (1982) 134 Cal.App.3d 949, 956-7.)

Here, given the numerous allegations of preparation and concealment acts, the Los Angeles murder was properly tried in Humboldt County. These acts included procurement of weapons and phone calls from Eureka to Michelle Scarborough and others in Los Angeles arranging lodging. According to some testimony, killing Elizabeth Hickey to quiet her about weapons taken in the Moore burglary was also in concealment of the Barnes killing. In fact, underlined elements of the murder were committed in Humboldt County, in that the preparatory acts were evidence of premeditation and deliberation, the mental elements of first degree murder. Also, given that the Barnes murder was a prime object of the conspiracy, and the conspiracy was a continuing Humboldt County undertaking, venue was properly established.

### 2. Venue for Conspiracy

As to the conspiracy, venue was properly laid in any county in which an overt act was committed. (*People* v. *Jones* (1964) 228 Cal.App.2d 74, 86.) Because the conspiracy itself, as well as eleven overt acts were alleged in Humboldt County, the trial was properly held there. (CT 3078.)

### B. Vicinage

Appellant next raises a challenge on the obscure ground of vicinage. This is a constitutional challenge distinct from the venue issue. Venue is a legislative decision about which county has territorial jurisdiction over a crime. Vicinage is a constitutional right to a jury drawn from the "district" in which the crime was committed. (*O'Hare* v. *Superior Court* (1987) 43 Cal.3d 86, 95; *People* v. *Guzman* (1988) 45 Cal.3d 915, 938.) Appellant claims simply that no murder committed in Los Angeles County may ever be tried by a jury drawn from any other county including Humboldt County. Appellant's arguments on this ground fail for numerous reasons.

First, appellant did not preserve the issue for appeal by timely objection. *People* v. *Jones*, *supra*, 9 Cal.3d at p. 556, n. 7 states "it is well settled that challenges, including constitutional challenges, to the jury panel must be taken within the time prescribed by section 1060 [now repealed] and cannot be raised for the first time on appeal." (See also *People* v. *Barney* (1983) 143 Cal.App.3d 490, 493.)

Appellant claims to have objected on vicinage grounds and cites to the clerk's transcript. Examination of the cited pages reveals that appellant made two attacks on the propriety of the trial in Humboldt County. However, both attacks were exclusively on grounds that venue was absent in Humboldt County because the murder and conspiracy did not occur there; neither mentions or alludes to the obscure vicinage grounds.

The first attack (CT 3274-3275) is in a motion specifically to change venue, and the second attack (CT 3478, 3485) on identical grounds appears in a severance motion. The word "vicinage" is never used, nor is the objection ever made on constitutional grounds, nor specifically to the Humboldt County jury venire. Rather, the objections are consistently couched in the language of venue, attacking "jurisdiction" in Humboldt County under the state statutes and not the Constitution. Despite his claims to the contrary, appellant waived all objection to the Humboldt County vicinage.

Although we believe the above discussion dispositive, the law of the state indicates that appellant's vicinage rights were in fact honored in this case. It was appellant's constitutional right to have a jury drawn from the district where the crime occurred. However, it is a legislative prerogative to define where a given crime "occurred." In California, the determination of the county where the crime "occurred" for vicinage purposes is identical to the determination of venue.

It has been ruled that "for Sixth Amendment [vicinage] purposes California interprets the word '"crime" as including the preliminary acts which satisfy the venue requirement of section 781.'" (*People* v. *Bismillah* (1989) 208 Cal.App.3d 80, 89; quoting *People* v. *Powell* (1974) 40 Cal.App.3d 107, 123.) In *Bismillah*, appellant was chased by police from San Francisco to Alameda County, where he committed assaults during his arrest in Alameda County. *Bismillah* held that those Alameda County assaults were properly tried in San Francisco. Although it was "undisputed" that the assaults were committed solely in Alameda County,

the preparatory acts of fleeing from San Francisco made that county equally the vicinage of the crimes. (*Id.* at pp. 88-9.)

Similarly, the court in *Powell, supra,* accepted the argument that the intent to murder a kidnapped police officer arose only after the defendants passed from Los Angeles to Kern County. Nevertheless, the preparatory acts of kidnapping in Los Angeles County made it equally the vicinage of the murder that was executed in Kern County. (*Powell, supra,* 40 Cal.App.3d at p. 123.) Similarly, in our case, the conspiracy and other preparatory acts established Humboldt County as the vicinage.

The only other cases on this point in California law are not inconsistent with this rule. The early case of *People v. Powell* (1891) 87 Cal. 348, 360 found defendant's vicinage rights violated by the grant of a prosecution motion to change venue. However, in that case, the eventual county of trial was not arguably one where any acts of preparation, commission or concealment occurred, nor was that issue addressed. Similarly, in *People v. Barney* (1983) 143 Cal.App.3d 490, 493 a venue statute allowing trial where defendant was apprehended was found (after a timely vicinage objection) to be overbroad. But, again in *Barney* no act relating to the crime was alleged to have occurred in the county of apprehension and trial. As such, the case is not in conflict with *Bismillah* and *Powell.*[8]

Any other rule than that stated in the more recent *Powell* case and *Bismillah* would have ludicrous results. Under appellant's interpretation of vicinage, his two murders committed during the course of a single conspiracy simply could never be tried together, because they occurred in separate counties, no matter how closely related in time or motivation. Hypothetical cases illustrate further absurdities. Had appellant merely aided and abetted the Los Angeles murder while remaining in Humboldt County, appellant would have to be tried for first degree murder in Humboldt County, separate from the accomplice, who would have to be tried for the same murder in Los Angeles County.

---

8. It is also worth noting that the United States Supreme Court has never found the Sixth Amendment vicinage right to apply to states. The 1891 *Powell* case was repudiated in *People v. Richardson* (1934) 138 Cal.App. 404, 408 which held that substantive Supreme Court cases held that the common law in 1850 did not include vicinage rights, and therefore the place of trial is purely up to the Legislature. (But see *Hernandez v. Municipal Court* (1989) 49 Cal.3d 713, 722.)

The rule established by the cases we cite is also in accord with the uncontested rule that a state may define the location of the occurrence of a crime. The state may label a crime a "continuous" one, and so allow it to be tried, for <u>vicinage</u> purposes, in any county in which the defendant spent time during the duration of the crime. The state's right to define the occurrence of a crime in terms of preparation and concealment is a logical outgrowth of this principle.[9]

Finally, we assert that any vicinage error in the present case would be harmless. It is not a fundamental right, and cannot be asserted to be one whose violation would "abort" the truth finding process. (See *Rose* v. *Clark* (1986) 478 U.S. ___, 92 L.Ed.2d 460.)

The disingenuousness of appellant's argument in this case is shown by the rights vicinage was meant to protect. These include (1) the right to be tried near one's home (i.e., the right for an American colonial not to be transported to England for trial); (2) the right to be tried by jurors who are familiar with the defendant's character; and (3) the right to have jurors who are familiar with the particular circumstances in an area which might justify a crime. (*Guzman*, *supra*, 45 Cal.3d at p. 934.) It is plain that only a trial near his home in Humboldt County was consistent with the purposes of the vicinage rule. He has neither occasion to complain nor any basis whatever to assert prejudice.

## C.  Absence of Findings

Appellant argues that even if the counts were correctly tried in Humboldt County, the jury should have been required to find that some overt act of the conspiracy, and some act in preparation or concealment of the murder occurred in Humboldt County. We discuss findings on both venue and vicinage for both conspiracy and murder.

---

9. Actually, the continuing crime rule may strictly apply in this case. Here, as we have noted, appellant premeditated and deliberated his first degree murder in Humboldt County. In this sense, first degree murder is a continuing crime, giving vicinage under this theory in any county in which such premeditation and deliberation occurred.

### 1.  Findings on Venue for Conspiracy

Appellant argues that the jury did not return the necessary findings supporting venue or vicinage in Humboldt County for the conspiracy conviction.  The argument is unavailing.

In fact, the Information, jury instructions and verdict form insured that the jury's finding of guilt necessarily included a finding of performance of an overt act in Humboldt County.  The conspiracy count was charged as follows:

"The said CURTIS FLOYD PRICE is further accused by the District Attorney of and for the County of Humboldt, State of California, by this Information, of the crime of VIOLATION OF SECTION 182 OF THE PENAL CODE OF CALIFORNIA, a felony, committed as follows:  That the said CURTIS FLOYD PRICE, on or about the months of April to September, 1982, at and in the County of Humboldt, State of California, did wilfully and unlawfully conspire together with another person and persons whose identity is unknown to commit the crime of Robbery, Grand Theft and Murder, in violation of Sections 211, 487(c) and 187 of the Penal Code, felonies; that pursuant to and for the purpose of carrying out the objects and purposes of the aforesaid conspiracy, the said defendant committed the following overt act or acts at and in the Counties of Humboldt and Los Angeles, State of California, and at and in the County of Washoe, State of Nevada: . . ." (CT 3078.)

The verdict returned by the jury stated:

"Defendant is charged in Count Twelve, a violation of California Penal Code Section 182, to wit, conspiracy, formed between April and September 1982, and ending in March 1983.

"We, the Jury in the above entitled case find the defendant, Curtis Lloyd Price, guilty of conspiracy as set forth in Count Twelve of the information." (CT 10236.)

We believe the only logical conclusion from the verdict is that the jury found at least one overt act pursuant to the conspiracy count was performed in Humboldt County.  The jury was instructed that conspiracy has three elements:  the intent to conspire, the intent to commit a crime or crimes, and, the performance of an overt act with those two specific

intents. (RT 2031 et seq.)  On these instructions, the jury would have been forced to conclude that, for the conspiracy to have occurred as charged in Humboldt County, appellant must have fulfilled all three elements in Humboldt County.  No instruction allowed the jury to find conspiracy in Humboldt County where less than all three elements were present.  Thus, the verdict of guilty as charged could only have been returned had the jury believed that appellant committed <u>at least one overt act</u> in Humboldt County in conjunction with the two requisite intents.  The instructions required no less a set of findings, and we must presume the jury did not ignore the instructions.  Even if some theoretical ambiguity exists in the instructions, no realistic probability exists that the jurors were misled.  (*People* v. *Balderas* (1985) 41 Cal.3d 144, 175-6 ("In context, there is no substantial chance the jury was misled."); *People* v. *Martin* (1983) 150 Cal.App.3d 148, 158 ("We assume jurors are intelligent persons capable of understanding and correlating jury instructions . . . .  On review even if an erroneous instruction is included, reversal is required only when the error was likely to have misled the jury."); see also *People* v. *Malone* (1988) 47 Cal.3d 1, 52.)

It is true that the information charged that the conspiracy occurred "on or about" April through September 1982, but that none of the conspirators was present in Humboldt County during those months.  There are two answers to this complaint.  First, the overt acts charged in Humboldt County all were charged as occurring later, in early 1983, when appellant was in fact in Humboldt County.  The verdict form states the conspiracy was formed between April and September of 1982 and ended in March 1983 (CT 10236), reinforcing the conclusion that the jury found that the conspiracy was born in state prison in Chino in April through September 1982, but that an overt act was committed later, in Humboldt County, while appellant remained motivated by the two specific intents, as charged.  Again, the jury instructions required the jury to make such a finding in order to convict on conspiracy "in Humboldt County."

Second, appellant waived any argument that the jury instructions were inadequate on this point.  After preliminary instructions, the judge and all trial counsel discussed this very point.  (RT 20929 et seq.)  The prosecution recognized that the Information could be made somewhat clearer and proffered an amendment to conform to proof, extending the date of conspiracy to March 1983, which would have covered all of the

overt acts. The trial court stated it would accept such an amendment, because the prosecution had, from the beginning, relied on one and only one theory of conspiracy, giving appellant complete notice and opportunity to respond. Nevertheless, defense counsel rejected the amendment, thus waiving any claim of jury confusion on this point. (RT 20931.) Appellant's excuse on appeal for this waiver, that defense counsel was justified in attempting to preserve error for appeal rather than eliminating any chance of error when he had the opportunity, is untenable. (See *People* v. *Bell* (1989) 49 Cal.3d 502, 550 (burden is on defendant to request clarification of confusing instruction).)

In sum, the instructions required the jury to find that the three elements of conspiracy were present in Humboldt County. The verdict of guilty as charged delivered an adequate jurisdictional finding on conspiracy.[10]

Finally, if it is postulated that the instructions were so confusing as to theoretically allow the jury to convict appellant without finding any overt act in Humboldt County, the error would still be harmless on this record, because the jury did no such thing.

The jury found appellant guilty of conspiracy to rob and murder in Humboldt County. Appellant's only possible argument on this ground is that although the jury found the conspiracy, and therefore at least one overt act, it is nevertheless possible the jury found true only overt acts that did not take place in Humboldt County. There were two such overt acts. Overt act 13 alleged concealment of the Moore weapons in Washoe County (Reno) Nevada. (CT 3080.) However, the jury also convicted appellant of concealing these weapons in Humboldt County. (Count 7, CT 3076, RT 21046.) (This conviction was fully supported by the evidence, see argument XX.) If the Moore weapons constituted the overt act, we know those weapons were possessed in Humboldt County, thus supporting venue there.

The only other overt act performed outside of Humboldt County was the Barnes murder. However, under *Rose* v. *Clark* (1986) 478 U.S. 570, 92 L.Ed.2d 460 the jury made ample findings in this area

---

10. In *People* v. *Jones* (1964) 228 Cal.App.2d 74, 86-8, a conspiracy was charged in Contra Costa County, but the only charged and proved overt acts occurred in Alameda County. The court affirmed, holding that the jurisdictional overt act need not be charged. Because substantial evidence supported uncharged overt acts in the county of trial, the jury verdict was affirmed. Much substantial evidence supports the finding that numerous uncharged overt acts were committed in Humboldt County.

for us to conclude the jury believed numerous overt acts were performed in Humboldt County pursuant to the conspiracy. (See *United States* v. *Moeckly* (8th Cir. 1985) 769 F.2d 453, 461-2; *United States* v. *Honneus* (1st Cir. 1974) 508 F.2d 566 (failure to request finding on venue is instructional error waived by failure to request the instruction).) This argument is supported by the rule that venue is not an element, and need only be shown by a preponderance of the evidence. (*People* v. *Cavenaugh* (1955) 44 Cal.2d 252, 262; Witkin, California Criminal Law (2d ed.) § 1872 at p. 2209.) The jury convicted appellant of the Hickey burglary and murder, of possession of the Moore weapons and of the Triplex robbery, as well as of the conspiracy to, at minimim, kill Barnes. But, the same evidence of a conspiracy to kill Barnes showed the conspiracy encompassed the theft and stockpiling of weapons. Appellant himself admitted to his mother that the stolen weapons were "Brand business" (RT 16556), that is, part of the AB enterprise. It is simply unbelievable that the jury did not believe the crimes of which it convicted appellant in Humboldt County were committed pursuant to the conspiracy. Any possible imprecision in the conspiracy instructions was harmless. (*People* v. *Lee* (1987) 43 Cal.3d 666, 675.)

### 2. Findings on Venue for Murder

Appellant also contends that the jury returned no specific findings showing that acts in preparation, commission, or concealment of the Barnes murder occurred in Humboldt County, so as to support venue in that county. In fact, substantial evidence supported the implicit finding of venue.

The jury returned a verdict that appellant conspired in Humboldt County to commit murder and robbery between April 1982 and March 1983. Appellant concedes that the Barnes murder was a product of the conspiracy. (AOB 110.)[11/] The jury could not rationally have convicted appellant of the Barnes murder without accepting the conspiracy theory. The only theory argued to the jury, supported by the only evidence in the case, was that the Barnes murder was pursuant to

---

11. Appellant states "the jury found Mr. Price guilty of the killing of Barnes, which was clearly an overt act in furtherance of the conspiracy." (AOB 110.)

the conspiracy. No motive other than the conspiracy was provided for the Barnes murder. Only the testimony of the co-conspirator Thompson, and the Aryan Brotherhood associate Janet Myers, placed appellant at the scene. Only the conspiracy gave appellant a motive, along with evidence of appellant's intent to carry out the murder. But, if the Barnes murder was pursuant to the Humboldt County conspiracy, preparation was established. The conspiracy showed appellant was planning the Barnes murder when he obtained the Moore weapons, and when he called Los Angeles to arrange to be picked up at the bus station, and to arrange lodging. It is clear beyond reasonable doubt that a preponderance of the evidence supported venue.

### 3. Findings on Vicinage for Murder

Finally, appellant argues the jury did not make specific findings on vicinage. This argument is insignificant for numerous reasons. First, the lack of findings was due to appellant's failure to timely object, or even mention vicinage below. Defense counsel was correct in so declining, because, under the settled law, any objection would have been futile since preparation and concealment in Humboldt County were proved. Appellant also failed to request instruction on the issue. Finally, even if incompetence of counsel is hypothecated on the failure to object, appellant lost no defense and was in no way prejudiced by the lack of a vicinage objection. (Cf. *Strickland* v. *Washington* (1989) 466 U.S. 668.) At any rate, the venue findings discussed above satisfied the vicinage requirements. No error is shown.

### D. Conclusion

Before we close, we note a final reason why appellant's vicinage and venue arguments cannot affect the judgment of death below. Even if this court accepted appellant's arguments in full, and reversed the Barnes and the conspiracy verdicts, the death judgment would stand. As we show in Argument II, *infra*, all evidence of the Barnes murder and conspiracy would be cross admissible in the Hickey murder trial, even if the first two <u>were not charged</u>. Thus, the evidence in a trial solely on

guilt, and the burglary special circumstance, of the Hickey murder would be identical to the guilt phase below. The only exception would be that the jury would not need to return a verdict beyond a reasonable doubt on the Barnes murder and the conspiracy. As such, even accepting appellant's argument, the Hickey guilt verdict and special circumstance survive.

A fortiori, the death verdict at the penalty phase would have been identical in a trial solely of the Hickey murder, because the Barnes murder and conspiracy would also be considered as aggravating violent acts. Once again, the evidence at a penalty phase of a trial charging only the Hickey murder would be identical to that below. Beyond doubt, the verdict of death would also be the same. Thus, even if this court reversed the Barnes and conspiracy verdicts, the death verdict on the Hickey burglary-murder special circumstance must stand.

For all these reasons, appellant's various arguments may be rejected.

## II.

### APPELLANT'S MOTION FOR SEVERANCE WAS PROPERLY DENIED DUE TO THE CROSS-ADMISSIBILITY OF THE EVIDENCE AND OTHER FACTORS IN THE RECORD

Appellant next contends that the joinder of counts in this case was improper. Appellant particularly asserts that the two murder charges should have been severed. The record belies the argument on several grounds.

The mode of post trial review of denial of a severance motion is two-fold. First, the preliminary hearing may be examined to determine if the trial court's pretrial denial of the motion was correct. However, under recent cases, the more important inquiry is whether prejudice is shown from the joinder on the evidence actually received at trial. (*People* v. *Smallwood* (1986) 42 Cal.3d 415, 429 (mistaken joinder may be nonprejudicial on record even where crimes would not have been cross-admissible); but see *People* v. *Bean* (1988) 46 Cal.3d 919, 938-9 (burden on defendant to show prejudice).) On either ground, the record here demonstrates none to appellant.

We have no quarrel with appellant's citation to *Williams* v. *Superior Court* (1984) 36 Cal.3d 441 for the framework of the severance inquiry. *Williams* set out the factors relevant to the inquiry, which include whether the evidence of the crimes is cross-admissible, whether strong evidence of one crime is being used to support weak evidence of another, whether either crime is particularly inflammatory, and whether the case is a capital one. Of these factors, the most important is cross-admissibility. Where cross-admissibility is shown, any inference of prejudice will be eliminated. (*People* v. *Ruiz* (1988) 44 Cal.3d 589, 606.) On the other hand, even where cross-admissibility is not established, a joinder may still prove nonprejudicial on the facts of the case. (*People* v. *Poggi* (1988) 45 Cal.3d 306, 321.)

Here, the severance issue is not a close one. The various crimes charged in this case are all cross-admissible. First, the charged crimes were all plainly pursuant to an ongoing conspiracy. As such, each crime proved the existence of the conspiracy, and, as a logical result, each crime proved the identity and motive of the perpetrator of each other crime. Second, even without the conspiracy, the crimes had

substantial probative value to each other in such areas as motive. We detail these two theories of cross-admissibility.

## A. <u>Conspiracy</u>

It is settled law that where there is preliminary evidence that any two acts were committed as part of a conspiracy, evidence of each act is relevant to prove that the other act was committed pursuant to the conspiracy, by the same conspirator for the same motive. This rule applies whether any act to be proved is charged as an overt act, or as a separate crime, or both, or neither. And, such facts may be proved whether the conspiracy itself is charged or not.

"As a general rule, evidence that the defendant committed other crimes is inadmissible if offered solely to prove his criminal disposition. (Evid. Code, § 1101, subd (b); *People* v. *Thomas* (1978) 20 Cal.3d 457, 464 [143 Cal.Rptr. 215, 573 P.2d 433].) However, as an exception to the rule, evidence of other crimes is ordinarily admissible where it tends to show guilty knowledge, motive, intent, or presence of a common design or plan. (*Ibid.*) The 'common design or plan' exception has two distinct applications: (1) it may refer to the defendant's modus operandi or distinctive, characteristic method of committing crimes, or (2) it may refer to '"a larger continuing plan, scheme, or conspiracy, of which the present crime on trial is a part."' (*People* v. *Sam* (1969) 71 Cal.2d 194, 205 [77 Cal.Rptr. 804, 454 P.2d 700], quoting from McCormick on Evidence (1954) § 157, p. 328; *People* v. *Thomas, supra,* 20 Cal.3d at pp. 464, 465.)" (*People* v. *Cooks* (1983) 141 Cal.App.3d 224, 313 at n. 68.)

"Failure to charge conspiracy as a separate offense does not preclude the People from proving that those substantive offenses which are charged were committed in furtherance of a criminal conspiracy. (*People* v. *Pike* (1962) 58 Cal.2d 70, 88 [22 Cal.Rptr. 664, 372 P.2d 656]); nor, it follows, does it preclude the giving of jury instructions based on a conspiracy theory." (*People* v. *Remiro* (1979) 89 Cal.App.3d 809, 842.)

". . . evidence of uncharged crimes may be admissible to prove that the charged (substantive) crimes were committed as

part of a conspiracy to commit other crimes." (*People* v. *Cooks*, *supra*, 141 Cal.App.3d at p. 314.)

(See *People* v. *Frausto* (1982) 135 Cal.App.3d 129, 140-141.)

Appellant asserts that there is no substantial evidence that the Hickey murder and the Triplex robbery were part of the conspiracy, because those crimes post-dated the Barnes homicide. There is no dispute that the Barnes homicide was a primary goal of the conspiracy. (See AOB 110.) But, a conspiracy may have numerous goals, and the successful execution of one does not terminate the conspiracy. "A given conspiracy may be as 'limited or as expansive as the capacity of criminal minds to design unlawful combinations' regardless of how bizarre and fanciful. . . . [W]hether an uncharged crime was committed by the defendant or co-conspirator in furtherance of the conspiracy is a question of fact." (*Cooks*, *supra*, 141 Cal.App.3d at 314.)[12]

Appellant attempts to show, from one brief quotation, that Michael Thompson stated at the preliminary examination that the conspiracy covered <u>only</u> the murder of the elder Barnes, and that it then ceased. Appellant ignores Thompson's statement a few pages later in the transcript that the conspiracy had numerous goals beyond the Barnes murder, including, the murders of Tommy Lamb and Roger Wiersma, and the continued accumulation of weapons for Aryan Brotherhood projects. All doubt on this score is erased by the full exchange which occurs at CT 2656:

"Q. All right. But the Council was insistent that it wanted weapons stolen in Northern California; is that your testimony?

"A. Yes, sir.

"Q. To complete this contract [(the Barnes murder)]?

"A. Amongst others, yes, sir.

"Q. Amongst others, but you didn't give him any others at that time?

"A. No, sir.

"Q. What were you doing, planning for the future?

"A. Of course.

"Q. 'Of course.'?

"A. Yes, sir.

---

12. The continuing nature of a conspiracy with multiple goals is not to be confused with mere concealment activity after the completion of a single-goal conspiracy. (See *People* v. *Zamora* (1976) 18 Cal.3d 538, 546.)

"Q.  What were you planning for the future?

"A.  Further contracts.

"Q.  What contracts.

"A.  Well, you had, for instance, the Tommy Clark [sic] contract, had the Roger Wearsma [sic] contract."

Thompson testified that these murder contracts were in fact eventually given to appellant during the course of the conspiracy:

"Q.  Who did you give the contract to to kill Tommy Lamb?

"A.  Curtis Price.

"Q.  On that same day?

"A.  I don't believe so.

"Q.  How about the contract on Mr. Wearsma?  [sic]

"A.  In relationship to what?

"Q.  Who did you give that to?

"A.  Curtis Price.

"Q.  Same day?

"A.  I don't believe so.

"Q.  Before or after the contract on Steven Barnes?

"A.  After.

"Q.  Before or after he was released from Chino?

"A.  After.

"Q.  Before or after; how about the contract on, on Lamb, was that before or after the contract on Barnes?

"A.  After.

"Q.  When Mr. Price was there or out of Chino?

"A.  Out of Chino.

"Q.  Did you give him that one too?

"A.  No.

"Q.  Who did?

"A.  John Stinson.

"Q.  The Council voted again?

"A.  Yes.

"Q.  How about the Wearsma [sic] contract, did the Council vote on that too?

"A.  Yes."  (CT 2192-2193.)

Thus, at the time of the Hickey homicide and the Triplex robbery, several days after the Barnes murder, the record supports the inference

that the conspiracy to steal weapons and kill various subjects of Aryan Brotherhood disdain was in full force and effect. (Further support for these inferences appears at CT 2672, 2096, 2103-2104.) In addition, Thompson acknowledged that the weapons stored by appellant in Nevada were considered an Aryan Brotherhood resource. (CT 2705; see also 2680.)

Based on this evidence, the trial court denied severance, concluding that:

> "In September of 1983, the District Attorney became aware of Mr. Michael Thompson and his allegations that the killing of Richard Barnes was an Aryan Brotherhood contract accepted by Mr. Price. Mr. Price was to go to Northern California to obtain weapons and money for use in the killing of Barnes. The killing of Barnes was to be an execution slaying. The slaying was to be in the Los Angeles area. The idea being that the robberies and burglaries in Northern California necessary to accomplish the killing of Barnes, and others, would not be connected to the scheme. The evidence indicates that the conspiracy did not end with the killing of Barnes. Indeed, Price was to continue to amass weapons and money for the Brotherhood.

> "There is little doubt that if all these charges were separated and treated under Evidence Code Section 1101, that the 'common marks' test cannot be met. However, the evidence still appears to be admissible because each homicide case is an integral part of the on-going conspiracy. If the homicide charges were severed, the prosecution would still have the right, in each trial, to prove the extent of the conspiracy.

> "The same reasoning applies to the robbery charges." (CT 3630-3631, emphasis added.)

The trial court was correct. Even had the two murders been severed and tried separately, the entire conspiracy, whether or not charged, would have been admissible in each separate murder trial. As the Hickey murder and the Triplex robbery were integral portions of the conspiracy, cross-admissibility was established. The severance motion was properly denied.

We briefly note that the evidence at trial was even stronger on the continuing nature of the conspiracy, and thus on the cross-

admissibility of the charges.   As such, all danger of prejudice was eliminated.   The testimonies of Thompson and Smith plainly show the inferable continuing nature of the conspiracy, which was, of course, a question of fact for the jury. (See *Cooks, supra*, 141 Cal.App.3d at p. 314.)   Added to this was appellant's statement that the guns in Reno were "Brand business."  This statement, made by appellant to his mother after his arrest as part of his instructions to her to destroy evidence, plainly supported the inference from the previous testimony that the collecting of guns was a continuing Aryan Brotherhood criminal enterprise.   As such, the Hickey murder and the Triplex robbery, which financed appellant's transportation and livelihood, were integral parts of the conspiracy, which did not terminate until appellant was incapacitated by his arrest.[13]/

While we believe the preceeding argument is dispositive, we briefly note that the Barnes murder would have been cross-admissible in a separate trial of the Humboldt County Hickey murder because the Barnes murder was part of the motive  for the Hickey murder. (*People v. Archerd* (1970) 3 Cal.3d 615 (even highly prejudicial prior crimes admissible when probative value to motive was great); see also *People v. Peete* (1946) 28 Cal.2d 306; *People v. Cooks, supra*, 141 Cal.App.3d 224.) Although we do not know for certain appellant's motivation, it is a reasonable inference that Hickey knew a great deal about appellant's

---

13. We do not argue that any random crime in Humboldt County could be alleged as an overt conspiratorial act, and proved by proof of other acts of the conspiracy.  Plainly, before the conspiracy was relevant to prove the additional act, or vice versa, the additional act must be shown by independent substantial evidence to be part of the conspiracy.  Here, both murders were shown independently of each other to be part of the conspiracy; once this initial showing was made, the additional logical step of using each murder to prove the identity and motivation of the perpetrator of the other murder was proper.

Connection of the Hickey murder with the conspiracy was shown by appellant's possession of Hickey's weapons after her death, by appellant's repeated presence at Hickey's apartment and by appellant's statements that the Hickey weapons were part of "Brand business."  As for the Barnes murder, as appellant has previously conceded, that crime was shown by substantial evidence to be part, and in fact one of the major purposes of the conspiracy.  Finally, it was inferable that the Triplex robbery was part of the conspiracy because of the physical evidence tying appellant to that robbery, because of appellant's written statements that he needed money, and because of the general evidence that appellant was engaged in the conspiracy at the time of the robbery.

Once these acts were individually shown to be part of the conspiracy, evidence of each became relevant to support the proof that the conspiracy existed, and therefore that appellant was responsible for each act.

criminal actions, including the Moore burglary and, possibly, the Barnes homicide. This was an argument stressed by the prosecutor at trial.

## B. Conclusion

The jury here showed it could distinguish between strong and weak evidence when it refused to convict appellant on five robbery counts in the face of substantial evidence on those counts, and despite its belief that appellant was at the time involved in a conspiracy. Such discrimination by the jury has been used by courts to rule out prejudice from mistaken joinders. (*People* v. *Ruiz* (1988) 44 Cal.3d 589, 607; *People* v. *Moore* (1986) 185 Cal.App.3d 1005, 1012 (per Kaufman, Acting P.J. [acquittals on some counts show "although faced with inflammatory charges, the jury clearly considered and weighed the evidence carefully as to each charge separately. The acquittals demonstrate a careful sifting of the evidence and a properly cautious verdict."]).) On this record, the denial of the severance motion was plainly proper, regardless of the cross-admissibility of the Barnes murder to the Hickey murder. In any event, no prejudice can be shown on this record.

## III.
## THE CHANGE OF VENUE MOTIONS WERE PROPERLY DENIED

Appellant contends that his motions before and after voir dire to change venue were improperly denied, and that this error proved prejudicial. Appellant's argument is without merit.

"A change of venue must be granted when the defendant shows a reasonable likelihood that in the absence of such relief, a fair trial cannot be had... Whether raised on petition for writ of mandate or on appeal from judgment of conviction, the reviewing court must independently examine the record and determine de novo whether a fair trial is or was obtainable... . The factors to be considered are the nature and gravity of the offense, the nature and extent of the news coverage, the size of the community, the status of the defendant in the community, and the popularity and prominence of the victim. . . .

"A significant difference between pretrial and posttrial review is that after conviction in determining whether a defendant received a fair and impartial trial under the "reasonable likelihood" standard, the review is *retrospective*. It extends to an examination of what actually occurred at trial.'

. . . In other words, voir dire may demonstrate that pretrial publicity had no prejudicial effect." (*People* v. *Harris* (1981) 28 Cal.3d 935, 948-9; see *People* v. *Williams* (1989) 48 Cal.3d 1112, 1125-6.)

Beginning with the traditional factors, a capital murder case is of course grave. The size of Humboldt County is relatively small among California counties, which some cases have found to be a factor. (But see *People* v. *Adcox* (1988) 47 Cal.3d 207, 233 (small size of county not decisive).) On the other hand no unique emotional reaction would have arisen because of personal characteristics specific to Humboldt County of Hickey, a relatively unknown and unappealing victim, nor of appellant, a little known Eureka native. Appellant argues at length that the remaining factor, pretrial publicity, was so extensive and inflammatory as to make a fair trial impossible. We disagree on several grounds. First, the publicity was not particularly extensive. Although there were numerous newspaper stories at the time of the offense and again during

the preliminary examinations, the publicity had completely died down by the time of trial. In ruling on the pretrial motion, the court reviewed and individually noted the media articles and broadcasts concerning the trial. The court concluded:

"[S]ince June the twelfth, nineteen eighty-four, the Court is aware of only one media report via the TV on November the thirteenth, nineteen eighty-four, essentially reporting that the case had been continued.

"There has been about a nine-month span of near media blackout. The public opinion surveys conducted by both sides show that the large majority of those surveyed have either no knowledge or little knowledge of the case. Both surveys indicated that ten percent has formed an opinion. The defendant's expert, Dr. Coyne, indicated that over half of those [that ten percent] claimed to be able to set aside any formed opinion and judge the case on the facts and the law. It appears to the Court that out of the eighty-one thousand potential jurors, at least seventy-one thousand have formed no opinion at this point. And as many as seventy-six thousand could be potential jurors. Of course, the surveys cannot adequately measure all the variables and all the problems that are associated with choosing a fair and impartial jury; but on their faces, they themselves do not support a change of venue at this time." (Emphasis added; for defense survey see CT 4123; the creator of the defense survey, Peter Coyne, testified at RT 917; the creator of the prosecution survey, Barry Brown, testified at RT 1004.) (RT 1359-60.)

Thus, although appellant asserts prejudice in the abstract, the facts show no prejudice occurred.

The factors ameliorating initial publicity noted by the trial court have been found significant in past cases. For example, in *People* v. *Bonin* (1988) 46 Cal.3d 659, 677 this Court found that the massive publicity surrounding defendant's first conviction of the "freeway killings" had subsided by the time of his second trial, neutralizing chances for prejudice. (*Accord People* v. *Coleman* (1989) 48 Cal.3d 112, 133.)

More important perhaps is this Court's recognition that:

"[w]ith modern communications, 'scarcely any of those best qualified to serve as jurors will not have formed some

impression or opinion as to the merits of the case.' Thus, '[i]t is not required . . . that the jurors be totally ignorant of the facts and issues involved . . . It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' (*Irwin* v. *Dowd* (1961) 366 U.S. 717, 722-723 [6 L.Ed.2d 751, 756, 81 S.Ct. 1639], quoted in *Harris*, *supra*, 28 Cal.3d at pp. 949-950.)"

Before we inquire as to whether those familiar with this case through publicity could be fair, it is necessary to determine whether appellant's abstract arguments about pervasive publicity can be completely negated on the record. In fact, appellant fails to show that the jurors actually chosen had any pretrial familiarity with the case whatsoever. At the <u>renewal</u> of the venue motion <u>after</u> the intense and extensive voir dire, the court concluded:

"THE COURT: . . . The Court has spent a great deal of time counting the number of jurors who had various responses on the questionnaires. There were seven hundred thirty people that were talked to. Four hundred eighty-four claimed they had <u>absolutely no knowledge of this case</u> and no knowledge of the Aryan Brotherhood. Another forty-eight to fifty claimed they had no knowledge of the case, but know of the A. B. and could be fair. That brings a total of about four hundred and ninety who have no -- or four hundred, excuse me -- four [sic: should be five] hundred thirty-two or so who have no knowledge of the case whatsoever and eighty-eight more had knowledge of the case, no knowledge of the A. B., and another thirty or so had knowledge of the case, said they could be fair, and knowledge of the A. B. and said they could be fair.

"So when you get down to it, there are approximately six hundred fifty jurors who have either no knowledge whatsoever or have knowledge about something they claim they can be fair, which is eighty-nine to ninety percent of the total draw. Seventy to seventy-five were excused for various reasons for cause, which is nine to ten percent of the total draw. I have a list of those people who were excused for cause, and they run the gambit [(sic)] of not only knowledge, but a lot of other things. . . .

"But the long and the short of it is, when you get down to the knowledge within the community of this case and you take away all the challenges for cause that are not based on some particular facts, such as the inability to follow the law, a very small percentage of people actually learned anything from the media. And I think the records of the Court adequately reflect that the change of venue should be denied and it will be." (RT 9804-6.)

This Court similarly rejected an identical argumetn in *Bonin*, as follows:

"This great potential for prejudice, he goes on, cannot be deemed to have diminished substantially between March 1982, when sentence was imposed in the Los Angeles action and coverage became minimal, and March 1983, when jury selection in this proceeding began: a year is simply too brief a period of time. In view of this great and undiminished potential for prejudice, he concludes, we must presume that, at least when they had their memories refreshed by the evidence introduced at trial, the jurors and alternates might not have been able or willing to be fair and impartial.

"Defendant's argument is to no avail. To begin with, it appears to be essentially empty of persuasive force, supported as it is more by conjecture than by evidence. In any event, it seems to establish at the very most the mere *possibility* of an unfair trial. But such a showing, as we have explained, is insufficient." (*Bonin, supra*, 46 Cal.3d at p. 678.)

Contrary to appellant's speculative claims, the court below was satisfied that those jurors actually chosen actually had no significant knowledge of the case. Nothing in the record suggests otherwise.

Indeed, the fairmindedness of the jury is reflected in appellant's use of only eighteen of his twenty six peremptory challenges at voir dire of the jury (CT 9471), and only six of his eight challenges at voir dire of the alternatives. (CT 9728.) This fact is a "strong indicator [] that the jurors were fair, and that the defense itself so concluded." (*Balderas, supra*, 41 Cal.3d at p. 180.) On this record, the venue motion was properly denied.

Appellant next claims that prejudice occurred through the appearance of one additional article after the jury had been chosen and admonished to avoid information about the case. Appellant states that

"almost every juror knew of" this article. (AOB 149.) Appellant fails to report that beyond the one juror who admitted reading the article and was excused, only five or six of the remaining jurors knew anything whatsoever of the content of the article; the rest had merely been informed of its existence and had told their informers to cease discussing the article at once. (See generally RT 9900-10042, 9951, 9961, 99676, 9980, 9986.) Of the jurors that had any knowledge whatsoever of the content of the article, none of them knew more than that the article discussed the costliness and lengthiness of the trial, facts obvious to anyone sitting through voir dire or the trial. Appellant's assertions that any of the jurors knew anything about the county supervisors' reluctance to pay for the trial, or about appellant's reputed escape in Montana, have absolutely no support in the record.[14]

Next, appellant advances arguments that essentially ask this court to rule that a small county may never hold a major trial. Appellant first claims that the possibilities were too high that a juror might know a minor participant, or a relative of a minor participant in the trial. This Court rejected a similar claim in *People* v. *Adcox* (1988) 47 Cal.3d 207, 276 (Mosk, J., concurring). Rather, the law provides remedies for any such untoward coincidences. We will therefore discuss appellant's complaints as to each such incident later in this brief, in response to appellant's specific allegations of prejudice from those incidents. Nothing is gained by attempting to import the mere possibility of such issues into the change of venue motion.

Appellant similarly claims that the trial court should have been prescient of appellant's subsequent run-ins with jail personnel, which caused the increasing degree of security. Again, such problems have their own remedies at law. Any resulting prejudice will be dealt with as a freestanding problem; the inclusion of such issues in a hindsight review of a venue motion does not change the fact that the import of the issue turns on the existence or non-existence of intrinsic prejudice from the incidents. We do note however that this Court has ruled that appellant cannot take advantage of such misbehavior. *Fain* v. *Superior Court*

---

14. The recent case of *People* v. *Williams, supra,* 48 Cal.3d 1112 is distinguishable. There, of a tiny pool of 116 prospective jurors, about 50% had heard of the case. Here, out of 730 prospective jurors the court found over 66% had no knowledge of the case or of the AB. An additional 6% knew of the AB but not of the case. This pool of over 500 jurors was more than enough for a fair jury. Also this case did not involve "sensational racial [and] sexual overtones." (*Id.* at 1127.)

(1970) 2 Cal.3d 46, 52-3 citing with approval *People* v. *Gomez* (1953) 41 Cal.2d 150, 162, held that the defendant there could not rely on the prejudice created by his own escape attempt during voir dire to obtain a mistrial on the basis of that prejudice, because a defendant cannot benefit from his own wrong. *Fain* allowed a change of venue based on the record showing prejudice stemming from that defendant's escape, distinguishing *Gomez* because (1) *Fain's* escape put potential jurors personally in fear and (2) defendant *Fain* could not have foreseen the later use of his escape to his advantage in that manner. To the contrary, here, appellant's jail misconduct had no personal effect on the potential jurors, and the misconduct most certainly appeared to be in great part an attempt to set up an artificial ground for a future appeal. As such, even if foreseeable, appellant's jail misconduct cannot be considered grounds for a change of venue.

Appellant next asserts prejudice on a completely different theory, claiming that the evidence entered in the trial was simply too inflammatory for a Humboldt County jury to fairly consider. It is important to note that virtually none of the prejudicial effect of this evidence has any greater relation to Humboldt County citizens than to the citizens of any other county in California. "Predispositions based on a stereotype of defendant or of the victims, rather than on personal acquaintance, might well be present in other counties to which venue could be changed." (*People* v. *Coleman* (1989) 48 Cal.3d 112, 134.)

Appellant argues that Humboldt County jurors would have been more particularly outraged by a prison gang murder of a mother of two in their community. Appellant's principles of sociology fail to account for why any citizen of the state, including a juror from Marin County, would be less affected by an organized crime hit man's murder of a young mother, particularly since the evidence showed the conspiracy to be statewide in planning and execution.

Appellant then makes the unexpected argument that the prejudice would have been lessened had the residents of the county been more familiar with prison gangs, on the theory that exposure to such behavior causes acceptance. This theory also directly contradicts appellant's previous arguments that the Humboldt County jury was prejudiced by pretrial articles in statewide publications on the workings of prison gangs. (AOB 138.) We are at a loss to understand why such

69

statewide publicity would prejudice Humboldt County jurors more than others.

Finally, this case contrasts with most cases ordering a change of venue because of pretrial publicity in that those cases turn on citizen exposure to inadmissible evidence. In *Fain*, defendant's confession and previous conviction were widely reported. (*Fain, supra,* 2 Cal.3d at p. 52.) In *Frazier v. Superior Court* (1971) 5 Cal.3d 287, 293, appellant had been reported as making "highly incriminating threats" of death. Here, appellant's primary arguments address possible pretrial exposure to facts to which the jury was exposed in much greater detail at the trial. Such preexposure must be seen as much less grave than exposure to inadmissible facts.

To conclude, any feeling generated by pretrial publicity and admissible evidence at trial in this case was not specific to Humboldt County. The fact one of the murders took place in Humboldt County to a low profile victim simply does not add much to the impact of the case. Nor, contrary to appellant's assertion, is the normal juror from Marin County, the site of San Quentin, for example, more unmoved by evidence of outrageous prison gang behavior. Appellant's arguments here are disassociated from any fact or principle. Appellant does not allege that any juror falsely swore his pledge of good faith. Nor does appellant show that any juror was aware of any fact reported by the press which was not entered in evidence at the trial. The trial court, and defense counsel who retained eight peremptory challenges, showed themselves to be satisfied with the objectivity of the jury. No error is shown.

## IV.
## THE TRIAL COURT'S RULING ON SANCTIONS
## WAS TEMPERATE AND JUSTIFIED

Appellant complains of the trial court's order of September 5, 1985; the order criticized appellant's attorneys for repetitive filings of previously denied motions, and for misstatements and omissions of facts in those motions. The trial court's order ruled that hearings re "sanctions pursuant to CCP 128.5" would be held after the trial as to both defense counsel. Given the record of counsel's overzealousness, the trial court's moderate rulings were well within its discretion.

### A. No Contempt Citation was Made

Preliminarily, we note that appellant incorrectly and repeatedly refers to the court's actions as a citation for contempt. The actions discussed were never more than sanctions under Code of Civil Procedure section 128.5[15]. Sanctions under that section are limited to the amount of attorneys' fees required to oppose a frivolous motion. The significance of the difference between contempt and section 128.5 is two-fold. First, no penal sanctions were ever threatened, and the amount of a possible monetary sanction was small, being directly limited to the

---

15.  "§ 128.5.
"(a) Every trial court may order a party, the party's attorney, or both to pay any reasonable expenses, including attorney's fees, incurred by another party as a result of bad-faith actions or tactics that are frivolous or solely intended to cause unnecessary delay. This section also applies to judicial arbitration proceedings under Chapter 2.5 (commencing with Section 1141.10) of Title 3 of Part 3.
"(b) For purposes of this section:
"(1) 'Actions or tactics' include, but are not limited to, the making or opposing of motions or the filing and service of a complaint or cross-complaint. The mere filing of a complaint without service thereof on an opposing party does not constitute 'actions or tactics' for purposes of this section.
"(2) 'Frivolous' means (A) totally and completely without merit or (B) for the sole purpose of harassing an opposing party.
"(c) Expenses pursuant to this section shall not be imposed except on notice contained in a party's moving or responding papers; or the court's own motion, after notice and opportunity to be heard. An order imposing expenses shall be in writing and shall recite in detail the conduct or circumstances justifying the order.
"(d) The liability imposed by this section is in addition to any other liability imposed by law for acts or omissions within the purview of this section.

71

amount of prejudice to the prosecution for the particular motion.
Second, appellant repeatedly criticizes the trial court below for making
statements that no penal sanctions would be forthcoming, and that
appellant's attorneys were not under citation for contempt. (See AOB
159 et seq.) These statements by the court were the simple truth.

Appellant advances several arguments condemning the court's
action. First, appellant argues that the trial court's order was beyond the
court's legal rights because it chilled the defense team's freedom to
forcefully litigate the case. Second, appellant alleges the court's ruling
contained numerous factual inaccuracies and unsupported allegations,
rendering the ruling error. Third, appellant alleges he lost confidence in
his trial counsel as a result of the court's impugning their abilities. We
assert in response that (1) the trial court's actions could not have
intimidated counsel because settled law provided counsel with legal
recourse; (2) the court's sanctions were fully justified to curb defense
counsel's excesses; (3) no factual showing of any actual "chilling" is
alleged or proved by appellant, rendering his argument moot; and (4) the
proposition that appellant accepted the alleged aspersions on his defense
counsel is demonstrably false.

## B.    Counsels' Rights Were Protected

First, appellant does not cite any authority holding that a
contempt sanction (let alone a sanction under section 128.5) imposed
during trial prejudices the defendant or is otherwise improper. The
cases appellant does cite do not suggest such a result. *Smith* v. *Superior
Court* (1968) 68 Cal.2d 547, 562 found prejudice where the trial court
removed defense counsel entirely for incompetence over objection by
defendant. In the other cases cited by appellant, *Fabricant* v. *Superior
Court* (1980) 104 Cal.App.3d 905, 916; *In re Hallinan* (1969) 71 Cal.2d
1179, 1185; and *In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 653 the
court merely discussed the propriety of the contempt citation per se, and,
interestingly, did not discuss any purported prejudice to the underlying
trial, even where the contempt citation was found to have been in error.

But, the latter three cases do establish that the trial court's
actions here were entirely appropriate. California law has carefully
examined the propriety of contempt citations for attorneys who mislead

72

the court or question settled rulings. The procedure this Court has decreed as necessary and, presumably, sufficient to protect those attorneys from any threat of unjustifiable harm, is a due process hearing where the trial court must justify its decision to award sanctions. (*Bauguess* v. *Paine* (1978) 22 Cal.3d 626, 637; *In re Buckley* (1973) 10 Cal.3d 237, 253.) This hearing is expressly provided for in C.C.P. section 128.5. The trial judge must recuse himself at such a hearing if there is an <u>appearance</u> of bias stemming from his differences with the alleged contemner. (*In re Martin* (1977) 71 Cal.App.3d 472, 480-1.) Further, "any ambiguity in a decree or order must be resolved in favor of an alleged contemnor." (*In re Blaze* (1969) 271 Cal.App.2d 210, 212.) Appellant's counsel had nothing to fear from the system, and, on his version of the facts, he had a full defense to all charges.

Implicit in the cases is the recognition that the hearing and review procedures form ample protection against any possible false charge of contempt and so any possible prejudice to the defense. Defense counsel below could safely rely on the due process of such a hearing, and subsequent appellate review, to protect them from any injustice. Defense counsels' duty was to continue to be forceful advocates and to rely on the processes of the law to determine whether any sanctions were appropriate. Counsel had no basis to assume they would be punished improperly. Appellant's argument on appeal essentially denies the efficacy of the established hearing and review procedure and improperly assumes that a judicial officer will not properly and regularly perform his duties. The assumption is unfounded. (Cf. Evid. Code, § 664.)

Further, any untoward effect of the trial court's written ruling was limited by its subsequent oral statements. Contrary to the impression appellant wishes to give, the trial court was at all times open to discussion about defense counsels' complaints or confusions. When counsel brought up the question of the sanction order, the court attempted to reassure counsel as follows:

"The Court, on September the 5th, indicated that there was a possibility -- at least if I didn't say possibility, I intended to mean a possibility -- that at the end of the case, there might be a hearing pursuant to 128.5. The Court doesn't intend by reference to chill anyone's ability to represent Mr. Price. There's a constitutional duty to provide him an adequate

defense.   Also a statutory and ethical duty to perform in accordance with mandates of a member of the California State Bar.

"Certainly, the record up to this point would reflect the defense counsel had not been precluded from filing numerous motions in order to protect Mr. Price's rights.   To clarify that in regard to the mention of the possibility of imposing sanctions pursuant to 128.5 of the Code of Civil Procedure, it is my feeling that there may never be a hearing in that regard.

"The Court may conclude that there's no hearing necessary in the matter.  The . . . obligations . . . of an attorney remain, in my opinion, the same throughout this proceeding before the Court's order, at the time of the Court's order, and will continue to be the same after the Court's order.   And I don't think my mention of that code section changes that fact.  (RT 7271-2, emphasis added.)


## C.   No Prejudice is Shown

We believe the obvious framework for treating any possible prejudice from this issue would be the standard framework for determining when the level of counsel's performance falls below an acceptable level of competence under *People* v. *Pope* (1979) 23 Cal.3d 412, 426 and *People* v. *Fosselman* (1983) 33 Cal.3d 572, 581-2.  However, under those cases it would be appellant's burden to show some action or omission by counsel which prejudicially fell below the level of acceptable counsel.  Appellant makes no such allegation nor such showing.  In the absence of any such showing or prejudice, this court may dismiss this issue.


## D.   Substantively, the Court's Rulings were Correct

We briefly discuss the substance of the court's ruling.  The trial court specified two acts by counsel as appearing so excessive as to warrant sanctions under section 128.5 for wasting the court's time and misleading it.  The court found:

"15. The only hearings merited by [appellant's previous] motion will be the following:

a. A hearing re sanctions pursuant to C.C.P. § 128.5 as to Mr. DePaoli for filing this motion;

b. A hearing re sanctions pursuant to C.C.P. §128.5 as to Ms. Klay for filing the 'Motion for Release on Own Recognizance on Setting of a Reasonable Bail' on August 30, 1985;

c. These hearings will be held post-trial and the Court will consider compliance with this ruling as a factor at that hearing.

"16. From this point forward Mr. DePaoli is to assume his duty as the lead attorney in this case. Ms. Klay shall be the second or assistant attorney; she shall have no right to file any paper unless it is received and approved as to form, content and legal authority by Mr. DePaoli.

"17. Each defense counsel is hereby notified that they are to be ruled by previous decisions of this Court on factual issues and the law, <u>unless the facts change</u>. Further motions based upon unchanged facts and law will be regarded as a reason to cite counsel for misconduct and impose proper sanctions.

"18. All counsel are advised that they have the sworn duty to get this case to trial. Groundless, frivolous, spurious motions based on incomplete or misstated facts do not show a good faith attempt to fulfill that duty. This case must be tried; the intolerable delays evidenced here will no longer be condoned in any fashion by this Court. It is only because those delays have been caused by the defense that this case remains at issue. No further unfounded delay will be allowed. Both sides <u>will</u>, I repeat, <u>will</u> be prepared to try this case as of September 15, 1985. [Emphasis in original.] (CT 7768-9.)

As to Ms. Klay, appellant asserts that the trial court in its ruling was criticizing Ms. Klay's renewal of the motion for bail even though enough time had allegedly passed for the substantive issue to have changed. We believe the court's specific concern was not the motion, but Ms. Klay's refusal to accept the court's ruling on that motion. The original motion for release on bail or own recognizance was filed on August 16, 1985. (CT 7309.) The court denied that motion on August

75

21, 1985, noting that facts <u>had changed,</u> but only to the extent that the defense had received further discovery. The court concluded:

> "The evidence here creates a presumption that there is a substantial, or great, possibility that the prosecution will prevail. The offense is therefore not bailable and there is absolutely no merit to the motion. The issue has also been <u>previously decided</u> on a number of other requests and is therefore ruled by those decision.
>
> "The motion is denied without hearing <u>the defense will not refile such a motion.</u>" (RT 7392.)

There was no mention of sanctions in this order.

Next, 9 days later on August 30, 1985, Ms. Klay filed her "Declaration . . . Re Court's Ruling on Motion for Bail for Release on Own Recognizance." (CT 7562.) Ms. Klay declared as to one of the court's statements in its ruling "I know this statement to be inaccurate." (CT 7562.) The declaration went on to further dispute the court's ruling and claim that the court's conclusions were incorrect. This direct challenge to the court's final ruling and express order that the issue not be raised again was the plainly unprofessional act which moved the court to warn Ms. Klay to toe the line. The court showed admirable restraint in not immediately sanctioning Ms. Klay for contempt.

For his part, soon after Ms. Klay filed her motion, Mr. DePaoli filed his motion to dismiss under Penal Code section 1382 on August 21, 1985. The court noted correctly that the statement of facts was "so incomplete that it is misleading," (CT 7761) which we believe bordered on a finding of willful misconduct. Appellant replies that the court must have been aware of the innumerable details of the complex litigation and so was incapable of being misled, or at least defense counsel must have so believed. Whether that argument has any truth to it, and we dispute that it does, the issue could have been resolved at a post-trial sanction hearing. The point is that the record supports the trial court's belief that counsel's conduct was improper and subject to later proceedings on sanctions. (*In re Ciraolo* (1969) 70 Cal.2d 389, 394 (disregard for falsity of sworn statements is contempt).)

The substance of the court's assignment of inaccuracy to Mr. DePaoli was appellant's continued claim that he opposed one continuance in the case. (CT 7355.) Appellant admits in his brief that he formally withdrew all opposition to the motion at issue. (See CT

7761.) He further admits that he received a quid pro quo for that withdrawal of opposition, namely the prosecution's pledge to be bound by one section 1538.5 motion, rather than waiting until after a second such motion to consolidate the cases. (AOB 153, n. 213.) Nevertheless, appellant continues to maintain even now that he legally opposed the continuance motion, apparently solely on the basis that the requirements of the law in California unfairly coerced him to give up his opposition.

The misstatement on this ground affected a major issue. Appellant's motion to dismiss this entire grave case on speedy trial grounds turned on such technical details as whether or not he consented to one or another of many continuances. Appellant's flat misstatement of law on this ground, claiming that he did in fact oppose a continuance beyond 60 days, could arguably have led to a miscarriage of justice.

However, although appellant stresses that that factual dispute was the basis of the court's ruling, we think once again the court's main point is not that appellant's argument is untenable, but rather that the argument had been raised and settled previously. The court stressed in its order that it had resolved all of these factual issues against appellant previously. Appellant's basic argument in the August 21 motion, that the undue delay in discovery required dismissal, was rejected by the court expressly on March 12, 1985. (RT 1396.) At that hearing, the court recited with some completeness the details of the procedural history of the case. The court specifically found that appellant's opposition to the continuance motion discussed above had been voluntarily withdrawn. The court detailed its thinking on the good faith of the prosecution on discovery matters. (RT 1403 et seq.) The court found that the defense was partly to blame for the discovery problems. (RT 1406.) The court concluded that appellant's speedy trial rights had not been violated, and that good cause existed for a continuance. At that point, appellant requested a three month continuance which was granted. (RT 1410-11.) Jury selection started at the end of that three month continuance, thus eliminating any argument for dismissal on speedy trial grounds.

Mr. DePaoli's motion of August 21 was, as the court ruled, "nothing other than a motion to reconsider the Court's Ruling of March 12, 1985." (CT 7765.) Mr. DePaoli's motion expressly disputed almost every aspect of the court's March 12 ruling. (See e.g. CT 7374-5.) The baselessness of the defense motion was not at the heart of the court's

ruling on sanctions. Rather, the continuing disrespectful quibbling and arguing with settled rulings of the court, causing delay and confusion, was the crux of the issue. Defense counsel's actions were in fact contemptuous. It was to the court's credit again that it limited its possible sanctions to section 128.5.

Finally, we deal with appellant's claim that he lost faith in his attorneys because of the court's criticism of their motions. Appellant's argument is that the trial court's criticism caused him to believe his attorneys must be incompetent. (See AOB 157.)

First, the court never questioned the competence of counsel, but, as we have discussed, tried only to rein in their overzealousness in their service of appellant. The court's statement would not have caused a reasonable person to lose faith in the competence of defense counsel.

Next, it is startling for appellant to assert that the trial court's opinions in this case affected him. Appellant expressed a clear contempt for the ability and motives of the trial court. For example, on February 20, 1986, appellant wrote to the court, "take your threat and stuff it. What are you, a bully and a coward like Captain Williams in the jail staff? . . . We all believe you are under the prosecution's thumb . . ." (CCT 2130.) On February 4, 1986, appellant sent a letter to the court, read into the record by the judge, which stated "I think allowing Smith to testify without ensuring complete discovery first . . . is the same as allowing secret testimony in a secret trial you commie, Gestapo traitor to the U.S. Constitution." (RT 14562, see also RT 22458.) Appellant repeated variations on this theme almost daily. We think that appellant would treat as a badge of honor any criticism directed to his counsel from this "commie, Gestapo" "bully" and "traitor." No error appears.

## V.

## USE OF THE NAME ARYAN BROTHERHOOD WAS PROPER

Appellant contends that even if evidence of appellant's membership in the Aryan Brotherhood gang, and of activities of the organization, were properly introduced, it was error to allow the jury to hear the name "Aryan Brotherhood." Appellant asserts the word "Aryan" is so inflammatory that allowing the jury to know that it was used as the title of appellant's prison group was likely to cause the jury to unreasonably convict him of the crimes charged here.

Appellant apparently attacks the court's allowing the use of the term "Aryan Brotherhood" as both irrelevant and overly prejudicial under section 352. Appellant cites no single case which holds that the name of a gang is either irrelevant or prejudicial. The only substantive case appellant cites is, as appellant acknowledges, not on point. *United States v. Abel* (1984) 469 U.S. 45 held that membership in the Aryan Brotherhood was highly probative of a witness' motive to be biased in his testimony about another Aryan Brotherhood member. However, in that case the trial court had excluded the term "Aryan Brotherhood" in the interests of avoiding "undue" prejudice. Such action was neither required nor disapproved by the Supreme Court in *Abel.*

Here, numerous good reasons existed for allowing mention of the group's name.

### A.  Name Proved Existence

First, one requirement for the prosecution case was to prove the existence of the Aryan Brotherhood. Various members of the organization flatly denied the existence of such an organization. Evidence that the Aryan Brotherhood was a widely recognized name, with a set of connotations well known to numerous inmates and corrections personnel was probative evidence of the existence of the gang. Failure to prove such a name would have been circumstantial evidence that the gang did not exist, or at least was much less organized and powerful than it was. It would have been impossible to effectively prove the existence of a recognized gang without use of the name.

## B.    Character of Name was Probative

Second, the name could not have been sanitized or referred to by a euphemism, without removing substantial probative value. Many members who had admitted an Aryan Brotherhood existed insisted it was merely a social club for card playing and sharing ideas. (E.g., RT 19083.) Appellant's arguments acknowledge that the name "Aryan Brotherhood" is inflammatory; the name in fact constitutes "fighting words" to many. Prison was shown by the evidence to be an environment where "fighting words" were not ignored. The fact the group took on such an offensive, taunting name was probative evidence of the intent of those who joined the gang, as they could hardly have joined and taken on the name without expecting violence to follow. The name Aryan Brotherhood showed the character of the gang, and the intent of those who joined. It also implied the solemnity of the decision to join the gang, and so be identified by its inflammatory name. Identifying oneself by such a name in the racially charged atmosphere described by members was not a casual decision. Because of such considerations, the inflammatory name was probative evidence in the dispute as to whether or not the Aryan Brotherhood was merely a social club or was a gang likely to enforce blood oaths on its members, and therefore had motivation to commit murders outside of the prison.

## C.    Sanitization

Third, sanitization was a practical impossibility. It was simply not reasonable that, throughout the lengthy trial, the name Aryan Brotherhood would not be mentioned by some witness for the prosecution or the defense, regardless of any attempt to control them. Although instruction at such point could be tried, it was far more reasonable to avoid wasting resources trying to forestall the inevitable, and rather to prepare for such an event by allowing full airing of the issue at voir dire and at trial. This practical factor would strongly weigh in in favor of admission in any weighing process under section 352.

**D.  Prejudice Dispelled**

Any potential prejudicial impact, that is, irrational impact, of the Aryan Brotherhood name was eliminated in this trial.  First, both sides were allowed to voir dire fully on any possible prejudice maintained by the jurors against the name Aryan Brotherhood.  Although appellant attacks 42 prospective jurors as commenting on unpleasant connotations of the Aryan Brotherhood, appellant only singles out one juror who actually sat at the trial as having any express bias.  The colloquy with juror Ina Clark clears up any concern on this issue:

"Q.   All right.   Now, does the phrase, "Arian [sic] Brotherhood," mean anything to you?

"A.   Yes.

"Q.   Tell us what it means, please.

"A.   Only in the sense that the German Arian culture started the war -- Second World War -- as far as I know.

"Q.   Do you associate it with anything other than the German nation at that time -- at this time?

"A.   No.

"Q.   You do not.  Would that name, in and of itself, if it came up in this trial, because of your association with it -- cause you in any way in your opinion to, perhaps, not be a totally fair and impartial juror?

"A.   I don't think so.

"Q.   Are you quite certain?

"A.   Yes.

"Q.   Do you believe, like some people believe, that some people are just born bad, so to speak, and can never change?

"A.   No, indeed."  (RT 8555.)

As for the remaining jurors, the trial court assured appellant's counsel that anyone displaying actual bias on this basis would be excused for cause.  It is also striking, once again, that despite his present complaints, appellant retained eight peremptory challenges at the close of jury selection.  (CT 9471.)

Further, any prejudicial impact of the name faded given the extensive evidence on the gang's genesis, organization, and activities.  Appellant is correct in stating that the gang had little relation to anti-semitism or to loyalty to World War II Germany.  As the prosecutor

argued, any such mistaken negative notions as to the gang were dispelled. Rather, accurate negative notions were created. The jury was fully acquainted with the actual philosophy of the gang, including the policy of war with Black inmates, the casual attitude bordering on enjoyment of executing their fellow members and other persons in the general prison population, and the utter contempt for any authority outside of their own strength. Given this evidence of acts, no error or prejudice is shown.

## VI.

## THE PLEADING OF THE CONSPIRACY COUNT WAS COMPLETELY ADEQUATE

Appellant attacks Count XII of the information, which charges the conspiracy. Appellant points out that the date of the conspiracy was charged as "April to September, 1982" in Humboldt County, (CT 3078) and correctly notes that no member of the conspiracy was in Humboldt County during those months. Appellant concludes that appellant received insufficient notice of the charge.

Appellant's argument is undercut by the fact that the overt acts charged are all dated January through March 1983, (*id.*) that the verdict form describes the conspiracy as stretching from April of 1982 through March of 1983, (CT 10236) and by the clearcut notice of the charges appellant received before and during the trial.

The law is simple. A defendant has the right to notice of the crime with which he is charged. A defendant generally may only be convicted of the charged crime or a lesser included offense. However, where, as here, the crime charged is the crime proved, variances in pleading and proof will not require reversal "by reason of any defect or imperfection in matter of form which does not prejudice a substantial right of the defendant upon the merits." (Pen. Code, § 960; see *People v. Thomas* (1987) 43 Cal.3d 818, 830-832.) Unless appellant can show he was prejudicially misled as to the evidence or theories to be relied on by the prosecution, minor errors in wording of the charge are unimportant.[16]

Appellant's cited cases are not to the contrary. *People v. Valencia* (1980) 112 Cal.App.3d 939, 943-944 reversed a finding of a special circumstance because it was uncharged, and was so grossly different from the charged special circumstance that the defense may have limited its case in reliance on the special circumstance that was actually charged. Actual prejudice was therefore shown. In *Feagles v. Superior Court* (1970) 11 Cal.App.3d 735, 737-739, the Court of Appeal issued a pretrial writ because the proof at the grand jury proceeding of an overt act was legally insufficient. The case is not relevant here.

---

16. Further, given the patent self-contradiction in the charged count, appellant's failure to demur for uncertainty waived the issue. (*People v. Thomas* (1986) 41 Cal.3d 837, 843.)

*People* v. *Ramirez* (1987) 189 Cal.App.3d 603, 622 prohibited conviction of an <u>uncharged</u> crime. Such is not the issue here, where conspiracy was charged and proved. Finally, in *People* v. *Paul* (1978) 78 Cal.App.3d 32, 43, the Court ruled:

> "Can it be seriously maintained from all the facts and circumstances that the appellant was not aware of the charge against him, that he did not have an opportunity to prepare to meet the charge? . . . The appellant was not misled in any way by the pleading defect . . . Appellant had the benefit of pretrial discovery and was aware of the evidence against him. In addition . . . 'An information is sufficient if it contains in substance a statement that the accused has committed some public offense therein specified.'" (*People* v. *Paul, supra,* 78 Cal.App.3d at 43.)

Here, appellant was charged and convicted of conspiracy. The information contained a manifest misstatement as to the date of the conspiracy. That misstatement was insignificant. First, appellant tests the credulity of the court by claiming that defense counsel below could have had any doubt as to the substance of the prosecution's conspiracy theory. That theory, including Thompson's and Smith's stories, appellant's murders of Barnes and Hickey, and the Triplex robbery, <u>were</u> the prosecution case. Appellant was inundated with discovery on these topics, and was present through the preliminary hearing detailing much of the testimony. Throughout the numerous pretrial motions the prosecution was frank about its theory, and the defense showed itself well aware of the substance of the case. See, for example, the defense pretrial severance motion, RT 3475, discussing the conspiracy theory in detail, at 3483.

Then, at the end of the prosecution case in chief, during the motion for acquittal under Penal Code section 1118.1, the trial court expressly told the defense that the pleading was inaccurate, thus putting the defense on express notice not to rely on any abstract defect in the pleading. The court ruled:

> "Count Twelve indicates the count dealing with the conspiracy and the conspiracy was entered in Humboldt County. That is, of course, incorrect. It's also been known since the start of the case that [since] Mr. Thompson's roll-out that the site of the agreement was alleged to be Palm Hall. The

pleadings indicate overt acts were performed in both Los Angeles and Humboldt counties. The error in wording is there and has not prejudiced any party to this case." (RT 17784 (3/20/86).)

After this ruling, the record shows that the defense did not rest on such technical points, but rather, thoroughly sought to rebut every aspect of the conspiracy theory presented by the prosecution. An argument of prejudice simply cannot be made.

Finally, after argument, the court once again asked the defense if it wished to correct the Information. Appellant refused the offer. (RT 20929-31.) Whether this refusal was intended to waive the issue, confuse the jury or preserve error that was otherwise correctable, so as to enhance chances of reversal on appeal, is immaterial. Appellant had long since been apprised of the substance of this case. The technical pleading error was never a factor.

## VII.

## THE JURY SELECTION PROCESS WAS PROPER

Appellant's next issue concerns jury selection. Appellant believes the trial court wrongly rejected some of his challenges for cause, wrongly granted some prosecution challenges for cause and wrongly excused one sitting juror. Examination of the record and the law quiets all concern on this issue.

The basic law of review of voir dire is well settled. The first principle is that:

"Our Court of Appeal has stated that '"'"[t]he question of whether a prospective juror has a prejudiced state of mind amounting to actual bias is ordinarily an issue of fact left to the sound discretion of the trial judge." [Citations.] "It is also the rule that 'Where a prospective juror gives conflicting answers to questions relevant to his impartiality, the trial court's determination as to his state of mind is binding upon an appellate court.    . . .'" [Citations.]' (*People* v. *Clay* (1984) 153 Cal.App.3d 433, 450 [200 Cal.Rptr. 269].)" (*People* v. *Williams* (1988) 199 Cal.App.3d 469, 477; *People* v. *Coleman* (1988) 46 Cal.3d 749, 767, n. 10.).)

We discuss other legal principles as they arise.

### A.   Exclusion of Jurors

#### 1.   Kenneth Price

Appellant claims several jurors were wrongly excluded from service by the trial court. The most interesting such exclusion was of Kenneth Price (no relation to appellant) who was voir dired and sworn as a regular juror. Early in the trial, the trial court became aware that juror Price had concealed facts of his contacts with law enforcement; after a hearing, Price was excused and an alternate seated in his place.

During voir dire, Price had stated that he answered the jury questionnaire thoroughly:

"A.  . . . I spent over three hours answering this.

"Q. Okay. You spent three hours?

"A. Really made you reach down far and answer." (RT 5055-5056.)

Price stated he knew Dick Wild from the "Toastmasters" organization. Wild had been identified as a prosecution witness in the case. Price discussed their acquaintance as follows:

"A. He and I were both in Toastmasters International.

"Q. How often do you see Mr. Wild.

"A. Oh boy. Not very often. We don't see each other socially, if that's what you mean. . . .

"Q. When you were both in Toastmasters, would you see him regularly, like once a week, once a month?

"A. Oh, maybe once a month. . . .

"Q. Have you ever done anything just with, say, you and he preparing for a speech, taking a trip for Toastmasters or anything like that?

"A. No, sir. . . .

"Q. Now, have you ever discussed . . . Mr. Wild's work with [him], what they do?

"A. No, sir. . .

"Q. All right. What do you understand Mr. Wild to do for a living?

"A. He works for the State of California to the best of my knowledge. I believe a parole agent or he did at one time anyway. I don't know if he still does or not." (RT 9454-9455.)

Price was asked about his knowledge of life in state prison.

"Q. Okay. Have you read anything about life in state prison at all, Mr. Price?

"A. No. I knew a couple -- or worked with two guys that had served time, and I hear them speaking, but --

"Q. Was that very long ago?

"A. Seven or eight years ago. . . .

"Q. Did they ever speak about the violence in state prison at all or did they not talk about it?

"A. Yes, sir. They did.

"Q. Do you understand it to be a violent place?

"A. Anytime you confine people together, there is a potential for violence.

"Q. Do you believe people are capable of rehabilitating themselves?

"A. Yes, sir.

"Q. Do you believe that they do?

"A. Yes, sir." (RT 9460.)

Price was sworn on October 29, 1985 and sat through the early weeks of the trial. (CT 8488.)

On January 6, 1986, after about two months of trial testimony, the court became aware of Price's true background. In 1963, Price had been convicted of assault with a deadly weapon in Oregon and sentenced to state prison, where he served until his parole in 1965. (CT 1765, et seq.; RT 12321 et seq.) Price was supervised on parole in California by Dick Wild. (RT 12331.)

Later, in 1976 or 1977, Price was booked and arraigned for a crime in Humboldt County. (RT 12327.) The case was dismissed before the preliminary hearing. Price felt "anger . . . frustration . . . and humiliation" at the arrest, which "ruined a military career for me." (RT 12329.) Consequently, Price sued the District Attorney's Office among others. Price's specific target in the District Attorney's Office was then-Humboldt County District Attorney John Buffington, the presiding judge at the trial below. Price stated he eventually dropped the suit because, among other reasons, "my dispute was not with the District Attorney's Office but with the district attorney [Judge Buffington] himself." (RT 12329, see 12332.)

Price explained he did not mention the Oregon conviction and prison term and the parole supervision by Wild during voir dire because of a letter he had received from a "legal counsel" in the Oregon Governor's office. Price had received a pardon for the conviction in 1972. (CT 1761.) The subsequent letter he received stated:

"In my opinion, it is the law of Oregon that a full pardon not only remits punishment, but blots out of existence the guilt, so that in the eye of the law the offender is as innocent as if he had never committed the offense. See *Wood* v. *Fitzgerald*, 3 Or 568 (1870).

"If an individual's innocence in effect has been restored by a full pardon, it would be anomalous if he were required thereafter to state that he had been convicted, thereby incurring the disabilities of which he supposedly was relieved.

Consequently, in Oregon I believe an individual legally may answer "No" to such question, after receiving full pardon.

"At the same time, I have counseled persons that it generally is better voluntarily to apprise a prospective employer of a prior conviction and full pardon. This is particularly so if the prospective employment involves the exercise of some official function, public trust or law-enforcement duty." (CT 1760.)

Price stated he believed the pardon removed his need to ever answer truthfully not only about the conviction, but also about the prison term, the acquaintanceship with Wild, the knowledge he gained of prisons, and all other facts which could lead anyone to know of the conviction. Price did admit he wrestled at length with his conscience, and brought the pardon to court with him during voir dire, but concluded he could legitimately mislead the court.

As to the Humboldt County affair, Price thought he need not mention it because the criminal charges were dismissed. (RT 12325.) When he filled out the jury questionnaire he answered affirmatively the questions relating to whether he felt he had been fairly treated by the authorities after an arrest, then crossed these "yes" answers out. Price explained he was thinking only of the Oregon arrest, and crossed out the yes answers because of the pardon. (RT 12328.)[17]

After much testimony from Mr. Price, and much argument by counsel, the court stated its problems with the situation.

"MR. DePAOLI [defense counsel]: He said he could be fair. There's nothing been done to impeach that.

"THE COURT: Okay. I understand that. And I want you to premise your comments on that basis. I'm assuming he can be fair. I don't know whether that's true or not, but even so, I think if you were in [the prosecution's] position and you found out what you found out today, you'd be making the same arguments they are. But I don't know what to do about it. I think it comes down to the fact they've been denied the right to get rid of him on a peremptory." (RT 12345.)

---

17. The district attorney was in possession of a juror card on Price stating "this guy tried to sue the D.A'S office." The district attorney below explained that he discounted that statement based on Price's lack of testimony on voir dire indicating such activity. (RT 12346-7.)

On January 7, 1985, the trial court excused Price and seated an alternate juror, ruling in part:

> "In this situation Mr. Price concluded, with straight-forward logic, that his pardon meant he need not divulge a fairly significant event in his past. He felt uneasy enough about it to consider what to do for over five months. He concluded he did not need to divulge the conviction and pardon. That conclusion, while logically based on his understanding of the pardon's effect denied the prosecution significant knowledge about his background.

> "That information would not be obvious to the prosecutor since his jury card did not list any convictions. The previous local arrest being dismissed, the District Attorney was entitled to assume that Juror Price was free of previous felony convictions or state prison experiences. As it turns out those assumptions were not correct. The District Attorney has been denied the ability to question Juror Price at the appropriate time. That has interfered with the People's ability to exercise their peremptory challenges.

> "Pursuant to *People* v. *Diaz* (1984) 152 CA3d 926, 933 Mr. Kenneth L. Price, Sr. is excused from further service on this jury. The next alternate will be sworn. The Court has adopted *People* v. *Diaz, supra*, rather than *People* v. *Jackson* (1985) 108 CA2d 700 because the failure to disclose here is intentional and not inadvertent as in the *Jackson* case, *supra*." (CT 9133-4.)

We believe the trial court's ruling was correct on both common sense and technical legal grounds. To begin, it is obvious that Price's silence robbed the prosecution and the court of an adequate opportunity to voir dire, both as to peremptory and to cause challenges.

In the recent case of *People* v. *Burgess* (1988) 206 Cal.App.3d 762, 766-9, the trial court allowed a reopening of voir dire after the jury had been sworn, and after a juror had expressed possible hostility to the district attorney. The trial court denied a challenge for cause, and the Court of Appeal declared itself bound by that decision. The appellate court thus held the reopening to be error, though harmless, because a sworn juror may only be excused for cause. (*People* v. *Burgess, supra*, 206 Cal.App.3d at p. 766-9.) Unlike *Burgess*, the trial court here did not find the challenge for cause baseless. The juror below was shown on

strong evidence to have concealed highly charged facts.  Common sense compels the conclusion that such destruction of the voir dire process intrinsically constitutes good cause to dismiss a juror and seat an alternate under Penal Code section 1089, regardless of a showing of actual bias.

The trial court's decision is also supported by *People* v. *Diaz* (1984) 152 Cal.App.3d 926.  The trial court below expressly found the concealment by Price to be "intentional and not inadvertent." (CT 9134.)  Under *Diaz*, intentional concealment gives rise to a presumption of prejudice.  (*Diaz, supra*, at p. 935.)  Here, the trial court plainly resolved conflicts and found that the defense had not borne its burden of overcoming the presumption of prejudice.  Despite appellant's claim that later cases "rejected" *Diaz, Diaz* and those cases are in harmony.  *People* v. *Jackson* (1985) 168 Cal.App.3d 700, 703, *People* v. *Kelly* (1986) 185 Cal.App.3d 118, 120, 127, and *People* v. *Dyer* (1988) 45 Cal.3d 26, 58-9 concerned <u>unintentional</u> concealment.  *People* v. *Blackwell* (1987) 191 Cal.App.3d 925, 928-30 concerned intentional concealment, and, consistently with *Diaz*, presumed prejudice, which, in turn, that court found rebutted.

Here, the trial court's finding of intentional misconduct was tantamount to a finding of bad faith by Price.  Such an inference is supported by the court's reference in its ruling to appellant's uneasiness about his concealment.  The court took pains to avoid offending Price, whom it considered an admirably rehabilitated citizen.  Nevertheless, the express and implied findings of the trial court indicate that the presumption of prejudice was not rebutted.

We note further that no reasonable argument can be made that Price had no obligation to disclose the nature of his acquaintance with Wild, the source of his first-hand knowledge of prison, and other facts peripheral to the specific fact of his conviction.  Legally, it is well settled that a pardon does not "blot out" past wrong doing, but merely eliminates some direct consequences of the conviction.  For example, in California, a pardoned out of state conviction may still be used to trigger a habitual offender statute after a subsequent conviction.  (*People* v. *Biggs* (1937) 9 Cal.2d 508, 511-14; *see* Witkin, California Criminal Law § 1777; *People* v. *Sweet* (1989) 207 Cal.App.3d 78, 84.)

And, as for common sense, a pardon cannot reasonably be seen as allowing the subject to intentionally lie under oath as to every

peripheral fact which might reveal the fact of the conviction. Even Price's letter from Oregon stated only that he need not say he was "convicted," (emphasis added) and did not purport to address whether Price could deny he knew his parole officer, or where he learned first-hand of prison conditions. The trial court inferably found such conclusions unreasonable, and Price's silence intentional concealment.

At any rate, it is unassailable that any error was harmless under settled law because the seating of a properly voir dired alternate eliminated any possibility of prejudice. Appellant

> "was not entitled to be tried by a jury composed of any particular individuals. (*People* v. *Howard*, 211 Cal.322, 324-325 [295 P. 333, 71 A.L.R. 1385].) The juror who was substituted . . . was examined fully by both sides on *voir dire*, accepted as a qualified alternate and served as such from the start of the trial until seated as a regular juror. There is no claim that he was unable to render a fair verdict." (*People* v. *Abbott* (1956) 47 Cal.2d 362, 372. *Accord People* v. *Burgess* (1988) 206 Cal.App.3d 762, 766-9.)

There are only two exceptions to this flat rule of harmlessness. First, the rule does not apply to erroneous exclusion of jurors on *Witherspoon/ Witt* grounds, that is, mistaken exclusion of a juror on the ground he is overly hostile to the death penalty. (*In Re Arguello* (1969) 71 Cal.2d 1316.) This exception does not apply. The second exception consists of one case, and may be characterized as a factual exception which does not alter the general legal rule. In *People* v. *Hamilton* (1963) 60 Cal.2d 105, 127-8 a juror was removed by the trial court during trial, specifically because the juror expressed a pro-defense opinion, apparently based on the evidence entered at trial. This Court found such an act "stacked" the jury against the defendant, and, certainly gave rise to an appearance of a slanted system.[18]

As *Burgess* noted, *Hamilton* analyzed the wrongful exclusion issue for prejudice, rather than assuming that a proper alternate would ameliorate harm. (*Burgess*, *supra*, 206 Cal.App.3d at p. 769.) *Burgess*, perhaps questionably, engaged in a similar test and found harmlessness

---

18. *Hamilton* stated the error, when accumulated with other errors, required reversal. The Court did not hold that the juror's removal alone actually prejudiced the defendant. (*Hamilton*, *supra*, 60 Cal.2d at 128.)

on the facts there. Even ignoring the proper rule of per se harmlessness held by *Abbott* to result from substitution of a proper alternate, harmlessness is plain on the facts here. Appellant concedes "nothing in the present case indicates any actual bias on the part of Price." (AOB at 207.)          If this is true, then excusing Price was harmless. A fully qualified alternate was seated when Price was excused, and nothing suggests that this replacement "stacked" the jury in any way. If Price was biased, his bias was extrinsic to the case, not based on the evidence, and excusing him was justified by cause. We therefore move on to the question of exclusion of other jurors. (See *Ross* v. *Oklahoma* (1988) 487 U.S. ___, 108 S.Ct. 2273, 2275 et seq.; *People* v. *Wilkes* (1955) 44 Cal.2d 679, 686; *People* v. *Hernandez* (1979) 94 Cal.App.3d 715, 718-9; *see Coleman, supra,* at p. 770.)

## B.    Challenges for Cause

Appellant contends that the trial court erroneously denied numerous defense challenges for cause, some based on death penalty attitudes, others based on general competence. Some of the individuals allegedly wrongly passed by the court eventually sat on the jury, others were peremptorily challenged by appellant. Appellant's contentions of error find no support in settled law.

### 1.    Legal Principles

The law controlling such issues was recently settled in detail by this court in *People* v. *Coleman* (1988) 46 Cal.3d 749. First, this Court established:

"'the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." . . . [T]his standard . . . does not require that a juror's bias be proved with "unmistakable clarity."'" . . . A defendant seeking to exclude a prospective juror for cause, based on the person's

views of the death penalty, must therefore demonstrate that those views 'would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath" . . . .' (*Witt, supra*, 469 U.S. at p. 424 [83 L.Ed.2d at pp. 851-852]; see also *Ross* v. *Oklahoma* (1988) 487 U.S. ___, ___ [101 L.Ed.2d 80, 88, 108 S.Ct. 2273] [applying *Witt* in such a case].)" (*People* v. *Coleman, supra*, 46 Cal.3d at p. 764-5.)

The same standard applies both to exclusion on a <u>prosecution</u> challenge for conscientious objections to the capital punishment, and to exclusion on a <u>defense</u> challenge for overstrict tendency of a prospective juror to impose the death penalty. (*Id.*, at p. 765.) The standard does not require a rigid intent to "automatically" vote a given way on the case's particular facts; rather, the "substantial impairment" standard gives the trial court leeway to determine the fairness of the juror based on the intricacies of the case and the juror's psyche.

<u>Second</u>, given the acknowledged intricacies of the determining a juror's true feelings on the death penalty, the trial court's findings on conflicting facts will be considered binding on the appellate court. This is true even where the juror at some point stated an inflexible or impermissible view. (*Ghent, supra*, 43 Cal.3d at p. 768.)

<u>Finally</u>, this court discussed the nature of peremptory challenges and defense counsel's responsibility to ensure a fair jury in *Coleman*. This court endorsed the rule that:

"the defendant must exercise his peremptory challenges to remove prospective jurors who should have been excluded for cause, and . . . to complain on appeal of the composition of the jury, the defendant must have exhausted those challenges. (*Kimbley* v. *Kaiser Foundation Hospitals* (1985) 164 Cal.App.3d 1166, 1169 [211 Cal.Rptr. 148].) As stated in *Kimbley*, 'It has long been the rule in California that exhaustion of peremptory challenges is a "condition precedent" to an appeal based on the composition of the jury. [Citation].'" (*Coleman, supra*, 46 Cal.3d at p. 770; see also *People* v. *Wilkes* (1955) 44 Cal.2d 679, 686; *People* v. *Hernandez* (1979) 94 Cal.App.3d 715, 718-719.)

This rule was specifically approved as proper by the Supreme Court in *Ross* v. *Oklahoma* (1988) 487 U.S. at ___, 101 L.Ed.2d 80, 91-2.

Appellant waived error by failing to peremptorily challenge the jurors he alleges were seated erroneously.

This last issue of waiver is of course a threshold question in this case. At the end of selection of the jury below, appellant retained eight peremptory challenges. (RT 9471.) At the end of the selection of alternates, appellant retained two of the additional eight peremptory challenges granted for that procedure. (CT 9728.) The law, as settled by *Coleman*, is that appellant has waived his right to challenge the court's failure to exclude any juror for cause.

Appellant may assert a distinction between this case and *Coleman* in that here, two challenged jurors were seated as regular jurors, and two others were seated as alternates, and eventually replaced regular jurors and heard the case. In *Coleman*, defense counsel properly used peremptory challenges each time he believed a cause challenge was erroneously denied, so no objectionable jurors sat. But, *Coleman* makes it clear that it is the responsibility of defense counsel to use his peremptories in this manner to excuse those jurors believed to be unfair. (But see *People* v. *Box* (1984) 152 Cal.App.3d 461.)

Finally, appellant claims the waiver rule is not absolute. This court noted in *Coleman* that in one recent case, *Box*, *supra*, 152 Cal.App.3d 461, the Court of Appeal excused the failure to exhaust peremptory challenges and reversed. *Box* found special factors that distinguished that case and excused it from the general rule. First, that court stressed that only <u>one</u> peremptory challenge, not "several" was left unused, and that defense counsel may consider saving the last peremptory prudent, in that the unchallengeable replacement might be worse than the unseated juror. Further, the serious substantive error in *Box* was the limitation of defense counsel to ten instead of 26 peremptories, plainly a serious infringement on the right to peremptory challenges.

In contrast, appellant here retained 8 of his rightfully allotted 26 peremptory challenges at the end of regular voir dire, and 2 of 8 at the end of voir dire of the alternates. This case is not comparable to *Box* even on *Box'* own terms. We therefore only briefly discuss appellant's lengthy attack on the waiver rule. Appellant claims prejudice because the court made numerous errors as to cause challenges, which would have caused him to waste numerous peremptories. He therefore settled for a given jury with 8 peremptories left, rather than risk a worse

jury. We believe the legitimate function of peremptory challenges must be to serve as a safeguard to correct trial court mistakes on cause challenges, and perhaps to screen out the worst jurors passed for cause, ones who counsel perceive are borderline prejudiced jurors. Peremptories are not designed to allow for a games playing attempt to secure a jury more favorable to one side or the other. So long as the defense has peremptory challenges remaining, it is protected, because, it may be inferred, no truly undesirable, cause challengeable, or even nearly cause-challengeable juror will remain. (See *People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1082-7.)

Appellant's claim that he is entitled not to a "fair" jury, but to the "fairest" jury possible, is an ill disguised assertion of a right to attempt to secure a pro-defense jury. Such is not the proper function of peremptory challenges.

The number of peremptories allowed is a function of statute. At some point, appellant will run out, and the possibility that he would wish more to fine tune the jury is not of legal significance.[19] Here, had a truly prejudiced juror remained, appellant had peremptories remaining. The result, regardless of the precise membership of the panel, is by constitutional definition a "fair" jury.

## 2. Denial of Defense *Witherspoon/Witt* Challenges

Appellant claims *Witherspoon/Witt* challenges were wrongly denied for eight jurors. We discuss these jurors only briefly. Only the first two jurors actually sat at the trial, rendering arguments on the remaining six insignificant. At any rate, the conflicts in each juror's testimony as to death penalty attitudes are obvious in the record. The trial court's discretionary decisions on these jurors were fully supported.

Susan Hinds. Susan Hinds served as a regular juror at trial. In response to voir dire by the trial court Hinds stated:

"THE COURT: I take it what you're telling me is that you would be able to follow the Court's instructions on the finding of guilt that the People must prove beyond a reasonable doubt

---

19. Note that the number of peremptory challenges in a capital case has been reduced from 26 to 20. (Code of Civil Procedure, § 231.)

that there's a first degree murder and there's one or more
special circumstances --

"PROSPECTIVE JUROR:  Yes.

"THE COURT:   -- to the jury's satisfaction before you
would vote for such a verdict?

"PROSPECTIVE JUROR:  (Nods head.)

"THE COURT:   On the other hand, once the penalty
phase was instituted, if we got that far, you would be
approaching it with an open mind?

"PROSPECTIVE JUROR:  Yes.

"THE COURT:  You would listen to the Court's instruction
on the law?

"PROSPECTIVE JUROR:  Yes.

"THE COURT:  And you would weigh the circumstances
in aggravation and mitigation?

"PROSPECTIVE JUROR:  Yes."  (RT 3466-7.)

Later, in response to leading questions by defense counsel, Hinds replied
"yes" to defense counsel's suggestion that the death penalty ought to be
automatic in case of a premeditated murder.  (RT 3471.)  In reply to
defense counsel's suggestion that that feeling on her part was fairly
strong Hinds replied "yeah."  (RT 3472.)

The prosecutor argued, we believe reasonably, "she indicated
that it would be difficult for her to set those beliefs aside, and she also
indicated that <u>she would follow the law</u> and that she could set those
belief (sic) aside.  And that's probably the key here."  (RT 3476.)  The
judge evidently agreed, as he denied the challenge for cause.  (CT 8499.)
No error appears.

Loyce Stovall.  Stovall served as a regular juror in the case.  At
the outset of Stovall's testimony she repeatedly stated she would
approach the case and the penalty phase with an open mind.  (RT 5313-
5316.)  In response to the court's question:

"What I need to know is whether you think, having
returned that first degree verdict plus the truth of the special
circumstance, that your mind would already be made up going
into the penalty phase.

"PROSPECTIVE JUROR:  No.  I think I would want to
hear everything to the end."  (RT 5316.)

Later, after defense counsel asked numerous questions bringing out Stovall's feelings that "take a life, be prepared to pay with your own life," (RT 5319) defense counsel asked:

"Q. Then, we get to the penalty phase. So, you've already -- have found he committed two murders.

"A. You mean, would I not even consider life in prison without parole?

"Q. Yes. Ma'am.

"A. No. I would consider it. I'm sure there would be a lot of stuff along the way that makes you think about this thing a lot.

"Q. Would in your opinion the defendant in this kind of case start off with any sort of disadvantage or would you have an open mind at the penalty phase?

"A. At the penalty phase? No. I think I would probably have an open mind." (RT 5322-23.)

Finally, after Stovall answered the court saying she thought she could put aside any strong feelings with which she entered the trial, the court asked:

"You understand that if you are chosen to serve on this jury, that's going to be the requirement that you follow the law. You think you can do that; is that correct?

"PROSPECTIVE JUROR: Yes." (RT 5327.)

Appellant's argument that the court denied the defense challenge on the basis of "two pro forma of questions" is baseless. No error appears.

Gertrude Bertelsen. Bertelsen was excused from service after a peremptory challenge by the defense. After extensive instruction on the law of the case, (RT 3339-3348) Bertelsen stated she had strong feelings that "I believe if they take a life they should give a life." (RT 3348.) However, Bertelsen continued in response to the court's questions:

"THE COURT: Could you as a juror vote for the death penalty in a case where you've heard all the evidence introduced on the question of guilty, (sic) special circumstances and punishment and you've been properly instructed by the court as to the law that is applicable?

"PROSPECTIVE JUROR: I would have to go by the law.

. . .

"THE COURT: If the court instructs you that murder in the first degree is not enough, that there needs to be more, would you follow the court's instructions?

"PROSPECTIVE JUROR: Well, -- yes." (RT 3348-9.)

Bertelsen stated "I guess that's right," When defense counsel suggested that "a criminal defendant has spent time in state prison before he is more likely to be guilty than not, correct? (RT 3356.) This of course is a logical inference. Evidence on this ground is excluded because the inference is <u>too</u> probative, not because it is illogical. (See Witkin, California Evidence (2nd Ed. 1966) § 341 at p. 300.) The important point is that when the trial court informed Bertelsen that she must "set those personal opinions aside and follow the law the court gives you in this case . . ." Bertelsen replied "I feel I could listen to the law." (RT 3357.) The reasonable interpretation of Bertelsen's last answer, that she fully intended to follow the court's instructions, supports the court's denial of the challenge for cause in this case. That interpretation was the trial court's to make. No error appears.

<u>Larry Glenn</u>.    Glenn was <u>excused</u> from service after a peremptory challenge by the defense. (RT 9223.) Appellant argues Mr. Glenn was overly strong in his support of the death penalty. The following exchange occurred early on in the trial court's voir dire of Mr. Glenn:

"PROSPECTIVE JUROR: I don't feel it should be in every case. But, as I said before, if in my mind it's proved beyond a doubt that he's -- whoever is guilty, then I feel that it's just there's no reason for the people of California to support someone behind bars for the rest of their life.

"THE COURT: Do you understand that's fine if you have that feeling, but the feeling based upon the cost to the state or -- that's not to come into this. What you're going to have to do at the penalty phase is to weigh evidence, circumstances in° aggravation, presented by the People against circumstances in mitigation presented by Mr. Price and his attorneys. You must do that fairly and impartially.

"All right. Do you think -- do you think you could do that?

"PROSPECTIVE JUROR: I think I could. Yes." (RT 5580-1.)

Next, defense counsel postulated that appellant was found guilty of the crimes charged in the information, related in a damming manner by the defense counsel, and asked Glenn:

"Even if the defendant and his lawyers were producing evidence that did not in any way excuse the crimes he found him guilty of but that were positive things about his character, person, his family?

"A. [Juror Glenn]: I feel that the death penalty should be -- is what should be issued." (RT 5583.)

The prosecutor replied in his own voir dire by asking Glenn:

"If you found the mitigating factors outweighed the aggravating factors, the reasons why life without possibility of parole was the appropriate punishment were of greater weight than in other factors, could you come back and sentence the defendant to life without possibility of parole?

"A. Yes. I could." (RT 5586.)

The trial court did not abuse its discretion in denying the defense challenge. No error appears.

James Hill. Mr. Hill did not sit on the jury panel that tried this case. Early in his voir dire, the trial court explained at length to Mr. Hill the function of the penalty phase, stating among other things:

"The law requires that [the jurors] fairly and impartially listen to the additional evidence and in accordance with the law that they will be given at that time weigh that evidence . . . If the mitigating circumstances . . . outweigh the aggravating circumstances, they shall return a sentence of life without possibility of parole. . . . My question to you is: Are you the sort of person, knowing yourself, who would in each and every case enter a verdict for the death penalty?

"PROSPECTIVE JUROR: I have no experience in it, your Honor. But I would say probably not." (RT 6123.)

Later, after defense counsel related the crimes appellant had been accused of in some detail, counsel asked:

"Do you think, sir, that knowing yourself as you do inside, that if those were the facts as I have related them in my hypothetical to you and you were a juror involved in the penalty phase, that you could consider arguments by the defendant and as counsel and arguments and facts presented by them for a life

sentence, or would you automatically, having known he was convicted of the things I have told you, vote for the death penalty?

"A. Pardon me. Weighing the mitigating circumstances, I could come up with the decision for life." (RT 6130.)

Next, after defense counsel again postulated appellant guilty of all of the crimes, and adding that the defense presented some:

"Good facts, such as he was good to his family, he wished to make a contribution to society, he liked helping other people, could you really, honesty weigh those things in light of what the finding has been and consider a life without possibility of parole?

"A. No." (RT 6131.)

It is clear that the court concluded that Hill merely meant that under those circumstances such general facts would not be sufficient mitigation to outweigh his belief that the death penalty was appropriate. This conclusion was supported by the previous record and finally by Hill's statement at RT 6133 in answer to the prosecutor's question whether he could consider all of the mitigating and aggravating evidence, "A. Yes. I think so." The challenge for cause was properly denied. No error appears.

Robert Meyer. Meyer was excused from service after a defense peremptory challenge. (RT 8900.) Mr. Meyer began by repeatedly stating to the trial court that he could put aside his personal views and follow the law as instructed. (RT 6515-17.) Next, after defense counsel hypothesized that appellant was found guilty of all of the crimes charged, related in some detail, defense counsel asked:

"Do you believe in that kind of case, sir, if those were the facts that you would be unable to consider evidence -- consider and weigh evidence presented by the defendant to ask for a life without possibility of parole sentence because in that kind of case the penalty automatically should be death? . . .

"PROSPECTIVE JUROR: No. I'd be able to take into other consideration beyond the penalty phase. Yes."

Given defense counsel's forceful statement of appellant's potential guilt, Mr. Meyer expressed some difficulty in finding in favor of life without possibility of parole. However, first and last, Meyer maintained that he would consider all mitigation, and that he could put

aside his personal feelings and rule on the evidence. The defense challenge was properly denied.

Gerald Eggleston. Gerald Eggleston was excused from jury service after a defense peremptory challenge. (RT 9167.) Early in his voir dire, Eggleston replied as follows to the court:

"THE COURT: Okay and I want you to assume you're a juror who serves on a jury who's . . . found first degree murder and they found the truth of one of those special circumstances.

"PROSPECTIVE JUROR: Right.

"THE COURT: Do you have your mind made up at that point what the penalty ought to be?

"PROSPECTIVE JUROR: It's hard to answer. I don't really know. I think some place in there I believe you're going to have to tell us where the law lies. . .

"THE COURT: So what you're telling me since you don't know enough about the law, you're uncertain, but you don't believe anything is cut and dry or automatic; is that the idea?

"PROSPECTIVE JUROR: Yes." (RT 7156-7.)

Next, on voir dire by defense counsel, Eggleston listened to defense counsel's description of appellant's hypothetical guilt of all of the crimes charged:

"Do you think that if those crimes were the crimes that were proved to you and you had to get the penalty phase, that the penalty for that kind of situation should automatically be death without regard to arguments and facts for life without possibility of parole?" (RT 7161.)

Eggleston answered "I think so," which alerted the trial court and the prosecutor to a problem, and both extensively re-asked the question of Eggleston whether in fact the death penalty would be automatic or whether he could listen and fully consider mitigating circumstances after a special circumstance was found. Eggleston repeatedly affirmed that he would listen and consider the mitigating evidence:

"Q. [THE PROSECUTOR] [Could you] listen to additional evidence, some of which might point towards the death penalty, some of which might point towards life without possibility of parole.

"Can you do that, too?

"A.  I believe so.

"Q.    And not make up your mind which sentence is appropriate until after all of the evidence is -- is received and the arguments are made in the penalty phase of the case?

"A.  Yes." (RT 7163-4.)

Next, the trial court repeated similar questions and Eggleston replied:

"You explained there would be a recess, and there would be additional -- these people get to say their own side.  Then you make up your mind again, more or less.

"THE COURT:  You would be able to do that?

"PROSPECTIVE JUROR:  I believe so.

"THE COURT:  Your mind wouldn't already be made up that based on those facts there shouldn't be a death penalty imposed right then?

"PROSPECTIVE JUROR:  I don't believe so.  I think I should listen . . . to the additional testimony . . . then go back and discuss it and make your decision that way." (RT 7165.)

On this record, denial of the defense challenge for cause was proper. Furthermore, the court acknowledged that Eggleston indicated an openmindedness on the one hand, and then, in answer to one of defense counsel's questions, seem to indicate a more mechanical attitude towards the death penalty.  The court indicated it would deny the challenge, but would allow further questions to clarify the issue later on.  (RT 7168.) Failure to take up the court's offer again waived any objection on defense counsel's part.  No error appears.

Manuel Ferreira.  Manuel Ferreira was excused from service after a defense peremptory challenge.  (RT 9407.)  In response to a recitation by defense counsel of the facts of the crimes, Ferreira stated "yes" when asked by defense counsel "so that's the kind of person that should automatically get the death penalty." (RT 7911.)  The prosecutor clarified Ferreira's answer to that question by asking Ferreira if he understood that nothing was automatic as far as the penalty phase was concerned.  Ferreira stated he understood that and could follow such instruction.  The prosecutor continued:

"Q. With the facts as given to you by the defense attorney, he didn't tell you any positive things about the defendant or any mitigating circumstances about the defendant, did he or do you remember hearing any?

"A.  No.

"Q.  Just told of the murders, the robberies?

"A.  Yeah.

"Q.  And everything else.  So under those circumstances, you think that the death penalty would be appropriate?

"A.  (Nods head.)"  (RT 7912.)

Ferreira went on to state that he would consider aggravation and mitigation at the penalty phase, and that he understood that "I have to follow the law." (RT 7913.)  Ferreira stated that based on the evidence related by the defense counsel, he would vote for the death penalty in the absence of any mitigating evidence, but that he would be willing to consider any presented mitigation. (RT 7913-14.)  Any problem on this issue was put to rest by the trial court who asked of the juror:

"Would you be the sort of person who could consider imposing life without possibility of parole if [defense counsel's] situation is true??

"PROSPECTIVE JUROR:  I think so.

"THE COURT:  Okay.  You could?

"PROSPECTIVE JUROR:  Yes.

"THE COURT:  So its not automatic?

"PROSPECTIVE JUROR:  No.  Its not automatic." (RT 7919.)

Given the prospective juror's answers, the denial of the challenge for cause was supported by substantial evidence.  No error appears.

### 3.  Contested Denials of Defense Challenges (Non-Witherspoon/Witt Grounds)

Zetta Southworth.  Appellant refers, without quotation, to several brief comments made by juror Southworth in answer to leading questions by defense counsel, answers which give an impression that Southworth might have had a false impression of the law.  In fact, a reading of her entire short voir dire shows Southworth expressed complete willingness to follow the law, and, when the court corrected her false impression of legal requirements, perhaps left with her by defense counsel's questioning, Southworth reaffirmed her intention to follow the court's instructions.

Southworth began by stating she would make up her mind about penalty based on the facts of the case.  The court informed

Southworth that this was not quite correct, and that there would be a penalty phase in which evidence bearing on a penalty would be presented. (RT 7191.) Southworth accepted this procedure, stating she would consider such evidence before deciding on a penalty. (RT 7191-2.)

Defense counsel then postulated that Southworth had found appellant guilty of a series of terrible crimes and asked what her penalty decision would be. Southworth replied that she had a strong feeling in such circumstances that death was the appropriate punishment. (RT 7194.) The prosecutor then corrected the false impression left by defense counsel's questions and informed Southworth that additional evidence bearing on penalty would be presented at the penalty phase, evidence which she would be expected to consider. (RT 7195.) Southworth agreed to consider such testimony. Defense counsel had another turn, and in response to one of his questions, Southworth stated that the lack of a guilty conscience would be a strong factor in her decision. Defense counsel also brought up the burden of proof, without stating what the proper burden of proof should be, and got Southworth to indicate that she might expect the defendant to carry some burden of showing mitigation. (RT 7198.) To clarify matters, the trial court explained:

> "THE COURT: Okay. The real crux of this issue comes down to would you, having returned that first degree murder verdict and the truth of the special circumstance, be able to listen to and choose or would you have your mind already made up?
>
> "PROSPECTIVE JUROR: No. I would be able to listen and choose. I -- I keep an open mind until everything is --
>
> "THE COURT: So even though the facts that Mr. DePaoli's given you are relatively gross or gruesome and you did find them all to be true, you could listen to other evidence and make a choice based on that evidence?
>
> "PROSPECTIVE JUROR: Yes.
>
> "THE COURT: And you could, if the evidence showed it to be correct, vote for life without possibility of parole?
>
> "PROSPECTIVE JUROR: Yes." (RT 7200.)

On this record, rejection of the challenge for cause was fully within the trial court's discretion.

Appellant goes on to cast aspersions on Southworth's ability to be a juror based on reports that she was seen intoxicated numerous times by a court worker who was her neighbor. (RT 9245.) Mrs. Southworth was later arrested twice during the lengthy trial for driving under the influence, and convicted once. (RT 12295, 12454.) Her probation revocation on the second count was postponed with the consent of the district attorney's office and her attorney until after the trial. (RT 22649.)

The law governing review of trial court decisions on general juror bias is essentially the same as the principles of review of *Witherspoon/Witt* error:

"Our Court of Appeal has stated that '"'"[t]he question of whether a prospective juror has a prejudiced state of mind amounting to actual bias is ordinarily an issue of fact left to the sound discretion of the trial judge." [Citations.] "It is also the rule that 'Where a prospective juror gives conflicting answers to questions relevant to his impartiality, the trial court's determination as to his state of mind is binding upon an appellate court. . . .'" [Citations.]' (*People* v. *Clay* (1984) 153 Cal.App.3d 433, 450 [200 Cal.Rptr. 269].)" (*People* v. *Williams* (1988) 199 Cal.App.3d 469, 477.)

Here, the court's pretrial decision was supported by substantial evidence.[20] And, appellant waived any issue on this point by declining to peremptorily challenge Southworth, and by failing to exhaust his peremptories.

As to Southworth's arrests during trial, appellant did not request she be excused for cause for this reason. At any rate, the trial court was sensitive to the problem and its declining to seat an alternate for Southworth constituted a finding that she was a capable juror. Appellant points out that *Williams*, *supra*, the Court of Appeal affirmed the excusing of a juror because he was being prosecuted by the same district attorney's office, basing the affirmance on the trial court's perception of possible prejudice. But, that opinion stands not for the principle that such jurors <u>must</u> be excused, but rather for the principle that the trial court's discretion in such circumstances must be trusted. (*People* v.

---

20. Appellant alleges Southworth flatly denied she drank. Actually Southworth only denied she had a drinking problem, and she pointed out that she worked daily without any alcohol-related problems. (CCT 1689-90.)

*Williams* (1988) 199 Cal.App.3d 469, 477; see also *People* v. *Keenan* (1988) 46 Cal.3d 478, 531.) Appellant cites no cases requiring excusing a juror under these circumstances. No error appears.

<u>Debra Kramer</u>.   Appellant next produces a laundry list of complaints against juror Kramer. Appellant's first group of complaints prove nothing except a possible pro-defense bias on the part of Kramer. Specifically, appellant notes that Kramer belonged to the same Synagogue as defense attorney Klay; Kramer's husband played cards with Klay's husband; and that defense attorney DePaoli, as a former deputy district attorney, had prosecuted a case in which Kramer was a victim. (RT 7393.)

Next, appellant complains that Kramer, a Jew, testified that "Aryan Brotherhood" had for her an antisemitic connotation. (RT 7393.) Nevertheless, Kramer's later statement that she could judge the case on its evidence was believed by the trial court and so defused this issue.

Finally, appellant notes a number of factors which connected Kramer to the trial. First, Kramer's husband Dr. Richard Kramer at one point was asked questions as an expert psychologist by the police department concerning Berly Petry's polygraph examination. Later, Mrs. Kramer received a subpoena for records concerning that interview. Mrs. Kramer's response to that subpoena was to refuse to have anything to do with it because she was on notice of jury duty in the present case. It may be inferred that Mrs. Kramer's diligence in this regard impressed the trial court.

Dr. Kramer was also employed by the court to prepare a competency report on appellant. (RT 8006-7.) Although Dr. Kramer was never called as a witness, his report apparently was referred to in passing by one defense psychologist. (RT 22148.) Finally, a friend of Dr. Kramer gave noncontroversial testimony at the trial. (RT 18216.)

Mrs. Kramer testified to, and demonstrated, her willingness and ability to separate the trial from her personal life. The only worries she expressed with regard to her possible fairness in the case concerned speculation that her husband would be called as a witness, or that her memory would be jogged as to possible past events which might prejudice her. After discussion of the preliminary facts at the first voir dire of Mrs. Kramer, the trial court queried her as follows:

"THE COURT:  Ma'am, what we need to know and only you can answer this, because of the background and the various

things you know and whatever problems you may foresee in being able to perform this service, do you feel that you would be able to listen fairly and impartially and follow the law or is that going to be something that you feel like you can't do? I need to know that now. I know that's hard to answer. I need a yes or no.

"PROSPECTIVE JUROR: I think I could do it." (RT 7394-5.)

Finally, after all of the events outlined had been aired and thoroughly discussed, the prosecutor ended Mrs. Kramer's voir dire as follows:

"BY MR. DIKEMAN: Q. If that doesn't occur [(Dr. Kramer's testifying)] and you are already advised of other things that might cause one side or the other to be less than satisfied with you as a juror, but if those things don't occur as to your state of mind, is there any reason why you couldn't be fair to both sides?

"A. I don't -- I don't know. It's a really hard question to answer.

"Q. Sure it is.

"A. I think I would make a good juror. I think I would do everything I could to be fair. I'm just not sure that in this particular case that's the best thing to do, that's best for me to be there.

"Q. Because of these two potential problems that you foresee?

"A. Because of all the what if's. (RT 8019-20.)

Mrs. Kramer gave no indication during the trial that there was any reason to doubt her sincerity, nor her ability to be a fair juror. We note again, that appellant at no time lodged a peremptory challenge against Mrs. Kramer. On this record, the issue was waived, and, at any rate, the trial court's decision was fully within its discretion.

Chester Aggeler. Appellant posits error in the denial of a cause challenge to Aggeler despite the fact that Aggeler was excused from service on a defense peremptory challenge.

Aggeler was acquainted with a clerk, Mr. Garrisi, who was robbed at the Liquor Still store, and Aggeler had heard a few facts about the robbery, although the clerk did not like to talk about it. The

clerk "said something about . . . there was an apprehension," although Aggeler knew no incriminating facts concerning the case. (RT 9046.) Aggeler also knew numerous police officers. The court ruled:

"THE COURT: All the law requires as I understand it, no matter how many times he goes to the Liquor Still or the Village Liquors, whichever it is, is that he be able to be fair and impartial to both sides and say so. I thought he said in regard to your question, 'Yes, I know Mr. Garrisi, but I would make sure that I have no bias in his favor.' Is that not what he said?

"MR. BASS: That's what he said and that's what he said on the form as well, your Honor, that we had him fill out. And 'The cops are not gods.'

"THE COURT: I can't sit up here and invent reasons to excuse jurors.

"Denied." (RT 9052.)

No error appears.

### 4.    Contested Sustained Prosecution Challenges

Appellant challenges the exclusion of two jurors who were rejected for their professed inability to vote for the death penalty even where the law indicated it would be appropriate. Appellant analyzes the answers of these jurors and attempts to compare them with jurors who were seated by the court over defense objections of strong pro-death penalty bias. Appellant's point seems to be that the trial court must apply one mechanical standard to all jurors. That is to say, the court must decide a set standard for when an answer by a prospective juror indicates an attitude sufficiently "automatic" either pro-or anti-death penalty, to justify exclusion. Appellant seems to postulate when any prospective juror gives one answer rising to this level of "automaticity" that juror must be rejected. Appellant's arguments bear no resemblance to the settled law on the subject, which, as quoted *supra* recognizes the complexity of the inquiry, and entrusts the decision on conflicting answers to the trial court, even where the juror at some point expresses an "automatic" attitude:

"If there are conflicting answers to the voir dire, the court may assess the jurors' state of mind and is not bound by statements which, taken in isolation, are unequivocal. When

such a prospective juror has both equivocated and taken (at some point) a clear stand, the wisdom of entrusting the ruling on the challenge for cause to the trial court becomes clear . . . Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . [T]his is why deference must be paid to the trial judge who sees and hears the juror.' (*Wainwright* v. *Witt*, *supra*, 469 U.S. at pp. 424-426 [83 L.Ed.2d at p. 852].) (*People* v. *Coleman*, *supra*, 46 Cal.3d at p. 767, n. 10.)

On this standard, the trial court's decisions were correct.

Janet Oligschlager. Oligschlager's voir dire began with her answering the court's question as follows:

"[The Court]: I think what you're telling me is that you have such a conscientious opinion concerning the death penalty that your feeling is that you couldn't vote for it even though the People presented evidence that would indicate it's a proper punishment, correct?

"PROSPECTIVE JUROR: Correct." (RT 4757.)

Although she stated to defense counsel that she "could try" to put aside her feelings on the death penalty (RT 4758), she closed her testimony as follows:

"THE COURT: . . .

"You can't think of a fact situation that would cause you to vote for the death penalty because of your feeling about participating in the verdict that would end up taking another person's life; is that correct?

"PROSPECTIVE JUROR: Um-hmm. Pretty much. Yeah." (RT 4761.)

The trial court sustained the People's challenge for cause. There is no doubt that this ruling was correct.

Sandy Natt. Again, the propriety of excusing Sandy Natt for cause is not a close question. Mr. Natt began by answering the court as follows:

"THE COURT: So are you of the opinion that you could not vote for death if the People proved the case?

110

"PROSPECTIVE JUROR: I don't think I could." (RT 5417.)

He replied to the prosecutor:

"If you found in your own mind that the bad things about Mr. Price outnumbered the good things, that the aggravating evidence was of more weight, could you come back into this courtroom where Mr. Price was seated at the counsel table and sentence him to death?

A. Un-huh. Right. Now, I say I don't think I could.

"Q. Okay. If the jury did that and the verdict was read aloud, 'We the jury in the above-entitled case sentence the defendant Curtis Price to death.' And the jury was asked as a whole, 'Ladies and gentlemen, is that your verdict as read?' Could you answer out loud, yes, it is?

"A. Like I say, I don't think I could. I don't know. Might be -- if he had enough real bad stuff about him, maybe I could. But I don't really think I could. I don't really think I could." (RR 5424-5.)

When defense counsel asked Mr. Natt if he could try to follow the law, Natt compounded the problem by stating:

"A. Yeah. But deep down, I'm thinking I'd find this guy guilty, then I would have to go into this other phase of it. That I would have trouble with." (RT 5427.)

This last statement was an independent reason to reject Mr. Natt, as it showed his guilt phase deliberations would be colored by his opposition to the death penalty. Although Mr. Natt closed by telling defense counsel that he would try his best to follow the court's instructions, no reasonable argument can be made that the trial court abused its discretion in excusing Mr. Natt for cause under the *Witherspoon/Witt* standards.

## C.  Conclusion

In sum, appellant's long list of voir dire grievances reveals no single erroneous decision as to a juror. Any error as there may have been was harmless beyond any doubt. No prejudicial error appears.

## VIII.

### THE COURT'S ORDER THAT APPELLANT BE SHACKLED IN COURT WAS FULLY JUSTIFIED BY THE RECORD AND WAS HANDED DOWN ONLY AFTER DILIGENT EFFORTS AT MITIGATION BY THE TRIAL COURT

Appellant contests the propriety of the order by the trial court that appellant be shackled by a unobtrusive belly chain under his shirt connected to a specially designed chair in court. The order followed more than a year of violent misconduct and threats by appellant, and a long series of hearings on the conduct. On this record, the trial court's action was judicious and proper.

### A.  Factual Background

On March 3, 1983, appellant was arrested and taken to the Humboldt County Jail. Appellant was housed in the Humboldt County Jail from March 3, 1983, in "super maximum security" because he was suspected of violent crimes, and had a past prison record. After several weeks, Eureka County Jail Classification Officer Ciarabellini learned from parole officer Dick Wild that appellant was considered a member of the Aryan Brotherhood, and was extremely dangerous. After learning this, Officer Ciarabellini issued an order that during all movements in the jail appellant was to be restrained by shackles, and accompanied by at least two officers. (RT 89, CT 4003.)

The trial court described appellant's later housing in a subsequent ruling as follows:

"When Mr. Price was first housed in the Humboldt County Jail he was placed in a two-man barred cell on the fourth floor. After a number of days he was moved to a nearby single-man cell with a solid steel door which had a small window. Mr. Price remained in that cell until June 29, 1983, when he agreed to move to a similar cell on the third floor. That move was not a reclassification nor a disciplinary move. It was apparently caused by Mr. Price's complaints about the 4th floor cell's ventilation, space restrictions and lack of T.V. At that time, the agreement stated: 'Price is still considered a security risk and

112

will be considered as such.' Mr. Price signed this agreement apparently with assurances that he would waive no legal rights. Mr. Price remained in this cell until August 28, 1984, when Mr. Price broke out the cell door window and knocked a hole in a wall of the cell. Shortly thereafter, Price was moved to the N.E. maximum security wing. In that wing there are three cells. Mr. Price occupies the middle cell; the other two have, since his placement there, been kept vacant by jail personnel. The space outside the cell provides some room to walk and do some exercises. Mr. Price is denied any extensive contact with other prisoners." (CT 4003-4.)

On December 3, 1984, appellant filed a writ of habeas corpus complaining of his treatment at the hands of jail staff. (CT 3799.) The court granted the writ and ordered an extensive hearing on December 13, 1984, including a personal tour of the jail and appellant's cell area. Evidence of misbehavior by appellant was entered. Specifically, evidence showed that once as Sheriff's Deputy Filyau opened appellant's cell door appellant had leaped out and punched the deputy. Witnesses stated that no provocation other than past bad feelings existed for appellant's assault. (RT 439-443.) Appellant had also been reported for springing through an open cell door and punching another inmate. (RT 443.) Appellant had been reported as having threatened officers, inmates, and their respective families. (RT 364.) Also, appellant declared that he had disliked one cell in which he was housed, and that the

"isolation and chains got to be too much for me to deal with. I asked them to move me out of that cell. They said no. I told them to move me or I'd move myself, that the cell was literally killing me. They said that's tough.

"I knocked a hole clear through a wall in the cell, big enough to crawl through, in about ten minutes time and generally ruined the cell for human occupation in order to force them to move me." (CT 39, 88.)

The particular incidents sparking the writ petition occurred on November 21, 1984 during a "shakedown" search of the entire jail. (CT 4006; RT 345, 367.) Officers approached appellant's private cellblock and ordered appellant to put out his hands so that he could be handcuffed and removed from his cell prior to the search. Appellant repeatedly refused these requests, and Humboldt County Sheriff's Deputy

Robert Williams, the captain of the jail, was called. Deputy Williams testified:

> "They told me he refused to come out. So I went back there and told him what we were going to do. And I said, 'You have a chance to walk out like a man.'
>
> "And he said, 'I will walk out like a man,' with his fists up like this (indicating).
>
> "So I said, 'Well, take him out.'
>
> "Q. All right. Now --
>
> "A. If that's not a threat to me, I don't know what it is."

(RT 348.)

Deputy Williams also testified appellant said "he told us before that it would take eight or ten of us to get him out." (RT 381-2.) Appellant was maced, deputies entered his cell, wrestled him to the ground and handcuffed him. (RT 4006.) Appellant declared in the writ petition:

> "When I could speak again I spoke loudly; that all that were involved were cowards and bullies and that I would retaliate. I'm doing that now. I never told them how, I left that to their own paranoid minds." (CT 3997, 4006.)

After the extensive hearing, the trial court issued a 22-page ruling on December 21, 1984. The court noted that while appellant's incarceration in the jail was fully legal, appellant as a pretrial detainee could not be punished, and had greater constitutional rights than would a convicted prisoner. (CT 4009-10.) However, despite its sensitivity to appellant's dislike for incarceration, the court ruled:

> "Has the evidence here shown a potential danger? It seems clearly established that Mr. Price has struck one correctional officer, one inmate and done damage to one cell. In addition, he has threatened both inmates and staff with physical abuse. Those factors alone indicate that he is a potential danger to guards, other inmates and property. Those facts alone would support regulations and restrictions relative to his detention to protect the institution's security. . . .
>
> "To begin with, there is no doubt that Mr. Price has attacked two people. Petitioner implies that these people deserved it and if not provoked he would conform to the rules. But the jail must protect the constitutional rights of all other inmates as well as Mr. Price. His behavior shows that when not

segregated and when not fettered he is fully capable of striking the nearest target." (CT 4012, 4015.)

Nevertheless, the court issued a lengthy detailed order to jail personnel to protect appellant's rights, including the right to adequate exercise, access to legal materials, and basic humane treatment. (CT 4021.)[21]

---

21. The complete order read:

"THE COURT ORDERS:

"1.  Mr. Price must be provided adequate food, clothing, shelter, sanitation, medical care, dental care, psychiatric care and personal safety.

"2.  Mr. Price must be provided adequate out-of-doors physical exercise. His segregated status should call for extra, not less, such exercise. The total hours per week must equal, and should exceed, those set forth in C.D.C. title 15 § 3343(A).

"3.  Mr. Price must be provided reasonable access to the jail law library. He must be allowed to visit the facility each day or, in the alternative, books must be brought to his cell.

"4.  Mr. Price must be provided reasonable access to his attorneys. In-jail conferences should be allowed and perhaps should be scheduled on a regular basis. This access should include contact by telephone in the morning and late afternoon. (The prompt installation of the new phone in N.E. Max. will solve all phone access problems; this should be first priority.)

"5.  Mr. Price is not to be denied legal tablets, writing implements, transcripts, legal papers, taped statements and a tape player.

"6.  Mr. Price, if he becomes physically belligerent, may be dealt with by use of reasonable force. Mr. Price is not to be subject to beatings while restrained or unrestrained.

"7.  This Court denies the request for a special conference room to be set up in the jail.

"8.  This Court denies the request for an order requiring Mr. Price's electricity to be left on after the inmates lose such service.

"9.  This Court grants an order requiring the Humboldt County Sheriff to notify Mr. Price of his status as an administratively segregated detainee. The notice shall give specific and detailed reasons for such segregation. Mr. Price shall be afforded a hearing, if he so desires.

"10.  This Court grants an order requiring the review of such status every ten days. The fact of such review shall be documented by a report which shall be filed in Mr. Price's file. The review shall address the following specifics:

"A.  Adequate food.
"B.  Adequate clothing.
"C.  Adequate shelter and sanitation.
"D.  Adequate exercise in conformance with this opinion.
"E.  Adequate access to
(1)  Law library
(2)  writing paper and utensils
(3)  tapes and tape player
(4)  transcripts.
"F.  Adequate medical, dental and psychiatric care - with emphasis on the effects of leg shackles.
"G.  Changes which can reasonably be made to lessen the burden of incarceration without lessening security.

115

No major outbreaks of violence were reported for nearly a year after December 21, 1984. However, the truce was uneasy. Appellant bragged about his ability for verbal provocation. He wrote:

"I have spent a lot of time in different places listening to and learning from some of the hands down best trash talkers the world has produced, they were of every color and creed and background and any one of them would be able to make the Captain [(Williams)] and [Officer] Gray both look like unschooled babies in that regard, and like I said I learned a thing or two about verbal altercations myself. I was a good student and I learned what the boundary's (sic) were between verbal and physical arguments and how to use exact phrases in the most calculated manner possible to produce desired responses from the opponent." (CT 3993.)

Later testimony showed appellant used racial insults and sexual innuendo to taunt jail personnel.[22]

Then, when it became evident that appellant's motions which attempted to avoid or delay the trial, would not succeed, and that trial would commence within months if not weeks, violent incidents against jail staff recommenced.[23]

On October 18, 1985, the court filed an order to show cause re contempt after appellant claimed that jail personnel were giving him inadequate exercise in violation of the order issued on appellant's writ of habeas corpus, quoted *supra*. (CT 8116.) On October 21, 1985, the court issued relief in the form of the following minute order:

"Court has reviewed OSC, re: Contempt of Mr. Price and it appears not to be needed. Court Orders that a formal log of all exercise received by Mr. Price to be kept by the Jail.

---

"11. In all other respects the Writ is denied, based upon the preceding opinion."

22. It must be remembered that Clifford Smith, an Aryan Brotherhood member, reported at trial that calling someone a "punk," meaning a submissive homosexual, was so objectionable that Smith gladly stabbed a man 37 times for such an insult. (RT 14926, 14842.)

23. Appellant and his attorneys early on indicated they did not believe the case would go to trial. (See CCT 1177 (letter from Curtis Price to Michael Thompson of August 24, 1983 containing secret message on left margin "could walk"); RT 5 (statement by defense counsel that motions were the case).)

Each hour of exercise is to be recorded. The Captain is to verify same. A copy of same is to be forwarded to this Court each day by 9:00 a.m. . . .

"Court states OSC re: Contempt may be resolved, continued for one week - date to be set after physical review by the Court if deemed necessary." (CT 8140-1.)

Five days later, after an exercise session, appellant punched Correctional Officer Sylvia without provocation, as we detail infra.

Due to appellant's punching of Officer Sylvia, the jail restricted appellant's privileges, including recreation, and instituted a policy of handcuffing appellant in his cell before transporting him. Officer Doane testified:

"So prior to having a labor problem in the jail, jail representatives and myself and the sheriff and under-sheriff met and we developed a procedure which would allow more security for the jail staff and still allow Mr. Price to come to court in essentially the same manner in which he has come to court now. He's able to carry his own legal files, et cetera.

"What it amounts to is handcuffing him in front, prior to him coming out of the cell, and this required -- requires that he cooperate in the point of putting his hands out so he can be secured; . . ." (RT 10014.)

On November 12, 1985, appellant refused to accept the handcuffing procedure, and court proceedings were halted. Appellant was eventually brought to court where he made a lenghty detailed statement complaining about jail procedures and accusing jail personnel of mental and physical bullying. (RT 10024-38.) The court once again treated appellant with respect, stating:

"And I can imagine that the stress of being in his position after two and a half years up there -- or nearly two and a half years has to be more than I can imagine and at times -- I think counsel know that I have said that I wonder how Mr. Price has been able to last as long as he has in this situation, but he does. In some ways, he may be stronger than any other person in this courtroom.

"At any rate, that's not what I'm getting at. The fact is that the Court -- understanding all the problems, both from the jail side and Mr. Price's side, what I want is apparently the

same thing Mr. Price wants. And that is to get on with this
with the least amount of trouble that we can have and get it
done. And I will attempt to do something. I don't make any
promises, but I certainly will make that attempt. And that's on
the record and I will try to get back to you at the end of the
day with whatever results may occur from that endeavor." (RT
10040.)

However, as the court later lamented, it was impossible to order jail
personnel to cooperate more fully with appellant when appellant proved
intransigent.[24/]

Finally, on the second day of trial, appellant did not appear for
court. The court held an extensive evidentiary hearing to explore the
problem of appellant's intransigence. The two day hearing included an
extraordinary convening of court at appellant's jail cell, in the presence
of prosecution and defense counsel, to get the entire picture of
appellant's situation from appellant himself.    The following facts
appeared through testimony or evidence at this hearing.

Three weeks before, on October 26, 1985, Humboldt County
Sheriff's Correctional Officer John Sylvia along with another officer went
to an indoor recreation room in the jail to escort appellant back to his
cell. The officers stood by while appellant dressed. Appellant became
upset, accusing Sylvia of watching. Officer Sylvia testified:

"[Appellant] came up and put his face near mine, about six
inches away, as near I recall. And he was telling me how
impolite it is to stare and said something about -- implied that

---

24. The court later stated:
"THE COURT: Well, Mr. DePaoli, normally I suppose I could accept
that argument, and I know you're in a difficult position, but what I find here
is the gentleman who just testified before this gentleman was indeed coming
to fetch Mr. Price after the exercise had been afforded him, got cigarette
smoke blown in his face and ashes on his pants, struck in the jaw, and now
there's a complaint about lack of exercise. Well, my goodness, yes.
"I wonder why there isn't a complaint about anybody having to be
subjected to the sort of conduct that has been described here, being struck
after being called a nigger mother and giving someone head.
"You know, there is a standard of conduct both for the jailer and the
inmate, and I don't know what Mr. Price expects me to do, but I can -- I
cannot, as he indicated yesterday in the jail on the record, control the jail
if he won't cooperate with the jail.
"All I've heard so far and what I see from what's happened in this case
is that it takes two sides to get to the point where there can't be exercise."
(RT 10663.)

> staring is impolite. And as he was smoking at the time, he took a big puff of cigarette smoke and blew it in my face. Then he flicked it down at my leg. I looked down at my pants starting to smolder and I picked it off." (RT 10619.)

When the second officer said appellant owed Officer Sylvia an apology, appellant replied:

> "'No, you owe me an apology.' And he was saying things like -- calling -- saying things like 'Nigger mother,' and things like that. Some verbal abuse. And he told me I could go ahead and report it. I said I would. And at that time he came at me and struck me with his fist and --
>
> "THE COURT: Where?
>
> "THE WITNESS: Right there (indicating).
>
> "THE COURT: All right.
>
> "MR BASS [The Prosecutor]: Indicating the left side of this face, jaw." (Rt 10619-20.)

Officer Sylvia, an accomplished wrestler (RT 10648), grabbed appellant around the chest and put him to the ground and held him there until appellant relaxed. Appellant's recreational privileges were suspended on October 29, 1985 as a result of this assault. (RT 10689.)[25]

On November 2, 1984, appellant posted a letter on his cell door entitled "Notice of Fair Warning to All Male Jail Personnel." The "Notice" stated that jail personnel were insensitive to appellant's needs and the court's orders, and warned "you are directly responsible for my pain and when I can't take it anymore I will punish and pain you to the best of my ability because you are each and everyone of you fully aware of my condition. . ." (CCT 1705-6.)[26]

On November 17, 1985, after a new altercation, Officer Sylvia reported appellant for "serious (verbal) act of disrespect" for "advocating violence." (CCT 1710) Among other comments appellant told Officer Sylvia that if Officer Sylvia pushed him appellant would push Officer

---

25. Appellant claims Officer Sylvia and he shook hands and that Officer Sylvia was apologetic about the incident. (AOB 273.) The record shows that Officer Sylvia denied any such characterization of the events. (RT 10622-3.)

26. The notice included the following sentence: "'Jail Commander,' has, and always has had, a burning personal driving need to punish and pain me -- (just because I told on him and Sgt. Gray for going camping together last year with only one sleeping bag). . ." (Id.)

Sylvia back, and according to the officer, "If I meet him with anger, he'll meet me with anger. If I push him, he'll push me." (RT 10633.)

On November 19, 1985, the second day of trial, some time before 9:00 a.m. Officer Larry Wolf went to appellant's cell area and appellant called to Officer Wolf from an adjoining shower area. Officer Wolf could not understand appellant over the water, so he entered the shower area and stood six to seven feet from appellant. Officer Wolf felt safe with appellant because the two previously had a good relationship. (RT 10661.) Appellant requested Wolf to get Officers St. Denis and Gray. The officer testified:

"Well, he -- in approximately thirty seconds, I would estimate, he clenched his fists and attacked me, basically.

"THE COURT: How did he do that?

"THE WITNESS [Officer Wolf]: Well, he was in the shower underneath the water. I was standing approximately six or seven feet away. And he ran at me. Threw a right cross -- what I call a right cross at me. I was able to partially duck it and he clipped me on the chin." (RT 10654.)[27]

A few minutes after the shower incident, at 8:50 a.m., Correctional Lieutenant Henry Doane and three other officers went to appellant's cell to bring him to his 9:00 a.m. court appearance. (RT 10573.) Appellant stated he would not be finished with his grooming until 9:00 p.m. The officers left and returned at 9:03 p.m. Appellant demanded a copy of a previous disciplinary report before he would agree to be shackled for transportation to court. Lieutenant Doane refused, but when appellant proved adamant, Lieutenant Doane went to his superior, got the report, and took it to appellant. (RT 10574.)

---

27. Appellant testified:
"THE DEFENDANT: He said okay, and then he wanted to talk to me about some other stuff and he come in through that door right there to where he could stand right in front of the shower where I was naked. When I was showering, I was naked. And he wanted to talk to me there. I told him, 'Hey, leave. You talk to me out around the corner.' I went, 'I don't want you staring at me' and he wouldn't leave. He said he wanted eye contact, but his eyes weren't on my eyes, his eyes were on my dick. And I got mad and I told him, 'Leave. Get out of here. Leave. Talk to me from outside the door.' He wouldn't do it, and so I threw him out. And I'll do it again the next time it happens." (RT 10603.)
Appellant admitted he previously got along with Wolf. (*Id.*) Two inmates testified that they saw the incident but only saw appellant push, but not punch, Officer Wolf. (RT 10733, 10738.)

120

Appellant attempted to question the officers about the report, but Lieutenant Doane instructed them not to answer because the current business was to transport appellant to court. Appellant allowed himself to be shackled. Appellant proceeded about 20 yards down the hallway when he stopped, complaining that the ankle cuffs on his chains were too tight.[28/] Lieutenant Doane asked appellant to face the wall so that the cuffs could be adjusted back onto the ankle pads. The officers did not want to adjust the pads facing appellant because appellant could cause injury in that position, and in fact had physically struck Correctional Officer St. Denis, lightly, in such a manner before. (RT 10697-8.) Appellant refused to face the wall. He later testified:

> ". . .[W]hen the pads slip off, I stop. I don't take another step. I tell 'em that before I put 'em on. I tell 'em if these things don't stay on, if they slip and fall down to where it hurts, I won't walk." (RT 10600.)

The officers again asked appellant to face the opposite corridor wall. According to Lieutenant Doane:

> "He was asked to my recollection three times to do that. And then he was taken by Investigator Bessette and Correctional Officer St. Denis and placed face to the opposite wall of the hallway.

> "He became violent. Attempted to use his elbows and his feet to strike the officers. He was restrained by the four of us. We made the decision under the circumstances to return him to his cell.

> "While attempting to return him to his cell, he continued to try to use his elbows, his feet and his mouth as weapons. Attempted to bite Correctional Officer St. Denis." (RT 10575-6.)

Because of these facts, the prosecution renewed its request that appellant be shackled in court. (RT 10583.) In addition to the above noted violent acts, the court was aware of numerous provocative verbal acts by appellant both in and out of the courtroom. Early in the trial, Deputy District Attorney Dikeman stated on the record that appellant

---

28. Extensive testimony was received that appellant had been shot by prison guards with bird shot to stop fights, and that dozens of shotgun pellets had lodged in his legs and ankles. These unremovable pellets caused appellant pain, and the trial court had ordered ankle pads be given appellant to cushion the leg chain cuffs.

had made in court statements "which could be construed as threats against Deputy Attorney General Ron Bass, against his person." (RT 1320.) The court admonished the parties that it would not tolerate any such behavior, and the parties moved on to other matters. (RT 1621-2.) At least one other time the court threatened to remove appellant for his habit of interrupting other speakers to speak his mind. (RT 1623; see 10770-1.) During a subsequent discussion of appellant's misbehavior in the jail, appellant stated directly to Mr. Dikeman "I'm laughing at you. If you'll excuse me. If you want my explanation of what I'm laughing at, I think you're very funny. I think you're hysterical." (RT 2437.) Officer St. Denis later affirmed that appellant had stated to him "'When I get out, I'm going to come to visit you.'" (RT 10727.) At the November 19 hearing, the court noted "Yesterday in this court, Mr. Price said to Mr. Dikeman, 'Are you a nasty person?' The tone and comment made in the presence of the court was apparent attempt to bait or degrade or disrupt the proceedings." (RT 10759.)[29]

It was against this background of appellant's violence, threats, and relentless testing and probing of the entire judicial and correctional system that the trial court addressed the prosecutor's request for courtroom restraints on November 19, 1985. The court heard extensive testimony over a two day period, including the session at appellant's cell when appellant refused to come to court, in order to learn appellant's side of the issue. On November 20, 1985, appellant had been transported to court and remained in court shackled while further evidence and rebuttal evidence and argument was given. At the close of the November 20, 1985 hearing, the court queried appellant on his reaction should the court order appellant shackled in court. Appellant stated he would have to think about it. The court adjourned for the evening in order for all sides to ponder the situation. (RT 10746-8.)

On November 21, 1985, the court ruled. First, the court listed at length appellant's history of violence in the jail, his threats to court personnel, and his threats to the prosecutors. The court referred knowledgeably to the cases of *People* v. *Duran* (1976) 16 Cal.3d 282, 293

---

29. The tenor of this comment is illustrated by the statement in a subsequent letter of appellant's which stated "I honestly don't feel I'd do 99 percent of any of the things I've ever threatened or implied although punching Dikeman out, etc., does have a lot of objective appeal to it." (CCT 1215.)

and *People* v. *Jacla* (1978) 77 Cal.App.3d 878, 884, and focused its inquiry on whether appellant's behavior disrupted court proceedings. The court concluded disruption had occurred for two basic reasons. First:

"Mr. Price acts out in the confines of the jail to the point that the trial process is disrupted to being brought to a halt.

"Evidence from the jail presented yesterday shows that Mr. Price has been involved in at least four altercations with jail staff. Deputy Filyau, Mr. Sylvia, Mr. St. Denis, Mr. Wolf. Three of those altercations have occurred since the jury was selected and within the last thirty days. . . .

"The recent conduct has disrupted this court as surely as if Mr. Price had attacked someone in this courtroom." (RT 10758, 10761.)

This was a direct finding that appellant's behavior, both in and out of court, disrupted the court's proceedings. Second, the court concluded:

"At this point in time, it appears to the Court that the conduct has alienated and frightened the jailers. It has probably angered the jurors, although they don't know what has caused it. It has deflated the emotions of Mr. Price's attorneys. And I believe it's frightened, to some degree, every person in this courtroom.

"And ultimately, it is finally convinced this Court that I can no longer allow the interference with the schedule and the causation for everyone here, . . . to live in some form of fear. . . .

"The Court can no longer abide having to worry about the safety of the personnel who are required to be here to do their jobs." (Emphasis added; RT 10764, 10762.)

Here, the court made the second finding that shackling was necessary because of sincere fear of appellant and concern for all members of the bar, the court staff, and civilians in court, for whose safety the court was responsible.

The court ordered:

"Mr. Price will be, from this point forward, shackled to his chair in such a way that the jury will be unable to see the shackles. The belly chain will be locked to the chair. His

hands will be free. And the fashion that it will be done will be unable to be observed by the jury.

"He will be placed in that position both before the jury comes in and kept there until they are out so that they will not know. I reluctantly do that. Mr. Price will be in this court at the time set by the Court from this date forward." (Emphasis added; RT 10762.)[30]

## B.    Legal Analysis

Appellant claims that the shackling order was both erroneous and prejudicial. In fact, this court's previous cases plainly support the propriety of the order on the record below. The basic legal principles on this issue are well settled:

"In the interest of minimizing the likelihood of courtroom violence or other disruption the trial court is vested, upon a proper showing, with discretion to order the physical restraint most suitable for a particular defendant in view of the attendant circumstances. The showing of nonconforming behavior in support of the court's determination to impose physical restraints must appear as a matter of record and, except where the defendant engages in threatening or violent conduct in the presence of the jurors, must otherwise be made out of the jury's presence." (*People* v. *Duran* (1976) 16 Cal.3d 282, 291.)

"When the court's determination is made in accordance with the guidelines established in [Duran] the court's decision 'cannot be successfully challenged on review except on a showing of a manifest abuse of discretion.' (16 Cal.3d at p. 293, fn. 12.)" (*People* v. *Allen* (1986) 42 Cal.3d 1222, 1264; see *Kennedy* v. *Cardwell* (6th Cir. 1973) 487 F.2d 101, 110.)

The court's decision below was well within its proper discretion.

The precedent with a striking resemblance to this case is *People* v. *Hamilton* (1985) 41 Cal.3d 408. There, defense counsel reported

---

30. Immediately after the order, appellant disrupted the court once again by interrupting and stating that the jury would know that he was chained because he would remain seated while the others rose for the court's entrance. The court later allayed this problem by dispensing with the requirement that anyone rise on the court's entrance or exit. (RT 10770-1.)

defendant had punched counsel and counsel's assistant in the previous ten days.[31/]  Defendant was restrained with a knee brace, which would not have been visible to the jury, but about whose discomfort defendant complained.  The court then ruled defendant did not have to wear the brace.  Two days later, a hearing was held at which a sheriff's deputy testified defendant refused to dress for trial, and had taken a "fighting stance" when deputies entered his cell.  Appellant was eventually dragged to court wrapped in a blanket.

The trial court ruled in language almost exactly applicable to this case.  It noted that defendant had received special privileges, but that he continually defied orders of his jailers.  The court ordered shackling, ruling defendant:

". . . has chosen to defy orders that have been made by officers in the jail.  He has refused to dress to come to court. He is coming into court with jail garb and apparently a blanket thrown over his body and one shoe on and one shoe off, apparently.  He has defied all authority <u>and I think it is just a matter of time before he would begin to defy all authority here in the courtroom.</u>  I am going to take the steps that are necessary to make certain that doesn't happen.  I am going to require that he be in chains, his ankles and hands, for the trial. I regret the necessity to do it.  I regret that Mr. Hamilton brought this upon himself.  But I find no alternative.  <u>I am not going to subject anybody in this courtroom to any possible injury or violent confrontation.</u>  This case is going to be tried in an orderly and a quiet manner."  (Emphasis added; *Hamilton*, *supra*, 41 Cal.3d at p. 423.)

This court affirmed, stating "the fact that defendant had made numerous earlier appearances without disruption does not dispel the present threat that the court found based on defendant's current actions." This court noted that the trial court had held a proper due process hearing, and that, lacking a manifest abuse of discretion, such a shackling order cannot be successfully challenged on review.  (*Id.* at p. 423.)

---

31.  Note defense counsel in *Hamilton* originally <u>sought</u> shackling to prevent a prejudicial outburst by defendant, but this court stressed that defense counsel reversed his position, and that his previous support of the shackling was not a factor in *Hamilton's* holding.  (*Hamilton*, *supra*, 41 Cal.3d at p. 424.)

The case for shackling is at least as strong here as in *Hamilton*. Appellant's history of violence and threats of violence was much more extensive than that in *Hamilton*.[32] The trial court below found, in even stronger language than did the trial court in *Hamilton*, that appellant's previous actions raised substantial apprehension that appellant would continue his disruptive and violent acts inside the courtroom, a threat which the court could not responsibly ignore.

Appellant attempts to distinguish *Hamilton* on the basis that *Hamilton's* violence was committed specifically to avoid going to court, whereas appellant's violence below was carefully limited to out-of-court matters and was aimed only at repaying insults by his jailers. The argument is false to the extent that it does not wholly miss the point. First, the ultimate incident of November 19 which directly led to the shackling was interpreted by the trial court precisely as an attempt by appellant to disrupt the trial. That incident of course involved appellant's first stalling under various pretexts until he was late for court, and then violently resisting being taken to court.

Second, the trial court below was sincerely concerned for the safety of persons in the courtroom. Appellant at length argues that he was intent on behaving properly in court, that he never misbehaved in court, and that he only caused disruptions for justifiable reasons on adequate provocation by jail personnel. This argument fails for numerous reasons. For one, the court expressly concluded it could not trust the safety of court personnel to the good faith of appellant's claim that he recognized a line between in-court and out-of-court conduct. It is plain that *Duran* and following cases contemplate that out-of-court violence may be sufficient to raise a reasonable fear of in-court violence requiring shackling. This principle is inherent in the statement in *Duran* that a hearing must be held out of the jury's presence unless the nonconforming conduct happened in front of the jury. (*Duran, supra,* 16 cal.3d at p. 291.) Here, the court properly concluded that all court personnel were in jeopardy based on appellant's out-of-court violence. The decision was proper.

Further, appellant's own statements showed he considered physical violence a justifiable response to purely verbal "provocation."

---

32. Appellant also has an extensive record of violent escapes and felonies. (*See* CT 4013-4.)

126

Appellant admitted repeated physical assaults on jail personnel without any prior physical provocation. Appellant himself stated in essence he would promise to behave civilly only on condition he was not verbally provoked.[33/]   Given that appellant considered verbal provocation sufficient for a physical response, his willingness to disavow violence in court only on the stated condition implied a serious threat of physical violence in the courtroom whenever he considered himself suitably provoked. The court acted properly to protect innocent parties.

Finally, despite appellant's ardent claims to the contrary, we have shown that appellant did actually cause disruption in court on numerous occasions, by interrupting out of turn, by challenging the court, by walking out of the courtroom, and by making veiled threats to the prosecutors. The court's shackling order was proper under this Court's precedent.

We briefly discuss appellant's claims that he was a reasonable man pushed over the edge by unreasonable demands in the jail. As appellant notes, the trial court in numerous instances showed sensitivity to appellant's problems. For example, the trial court issued the original writ of habeas corpus in December of 1984, and, after a full hearing, issued the lengthy protective order quoted *supra*. The court issued the order to show cause re contempt in October of 1985 and ordered it be personally notified daily of appellant's hours of exercise. Five days later, after an exercise session, appellant punched Officer Sylvia. (RT 8116.) The court held the lengthy hearings noted above on November 19 through 21, 1985 regarding appellant's refusal to come to court, and the necessity for shackling. Throughout these proceedings, the trial court maintained an even-handed awareness of appellant's point of view. Appellant interprets this even-handed approach as a sign of confusion. Appellant ends with unjustified criticism of the trial court: "when Price's frustration predictably erupted, the trial court lost all patience with its own inability to solve the ongoing problems, ridiculed Price for concern about his personal problems in the jail instead of the serious charges he faced (RT 10607-10608), and imposed the shackling order. The order was the product of frustration over the problems, rather than a reasoned decision that a 'manifest need' existed." (AOB 301.)

---

33. See AOB at 280 ("[appellant] agreed that if he then acted improperly without provocation, it would be appropriate to shackle him," emphasis added).

In actuality, the court bent over backward to accommodate appellant's needs. The court stated:

"THE COURT: I understand that, but the problem that occurs every time I have a situation where there's an acting-out in the jail, is that it lessens my ability to order the jail to continue to afford privileges which I've never given any other inmate." (RT 10751.)

But, the court repeatedly counseled appellant that violence could not be justified even accepting as true every verbal provocation appellant alleged of jail personnel.[34] The court stressed it could not order improved conditions for appellant when appellant responded to such orders, such as the increased recreation order of October 1985, by punching guards who carried out those orders. The court counseled appellant that he was harming his own ability and his attorneys' ability to defend by distracting them with squabbles with jail personnel. Only when appellant showed he was unalterably set on continued violence and disruption did the court determine it could not trust appellant's promises to conform his behavior in the courtroom. (RT 10761.)

Appellant's implication that the court condoned his behavior in the jail is false, as is appellant's allegation that the "only problem with which the court was concerned here was Price's poor relationship with his jailers." (AOB 295.) Rather, it was the implications of appellant's course of conduct in and out of the jail which caused the court to fear in-court violence requiring shackling. The fact the court was able to maintain a civil attitude toward appellant implies a diligent judge, not approval of appellant's violence.[35] In sum, the shackling order was proper.

Finally, appellant made numerous additional threats of violence were he to be forced to appear in court in shackles, threats which we detail in the next section.[36] Appellant may argue that these threats,

---

34. The court was also well aware of appellant's complaints about jail food and about problems scheduling dental care. (See Order of 12-21-84, p. 1, *supra*; CT 4021.)

35. Appellant also attempts to justify his violent outbursts by claiming he was incensed when jail personnel gave him disciplinary reports immediately before trial. The record belies the claim. On November 19, 1985, for instance, appellant demanded such a report before trial, and refused to go to trial until the report, which the guard initially refused him, was produced. (RT 10574.)

36. Appellant immediately walked out of the courtroom, refused to dress for

which occurred immediately after the shackling order before trial resumed, were caused by, and contingent on, the order, and so should not be used to evaluate the propriety of that order. In fact, the threats supported the trial court's judgment of appellant's potential for disruption should a ruling to his detriment be made. This is true whether or not the shackling order was correct. It was inevitable that some rulings, correct or incorrect, would incense appellant during the trial. But, no appellant has a right to disrupt a trial, even on the basis of an erroneous legal ruling. Appellant had recourse by respectfully requesting reconsideration of the ruling, by writ and by this appeal. Further, he was obligated to minimize any prejudice, not increase it. Even had the jury seen appellent shackled, which the trial court thought unlikely, a later ruling removing the shackles would have negated any impression gained by the jury that the trial court thought appellant dangerous. Appellant had months of trial to show his good faith and gain this remission. Appellant instead chose to display his belligerence and insistence that he run the trial. By his actions, appellant demonstrated that the shackling decision was necessary.

## C. Prejudice

It is well established that shackling will not constitute reversible error absent evidence of prejudice. Because appellant absented himself during the guilt phase of the trial, the jury did not ever see appellant in shackles. Appellant <u>cannot</u> show prejudice. Alternatively, it must be concluded that appellant waived any issue by absenting himself from trial.

Numerous cases, starting with *Duran*, rule that shackling can be made invisible to the jury, and that instances where shackles are briefly visible to the jury "have generally been recognized as not constituting prejudicial error." (*Duran, supra*, 16 Cal.3d at p. 287, fn. 2; see also *People* v. *Rich* (1988) 45 Cal.3d 1036, 1084; *Wilson* v. *McCarthy* (9th Cir. 1985) 770 F.2d 1482.) Here, the court ordered a simple belly chain

---

trial, made veiled threats to jail personnel who were sent to return him to court, refused to assure the court he would not violently resist being returned to the court in shackles and, finally, predicted his behavior if he were forced to return to court in the belly chain "would probably appear" to be disruptive. (See argument IX, infra; RT 10776-81.)

which easily could have been wrapped for silence and concealed under appellant's shirt. Appellant shows no inevitable prejudice.[37/]

Finally, appellant argues that his leaving the courtroom after the shackling order was a legitimate response. In fact, appellant had no right to disregard an order clearly within the jurisdiction of the trial court, whether or not appellant considered the order error, and in fact, whether or not the order is in fact error. This principle is especially true where prejudice must be proved before an error in such a ruling will be considered reversible.

This line of reasoning is supported by this court's decision in *People* v. *Collins* (1986) 42 Cal.3d 378 where this court held errors in admitting prior convictions are waived if defendant does not testify, stating:

> "'Any possible harm' from such an *in limine* ruling is 'wholly speculative.' To begin with, the trial court has discretion to make a different ruling as the evidence unfolds. . . .

> "When the trial court errs in ruling the conviction admissible the reviewing court cannot intelligently weigh the prejudicial effect of that error if the defendant did not testify. The Supreme Court reasoned that if such rulings were reviewable on appeal, 'almost any error would result in the windfall of automatic reversal; the appellate court could not logically term "harmless" an error that presumptively kept the defendant from testifying. Requiring that a defendant testify in order to preserve Rule 609(a) claims, will enable the reviewing court to determine the impact any erroneous impeachment may have had in light of the record as a whole; it will also tend to discourage making such motions solely to "plant" reversible error in the event of conviction.'" (*Id.* at p. 384. quoting *Luce* v. *U.S.* (1984) 469 U.S. 38, 42.)

---

37. We note that appellant's opposition to shackling at the hearing was primarily on grounds of principle. Appellant admitted he had been shackled without problems previously during his acquittal of an in-prison killing. Appellant's objections at this trial centered on the legally insupportable theory that because he was a convicted felon at the previous trial, shackling was proper, whereas at this trial the presumption of innocence precluded shackling. (RT 10779.) We also note that appellant does not attack his shackling at the post-conviction penalty phase below, thus waiving the issue, presumably because he was once more a convicted felon.

Appellant must be required to make the best of a situation he considers unjust, rather than attempting to exacerbate the situation and preclude appellate review.  Cases of this court are plain that the shackling order itself did not necessarily negate a fair trial.  It was appellant's obligation to attempt to seek that fair trial, and to ameliorate any possible errors by the trial court.  Appellant's intentional failure to react responsibly in this case waived his right to have this issue considered on appeal.

## IX.

## APPELLANT'S ABSENCE FROM HIS TRIAL WAS IN CONFORMITY WITH STATE AND FEDERAL LAW

Appellant next contends that his absence from the bulk of the evidentiary portion of the guilt phase was prejudicial error. We disagree that the absence was error because (1) appellant was properly removable for disrupting the trial, and (2) appellant voluntarily absented himself.

### A. Factual Background

We begin by discussing the factual setting. As we set out in the previous argument, appellant's violent actions in the jail and his threats and disruptions in the courtroom had caused the trial court to conclude that shackling appellant was necessary for the safety of those in the courtroom. The court asked appellant whether he would "comply with and conduct yourself . . . in the framework of this order?" (RT 10767.) When appellant refused to reply, the trial court gave appellant time to think about the question; appellant returned to court and stated in part:

"If I have to be here in chains, like a slave or an animal, even though I never caused a problem in this court, then you'll have to do that without me. But I want it clear that this decision is anything but voluntary." (RT 10769.)

The court ordered the trial to proceed, stating:

"If you want to remain, you'll be shackled to the chair. If you don't want to remain, you may get up and leave.

"The record will reflect that Mr. Price is now leaving the courtroom.

"I'm taking that as a voluntary waiver, sir." (RT 10771.)

Defense counsel was allowed to leave court to converse with appellant.

Appellant's behavior caused the parties to reverse their normal positions; the prosecution argued that proceeding without appellant jeopardized the propriety of the trial. The prosecutor was concerned

about Penal Code section 1043, which allows non capital defendants to be voluntarily absent, but does not address capital defendants.[38]/

Defense counsel in turn argued aggressively that appellant should be allowed to be absent from the courtroom during the trial. Defense counsel argued that, beyond his knowing and intelligent waiver of his presence, appellant actually had been disruptive in the courtroom, and so indisputably fell within section 1043(a)(1). Defense counsel stated:

"As I understand the Court's findings after taking of the evidence and I think even today's comments, if I have -- if I have heard them correctly -- have used the words 'disruptive to the courtroom,' [in] at least two instances in the Court's comments this morning. There is -- it is clear that the Court has warned Mr. Price on several occasions and has done that by way of written ruling as well. And the Court made reference to today to what it perceived as a comment directed towards Mr. Dikeman that allegedly occurred yesterday.

"Under those circumstances, I -- as I understand the record, the Court has made a finding that Mr. Price has been disruptive. Has certainly cited the Duran case and other cases to indicate that disruption in the courtroom includes going to and from the courtroom, to and from his cell. I think the Court has made that finding.

---

38. Section 1043 provides in part:

"(a) Except as otherwise provided in this section, the defendant in a felony case shall be personally present at the trial.

"(b) The absence of the defendant in a felony case after the trial has commenced in his presence shall not prevent continuing the trial to, and including, the return of the verdict in any of the following cases:

"(1) Any case in which the defendant, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that the trial cannot be carried on with him in the courtroom.

"(2) Any prosecution for an offense which is not punishable by death in which the defendant is voluntarily absent.

"(c) Any defendant who is absent from a trial pursuant to paragraph (1) of subdivision (b) may reclaim his right to be present at the trial as soon as he is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings.

"(d) Subdivisions (a) and (b) shall not limit the right of a defendant to waive his right to be present in accordance with Section 977."

"Mr. Price has now, after reading his statement to the Court, got up and exited the court unwilling to attend any further. I would certainly think that if there is to be jeopardy at a higher level than this Court, it would be compelling him to remain . . .

"And, therefore, I don't think we should put an accused person like Mr. Price in that position of having to choose to be disruptive, prejudice himself further in the eyes of the jury in order to leave, which in itself is prejudicial enough. And I think the record is clear that under the circumstances imposed by the Court, Mr. Price did, in fact, get up and leave the courtroom." (RT 10776-7.)[39]

The court again called appellant back to court to query him further whether appellant would disrupt the trial because of the belly chain:

"What I'm inquiring is if the law requires you to be here, are you going to voluntarily be here or are you going to disrupt the proceedings?

"THE DEFENDANT: With the chains?

"THE COURT: Yes, sir.

"THE DEFENDANT: With the chains, I won't voluntarily be here.

"THE COURT: And does that mean that you would disrupt proceedings once here?

"THE DEFENDANT: Not intentionally. It's very likely that because of my inability to cope with the pain and discomfort and -- and the -- and the confinement of that that it would probably appear to people that I'll be disrupting, but it won't be me being disruptive, it will be reacting to disruptive circumstances of my normal condition which are -- the Court knows that my arthritis, my -- my other --

"THE COURT: Do you know the only chain you would have on would be around your waist, under the coat?

---

39. We would assert that this constitutes a concession on a _factual_ issue, concurred in by the trial court and the prosecution, and estops appellant from claiming on appeal he was not in fact disruptive at the trial. Given that disruptive behavior is grounds for absence of a defendant from a capital trial, see text, _infra_, the court's ruling was unarguably correct.

"THE DEFENDANT: Yes, sir. . . .

"THE COURT: My question to you is if I order you to go back up and get your clothes on, will you go do that and come back here and sit down while the jury comes in?

"THE DEFENDANT: In chains?

"THE COURT: Yes, sir, just like I said, shackled around the waist.

"THE DEFENDANT: Not voluntarily.

"THE COURT: Okay. That's my order. That means I'd have to have people come and get you. Are you going to resist that?

"THE DEFENDANT: I won't cooperate.

"THE COURT: But you would come?

"THE DEFENDANT: Not voluntarily.

"THE COURT: I think under the law I have to -- with his responses, he's going to maintain himself in front of the jury, I have to have him here." (Emphasis added; RT 10778-81.)

Appellant and defense counsel continued to dispute the court's ruling. Appellant was ordered to go back to his cell and to dress in civilian clothes for the trial.

Next, the officers sent to escort appellant back to court reported that appellant refused to dress in civilian clothes. A tape of appellant's conversation with the officers was played and the court concluded "at this point, if Mr. Price is to come to court, he either comes in jail clothes or someone bodily dresses him, shackles him and brings him down." (RT 10784.)

Counsel resumed argument, and defense counsel concluded by urging that appellant be allowed to absent himself, stating:

"I'm sure refusal can be interpreted as exactly what 1043 sought to address itself with under the circumstances, and no Court can possibly blame this Court for inviting violence in the courtroom to our client under the circumstances as they've been set forth here.[40]  (Emphasis added.)  (RT 10786-7.)

The court concluded:

---

40. Again this is a factual concession of the likelihood of violence in the courtroom should appellant be forced to attend.

"Obviously I can order him to be shackled and each day brought down here.

"First of all, I don't think that such a procedure is humane to him or the people who have to perform it, chances for him to be harmed and for the security personnel who would have to bring him here to be harmed. <u>I cannot believe that even though 1043 requires a capital defendant's presence in court that that Code section means I must subject Mr. Price or other innocent individuals to harm because he chooses to not be here</u>.

"His conduct has disrupted and continues to disrupt the procedure of this Court. I can't even schedule a hearing, I can't schedule the appearance of a jury, I can't schedule the appearance of any witnesses. . . .

"The question then becomes, I think, put as directly as I can, whether he, while not actually violently disrupting the Court, can choose to passively resist and not appear here without causing reversible error pursuant to 1043.5 (sic) of the Penal Code, that's what happened. I don't know the answer to that. I know there's no case that deals with that. . . .

"Anytime he wants to tell me that he wants to come down here and submit to the Court's order of having him shackled, without my having to order that <u>he be harmed or somebody else be harmed to get him here, which is essentially what I do when I order him to be hauled down here</u>, then he's perfectly welcome to be here. I invite him to be here. I invite him to be here at 1:30 and direct that that be passed on to him, but I will not drag him down here in shackles and subject the jail personnel and himself to further conduct that has been evidenced in the testimony of yesterday." (Emphasis added; RT 10787-9.)

## B. <u>Legal Analysis</u>

We believe the trial court's conscientious resolution of the complex situation was wholly proper. Appellant argues that a capital defendant not only has a right to be present during trial, but also that that right is not waivable by defendant. We believe the law is in fact

reasonably clear that two exceptions apply to the no waiver rule, and that both exceptions apply in this case: a capital trial may proceed in defendant's absence where (1) defendant knowingly and intelligently voluntarily absents himself, or (2) where defendant is removed for disrupting the courtroom.

## 1. Voluntary Absence

Appellant spends great energy arguing that the court's allowance of voluntary absence by a capital defendant is error. Appellant straightforwardly acknowledges that this court has recently settled this issue, or one very closely related, to his detriment in *People v. Robertson* (1989) 48 Cal.3d 18, and so appellant argues that that case was wrongly decided. In fact, *Robertson's* reasoning is compelling.

*Robertson* held that it was proper to allow a capital defendant's voluntary absence from a penalty reduction hearing after a jury imposed a death sentence. This court first distinguished the old case of *Hopt* v. *Utah* (1884) 110 U.S. 574, 579 as one concerning construction of a state statute which mandated presence. *Hopt* merely held that the statute was mandatory, and that violation of a mandatory state statute might be federal constitutional error. (See *Diaz* v. *United States* (1912) 223 U.S. 442, 458; *Robertson, supra*, at p. 60.) *Robertson* continued:

"In *Snyder* v. *Massachusetts* [(1934) 291 U.S. 97, 106] [78 L.Ed. at page 678], the high court stated the federal constitutional right 'no doubt . . . may be lost by consent or at times even by misconduct.' Thereafter, in *Illinois* v. *Allen* (1970) 397 U.S. 337, 343 [25 L.Ed.2d 353, 90 S.Ct. 1057], the court expressly held a defendant can lose his right to be present at trial if he conducts himself in a disruptive manner. Most recently, in *Drope* v. *Missouri* (1975) 420 U.S. 162, 182 [43 L.Ed.2d 103, 95 S.Ct. 896], the high court indicated the question of waiver was an open one." (*Id.*, at p. 60; but see *Hall* v. *Wainwright* (11th Cir. 1984) 733 F.2d 766, 775.)

This court pointed out that a capital defendant may "waive the most crucial of rights" in a capital case, including the right to counsel or to a jury trial, and that, in fact, a capital defendant may plead guilty to the

charge, and the special circumstance, and decline to put on a defense at the penalty phase, and in fact may go so far as to testify as to his preference for the death penalty. This court concluded:

> "If a capital defendant may waive counsel to his detriment, and if other felony defendants may waive their right to presence at various stages of trial (e.g., §§ 977, 1043; *Taylor* v. *United States* (1973) 414 U.S. 17 [309 P.2d 949] [38 L.Ed.2d 174, 94 S.Ct. 194]; *People* v. *Rogers* (1957) 150 Cal.App.2d 403, 414-415) and at sentence (§ 1193; *People* v. *Brown* (1951) 102 Cal.App.2d 60 [226 P.2d 609]), we see no sufficient reasons not to permit a capital defendant to waive the right to be present as well." (*Id.* at p. 61; accord, *People* v. *Lang* (12-7-89) 89 C.D.O.S. 8898, 8905 (Crim. No. 24257/SOO4655).)

This conclusion is consistent with federal authority. Although, as appellant has pointed out, *Drope* v. *Missouri* (1975) 420 U.S. 162, 182 indicated that the question of voluntary absence of a capital defendant may be open, that same Supreme Court proposed pertinent amendments to the Federal Rules of Criminal Procedure, which were adopted in 1975. Those amendments eliminated the former distinction in Rule 43 between capital and non-capital cases in regard to the right to waive presence at court during trial.[41] In light of this change, a leading commentator has written:

> "It was once thought to be the law that in a capital case a defendant could not waive his right to be present. Original Rule 43 reflected this understanding in its provision for waiver in 'prosecutions for offenses not punishable by death.' It now

---

41. Rule 43 now provides in part:
    "(a) Presence Required. The defendant shall be present at the arraignment, at the time of the plea, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by this rule.
    "(b) Continued Presence Not Required. The further progress of the trial to and including the return of the verdict shall not be prevented and the defendant shall be considered to have waived his right to be present whenever a defendant, initially present,
        "(1) voluntarily absents himself after the trial has commenced (whether or not he has been informed by the court of his obligation to remain during the trial), or
        "(2) after being warned by the court that disruptive conduct will cause him to be removed from the courtroom, persists in conduct which is such as to justify his being excluded from the courtroom."

seems highly doubtful that there is such a limitation on waiver. As amended in 1975, the rule is now silent on the question and the matter was left for the courts to decide." (Footnotes omitted; 3A Wright, Federal Practice and Procedure (2d ed. 1982) § 723 at 18.)

This rule is not contrary to California Penal Code section 1043. That statute allows voluntary absence in all non-capital trials. However, the statute does not prohibit voluntary absence in capital trials, but is merely silent on the issue. We believe the function of the statute is plain. Formerly, it was the law of this and many other jurisdictions that absence could not be waived in <u>any</u> felony trial. (See *former § 1043; Diaz, supra*, 223 U.S. at p. 453 et seq.) Section 1043 as amended served the purpose of expressly excepting non-capital cases from this no-waiver rule in conformance with law that had become settled. However, capital cases have always stood on a different, and possibly constitutional footing. It would have been imprudent for the Legislature to attempt to legislate where the law was in flux, and where the Legislature's prerogatives in the area were preempted by the judiciary. That judiciary has now spoken. As we have noted, in *Snyder v. Massachusetts, supra*, 291 U.S. at p. 105-6, a capital case, Justice Cardozo wrote "No doubt the privilege [to be present at trial] may be lost by consent or at times even by misconduct." (*Accord Illinois v. Allen* (1970) 397 U.S. 337, 342-3 (endorsing *Snyder* and stating *Snyder* rejected the dicta in *Hopt. Allen* was a non-capital case.) And, of course, this court has ruled similarly in *Robertson*. The area left undetermined in section 1043, the right of a capital defendant to voluntarily absent himself, has been resolved. It is not necessary to interpret section 1043's silence on the issue as an obstructionist intent on voluntary waiver.

Finally, appellant's position on the issue makes no sense. Voluntary waiver is allowed on virtually all other crucial rights. The trial court and defense counsel were acutely aware that appellant could secure his "voluntary" absence by being forced to appear in chains and jail clothes, disrupting the court, and unequivocally earning the right to be absent. Such a requirement for "voluntary" absence is absurd. This court noted this point in *Robertson*, stating such a principle "would force a defendant to 'the untenable position of having to disrupt the courtroom to such an extreme as to result in his removal, thereby seriously prejudicing his case.'" (See *Peede v. State* (Fla 1985) 474 So.2d 808, 815,

139

*cert. den.* 477 U.S. 909; see also *Illinois* v. *Allen*, *Supra*, 397 U.S. at p. 344.) Similarly, Justice Brennan stated in concurrence in *Illinois* v. *Allen* that removal is much preferable to shackling and gagging a defendant. (*Illinois* v. *Allen*, *supra*, 397 U.S. at p. 350-1.)  The trial court below acceded to the express arguments of appellant and his defense counsel that he had the right to voluntarily absent himself, without prejudicing himself by a prior display of disruptive behavior in front of the jury. Such a decision was correct.[42/]

## 2.    Disruption of the Courtroom

It is even less controversial that the trial court may remove a capital defendant where he has proved disruptive or disrespectful to the court.  It was stated in *Illinois* v. *Allen*:

"The broad dicta in *Hopt* v. *Utah*, *supra*, and *Lewis* v. *United States*, 146 U.S. 370, 36 L.Ed. 1011, 13 S.Ct. 136 (1892), that a trial can never continue in the defendant's absence have been expressly rejected. *Diaz* v. *United States*, 223 U.S. 442, 56 L.Ed 500, 32 S.Ct. 250 (1912). . . .  Although mindful that courts must indulge every reasonable presumption against the loss of constitutional rights, *Johnson* v. *Zerbst*, 304 U.S. 458, 464, 82 L.Ed. 1461, 1466, 58 S.Ct. 1019, 146 A.L.R. 357 (1938), we explicitly hold today that a defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom."

Here, defense counsel argued that the court had made factual findings to the effect that appellant had disrupted court proceedings, both because of appellant's violence to the jailers who transported him to court, and by threats and actions made in the courtroom.  (RT 10776-7.)  Defense counsel argued that (1) the court had ruled that it had

----

42.  The People waive in this case any rights they may have to protest appellant's absence where appellant's presence was not specifically required by the trial court.

perceived facts establishing that appellant had disrupted the court proceedings, and (2) compelling appellant to remain in court would, in defense counsel's interpretation of appellant's words, cause appellant to prejudice himself by disrupting the courtroom in order to secure his absence.    While appellant contends he had no power to voluntarily absent himself, he does not contend his attorney had no power to concede facts establishing a disruption, or a threat of future disruption. That issue is a factual one, based entirely on interpretation of appellant's acts, words, and tone of voice and on appellant's very recent acts of physical violence on the way to court.    Given that counsel and the court agreed that appellant by his behavior had implied a threat of physical violence in the courtroom this court must be bound by such a finding.[43]

Defense counsel concluded:

"The record should now be clear that Mr. Price, our client, will not appear in court under the circumstances imposed." (RT 10785-6.)

The trial court ruled:

"To invite now the prospect of serious injury to him, perhaps to others, I think no Court requires -- at least under none of the cases involved in 1043 or in looking at that section -- the right to be present -- as the Court has noted, Mr. Price is a very intelligent person, he has clearly now on several occasions stated his position to the Court and he is saying he will not be here and refuses to come to Court under the circumstances outlined, to be in front of the jury with a belly chain around him.

"His refusal, I submit, is sufficient under 1043, under any reasonable construction of 1043, under the circumstances as they have occurred in this courtroom, and as such, he should not be forced to come." (Emphasis added; RT 10786-7.)

The court's conscientious conclusion was proper.

---

43. We believe the principle demonstrated in the previous section that shackling may be appropriate based wholly on out-of-courtroom behavior applies equally here to disruptive behavior requiring appellant's removal where the out of court behavior, by threat or inference, raises a strong probability that the defendant will violently misbehave in court.  Of course, the court here also found appellant acted disruptively in court, through interruptions, veiled threats, and by walking out.

3.    **Concluding Points**

Although we believe it unnecessary, we briefly discuss harmless error. First, based on defense counsel's representations to the court, along with appellant's flat statement that he would not voluntarily be present in court in chains, we believe it is possible for this court to conclude beyond a reasonable doubt that had the court insisted on appellant's continued presence, he would have immediately disrupted the court proceedings sufficiently to justify his removal. (*See People* v. *Robertson, supra*, 48 Cal.3d at p. 63 (applying *Chapman* analysis to absence from courtroom)); see also RT 17054-5 (where appellant states he would use force to resist being brought to court in chains).)

Further, basic principles of justice indicate that where a party by his conduct induces the commission of error, he is estopped from asserting it as ground for reversal. (*See People* v. *Wickersham* (1982) 32 Cal.3d 307, 330-336; *see also* Witkin, California Procedure (3d Ed.) Vol. 9, §§ 301-304, pp. 313-316.) Where both appellant and his defense counsel assiduously demanded the right to be absent, we believe appellant may not be heard to later complain of the granting of his knowing and intelligent request. Any error was waived.

Finally, the court's good faith was further shown by its ordering installation of a closed circuit television system showing the courtroom and a two way phone system from appellant's cell to the defense table. Such a system helped to render any error on the judge's ruling harmless beyond a reasonable doubt. (*See Illinois* v. *Allen, supra*, 397 U.S. con. opn. of Justice Brennan at 350-51; *United States* v. *Washington* (D.C. Cir. 1983) 705 F.2d 489, 497, n. 4 ("when security is a problem or a dangerous defendant or a group of defendants is involved, the right to be present can be satisfied by use of closed circuit television and the opportunity to consult with counsel, if such procedure is considered necessary by the trial court").) For all of these reasons, the trial court's handling of the issue was correct.

**X.**

**APPELLANT ESTABLISHES NO ERROR OR PREJUDICE FROM HIS ABSENCE FROM SEVERAL OTHER HEARINGS**

Appellant next points to several instances during the lengthy trial when appellant was not present in court during various hearings, and he claims error and prejudice. In fact, appellant had no legal right to be present at most of these hearings, he expressly waived presence at the rest, and he shows no prejudice as to any.

**A.   July 31, 1985**

On July 31, 1985 during jury voir dire, appellant sent a note to court:

"MR. DePAOLI:   I recognize Mr. Price's writing.   It says, 'Time: seven thirty-one eighty-five (sic) a.m.

"Subject:   Recreation and Doctor Fuller and Court trial.

"I waive my presence -- which is underlined in red -- in court for the morning session on this day and this day only.

"The first reason for this is my court-ordered recreation which the jail and the court itself refuses to give me -- so I'll give it to myself from now on.

"The second reason is I have a doctor appointment today at noon and I'm not going to miss it because of any reason like last week when the jail turned him away.

"I'll attend the afternoon session upon completion of my recreation and doctor call.

"I expect the recreation problem to be on-going as in this Friday I'll again have a choice to attend court or recreation and I expect to be allowed to choose myself and not have the court choose for me.   It's my health at stake not the court's.

"Curtis F. Price.   7-31-85."   (RT 5349-50.)

The court and all counsel discussed the issue.   The prosecution wished appellant physically brought to court to sign a waiver of presence form. Defense counsel opposed such an action, stating:

"MR. DePAOLI:  . . .

"It's my understanding that the statutory right can be waived if the Court finds knowingly and intelligent waiver. And we could proceed this morning and when Mr. Price comes down this afternoon ask him if he waives it for this morning. I can represent he certainly would. He will tell the Court that on the record. . . . He can waive it after the fact. We can waive any defect in the selection or prospective examination of these prospective jurors after they have been so examined when he comes down this afternoon." (RT 5353-54.)

The court sent a note to appellant:

"THE COURT: Lieutenant Doane -- for the record, I'm going to give this note to Lieutenant Doane. It says, 'Mr. Price, you have the statutory right pursuant to Penal Code Section 1043 to be personally present at all proceedings. If you wish to waive that right, you may do so by signing below.' I've put a line for the signature and date of 7-31-85. Signed the note Judge Buffington. We'll stand in recess until Lieutenant Doane is able to determine whether Mr. Price wishes --whether he wishes to sign that form or not." (RT 5356-7.)

Lieutenant Doane testified he watched appellant sign the note as follows: "Curtis F. Price, for today, 7-31, a.m. session only." (RT 5359.)

As to this incident, appellant was legally authorized to waive his presence. Section 977 authorizes a defendant's waiver of his presence at all except five stages of trial, not including voir dire.[44] Section 1043

---

44. Section 977 states:

"(a) In all cases in which the accused is charged with a misdemeanor only, he may appear by counsel only.

"(b) In all cases in which a felony is charged, the accused must be present at the arraignment, at the time of plea, during the preliminary hearing, during those portions of the trial when evidence is taken before the trier of fact, and at the time of the imposition of sentence. The accused shall be personally present at all other proceedings unless he shall, with leave of court, execute in open court, a written waiver of his right to be personally present, approved by his counsel, which waiver must then be filed with the court; provided, however, that the court may specifically direct that defendant be personally present at any particular proceeding or portion thereof. The waiver shall be substantially in the following form:

WAIVER OF DEFENDANT'S
PERSONAL PRESENCE

"The undersigned defendant, having been advised of his right to be present at all stages of the proceedings, including but not limited to presentation of and arguments on questions of law, and to be confronted by

---

requires appellant's presence, but expressly authorizes waiver of presence under section 977.[45] Appellant could waive his presence at voir dire. (See also *People* v. *Grant* (1988) 45 Cal.3d 829, 846 (voluntary absence from jury selection is not error).) Second, the waiver was adequate. Appellant waived his right to be present by his note, and by his signing the note from the court. Further, appellant waived his right to have an in-court waiver as specified by section 977. After appellant and his

---

and cross-examine all witness, hereby waives the right to be present at the hearing of any motion or other proceedings in this cause, including when the case is set for trial, when a continuance is ordered, when a motion to set aside the indictment or information pursuant to the provisions of the Penal Code, Section 995 and following is heard, when a motion for reduction of bail or for a personal recognizance release is heard, when a motion to reduce sentence is heard, and when questions of law are presented to or considered by the court. The undersigned defendant hereby requests the court to proceed during every absence of his which the court may permit pursuant to this wavier, and hereby agrees that his interest will be deemed represented at all times by the presence of his attorney the same as if the defendant himself were personally present in court, and further agrees that notice to his attorney that his presence in court on a particular day at a particular time is required will be deemed notice to him of the requirement of his appearance at said time and place.

Dated:    ................................................................................

          Defendant

          ...............................................

          Address

Approved:

Dated     ................................................................................

          ............."

45. Section 1043 states:

"(a) Except as otherwise provided in this section, the defendant in a felony case shall be personally present at the trial.

"(b) The absence of the defendant in a felony case after the trial has commenced in his presence shall not prevent continuing the trial to, and including, the return of the verdict in any of the following cases:

"(1) Any case in which the defendant, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that the trial cannot be carried on with him in the courtroom.

"(2) Any prosecution for an offense which is not punishable by death in which the defendant is voluntarily absent.

"(c) Any defendant who is absent from a trial pursuant to paragraph (1) of subdivision (b) may reclaim his right to be present at the trial as soon as he is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings.

"(d) Subdivisions (a) and (b) shall not limit the right of a defendant to waive his right to be present in accordance with Section 977.

counsel strongly argued against an in-court waiver, appellant cannot now on appeal question the court's grant of the alternative waiver by signed witnessed note. Appellant does not attack the validity of that note or deny his expressed desire to waive presence. The waiver constituted at least substantial compliance with the statute. (See *People* v. *Garrison* (1989) 47 Cal.3d 746, 783 (oral waiver sufficient under section 977); see also *People* v. *Lang* (12-7-89) 89 C.D.O.S. 8898, 8905 (S004655).)

Finally, appellant argues that his waiver was not voluntary because he had not received sufficient exercise and because he needed to see a doctor. This argument is illogical. It would make some abstract sense if appellant had refused to come to court because he needed to exercise, or because he wanted to see a doctor. Rather than demanding proceedings halt in his absence, appellant specifically authorized voir dire to continue during the morning session pending his return. Appellant expressly waived any issue as to the voluntariness of his absence.

At any rate, the trial court essentially rejected appellant's claims that he was coerced into being absent. The court stated:

"Now, I thought the jail and Mr. Price had worked it out that there was going to be an exercise at other times during the day when he wasn't here. If that's not happening, then, that's not happening. That is something that needs to be dealt with. Obviously, everybody who comes to trial sets aside their normal activity except for those of us who work in the system to be here. The jurors, Mr. Price, other people who are here.

"What I'm saying, he can't unilaterally make a decision which deprives the court of the ability to go forward because he wants exercise or he wants to see a doctor. The doctor -- the jail has a doctor. If another doctor is needed, fine. We'll get the doctor, but we're going to get it at the time when it doesn't disrupt everybody." (RT 5355.)

The court showed its continuing willingness to work with appellant to solve any problems in the jail. Instead, appellant unilaterally scheduled exercise and a doctor's appointment. (See RT 5353.) Appellant shows only a headstrong insistence that he be allowed to set his own schedule, in disregard of court priorities. No involuntary action by appellant is shown.

At any rate, no prejudice is alleged or shown. Appellant was absent for less than two hours of the morning session of voir dire, and

he returned for the afternoon session. (RT 5359-5433.) Only six jurors were questioned in that time. None sat on appellant's jury. Two were dismissed on prosecution challenges for cause (see RT 5375, 5382) which of course appellant could not have prevented. Four other potential jurors were preliminarily passed. Appellant received the transcript of the voir dire and later had the chance to voir dire, and challenge any juror. Appellant fails to complain of any later restriction on voir dire as to those jurors. No conceivable prejudice is shown.

### B.  August 5, 1985

Appellant was absent under similar circumstances a week later on August 5, 1985. Again the court stated it had received a signed waiver of presence from appellant. (RT 5603.) Again, appellant's waiver was proper and procedurally adequate, and no evidence shows that appellant's authorization of continued voir dire, let alone his absence, was "involuntary." And, once again, no prejudice is shown. Only seven jurors were briefly interviewed. (RT 5615-5703.) Three defense challenges for cause were allowed (see RT 5626, 5662, 5671.) as well as one prosecution cause challenge. (RT 5690.) One juror was excused for hardship and two were passed as potential jurors. Neither of the latter sat at trial. (RT 5615, 5651.) Appellant advances no theory on which his absence could have been prejudicial.

### C.  Hearings on Complaints About Counsel

Appellant next protests his absence from certain proceedings concerning complaints he expressed about his counsel. On February 11, 1986, the trial court announced that it had received a letter from appellant purporting to be a motion to relieve his attorney Anna Klay, on grounds she would be a witness at trial. Klay had spoken to witness Clifford Smith, an Aryan Brother, before Smith had turned state's evidence, and so Klay may have had knowledge of prior statements inconsistent with Smith's court testimony. (RT 14903; see appellant's letter/motion at CCT 2089; see also RT 15715 describing the sequence of events.) Appellant was absent from trial at this time due to his

147

disruptive behavior, as detailed in the previous argument. As was its daily habit, the trial court sent the following note to appellant on the morning of February 11, 1986:

"2-11-86

Mr. Price:

Will you, today, dress in civilian clothes and submit to hidden shackles in Court so as to be present in Court at your trial?

\_\_\_\_\_ Yes

\_\_\_\_\_ No

_____
(signature)

You will be allowed to return at any time you agree to follow the Court Ordered procedure.

_____

John E. Buffington
Judge of The Superior Court"    (CCT 2088.)

Appellant wrote on the note:

"This farce will not protect you from having violated my civil and constitutional rights Judge. You should concede the issue or hold hearings on them.

Curtis F. Price  2/11/86"  (CCT 2208.)[46]

Again, we believe this was substantial compliance with section 977. At any rate, only legal discussion was had at the hearing, at which appellant was fully represented by Mr. DePaoli, who was in no way implicated in appellant's motion to relieve Ms. Klay because of her possible need to testify. The hearing was recorded in the reporter's transcript. Appellant's failure to object to any aspect of that discussion further waived any issue.

The issue was discussed at greater length on February 21, 1986. (RT 15712-42.) Again, the issue was well understood. Various options were discussed (RT 15725), including a stipulation as to what Ms. Klay's testimony would be, relief of Ms. Klay as appellant's counsel, and foregoing Ms. Klay's testimony because Mr. Smith's credibility could

---

46. Appellant's vituperative answers to the trial court's daily note are included at various points in the Corrected Clerk's Transcript, see e.g. CCT 2029-2047.

obviously be soundly impeached from numerous other sources, including Mr. Smith's admissions of his previous years of perjury. The court repeatedly stated it believed appellant's interests on the issue were being protected by Mr. DePaoli, but that appointment of independent counsel, or relief of Ms. Klay and appointment of new counsel could be considered as possible avenues of relief, albeit only as last resorts. The court finally concluded the issue was premature, in that a stipulation might be formulated to avoid Ms. Klay's testifying.

Appellant was absent from this hearing wholly because of his own desire to be absent, and because of his refusal to assure the court he would not further disrupt proceedings. Appellant had only to walk to court and don the unintrusive belly chain to reclaim his right to be present. Rather, appellant refused to be present, once again acknowledging but rejecting the trial court's daily letter. (CCT 2153; see CCT 2097.) Appellant's waiver substantially complied with section 977. And, given appellant's access to the transcript of the hearing, his representation by Mr. DePaoli, and lack of subsequent requests to enlarge on the arguments offered at the hearing, any prejudice was eliminated or waived.

Next, on March 6, 1986, appellant purportedly attempted to fire Mr. DePaoli. As usual, the trial court's explanation of the exasperating situation was calm, thorough and legally correct. The court stated:

"During the afternoon, Mr. DePaoli indicated to the Court at the direction of his client that Mr. Price intended to fire Mr. DePaoli -- I think those were the exact words -- were on a three-by-five card signed by Mr. Price, contained two words, 'You're fired.'

"Not being able to assemble anyone yesterday to do anything about that, the Court determined to wait until this morning." (RT 16880.)

The court directed Mr. DePaoli to ask appellant if he continued his previous day's desire to fire Mr. DePaoli. Mr. DePaoli told the court appellant refused to answer the question. (RT 16880.)

The court then discussed numerous *Marsden* cases in considerable detail, noting that *Marsden* required a hearing, that timeliness could be a factor in granting or denying a substitution, and that simple disagreement over tactics would not justify substitution of an appointed attorney. The court concluded:

"Ultimately, what I've determined here is that Mr. Price has never made a formal request to relieve his attorney. He's had a fight with Mr. DePaoli yesterday over something that Mr. DePaoli hasn't told me about and certainly has no reason to tell me about.

"He stated, 'You're fired.' Then when he was asked today whether he wanted to relieve his attorney, he refused to make any comment either to his attorney or to the Court.

"So be it.

"He made his choice. He's been told that he has the right to make the request, and he must state his reasons. He's refused to do so. . . .

"My only reason for sending him the note this morning was to attempt to get what he wants to do. He has refused to cooperate. I assume that's intentional, but that's neither here nor there.

"Had he told me he wanted to relieve his attorneys, he would have been here in court this morning to state those reasons on the record.

"I have no other way to do it. I have -- I do not intend and will not set up court in the tier anymore. I did it on that particular morning because I thought it was the easiest way to solve the problem." (RT 16884-5.)

The court also noted that appellant now refused to use the direct phone between his cell and defense table.

It is of course settled that a breakdown in the attorney/defendant relationship caused by the intransigence of a defendant will not justify substitution of counsel. (*People* v. *Walker* (1976) 18 Cal.3d 232, 238; *People* v. *Kaiser* (1980) 113 Cal.App.3d 754, 761; *People* v. *Lindsey* (1978) 84 Cal.App.3d 851, 860.)

The next morning, March 7, 1986, appellant was brought to court against his will because the trial court believed it was necessary to make a record of appellant's reasons for requesting Mr. DePaoli relieved. As appellant concedes, appellant flatly refused to tell the court his reasons for being dissatisfied with Mr. DePaoli. The discussion included the following:

"THE DEFENDANT: Then why am I here under these conditions?

150

"THE DEFENDANT:  Then why am I here under these conditions?

"THE COURT:  You are here because you sent the communication, sir, and the law requires me to do certain things.  That's why you're here.  It's just as simple as that.

"THE DEFENDANT:  I don't believe you.

"THE COURT:  You don't have to believe me.

"THE DEFENDANT:  I don't want to tell you my reasons for firing Mr. DePaoli.

"THE COURT:  You won't do that?

"THE DEFENDANT:  I will not do that except through a legal representative.

"THE COURT:  You don't have any right to any more legal representation --

"THE DEFENDANT:  I don't know what my rights are. You rode over every one of them I have anyway.

"THE COURT:  Your personal opinion of me is not what I am here for.

"Do you care to divulge on the record your reasons for re --

"THE DEFENDANT:  My personal opinion of you is not in my mind here, neither.  I am only reacting to your job --

"THE COURT:  I am asking you to respond with reasons why you want Mr. DePaoli relieved.  That's the sole purpose of bringing you down here --

"THE DEFENDANT:  I will respond to those through a legal representative --

"THE COURT:  Listen to me --

"THE DEFENDANT:  I am listening --

"THE COURT:  I am telling you the law doesn't allow me to appoint any more legal representatives --

"THE DEFENDANT:  Then we don't have nothing to talk about.

"THE COURT:  All right.  Take him back upstairs.

"THE DEFENDANT:  The next time you see me, they are going to have to use the force they threatened today if you ever do this to me again."  (RT 17054-5; see also appellant's letter at CCT 2203.)

151

Cal.3d 80, 93-4. That case in no way holds that a doubt as to defendant's competency is raised by a desire to fire one attorney, and a refusal to cooperate with another attorney on the logical, if legally insupportable, ground that the second attorney might prove to be a defense witness. Unlike *Stankewitz*, appellant below did not request such a competency hearing, nor did his counsel below. As this court has ruled "'under the substantial evidence test . . . more is required to raise a doubt than mere actions . . . or bizarre statements . . . or statements of defense counsel that defendant is incapable of cooperating in his defense . . .'" (*People* v. *Grant* (1988) 45 Cal.3d 829, 859.)

Appellant next points to an order sealing several pages of transcript. (CT 9719 sealing RT 17679-17679-4 referring to the March 13, 1986 hearing.) Appellant speculates that the sealing prevented appellant from gaining access to the pages. There is no support for this inference anywhere in the record. The burden of proof of creating a record on appeal is on appellant. Here, appellant fails to create a prima facie issue by failing to show what if any significant content was in the sealed pages, of which counsel below was aware, or even that appellant was barred from access to the pages either directly, or through his attorney. No issue appears.

### D.  March 20 and 24, 1986 and June 26, 1986

Appellant finally protests his absence from two hearings, citing grounds that have been flatly rejected by this and other courts. First, appellant was absent from hearings on March 20 and 24 on a motion for acquittal under section 1118.1, and on admissibility of exhibits. Second, appellant protests his absence from a hearing during the penalty phase concerning admissibility of exhibits.

First, appellant waived his presence under section 977 on March 20 and 24 by acknowledging and rejecting the daily form note sent by the court. (CCT 2127, 2174.) More importantly, appellant had no right to be present at these purely legal hearings:

"The cases which have interpreted sections . . . [§§ 1043 and 977] uniformly have held that the accused is not entitled to be personally present either in chambers or at bench discussions which occur outside of the jury's presence on questions of law

or other matters in which defendant's presence does not bear a "'reasonably substantial relation to the fulness of his opportunity to defend against the charge.'"" (*People* v. *Jackson* (1980) 28 Cal.3d 264, 309.)

As to admissibility of exhibits, this court held:

"Defendant contends he was deprived of his constitutional and statutory right to be present personally at all trial proceedings. (See Cal. Const., art. I, § 15; Pen. Code, §§ 977, 1043.) As the People's case-in-chief drew to a conclusion, a hearing was held in the absence of the jury as to the admissibility of the People's exhibits theretofore marked for identification. There was also a brief review of the question whether the jurors should have been polled by the court as to whether they had read defendant's reference to his parole status in the transcript of his interview with Officer Dreis. The record clearly indicates defendant was not present at this hearing; it also reveals, with equal clarity, his counsel did not object to his absence. Given the nature of the matters under discussion, defendant''s presence was not necessary to protect his interest. Accordingly, the court did not err in holding the hearing in defendant's absence. (See *People* v. *Jackson* (1980) 28 Cal.3d 264, 309, 311 [168 Cal.Rptr. 603, 618 P.2d 149].)" (*People* v. *Harris* (1981) 29 Cal.3d 935, 955; see also *Jackson, supra*, at p. 310.)

As to the subject of absence from a hearing on a section 1118.1 motion, the court in *People* v. *Jones* (1985) 164 Cal.App.3d 1173 stated: "[A]ppellant has failed to suggest plausible reasons why his presence at the [hearing] was necessary. We are unable to discern any way in which his presence would have furthered his interests . . ." (*Jones, supra*, at p. 1180.) The same being true here, no error appears.

## XI.

## THE OFFICERS HAD SUFFICIENT PROBABLE CAUSE TO ARREST APPELLANT

Appellant contends that the bulk of the physical evidence in this case should be suppressed because appellant's arrest on March 3, 1983 was not based on probable cause, and because the evidence was seized as a direct result of that arrest. We believe the arrest was amply supported by probable cause as that term is defined under settled law.

### A. Facts[47]

On the evening of Sunday, February 19, 1983, the night after the murder of Elizabeth Hickey, the Triplex Movie Theatre in Eureka was robbed of seven thousand dollars. (CT 816.) The robber was described by numerous witnesses as a white male in his twenties, 6 feet 2 inches tall, 160 pounds, with long blond hair or wig, wearing a bulky jacket, gloves, dark glasses and a knit hat. (CT 1580, 1480, 1210-11.) Eleven witnesses gave descriptions of the robber and composite pictures were composed. (CT 819, 821.)

Earlier, on January 23, 1982, Humboldt County Deputy Sheriff Richard Walton had approached appellant as appellant sat in a car parked diagonally in a parking lot in McKinleyville, near Eureka, facing across an intersection towards a gas station and mini-mart. Deputy Walton spoke to appellant, who said he was parked because the wind "was blowing too hard" to drive. (CT 1095.) Deputy Walton had noticed no unusual wind conditions. Deputy Walton observed binoculars on the front seat of appellant's car. (CT 1096.) Deputy Walton ran a record check and found appellant had a substantial criminal record, which the deputy believed should be brought to the attention of Eureka police authorities, which was accomplished by means of an "Officer Safety Information" notice. (CT 1097-8, 849.)

During his investigation of the Triplex robbery, Eureka police detective Pat Freese became aware of the Officer Safety Information, and noted that the description of appellant was "very similar to the

---

47. The suppression motion below was based on the transcripts of the two preliminary examinations plus certain other testimony. (RT 21; CT 3363-7.)

composites given" by the Triplex employees. (CT 819, 822.) Freese obtained a six-year old picture of appellant and prepared a six photo line-up, which he showed to various Triplex employees. (CT 823.) At least six employees picked appellant's picture out of the lineup. Of these, Detective Freese testified that the manager, Mark Silverman, picked appellant's picture because "the facial structure . . . was similar." (CT 1214.) Deborah Eires stated appellant's "face was close to the suspect." (CT 1215.) Tyche Gage stated appellant "had facial features similar" to the robber. (CT 1216.) Pamela Scheffler said appellant "had similar facial features." (CT 1216.) Marcie Conn said appellant's "facial features" were "similar" to the robber. (CT 1217.)

Detective Freese thoroughly discussed the case with his colleague Detective Douglas. (CT 1590.) Detective Douglas also saw the composites, and Deputy Walton's Officer Safety Information, and Detective Douglas was also aware of appellant's Aryan Brotherhood membership, and some of his previous history. Detective Douglas knew that several witnesses thought appellant was "very similar to the person who had robbed the Triplex Theatre." (CT 1598.)

On March 3, 1983, after a tip, Detective Douglas went to the Social Security office in Eureka where he confronted appellant. (CT 1599.) Douglas wanted to ask appellant to voluntarily come to the police station to talk, but, appellant

"[w]as extremely agitated. He was tense. His voice was belligerent. His fists were clenched. . . . He seemed to be starting to perspire and his eyes were moving back and forth. Generally he seemed to appear very nervous and he was becoming what I thought was belligerent and hostile." (CT 1601.)

Detective Douglas handcuffed appellant and took him to the police station.

## B.  Argument

Appellant makes numerous points in his attacks on the officers' actions below. Appellant asserts (1) no probable cause existed on these facts to suspect appellant of the Triplex robbery; (2) even if probable

cause existed, Detective Douglas was not aware of it; and (3) even if Detective Douglas was aware of it, he did not believe the facts he knew were sufficient for an arrest. We discuss the issues in reverse order.

Preliminarily, we repeat the familiar standard of review of a section 1538.5 motion denial, which requires this court first credit all reasonable inferences from the record below which support the trial court's decision, and that this court only then exercise independent judgment by applying the law to that inferred record. (*People* v. *Leyba* (1981) 29 Cal.3d 591, 596-7; *In re James D.* (1981) 116 Cal.App.3d 810, 814.) We next turn to two minor points.

### 1. Did Detective Douglas Have Personal Knowledge of Facts Establishing Probable Cause?

The first point to be made under this topic is that Detective Douglas' knowledge of the objective facts showing probable cause is not important. It is settled that the pool of knowledge of all officers involved in the case must be evaluated for probable cause, and that the individual arresting officer need not know all the facts. (*People* v. *Ramirez* (1983) 34 Cal.3d 541, 547; *United States* v. *Pinion* (9th Cir. 1986) 800 F.2d 976, 979, n. 1.) Here, Detective Douglas knew Detective Freese had strong suspicion that appellant was a good suspect. The trial court so found, and that finding was correct. (CT 3405, 915.)

At any rate, the trial court further found that Detective Douglas did know essentially every fact known to Detective Freese. The two shared an office and discussed the case fully. (CT 1566, 1592.) Detective Douglas testified he knew, among other details, that several witnesses had identified appellant's photo in the line-up as being "very similar to the Triplex robber." (CT 1598.) Douglas had read Deputy Walton's Officer Safety Information, had seen the composites, and knew that appellant had a history of violent escape and charges of armed robbery. (CT 1591-2, 1597.) And, Detective Douglas saw appellant's belligerent response to questioning at the Social Security Office. (CT

912.) If anything, Detective Douglas had greater knowledge of probable cause than did Detective Freese.[48/] Appellant's argument is baseless.

## 2. The Officers' Subjective Belief on the Issue of Probable Cause is Irrelevant

Again, appellant's argument is without legal basis. Detective Freese and Douglas' legal conclusion as to whether the facts they knew constituted probable cause is irrelevant. The reviewing court's "independent scrutiny" of the record can establish probable cause regardless of the arresting officer's belief." (*Scott* v. *United States* (1978) 436 U.S. 128, 138; *Berkemer* v. *McCarty* (1984) 466 U.S. 923, 82 L.Ed.2d 317, 322-3; *United States* v. *Moses* (9th Cir. 1986) 797 F.2d 281, 285; *People* v. *Loudermilk* (1987) 195 Cal.App.3d 996, 1005.)

At any rate, appellant's factual argument is as baseless as his legal assertion. Here, both detectives believed they had the legal right to arrest appellant and take him to the station for questioning. The trial court noted in its ruling, "Douglas said, 'I felt cause existed to bring him in.'" (CT 3402.) Detective Freese testified he did not intend to arrest and book appellant because the local district attorney's office would not issue a complaint without sufficient evidence to convict. However, Detective Freese stated he suspected appellant of the Triplex robbery. (CT 1567.) No error appears on this ground.

## 3. Did Probable Cause Exist?

We turn to the crux of the issue, which is the substantive probable cause question. Several kinds of persuasive evidence tied appellant to the Triplex robbery. The trial court in its ruling listed the facts known to Detective Douglas on which it based its decision:

"Douglas knew of:

---

48. In any event, Detective Douglas phoned Detective Freese within five minutes of the contact with appellant, and Detective Freese arrived at the station within ten more minutes, inplicating his full knowledge at a time when a simple detention was all that had matured. (CT 919-20.)

"(1) Mr. Price, an apparent Eureka resident, being parked alongside a roadway in McKinleyville on January 23, 1983;

"(2) Mr. Price being an ex-convict;

"(3) Mr. Price having been connected with a robbery attempt (although he did not know of convictions);

"(4) Deputy Walton's suspicion that Price on January 23, 1984, was casing a possible hold up victim;

"(5) The general physical description of Mr. Price and the general physical description given by the Tri-Plex victims;

"(6) The fact that six witnesses at the Tri-Plex had picked the defendant out of a photo line-up displayed by Freese as similar;

"(7) The fact that the same Mercury vehicle was seen parked near the Tri-Plex some time before the Tri-Plex robbery (this fact was false) (sic);

"(8) The fact that Price was considered to be dangerous and hostile particularly to law enforcement officers;

"(9) The fact that when approached Mr. Price became coolly and quietly uncooperative.

"There is no doubt that Douglas knew that the Tri-Plex had been robbed; radio logs showed him that much. He knew a felony had been committed on February 19, 1984. The question becomes whether the state of facts known to him, on March 3, 1984, would have lead him, as a man possessed of ordinary care and prudence, to believe the defendant had committed that crime. In other words, was his belief reasonable - measured by objective legal standards?

"An ordinary and prudent man would have little doubt that the facts known to both Freese and Douglas were sufficient to cause the formation of a strong suspicion that Mr. Price - based on background, the conduct of January 23, 1984, the general descriptions, the line-ups and his reaction upon being confronted - was the robber. The officers were aware that they needed more evidence to convict and had delayed arrest. But the cause

needed for arrest is reasonable probable cause; it is not certainty nor even proof beyond a reasonable doubt.

"THE COURT FINDS that the information known by Douglas, provided by Freese, Walton and Wild, was reliable with the exception of the notation of the vehicle near the Tri-Plex. That information has been deleted for the purpose of testing this warrantless arrest. The Court concludes that Douglas was aware of reliable official information, most of which is documented by exhibits or testimony, and that official information provided sufficient specific and articulable facts to support the arrest of the defendant for robbery. Those facts, in hindsight, are objectively reasonable facts supporting the arrest." (CT 3403.)

We discuss these categories of probable cause.

### a. Appellant's Criminal History

The officers knew that appellant had a history of violent behavior, that he was a member of a professional criminal organization, and that appellant had been arrested, at minimum, for armed robbery in Arcata ten years previously. Deputy Walton had run a thorough rap sheet on appellant, which would have included his past armed robbery conviction, although it is not certain that Detective Douglas was aware of such details. Appellant's history of and commitment to criminality, while not alone sufficient for an arrest, was a factor to consider.

Although past bad acts showing criminal character are not admissible at trial, they are relevant for a probable cause determination. (See LaFave, *Search and Seizure* (2d ed. 1987) § 3.2c at p. 579-81.) It is a commonplace that past bad acts are excluded at trial not because they are not probative, but rather because they are too probative for them to be entrusted to a jury. Here, appellant's profession, history and physical appearance singled him out.

159

#### b.  The McKinleyville Sighting

Next, Deputy Walton's expert opinion was that he had observed appellant "casing" a gas station "mini market" for a robbery.  (CT 3403.) An officer's expert opinion of behavior appearing commonplace to an ordinary citizen must be afforded respect, and, where, as here, accepted by the trial court on reasonable evidence, must be accepted on appeal. (*People* v. *Wimberly* (1976) 16 Cal.3d 557, 565; *United States* v. *Moses* (9th Cir. 1986) 796 F.2d 281, 284; *Guam* v. *Ichiyasu* (9th Cir. 1988) 838 F.2d 353, 356-7; LaFave, *supra*, at p. 570.)

#### c.  The Composites

Third, the descriptions and composite sketches of the witnesses at the Triplex matched appellant.  Similarity of description may be a strong factor indicating probable cause, when added to additional factors. (*People* v. *Flores* (1974) 12 Cal.3d 85, 92; *People* v. *Loudermilk*, *supra*, 195 Cal.App.3d at p. 1005.)

#### d.  Demeanor of Suspect

When confronted at the Social Security Office, appellant became panicky and hostile.  The suspect's reaction to police inquiry is relevant to his guilty state of mind, and therefore is relevant to probable cause.  (*People* v. *Fields* (1984) 159 Cal.App.3d 555, 564 (on detention appellant appeared to be startled by the officer, had a look of fear in his eyes and quickly looked away from the officer, thus confirming the officer's suspicions); *Guam* v. *Ichiyasu*, *supra*, 838 F.2d at p. 353, 356-7 (refusal to look at officer is relevant factor); *United States* v. *Pinion*, *supra*, 800 F.2d at p. 979 (ignoring officers is relevant factor).)

#### e.  The Photo Lineup Identification

Next, we turn to the extremely strong evidence of probable cause in the fact that five witnesses from the Triplex robbery picked

appellant's photo in a six photo lineup.  First, however, we review the substantive principles of the law of probable cause.

The concept of probable cause has been defined with some care by the Supreme Court.  That court has stated "probable cause does not demand the certainty we associate with formal trials.  It is enough that there was a 'fair probability' of criminal activity by the suspect." (*Illinois* v. *Gates* (1983) 462 U.S. 213, 246.)  Further,

> "probable cause merely requires 'that the facts available to the officer would "warrant a man of reasonable caution in the belief," that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false.  "Practical, non-technical" probability that incriminating evidence is involved is all that is required.'" (*United States* v. *Murray* (9th Cir. 1985) 751 F.2d 1528, 1532, quoting *Texas* v. *Brown* (1983) 460 U.S. 730.)

The instruction on circumstantial evidence, requiring a jury accept a reasonable inference favoring innocence over one favoring guilt does not apply in a probable cause determination.  The test is not whether the conduct under question is consistent with innocent behavior; law enforcement officers do not have to rule out the possibility of innocent behavior.  This is especially so where the officer's experience tells him that suspicious behavior is afoot.  (*United States* v. *Hayes* (9th Cir. 1989) 868 F.2d 1131, 1136; *Illinois* v. *Gates* (1983) 462 U.S. 213, 231 et seq.)  With these basic ideas in mind we turn to the lineup evidence.

Appellant would have this court believe that the five witnesses merely stated in underline relative terms that appellant's photo was the underline most similar of the six in the lineup to the robber.  Such a proposition would ensure that one of the six would have been chosen, whether guilty or not.  This reading of the record is false for numerous reasons.  First, the witnesses were instructed they need not pick any photo out of the lineup if none resembled the robber.  Second, the fact that five witnesses picked appellant, even as most similar of six similar men, would have probative force.

In fact, however, the five did not use such relative terms.  Although no witness picked appellant with certainty, the five we discuss

used absolute terms, and stated that the picture of appellant flatly, and to some witnesses' eyes strongly, resembled the robber.[49]

To review the evidence a final time, Detective Freese testified that Debra Eiers stated that appellant's face in the picture "was close to the suspect." (CT 1215.) Tyche Gage said appellant had facial features that were "similar" to the robber. (CT 1214-15.) Pamela Scheffler stated that the picture had similar facial features. (CT 1216.) Marcie Conn stated that the facial features of appellant's picture were similar. (CT 1216-17.) And, Mark Silverman stated the "facial structure on [appellant] was similar." (CT 1214.)

None of the witnesses positively identified appellant, which made sense given that appellant wore a cap, long blond wig and sunglasses. Given the ambiguity of the identifications, it was up to the trial court to evaluate Detective Freese's credibility as to the certainty and reliability of the witnesses. The trial court also received actual testimony from the witnesses themselves, and so had a further opportunity to evaluate the credibility and degree of certainty. (CT 1476.) This Court should defer to this firsthand determination and accept these factual findings.

The only case appellant can find to support his argument is *Vukman v. Superior Court* (1981) 116 Cal.App.3d 341. There are several reasons why *Vukman* does not control here.

*Vukman* is distinguishable factually. Here, five witnesses testified that appellant resembled the robber. In *Vukman*, only one witness testified, and in that case there was no additional evidence such as was present here. Also, the holding of *Vukman* was:

"Here, the victim was asked (to use the district attorney's words) 'to see if [he] could select a person that was the person or most clearly fit the person that robbed [him]'; or (in the victim's words), he was asked 'which one looks like the person.' He was not asked if he believed the photograph was *of* the robber, but if it resembled him." (*Vukman, supra*, at p. 345.)

The court emphasized the relative nature of the questions, that is, the stress on which picture "looked more like the person . . . than the other five." (*Id.* at p. 344.) Here, as set out *supra*, five witnesses stated

---

49. Note that contrary to appellant's suggestion, the photo of appellant was less than six years old, and, according to the testimony of one witness "certainly looks like [appellant]." (CT 1509, 823.)

not that the picture most nearly fit the robber, but rather that the picture and appellant had "strong" resemblances.

Finally, it is plain that *Vukman* was wrongly decided. First, the holding in *Vukman* simply ignores the witness' statement there that he was sure to a level of "eight" on a scale of one to ten. Several principles of law are implicated. First, as noted *supra*, reasonable suspicion does not require a preponderance of the evidence showing of guilt. Where a witness states an identification with an eighty percent certainty, and the trial court, which has observed the demeanor of the witness, accepts the testimony as persuasive, it cannot be proper for the Court of Appeal to reverse such a decision. It is settled that credibility is "to be evaluated by the jury . . . and the testimony of a single eye witness, if not inherently incredible, is sufficient to support a verdict." (*People* v. *Keltie* (1983) 148 Cal.App.3d 773; CALJIC No. 2.27.) Thus, the evidence here, and in *Vukman*, may well have been sufficient for a conviction, let alone for a holding order. Similarly, in *People* v. *Barranday* (1971) 20 Cal.App.3d 16, 22 testimony of one witness that the defendant "resembles" or "looks like the same man" was ruled, in the discretion of the jury, sufficient to sustain a conviction. In *People* v. *Rede* (1986) 176 Cal.App.3d 1005, 1007 the court held that a chemist's statement that a substance was "more likely than not phencyclidine" was sufficient evidence of the contraband nature of a substance, causing the Court of Appeal to reverse the trial court and reinstate an information. All of these cases support the principle that where substantial evidence of identification appears, and the trial court is satisfied with the persuasiveness of the evidence, the reviewing court may not interfere with such a decision.

In sum, here, five witnesses chose appellant not only as the most similar to appellant of six photos, but also stated appellant was flatly similar in several respects to the well disguised robber. Appellant was known to law enforcement officers to be a professional criminal experienced in armed crime, who had been observed "casing" a store for a robbery. On being confronted by an officer, appellant became hostile and panicky, exhibiting consciousness of guilt. We believe ample evidence existed for a reasonable officer to discern a "fair probability" of criminal activity.[50]

---

50. Within ten minutes of his arrest, marijuana was discovered on appellant's person, further justifying arrest. (CT 924-5.)

## XII.
## THE COURT PROPERLY HANDLED THE THIRD
## PARTY CULPABILITY EVIDENCE

Appellant makes numerous claims that the trial court wrongly excluded evidence showing that Elizabeth Hickey's live-in boyfriend Berly Petry might have been guilty of her murder. Specifically, appellant challenges restrictions on admission of prior writings of Berly Petry, of tapes of lengthy interviews between Petry and the police soon after the murder, and of Petry's preliminary hearing testimony. The first point to be made is the obvious one that all of these materials are hearsay, and that it was appellant's burden to convince the trial court that some exception applied.

### A.   Petry's Prior Writings

Appellant first claims the court improperly restricted admission of a number of writings in Petry's handwriting found at the apartment. Appellant proposes several grounds for admissibility of this hearsay evidence.

First, appellant notes that Petry's memory of his relationship with Hickey and of the events surrounding the murder was much weaker at trial several years after the event than it was in interviews immediately after the crime, and at the preliminary examination. Appellant proposed to enter the writings to show Petry was intelligent and must be misleading the jury by his claimed lapses of memory. The court allowed in evidence for this purpose a long excerpt of the writings, consisting of an apparent attempt by Petry to write several short stories. The writings showed Petry's spelling was completely untutored, but that he had some grasp of grammer and diction. The court concluded the excerpt was sufficient to display Petry's level of intelligence, and was not prejudicial, as it concerned fiction, not Petry's relationship with Hickey. The remaining writings were excluded. (CT 13634, CCT 1813-20, 1838-41.)

This ruling was correct. The court was far from convinced of the soundness of the defense's theory of impeachment by proof of intelligence. Petry testified at length, and, as discussed *infra*, was shown to be lying on several occasions. Also, the tapes of the original interviews themselves were given the jury and discussed in detail by defense counsel. The jury had ample material with which to assess Petry's intelligence and credibility. The ruling was within the court's discretion under Evidence Code section 352.

The second ground for admission of the writings was to prove Petry's state of mind regarding Hickey, in particular his deep devotion to her, and his sense of betrayal from her irresponsible behavior, which could lead to motivation for murder. In fact, the writings were effectively used by the defense to impeach Petry on precisely these grounds. When Petry testified that he did not remember telling Hickey that he had stopped loving her, defense counsel was allowed to read to the jury the following excerpt from the letters:

> "'But now I tell you the truth, that my heart, my soul, and my mind, for my love for you is gone, sensiously. For you took this magnitude of personal love from me when you chose to go and hear sensious sounds and get written words' -- parenthesis -- 'letters' -- close parenthesis -- 'from and with other men; when I look at your naked body now with a sad and broken heart, for I have known for a long time.'" (RT 13653.)

Again, when Petry stated Hickey had never bit or struck him, defense counsel read to the jury Petry's words: "I've gotten kicked, hit, bitten, and bitched at." (RT 13663.) Later, Petry denied being Hickey's disciplinarian, to which defense counsel was allowed to read "Berlie is your guardian disciplinarian" from the writings. (RT 13742.) Other impeaching statements were also allowed during the cross-examination. The court also allowed a diagram which showed Petry's obsessive analysis of Hickey's lifestyle.

Further, defense counsel was able to smuggle much more of the content of the writings into evidence. In asking the above questions, and others, counsel used the device of reciting the content of the writings in leading questions, and then, when Petry stated he did not remember the content, by challenging Petry to read the transcript of the letters to refresh his recollection. Given that Petry admitted making many of the statements after reading the transcripts, the jury was quite aware of the

165

content of the writings, and of the implication in defense counsel's actions that Petry was plainly lying.[51]

Ample portions of the writings were admitted to accomplish the ends sought by appellant: display of Petry's intelligence, and his sense of betrayal by Hickey. The trial court's exclusion of additional hearsay was within its discretion.

Appellant next claims that exclusion of the writings themselves was error, even though the writings were read aloud to the jury. Appellant cites no authority for such a proposition. The jury was free to ask for a reread of the transcript had it so wished.

Next, as to one particular passage in the writings, appellant claims Petry wrote that he thought Hickey had accused him of child molestation, and that this was a powerful motive for murder. The writings do not bear out appellant's allegation. In the actual passage, Petry wrote he believed he had been "cussed at, ignored, conned, scorned, left with the children and accused of child abuse and with the acusation (sic) of being a potential child molester. This is what I get in returned (sic) for disciplining the kids." (Emphasis added; CCT 1833.) Thus, Petry's actual phrase was much milder than appellant now claims. Further, the court was quite correct that no time frame was shown for when the letter was written. Had the letter been written, as it may have been, years before the murder, its relevance would be quite small, compared to its possible prejudicial value. The court was within its discretion in excluding the statement.

In sum, the jury was completely aware of the precise character of the squalid Hickey/Petry relationship. The jury knew that Petry deeply loved Hickey, that he more than once discovered her in bed with other men, and had done nothing, that he had never slept with any other woman, that he had repeatedly contracted venereal disease from her and knew it stemmed from her affairs, that the two fought loudly, daily, that Petry had been seen assaulting or slapping Hickey more than once, that Hickey told Mrs. Moore Petry had hit her once, that Hickey regularly had bruises on her face, that he called her hourly from work on his graveyard shift and that he was aware she took cabs to and from bars

---

51. These writings also tended to show Petry's level of intelligence, thus further supporting the court's exercise of discretion in not admitting other writings.

between his calls, as well as numerous other details. Exclusion of portions of the writings was minor, and was within the court's discretion.

## B.    The Interview Tapes

Appellant next contests the court's handling of the tapes of Petry's interviews with police following the Hickey murder, on February 19 and 22, 1983. (See Transcripts at CCT 1875-2014, see also CT 10084, 10137-8, RT 13490-1.)   Appellant's lengthy argument mis-analyzes the issue.

As appellant concedes, the tapes were admitted in evidence in their entirety. (See RT 13489 et seq.) Appellant also tacitly concedes that the defense never requested the tapes be played for the jury. Any error on this ground was thus waived.

And, counsel's decision made sense. Much of the tapes consisted of Petry making exculpatory statements about his acts at the time of the murder and during his relationship with Hickey. The interviews actually convinced the police Petry was not culpable. There was no reason for the defense to·want these exculpatory portions played for the jury. As for the damaging portions, the defense strategy was to use closing argument to go over these portions thoroughly, pointing out in detail the contrasts with Petry's testimony, and illustrating his motive for murder. This close analysis of the tapes was accomplished at length in closing argument by defense counsel. (RT 20645-63.) Thus, the defense gained all the advantage it desired out of the tapes, and forced the prosecution to play the portions of the tape it thought aided their case, as was done. On the record here, there was simply no error whatsoever in the handling of the tapes.

As for sending the tapes into the jury room during deliberations without playing them in open court, this again, was simply not error. The tapes were evidence, and the jury was entitled to them under Penal Code section 1137. The court was no more obligated, nor authorized, to control the jury's access to, and use of, the tapes, than it would have been to control the jury's use of any other documentary or physical evidence. Just as jurors may reread documents, individual jurors were free to make any use they wished of the tapes. (*People* v. *Fujita* (1974) 43 Cal.App.3d 454, 472-3.) In the absence of any defense request during

trial for playing of the tapes, no error appears. (See *People* v. *Floyd* (1987) 43 Cal.3d 333, 361; *People* v. *Stewart* (1983) 145 Cal.App.3d 967, 973-4.)

It may technically be true that appellant's cited case of *People* v. *Hogan* (1982) 31 Cal.3d 815, 849-50 required counsel's agreement before exhibits were sent to the jury. That case is not applicable here for several reasons. In *Hogan*, inadmissible material was given to the jury; appellant does not claim such was done here. (See, *People* v. *Brew* (1984) 161 Cal.App.3d 1102, 1106.) Nor does appellant claim that his counsel did not know the exhibits were being provided, nor that he could or would have objected had he known, as was obviously the case in *Hogan*. (See CT 10204 showing court's order the tapes to be transported to the jury, and also showing that court and counsel were in constant communication over evidentiary issues.) Rather, appellant here merely claims that his counsel would have demanded the entire tape be played for the jury. Aside from such a claim being belied by the lack of any request on the record after counsel became aware of the transmission of the tapes, the argument is baseless. Appellant had no right to demand, after the deliberations had begun, that the jury consider the evidence in any particular manner. Appellant's right on the issue ended when the taking of evidence ended, and he sensibly decided at that time he did not wish the entire tapes played. No error or any conceivable prejudice is shown.[52]

## C. The Preliminary Examination Transcripts

Appellant makes lengthy argument in regard to admissibility of the preliminary examination transcripts.

Appellant's legal arguments are weak. It is settled beyond question that a statement by a witness that he does not remember does not contradict a prior substantive assertion, and therefore Evidence Code section 1291 does not provide a hearsay exception for admission of these prior statements. (*People* v. *Jiminez* (1978) 21 Cal.3d 595.) An exception to this rule is that where deliberate evasion is found, the prior

---

52. Once again, the voluminous tapes covered virtually every conceivable aspect of the Hickey/Petry relationship. They were admitted in their entirety and exploited to the fullest by defense counsel. These facts undercut any previous argument for error in the handling of the writings.

statement may be admitted. However, the finding of deliberate evasiveness is a question of fact to be determined by the trial court. (*People* v. *Rohaus* (1975) 15 Cal.3d 540, 550-1.) Here, after consideration of all the evidence, and of Petry's previous statements, the trial court concluded: "the court finds the totality of all the proceedings gives no reasonable basis to believe that Mr. Petry's 'I don't remember' responses are deliberately evasive." The court queried counsel "how can you, observing all this, really feel this dull man could hope to fool the truth? . . . [his responses] are a product of his limited capability." (RT 13511.) Based as it is in part on the trial court's observation of appellant's demeanor, this decision must be afforded deference on appeal.[53/]

Even hypothesizing error in the court's decision, appellant points out no conceivable prejudice. The argument is undercut by the fact that the police interview tapes were admitted in evidence, and used extensively in final argument. The tapes were much more thorough and detailed than the preliminary examination testimony, and appellant identifies no instance in which statements in the preliminary examination transcript were not fully covered in the tapes. The preliminary hearing testimony was cumulative. No error or harm appears.

D. **The Trial Court Properly Handled the Expert Witness Testimony of Dr. Blinder**

Appellant next attacks the trial court's handling of the testimony of Dr. Martin Blinder. Dr. Blinder was allowed to thoroughly examine all of the evidence in the case, including some inadmissible matter. The court then allowed Dr. Blinder to testify how the relationship of Berly Petry and Elizabeth Hickey fit the symptoms of what Dr. Blinder dubbed "domestic violence syndrome." In other words, Dr. Blinder testified that the evidence showed that Berly Petry and Elizabeth Hickey's relationship showed patterns typical of relationships examined by Dr. Blinder after they had ended in the killing of one partner by the other.

---

53. Note that Hickey's stepfather Richard Moore testified Petry could only be described as a "dumb shit," who did not have a "normal intelligence." (RT 11632.) The court also read Petry's high school transcript and other such materials provided by the defense.

Appellant protests on the minor point that, even though Dr. Blinder was allowed to testify, he was prohibited from reciting to the jury the content of inadmissible writings of Berly Petry, writings which otherwise were inadmissible hearsay. Appellant argues that under Evidence Code section 800 et seq., an expert is allowed to rely on hearsay, and the expert may bolster his opinion by relating to the jury on direct examination the content of the hearsay to explain how he came to his conclusion.

Appellant's argument boils down to a dispute over whether Dr. Blinder's opinion was prejudicially undercut by his inability to recite the hearsay content of some of Petry's writings to the jury.[54] Appellant's argument is insignificant for several reasons. "'Where expert opinion evidence is offered, much must be left to the discretion of the trial court.'" (*People* v. *McDonald* (1984) 37 Cal.3d 351, 376.) It is well established that the trial court may exclude the hearsay basis of an expert's opinion under Penal Code section 352. (*People* v. *Fair* (1988) 203 Cal.App.3d 1303, 1310-11; *People* v. *Bowker* (1988) 203 Cal.App.3d 385, 390.) The trial court was justified in so doing here for several reasons. The hearsay writings were, by definition, unreliable, and incapable of being cross-examined, since Petry did not recall their context. At any rate, the court admitted major portions of the writings, which were sufficient in the court's judgment to give the jury a feel for Petry's attitude. The writings and the bizarre diagram admitted gave indication of the obsessive nature of Petry's feelings. More importantly, however, was the minor importance of the writings as a whole. The jury was thoroughly familiar with Elizabeth Hickey's infidelities, of Petry's observations of them, of the contraction of venereal disease, of Petry's obsessive nightly, hourly phone calls, of Hickey's bruises and Petry's alleged assaults on her, of the character of Hickey's physical wounds as inflicted by the murderer, as well as volumes of additional evidence describing the Hickey/Petry relationship. The few pages of hearsay writings disputed here by appellant were trivial, and were properly excludable under Evidence Code section 352.

---

54. Because of the trivial nature of appellant's argument, and because the bulk of Dr. Blinder's opinion was admitted, we do not dispute, though we do not concede, the basic admissibility of the expert's opinion on "domestic violence syndrome." (But see *People* v. *Bledsoe* (1984) 36 Cal.3d 236, 249-51.)

Finally, the hearsay writings could not have been considered for their truth, but rather only to show how Dr. Blinder came up with his opinion and the jury would have had to be so instructed. But, without proof of the truth of the content of the writings, Dr. Blinder's opinion was no more than a hypothetical one. Given the difficulty the jury would have had in limiting consideration of the writings to an assessment of the logic of Dr. Blinder's opinion, and not of proof of any fact, exclusion under section 352 was prudent. At any rate, the content of the writings was essentially known to the jury. No error occurred.

## E. The Trial Court Properly Excluded the Hickey State of Mind Evidence

Appellant next protests the trial court's exclusion of hearsay statements of Elizabeth Hickey to a therapist indicating she was afraid Berly Petry, that Berly Petry beat her, and that Hickey wanted to leave Petry but could not afford to. (RT 18212.) All of these statements were allegedly overheard eight months to a year before her death. Appellant is somewhat unclear here, as he was below, as to which statements he believes were admissible, and for what purpose. At any rate, the trial court's exercise of discretion in excluding the remote hearsay statements was proper.

The rules concerning admissibility of hearsay evidence under Evidence Code section 1250 as evidence of state of mind are well settled.[55] Such evidence may be entered to show the state of mind of the declarant (1) if that state of mind is at issue, or (2) to explain acts in conformance with the state of mind. Here, it is not argued on appeal that Hickey's state of mind per se was relevant. (But see Argument of

---

55. Evidence Code section 1250 states:
"(a) Subject to Section 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when:
"(1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or
(2) The evidence is offered to prove or explain acts or conduct of the declarant.
"(b) This section does not make admissible evidence of a statement of memory or belief to prove the fact remembered or believed."

Defense Counsel below at RT 18213.)  The hearsay evidence could be admissible here only to show that Hickey acted in conformance with a given state of mind.  On the other hand, it is strictly forbidden to attempt to prove the actions of other persons from the declarant's state of mind either by the content of the hearsay statement, or by implication from the state of mind of the declarant.  (*People* v. *Ruiz* (1988) 44 Cal.3d 589, 608 (hearsay "not admissible as proof of the fact remembered or believed").)

Here, appellant sought to enter several types of statements of Hickey.  First, appellant proffers statements of Hickey that she was afraid of Petry because he beat her.  It is quite plain that such statements may not be used to prove Petry did beat Hickey.  It is improper to admit "evidence of the victims' expressions of fear of defendant" to prove "that those fears were justified".  (*Ruiz, supra*, 44 Cal.3d at p. 608.)  This is precisely the purpose for which the defense below sought to admit the evidence, and the primary purpose advanced on appeal.  (See AOB 406; RT 18089 et seq, 18200.)

Next, appellant claims Hickey stated she was waiting for someone stronger than Petry to take her away from Petry, and that this proved something about Hickey's relationship with appellant.  In fact, there was no testimony Hickey said any such thing.  Dr. Barney of the women's health clinic actually testified this was merely his "impression." (RT 18186.)  As such the evidence was improper, and need not be discussed further.

With these matters clarified, what is left is statements by Hickey that she did not leave Petry because she believed he would harm her, and, perhaps, statements that she intended to save money to leave him.

On appeal appellant claims this evidence was relevant to prove not the impermissible inference that Petry beat Hickey, but that Hickey acted in conformity with her state of fear by giving the guns to appellant on consignment, to raise money so that she could afford to leave Petry.  However, appellant points to no place in the record where this ground of admissibility was specifically urged below.  Rather, counsel below wanted the evidence admitted to show that Hickey was afraid of Petry and so to prove that Petry beat Hickey and was likely to have killed her.  (RT 18213 et seq.)  This sort of deduction is precisely the prohibited use of the evidence. (*Ruiz, supra*, 44 Cal.3d 589, 608.)

172

Further, it makes sense defense counsel did not urge the theory now advanced on appeal. While appellate counsel may urge any abstract theory of admissibility, defense counsel is faced with a live skeptical jury. It is understandable that defense counsel did not wish to argue that the prior mental state hearsay evidence showed Hickey was deathly afraid of Petry, and so did not leave him, but for counsel to then look the jury in the eye and argue as follows; Hickey gave a virtual stranger, appellant, not only her own guns, but also Petry's, on consignment, with no money in return or even any receipt, so that Hickey could raise money to leave Petry; that Hickey then remained in the apartment waiting for Petry, whom she so feared, to discover that his guns were gone, and that Hickey planned to leave him; and that all this occurred when Hickey had numerous other places to go, including at minimum her mother's house and her friend Zelma Hunsinger's home. (RT 18083.) Defense counsel is not required to advance improbable arguments.

There are additional serious problems with this theory of admissibility. It would have opened the door to other hearsay evidence of Hickey's state of mind. Specifically, the prosecution wished to enter evidence that Hickey had stated she had loaned a hammerless pistol to someone named "Curt," similar to the one used in the liquor store robberies, that Hickey was afraid of this "Curt" and that she believed "Curt" burglarized the Moore residence of the guns later found in appellant's locker. (RT 18090-1.) This evidence would have been admissible to show conduct in conformance, namely that Hickey was likely to have refused to do business with appellant, a man whom she feared, not trusted, especially on a consignment basis. This would support the conclusion that appellant must have taken the guns by force. Also, Hickey's suspicions of appellant and her possible knowledge of the source of a gun used in the robberies added to appellant's motive for murder, which would render the statements substantively admissible. Recognizing these facts, defense counsel withdrew its request for admission of Hunsinger's testimony on Hickey's state of mind. (RT 18091.) This supports the argument that defense counsel was not truly interested in attempting to show Hickey acted in conformance with her state of mind, which was the only legitimate use for the evidence, but rather in trying to prove Petry beat Hickey, through evidence of Hickey's alleged fear of Petry.

173

Moreover, any probative value of the evidence was minimal and weak, and was made even weaker by its remoteness. As this court has stated:

"Even if [state of mind] evidence is relevant, we have stressed its potential prejudice and have required that the trial court engage in a careful weighing of its probative value against the nature of undue prejudicial effect on the jury." (*People* v. *Thompson* (1988) 45 Cal.3d 86, 103.)

This court allowed state of mind evidence in that case because "the statement did not occur long before the rape and killing. It was not cumulative to other evidence." (*Id.*) By contrast, the evidence here was stale, being about a year old, and there was no evidence of Hickey's later financial situation. Further, Hickey's fear of Petry was well documented by evidence of third parties, at least two of whom were eyewitnesses to assaults on Hickey by Petry, by evidence of Hickey's black eyes, by evidence of Petry's hourly phone calls, his verbal abuse of Hickey in public, and his cutting off her visits to counselors.

In sum, the character of the relationship between Petry and Hickey was well known to the jury. Evidence that Hickey feared Petry was inadmissible on the theory that it proved that Petry beat Hickey, and on legitimate matters it was cumulative. Evidence that Hickey thought she needed money to leave Petry was trivial, and stale in that Hickey had not acted on such a belief in the year after it was made. The theory appellant advances on appeal is not the one stressed below, and has minimal probative value because it does not fit the facts. Appellant below withdrew his request to admit much of the evidence. The trial court was well within its discretion in excluding Hickey's hearsay declarations as remote and cumulative.

## F.  The Videotape of Hickey's Children's Room was Properly Excluded

Appellant next argues that a video tape of the Hickey apartment was improperly edited to eliminate shots of the bedroom of Hickey's two young girls. The bedroom was apparently in an appallingly dirty state. We are unable to understand any legitimate prejudice to the defense from the suppression of the pictures.

On the other hand, the prejudice to the prosecution of allowing the pictures is obvious. As the mother, victim Hickey would naturally take the brunt of the disapproval of the jury stemming from lapses in care of the children. Such deprecation of a victim is prejudicial and improper. As Justice Jefferson has stated:

> "Defendant urges the contention that it is a misuse of Evidence Code section 352 for the trial court to exclude proffered *defense* evidence even though such evidence is cumulative of other evidence. We know of no rule which precludes the trial court from using Evidence Code section 352 in the prosecution's favor to exclude evidence offered by defendant, the probative value of which is substantially outweighed by the danger of undue prejudice to the *prosecution*. In *People* v. *Arline* (1970) 13 Cal.App.3d 200 [91 Cal.Rptr. 520], the court held that the prosecution in a criminal case is entitled to the benefit of Evidence Code section 352 and to have excluded relevant evidence proffered by defendant because the probative value of such evidence is substantially outweighed by danger of undue prejudice to the prosecution." (*People* v. *De La Plane* (1979) 88 Cal.App.3d 223, 241.)

Further, the evidence was cumulative. Lynne Harden lived directly behind the Hickey apartment and her home overlooked the Hickey backyard. Harden testified the Hickey children were "filthy" but "pretty happy little girls." (RT 12710-2.) Given the breadth of detail known to the jury of Hickey's lifestyle, including Hickey's habitually engaging in sex at home with strange men, and leaving the girls alone in the apartment for hours each night, the jury had a fair picture of Hickey's skill as a mother.

Appellant argues the filthy state of the room would have rebutted Petry's claim he was the head of a happy family. The jury was well aware of what a squalid affair the Hickey/Petry liaison was. The fact Petry allowed Hickey to keep her children in poor conditions added nothing to his motivation to kill their mother. No issue appears.

## G.   The Polygraph Evidence was Properly Excluded

Appellant next challenges the trial court's rejection of the offer into evidence of the results of Berly Petry's polygraph examination which took place at police headquarters immediately after Hickey's murder. Defense counsel claimed Petry was deceptive as to questions about who killed Hickey, and as to where the weapons were presently. The court excluded the evidence under Evidence Code sections 351.1 and 352. (RT 13234 et seq., 13251.) This decision was correct for numerous reasons.

Polygraph evidence has traditionally been considered unreliable and has been excluded on that ground. (*People* v. *Adams* (1975) 53 Cal.App.3d 109, 115, 119.) In 1982, the opinion in *Witherspoon* v. *Superior Court* (1982) 133 Cal.App.3d 24 held polygraph techniques might have advanced, and that it would thenceforth be proper to hold a hearing as the reliability of polygraphs, and as to the expertise of the operator, in any trial where such evidence was proffered. The Legislature responded rapidly by passing Evidence Code section 351.1 which took effect as urgency legislation on July 12, 1983. The bill included the following language:

"SEC. 2. This act is an urgency statute . . . and shall go into immediate effect. The facts constituting the necessity are:

"In order to establish clear rules for the admission of evidence in criminal cases for the proper administration of justice by the courts it is necessary that this act go into immediate effect. (Stats. 1983, chap. 203, § 2, p. 668.)

This was a legitimate exercise of power by the Legislature. The legislative history in subsequent case law reveals three legislative intents in the passage of the statute.

First, and most importantly for our purpose, the statute constituted a legislative determination that at the time of the trial below, polygraphs were unreliable. This court has interpreted the statute as expressing "continuing doubt" about the "reliability" of polygraph evidence. (*Arden* v. *State Bar* (1987) 43 Cal.3d 713, 723-4; *People* v. *Miller* (1989) 208 Cal.App.3d 1311, 1314 ("polygraph tests are deemed unreliable for evidentiary purposes").)

It is appropriate for the Legislature to make such a determination. "Rules of evidence may also be prescribed by the

176

Legislature without compromising the authority of the judicial branch of government. . . . '[t]he power of the Legislature to determine what is or is not competent evidence in a civil or criminal case is unquestionable.'" (*In re Lance W.* (1985) 37 Cal.3d 873, 891.) The evidence was properly excluded in this case, and any failure to hold a hearing was conclusively harmless.

It is conceivable that a legislative determination of incompetency of evidence could be so irrational and restrictive as to violate the Sixth Amendment right to a fair trial. Such concern is not warranted here. As noted, this Court, the ultimate arbitrator of the constitutionality of evidentiary restrictions, has previously endorsed the findings of unreliability of polygraph testimony. It is irrelevant whether polygraph technique has since improved; it remains true that this court has endorsed the determination that at the time of the testing here, 1983, the technique was not suitably reliable for use in criminal trials in California.

Second, reliability is not the sole criteria for the admissibility of evidence. "[Section 351.1] clearly rests on considerations of reliability and integrity of the criminal justice system." (*People* v. *Kegler* (1987) 197 Cal.App.3d 72, 89.) *Kegler* detailed the tremendous judicial inefficiency which would result from requiring a hearing on the legitimacy of polygraph evidence, and the expertise of an individual method and operator, in each case. Decisions concerning such widespread issues as polygraph admissibility are properly made by the Legislature, as overseen for constitutional legitimacy by this court. The power of the Legislature to promote fair adjudications also underlies the legitimacy of section 351.1.

Finally, we briefly note that the evidence excluded in this case was by no means crucial. As stated in *Kegler*, a case quite similar to this, "the fallacy of [appellant's] argument is that even expert opinion evidence that [the third party] was lying goes only to the issue of [that party's] credibility and cannot in itself provide affirmative evidence that [the third party] was the killer. Disbelief of a witness does not establish that the contrary is true, only that the witness is not credible." (*Kegler, supra*, 197 Cal.App.3d at p. 85.) Here, Petry had been caught in lies by the defense several times on the stand; further proof of his shaky credibility was unnecessary. Further, the jury would have been faced with the problem of reconciling the expert's opinion that Petry had been deceptive when he stated he did not know where his guns were at

present with the fact that that statement was true. For this additional reason no error or prejudice appeared.

Appellant raises two other issues on the polygraph question. First, appellant claims section 351.1 was not intended to be retroactive. The quoted enacted intent states the need to end confusion on the issue of admissibility of polygraph evidence at trial. This statement, combined with the urgency status of the bill, is strong proof of retroactive intent. It is also true that the trial court was correct in noting section 351.1 in its decision under section 352. Even if section 351.1 was not retroactive, the statement by the Legislature that polygraph evidence is unreliable and contrary to public policy in this state is a legitimate and presumably decisive element in a decision under section 352. The retroactivity question thus casts no doubt on the correctness of the trial court's decision.

Finally, appellant urges application of section 351.1 would be a violation of ex post facto principles. His argument is untenable in the face of settled law. It has recently been stated:

"Generally, retroactive changes in evidence or procedure must have the effect of changing the prosecution's burden of proof or lessening the amount of evidence necessary to convict before ex post facto considerations are implicated. (*Calder* v. *Bull* (1798) 3 U.S. (3 Dall.) 386 [1 L.Ed. 648]; *De Woody* v. *Superior Court* (1970) 8 Cal.App.3d 52, 56 [87 Cal.Rptr. 210].) However, changes in evidentiary rules which broaden or narrow the class of persons competent to testify are not deemed ex post facto in operation. (*People* v. *Bradford, supra*, 70 Cal.2d 333, 343-344, fn. 5.) For example, a statute permitting the introduction of a defendant's letters for comparison of handwriting (*Thompson* v. *Missouri* (1898) 171 U.S. 380 [43 L.Ed. 204, 18 S.Ct. 922]) and statutes enlarging the class of persons competent to testify by permitting testimony of felons (*Hopt* v. *Utah* (1884) 110 U.S. 574 [28 L.Ed. 262, 4 S.Ct. 6, 202]) are not ex post facto; nor is a change in a rule of evidence relating to the proof of death of victim of homicide allowing a period of three years and a day instead of one year and a day (*People* v. *Snipe* (1972) 25 Cal.App.3d 742 [102 Cal.Rptr. 60 A.L.R.3d 1316])." (*People* v. *Seldomridge* (1984)

154 Cal.App.3d 362; see also *People* v. *Sweet* (1989) 207 Cal.App.3d 78, 82.)

Once again, however, these arguments are not crucial because no ex post facto rule is implicated by the trial court's consideration of the legislative statement of policy inherent in the adoption of section 351.1 as part of the trial court's exercise of discretion under section 352. Once again, the trial court's ruling was unimpeachable.

## XIII.
## THE TRIAL COURT'S FURTHER EVIDENTIARY RULINGS EXCLUDING DEFENSE EVIDENCE WERE CORRECT

A.  **Appellant Next Protests the Exclusion of the Testimony of Dr. Richard Korn as an Expert on California Prison Gangs**

     Appellant stated that Dr. Richard Korn would testify:

     ". . . that the size of the AB was different than Smith and Thompson had claimed, that the organizational structure did not match the descriptions by Smith and Thompson, and that CDC considered the AB the smallest and least organized of the prison gangs. (RT 19551.) Defense counsel added that Dr. Korn would also be used to describe how inmates became labeled as gang members merely by association with known members. (RT 19552.)" (AOB 445.)

The court's exclusion of the proffered testimony was correct.

     The court's ruling was primarily based on its discomfort with the sources of Dr. Korn's knowledge of the Aryan Brotherhood in California prisons. Dr. Korn's knowledge came primarily from two sources, CDC reports, and interviews with purported Aryan Brotherhood members and other inmates. (RT 19558, 19517 et seq.) The trial court was suspicious of whether the CDC reports could be the proper basis of an expert opinion. The court stated the reports were not reliable enough to be counted on for accuracy. The trial court made clear it based its skepticism on the extensive and conflicting testimony it had heard at trial of the nature and actions of the Aryan Brotherhood. (RT 19551 et seq.)

     More importantly, the court perceived that the bulk of Dr. Korn's expertise came from interviews with prison inmates. However, Dr. Korn stated he would refuse to reveal the identities of these inmates without their consent. The court found it highly unlikely such consent would be forthcoming, a position never seriously disputed by the defense. (RT 19550-1.)

     Dr. Korn proposed to give authoritative opinions about gangs based on the confidential statements of gang members, while concealing

the identity and interest of those hearsay sources. Given the parade of pathologically lying inmates who had testified, the court was understandably unwilling to accept the opinions of an "expert" without affording the prosecution a chance to prove the man was a dupe of sociopaths. (*See People* v. *Reynolds* (1984) 152 Cal.App.3d 42, 47.) Such logic cannot be faulted in this case.

While the court understood that some background testimony on prison gangs could be helpful to the jury, the court was rightly firm in its decision to exclude Dr. Korn's testimony for several reasons. First, the court read to the jury many of Dr. Korn's conclusions by personally reading the findings of fact of Judge Stanley Weigel of the Federal District Court for the Northern District of California, findings which were made after exhaustive hearings on the California penal system, including the conclusions that:

"Despite all of these precautions, assaults on inmates in lock-up are common. Violence among . . . inmates is frequently channeled through social organizations. Prison authorities and many inmates term these organizations, quote, 'gangs,' end quote, and ascribe to them colorful names, such as Aryan Brotherhood, Mexican Mafia, and Black Guerilla Family.

"Expert sociologists who testify at trial expressed the view that these groups are not as stable or as well organized as prison officials believe.

"Alliances and enmities among inmates shift constantly.

"The institutional labeling of an inmate as a gang member frequently proves to be a self-fulfilling prophecy.

"Fellow prisoners tend to accept the label, forcing the inmate to ally himself with others similarly labeled, in order to survive. Inmates seeking to identify themselves with a gang sometimes perform acts of violence in order to gain membership. Factional strife and leadership struggles within gangs occasion violence as do battles between rival gangs." (RT 20280-1-3.)

It seems only logical that such pronouncements would carry more weight when read to the jury by the trial court than when related by a purported expert called by one party.

In addition, numerous witnesses at the trial testified to facts identical to those which Dr. Korn proposed to state. The difference

between these witnesses and Dr. Korn was that they were capable of being cross examined. For instance, even prosecution witnesses Thompson and Smith could not agree as to when the Aryan Brotherhood organized a ruling commission, how many members sat on the commission, or who those members were. John Stinson claimed he was mistakenly labeled as an Aryan Brotherhood member by prison officials (RT 18604), that Thompson was a well known liar (RT 18601), and that the Aryan Brotherhood had no formal organization. (RT 18631.) Similar facts were testified to by Wendall Norris (RT 18900, 18848) and Robert Rowland (RT 18985). In all, Dr. Korn's statements would have been cumulative.

Finally, Dr. Korn did not intend to testify that the Aryan Brotherhood did not exist, or that it did not use murder to achieve its ends, or that the killing of "snitches" was not considered honorable by Aryan Brotherhood members and other inmates. Those were the important gang related points at trial. The actual structure of the Aryan Brotherhood was less vital. Even if Thompson exaggerated in his testimony that the decision to kill Richard Barnes was a statewide gang decision as Dr. Korn stated was likely, that exaggeration had little impact on Thompson's testimony that he, Smith and Stinson in fact planned the killing and ordered appellant to carry it out. Any argument that the jury needed further direct impeachment of Thompson or Smith's character for veracity, given the jury's complete familiarity with their murderous and treacherous characters, is absurd.

In sum, Dr. Korn's testimony was tangential in that it would not have contradicted the prosecution's theory of the existence of a murderous Aryan Brotherhood gang; it was cumulative in that Thompson and Smith had been thoroughly exposed as habitual liars; the judge read findings of a federal judge which were quite similar to the conclusions of Dr. Korn; and, the evidence was improper and unreliable since it was based on questionable sources and was incapable of cross examination. The trial court's decision to exclude Dr. Korn's testimony was well within its discretion.

The trial court's ruling that Dr. Korn could not testify unless he revealed the sources of his information so as to allow proper cross examination was correct.[56]

---

56. Appellant attempts to equate the testimonies of Dr. Blinder and Dr. Korn. The comparison is instructive. In Dr. Blinder's case, very slight restriction was placed

**B.   The Motion for a View of the Scene was Properly Denied**

The trial court denied appellant's motion for a nighttime view of the street in front of the Hickey apartment.   Witness Tina Ransbottom testified she saw appellant repeatedly in the wee hours of the morning on this street with Hickey, or in his rootbeer brown colored car, in the weeks before Hickey's death.   The defense sought a view to determine the viewing conditions of Ransbottom's observations.

"The grant or denial of a motion to view the scene rests in the sound discretion of the trial court. . . . The burden is on the moving party to affirmatively show that such discretion has been abused." (*People* v. *Mooring* (1982) 129 Cal.App.3d 453, 460.)   Here the court noted that there was no foundational showing that the viewing conditions or lighting were the same at the time of trial as they had been three years earlier when Ransbottom observed appellant.   (CT 10140 et seq.) "A court may consider whether the conditions to be viewed by the jury are the same as those perceived by the witness to the extent that the conditions differ, their probative value is substantially diminished." (*Id.*; see also *People* v. *Peggese* (1980) 102 Cal.App.3d 415, 421; *People* v. *Keltie* (1983) 148 Cal.App.3d 773, 782-3.)

The defense was allowed to fully explore through other witnesses the viewing conditions on Hickey's street at night, as well as Ransbottom's credibility and perceptiveness.   No error nor any prejudice is shown.

---

on his ability to testify on <u>direct</u> examination as to the bases of his opinion.   All of the voluminous interview tapes were admitted.   Large portions of Petry's writings and diagrams were admitted, either on direct or by way of prior inconsistent statements on cross examination.   It is also true that "a broader range of evidence may be properly used on <u>cross examination</u> to test and diminish the weight to be given the expert opinion than is admissible on direct examination to fortify the opinion." (*People* v. *Coleman* (1985) 38 Cal.3d 69, 92.)   The trial court was rightly more concerned with the basis of Dr. Korn's opinion when he refused to allow any cross examination on his inmate informants.   Thus the difference is that virtually all of Dr. Blinder's basis was available, while Dr. Korn flatly refused to discuss the primary portion of the basis of his opinion.   For all of these reasons, the two situations are really not comparable.

## C.  There Was No Improper Limitation of Cross Examination of Clifford Smith

During cross examination of Clifford Smith defense counsel queried about the state's efforts in moving or protecting Smith's family. (RT 14859-60.) The prosecutor objected and defense counsel moved on to other matters. Later, defense counsel renewed his request to find out about protection and movement of family members of Smith. (RT 14901 et seq.)  The prosecutor again protested requesting that before such questions be asked and answered, the trial court review certain materials *in camera* with the prosecutor. The court agreed, and the situation was left as follows:

"THE COURT:  Any point you [defense counsel] get to where you feel like you can't ask any more questions of Mr. Smith without the other information that the court's reviewing, just come to the bench and tell me." (RT 14909.)

Thus, the court did not preclude the desired cross examination, but merely cautioned counsel to check with the court before going into the matter again.

Appellant points to no place in the record, nor are we aware of any, where defense counsel ever raised the subject again, nor where the trial court expressly excluded any such evidence. As such, the issue was waived by appellant.

Although we believe the waiver disposes of the issue, we note that Smith's motives for turning against his gang and testifying in court were gone into in detail. On direct examination, Smith testified that he was heavily guarded in prison and that the state had arranged to protect his family. (RT 14644.)  He testified that he was not testifying for personal gain, and that he was getting nothing out of it. (RT 14700-1.) He described how state investigators had flown his mother to talk to him in San Quentin as part of the arrangements for his deal with the state. (RT 14777.)  Finally, Smith testified he expected that his chances for parole would be increased by his testimony, and also that he believed that some inmates had been released from prison early because of their cooperation with the state, although he was beginning to doubt that that was in fact an accurate perception. (RT 16157-9.)  It is also true that the jury knew about state procedures on moving witnesses from testimony concerning moving, protecting and relocating Janet Myers and Michel Thompson's family. (RT 17016 et seq.)

184

To conclude, any cross examination of Smith as to movement of his family was waived by counsel below. That waiver was reasonable considering the extensive record of Smith's reasons for testifying, and of course the extensive impeachment on more serious grounds, including Smith's admission that he repeatedly perjured himself in the past, under oath in testimony in court. (RT 14858.) No error or prejudice appears.

## D.  Stephen Barnes' Prior Statement

A prior statement by Stephen Barnes that he was not an AB member was excluded by the trial court. The statement apparently occurred at appellant's previous trial for murder for a San Quentin killing. The trial court initially leaned toward admitting the statement, but denied the prosecution request to provide a full context for it in the previous trial, just as the court denied a similar request for the defense to elaborate on appellant's admission of AB membership at that same trial. (See Argument XIV, section 3.) The court later sustained the prosecution objection to the statement after the prosecution interposed a hearsay objection. (CT 10137.)

This ruling was correct. Appellant claims the statement was admissible as prior testimony of an unavailable witness. The theory fails for several reasons. No showing was made by the defense of due diligence to locate Mr. Barnes. Defense counsel DePaoli merely stated "I don't have the time to get Mr. Barnes here." (RT 20250-5.) The court had previously noted "Apparently the defense may call him here anyway." (RT 19913.) It is true that co-defense counsel Klay stated the prosecution refused to reveal Barnes' location, but Ms. Klay did not state why the prosecution would have such information.

A second aspect of the hearsay exception blocked admission. It was not argued by the defense whether Barnes testified for the prosecution in the previous trial. If not, the hearsay would be inadmissible as not being offered against the person "who offered it in evidence in his own behalf on the former occasion" Evidence Code section 1291(a)(1).

Finally, the statement was insignificant. Appellant's claim here that even-handedness required admission of both appellant's admission of AB membership and Barnes' denial is specious. Appellant's admission

185

had inherent reliability in the strong consequences against appellant's penal and reputation interests, as well as against his safety interest in prison. In contrast, Barnes' denial shared none of the reliability of such an admission, and was undercut by the acknowledged AB procedure of denying AB membership, and of disciplining those who did not. The statement's probative value was minimal.[57]

---

57. Smith testified that Barnes did not drop out of the Aryan Brotherhood and start testifying against the gang until 1981. (RT 14651.) If this is true, and Barnes did testify for appellant and against the prosecution in the previous trial, Barnes was at that time under an oath to deny his membership in the gang.

## XIV.
## THE TRIAL COURT'S EVIDENTIARY RULINGS WERE CONSISTENTLY SOUND AND EVEN-HANDED

### A.    The October Arrest of O'Rourke in Lakewood

The prosecution was allowed to prove that Sgt. Barnett arrested Joseph O'Rourke in Lakewood near Los Angeles on October 12, 1982, and that a third individual present identified himself as appellant, and stated he was waiting for Joseph O'Rourke. The evidence was very minor, and was properly admitted.

We begin by noting the defense never disputed the facts that appellant was present at the residence for the purpose of meeting O'Rourke, that O'Rourke was arrested at this time, or that appellant was not held but was rather questioned and released. (RT 17661 et seq.) This evidence had relevance on several grounds. It showed appellant's whereabouts on a particular date during the conspiracy, a fact of continuing importance. Appellant and O'Rourke, a known AB member and official were shown associating at this time, in disobedience of AB orders to appellant to stay away from O'Rourke in Southern California. O'Rourke was shown as having been arrested at this time, thus ending any business relationship between him and appellant, as was testified to at some length by Janet Myers. (RT 13981-3.) The latter point is important as it bore on appellant's source of income, also a relevant issue throughout this conspiracy.

Relevance being established, we turn to prejudice. Appellant is fuzzy as to what the exact prejudicial content of the evidence could be. No prejudice arose from the showing of an association between O'Rourke, an AB member, and appellant. Appellant was shown by other evidence to regularly associate throughout this time with AB members and their women, including, for example, a visit with Michelle Scarborough and Becky Williams to Auburn for a visit to AB related inmates in Folsom. (RT 13097.) Nor was there prejudice in showing O'Rourke was arrested in appellant's presence. Arrest of AB members was common. The defense even stressed that appellant obtained money from large scale marijuana sales. Evidence of one more AB member's arrest added nothing to the case.

187

Nor was there prejudice in allowing the prosecution to argue the arrest ended appellant's working relationship with O'Rourke. Appellant himself argues on appeal that the court erred in not forcing the prosecution to accept defense counsel's stipulation on this very point. (AOB 466.)   At any rate, the prosecution offered to prove that O'Rourke remained in custody on a parole violation for six months after his arrest, until after appellant himself had been arrested. (RT 17659.) The good faith of this allegation was supported by O'Rourke's testimony during the penalty phase where he admitted he had not seen appellant after his arrest. (RT 22212.)

Thus, the only argument as to prejudice worth noting is that appellant's presence near O'Rourke at an arrest implicated appellant in wrongdoing.  This inference is weak, and is rebutted by the immediate release of appellant.   Any doubt was erased by the court's express admonition to draw no inference of involvement by appellant in any illegitimate act of O'Rourke's. (RT 17663.)  In sum, the evidence was true and probative, and its little prejudicial potential was offset by admonition.

Before leaving the subject we note appellant ignores the trial court's even-handedness once again in this instance.  The prosecution wished to prove that O'Rourke and his female companion were in fact arrested for possession of a sawed-off shotgun and shells, and that O'Rourke later pled guilty to the offense.  O'Rourke admitted these facts during the penalty phase.  (RT 22216.)  The prosecution was prepared to show the police had set up O'Rourke using another AB parolee Kendricks, who called O'Rourke and set up the meeting and transfer of the shotgun.  Appellant's address book had contained Kendricks' phone number.  (Rt 17650-1.)  The prosecution also wanted to prove such gun rental was O'Rourke's regular business, that he rented guns for robberies to persons such as Kendricks and received a percentage of the spoils. The contact of appellant with AB members who had access to guns and who committed robberies was probative and admissible.   The court excluded all but the bare fact of appellant's presence at O'Rourke's sanitized arrest.  The ruling was only one instance of the trial court's evenhandedness.

**B. The January 23, 1983, Contact in McKinleyville**

The prosecution called Deputy Richard Walton to testify that while driving on his regular patrol in McKinleyville on January 23, 1983, he saw an occupied brown car parked in a lot at the edge of the business district. When the car hadn't moved when Deputy Walton returned after half an hour Deputy Walton approached and contacted the driver, who turned out to be appellant. Binoculars and potato chips were on the seat beside appellant. Appellant told Deputy Walton he had pulled over because the wind was too strong to drive. Deputy Walton had noticed no unusual wind. (RT 11529.) Pictures of the area surrounding the parking lot were admitted, showing appellant's car was pointed in the direction of a gas station mini market.

After much discussion, the court admitted only the above evidence, and excluded all mention of Detective Walton's expert opinion that appellant had been casing the mini market. This conclusion was of course a substantial basis of the probable cause later used to arrest appellant. (See Argument XI.) During argument, the prosecutor referred to this contact and noted it was "conceivable" appellant was "casing" the market. (RT 20425-7.)

Appellant heaps a remarkable amount of legal argument on this minor factual situation. We begin by analyzing the relevance and probative value of the various portions of the testimony. First, appellant's presence in Humboldt County was relevant at all times between September 1982 and March 1983, the pendency of the conspiracy. The citing occurred less than two weeks after the two Arcata robberies, and one day after the Moore burglary, making the time of appellant's presence in the county material. Appellant claims that while his presence may have been relevant, the facts allowing an inference he was casing a store were prior bad acts evidence, excludable under Evidence Code section 1101. The trial court never hinted that such a use was involved. Rather, the reason the trial court allowed facts implying casing was that appellant was charged with conspiracy to illegally obtain guns and money in Humboldt County. The court concluded that facts showing casing activities supported the conspiracy theory and so were relevant and arguable. The court never ruled that the casing could be used as a prior bad act of similar modus operandi

189

to prove the fact of any other robbery directly, and in particular not the Arcata and Triplex robberies. (RT 11463.)

Appellant argues that such a use of the evidence was in fact made by the prosecutor. We think such a conclusion is far from clear. The prosecutor actually argued:

> "Now, this -- this is one of those oral admissions of a defendant that ought to be viewed with caution. But what could you reasonably suspect that Mr. Price was doing on a day that the wind was too hard -- or blowing too hard to drive, and Deputy Walton just saw him a few minutes later driving? This is when he doesn't live in McKinleyville anymore because he and his brother, Alan Fletcher, have come to a parting of the ways, where he's just sitting there, where he has one business behind him and one business in front of him, and he has a sack of potato chips to while away the time and a pair of binoculars. Now, what could he reasonably be doing there? That maybe this guy was checking out those two business establishments because he was thinking about another robbery, a robbery in addition to the ones in Arcata, in addition to the Triplex Theater? It's conceivable."

Thus, the prosecutor never singled out the Triplex robbery, which was the only other robbery where casing was proved, and argued that the similar modus operandi in McKinleyville proved the Triplex robbery. Nor did the prosecutor argue appellant's disposition for crime proved him guilty. The prosecutor only argued that the casing showed criminal intent in McKinleyville. Inferably, this helped prove the conspiracy, which helped prove the other robberies. There was nothing improper in drawing this inference.

The prosecutor's argument was mild enough that defense counsel did not feel the need to object. Although appellant may assert such objection would have been futile given the court's previous ruling, this assertion would be in error. As we have shown, the court did not admit the evidence as disposition or modus operandi evidence, and, had defense counsel perceived the jury was so interpreting the prosecutor's argument, an objection might have been sustained on those grounds. Any error was waived.

At any rate, the evidence was very minor. The best proof that the jury was able to take each count on its own merits and not convict

appellant because of criminal disposition is the fact that the jury hung on the Arcata robberies, and that appellant was acquitted of the Pat's Market robbery. The Arcata robberies were closest in time and style to the Mckinleyville "casing," and so would have been most infected by any error. The Triplex robbery was different factually, being indoors at night and for higher stakes.

Further, we briefly note that the proof of the Triplex robbery was strong. (See Argument XXII for detailed discussion of proof.) Appellant was identified as resembling or closely resembling the robber by at least four witnesses, despite his woman's wig and other disguise. Four witnesses noted appellant used a snub-nosed, brownish tinted gun. Such a brown gun was found in the black suitcase in appellant's garage, and the witnesses testified that gun was indistinguishable from the one the robber used. And, the gun was found in a lunch box in the suitcase on top of a blond women's wig identified by the witnesses as similar to the one worn by the robber.

If this were not proof enough, there was the remarkable note in which appellant totalled up his financial obligations to his mother, which corresponded to the gas that he had been charging on her credit card, along with other expenses, and wrote that they were an "impossible" amount, "need mucho dinero," and "$1,000.00 I owe mom . . . means its all about 'movie time'." (CCT 590.)

It is also damning that the day of the $7,000 Triplex robbery, appellant's voluminous use of his mother's gasoline charge card suddenly stopped completely (RT 19403-4, 11231), and the following week appellant purchased a car for $1,600 in cash. Later on the day of buying the car, appellant got into an accident and paid the other driver $100 in cash from a box in his trunk which the passenger in the other car stated contained "large sums" of money. (RT 15906.) All this from a man who had been borrowing money all winter, had received a $155 money order from his mother on February 15, 1983 (RT 16597) and who had labeled $312 "an impossible number . . . need mucho dinero" in the "movie time note." Recall also that his mother asked appellant after his arrest how he would account for the money when he went to spend it. (RT 16574.) The Triplex evidence was conclusive.

In conclusion the McKinleyville sighting was admissible for the purpose asserted, to prove appellant's presence in Humboldt County on January 23, 1983. The evidence was not admitted on the theory of

modus operandi or disposition evidence, nor was such an inference clearly argued. Defense counsel did not object on this ground. At any rate, the evidence was slight and demonstrably did not affect the verdict on the counts most likely to be affected. The evidence was minor compared to the bulk of evidence in the Triplex robbery, and of course, the remaining robbery charges did not result in conviction.

We briefly address two additional points. First, the statements to Detective Freese and Deputy Walton were admissible. They fit the hearsay exception for admissions of a party because they were used in context to incriminate appellant. Appellant advances the dubious theory that they were not admissions because they were not entered for their truth, rather for their falsity. If such is the case, the statements were not hearsay, but were rather evidence of consciousness of guilt, and appellant gives no other rationale for their exclusion.

Finally, as to the instruction that inconsistent statements may show consciousness of guilt, this Court need not assume the jury interprets instructions irrationally. The admissions may have shown consciousness of guilt as to "casing," or as to a conspiracy. However, it is irrational to believe that the jury assumed that appellant's lie to the officer in January somehow directly showed consciousness of guilt of the murders in February or any other crimes. The argument is baseless.

## C. Appellant's Prior Admission of AB Membership

The court took judicial notice of appellant's testimony in a prior trial that he was an Aryan Brotherhood member. The jury learned neither the crime charged nor the identity of the defendant at that prior trial. Only the admission was read to the jury. (RT 17280-1.) The testimony was admissible and no prejudice is shown.

It cannot be disputed that the testimony was relevant and probative. The particular portion of transcript containing the admitted statement by appellant was unambiguous and unqualified. Appellant claims the jury would have thought badly of appellant because he testified at a prior trial. However the jury only knew that appellant was in prison at the time, and testified at a trial. The prejudicial inferences argued by appellant are pure speculation, and they stem not from the fact of the previous trial and testimony, but rather from appellant's

admission of Aryan Brotherhood membership. The nature of the Aryan Brotherhood, be it prison gang or social and philosophical society, was well detailed through other testimony, and no self serving hearsay from defendant's prior testimony was necessary to elaborate the issue. The probative value of appellant's own admission was high (even given appellant's self-contradictory concession that there was much other evidence of his Aryan Brotherhood membership), and the admission corroborated Smith and Thompson. The statement was not remote, having occurred only a year and half before the conspiracy began, especially considering that the jury was aware of the difficulty of voluntarily leaving the gang. And, the statement was reliable; such a statement would never be made lightly. No error or prejudice is shown.

## D. Clifford Smith's Claim of Having Taken a Polygraph Test

During defense cross examination, Clifford Smith spontaneously mentioned he had taken a polygraph test.

"A. That's where I done the whole thing. I talked to Tulleners, I talked to Barnett, I took lie detector tests, I talked to the SSU, talked to the Department of Justice." (RT 14983.) Smith did not state the content of the test, nor the results.

After the noon recess that day, the court admonished the jury as follows:

"Ladies and gentlemen, this morning before we broke for lunch, there was a nonresponsive answer to one of Mr. DePaoli's questions. Mr. Smith indicated he had taken a polygraph examination. The fact of a polygraph exam is to be disregarded. It is not admissible evidence in any case in the State of California. Generally throughout the United States, it is inadmissible evidence.

"The reason that a polygraph is not admissible is simply that it is scientifically unreliable. It measures pulse rate, respiration and blood pressure. By reading three charts of these variables, a polygraph examiner may form opinions as to a witness' truthfulness at a given time.

"The problems in that procedure are enormous. Some people can lie without any visible physical reaction in their pulse

rate, blood pressure or respiration. Others may intentionally take drugs to overcome the graphs used in the machine. Others are so excited by the very procedure that the readings as to them are skewed, and there are still others who react to past wrongdoings when they're asked about present facts subconsciously. That skews the reading.

"The test is so unreliable that California's passed a specific statute which bars the mention of a polygraph in evidence. Mr. Smith has not been connected to a polygraph machine while here in court. Mr. Smith has not been given a polygraph examination on his courtroom testimony.

"You are, therefore, instructed in accordance with the law that you must form all opinions as to Mr. Smith's credibility in regard to his testimony based on his appearance and testimony here in court, and not from any other source." (RT 14996-7.)

Appellant gives no reason why this admonition would not have been adequate. Appellant claims *People* v. *Hogan* (1982) 31 Cal.3d 815, 847 is similar to this case. It is not. In *Hogan*, it was revealed to the jury that the <u>defendant refused</u> to take a polygraph test. The issue here did not concern the defendant, but just one witness. On this ground the prejudice is completely different in this case from *Hogan*. Second, *Hogan* noted that refusal, showing personal consciousness of guilt and fear of the test results, was a completely different matter and more prejudicial than simply failing the test, which could be explained by the unreliability of the test itself. Refusal to take the test is rather a comment on the defendant's state of mind by the defendant himself. Here, even had Smith passed the test, the prejudice would be of this latter, less serious kind, explainable by the failure of the test, and not indicating Smith's own implied admission against interest.

*Hogan* also postulated error where the jury was "unfamiliar with the present scientific uncertainty of the tests." (*Hogan, supra,* 31 Cal.3d at p. 847.) Here, of course, the trial court explained to the jury the scientific uncertainty.

Finally, *Hogan* did not declare that even the more serious error, refusal by a defendant to take the test, would be reversible per se. In any event, that discussion was dicta, and was contained in an opinion signed by only two members of the court. Appellant gives no reason

why any error surviving the court's admonition should not be tested by the normal *Watson* standard. No uncured error or prejudice is shown.

### E. The Jury was Not Told That Appellant had Refused to Provide a Blood Sample

The prosecution asked criminalist John Boyd "did you ever receive a sample of Mr. Price's blood." (RT 15372, 93.) Defense counsel immediately objected and the prosecutor explained, out of the jury's presence, that he wished to prove that appellant had refused the request which showed consciousness of guilt. Defense counsel protested that the refusal was not a flat one, that appellant just demanded a warrant, and, at any rate, no analyzable blood which could have been the perpetrator's was recovered in the case. The court noted appellant may not have known that there was no blood to compare with his own when he refused the request, which would show consciousness of guilt. Nevertheless, the court excluded all evidence that the prosecution had requested blood, and that the defense had conditionally refused it.

The court's ruling eliminated all possibility of prejudice. The jury never learned whether the prosecution requested blood, nor whether the defense refused. All the jury knew was that Mr. Boyd for whatever reason never personally received a blood sample, and, at any rate, he had no use for such a sample, since no blood which he could type as the culprit's was found. (RT 15373.)

In fact, the court was over cautious in its limitation on the testimony. As the court noted, appellant's refusal to give a sample at a time when he did not know whether his blood was at any crime scene would have been strong evidence of consciousness of guilt. A defendant's mistaken reliance on the Fourth Amendment does not preclude prosecution comment on his refusal to provide evidence. (*People* v. *Redmond* (1981) 29 Cal.3d 904, 909.) Far from showing error or prejudice, appellant shows the trial court favored him with a questionable evidentiary ruling.

F.    **Impeachment of Becky Williams by Her Previous Silence was Correct**

Becky Williams testified that she believed appellant was with her the night of February 19, 1983, the night of the Triplex robbery, and so appellant could not have committed that crime. She testified she spoke about this with appellant, his investigator, and his attorney. (RT 19336.) Prosecution investigator Barry Brown testified that Williams refused to talk to him. Williams stated she did not notify officials before trial of this exculpatory information because "I figure (sic) when I was called to testify, that I would tell my story then." (RT 19302, see RT 19336.) Appellant protests the entry of this evidence, and the prosecutor's brief mention of it in argument. (RT 20874.) The argument is unpersuasive.

The evidence was admissible on two grounds. First, no party or attorney has the right to order a witness not to talk to the other side in a criminal case. Here, defense counsel's argument was that he counseled Williams not to talk to the prosecution. Williams complied. Such compliance was admissible evidence of Williams' attitude toward the parties and the action. This Court has stated:

"There is an appropriate remedy when a witness refuses to speak about a case with one party's investigator after having previously informed the other party about his knowledge of the case. The remedy is simply impeachment on the basis of bias . . . ." (*People* v. *Hannon* (1977) 19 Cal.3d 588, 601.)

The evidence was relevant on this theory.

The prosecution also argued the evidence was admissible to show Williams likely fabricated her story recently. It is settled law that evidence of a third party's previous silence is admissible to imply recent fabrication. In *People* v. *Ratliff* (1987) 189 Cal.App.3d 696, 701-2 the court recognized this principle, but stated the prosecution must make a foundation that the witness was not ordered by counsel not to conceal the information.

*Ratliff* was decided wrongly. First, as stated in *Hannon*, defense counsel has no right to make such a gag order. Second, *Ratliff* is unsupported by citation to any previous California case, and it has never since been cited or supported on this point. Third, the case legislates a new exclusionary rule into the Evidence Code. Such legislating violates the intent of the code, and of California Constitution, Article I, section

196

28. Finally, the rule makes no sense. Nothing in the Evidence Code indicates that the jury is not capable of weighing evidence of silence against the explanation given by the witness.

Here it is noteworthy that Williams never indicated defense counsel told her not to tell the story to the authorities. Thus, even under *Ratliff's* rules, the evidence was correctly received.

The Williams evidence was minor, and was correctly received on two different theories. No error appears.


## G. The Trial Court Properly Handled Evidence of Appellant's Admission of the Length of His Prison Sentence

The following exchanged occurred during the direct examination of Detective Freese:

"Q. Did you ask Mr. Price where he was on February the 19th, 1983?

"A. Yes, sir, I did.

"Q. What was his response?

"A. He indicated that he wasn't sure where he was on the 19th. That most of his days had run together.

"Q. Did he explain why they ran together?

"A. He had indicated -- indicated that he'd been in prison for the past eleven years and had just gotten out in the past October." (RT 16002.)

Soon after, defense counsel moved for a mistrial based on the disclosure of the length of appellant's prior term. The court admonished the jury at length that appellant's prior imprisonment could not be considered as evidence of criminal disposition, nor, intrinsically, as any evidence of guilt of the charges in this case. (RT 16008-9.)

We note that the evidence was admissible, relevant, probative, and responsive to the question of the prosecutor. The court noted that the jury was well aware appellant had been in prison for a good stretch of time. (RT 16007.) The jury also knew that appellant had become an Aryan Brotherhood member, with all that implied. The court gave the proper admonishment, stressing the evidence in the case must be evaluated without regard to whether prior events showed appellant's criminal disposition. (RT 16007.) The court wisely avoided mentioning

197

the length of appellant's imprisonment, and thereby reinforcing the testimony.

The jury indicated it was able to follow the admonishment when they hung on four robbery charges and acquitted appellant on a fifth. Further, their lengthy deliberation on the remaining counts showed conscientiousness and diligence. Exposure of the jury to the alleged length of appellant's incarceration was not error, was properly handled by the trial court's admonishment, and was largely cumulative of other evidence. No significant prejudice is shown.

## H.   Evidence that Appellant's Mother's Neighbor was Hostile to Police was Correctly Received and was Minor

Appellant advances the unlikely argument that evidence of hostility by a friend of appellant's mother towards police officers was prejudicial. Appellant points out that his mother on cross examination testified that she could not remember whether her friend, Mrs. Markley ordered Inspector Brown off their property when Inspector Brown came to interview her about the charge that her son had committed two cold blooded murders. (RT 16724.)

We begin by noting that the only mention of foul language occurred in the prosecutor's first leading question of the hostile witness Mrs. Lloyd, and that Mrs. Lloyd never answered the question. If the jury thought Mrs. Markley was speaking as Mrs. Lloyd's agent, then her statements showed Mrs. Lloyd's attitude toward the action and as such were relevant and admissible. If the jury thought Mrs. Markley acted on her own to protect her friend in a time of tremendous stress, no conceivable prejudice is shown.

In all, the hostile reaction to authorities of the mother of a man whom police accused of two ghastly murders could hardly be thought significant evidence. Such a hostile reaction by a protective neighbor is utterly without significance. Mrs. Lloyd was seriously impeached on numerous more realistic grounds, including her attempts to explain away her powerfully inculpatory shorthand notes of her jail house interview with appellant, her admission she destroyed items from appellant's room, and her general hostility toward law enforcement as expressed on the witness stand. No error or prejudice is shown.

## I. AB Votes Involving Other Parts of the Country were Relevant and Probative

The prosecutor was permitted to question Michael Thompson on activities of the Aryan Brotherhood outside of California. In particular, Michael Thompson discussed the taking of votes, by way of telephone, and through messages to and from AB "couriers" or other hangers on who lived near various federal prisons throughout the county, including "the State of Arizona, New York, Nevada. And like I said, its in Illinois, Michigan. Just a number of states. Wherever there is a federal institution any more there is likely to be an Aryan Brotherhood member or members." (RT 16745.)

One basic question in this case was the nature of the Aryan Brotherhood. The defense repeatedly argued through its witnesses that the AB was loose, unorganized, and incapable of concerted action, and, in fact, merely a social and philosophical society. On its part, the prosecution attempted to prove the AB imposed order on members through organized executions, that it had a commanding "commission" and was generally a competent criminal organization. Evidence of how the AB conducted a nationwide vote on an issue central to this case was plainly relevant.

Appellant's artificial distinction between California and the rest of the country has no basis in fact or law. No case law rules that evidence of the composition of the AB need be restricted to California actions. And, at least two major central acts of the conspiracy here allegedly occurred outside of California. These were appellant's storing of the guns in Nevada, which was charged as an overt act of the conspiracy, and the allegation that the AB deliberately subpoenaed appellant to Chino from Montana ostensibly to testify at a trial, but actually to give appellant his marching orders. (See e.g. RT 16272.) Evidence of a nationwide vote supported the picture of a well organized and savvy criminal organization with the ability to summon its members from afar. The evidence was relevant and admissible.

**J.    Various Items of Physical Evidence were Admitted in Legitimate Exercise of the Court's Discretion Under Section 352**

1.    The weapons found in the storage locker in Reno were found loaded.  The prosecution noted that Mr. Moore and Berly Petry testified that the weapons were not loaded when they were stolen.  (CT 17709.)  The prosecution correctly argued that the fact that the weapons were loaded impeached the defense theory that appellant had the weapons on consignment for sale, since legitimate gun sellers are less likely to transport loaded weapons than are individuals who intend to use the weapons.  (CT 17709.)  Appellant also argues that the bullets were prejudicial.  Given that the guns were in evidence, as was the fact that the guns were loaded, the sight of the loaded guns was not prejudicial.  Furthermore, an enormous amount of ammunition, about 1,000 rounds (RT 14261), was included in the storage locker along with the guns, a point of unquestionable relevance in this conspiracy trial.  (RT 14133.)  The point is insignificant.

2.    A bandolier of shotgun shells was found in appellant's mother's garage and was admitted into evidence.  (RT 17348 et seq.)  Appellant was tied to shotguns, including the sawed-off shotgun Myers saw appellant cleaning in Los Angeles, the two shotguns stolen from Mr. Moore and found in the Reno storage locker (RT 11591, 11606) and the sawed-off Moore shotgun found next to the bandolier in appellant's mother's garage.  (RT 13787.)  Appellant's possession of shells tied him to the guns.  He was free to prove that the shells would not have fit any of the guns, but did not.  The shells were probative of appellant's intent to use the weapons, and their probative value outweighed any prejudicial effect.

3.    Photographs were admitted of the four makes of gun the prosecution expert testified could have killed Richard Barnes.  (RT 17856.)    The evidence was admitted to illustrate the expert Mr. Christian's testimony about how he could match the bullet with the "lands" and "grooves" of all guns manufactured and narrowed the field down to four.  Because no gun was found matching the Barnes bullets, the main purpose of the charts was to reject the defense theory that acquaintances of Barnes, Baca and Regalado, were involved in Barnes' death.  It will be recalled that Baca sold Regalado a Rohn .22 caliber pistol along with some spent shells on the day after the Barnes' murder, February 14, 1983.  Christianson examined that pistol and ruled it out as

a possible weapon. (RT 12104, 12224.) The pictures were thus probative, if on the whole insignificant.

4. A blue woman's fabric glove with a small human blood stain on the fingertip was found in appellant's room in his mother's house and admitted in evidence. (RT 15316, 15331.) Evidence was entered that the glove was of a very small size, and that it was of a type used by Mrs. Lloyd in gardening. Appellant is correct that the glove proved little. For that reason, and especially because the defense established that the glove was of a woman's size, probably too small to fit appellant (RT 15364), and that appellant's mother had used such a glove to garden, the evidence was insignificant.

5. A document was admitted which, on August 12, 1982, granted a request by Robert Griffin's attorney to transport appellant to San Bernardino County to testify for Richard Terflinger that Robert Griffen had committed perjury. (CT 495-8.) The document was vital to illustrate the claim that the Aryan Brotherhood had the intelligence and ability to summon members to distant prisons for meetings or for other purposes, and that <u>this was how</u> appellant was summoned to Chino to be given his assignment to kill Barnes just as Thompson and Smith claimed. Defense witness John Stinson stated he used the same method to subpoena AB members Clark and Thompson to Los Angeles because he wanted to kill them. (RT 18705.) Appellant's argument is far off the point.

## K.  Impeachment of John Stinson

On cross-examination, inmate and defense witness John Stinson testified that the AB did not exist as an organization, and was merely an administrative ploy by the California Department of Correction (CDC). Stinson denied the existence of any leadership or order giving commission in the AB. He stated the numerous pictures of him taken with other AB members were not an indication of any confederation, and he stated he had strongly disliked Michael Thompson for many years. (RT 18605, 18613, 18641.)

Stinson also participated in the following colloquy:

"[I]s it just all the people that feel the same way as you do and so you associate with them and have similar tattoos as you,

201

and you get along with and everything?  Do they just all happen to be members of the Aryan Brotherhood, excuse me, reputed or members of the Aryan Brotherhood.

"A.     No.     They all happen to be the people that everywhere I go, custodial officials place me with.

"Q.  Right.

"A.  Therefore, those are the only things that I'm witness to.  I don't see -- I'm not around anything else really.

"Q.  As a matter of fact, they keep locking you down, putting you into secure housing units and places that are prisons within a prison because they keep linking you up with this Aryan Brotherhood group; isn't that what you said?

"A.  Exactly.

"Q.  And rather than you being out there in a general population, where you could have a nice stay in prison, you're being locked down continually with these Aryan Brotherhood people, right?

"A.  Correct."  (RT 18684-5.)

Impeachment was relevant on Stinson's disclaimers of the existence of an AB and of duplicity by Corrections personnel.  The prosecution entered evidence of several incidents of Stinson's in-custody violence prior to his present lockdown status which would have justified any reasonable administration in maintaining that status.  In particular, Stinson admitted coming to Thompson's aid in a fight on a jail bus, and in receiving a hacksaw blade from Steven Barnes.  (RT 18685-9.)  Stinson admitted two other recent in-prison stabbing incidents.

One major defense theme in the trial was the alleged plot by law enforcement, prison authorities and the prosecution to railroad AB members.  This defense theory impugned the confidence and honesty of all official witnesses and of the prosecutors.  Showing that Stinson lied in accusing the CDC of falsely accusing him of AB membership attacked this defense theory of official corruption.  The impeachment of Stinson thus was not on a collateral matter, but directly attacked his assertions that the AB did not exist.  The impeachment also served the second purpose of attacking Stinson's assertions that his association with AB members was casual.  The violent incidents involved other AB members in situations which showed Stinson's fellowship to be beyond that normal of acquaintances.  The incidents thus showed a "brotherhood" between

Stinson and other AB members and indicated a bias favoring his brother appellant. These incidents impeached Stinson's claim that his association with Thompson and Barnes was enforced by CDC housing decisions. For all these reasons, the evidence was legitimate impeachment of Stinson.

## L.  The Letter Signed by Stinson and Griffin was Admitted Properly

Appellant next protests the admission of a portion of a letter co-written by Robert Griffin and John Stinson, which those AB members sent from Chino to San Quentin.  (CCT 714-715.)  The letter was a "bombshell," in which two AB members frankly discussed "hitting" i.e. killing, a fellow AB member for disloyalty to the AB.  Progress of the gang wars in prison was also discussed with sophistication and at length. Appellant does not contest that the last quarter of the letter in Stinson's handwriting was admissible to impeach defense witness Stinson. Appellant does claim that the remainder of the letter, in Robert Griffin's handwriting, was hearsay and so inadmissible.  Appellant's legal argument is mistaken.

First, we note that the letter was fully authenticated.  Clifford Smith testified that the first part of the letter was in Robert Griffin's handwriting (RT 19660-1), and both Stinson and Smith testified that the last part was Stinson's writing.  (RT 19660-1, 18716.)

It will be recalled that Stinson had testified for the defense that there was no such thing as an organized Aryan Brotherhood gang, that alleged members of the gang merely shared social and philosophical tastes, and that he knew nothing of the killings testified to by Smith and Thompson.  (RT 18602, 18611, 18627, 18631.)  The content of the letter detailed Griffin and Stinson's apology to other AB members for having to kill a third AB member, Steven "Loser" Clark by Clifford Smith.  In addition, Griffen's portion of the letter spoke in detail about AB gang activities, the "war" with other gangs, and strategic movements and conferences between various AB members.  As such, the letter strongly impeached Stinson, Wendall Norris, and all other AB defense witnesses who claimed that the AB was a loose-knit social organization unconnected with disciplined killings and wars.  The letter was conclusive

evidence on the existence and nature of the AB, and so was highly relevant and probative.

Appellant now for the first time claims that the letter was inadmissible as hearsay. He further claims that objections made by defense counsel were implicitly hearsay objections. As appellant points out in his brief, the word hearsay was never mentioned by defense counsel below. (AOB at 513, n. 468.) Rather, defense counsel was concerned about using the letter to impeach those who had not written it, and making sure those who wrote the letter had personal knowledge of the topics they were addressing. The judge overruled these objections, because, as just pointed out, the letter was strong valid impeachment, it was fully authenticated, and, as the trial court stated "the letter speaks for itself." (RT 19672.)

It is well established in the law that objections must be made on specific grounds, and where those grounds are not mentioned at trial, they are waived on appeal. Here, defense counsel plainly waived all hearsay objections to the letter. (Evid. Code § 353; *People* v. *Lescallet* (1981) 123 Cal.App.3d 487, 493-4; *People* v. *Lewis* (1987) 191 Cal.App.3d 1288, 1297, no. 7.)

At any rate, the hearsay issue is a red herring. The portion written by Stinson was plainly admissible to impeach Stinson. The portion written by Griffin, in which he justifies past gang killings and plans future ones, is as plain a statement against interest as can be conceived. (Evid. Code § 1230.) Had defense counsel objected on hearsay grounds, only a limited number of possibilities existed. First, and most likely, Griffin would have been asked by the prosecution and would have refused to testify at trial. If he had done so, the letter would have been admissible under section 1230 as a statement against interest by an unavailable witness. Had Griffin chosen to testify, he would have either admitted the content of the writing or denied it. Had he admitted it, the writing would not have come in, but its content would have. Had he denied the content of the writing, the writing would have come in as tremendously probative past inconsistent statements. (Evidence Code § 1235.) And, in such case, other tremendously damaging information might have come out from Griffin, one of the most knowledgeable AB leaders. Under the rule of *People* v. *Fosselman* (1983) 33 Cal.3d 572, 581-2, these highly rational reasons for defense counsel to fail to object to the letter render any argument on the subject unpersuasive.

Finally, strictly speaking, the letter was only marginally entered for its truth. Rather, the fact that Stinson and Griffin were talking at length about gang related issues, and apologizing for killing an AB member, was powerful circumstantial evidence that the gang existed. Again, a hearsay objection was beside the point.

## M.  The Impeachment of Robert Rowland was Correct

The prosecution queried defense witness Robert Rowland on several past acts of violence and concealment of weapons. Appellant protests the correctness of the admission of such impeachment on two grounds:  first, appellant claims that the prosecution "was not even disputing the truth of the only relevant testimony Rowland gave!" Appellant adds that the past bad acts were completely collateral to the issue of Rowland's veracity. Appellant vastly oversimplifies the situation at trial, and ignores the evidence that made the impeachment of Rowland both necessary and proper.

As appellant acknowledges, Robert Rowland received a prison made zip gun from Thompson two days before Thompson left the AB. Immediately on leaving the AB, Thompson told the authorities about the gun and Rowland's cell was searched and the zip gun was seized in two pieces from under his pillow.  (RT 19679-80.)  Smith testified that Rowland was a member of the AB, and that he was given the gun so that he could kill a member of a rival black gang.  (RT 19679-80.) Rowland by contrast testified he was not an AB member, that there was no AB and that he merely was holding the zip gun as a favor for Thompson, a powerful individual in his "yard." (RT 19003, 18980-2.) It is immediately obvious that appellant's argument that the prosecution had no need to impeach Stinson is baseless.

The prosecutor's strategy in impeaching Rowland was to begin by exploring the method Rowland used to conceal the zip gun in his cell. The prosecutor's point was that the gun, a highly prized artifact in prison, was very poorly concealed, in that it was lying loose under a pillow within a couple feet of the bars to Rowland's cell, and sight lines of guards and other prisoners.  The prosecutor believed Rowland's placement of the gun implied he wanted it close by for ready use in

killing the passing black gang member. The following exchange occurred:

"Q. And you were just supposed to hold that weapon until you got further word; isn't that correct?

"A. [Rowland] Well, just hold it is doing a favor for him until he wanted it back.

"Q. And so why didn't you hide it a little bit better than under your pillow?

"A. Where -- where can you put it? There isn't too many places you can put it in there.

"Q. Why don't you hide it the same place you hide your knives?

"MR. DePAOLI: Objection, your Honor. Don't know what he's talking about. I have no discovery on anything like that.

"THE COURT: Well, he can ask him if he has a place where he hides his knifes. Overruled.

"MR. BASS: Q. Do you have a place where you hide your knives, sir? Perhaps someplace on your body?

"A. No, I don't have a knife.

"Q. No, not right now. I'm talking about in the past.

"A. I haven't had one in the past.

"Q. Never had a knife in the past?

"A. No.

"Q. Didn't have a knife in your rectum on the 25th of March of 1986, just a couple of days ago?

"A. No, I didn't.

"Q. Or a handcuff key in a cigar on the 28th of March?

"A. No. I didn't.

"Q. 1986. Or a hacksaw blade in your mouth yesterday?

"A. Not aware of any of that. I've never been to court on nothin' like that or anything.

"Q. So you haven't been formally charged for any of these things, right?

"A. I haven't been charged with nothin' like that at all.

"Q. But you don't think that because that gun back on the 12th of September, 1983, was under your pillow that you were getting ready to use it to perhaps shoot at a Black Guerilla

Family member, do you, on the way to the yard, dressed in shorts only for a shower?

"A.    That's what Thompson told the cops, but that isn't what I was going to do." (Emphasis added; RT 18988-9.)

The prosecutor's questions were logical and sensible. Rowland had the gun lying loose under a pillow although he claimed it was not there to be used, but only to be stored. On the other hand, when Stinson had a mind to, he had much more effective ways of hiding contraband, including in his rectum. Appellant protests the impeachment was on a collateral ground. The trial court presumably saw the zip gun and the knife, and could determine whether having the knife in his rectum proved Rowland could have hid the zip gun in his rectum, which tended to prove the zip gun under the pillow was being readied for action, not stored safely. Such a decision was within the trial court's discretion. (*People* v. *Lavergne* (1971) 4 Cal.3d 735, 742-3.)

Rowland himself complicated the issue by not only denying that he hid the object in his rectum, but by overstating the issue by claiming flatly that he never had a knife in the past whatsoever. (RT 18988.) Obviously, after this flat denial, it was proper for the court to allow direct evidence by a prison guard that that guard had discovered and removed a stabbing instrument from Rowland's rectum while Rowland was in prison. (RT 20165-7.) The issue was not collateral, but directly related to Rowland's ability to conceal weapons.

Appellant also complains about impeachment in which it was proved by correctional officers that they had recovered a hacksaw blade from Rowland's mouth (RT 19859) and a handcuff key in a cigar in Rowland's cell. (RT 19879-81.) Given that these incidents were quite close to the time of trial, they were relevant to show Rowland's attitude toward the action in which he was testifying. The fact that Rowland had a handcuff key implied that he had an intent to escape. Other testimony during the trial showed that AB members considered jail custody as ideal times for escape attempts. If Rowland's only interest in testifying was to gain such an escape opportunity, the credibility of his testimony would be accordingly lessened. The prosecutor's argument on this ground was correct. The evidence also showed Rowland could hide things well when hiding them was his sole aim.

At any rate, such minor transgressions by Rowland were hardly significant. Rowland denied all serious allegations in impeachment.

207

However far more serious allegations were made against Rowland by Smith and Thompson, including the allegation that he had been a loyal AB member, and that he had been willing to receive the zip gun to kill a BGF member. Handcuff keys and hacksaw blades were insignificant compared to the main body of evidence entered about Rowland. Even had there been error, it would have been minor.[58/]

### N.  The Prosecution Comment on Defense Failure to Call its Ballistics Expert was Proper

During argument the prosecution asserted that the evidence had shown that a defense expert was allowed access to the bullets found in Richard Barnes' skull. The prosecution expert Christiansen had previously testified that those bullets were not fired from a gun exchanged by acquaintances of Barnes, Baca and Regalado, the day after the killing. (RT 12224, 12104-5.) Appellant had attempted to raise suspicion of third party culpability on the part of those two acquaintances because of the gun transaction. Appellant now claims it was a Sixth Amendment violation for the prosecution to point out the failure of the defense expert to testify, and to argue that it was inferable that the defense expert was not called because he would have agreed with the prosecution expert. No issue of any significance is raised.

First, it was established that one Chuck Norton was allowed full access for three hours to the bullets, and to all crime lab equipment necessary to fully examine those bullets. It was established that the prosecution expert Christiansen and the defense investigator Delong were also present at that examination. (RT 19670-2 through -3.) From these facts, it was reasonable to infer that Norton was in the employ of Delong and the defense. This was the inference discussed by the prosecutors to the jury. (RT 20447, 20873.) The inference was in fact so reasonable that defense counsel did not object, which waived any issue on this point.

As to the substantive issue, we begin by noting that the evidence was insignificant. The prosecution expert Christiansen testified

---

58.  Appellant points to no objections by defense counsel below to many of the prosecutor's questions about past stabbings by Rowland. The reason seems to be clearly that defense counsel knew that the prosecutor was in good faith in these questions and that defense counsel did not wish to invite more evidence more clearly proving the incidents.

plainly to his solid experience and to his flat conclusion that the bullets were not from the questioned gun. No additional evidence was needed to support this inescapable and unimpeachable conclusion.

Substantively, the evidence and the prosecutors' comments were proper. Appellant cites no case which holds it improper to comment on the failure of the defense to call a known expert. To the contrary, the Ninth Circuit has held, in language fully applicable to this case:

> "Nor was the argument to the jury improper. In fact, defense counsel conceded the right of the Government's attorney to comment upon the failure of the defense to call its own fingerprint expert to impeach the Government's expert. The Government's attorney did no more than suggest that the failure of the defense expert to testify left the testimony of the Government's expert uncontradicted. This in no way commented upon the *defendant's* failure to testify. In *Ignacio v. People of Territory of Guam*, 413 F.2d 513, 521 (9 Cir. 1969), the court stated: 'The closing comment of the prosecution to which appellants objected pertained to the failure of the attorneys for appellants to call their own ballistics expert. This was in no way directed to the failure of the appellants to testify on their own behalf. The appellants were not referred to, either directly or indirectly. There clearly was no prejudicial misconduct.' Likewise, there was no prejudicial misconduct in the present case." (*United States* v. *Grammer* (9th Cir. 1975) 513 F.2d 673, 676; see *People* v. *Ford* (1988) 45 Cal.3d 431, 449 (comment on defense failure to present reasonable evidence is permissible).)

In sum, appellant's issue is trivial, and appellant's legal argument is bankrupt.

## XV.

## THE PHOTOS OF THE BODIES OF RICHARD BARNES AND ELIZABETH HICKEY WERE ADMISSIBLE AS STRONGLY PROBATIVE OF IMPORTANT FACTUAL ISSUES IN THIS CASE

Appellant next asserts that photographs of the dead bodies of Elizabeth Hickey and Richard Barnes were relevant to no disputed issue, and were merely prejudicial to appellant. Appellant notes without discussing or citing a single case that this Court has recently found similar photos to be probative and admissible despite their gruesome nature. Here, the relevance of the photos, although ignored by appellant, was plain to all below.

This Court has recently pronounced as follows on the issue of death scene photographs:

"We have repeatedly stated that the court has wide discretion in determining the admissibility of photographs of a murder victim . . . . We have previously held that a court may admit even 'gruesome' photographs if the evidence is highly relevant to the issues raised by the facts, or if the photograph would clarify the testimony of a medical examiner." (*People* v. *Coleman* (1988) 46 Cal.3d 749, 776.)

"Defendant also argues that the photographs were cumulative because the autopsy physician and Officer Reese were allowed to testify fully as to the location and condition of the body. The photographs in this case were not cumulative, but *corroborative*. (See *People* v. *Murphy* (1972) 8 Cal.3d 349, 364-365 [105 Cal.Rptr. 138, 503 P.2d 594].) They helped to clarify the testimony of Officer Reese regarding the precise location of the body and various other items related to the commission of the crime. . . . 'Photographs which disclose the manner in which a victim was wounded are "relevant on the issue of malice . . ."'" (*People* v. *Milner* (1988) 45 Cal.3d 227, 247.)

The evidence here falls well within these rules.

As to Barnes, the prosecution case rested on the assumption that appellant executed Barnes as an official cold blooded Aryan Brotherhood mission. No amount of description by the prosecution witnesses would be the equivalent of the photographs of Barnes lying

peacefully on his stomach on an unrumpled bed with three bullet holes on the back of his head. The prosecution was entitled to enter its best proof that the killing was methodical, took place with no struggle, and was executed in a professional and deliberate manner.

The physical characteristics of the gunshot wounds visible in the photographs further support the prosecution theory. Evidence was received that point blank shooting in the back of the head was the accepted way to label a killing an execution, so that others would understand that this was not a haphazard act. The point of killing Barnes was to send the message that the AB did not tolerate being "crossed." The ritualized execution style was necessary in the eyes of the AB to tie Richard Barnes to his son's supposed treachery.

Further, others testified that Richard Barnes lived a life which could have led to his death by random causes, because he drank heavily and often befriended strangers. It was important to the AB that the killing be immediately recognizable as their own purposeful work.

The medical examiner at trial testified that visual markings on the wounds, including peripheral discoloration, stelloid, or star shape, markings, and "soot on the periosteum" under the skin proved that the gun was actually in contact with the skin when it was fired. (RT 11681-3.) This was the trademark of an AB execution. Visual proof of the expert's opinion was plainly relevant. The trial court properly admitted the Barnes photos.

As to the Hickey murder, the pictures were even more vital. Bloodstains on the bed showed, in the opinion of prosecution expert witnesses, that Hickey's body had been moved significantly while it bled. The prosecution concluded from these signs that appellant beat Hickey, searched the room, and came back to Hickey and discovered she was still alive, moving her in the process, and then, beat her again to finish her off. (RT 13026-8.) A lover such as Petry in a burst of rage would be unlikely to be so deliberate as to move and beat the unconscious victim after the initial fit of blinding emotion had subsided. It was thus crucial to allow the jury to see the pattern of bloodstains, and the exact attitude of Hickey's body on the bed, to determine whether the prosecution theory of movement between beatings was supported by the evidence.

Three other points required illustration by photograph. First, Dr. Blinder, the defense psychology expert, testified that as a lover, Petry

would have attacked Hickey's face, to disfigure it. It was vital to enter a picture of Hickey's face and head, to show that Hickey's face in fact was surprisingly intact, and that most of the blows were to the top of the skull. (See RT 18391.)

Second, appellant ignores a tremendously incriminating minor detail. Hickey had two small one-inch long, two-inch deep knife wounds below one breast. (RT 13021-2.) She had no other knife wounds. Further, it was testified that these wounds were made <u>after death,</u> because of the lack of bleeding from them. The defense had no plausible explanation why Petry would have made these wounds had he been the killer. But, under the prosecution's scenario, where appellant beat Hickey severely, found she was still alive and was forced to beat her again, it would follow that appellant, before he left, insured that Hickey had actually been killed. To this end, the prosecution argued, appellant took a knife, as the expert killer he was, and made the two small cuts on Hickey's breast to observe whether or not they bled. The lack of bleeding showed appellant that Hickey was dead and his task was complete. Only a picture of these wounds could fully express the plausibility of this scenario, and support the lack of bleeding in the wounds.

Finally, there were numerous blood splatters throughout the Hickey bedroom. Only the jury could decide whether the patterns of spots, in conjunction with the location of the closets, and the body of Hickey, could tell the story of what happened in the bedroom that night. (RT 12874.) Further, the jury did have to determine malice, given the alternative felony murder and premeditated murder theories in the instructions. Given these intensely fact bound questions, and given that the photographs were the bedrock reality of the situation, arguments that the photographs should have been excluded border on the nonsensical.

## XVI.
## THE COURT'S INSTRUCTIONS ON ACCOMPLICE
## LIABILITY WERE WHOLLY CORRECT

Appellant next addresses several aspects of the court's instruction to the jury on whether Janet Myers was an accomplice, and whether her testimony therefore needed corroboration. The court left Myers' accomplice liability with the jury as a question of fact (RT 20296), after instructing that Thompson and Smith were accomplices as a matter of law. (RT 20295.) We believe previous precedent of this court quickly establishes that the decision to leave Janet Myers' accomplice status to the jury was correct. Also, more than ample corroboration was present should the jury have found Myers such an accomplice. Finally, the court properly omitted instruction on the concept of the natural and probable consequences of Janet Myers' acts of aiding and abetting. We begin with the last point.

### A.    Natural and Probable Consequences

Myers testified she put appellant up at her apartment in late January and early February at the behest of Clifford Smith. She saw appellant carrying and cleaning weapons. On one of the nights before the Richard Barnes' killing, she drove appellant around the outskirts of Los Angeles, including to one house she later was told by appellant and by police personnel was Richard Barnes' home. Appellant at the time explained he was looking for Tommy Lamb's home. (RT 13798, 13829, 13802, 14801-2.)

Appellant now asserts that even though she had no actual foreknowledge of appellant's intent to commit the Barnes murder, Myers was an accomplice in the Barnes killing, on the theory that that killing was a "natural and probable" consequence of Myers' previous criminal acts. Appellant notes, accurately, that the jury was not instructed on the liability of an accomplice for the acts of a co-principal which are the "natural and reasonable" consequences of the agreed upon criminal act. Here, the jury was instructed only that Myers could not be an accomplice unless she had actual foreknowledge of the Barnes killing. Appellant assigns this failure to instruct as error.

213

Appellant begins by stating that for Janet Myers to be an accomplice "it is enough that she intended to aid in a crime, and that the particular crime was a reasonably foreseeable consequence of whatever crime she intended to aid." (AOB 543; emphasis added.) Appellant fails to specify any actual crimes aided and abetted by Janet Myers which reasonably and naturally led to Richard Barnes' death. And, obviously, Myers could not aid and abet the Barnes murder itself if she did not know it was to take place.[59]

Appellant does not argue that Janet Myers was liable as an accomplice because she drove appellant around the night before the murder, in her only act that actually contributed to the murder. If Myers did not know appellant intended to commit murder, she was not an aider and abettor; driving a friend is not a crime, so its "natural consequences" cannot be culpable. Strong and reasonable suspicion that another is going to commit a crime does not invoke criminal liability. Only actual knowledge of appellant's guilty intent, and intent by Myers to aid it, could have made her driving of appellant culpable. By the same token, picking appellant up at the bus station, and lodging him were not culpable acts absent actual knowledge of appellant's mission. This is exactly what the jury was instructed. Appellant does not dispute the point.

Instead, appellant hints that Janet Myers was involved in some simmering "illegal activities" with the Aryan Brotherhood and that because Myers knew the Aryan Brotherhood was a murderous, vindictive group, aiding any such "illegal activities" led naturally and reasonably to responsibility for the Richard Barnes killing. Such a theory would also render Myers culpable for every other crime ever committed by the Aryan Brotherhood. Appellant can cite no case supporting anything resembling so broad a rule of conspiracy liability, especially in the complete absence of evidence that Myers and AB members conspired to do anything more serious than smuggling contraband.

---

59. CALJIC 3.01:
    "A person aids and abets the [commission] [or] [attempted commission] of a crime when he or she,
        "(1) with knowledge of the unlawful purpose of the perpetrator and
        "(2) With the intent or purpose of committing, encouraging, or facilitating the commission of the crime, by act or advice aids, promotes, encourages or instigates the commission of the crime." (Emphasis added.)

Further, defense counsel below argued long, hard and successfully against the theory that the Aryan Brotherhood, per se, was an ongoing criminal conspiracy, which included all of its brothers, in and out of prison, and runners like Janet Myers and Michele Scarborough. Defense counsel below made such strong efforts because of the desperate need to avoid opening the floodgates to masses of damning hearsay under the co-conspirator exception to the hearsay rule. (See e.g. RT 14689.) Appellant forcefully conceded this _factual_ issue below. The argument for a general Aryan Brotherhood conspiracy including Janet Myers was waived.

The substantive question remains, what _crime_ committed or aided and abetted by Janet Myers naturally and reasonably led to the Barnes' murder? In a later section of his brief, AOB at 548, appellant notes several specific crimes the evidence showed Myers had committed. But, these crimes, smuggling drugs and guns _into_ prison for unspecified reasons, cannot rationally be tied to the Barnes murder. As to smuggling messages, the only evidence of such activity was that the only message about the killing was delivered to Clifford Smith in prison _after_ the Barnes murder. The other messages allegedly delivered were not read by Myers because they were sealed in cellophane, and were at any rate delivered months before the killing. (RT 14688 et seq.) Again, the Barnes killing cannot rationally be called a natural consequence of letters sent months earlier, unless Myers had actual knowledge of the plan to kill Barnes. This is what the jury was instructed. It is simply not rational to argue that delivering letters with _unknown_ contents to a murderous group invokes culpability for a murder occurring months later.

It becomes clear on analysis that Janet Myers committed no _crime_ whose natural and reasonable consequence was the Barnes killing. None of her relatively innocuous criminal acts had any rational connection with the Barnes killing absent some undisclosed actual knowledge by Myers.

In sum, there was no rational substantial evidence that Myers ever committed or aided and abetted any crime which naturally and reasonably lead to the Barnes killing. Appellant stretches the natural consequences doctrine beyond its actual use. Omission of instruction on that score was correct.

## B.  Myers was not an Accomplice as a Matter of Law

Appellant also argues that Myers was an accomplice as a matter of law and the jury should have been so instructed.  Appellant cites not a single case in his discussion of this point.  This is understandable considering that the settled law is against his point.

"It is well settled that the phrase 'liable to prosecution' in section 1111 means, in effect, *properly* liable.  Any issues of fact determinative of the witness's factual guilt of the offense must be submitted to the jury.  Only when facts are clear and undisputed may the court determine that the witness is or is not an accomplice as a matter of law."  (Emphasis in original; *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 759.)

Appellant all but concedes that the evidence as to whether or not Myers was an accomplice was reasonably disputable.  Although it is certainly possible Myers knew what appellant intended when she drove him around the outskirts of Los Angeles in search of the Barnes home, it is plausible that Myers was only acting on the instructions of her lover Clifford Smith to help a fellow Aryan Brotherhood member in any way he requested.  On the latter view, Myers did not understand that she was aiding in a murder plot, and so was not an accomplice.  Because substantial evidence supported both of these two theories, or some other, the trial court properly left to the jury the factual issue of whether Myers was an accomplice.  No error appears.

## C.  Sufficient Evidence Corroborated Myers, Thompson and Smith's Stories

Appellant's next argument is that insufficient evidence was present in the record to corroborate the stories of Smith, Thompson and Myers if they all were accomplices.  We agree with appellant that *People* v. *Szeto* (1981) 29 Cal.3d 20 summarizes the law in the area; but, the required level of corroborating proof is relatively low.  "'Although the corroborating evidence must do more than raise a conjecture or suspicion of guilt, it is sufficient if it tends in some degree to implicate the defendant.' . . . '[T]he corroborative evidence may be slight and entitled to little consideration when standing alone.'"  (*Id.* at p. 26-7.)  Here, more than adequate evidence tied appellant to the crime.

216

First, the manner of killing showed that the Barnes murder was no random burglary. Great care was taken by the killer to have Barnes lay face down on his bed before the killing, and to then shoot him three times, the gun in contact with Barnes' skull each time. Plainly, the professionalism of the killing showed a desire to proclaim that this was an execution. (See RT 11770.)

What message was intended was shown by the evidence that the AB had the motive and the inclination to execute Barnes. The first step in this proof was to prove the existence of the AB. Defense witness Wendall Norris testified on cross examination that the AB was a confederacy of white state prison inmates who stood up for themselves, by force when necessary. Norris admitted he testified in 1984 that the AB had been at "war" with the Black Gorilla Family, a black gang, for ten years. Norris admitted he probably requested to be housed with other AB members. (RT 18804, 18865, 18877-92.) Norris testified he felt strongly about the AB, and about symbols AB members used, such as shamrock tatoos. Norris himself had put a shamrock tatoo onto Thompson's hand as late as December 1982, an act Norris regarded with great solemnity. (RT 18864, 18903.)

Norris stated Robert Griffin felt the same as he did about the AB, and that he would call appellant "his brother", as he formerly had addressed Clifford Smith. (RT 18886-7.)

Norris recalled Smith and Thompson had believed that the AB should be organized into a disciplined group, but Norris claimed he disagreed. However, Norris admitted he and Griffin wrote a poem which embodied the AB creed of standing up for ones honor and for one's brothers. (RT 18865.)

Norris knew Stephen Barnes had testified against his friends in April 1982. (RT 18811, 18875.) Defense witness John Stinson also knew as much. (RT 18661.) Both Norris and Stenson believed that snitches like Barnes were despicable. Norris stated they were on the level of child molesters, who routinely are killed in prison. (RT 18875.) Although Norris resisted stating it flatly, the implication of his testimony was clear that AB members believed snitches should be killed.[60]

---

60. The police reported that Richard Barnes knew his son had testified against AB gang members, and that the elder Barnes' reaction was "that boy is going to get me killed." (RT 12195.)

The previously discussed letter from Stinson and Griffin was also entered into evidence. (See Argument XIV, section L.) This letter established that the AB, known as "the Brand" deliberately carried out cold blooded murders for group purposes, and that going against "the Brand," was considered treachery and was grounds for execution.

Evidence was entered that a year or two before his arrest, appellant had testified under oath that he was an AB member, a statement not likely to be made if it were not true. (RT 17280-8.) Also, after his arrest, appellant had written to his mother that the guns in the storage locker were "Brand business." (RT 16556.)

To summarize thus far, substantial evidence established that the AB existed as a formal organization dedicated to helping white convicts, engaging in armed combat to the death if necessary for its purposes, and for punishing disloyalty to the gang with death. It was established that Stephen Barnes testified against AB members, and that AB members considered snitches despicable, as worthy of death as child molesters. Evidence showed that death by execution was a foreseeable consequence of betraying the AB, and was in fact the fate of Richard Barnes. Finally, Michael Thompson, Clifford Smith, John Stinson, Wendell Norris, Robert Griffin and others, including appellant, were shown as being affiliated as brothers in the AB. Appellant was further tied to the AB by Stinson's testimony which showed that AB members knew that they could summon brothers from distant parts by subpoenaing them in court cases. (Stinson testified he subpoenaed Clark and Thompson once to kill them, but changed his mind after face to face conversations, RT 18705.) It was shown by court document that appellant was summoned to Chino, to testify in Robert Griffin's trial. (RT 14650-1, CCT 495.) While there, he had access to his fellow AB members. (See prison records at CCT 554 et seq. which proved appellant and Thompson were in Chino together for about two weeks.) After his arrest, appellant sent a letter to Michael Thompson with the secret message "need contact . . . could walk" indicating appellant and Thompson were closely associated. (RT 18545.) To conclude, appellant was shown by substantial evidence to be an AB member with a strong motive to kill Richard Barnes.

Appellant also had the opportunity to kill Barnes. Although after his September release from prison appellant spent nearly all of his time in Northern California, appellant arrived in Southern California around January 24, 1983. He charged gas on February 10 and February

12, 1983 in Pomona, and on February 13 in Anaheim, while in a car registered at an El Monte address just a few miles from the Richard Barnes home. (RT 19395, 19405, 19410-1, 19741; see CCT 700 et seq.) Richard Barnes address in Temple City was found among appellant's personal effects, with the damning note "send subpoena to him." (RT 17357; see CCT 595.) This note had real meaning for the jury given Stinson's testimony about using subpoenas to set up killings.

It was also striking that appellant left Los Angeles immediately after the Barnes murder. He arrived in Auburn according to defense witness Rebecca Williams around noon on February 13 or February 14, indicating he most likely left Los Angeles after midnight within 24 hours after Barnes murder. (RT 19170-1.)

Appellant was thus shown by his own admission and through the testimony of Norris to be an Aryan Brotherhood member. The AB was shown to be an organization which deliberately murder those who betrayed it. Richard Barnes' son, Stephen Barnes, was shown to have testified against Aryan Brotherhood members, thus becoming a snitch. Snitches were considered despicable by AB members, deserving of cold blooded killing. Richard Barnes was shown to have been killed in precisely the characteristic execution style used by gangs to proclaim that their victims had sinned against them, and that others would be similarly treated. This style of execution tied Barnes death to his son's treachery and to the AB's honor. Appellant was shown to have been summoned to Chino by the AB, by a method used to communicate with AB brothers. Appellant spent about three weeks in Los Angeles in 1983, probably leaving the day of the Barnes murder. While there, appellant drove a car registered at an address a few miles from the Barnes residence, and charged gas in Pomona and Anaheim, which form a right triangle with the Barnes residence in Temple City, a triangle with sides of about 18 miles.

All of this evidence, none of it provided by accomplices, is substantial evidence that appellant killed Barnes. It is far more than the minimal showing necessary to connect appellant with the crime sufficiently to corroborate Myers, Smith and Thompson.

We make one final point. It is settled in the case law that while the defendant's connection with the conspiracy must be corroborated, the conspiracy itself may be proved by accomplice testimony without corroboration. (*People* v. *Cooks* (1983) 141 Cal.App.3d

224, 312 ("the testimony of an accomplice is sufficient to establish . . . a conspiracy" without corroboration).) Here, appellant's connection with the conspiracy was amply corroborated by the testimony of Norris, by appellant's admission, and by the subpoenaing of appellant to Chino. Appellant's actions in Northern California and his reference to "Brand business" also were significant ties to the conspiracy. The testimony of Smith and Thompson could be used to establish the fact of the conspiracy to kill Richard Barnes without any need for corroboration. Either way, appellant's connection to the conspiracy and to the Barnes murder was corroborated beyond any colorable dispute. The instructions and the verdict were correct.

## XVII.
## THE INSTRUCTIONS ON THE IMMUNIZED WITNESSES WERE CORRECT

Appellant discusses several instructions relating to the testimony of immunized witnesses. His points have all been thoroughly rejected by this court.

1. Appellant begins by noting that CALJIC 2.11.5[61/] was read to the jury below, instructing the jury not to consider why other potentially guilty parties were not prosecuted for the crimes. (RT 20286.) Appellant claims this instruction told the jury not to consider the motive for bias of those witnesses because immunity from prosecution was part of their motive for testifying. Appellant's analysis does not recognize that CALJIC 2.11.5 is aimed at the motive of the prosecutor, not the motives of the <u>witnesses</u>. Whatever the motives of the prosecution, the jury still is free to consider why the witnesses chose to testify, and what incentives were given to them.

The jury was unlikely to fall into the confusion appellant proposes. The jury had seen the trial court countless times limit or strike evidence because it was improper. On this issue, the jury was aware that the court had allowed a great deal of evidence about discussions on immunity, and possible incentives or other motives for immunized testimony. (See e.g., 14008-13, 16902, 14855, 14775.) It would not be reasonable to assume that the jury disregarded all of this properly received evidence because of an arguably ambiguous general instruction.

This court recently settled this precise issue based on similar reasoning.

"The potential for such a misunderstanding of the instruction appears minimal, however, and the error in giving the instruction accordingly harmless. The jury was instructed under CALJIC No. 1.01 'to consider all the instructions as a

---

61. CALJIC 2.11.5 states:
"There has been evidence in this case indicating that a person other than defendant was or may have been involved in the crime for which the defendant is on trial.
"Do not discuss or give any consideration to why the other person is not being prosecuted in this trial or whether [he][she] has been or will be prosecuted."

221

whole and . . . to regard each in light of all the others. . . .'
The jurors were also instructed in the language of CALJIC No.
2.20 (1980 rev.) that '[i]n determining the believability of a
witness you may consider anything that has a tendency in reason
to prove or disprove the truthfulness of the testimony of the
witness, including . . . [t]he existence or nonexistence of a bias,
interest, or other motive [and] [e]vidence of the existence or
nonexistence of any fact testified to by the witness    . . . .'
Rather than being 'countermanded' or 'nullified' by CALJIC No.
2.11.5, as defendant posits, CALJIC No. 2.20, considered with
other instructions given, delivered a correct interpretation of the
law.  (See *Garrison, supra,* 47 Cal.3d at p. 780; *People v. Silva*
(1988) 45 Cal.3d 604, 627 [247 Cal.Rptr. 573, 754 P.2d 1070].)
Whether we apply a *Chapman,supra,* 386 U.S. at p. 24 [17
L.Ed.2d at pp. 710-711] [error affecting defendant's right to
confront witnesses and present a defense]) or merely seek to
determine if it is reasonably probable a result more favorable
to defendant would have been reached had CALJIC No. 2.11.5
not been given (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299
P.2d 243] [error affecting jury's evaluation of witness
credibility]), defendant cannot have been prejudiced." (*People*
v. *Carrera* (1889) 49 Cal.3d 291, 313.)

"As the People point out, the instruction does not tell the
jury it cannot consider evidence that someone else *committed*
the crime. (See generally *People* v. *Hall* (1986) 41 Cal.3d 826
[226 Cal.Rptr. 112, 718 P.2d 99].) It merely says the jury is not
to speculate on whether someone else might or might not be
*prosecuted.*  We agree that the instruction would be more
informative and might better deter speculation if it told the jury
explicitly that its sole duty is to decide whether *this* defendant
is guilty and that there are many reasons why someone who also
appears to have been involved might not be a codefendant in
this particular trial. (Cf. 1 Devitt & Blackmar, Federal Jury
Practice and Instructions (3d ed. 1977) § 11.06.) Nonetheless,
as far as it goes the instruction accurately states the law and
does not appear to have been misleading." (*People* v. *Farmer*
(1989) 47 Cal.3d 888, 918.)

222

2. Appellant next complains that the jury was instructed that the trial court had ruled that the Thompson immunity agreement was "not contrary to the public interest." (See Penal Code § 1324; RT 10132.) Appellant admits there was no objection below, which waived the issue, and indicated defense counsel thought the issue minor. The instruction was at any rate accurate and proper. The jury was not constrained to believe Thompson; rather, the instruction merely focused the jury's attention on his testimony, rather on the motives of the prosecution. No error is shown.

3. Finally, appellant complains of the instruction in CALJIC 2.27,[62] arguing that that instruction, allowing proof of any fact by one witness' testimony, conflicts with the need for corroboration of accomplice testimony. (RT 20289.) This precise issue was addressed and settled against appellant in *People* v. *Andrews* (1989) 49 Cal.3d 200, 216-217. For reasons stated there, the argument again must fail here.

---

62. CALJIC No. 2.27 states:
"Testimony concerning any particular fact which you believe given by one witness [whose testimony about that fact does not require corroboration] is sufficient for the proof of that fact. However, before finding any fact [required to be established by the prosecution] to be proved solely by the testimony of such a single witness, you should carefully review all the testimony upon which the proof of such fact depends."

## XVIII.
## APPELLANT'S ALLEGATIONS OF PROSECUTORIAL MISCONDUCT ARE INCORRECT OR INSIGNIFICANT

### A. <u>Introduction</u>

Appellant next provides an extremely lengthy discourse on his views on the prosecutor's actions during voir dire and during the trial. When viewed in context, these actions do not constitute reversible misconduct. More importantly, despite appellant's attempts to bootstrap small points into major issues, none of the actions, even if improper, was on a topic which could have significantly affected the outcome of the trial. Further, appellant ignores that this was an extremely bitter and hard fought trial. Even before the trial began, the trial court threatened both defense counsel with sanctions for their overzealousness and overreaching. These efforts by the defense team continued throughout the trial, and the defense team did not hesitate to press any advantage or adduce any questionable evidence, or to otherwise test the resolve of the trial court throughout the trial. Some of appellant's claims resulted from actions by the prosecution team which were responses to defense counsel's excesses, but were not substantively prejudicial to appellant. (*United States* v. *Young* (1985) 470 U.S. 1, 12-13 (where prosecutor's sharp comments merely respond to similar comments by defense counsel, reversal is not warranted).) We proceed to review appellant's contentions, matching our numbering to appellant's.

### B. <u>Voir Dire</u>

Appellant begins with alleged prosecutorial misconduct during voir dire. His arguments are unsound, and the issue was completely waived below for several reasons.

1.   **Appellant Waived Any Claim of Prosecutorial Misconduct During Voir Dire**

The primary fact about alleged misconduct during voir dire is that appellant retained eight peremptory challenges when he finally passed on the jury panel. (RT 9471.) As we have established in detail in Argument VII, *infra*, this retention constituted a waiver of any claim of prejudice from the jury selection process.

2.   **Appellant Names Only One Incident Which Could Have Affected Any Sitting Juror**

In the only incident appellant raises which could have affected a sitting juror, appellant points to a question by the prosecutor of whether a juror thought violent crimes in prison were more likely to be committed by inmates convicted of violent crimes or of non-violent crimes. Appellant concedes that the question was objected to and the objection sustained before the question was answered. Appellant argues the implication of the question, which he interprets as being that violent criminal are more apt to commit crimes in prison than non-violent criminals, was prejudicial.

In the first place, implication that those who have committed violent crimes are more likely to commit violent crimes in prison than those who have committed non-violent crimes is obvious. The common sense of this implication is plain from the fact that this is the inference appellant draws from the question, even though the question itself was completely neutral. The question itself could not have been harmful.

In fact, Judge Weigel's findings about prison gangs, which were read to the jury by the judge as part of the instructions, specifically stated that the primary reason for violence in prison was the violent propensities of the inmates. (RT 20280-1 through -2.) Further, the prosecutor did not argue that appellant in particular was more likely to have committed a particular crime because of his violent disposition. Many prosecution witnesses were inmates as well. Any conceivable implication from the question would have affected the prosecution's witnesses as well as the defense witnesses. At any rate, the jury was fully instructed as to what deductions from the evidence were proper and that questions were not evidence. Appellant shows no real misconduct and no prejudice.

Since appellant admits no sitting juror was affected by any of his other claims, no issue is raised.

### 3. Had Defense Counsel Believed Any of the Prosecutor's Comments During Voir Dire were Prejudicial, He Could have Challenged Jurors for Cause

Defense counsel had cause challenges available to combat any prosecutorial misconduct. The use of these challenges would have produced findings by the trial court as to the effect of the prosecutor's questions. Absence of such challenge waived the issue below because the trial court was prevented from acting to cure any prejudice that might have been created.

### 4. Substantive Complaints

Notwithstanding appellant's waiver on this issue, we briefly address appellant's substantive complaints.

We begin by noting again the unprecedented thoroughness of voir dire in this case. Each of hundreds of potential jurors filled out written questionnaires with dozens of questions. Then, over a period of months and 7,000 transcript pages, each juror was repeatedly voir dired individually and in front of the panel. At the end of this exacting process, defense counsel retained eight peremptory challenges. In this light, it is difficult to believe any comments by either counsel which merely expressed an attitude toward the opposing side could have had any serious effect on the jurors, who were personally familiar by this time with the characters of all counsel, and who would become even more familiar with them in the months of trial.

Appellant's first complaint with the voir dire is that the prosecutor objected too much to the defense team's questions. Appellant, however, points to only a dozen or so incidences of such behavior in the 7,000 transcript pages of voir dire. On its face, his argument is unconvincing.

The prosecutor's objections were reasonably founded. The prosecutor objected to several consistent tactics of the defense team. First, defense counsel tried to use voir dire to ingratiate themselves and the defense team with the jurors. Counsel repeatedly introduced the

226

defense team to the jurors, and he used the word "we," implying, at least to the ear of the prosecution team, that the prosecutors and the defense were somehow in agreement on certain propositions. The prosecutor's objections to such attempts were reasonable. (See e.g., RT 6294, 5649.) If defense counsel saw fit to make such trivial attempts to influence the jury, it follows that the prosecutor would see fit to object. Given the cold transcript, we cannot know the true effect of defense counsel's statements or inflections, but we do know the trial court was active and diligent in attempting to eliminate such trivial by-play. No challenges for cause were requested on this ground. The issue was not significant.

The prosecutor also objected to two other ploys by the defense team. First, defense counsel was given to stating hypotheticals in reference to the death penalty which included only some aggravating or mitigating circumstances. These hypotheticals were misleading to the extent that they left the impression with the juror that those factors mentioned were the only ones approved in the law. (See e.g., RT 6322, 7033, 5581-6, 6517 et seq., 7198.) Although instruction would have eventually clarified the issue, the prosecutor attempted to keep such misimpressions from forming; such objections to "incomplete statements of law [which] tended to cause confusion about the legal principles and facts of the case" (*People* v. *Johnson* (1989) 47 Cal.3d 1194, 1225; see *People* v. *Williams* (1981) 29 Cal.3d 392.) did no harm.

Defense counsel also habitually discussed legal concepts with the potential jurors, who were untutored in such rules. For example, defense counsel repeatedly gave gruesome hypotheticals and asked whether such acts "automatically" deserve the death penalty. Most jurors said yes, based on the narrowness of the hypothetical and their own common sense. The prosecution was later able to bring out that in most cases those jurors only meant "automatic" in the narrow sense of the hypothetical, and that they would be quite willing to listen to other facts, including mitigating evidence, before deciding on the penalty. (See e.g. RT 3357, 5327, 5581-6, 6133, 7911.) Rather than allow a false impression of the law, and a misleading record of the juror's true views, the prosecutor repeatedly objected to such narrow questions. The objections were reasonable, and again did no harm to the voir dire process. (See *Johnson, supra*; *Williams, supra*; Code of Civ. Proc. 223.)

Finally, appellant claims the trial court erred in not reprimanding the prosecutor more pointedly. Appellant concedes that

numerous admonitions by the trial court came immediately after prosecution objection.  (RT 6322, 6328-9, 6222.)  Even though the admonitions were addressed judiciously to both sides, the timing reasonably implied reference to the prosecutors in particular.  (See e.g., RT 3310, 3325, 4145.)

In sum, appellant claims the trial court and the prosecutors prejudiced the jury against the defense counsel.  The argument ignores defense counsels' manifest abilities to hold their own in the byplay, as well as the extensive opportunities for voir dire by both sides.  The argument also ignores that appellant points to absolutely no criticism of defense counsel whatsoever before any juror who actually sat at the trial. The only incident assigned as misconduct by appellant which occurred before any chosen juror was one simple ambiguous question to which an objection was sustained before an answer was given, and which could not have seriously prejudiced appellant in any event.  No issue is raised as to prosecutorial misconduct at the voir dire.

## C.  Prosecutorial Misconduct at the Guilt Phase

### 1.  The Prosecutor's Behavior was Proper

a.  During voir dire of Officer Barry Brown it came out that Rebecca Williams had originally agreed to talk to Brown, who had advised her that she had the right to refuse to talk.  Williams then hestitated, and called defense counsel DePaoli, and talked for about a minute.  Williams then hung up and told Officer Brown that she had changed her mind, that she now knew her rights and did not wish to talk to him.  (RT 15519-20.)  The prosecutor obviously felt that this revealed Williams' attitude toward the action, if not actual misconduct by Mr. DePaoli, and consciousness of guilt by appellant.   The trial court acknowledged these points, but did not want Mr. DePaoli to be necessary as a witness, and so ruled:

"THE COURT:  The fact she refused to give a statement is admissible evidence, the reasons for her refusal at this point in time.  We're treading very closely upon the issue of once again an attorney becoming a witness because once you get into her refusal after the phone call to give him a statement, then we get in the veracity of what was said to her credibility of her

228

statement as to what was said to her. I don't want that to
happen.

"MR. DePAOLI: But —

"THE COURT: And the next thing you get into, I
suppose, is some claim that there's been an effort to suppress
evidence. That can't be done until there's some showing Mr.
DePaoli as an agent was directed by his client to do such a
thing. There's no showing of that. I'm going to sustain the
objection at this point. She can testify — she can testify she
refused to give a statement without all the other folderol.

"MR. DIKEMAN: Fine, your Honor.

"MR. DePAOLI: This is a perfect right of a person not to
do.

"THE COURT: Certainly if she chooses the right not to
talk to him. The fact here shows she was going to talk and
changed her mind after the phone call which the old saying
goes, a horse of a different color, but we're not going to get
into that now." (RT 15521.)

Later, the prosecutor asked Officer Brown:

"BY MR. DIKEMAN: Q.    Before she made her final
decision not to be interviewed by a representative of the
Humboldt County District Attorney's Office investigating a
homicide involving Curtis Floyd Price, did she place what
appeared to be a long distance telephone call?

"MR. DePAOLI: Objection, your Honor. Irrelevant.

"THE COURT: Sustained." (RT 15525.)

No harm was done by this question as the question was not answered,
and no possible recipient of the call was named. The prosecutor was in
effect asking the court to reconsider its ruling. The court and defense
counsel quickly acted to avoid any damage. But, to explain the ruling,
the court admonished the jury as follows:

"THE COURT: Ladies and gentlemen, just to make it
clear, in a legal proceeding, the attorneys from the opposing
sides are by law required not to talk to the opposing party
without the consent or presence of the opposing counsel.

"In other words, they can't talk to the client on the other
side. However, the witnesses involved in any legal proceeding
have a choice. They can talk to anybody they want to. The

attorneys have the right to approach. They have the right to have their investigators approach and attempt to talk to them. And if the witnesses tell them, 'I don't want to talk to you,' that should normally end the situation.

"There's nothing nefarious about any of this. It's just some people don't understand it. It's something like Mrs. Moore testified to yesterday. She was under some sort of gag order I think she said.

"Well, there is and has been and always will be in a case like this an order that witnesses cannot sit in the audience nor can they talk to another witness before or after having testified. And the reason for that, I think you understand, is to attempt to get a straight story from the witnesses here and not somebody else's version of what may have happened.

"So no one's trying to hide anything by these rules of procedure that we go through in every case. They may sound strange. The point is, after all this is that the witness has a choice if they are properly advised to either talk to the attorney who is approaching them or not. And in their own best judgment. No one, however, from either side has a right to tell them if they're simply a witness, 'You cannot talk to the other side.' Okay." (RT 15525-6.)

In sum, no inference was created that defense counsel or appellant suppressed any evidence, even though such evidence would have been relevant and admissible, and may have existed based on the record. And, the court showed its customary care to avoid any possible misunderstanding on the part of the jury. On all counts, appellant's complaint is baseless.

b. Prosecutor Dikeman attempted to bring out the fact that appellant refused to consent to a search of his car, saying he didn't want to do "anything that would help." (RT 16040.) The prosecutor first asked whether appellant consented to the search of his car. An objection was sustained before an answer was given. The colloquy was as follows:

"Q. Now, did Detective Parker have a conversation with Mr. Price about whether or not Mr. Price would voluntarily consent to allow the officer to go search his car?

"MR. DePAOLI: Objection, irrelevant.

"MR. DIKEMAN:  Excuse me.

"MR. DePAOLI:  Irrelevant.

"THE COURT:  Sustained.

"MR. DIKEMAN:  Could I be heard to this?

"THE COURT:  You may when we get to the break.  Go on and ask him some more questions.

"MR. DIKEMAN:  What was Mr. Price's response when he was asked to sign the consent --

"MR. DePAOLI:  Same objection.

"MR. DIKEMAN:  -- to search his vehicle --

"MR. DePAOLI:  Asked -- asked --

"THE COURT:  Sustained.

"We'll take it up at the break.  If you have no further questions, say so.  We'll take it up.  If the Court's ruling, I'll allow you to go back into it after the lunch hour."  (RT 16011-2.)

First, appellant implies that the purpose of the two questions was identical, and so flouted the court's ruling.  The prosecutor's offer of proof showed that the second question was intended to elicit appellant's exact answer to that question, namely that he refused to do anything that could possibly help the police investigation, a statement reasonably implying consciousness of guilt, or at minimum, hostility to the justice system and so attitude toward the action.  Such a statement was unrelated to specific Fourth Amendment right to refuse consent to search.  Whether or not appellant's actual statement was protected by the Constitution, the prosecutor reasonably thought it stood in a different posture from the actual refusal to consent.  His good faith was thus established.

It is true that the prosecutor had a difficult time accepting that the refusal to consent to search was inadmissible, even where it seemed plainly probative because the officers involved demonstrably had sufficient probable cause to obtain a warrant.  (RT 16040 et seq.)  The lengthy colloquy between the court, which stoutly refused to allow into evidence any comment on the refusal, and the prosecutor, makes two points.  First, appellant's continual complaints that the trial court was sharp and firm only with defense counsel are incorrect.  Second, the prosecutor, although slow to accept the court's reasoning, was trying in good faith to understand why evidence he believed probative could not

231

somehow be admissible despite the constitutional objection. Finally, no prejudice is conceivable in any event. The highly incriminating items actually found in appellant's car rendered insignificant the possible mere implication of consciousness of guilt concerning the searches. The issue was trivial.

    c.  Appellant again complains of a question which was not answered, and in this case was not even asked. Defense counsel had been allowed to elicit the fact that Detective Freese had not ordered Detective Douglas to arrest appellant. The court, although convinced the issue was minor (RT 16051-7, see especially 16056: 9-15), allowed the testimony that Detective Freese was being cautious and did not want to arrest appellant before he talked to him. This implied to very minor degree an expert opinion by Detective Freese about the eyewitness identifications. It also, to the prosecutor's ear, supported the defense theory of official incompetence and persecution of appellant. To combat that implication, the prosecutor asked the following:

    "Q.  Sir, on March the 3rd, 1983, when you formed that opinion, [not to arrest] would your opinion have been the same if you were aware that the defendant was --

    "MR. DePAOLI:  I would object, your Honor, based on the fact counsel's testifying, calls for speculation.

    "MR. DIKEMAN:  It's a hypothetical question. He's asked for an opinion. I think I'm allowed to ask him about factors which might change that opinion.

    "MR. DePAOLI:  I don't believe there's been a foundation established for that, your Honor.

    "THE COURT:  Overruled.

    "MR. DIKEMAN:  Would your opinion have been the same if you were aware that Mr. Price --

    "THE COURT:  Wait a minute. Just a minute. Just a minute. Are you going into factors that --

    "MR. DIKEMAN:  I'm going to ask him a hypothetical question, additional factors which might alter that opinion.

    "THE COURT:  I assume if he had additional factors, that given enough additional factors, that his opinion would be changed. I -- I --

    "MR. DePAOLI;  It's not relevant, your Honor. It didn't happen that way.

"MR. DIKEMAN:  If Mr. DePaoli's really concerned, I'll withdraw it.

"THE COURT:     Apparently he is.     All right.     It's withdrawn.  Go ahead.  Ask another question."  (RT 16091-2.)

Appellant believes the question implied that the prosecutor had knowledge beyond that of the jury.  It is hard to imagine what such knowledge could have been.  Appellant states the prosecutor would have listed facts known to other officers but not to Detective Freese, facts which were legitimate for probable cause but inadmissible at trial.  This is unlikely; in fact, at the juncture being discussed, Detective Freese knew everything Detective Douglas knew and still did not order the arrest.  (See CT 819 et seq.)  Appellant does not explain why the prosecutor would ask if facts known to Detective Freese would change his mind, which they obviously would not.[63]  Rather, it is apparent that the prosecutor intended to ask Detective Freese whether the arrest would have been justified based on facts known to the jury that were developed on further investigation.

While this discussion shows the prosecutor's good faith and the unreasonableness of appellant's argument, the fact remains that no implication of hidden information was actually contained in the question.  Once again, appellant's complaint is factually and theoretically baseless.

d.     As discussed, Mark Silverman and Dennis Dahl, two witnesses in the Triplex robbery agreed with the other Triplex witnesses that the robber wore a blond woman's wig.  These two witnesses went on to point out that the robber used a snubnosed 1-1/2 to 2 inch barrel pistol with a brownish coloration.  A brownish snubnose Charter Arms .38 caliber revolver was found in a lunch box in a black suitcase in appellant's mother's garage.  The gun rested in the lunch box on a blond woman's wig.  Silverman and Dahl testified that the Charter Arms revolver closely resembled and was indistinguishable from the one used by the wigged robber.  Given the other evidence in the case, no doubt remained that appellant used that seized wig and gun to rob the theater.  Appellant omits these facts from his discussion of the Charter Arms revolver.

---

63. Even in the highly unlikely possibility that the prosecutor intended to mention appellant's prior arrests, known both to Detective Douglas and Detective Freese, no prejudice would have resulted, since the jury knew that appellant had previously been in prison.  But, the arrests were not mentioned.

When the gun was seized, its use in the Triplex robbery was less established. Although not specifically mentioned in the warrant, the gun was seized because appellant was a convicted felon who could not legally possess a pistol. It was later determined that the pistol had been reported stolen in Flint, Michigan, where Mrs. Lloyd had old family friends.

The prosecuter attempted to establish that the gun was stolen. He asked two questions, one of Mrs. Lloyd "would it surprise you to learn that that weapon was reported stolen in Flint, Michigan?" (RT 16691.) And one of Sergeant Frederickson "where was the Charter Arms reported stolen out of?" (RT 17409.) Both questions were objected to successfully before any answer was given, and the court fully admonished the jury in strong terms that the answer to the question was unknown and irrelevant. (RT 17430-2.)

No prejudice appears. There is no reason to believe that the admonishment was ineffective. (See *People* v. *Bell* (1989) 49 Cal.3d 502, 540-1.) Further, the issue of the gun's source was trivial compared to the conclusive proof that it had been used to rob the Triplex Theater, along with the undisputed fact of appellant's possession of a dozen or more other stolen guns.[64]

Finally, appellant does not establish the claimed reprehensible bad faith by the prosecutor. The first question was plainly in good faith, as it preceded any ruling on the issue, and as appellant's possession of a stolen weapon was relevant to the conspiracy charge. (Appellant does not deny the gun was stolen.) The prosecutor claimed that the second question was the result of a misunderstanding of the first ruling, and the trial court, in denying the mistrial motion, did not rule otherwise. This was an implict finding of no prejudice. No issue appears.

e. The court was cautious about letting the jury know the length of appellant's prior imprisonment, although the fact of his prior imprisonment was obviously known. Appellant confuses the length of appellant's imprisonment with the length of time appellant knew

---

64. We note parenthetically yet another instance where the trial court admonished the jury to ignore the prosecutor's question. This court action adverse to the prosecution is another instance of court intervention favoring appellant that he conveniently fails to recognize.

We also note that the prosecutor objected to evidence equally as many times as did the defense. Any implication that objections to the entry of evidence implied an intent to hide evidence would have affected both sides.

Thompson. The latter related to Thompson's biases, and to issues of loyalty in the AB. The prosecutor asked Thompson the length of his acquaintanceship with appellant; Thompson answered "five to six years" (RT 16765), and the court approved the exchange.

Appellant assigns this as bad faith by the prosecutor and misconduct by the trial court. His arguments are unpersuasive. First, there is no reason to conclude that appellant and Thompson knew each other only in prison. Janet Myers, Rebecca Williams and others knew Thompson, Smith and other inmates even though they had never been in prison together. Appellant himself was known as an extensive letter writer, and Myers and Williams reported that they had gone visiting to Folsom once with appellant when he was a free man. (RT 19167.) Further, Thompson and appellant were not even in the same prison for most of their acquaintanceship. Appellant's conclusion that the length of Thompson's and appellant's acquaintanceship indicated the length of appellant's incarceration is simply wrong. Both the prosecution and the trial court understood this distinction.

Beyond his baseless legal argument is the fact that Thompson's answer did not prejudice appellant. Thompson's statement of five to six years occurred in March of 1986. Thus, even accepting appellant's reasoning, Thompson's statement put appellant in prison no further back than 1980 or 1981. As appellant was released in the Fall of 1982, his total stay during the period he knew Thompson was no more than 1.5 to 2.5 years. No prejudice could reasonably have arisen from this information.

f. We wholeheartedly agree with appellant's admission that his next issue is "trivial[]." (AOB 623, n. 543.) It concerns a vehicle registered to Michelle Scarborough that was later transferred to Tami Shinn in 1985. The prosecutor wished to enter evidence of this undisputed fact, presumably to support the tie between the various AB "runners." The defense objected in advance, and the court sustained the objection. However, on cross examination of Agent Tulleners, defense counsel brought out that in 1983 no car known to the police was registered either to Shinn or Scarborough. (RT 19749.) The prosecutor evidently believed that that question had changed circumstances in that defense counsel had used ownership of cars to dispute the closeness of the runners. On redirect, he asked a leading question including the allegation that the transfer took place in 1985. The court excused the

235

jury and informed the prosecutor that circumstances had not changed, and that the question was improper.[65]

As appellant points out the issue was insignificant. The prosecutor may have walked close to the line, but the trial court saw fit to make no finding of bad faith. No issue is raised.

### 2. Appellant's Arguments About Misconduct Concerning Appellant or His Counsel

a. Appellant finds fault with a comment by the prosecutor in opening argument:

"You're going to be spending a good deal of time in Mr. Price's presence while he plays his 'Gee willikers, golly shucks,' role and probably misses a chance to hold Ms. Klay's chair. But during the evidentiary portion of this case, which we will shortly embark upon, you're going to have the opportunity to meet some other people who have had contact with Mr. Price.

"Contacts when he was projecting a much different image."

(RT 10125-26.)

Appellant admits no objection was made to the statement. Any claim based on the statement was therefore waived. (*People* v. *Bell, supra*, 44 Cal.3d at 534-5.)

*People* v. *Garcia* (1984) 160 Cal.App.3d 82 provides a reasonable framework for evaluating comment on the courtroom behavior of a nontestifying defendant. Such comment is normally improper, as it constitutes character evidence unrelated to any issue. However, jurors will inevitably notice a defendant's behavior, and this is why inter alia civilian clothes are provided. (*Id.*, at p. 91.) As such, the comment in this case must be thought innocuous. *Garcia* further noted that CALJIC 2.00 defining proper evidence would help ameliorate any error. (*Id.*, at p. 92.) Such instruction was given in this case. (RT 20280-4 et seq.)

Here, appellant's failure to object waived the issue. The reason for the lack of objection was likely that appellant was in fact attempting

---

65. This was another instance of firm treatment of the prosecution by the trial court.

very energetically to project a positive image, and he welcomed the prosecutor's emphasis of the fact. (*Bell, supra,* 49 Cal.3d at 534-5.)

      b.   During the testimony of AB "runner" Janet Myers, the woman who drove appellant to Temple City and the Barnes house a few nights before the murder, the prosecutor asked "have you ever seen -- personally seen the defendant Curtis Price mad enough to kill somebody?" and "while the defendant was staying at your house in Southern California, did you ever see him violently mad?" (RT 13867.) Defense counsel objected to both questions before Myers could answer. After a bench conference, the court admonished the jury once again that unanswered questions are not evidence and signify nothing. (RT 13871.) No prejudice is shown.

      Appellant condemns the prosecutor's questions as misconduct without mentioning the prosecutor's theory of their relevance.  He argued that Janet Myers was convinced to testify by Michael Thompson, who told her, among other things, that her life was in danger because she knew too much about appellant's activities.  Myers' credibility was obviously aided by the knowledge she believed her life was actually in danger from her testimony, or from the fact that she decided to testify, not out of some theory of personal gain, but rather to lock up someone whom she perceived as a personal threat.  The prosecutor also told the court that it could prove through Myers' testimony that Myers had in fact seen appellant "violently mad" and that Myers was afraid of appellant.   (RT 13869.)   These facts show that the evidence unquestionably was relevant and offered in good faith.  The trial court decided to exclude it, presumably on section 352 grounds.

      The prosecutor's questions were in good faith.  The objections and admonitions served their designed function and avoided entry of the evidence of prejudice.  No issue was raised.

      c.  Appellant's next argument involved the prosecutor's question to prosecution witness and former AB leader Clifford Smith:

> "Are you personally aware of whether or not the Aryan Brotherhood membership is doing anything right now to assist the defendant Curtis Price in his defense of this case?"  (RT 16185.)

Defense counsel immediately objected before the question was answered and later requested a mistrial on this ground.  The court ruled:

"THE COURT: Mistrial is not going to be granted, because there's no evidence . . . admitted before the jury that harmed anyone. I sustain your objection, so the mistrial is denied.

"The fact that there was a question asked that was sustained, they'll be instructed time and again throughout this trial their not draw any inference from that, so I don't know why you made the motion." (RT 16261-2.)

The relevance of the prosecutor's question is, contrary to appellant's protests, indisputable. The entire case against appellant was based on his being involved in a conspiracy to achieve Aryan Brotherhood ends. Aid by current AB members was relevant and probative evidence of the existence of the Aryan Brotherhood and of appellant's membership in and ties to the AB, both of which were hotly disputed issues at trial as being probative substantively and on credibility. It did not matter whether or not the aid given was legitimate, such as testifying truthfully, or illegal, although no implication of illegitimate acts was actually contained in the prosecutor's question. We also note that given the patently perjured testimony of AB members Stinson, Norris and Rowland, who denied even the existence of the AB, such implication of illicit aid would have been harmless.

Finally, the objection to the question was made on hearsay grounds. Appellant claims Clifford Smith had no way of knowing first hand of any AB efforts. This trial proved the porousness of prison security systems. Also, Smith was not in prison when he was transported to Humboldt County. Smith had numerous opportunities to gain first hand information about AB efforts.

In sum, the question was relevant, probative, and in good faith. It was not answered, and the jury was admonished not to consider it. The jury had ample evidence of AB efforts to aid the defendant. No issue appears.

d. A wood chip was found in the AR-7 manual stolen from the Hickey apartment when the manual was seized from appellant's car. An expert witness testified that the chip could not be matched to any wood splinters around the closets in the Hickey apartment.

Defense counsel later asked Detective Freese:

"Has there been any sort of investigation of the department to see if an officer placed [the wood chip] there in the pamphlet?

"A. No, there hasn't." (RT 15486.)

The question was without any good faith foundation. Understandably, at his first opportunity, the prosecutor questioned Detective Freese as follows:

"MR. DIKEMAN:  Q. Sergeant Fredrickson, perhaps we can eliminate Mr. DePaoli's sleezy --

"MR. DePAOLI:  I'll --

"MR. DIKEMAN:  Information right up front.

"MR. DePAOLI:  And ask that it be stricken.

"THE COURT:  Sustained. Ladies and gentlemen, you're admonished to disregard Mr. Dikeman's implication that there was anything sleezy.

"MR. DIKEMAN:  Sergeant --

"THE COURT:  Please refrain from that conduct in the future.

"MR. DIKEMAN:  Yes, your Honor." (RT 15494.)

No doubt the prosecutor's comment was inappropriate and fueled by anger.  The trial court however firmly reprimanded the prosecutor (as appellant claims never happened).  We do not justify the act, but merely point out that where one counsel, without basis, accuses a police officer of sleazy behavior, to wit, fabricating evidence, some reply may be expected.  (*United States* v. *Young* (1985) 470 U.S. 1, 12-13.)  At any rate, no prejudice to the defense is shown.

e.  During examination of a police officer concerning a card listing evidence the following exchange occurred:

"THE COURT:  Yes, you may approach the bench.

"(The following was held at the bench:)

"MR. DePAOLI:  The card shown to the officer, card number 574, we asked for in motions.  We have a motion specifically -- specifically we asked for card number 574.

"I can show this Court the transcript where they said it was lost, looked for, lost, destroyed --

"MR. DIKEMAN:  Tell them you got it, DePaoli, don't lie to him anymore. If he says he hasn't had it, that's a fucking lie.

"MS. KLAY:  Would you please ask him to --

239

"THE COURT:  Just a minute.

"MR. DePAOLI:  If he gave it to me --

"THE COURT:  Just a minute.

"MR. DePAOLI:  -- at ll, then do it --

"THE COURT:  Just a minute.  Just a minute.  You will both go back and sit down at the table, please, now.

"MR. DePAOLI:  Yes, your Honor.

"(The following was held in open court in the presence of the jury:)

"THE COURT:  Ladies and gentlemen, I seem to have a problem here that I intend to control.  We will take a recess." (RT 15677.)

The trial court ordered counsel to their seats, excused the jury, and stated:

"THE COURT:  Court is reconvening in nine eight nine eight.  The attorneys are present.  The jury is not.

"Let me indicate that prior to the break at the bench, there was a statement made about someone being a 'fucking liar.' The person who made the statement knows who he is.  The record reflects it.

"I deplore it.  It is not needed.  It proves nothing.  It is nothing but inflamatory to the situation.  I'm well-aware that this card has been sought by Mr. DePaoli and Ms. Klay.  I don't know whether they've been provided it before or not.

"The statement made was not needed and I'm not citing anyone for contempt on that basis because I know it was made in frustration.  I know Ms. Klay's comments and interruptions were made in frustration.  They were not needed, either.

"I'm here to try to rule on this piece of evidence which is going to be involved in this case for a man on trial for murder. I don't need profanity.  I don't need interruptions from someone [Ms. Klay] who is seated clear across the courtroom at counsel table and has absolutely no idea what was happening here at the bench.  Then when I say enough is enough, continues to talk.

"If there are further profanity, if there are further bickering at counsel table, if there's further interruptions from anyone who sits down there and knows how they're supposed to

conduct themselves, I will cite you for contempt and I will impose the sanctions that are required by law. Enough is enough.

"Let's find out about the blue card.

"MR. DIKEMAN: Your Honor, if I might, I would apologize both to your Honor and to Mr. DePaoli. It was inexcusable.

"THE COURT: Thank you. I think that is well-taken."
(RT 15681-2.)

There is no evidence whatsoever on the record that the comment was made loud enough for the jury to over hear. Despite defense counsel's assertion, the trial court never made such a finding. Nevertheless, in the interests of caution, the trial court admonished the jury without repeating the comment, that the comment, if heard, "is not evidence in this case and must be disregarded by you. ¶ The Court, I believe, has made it eminently clear to the attorneys that comments along that line are not going to be accepted from this date forward. . . ." (RT 15811.) Once again, the court communicated its sharp disapproval of prosecution tactics to the jury. Appellant's continual arguments that the court was unwilling to be firm with the prosecutor are once more belied. Further, the admonition undid any prejudice to the defense; with or without the judges admonition, it may be reasonably presumed that the prosecutor's intemperate comment harmed himself more than the opposition.

Appellant makes several additional points. First, the allegation that the court was "rude to" Ms. Klay is false. Rather, it is plain that the trial court was attempting to forcefully control all attorneys and regain the appropriate decorum of the court. Even after the two attorneys directly involved in the verbal altercation regained their control, Ms. Klay persisted in "bickering" as the court characterized it (RT 15681), and despite several orders by the court, would not be quiet. The court spoke sharply, but not intemperately, to Ms. Klay to finally induce her to be still. Examination of the record shows the court behaved judiciously. (See RT 15678-9.)

Second, the comment by the prosecutor, though inexcusable, was, as the trial court recognized, the result of frustration. As the court noted, in seven months of trial, only about 30 days of testimony had been received. (RT 15811.) Both the trial court and the prosecutors

attributed a great deal of the delay to disruptions by appellant and frivolous motions by defense counsel. Defense counsel generally responded by accusing the prosecutor of blocking discovery and impugning the good faith of the prosecution. On this particular occasion, defense counsel once again accused the prosecutor of withholding discovery. The prosecutor exploded at one more such interruption and accusation, given the clarity of the notation on the card that it had been provided to the defense. The prosecutor's comment was wrong. But, his motivation was understood by the trial court.

There is no evidence that the jury heard the comment. It is appellant's burden to provide such a record on review. At any rate, given the court's reprimand of the prosecutor, and given the damage to the prosecutor's own image done by his lapse, no prejudice can be shown.

f. Appellant again objects to an unanswered question to which a successful objection was imposed. The prosecutor asked appellant's mother whether her other son, Alan Fletcher, threw appellant out of Fletcher's house. Appellant claims this was asked merely to blacken appellant's character. Once again, appellant ignores a more reasonable theory of relevance provided in the record.

Alan Fletcher claimed he gave appellant the brand new Sampo radio that was found in appellant's garage after the Hickey murder. The prosecutor found this a poor explanation for appellant's possession of a very significant item, given that an identical brand new Sampo radio was missing from Hickey's apartment. Allen Fletcher admitted on the stand only that he and appellant had had a disagreement, and that both had agreed it would be better for appellant to find other lodging, and that Fletcher gave appellant the radio a few weeks later as a peace offering. (RT 17220-3.) Out of the presence of the jury, Fletcher testified that in fact appellant had broken up Fletcher's mobile home for no good reason, and that Fletcher had kicked appellant out. (RT 17267.) The trial court excluded those facts under section 352. However, Officer Brown did testify that Fletcher told him, contrary to Fletcher's testimony, that Fletcher had asked appellant to leave. (RT 17701.) The prosecutor argued that giving a gift of a brand new radio after kicking someone out of one's home was not believable, and that it was more believable that appellant stole the radio from Hickey during the murder.

As to the statement actually objected to, Officer Brown was allowed to testify that Fletcher essentially did throw appellant out of his home. Whether or not the question was beyond the scope of examination of Mrs. Lloyd, which was the ground on which the objection was sustained, no prejudice can be cited because, even had the question been answered in the affirmative, the jury already had similar evidence before it. The fact that the question was not answered at all completely eliminates the issue.

g. Appellant's next complaint is a question asked by the prosecutor of the police officer who reproduced the composites of appellant made by three Triplex Theater employees, through use of the "Identi kit." This kit was a device which created composites through use of numbered plastic overlays, which allowed reproduction of the composite at a later time merely by reinserting the correctly numbered overlays. (RT 15128 et seq.) The defense objected in the jury's presence to the three composites brought by the officer. Later, the prosecutor asked Officer Waters:

"MR. DIKEMAN: Q. Officer Waters, were you aware that the only composites that Mr. DePaoli didn't want the jury to see were those by Ms. Eiers, Ms. Scheffler and Mr. Dahl?

"A. No.

"Q. But those were the only three that you brought with you today?

"A. Yes." (RT 15878.)

Appellant puts a sinister cast on the question, but had the prosecutor been implying that defense counsel was trying to hide evidence, defense counsel would have objected. He did not. An admonition to the jury that the defense counsel was concerned with reliability, not with suppressing good evidence, would have been effective. At any rate, the jury was exposed to hundreds of such objections by both sides. The issue was minor, and lack of objection waived it.

### 3. The Prosecutor Properly Handled the Defense Experts

a. Appellant raises two issues with respect to Doctor Martin Blinder. First, the prosecutor brought out on cross-examination that Dr.

Blinder's fee was a $125 per hour. Appellant characterizes this evidence as "unfair." Appellant's sense of fairness is distorted. It is obvious that being paid to evaluate facts raises the potential for bias in favor of one's employer. (See *Brown* v. *McCuan* (1942) 56 Cal.App.2d 35, 41.) This bias may be conscious, as a desire to please the employer so as to gain a good reputation and ensure future employment as an expert witness. Or, as the scientific community is well aware, the bias may be subconscious, causing one to arrive at a desired result without conscious awareness of having shaded the facts. The "double-blind" experiment standard in scientific fields is testimony to the reality of such potential bias.

Appellant's second complaint regarding Dr. Blinder was waived by lack of objection, and was in legitimate response to an opening by defense counsel. The prosecutor asked of Dr. Blinder:

"You were retained by and testified by -- for the defense in the Dan White case?

"A. Yes.

"Q. Was Mr. White one of the cases that you discussed in this books [sic], Lovers, Killers, Husbands and Wives?

"A. Yes." (RT 18389.)

Later, in argument, the prosecutor made the following brief comment:

"We heard from Dr. Blinder, the Dan White psychiatrist, the man behind the 'Twinkie Defense.' Dr. Blinder came here. He brought his typewritten script and his $125 per hour meter." (RT 20341.)

The "script" mentioned by the prosecutor referred to Dr. Blinder's admission that every question and answer asked and provided by him during his examination by the defense was previously typed and provided to the defense. (RT 18387.) Appellant objects vociferously to this mention of Dan White in impeachment.

First of all, as mentioned, the issue was waived because the defense did not object to the question. Of the many reasons for this failure to object, one may be that defense counsel realized that it was he who initially introduced the book Lovers, Killers, Husbands and Wives when he asked Dr. Blinder whether this was a book he had written and Dr. Blinder answered in the affirmative (RT 18358), during defense counsel's attempt to qualify Dr. Blinder as an expert on the so-called "domestic homicide syndrome." Dr. Blinder also testified on direct that

the book had been published the previous year. The book was introduced in the midst of a list of articles in scientific journals published by Dr. Blinder and followed by evidence that Dr. Blinder had written a textbook. Given the plain need by defense counsel to qualify Dr. Blinder on the topic by use of the book, and given Dr. Blinder's admission that the Dan White case was mentioned in the book, the prosecutor's question was eminently fair.

The prosecutor's question would have been fair even without defense counsel's initial admission of the Dan White book:

> "The prosecutor may freely comment on matters of common knowledge in illustrating and supporting his argument for conviction. It is permissible, therefore, to talk about the serious and increasing menace of criminal conduct, and the necessity of a strong sense of duty on the part of law enforcement officers, prosecutors, and jurors. . . . Reference to other well known cases, to illustrate or reinforce some part of the argument, come within the exception of matters of history or common knowledge. (Witkin and Epstein, California Criminal Law (2d ed. 1989) pp. 3556, § 2905.)

The prosecutor's point was merely that expert witnesses are not infallible or super human, and that lay jurors must continue to "'use [their] own commonsense.'" (*People* v. *Rich* (1988) 45 Cal.3d 1036, 1090-1.) The prosecutor was justified in using the Dan White case and the "Twinkie Defense" to impress on the jury that it was possible for expert witnesses to have an overstrong effect on a jury in the hothouse environment of a courtroom. The argument was proper.

We also note that we have shown repeatedly in this argument that objections by defense counsel were taken seriously by the trial court and admonitions were regularly given. Appellant's argument that objection was not necessary to preserve the issue because such objection was futile is not supported by the record, nor is it supported by any such notation of futility on the record by defense counsel below.[66]

---

66. We note briefly that Dr. Blinder's arguments were implausible on their face. He testified that Petry's passivity was what led him to believe Petry exploded in violence. (RT 18365.) However, Dr. Blinder was not deterred in his arguments by the defense evidence that Petry had been known to hit Hickey on more than one occasion. Thus, Dr. Blinder could not be incorrect; passivity bred explosions of violence, as did previous violence. The jury must have viewed Dr. Blinder with suspicion based on the content of his testimony in this trial. Also, Dr. Blinder

b.   Appellant protests the prosecutor's questioning defense eyewitness testimony expert Robert Shomer about his fee.  We addressed the propriety of such information in the previous subsection.

On cross-examination, Dr. Shomer gave a long exegesis of his qualifications.  The trial court interrupted:

"THE COURT:  May I interrupt you?  May we get back to the case?

"MR. DIKEMAN:  I was just curious.

"THE COURT:  I understand.  Advertisement is fine, but I'd like to get to the case.

"THE WITNESS:  I apologize for my lengthy answer, your Honor.

"BY MR. DIKEMAN:  Q.  Doctor, you have testified, I think, you indicated at least a hundred times in state and federal couts in California, Oregon and Alaska; is that correct?

"A.  That's correct.

"Q.  In the superior courts of the State of California, can you think of any counties that you've actually gone in and testified to?

"A.  Certainly.  Many.

"Q.  Could you name some of them for us?

"A.  Eldorado County, Riverside County, San Bernardino County, Contra Costa County, Los Angeles County, San Diego County, San Francisco County, Alameda County.

"Q.  Those instances that you've actually gone into court and testified as a witness on eyewitness identification, how many times have you been called by the People?

"A.  I've never been called by the People yet as I indicated earlier.

"Q.  I -- I thought you indicated earlier that you'd been a consultant with police departments and prosecutors and things of that nature, but you've never actually testified as a witness for the People of the State of California?

"A.  They have never called me yet.

---

admitted Hickey's wounds were inconsistent with his theory, which predicted great facial mutilation.  (See RT 18391.)

"Q. How many cases have you testified in in Contra Costa County?

"A. I believe I testified about four times in Contra Costa County.

"Q. One of them was an eyewitness murder in the case of People versus Ricky Bell?

"A. I don't remember the name, but I'll take your representation on it.

"Q. Mr. Bell was convicted?

"A. If you say so.

"Q. How about People versus James and Harris Fraser in December of 1982?

"MR. DePAOLI: Objection. Relevancy." (RT 19120.)

Several points appear. First, given Dr. Shomer's self congratulatory statements, even defense counsel did not see fit to object to the prosecutor's first question, which pointed out that Dr. Shomer's testimony was not conclusive as to guilt or innocence. Such demystification was a logical extension of the standard practice of supporting the expert's qualifications by establishing the number of times he had previously qualified to be a witness. Similarly, pointing out the number of times the witness had testified for one side exclusively is also fair impeachment. Such cross-examination is fair in that it does not disparage any particular portion of the expert's testimony, but merely reemphasizes to the jury that they must decide the case, and that the doctor's opinion is not beyond lay evaluation. The question here was reasonable and mild, and the point could have unquestionably been made independently in argument. No prejudice nor any real error is shown, and the issue was waived.

Finally, we note that appellant argues that the prosecutor's question prejudiced only the Triplex robbery case, because that case was the only dependent on eyewitness identification. As we have established previously, the physical evidence in the Triplex case was conclusive, including the brown snubnosed gun, the wig, the "movie time" note, and appellant's sudden possession of money after February 19, 1983. The five eyewitnesses were all white, as was appellant, and all identified appellant in a legitimate photo lineup, not in one-on-one show-ups. Dr. Shomer's testimony was insignificant.

247

**4.    Additional    Unfounded    Assertions    With
Regard to the Prosecutor's Actions**

a.  On cross-examination <u>defense</u> counsel questioned Clifford Smith:

"Q.  She [your mother] ever smuggle dope into prison for you?

"A.  No, she has not.

"Q.  Ever told the woman there, the lawyer there, she did?

"MR. BASS:  Indicating Anna Klay?

"MR. DePAOLI:  Right.

"THE WITNESS:  I don't believe so, no.

"BY MR. DePAOLI:  Q.  All right.

"A.  I may have.  I can't recall.

"Q.  Did you ever write her a letter saying that?

"A.  Did ever write my mother?

"Q.  No.  Ms. Klay.

"A.  No, sir.

"Q.  Sure?

"A.  Yes, sir.  I never wrote no one a letter saying, 'Yeah, my mom smuggled me some dope.'

"Q.  Why would you have told Ms. Klay that if you did?

"MR. DIKEMAN:    Objection.    Assumes facts not in evidence.  Argumentative.

"MR. DePAOLI:  Said he doesn't remember.

"THE COURT:  He said he doesn't remember.  I don't know if he told her that.  Just ask him if he recalls that statement to be more specific, but he doesn't recall at this point.

"BY MR. DePAOLI:  Q.  Let me ask you that again.  Do you recall whether or not you told Ms. Klay --

"A.  I'm sure I didn't.

"Q.  Sure you didn't?

"A.  I'm sure I didn't."  (RT 14860.)

On re-direct the following occurred:

"Q.  And Mr. DePaoli was asking you about something about your mother smuggling dope into the prison to you.  Do you know anything at all about this?

"A. No, sir.

"Q. Do you think that you could have put it in one of those other ten letters or how many other letters that we haven't seen that you wrote to Anna Klay?

"A. No, sir. My mother never smuggled me no drugs.

"Q. Where would this come -- where did this come from. Do you have any idea at all?

"A. Um, come from Curtis Price. Well -- I'm assuming.

"THE COURT: Ladies and gentlemen --

"MR. DePAOLI: Objection.

"THE COURT: That assumption you can understand, but that's to be stricken. It's not to be used by you in any way in deciding this case.

"You may proceed, counsel." (RT 16173.)

No error is shown.    Appellant insists on putting false interpretations on this exchange, stating flatly that the trial court told "the jurors that Price probably was the person responsible for making the allegation against Smith's mother." (AOB 647.)  We think it more reasonable that the trial court was merely commenting that it was obvious why the pro-prosecution, anti-AB witness Smith would blame appellant for any negative information. The court's statement underlined the weakness of Smith's "assumption." The admonition was effective.

Defense counsel did not accuse the prosecutor of bad faith, and the court did not so find. The prosecutor was likely emphasizing the outrageousness of defense counsel's question that Smith's mother smuggled drugs to him in prison. We note briefly that this is another example where defense counsel engaged in "fishing" type questions on cross-examination without stating any possible basis and fact for the question. (See Argument XIII C.2.d., *supra*.) This practice is roundly condemned as bad faith by appellant in this argument. No issue is shown.

b. The following exchange occurred on direct examination of Clifford Smith:

"Q. Can you tell me now as of the time you left the organization, how many people are on the Aryan Brotherhood hit list? People designated to be killed?

"A. A whole lot.

249

"Q.  Can you just run me off a couple of names or as many names as you can think of off the top of your head?

"MR. DePAOLI:  Objection.  Irrelevant.

"THE COURT:  Sustained.

"BY MR. BASS:  Q.  Do you know whether or not Paul Tulleners is on the Aryan Brotherhood hit list?

"MR. DePAOLI:  Objection.  Irrelevant.  Ask that it be stricken.

"MR. BASS:  He hasn't answered.

"THE COURT:  Well, he's got a right to object to the answer before it occurs.  Sustained."  (RT 16180.)

Appellant asserts this was a bad faith attempt to scare the jurors and blacken the name of the AB.  It is difficult to imagine how the jury could have been affected by such information after the parade of horrors it had heard in testimony of Clifford Smith and Michael Thompson. Further, the question was not answered and the court admonished the prosecutor that the defense had "a right to object."  The jury was quite familiar with the fact that both sides were entitled to object to evidence.

Substantively, the fact that a chief prosecution witness was on an AB hit list would have been strong evidence affecting that witness' credibility.  Despite appellant's attempts to cloud the issue, it was apparent to all in the courtroom that, regardless of appellant's guilt or innocence, Agent Tulleners was risking his life daily by investigating and testifying against an obvious AB member in good standing.  The prosecutors were in a similar situation, and given appellant's repeated denunciations, the trial court was under such a shadow as well.  The jury was entitled to know the character of the men testifying against appellant.

We note the prosecutor merely asked Smith if he _knew_ if Tulleners was on a list, not whether or not Tulleners was on it, giving the defense ample time to object.[67]  The evidence did not come in.  No issue is shown.

c.  Appellant takes yet another statement out of context and attempts to portray it as prejudicial when in fact the jury fully understood its impact.  The prosecutor was attempting to piece together

---

67.  We also note that the jury knew that Tulleners was under a threat of death from Smith himself if the AB harmed Smith's mother.  (RT 16347.)

Thompson's "rolling out" of the AB, his contacts with authorities and with other AB members in prison, and his awareness of the circumstances of appellant's crimes. Determining what Thompson knew and when he knew it was important because the defense was attempting to impeach Thompson by showing that his early statements did not actually reflect the facts of the Hickey and Barnes killings, and so indicated that his claimed intimate connection with the conspiracy was false. For instance, at one point, defense counsel asked Thompson on cross-examination:

> "Q. Now you told Detectives Ross and Morck that the guns used that killed Richard Barnes came from Elizabeth Hickey's residence, correct?
>
> "A. Yes.
>
> "Q. And you told them that Elizabeth Hickey was killed before Mr. Barnes was killed, correct?
>
> "A. I may have." (RT 17806.)

There was also a dispute over whether Stinson was appellant's AB contact person in the conspiracy. (RT 14696, 14984, 16820.)

It was thus important to the prosecution to reconstruct Thompson's chain of information. This was the basis of the prosecutor's questions on redirect as to the source of Thompson's information about the Moore burglary and the Hickey and Barnes murders. To this end, the prosecutor quizzed Thompson on who gave him his information, and where that person's information came from. Thompson answered that his information came from Price directly through Stinson. The court admonished the jury to disregard the reference to appellant. (RT 17132.)

Appellant is correct that the trial court's admonishment did not rule out all consideration of the statement. The court allowed the fact that Thompson claimed his source was Stinson, but explained to the jury that the content of Stinson's statement, i.e., that Price had admitted to the killing, was hearsay. We believe the jury must have by this point in this very lengthy trial understood the basic concept of evidence being testimony, and that second hand statements were hearsay, unreliable and therefore out of bounds.

No realistic prejudice could have accrued. Had the jury believed Thompson, no personal statements by appellant would have been necessary to convict. On the other hand, the mere claim by

Thompson that Stinson said that appellant admitted a murder had no real effect on the basic credibility question. Rather, the statement was exactly to be expected from Thompson had he been lying.

Finally, we note that the statements by Stinson could have been legitimately admitted. Stinson testified he had no connection with the AB or the conspiracy. Prior statements by him to Thompson implicating himself were prior inconsistent statements and so admissible. Statements by appellant within those prior inconsistent statements of Stinson were admissions of a party. Thompson could have properly testified to Stinson's entire hearsay statements, and their content would have been admissible. Thus, good faith by the prosecutor is shown, for numerous reasons, and no significant prejudice can be established.

d. Appellant objects to the prosecutor's statements in an offer of proof that a gun once possessed by appellant had shown signs of an attempt to convert it to an automatic weapon. Evidence had been admitted showing that the gun was taken to a gunsmith by Rebecca Williams and left under the name "Curtis Pierce" [sic]. (RT 19354, 19803.) The prosecutor believed the cause of the need for repair was the attempt to convert the gun to an automatic, thus inculpating appellant in that act, a fact reasonably related to the AB conspiracy. The trial court disagreed, at least to the point of excluding evidence of the attempted conversion, because appellant was not sufficiently implicated in that act. No evidence was entered on the point.

Defense counsel did not request an admonition after the prosecutor's question was disallowed. The issue was therefore waived. (*Bell, supra*, 49 Cal.3d 502, 534-5.) Obviously, an admonition by the court that there was no evidence of the modification, or of appellant's tie to it, would have been effective. Defense counsel saw no need for such admonition, thus indicating he believed the jury knew the difference between admissible evidence and an offer of proof. At any rate, no prejudice is even proposed.

### 5.  Appellant Closes His Evidentiary Phase Misconduct Section With Two Thoroughly Minor Points

a. As we discussed, *supra*, the prosecutor had information that the brown snubnosed Charter Arms gun used to rob the Triplex Theater and found with the blond wig in the lunch box in appellant's mother's

garage had been stolen from Flint, Michigan. Mrs. Lloyd claimed she had family friends, the Markleys, in Michigan. Even though Mrs. Markley had visited Mrs. Lloyd once in Eureka, the prosecutor wanted to know the relationship between the two, how it started, and whether Mrs. Markley was somehow connected with the Charter Arms gun. The following exchange occurred:

"Q.    You have been at your Vance Street home for eighteen years?

"A.   [Mrs. Lloyd] Yes.

"Q.   How is it that you had contact with Ms. Markley in Flint, Michigan?

"MR. DePAOLI:  I think we have already a court ruling that this is too time consuming and is irrelevant.

"MR. DIKEMAN:  Now, I think I can tie it to something specifically that Mr. DePaoli asked on cross.  I think his objection before was that it was outside the scope.

"MR. DePAOLI:  It is outside the scope.

"THE COURT:  Do you want to approach the bench.

* * *

"(The following was held at the bench.)

"THE COURT:  What is it that you can tie it to?

"MR. DIKEMAN:  Well, I'm simply curious.  She says this lady is a family friend, yet she's indicated that her residence at least or domicile for eighteen years has been Eureka, Humboldt County, California.  I -- I find it a little interesting that you've got a family friend when you argue you have never been to Michigan.

"THE COURT:  What issue does it go to in this case?

"MR. DIKEMAN:  I can't think of any right now.

"THE COURT:  Curiosity is not going to kill the cat then.

"MR. DIKEMAN:  Okay."  (RT 16687-16688.)

While the prosecutor displayed curiosity, it was not idle. At any rate, since no evidence came before the jury, no prejudice is shown.

b.   In appellant's final incident, one evening the prosecutors were asked if they knew the order of their witnesses for the next week. Both replied no, and offered to provide the information on the next Monday before the next court day on Tuesday. (RT 11822.) The trial court prodded the prosecutors and they listed three witnesses that were

likely to be called on Tuesday. As to further witnesses, the prosecutor stated they "were working on it." (RT 11822.) Appellant does not relate what further information the prosecution provided defense counsel. It is hard to understand why appellant thinks this episode worthy of mention.

### D. Guilt Phase Argument

Appellant candidly notes that there were no objections to the statements he complains of by the prosecutor in argument at the guilt phase. Although the trial court did attempt to discourage needless objections by both sides during argument, appellant also points to no subsequent objections after the argument, or during recesses, nor to any requests for admonition concerning any alleged misstatements. All errors were thus deemed unimportant by defense counsel or answerable in his own portion of argument, and so were waived. (*Bell, supra,* 49 Cal.3d 502, 534-5.) We therefore discuss them very briefly.

1. The prosecutor mentioned that appellant's flight from Los Angeles after the Barnes murder showed consciousness of guilt. Appellant does not dispute the fact of the flight, but believes that because no flight instruction was given the argument was improper. However, appellant concedes the trial court never finally rejected the propriety of such an instruction, or such a legitimate inference from the record. The prosecutor's argument was mild. (See RT 20336.) No prejudice is shown.

2. Appellant protests the prosecutor's notation that Wendall Norris' conviction for murder, admitted to by Norris on the stand, had been reduced from first degree to second degree. Norris, an AB member, admitted far worse facts on the stand, including that he testified that Smith stabbed Clark 37 times in self defense, and that child molesters and snitches deserve to be, and generally were, killed in prison. (RT 18857, 18876.) The prosecutor made no implication from the complained of comments. No prejudice is shown.

3. Appellant next makes the baseless statement that the prosecutors knew appellant did not attend the guilt phase because of the chaining order. Appellant may have been absent to set up an appellate issue, or to prevent eyewitnesses from identifying him before the jury at trial, or for other reasons, but the order of an invisible chain was the

least likely reason for his absence. In fact, appellant appeared and testified at the penalty phase.

    4. The prosecutor stated in passing that Rebecca Williams became sick after being subpoenaed. Williams did testify and the jury was able to judge her credibility, which was very poor. Further, she admitted she refused to talk with prosecution investigators. No prejudice is shown.

    5. The prosecutor mentioned the defense received discovery of prosecution materials, but not vice versa. The accurate statement of law explained why the prosecutor sometimes needed time to prepare arguments, and was in essence an apology to the jury for delays. No prejudice is shown.

    6. Mrs. Lloyd agreed to give the prosecutor a calendar, and then did not. The prosecutor's implication that she refused was reasonable. The jury was quite aware Mrs. Lloyd was hostile to the authorities from her own testimony. (RT 16638, 16723-16724.) No prejudice is shown.

    7. The prosecutor stated in closing argument:

> "God, what a great witness. That's my opinion. If you don't feel that way, you think that Clifford Smith was a lying whatever, that's fine because you are now the judges. You can throw his whole testimony out. Thompson's, everything because you have all the power to do whatever you want . . ." (RT 20846-20847.)

The prosecutor's comments were based on the testimony. No error is shown.

### E. Conclusion

    To conclude, none of appellant's assignments of error either constituted misconduct or was prejudical. His prosecutorial misconduct claims should be rejected.

## XIX.
## MORE THAN SUFFICIENT EVIDENCE SUPPORTED THE BURGLARY CONVICTION.

Appellant argues that the evidence was insufficient to prove beyond a reasonable doubt that appellant intended to steal the guns when he entered Hickey's apartment the evening he killed her. Under the settled standard of review, ample evidence supported the jury's verdict.

"This court must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] If the circumstances reasonably justify the trial court's findings, reversal is not warranted because the circumstances might also be reasonably reconciled with a contrary finding. [Citations.] The test on appeal is whether there is substantial evidence to support the conclusion of the trier of fact; it is not whether guilt is established beyond a reasonable doubt. [Citation.] [¶] Before the judgment of the trial court can be set aside for insufficiency of the evidence to support the verdict of the jury, it must clearly appear that upon no hypothesis whatever is there substantial evidence to support it." (*People* v. *Redmond* (1969) 71 Cal.2d 745, 755.)

As to intent of a burglary:

"The felonious intent which supports a burglary charge must usually be inferred from all of the facts and circumstances disclosed by the evidence, rarely being directly provable. (*People* v. *Moody* (1976) 59 Cal.App.3d 357, 363 [131 Cal.Rptr. 923]; *People* v. *Earl* (1973) 29 Cal.App.3d 894, 896 [105 Cal.Rptr. 831].) 'When the evidence justifies a reasonable inference of felonious intent, the verdict may not be disturbed on appeal.' (*People* v. *Matson* (1974) 13 Cal.3d 35, 41 [117 Cal.Rptr. 664, 528 P.2d 752].)" (*Id.*)

In the cases cited by appellant, *Reeves, supra,* and *People* v. *Osegueda* (1984) 163 Cal.App.3d Supp. 25, evidence of felonious intent was found sufficient where a defendant was found inside a business at night with no good explanation of his presence. Appellant distinguishes those cases from this one on the ground that appellant here had previously been in Hickey's apartment, inferably for sexual reasons.

256

Appellant argues that this hypothetical reason for his entry on the night of the murder is equally as reasonable as the possibility that he entered intending to take the guns away with him. Appellant concludes that because the two explanations are each reasonable, there was no rational way for the jury to choose between them, and that therefore the verdict cannot stand.

Appellant's argument is contrary to the well settled standard of review cited above. The argument is tantamount to a concession that it is reasonable to conclude on the facts that appellant entered to take the guns. As such, this court may not substitute its own conclusion for the conclusion of the jury.

And, the settled standard makes sense, given that the jury sat through a mountain of evidence in this trial bearing on appellant's possible motivation. Although we believe the preceding discussion is dispositive, much other evidence in the record supports the jury's conclusion that appellant entered to steal.

First, the jury concluded based on a great deal of evidence that appellant was on a conspiratorial mission to steal guns for the Aryan Brotherhood. It is obvious that from the first moment appellant became aware Hickey had a cache of guns at the apartment, appellant must have resolved that he would, sooner or later, take them. This intent was illustrated by appellant's acquisition of the Moore burglary guns through some criminal agency.

Thus, even if he had no certain plan to steal the guns when he entered on the night of the murder, this goal was always with appellant when he entered Hickey's apartment. Such a conditional intent is sufficient to support a burglary conviction when it is eventually brought to fruition. In cases such as *People* v. *Quicke* (1964) 61 Cal.2d 155, 158-9 and *People* v. *Hovey* (1988) 44 Cal.3d 543, 556-7, a conditional plan was sufficient to prove premeditated murder when the killing became a necessary contingency and was carried out. This court stated in *Hovey* "'[W]hen one plans a felony [kidnapping] against a far weaker victim, takes her by force or fear to an isolated location, and brings along a deadly weapon which he subsequently employs, it is reasonable to infer that he considered the possibility of homicide from the outset. [Citations.] Thus, there is substantial evidence of a "planned" killing . . .'" (*Hovey, supra,* 44 Cal.3d at p. 556.) Similarly, here, "it is reasonable

to infer that [appellant] considered the possibility of [theft] from the outset." This is substantial evidence of planned theft, i.e., burglary.

The evidence in fact points to the probability that appellant's intent on the night of the killing was not conditional, but rather was set on theft and murder. Facts about the manner of killing are probative. The evidence showed that appellant beat Hickey in two separate bursts, separated by his moving of the body on the mattress, and finally resulting in her death. Appellant then inflicted the two small shallow knife wounds to assure himself that Hickey had stopped bleeding, and so was dead. Such a methodical manner of killing supports premeditated murder, as opposed to an outburst of violence, and so supports a pre-existing intent to take the weapons.[68] The jury could have concluded that appellant, the meticulous killer of Richard Barnes, was unlikely to lose his head and kill Hickey without having previously reflected on the possibility of taking the guns. Rather, it was much more likely that appellant plotted Hickey's death, as he plotted Barnes death, including the use of a method of killing which would tend to incriminate Hickey's live-in boyfriend Petry, and so exculpate appellant. Only the jury at trial, with its ability to thoroughly examine the pictures of the crime scene, and the testimony of those who knew the victim and appellant, could properly make the complex decision as to appellant's actual motivation before and during the killing. That decision may not be disturbed here.

Finally, appellant's other proposed possible scenario for the killing involves his fanciful "consignment sale" theory. Such a theory is wholly refuted by the facts.[69] The central fact is that appellant arrived at his father's trailer in Reno with the Hickey and Moore guns separately packaged precisely when he would have been expected had he murdered Hickey around 2:00 a.m. and driven through the night with the hot weapons. This flight showed consciousness of guilt, not business motivation, and strongly tied appellant to the murder. (See detailed explication of this evidence in Argument XXII.) Had Petry killed Hickey, around 6:00 a.m., his only opportunity to do so, there would

---

68. We also note that Dr. Blinder the defense psychologist admitted that the pictures of Hickey's wounds did not necessarily support the idea of a lovers' quarrel. (RT 18390-1.) The jury may have used such evidence to reject a spontaneous killing.

69. Appellant's detailed theory that he received the weapons from a friend of Hickey's so that he could sell them and share the profits with Hickey was laid out in the penalty phase and, as we shall discuss later, was soundly thrashed by other evidence.

258

have been no reason for appellant to suddenly abscond from Eureka <u>hours earlier</u>. And, contrary to appellant's argumentative statement of facts, appellant's day of arrival in Reno with the Hickey guns was established with great clarity as the morning <u>after</u> the Hickey homicide. Further, appellant left behind parts of a valuable weapon, the barrel of an AR-7, an unlikely act for a business transaction, rather than a ransacking an apartment between beatings of Hickey. Appellant also took Hickey's knife, personalized with "Liz" prominently painted in nail polish on the handle, again, an unexplainable element of a consignment sale. The consignment sale theory is simply senseless. Also, as we discussed in Argument XII E, appellant's repetition of the consignment sale theory does not make it less unlikey. Appellant argues Hickey gave him, a virtual stranger, thousands of dollars worth of weapons, with no receipt, because she wanted to leave Petry because <u>she was scared</u> of Petry. Her mother and friends would have offered her a place to go if she just needed money, and she had a regular income from Social Security because of her first husband's death. Rather, appellant claims Hickey, who physically feared Petry, gave away Petry's guns to a stranger, and waited around for Petry to return to discover her treachery. The scenario is odd.

To conclude, the jury had ample evidence of the method of the killing to determine whether it was impassioned or cold blooded. Appellant's continuing motive to steal guns was well documented, and his unexplained flight proved that no business deal was involved. The conclusion, obvious from the facts from the outset, that appellant entered the Hickey apartment to steal her guns and covered his theft by killing her, is only supported by each additional piece of evidence. More than sufficient evidence was present to support the burglary conviction.

## XX.
## THE RECEIVING STOLEN PROPERLY CONVICTION WAS AMPLY SUPPORTED AND MAY STAND

Appellant next makes several arguments why his conviction cannot stand on the charge of possessing the weapons stolen from the Moore home which were later retrieved from appellant's storage locker. (CT 3076, 10231.) What is clear from the record is that appellant did possess the stolen weapons. Nevertheless, appellant requests this court to strike the conviction for technical reasons unrelated to the facts of the case. Such action by this court is not necessary.

Appellant starts by citing *People* v. *Jaramillo* (1976) 16 Cal.3d 752, 759 for the proposition that a defendant may not be <u>convicted</u> of both stealing and receiving the same property. This proposition of law is in itself highly curious. As has been persuasively argued, the situation is more reasonably thought of in terms of the normal section 654 bar on double <u>punishment</u>, rather than double <u>conviction</u>. (*People* v. *Stewart* (1986) 185 Cal.App.3d 197, 203, n. 2.) No justification appears in the letter of the statutes for *Jaramillo's* conclusion that a unique bar on multiple <u>conviction</u>, was intended by the Legislature.

Even accepting *Jaramillo*, appellant cites no case supporting his particular argument. All the cited cases state that a defendant may not be convicted of <u>both</u> theft and receiving for the same property. No cited case states that a single conviction of receiving stolen property may not stand where there is <u>no</u> jury finding that the defendant was also the thief. The conviction here was proper.

Appellant also attacks the pleading because it charges possession in Humboldt, whereas the weapons were seized in Nevada. This argument fails for three reasons.

First, appellant ignores the sawed off featherweight shotgun found in appellant's mother's garage among appellant's effects. (RT 17342-3.) Mr. Moore could not be certain this was his shotgun because of the disfiguration, but he was sure it was the right make and model. (RT 11604.) Given that three shotguns were stolen from Mr. Moore, and that the other two were found in the Reno locker, it was surely inferable that the featherweight was Mr. Moore's gun, and that appellant possessed it, and the other guns, in Humboldt County.

Second, the jury accepted the prosecution proof that appellant stole weapons from and killed Hickey in the early morning hours of February 18-19, 1983. Further evidence showed that appellant arrived with two bundles of weapons in Reno between 9:00 and 11:00 a.m. the next morning. (RT 14317.) The testimony of James Victory established that appellant arrived on Saturday morning, February 19, not Friday morning, February 18 as testified to by appellant's father Gaylord Lloyd. (See Argument XXII.) The two bundles corresponded to the two bundles of weapons found in appellant's storage locker, one bundle corresponding to each of the Moore and Hickey burglaries. The conclusion is inescapable that appellant travelled from Eureka to Reno with the bundles between the time he killed Hickey and 9:00 and 11:00 a.m. Saturday morning. Ample substantial evidence showed appellant possessed the weapons in Humboldt County within ten days of the charged date of February 28, 1983.

Finally, in section VI, *supra*, we discussed the rules of pleading. The language of *People* v. *Paul* (1978) 78 Cal.App.3d 32, 43 is again applicable here:

"Can it be seriously maintained from all the facts and circumstances that the appellant was not aware of the charge against him, that he did not have an opportunity to prepare to meet the charge? . . . The appellant was not misled in any way by the pleading defect . . . Appellant had the benefit of pretrial discovery and was aware of the evidence against him. In addition . . . 'An information is sufficient if it contains in substance a statement that the accused has committed some public offense therein specified.'" (*People* v. *Paul, supra*, 78 Cal.App.3d at 43.)

Appellant cannot reasonably contend that the defense was misled.

261

## XXI.
## THE LACK OF INSTRUCTION ON VOLUNTARY MANSLAUGHTER IN THE HICKEY MURDER WAS CORRECT

Appellant's final substantive guilt phase argument complains of the trial court's failure to instruct on voluntary manslaughter in the Hickey murder. Full instructions on first and second degree murder and on felony murder were given. (RT 20307-20309.) Appellant's argument fails for numerous reasons.

1. First, the issue was waived below. Trial counsel withdrew the request for the voluntary manslaughter instruction, waiving the issue. (RT 20032.)

2. Trial counsel was correct in withdrawing the request. There was no evidence to support a voluntary manslaughter instruction. As was pointed out in *People* v. *Wickersham* (1982) 32 Cal.3d 307, 327 even where some evidence of intense emotion is present, as in the manner of killing in this case, that fact alone does not suffice to call for a voluntary manslaughter instruction. Some further evidence that <u>reasonable provocation</u> which legally incited the emotion preceded the killing is necessary. Here, it is obvious that there is simply no evidence of any provocation, reasonable or otherwise.

3. The finding of first degree murder precluded any possible argument for voluntary manslaughter. As was stated in *People* v. *Thompkins* (1987) 195 Cal.App.3d 244, 251:

"In any event, the trial judge's response that there is no relationship between heat of passion and premeditation was in error. The two concepts are related in that they are mutually exclusive. As the Supreme Court explained in *People* v. *Sanchez* (1864) 24 Cal.17, 30 'The intent to kill . . . must be formed upon a pre-existing reflection, and not upon a sudden heat of passion sufficient to preclude the idea of deliberation.' This discussion continues to form the basis for the standard CALJIC instruction on the subject."

This is the law. The jury's finding of first degree murder embodied a finding of premeditation and deliberation (unless the first verdict was based on burglary felony murder, see infra). A first degree murder verdict is mutually exclusive with voluntary manslaughter, and with second degree murder. Also, there is no lesser included offense type

262

problem here. Had premeditation and deliberation been absent, the verdict would have been second degree murder. As the jury specifically found premeditation and deliberation were present, no error was possible from the failure to instruct on voluntary manslaughter.

4. Finally, this entire issue is fully settled by the fact that the jury found the burglary murder special circumstance true as charged, thereby resolving the issue adversely to appellant under other properly given instructions. (CT 10235.) Appellant tacitly concedes this point by his argument that the burglary special circumstance finding must be stricken because the burglary finding was unsupported by substantial evidence. The latter argument was shown to be unsound in section XX, *supra*. But, the finding of the special circumstance means a fortiori that the jury believed the burglary felony murder theory. The jury was instructed:

"To find that the special circumstance referred to in these instructions as murder in the commission of burglary is true, it must be proved first that the <u>murder was committed while the defendant was engaged in the commission of the burglary</u>; second, that the defendant intended to kill a human being; third, that the murder was committed <u>in order to carry out or advance the commission of the crime of burglary</u> or to facilitate the escape therefrom or to avoid detection.

"In other words, the special circumstances referred to in these instructions is not established if the burglary was merely incidental to the commission of the murder." (RT 20315, emphasis added.)

The jury specifically found:

"VERDICT OF JURY Special Circumstances . . . . We find that Elizabeth Ann Hickey was intentionally <u>murdered by the defendant in the commission of a burglary</u>, within the meaning of Penal Code Section 190.2(a)(17) such proof being made beyond a reasonable doubt." (CT 10235, emphasis added.)

The special circumstance finding constitutes a finding equivalent to a special verdict on first degree burglary felony murder, and renders discussion of appellant's mental state during the burglary and murder irrelevant. (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 721.) Failure to instruct on voluntary manslaughter thus could not have had any effect on

the first degree murder verdict.  No error is shown.

## XXII.
## NO INDIVIDUAL OR CUMULATIVE ERROR HARMED THE RELIABILITY OF THE JURY VERDICTS, ESPECIALLY GIVEN THE VOLUMINOUSNESS AND THE CONCLUSIVENESS OF THE EVIDENCE

Appellant's final argument is a grab bag of random complaints about his trial. We reply briefly to these unfounded claims; we then demonstrate the conclusive nature of the evidence adduced.


### A.  Length of Deliberations

Appellant first asserts that this case must be deemed close because the jury deliberated something over nine days. We believe conclusions from the length of deliberations are always unwise, given our lack of knowledge about what caused the prolongation, be it related or wholly unrelated to the issues of the case. The argument is demonstrably weak in this case, where the evidentiary portion of the guilt phase stretched over five months, from November 1985 to April 1986, where the reporter's transcript covered over 20,000 pages, and in which the jury was required to give verdicts on two murders, several robberies, a conspiracy with a dozen overt acts, and two special circumstances. The jury in fact acquitted appellant of one of the counts and hung on four others. Nine days of deliberations, interrupted by numerous requests for rereading of testimony from the massive record, can hardly be thought indicative of indecision by the jury. Rather, deliberations of a duration much shorter than nine days would now no doubt be used by appellant as grounds to argue the jury under-deliberated and so must have been prejudiced. Appellant's argument is unconvincing.


### B.  Prejudicial Aspects of the Case in General

Appellant next argues that he believes much of the evidence was prejudicial, in that it portrayed gangs and their activities, and thus, in his estimation, the jury must have convicted him on less than legal basis. Appellant's argument is extremely weak. Appellant was allowed

a discretion in the choice of the jury in this case which was, we may say without exaggeration, almost unparalleled in the history of Anglo-American jurisprudence. Jury selection in this case stretched from June 12 to October 30, 1985, and covered 7,700 transcript pages. (RT 2006 - 9729.) After such a proceeding and the extensive instructions before, during and after the trial by the court below, appellant's argument is nothing less than an assertion that an American jury cannot obey instructions and determine guilt or innocence under the rules of American law. We believe that anyone experienced in jury trial can attest to the general falseness of this proposition. The jurors here swore affirmation of their ability to be fair and to weigh evidence. The fact that appellant was not convicted on five of the counts is proof of their sincerity. Further, many of the witnesses against appellant were equally if not more severely stained with gang prejudice than was appellant. Appellant does not explain how, given the burden of proof on the prosecution, this equally distributed stain did not redound to his benefit. In sum, appellant's arguments that the jury could not be fair must be firmly rejected.

Appellant also argues he was prejudiced by his absence from the courtroom during trial, and by his failure to testify. The perversity of appellant's position is breathtaking. Appellant seeks to make capital of his self-initiated absence (which would have terminated at any time on his pledge of good behavior in the courtroom) by using the absence as ground for reversal. Appellant's presence and testimony at the penalty phase which added significantly to the case against him, see *infra*, further underlines the disingenuous nature of appellant's argument. To give appellant consideration for his self-imposed absence would be a perversion of justice.

We now proceed to a general discussion in reply to appellant's points as to the convincing force of the evidence of the major crimes in the case.

## C.   "Closeness" of the Hickey Homicide Case

Appellant argues that although decided beyond a reasonable doubt by the jury, the Hickey murder was a "close" case. In the circumstances of this case, the point is actually irrelevant. While we are

convinced no errors were made in the presentation of evidence in that case, even if minor errors were made, the fact remains that enormous amounts of prosecution and defense evidence on all major issues was presented. As such, the case was properly presented to the jury for decision, and that decision must stand.

The key point of evidence concerning the Hickey case is the proof that appellant arrived in Reno, Nevada, at his father's mobile home, around 11:00 a.m. on Saturday, February 19, 1983, the morning after the Hickey murder. Appellant had with him the two bundles of guns, one from the Hickey home, one from the Moore burglary, which were later retrieved from the Reno storage locker indisputably rented by appellant. Appellant's mother testified that the trip from Eureka to Reno took about ten hours. Thus, the timing was damning. Appellant killed Hickey around 2:00 a.m., stole her guns, and then drove through the night on a clear road, and arrived in Reno at 11:00 a.m. the next morning.

Appellant's father made a loyal attempt to convince the jury that appellant arrived with the guns on the morning of Friday the 18th, the morning before the Hickey killing, and stayed with Mr. Lloyd Friday night and Saturday night, the nights of the Hickey murder and the Triplex robbery respectively. Mr. Lloyd stated appellant stayed in the trailer of Mr. Lloyd's friend James Victory, who had taken a bus East to visit a sick relative. (RT 14317.) Thus, whether appellant arrived on Friday the 18th or Saturday the 19th became a crucial question in the case.

The proof that appellant arrived on Saturday morning was conclusive, and came from a wholly neutral source, Mr. Lloyd's friend, James Victory. Victory had no bias in the case and in fact stated appellant seemed "like a very nice guy." (RT 14412.) Victory recalled the week as follows: on Thursday the 17th, Victory and his companion Ida Murphy bought a used couch, and paid by check. (RT 14390.) The couch would not fit in Victory's small car, so he made arrangements to return to the store the next day, Friday the 18th, to pick up the couch, which in fact he did. (RT 14414, 14420-1.) Around noon of Friday the 18th, when the mail arrived, Victory received a letter stating his sister in Ohio was ill. Victory and Murphy resolved to take the next bus, but on examining the schedule discovered that that bus would arrive late at night, inconveniencing Victory's relatives. Instead, Victory and Murphy

267

spent the early evening of Friday night-Saturday morning, February 18-19, at Murphy's trailer, and left for the bus station around 2:30 a.m. Saturday morning the 19th. (RT 14391-2.) Before he left, Victory checked his own trailer and found all was normal. Appellant was not sleeping in it, nor were any of appellant's clothes or goods there, as they would necessarily have been had appellant's father's story of appellant's arrival the previous morning been true.

Mr. Victory's and Mr. Lloyd's stories were directly conflicting and choice must be made between them. The decision as to which story to believe might have been clear merely by examining the natural prejudice of Mr. Lloyd as against the total lack of bias on the part of Mr. Victory. However, the issue was firmly settled when Victory produced the cancelled check used to buy the couch, and dated February 17, 1983 just as Victory had asserted. (RT 14407.) It was simply unlikely that Victory would have confused such simple events: he paid for the couch on one day, the 17th; he returned with a truck to take it home the next day, the 18th; and, that very night, the 18th through 19th, he took the bus with Murphy to Ohio. Thus, Mr. Lloyd's story that appellant arrived on Friday the 18th, before the Hickey murder, stored his goods and slept in Victory's trailer the night of the 18th-19th, was false.[70]

It thus is plain that appellant arrived in Reno with Hickey's and Petry's guns exactly when Hickey's murderer would have been expected. Appellant's flight with the weapons was strong circumstantial evidence, and was also strong evidence of consciousness of guilt, as was his father's loyal attempt to confuse the record.[71]

---

70. Mr. Lloyd did not state the 18th as appellant's arrival date when police first questioned him in March 1983, and in fact did not state that date until much later, after he was familiar with the evidence at the preliminary examination. He stated he got the information from Mr. Victory. (RT 14347.)

Also, the conclusive proof of appellant's perpetration of the Triplex robbery, see *infra*, revealed Mr. Lloyd's testimony as incorrect as to appellant's movements on Saturday night as well.

Further, Mr. Lloyd's testimony conflicted with that of appellant's witness Rebecca Williams, who testified that appellant left her house in Auburn only after noon on Friday the 18th, with two bundles (ostensibly the guns) in her car. (RT 19272-3.) At that point of course appellant still would have had the 100 mile drive to negotiate between Auburn and Reno. (RT 14317, 19366.)
(footnote continued)

71. Note that appellant habitually left town after his crimes. He left Northern California around January 24, after the January 22 Moore burglary. He left Los

Appellant's motive for the Hickey murder was plain. There was evidence in the form of Hickey's note that Hickey had discussed the guns with appellant. There was further eyewitness evidence from Hickey's photographer neighbor Tina Ransbottom that appellant had visited Hickey's home after dark several times. It was known that Hickey habitually showed off her guns to her visitors and lovers. (E.g., RT 19380.) The evidence showed appellant was on a mission to accrue guns for the Aryan Brotherhood. One can only imagine appellant's elation at running into the naive Hickey and her cache. Appellant admitted to his mother after his arrest that the guns were "Brand business", thus confirming the motive from appellant's own mouth. (RT 16556.)

On appeal, appellant contends alternate explanations were as reasonable as the explanation inculpating him. At trial, the only other explanation supported by substantial evidence was that Petry was the guilty party. Several reasons Petry's guilt is unlikely appear immediately. Petry worked that night, punching security keys at his lumber yard, and his whereabouts were in doubt for at most 40 minutes, from 5:35 a.m. to 6:15 a.m. (RT 17584.) Appellant argues that despite the knowledge that the punch tape would be evidence against him, Petry decided to leave work and kill Hickey. Because his own Volkswagen was tremendously noisy, Petry must have taken the time to walk to one of the company cars, whose mileage was recorded, and to drive up to and unlock the lumber yard front gate, before driving home. (RT 19710-4.) The ride home took about 8 minutes according to the defense investigator. (RT 18226.) Thus, assuming the enraged homicidal lover acted with Swiss precision, getting the strange car, unlocking the gate, driving home, driving back, replacing the car, relocking the gate, and getting to the 6:15 punch station must have taken at minimum 20 minutes, 16 in the car, and at minimum 2 before and after. This leaves a maximum of 20 minutes for Petry to enter his house, mount the stairs, have whatever verbal interaction he desired with his lover of 3 years, learn that the guns had been given away, and, in a frenzy of rage, force open the doors to all the closets and storage lockers. (RT 15297.) Petry would then have proceeded to take Hickey, wrestle with her, as evidenced by the palm print bruises on Hickey's shoulders, begin to fight with her as evidenced by the defense wounds on Hickey's hands, beat

---

Angeles the night after the Barnes murder. (RT 19297-8.)

her repeatedly over the head with a missing weapon, move her body, detect that she was still alive, and beat her again. Finally, the outraged frenzied Petry took a knife, and for no discernable reason, made the two small quarter inch post-mortem incisions below Hickey's breasts.[72/]

After breaking open the doors and lockers, beating Hickey twice, moving her, waiting for her to die, and making the two delicate incisions, Petry on appellant's theory obviously would have been covered with blood. He would have been forced to change clothes and wash himself and dispose of the weapon before returning to the company car and driving to work. Petry left no blood stains in the house, on the car or on himself seen by others after he returned to work at the lumber yard. Thus, appellant posits that the insanely raging killer abruptly changed gears once again, and calmly cleaned himself up, changed clothes, disposed of the murder weapon and the bloody clothes, and cold-bloodedly went down the stairs, out the door, back into the car and drove crisply back to work. Once there, the now calm killer unlocked the gate, reparked the company car, locked the gate and immediately resumed writing his log and punching his clock. One must believe all of the Petry's actions at home, the frenzied killing and deliberate cleanup, took less than 20 minutes.

Appellant also ignores Petry's log, which showed he made his 3 hourly phone calls to guards at other plants at "0600," "0601" and "0602." (CCT 476, see CCT 1915-7, RT 19710-1.) This cut another 15 minutes off of the 40 minute "gap" in the "Detex" tape. In addition, Petry's story that the gap was due to "gate duty," i.e., the need to stand by the front gate to let employees in, was corroborated by Petry's supervisor Baugus. (RT 19711.) Further, the time card of a "planing" mill operator Petry claimed to have let in showed a clock-in time of about 5:50 a.m. (CCT 674 (Donald Mills).)

Even if the jury could have accepted appellant's highly illogical scenario, appellant's possession of the guns must still be explained. Appellant had no money; this was quite clear from his use of his

---

72. These incisions made perfect sense if appellant was the killer. It was established that Hickey was beaten, moved, and beaten again, before these post-mortem stab wounds were made. This persistence made sense for appellant, whose goal was to kill Hickey, but not for Petry, who, according to appellant, was merely striking out in a fit of rage. It was appellant, the skilled executioner, who made the two small incisions, to determine that Hickey no longer bled, and so was dead. Petry would have had no reason, nor self-control to make such wounds.

mother's charge card and from the content of the "movie-time note" in which appellant stated he did not have sufficient funds to repay the $1,000 he owed his mother and that even $312 was an "impossible #." The only evidence of a financial deal between appellant and Hickey was the one short note referring to "Curt" and "money for guns." (RT 13228-9.) But, appellant had no money for guns. Appellant is thus forced to the absurd theory that he was to take the guns on consignment. Appellant produced no written notation of the deal, nor did he so much as claim one existed. Thus, appellant claims Hickey gave a virtual stranger, a tattooed ex-convict, thousands of dollars worth of guns with no written record. Further, the purpose of giving the guns to appellant was supposedly to raise money so that she could escape from Petry, of whom she was terrified. This might explain Hickey's giving her own weapons to appellant, but the idea that Hickey gave Petry's guns away is senseless, as it would surely only incite more of the abusive conduct she allegedly sought to escape. Even had at some point Hickey naively agreed to give her own guns to appellant, the far more believable scenario is that appellant had no intention of going through with any consignment deal, but merely used that agreement as a ruse to get into the apartment, where his intent from the outset was to take all of the guns and kill the witness. And, it is certainly believable that appellant killed Hickey with a tire iron rather than execution style, in hopes of shifting blame to Petry or some other random burglar.

Other minor points also discount the consignment idea. First, appellant also was in possession after the killing of Hickey's hunting knife with "Liz" written in nail polish on the handle. Appellant gives no explanation why Hickey would have given him this weapon to sell, nor why he would have wanted a knife with a woman's name written on the handle. Also, a part of the AR-7's barrel was found in the closet. (RT 12871.) A gun fancier would not be likely to take part of a gun and not the rest, unless he had to leave an apartment whose occupant he had just bludgeoned. Finally, appellant gives no reason why Petry would have exploded that particular moment and decided to kill Hickey. As we discuss, *infra*, Petry's motivation to kill Hickey was certainly stronger at other times than on the night of her killing. Even Hickey's mother, Mrs. Moore, testified the Hickey/Petry relationship was improving in early 1983. (RT 15246.)

271

Thus far we have seen that the facts closely fit the scenario that appellant killed Hickey, took the weapons and fled to Reno. The facts must be stretched to fit a theory of Petry as the killer, both in terms of time frame and of psychology. However, the most important point in the harmless error equation is not our, or, respectfully, the court's opinion on the facts, but rather, the key point that the jury was given voluminous information, so much so that any particular evidence omitted or wrongly included could have had no significant effect. In particular, as we have shown, the jury viewed extensive examination and cross-examination of Berly Petry. They were given his 8 hour interview tape, which was edited and highlighted for them by defense counsel in argument. The jury received Petry's obsessive relationship charts, his writings that he was Hickey's disciplinarian, and that Hickey had gravely wronged him. The jury knew that Petry knew that Hickey slept with other men regularly, and that she had repeatedly given him venereal disease. The jury heard Petry's explanation of the gap on the security tape, and of the boiler problems at the lumber yard. After having heard all of this testimony, the jury made its decision. While we believe the decision was inevitable, the more important point is that appellant points to no error sufficient to significantly shift the massive amount of evidence already present.

### D.  The Triplex Robbery

The proof of the Triplex Robbery was simply indisputable.

Five eyewitnesses (of the same race as appellant) picked appellant out of a six photo lineup. (RT 11235, 10992-3. 11124, 11291, 12458.) The manager, Mark Silverman, who saw appellant most closely, stated appellant's picture had "very similar bone structure." The others testified similarly, even though appellant had been disguised with a watch cab, dark glasses, and long blond woman's wig. The composites given by the witnesses were strikingly similar to each other, and to appellant. (CCT 427-9, 437.) But, that was only the beginning of the evidence.

Mark Silverman and Dennis Dahl told police that the robber had carried a snubnosed brown pistol. (RT 11220, 11287-8.) Debra Eiers also recalled the gun was brown. In the search of appellant's

mother's garage, inside a black suitcase was found a lunchbox. In the lunchbox was a blond woman's wig, identified as similar, if dirtier, than the one worn by the robber. (RT 11025-6, 11132, 11244, 11292, 12456.) On top of this wig was found a brown snubnosed pistol. Dahl and Silverman testified the gun was very similar to and indistinguishable from the brown snubnosed gun used by the robber. This was enough evidence to convince any juror of appellant's guilt. There was in fact much more.

Appellant was broke for months after he got out of prison. He regularly borrowed small amounts of money from his brother-in-law Alan Fletcher, promising to pay him back when he got a job. (RT 17222.) Appellant used his mother's Texaco charge card 44 times between November 9, 1982 and February 18, 1983, the day before the Triplex robbery. For instance, appellant charged gas on the card three times on February 18, 1983. Appellant never again charged gas on the card. (RT 19403-7.)

In appellant's effects police found the "movie time" note in which appellant totalled up a column of numbers between 10 and 20 dollars, apparently gasoline credit card charges, which totalled $312.37. Appellant stated next to the number "impossible # -- need mucho dinero." Above these words were a total of other expenses and the words "$1,000.00 I owe mom . . . means its all about 'movie time.'" (CT 590.) Thus, before "movie time" appellant was broke and was borrowing money and cars. After February 18, appellant no longer charged gas, and, the very next week, spent over $1,600 in cash to buy his own car. (RT 17615, 17620.) During a traffic accident a couple of days later a bystander saw neat stacks of a great deal of money in appellant's trunk. (RT 15906.) $400 in $20 bills was found in appellant's room at his mother's house after his arrest. (RT 17315.) Finally, the note written by appellant's mother to appellant in jail was entered in which appellant's mother wrote "How are you going to account for the money when you go to use it?" (RT 16574.) Appellant never produced any explanation for his sudden wealth after February 19, 1983 beyond his unsupported story that he had all along been selling large quantities of marijuana.

To conclude, the proximity of the blond wig and the brown snubnosed gun in the lunchbox, the movie time note, appellant's documented sudden wealth after February 19, 1983, all combine to quiet

any doubt as to appellant's guilt of the Triplex robbery. Appellant's arguments to the contrary are without any persuasive power.

### E.  The Barnes Murder

The first plank in the structure of evidence in the Barnes killing was proof of the existence of the Aryan Brotherhood and of appellant's membership. Beyond Thompson and Smith's testimony, independent evidence proved these points. The letter from Griffin and defense witness Stinson explaining the execution of Clark established in detail that the Aryan Brotherhood existed, that the members consulted, that disloyalty was punishable by death, and that members actually did carry out cold-blooded executions out of a sense of duty. (CCT 714-5.) Stinson admitted authorship of the letter. (RT 18716.)

Appellant confirmed his membership in the AB both by his previous testimony admitting membership (RT 16866) and by his statement to his mother after his arrest that the guns in Reno were "Brand business." (RT 16556.) (Stinson used the word "Brand" in the letter (CCT 715).)

Defense testimony showed that the AB knew how to summon and confer with distant members by subpoenaing them to trials, and that appellant was subpoenaed from Montana to Palm Hall in Chino where he had access to Smith, Thompson and the other major AB figures. (RT 18705-11, 14650-1, CCT 495.)

Motivation for the Barnes killing was provided by the defense's own witnesses, Stinson and Norris, who testified that Steven Barnes had testified against AB members. (RT 18658, 18811.) Richard Barnes himself had heard about his son's testimony and exclaimed that such testimony would get the elder Barnes killed. (RT 12195.)

The nature of Barnes' killing was unmistakable from the three shots to the back of the head at point blank range. The killing was a self-proclaimed execution.

Appellant's connection with the crime was proved by several sources. Appellant was in Los Angeles at the time of the crime and nonaccomplice testimony showed appellant stated that he had left Los Angeles within 24 hours. (RT 19297-8.)

Proof of appellant's presence in Los Angeles at the time of the crime was not dependent on eyewitness testimony. Throughout his stay in Los Angeles appellant was charging gasoline on his mother's Texaco credit card, as previously discussed. Texaco records established that appellant charged gas on February 12 in Pomona, and February 13 in Anaheim, only miles from the Barnes home. (RT 19406.) While appellant had numerous address books and address lists, Richard Barnes' address was found on a piece of paper in appellant's wallet. (RT 17357.) Another paper with Barnes' address was found in appellant's room at his mother's house. It contained the words "send a subpoena to him." The jury understood this macabre joke given Stinson's testimony that he subpoenaed people in prison to gain access and kill them. (RT 18705.)

The evidence of nonaccomplices thus showed appellant had the motivation and the opportunity to kill Richard Barnes, and that Richard Barnes was killed in an Aryan Brotherhood execution. The only additional pieces of information necessary to finish off the case were provided by Janet Myers.

Myers, a loyal AB "runner," testified she drove appellant around Los Angeles in the nights before the murder, including a trip to Barnes' house in Temple City, where appellant parked and snooped around the house. Myers later led police, who were strangers in the area and had the wrong address for Barnes' house, (RT 14007) back to the house, proving that she knew its location. Myers testified appellant and another AB "runner" Tami Shinn drove away together the night of the murder, and that the next morning appellant told Myers to tell her AB contacts in prison that everything had gone well. According to Myers, that very night appellant took the bus to Auburn. The nonaccomplice Rebecca Williams testified that appellant arrived in Auburn the next morning before noon and told her that he had been on the bus from Los Angeles all night. (RT 19270-1.)

The rest of the evidence against appellant was provided by Thompson and Smith, who explained how the AB had deliberated retribution for Steven Barnes, and when Barnes himself was unavailable because he was in protective custody, they assigned appellant to execute Barnes' father.

Appellant claims certain rulings prevented the jury from accurately gaging the credibility of Thompson, Smith and Myers. We

275

think the assertion is made tongue in cheek because <u>no</u> witnesses could have been more thoroughly impeached as to character for veracity than were Thompson and Smith. Appellant suggests virtually no piece of evidence useable to impeach Myers that was not in fact given to the jury.

Thompson and Smith together and separately admitted to upwards of three dozen murders. Smith gave graphic testimony of the joy he took in stabbing another man 37 times after that victim called Smith a name in front of Smith's daughter. (RT 14875.) As to Thompson, at one point he was asked if he would do anything differently if allowed to start his life anew. Thompson stated he would. In a moment of spine chilling black humor, Thompson explained that he would forsake his former ways. He would instead concentrate on organized criminal activity, such as extortion and murder, and not on random robberies and race killings, because organized Mafia-type crime was where the real money was. (RT 16750.)

Beyond admitting to innumerable horrible crimes, Thompson admitted to at least three prior instances of perjury including one in the preliminary examination of this trial, before he left the AB. Smith reported his protective treatment in prison, his special food preparation to avoid AB reprisals, and the protection his family was receiving. (RT 14644.) In his argument, appellant provides a voluminous list of further instances of facts impeaching Thompson and Smith. The key point in this list is that <u>essentially all were provided to the jury</u>.

For emphasis, Thompson revealed his unfamilarity with any normal concept of honesty when he insisted he did not perjure himself in Smith's stabbing trial. Although Thompson knew the killing was an AB contract killing, Thompson testified Smith stabbed the victim 37 times in self-defense. Thompson claimed this was truthful testimony because the killing was designed to look like self-defense to someone standing in Thompson's place. The fact that the stabbing of an unarmed man 37 times could not have looked like self-defense merely added another layer to Thompson's psychopathy. (RT 17092-3.)

Smith, Thompson and Myers, as detailed by appellant, all testified and were cross-examined at length as to their motives for testifying, and about the minimal acts by officials in recompense. These acts were almost entirely in the area of protection for these witnesses and their families. Thompson testified his housing in protective custody

276

was uncomfortable and highly restrictive, and that mainline housing was more comfortable. (RT 16780-2.)

The key point once again has little to do with this Court's opinion of the substance of Thompson, Smith, and Myers' testimony. Rather, appellant's own attack on their reliability establishes plainly that restrictions on or excess of evidence were of no importance. Rather, the tremendous mass of information given the jury rendered the issue of credibility essentially error-proof.

Finally, appellant fails to establish what motivation Thompson and Smith would have had to turn on appellant and the rest of the AB, and thereby sacrifice their high positions in the gang, and in fact make themselves targets for death. Appellant's only answer to this question is that Thompson and Smith feared state or federal prosecution for this or other crimes. This argument is simply unpersuasive. It was established in the record that prior to Thompson's decision to testify and his convincing of Myers to follow him, authorities simply had no evidence with which to proceed with the prosecution. Detective Ross specifically testified that he took the case to the Los Angeles District Attorney's office, which refused to prosecute it. (RT 11973.) Thus, Thompson and Smith had nothing to fear in regards to this case until they themselves provided police with key evidence. As to other prosecutions, Thompson and Smith's immunity agreements had no effect outside of this case. (RT 13986, 14600, cf. 14775.)

It cannot be reasonably argued that Thompson and Smith's testimony in this case, which admitted innumerable crimes, and in which they personally heaped abuse and scorn on prosecution and Department of Corrections personnel, could insulate them should officials find grounds to prosecute them for other crimes committed in the past or the future. In fact the very record of this trial will presumably convince any sane parole official that neither Thompson nor Smith will _ever_ be fit to return to free society.

Further, Thompson, Smith and Myers' testimony made sense. The killing plainly was an AB execution, brought on by Steven Barnes' testimony. The only question in the case was which AB member was guilty. Appellant was brought to Palm Hall by AB subpoena, just as Thompson testified. Appellant was released without parole, through a technicality, and so was free to move without scrutiny, as Thompson stated. Appellant himself admitted to his own witness Rebecca Williams

277

that he had taken the midnight bus from Los Angeles to Auburn the night after the Barnes murder. Janet Myers did lead police directly to the Richard Barnes home, confirming her awareness of its location. And, Myers, Rebecca Williams and Michelle Scarborough were in almost constant contact by long distance telephone before and after the Richard Barnes killing. The absence of testimony by Tami Shinn, who Myers said drove appellant to the Barnes home on the night of the murder, was no doubt significant in the eyes of the jury.

Nevertheless, the primary point remains that the jury had all the information necessary to it to judge the credibility of Thompson, Smith and Myers. The jury observed those witnesses' demeanor, as well as that of the defense AB witnesses. Given this mass of evidence, it would take a truly extraordinary error of evidentiary admission or exclusion to have had any significant effect on the jury's deliberation. As appellant points to no such extraordinary error, the jury's judgment must stand.

F.   Appellant's Failure to Testify

Appellant argues that his problems with the jail staff and the subsequent order of invisible waist chaining prevented him from testifying in the guilt phase. Fortunately, we can evaluate the harmfulness of the failure to testify because appellant did in fact testify in great detail at the penalty phase. That testimony was tremendously compromising to appellant's case. Foregoing it at the guilt phase could have had no ill effect. Examination of appellant's eventual testimony in fact reveals that appellant must not have wanted to testify at the guilt phase at all, but attempted to disguise that fact to strengthen appellate issues. (See RT 19644.) At any rate, appellant's testimony at the penalty phase conclusively eliminated all doubt of his guilt of both the Barnes and Hickey murders.

The first significant point of appellant's penalty phase testimony was appellant's explanation of Janet Myers' damaging testimony. Appellant did not deny Myers' good faith. He openly admitted driving around with Myers at night before the Barnes murder. He even admitted that at one point he got out and walked up to a house. Appellant's explanation was that this was Tommy Lamb's house, that he

278

spoke with Lamb's sister at the door, found Lamb was not in, and left. Of course, Lamb's sister did not testify. (RT 22465 et seq.)

Appellant brought in a picture of the Lamb house, and explained it was a yellow house in a cul-de-sac, next to a hedge, facts matching Myers' description of the Barnes house. Appellant concluded that Myers was simply mistaken about the Barnes house, to which they did not travel. (RT 22581 et seq.)

Appellant's explanation might have some plausibility had the police taken Myers to the Barnes house and asked her if it was the one she had gone to with appellant. This did not occur. Rather, the investigators were unfamiliar with the area. Myers, who had lived in the area, was the guide, and took the officers first to Temple City then to Lower Azusa Road and to the house. Myers had similarly guided appellant, who had verbally requested her to take him to Temple City and Lower Azusa Road and 4802 Alessandro. (RT 13799-801.) Myers testified appellant did also want to find Tommy Lamb's cousin's house, but she had no confusion whatsoever about the Barnes home location.

Appellant's testimony thus fully corroborated Myers about driving around Los Angeles and getting out at a yellow house. Appellant's only dispute with Myers was whether Myers mistook Lamb's house for Barnes' house. This dispute was firmly resolved in Myers' favor. Thus, beyond removing any issue on appeal of accomplice corroboration, appellant's testimony at the guilt phase would have shown he was at Barnes' house a couple of days before the murder. This evidence dammed him as to the Barnes murder. Appellant's true reason for reluctance to testify at the guilt phase is plain.

Appellant's penalty phase testimony was just as damning on the Hickey homicide. Some background is necessary. On April 11, 1986, appellant informed the court that he would not testify, and he offered an "offer of proof" stating his proposed testimony. (CT 10167.) This offer of proof contained detailed denials of all of the charged crimes. Included was the statement: "N. That I received those guns [(that were found in the storage locker)] in Upper Lake, California, two days before Elizabeth Hickey was murdered." (CT 10171.)

This claim appellant received the guns as a consignment deal on Thursday, February 17 fit with other elements of appellant's story. Rebecca Williams testified that appellant stayed with her in Auburn from February 14 to February 17. On Thursday morning, February 17,

appellant asked directions to Clear Lake and drove off. Williams stated appellant returned the next morning, Friday the 18th, and that she saw the bundles in the car at that time. (RT 19270-4.) Williams testified that appellant left again after noon on the 18th to go to Reno. Appellant's father testified that appellant arrived <u>before</u> noon on the 18th with the bundled guns and stayed that night, Friday night, in James Victory's trailer. Further, Texaco gasoline receipts showed appellant had charged gas in Auburn and Upper Lake on Friday, February 18. (RT 19407.)

Several holes appeared immediately in this story. First, James Victory's cancelled check proved conclusively that he was at home on Friday, February 18, and thus that appellant could not have arrived until Saturday morning the 19th, after the Hickey murder. But, the story began to collapse in earnest when the prosecution discovered further unsuspected charge card records existed. It was found that the Shell Oil Company had accepted Texaco credit cards for a time, and that on February 18th appellant had charged gas in Redding. (RT 19738.) Redding is as far north as Eureka, approximately 60 miles north of the east/west line between Auburn and Upper Lake. Appellant's offer of proof, created <u>before</u> the discovery of the Redding charge receipt, had no explanation for this excursion to counter the obvious implication that appellant had travelled north to Redding and Eureka on Friday to kill Hickey.

On direct examination in the penalty phase, appellant explained his presence in Redding by stating that Hickey had told him a friend of hers, "Kenny," would deliver the guns in Redding on Thursday the 17th. When the highway between Eureka and Redding proved impassable (highway records revealed that the highway was washed out during this time(RT 19764)) Hickey told appellant by phone to meet "Kenny" on Friday in Lakeport instead. (RT 23460.) Appellant stated he slept in his car in Redding the night of the 17th through 18th, charged gas on Friday morning, went to Lakeport, got the guns and returned to Auburn.

While this scenario explained the Redding charge slip, it had the fatal side effect of completely contradicting appellant's own sworn offer of proof. The offer stated that appellant got the guns in <u>Upper Lake</u> on <u>Thursday</u>. Appellant now testified that he got the guns in <u>Lakeport</u> on <u>Friday</u>. When pressed on the point, appellant lamely denied that this constituted a change in his story:

"Q. [the prosecutor]  Well, there's a problem here, and that is that the N [in the offer of proof]  -- you're talking about the guns of Elizabeth Hickey, that 'I received those guns in Upper Lake, California, two days before Elizabeth Hickey was murdered.'  Why don't you just take a look at that.

"A. [appellant]  (Witness complies.)

"Q. Is that true or false, Mr. Price?  Is that the truth or is it not the truth?

"A. It's the truth that two days before Elizabeth Hickey was -- was murdered, I was supposed to receive those guns in --

"Q. In Redding?

"A. In Redding which actually occurred in -- in Upper Lake.

"Q. In Lakeport, in a shopping center in Lakeport?

"A. Yeah.

"Q. And when did you find out that we had you getting gas in Redding, Mr. Price?  When did you first learn about the Shell credit cards putting you in Redding sometime after this date, Mr. Price?

"A. No, I think I learned about those probably in 1984.

"BY MR. BASS:  Q. Oh.  About the Shell Credit cards?

"A. No.  No.

"Q. Putting you in Redding?

"A. Not Shell credit -- I don't know about the Shell credit cards.

"Q. Well, I'm talking about the Shell credit cards, Mr. Price.  you had the story all set up for the Texaco credit cards. Auburn, Upper Lake.  You knew about that for a year.

"A. Oh, I understand.

"Q. Well, I'm talking about the Shell credit cards that you found out about the same time we did.

"A. I understand.

"Q. On the 15th of April, 17th of April.

"A. Can I ask something to clarify a question in my mind?

"Q. Sure.  Go ahead.

"A. Are you calling me a liar about my explanation about the whole trip.

281

"Q. Yeah.

"A.    Okay.    All right.    What happened when this declaration was made up was that when I -- when I said that I received those guns in Upper Lake, California, two days before Elizabeth Hickey was murdered, it was contextually the truth to me in my mind.  The context of two days before this -- if I -- if I had -- if I had been -- may be if I had been a littler clearer of mind, I would have said that one day before Elizabeth Hickey was murdered I received those guns in Upper Lake.  And I would of added but I was supposed to have received them two days before Elizabeth Hickey was murdered in Redding.

"Q.  And then you could have added but it really wasn't in Upper Lake because I know you guys know I was in Upper Lake because we have -- you have me getting gas in Upper Lake.  So, therefore, I'd better get the guns in Upper Lake.  And now you're telling us you got them in Lakeport from a shopping center from some guy?

"A.  Now --

"Q.  Some guy named Kenny?

"A.  Now -- I'm telling you nothing different now from my mind when I said this.

"Q.  You've just changed a couple of things.  Added a day or so.  Subtracted a day or so.

"A.  I think you changed things.

"Q.  Moved to a different town.  I did?

"A.  Yeah."  (RT 22541-2.)[73]

Whatever the substance of the testimony, what is undeniable is that appellant swore in writing to a story, and then when new information damaged that story, appellant changed his story and swore to contradictory testimony on the witness stand.  Appellant was lying on crucial issues and the jury knew it.

---

73.  The true story must have been that appellant left Auburn on February 18, drove to Redding, found the highway blocked, went back down to Williams on Route 5 and then across on Route 20 to Route 101, and then North to Eureka.  As the prosecution pointed out, stopping in Upper Lake for gas made sense on this route, but no sense at all if appellant's destination was actually Lakeport, the cutoff for which avoided Upper Lake entirely.

We note two other points. First, appellant could offer no reasonable explanation for why Hickey included her knife, with "Liz" written on the handle in nail polish, in a consignment sale lot of guns. Lastly, we discuss the Sampo brand radio found in appellant's bedroom after his arrest. It was established that Berly Petry bought Elizabeth Hickey an identical Sampo radio for Valentine's Day, five days before her death. The radio was missing from the Hickey apartment when the body was found. (RT 13401 et seq.)

Appellant explained that he received the radio as a gift from his brother and sister-in-law, the Fletchers. Appellant's odd story was that he had been staying with the Fletchers but was asked to leave when he had destroyed some furniture after a misunderstanding with his brother. However, to show there were no hard feelings, the Fletchers had given appellant the radio. (RT 17226.) Remarkably, store records indeed showed that the Fletchers had bought an identical radio on December 23, 1982, and Alan Fletcher backed up appellant's story. Store records of the serial numbers of the radios shed no light on which of the two radios was found in appellant's room.

However, the disappearance of Hickey's radio still must be dealt with. One has the choice of believing appellant's story, which is that his brother gave him a brand new radio at the same time he was angry enough to kick appellant out of his home. Along with this, one must also believe that Hickey's radio disappeared into thin air after Petry killed her. The alternative is that appellant stole Hickey's radio, and that the Fletchers destroyed their own radio to support appellant's alibi once they had discovered that the two radios were identical. This point is supported by the fact that appellant's mother removed the radio from appellant's room, and did not turn it over to the police until several weeks later. (RT 17370-7.) Appellant's possession of the radio might be explained by some artifice, but not without admitting that appellant had seen Hickey in February, which appellant continually denied.

As we have previously shown, appellant also lied about the Triplex robbery. Thus, on the three major charged crimes, the jury at the penalty phase was able to evaluate appellant's testimony against objective facts. On three major points, connected with the Hickey murder, the Barnes' murder, and the Triplex robbery, appellant was obviously lying on the stand. Appellant must have recognized the necessity for such lies, and avoided testifying at the guilt phase. That

decision was wise.  Appellant's current arguments that his failure to testify at the guilt phase was harmful may be utterly rejected.

## XXIII.
### NO JURY COERCION IS SHOWN

Appellant asserts that the trial court coerced a deadlocked jury into a penalty verdict. Appellant advances several arguments which either ignore settled law or mischaracterize the trial court's careful and sensible comments. We discuss all of appellant's complaints.

On July 1, 1986, the 16th court day of the penalty phase, the 147th court day overall, the jury finally retired to deliberate on appellant's penalty. (CT 10745.) Barely two and one-half days later, the judge received a note declaring a deadlock. (RT 23050; CT 10777.) At 2:33 p.m., July 3, the jury returned to the court, before all parties and counsel, where the foreperson declared that since the note was sent, the vote had changed. The foreperson was no longer certain of a deadlock. The court sent the jury to return to deliberations. (RT 23050.)

An hour later, the foreperson sent the judge another note declaring a deadlock. Court was convened and the foreperson declared:

"THE FOREMAN: I think the convictions to the opinions that have been expressed in the votes are hard and fast. I don't think any amount of evidence that's available or discussion will change those opinions." (RT 23051.)

The court then questioned each juror individually. Ten others declared the panel was hopelessly deadlocked; one replied he was:

"[w]ell, yeah, a bit unclear. But I believe -- I wonder if -- maybe if I were to meditate on it, if I would have any change, but -- " (RT 23053.)

After conferring with counsel, the court made the following statement to the jury:

"THE COURT: Ladies and gentlemen, at a time like this, the law is in an odd position in a way. The law's clear that there can be no force or coercion applied to a jury to reach a verdict. You're asked to give your individual opinion and, apparently, you certainly have. And, of course, on the other side of that coin, there's a desire of everyone, I'm sure yourselves, to conclude this once and for all.

"So, my comments at this point are not to be in any way an attempt to change anyone. All I'm saying, at this point in time, everyone here -- I think everyone who hasn't been in the

jury room can't imagine what you've struggled with. We know you've been here for the last year struggling with everyone else to get through the case.

"And on the other hand, everyone here would like to see it over with. I think they would also like to see -- well, without going any more, we would all like to see it end today, of course. I think what I'd like to do, although I have reservations, I see things both ways.

"I think what I'll do is recess until Monday and let you meet again Monday morning and discuss it. And if you feel the same way you feel now, then we'll reassemble just like we are now. So at this point I'm going to give you the admonition. . . . [Court gives lengthy admonition not to discuss the case.]

"If you can, please have a pleasant Fourth of July weekend. Try to forget about the problem that faces you. And please do not take my continuing this to Monday as any attempt to coerce you in any way. I just want to give you time to get away from it for a while, come back and approach it fresh. If you still have the same mind, there's no one here going to force you to do anything you don't want to abide by.

"JUROR NUMBER NINE:  I presume I can't ask a question?

"THE COURT:  Please, not now.

"Nine o'clock Monday morning." (RT 23056-23058.)

The next statement in the record occurs at 10:30 a.m., Monday, July 7, 1986, when the court stated that the jury had requested numerous additional exhibits and testimony. (RT 23056.) The jury continued to request exhibits and testimony throughout the next two days, until it returned its verdict of death the next afternoon. (RT 23091, 23103.) Based on this record, we may quickly dispose of appellant's numerous objections.

A.    The court was well within its discretion to require a continuance of deliberations when the jury reported a deadlock after two and one-half days of deliberations following a six month trial and a three week penalty phase.

"The applicable legal principles are well established. Under section 1140, the trial court is precluded from discharging the jury without reaching a verdict unless both parties consent or

'unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree.' We have explained that '[t]he determination whether there is reasonable probability of agreement rests in the sound discretion of the trial court. [Citation.] The court must exercise its power, however, without coercion of the jury, so as to avoid displacing the jury's independent judgment "in favor of consideration of compromise and expediency." [Citation.]'" (*People* v. *Sheldon* (1989) 48 Cal.3d 935, 959.)

It is well settled that absent other coercive elements, requiring a deadlocked jury to continue deliberating is proper. (*United States* v. *Sommerstedt* (9th Cir. 1985) 752 F.2d 1494, 1497-1498 (twice instructing deadlocked jury on importance of reaching a verdict is proper); *People* v. *Frazier* (9th Cir. 1985) 772 F.2d 1449, 1450; *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 775-776.)

This case is similar to *Rodriguez* where:

"the trial had been long, the evidence voluminous, and the issues complex. Deliberations had been punctuated by the reading of testimony and three supplemental charges to aid the jury in its task. Under the circumstances, the trial judge could reasonably conclude that his direction of further deliberations would be perceived as a means of enabling the jurors to enhance their understanding of the case rather than as mere pressure to reach a verdict on the basis of matters already discussed and considered. (See *People* v. *Tarantino* (1955) 45 Cal.2d 590, 600 [290 P.2d 505].) Subsequent events bore out that conclusion, for on the next three days following the jury's final statement of deadlock, it requested, and was read, five portions of testimony that had not previously been read to is during deliberations. Thus, the deliberations remained 'properly focused on the evidence.'" (*People* v. *Rodriguez*, *supra*, 42 Cal.3d at 775.)

No error is shown.

B.    Appellant next argues it is error to inquire as to the numerical count breakdown of the deadlock. He is mistaken.

"We remain persuaded, as in *Carter*, that a neutral inquiry into numerical division, properly used, is an important tool in

287

ascertaining the probability of agreement. As noted, there is no convincing evidence of coercion here. The jury's numerical division was requested and revealed on February 18. Thereafter the jury requested and heard substantial additional testimony, and continued deliberations, for four more court days. (*People v. Rodriguez, supra*, 42 Cal.3d 730 at 776, n. 14.)

The case is ruled by that holding.

C. Appellant claims the court erred in refusing to answer the juror's question. The argument is unpersuasive. The court did not, as appellant states, "flatly refuse[ ]" to answer the question. (AOB 764.) His reply, "Please, not now. Nine o'clock Monday morning," was clear. The court, along with all others present, was weary; but, the court expressed perfect willingness to answer any questions on Monday morning. The clarity of the answer was borne out by the steady flow of questions from the jury which were answered by the court the following Monday and Tuesday, as had been done during the entirety of previous deliberations. Appellant's issue has no substance.

D. Finally, we address appellant's charge of coercion in the court's comments to the jury on Thursday evening before he dismissed them. A simple reading of the remarks belies the claim.

Almost the entire content of the court's comments is a repeated caution against feeling coerced, changing an opinion for the sake of ending the deliberations, or sacrificing an "individual opinion." The court began by stressing that "The law's clear that there can be no force or coercion applied to a jury to reach a verdict. You're asked to give your individual opinion . . ." (RT 23056.) The court ended by stating "And please do not take my continuing this to Monday as any attempt to coerce you in any way. . . . If you still have the same mind, there's no one here going to force you to do anything you don't want to abide by." (RT 23056.) Appellant's claim that the jury could have concluded that the court would not have accepted a deadlock on Monday morning is without basis.

Appellant finally claims that the court improperly warned the jury about the need for a retrial, or of the necessity for a decision in the case, or of the cost of a new penalty phase. Those messages are simply not present in the court's comments. The court merely stated that everyone would like the case to end. That mild comment on the plain and proper desire for a unanimous verdict after a six month trial was not

error. (See *Sommerstedt*, *supra*, 752 F.2d at 1497-1498.)  At any rate, even if appellant's imagined comments had been present, the repeated admonition to feel no coercion and retain individual opinions would have negated any error. (See, *Frazier*, *supra*, 772 F.2d at 1451 (*Allen* charge referring to need for and expense of retrial improper, but, negated by counterbalance of instruction not to abandon conscientiously held view).) The court below acted correctly.

## XXIV.
### CERTAIN INQUIRIES BY THE JURY AS TO THE SOURCE OF THE PROSECUTOR'S QUESTIONS WERE CORRECTLY ANSWERED BY THE TRIAL COURT

### A.  Introduction

Appellant complains that the trial court improperly replied to the jury after a request for exhibits during penalty phase deliberations. The request concerned the prosecutor's having mentioned the phrase "took a girl to the country" to AB witnesses.  Thompson and Smith identified the phrase as AB slang for killing a woman.  Smith testified he had seen the phrase written down.  The prosecutor also asked Smith, and appellant, whether appellant had written the phrase with reference to Elizabeth Hickey.  Appellant denied it, but Smith was precluded from answering by a sustained objection.

Later, in deliberations, the jury requested all evidence pertaining to the "take her to the country" phrase.  The trial court informed the jury that no exhibits were in evidence, or known to the prosecution or defense, containing that phrase. The court also ordered reading back of all of Thompson, Smith and appellant's testimony on the subject. Finally, the court instructed that it was up to the jury to decide whether at some point the phrase had been written down.  Defense counsel did not object to the court's final admonition.

Appellant assigns the court's response to the jury as reversible error, and asserts that the jury displayed profound confusion, which in fact infected the guilt phase as well.  His argument flounders for numerous reasons.

### B.  Facts

Smith testified as follows:
"BY MR. BASS:  Q  What does it mean to 'take someone to the country,' those terms, 'take someone to the country'?
"A  Kill.

290

"Q  Where did that saying originate, if you know, or come into being?

"A  Just made it some years back.  Spider Craig was a member then.  He's dead now.  He was involved in a killing where he took some female to the country, and we kind of picked up the phrase after that.

"Q  Did you ever personally see those words written by Curtis Price?

"MR. DePAOLI:  Objection, your Honor, calls for hearsay.

"MR. BASS:  Hearsay?

"MR. DePAOLI:  Yes.

"THE COURT:  Well, let's get a time frame once again as to when they were written, if they were written.

"MR. BASS:  I don't know --

"THE COURT:  I don't think it's hearsay, but it may not be relevant.

"MR. BASS:  I would be arguing, of course, an admission if that was -- if he did personally see such a statement.

"THE COURT:  Depending on when it occurred.

"BY MR. BASS:  Q  I am talking about February, January and February, '83.

"A  No.

"Q  March?

"A  (Shakes head.)

"Q  Did you hear of such a statement?

"MR. DePAOLI:  Objection.  Calls for hearsay.

"MR. BASS:  Statements of co-conspirators.

"MR. DePAOLI:  The judge has made --

"THE COURT:  If it's after the arrest, it can't be admitted, I don't believe, without some further foundation that I am unaware of.  Sustained."  (RT 14783-14784.)

Note that the objection to the question of whether appellant had written the words was sustained.

Later, outside the jury's presence, Smith had testified that he had not seen such a note personally.

"Q  About this, do you know anything about taking a girl out to the country?

"A  Just what I heard.

"Q  From who?

"A  From Robert Griffin.

"Q  Did he receive a note or did he say he received a note from --

"A  I don't know how he received it.  He came back from a visit.  Said, 'Baby's [appellant] been busted.  Had to take some bitch to the country.  He's in Eureka right now.'"  (RT 14795.)

The court excluded Griffin's statement as hearsay because appellant's arrest previously ended the conspiracy.

Thompson testified to having received postcards from appellant. (RT 16907-16908.)  One was right at trial by Thompson, and had been postmarked in November of 1982.  Later, Thompson testified as follows:

"BY MR. BASS:  Q  Do you know what it means to -- what the phrase 'sent a girl to the country' means?

"A  Yes.

"Q  What does it mean?

"A  It means that the girl in question has been killed and dumped.

"Q  Have you seen that phrase, 'sent somebody to the country,' before as a member of the Aryan Brotherhood?  Have you ever seen that phrase written?

"A  Yes.

"Q  Before the defendant was arrested, after his release from prison, did you ever receive, other than the letter you've talked about there, receive any letters or cards or notes that had been written by him?

"A  Yes.

"Q  Were they written to you, other than the one, of course, you've got in front of you now, or to other members of the Aryan Brotherhood?

"A  Both.

"Q  Who, other than the ones written to yourself?  Who else did the defendant write to while he was out on the streets before being arrested in March of '82, that you can recall now?

. . .

"A  Bob Curl, John Stinson.  I believe Clifford Smith and Robert Griffen."  (RT 16909-16910.)

Thompson's statements establish two points. First, implication that appellant wrote the words "took her to the country" was carefully avoided. Second, however, Thompson plainly testified that he had seen the words written down.

Finally, during cross examination at the penalty phase, the prosecutor asked appellant:

"Q. Do you remember writing to convicts who were still in custody about Elizabeth Hickey and tell them you took her to the country?

"A. I surely don't.

"Q. Did you write to convicts who were still in custody after Elizabeth Hickey's death and advise them that you took her to the country?

"A. Was this time period --

"Q. Sometime after February 19th, 19 --

"A. Before my arrest or after?

"Q. -- 1983. Sometime after February 19th, 1983, when her body was discovered in the bedroom of her home, did you write a convict who was in custody at San Quentin -- tell him that you took Elizabeth Hickey or took her to the country?

"A. Prior to February 19th, did I do that?

"Q. After February 19th, 1983?

"A. And prior to 3-3-83, my arrest date?

"Q. After February 19th, 1983, and before today, sir, did you write to a prisoner in custody within the state prison system about Elizabeth Hickey and tell that person, 'I took her to the country'?

"A. I never wrote to any person anywhere about Elizabeth Hickey in any context except after I was in jail. I wrote Mike Thompson a letter to let him know what my conditions were because at that time I thought that he was a friend. That he was -- as he had represented himself to be to me. And he -- he was -- he was likeable and he wrote good letters. Entertained you. Um, um, I wrote him and gave him your perspective of the case as I had been given it through discovery. That's the only time I ever wrote any -- anybody in prison as to any of my charges as I recall. (RT 22484-22485.)

293

294

Appellant argues that when penalty phase jury deliberations began, there was not one shred of evidence that could legitimately support any inference that Price had ever written or uttered anything similar to the phrase "sent a girl to the country." (AOB 777.) This is probably correct. No direct tie was made between the phrase and appellant. On the other hand, the phrase was admissible evidence. As AB slang, it showed the existence of the organization, and disputed defense evidence that the AB's character was social not criminal. At any rate, defense counsel never objected to the evidence.

Next, during deliberations, the jury sent the following request:

"DATE: 7/7/86    TIME: 10:00 A.M.
"TO: JUDGE BUFFINGTON
"FROM: DEBRA KRAMER, JURY FOREMAN
"MESSAGE: We would like the following:
"1.) Writings &/or testimony re:
"'Take her to the country'
or
"'Took girl to the country.'"

(CCT 3102.)

After conferring with counsel, the court ordered re-read of the three long colloquys quoted supra, except that the Smith testimony excluded everything including and after the question as to whether Smith had seen a writing specifically by appellant. (RT 23079-23080, ordering re-read of RT 14783:23 through 14784:3; 16909:13 through 16912:5; and 22484:2 through 22485:15.)

After hearing those passages, the jury asked for all postcards in evidence. (CCT 3103.) The jury then sent the court the following request:

"DATE: 7/7/86    TIME: 4:30 P.M.
"TO: JUDGE BUFFINGTON
"FROM: DEBRA KRAMER, JURY FOREMAN
"MESSAGE: In order to give you greater specificity re: the writing/postcard we are looking for: We would like to see the writing, postcard or whatever evidence it was that led to the prosecution's questions about the phrase 'took a girl to the country.' Debra Kramer." (CCT 3104.)

Rather than simply informing the jury that no such card was in evidence, the defense requested the court not leave the impression that

the defense was somehow hiding it. The court obliged by giving the following admonition:

"First, before I get to the issue of giving you the admonition, to advise you about your last note which speaks of a postcard which gave rise to the prosecution's questions about the phrase 'Take a girl to the country,' everyone here agrees that postcard was never physically present nor marked in this case. We could all speculate, I think, individually and perhaps collectively as to what may have happened to it, but no one here really knows. It's never been before the Court as far as I know and certainly is not marked and is not in evidence." (RT 23084.)

Defense counsel immediately objected and told the court he believed the admonition could be interpreted as presupposing the original existence of such a card. The court responded with a more sweeping admonition:

"THE COURT: Ladies and gentlemen, I don't recall the exact wording that I gave you about the postcard. Whatever I said is not meant to infer that necessarily there was ever such a postcard in existence. All I'm trying to convey to you clearly is that there is certainly not one marked. There is not one in evidence, and it may be or it may not be, and no one here really knows because we -- we haven't seen it, and I don't want you to be inferring that there was necessarily one in existence at any given time. That's something that you should treat along with the other evidence and make your determination on if there is enough evidence for to make a determination on that issue, if it's important to you.

"We do not have one marked. We do not have one in evidence. And anything I am saying here is not to infer or cause you to believe that I have some inside information that one did indeed exist at any given time. I don't know that.

"Thank you." (RT 23086-23087.)

Appellant's complaints with this admonition were waived and are groundless.

## C.  Argument

1.    Appellant's arguments presuppose that the court's admonition allowed the jury to infer that appellant wrote a postcard using the phrase "took a girl to the country." Appellant asserts error because there was no evidence of such a writing by appellant.

Appellant ignores the wording of the jury request and the admonition. Neither the court nor the jury at any time stated appellant's name, or in any way connected appellant with the writing it discussed. Thompson's testimony that he had seen such a writing put such a writing in evidence. This is all the court's admonition addressed.

Examination of the jury's notes confirms this view. The jury's questions never tied appellant to the writing, nor in fact, ever mentioned his name in relation to them. Rather, in contrast to the rest of the note on CCT 3102 and other notes, the jury carefully worded the "country" request as a general request for all relevant evidence, not just evidence concerning appellant.

The final note at CCT 3104 is even clearer. The jury sought any basis, written or otherwise, for the prosecutor's questions about the "country" phrase. Nothing in this detailed note tied the evidence to appellant, rather than to some other AB member. The court's admonition in relation to this note is crystal clear. The court stated "we", inferrably including the prosecution, had never seen such a note, and that no implication was intended from the admonition beyond what was present in the evidence. (Note that the court carefully concealed that it actually did have hearsay information that appellant had written such a note. See RT 23082.)

Thus, the court's actions were correct. Evidence of a writing did exist. The court so informed the jury. The jury never postulated that appellant wrote such a note, and the court never uttered a word so suggesting. The jury was firmly informed that the prosecution had no extra knowledge not contained in the testimony, and that hearsay questions could not be considered as evidence.

Defense counsel did not object to the final admonition. This confirms our belief that the admonition was proper. It also waives the issue. At any rate, the factual premise of appellant's argument is not supported by the record.

2.  Appellant bases his legal argument on *People* v. *Hannon* (1977) 19 Cal.3d 588.  That case is distinguishable.

*Hannon* began by citing dictum:  "It is an elementary principle of law that before a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference."  (*Id.* at 597.)  In *Hannon*, the court told the jury that evidence "if . . . any," that the defendant attempted to suppress evidence could be considered as consciousness of guilt.  But, that was not the prejudice.  The prosecution also argued that defense <u>counsel</u> ordered a defense witness not to speak to the prosecution and that this constituted suppression of evidence by the <u>defendant</u>.  *Hannon* held defense counsel's acts could not be imputed to defendant, and therefore there was no evidence of consciousness of guilt.  *Hannon* examined the error under the *Watson* standard (*People* v. *Martin* (1980) 101 Cal.App.3d 1000, 1010-11;  *People* v. *Laws* (1981) 120 Cal.App.3d 1022, 1036-7) and reversed.

The major error in *Hannon* was not the trial court's "sitting on the fence" as to the existence of substantial evidence of consciousness of guilt.  Rather, the prejudice was in allowing the improper argument that defense counsel's acts could be imputed to defendant, when there <u>was</u> indeed evidence defense counsel did so act.

Our case is different.  Appellant argues that no evidence existed of a writing by appellant, and that the court's message was neutral and did not forbid the jury from so concluding.  However, here the court did not take the next step and <u>wrongly</u> instruct on the inferences allowable from that disputable evidence.

To clarify, had the trial court in *Hannon* merely instructed that it expressed no opinion on whether defendant personally suppressed evidence, and that such evidence could show consciousness of guilt, any error would have been harmless, because the legal rule would have been correct despite the asserted error on the factual issue.  The court below did no more than repeat the same rules under which the jury had been working all along, namely, that only rational inferences could be accepted and that attorneys' questions were not evidence.  This contrasts with *Hannon* in which, as a next step, a palpably incorrect rule of law was given to the jury.

We question whether the error *Hannon* discerns, neutrality by the court on whether a rational inference can be made, is error at all.

At any rate, here, the inference appellant protests against, namely that appellant wrote a postcard with certain language on it, was never implied by the trial court, and never shown to have been inferred by the jury.

At any rate, the full rereading of testimony showed that the inference was not in fact supported by evidence. Under *Watson*, any error would have been harmless.

## XXV.
## SEVERAL QUESTIONED PIECES OF EVIDENCE IN AGGRAVATION WERE HANDLED CORRECTLY BY THE TRIAL COURT

Appellant asserts four errors as to aggravating evidence at his penalty phase. We discuss them in order.

A. Appellant claims the court wrongly allowed evidence of appellant's prior marijuana possession felony conviction. Appellant argued that the conviction could not be used because the crime was later reduced to an infraction or a misdemeanor, under the abatement principles of *In re Estrada* (1966) 63 Cal.2d 740, and could no longer be considered a felony. Also, appellant argues that under Health and Safety Code section 11361.7, evidence of a two-year old marijuana conviction may not be "considered to be accurate, relevant, timely or complete for any purpose by any agency or person." It is unnecessary to dispute these arguments because the evidence was undoubtably harmless.

It will be recalled that much evidence was entered showing appellant had no money before the Triplex robbery, and much money thereafter.

Against this damaging evidence, appellant could only lamely reply that he gained his new found wealth from selling marijuana by the pound. (RT 22573, 22837.) A quantity of marijuana was in fact found in his storage locker in Reno. As this court stated in *People* v. *Heishman, supra,* 45 Cal.3d at p. 191, a defense witness' statement that the defendant had been arrested for marijuana "was harmless in light of [other] testimony of defendant's smoking marijuana and the evidence of far more serious violent offenses committed by defendant." That holding applies equally in this case.

B. The documents proving the marijuana conviction mention a concurrent misdemeanor conviction for possession of L.S.D. (CCT 808.) Appellant argues that this mention was prejudicial. Apparently defense counsel below did not agree, because he did not object, waiving the issue.

Appellant claims the fault was with the trial court who agreed to edit improper material from the document. Nevertheless, when the edited version was offered into evidence, defense counsel did not object. (RT 21866.) The minor issue was waived.

C. Appellant claims that the prosecutor argued lack of remorse as an aggravating factor. He did not. This court has stated "the propriety of commenting on lack of remorse depends to a degree on the inference one is asking the jury to draw from it. . . .here, however, it appears that the prosecutor's arguments were directed at attacking defense evidence adduced to produce sympathy. Fairly read, he was attempting to negate evidence in mitigation, not directing the jury's attention at a specific aggravating factor. (*People* v. *Ghent* (1987) 43 Cal.3d 739, 771 . . .)" (*People* v. *Thompson* (1988) 45 Cal.3d 86 124.)

Defense counsel did not object to the prosecutor's argument (although defense counsel did object, successfully, in the pages previous to and immediately after these comments.) Appellant does not claim that the prosecutor ever argued lack of remorse as an aggravating factor. Rather, by the simple mention of lack of remorse, the prosecutor was trying in part to counter sympathy evidence, such as when he remarked a page earlier in the transcript after quoting some abusive language used by appellant toward jail guards, "This is Curtis Floyd Price. This is the man who writes these beautiful works that Anna Klay begs you to read." (RT 23022.) Later, the prosecutor, in a similar vein mentioned that defense counsel had argued that their hearts would be broken if appellant were executed. (RT 23027.) Much such evidence was brought forward by the defense. Twice, defense counsel referred to appellant crying in reaction to the memory of his crimes. (RT 22973, 22990.) In another passage, defense counsel stated that appellant would have to take responsibility for his acts in order to gain redemption, and that appellant indeed had taken responsibility for all the wrongs he had committed during his life. (RT 22991.) To state that appellant, who had testified at length on the stand, had shown no remorse, was fair reply to these bids for sympathy. No error is shown.

D. Finally, appellant argues that the Montana hostage incident was used as an aggravating factor under Penal Code section 190.3, both under subsection (b) as prior violent criminal activity, as well as under subsection (c) as a prior felony conviction. This Court has decided this point in *People* v. *Melton* (1988) 44 Cal.3d 713, 764 holding that there is no reason such dual categorization is improper.

Appellant persists that the jury may have been confused into thinking that the conviction concerned a separate incident because the conviction was on a day separate from the day of the crime. The claim

seems unreasonable on its face, as the prosecutor would certainly have entered evidence of another Montana incident had it existed.  At any rate, defense counsel was free to explain away any possible confusion during argument.  To the extent that he chose not to do so, the issue was waived.

## XXVI.
## THE TRIAL COURT'S EVIDENTIARY RULINGS ON CROSS EXAMINATION AND REBUTTAL WERE REASONABLE

A.    Appellant begins by spending a great deal of time protesting against evidence that appellant's sister Sheila Yates had heard rumors from her late sister Cheri that appellant had bragged about six murders. Appellant waits until late into his argument to admit that the jury received not a hint of such evidence. Rather, appellant falls back on certain questions by the prosecutor about whether Yates heard and believed family rumors that appellant had bragged about acts of violence. Appellant is forced to admit that objections were sustained to those questions before they were answered. Undeterred, appellant takes it for granted that the jury accepted the questions as evidence, despite the fact that they were not answered, and despite the repeated admonitions that questions were not evidence.

The only questions Yates actually answered occurred in the following exchange:

"BY MR. DIKEMAN:  Q.  Mrs. Yates, prior to the time that you talked to Sergeant Fredrickson, you talked to your sister, Sandra, and she told you that Curtis had bragged about acts of violence against human beings?

"MR. DePAOLI:  Objection.  Beyond -- that's beyond the scope.  Based upon hearsay.

"THE COURT:  Did she have information previous to that that caused you some concern before you talked to Sergeant Fredrickson?

"THE WITNESS:  Just my -- my sister had called me that our sister had called her.

"THE COURT:  I don't want the statement.

"THE WITNESS:  Nothing else other than that.  Other than that phone call, there was nothing.

"THE COURT:  Answer my question.  Did it cause you concern?

"THE WITNESS:  Concern enough that -- yes -- that conversation did cause me concern.

"THE COURT:  Okay. Go ahead, Counsel.

"BY MR. DIKEMAN:  Q.  It scared you?

"A. No, I couldn't figure out what in the world was going on.

"Q. The information --

"A. I wasn't scared until after I talked to Fredrickson.

"Q. The information that Sandra was relaying to you was information she got from Shari (sic) Fletcher, Alan Fletcher's wife?

"A. Yes.

"Q. You were also personally aware that Mr. Price had been involved in acts of violence against other human beings, yes or no?

"A. Well, I had heard it through the -- you know -- through the family with the --

"Q. Yes or no, please.

"A. Yes, I guess.

"Q. You were aware that he was a member of a prison gang called the Aryan Brotherhood?

"A. I had heard talk about it, but --

"Q. Did you ever see the tattoo on his chest that said 'Aryan Brotherhood'?

"A. (Shakes head.)

"Q. You have to answer out loud.

"MR. DePAOLI: You have to answer out loud.

"THE WITNESS: No.

"BY MR. DIKEMAN: Did your mother tell you that --

"MR. DePAOLI: Objection. Calls for hearsay.

"THE COURT: Sustained.

"MR. DIKEMAN: Nothing further." (RT 22058.)

The passage arose because Yates had testified that she believed her brother was innocent, and that his life was worth saving. Other evidence was entered showing Yates had called the police after appellant's arrest because Yates did not trust appellant, and was afraid he would cause her mother's arrest for destroying evidence, specifically the black suitcase which was later found to contain the Triplex gun and wig. (RT 22044, 22051.) The trial court ruled as follows:

"The whole idea of cross-examination is to test the validity of a witness' statement. If I deny the People the right to at least ask her questions about her beliefs as to what her brother

303

is and what he's done in the past to some degree it seems to me they have no ability to attack her opinion offered here today. That he has some value in regard to counseling and perhaps the production of a book and even her love for him.

"I can only tell you this. I will allow cross-examination. I don't want to go into all the statements and I'll do it on a piece-by-piece basis.

"So if there's an objection raised, I want to stop it right there and we'll take the objections. And I'll try to rule as best I can." (RT 22041-2.)

We believe the court's ruling unassailable. Yates had been "terrified" of her brother's possible guilt (RT 22050), due to her self-initiated conversation with Sergeant Fredrickson, but had been concerned even before that due to information from her sisters Sandra and Cheri. (RT 22046, 22058.) It was fair to allow the prosecution to probe the relation between her previous feelings and her present ones. The examination was quite circumscribed, and it is striking that at one point when Yates seemed on the verge of divulging the "six murder" hearsay, it was the prosecutor who quickly stopped Yates from further discussion:

". . . all of a sudden out of the clear blue sky, I get a phone call that's --

"Q. From who?

"A. From my sister.

"Q. Sandra?

"A. Sandra. That Sherry (sic) had said --

"Q. I don't believe there's any question pending at the present time.

"A. Un-hum." (RT 22046.)

Appellant shows no error nor any prejudice.

B. Evidence brought out through cross examination about O'Rourke's arrest with a sawed-off shotgun, and appellant's nearby detention, was relevant. During the penalty phase, appellant and Joseph O'Rourke testified to a scenario of appellant's activity in Los Angeles after his release from prison in September of 1982. They asserted that O'Rourke had a prosperous gardening and roofing business, that appellant worked for O'Rourke (RT 22184, 22226), that appellant "loved" the strenuous outdoor work. (RT 22402-3.) An implication was set up that the police unfairly arrested O'Rourke, and after the arrest police

found appellant in a wholly legitimate position nearby. (RT 22216.) The police acted like bullies and told appellant to get out of town and stay out. (RT 22404-5.) Appellant implied that this rough treatment was typical of his experience with authorities, and that it soured him on the possibility of success at legitimate work. By implication, appellant in this way used this and other alleged injustices perpetrated against him to mitigate his criminal actions and seek sympathy.

It had been brought out at the guilt phase that O'Rourke and his girlfriend Clair Gardner had been arrested at the home of one Donald Kendricks, an ex-convict, for possession of a sawed-off shotgun. O'Rourke and Gardner were transported to their residence, the lavish home of a lawyer for whom O'Rourke was working, for a parole search of O'Rourke's habitation. While at the Lakewood home, police "intercepted [appellant] in the backyard of the residence up near a wall amongst the bushes." (RT 17662.) At the penalty phase, O'Rourke admitted possession of the sawed-off shotgun.

As we have previously noted, the prosecution had evidence that O'Rourke was running a gun rental business, where he took a percentage of robberies in return for provision of guns. O'Rourke was set up by the police with the aid of Kendricks, and that led to his arrest.

After the defense brought out the facts of O'Rourke's arrest, appellant's honest attempts at legitimate labor, and the police officer's bullying, the prosecution again sought to impeach O'Rourke on the basis that his business was a front for criminal activity, and that appellant was involved, as demonstrated by his attempting to run away at the sight of O'Rourke and the police. This running away showed consciousness of guilt. The trial court noted:

"THE COURT: I don't want him [O'Rourke] to go into the conviction. I don't think the conviction has anything to do with it; that the fact he was arrested    -- he had already -- I don't know if it impeaches him of not. I guess it depends what he testifies to." (RT 22215.)

Ultimately, O'Rourke admitted being set up by Kendricks, being arrested with the sawed-off shotgun, and transported to the Lakewood home. But, O'Rourke denied appellant was hiding in the bushes. O'Rourke confirmed appellant was ordered out of Los Angeles. However, no evidence of the gun rental business or of appellant's connection to it was entered.

305

In sum, the prosecution legitimately impeached O'Rourke as to the legitimacy of his business, and, by implication, cast doubt on appellant's story of his own efforts to go straight. O'Rourke's possession of a sawed-off shotgun and appellant, the ex-convict, hiding in the bushes explained the police officers' hostility toward appellant, and made appellant's lack of understanding of the attitude, and so appellant's wounded feelings, less compelling. All in all, the evidence was minor, strictly limited and properly explored.

C. Appellant's next complaints concern the trial court's allowance of two specific past acts of violence by appellant, as impeachment of a broad statement by appellant proclaiming himself incapable of violence. Appellant's several arguments on the point are untenable.

The first of the two past incidents involved proof from ex-inmate Ricky Carpenter that appellant stabbed an inmate Banks several dozen times in San Quentin in 1978. Former Correctional Lieutenant Rodney Perryman testified that he saw Banks and appellant alone on a tier; Banks was bleeding profusely, appellant stood behind him, holding him up. Appellant had a knife in his hand. (RT 21807, 21821-3.) Officer Perryman was impeached on cross-examination by evidence he had not written in his report at the time that he saw the knife in appellant's hand, but only that he found it nearby on the floor. (RT 21830-3-5.)

The trial court had excluded evidence by Carpenter, appellant's accomplice in the Banks killing, because the prosecution had waited too long before giving the defense notice of Carpenter's testimony. (RT 21505.) However, the court ruled that it might still allow the evidence as rebuttal, especially if other testimony made it necessary.

In the meantime, appellant testified. On _direct_ examination he addressed the Banks killing. He stated he was never prosecuted for the incident, although he was given three years in the Adjustment Center. Also, he testified his counsel Mr. DePaoli and Ms. Klay advised him not to discuss the incident on the stand. (RT·22234.) Finally, on _direct_ examination, appellant testified in answer his attorney's question of whether he killed Elizabeth Hickey:

"Q. Why are you saying that you did not kill Liz Hickey?

"A. There are several reasons. In the first place, I -- I was trying to help Elizabeth. I wasn't trying to hurt her. I liked her

personally. I -- I'm not personally capable of doing what -- whoever did that to Elizabeth. I couldn't have done that. And because Liz was my -- I can't think of any better words to put it. She was -- she was worth more to me alive than she was dead because she was my bill of sale for the guns that she gave me to see for." (RT 22280-1-2.)

At this point, the trial court ruled that it would now allow the prosecution's request to put Carpenter on the stand on rebuttal. The trial court ruled:

"The attack upon Mr. Perryman's credibility plus the testimony about not being charged which was elicited on direct examination plus the statements of Mr. Price about his ability to commit the act causing the death of Miss Hickey caused this Court to conclude that the testimony of Mr. Carpenter is relevant on two bases: It impeaches Mr. Price's broad statements of his capability, and on secondly, it rebuts in regard to the attempt to discredit the observations of Mr. Perryman" (RT 22615.)

This ruling was correct for multiple reasons.

First, there was from the outset no dispute that the incident constituted legitimate prior violent conduct under section 190.3(b). The only reason Carpenter was excluded from the prosecution's case-in-chief was the notice problem. The court made crystal clear, however, that the problem would not exist on re-direct if the defense case cast doubt on Officer Perryman's version of the Banks homicide. Specifically, the court counselled the defense that if appellant disputed the evidence, it would be very difficult to avoid allowing Carpenter's testimony. (RT 21506-7.)

Plainly, the court was correct in allowing Carpenter after the defense cross-examination of Officer Perryman, and after appellant testified he was not prosecuted for the Banks killing, which was a clear implication that he was not guilty of murder. Appellant's argument that the court did not rely on these grounds is simply incorrect. (AOB 815, see ruling, *supra*, 22615.)

Effectively ignoring all of the above, appellant creates the straw man that the trial court allowed the Carpenter testimony solely because of appellant's statement he was incapable of serious violence. Although

this misreads the record, even if true, such a ruling would have been correct.

Justice Jefferson discussed a case similar to this. In *People* v. *Gardner* (1975) 52 Cal.App.3d 559 the trial court excluded defendant's prior conviction of manslaughter under section 352. Defendant then testified "I don't threaten people. I never threatened anybody. I am 30-some years old and I never thought about committing any kind of crime against a person." This statement properly called for the manslaughter crime as impeachment. Justice Jefferson stated "Under the circumstances presented in *Gardner*, [defendant] cannot be permitted to claim that the trial judge's limine ruling was intended to preclude the use of his prior felony conviction to attack his credibility on all possible grounds. ¶ The lesson to be learned from *Gardner* is that, if a defendant or other witness gives an overly broad answer to a proper question asked on direct examination, he opens the door to impeachment by means of evidence that disproves that answer, pursuant to EVID. C section 780(i)." (Jefferson, California Evidence Bench Book (2nd ed. 1982) 816-17, § 28.18.)

Dicta in *People* v. *Willoughby* (1985) 164 Cal.App.3d 1054, 1064, fn. 2 cited by appellant, disagrees flatly with these precepts. *Willoughby* is simply wrongly decided and we request the court to disapprove that discussion.

Appellant's statement here embodied two basic assertions. First, appellant implied "I have never committed an act of violence of the seriousness of the murder of Elizabeth Hickey." Second, the statement implied "I have known Curtis Price for 35 years and my experience with him (myself) is that he is incapable of such violence." The prosecution was permitted to rebut the first claim by attempting to show that appellant was simply a liar, in that he had in fact committed serious acts of violence. It was within the jury's province to decide whether these acts were so serious as to show personal culpability of lying on the part of appellant.

Second, appellant asserted that he had the character trait of relative non-violence. Although a character trait may not be directly established to attack credibility, here the existence of the character trait was precisely the fact the prosecution wished to disprove under Evidence Code section 780(i). Here the prosecution was allowed to show that appellant was aware that he had committed acts of violence which

308

showed him capable of the Hickey homicide. The jury could therefore conclude that appellant was consciously attempting to delude them. Again, it was up to the jury to decide whether the acts of violence appellant was aware he had committed were sufficiently similar to the Hickey killing to brand him a liar.

Finally, once appellant testified he was incapable of violence, he put his character at issue. Appellant points to one other incident allowed by the trial court to rebut appellant's "incapable of violence" statement. The prosecution on cross-examination brought out a 1970's Arcata armed robbery, which appellant admitted. (RT 22422.) The court allowed the evidence both because appellant's testimony on direct examination which implied that he was admitting his entire life's criminal conduct, and justifying it, omitted this robbery, and because the "incapability" statement made the robbery relevant. (See court's ruling RT 22421.) Again, the ruling was correct. At any rate, the incident was substantively admissible under section 190.3(b).

D. Appellant next addresses the prosecutor's queries as to where appellant got the Jennings pistol. Extensive testimony was introduced at the guilt phase which showed that Rebecca Williams had lied on the stand about having gotten the Jennings pistol from her grandfather in 1975, (RT 19358) because the gun had in fact been manufactured in 1981 or 1982. (RT 19491, 19786-7.) Further, it was shown that Rebecca Williams had given the gun to a gunshop for repairs under the name "Curtis Pierce." (RT 19303, 19803-10.) Obviously, the source of any pistol possessed by appellant was relevant to the conspiracy to obtain guns and so relevant to rebut appellant's claims that he was innocent of the conspiracy. The question was also relevant to explore Williams' credibility, and the possibility that appellant told Williams to lie about the weapons. The prosecutor's question of appellant as to where he got the weapon was obviously relevant.

Although the prosecutor justified the question on the basis of section 190.3, the court merely stated "overruled" after the defense objected. Given the plain admissibility of the evidence, no error can be presumed from the court's ruling. At any rate, the jury had ample evidence of appellant's contacts with guns, including this one, which was given to a gun store under his name "Curtis Pierce." No prejudice could have arisen from associating appellant with yet one more gun.

309

E.   Agent Tulleners properly testified about the Lakeport highway sign.  As we have discussed, appellant claimed he drove from Redding to Williams to Lakeport on February 18, 1983 to pick up Hickey's guns from the mysterious "Kenny." This testimony contradicted his statement in his written offer of proof at the guilt phase wherein he stated he drove from Auburn to Williams to Upper Lake on February 17 to pick up the guns.  When he made the written assertion, appellant was aware of gasoline company records showing he charged gas in Auburn and Upper Lake on February 18.  He was unaware that a third record showed that he charged gas in Redding on the 18th.

The prosecution impeached appellant on the plain contradiction in appellant's testimonies obviously necessitated by the newly discovered charge record from Redding.  However, as noted, appellant had, for unknown reasons, changed his story as to the pick-up location for the guns, from Upper Lake to Lakeport.  This now conflicted with the Upper Lake charge record, because Upper Lake is 4.5 miles off the main route between Williams and Lakeport.

Compared to the other conflicts in his stories, this issue was minor.  Nevertheless, the jury was allowed to see that appellant plainly was lying about the side trip to Upper Lake, which appellant claimed was on his way to Lakeport.  To enforce the idea that appellant was fabricating, the prosecutor sent Agent Tulleners to the local Caltrans office to check whether the main route to Lakeport, which avoided Upper Lake, was clearly marked.

Agent Tulleners discovered that just before the turnoff to Lakeport, there is a sign 54 inches high and 124 inches wide directing traffic to Lakeport and away from Upper Lake.

Appellant now protests that Agent Tulleners' testimony was untrustworthy.  Appellant bases his argument on some descriptive information Agent Tulleners mentioned about a film that Caltrans makes of each 50 feet of California highways, and which is updated every few years.  (RT 22691-2.) Appellant protests that this testimony means that the film Agent Tulleners viewed could have depicted a sign not present in 1983.

Appellant somehow ignores the following testimony by Agent Tulleners:

"Q.   And has that sign -- your review of the records indicated that sign had been there for a number of years?

310

"A.    Yes.    I believe since the 60's.    The other one I specifically recall, but this one I believe was some time in the 60's."  (RT 22693.)

The jury was free to evaluate the trustworthiness of Agent Tulleners' testimony.  The defense was also free to determine from the Caltrans records mentioned by Agent Tulleners that his testimony was false.  No error nor prejudice is shown.

## XXVII.
## APPELLANT'S ALLEGATIONS OF PROSECUTORIAL MISCONDUCT ARE IN THE MAIN BASELESS, AND, AS A WHOLE, INSIGNIFICANT

### Introduction

Appellant next advances claims of prosecutorial misconduct at the penalty phase. The issues fall into a few broad categories. First, in perhaps the majority of the instances referred to, there was no objection, or request for admonition, or both. Such issues were waived below. Next, appellant objects to a large number of issues in which the trial judge sustained defense objections to the prosecutor's questions, causing no answer whatsoever to be received. Given the numerous times throughout both phases of the trial that the jury was instructed that questions by either side are not evidence, it must be assumed that the jury understood and heeded this frequently received admonition.

As to nearly all of the rest of appellant's arguments, the record firmly rules out any possibility of error, or of prejudice. For the court's convenience we follow appellant's organization.

A.    The prosecutor asked questions of the two officers kidnapped at gunpoint in Montana in 1971 by appellant, who locked them in a car trunk on a little-used road, in sub-freezing weather. The prosecutor asked Gerald O'Bresley:

"Now, sometime after that, did you have occasion to draft a letter to the parole authorities recommending that they not release this particular man?

"MR. DePAOLI: Objection, your Honor. That's beyond the scope of the cross-examination.

"THE COURT: Sustained." (CT 21608.)

The subject was dropped. Later, the prosecutor asked the other kidnapped officer:

". . . did you have occasion to express an opinion to the Board of Pardons concerning whether or not the man who had done this to you should be paroled from the Montana State Prison?

"MR. DePAOLI:   Objection, your Honor.   Beyond the scope.

"THE COURT:  Sustained."  (RT 21623.)

Again the subject was dropped.  Although it is obvious on the face of it that the jury was quite able to deduce O'Bresley and Farago's reactions considering the terrifying kidnapping experience and their emphatic demeanor on the stand, appellant bases several claims of error on these questions.  None is convincing.

First, obviously the questions were not answered.  The jury was instructed repeatedly that questions were not evidence.  No prejudice appears.  The question to Farago did not even imply an answer, in that the prosecutor merely asked "whether or not" he drafted a letter.

Next, appellant proposes several possible reasons by the prosecutor may have asked the questions.  We do not and cannot know the answer to that question, because appellant made objections only on "beyond the scope" grounds.  Given that defense counsel did not object on the ground of bad faith, or of improper subject matter or irrelevance, and given the lack of request for admonition on these grounds, the prosecutor was never asked to reveal his motivation.  The lack of other specific objection or request for admonition showed defense counsel did not sense any prejudice from the questions; the issue was waived.

At any rate, no prejudice is shown.  Predictions of future dangerousness by lay witnesses are not considered inflammatory.  (*People* v. *Thompson* (1988) 45 Cal.3d 86, 125; *People* v. *Miranda* (1987) 44 Cal.3d 57, 111.)  Those predictions have been called improper when given by experts, who project the air of authority which contrasts with the unreliability of the opinion.  (*Ibid.*)  These concerns do not apply to lay witnesses.  And, the objection below was in any event not grounded on implication of future dangerousness.  No error is present.

Finally, the reactions of the two officers were relevant as circumstances of the crime, as appellant was inferably aware of the officers' fear and his continued action showed callousness.  This subject was relevant because appellant's continued assertions he was now remorseful, and was a man of new sensitivity.

At any rate, the unanswered questions only mildly hinted at any improper inference.  The issue was minor.

B.  Appellant complains of the following exchanges with Officer Perryman in regards to the Banks stabbing:

"A.    [Officer Perryman] Well, there was tension just because there was a murder in that housing unit.

"MR. DePAOLI:  Object to the word 'murder.'  Ask that it be stricken.

"MR. BASS:    I don't know what else it could be characterized as.

"MR. DePAOLI:  How about self-defense.

"THE COURT:  The word 'murder' is stricken, ladies and gentlemen.  You'll determine from the facts what occurred on that tier on that date.  At this point in time, we'll call it an assault."  (RT 21853-4.)

It is true that the prosecutor plainly expressed his opinion. However, the prosecutor gave no hint that his opinion was based on anything other than the facts before the jury.  The prosecutor was of course free to expressly argue such conclusions later during closing argument.  (*People* v. *Gates* (1987) 43 Cal.3d 1168, 1186-7.)  Here, the prosecutor's remarks were merely vigorous advocacy, no different from defense counsel's characterization of the incident as "self-defense."  The trial court's admonition plainly labeled the prosecutor's remarks as a personal conclusion.  No issue is shown.

C.  Appellant next spends six pages of his brief (AOB 827-833) discussing an issue about which it is doubtful there was any error, but where there is no reasonable argument that any prejudice accrued. Appellant focuses on a question asked by the prosecutor during the cross-examination of a San Quentin prison guard, Rogers Larry, who claimed appellant was a ward of his between 1971 and 1975 and that appellant was a respectful well-behaved prisoner.  (RT 22060-3 et seq.) The prosecutor wished to point out by way of impeachment that Officer Larry's dates were confused.  To this end the prosecutor asked the following question:

"On April 17th of 1971, in Montana -- Great Falls, Montana, Curtis Floyd Price or at least the guy we have here in this courtroom was arrested with a gun, high speed chase and everything at the time you say he was working in the mess hall in San Quentin.  That's where my problem is.  I was wondering if you had any way to explain that?"  (RT 22066.)

At a later bench conference defense counsel objected to the prosecutor's mention of the facts of the 1971 chase.  This had to do with a previous

ruling by the trial court that a conviction stemming from those facts was invalid. The trial court had also ruled that the actual facts of the offense, as opposed to the conviction, would be admissible as prior violent acts. The trial court did note that the prosecution had neglected to specifically name these facts as part of their penalty phase evidence, and therefore, "to assure avoidance of error this shall be saved for rebuttal." However, the court was quite clear that the evidence was admissible and would be admitted in rebuttal on request by the prosecution:

> "The defense has clearly had knowledge of this prior; it had the chance to consider and to investigate this issue. They are not surprised by any fact. . . . The defense knew of this prior violent act. The Court's Ruling as to convictions in validity does not change the truth, or lack of truth as to that violent act. . . . The defense is not prejudice by this evidence for they have been aware of it and the law for some time. To assure avoidance of error this shall be saved for rebuttal." (CT 10284.)

Appellant now argues that in light of this ruling the prosecutor's mention of the facts was misconduct. A simple reading of the ruling makes it clear that it was reasonable to conclude that the trial court had ruled the facts flatly admissible for rebuttal in the case. The facts became relevant for impeachment when Officer Larry stated appellant was in San Quentin at a time when he was being arrested in Montana.

The trial court essentially acknowledged the prosecutor's good faith. The trial court also maintained, in light of its ruling, that the evidence should be saved for rebuttal, and it offered to admonish the jury to consider only the date, and to ignore the facts stated in the prosecutor's question. The trial court and defense counsel both acknowledged that such admonishment might just reinforce the jury's memory of those facts. However the important point was the trial court found no misconduct by the prosecutor. The following colloquy occurred at the bench:

> "[The Prosecutor] We can get that in. So I don't see any difficulty.
>
> "MR. DePAOLI: Excuse me. I don't -- is that what they have been told?
>
> "THE COURT: That's what the ruling clearly said." (RT 22070-1.)

The order of entry of evidence is in the discretion of the trial court. The trial court here saw no bad faith, and no real substantive problem with regard to the prosecutor's question. Appellant shows no prejudice from the timing of having the evidence first referred to as impeachment, rather than in rebuttal. The issue is insignificant.

Even if appellant were able to raise some hint of error as to the prosecutor's question, he can make no showing whatsoever of any prejudice. First, as we have shown, the evidence was fully admissible in rebuttal. The trial court's ruling made that plain. Second, the evidence did in fact come in, in cross-examination of appellant. At that point, there were three independent reasons for admission of the evidence. First, the evidence was prior violent activity by appellant under section 190.3(b). Second, the evidence of appellant's use of a gun and endangering of officers by high speed chase impeached his statement that he was not capable of bludgeoning Hickey. Third, the trial court noted that appellant's opening of the subject of his dates of confinement allowed entry of the evidence. Thus, since the evidence could and did come in independent of the prosecutor's question, and since appellant can show absolutely no reason why the timing of the evidence's admission had any effect on his case, appellant is unable to raise any colorable issue of prejudice. No issue is shown.

D.1.   Fred Perry was one of the inmates in Montana State Prison who was moved along with appellant to other state and federal prisons.   During cross-examination of Perry, the following colloquy occurred:

"Q.  How soon after the fire at Montana State Prison were the four of you moved?

"MR. DePAOLI:  Objection, your Honor.  That's beyond the scope of cross-examination.  There's -- I've got an objection.  Leading the witness.   There's never been any disciplinary findings for a fire or anything like that.

"THE COURT:  Overruled.

"First of all, was there a fire before you were moved?

"THE WITNESS:  Was there a fire before?

"THE COURT:  Someplace in Montana State Prison?

"BY MR. DIKEMAN:  Q.  Was there a fire in the library August 21st, 1975, approximately eight days prior to the time

that you, Mr. Price, Mr. Broderick, and Mr. Wilkins were transferred out of the Montana State Prison system?

"A. Yes, sir. There was a fire.

"Q. Who set it?

"A. Whether any of those people you just mentioned had anything to do with that fire is an entirely different matter.

"We had hashed that out in federal court once." (RT 22120 through 22120-1.)

The relevance of the issue stems from Perry and appellant's continued assertions that the Montana prison authorities, as well as all other law enforcement officials everywhere, were thoroughly corrupt and brutal. Perry's examination was a litany of brutalizations, beatings and unjust transfers perpetrated on him by guards in the Montana, Idaho and federal prison authorities. Appellant similarly later testified that the transfers between the prisons were completely unjustified, and were in fact motivated by a dishonest desire to punish him because he knew facts about misconduct by prison guards. (RT 22330-3.) Appellant and the defense team's continued attempts to portray police and prison authorities as liars and corrupt throughout both phases of the trial. Thus, the relevance of the prosecutor's question was that it attempted to show that Montana prison authorities may well have had good faith reasons to believe appellant and Perry were involved in, or at least peripherally connected to unusual disciplinary problems in the prison. The questions were relevant.

Next, it is vital to note that defense counsel below objected solely on the ground of the questions being beyond the scope of cross-examination and leading. Of course, it is proper to lead on cross-examination. Further, the question was not beyond the scope, as we have just discussed, and that objection was overruled by the court. Defense counsel never objected on the grounds that the prosecutor's question was in bad faith, nor did he ever demand the prosecutor prove the implication of his question. As such, objections on those grounds were waived, and cannot be raised on this appeal. This rule makes sense here in that it is quite reasonable to believe that defense counsel had no interest in putting the prosecutor to his proof on the issue, but was quite content with having appellant and Perry simply deny the accusations, in the hopes that the prosecutor would not fly in Montana prison officials with first hand knowledge of the incidents to testify

against appellant. The record implies that such would have been feasible for the prosecutor, had defense counsel made an issue of the topic, and caused the court to require proof of the prosecutor's good faith. Lack of an objection was prudent, and waived the issue on appeal.

2. Appellant next isolates a colloquy where the prosecutor asked appellant whether he was using marijuana during his testimony. This question was followed by appellant's acknowledgement that a doctor had testified the previous day that appellant was taking tranquilizers, and appellant's testimony that that doctor was in fact mistaken. The prosecutor continued:

"Q. How about nonprescription controlled substances or drugs?

"A. Such as?

"Q. Marijuana?

"A. Today?

"Q. Sure.

"A. No.

"Q. Yesterday?

"A. No.

"Q. Had to think about it?

"A. No." (RT 22417-8.)

Appellant's charge that the prosecutor implied knowledge of appellant's marijuana use is simply not supported by this record. Appellant is also mistaken in inferring that the prosecutor asked whether appellant was "sure" of his drug use. The use of the word "sure" was not a question, but rather an answer to appellant's question whether the prosecutor was referring to "today?" No issue is shown.

3. Appellant once again addresses the issue of the robbery in Montana in April of 1971. The prosecutor asked a question of appellant on cross-examination which included the query whether appellant "shoved a pistol . . . in the face of a man named Barzotti and demanded money from him?" (RT 22419.) Appellant strongly denied pointing the pistol at the man's face, and explained he merely pointed the gun at the victim. (RT 22420.) The subtlety of this distinction makes the asserted prejudice trivial; defense counsel below apparently agreed, because there was no objection on this ground below. Rather, the only objection was on the basis that the question was beyond the scope of direction examination,

which objection was overruled for reasons we discussed in section C *supra*. No issue is shown.

4. Appellant next complains of a series of questions asked of him on cross-examination by the prosecutor. The questions concerned possible reasons Montana state prison authorities would have had for transferring appellant out of their prison. Appellant consistently maintained he had never engaged in any violent or antisocial behavior in Montana State Prison or any other state prison. He maintained that the reasons for his transfers stemmed from corruption by prison guards and authorities. (See RT 22330-3.) In part to rebut this allegation of arbitrary action, the prosecutor pointed out that a detailed statement of reasons for his transfer had been prepared by Montana authorities. Appellant admitted as much. (RT 22466-7.) The prosecutor then went into the allegations in this letter, asking appellant to admit or deny them. The allegations included illegal sale of hobby-craft material (RT 22467), drug trafficking (RT 22467), setting a fire in the library facility (RT 22468), intending to kill a staff member (RT 22468), seriously assaulting a fellow inmate (RT 22468) and believing in white supremacy and intimidation of minority group members. (RT 22471-2.) Appellant flatly denied most of these allegations except for the drug trafficking, to which he said "from their prospective [sic], that could be a possibility. Not a fact. And, therefore, I would call that a lie." (RT 22467.) To the question about intending to kill a staff member, appellant replied "Yeah, because if I intended to, I would have." (RT 22468.) Appellant also did not admit or deny an allegation that one of the reasons he was transferred was because he had been shot with a homemade weapon (RT 22467), although Perry had admitted that fact earlier. (RT 22120 et seq.)

None of the questions ever drew an objection. The issue was waived. Appellant argues that the questions were too repetitive and intense for a successful objection. In fact the first question that was asked below concerned the allegation that appellant had engaged in selling illegal hobby-craft material. Had appellant objected then and requested the letter no longer be used to refresh appellant's recollection in front of the jury, all of the more serious allegations would have been eliminated. The lack of objection waived any issue on appeal.

There were several possible reasons why defense counsel did not object. First, they must have realized that the questions were

319

relevant to impeach appellant's allegation that the Montana authorities had no good faith belief in any reasons to transfer him. Second, as we discussed earlier, defense counsel may have been content to allow the prosecutor to suggest the facts, rather than challenging him to fly in Montana prison officials to prove the facts by first hand knowledge. Every indication in the record is that the prosecutor could have done so had he been forced to by defense counsel. Finally, defense counsel might have been satisfied with appellant's demeanor and attitude on the stand, and believed that allowing appellant to directly answer attacks by the prosecutor with flat denials was his best course in front of the jury. In sum, the issue was waived, and at any rate, no misconduct is proven on the part of the prosecutor. Defense counsel may have also been content to rely on the repeated admonitions to the jury that questions by the prosecutor were not evidence, in the belief that appellant's denials of the information were more convincing to the jury than the prosecutor's unproven implications.

5. Appellant next complains that the prosecutor accused him of telling Rebecca Williams to lie. The point is an odd one, since appellant on the page after the objected to question admitted on the stand that he did tell Rebecca Williams to lie.

As background, Rebecca Williams was shown to have told numerous lies on the witness stand during the guilt phase. The most notable of these was her false story of appellant's whereabouts and his possession of two bundles of guns on the Friday morning before Elizabeth Hickey was killed. The testimony of appellant's father's friend, James Victory, established conclusively that appellant arrived with the guns in Reno on Saturday. Also, given the conclusive evidence of the Triplex robbery, Williams' testimony that appellant was in Auburn around that time was forcefully disproven. Further, appellant's mother testified that appellant was in Eureka that weekend, again contrary to Williams' testimony.

Additionally, Williams lied that a .22 caliber Jennings semi-automatic pistol that she took to a gunshop in Auburn and placed under the name of Curtis "Pierce" had been left to her by her grandfather in 1975. (RT 19358, 19304.) The manufacturer of the gun was called as a witness and testified that the gun was in fact manufactured no earlier than late 1981. (RT 19786.) Williams also denied telling Officer David Brose that in fact the gun was appellant's and that he had in fact

320

inherited it from his grandfather. (RT 19305.) Brose flatly contradicted Williams on that point. (RT 19805.)

Given the proof of deception, it is clear that the prosecutor's question to appellant of why he told Williams to lie about the gun was reasonable. The prosecutor asked "Why did you tell Rebecca Williams to lie about the Jennings .22 caliber semi-automatic pistol?" (RT 22487.) As appellant omits to mention, appellant did not deny the question. Rather, he admitted that he told Williams that the gun was his grandfather's gun, and that she should lie, and tell the gunsmith as much. (RT 22487-9.) As such, appellant fails to raise even a colorable issue.

Finally, appellant objected to the prosecutor's question of appellant as to whether Williams would have been lying had she told Agent Tulleners that she had lied about the gun. Since the jury knew that Williams was lying, the question could have had no impact whatsoever. Moreover, appellant failed to object to the question, waiving the issue. The reason for the lack of objection was obvious, in that defense counsel may have believed in the prosecutor's good faith, because Agent Tulleners was sitting in the courtroom when the question was asked. In sum, appellant spends three pages of his brief on an issue with absolutely no substance.

E.   During cross-examination of Fred Perry, who complained about numerous unlawful meetings and other improper prison conditions, the prosecutor inquired whether he knew Patricia Sewell, who had testified she was a friend to many of the inmates in the Montana State Prison. Defense counsel objected. The prosecutor stated: "I'm going to ask him if he finds it strange that she didn't mention these people --." (RT 22127.) This was all of the offer of proof that was given in earshot of the jury. At the bench, the prosecutor explained that Sewell would have seen many of the injuries described by Perry, and the fact that she did not mention them in her testimony impeached Perry's assertions that they occurred. The trial court noted that the inference was valid and could be argued to the jury, but that Perry had no reason to know why Sewell failed to so testify. No prejudice is shown. Appellant builds a straw man, claiming the prosecutor was inquiring why Mrs. Sewell didn't relate complaints by appellant, and that those would have been hearsay. Appellant is obviously mistaken, as statements by appellant elicited by the prosecution can never be hearsay. Appellant is in fact worse than mistaken, because such statements weren't the goal of

the prosecutor, but rather, he was referring to observations by Mrs. Sewell of the many inmates with whom she visited. Appellant's logically twisted and legally erroneous argument is baseless.

F. Appellant objects once again to a question to appellant on cross-examination regarding the Banks killing. As we have shown previously, the evidence was relevant for numerous reasons, including appellant's denial that he was capable of committing a violent act, and appellant's evidence that he was a model prisoner. The trial court ruled unmistakably that the evidence was admissible because of the testimony of appellant and the other defense witnesses. (RT 22446-7.) The trial court at that point did however at one point direct the prosecutor to go on to a different issue rather than force appellant to take the Fifth Amendment on the topic in front of the jury. The prosecutor did so, but some time later returned to the subject and asked appellant:

"Let's talk about the Banks incident. May 29, 1978 in San Quentin Prison. Why did you stab inmate Banks twenty, thirty times to death?

"MR. DePAOLI:   May we approach the bench your Honor?

"THE COURT:  Certainly." (RT 22514.)

As it appears from the quotation, the question was never answered. The prosecutor stated that he believed the question was now correct because appellant had had time to decide whether to withdraw his previous testimony on direct examination, or to take the Fifth on the stand in front of the jury if he refused to answer cross-examination questions on the topic. The trial court showed complete agreement with the prosecutor and absolutely no sympathy for the defense arguments. The trial court and the prosecutor were quite correct.

It is well established that once a defendant takes the witness stand and waives his Fifth Amendment privilege, the prosecutor may ask questions which he knows will cause the defendant to invoke his Fifth Amendment rights. (*United States* v. *Hearst* (9th Cir. 1977) 563 F.2d 1331, 1341-2.) "'[A] defendant who testifies at his trial may be cross-examined as to all matters reasonably related to the issue he puts in dispute by his testimony on direct.'" (*United States* v. *West* (9th Cir. 1987) 826 F.2d 909, 912.) Here, on direct, appellant specifically testified that he had never been prosecuted for the Banks homicide. (RT 22334.) The clear implication of this statement was that he was not in fact guilty

of the homicide. Such implied denials on direct examination open up the topic on cross-examination. (*People* v. *Gates* (1987) 43 Cal.3d 1168, 1185.) This is yet another reason why the cross-examination was proper. The trial court below saw no basis for appellant's arguments on this ground, and none appear on appeal.

G.1. Appellant testified on direct examination that he had been in the Marine Corps, that he liked it and that he had planned a career there. (RT 22283, 22303.) This was part of a continuing attempt by appellant to gain sympathy with the jury, to show his self-worth, and also, to show that if it had not been for the corruption of police authorities and society in general, appellant would have been a model citizen. Quite naturally, the prosecutor wished to bring out the fact that appellant was discharged from the Marine Corps before his term of enlistment was up. Appellant admitted that the prosecutor's facts were correct. (RT 22449-22450.) Appellant does not object to this question, which contained all the persuasive force available on the topic. Rather appellant objects to the prosecutor's next question, which in fact was not even answered. The question was "Okay. So your dreams of a career in the Marine Corps were nothing more than just dreams because you didn't complete -- they didn't want you?" (RT 22450.) Defense counsel objected that the question was argumentative and beyond the scope. The objection was sustained. Absolutely no prejudice is shown. Although the question was argumentative, it was plainly based on inferences from the record, and so, was not inflammatory. The prosecutor could properly bring out the inference in argument. At any rate the question was not answered. No error is shown.

2. Appellant objects to the prosecutor's question of appellant as to where he got the gun he used to rob a grocery store in Arcata in 1971. (RT 22466.) Appellant admitted the robbery. The question was objected to as argumentative and the objection was sustained. As the trial court had previously mentioned, appellant had put in issue his character throughout his entire life. The source of a firearm used in a robbery was reasonably related to those issues. At any rate, the question was not answered. The jury knew that appellant indeed had the gun, as they knew that appellant had at various times had dozens of other weapons. No prejudice is shown.

3. Appellant next objects to a question by the prosecutor "So when you are going to San Quentin, you'll be wanting to escape, right?" (RT 22524.) Appellant's complaint is baseless for numerous reasons.

First, as appellant admits, there was no objection to the question. *People* v. *Lucky* (1988) 45 Cal.3d 259, 293 held that an admonition would have cured a more inflammatory statement by a prosecutor that appellant would be dangerous in the future because he was an escape risk. (See also *People* v. *Bandhauer* (1970) 1 Cal.3d 609, 616.) Next, we would argue that speculation on the possibility that appellant would escape and cause more damage to society was a perfectly legitimate argument to make in this penalty phase. As Justice Mosk wrote in dissent in *People* v. *White* (1968) 69 Cal.2d 751, 764, "defendant's attempt to escape from the county jail was his voluntary act. From that established circumstance flows a perfectly rational deduction that defendant was, and in the future might be, a difficult rather than contrite prisoner." In *White*, Justice Mosk urged affirmance even though the prosecutor argued that the escape might lead to harm to citizens outside the prison. Here, the prosecutor made no such implication. The prosecutor's argument was proper.

Finally, appellant argues that once the escape risk idea was "planted" in the minds of the juror, no admonition could have prevented the jurors from thinking about it. (AOB 846-7.) If appellant's argument is correct, then there could have been no prejudice from the prosecutor's argument because it was appellant who first raised the issue of escape. Appellant testified on direct that "anybody gets put in prison, first thing they want to do is how to get out. Its natural to human nature. . . . It's just what prisoners do." (RT 22427.) When the prosecutor brought the subject up appellant admitted "all convicts plan escapes." (RT 22523.) If the prejudice was incurable, appellant was responsible for it. (*People* v. *Keenan* (1988) 46 Cal.3d 478, 512.)

4. Appellant next objects to two more questions which were not answered. In both cases, the trial court itself intervened, finding the questions by the prosecutor too argumentative, thus forestalling any possible prejudice to appellant.

On the other hand, the substance of the questions was entirely proper. The first question was "Mr. Price, in state prison they are not going to take what you get away with up here in our county jail." (RT 22533.) As we have discussed in detail previously, a strong portion of

appellant's argument against the death penalty was that he planned to be a model prisoner, that he planned to write a book about his prison experiences to aid others, and that he was willing and able to help younger prisoners get on the right track and avoid violence in prison. (RT 22297, 22333, 22300-1 (discussion of appellant's aspirations to high moral standards of "convict code"); CT 1216; see also testimony of Joseph O'Rourke RT 22206-8.) The subject of the prosecutor's question, to which objection was not made or sustained, was a proper attempt to impeach appellant's protestations of his well-mannered behavior toward figures of authority.

The prosecutor's second question was "Well, you disagree with everything, Price. You don't see things the way anybody else sees them." (RT 22592.) Appellant's reply to this question was "Well, put me in the gas chamber, Mister, you know, if that's a crime." The trial court immediately stepped in and stated "that's enough" and admonished appellant and perhaps the prosecutor as well, to stop arguing. The point of the prosecutor's question was that appellant repeatedly maintained during cross-examination that he would obey only orders with which he agreed, or which he fully understood. (RT 22525-7.) In particular, appellant maintained that he had no understanding of any justifiable reason for the trial court's order that he be chained during the guilt phase of the trial, despite the two day hearing and the numerous witnesses who testified, and despite appellant's acknowledgement of all of the problems alleged against him with jail staff. The prosecutor's question was plainly argumentative, but given the factual background from which it arose, the jury fully understood its implications. As those implications were arguable in closing argument, and arose from facts in evidence, no conceivable prejudice is shown.

H.1.  Appellant next objects to the prosecutor's argument that, in light of the Hickey, Barnes, and Banks murders, "the defendant should die for anyone (sic) of those murders." (RT 23018.) After objection, the trial court stated "the jury is instructed on the law. They will follow the law. They know what the facts are." (RT 23019.) Despite this admonition, appellant maintains prejudice occurred.

Appellant argues that because the Banks killing was not charged as a capital murder, but was only a circumstance in aggravation, the prosecutor's comment was incorrect. As the court noted, the jury was fully instructed on the law, on aggravation and mitigation, and on their

325

duties. The prosecutor's brief comment was not likely to affect that determination.

At any rate, we are not convinced that the comment was error. Appellant forgets that the jury had already found appellant guilty of the first degree murder of both Barnes and Hickey. If the jury considered the Banks murder such a heinous murder in itself that it was such a strong aggravating factor that it outweighed all mitigation, the jury could properly have decided on death because of that murder, even without the additional aggravation of the circumstances of the Barnes and Hickey homicide. Appellant cites no case to the contrary. No issue is raised.

2. The prosecutor referred to threats made by appellant against jail personnel, and stated "Well, you know, in this business, I never talked to Mr. Dikeman about it, but we . . . threatened all the time. And every time I've been threatened -- 23024.) Defense counsel then objected on the ground that the prosecutor was arguing facts not in evidence and the objection was sustained. Appellant argues that the jury must have understood that the prosecutor was implying that he had been threatened in this case. It is simply clear that no such implication was intended. Had defense counsel thought such was the prosecutor's intent, he could have asked for an admonition by the trial court stating that there had been no such threats in evidence, and that the prosecutor would have proved them had they in fact occurred. No prejudice is shown.

At any rate, appellant shows no prejudice even had the jury drawn the inference appellant fears. This jury, after all, had just convicted appellant of cold-bloodedly murdering the father of a gang member for testifying in court against another gang member. The prosecution witness Clifford Smith had been shown to have threatened the prosecution investigator Agent Tulleners with death should anything occur to him or his family. (RT 16347.) Thompson and Smith demanded very little of the prosecution other than immunity and absolute protection from murder for them and their families from remaining AB members, to the extent that they were forced to be housed in protective custody, where even their food was tested before they ate it. Speculation about whether the prosecutor had been threatened by someone other than appellant would have added very little to these facts. No significant issue was raised.

326

3.  In his closing argument the prosecutor discussed the fact that appellant's family had come in and testified that they loved him and thought he should be spared.  The prosecutor told the jury "I think it's perfectly natural and you'd do the same thing" in the same circumstances.  (RT 23205.)  The prosecutor later continued:

"But what I want to know is, what I want to hear or what I was waiting to hear and what I never heard, was reasons why you should show Curtis Floyd Price any mercy at all, over and above the mercy that, you know, should be shown to the families -- surviving families, friends, relatives, et cetera, of all the people that he's killed.

"Give me something, Mr. Price, to show this jury why they should not render a verdict of death.

"(Pause.)"  (RT 23026.)

Appellant assigns this rhetorical question as error.  We fail to perceive the prejudice.  Appellant had had the best part of a year to place his version of the facts, as well as his version of most every detail of his previous life, before the jury.  Appellant's argument is baseless on its face.

Appellant asserts that this rhetorical question was in response to an exchange several pages earlier in the argument:

"This is a tactic that was used during the guilt phase of the trial which evidently didn't work.

"I mean, 'I'm on trial for life -- for my life.'  You know, the least you can do is look remorseful.  Ask you people to spare his life.  But no --

"THE DEFENDANT:  Let me read my statement.

"THE COURT:  Mr. Price, there isn't any need for any statement from you.

"THE DEFENDANT:  Proves he's a liar.

"THE COURT:  Mr. Price, you'll be quiet or you'll be removed.

"THE DEFENDANT:  Excuse me. ·

"THE COURT:  Proceed, Mr. Bass."  (RT 23022-3.)

At any rate, it is well settled that the prosecutor may comment on the demeanor of a testifying defendant.  (*People v. Heishman* (1988) 45 Cal.3d 145, 197; *People* v. *Adcox* (1988) 47 Cal.3d 207, 258.)

Appellant testified here and so placed his character at issue.    His demeanor during other portions of the trial was relevant.

Appellant argues that the jury must have believed that appellant was at a loss for words as to why he deserved mercy.   Anyone reading even a portion of this case's transcript would know that appellant was never at a loss for words, and that his failure to reply was directly attributable to the trial court's threat to remove him.   No issue is shown.

## XXVIII.
### THE COURT PROPERLY EXCLUDED CERTAIN JAIL HOUSE WRITINGS OF APPELLANT AS MORE PREJUDICIAL THAN PROBATIVE, AND AS BEING CUMULATIVE TO THE LARGE MASS OF WRITINGS BY APPELLANT ALREADY IN EVIDENCE

A.   In evidentiary arguments at the end of the penalty phase, appellant offered 13 documents written by appellant from the county jail. These documents consisted almost entirely of vituperations justifying his own behavior toward the jail staff, and which repeatedly asserted the unfairness and prejudice of the trial court. (Defense Exhibit FFFFFFF (hereafter 7F); CCT 5497-5519.)   The prosecutor objected to these documents as hearsay and as cumulative.  Defense counsel pointed out that at the penalty phase nearly anything that can give an indication of the character of the defendant is relevant and admissible.  Defense counsel argued that the writings showed remorse, that they showed he had the ability to communicate, and that he had redeeming qualities, including the ability to write a book about his life in prison as he testified he planned at the penalty phase.  (RT 22297; CT 22732-3.) The prosecution noted that the writings being offered in 7F were exclusively concerned with jail conditions and the injustice of the trial court's orders.  The court noted that as to the arguments about remorse and jail conditions, the documents were hearsay.  As to the other defense theory for admissibility, the fact that the letters gave an indication of appellant's writing aptitude, the court noted the letters also gave a false indication of the fight over jail conditions.  In order to give a fair impression to the jury, the court noted that the prejudice involved in the specific documents of 7F could be ameliorated by adding other documents written by appellant.  Ms. Klay asked, "Is the court offering those as evidence against Mr. Price?" (RT 22735.)  The court replied that it was merely attempting to allow appellant to put on the requested evidence by ameliorating the prejudice involved.  The court concluded that it did not want to argue with Ms. Klay, and that it would consider the submitted items on their own merits.  The court stated "I don't want to argue with you.  . . . If you don't want to admit the rest of them on your motion, that's fine.  I'm not going to interfere with the presentation of your case." (RT 22736.)  Shortly thereafter, Ms. Klay noted that

there was a recent case in which this Court found error in excluding poems written by a defendant at a penalty phase. The trial court replied "Good. Give me the cite. I'll read it. . . . Probably solve a lot of your problems if that's the case." (RT 22740-1.) Ultimately, on June 20, 1986 the trial court issued an order deciding these evidentiary issues:

> "Defense Exhibit (7)F - These documents are excluded because they are hearsay and because they fail to present the complete picture. There is no mention of the 230 pages of testimony on November 19, 20, and 21, 1985; the daily waiver sheets sent to Mr. Price each day thereafter nor all of the preceding evidence which constitutes the totality of the situation re: Mr. Prices (sic) custodial status. To allow this selection of documents to be presented to the jury would place the Jury in the position of being mislead (sic)." (CT 10709.)

Given the ruling of *People* v. *Harris* (1984) 36 Cal.3d 36, 68, the case Ms. Klay no doubt was referring to, the evidence admissible during a penalty phase to show positive aspects of the defendant's character is very broad. Based on appellant's presentation of the record, one might wonder if the trial court were too severe in restricting all such evidence. In fact, the record shows that the trial court's action was beyond reproach.

What appellant does not mention is the great mass of personal writings in appellant's own hand which were in fact admitted and given to the jury. Included in these was exhibit 7(I), entitled "Shorty and the Apple Orchard," a short story about appellant as a child riding a horse; exhibit 7J, an approximately 20 page story about everyday life in prison titled "Chapter 2 San Quentin State Prison 1970-71." (CCT 1193); exhibit 7K, an introspective piece of philosophy entitled "'A Boxcar Realization' for Anna Klay" consisting of a 3-page exploration of the emotional trauma of crime for the victim (CCT 1211); exhibit 7L, a 2-page letter to "Dick" apologizing in detail for an argument (this was probably addressed to defense investigator Dick DeLong) (CCT 1214); exhibit 7O, a 7-page letter written to a middle aged man of appellant's acquaintance who was threatened with imprisonment for the first time in his life (CCT 1216) (this letter was discussed at length by defense counsel in closing argument); exhibit 7Q, a short story titled "Incorrigible" apparently intended as a heartrending account of harsh justice as seen

through the eyes of appellant as a boy (CCT 1223); exhibit 7R, an essay titled "The Kind of Juror I Would Like", an in-depth examination of the characteristics appellant desired in a juror, apparently intended to show his sense of honor and fair play (CCT 1228). Obviously this mass of extremely personal writings better showed "Price's ability to express his feelings in writing [as] a unique aspect of his personality that demonstrated his life was worth saving" (AOB 858) than the venomous writings berating the judge's rulings concerning the jail conditions. Obviously those writings were excluded properly both on the ground of excessive prejudice and as cumulative. No error can be shown in this record.

B. Ricky Carpenter was thoroughly impeached as to his shaky position on parole. Carpenter admitted at the penalty phase being an accomplice in the Banks killing in San Quentin, and he implicated appellant as having done the actual stabbing. (RT 22620 et seq.) Carpenter testified that he was currently on parole and that he had been promised nothing for his testimony. Carpenter admitted that he had received immunity for the testimony and that he had received about $800 for relocation of his family. (RT 22620-1.) Carpenter also testified on the collateral matter that he had not used drugs or illegal substances since February of 1986, several months before his June 1986 testimony. (RT 22657.)

Carpenter's parole agent Shirlee Abdulhafiz testified out of the jury's presence. She testified that Carpenter had had positive test results for morphine and cocaine in April, May and June of 1986, although only the May test had been communicated to Carpenter. (RT 22802-3.) Ms. Abdulhafiz stated that after she pointed out puncture marks and scabs on Carpenter's hand, Carpenter admitted use of opiates. (RT 22806-7.) Abdulhafiz also stated that Carpenter had failed to verify his employment with a pay stub or some other document as she had requested of him.

After the preliminary testimony, the trial court ruled that the drug evidence was relevant to impeach Carpenter's direct testimony that he did not use drugs. However, the trial court excluded the information about the lack of verification of employment. We must immediately note that defense counsel did not object to this exclusion. The issue was waived.

Substantively, appellant's arguments are equally as weak. Ms. Abdulhafiz testified that in fact Carpenter, as a result of the May 13 drug test, was in violation of his parole. Carpenter was so notified. However, the final decision of the parole agency was that Carpenter "was in violation of his parole. And we elected to continue him on parole with the stipulation that he enter a detox program." (RT 22813.) Thus the jury was fully conversant with all of the particulars of Carpenter's parole, and with all possible pressures on him to testify in a given manner. The lack of work verification was subsumed under the ruling on the more serious charges. Appellant is able to raise no issue on these grounds.

## XXIX.
## EXCLUSION OF CERTAIN DEFENSE EVIDENCE
## IN MITIGATION WAS PROPER

A. Appellant protests the court's handling of the testimony of Pat Manuel, a dietician, in two respects..

1. Appellant complains the trial court did not allow Ms. Manuel to tell the jury why appellant was vegetarian. Ms. Manuel did testify that appellant was in fact a vegetarian. The prosecution objected to the question as to why appellant was a vegetarian as hearsay. The court granted the objection. (RT 21886.) The ruling was correct.

First, obviously the reasons told Ms. Manuel by appellant for his vegetarianism were hearsay. Appellant was quite capable of, and did, testify as to those reasons during the penalty phase. (RT 22377.) Ms. Manuel's opinion of appellant's motivation was inadmissible. Also, the reason for appellant's vegetarianism was irrelevant to the discussion with Ms. Manuel, which involved appellant's mental and physical health. In context, the question was irrelevant as well as inadmissible hearsay. Defense counsel never explained any other reason for its admissibility.

2. Appellant protests Ms. Manuel was not allowed to testify on the relation between appellant's diet and his decision not to attend the guilt phase. The prosecutor objected to such testimony, arguing in essence that a dietician was not a qualified psychologist, and that Ms. Manuel was not qualified to discuss the issue. The trial concluded: "Put her on. Qualify her and let us know what she's going to say. If she's qualified, she is, if she is, if she's not, she's not." (RT 21874-5.)

Ms. Manuel testified as to appellant's diet. She stated it was repetitive, and inadequate, in part due to limitations on the jail kitchen, and because of appellant's refusal to eat meat. (RT 21888-9.) Ms Manuel concluded:

"THE WITNESS: . . . The effects that I believe Curt had was anxiety and disorientation as partly a result of the B vitamins that, I believe, he had been depleted through a very poor diet and through a stressful situation and also just a lack of calories being a weakness and, I believe, that says what I wanted it to.

"BY MS. KLAY: Q. Are there any emotional or mental consequences that you're aware of regarding the effects of a diet such as Curt had?

"A.  Certainly inadequate food intake results in a lack of
clarity of thinking, a weakness.  Just a general debilitation, but
that definitely extends into the mental areas also." (RT 21891.)
The relation defense counsel intended to draw between appellant's diet
and appellant's decision not to come to court is not clear.  If it was
defense counsel's position that appellant's decision not to attend was a
rational one, which is what appellant asserted in his testimony at the
penalty phase (RT 22347 et seq.), then no opinion as to appellant's
mental state was relevant.

If, on the other hand, defense counsel sought to show that
appellant's decision not to attend was an irrational one, sparked by a
diet which left appellant incapable of reasoning, the court was correct in
stating defense counsel had failed to qualify Ms. Manuel to give such an
opinion.  Ms. Manuel had testified in general terms that a poor diet can
lead to a irrationality.  Defense counsel did not ask Ms. Manuel whether
the decision not to come to court was affected by such factors.  Indeed,
Ms. Manuel had seen appellant only once, over a month before the
decision not to come to court.  (RT 21882, 21888.)  Thus, in addition to
being professionally unqualified to render a psychological opinion, Ms.
Manuel was also factually unqualified because of unfamiliarity with the
case.  Defense counsel in fact conceded that Ms. Manuel was not
qualified to testify on the relationship between diet and appellant's
violence in jail.  Failure to ask the question as to the relation between
diet and the decision not to testify waived the issue.  At any rate, the
evidence was not admissible.

B.  Appellant entitles his next argument "The Defense Was
Improperly Precluded from Presenting Evidence That Counselor Helen
Vatcher Had Seen Curtis Price Crying." (AOB 866.)  Appellant claims
that evidence that he was crying was relevant to his character and that
exclusion of such evidence would have been error.  The testimony of
Mrs. Vatcher was as follows:

"BY MRS. KLAY:  Q.  Miss Vatcher, did you ever see
Mr. Price cry?

"MR. BASS:  Objection.  Irrelevant.

"THE WITNESS:  Yes, I did.

"MS. KLAY:  It's not irrelevant, your Honor.

"THE COURT:  Sustained.

"BY MS. KLAY:  Q.  Did you ever see him in what you would consider an extremely depressed state?

"A.  Yes, I did.

"Q.  Did you ever see him express emotional pain?

"A.  Um-hum.  Yes, I did.

"Q.  Did you ever see him express extreme emotional pain?

"A.  Yes.  <u>He cried with me</u>."  (RT 21933-4; emphasis added.)

335

## XXX.
## APPELLANT'S ARGUMENTS ABOUT LINGERING DOUBT ARE UNSUPPORTED BY CALIFORNIA LAW

### A.    There is No Requirement in California Law for Instruction on Lingering Doubt

Appellant next argues that although he did not request it below, he was entitled to a sua sponte instruction that lingering doubts from the guilt phase may be considered in the penalty phase to weigh against the death penalty. Appellant's arguments are without legal support.

In *Franklin* v. *Lynaugh* (1988) ___ U.S. ___, 101 L.Ed.2d 155, 108 S.Ct. 2320 the Supreme Court rejected the argument for an eighth amendment constitutional right to consideration in the penalty phase of lingering or residual doubt as to guilt. In *Franklyn* "a majority agreed that 'residual doubt' as to . . . guilt was not a constitutionally mandated mitigating factor." (*Penry* v. *Lynaugh* (1989) ___ U.S. ___, 109 S.Ct. 2934, 2948.)

This Court recently treated a similar issue and stated that had defendant requested instructions on lingering doubt "we might seriously consider whether refusal to give such instruction was error." (*People* v. *Thompson* (1988) 45 Cal.3d 86, 134-5.) This dictum plainly implies that failure to request such instruction waived the issue.

The cases appellant cites do not support his precise point. *People* v. *Fields* (1983) 35 Cal.3d 329, 352 merely stated in passing that a single jury at both the penalty phase and guilty phase would "guarantee" that lingering doubts of the jurors in the guilty phase would be considered in the penalty phase. However, the court was merely making the point that such a process could be salutary and so could be considered by the state. *Fields* in no way advanced the proposition that such consideration was necessary. (*People* v. *Keenan* (1988) 46 Cal.3d 478, 531, n. 24.) Similarly, the strongest statement in *People* v. *Terry* (1964) 61 Cal.2d 137, 145-7 is that the trial court is prohibited from instructing a jury that it cannot consider lingering doubts. Here, as appellant concedes, the trial court specifically told the jury, including the

new alternate, that the guilt phase evidence could be considered. This is all that is required by the California cases. No error is shown.[74]

Lingering doubt is not a statutory factor in mitigation, the failure to instruct on which could be federal constitutional error. Nor is there any state rule requiring such instruction. We would argue that the concept is foreign to California jurisprudence. As the court below stated, proof beyond a reasonable doubt is the final level of proof in this state. Any remaining doubt is irrational doubt, and decisions on life or death should not be based on non-rational factors. We do not think it wise or proper to encourage such irrational decision-making in the penalty phase. No error is shown.

## B. No Instruction on Lingering Doubt or on Redeliberation From Scratch is Required When An Alternate Juror is Substituted at The Commencement of Penalty Phase Deliberations

Appellant also argues that when an alternate juror was seated at the penalty phase, the jury should have been instructed to recapitulate its entire guilt phase deliberations from scratch. Appellant cites as authority for this position *People* v. *Collins* (1976) 17 Cal.3d 687. That case contains no such holding.

This court has spoken on this precise subject:

"Defendant argues the court failed to follow the mandate of *People* v. *Collins* [*supra*] because it did not instruct the jurors to 'disregard the earlier deliberations as if they had not been had.'

"*Collins* requires the trial court to instruct the jurors to begin deliberations anew if substitution becomes necessary after the jury has begun its deliberations. (*Ibid.*) Here, the alternate juror joined the panel of jurors before the penalty trial began, and hence, before the penalty phase deliberations began. Under these circumstances, the *Collins* instruction was not necessary to insure the preservation of the 'essential elements of trial by jury. . . .'" (*People* v. *Brown* (1988) 46 Cal.3d 432,

---

74. We note that, as we discussed in Argument XXII, section F appellant's penalty phase testimony greatly <u>increased</u> evidence of his guilt.

460-1; accord *People* v. *Hernandez* (1988) 447 Cal.3d 315, 339; see also *People* v. *Keenan* (1988) 46 Cal.3d 478, 531, n. 24.)

Second, defendant has no constitutional right to a jury's consideration of lingering doubts. In addressing the constitutionality of seating an entirely new jury at a penalty phase retrial, the Supreme Court stated in *Franklin* "we are quite doubtful that such 'penalty-only' trials are violative of a defendant's Eighth Amendment right. Yet such is the logical conclusion of petitioner's claim of a constitutional right to argue 'residual doubts' to a capital sentencing jury." (*Franklin, supra*, 101 L.Ed.2d 155, 165, n. 6.)

Finally, neither *Fields*, *Terry*, nor any other California case holds that appellant has a right to the determination of lingering doubts in the penalty phase, much less a sua sponte instruction thereon. The jury here was specifically encouraged to reconsider guilt phase evidence. This was a jury which sent innumerable requests to the court and showed no hesitation in requesting information on issues on which it had doubt. Appellant points to no request on the issue of whether lingering doubts from the guilt phase could be considered. No error is shown.

## XXXI.
## INSTRUCTIONS ON EVIDENCE OF OTHER CRIMINAL ACTIVITY BY APPELLANT WERE CORRECT

Appellant argues that the penalty phase instructions were faulty. Appellant points out that when the court instructed that the Banks killing could be considered under section 190.3(b) if proven beyond a reasonable doubt, the court instructed only on premeditated and deliberated murder, and omitted instruction on second degree murder or voluntary manslaughter. Appellant claims the omission of instruction on these lesser offenses was error.

Once again, the record throws light on the subject. During the penalty phase instructional discussions, the court indicated it did not intend to instruct on degrees of murder, but merely on murder as a killing with malice, express or implied. The court also stated "To get right down to it, I don't think there has to be the proof of a murder. There has to be proof of an assault with a deadly weapon." (RT 22781.) This was, of course, a correct statement of law. Once the acts were shown in a non-misleading way to be criminal, the jury was free to consider them. (*People* v. *Adcox* (1988) 47 Cal.3d 207, 256 (where facts are unclear, as between whether appellant was trigger man or non-trigger man, specific instructions may be necessary).) Here, if the jury had determined that appellant committed an assault with a deadly weapon on Banks, it would have been free to consider the additional circumstances of the crime, including Banks' death. The legal classification of the acts was minor.

However, defense counsel insisted that the ante be raised. Defense counsel requested that before the jury be allowed to consider the incident, it decide that the prosecution theory was true and that appellant premeditated and deliberated the killing of Banks.

"MR. DePAOLI:  But in light of the allegations that there was a murder under the theory presented by the prosecution, the law requires them to prove murder beyond a reasonable doubt or it can't be a circumstance in aggravation.

"THE COURT:  That's true.  I don't know why we need deliberated and premeditated given.

"MR. DePAOLI:  I don't know there can be a murder without provocation (sic) and deliberation.

339

"MR. DIKEMAN: I mean, under the theories of this case.

"THE COURT: Well, the elements are that somebody was killed, it was unlawful, and that it was done with malice aforethought. Malice aforethought is express when it is manifest when there is an intention unlawfully to kill.

"I thought that's what Mr. Carpenter said was occurring.

"MR. DIKEMAN: Well, that's -- that's what I think was occurring.

"THE COURT: Okay.

"MR. DIKEMAN: We certainly don't have any evidence to the contrary.

"THE COURT: Do you want deliberate and premeditated, too? If you do, I will give it.

"MR. DePAOLI: I believe it has to be.

"THE COURT: All right. Fine. It will be given." (RT 22781-2.)

This Court has repeatedly held that, in the penalty phase, the trial court is under no sua sponte duty to instruct on elements of crimes proved under section 190.3(b). This Court has repeatedly endorsed "the proposition that a trial court has no sua sponte duty to instruct the jury as to the elements of all of the other crimes that have been introduced at the penalty phase . . . Normally, a defendant's failure to request instruction on the elements of the other-crimes aggravating evidence will preclude him from raising the issue on appeal." (*People* v. *Davenport* (1985) 41 Cal.3d 247, 281-2; *People* v. *Jennings* (1988) 46 Cal.3d 963, 985, n. 9; *People* v. *Milton* (1988) 44 Cal.3d 713, 754.)

Appellant did not request instruction on the elements of the lesser included offense of second degree murder. (Note there was no evidence of manslaughter, making instruction on that crime improper.) It was defense counsel's choice to invoke the all or nothing choice, and appellant cannot be heard to complain here.[75]

Any purported error would be harmless. The only possible error created by the instruction would have occurred if one or more jurors thought appellant guilty of something less than first degree murder, but considered the incident anyway, contrary to the instructions.

---

75. The instructions must have satisfied defense counsel, because there is no record of an objection or a request for further instruction on second degree murder.

340

But, what would be the consequences of such a misdeed?  No verdict or finding would have resulted.  The result would have been that <u>the juror considered the incident</u>.  But, it would be wholly proper for a juror to consider a second degree murder or an assault with a deadly weapon.  On this ground, no possible prejudice could result from the instruction.

Appellant's argument for prejudice is that wrongly classifying the crime as first degree murder would somehow convince the juror that its facts were more grave.  This is unlikely given that on appellant's theory of prejudice, the juror wrongly considering the facts would have believed that the crime was <u>not</u> really first degree murder.

At any rate, it is unlikely that the mere legal classification of the crime would alter the jurors' perception of its facts.  And, the real point is that on any theory, a juror could properly consider the incident as aggravation if he or she thought any violent crime at all was committed.  No conceivable prejudice is shown.

## XXXII.
## APPELLANT PINPOINTS NO CONSTITUTIONAL FLAWS IN THE CALIFORNIA CAPITAL SENTENCING PROCEDURES

Appellant produces a laundry list of alleged errors in the California capital sentencing procedure. Appellant's arguments for the most part contain within them their own refutation. We deal with them only briefly.

A. Evidence of unadjudicated prior crimes is properly admitted in aggravation and violates no requirements of fair trial, trial by an impartial jury, speedy trial, reliability, or double jeopardy. (*People* v. *Balderas* (1985) 41 Cal.3d 144, 204-5; *People* v. *Jennings* (1988) 46 Cal.3d 963, 980-1.)

B. Statutes of limitations do not apply to the use of prior unadjudicated criminal activity in the penalty phase under section 190.3(b). (*People* v. *Jennings* (1988) 46 Cal.3d 963, 981; *People* v. *Morris* (1988) 46 Cal.3d 1, 15; *People* v. *Frierson* (1979) 25 Cal.3d 142, 180.) There is no requirement of a finding beyond a reasonable doubt as to aggravating circumstances, the fact that aggravation outweighed mitigation, or that death was the appropriate punishment. (*People* v. *Allen* (1986) 42 Cal.3d 1222; *People* v. *Miranda* (1987) 44 Cal.3d 57, 99.)

C. There is no requirement of written findings, or of jury unanimity on aggravating factors. (*People* v. *Frierson* (1979) 25 Cal.3d 142, 179; *People* v. *Miranda* (1987) 44 Cal.3d 57, 99.)

D. Although it is improper for the jury to "double count" a single fact as both a circumstance of the crime under section 190.3(a) and other criminal activity under section 190.3(b), CALJIC 8.84.1 is adequate to avoid this problem. (*People* v. *Adcox* (1988) 47 Cal.3d 207, 272.) Such double counting will not be presumed unless the prosecutor expressly argues in favor of it. Such did not happen here. (*People* v. *Bonin* (1988) 46 Cal.3d 659, 703.)

E. There is no multiple use problem in using the same felony to support a felony murder theory, as a special circumstance, and as an aggravating factor under section 190.3(a). (*People* v. *Gates* (1987) 43 Cal.3d 1168, 1193, 1209 (same burglary used for felony murder, special circumstance and aggravating factor); see *Lowenfield* v. *Phelps* (1988) ___ U.S. ___, 98 L.Ed.2d 568, 582-3 (no constitutional bar against using same

felony as special circumstance and aggravating factor); *People* v. *Belmontes* (1988) 45 Cal.3d 744, 794-5.)

    F.  The fact that the trial court read the presentence report before ruling on the automatic motion for reduction of the death penalty does not constitute *Booth* error. (*Booth* v. *Maryland* (1987) 482 U.S. 496, 96 L.Ed.2d 440.)  "[A]bsent evidence in the record to the contrary, we must assume that the court was not improperly influenced by the report in ruling on the application." (*People* v. *Adcox, supra*, 47 Cal.3d 207, 274.)

        "Trial courts are generally presumed to have understood and followed established law (*Ross* v. *Superior Court* (1977) 19 Cal.3d 899, 913); having reviewed the record in this case, we conclude the presumption has not been rebutted. In stating the reasons for his ruling on the motion, the trial judge referred only to the evidence presented to the jury and did not indicate his decision was in any way influenced by the presentence report or the victim impact evidence it contained. (See *People* v. *Jennings, supra*, 46 Cal.3d 963, 994-995.)  Although the judge did state he had read and considered the presentence report, we assume he considered the report solely for the permitted purpose of sentencing on the noncapital offenses (i.e., robbery and possession of a concealable firearm by a convicted felon). (See *People* v. *Babbitt* (1988) 45 Cal.3d 660, 724-725.)" (*People* v. *Lang* (Crim. 24257, 12-12-89) 238 C.D.O.S. 8898, 8911.)

This language applies to our case, and covers any issue as to the statement by the victim's mother.  We note briefly that after living with the case for years and having continually dealt with appellant on extremely personal terms, it is inconceivable that any statement by Mrs. Moore could alter the trial court's opinion on any issue.

## XXXIII.
## APPELLANT'S CUMULATIVE ERROR ARGUMENT IS UNPERSUASIVE

Appellant finally argues that errors that were harmless in the guilt phase might effect the penalty phase determination and that any substantial error requires reversal of the entire judgment. We have addressed each of his arguments individually and collectively in previous sections. We concluded in those sections that any error in this trial was minor. At any rate, given the enormous amount of evidence placed before the jury, it would take an error of truly major proportions to have had any effect on the jury's final determination, either in the guilt phase or the penalty phase. Appellant's arguments are unconvincing.

## XXXIV.
## THE DETERMINATE TERM

Finally, appellant attacks certain aspects of his determinate sentence. Appellant received the upper term of five years for the Triplex robbery, with a two year enhancement for gun use under section 12022.5. Consecutive terms of 1/3 the mid term were imposed for Count VII, receiving stolen property, and Count IX, burglary of the Hickey apartment. These terms were eight months and sixteen months respectviely. Finally, a one year enhancement was assessed under 667.5 for a prior prison term. The total determinate term was ten years. (CT 10805.)

1. Appellant was sentenced to the upper term of five years for the robbery of the Triplex Theater. The trial court stated seven factors in aggravation, citing to the applicable sentencing rule numbers:

"1. 421(a)(1) -    crime involved threat of great bodily harm.

"2. 421(a)(2) -    defendant used a weapon.

"3. 421(a)(6) -    the defendant suborned perjury of Rebecca Williams

"4. 421(a)(8) -    the planning, casing, and use of disguises indicates a very high degree of sophistication.

"5. 421(a)(10) -  the crime involved the taking of $7000.00.

"6. 421(b)(1) -    the defendant has engaged in a pattern of violent conduct which indicates that he poses a most severe threat to society.

"7. 421(b)(2) -    the defendant's prior convictions are numerous and of an increasingly serious nature." (CCT 10804-5.)

Appellant acknowledges that four of the seven reasons are unassailably correct. We concede that reason number 2, use of a weapon, was improper, given the imposition of the use enhancement under section 12022.5. (CT 10815.) As to the subordination of perjury of Rebecca Williams, we believe ample substantial evidence supports the trial's courts finding. Reasonable inferences from the record will support a finding of a sentencing factor. (*People* v. *Hall* (1988) 199 Cal.App.3d 914, 922.) The standard for review of the weighing of sentencing

factors is the preponderance of the evidence standard.  (*People* v. *Ramos* (1980) 106 Cal.App.3d 591, 606.)

Here, it was clear that Williams lied on numerous accounts. The most crucial point was appellant's activities on February 16-20 about which Williams' story was rife with lies.  When police authorities requested an interview with Williams, she first phoned appellant's attorney, and then refused to speak.  Appellant was of course aware of Williams' mendacity on the stand, and Williams was, of course, a defense witness.  The trial court's inference of subornation of perjury was justifiable.       Finally, we will not spend long disputing whether appellant's gun use was a dual use with the factor of threat of great bodily harm.   The fact remains that the court stated five valid aggravating factors.  Further, as appellant omits to mention, the court also stated "the court finds no circumstances in mitigation and therefore finds the circumstances in aggravation are the only ones present." (CT 10805.)  On this record, any error would be harmless. (*People* v. *Wright* (1982) 30 Cal.3d 705, 714 (*Watson* test applies to errors in sentencing).)

2.  Appellant's next argument is that Penal Code section 654 bars consecutive sentences in a felony murder case for both the murder and the underlying felony.   Appellant argues that the consecutive sentences for the Hickey murder and the burglary which led to the felony murder conviction were improper.   Under the case law his argument is correct. (*People* v. *Eddahbi* (1988) 199 Cal.App.3d 1135, 1143.)  Sentence on the burglary should be stayed under section 654.

3.  Finally, appellant asserts that using the Barnes murder to render the Hickey murder a capital offense, and then separately sentencing on the Barnes murder was a violation of section 654. *Lowenfield* v. *Phelps*, *supra*, ___ U.S. ___, 98 L.Ed.2d 568, 582-3 stated that the use of a fact as a special circumstance was merely a narrowing of the range of crimes punishable by death.  As such, use of the fact underlying the special circumstance to increase punishment in other ways was not a forbidden dual use.  If the use of a factor as a special circumstance does not constitute punishment, the additional sentence of a murder does not constitute double punishment under section 654.

## CONCLUSION

Accordingly, for the reasons stated, respondent respectfully asks that the judgment be affirmed.

Dated: January 24, 1990.

Respectfully submitted,

JOHN K. VAN DE KAMP
Attorney General of the State of California

RICHARD B. IGLEHART
Chief Assistant Attorney General

JOHN H. SUGIYAMA
Senior Assistant Attorney General

RONALD E. NIVER
Supervising Deputy Attorney General

*David Rose*

DAVID H. ROSE
Deputy Attorney General

**Attorneys for Respondent**

DHR:cab
SF86XS0009

## DECLARATION OF SERVICE BY MAIL

Case name:   __People v. Curtis Floyd Price__   No.: ___S004719___

I declare that:

I am employed in the County of San Francisco, California.  I am over the age of 18 years and not a party to the within entitled cause; my business address is 350 McAllister Street, Room 6000, San Francisco, California  94102.

On ___January 26, 1989___, I served the attached
          (Date)

RESPONDENT'S BRIEF

in said cause, by place a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Francisco, California, addressed as follows:

MARK E. CUTLER
Attorney at Law
P. O. Box 172
Cool, CA  95614

FIRST DISTRICT APPELLATE PROJECT
730 Harrison Street, Suite 201
San Francisco, CA  94107

HONORABLE TERRY R. FARMER
District Attorney
County of Humboldt
3033 "H" Street
Eureka, CA  95501

DONALD R. MICHAEL, Clerk
County of Humboldt
825 Fifth Street
Eureka, CA  95501

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed at San Francisco, California, on ___January 26, 1989___.
                              (Date)

___Cheryl A. Branin___
     (Typed Name)

_Cheryl A. Branin_
        (Signature)

DSM 1 -SF                                              (8/84)