KAREN S. SORENSEN (CA Bar #75072)
ATTORNEY AT LAW
PMB 394
336 Bon Air Center
Greenbrae, CA 94904-3017
Telephone: (415) 925-1530

ROBERT L. MCGLASSON (GA. Bar #492638)
ATTORNEY AT LAW
1024 Clairemont Ave.
Decatur, GA 30030
Telephone: (404) 373-9334

Attorneys for Petitioner

CURTIS FLOYD PRICE

RECEIVED
SEP - 5 2006
RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CURTIS FLOYD PRICE,                    ) Case No. C-93-0277-PJH
                                       )
            Petitioner                 )
                                       ) **DEATH PENALTY CASE**
      vs.                              )
                                       )
ROBERT L. AYERS, Acting Warden of      )
San Quentin State Prison               )
                                       )
            Respondent                 )
_____)

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS

VOLUME II

(of 4 Volumes)

# CLAIM V

## ANOTHER MEMBER OF THE JURY WAS BIASED AGAINST THE DEFENSE AND DISHONEST ON VOIR DIRE, IN VIOLATION OF PETITIONER'S RIGHTS TO A FAIR TRIAL BY AN IMPARTIAL AND UNBIASED JURY, AND TO DUE PROCESS OF LAW

567.     Debra Kramer, the foreperson of the penalty phase jury in this case, was biased against Mr. Price, and failed to reveal on voir dire pertinent information about her prior relationship with defense counsel, depriving petitioner of a full and complete voir dire, and a fair trial by an impartial and unbiased jury, in violation of his rights as guaranteed by the Fifth, Sixth and Eighth Amendments to the U.S. Constitution.

568.     Petitioner alleges the following facts in support of his claim for federal habeas corpus relief on the grounds specified above, among other facts to be presented after he has access to discovery, to an evidentiary hearing and to adequate funding.

569.     Debra Kramer was one of the members of the venire in this case.  Despite defense counsel's challenge for cause, she ultimately served on the jury, during the guilt/innocence phase as an alternate, and during the sentencing phase, as the foreperson of the jury.

570.     Years before the voir dire and trial in this case began, and shortly after Mr. Price was arrested, Ms. Kramer's husband, Dr. Richard Kramer, a local Eureka psychologist, was called in by the prosecutor's office to assist them in the investigation of the case.  Dr. Kramer was often relied upon in the Humboldt county criminal justice system to do forensic work for the courts and law enforcement.  In this case, he was asked to explain away the fact that suspect Berlie Petry, the abusive boyfriend of the deceased, Elizabeth Hickey, had flunked two police-administered polygraph examinations.  RT 8003.  Apparently he completed his work to the

prosecution's satisfaction, as Mr. Petry was never charged with the murder of his girlfriend.

571.   Some time later, but again years before the voir dire or trial process in this case began, Dr. Kramer had formed very clear and distinctly negative opinions of the defendant in this case, Curtis Price.   Defense trial counsel Anna Klay filed a declaration in support of a motion for bail on August 16, 1985, in which she related facts of Dr. Kramer's feelings about Mr. Price.  CT 7347-7351.  In that declaration she described how Mr. DePaoli had asked her to be co-counsel in the case, and about the reaction she received from friends in the community.  In particular, she stated that Dr. Richard Kramer had "expressed grave concern to myself and my husband that I should never be alone with Mr. Price as he would surely harm me."  Id.  When she questioned him about his concern, he said that he based his views on what he had heard from local law enforcement.  CT 7349.

572.   Ms. Kramer was undoubtedly privy not only to her husband's involvement with the prosecution in this case, but also to her husband's views towards Mr. Price.  In the first place, from the beginning this case was a well publicized, high profile event in the small community of Eureka, California and the surrounding communities.  See Claim XIII infra.   At the time Dr. Kramer performed his work for the prosecution, and shared his concerns about petitioner's propensity for violence with Ms. Klay, there is no question Debra Kramer would have been already aware of the case, given its local notoriety.  More importantly here, given the nature of the case and of Dr. Kramer's connection to it, and given the fact that Debra Kramer was not only his wife, but also his office secretary and assistant, see RT 7392, it is clear that the couple would have spoken to one another about the case and about Dr. Kramer's personal involvement in it and his views about petitioner.  And critically here, at that time, years before the beginning of jury selection, Ms. Kramer would not have known that she was to be called for jury service and

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH
- 266 -

would actually serve on the jury in this case.

573.    Voir dire in the case began in June, 1985. On September 12, 1985, Ms. Kramer was initially questioned. Ms. Kramer testified that she was married to Dr. Richard Kramer. RT 7392. As noted previously, she was also Dr. Kramer's secretary. Id. Ms. Kramer testified that she was aware that Dr. Kramer had already served as an expert consultant for the Humboldt County District Attorney's office in the investigation of the murder of Elizabeth Hickey. Id. She did not mention that Dr. Kramer had already formed very negative views of Mr. Price.

574.    During this initial voir dire examination, Ms. Kramer revealed that she had known Bernard DePaoli, petitioner's trial counsel, because she had been a victim in a criminal matter in which Mr. DePaoli was the prosecutor. RT 7394. She said nothing more about her relationship to Mr. DePaoli. Ms. Kramer did testify that she was Jewish, and that it was her understanding that the Aryan Brotherhood was an anti-Semitic organization. RT 7393. For all of these reasons, Ms. Kramer expressed reservations about serving on the jury in petitioner's case. RT 7394.

575.    The defense immediately moved to challenge Ms. Kramer for cause. Id. The prosecution opposed the challenge, and the trial court denied the challenge and ordered that Ms. Kramer fill out the longer juror questionnaire so that she could be subject to further voir dire. RT 7395.

576.    Approximately one month later, on October 16, 1985, after her husband had been appointed to conduct a mental competency evaluation of Mr. Price and had completed his report on the issue, and after the defense had subpoenaed any records Dr. Kramer had concerning his consultation with the prosecution in the case, Ms. Kramer was again subjected to further examination on voir dire. RT 7992. The court introduced Ms. Kramer noting that she was both Dr. Kramer's wife and his secretary and receptionist. RT 7991.

577. The defense first asked Ms. Kramer a series of general questions about whether there was anything she had thought of during the period between her first voir dire examination and the present that she wanted to reveal to the court:

> Q — All right. Having had the time between then and now, did
> any of the questions occur to you that you answered at that time
> that may cause your answers to be different today than they were at
> that time?
> Is there anything that you could think of that you wish you could
> have answered differently?
> A — On the questionnaire?
> Q — Yes.
> A — No.
> Q — Is there something else?
> A — Yes.
> Q — Could you tell us about it? RT 7992-7993.

578. Ms. Kramer then testified that the defense subpoena for records regarding her husband's consultation with the prosecution had come to her as the keeper of records in her office. RT 7993-7995, 8012-8013. She stated that she read through the subpoena when she received it and then had her husband deal with it. Id. She also recalled making an entry into the books as a "no charge" consultation matter. RT 7994, 8013. Finally, having read it, she was aware that the subpoena had to do with her husband's consultation with the prosecution regarding "the boyfriend in this case," Berlie Petry. RT 7994, 8012. She also knew that her husband had written a letter in response to the subpoena. RT 8013. No one asked her if she had

1 read her husband's response to the subpoena.

579. Ms. Kramer also testified that she was aware that her husband had been asked to counsel with Mr. Price at the request of the court for some reason of which she was allegedly unaware. RT 8011, 8014. In fact, because of her role as secretary and receptionist (and apparently bookkeeper), she knew that her husband had just received a check in the mail for his services the day before her testimony. RT 7993, 8011.

580. In the middle of questioning about the subpoena for records regarding the prosecution's use of Ms. Kramer's husband as an expert consultant in the case, the prosecutor objected to any further questioning along these lines, and the trial judge ordered the defense to move to another subject area of questioning. RT 7995. During his later explanation for this objection, the prosecution for the first time acknowledged that Dr. Kramer had in fact been consulted by Barry Brown, an investigator with the district attorney's office, about Berlie Petry's reactions to the two police-administered lie detector tests which he had previously failed. RT 8003.

581. In making a transition to general questions about the death penalty, Mr. DePaoli again asked Ms. Kramer if there was anything else elicited by the juror questionnaire which would cause Ms. Kramer to add anything to her previous testimony. She answered in the negative. RT 7995-7996.

582. Finally, once again, at the end of the defense questioning, Mr. DePaoli asked Ms. Kramer:

> Q -- Can you think of any other reason now as you sit there having
>
> read the questionnaire, having discussed the matter with me,
>
> having listened to the Court, where you think you could not be a

fair and impartial juror on any phase of this potential trial other

than what you've said?

A -- No.   RT 8002.

583.   Upon questioning by the trial judge, Ms. Kramer stated in several different ways that she did not feel she would be an appropriate juror in this case. She testified that the fact that her husband had been a "counselor at the request of the Court" would interfere with her ability to be a fair and impartial juror. RT 8014. She explained that with her working in her husband's office, and his having involvement in the case, "the chances are increasing that some sort of information would come across my desk..." Id. She also stated that if her husband testified she would be more likely to believe him because of their relationship. The court then informed her why her husband was called into the case by the court, namely, to consult on Mr. Price: "his present status and your husband's opinion of his status at that time." RT 8015. The court also informed her that her husband had issued a report; that it was not clear whether he would testify about its contents, but that, in any event, such testimony would be limited to Mr. Price's "particular condition on a particular day..." RT 8015-8016.

584.   Even when defense counsel attempted to characterize her testimony, suggesting that she would have no problem as a juror so long as her husband did not testify as a witness, Ms. Kramer still expressed reservations about being a juror in this case. RT 8016. Indeed, when limited to the simple issue of whether, in her own mind, she could be fair and impartial, regardless of all of the other factors, Ms. Kramer stated uncertainty about the matter. RT 8017. She reiterated that she might overhear a phone conversation in her husband's office, and that then "it could be a big waste of time and money for the courts" if she was serving on the jury. Id. She also worried that she might hear testimony that would jog her memory about something

else as yet unrevealed that would contaminate her as a juror in the case. Id.[114] Even when the prosecution attempted to rehabilitate her, Ms. Kramer continued to express clear reservations about her ability to be fair and impartial in this case. RT 8018-8020.

585. At the end of this second phase of her voir dire, the defense again moved that she be excused for cause. RT 8018, 8043-8047. The defense argued that Dr. Kramer might be called as a defense witness with regard to his use by the prosecution on Berlie Petry's failed polygraph tests, and as an expert in mitigation at the sentencing phase of the trial. Id.

586. Throughout the voir dire of Ms. Kramer, the prosecution continually opposed the defense challenges for cause. See e.g., RT 7394, 8047. In addition to the reasons that appear on the face of the record, the prosecutors had another reason why they felt she would make a good jury for the prosecution. Once again, although neither the prosecution nor Ms. Kramer revealed the fact, Ms. Kramer was at the time being assisted by the district attorney's office in collecting child support from her ex-husband, Robert Lee Balsley, Jr., the father of her child. Exhaustion Petn. Exh. 55 & Exh. 8 at 1.

587. On October 15, 1985, in a minute order the court denied the defense challenge for

---

[114] Her prediction was prophetic. During a subsequent voir dire, Ms. Kramer revealed that her husband, Dr. Kramer, worked with the local parole office, and that they were social friends with Dick Wild, a parole agent in that office. Ms. Kramer testified that she liked Mr. Wild. RT 9568-9569. Wild was well aware of the Price case, and in fact had assisted in Mr. Price's initial arrest. RT 80-89. Wild testified at the preliminary hearing, and he testified during the trial in this case about Mr. Price's arrest. RT 18515. In addition, several witnesses testified during the trial about Mr. Wild's assistance in the arrest of Mr. Price, and about his attitude that Curtis Price was one of the most dangerous persons ever to be released from the California Department of Corrections. RT 80-89, 94. Ms. Kramer also revealed that she had recently met Officer Randy Mendosa of the Arcata police department, who investigated the Village Liquors robbery with which Mr. Price was charged. RT 15687. Later during the trial, the court revealed that Ms. Kramer was a social friend of Dr. Kenneth Barney, who was a psychotherapist who had treated the victim, Elizabeth Hickey, before her death. RT 18181, 18216.

cause. CT 8109.

588.    When the ultimate jury was selected, the defense did not use a peremptory challenge against Ms. Kramer. RT 9728-9729. The record is silent as to why the defense, having twice sought to challenge Ms Kramer for cause and still having peremptory challenges remaining, did not exercise a peremptory challenge against her.

589.    The record thus reveals that Ms. Kramer was at the very least uncertain, if not uncomfortable, about being a juror in this case. What the record does not reveal, because Ms. Kramer chose to keep the facts concealed, was that she had even stronger reasons why she knew she should not be involved as a juror in this case.

590.    Although Ms. Kramer alluded to having known Mr. DePaoli when he prosecuted a rape case in which she was the victim, what she did not reveal, and what Mr. DePaoli also kept to himself, was the fact that he and Ms. Kramer had a brief romantic relationship at that time, and that Mr. DePaoli had provided financial assistance to her as well. Exhaustion Petn., Exh. 9 at 10-11. The scope of their personal relationship included going out on dates, dancing together, and some physical intimacy. Mr. DePaoli has described the relationship with Ms. Kramer as "sexually flirtatious." Id. at 10. Around the same time, Mr. DePaoli assisted Ms. Kramer financially by personally co-signing the note for her car loan. Id. [115]

_____

[115] Petitioner is informed and believes that it was not too long after DePaoli co-signed the note that Ms. Kramer stopped having any further contact with him. One likely explanation for the collapse of their relationship is that Ms. Kramer was not comfortable with DePaoli's sexual interest in her, and did not want to have anything further to do with him. She was after all recovering from the trauma of a brutal rape, and he was the prosecutor in that rape case. During petitioner's habeas investigation, he attempted to obtain a declaration from Ms. Kramer about her prior personal relationship with Mr. DePaoli, but Ms. Kramer refused. See Exh. Petn. Supp.
Footnote continued on next page.

591. Ms. Kramer failed to reveal the foregoing information during voir dire or in her jury questionnaire. See Exhaustion Petn., Supp. Exh 73.[116] This was a knowing and intentional omission on Ms. Kramer's part of material, relevant information that, had it been revealed, would have resulted in the trial court's having granted the defense's challenge for cause. In the first place, Ms. Kramer did reveal that she had known Mr. DePaoli because of a criminal matter in which she was the victim and DePaoli was the prosecutor, so it is clear she had not simply forgotten about her association with Mr. DePaoli.

592. Secondly, it is not the case that she had no opportunity to reveal the extent of the prior relationship between her and Mr. DePaoli. On three separate occasions during her voir dire the defense asked her in an open-ended way if there were any other facts she felt she should disclose about any of the matters that had been discussed in court or in the jury questionnaire. Each time she failed to mention the prior relationship with Mr. DePaoli.

593. Third, it cannot fairly be said that Ms. Kramer was unaware that her relationship with Mr. DePaoli was precisely the type of information which she was being asked to reveal (and which she should have revealed) on more than one occasion, both by the court, and by the parties, throughout the voir dire process. For this reason her failure to do so must be construed

---

Exh. 65. This is an indication that she was uncomfortable about what had occurred between her and DePaoli and did not view their prior personal involvement or Mr. DePaoli in a positive light.

[116] On her jury questionnaire, Ms. Kramer acknowledged that she knew both DePaoli and Anna Klay. See Exhaustion Petn., Supp. Exh. 73. One of the questions on the form asked whether the juror had any particular opinion about the defense attorneys or prosecutors one way or the other. Ms. Kramer answered yes to that question, but furnished no explanation. Id. During voir dire, neither the defense nor the prosecution asked her whether her opinion was favorable or unfavorable. On her questionnaire Ms. Kramer did indicate that she was satisfied with the ultimate conclusion in her rape trial but she did not indicate how she viewed DePaoli's handling of the case.

as a constructive act of intentional concealment.

594. Read separately or together, all of these facts demonstrate that petitioner did not receive a fair trial by an impartial jury in accordance with due process of law.

595. The Sixth Amendment right to a jury trial "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." Irvin v. Dowd, 366 U.S. 717, 722 (1961). "Even if 'only one juror is unduly biased or prejudiced,' the defendant is denied his constitutional right to an impartial jury." United States v. Eubanks, 591 F.2d 513, 517 (9th Cir. 1979), quoting United States v. Hendrix, 549 F.2d 1225, 1227 (9th Cir. 1977).

596. The U.S. Supreme Court has long held that a thorough voir dire examination serves to protect the right to an impartial trier of fact "by exposing possible biases, both known and unknown, on the part of potential jurors. Demonstrated bias in responses to questions on voir dire may result in a juror being excused for cause; hints of bias not sufficient to warrant challenge for cause may assist parties in exercising their peremptory challenges. The necessity of truthful answers by prospective jurors if this process is to serve its purpose is obvious." McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548, 554 (1984). In McDonough the Court held that a new trial should be granted where a petitioner demonstrates that "a juror failed to answer honestly a material question on voir dire" and "that a correct response would have provided a valid basis for a challenge for cause."

597. The concurring opinions in McDonough received a total of five votes, hence it is to them that we look for guidance on the precise scope of the ruling. Both concurring opinions hold that the actual, intentional honesty or dishonesty of a particular juror was not essential to a finding of juror bias sufficient to warrant a new trial. "[R]egardless of whether a juror's answer is honest or dishonest, it remains within a trial court's option, in determining whether a jury was

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH
- 274

biased, to order a post-trial hearing at which the movant has the opportunity to demonstrate actual bias or, in exceptional circumstances, that the facts are such that bias is to be inferred." Id. at 556-57 (Blackmun, J., with whom Stevens, J., and O'Connor, J. join, concurring) citing Smith v. Phillips, 455 U.S. 209, 215-16 (1982). The concurring opinion of Justice Brennan, joined by Justice Marshall, likewise held that juror bias can be "actual or implied", and that "[w]hether the juror answered a particular question on voir dire honestly or dishonestly, or whether an inaccurate answer was inadvertent or intentional, are simply factors to be considered in [the] determination of actual bias." 464 U.S. 548, 558 (Brennan, J., with whom Marshall, J., joins, concurring in the judgment). Thus a majority of the Court in McDonough agree that the dishonesty of the juror is not critical to the outcome in a case of juror bias, and that bias may be implied from the totality of the circumstances in some cases.

598. The principles set forth in McDonough have been interpreted to apply to both civil and criminal cases. See United States v. Aguon, 851 F.2d 1158, 1170 (9th Cir. 1988) (en banc). Moreover, the Ninth Circuit has acknowledged since McDonough that implied or inferred bias, apart from actual bias, may require a reversal where juror partiality can be presumed from the "'potential for substantial emotional involvement, adversely affecting impartiality,' inherent in certain relationships." Tinsley v. Borg, 895 F.2d 520 (9th Cir. 1990) (citations omitted).

599. In this case Ms. Kramer's responses on voir dire satisfy any possible applicable standard that may be gleaned from McDonough. In the first place, her failure to divulge information about her the nature and extent of her prior relationship to Mr. DePaoli can only be viewed as an act of dishonesty in light of the questions she was asked both in the lengthy juror questionnaires and on voir dire, as noted above. Had she revealed this information, she would have been excused for cause, especially given the remainder of her testimony on voir dire. For

this reason alone, a new trial should be granted.

600.    Moreover, the fact that Ms. Kramer did not reveal the nature and extent of her relationship with Mr. DePaoli and her financial involvement with the district attorney's child support office, when viewed in light of all of the facts which she did reveal on voir dire connecting her to the case and to the parties involved, are such as to require this Court to presume unfair bias in this case.

601.    Ms. Kramer must be presumed to have been biased in petitioner's case, where she failed to disclose the fact that she and the prosecutor in the rape case in which she was the victim, had unprofessional dealings with each other in the past, and that prosecutor was now serving as lead defense counsel for Mr. Price.  As noted above, it is not the case that she did not have more than enough of an opportunity to disclose this information.  Instead, on more than one occasion, she intentionally kept quiet about the matter.  Her silence should not be understood to mean that Ms. Kramer was biased in DePaoli's favor.  Petitioner is informed and believes that the opposite was in fact the case, and that rather than viewing Mr. DePaoli favorably, she was instead embarrassed by and uncomfortable with what had occurred between her and him in the past, which in and of itself is indication of her bias against him and therefore against petitioner.

602.    Ms. Kramer must also be presumed to have been biased here, where she intentionally failed to mention the fact that on May 15, 1985, just months before she appeared in this case as a prospective juror, the Humboldt County District Attorney's Office (which was prosecuting the case against petitioner) was appointed to enforce a child support order on her behalf against her former husband.

603.    Ms. Kramer must also be presumed to have been biased in this case because she was married to and worked for a psychologist who had significant personal and professional ties

to the case and to all parties involved in the litigation. Her husband, Dr. Richard Kramer, had consulted with the prosecution, had been an expert for the trial court on the issue of mental competency, and ultimately conducted psychological tests on Mr. Price for the defense in preparation for the sentencing phase of his trial. RT 21103-21113. As the office secretary, receptionist, and bookkeeper, Ms. Kramer admitted that she had seen several documents come through her husband's office relating to the case, including a subpoena with case-related information, a check from the court, and a reference to her husband's work for the prosecution. She herself felt these entanglements were sufficiently prejudicial and pervasive that she could not be certain of her objectivity in the case. And, as noted above, her husband's involvement and negative mind-set about Mr. Price was formed long before Ms. Kramer would have known that it would have been improper for her husband to have shared his knowledge and views about the case with her.

604. In addition, Ms. Kramer must be presumed to have been biased where her husband performed work for the local office of the state parole department in Eureka. One of its agents, Dick Wild, was heavily involved in the surveillance, initial apprehension, and arrest of Mr. Price. Wild felt Price was one of the most dangerous people in California, a feeling he readily expressed to other people. Wild was also a personal friend of the Kramer's. See Exhaustion Petn., Exh. 9 at 11. It is no surprise then, that Dr. Kramer had similarly strong negative views of Mr. Price, which he likewise felt free to discuss with others in the community and surely, with his own wife.

605. Ms. Kramer must also be presumed to have been biased in this case because she had been the victim of a brutal gang rape, and petitioner was on trial for the murder of Elizabeth Hickey, who had likewise been the victim of a brutal assault. Even though this case did not

involve any charges of sexual assault, petitioner would note that Hickey's body was found nude and laying spread out across her bed.

606. And finally, the presumption of bias should also arise from the fact that Ms. Kramer was Jewish, and she believed that the Aryan Brotherhood was a gang with strong anti-Semitic principles and beliefs.

607. Although Ms. Kramer served only as an alternate during the first phase of trial, curiously, when she was placed on the jury for the sentencing trial, she was elected foreperson. This fact shows that she obviously commanded the respect of the jury even as an alternate, which likely would have come from her having had prior discussions with the other members of the jury about the guilt-phase issues in the case.

608. All of these facts point to one conclusion: Debra Kramer had so many reasons to be biased in this case, and her impartiality was so improbable, that this Court should find that she was biased, either actually or implicitly, and grant a new trial.

# CLAIM VI

## PETITIONER WAS DENIED HIS RIGHT TO A FAIR TRIAL BECAUSE HIS LEAD TRIAL ATTORNEY, BERNARD C. DEPAOLI, LABORED UNDER AN ACTUAL CONFLICT OF INTEREST WHICH ADVERSELY AFFECTED HIS PERFORMANCE AT TRIAL

609. Petitioner's lead trial attorney, Bernard C. DePaoli, labored under an actual conflict of interest which adversely affected his performance at trial in this case, in violation of petitioner's rights to a fair trial, due process, and to adequate representation, as guaranteed by the Fifth Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

610. Petitioner alleges the following facts in support of his claim for federal habeas corpus relief on the grounds specified above, among other facts to be presented after he has access to discovery, to subpoena power, to an evidentiary hearing and to adequate funding.

611. The conflict of interest under which Mr. DePaoli labored in petitioner's case stemmed from DePaoli's unprofessional relationship in the past with Debra Kramer. Ms. Kramer was a member of the venire in petitioner's case, and ultimately served as an alternate juror during the guilt/innocence phase and as the foreperson of the sentencing phase jury.

612. Approximately eleven years before the jury selection proceedings in petitioner's trial, Mr. DePaoli had been the prosecutor in a rape case in which Ms. Kramer was the victim. Ms. Kramer mentioned that fact during her voir dire examination in petitioner's case. However, she did not disclose the fact she and Mr. DePaoli also had a brief but "sexually flirtatious" relationship at the time, which involved going out on dates, dancing and even making out together at a bar. See Exhaustion Petn., Exh. 9 at 10-11. She also did not disclose that Mr.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

- 279 -

DePaoli had provided financial assistance to her at the time by personally cosigning the note on her car loan. Id.

613. Petitioner has alleged in Claim V, supra, that Ms. Kramer's failure to reveal the above information was an act of intentional and deliberate concealment on her part especially in view of the multiple opportunities she had to disclose the information either during voir dire or in her jury questionnaire. As part of his showing in that regard, petitioner provided the relevant details of Ms. Kramer's voir dire, including questions posed to her by Mr. DePaoli. Many of those details are also relevant to the present claim. Petitioner therefore recounts those facts below.

614. On September 12, 1985, Ms. Kramer was initially questioned on voir dire. Ms. Kramer testified that she was married to Dr. Richard Kramer. RT 7392. She was also Dr. Kramer's secretary. Id. Ms. Kramer testified that she was aware that Dr. Kramer had already served as an expert consultant for the Humboldt County District Attorney's office in the investigation of the murder of Elizabeth Hickey. Id.

615. During this initial voir dire examination, Ms. Kramer revealed that she had known Mr. Bernard DePaoli, petitioner's trial counsel, because she had been a victim in a criminal matter in which Mr. DePaoli was the prosecutor. RT 7394. She also noted that she was Jewish, and that it was her understanding that the Aryan Brotherhood was an anti-Semitic organization. RT 7393. For all of these reasons, Ms. Kramer expressed reservations about serving on the jury in petitioner's case. RT 7394.

616. The defense immediately moved to challenge Ms. Kramer for cause. Id. The prosecution objected to the defense challenge, the trial court denied the challenge, RT 7395, and

ordered that Ms. Kramer fill out the longer juror questionnaire so that she could be subject to further voir dire.

617. Approximately one month later, on October 16, 1985, after her husband had been appointed to conduct a mental competency evaluation of Mr. Price and had completed his report on the issue, and after the defense had subpoenaed any records Dr. Kramer had concerning his consultation with the prosecution in the case, Ms. Kramer was again examined on voir dire. RT 7992. The court introduced Ms. Kramer noting that she was both Dr. Kramer's wife and his secretary and receptionist. RT 7991.

618. The defense first asked Ms. Kramer a series of general questions about whether there was anything she had thought of during the period between her first voir dire examination and the present one that she felt she should reveal:

> Q — All right. Having had the time between then and now, did
>
> any of the questions occur to you that you answered at that time
>
> that may cause your answers to be different today than they were at
>
> that time?
>
> Is there anything that you could think of that you wish you could
>
> have answered differently?
>
> A — On the questionnaire?
>
> Q — Yes.
>
> A — No.
>
> Q — Is there something else?

A — Yes.

Q — Could you tell us about it?    RT 7992-7993.

619.    Ms. Kramer then testified that the defense subpoena for records regarding her husband's consultation with the prosecution had come to her as the keeper of records in her office.    RT 7993-7995, 8012-8013.    She stated that she had her husband deal with it, although she did read through the subpoena when she received it.    Id.    She also recalled making an entry into the books as a "no charge" consultation matter.    RT 7994, 8013.    Finally, having read it, she was aware that the subpoena had to do with her husband's consultation with the prosecution regarding "the boyfriend in this case," Berlie Petry.    RT 7994, 8012.    She also knew that her husband had written a letter in response to the subpoena.    RT 8013.    No one asked her if she had read her husband's response to the subpoena.

620.    Ms. Kramer also testified that she was aware that her husband had been asked to counsel with Mr. Price at the request of the court for some reason of which she was allegedly unaware.    RT 8011, 8014.    In fact, because of her role as secretary and receptionist (and apparently bookkeeper), she knew that he had just received a check in the mail for his services the day before her testimony.    RT 7993, 8011.

621.    In the middle of questioning about the subpoena for records regarding the prosecution's use of Ms. Kramer's husband as an expert consultant in the case, the prosecutor objected to any further questioning along these lines, and the trial judge ordered the defense to move to another subject area of questioning.    RT 7995.    During his later explanation for this objection, the prosecution acknowledged that Dr. Kramer had in fact been consulted by Barry Brown, an investigator with the district attorney's office, about Berlie Petry's reactions to the

two police-administered lie detector tests which he had previously failed. RT 8003.

622.   In making a transition to general questions about the death penalty, Mr. DePaoli again asked Ms. Kramer if there was anything else elicited by the juror questionnaire which would cause Ms. Kramer to add anything to her previous testimony.   She answered in the negative. RT 7995-7996.

623.   Finally, once again, at the end of the defense questioning, Mr. DePaoli asked Ms. Kramer:

> Q -- Can you think of any other reason now as you sit there having
>
> read the questionnaire, having discussed the matter with me,
>
> having listened to the Court, where you think you could not be a
>
> fair and impartial juror on any phase of this potential trial other
>
> than what you've said?
>
> A -- No.   RT 8002.

624.   Upon questioning by the trial judge, Ms. Kramer stated in several different ways that she did not feel she would be an appropriate juror in this case.   She testified that the fact that her husband had been a "counselor at the request of the Court" would interfere with her ability to be a fair and impartial juror.  RT 8014.  She explained that with her working in her husband's office, and his having involvement in the case, "the chances are increasing that some sort of information would come across my desk..."  Id.  She also stated that if her husband testified she would be more likely to believe him because of their relationship.  The court then informed her why her husband was called into the case by the court, namely, to consult on Mr. Price's "present status and your husband's opinion of his status at that time."  RT 8015.  The court also informed

her that her husband had issued a report, and that it was not clear whether he would testify about its contents, but that, in any event, such testimony would be limited to Mr. Price's "particular condition on a particular day..." RT 8015-8016.

625. At the end of this second phase of her voir dire, the defense again moved that she be excused for cause. RT 8018, 8043-8047. The defense argued that Dr. Kramer might be called as a defense witness with regard to his use by the prosecution on Berlie Petry's failed polygraph tests, and as an expert in mitigation at the sentencing phase of the trial. Id. On October 15, 1985, in a minute order the court denied the challenge for cause. CT 8109.

626. During a subsequent voir dire, Ms. Kramer revealed that her husband, Dr. Kramer, worked with the local parole office, and that they were social friends with Dick Wild, a parole agent in that office. Ms. Kramer testified that she liked Mr. Wild. RT 9568-9569. Wild was well aware of the Price case, and in fact had assisted in his initial arrest. RT 80-89. Wild testified at the preliminary hearing, and he testified during the trial in this case about Mr. Price's arrest. RT 18515. In addition, several witnesses testified during the trial about Mr. Wild's assistance in the arrest of Mr. Price, and about his attitude that Curtis Price was one of the most dangerous persons ever to be released from the California Department of Corrections. RT 80-89, RT 94. Ms. Kramer also revealed that she had recently met Officer Randy Mendosa of the Arcata police department, who investigated the Village Liquors robbery with which Mr. Price was charged. RT 15687.

627. Later during the trial, the court revealed that Ms. Kramer was a social friend of Dr. Kenneth Barney, who was a psychotherapist who had treated the victim, Elizabeth Hickey, before her death. RT 18181, 18216.

628. When the ultimate jury was selected, the defense did not use a peremptory challenge against Ms. Kramer. RT 9728-9729. The record is silent as to why the defense, having twice sought to challenge Ms Kramer for cause and still having peremptory challenges remaining, did not exercise a peremptory challenge against her.

629. The explanation may only lie in a fact that, though well known to Mr. DePaoli, and also to Ms. Kramer, was kept hidden from the trial court, the prosecution, and most importantly here, the defendant, Curtis Price, and the other members of the defense team. Although Ms. Kramer alluded to having known Mr. DePaoli when he prosecuted the rape case in which she was the victim, she kept to herself, as did Mr. DePaoli, the fact that they had a brief romantic relationship at that time. See Exhaustion Petn., Exh. 9 at 10-11. The scope of their personal relationship included going out on dates, dancing together, and certain physical intimacy that included making out together. Mr. DePaoli has described the relationship with Ms. Kramer as a "sexually flirtatious" one. Id at 10. Ms. Kramer also kept to herself, as did Mr. DePaoli, that around the same time, DePaoli assisted Ms. Kramer financially by personally co-signing the note for her car loan. Id. at 10-11.[117]

630. Mr. DePaoli did not reveal the information about his romantic involvement with

---

[117] Petitioner is informed and believes that it was not too long after DePaoli co-signed the note that Ms. Kramer stopped having any further contact with him. Petitioner is further informed and believes that one reason for the collapse of their relationship is that Ms. Kramer was uncomfortable with DePaoli's sexual interest in her and therefore did not want to have anything further to do with him. She was after all recovering from the trauma of a brutal rape, and he was the prosecutor in the rape case. During his habeas investigation, petitioner attempted to obtain a declaration from Ms. Kramer about her prior personal relationship with Mr. DePaoli, but Ms. Kramer refused to provide one. See Exhaustion Petn, Supp. Exh. 65 at 21. This is an indication that she was uncomfortable about what had occurred between her and DePaoli, did not view their prior personal involvement or Mr. DePaoli in a positive light, and did not want to publicly discuss the matter.

Ms. Kramer to Ms. Klay until after the end of Mr. Price's trial. Exhaustion Petn., Exh. 8 at 2-3; Exh. 9 at 10-11. He never told Ms. Klay at any time about his financial involvement with Ms. Kramer. See Exhaustion Petn., Exh. 8 at 3. Thus, at the time when the for-cause challenges against Ms. Kramer were denied and the parties were exercising peremptory strikes against potential jurors, Mr. DePaoli was the only person on the defense team who was aware of his prior personal involvement with Ms. Kramer.

631. Ms. Kramer's failure to reveal these critical facts during her voir dire is dealt with in claim V, supra; Mr. DePaoli's failure to disclose it to the court or to his own client and co-counsel, is the subject of this claim.

632. Mr. DePaoli's decision to conceal information about the nature of his prior relationship with Ms. Kramer must be viewed in light of the effects of his alcoholism on his judgment, and in light of the consequences such a disclosure would have had for him both personally and professionally. As noted in Claim VII of this petition, Mr. DePaoli suffered from severe alcoholism throughout the time he represented Mr. Price. See Exhaustion Petn., Exh. 9 at 8-9 & Exh. 8 at 1-2. By his own admission and that of his co-counsel, he drank large amounts of gin every night and on weekends during the Price case. Id. While Ms. Klay was well aware of the extent of Mr. DePaoli's alcohol problem (Exhaustion Petn., Exh. 8 at 2), as was the trial judge (see id. at 4-5, and Claim VII, infra) Mr. DePaoli was in complete denial about his problem and the effect it was having on his exercise of good judgment in the Price case. See Exhaustion Petn., Exh. 9 at 9. Co-counsel Klay was quite concerned about the extent to which Mr. DePaoli's alcohol problem was affecting his performance and judgment in the Price case. See Exhaustion Petn., Exh. 8 at 2-5. Thus any judgment call Mr. DePaoli was forced to make,

including the particularly sensitive one of whether to reveal potentially damaging and embarrassing information about his prior relationship to juror Kramer, was necessarily impacted adversely by his alcoholism.

633.    Alcoholic or not, DePaoli was caught between a rock and a hard place in dealing with the Kramer problem. He had engaged in a potentially unethical relationship with the chief witness/victim in a rape case in which he was the lead prosecutor. Indeed, ethical questions had been previously raised about his having allegedly had sex with a rape victim, so he was clearly sensitive to the problem and to its potentially damaging impact on his legal career. See Exhaustion Petn., Exh 9 at 11. Such problems were only compounded by the fact that he had personally provided financial assistance to a witness in a criminal case he had prosecuted, a fact which possibly could have compromised the verdict in that case. Id. The legal ramifications of revealing such assistance, see United States v. Bagley 473 U.S. 667 (1985), Giglio v. United States 405 U.S. 150 (1972); Napue v. Illinois, 360 U.S. 264 (1959), were surely not lost on a successful prosecutor turned defense attorney such as Mr. DePaoli. Thus, DePaoli was faced with a difficult choice: he could either disclose his prior personal and financial relationship with Ms. Kramer to the trial court and to the defense, and risk his personal and professional reputation (not to mention the verdict in the rape case), or he could sit on the information and deprive his client of facts that would have been undisputably critical to an adequate assessment of Ms. Kramer's propriety as a sitting juror in this case. Having chosen the latter, the objective (and non-alcoholic) part of the defense team was left completely in the dark in making a decision that was fundamentally important to the overall fairness of the trial in this case. See Ham v. South Carolina, 409 U.S. 524 (1973).

634.    Mr. DePaoli had no valid tactical reason for leaving Ms. Kramer on the jury, and he does not claim that he did.    Regardless of what Mr. DePaoli's intentions or motivations were in not removing Ms. Kramer as a juror, there can be no doubt that Mr. DePaoli was divided in his loyalties.  By law he owed a duty of loyalty to his client Curtis Price.  Mr. Price and the defense team had a right, and a clear need, to know about his attorney's relationship with a potential juror, and the ramifications of that relationship to the suitability of that person as a juror in his capital trial.  This was particularly critical with regard to Ms. Kramer, since she herself doubted her suitability to be on the jury on this case, pointing to her husband's involvement as a consultant to the district attorney about a case-related matter and as an expert appointed by the court to examine petitioner for mental competency to stand trial, and to a host of other reasons.  And yet, having failed to reveal the critical information to anyone during the trial, Mr. DePaoli instead protected himself, his reputation in the community, and/or, as the former prosecutor in a successful rape trial, the verdict in that case.  The conflict between these loyalties is clear.

635.    Finally, it is also clear that this conflict hampered Mr. DePaoli in his defense of Mr. Price.  As a result of divided loyalties and to avoid personal and professional embarrassment to himself, Mr. DePaoli kept the information that he had had more than a prosecutor-crime victim relationship with Ms. Kramer and had co-signed a loan for her to himself.  By his silence, Mr. DePaoli deprived his client of additional grounds that would have strengthened petitioner's challenges for cause against Ms. Kramer, and he also prevented his non-conflicted second counsel and petitioner from making a knowing and intelligent decision to exercising a peremptory challenge against Ms. Kramer, even without DePaoli's concurrence.  Had DePaoli revealed the undisclosed information to Ms. Klay, she would have done whatever she could to

ensure that Ms. Kramer did not serve on the jury, including revealing the information in camera to the trial judge. See Exhaustion Petn., Exh. 8 at 3.

636. The law is clear that Mr. DePaoli labored under a conflict of interest in this case which rendered Mr. Price's trial unfair, and unconstitutional. It is axiomatic that the most basic duty of counsel, whether appointed or retained, is the duty of loyalty. See, e.g., Strickland v. Washington, 446 U.S. 668, 692 (1984); Nealy v. Cabana, 782 F.2d 1362 (5th Cir. 1986); see also ABA Model Rules of Professional Conduct, comment to Rule 1.7 (1983) ("loyalty is an essential element in the lawyer's relationship to a client"). If the Sixth Amendment right to the effective assistance of counsel guarantees anything, it guarantees that the accused in a criminal case be afforded counsel whose ability to act on his client's behalf is untrammeled and unimpaired by a conflict of interest. See Holloway v. Arkansas, 435 U.S. 475, 489-90 (1978); Cuyler v. Sullivan, 446 U.S. 335 (1980); Wood v. Georgia, 450 U.S. 261, 271 (1981); Strickland, 446 U.S. at 692.

637. Here, Mr. DePaoli did not reveal information to his client which he should have revealed in order for the defense to make knowing and intelligent usage of their peremptory strikes. He was conflicted from revealing this information because of his desire to avoid embarrassment and the potential for reversal in one of his prior successful prosecutions. This is therefore a classic example of a conflict of interest in which the attorney has divided loyalties between his client, on the one hand, and another outside interest, (in this case, his own), on the other hand.

638. Moreover, in this case petitioner can make the requisite showing as to prejudice. In conflict jurisprudence, the accused must demonstrate that counsel's performance was

adversely affected by an actual conflict of interest. Cuyler, 446 U.S. at 348-49. Once an actual conflict of interest adversely affecting counsel's performance is established, prejudice is presumed. Id. at 349-50 ("[A] defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief."); Strickland, 446 U.S. at 692; see also Nealy, 782 F.2d at 1365 ("Adverse effect is not the equivalent of prejudice," "[w]hether the outcome of the trial was affected ... is not the test", rather, "sufficient prejudice is presumed from any adverse effect"). See also United States v. Olivares, 786 F.2d 659, 664 (5th Cir. 1986) ("proof of adverse effect does not require proving that the outcome of the trial was affected").

639. Actual ineffectiveness claims, which rely upon the two-prong inquiry in Strickland v. Washington, potentially implicate the entire gambit of attorney performance. Conflict of interest cases, however, implicate only a single dimension of counsel's performance -- albeit the most fundamental one. At stake in a conflict claim is the duty of loyalty, "the most basic of counsel's duties." Strickland, 466 U.S. at 692. Given the importance of this obligation, as well as the inability of a reviewing court to measure the precise effect of its denial, the United States Supreme Court has insisted that reviewing courts must presume prejudice if there was an actual conflict that adversely affected counsel's performance. This rule applies regardless of counsel's performance in the remainder of the case. Id.; Cuyler, 446 U.S. at 349-50. Indeed, in recognition of the singular importance of this duty, conflict cases are the only instance of attorney error for which the Court employs a presumption of prejudice. Strickland, 466 U.S. at 693 ("Conflict of interest claims aside, actual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove

prejudice.")(emphasis added); <u>Osborn v. Shillinger</u>, 861 F.2d 612, 625 (10th Cir. 1988).

640.    To establish that a conflict adversely affected counsel's performance, a defendant need only show that some effect on counsel's handling of a particular aspect of the trial was likely. <u>United States v. Mett</u> 65 F.3d 1531 (9th Cir. 1995), citing <u>United States v. Miskinis</u>, 966 F.2d 1263, 1268 (9th Cir. 1992). Here, petitioner has shown that regardless of his performance during the remainder of the trial, Mr. DePaoli's conflict of interest did have an effect in his handling of jury selection. He concealed relevant information about his prior relationship with prospective juror, Ms. Kramer, from his own client and from second counsel, Ms. Klay that was relevant not only to strengthen the defense challenges for cause against Ms. Kramer but also to the intelligent exercise of a peremptory challenge against her. As a result, she remained on the jury, and this harmed petitioner.

641.    Indeed, now that he is in recovery and is sober, Mr. DePaoli admits that his failure to disclose this information was a bad judgment call made to protect his personal reputation in the community. <u>See</u> Exhaustion Petn., Exh. 9 at 11-12. This is the type of information that any defendant or member of a defense team would want to know in making reasonable, informed decisions during jury selection.

642.    It was also information that would have likely impacted the jury selection process. In the first place, had it been revealed, it is probable Ms. Kramer would have been excused for cause. The record was already filled with facts about Ms. Kramer which suggested she was not an appropriate juror in this case. On that basis the defense had twice moved to challenge her for cause. If Mr. DePaoli had revealed the extent of his prior relationship with her, she would not have been found suitable and would have been struck for cause.

643. At the very least, this information would have impacted the defense's use of peremptory strikes. Having attempted more than once to remove her for cause, there can be little doubt that the other members of the defense team would have wanted to exercise a peremptory against Ms. Kramer had they known of her prior association with Mr. DePaoli. See Exhaustion Petn., Exh. 8 at 3. Indeed, Mr. DePaoli himself now acknowledges that had he been sober, he would not only have revealed the potentially embarrassing information, but also, if necessary, he would have exercised a peremptory challenge against Ms. Kramer. See Exhaustion Petn., Exh. 9 at 11-12.

644. For all of these reasons, Mr. Price was denied his right to due process and a fair trial represented by competent, conflict-free counsel, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

# CLAIM VII

## IN THIS CASE A NUMBER OF INTER-RELATED ISSUES LED TO A COMPLETE BREAKDOWN IN THE ADVERSARIAL PROCESS, DEPRIVING PETITIONER OF HIS RIGHT TO A FAIR TRIAL AND TO DUE PROCESS OF LAW

645.    Petitioner was deprived of his constitutional rights to trial before a fair and impartial judge, as guaranteed by the Fifth, Eighth and Fourteenth Amendments to the U.S. Constitution, and also his rights to a fair trial and to the effective assistance of conflict-free counsel as guaranteed by the Fifth, Eighth and Fourteenth Amendments to the U.S. Constitution. As alleged in detail below, the trial judge was biased against petitioner, manifested antagonism toward petitioner's defense attorneys, acted in ways that were not fair or impartial and failed to act in ways that were necessary to ensure that petitioner received a fair trial. This deprived petitioner of his right to federal due process of law. Tumey v. Ohio (1927) 237 U.S. 510, 532. Because petitioner was on trial for his life, this also deprived petitioner of his Eighth Amendment rights. The error was compounded by the conduct of defense counsel, the prosecuting attorneys and members of the jury, and led to a complete breakdown in the adversarial process, thereby denying petitioner his federal constitutional rights to a fair trial and to the effective assistance of conflict-free counsel as guaranteed by the Fifth, Eighth and Fourteenth Amendments to the U.S. Constitution.

646.    Petitioner alleges in support of his claims for federal habeas corpus relief on the grounds specified above the following facts, among other facts to be presented after he has access to discovery, to an evidentiary hearing and to adequate funding.

647.    Petitioner will first address the lack of fairness and impartiality on the part of the

trial judge, the Honorable John E. Buffington, who presided over petitioner's Humboldt County capital case proceedings. As the trial judge it was Judge Buffington's duty to conduct the proceedings in a neutral and fair manner, to take the actions necessary to ensure that petitioner received a fair trial, and to remain above the adversarial battles of the parties with respect to the information, allegations, or arguments presented to him.

648. The record reflects that Judge Buffington did not abide by those duties. Instead, Judge Buffington manifested overt hostility toward defense counsel, particularly toward lead defense counsel, Bernard DePaoli, expressed actual bias against petitioner in an off-the-record conversation with defense counsel, Anna Klay, and did not act to ensure that petitioner received a fair trial. Instead, the judge acted in ways that failed to hold the balance between vindicating the court's interests and those of Mr. Price and the balance between the State and the defense. Taylor v. Hayes (1974), 418 U.S. 488.

649. Judge Buffington's overt hostility toward lead counsel DePaoli during the proceedings in petitioner's case was actually a continuation of serious friction and disagreements between the two men that arose before DePaoli was appointed to represent Mr. Price. See CT 4398-4412, 4400 & Exhaustion Petn., Exh. 9 at 2-3. By way of background, Judge Buffington had been the district attorney for Humboldt County prior to becoming a judge. Mr. DePaoli had worked for him as a deputy prosecutor in the office. See Exhaustion Petn., Exh. 9 at 2. During that time, D.A. Buffington and Mr. DePaoli were social friends and had drinks together. Id. Once Buffington was elevated to the bench, DePaoli became the district attorney for Humboldt County, and their relationship quickly deteriorated. According to Mr. DePaoli, Judge Buffington would not let go of his role as a prosecutor and would not give up his control over the district attorney's office. Id. at 3. Indeed, while Mr. DePaoli was district attorney, Judge Buffington

would write memos to him about office management, office policy, and even about individual cases and the appropriate outcomes in them. Id. This created friction between Judge Buffington and DePaoli. DePaoli resented Judge Buffington's actions in this regard, and communicated that directly to the judge. The friction even became public, as Mr. DePaoli complained locally about Judge Buffington's apparent use of the crony system to hand out particularly lucrative appointment cases. Id. The rift between Judge Buffington and Mr. DePaoli grew, so much so that Judge Buffington did not endorse Mr. DePaoli in his re-election bid for district attorney in 1982. See Exhaustion Petn., Exh. 9 at 2-3. Mr. DePaoli was not re-elected to that position. After he entered into private practice, Mr. DePaoli accepted appointment as lead counsel for Mr. Price.

650. Tensions between Judge Buffington and DePaoli resurfaced during the proceedings in petitioner's case, and relations between the defense and Judge Buffington deteriorated significantly during the time period from January through September of 1985. By the eve of trial, the court had lost most of its ability to treat the defense attorneys in a fair and balanced manner. As the state court record reveals, Judge Buffington also acted in ways which failed to hold the balance between vindicating the court's interests and those of petitioner and the balance between the State and petitioner. Taylor v. Hayes, supra. Several incidents in particular make this manifest.

651. The first incident occurred during pretrial proceedings when the judge began to suspect that Mr. DePaoli was engaging in dishonest and potentially criminal misconduct while representing petitioner. Specifically, in May of 1985, Judge Buffington suspected that DePaoli had altered dates on certain subpoenas duces tecum after they had been issued by the court. Rather than referring the matter to another judge who was not involved in the proceedings in

petitioner's case, Judge Buffington instead conducted his own personal investigation of the matter. Thus, on June 4, 1985, Judge Buffington held an in-chambers hearing, with only himself present, during which he dictated for the court reporter his concerns about DePaoli's misconduct. See RT 1714-a through 1714-i. During this bizarre "hearing", Judge Buffington stated that he believed DePaoli had falsified names, dates and other information on defense subpoenas in the case. Id. Throughout this "hearing" the trial judge acted as witness, expert witness, prosecutor, victim, and judge of his own judicial conduct. For example, acting as the court's own expert, Judge Buffington claimed that the changes were made with the same typewriter as that which was used originally. Id. at 1714-f. Acting in the role of prosecutor, the judge argued that DePaoli's conduct constituted a crime, as well as a breach of the code of professional responsibility. Id. at 1714-g. Importantly, there was no suggestion by the judge or any evidence that petitioner had any complicity in Mr. DePaoli's actions in this regard.

652. Acting as a judge over himself, Judge Buffington determined, again, without anyone but the court reporter present, that despite his "discovery" of DePaoli's alleged crimes and misconduct, he could nevertheless be fair and impartial to Mr. Price and his attorneys, and therefore should not recuse himself. Id. at 1714-i. The judge also decided, erroneously, during this private "hearing", that it would be wrong to remove Mr. DePaoli from the case because Mr. Price was entitled to counsel of his own choosing, ignoring the fact that DePaoli was appointed counsel whose service was controlled by the court and not by a private retainer from Mr. Price. Id. at 1714-g.

653. Of particular significance for the present claim is the fact that Judge Buffington did not keep his investigation and conclusions confidential until the proceedings in petitioner's trial were concluded. Instead, he shared his conclusions with only one side – the prosecution.

RT 1714-g; see Exhaustion Petn., Exh. 9 at 3-4, Exh. 8 at 4 & Exh. 54. Even worse, the judge imparted the information and made known his harshly critical attitude toward Mr. DePaoli and DePaoli's actions in the case to prosecutors Bass and Dikeman. They were the very prosecutors who were handling the capital case proceedings against Mr. Price and who were involved in the bitter and ongoing controversy with the defense over discovery. Indeed, it was their legally erroneous position that they had no duty to obtain discoverable information in the hands of other agencies that made it necessary for DePaoli to have to seek subpoenas duces tecum for that information in the first place. See infra.

654. Bass and Dikeman informed Judge Buffington that they would hold off prosecution of DePaoli on the subpoena alteration matter until after petitioner's trial. RT 1714-g. However, that did not remedy the unfairness to petitioner that resulted from the judge's decision to share damaging information about petitioner's lead defense attorney with Mr. DePaoli's opposing counsel. Having been made aware of the fact that Judge Buffington did not respect or trust DePaoli, Bass and Dikeman knew that the judge would be much more likely to blame DePaoli rather than them for the ongoing discovery problems in the case. That is precisely what occurred, and Bass and Dikeman exploited the situation to their advantage and to petitioner's detriment.

655. Later on in the trial, Judge Buffington again reacted to conduct by Mr. DePaoli in a manner showing the judge's lack of neutrality. The conduct in question involved DePaoli's representations to the court concerning a defense ballistics expert's alleged unavailability to testify. Suspecting DePaoli's representations that the expert was unavailable, Judge Buffington launched an immediate investigation into the matter, turning to district attorney investigator Barry Brown, one of the lead investigators in petitioner's case, to conduct the investigation on

the court's behalf. During an in-chambers hearing, Judge Buffington confirmed that he had asked the district attorney's office to investigate the matter, and that Barry Brown did in fact investigate DePaoli's conduct for the judge and determined that DePaoli had engaged in misconduct. Id. at 19772. Once again, there was no suggestion or any evidence that petitioner had any complicity in his lead counsel's misconduct. In using Barry Brown, an investigator who was assisting in the prosecution of petitioner's case, to investigate acts done by petitioner's counsel in the course of representing petitioner, Judge Buffington clearly failed to "hold the balance between vindicating the interests of the court and the interests of the petitioner" (Taylor v. Hayes, supra, 418 U.S. at 501) and "the balance nice, clear and true between the state and [petitioner]." Tumey v. Ohio, supra.

656. Unlike the earlier private "hearing" into DePaoli's alleged misconduct, DePaoli was present at the in-chambers hearing about his representations concerning that defense expert. At that hearing, Judge Buffington directly accused DePaoli of lying in claiming that the expert was unavailable. RT 19771-19776, 19800-1 through 19800-3. The judge also stated that DePaoli's conduct violated ethical rules and was an act of contempt of court. Id. Later, after this initial sealed "hearing", the judge had another private "hearing" with himself in which he accused Mr. DePaoli of yet another, separate contempt of court, namely, lying to the court in the earlier in-chambers hearing regarding the initial issue of dishonesty. RT 19800-1 through 19800-3.

657. It is important to note here that Judge Buffington was aware of the fact that Mr. DePaoli had a serious alcohol problem. While not excusing or justifying his misconduct, DePaoli's serious alcohol problem was undoubtedly a contributing factor to his exercise of bad judgment in altering subpoenas and in being untruthful to the court about the alleged

unavailability of the defense expert. Importantly, Judge Buffington was made aware of the fact on more than one occasion that DePaoli's alcohol problem was negatively impacting his ability to exercise sound judgment in petitioner's case. The trial judge's response was to fail to address these problems directly in a manner that protected petitioner's right to a fair trial and to the effective assistance of counsel.

658. As lead defense counsel in petitioner's case, DePaoli ultimately controlled all of the significant decisions in the case, from the pre-trial motions, throughout the voir dire process, and throughout both evidentiary phases of the trial. Exhaustion Petn., Exh. 9 at 1-2 & Exh. 8 at 1. Although Anna Klay was appointed as second counsel to Mr. Price, her involvement was largely as an assistant to DePaoli. Id. She had virtually no prior criminal experience. No substantive decisions were made, and no pleadings prepared, without DePaoli's authorship and/or approval. Id. Indeed, at one point in the trial Judge Buffington, frustrated by what he believed were frivolous motions signed by Ms. Klay, ordered that DePaoli review and expressly certify every pleading in the case as to form and content, regardless of whether he prepared it. CT 7769.[118]

659. Despite his role as the lead defense attorney in a complex criminal conspiracy case involving hundreds of witnesses and thousands of pages of documents, DePaoli had a severe alcohol problem throughout all phases of this trial. He drank regularly at night throughout the pre-trial and trial proceedings in this case. Exhaustion Petn., Exh. 9 at 8-9 & Exh. 8 at 1-2. Each night he would open a large bottle of alcohol, and he would not quit drinking until the bottle was completely empty. Id. Judge Buffington was aware of the extent of the problem.

---

[118] The court later rescinded this order, noting that it was "not a workable situation." RT 7659.

660.   Ms. Klay was a licensed social worker prior to becoming an attorney.  Exhaustion Petn., Exh. 8 at 2.  Thus she was knowledgeable about the signs and symptoms of alcoholism.  Id.  It was clear to her that Mr. DePaoli had a serious alcohol problem, and that it was damaging his ability to perform as Mr. Price's attorney.  Id.  According to Ms. Klay often Mr. DePaoli would promise to do a particular task in the case and then would fail to follow through.  Id.  This left him unprepared to handle what happened in court.  Id.  In addition, she witnessed that his alcoholism affected his judgment in many ways during the Price trial.  For example, she felt the defense was woefully unprepared to enter the penalty phase of trial, and that this was largely because DePaoli used poor judgment in assessing the viability of the guilt-phase defense.  Id.  Characteristic of alcoholics, he kept secrets and failed to reveal information that he should have revealed, including the information set forth in Claims V and VI of this petition regarding his prior relationship with juror Debra Kramer.  Id. at 2-3.

661.   On several occasions Mr. DePaoli's drinking problem surfaced on the record in this case.  For example, several times during the trial he failed to appear in court in the morning because of an alcohol binge the previous night.  Also, several times during the trial, DePaoli was arrested for alcohol-related offenses, including public drunkenness and disorderly conduct.  See e.g., CT 8147, 8380 (4/30/85 arrest in which DePaoli was reported being verbally abusive to arresting officer); CT 8147, 8383 (9/17/85 arrest for public drunkenness); RT 20158 (DePaoli stopped by local police on DUI charges).

662.   Judge Buffington knew the problem was sufficiently serious that he felt a need to do something to protect the record on this issue.  On May 3, 1985, Judge Buffington spoke with Mr. DePaoli and Mr. Price about the first public drunkenness incident.  See e.g., RT 1515-0-a through RT 1515-0-i; RT 7658-1 (sealed).  On this date he held an in-chambers hearing during

which he discussed with the defense an article in the local newspaper regarding DePaoli's arrest for public drunkenness. Id. Although the record is not clear, it can be gleaned that this incident generated local public attention in the media, as Mr. DePaoli claimed that the local police were harassing him because of his defense of Mr. Price. Id. Notably, DePaoli's conduct involving the alteration of certain subpoenas duces tecum occurred only a short time after his April 30, 1985 arrest for public drunkenness, and Judge Buffington was aware of that fact.

663. In addition to what is on the record about this incident, Judge Buffington was made even more fully aware of the extent of Mr. DePaoli's alcohol problem off the record. When Mr. DePaoli was arrested for public drunkenness in April 1985, co-counsel Klay spoke with Judge Buffington in private and off the record. See Exhaustion Petn., Exh. 8 at 4. She told him that Mr. DePaoli had a serious alcohol problem, and that it was severely interfering with his ability to do his work and exercise good judgment in the Price case. Id. She also told Judge Buffington that, under the circumstances, she felt the proper course of action was to relieve Mr. DePaoli and herself as counsel in the case, and find other counsel to represent Mr. Price. Id. According to Ms. Klay although Judge Buffington acknowledged the extent of Mr. DePaoli's alcohol problem, he was unwilling to even consider finding new counsel for Mr. Price. Id. at 4-5. Thus, rather than take steps necessary to protect petitioner's rights to a fair trial and to the effective assistance of counsel, Judge Buffington instead ignored the problem and merely had Mr. Price agree to continue to being represented by DePaoli without communicating to Price his own knowledge of the extent of the problem.

664. Judge Buffington reacted similarly when Mr. DePaoli received another alcohol-related charge during the guilt-innocence phase of the case. RT 20158. In this instance, again, the judge brought it up, this time in court, and asked if the defense wanted to have it raised

before the jury. DePaoli, of course, said he did not; Judge Buffington then sent a note to Mr. Price, who was still in his jail cell absent from his trial, and Price agreed with DePaoli. Once again, however, Judge Buffington did absolutely nothing to determine whether, once again, DePaoli continuing alcohol problem was affecting his ability to fairly represent his client.

665. The alcohol issue surfaced before Judge Buffington repeatedly throughout the trial in this case. Again and again, defense attorney Anna Klay approached Judge Buffington privately, off the record, and informed him about DePaoli's drinking problem. See Exhaustion Petn., Exh. 8 at 4-6. She complained over and over again that he was drinking excessively, and that it was interfering with his judgment and his ability to represent his client adequately. Id. On every such occasion, Judge Buffington acknowledged the problem, but stated that there was nothing he could do about it, and that he would never let DePaoli or her off the case.

666. At one point during jury selection proceedings, DePaoli asked to be relieved as counsel, citing health problems, which were confirmed by his doctor. Although the record does not make clear the source of the problems, they are of the type, namely hypertension, encountered by individuals with severe alcohol addiction. RT 7660-7689.[119]

667. Should there be any doubt that DePaoli's alcoholism was a serious problem that grossly hampered his ability to exercise good judgment, his personal and professional life continued in a downward spiral after the Price trial was finished. In fact, he ended up losing his license to practice law in the State of California. See Exhaustion Petn., Exh. 9 at 1. He has been

---

[119] It should be noted here that Judge Buffington felt tremendous pressure from the Board of Supervisors and from his fellow judges to keep the county's costs down in the trial of this case. The local press reported that it was the most costly criminal trial in Humboldt County history. Moreover, the county was already hard strapped for cash due to the deteriorating economy from the fall off in logging and fishing. See Exhaustion Petn., Exh. 8 at 5.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

- 302

convicted and imprisoned for crimes in the States of Nevada and California ranging from repeated drunk driving charges, to embezzling client funds, to bribing a witness in a criminal case. He has already served a prison sentence in the State of Nevada and a prison sentence in the State of California. Id. He also voluntarily relinquished his license to practice law in California.

668. These facts are presented here not to shame, embarrass, or moralize. Alcoholism is clearly a horrible and debilitating medical disease, one which has effectively ruined Mr. DePaoli's professional life. However, it cannot be ignored that this disease, with all of its attendant effects on the exercise of good, rational judgment, was raging full blown in DePaoli throughout the trial in this case, and Judge Buffington was well aware of this fact.

669. There is no way to know the degree to which this disease impaired the millions of individual judgments and decisions DePaoli had to make throughout the pre-trial and trial proceedings in this case. What is clear, however, is that this disease negatively impacted DePaoli's judgment throughout the Price trial. See Exhaustion Petn., Exh. 9 at 9-12 & Exh. 8 at 1-4. What is also clear is that Judge Buffington should have taken the appropriate steps to find counsel for Price who was not similarly impeded in his or her exercise of sound judgment.[120] Unwilling to allow the course of the proceedings to be interrupted with a search for competent counsel to represent petitioner, the trial judge instead attempted to cover the record by getting Mr. Price to accept DePaoli's representation despite his obvious debility and even though

---

[120] That is also, why, in such a circumstance, where there is no question petitioner's lead trial counsel had a serious medical condition that interfered with his ability to make good decisions for his client, and where the trial judge was fully informed of the problem and failed to do anything to address it, the adversarial process entirely broke down, petitioner should not have to prove how he was prejudiced, but rather prejudice should be presumed. United States v. Cronic 466 US 648 (1984).

DePaoli's mental condition was steadily deteriorating, as Judge Buffington later acknowledged: "Record should reflect Mr. DePaoli is slowly but surely flipping out." RT 21012.

670. The trial judge acted unfairly to petitioner in other ways as well. For example, the judge kept petitioner, but not the two prosecutors, in the dark about the fact that the court had lost confidence in the honesty and integrity of petitioner's lead counsel and believed that Mr. DePaoli had committed criminal misconduct by altering subpoenas in petitioner's case. It was that the judge did not have a clear opportunity to have so informed Price. When Price filed a motion to have his counsel relieved from service in September 1985, he noted that it appeared to him that Judge Buffington had lost confidence in his attorneys' competence to defend him. CT 8155. Rather than telling Price the truth and safeguarding his right to the effective assistance of counsel by appointing different counsel to represent him, Judge Buffington failed to disclose the aforementioned private "hearing" into Mr. DePaoli's suspected misconduct and ultimately required both DePaoli and Ms. Klay to continue in their representation of Price.

671. As the record reflects, it was not only Mr. DePaoli who was the recipient of Judge Buffington's contempt and disdain. The judge also manifested contempt and disdain for defense attorney Anna Klay. The record is replete with examples where Judge Buffington was curt, ill tempered, and rude toward Ms. Klay. On numerous occasions throughout the pre-trial and trial proceedings, Judge Buffington rudely cut her off and even made chastising remarks directly to her. See e.g., RT 12261 (Judge ridiculed Klay's comment as "absurd" regarding defense failure to receive witness list interfering with defense preparation); RT 15679-15681, 15711 (cut off Klay after prosecutor has used profanity toward DePaoli at the bench but in front of jury, not allowing her to make record that she witnessed jurors hearing the prosecutor's profane remark; later notes he was in error); RT 16760-1 through 16760-2 (cut off Klay with the remark, "why

don't you just stay out of it" after Klay is accused of telling a witness not to talk to the police, and she attempted to respond); RT 17700-5 (judge made derogatory comments that prosecution would have gotten what they wanted from a defense witness if Klay had to "stayed out of it").

672.     Significantly here, the Judge's dismissive and inappropriate conduct of the type here described was directed for the most part against Ms. Klay, and not to the other male parties to this litigation.  This is indicative of the fact that Judge Buffington had clear problems with gender bias, which he took out on Ms. Klay.

673.     Both defense attorneys were cognizant of Judge Buffington's gender bias against Ms. Klay during the Price trial.  Ms. Klay recalls numerous times on and off the record when Judge Buffington was rude, patronizing, and degrading toward her.  See Exhaustion Petn., Exh. 8 at 7.  She believed his conduct toward her was much worse than it was toward the male attorneys involved in the Price case, and for this reason, believed his attitude was sexist toward her.  Id. This view was confirmed by one particularly inappropriate private, off-the-record comment that Judge Buffington made to Ms. Klay in which he said: "You used to be a pretty, fun loving girl, and now you're a goddamn basket case." Id.

674.     Mr. DePaoli also witnessed Judge Buffington's sexist treatment of Ms. Klay.  See Exhaustion Petn., Exh. 9 at 12.  He saw Judge Buffington chastise her and treat her in a derogatory manner, sometimes on the record, and sometimes off.  Id.  Based on his prior associations with Judge Buffington, DePaoli believed that the judge's sexist attitude toward Ms. Klay as exhibited during the Price trial was part and parcel of his "good old boy" mentality, a mentality in which he viewed women as ornaments for men and female attorneys as intellectually inferior to male attorneys.  Id. at 13.

675.     Judge Buffington's sexist treatment of Ms. Klay had a spillover effect in how the

other male attorneys in the case treated her. <u>See</u> Exhaustion Petn., Exh. 8 at 7. On one occasion, prosecutor Worth Dikeman called her a "lying sack of shit" in the hallway at the courthouse during the trial. <u>Id.</u> Ms. Klay believes some of the jurors heard his comment. <u>Id.</u> In her judgment, such comments would never have been made had Judge Buffington not effectively condoned such conduct by his own bad example. <u>Id.</u> at 8.

676. Judge Buffington's inappropriate treatment of Ms. Klay had a negative impact on her ability to represent Mr. Price competently. <u>See</u> Exhaustion Petn., Exh. 8 at 7-8 & Exh. 9 at 12. She lost confidence in herself as a result of his comments and actions toward her, and she became less vocal during the trial. <u>Id.</u> Her communications with her client were also impacted as a result, because he was well aware of Judge Buffington's attitude toward her. <u>Id.</u> Judge Buffington's gender-biased treatment of Ms. Klay in petitioner's case was not the only time that the judge manifested such behavior in a case over which he presided. In <u>Catchpole v. Brannon</u>, 36 Cal.App.4th 237 (1995), Judge Buffington made comments that showed his gender bias and pre-conceptions against women. These same pre-conceptions existed ten years earlier when he mistreated Anna Klay in petitioner's trial. In <u>Catchpole</u>, the appellate court reversed and remanded the case for a new trial due to gender bias. Judge Buffington's gender bias against Ms. Klay calls for the same result in petitioner's case.

677. In addition to manifesting hostility, derision and irritability toward petitioner's two defense attorneys, Judge Buffington also threatened both defense attorneys with contempt and with possible referral to the State Bar for disciplinary proceedings. The judge also informed them that he would be judging their conduct during the trial as part of his determination whether to actually hold them in contempt. Such threats to defense counsel created a conflict of interest on their part. Those threats and the trial court's hostility towards defense counsel deprived

petitioner of his Sixth Amendment rights to the effective assistance of counsel. See e.g. Cuyler v. Sullivan, 446 U.S. 335 (1980); Wahlberg v. Israel 766 F.2d 1071, 1076-77 (7th Cir. 1985) (judicial animosity toward defense counsel resulted in unfairness difficult to quantify, but nonetheless a denial of fair trial by fair judge with adequate counsel).

678. The primary beneficiaries of Judge Buffington's hostile and negative attitude towards Mr. DePaoli and Ms. Klay were the two trial prosecutors. After he privately confided in those prosecutors about his distrust for and suspicions about DePaoli, Judge Buffington began increasingly to blame defense counsel rather than the prosecutors for the ongoing discovery problems in the case. The prosecutors exploited the situation to their benefit.

679. It is important to note here that discovery issues, and the prosecution's failures to comply with court orders regarding such, were perhaps the most contentious ongoing issue in this case at trial. See Exhaustion Petn., Exh. 9 at 5 & Exh. 8 at 8. The details of these skirmishes are set forth below here and also in Claim I. As a result of the prosecution's continual foot-dragging, hiding of evidence, and refusal to comply with court orders, the defense filed numerous motions designed to force the prosecution to provide discovery in compliance with Judge Buffington's rulings, including motions for sanctions, motions to dismiss, and motions to exclude the testimony of witnesses.

680. Judge Buffington's response to the defense discovery motions and motions for sanctions that were filed on petitioner's behalf traces the course of the judge's increasing antagonism toward the defense. On March 12, 1985, at a hearing on a variety of motions, the court denied a defense motion to dismiss relating to the prosecution's failure to provide discovery. See RT 1371-1409. The court's tone at this point in the proceedings was relatively balanced and impartial. The court acknowledged that the prosecution had perhaps being

negligent in failing to provide the defense with discovery in a timely manner. RT at 1403, 1407-08. The record reflects no bitterness or hostility toward the defense, although the judge does note that the defense had some responsibility in failing to bring the issue to the court's attention at an earlier time. Id. In the end, although the judge denied the motion, he left open the possibility of some other type of sanction against the prosecution for their discovery violations. The only threatened sanctions that were forthcoming, however, despite continued discovery abuse by the prosecution, were directed toward defense counsel.

681. Several months earlier, Judge Buffington had even privately acknowledged to Ms. Klay that the prosecution was indeed playing games with discovery in this case.[121] On January 9, 1985, Anna Klay met with Judge Buffington in private in his chambers. See CT 8053-8054. Among the matters they discussed were the discovery problems the defense was having with the prosecution. In the course of that discussion, although the judge did indicate that some of the defense requests were incomplete, he also made clear that he knew the prosecution and other government agencies were playing games with discovery and refusing to turn over information that they were required to disclose. Id. This fact is crucial, because it highlights the judge's true feelings about the discovery issue at the time, feelings which were to change dramatically in the aftermath of the subpoena alteration incident.

682. By September 1985, when faced with ruling on another defense motion to dismiss relating to further discovery problems, the judge's sentiments toward the defense had clearly

_____

[121] Petitioner notes in this regard that now retired SPU agent, Paul J. Tulleners, the Attorney General's own lead agent on petitioner's case, has confirmed that certain members of the prosecution team, including Ron Bass and Bass' supervisor, John Gordnier, were indeed playing games with discovery. See infra.

taken a severe turn for the worse. See CT 7760-7770. In his ruling, Judge Buffington made clear his disdain for defense counsel, accusing them of being unethical, dishonest, and playing games with the court and the entire process. Id. Rather than acknowledging what were blatant discovery violations by the prosecution, the court sided against the defense and blamed them for not doing their job properly. In the end, he denied a hearing on the motion, and then acerbically declared that "the only hearings merited by this motion" are contempt hearings against both defense attorneys for filing what the court believes are frivolous motions. Judge Buffington went on to declare that "these hearings will be held post-trial and the Court will consider compliance with this ruling as a factor at that hearing." Id. at 7769-7770. The trial court's threat to hold defense counsel in contempt and the court's refusal to resolve the issue until after the trial proceedings over the heads of defense counsel during the trial is addressed in Claim VIII of this petition and the allegations and arguments therein are incorporated here by express reference.

683. By the eve of the evidentiary phase of petitioner's trial, Judge Buffington's attitude toward the defense had become so personally bitter and overtly hostile that the court had lost most of its ability to treat the defense attorneys in a fair and balanced manner. In view of this, defense counsel moved to disqualify him on the grounds of bias. CT 8027 et seq. The defense filed the motion on October 15, 1985, toward the conclusion of voir dire. This was actually the second motion they had filed to disqualify Judge Buffington. They filed the first motion against him in early January 1985.[122]

---

[122] In the first disqualification motion, the defense alleged that Judge Buffington had engaged in improper ex parte contacts with members of the jail staff. Having just heard and ruled upon a habeas corpus action involving Price's treatment and the conditions at the Humboldt County jail
Footnote Continued on Next Page

684. The defense filed the second disqualification motion shortly after Judge Buffington had inquired on his own about the possibility of voluntarily disqualifying himself due to bias. See RT 7615-7616, 7624-7631. The defense noted in response that the fact that the judge had raised the issue on his own was itself further reason to question his ability to be fair and impartial to the defense. CT 7929. In their second disqualification motion, the defense cited a number of examples of the judge's hostile conduct toward the defense and asserted that the judge's personal animosity towards Mr. Price's defense counsel colored the court's viewpoint and rendered him unable to be fair and impartial. Id. at 8034 et seq.[123]

685. In his response to the disqualification motion, Judge Buffington admitted to being perhaps somewhat "caustic" on occasion but never mentioned the depth of his disdain for DePaoli and his own attempts to suggest that DePaoli be prosecuted for his perceived misconduct. See CT 8142, 8144. Judge Buffington also never mentioned what he had privately acknowledged to Ms. Klay – that he was actually biased against Mr. Price. See CT 8053-8054

---

in early December 1984, Judge Buffington was contacted by jail officials later in the month, and they asked him to modify his order regarding the amount of recreation time to be allowed petitioner. Without notifying the defense, the court sua sponte modified its order detrimentally to petitioner. CT 4173-4195. In response to the disqualification motion, Judge Buffington admitted the ex parte contacts, but justified them on the basis of it being over the course of the Christmas holiday season when attorneys were out of town. Id. at 4278. Although this disqualification motion did not itself produce substantial visible signs of animosity between Judge Buffington and the defense, it marked the beginning of what would become a serious problem.

[123] The judge's private "hearing" in June 1985 regarding his views about DePaoli's criminal misconduct in altering subpoenas and the judge's decision to share his views about the matter with Bass and Dikeman and to refer DePaoli to them for prosecution were not included in the disqualification motion because the defense were not informed of those matters. Had defense counsel known about those actions by Judge Buffington, they would have included them as additional support in their motions to disqualify him. See Exhaustion Petn., Exh. 9 at 5.

and Exhaustion Petn., Exh. 8 at 6. Instead, the judge claimed he was not prejudiced against the defense attorneys or against petitioner, and pointed inter alia to the fact that he had even allowed Mr. Price to make the decision about whether Mr. DePaoli should remain as lead defense counsel in the case despite DePaoli's alcohol problems – something the judge said he believed he would not have done had he in fact biased against Mr. Price. Id. at 8147. Rather than establishing a lack of bias on the judge's part, this is instead a clear example of the judge's insensitivity to the need to employ scrupulously fair procedures in this capital case. See e.g. Sawyer v. Whitley, supra, (Stevens, J. concurring). Allowing Mr. Price to make that decision about Mr. DePaoli without having knowledge of the fact that the court had already determined that Mr. DePaoli had probably engaged in criminal misconduct by altering defense subpoenas in the case, that the court had confided that information to the two prosecutors handling the case against petitioner, that the court had referred the matter to those prosecutors for possible prosecution of Mr. DePaoli, and that the court had been informed by Ms. Klay that Mr. DePaoli's alcohol problems were adversely affecting his ability to exercise good judgment in handling petitioner's case, was anything but a scrupulously fair procedure.

686. Mr. Price was himself in a fragile mental and emotional state at the time and was exhibiting what all agreed were signs of possible incompetence to stand trial. Judge Buffington had information so indicating but once again, he failed to employ scrupulously fair procedures in dealing with the problem. First, the judge appointed what he should have known was a tainted expert to examine Mr. Price. Then, when the report came back with an inconclusive result, which explicitly pointed to the need for further evaluation, Judge Buffington completely mischaracterized the report on the record without first even showing it to defense counsel. See RT at 7601, 8006. Those were not the actions of a fair and unbiased judge.

687. The two prosecutors were aware not only of Mr. Price's deteriorating condition, but also of the alcohol-related disabilities of his lead counsel. The two prosecutors also knew that Judge Buffington harbored distrust for Mr. DePaoli, but not for them, given the fact that the judge had chosen to confide in them about DePaoli. This is one reason why the prosecutors engaged in unfair and unconstitutional tactics regarding discovery with impunity. Aware that Judge Buffington was increasingly willing to blame the defense for the discovery issues in the case, rather than them, and that there was therefore little to no chance that they would be subject to any sanctions, the prosecutors utilized numerous unfair tactics to frustrate and hamper the ability of defense counsel to adequately meet and counter the prosecution's evidence. Those use of such tactics triggered protracted discovery hearings, the filing of numerous discovery motions by the defense, and numerous motions for sanctions and mistrial motions. See e.g. CT 4431-4452. The record contains scores of instances where such unfair tactics were used, and more than a decade after petitioner's trial, additional instances of the prosecution's game-playing with discovery came to light. There are simply too many instances for them all to be listed in this petition. Petitioner will therefore provide some illustrative examples below. However, these are not meant to be an exhaustive list.

688. The prosecution's unfair tactics included, among others, delaying the production of court-ordered discovery without good cause. There are abundant examples of this in the record, including, inter alia, the following:

(a) The unjustifiable delay in providing the defense with audible tapes of various interviews by law enforcement with key prosecution witness Michael Thompson conducted in 1983 and early 1984 until months after he had testified against petitioner at his April 1984 preliminary hearing. See CT 3455.

(b) The unjustifiable delay in providing Thompson's taped interview with SSU agent Hahn on September 14, 1983 until April 1986, a month after Thompson had concluded his testimony. See RT 17816-17817.

(c) The unjustifiable delay in providing over 1485 pages in previously ordered discovery until March 1, 1985, which was just before the trial was scheduled to begin. RT 801-821. That discovery included documents which had been generated by or were in the possession of the Humboldt County prosecutor long before then, including, inter alia, witness protection assistance expenditure records from March 1984. CT 4930-4938. Those records were requests by Humboldt County for reimbursement for $25,800 in funds for Michael Thompson, Linda Thompson (his sister) and Janet Myers. Id. The prosecution had those records before petitioner's April 1984 preliminary hearing, at which both Michael Thompson and Janet Myers testified on the prosecution's behalf. Rather than timely disclosing those records to the defense, the prosecution instead unjustifiably delayed disclosing them for a year.

(d) The unjustifiable delay in providing the alleged "hit or miss" message evidence, which Thompson had furnished to Humboldt County law enforcement officials in late 1983. See Exhaustion Petn., Exh. 7. Petitioner is informed and believes based on the fact that the defense did not question Thompson about the alleged "hit or miss" message at petitioner's April 1984 preliminary and would have done so had the defense known about that evidence, that the letter[124] containing that alleged message was among the documents that the prosecution delayed in disclosing to the defense until March 1985.

---

[124] The handwritten notation on the letter indicating "disco 12/23/83" appears to be an internal district attorney office reference, and not the date the letter was turned over to the defense.

(e)   The unjustifiable delay in providing a report of a June 1983 interview of Franklin Sherman Thompson, who had been with Elizabeth Hickey within days for the time she was killed and to whom she had shown various guns she wanted to sell, until April of 1985.   See Exhaustion Petn., Exh. 56.   The defense had earlier requested all reports of interviews with Franklin Thompson.  They made that request in September of 1984.  CT 3468.  The prosecution claimed at that time that the defense had everything available.  RT 801-821.  That representation was clearly wrong.

(f)   The unjustifiable delay in disclosing LASO Sgt. Barnett's interviews with Clifford Smith in October 1985, which were not produced by Barnett until February 11, 1986 and as to which he claimed privilege (RT 14891-14895).

(g)   The unjustifiable delay in disclosing the transcript of Michael Thompson's February 26, 1986 parole hearing which was not provided to the defense until April 3, 1986 (RT 18975), one month after Thompson had testified for the prosecution.

(h)   The unjustifiable delay in disclosing various daily case-related logs of SPU investigator Paul Tulleners, which were often not provided until weeks after they had been prepared and sent to DAG Bass.   See e.g. RT 4091-4092.   One daily log for the date 3/7/86 contained relevant statements made by prosecution witness Michael Thompson to DAG Bass and Tulleners at the Humboldt County Jail shortly before Thompson took the stand.   That log was not disclosed to the defense, however, until April 10, 1986, which was again about a month after Thompson's testimony had concluded, and he was back in Los Angeles County.   See Exhaustion Petn., Exh. 43 at 32-33.

689.   Another unfair discovery tactic that the prosecution used was to maintain that certain discoverable information did not exist, only to have that information turn up months and

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH
-314-

sometimes even years later. For example, the prosecution, inter alia, maintained that SSU agent Hahn's interview in early 1984 with cooperating informant Larry Turtle Jones was not tape-recorded, only to have a tape recording of that interview and a transcript of that tape-recording surface in June 1985 in the possession of prosecutor Bass.[125] The prosecution also maintained that Los Angeles homicide detective Morck did not have notes of his investigation in 1983. RT 2364. Then, in July of 1985, those notes surfaced. RT 3532-3533. By that time, however, Morck could no longer recall what many of his entries meant or to whom they referred. See e.g. RT 3656, 4005, 4034-4035.

690. The prosecution also maintained that certain discoverable documents could not be produced because they were missing or lost. For example, Barry Brown, the investigating agent for the Humboldt County District Attorney's Office, claimed that he had lost his notes of his visit

---

[125] The prosecution and the Humboldt County Sheriff's Department also maintained that there was no tape recording of prosecution witness Berlie Petry's call to emergency services to report the Elizabeth Hickey homicide because the recording device at the dispatch center allegedly malfunctioned. See RT 18053-18055, 18061. However, several years after petitioner filed his state exhaustion petition, retired SPU case agent Paul Tulleners, a member of the prosecution team in the Price case, informed petitioner's habeas counsel that he (Tulleners) had just learned that the reel-to-reel audiotape he had seen in prosecutor Bass's possession after petitioner's trial was the dispatch tape of Petry's call reporting the Hickey murder. See Petitioner's Reply to Respondent's October 6, 2000 letter brief, at pp. 31-34, and exhibits cited therein. Petitioner could not have discovered that new information through the exercise of due diligence any earlier because the information was known only by members of the prosecution team, and except for agent Tulleners, none of them has disclosed it. Before Tulleners learned that new information, he had erroneously believed that the tape in question was the Fredrickson-Petry interview tape, and that is what Tulleners had previously told petitioner's federal habeas counsel. Petitioner would note here that since all of the Fredrickson-Petry interviews appear to have been introduced at his trial, petitioner's counsel did not consider Tulleners' initial information about the identity of the audiotape that Bass had in his possession after the trial to be accurate and for that reason, petitioner did not include that initial information in the examples he provided in his initial federal habeas petition of prosecutorial discovery-related game playing.

with Janet Myers to the Barnes crime scene in 1984. RT 14021-14023. No explanation was even given for the non-disclosure of any reports and notes of the visit Myers made to the Barnes crime scene with LASO Sgt. Barnett and LASD homicide detectives Ross and Morck.

691. In addition to the unfair tactics of providing discovery belatedly or not providing it at all, the prosecution failed to timely inform the defense about which witnesses would be called the next day, as the court had ordered. See RT 12174. This kept the defense off-balance and at a disadvantage by not knowing which of the hundreds of witnesses on the prosecution's witness list they had to prepare to cross-examine the following day. See e.g. RT 11823, 12174, 12260, 12523-12524.

692. The prosecution also utilized the unfair tactic of maintaining [erroneously] that it had no duty to obtain or turn over records that were not in the prosecution's possession but were instead in the possession of other agencies See e.g. RT 263-29, 263-41. The trial court recognized that the prosecution's tactics amounted to an improper attempt to "shuffle justice." RT 14544-14545. However, the trial court still ruled in the prosecution's favor and allowed the prosecution to prevail in its unfair discovery tactics. This left the defense in the position of having to obtain and serve subpoenas duces tecum on such agencies as the California Department of Corrections (CDC) and the Los Angeles County Sheriff's Department (LASD), only to have the prosecution then side with the agencies at which those subpoenas were directed in claiming that the defense subpoenas were technically deficient and should be quashed. [126]

---

[126] The prosecution's position was erroneous as a matter of federal constitutional law with respect to Brady evidence. See Kyles v. Whitley, 514 U.S. 419 (1995) [the prosecution has the burden and duty to find out about and disclose impeachment and other Brady evidence in the
Footnote Continued on Next Page

See RT 14542-14550-1.

693.    That tactic was utilized to frustrate efforts by the defense to obtain timely disclosure of prosecution witness Clifford Smith's prison file.  As a result, the defense did not get disclosure of any information from that file (to the limited extent the trial court ordered such disclosure) until February 6, 1986, which was months after Smith first began cooperating against petitioner, and the defense never got disclosure of Smith's 1983 visiting records, even though the defense obtained and served court authorized subpoenas for production of those records and even though those records were Brady material.[127]

694.    Another of the prosecution's unfair tactics was to claim surprise when their witnesses disclosed damaging information for the first time at petitioner's trial.  For example, prosecution witness Tina Ransbottom testified that she had seen a brown-colored car parked near the Hickey residence the night she was killed.  Mr. Price had a brown-colored car, but so did other men Ms. Hickey knew.  Prosecutor Dikeman said Ms. Ransbottom's description of the car and driver was news to him.  See RT 12625-12627.  Another example occurred during Clifford Smith's testimony when he referred to a San Quentin counselor and said she had monitored a phone conversation between him and his mother.  DAG Bass represented he did not know that until it was brought up in court.  RT 14799-14800.

---

possession of any law enforcement agencies involved in the investigation and/or assisting the prosecution].  In petitioner's case, that duty therefore extended to Brady information in the possession of the Los Angeles County Sheriff's Department.  Also, since the government is to be treated as a single entity for purposes of Brady, the prosecution had a duty to obtain and disclose and disclose impeachment and other Brady evidence the California Department of Corrections, a state agency for which the California Attorney General's Office served as legal representative.  See Carriger v. Stewart, 132 F.3d 463 en banc (9th Cir. 1998).
[127]  See Claim I, section E (1), supra.

695.    There were simply too many lost documents, too much concealed evidence, and too much game-playing by the prosecution concerning discovery to make those claims of surprise credible.    Moreover, SPU agent Tulleners, the lead case agent for the California Attorney General's Office in petitioner's case, has confirmed to petitioner's habeas counsel that certain members of the prosecution team, including but not limited to prosecutor Ron Bass, engaged in discovery-related game playing.    See Exhaustion Petn, Exh. 6.    According to Tulleners, Bass, among others at SPU, wanted to keep as much information as they could from the Price defense, including relevant and potentially discoverable evidence.    Id.

696.    Tulleners was strongly opposed to such tactics and to any game-playing with discovery, particularly in a capital case, and he made his opposition known to his superiors at SPU.[128]    His superiors reacted by keeping him out of the information loop despite the fact that Tulleners was the assigned lead investigator on the case for the Attorney General's Office in the Price case and was one of the most experienced members of the prosecution team.    Indeed, Bass even acknowledged during his testimony at the March 1985 discovery hearing: "Tulleners is a top man, top – top guy in the State, one of the best investigators in the department."    RT 872.

697.    In addition to cutting Tulleners out of the information loop, his superiors at SSU

_____

[128]    For example, Tulleners sent a strongly worded dissent to Senior Assistant California Attorney General John A. Gordnier, who headed the Special Prosecutions Unit, protesting Gordnier's proposed policy guidelines requiring SPU agents to prepare two separate reports of their interviews with informant witnesses and potential informant witnesses.    Under those guidelines, one of those two reports would be a confidential or "blind" report, and Gordnier or another SPU official would get to make the ultimate decision about whether or not the "blind" report would be submitted to the trial court for its determination as to whether any of the information in that report should be disclosed to the defense.    See Petitioner's Reply to State's Letter Brief at pp. 48-50, and exhibits cited therein.

also sharply curtailed the scope of his duties in the Price case. For example, they directed Tulleners not to take notes of any interviews he witnessed or to prepare any written reports of such witness interviews.[129] In addition, Bass directed Tulleners to keep two separate daily logs of his activities. One log would be for internal review. The other would be provided to the Price defense after Bass determined which entries were irrelevant and those entries were then excised. At some point during the case Tulleners also began to keep notes on the reverse side of pages in his official daily logs to memorialize what has really happening behind the scenes of the Price prosecution, including the unfair discovery tactics that the prosecution was utilizing. See Exhaustion Petn., Exh. 43. Those reverse side log entries were not disclosed to the judge in the Price case or to the defense, and although Bass knew that Tulleners was writing notes on the back side of his case logs, petitioner is informed and believes that Bass and the others did not know the substance of those entries. Certain of those log entries document the outright deceitfulness of Bass in petitioner's case. For example, in one entry Tulleners described Bass' actions concerning the trial court's suggestion that defense counsel DePaoli and agent Tulleners meet informally and try to resolve some of the ongoing discovery problems in the case. Bass

---

[129] Those directives issued after Bass and several high-ranking SPU and CDC officials were required to testify at a pretrial discovery hearing in March 1985 that was ordered after discoverable information came to light that had not been previously disclosed to the defense. That information only came to light because Tulleners included it in a witness interview report. It was Tulleners' standard practice to include in his witness interview reports all relevant information provided by the witness, including information that might prove helpful to the defense. Initially, after the March 1985 pretrial discovery hearing, SPU officials ordered Tulleners to cease having any further contact with witnesses in the Price investigation, and banned him from participating in any further witness interviews. That ban was eventually lifted and Tulleners was authorized to resume his contacts with witnesses and to attend witness interviews, but with the caveat that some other agent, and not Tulleners, would prepare the witness interview reports.

made it appear to the court that he was willing to go along with that suggestion. However, after court, he took the opposite tact, advising Tulleners to tell DePaoli to "get the fuck" lost. See Exhaustion Petn., Exh. 43 at 11.

698.    By engaging in purposeful tactics and game-playing designed to keep relevant, discoverable information out of the hands of the defense and thereby frustrate the defense's ability to defend this case, by their deceitful, self-righteous portrayal of themselves as the party not at fault on the ongoing discovery disputes with the defense, by their knowing use of and/or knowing failure to correct perjured testimony and by their suppression of constitutionally material evidence, as alleged in Claim I of this petition and incorporated herein by express reference, the prosecution ultimately turned the trial into a sporting event, and infected petitioner's trial with unfairness. Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) (prosecutorial misconduct requires reversal where it "infected trial with unfairness"; Berger v. U.S., 295 U.S. 78 (1935) (prosecutorial methods "calculated to produce a wrongful conviction" are unfair and unconstitutional).

699.    In the end, however, the ultimate responsibility for the breakdown in the fairness of the proceedings in petitioner's case rests with the trial judge, who demonstrated a clear lack of impartiality in petitioner's case. Judge Buffington manifested inappropriate hostility, disdain and derision towards petitioner's court-appointed attorneys, harbored actual bias against petitioner, and failed to hold the balance between the State and the defense and/or the balance between vindicating the court's interests and those of Mr. Price. See Tumey v. Ohio, supra, Taylor v. Hayes, supra. Any one of those factors was sufficient to have required that Judge Buffington be disqualified from presiding over petitioner's capital case proceedings.   In combination, those factors made the need for Judge Buffington to disqualify himself

overwhelming clear. Rather than stepping down and allowing an impartial judge to make the critical rulings in petitioner's case, Judge Buffington instead made those rulings himself -- rulings that overwhelmingly favored the prosecution and were adverse to the defense. A number of those rulings are alleged as separate claims for relief in this petition, including but not limited to Judge Buffington's ruling granting the prosecution's request that petitioner be shackled during his trial. See Claim XIV, infra.

700. Other rulings by Judge Buffington led to events that also contributed to the breakdown in the fairness of the proceedings in petitioner's case. For example, Judge Buffington's refusal to move this case to a different venue culminated in a series of events which denied petitioner a fair trial. As a result, the boundaries between counsel and jurors were inevitably to be violated repeatedly. As noted elsewhere in this petition, and incorporated herein by express reference, the prosecution engaged in unethical conduct aimed at currying favor with a juror. This fact alone warrants reversal. See Remmer v. United States, 347 U.S. 227 (1954). This same juror had previously lied about her own alcohol problem on voir dire, see CCT-9277-9278, and then when she received two DUI's during the trial, faced criminal proceedings by the same prosecution office litigating the case on which she sat as a juror. RT 12295-12297; 12454. Her potential for bias against the defendant was clear, and yet the court did nothing to correct the problem. See McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548, 554 (1984). Also, because this case arose in a small community, many jurors were quite familiar with the witnesses in this case. For example, also noted in Claim V in this petition, and incorporated herein by express reference, juror Kramer was married to, and worked for, local psychologist Richard Kramer, who ultimately acted as an expert for the prosecution, the court, and the defense. She also had previously been involved with DePaoli, and yet neither she nor DePaoli

disclosed this fact to the court or the parties. Thus juror Kramer's potential for bias was also clear. Id.

701.   In sum, because of the trial court's bias and lack of impartiality and a combination of other factors, including the conduct of defense counsel, the prosecuting attorneys and members of the jury, there was an overall breakdown in the fairness of the proceedings that denied petitioner his federal due process right to a fair trial and his Sixth Amendment right to adequate legal representation. Under the unique circumstances of this case, prejudice from the breakdown in the fairness of petitioner's trial should be presumed. See e.g. US. v. Cronic 466 US 648, 658-661 (1984). Indeed, the denial of petitioner's right to trial before an impartial judge, as guaranteed by federal due process, is a structural error -- an error that requires the granting of federal habeas corpus relief without any showing of prejudice. See e.g. Sullivan v. Louisiana 508 U.S. 275, 279 (1993); Edwards v. Balisok, 520 U. S. 641 (1997). But even if a showing of prejudice is required, petitioner was in fact prejudiced, and his convictions and sentence of death must be vacated.

# CLAIM VIII.

## THE TRIAL COURT'S THREAT OF HOLDING DEFENSE COUNSEL IN CONTEMPT AND THEN REFUSING TO RESOLVE THE ISSUE UNTIL AFTER TRIAL VIOLATED PETITIONER'S RIGHT TO A FAIR TRIAL, DUE PROCESS, AND THE EFFECTIVE ASSISTANCE OF COUNSEL

702.    During the trial, the trial court threatened to hold petitioner's defense attorneys in contempt in this case, and then refused to resolve the issue until after the trial, in violation of petitioner's right to due process, a fair trial, and the effective assistance of counsel, as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

## A. Factual and Procedural Background

703.    On August 21, 1985, the defense filed a "Motion to Dismiss for Failure to Provide Speedy Trial Pursuant to California Penal Code Section 1382." CT 7352-7388. The Statement of Facts in the motion explained that petitioner had been in custody without bail for nearly thirty months. CT 7353.   After almost a year, the prosecution had moved to dismiss the case in order to re-file it with additional charges. CT 7353-7355.   As a result, the information was not filed in the Superior Court until June 25, 1984, more than fifteen months after the arrest. CT 7355.   The motion then detailed procedural events that resulted in a necessary postponement of trial, with no waiver of time because the prosecution failed to provide timely discovery and then presented the defense with 1,500 pages of new discovery materials just before the trial was to begin in early March, 1985. CT 7356-7359; RT 801.

704.    Based on these facts, the defense argued that Price had been improperly deprived of his statutory right to a speedy trial (Penal Code section 1382) requiring a dismissal of the charges. CT 7360-7386.

705.     On September 5, 1985, the court filed a written ruling noting that jury selection had finally begun on June 11, 1985, and was still in progress. CT 7760-7770. The ruling attacked the statement of facts in the defense motion as being "so incomplete that it is misleading," (CT 7761) and set forth portions of the motion which the court found improper.[130]

706.     Among the court's complaints was the fact that the defense motion had asserted that the previous filing (Humboldt County Superior Court case number 9830) had been dismissed over the objection of the defense. The ruling noted that the defense had made this claim at least twice before and that the court had already ruled that the defense had agreed not to object to the dismissal. The ruling criticized the defense for urging this claim again after it had been resolved against the defense.[131] The ruling concluded, "[t]his conduct is in violation of an attorney's duty and oath and subject to sanctions." CT 7762.

---

[130] Of course, the trial court was already thoroughly familiar with the procedural history of the case, so it is difficult to understand how the court could possibly have been misled, even by an incomplete statement of the facts. Thus, if it were true that relevant facts were left out, or even misstated, it seems clear that it must have been due to an honest disagreement as to what had occurred or as to which facts were relevant to the issue presented, rather than an intentional effort to mislead the court.

[131] The actual events in case number 9830 were somewhat more complicated than the trial court acknowledged. Shortly before hearing on a motion which the defense thought would succeed and end the prosecution altogether, a new prosecutor on the case made the determination to dismiss and refile in order to add the Barnes' homicide and conspiracy charges. The defense strongly objected to this procedure, but it was not very likely the trial court would preclude the prosecutor from proceeding as he desired. Finally, the prosecutor agreed to proceed with the suppression hearing and be bound by the result, and the defense agreed in return that after the hearing, it would not oppose a prosecution motion to dismiss. It is quite clear that at all times, the defense did not want case number 9830 dismissed if it would mean delay in an ultimate resolution, but the defense agreed reluctantly since that was the only way to obtain an expeditious hearing on the suppression motion. See CCT 3932-3943 4011-12; see also the supplemental reporter's transcript on appeal covering case number 9830, at pp. 62-83.

707. Finally, the ruling stated that the defense motion was denied without any hearing because it had been ruled on previously. The ruling went on to provide that the only hearings merited by this motion will be the following:

(a) A hearing re sanctions pursuant to C.C.P. §128.5 as to Mr. De Paoli for filing this motion;

(b) A hearing re sanctions pursuant to C.C.P. §128.5 as to Ms. Klay for filing the "Motion for Release on Own Recognizance on Setting of a Reasonable Bail" on August 30, 1985;

(c) These hearings will be held post-trial and the Court will consider compliance with this ruling as a factor at that hearing. CT 7768-7769.

708. The ruling contained several additional pronouncements, including the following:

709. Each defense counsel is hereby notified that they are to be ruled by previous decisions of this Court on factual issues and the law, unless the facts change.

710. Further motions based upon unchanged facts and law will be regarded as a reason to cite counsel for misconduct and impose proper sanctions.

711. All counsel are advised that they have the sworn duty to get this case to trial. Groundless, frivolous, spurious motions based on incomplete or misstated facts do not show a good faith attempt to fulfill that duty. ... See CT 7769; emphasis in original.

712. Additionally, despite the lack of any specificity as to what the trial court believed attorney Klay had done wrong, the ruling contained a further unusual direction that attorney Klay would not be allowed to file any documents in this case unless they had first been received by attorney DePaoli and "approved as to form, content and legal authority..."

CT 7769.

713. On September 10, 1985, in response to this action by the trial court, the defense filed a "Motion to Advance Date for Hearings Regarding Sanctions of Both Defense Counsel", along with supporting declarations by both defense counsel. CT 7788-7803. Defense counsel each contended they believed their motions had been merited by developing circumstances, and that they had filed the various documents in good faith, with no intent to mislead the court in any way. CT 7788-7789.

714. Defense counsel stated their belief that the court's September 5 ruling had created "a very chilling effect on defense counsel's ability to fully represent Mr. Price." CT 7793. Specifically, with the express threat of sanctions to be imposed at the end of the trial, both defense counsel were concerned that their ability to fully protect the rights of their client had been compromised. They felt intimidated by the knowledge that a vigorous defense would only result in stronger sanctions against them at the conclusion of the trial. CT 7793-7794; see also CT 7795-7803. To alleviate this problem, defense counsel asked the court to promptly hold a hearing and determine any sanctions to be imposed, rather than to delay until the conclusion of the trial. CT 7794.

715. The next day, the trial court briefly addressed the matter, stating that what it meant to say in the September 5 ruling was that there was a possibility the court would hold a contempt hearing at the end of the case. The court denied an intent to chill the ability of defense counsel to represent Mr. Price in the manner required by the constitution. RT 7271.

716. The court noted that by the end of the trial it might find it unnecessary to hold the contempt hearings at all. The Court ordered the defense attorneys not to let the possibility of sanctions to interfere with their representation of Price. Finally, the court refused to delay

Price's trial in any way in order to deal with the sanctions, since they had nothing to do with Price's guilt or innocence. RT 7272-7273.

717.    Aside from the impact the threat of contempt had on defense counsel, the court's harsh criticisms clearly caused Price to lose confidence in his attorneys. On September 16, 1985, Price sought to have his counsel relieved and to have new counsel appointed, explaining, "I can tell by the Court's rulings and admonishments that it feels my attorneys are both individually and personally incompetent." CT 8155.

718.    The Court then appointed independent counsel to advise Price as to the competence of his counsel. Attorney John Young appeared on September 18, 1985 and noted he had not had any opportunity to review the records pertaining to the contempt citations that had been levied. RT 7593.  The trial court responded without explanation, "There have been none." RT 7593.

719.    Apparently confused by mixed signals and frustrated by the court's refusal to reach a final determination of the matter, the defense attorneys obtained counsel of their own and, on October 22, 1985, filed a petition for writ of mandate in the Court of Appeal, First Appellate District. CT 8407-8464. Two days later, the writ was summarily denied. CT 8485.

720.    Nothing more was said about the threatened contempt action until April 22, 1986, when the court filed a written ruling regarding an offer of proof made by Mr. Price. CT 10173-10175.  In the course of that ruling, the court noted, "Mr. Price's attorneys have not been held in contempt and do not face any penal sanctions as of this date." CT 10174-10175. Again, on July 1, 1986, in a written ruling rejecting Price's request to read a statement to the jury during the penalty phase hearing, the court stated that factual allegations that had been

made by Price were inaccurate.[132] The ruling then noted, "[f]or instance, there is no pending

contempt charge against Ms. Klay or Mr. DePaoli." CT 10765.

721.    The trial court proceedings came to an end with the pronouncement of

judgment on July 10, 1986, with no further action taken on the contempt matters.

**B.    Threatening Contempt Findings and Refusing to Resolve Them Was Unjustified, Inappropriate, and Inevitably Interfered with Mr. Price's Right to the Effective Assistance of Counsel**

722.    Although the trial court was ambiguous about its intent whenever the subject of

the threatened contempt came up, there was no ambiguity in the language used in the

September 5, 1985 ruling. That ruling said that attorney DePaoli's conduct "is in violation of

an attorney's duty and oath and subject to sanctions under C.C.P. §128.5." CT 7762; emphasis

added.    The order further stated that hearings regarding sanctions were merited as to both

defense counsel. The order specified, "[t]hese hearings will be held post-trial and the Court

will consider compliance with this ruling as a factor at that hearing. CT 7768-7769.

723.    The ruling unmistakably communicated the fact that the court had found both

defense counsel in contempt and the only remaining issue was the appropriate sanction.

Furthermore, the ruling made clear that a hearing would be held, and that the trial court's

assessment of both trial counsels' behavior throughout the remainder of the trial would be

considered in mitigation or aggravation at the sanction hearing.

724.    At the same time, the written ruling was ambiguous and/or problematical in

several crucial respects. There was no hint as to what it was that the trial court found con-

---

[132] The statement set forth Price's explanation for his absence during most of the guilt phase and his views about the unfair treatment he had received. CT 10768-10770.

temptuous about attorney Klay's bail motion. As noted above, it was unclear to which

document the court referred. Also, while it was clear that the court was quite displeased with

attorney DePaoli's alleged omission of certain facts, it was equally clear that the facts specified

by the court were, in most or all instances, facts about which there could be a reasonable

disagreement as to whether inclusion was necessary.[133]

725.     There were other problems with the September 5, 1985 ruling. For example,

among the directives leveled at trial counsel was the following:

> Each defense counsel is hereby notified that they are to be ruled by
>
> previous decisions of this Court on factual issues and the law,
>
> unless the facts change. Further motions based upon unchanged
>
> facts and law will be regarded as a reason to cite counsel for
>
> misconduct and impose proper sanctions. CT 7769 (emphasis in
>
> original).

726.     This directive appears quite inappropriate and could easily have discouraged

appropriate motions. For example, suppose the same set of facts are relevant to both a motion

for change of venue and a motion to sever counts. If a motion to change venue is heard and

denied, the issue is preserved for appeal. If the facts that are also relevant to the severance

issue are resolved against the defense, the severance issue has not yet been preserved for

appeal. Surely, even though defense counsel knows the trial court will deny the severance

---

[133]     For example, the ruling states that, "Mr. DePaoli also fails to mention that the defense
attempted to disqualify this judge in January, 1985. Pursuant to that attempt, between January 9,
1985, and February 19, 1985, this Court lost jurisdiction by operation of law." CT 7763. Since
the thrust of the motion pertained to delays that occurred after February 19, 1985, a reasonable
attorney might find it unnecessary to mention the earlier disqualification motion, especially since
all parties and the court were thoroughly familiar with that motion and the delays it caused.

motion (since the crucial facts have already been resolved against the defense), he would have

the obligation to pursue a potentially meritorious matter to preserve it for appeal.[134]

727.　For all these reasons, a hearing was necessary so that defense counsel could be

more precisely informed as to what was objectionable about their behavior and what they

could or could not do in the future.  A hearing would have provided defense counsel with the

opportunity to not only offer their explanations for their behavior, but to have the court rule on

whether their explanations were satisfactory.

728.　Without such a hearing, defense counsel were inevitably left in a state of

uncertainty as to what future behavior would be proper.  Since behavior they believed was

appropriate had been found contemptuous by the trial judge, defense counsel would have had

an unavoidable tendency to limit their advocacy in order to avoid offending the judge further,

---

[134] A reviewing court might find fault with the manner in which the trial court resolved a
disputed factual issue.  Other undisputed facts might make a trial court finding unreasonable, or
there might be a meritorious claim that the factual finding was tainted because of evidentiary
errors that permitted the consideration of evidence which should have been excluded, or that
disallowed evidence which should have been considered.  A reviewing court might find such an
error, but conclude the error was harmless in regard to the change of venue motion.

If the severance issue was also preserved for appeal, the same reviewing court might find
the same erroneous factual determination was prejudicial in that different context.  In order to
fully preserve such an issue, the defense would have to proceed on the basis of the facts believed
correct by the defense, even though the trial court had previously ruled that the facts were
otherwise.

A related problem with the court's directive is that it required defense counsel to abide by
the court's rulings rejecting defense contentions as to the state of the law.  However, requiring
the defense to abide by trial court pronouncements as to what current law required could easily
interfere with the clear right (and obligation) of defense counsel to urge changes in the law.  (See
Stovall v. Denno (1967) 388 U.S. 293, 301.)

while the matter of sanction for the earlier incident was left unresolved.[135]

729. In short, legitimate and important reasons existed to resolve the contempt issue that had been raised by the judge, thereby enabling everybody to know precisely what would happen and how they should proceed. Price, as well as defense counsel, was entitled to such a resolution. If defense counsel's claim of good faith was accepted by the court, then Price would have proceeded with the trial with greater confidence in his counsel. On the other hand, if the claims of good faith were rejected by the trial court, then Price might have had a legitimate basis for seeking new counsel. Price, of course, with his life at stake in the outcome of the case, had a compelling interest in going to trial represented by counsel who were not under the cloud of an unresolved contempt finding.

---

[135] Had a final determination of the matter been made, then any error in the determinations could have been readily reviewed on appeal. On the other hand, with no hearing and no specific ruling it is far more difficult to now determine whether the directives in the September 5, 1985 order were proper or not. The matter is complicated even further by the impossibility of ever determining the precise effect the September 5 order had on the subsequent behavior of the trial attorneys. Since the defense actively sought a prompt and decisive resolution, and it was the trial court that insisted on leaving the matter intolerably ambiguous, the State and not Price should bear the burden on any issue of prejudice.

The actions of the trial court are directly responsible for any difficulties in the record in establishing specific prejudice. The defense attorneys could hardly be expected to state on the record that fear of further sanctions caused them to refrain from taking certain action. Such an offer would have been contemptuous after the trial court's unrealistic order to not allow the threat of contempt to effect the quality of the representation. Also, the cloud of intimidation under which the defense was forced to function throughout the last ten months of the trial undoubtedly had subtle effects on their behavior so that even they could never be quite certain how much a decision to forego a motion or an objection was based on a fear that it might result in incurring the judge's wrath and increasing the sanction for the contempt that had apparently already been found.

Because of this interference with the fundamental constitutional right to effective assistance of counsel, and the inevitable impact on the composition of the record, the only fair standard to apply if this Court agrees that the trial court acted improperly is to presume that the error was prejudicial, unless the People can establish beyond a reasonable doubt that it was not. See U.S. v. Cronic, 466 U.S. 648, 658-61 (1984); Rose v. Clark, 478 U.S. 570 (1986).

730.    There were no offsetting reasons to leave the matter unresolved.  Although the court ordered defense counsel not to allow the contempt incident to interfere with the effectiveness of their representation, and the court indicated there had not been any actual contempt finding, the strong language in the September 5, 1985 ruling could not be disregarded.  Also, in expressly refusing to "interrupt" the trial to deal with the sanctions (CT 7272-7273), the court communicated an intent to deal with them at some future time, which was inconsistent with the court's statements that there had been no contempt finding.

731.    The only reason ever given by the court for refusing to resolve the contempt matter was to avoid any further delay in the trial proceedings.  However, the jury selection proceedings did not consume every minute of every day, and many other motions were heard and decided while jury selection proceeded.  Surely, whatever hearing was needed to resolve the contempt matter could have been scheduled to avoid any disruption in the jury selection process.  Moreover, it was unlikely that such a hearing would be lengthy.  Thus, the only remaining explanation for the trial court's refusal to speedily resolve the contempt matter was the court's belief that there was an advantage in going through ten more months of trial with defense counsel constrained by fear of unknown sanctions.

732.    Holding the ambiguous but intimidating threat of sanctions in abeyance was extraordinarily counter-productive to zealous advocacy by defense counsel in an adversarial system of justice.  As such, the trial court's errors resulted in a serious interference with the fundamental right to the effective assistance of counsel.  Strickland v. Washington, 466 U.S. 668 (1984).  More importantly, this interference occurred in a manner that inevitably affected the composition of the record.  As shown above, the only appropriate remedy in such an instance is a presumption that Mr. Price has been prejudiced.  U.S. v. Cronic, 466 U.S. 648

(1984). Such a presumption cannot be overcome on the present record, and the judgment must be reversed.

733. Moreover, California law regarding the use of contempt sanctions to control the behavior of defense counsel or the defendant in a criminal case supports the view here that petitioner was denied his right to a fair trial with effective representation in this case. State law requires compliance with procedural safeguards which were not in any way met in this case. For example, in Fabricant v. Superior Court, 104 Cal.App.3d 905 (1980), a pro per defendant complained about restrictions on his ability to prepare his defense while in jail. He subpoenaed fifty attorneys, randomly selected from the telephone book, to appear at a hearing in order to testify about the type of facilities available to private attorneys. The trial court quashed the subpoenas and assessed the defendant with costs for the time taken by some of the attorneys. In overturning the imposition of sanctions, the Court of Appeal concluded that the Code of Civil Procedure sections authorizing such sanctions for abuse of process applied only in civil cases.

734. In reaching that conclusion, the court noted that the Legislature "probably considered the imposition of sanctions for an attempt to exercise this right [to compel the attendance of witnesses in a defendant's behalf] might tend unduly to chill the vigor of the defense which would be undertaken in behalf of criminal defendants." Fabricant, supra, at p. 915; (emphasis added). The court noted that while defendant could have been found in contempt for abuse of process, such a proceeding would have required a number of procedural safeguards, not afforded in that case. Id. at 916-917.

735. Fabricant is relevant to the present case for several reasons. First, it shows that the trial court did not even have power in a criminal case to impose monetary sanctions pur-

suant to Code of Civil Procedure section 128.5. Moreover, it demonstrates that, under California law, when a trial court desires to use the contempt power, it must follow strict procedures that were ignored in the present case. In general, it recognizes the very grave danger to the proper functioning of the adversarial system that follows from the imposition of sanctions for vigorous advocacy.

736.    The California Supreme Court has also spoken in this area of state law in a manner that supports petitioner's view here. In In re Marriage of Flaherty, 31 Cal.3d 637 (1982), the Court noted its concern with the lack of any clear definition of "frivolous" in the context of contempt sanctions for frivolous appeals:

> This lack of definition presents a problem both for attorneys and for the administration of justice. Counsel face the danger of being trapped between their obligation to their clients to diligently pursue any possibly meritorious claim, and their obligation to the judicial system to refrain from prosecuting frivolous claims. Flaherty, supra, 31 Cal.3d at p. 647.

737.    The present trial court's ambiguous order and its adamant refusal to hold a prompt hearing to conclusively resolve the disturbing matter posed the same dangerous trap as the lack of clear definition in Flaherty:

> Vague definitions of what constitutes a frivolous appeal raise the danger that attorneys will be deterred from asserting valid claims out of a fear that they will incur court sanctions. This in turn will

deprive their clients of their day in court.  Flaherty, supra, 31
Cal.3d at p. 651.

739.    Acknowledging that frivolous appeals posed a real problem, the court noted,
"The difficulty is in striking a balance that will ensure both that indefensible conduct will not
occur and that attorneys are not deterred from the vigorous assertion of clients' rights.
(Citation.)" Flaherty, supra, 31 Cal.3d at p. 648.  Here, it was the complete failure to seek
such a balance that made the procedure utilized here so unfair.  Such a balance would have
been struck by holding the hearing immediately.

739.    Flaherty underscores counsel's need for prompt hearing after his ethics are
publicly questioned by a court.  Aside from damage to the client's interests when counsel must
function under a cloud of intimidation, the attorney also suffers from an inability to respond to
serious charges.  "'[F]undamental fairness requires that an individual be permitted to defend
himself publicly against official charges, however informal, which threaten to stain his
personal and professional future.' (Citation.)" Flaherty, supra, 31 Cal.3d at p. 652-653.

740.    These principles of state law were not in any way honored or followed in this
case, which itself gives rise to the separate due process issue created by this matter.  See Hicks
v. Oklahoma, 447 U.S. 343 (1980) (due process right emerges from state's failure to follow
established state procedures).  In the present case, the trial court attacked the professional
ethics of both trial counsel in a highly publicized capital case in a small county, but the
procedures used by the court precluded counsel from officially answering the charges and
obtaining a resolution of them.

741.    In conclusion, the need for zealous advocacy by criminal defense attorneys has
long been well-recognized by the courts.  Similarly, courts have freely recognized the grave

disruption of the integrity of our adversarial system that results when inappropriate judicial action has a chilling effect on defense counsel's efforts. These principles can never be more important than when defense counsel is representing an unpopular client in a capital case. As shown above, the trial court's allegations of contemptuous behavior in the present case were at best overstated, and at worst grossly unfair. Even if the trial court's allegations had been fair and proper, it is indisputable that the procedures utilized were not, denying petitioner his federal constitutional rights.

# CLAIM IX

## AFTER A <u>BONA FIDE</u> DOUBT WAS RAISED ABOUT THE DEFENDANT'S MENTAL COMPETENCY TO STAND TRIAL, THE TRIAL COURT FAILED TO HOLD AN ADEQUATE HEARING WITH AN INDEPENDENT, UNBIASED EXPERT TO RESOLVE THE ISSUE, IN VIOLATION OF PETITIONER'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL

742.    Petitioner was deprived of his right to a full and fair hearing on the issue of whether he was competent to stand trial in this case, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

### A. The Trial Court Failed to Conduct a Competency Hearing Despite Evidence Raising A <u>Bona Fide</u> Doubt as to Mr. Price's Competency to Stand Trial

743.    On September 16, 1985, the trial judge, the prosecutor, and the defense attorneys all expressed concerns about Mr. Price's current competency to proceed in his trial. The court noted that the defendant had appeared earlier that day in an <u>in camera</u> proceeding regarding a letter he had written to the judge about the performance of his trial attorneys. The court also noted that the defendant had appeared extremely upset and agitated, and that he had alluded to a complete breakdown in the attorney-client communications. The trial judge also said that banging noises had been coming from the holding cell where Mr. Price was being housed. The court concluded that because of his behavior during "the last couple of weeks and particularly in the last three or four days," he had reason to look into whether Mr. Price was competent to continue the trial proceedings at that time. RT 7585. In fact the court had spent the previous weekend researching the legal issues involved because of his concern that "this would be a problem." RT 7588.

744.    The prosecutor also noted concerns about the defendant's mental state.  He stated for the record his observation that "the defendant's voice was shaking, as well as his body, hands, legs." RT 7586.

745.    Defense counsel then expressed their concern as to their client's mental competency.  Ms. Anna Klay, herself a state-certified social worker, stated that he appeared to be suffering from a psychotic episode.  Id.  When she sought to explain, stating her impression that Mr. Price was "suffering from delusions", the trial judge interrupted her and indicated he did not "want to get into that at the present time." RT 7587.

746.    However, the trial court did, on this same day, appoint Dr. Richard Kramer to examine Mr Price as to his mental competency at that time.  CT 7824.

747.    Two days later, on September 18, 1985, the trial judge received a five page report from Dr. Kramer following his examination of Mr. Price.  RT 7601.  The court stated on the record that the report "is not really conclusive; apparently, because of an inability to get a full interview with Mr. Price."  Id.  The court noted that it was thus left in an "odd position" with respect to the competency issue, but acknowledged that it would eventually have to address it.  Id.

748.    The record reflects that the trial court never did address the issue at any later point in the trial.  On October 16, 1985, defense counsel noted for the record that the trial court had not provided a copy of Dr. Kramer's report to them.  RT 8006.  The trial court responded by indicating that it felt "it wasn't relevant to anything I determined. [sic] Determined there was no basis to any problem there... The only reason I haven't provided it is, as far as I can tell, there's nothing in that report that bears upon any issue in this case."  Id.  The court went on to characterize Dr. Kramer's report: "The Doctor's determination was that there — my concern was

not justified pursuant to 1368 and that I ought to go peddle my papers elsewhere." Id.

749.    Eventually Dr. Kramer's report was released by the trial judge to the attorneys in the case.    Contrary to the judge's characterization, the report did little to dispel the doubts expressed by all of the parties as to Mr. Price's competency; instead, it confirmed the parties' suspicions that Mr. Price was not then capable of rationally consulting with his attorneys, and pointed to the need for further expert inquiry to adequately assess the situation.

750.    Dr. Kramer's report addressed both prongs of the constitutionally mandated test for competency to stand trial: (1) whether the defendant has a rational as well as factual understanding of the proceedings; and, (2) whether the defendant has sufficient present ability meaningfully to consult with counsel and participate in the defense.    See Dusky v. United States, 362 U.S. 402 (1960).    On the first prong, Dr. Kramer felt that, at that time, Mr. Price "does seem grossly conversant with the charges against him, his standing before the court and possible pleas and dispositions to both the charges and the incompetency procedure."    CCT (sealed) at 4340-4344, 4342.    Dr. Kramer did express some concerns, however, characterizing Mr. Price's adjustment as "tenuous" due to stress and anxiety, and a "rigidification of his personality structure" regarding his treatment at the Humboldt County Jail. Id. 4342-4343.

751.    On the second prong of the Dusky test, the issue of consultation with counsel, Dr. Kramer states: "With respect to his current ability to rationally collaborate with his current counsel, I would need more information to make an explicit determination." Id. at 4343.    Dr. Kramer went on to find that Mr. Price "may upon proceeding prove incompetent but in lieu of a longer and more in depth interview may only clearly manifest that level of incompetence if he is assigned the task of following the procedure outlined herein [regarding being seen regularly by a trained therapist]." Id. 4343-4344.

752. This report can in no way be characterized as "irrelevant" on the issue of Mr. Price's competency. The trial court's statement that this report provided no basis for believing there was any competency issue is erroneous. To the contrary, the report says in no uncertain terms that more evaluation and assessment is necessary before a conclusion could be reached. While it is not clear why the trial judge chose to withhold Dr. Kramer's report from the parties initially, what is clear is that, unbeknownst to trial counsel, the judge's descriptions of the report were definitively mischaracterizations.

753. Most importantly here, the trial judge should at the very least have followed up on Dr. Kramer's report by having a further examination conducted. Dr. Kramer's report was clearly inconclusive as to the second prong of the <u>Dusky</u> standard, and made clear that further interview and evaluation of Mr. Price was necessary. The trial judge's failure to do order such a follow-up evaluation violated petitioner's right to a full hearing on the issue once the "bona fide doubt" as to his competency had been raised by the evidence.

754. The law is clear that this issue alone warrants a new trial in this case. In <u>Drope v. Missouri</u>, 420 U.S. 162, 179 (1975), the Supreme Court held that the trial judge committed constitutional error warranting a new trial when it failed to hold a full competency hearing in the face of evidence that the defendant may have been incompetent. The Court also held that a retrospective hearing would not have been adequate to make the determination of competency. See <u>Pate v. Robinson</u>, 383 U.S. 375 (1966). The court's duty to conduct a hearing exists whether or not defense counsel make a full and adequate request for such a hearing. <u>Id</u>.

755. The trial judge's failure to conduct the proper inquiry was compounded by further events during the trial. Several times throughout the trial itself, the trial court received further information that should have warranted the follow-up testing and evaluation contemplated by the

court expert from the beginning. For example, just 2 months after the trial judge had ordered the mental examination by Dr. Kramer, and only a few days after the evidentiary portion of the trial had begun, Mr. Price refused to come to court on the morning of November 19, 1985. During the discussion that followed, defense counsel Klay stated, "Your Honor, Mr. DePaoli and I both strongly feel Mr. Price is just simply not capable mentally of cooperating at this time." RT 10593.

756.    The court asked if the attorneys were expressing their own bona fide doubt as to Mr. Price's mental competency under section 1368 of the California Penal Code, and defense counsel DePaoli asked for an opportunity to discuss that with his co-counsel before responding.[136] RT 10594.

757.    Later that day, the judge returned to the competency issue, stating:

> So I don't find at this point that I have cause to express a doubt
>
> about his competency. I would indicate for the record that if we
>
> continue to have interruptions on the basis of jail-related problems,
>
> that I might come to a position where I would consider someone

---

[136]Nothing more was said on the record that day about defense counsel Klay's expressed concern. Declarations from both trial counsel, attached as exhibits to the state habeas corpus petition and incorporated herein by express reference, demonstrate that after DePaoli asked to confer with Klay, they both recognized that they believed Price was, in fact, incompetent within the meaning of California Penal Code section 1367, but DePaoli still preferred to proceed with the trial rather than have competency proceedings initiated. Klay acquiesced and said nothing more on the record. See State Petition for Writ of Habeas Corpus and Motion for Consolidation (filed in 11/90), accompanying exhibits thereto at pp. E-42 and E-58 to E-59; see also penalty phase defense closing argument: "believe me, he was a mental and physical wreck during a large period of that time to the point where he wasn't capable of even participating in his own defense, at his own trial." RT 22967.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

who continually denies the fact that they are faced with a very

serious charge to -- on the other hand become involved with what

are to them personal problems, no doubt, but are minutia in

comparison. It might cause me some concern, but not today. RT

10607-10608.

758.    Two days later, based on continuing problems between Mr. Price and Humboldt

County jail officials, the court issued its order that Price be shackled throughout the remainder of

the proceedings. RT 10762-10763. (The shackling issue is addressed elsewhere in this petition.)

Soon afterward, Price told the court he preferred not to attend his trial, rather than appear before

the jury in shackles.[137] (The issue of Mr. Price's absence from his eight month trial is also dealt

with elsewhere in this petition.) Despite these events, the trial judge took no further proceedings

---

[137]The events surrounding this decision are set forth in detail in Appellant's Opening Brief, at
pages 305-306. It is also noteworthy that in penalty phase testimony offered by the defense,
board-certified psychiatrist Dr. Fred Rosenthal expressed considerable doubt whether Price was
able to make a rational decision to refuse to go to court and have people see him in shackles:

> "Well, I think at the time when he was involved with the problem
> of the shackles, he was very disturbed by it.  And I have some
> doubts on how rational he could be and make decisions about what
> he should do.  That is, whether he should go to court and be here
> for his trial even with the shackles or whether he shouldn't do that.
> I think that kind of decision may have been beyond him at that
> point.  And he was very disturbed then and angry about having to
> be shackled." RT 73:22141; emphasis added.

Declarations from both trial counsel which were filed by petitioner in support of his initial state
habeas petition, demonstrate that DePaoli had doubts about Price's competence to make a
knowing and intelligent waiver of his right to be present, and Klay was certain that Price was not
competent to make that decision.  Nonetheless, they chose not to share their concerns with the
trial court.  See State Petition for Writ of Habeas Corpus and Request for Consolidation (filed
11/90), accompanying exhibits thereto at pp. E-42 through E-43 and E-59.

to investigate or determine Mr. Price's mental competency.

759. There were, however, further incidents during the trial which, again, should have alerted the court to the need for further evaluation of Mr. Price's mental competency, especially given the contents of Dr. Kramer's report. Once again, however, the trial court failed to ensure that basic guarantees of constitutional due process were provided.

760. For example, in February, 1986, after continuing problems at the Humboldt County jail, including poor ventilation in the cell, lack of access to fresh air and sunlight, dental problems (Mr. Price's loss of his denture) which interfered with Mr. Price's ability to eat and which in turn led to nutrition problems, and continuing hostility between Price and the jail staff, Mr. Price was examined by Dr. Donald Baird, a medical doctor. See February 18, 1986 report of Dr. Donald Baird, CCT 2118-2120 (sealed), a copy of which was filed as an exhibit to petitioner's initial state habeas corpus petition at pp. E-165 through E-167 and is incorporated herein by express reference. Baird's report, dated February 17, 1986, noted that "[during the last several months I have witnessed a progressive deterioration in the medical and psychological status of inmate Curtis Price ... currently approaching a crisis since the onset of his voluntary 'hunger strike'..." Id. at 2118; E-165. Dr. Baird noted that Price was suffering from the effects of weight loss caused by malnutrition, chronic pain from degenerative arthritis, "depression with increasing focus on somatic symptoms" such as headaches, muscle spasms, and other pain, and personality deterioration, resulting in confrontations with jail staff. Id.

761. Dr. Baird also discussed Price's lost dentures, the continuing discomfort caused by leg irons which were used for all of Mr. Price's out-of-cell movements, Price's worsening arthritis, exacerbated by the combination of lack of exercise, malfunctions in the heat and ventilation systems, and the considerable stress of Price's incarceration. Id. at 2118-2119; E-165

through 166. Next, Baird again focused on Price's depression, described as:

> Depression in which the patient feels overwhelmed and 'I feel like
> a caged animal' resulting in personality disintegration to a point
> where minimal provocation/confrontation can result in dangerous
> and hostile aggressive behavior. Id. at 2119; E-166.

762. Critically here, Dr. Baird expressly recommended that a psychiatric/psychological evaluation been done on Mr. Price. He also recommended negotiations with Price as a means of avoiding confrontation, a regular exercise program outside the immediate cell area, and arrangements for dentures. Id. at 2120; E-167. Dr. Baird added:

> Although I share the staff's concerns regarding Mr. Price's volatile
> and unpredictable behavior I would consider discontinuance of leg
> irons within the jail as a basis of constructive de-escalation of the
> current situation and, informing the inmate that any abuse of this
> privilege would result in the institution of appropriate necessary
> restraint. Id.

763. In closing, Dr. Baird explained, "If the current jail facility is unable to provide the above, I would recommend transfer as soon as possible to a facility capable of providing these basic services in a secure setting." Id.

764. Thus, Dr. Baird, having seen Mr. Price some five months after Dr. Kramer, reached similar conclusions and made the same recommendation, namely, that he be given a full psychological evaluation at that time.

765. In response, the trial court indicated it would take steps to obtain dentures for Mr.

Price, and ignored the remainder of Dr. Baird's report. The trial judge was aware of Dr. Baird's findings. On February 19, 1986, the judge noted on the record that it had received Dr. Baird's report. In response, the court simply noted that it had ordered that Price's dentures, which had been lost January 12, 1986, should be replaced "as soon as possible." Apparently the court assumed that this was the main issue and would solve any other problems raised in Dr. Baird's report. RT 15226.[138]

766. Importantly here, in addressing the dental issue, the trial judge did note in passing that "[t]he dietician who approves the county's mainline population jail diet indicates that in his opinion that <u>the diet that Mr. Price has been having for months now is not nutritious</u>, so we have got a problem." RT 15415-15416 (emphasis added). Nevertheless, the court did nothing to follow up on Dr. Baird's report to assess whether nutrition, or any of the other many factors contributing to Mr. Price's "deteriorating" mental condition, had, as predicted by Dr. Kramer, rendered Price incapable of rationally assisting his counsel in his defense.

---

[138] Even the dental issue was not resolved immediately. On February 20, 1986, defense counsel DePaoli informed the court that Price was having problems with other teeth, in addition to the lost denture problem. RT 15412. The court again stated that it had ordered that Price's teeth be fixed, and that dental appointments were being made. In a written order filed the same day, the court directed that the dentures be replaced forthwith. The court also noted that for the preceding two weeks it had been under the impression that the denture problem was being resolved. CT 32:9506. The court expressly acknowledged: "I must admit that I am a little upset by the jail's position in this in not getting it done sooner." RT 15414-15415. On February 24, 1986, defense counsel DePaoli noted that Price still had not seen a dentist, and that he was still engaged in his hunger strike. The court promised that the dentist would see Price within the week. RT 15747. The following day, the trial court noted it had been informed that jail officials had started to take Price to the dentist on February 24, but they had misunderstood when the dental appointment was supposed to be, so nothing had been accomplished. RT 16025-16026. Price was finally taken to the dentist's office on February 28, 1986. The following day, he wrote the dentist, thanking him and his staff for the work they had done. See p. E-168 of initial state habeas corpus petition, incorporated herein by express reference.

767. Notably then, on March 6, 1986, while the evidentiary portion of the guilt-innocence phase of the trial was ongoing, the trial court was informed that Price had not communicated with defense counsel Klay for the preceding 6 weeks, and that he was now refusing to communicate with defense counsel DePaoli. RT 16891-16892. This lack of communication with either defense counsel apparently continued for a full week (see CT 9719, March 14, 1986 minute order), while the direct and cross-examination of crucial prosecution witnesses (including Michael Thompson) proceeded.

768. The trial judge chose to treat this matter solely as an issue of the defendant requesting to relieve his counsel, and failed to address the issue of mental competency raised by these events. RT 16885; 16892. This is so despite Dr. Kramer's earlier prediction that such an occurrence might happen and would indicate a deterioration in mental condition, and despite Dr. Baird's more recent report indicating that just such a deterioration had occurred.

769. Thus the next day, on March 7, 1986, Price was present in court, and the court's "sole purpose of bringing [Price] down here" to court was to hold a hearing on the issue of whether he was seeking to have defense counsel DePaoli relieved, and if so, why. RT 17055-56.

770. The deterioration in Price's mental state since he had last appeared in court is apparent from the face of the record of these proceedings. Mr. Price was clearly agitated, as he would not discuss with the court his concerns about his attorneys. Instead, Mr. Price talked in a rambling, confused, paranoid fashion about a number of things that were bothering him. For example, he expressed disbelief when told by the court that the reason he had been brought to court was that the judge was required to hold a hearing in response to the written request to have DePaoli removed from the case. See RT 17052-17056.

771. Price's paranoia was obvious. When the trial judge was attempting to get him to

respond to inquiries about relieving his attorneys. Mr. Price began making assertions that he was not getting an accurate transcript of the trial as it was happening. RT 17052-53. He later said that the only reason he came to court was out of fear that he would be "beat up" if he did not come. RT 17053-54. He even suggested that the court had the hearing in court because the judge "wanted to see me [Price] in front of you [the judge] beat up, bloodied, and bowed in submission. That's what you wanted to see." RT 17054.

772. In response to questioning, Mr. Price at one point digressed into talking about his dental problems and the pain he was suffering as a result. He stated he had seen the dentist, and was told that he would be seen again very soon. Dr. Baird had prescribed medicine for Price's pain, but the dentist had countermanded that prescription. RT 17053.

773. The court's failure to see this series of events as something more than a mere issue about relieving counsel was a constitutionally unacceptable response in this case. This occurrence was precisely the type of event predicted by Dr. Kramer in September, 1985. Nevertheless, having at this point received two expert reports both unequivocally indicating the need for further psychiatric evaluation, having observed the very breakdown in communication between client and counsel that was alluded to in the earlier report, and having witnessed a display of the defendant's mental deterioration in his own courtroom, the trial judge did nothing to investigate further Mr. Price's mental competency.

774. The trial court's failure to follow the clear recommendation of court experts, despite repeated warnings that such was necessary, violated petitioner's constitutional rights to an adequate hearing on the issue of his mental competency. See Drope v. Missouri, supra; Pate v. Robinson, supra.

**B. The Actions Taken by the Trial Court Were Inadequate Because, as the Trial Court was Aware, Dr. Richard Kramer was a Biased, Conflict-Ridden Expert Who was Not Capable of Rendering a Fair Assessment of Mr. Price**

775.    Prior to the appointment of Dr. Richard Kramer as a court expert on the issue of Mr. Price's mental competency, which occurred on September 16, 1985, the trial judge was made aware of matters which should have alerted him to that fact that Dr. Kramer was not an appropriate neutral expert to conduct a mental competency examination of Mr. Price. Having ignored these warnings, the trial court's reliance on Dr. Kramer to examine Mr. Price for mental competency further tainted the competency hearing process in this case, in deprivation of petitioner's right to a full and fair hearing on the issue of his mental competency. See Drope v. Missouri, 420 U.S. 162 (1975); Pate v. Robinson, 383 U.S. 375 (1966).

776.    The trial judge would have been well aware that Dr. Kramer was often relied upon as a forensic expert in the Humboldt County criminal justice system. Indeed, shortly after the crimes occurred in this case, Dr. Kramer was called in by the prosecutor's office to assist them in the investigation of the case. Specifically, he was asked to explain away the fact that suspect Berlie Petry, the abusive boyfriend of the deceased, Elizabeth Hickey, had flunked two police-administered polygraph examinations. RT 8003. Apparently he completed his work satisfactory to the prosecution, as Mr. Petry was never charged in connection with the murder of his girlfriend.

777.    Some time later, but again long before the voir dire or trial process in this case began, Dr. Kramer had formed very clear and distinctly negative opinions of the defendant in this case, Curtis Price. Defense trial counsel Anna Klay filed a declaration in support of a

motion for bail on August 16, 1985, in which she related facts of Dr. Kramer's feelings about Mr. Price. CT 7347-7351. In that declaration she described how Mr. DePaoli had asked her to be co-counsel in the case, and about the reaction she received from friends in the community. In particular, she stated that Dr. Richard Kramer had "expressed grave concern to myself and my husband that I should never be alone with Mr. Price as he would surely harm me." Id. When she questioned him about his concern, he said that he based his views on what he had heard from local law enforcement. CT 7349.

778. The trial judge was aware of these facts about Dr. Kramer. As noted, Kramer's bias against Mr. Price was revealed in an affidavit filed by the defense weeks before the court appointed him to examine Mr. Price. The judge was also aware that Dr. Kramer had worked for the prosecution in this case before appointing him to conduct the mental competency evaluation. On September 12, 1985, Ms. Debra Kramer, Dr. Kramer's wife and secretary/receptionist, was initially questioned on voir dire. RT 7392. Ms. Kramer revealed in her testimony that her husband, Dr. Kramer, had previously served as an expert consultant for the Humboldt County District Attorney's office in the investigation of the murder of Elizabeth Hickey. Id.

779. Thus the court's appointment of Dr. Kramer to conduct the mental competency examination also denied petitioner a full and fair hearing on the issue. Dr. Kramer's personal bias against the defendant, combined with his conflict of interest in having worked with the prosecution to exonerate a suspect who was the focus of the defense theory of innocence at trial, left him incapable of rendering a disinterested and fair evaluation of the defendant. The trial judge's knowledge of these facts should have led him to avoid the use of Dr. Kramer on the competency issue in the case. His reliance on Dr. Kramer deprived petitioner of a fair hearing as to his mental competency.

# CLAIM X

## CURTIS PRICE WAS MENTALLY INCOMPETENT TO STAND TRIAL DURING CRITICAL PERIODS IN THE PROCEEDINGS IN THIS CASE, INCLUDING DURING THE TIME HE DECIDED TO BE ABSENT FROM MOST OF HIS TRIAL, RESULTING IN THE DENIAL OF HIS RIGHTS TO DUE PROCESS, EFFECTIVE REPRESENTATION, AND FAIR TRIAL

780. Curtis Price was mentally incompetent during critical periods of his trial, and as a result he was denied his rights to due process, effective representation, and a fair trial as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

781. The facts which support this claim span the time from when Mr. Price was a child, continuing through the time he was incarcerated pre-trial and during the trial in the Humboldt County jail. Other relevant facts involve a variety of expert reports, evaluation, and testimony which establish Price's mental incompetency during the trial in this case. In the paragraphs that follow, these facts are organized as follows: section "A" contains facts about his childhood relevant to the claim of mental competency; section "B" contains the relevant pre-trial and trial facts which demonstrate his incompetency during that time; section "C" sets forth the expert testimony and reports which confirms Price's incompetency during trial; section "D" sets forth the relevant law and argues that, under the law, the facts establish a violation of petitioner's constitutional rights, both because he was incompetent to stand trial during his trial, and concomitantly, because he was incompetent to waive his right to be present during most of the guilt-innocence phase of his trial.

### A. Childhood Facts Relevant to Petitioner's Claim of Mental Incompetency at Trial

782. Curtis Price had an extremely difficult childhood which left him mentally and

psychologically damaged as an adult. This damage left him particularly vulnerable to the stresses he endured in the Humboldt County jail detailed in section "B" below, and thus the facts regarding his psychological development as a child and adolescent are relevant to the claim that he was mentally incompetent at trial.

783. Not only did Curt have infant health problems from the time of his birth in Oregon in 1947, but he also was subjected to violence and other types of abuse by parental figures, and outright rejection and abandonment by his own father when he was a young boy. His mother was married or involved with several different men during his early years, many of whom were alcoholic, and abusive toward her and Curtis. To the extent that Curt was at home, he had little adult supervision, and virtually no fathering from anyone who cared about him. For much of his life after he was about 8 or 9, he was sent away from the family. He was bounced around frequently, spending time in various reform schools, homes for troubled boys, and several different foster families.

784. Curt's health problems began in early infancy. He had severe recurrent fevers which produced convulsive episodes on more than one occasion. The mother was incapable of handling these problems, and sought help from neighbors or family members.

785. Curt's psychological well-being was compromised from the time he was born. His own father, Chester Price, was a promiscuous man with a bad temper. He left the family shortly after Curt was born, but would nevertheless come around on occasion during Curt's childhood. When he had temper fits, he would throw things, break dishes, shoot guns, and create chaos in the household. One time he almost killed Curt's older sister Sandra. Apparently he was displeased with her choice in a date during high school, and so he grabbed her around the throat and choked her so hard she passed out.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

786. Curt's mother, Beverly Lloyd, had poor choice in men. Within a year and a half after Curt was born, she gave birth to another son, Alan Fletcher. Ms. Lloyd and Alan's father, Thurman Fletcher, got married after she became pregnant with Alan, but the marriage only lasted a short period of time. Like Chester Price, Thurman Fletcher had a bad temper, and he often took it out on Curt.

787. Ms. Lloyd then married a man named Bruce Wicks. Curt was still a young boy at the time. Wicks had a very bad alcohol problem. He would drink daily starting in the afternoon after work. Wicks' drinking problem got worse and worse. Where at first he would come home to drink, as time went on he would already be drunk upon returning from work, and then he would just keep drinking.

788. At some point he began to get quite violent with Ms. Lloyd, Curt, and the other children. Wicks had a serious accident at work where he received a severe head injury. He was warned not to drink or it would have a bad effect on his behavior. However he continued to drink, and so his violent episodes became more frequent and more severe.

789. When he became violent, he would hit Ms. Lloyd and Curt. He would force Ms. Lloyd to have sex with him, and the children were well aware of what was happening. In one incident he pulled Ms. Lloyd from her chair by her legs as she held Curt's younger sister Sheila, who was an infant, and drug Ms. Lloyd across the floor, baby in arms.

790. In another such incident, Wicks started yelling at Ms. Lloyd and shoved her back onto the couch. Curt rushed into the room to protect his mother only to have Wicks turn his rage on Curt. Wicks threatened Curt, shook him severely, and took him back into Curt's bedroom. Curt was so upset by his inability to stop Wicks from hurting him and his mother that he lost control of his emotions, and boiled over with anger.

791. Sometimes his violent, drunken episodes would got out of control. On several occasions someone would have to run out of the house to a neighbor's home and call the police to intervene.

792. When Ms. Lloyd filed for divorce from Wicks, the lawyer took pictures of her arms, which were bruised black and blue from Wicks' beatings.

793. When Curt was still young, he started having temper tantrums himself. Something would set him off, he would lose control, and just start screaming and throwing and breaking things in the house. This happened from a very early age. He would also light fires on the coffee table.

794. At some point Curt was sent to live with his birth father, Chester. Unfortunately, because of the way it turned out, this may have been one of the worst things to have done to Curt. In short, things did not go well between Curt and Chester's then-current wife, and Curt was forced to leave and was returned to his mother's house. Curt was devastated by this second rejection and abandonment by his father.

795. Ms. Lloyd worked full time, and so Curt and the other children were often left alone at the house to fend for themselves. At some point, without the means or the ability to deal with Curt, Ms. Lloyd began sending him to various boys' homes, foster families, detention facilities, and other places for disturbed children. From the time Curt was about nine years old he did not live with his own family except for short periods of time. Among other foster families and institutions he was shuttled to during this time, Curt spent time at St. Mary's Home in Beaverton, Oregon, Skipworth Detention Facility near Eugene, Oregon, and Bayside Home for Boys near Arcata, California.

796. Curt had virtually no healthy male role models in his family. His father and

stepfathers are described above. In addition, his maternal grandfather, Lysle Collver, was a convicted child molester who molested Curt's mother and aunts, his sisters, and his cousins. Collver spent time in state prison in California in the early 1960's for molesting Curt's cousins. Curt's maternal uncle Jerry was also a child molester. His paternal aunt, Darlene, is severely mentally ill and for years has resided in and out of the state mental hospital in Salem, Oregon.

797. Thus, unsurprisingly, by the time Curt was a late adolescent, he was completely unequipped to handle the responsibilities of adult life. After a short stint in the military reserves, he quickly went downhill. He began to use drugs on a daily basis before he was twenty years old. He also began having problems with small-time criminal behavior. Thus by the time he was 20, he had been arrested and/or convicted for burglary, forgery, and various alcohol and drug possession offenses.

798. Curt's life in the state prison system began in 1968 when he was sent to prison for a marijuana and LSD possession offense, and a conviction for escape from a local jail in Tehama County.

## B. Pre-trial and Trial Facts Demonstrating Petitioner's Mental Incompetency[139]

799. The complete lack of proper parenting, combined with the medical and psychological damage done to him as a result of childhood abuse and neglect, left Curtis Price

---

[139] In his initial state habeas corpus petition, petitioner set forth in great detail the circumstances of his confinement at the Humboldt County jail, and its effects on his mental condition. Rather than repeat those details here, for the sake of efficiency this section of the petition highlights the most important facts relevant to the competency claim. For the sake of thoroughness, the initial state habeas corpus petition in its entirety, including the exhibits, is incorporated herein by express reference.

severely debilitated mentally before he ever arrived in the Humboldt County jail facing charges of capital murder. When thrust into a jail situation in which jail officials were clearly incapable of effectively handling long term incarceration of any individual, it is no surprise that Price eventually broke down under the stress of inadequate air, lighting, access to the out of doors, proper nutrition, and other basic necessities, and both before and during trial lost the ability to rationally communicate with his attorneys in this case. The course of his mental deterioration from prior to trial until the end of the trial is set forth below.

800. During the period from March, 1983 when Mr. Price was initially arrested, through June, 1984, Price was initially allowed to interact with other jail inmates and was not subjected to special shackling. He exhibited no signs of acting out under stress, but after the first seven weeks he was nonetheless subjected to isolation and shackling for all movements, based on information acquired about his background. During this initial period, Price gradually became more and more distracted by the frequent shackling, but he behaved remarkably well, with isolated minor exceptions.

801. It was also during this period that Mr. Price began to develop stomach problems which ultimately led to serious issues of malnutrition. Even jail officials who were not sympathetic to Price recognized that his complaints about the jail food were often well-founded. According to his defense attorneys, Price was cooperative with them and effectively assisted in his own defense during this initial phase of the pre-trial proceedings, although he was periodically depressed about the conditions in the jail. See Declaration of Anna Klay, attached to initial state habeas corpus petition at pages E-53 through E-54, incorporated herein by express reference; Declaration of Bernard DePaoli, attached to state habeas corpus petition at pages E-37 through E-38, incorporated herein by express reference.

802.  During the period from July of 1984 through June of 1985, Price's frustration over the shackling, the inadequate diet, the isolation, and the claustrophobic impact of his closed cell began to have a visible impact on his mental state and his ability to control his impulses.  On one occasion he caused serious physical damage to his cell in reaction to some of the jail issues discussed here.

803.  For a short period, jail officials seemed to recognize that he had legitimate grievances, and some interest was shown in working with him to solve problems.  Price responded very well to jail officials who responded humanely to his desire to be treated with basic human dignity, but other jail officials simply could not accept the notion that Price was entitled to any respect whatsoever.

804.  During this time Mr. Price had his first physical encounter with jail staff, punching a correctional officer once.  Price believed he was provoked by that officer, and other jail staff members freely acknowledged that the officer in question had a poor attitude and did not get along well with inmates.  In another incident that developed when Price objected to a search of his cell soon after a previous search, jail officials found it necessary to spray Price with mace in his cell so they could enter it and beat him in order to put him in shackles.

805.  Price had his first success in gaining relief from the trial court by means of a habeas corpus petition challenging jail conditions.  On December 8, 1984, Price filed what was the first in a series of habeas corpus actions alleging, often successfully, a variety of violations of his rights and of prior court orders on the jail conditions issues.

806.  The trial court issued a written ruling on the habeas issues on December 21, 1984.  CT 4002 et seq.  The court found that Price had been subjected to administrative segregation without being notified or given periodic reviews in compliance with minimal due process

requirements. CT 4018-4019. The court also ordered that Price be provided adequate out-of-doors physical exercise, noting that Price's segregated status called for more exercise rather than restricted exercise.[140] In the order the court recognized that, because of the isolation to which Price was subjected, he should receive more exercise than normal rather than being subjected to special restrictions. Reasonable access to the jail law library and to counsel was also ordered, along with several other miscellaneous items. CT 4021-4023.

807. According to Price's defense attorneys, he suffered significant weight loss during this period and he gradually became increasingly distracted by the adverse jail conditions. He began having periods of irrationality during which they could not talk with him in a coherent way about preparations for his trial or about the jail conditions. The attorneys began to believe that Price had become mentally incompetent to assist in his own defense. See Declaration of Anna Klay, attached to the initial state habeas corpus petition at pages E-54 through E-56, and incorporated herein by express reference; Declaration of Bernard DePaoli, attached to the initial state habeas corpus petition at pages E-38 through E-40 and incorporated herein by express reference.

808. According to Price's trial attorneys, during the period from June, 1985, through November, 1985, as the voir dire began and the trial commenced, Price's mental state deteriorated to the point that it simply became impossible to communicate with him in a rational

---

[140]In an addendum to the habeas ruling, filed January 8, 1985, the court noted that Jail Captain Williams had improperly contacted the court in an ex parte fashion in regard to the amount of exercise time that Price should be given. The court clarified its original ruling and stated that Price must get 5 hours exercise per week, at least 2 of which must be outdoors. "Such is required because Mr. Price has been locked up nearly two years in the local jail in administrative segregation." CT 4170-4171.

manner. Both attorneys described the jury selection proceedings as very difficult, with Price often taking totally irrational positions. See Declaration of Anna Klay, attached to the initial state habeas corpus petition at pages E-57 through E-59 and incorporated herein by express reference; Declaration of Bernard DePaoli, attached to the initial state habeas corpus petition at pages E-40 through E-41, and incorporated herein by express reference.

809. Jail records corroborate their assessment; Price acted out in verbally abusive ways with increasing frequency, he threw his food trays, and became increasingly hard to talk to in a rational manner.

810. Mid-way through this period, the trial court expressly recognized the possibility of a mental competency problem, and began an investigation into Price's mental state. Without explanation, that investigation was cut short. Later in this time period, Price was involved in another physical altercation with a correctional officer.

811. Price obtained court orders for increased amounts of exercise time, but this and any other relief from jail conditions ordered by the court was perceived by some jail officials as unwarranted special treatment for Price. These jail officials seemed determined to evade court orders that would help to alleviate Price's stress. They were largely successful in their efforts, causing the court to occasionally express exasperation.

812. The mental and physical pain Price experienced as a result of the shackling caused him to begin turning down opportunities for recreation or commissary visits rather than put up with the shackling. At other times, Price felt he needed the benefits of exercise but jail officials insisted on scheduling his exercise periods at the same time as his court sessions. As a result, Price would waive his right to be present at court proceedings so he could get some exercise in the jail recreation room.

813.   As noted, it was during this period that Mr. Price's mental deterioration became obvious not only for defense counsel, but also to the court.   The facts of this critical period during which limited competency investigations were undertaken by the court will be reviewed here in some detail, for this marks the beginning of the period where it was recognized by all the parties and the court that Price's mental competency was clearly in doubt.

814.   On September 16, 1985, the trial judge, the prosecutor, and the defense attorneys all expressed concerns about Mr. Price's current competency to proceed in his trial.   The court noted that the defendant had appeared earlier that day in an in camera proceeding regarding a letter he had written to the judge about the performance of his trial attorneys.   The court also noted that the defendant had appeared extremely upset and agitated, and that he had alluded to a complete breakdown in the attorney-client communications.   The trial judge also said that banging noises had been coming from the holding cell where Mr. Price was being housed.   The court concluded that because of his behavior during "the last couple of weeks and particularly in the last three or four days," he had reason to look into whether Mr. Price was competent to continue the trial proceedings at that time.   RT 7585.   In fact the court had spent the previous weekend researching the legal issues involved because of his concern that "this would be a problem."   RT 7588.

815.   The prosecutor also noted concerns about the defendant's mental state.   He stated for the record his observation that "the defendant's voice was shaking, as well as his body, hands, legs."   RT 7586.

816.   Defense counsel then expressed their concern as to their client's mental competency.   Ms. Anna Klay, herself a state-certified social worker, stated that he appeared to be suffering from a psychotic episode.   Id.   When she sought to explain, stating her impression that

Mr. Price was "suffering from delusions", the trial judge interrupted her and indicated he did not "want to get into that at the present time." RT 7587.

817. However, the trial court did, on this same day, appoint Dr. Richard Kramer to examine Mr Price as to his mental competency at that time. CT 7824.

818. Two days later, on September 18, 1985, the trial judge received a five page report from Dr. Kramer following his examination of Mr. Price. RT 7601. The court stated on the record that the report "is not really conclusive; apparently, because of an inability to get a full interview with Mr. Price." Id. The court noted that it was thus left in an "odd position" with respect to the competency issue, but acknowledged that it would eventually have to address it. Id.

819. The record reflects that the trial court never did address the issue at any later point in the trial. On October 16, 1985, defense counsel noted for the record that the trial court had not provided a copy of Dr. Kramer's report to them. RT 8006. The trial court responded by indicating that it felt "it wasn't relevant to anything I determined. [sic] Determined there was no basis to any problem there... The only reason I haven't provided it is, as far as I can tell, there's nothing in that report that bears upon any issue in this case." Id. The court went on to characterize Dr. Kramer's report: "The Doctor's determination was that there — my concern was not justified pursuant to 1368 and that I ought to go peddle my papers elsewhere." Id.

820. Eventually Dr. Kramer's report was released by the trial judge to the attorneys in the case. Contrary to the judge's characterization, the report did little to dispel the doubts expressed by all of the parties as to Mr. Price's competency; instead, it confirmed the parties' suspicions that Mr. Price was not then capable of rationally consulting with his attorneys, and pointed to the need for further expert inquiry to adequately assess the situation.

821.     Dr. Kramer's report addressed both prongs of the constitutionally mandated test for competency to stand trial: (1) whether the defendant has a rational as well as factual understanding of the proceedings; and, (2) whether the defendant has sufficient present ability meaningfully to consult with counsel and participate in the defense. See Dusky v. United States, 362 U.S. 402 (1960). On the first prong, Dr. Kramer felt that, at that time, Mr. Price "does seem grossly conversant with the charges against him, his standing before the court and possible pleas and dispositions to both the charges and the incompetency procedure." CCT (sealed) at 4340-4344, 4342. Dr. Kramer did express some concerns, however, characterizing Mr. Price's adjustment as "tenuous" due to stress and anxiety, and a "rigidification of his personality structure" regarding his treatment at the Humboldt County Jail. Id. 4342-4343.

822.     On the second prong of the Dusky test, the issue of consultation with counsel, Dr. Kramer states: "With respect to his current ability to rationally collaborate with his current counsel, I would need more information to make an explicit determination." Id. at 4343. Dr. Kramer went on to find that Mr. Price "may upon proceeding prove incompetent but in lieu of a longer and more in depth interview may only clearly manifest that level of incompetence if he is assigned the task of following the procedure outlined herein [regarding being seen regularly by a trained therapist]." Id. 4343-4344.

823.     This report can in no way be characterized as "irrelevant" on the issue of Mr. Price's competency. The trial court's statement that this report provided no basis for believing there was any competency issue is erroneous. To the contrary, the report says in no uncertain terms that more evaluation and assessment is necessary before a conclusion could be reached.

824.     Although the trial judge failed to pursue the appropriate investigations of Price mental competency, which fact is the subject of a separate claim in this petition, Price's mental

condition, and his ability to handle the stress of the jail situation, continued to deteriorate following the evaluation by Dr. Kramer. In fact, the trial court acknowledged that it was amazing that Price had been able to control himself as well as he had to that point. Soon afterward, defense counsel Klay again notified the court that Price was having mental problems, and Price was involved in another brief physical assault involving a correctional officer.

825. Apparently frustrated by its inability to obtain the cooperation of jail officials in seeking ways to alleviate Price's stress, the trial court lost patience. Despite having just recognized that the stressful conditions would cause anybody to have trouble coping, and despite the admission of the victim of the latest assaultive conduct that he doubted his own ability to act any differently under the adverse conditions Price experienced, the court ordered Price shackled during courtroom proceedings. Predictably, Price refused to tolerate this escalation of the shackling he had come to despise so thoroughly, and Price chose to be absent from the evidentiary portion of the guilty trial rather than accept the in-court shackling.

826. Price's frequent notes to the court during this period clearly reflect the deterioration in his mental state. Defense counsel Klay reported that Price stopped communicating with her at all, apparently because she had openly questioned his mental state and because she wanted to prepare for the possibility of a penalty trial. To Price, that indicated that she no longer believed in him. Eventually, he also stopped communicating with defense counsel DePaoli. See Declaration of Anna Klay, attached to the initial state habeas corpus petition at pp. E-58 through E-61, and incorporated herein by express reference; Declaration of Bernie DePaoli, attached to the initial state habeas corpus petition at pp. E-41 through E-43, and incorporated herein by express reference. The details of the events leading up to the court's decision to shackle Mr. Price at his trial, and Price's decision to absent himself from the

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH
- 362 -

courtroom throughout the remaining seven months of his trial, are important to several separate issues in this petition. A summary of those facts is set forth below because they reflect on Price's mental competency in fact at trial. The more detailed summary of these facts found in sections of this petition dealing with the shackling issue (Claim XIV) and the issue of Price's absence from his trial (Claim XX), are incorporated herein by express reference.

827. As noted, even as late as November 12, 1985, the trial court seemed to remain somewhat sympathetic to Price's problems. After defense counsel complained of several actions by jail officials, the court noted that it was helpless in regard to the most recent jail conditions habeas corpus petition, since the Judicial Council had directed the court to defer any action on it until resolution of a defense motion to disqualify the trial court. That motion had been pending before an out-of-county judge for nearly two months. The trial court recognized the delay was unfair to Price. RT 10016-10019. Price himself expressed the belief that jail officials were writing disciplinary reports simply to provide a reason not to comply with court orders about jail conditions. RT 10026.

828. The judge expressed his determination to try and do something about Price's lack of exercise, and fully recognized the stress Price was undergoing as a result of the 32 months of jail time Price had already endured:

> But I understand Price's predicament that he needs the exercise.
> And I understand that only too well that arthritics need exercise
> in a particular way because of the physical pain that's caused to
> them by the disease. And I can imagine that the stress of being
> in his position after two and a half years up there -- or nearly
> two and a half years has to be more than I can imagine and at

times -- I think counsel know that I have said that I wonder how

Price has been able to last as long as he has in this situation, but

he does. In some ways, he may be stronger than any other

person in this courtroom. RT 10039-10040.

829. Then just 2 months after the trial judge had ordered the mental examination by

Dr. Kramer, and only a few days after the evidentiary portion of the trial had begun, Mr. Price

refused to come to court on the morning of November 19, 1985. During the discussion that

followed, defense counsel Klay stated, "Your Honor, Mr. DePaoli and I both strongly feel Mr.

Price is just simply not capable mentally of cooperating at this time." RT 10593.

830. The court asked if the attorneys were expressing their own bona fide doubt as to

Mr. Price's mental competency under section 1368 of the California Penal Code, and defense

counsel DePaoli asked for an opportunity to discuss that with his co-counsel before

responding.[141] RT 10594.

831. Later that day, the judge returned to the competency issue, stating:

So I don't find at this point that I have cause to express a doubt

about his competency. I would indicate for the record that if we

---

[141]Nothing more was said on the record that day about defense counsel Klay's expressed concern. Declarations from both trial counsel, attached as exhibits to the initial state habeas corpus petition and incorporated herein by express reference, demonstrate that after DePaoli asked to confer with Klay, they both recognized that they believed Price was, in fact, incompetent within the meaning of California Penal Code section 1367, but DePaoli still preferred to proceed with the trial rather than have competency proceedings initiated. Klay acquiesced and said nothing more on the record. See pp. E-42 and E-58 to E-59 of initial state habeas corpus petition; see also penalty phase defense closing argument: "believe me, he was a mental and physical wreck during a large period of that time to the point where he wasn't capable of even participating in his own defense, at his own trial." RT 22967.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

continue to have interruptions on the basis of jail-related

problems, that I might come to a position where I would

consider someone who continually denies the fact that they are

faced with a very serious charge to -- on the other hand become

involved with what are to them personal problems, no doubt,

but are minutia in comparison. It might cause me some

concern, but not today. RT 10607-10608.

832. Two days later, based on continuing problems between Mr. Price and Humboldt County jail officials, the court issued its order that Price be shackled throughout the remainder of the proceedings. RT 10762-10763. (The legal issues surrounding the court's decision to shackle Price are addressed in Claim XIV of this petition.) Soon afterward, Price told the court he preferred not to attend his trial, rather than appear before the jury in shackles.[142] (The legal

---

[142]The events surrounding this decision are set forth in detail in Claim XX of this petition addressing Price's absence from his trial. It is also noteworthy that in penalty phase testimony offered by the defense, board-certified psychiatrist Dr. Fred Rosenthal expressed considerable doubt whether Price was able to make a rational decision to refuse to go to court and have people see him in shackles:

Well, I think at the time when he was involved with the problem of the shackles, he was very disturbed by it. And I have some doubts on how rational he could be and make decisions about what he should do. That is, whether he should go to court and be here for his trial even with the shackles or whether he shouldn't do that. I think that kind of decision may have been beyond him at that point. And he was very disturbed then and angry about having to be shackled. RT 22141. Declarations from both trial counsel, attached to the state habeas corpus petition, demonstrate that DePaoli had doubts about Price's competence to make a knowing and intelligent waiver of his right to be present, and Klay was certain that Price was not competent to make that decision. Nonetheless, they chose not to share their concerns with the trial court. See pp. E-42 through E-43 and E-59, attached to the initial state habeas corpus petition and incorporated herein by express reference.

issues surrounding Mr. Price's absence from his eight month trial are dealt with in section "D.2" below, and in Claim XX of this petition.) Despite these events, the trial judge took no further proceedings to investigate or determine Mr. Price's mental competency.

833. Immediately after issuing its order that Price be shackled for the remainder of the trial, the court fully recognized that there had been serious violations of federal constitutional rights in the manner in which the jail personnel had dealt with allegations of misconduct. The court stated,

> All present disciplinary punishment shall cease at this point in
> time. The imposition of discipline without a signature waiving
> a hearing or without a. hearing is simply not due process. If
> Price refuses to sign, a hearing should be held. And he is
> entitled to be provided copies of the incident reports which
> cause the institution of any disciplinary hearing. RT 10766.

834. Nevertheless, jail problems continued throughout the remainder of the trial, and their effect on Price's mental stability was equally damaging. For example, on the evening of December 20, 1985, Price complained that the ventilation in his cell area was not working properly, and that the smell was intolerable. See p. E-159 attached to initial state habeas corpus petition incorporated herein by express reference.

835. In testimony at a hearing about jail problems, jail officer St. Denis explained he knew that Price had been complaining about the lack of ventilation in his cell area for the past 3 weeks, and that nothing had been done about the problem. Although it was known that the solenoid controlling the fans that provided ventilation to Price was broken, there were no plans to fix the problem. RT 12361-12362. Price wrote his own "incident report" describing how the

vent near his cell was actually blowing stale air back into the area. The vent was next to Price's bed. Also, since Price now had to do his exercising in his cell area, the stale air interfered with his ability to exercise.

836. On January 14, 1986, a report prepared by Keith Ritter, an employee of consulting engineers Winzler and Kelly, was received as Court Exhibit 118. The report was a response to the trial court's earlier order for an investigation of Price's complaints about the jail ventilation system. The report verified that "the cell block was not receiving enough air, and what air was being supplied was too hot." The report indicated that the most pressing problems were rectified, but other problems of lesser concern were inherent in the design of the jail ventilation system. CCT 1782-1783.

837. As the trial progressed, Price's mental condition continued to deteriorate, mostly as a result of continuing problems with the jail.

838. For example, in February, 1986, after continuing problems at the Humboldt County jail, including not only the issue of poor ventilation noted, but also continued lack of access to fresh air and sunlight, dental problems (Mr. Price's loss of his denture) which interfered with Mr. Price's ability to eat and which in turn led to nutrition problems, and continuing hostility between Price and the jail staff, Mr. Price was examined by Dr. Donald Baird, a medical doctor. See February 18, 1986 report of Dr. Donald Baird, CCT 2118-2120 (sealed), a copy of which is attached to the initial state habeas corpus petition at pp. E-165 through E-167, and incorporated herein by express reference. Baird's report, dated February 17, 1986, noted that "[during the last several months I have witnessed a progressive deterioration in the medical and psychological status of inmate Curtis Price ... currently approaching a crisis since the onset of his voluntary 'hunger strike'..." Id. at 2118; E-165. Dr. Baird noted that Price

was suffering from the effects of weight loss caused by malnutrition, chronic pain from degenerative arthritis, "depression with increasing focus on somatic symptoms" such as headaches, muscle spasms, and other pain, and personality deterioration, resulting in confrontations with jail staff. Id.

839. Dr. Baird also discussed Price's lost dentures, the continuing discomfort caused by leg irons which were used for all of Mr. Price's out-of-cell movements, Price's worsening arthritis, exacerbated by the combination of lack of exercise, malfunctions in the heat and ventilation systems, and the considerable stress of Price's incarceration. Id. at 2118-2119; E-165 through 166. Next, Baird again focused on Price's depression, described as:

> Depression in which the patient feels overwhelmed and 'I feel
> like a caged animal' resulting in personality disintegration to a
> point where minimal provocation/confrontation can result in
> dangerous and hostile aggressive behavior. Id. at 2119; E-166.

840. Critically here, Dr. Baird expressly recommended that a psychiatric/psychological evaluation be done on Mr. Price. He also recommended negotiations with Price as a means of avoiding confrontation, a regular exercise program outside the immediate cell area, and arrangements for dentures. Id. at 2120; E-167. Dr. Baird added:

> Although I share the staff's concerns regarding Mr. Price's
> volatile and unpredictable behavior I would consider
> discontinuance of leg irons within the jail as a basis of
> constructive de-escalation of the current situation and,
> informing the inmate that any abuse of this privilege would
> result in the institution of appropriate necessary restraint. Id.

841. In closing, Dr. Baird explained, "If the current jail facility is unable to provide the above, I would recommend transfer as soon as possible to a facility capable of providing these basic services in a secure setting." Id.

842. Thus, Dr. Baird, having seen Mr. Price some five months after Dr. Kramer, reached similar conclusions and made the same recommendation, namely, that he be given a full psychological evaluation at that time.

843. Notably, the trial court's response did not directly address the looming competency issues found in Dr. Baird's report, but instead treated this as solely a dental issue. The court's inadequate response is the subject of another issue in this petition. Nevertheless, the court's failure to address the underlying competency issue here only exacerbated Price's mental condition.

844. Thus on March 6, 1986, while the evidentiary portion of the guilt-innocence phase of the trial was ongoing, the trial court was informed that Price had not communicated with defense counsel Klay for the preceding 6 weeks, and that he was now refusing to communicate with defense counsel DePaoli. RT 16891-16892. This lack of communication with either defense counsel apparently continued for a full week (see CT 9719, March 14, 1986 minute order), while the direct and cross-examination of crucial prosecution witnesses (including Michael Thompson) proceeded.

845. The trial judge chose to treat this matter solely as an issue of the defendant requesting to relieve his counsel, and failed to address the issue of mental competency raised by these events. RT 16885; 16892. This is so despite Dr. Kramer's earlier prediction that such an occurrence might happen and would indicate a deterioration in mental condition, and despite Dr. Baird's more recent report indicating that just such a deterioration had occurred.

846.     Thus the next day, on March 7, 1986, Price was present in court, and the court's "sole purpose of bringing [Price] down here" to court was to hold a hearing on the issue of whether he was seeking to have defense counsel DePaoli relieved, and if so, why. RT 17055-56.

847.     The deterioration in Price's mental state since he had last appeared in court is apparent from the face of the record of these proceedings. Mr. Price was clearly agitated, as he would not discuss with the court his concerns about his attorneys. Instead, Mr. Price talked in a rambling, confused, paranoid fashion about a number of things that were bothering him. For example, he expressed disbelief when told by the court that the reason he had been brought to court was that the judge was required to hold a hearing in response to the written request to have DePaoli removed from the case. See RT 17052-17056.

848.     Price's paranoia was obvious. When the trial judge was attempting to get him to respond to inquiries about relieving his attorneys. Mr. Price began making assertions that he was not getting an accurate transcript of the trial as it was happening. RT 17052-53. He later said that the only reason he came to court was out of fear that he would be "beat up" if he did not come. RT 17053-54. He even suggested that the court had the hearing in court because the judge "wanted to see me [Price] in front of you [the judge] beat up, bloodied, and bowed in submission. That's what you wanted to see." RT 17054.

849.     In response to questioning, Mr. Price at one point digressed into talking about his dental problems and the pain he was suffering as a result. He stated he had seen the dentist, and was told that he would be seen again very soon. He noted that Dr. Baird had prescribed medicine for his pain, but the dentist had countermanded that prescription. RT 17053. As noted, the trial court did nothing to address the visible signs of Price's deteriorating mental condition.

850.     On June 3, 1986, the defense filed its last habeas corpus petition challenging the

jail conditions. CCT 4310-4334. Remarkably, it was noted that Price had not been exposed to the outdoors since October 14, 1985, which was just short of an eight month period of time. He had not been allowed to exercise outside of his cell area since October 26, 1985. CCT 4311. A declaration by a psychiatrist, Dr. Fred Rosenthal, who later testified for the defense at the sentencing phase of trial, noted that for part of the time Price had not even been allowed to have any calendar or timepiece in his cell and without such methods to orient oneself to time and date, disorientation and psychological breakdown can occur. CCT 4330.

851. The June 3, 1896 habeas petition also contained a supporting declaration from Professor Richard Korn, a recognized expert on prison conditions and a former associate warden at the New Jersey State Penitentiary. Professor Korn was of the opinion that Price's occasional outbursts in the Humboldt County Jail were a "normal response to an unusual and abnormal psychologically intolerable living situation." CCT 4333. Professor Korn added that he had never before seen comparable conditions go uncorrected when brought to the attention of a judge. CCT 4333-4334.

852. On June 30, 1986, the trial court issued an order to show cause in regard to the June 3 habeas petition. The County was given until August 1, 1986 to respond, but on July 28, 1986 the writ was dismissed as moot because Price had been sentenced and transferred to the custody of the Department of Corrections. CCT 4336-4337.

### C. Expert Opinions on Petitioner's Mental Condition at Trial

853. In addition to the preliminary competency evaluation performed during the trial by Dr. Kramer noted above, as well as the evaluation of Dr. Baird conducted in February, 1986, a number of other experts examined and evaluated Mr. Price throughout the pre-trial and trial

phases of these proceedings. In addition, Mr. Price has been evaluated by other experts since the trial. When viewed in combination with the reports of Dr. Kramer and Dr. Baird, an overview of these additional reports and the testimony of these experts confirms what the record reveals: that Mr. Price was in fact incompetent to stand trial in this case.

854. First, on the issue of nutrition and other jail conditions issues affecting his mental stability, in July, 1985, Mr. Price was examined by Dr. Rob Fuller, at the request of Price's counsel, because of the weight loss Price had been experiencing. Dr. Fuller made recommendations for an improved diet, to be prescribed after consulting dieticians, and for exercise. Dr. Fuller also recommended against the use of leg irons on the lower legs or ankles, noting that "Even with rubber cuffs, the leg irons cause deep inflammation and excruciating pain." See CCT (sealed) at 4347-4349.

855. On July 24, 1985, Price was again examined in the jail by Dr. Fuller. The doctor recommended continued exercise, improvements in Price's diet, and "[d]iscontinued use of ankle shackles." Dr. Fuller's report noted that the diet provided to Price in the jail was "too bland" and "lacking in protein." See CCT (sealed) at 4346.

856. Shortly after Dr. Kramer performed his competency examination, on October 9, 1985, Pat Manuel, a nutritionist, confirmed that Price's diet at the jail was wholly inadequate. See RT 21875-21878. Working in conjunction with Dr. Fuller, Manuel found that Price was not receiving adequate proteins and other nutrients. She recommended an improved diet with added proteins, fresh fruits, and vegetables. Id. at 21883-21885.

857. In testimony given during the penalty phase of Price's trial, Manuel acknowledged

that part of the problem was that Price was a vegetarian;[143] in addition, the jail cook used a 1945 army diet manual as a cooking guide. Manuel noted that the science of nutrition had changed drastically in the preceding 40 years. Id. at 21886-21887.

858. Manual explained that for over a year, Price's lunch of cottage cheese and some type of fruit never varied. Dinners consisted of steamed rice and milk. The jail cook omitted meat, but did nothing to substitute for the necessary iron, zinc, and protein.[144] Aside from deficiencies in vitamins, minerals, and proteins, the diet was so monotonous that Price had difficulty maintaining his appetite, leading to a loss of 20 pounds from his normal and appropriate weight. RT 21889-21890.

859. The malnutrition also caused anxiety, disorientation, and a lack of clarity of thought. The added complication of a lack of exposure to sunlight caused a deficiency of calcium, which was necessary for proper functioning of the nervous system. Because of this deficiency, Manuel had recommended a Vitamin D supplement. In addition, Price was not getting enough Vitamin B, and the stress he was under had increased his need for Vitamin B beyond normal. RT 21891-21894. However, Manuel's recommendations for vitamin supplements were disregarded by the jail. Price was not even permitted to buy vitamin supplements through the jail canteen. RT 21894-21895.

860. Manuel explained that, in her experience, jails were able to provide relatively adequate nutrition on a short term basis, but a 3 year period was an entirely different situation.

---

[143] Price had been able to eat meat before he was in the Humboldt County Jail, but during his first month in jail he developed severe stomach problems and could no longer tolerate it. RT 22377.
[144] Beans or nuts would have been a good source of the nutrients that were being missed due to the absence of meat from Price's diet. RT 21901.

RT 21896.

861.    Helen Vatcher, a professional counselor who was called into the case as a result of Dr. Kramer's report regarding Price's mental competency, saw Price weekly from September through December, 1985 and from February through the time of her testimony in June, 1986. In testimony given during the penalty phase of Price's trial, she explained that she found that Price had a lot of pride and felt he was being treated in a humiliating and physically painful manner. Being shackled on the way to court bothered him. Being ordered to be chained to his chair in court in November, 1985 greatly affected his ability to participate in his defense. RT 21930 to 21930-1.

862.    Vatcher concluded that the conditions of Price's confinement affected his ability to communicate with everybody. He looked agitated, upset, pale, and gaunt, and displayed symptoms of stress. He was seriously depressed, particularly because of the deprivation of contact with other people. Vatcher also believed he suffered from sensory deprivation as a result of his isolation in the jail. RT 21932-21935.

863.    Dr. Fred Rosenthal, a well-known psychiatrist, gave more detailed penalty phase testimony about the prolonged sensory deprivation caused by the conditions to which Price was subjected in the jail, and the impact it had on his mental state. He noted that Price's cell was very small, and he was especially concerned about the dim lighting. He believed that Price's confinement in that particular cell for more than a year caused a significant deprivation of sensory experiences. RT 22132-22138.

864.    Dr. Rosenthal explained that prolonged sensory deprivation had a very disorganizing effect on a person's ability to relate to others. People in such circumstances tend to become agitated, assaultive, and belligerent. Deprivation of exercise was also an emotionally

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH
- 374 -

disorganizing factor, the negative effects of which were magnified by Price's inability to go out of doors. RT 22137-22140.

865.    Dr. Rosenthal noted that Price was depressed and was so obsessed with the jail conditions that he was often unable to talk about anything else. RT 22140 to 22141. Also, Dr. Rosenthal found that Price "was not always able to discuss things in a rational, coherent fashion." RT 22140-1.

866.    Dr. Rosenthal was aware of incidents in which Price had become assaultive, and he was surprised that Price was not more upset and disturbed than he was. RT 22142. The doctor concluded that if Price had been treated like other inmates, with regular exercise and association with other inmates, he would have been better able to focus on the legal issues in his case. RT 22147.

867.    Since his trial, Mr. Price has been examined two additional times, once by a psychiatrist in the state habeas corpus process, and once by a neuropsychologist in preparation for the filing of this petition. During the direct appeal and state habeas corpus proceedings, petitioner's state appellate attorney, Mark Cutler, sought funds to have his client evaluated on the issues, inter alia, of mental competency and voluntariness of the waiver of presence at the trial. Cutler sought funds not only for an expert evaluation by Dr. Joseph Satten, but also for a follow-up report by Dr. Rosenthal, and for testing and evaluation to be conducted by a psychologist.[145] The California Supreme Court granted the request in part, but limited the funding to the evaluation by Dr. Satten. Thus the court refused funds to hire a psychologist to conduct

_____

[145]Cutler also sought some investigative funds in his request.

psychological testing of petitioner. As a psychiatrist, Dr. Satten was not able to conduct psychological testing of petitioner, but he nevertheless produced a report which was submitted as an addendum to the initial state habeas corpus petition and which is incorporated herein by express reference.

868. Having reviewed Dr. Kramer's evaluation, and substantial records and transcripts from the trial, as well as having recounted some of the above-noted facts about Price's early life, Dr. Satten concluded both that the petitioner was incompetent to stand trial during his trial, and that he was not competent to make a knowing and voluntary waiver of his right to be present throughout his trial.

869. In stating his conclusions, Dr. Satten noted:

> As stated above, this is the case of a man whose mental condition gradually deteriorated over the course of pretrial and trial proceedings. His mental functioning, which was essentially normal at the start, broke down under the impact of multiple stresses, listed above under Axis IV, and he developed serious psychiatric symptoms, including depression, inability to concentrate, and paranoid thinking. He began to have symptoms in December 1983; these gradually got worse, reached a peak in September 1985, continuing at that level until sometime into the penalty phase of the trial, when they started to recede somewhat. The symptoms began to recede more rapidly after he arrived at San Quentin, but it took two more years for him to return to normal.

His early background and later life experience left him particularly vulnerable to the stresses he faced in the Humboldt County Jail. He was a hyperactive child, given to impulsive behavior. These early difficulties were non-criminal and were entirely consistent with a childhood Attention Deficit Disorder ... In action-oriented individuals, when the possibilities for action are drastically limited, the personality functioning tends to break down and gross psychiatric symptoms may develop. I have seen this in individuals in the Federal Prison System who, because of impulsive or acting out behavior in the institutions, were transferred from the minimum and medium security institutions to the tighter and more secure penitentiary at Leavenworth. There, they could not cope with the lesser activity allowed, and broke down mentally and had to be transferred to the Medical Center for Federal Prisoners at Springfield, Missouri.

See Report of Dr. Joseph Satten, M.D., pp. E-3 through E-36 attached to initial state habeas corpus petition and incorporated herein by express reference, at p. E-23 and E-24.

870.     After reviewing the reports of Dr. Kramer and Dr. Baird, the observations and testimony of Dr. Rosenthal, Helen Vatcher, voluminous jail records and transcripts of hearings regarding the conditions at the jail and Price's reactions to them, and the comments of the trial judge and the defense attorneys, Dr. Satten concluded:

In my opinion, all of the above elements are consistent, fit together, and corroborate the picture of increasing mental disorder in Price. While there is some evidence of undue severity in the handling of Price by jail personnel, that is not the only stress he had to deal with. Whether the "harassment" was real, whether it was caused by him, or whether it was a delusion, Price, under the impact of all the stresses he faced, did begin to feel he was unfairly treated, harassed, and humiliated. He reacted to this perception with hostility to his "tormentors" and a gradual development of symptoms of depression, paranoia, and an obsession about that treatment which crowded out all other considerations.

His obsession about jail conditions, linked to the other stresses of inadequate diet and exercise, human and sensory deprivation, left him at times in states of psychotic-like depressive withdrawal alternated with paranoid anger. He would not talk to his attorneys for days, sometimes weeks at a time. At times, he had the delusion his attorneys were working for the prosecution. Even when he was in somewhat better control of himself, he was so preoccupied about jail conditions that his mind was distracted and he could not concentrate on the particular issue at hand; he would always come back to talking about jail conditions. For these reasons, I believe he was unable

to cooperate with his attorneys in his own defense. Id. at E-27
and E-28.

871.    Dr. Satten also addressed the issue of whether petitioner was competent to waive
his presence at the trial:

> The issue of shackling in the court room came up in November
> 1985 when Price was already quite disturbed, as reflected by the
> observations of his attorneys and Helen Vatcher.   He was
> preoccupied with what he felt was harassment by the jail
> personnel and the court's inability to do anything about it.  He
> felt the court was unfair in its decision that he be shackled in
> court, and he felt it would be humiliating to him personally and
> prejudicial to his case.  He felt it would be too painful to him
> mentally and physically, and that he could not tolerate that pain.
> That was all he could think about.  He could not weigh the
> possible advantage to him of being in court, advising his
> attorneys on the spot regarding the testimony of adverse
> witnesses, and the value of his being able to testify in his own
> behalf.  He was unable to weigh the pros and cons of the sit-
> uation and thus was unable to make a rational and voluntary
> choice between being shackled in court or being absent entirely
> from the court room.   Id. at E-28.

872.    Thus Dr. Satten, having taken a broad view of the issue, looking at the entire
picture from early in Curtis Price's life, throughout the time he was incarcerated at the Humboldt

County jail, and having reviewed the reports, testimony and observations of doctors, jail personnel, attorneys, the trial court, and Mr. Price himself, found without question that Mr. Price was incompetent to stand trial and to waive his right to be present at it.

873. As noted, the California Supreme Court refused to allow any psychological testing of Mr. Price during the appeal and state habeas corpus proceeding. Prior to the filing of this petition, however, petitioner's counsel arranged for a neuropsychologist, Dr. Phillip J. Murphy, Ph.D., to conduct a full battery of psychological and neuropsychological tests on Mr. Price. The results of that testing corroborate and expand upon the conclusions reached by Dr. Satten.

874. In addition to corroborating Dr. Satten, finally, after the entire pre-trial and trial process was concluded, and after the initial round of state direct appeal and state habeas corpus proceedings, Curtis Price has been given the thorough psychological work-up and evaluation Dr. Richard Kramer initially suggested was needed back in September, 1985. When all of the evidence is taken into account, including the very evidence Dr. Kramer originally informed the trial court was necessary to make an adequate determination, there is no question that Curtis Price was in fact incompetent at his trial.

875. As noted, Dr. Murphy conducted a complete battery of psychological and

neuropsychological testing on Mr. Price.[146] That testing, combined with a review of Dr. Satten's report and all of the documentation and evidence relied upon by Dr. Satten, as well as additional information about Price's childhood obtained from various institutional records and from Price's family, show that Mr. Price did and does suffer from a debilitating mental condition which, when combined with the stress and other trauma he faced in jail during the trial, rendered him incompetent.

876. First, with regard to the diagnosis, the testing reveals that Mr. Price suffers from a delusional disorder which usually does not interfere with his daily functioning, but which at the time of trial became florid due to the gradual mental decompensation observed by the trial court, the attorneys, and the experts who observed at that time. Price's delusional disorder is accompanied by olfactory hallucinations (e.g., the experience of "smelling something rotten in his mouth"), as well as visual hallucinations (e.g., seeing black spiders dart through his visual field), that are the organic symptoms of mild brain damage, which was also noted in the

---

[146]Actually prison officials at San Quentin State Penitentiary refused to allow petitioner to be examined without being handcuffed and chained to a chair. Some of the standard neuropsychological testing which Dr. Murphy intended to conduct requires that the patient be standing, and/or have his or her hands free. San Quentin prison officials offered to remove the handcuffs for a brief period of time (and never offered to allow Mr. Price to stand during the evaluation), but they required that guards be present in the interview room during any such period. Rather than possibly waive the attorney-client privilege, counsel for petitioner asked Dr. Murphy to conduct any testing he could within the limitations dictated by prison officials. While the findings set forth in this petition are, we believe, accurate, any final determination may require follow-up testing at San Quentin, the circumstances of which will require the attention of this Court.

neuropsychological testing.[147]

877. In this case, the well-documented sensory deprivation to which Price was subjected at the jail during the proceedings exacerbated an otherwise relatively dormant psychotic condition in Mr. Price. Thus, although in normal, non-stressful circumstances, Price has been able to function relatively well despite his condition, the extreme pressure placed on him due to the intolerable jail conditions brought out the condition in a manner that rendered him irrational, paranoid, and precisely as his attorney Anna Klay, herself a trained social worker, suggested, "delusional". See RT 7587.

878. In his particular case, as a result of his mental disease, Price responded to the stress with delusional, overly rigid and simplistic logic, given the complexity of his criminal trial. He also utilized somatic delusions to explain what were, in fact, hallucinations. (E.g., he rationalized the "rotten smell" in his mouth as merely a dental problem, and hence the repeated complaints of dental problems during the trial).

879. Most importantly here, his delusional thinking, with its attendant rigidification and overly simplistic logic, caused him to fixate on irrational, and in the scheme of things, unimportant, or at least less important, matters. The record in this case shows repeated signs of this problem, where his attorneys, jail officials, and even the trial judge, complain over and over again that Price was unreasonably focused on jail problems and personal issues he confronted

---

[147]It should be noted here that, consistent with Dr. Murphy's findings, Dr. Rosenthal had some limited testing done on Price between the guilt-innocence and sentencing phases of the trial, and noted in his testimony that there were signs of "organicity" present. RT 22161, 22164-22165. The tests done at that time, however, were not neuropsychological tests and therefore were incapable of producing the level of accuracy and detail generated by Dr. Murphy's testing.

there rather than on the much bigger issue of his capital criminal trial. In this way then, his delusional disorder rendered him incapable of assisting and consulting with his attorneys in a rational manner to prepare his defense at trial.

880. This same delusional thinking, with its accompanying rigid, overly simplistic logic, also compromised his decision regarding appearing in trial in shackles. Rather than see the issue in a rational manner and realize that it was far more important for him to attend his trial than fight a principle, Price could not budge from the view that, because he was presumed innocent, he should not have to appear in court in chains. The point here is that while he may have had some justification for his opinion, it was a totally irrational product of a disturbed mental state for him to decide for almost eighth straight months to never once appear in court in front of the jury that was to decide his fate.

881. The diagnosis of delusional disorder and mild brain damage is consistent with the findings of prior experts. Those experts, including Dr. Satten, did not have the benefit of the testing that Dr. Murphy conducted. Dr. Kramer did not have the benefit of any testing, and yet he was clearly uncertain about Price's incompetence at the time he saw him in September, 1985. Dr. Rosenthal was not asked to evaluate Mr. Price for competency, but rather saw his role as providing useful information in mitigation of sentence. Even so, as noted above, Dr. Rosenthal found signs of the organic brain damage documented in the testing conducted by Dr. Murphy.

882. Finally, while the diagnosis of delusional disorder and mild organic brain damage is a more severe condition than Post Traumatic Stress Disorder, found by Dr. Satten, it is consistent with it. As noted, Dr. Satten did not have the benefit of psychological testing because the California Supreme Court refused to provide funds for such. And, although Price showed clear signs of Post-Traumatic Stress Disorder, the delusional disorder discovered through more

comprehensive evaluation supercedes that diagnosis and explains the underlying symptoms and behaviors in a more accurate manner. While it is true Price suffered from the trauma of jail conditions as well as that of a deeply disturbed and dysfunctional childhood, he also suffers from a delusional disorder which fully explains his response to the trauma. Thus Dr. Satten's diagnosis is not inaccurate per se, but rather understandable as the result of incomplete testing, and it is subsumed within the more accurate and detailed findings of Dr. Murphy.

### D. The Trial of Petitioner, While Incompetent, Violated Due Process and Deprived Petitioner of Adequate Representation and a Fair Trial

#### 1. Petitioner was Incompetent to Stand Trial

883. The above facts establish that petitioner was in fact incompetent during his trial, and as such, his constitutional rights were violated. See Medina v. California, 505 U.S. 437 (1992) ("the criminal trial of an incompetent defendant violates due process"); see also Pate v. Robinson, 383 U.S. 375 (1966).

884. The U.S. Supreme Court has held that the test for mental competency is whether the defendant has a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and a "rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, at 402 (1960). A criminal defendant's right not to be tried while incompetent is so fundamental that the claim cannot be waived by either the defendant or his counsel, and may be presented to and litigated in a collateral attack on the conviction and sentence in federal court. See e.g., Enriquez v. Procunier, 752 F.2d 111, 114 (5th Cir. 1984); Zapata v. Estelle, 588 F.2d 1017 (5th Cir. 1979). As the Supreme Court has recently articulated, "Competence to stand trial is rudimentary, for upon it depends the main part of those

rights deemed essential to a fair trial... The important of these rights and decisions demonstrates that an erroneous determination of competence threatens a 'fundamental component of our criminal justice system' -- the basic fairness of the trial itself." Cooper v. Oklahoma, 517 U. S. 348, 354-364 (1996) (citations and footnotes omitted).[148]

885.    To make out a claim of substantive mental incompetency, a defendant/petitioner must present facts which are sufficient to "create a real, substantial, and legitimate doubt as to [his] mental capacity... to meaningfully participate and cooperate with counsel." Adams v. Wainwright, 764 F.2d 1356, 1360 (11th Cir. 1985), quoting Bruce v. Estelle, 483 F.2d 1031, 1043 (5th Cir. 1973); Lee v. Alabama, 386 F.2d 97, 105 (5th Cir. 1967) (en banc). The record in this case shows both that petitioner was incompetent in fact, and that he was incompetent to waive his presence at trial.

886.    The combined opinion of those experts who have actually evaluated petitioner on the issue of competency point to one conclusion: he did not have a "sufficient present ability to consult with his lawyer[s] with a reasonable degree of rational understanding". Dusky, supra., at 402 (1960). No expert who has ever evaluated petitioner either during or after this trial has found anything that is inconsistent with this conclusion. And of the three doctors who have been specifically asked to render an opinion on the issue of competency, two (Drs. Satten and Murphy) have conclusively determined that petitioner was not competent, and one (Dr. Kramer) had serious doubts and could not reach a determination without further evaluation. Now that the further evaluation envisioned by Dr. Kramer has been completed, the expert opinions are

---

[148]Indeed as the California Supreme Court has recognized, the issue of competency is jurisdictional. Any trial of a mentally incompetent person is rendered null and void.

unanimous.

887. Moreover, petitioner's defense attorneys have never wavered from their view that petitioner was not competent at his trial. Several times during the progress of the pre-trial and trial proceedings they expressed their concerns to the court.[149]

888. Even the trial judge's observations led him to question petitioner's competency, and despite the court's failure to respond appropriately, Dr. Kramer's report at the time is wholly consistent with the facts and conclusions set forth in this claim.

## 2. Petitioner was Incompetent to Waive His Presence

889. For the same reason that petitioner's trial was constitutionally flawed because he was incompetent, it was similarly flawed because he was not competent to knowingly and intelligently waive his presence at it. Due to his mental condition, which the above facts establish remained unstable during the time petitioner chose to absent himself from the trial, petitioner was incapable of knowingly and intelligently waiving his right to be present at his trial, and for this additional reason, his conviction and sentence cannot stand. See Hopt v. People of Utah, 110 U.S. 574 (1883); Diaz v. U.S., 223 U.S. 442 (1912); Proffitt v. Wainwright, 706 F.2d

---

[149]It is true that at one point before trial, when Ms. Klay stated that she and her co-counsel felt her client was again incompetent, after an inquiry by the trial court and a brief recess, Mr. DePaoli returned to court and did not reiterate Klay's concern. RT 10593-10594. The trial court later, on its own, stated that it did not feel there was a doubt at that point about petitioner's competency, but alluded to the possibility that such might arise in the future. RT 10607-10608. DePaoli's failure to push the issue here did not reflect any retreat from the view that his client was not competent at the time, but rather was a reflection of his personal feeling that it would be unhelpful to his client and the case for him to be treated for mental incompetency at the state hospital at that time in the trial. See Declaration of Bernard C. DePaoli, attached to initial state habeas corpus petition and incorporated herein by express reference, at E-42, E-58 through E-59.

311, 312 (11th Cir. 1982); <u>Hall v. Wainwright</u>, 733 F.2d 766 (11th Cir. 1984); <u>see also</u> <u>Johnson v. Zerbst</u>, 304 U.S. 458 (1938).