1 | KAREN S. SORENSEN (CA Bar #75072)
2 | ATTORNEY AT LAW
| PMB 394
3 | 336 Bon Air Center
| Greenbrae, CA 94904-3017
4 | Telephone: (415) 925-1530

RECEIVED

SEP - 5 2006

RICHARD W. WIEKIN
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

5

6 | ROBERT L. MCGLASSON (GA. Bar #492638)
| ATTORNEY AT LAW
7 | 1024 Clairemont Ave.
| Decatur, GA 30030
8 | Telephone: (404) 373-9334

9

10 | Attorneys for Petitioner

11 | CURTIS FLOYD PRICE

12

13 | IN THE UNITED STATES DISTRICT COURT

14 | FOR THE NORTHERN DISTRICT OF CALIFORNIA

15

16 | CURTIS FLOYD PRICE,                    ) Case No. C-93-0277-PJH
|                                        )
17 |          Petitioner                   )
|                                        ) **DEATH PENALTY CASE**
18 |     vs.                                )
|                                        )
19 | ROBERT L. AYERS, Acting Warden of      )
20 | San Quentin State Prison               )
|                                        )
21 |          Respondent                   )
22 | ———————————————————————————————————— )

23 | FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS

24 | VOLUME III

25 | (of 4 Volumes)

26

27

28
| PRICE v. AYERS, JR.
| FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
| CASE NO. C-93-0277 PJH

# Claim XI

## THROUGHOUT THE GUILT PHASE OF THE TRIAL, ACTS OF MISCONDUCT BY THE PROSECUTORS WERE SO PERVASIVE AS TO MAKE A FAIR TRIAL IMPOSSIBLE

890.    In addition to engaging in the numerous acts of serious prosecutorial misconduct which are addressed elsewhere in this petition and include but are not limited to the knowing use of false testimony, the suppression of Brady evidence and the deliberate use of prejudicial discovery-related tactics (see Claims I and VII, supra), the prosecution also engaged in the following other repeated acts of misconduct during petitioner's trial, which resulted in a fundamentally unfair trial in violation of petitioner's rights to due process, a fair trial, the effective assistance of counsel, and his right to be free from cruel and unusual punishment, as guaranteed by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

### A.    Introduction

891.    Petitioner's trial was marked by exceptional bitterness between the attorneys representing the two opposing sides. The two prosecutors appeared to be absolutely convinced that Mr. Price had committed each of the crimes with which he was charged. The two defense attorneys seemed equally resolute in their belief that Mr. Price was the innocent victim of grossly unfair treatment by the jailers and the prosecutors.

892.    The strong belief by the two prosecuting attorneys in the righteousness of their cause led them to frequently lose sight of their proper role in the trial. Instead of insuring that justice was done, they apparently saw their job as merely assuring the conviction of the man they

believed was guilty. Thus, while the prosecutors believed they had the right man, it is not so easy to be confident that the jury had a fair basis on which to judge that belief.

893. The danger of prosecutorial overzealousness was recognized long ago in the following classic statement:

> 'The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor -- indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use legitimate means to bring about a just one.' Berger v. U.S., 295 U.S. 78, 88 (1935).

894. In the present case, many "foul blows" were struck. In a number of instances, there is simply no rational explanation for the prosecutors' behavior, except to conclude that the desire to win the case completely overshadowed any responsibility for assuring the fairness of the trial. The result was that the prosecutors got their victory, but Price did not get the fair trial to which he was entitled. The Supreme Court has held that prosecutorial misconduct will require federal habeas corpus relief if the misconduct "so infected the trial with unfairness as to make the

resulting conviction a denial of due process." <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974).

### B. Misconduct During Jury Selection Proceedings

#### 1. Throughout Jury Selection, the Prosecutors Harassed Defense Counsel and Repeatedly Ignored the Trial Court's Ground Rules

895.    The prosecution did not wait until opening statements or the start of evidence to begin its campaign of improperly influencing the jury, serious misconduct occurred repeatedly throughout the jury selection proceedings.  The prosecutors made numerous baseless objections to defense voir dire questions, and despite repeated warnings from the trial court, insisted on a regular course of arguing about objections, even while one or more jurors was present to hear the argument.[150]

896.    Apparently foreseeing such problems, the trial court attempted unsuccessfully to head them off at the outset.  The trial judge prepared a list of "Guidelines" for the trial proceedings that was discussed on the day before jury selection was to begin.  <u>See</u> RT 1893-1897. Item 9 on the list of Guidelines was as follows:

> Objections shall be stated in clear, concise and legal terms.  There
>
> will be no argument on the objection unless the court invites such
>
> argument.  Once an objection is lodged, the attorneys will remain

---

[150]  Indeed, so many such incidents occurred during voir dire proceedings that this summary will necessarily be lengthy.

silent until the court either requests argument or rules on the matter. Guidelines, CCT 14.

897. Neither prosecutor had any objection to the guidelines; indeed, Deputy Attorney General Bass commented, "Looks good to the People." RT 1893.

898. Nonetheless, the prosecutors were quick to disregard the court's order not to argue objections unless invited to do so. For example, during the first sequestered questioning of an individual prospective juror about her views on capital punishment, defense counsel asked how she had voted on a previous death penalty initiative. Although included on the judicially-approved questionnaire passed out to all prospective jurors, the prosecutor objected that the question was forbidden by the Evidence Code. Defense counsel merely pointed out that he was going by the questions that had been approved and the prosecutor responded by noting he had previously objected to that question and understood that the questionnaire would be revised. RT 3299. Nothing in the record explains why the prosecutor waited to register his complaints in front of a prospective juror, rather than seeking a further discussion of the questionnaire outside the presence of any jurors.

899. Defense counsel then asked the same prospective juror for an example of the type of case which the juror felt merited the death penalty. The prosecutor objected, arguing it was improper to ask jurors to speculate about other cases. An argument between counsel over what kinds of questions could be asked ensued in front of the juror, until the judge finally broke in and noted he was not expecting such battles over the questions that could be asked, and that he would need time to review some of the controlling cases. RT 3299-3302.

900. Defense counsel eventually asked the prospective juror whether she could put aside her own feelings and follow the law as set forth in the judge's instructions. The prosecutor

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

objected and launched into another extended argument about his view of the nature of proper voir dire about attitudes toward capital punishment. He then attacked the court-approved questionnaire, blaming the defense team for asserted improprieties in the questionnaire and in defense counsel's general behavior, all while the prospective juror sat by. RT 3306-3307.

901. The juror questionnaires were understandably long and detailed, in light of the many complexities that surrounded this case. It would not be surprising if many jurors perceived the task of filling out the form (like the task of jury duty itself) as tedious and, in some instances, violative of their privacy. Thus, the prosecutor's early efforts to identify the questionnaire as a product of the defense team could have easily resulted in improper juror resentment against the defense.

902. The prosecutor soon continued with more argumentative objections, prompting the judge to comment that the prosecutor was arguing objections without even giving defense counsel an opportunity to complete a question.[151] RT 3310, lines 6-22. As defense counsel continued in his efforts to question the prospective juror, the prosecutor continued with argumentative objections which openly accused defense counsel of improper and misleading behavior. RT 3312, lines 16-21; 3313, lines 16-25. When defense counsel asked about the types of factors which the juror believed would justify a sentence of less than death, the prosecutor interposed an argumentative objection that seemed to complain of the unfairness of a system that allowed the defense to introduce any evidence it wished in mitigation, while the prosecution was

_____

[151] Indeed, so many such incidents occurred during voir dire proceedings that this summary will necessarily be lengthy.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

limited to statutorily listed factors in aggravation.  RT 3316, lines 18-28.

903.    The prosecutor continued with other argumentative objections that seemed directed at defense counsels' integrity.  RT 3318, line 26 to RT 3319, line 5.  In his next argumentative objection, the prosecutor accused defense counsel of trying to pack the jury.  RT 3320, lines 1-8.  Finally, the questioning was completed and the first prospective juror was excused from the room.  RT 3321.  At this first opportunity to complain outside the presence of any jurors, defense counsel noted that the prosecutor had been making many comments "designed to impress the potential juror that I was attacking the potential juror."  RT 3324.  Defense counsel said it was improper for the prosecutor to repeatedly object to questions that already had been debated and approved for the questionnaire, and defense counsel argued that this was part of a deliberate effort to prejudice the juror against Mr. Price.  RT 3324.

904.    The court then noted that the prosecutor should avoid characterizing defense counsel's voir dire as an attack on the juror.[152]  The prosecutor deflected the discussion from his own wrongdoing by noting that defense counsel had made extra copies of the juror questionnaires so that each juror could have one with which to follow along; the prosecutor charged defense counsel with using this as a ploy to curry favor with the jurors.  RT 3325-3326.

905.    The next several jurors were questioned by both sides without argumentative objections.  RT 3337-3375; 3412-3424.  However, when defense counsel explained to a juror that he needed to get as much information as possible since the state was seeking the death

_____

[152]  The prosecutor had done exactly that at RT 3306, line 25 to RT 3307, line 1.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

penalty, the prosecutor argued, "That's not a question. That's an explanation and it's an inappropriate remark during this process." The judge quickly broke in and stated that no more argument was needed. RT 3450.

906. In another incident, defense counsel DePaoli started to explain to a prospective juror that the woman to his left, to whom he had been talking, was a jury consultant. He also noted that from time to time he would be talking to his client, Price, or to co-counsel Klay. The prosecutor objected to these simple introductions, stating. "This is not a question. Ask Mr. DePaoli to confine himself to questions relating to the feelings about the death penalty." Defense counsel replied that he was merely trying to make the juror feel comfortable and the judge broke in to say the matter would be resolved at the next break. RT 3468.

907. At the next break, Deputy District Attorney Dikeman complained about DePaoli's efforts to introduce members of the defense team to the jurors, arguing that the defense was trying to gain favor with the jurors by being "folksier or nicer" than the prosecution.[153] RT 3482. Defense counsel responded with a thorough summary of the events up to that point:

> Now Mr. Dikeman has -- and Mr. Bass have since the beginning of
>
> our questions on hardship done something I haven't seen in all my
>
> trial experience. They have objected to a person's common

---

[153] As the facts alleged elsewhere in this petition show, it was not defense counsel but rather prosecutor Ron Bass himself who engaged in misconduct and unethical behavior to curry favor with a member of the actual jury in petitioner's case -- sending drinks and money to that juror at her place of work one evening after court along with the message that the money was for a "guilty verdict" against Mr. Price. See Claim III, supra.

courtesy to the jurors. They've accused me of currying a favor when I say 'thank you.' They've accused me of currying favor -- I don't know if its because of their fear with my relationship of the potential juror or what. I've never heard that objection. It's not one in the law. When an attorney uses common courtesy, it's done so with the intentions of being a representative, officer of the court and has nothing to do in the way I've asked questions and introduced people -- to any attempt to curry any favor of the jurors just because I've used common courtesy. And perhaps they perceive themselves as not having used it, which I submit they haven't. I'm being constantly attacked in front of the potential jurors as a deliberate effort to intimidate and prejudice Mr. Price. And I strongly resent those kinds of objections and, to the contrary, would ask not only that kind of objection be overruled but a protective order issued saying when an attorney uses common courtesy he's not to be accused of currying favor of the jurors in front of the juror. RT 3484-3485.

908. The trial court did nothing about the point defense counsel raised in regard to the prosecutor's repeated arguments in front of the jurors. Instead, the judge merely noted that he would take care of all introductions and would include the defense jury expert, who had apparently been inadvertently left out by the court during previous introductions. RT 3485.

909. After exercising restraint through the next few potential jurors, the prosecutors returned to improper objections during the voir dire of Donald Spitzer, eventually seated as an

alternate juror. The Deputy District Attorney attacked a defense question as ambiguous, continued objecting to every effort to rephrase the question, and openly accused defense counsel of trying to confuse the juror. RT 4102-4103. The prosecutor soon followed with another argumentative objection that accused defense counsel of misusing voir dire. RT 4106-4107.

910. Before long, defense counsel asked, "With regard to your feelings in the death penalty, would you be comfortable if you were our client charged with these crimes in having twelve people of your present state of mind concerning the death penalty sit in judgment of your case?" RT 4111-4112. The prosecutor responded to this common voir dire question as follows:

> I'll object to the present time. If he were the defendant, obviously,
>
> he would want a jury that would acquit him notwithstanding what
>
> the evidence was. He would want a jury that would vote for life
>
> without possibility of parole, regardless of the magnitude of the
>
> aggravating circumstances. And to ask the juror to place himself
>
> in the defendant's shoes makes him automatically ineligible to sit
>
> on the panel. In other words, he would be subject to a challenge
>
> for cause. You can't have relatives or friends of the defendant sit-
>
> ting on the jury. You can't have the defendant sitting on the jury.
>
> It's obvious Mr. Price has a motive, interest or bias in the outcome
>
> of the case. RT 4112.

911. Although the judge found this to be a question that had "been used in this County whether right or wrong for a number of years" RT 4112, the prosecutor turned it into another argumentative objection that portrayed the defense as biased and seeking to identify jurors who

would improperly acquit no matter how strong the evidence might be.[154] The prosecutor soon followed with another argumentative objection, accusing the defense of asking unfair questions. RT 4113.

912.    Soon afterward, in questioning another prospective juror about his feelings regarding capital punishment, the prosecutor apparently became unhappy with the attention paid by defense counsel to certain questions from the questionnaire; in front of the juror the prosecutor argued, "I think he skipped past ten and was concentrating on fourteen and fifteen. Are we back on ten because he's unhappy with the answers he got?" RT 4139-4140; emphasis added.) Then the prosecutor utilized the objection "asked and answered," to complain whenever defense counsel asked about a matter that had been covered in the questionnaire. RT 4140-4141.

913.    At this point the juror was sent out of the room and the discussion between the court and counsel showed more clearly how unfair the prosecutor's objections had been. Defense counsel noted that on his questionnaire, the juror had indicated that in response to a question about his general feelings on the death penalty:

---

[154] Although this argumentative objection would have been improper in front of the prospective juror even if meritorious, it also appears that the prosecutor was arguing about problems that were not even present in defense counsel's question. The juror was not asked if he would want to be a juror in a trial in which he (the juror) was also the defendant; defense counsel asked only whether he would want jurors who were in the same state of mind he was now in. That appears to be a fair and common question used to encourage prospective jurors to reveal anything about their state of mind that might cause them to be inappropriate jurors. Nothing in the question or in any expected answer invited or encouraged the juror to express or endorse any improper bias in favor of the defense.   Later in the jury selection proceedings, the prosecutor repeated this same objection to the same type of question. RT 8520-8521.

I'm for it. Overcrowding in jails. Prison gangs, violence and death

threats. I feel if more were killed in the chair, it would make way

for less serious crimes in court and speed up the court proceedings.

RT 41421.

914.    It was defense counsel's very reasonable efforts to clarify what the juror meant by these comments that led to the prosecutor's belittling objections. Defense counsel charged that the prosecutor's objections and insinuations constituted "harassment in a degree that is hard to believe." RT 4142. Defense counsel reiterated his objection to the prosecutor's repeated efforts to intimate to the jurors that the defense was trying to do something improper. RT 4142-4143.

915.    The prosecutor repeated the fact that most of the questionnaire had been designed by the defense and adopted by the court over the prosecution's objection.[155] RT 4143. Defense counsel argued that the prosecutor should not be allowed to continue insinuating that the questionnaire was improper. The trial court responded strongly to both sides:

>      from this point forward -- and I want to underline this -- if
>
>      objections are going to be made, they will be made in a legal
>
>      fashion. There will be no argument in aid of objections from either
>
>      side. There will be no statement in front of a juror to curry favor,
>
>      to tip off facts, to do anything. RT 4145.

---

[155] The prosecutor failed to explain why he felt it was necessary to continue objecting in front of the jurors to questions the court had previously approved. Having been heard and overruled, it was his duty to abide by the court's rulings.

916.    This judicial admonition to all the attorneys resulted in some restraint for a short period of time.   Eventually, however, the prosecutor returned to his efforts to harass defense counsel whenever he asked about the juror questionnaires.   When defense counsel asked a prospective juror whether he had tried to be as truthful and candid as he could in filling out the questionnaire, the prosecutor objected, claiming the question had effectively been asked and answered in that the questionnaire had been signed under penalty of perjury.   RT 4316.   Soon after, when defense counsel prefaced a question with the remark that there were no right or wrong answers, the prosecutor objected that the statement was not a question.[156]   RT 4319.

917.    The following day, defense counsel asked the court to consider issuing a protective order to stop the theatrics by both Deputy District Attorney Dikeman and Deputy Attorney General Bass.   Defense counsel stated that he had asked his investigator to sit in the audience and the investigator verified defense counsel's belief that whenever the defense questioned a juror, one of the prosecutors would react to each question by wincing, head shaking, or otherwise trying to indicate that the defense was doing something wrong.   He also reiterated his concern with the continuing "asked and answered" objections whenever he sought to more fully explore answers on the written questionnaires.   RT 4404-4405.   The court took this complaint under submission without comment.   RT 4405, line 22.

918.    The court did respond to defense counsel's claims in a written order filed 3 days

---

[156]   Interestingly, although he frequently objected to any statements made by defense counsel which were not strictly in the form of a question, the prosecutor himself felt free to preface  s own questions with even more detailed explanations. (See for example, RT 4267, line 22 to RT 4268, line 8.

later. The court stated that the only times it had observed noticeable facial expressions by the prosecutors, they were in response to "repeated ingratiating, and irrelevant attempts, of defense counsel to curry favor with the prospective jurors." CT 6294. However, the court also criticized both sides for creating an atmosphere devoid of cooperation or efficiency in jury selection. The court expressly ordered each side to only ask questions, without including any introductory comments. The court again repeated that when a legal objection was made, "No argument will be made in front of the prospective juror." CT 6295.

919.    The court also ordered both sides to refrain from any "rolling of eyes, smiles, shaking of heads or whispered conferences." CT 6295. The judge finally stated, "Staring at opposing counsel, or their client, which both sides have engaged in will cease. There will be no attempts to 'psych out' the other side." CT 6295.

920.    Once again, the sharp criticism from the court was effective in reducing improper incidents, but only for a short time. When defense counsel asked a prospective juror if he would find it difficult to be fair during the penalty phase, the prosecutor repeatedly objected, arguing that the only issue was whether the juror could be fair and that it was irrelevant whether or not it would be difficult.[157] RT 5509-5512. Also, by that time, the prosecutor had returned to his habit of offering arguments on his objections that repeatedly imputed improper motives to defense counsel. See RT 5456, 5458, 5464, 5472, 5484-5487.

921.    At a subsequent opportunity to discuss the matter outside the presence of any

---

[157] The prosecutor had made a similar objection earlier that day when another juror was asked the same question. The trial court did not respond at that time. RT 5454.

jurors, defense counsel noted that the prosecution was repeatedly objecting on relevance grounds when the defense asked whether it would be difficult to be fair and impartial. The defense requested a ruling on the propriety of this question, and if the question was proper the defense wanted the prosecutor instructed to stop objecting on the same basis. The trial court did not comment, but took the matter under submission. RT 5533-5534.

922.    At the start of proceedings on the following day, the court approved defense counsel's question, but also noted that sometimes he changed the wording of the question, so the court was not willing to preclude future objections. However, the court did repeat several more times that there should be no arguments on objections in front of any jurors. RT 5539-5540. The judge expressly stated that the reason he did not want arguments in front of the jurors was, "[s]o we're not adding to any prejudice that might flow from the arguments that we need to make in order to get to the issue." RT 5539, lines 24-26. In a follow-up written order the next day, the judge repeated once more, "The arguments on the objections will be taken outside the presence of the prospective jurors. Both sides are admonished in that regard." CT 6477.

923.    These latest reminders did not hold the prosecutors in check for long. Soon, Deputy Attorney General Bass began making repeated argumentative objections to a question defense counsel had been asking of nearly every prospective juror. RT 5641, lines 2-4, 25-27. Deputy District Attorney Dikeman also returned to his practice of absurd argumentative objections: "Objection. That misstates the witness' answers to all of the other questions Mr. DePaoli has asked him." RT 5644, lines 9-11; emphasis added.

924.    At the next break, Deputy Attorney General Bass offered a surprising objection to a standard defense question. The question, as it had last been posed by defense counsel, was, "Is there anything about the fact that we're asking you questions now concerning your state of mind

about possible penalties that leads you to believe that perhaps we in the courtroom think that Mr. Price is more likely to be guilty than not?" RT 5636. Bass' unusual objection was made as follows:

> Your Honor, before the next juror is brought in, if Mr. DePaoli makes a statement in the future that, 'We in the courtroom think," or anything about what we've said makes we in the courtroom to believe he's not guilty or he's less likely guilty or whatever that silly word is, I don't want him to include me in his statements because I definitely believe that the defendant is more likely guilty than not. And I don't like him giving the impression that I don't believe that way. RT 5649-5650.

925. The judge ruled that the defense was entitled to ask the question. RT 5650.

926. Later in the proceedings, the prosecution sought to expand further on its objection to any implication that it agreed with the defense about anything. In trying to explain a question to a prospective juror, defense counsel commented, "[n]ow we -- we're concerned about getting twelve people, of course. But at this hearing this morning, we're concerned about talking to you --" RT 6031. The Deputy District Attorney interrupted defense counsel in mid-sentence and stated,

> I'll object to the use of the first person plural pronoun, either implies a special relationship between the potential juror and the defendant or his attorneys or implies that the defense and the prosecution are of a single mind. RT 6031.

927. Defense counsel asked that the juror be removed from the room during the

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

- 402

prosecutor's arguments. The court commented that it was too late, but reminded the prosecutor one more time, "That's the court's rule: the objection is to be made and argument to be made outside the presence of the juror." RT 6031.

928. Before long, the Deputy District Attorney repeated this pointless objection. When defense counsel noted in a question, "we're really just after your feelings," the prosecutor stated, "Objection. First person plural assumes facts not in evidence." RT 6117. Defense counsel soon followed by trying to point out to the juror some apparent inconsistencies in the statements he had made, and the following interchange occurred:

> MR. DIKEMAN: Objection. The question is argumentative and I
>
> think it's --
>
> MS. KLAY: No. It is not.
>
> MR. DIKEMAN: Misstates Mr. Enright's answers both to Ms.
>
> Klay, Mr. Bass, and your Honor.
>
> MS. KLAY: I haven't even finished stating what I perceive to be
>
> Mr. Enright's position, your Honor. But I think I can do that.
>
> That's clearly what he has said.
>
> MR. DIKEMAN: I think Mr. Enright stated his position quite
>
> clearly and if Ms. Klay doesn't understand it, it's too bad.
>
> RT 6118.

929. Thus, in that brief passage, Dikeman not only ignored the frequent admonition to

register objections without arguing them in front of the juror, but he also insulted the intelligence of defense counsel, all in front of the prospective juror.[158]Having gotten away with that dig at defense counsel, Dikeman soon made another argumentative objection to a perfectly reasonable question. In a single objection he managed to accuse defense counsel of asking an unfair question while offering his own political viewpoint on a controversial Death Penalty Initiative:

> Q. [By defense counsel:] All right. Do you think that because --
> because of your feelings towards this and your support for the
> Briggs Initiative, that you would let some of those attitudes or your
> feelings carry over into this trial and perhaps through your
> consideration of the evidence as a juror in this case?"
>
> "MR DIKEMAN: I'll object to that. The Briggs Initiative set up a
> standard whereby a person could be sentenced either to death or
> life without possibility of parole and, therefore, it's a very neutral
> initiative. The question perhaps isn't, but the initiative was."
>
> RT 6128.

930.    The prosecutor's determination to periodically upset the flow of defense counsel's questions with argumentative objections over pointless matters surfaced again in the following interchange:

---

[158] Mr. Enright was ultimately selected as a regular juror, although he was removed just before the start of the evidentiary portion of the trial for violating a court order to refrain from reading newspaper articles about the case. See RT 9999, esp. pp. 9953-9958; see also RT 10000-10008, 10041-10042, and 10102-10103.

"Q. [By defense counsel:] All right. Now I also take it from examining your questionnaire that you would have no problem whatsoever in sitting on any of the guilt aspects of the trial -- the guilt aspects of the trial to determine whether or not a person's guilty or not guilty?

A. No.

MR. DIKEMAN: Objection. Move to strike. That calls for hearsay and its an inaccurate statement of what his questionnaire contains. If you look at the four death penalty questions.

MR. DePAOLI: I'm sorry. Doesn't call for any hearsay whatsoever. That objection can't be made.

MR. DIKEMAN: When he starts to put into verbalizing what's already been written, then it is hearsay.

THE COURT: I thought we were going to argue these outside the presence of the jurors, gentlemen? That's the first problem with what's just happened. This will not happen again. RT 6222.

931. The next incident of prosecutorial impropriety was not in the form of an improper objection, but merits inclusion as a further indication of the prosecution attitude that any means were permissible in the effort to rid the juror pool of anybody who might hesitate to convict Price or to favor a death judgment. In questioning a prospective juror who had voiced some concern about his ability to participate in a decision to end the life of a fellow human being, the prosecutor stated:

But, see, if you are chosen as a juror in this case and you do find

those aggravating factors to outweigh the mitigating factors, you

will be the person who drops the pellet into the acid that kills the

defendant. RT 6235.

Both defense counsel immediately objected to this as argumentative as well as untrue, but the court said nothing at all. RT 6235.

932.　Thus, over and over, throughout the jury selection procedures, the prosecution offered one argumentative objection after another, often taking the opportunity to belittle defense counsel or merely to harass the defense with objections over matters that were clearly proper. Over and over again, the trial court insisted on a rule of no arguments in front of the jurors, but every time the rule was violated by the prosecutors, the judge merely repeated the rule without the slightest effort to enforce it.

933.　Furthermore, the judge seemed determined to always direct any criticism at <u>all</u> counsel, without ever acknowledging what is obvious when the full record of the voir dire is read. The simple fact is that rude and argumentative objections were frequently made by the prosecution and only very rarely by the defense. Despite this, and despite repeated complaints by the defense, the judge seemed completely unwilling to ever recognize that the prosecution was far more culpable than the defense. Sadly, though frequently stating a reasonable rule, the judge seemed unwilling to take any action to enforce it.

934.　With these observations in mind, petitioner submits that the next episode of prosecutorial misconduct dramatically shows the extent to which the prosecution team had learned that it could get away with anything, while the defense learned the sad lesson that reminding the judge about his unenforced rules would bring down as much criticism on the

defense as on the prosecution.

935. After defense counsel asked a prospective juror a hypothetical question aimed at eliciting the depth of the juror's feelings about capital punishment, and then started to change the hypothetical, Deputy Attorney General Bass attempted to make an anticipatory objection:

> Q. [by defense counsel:] All right. Let's talk about that. Now let's
>
> assume in the hypothetical I gave you --
>
> A. Um-hmm.
>
> Q. -- that there was no --
>
> MR. BASS: Now I will object to counsel now attempting to limit
>
> the hypothetical to such a degree that the only possible answer he
>
> could give would be the death penalty, and that's exactly what he's
>
> going to do now.
>
> THE COURT: Well, you don't know that, Counsel.
>
> MR. BASS: Oh, yes.
>
> THE COURT: Let him ask the question. RT 6322.

936. Defense counsel then asked his question and the prosecutor objected to it as unintelligible and compound. RT 6323. The question was then rephrased. RT 6324. The prosecutor then objected and argued as follows:

> MR. BASS: Objection, your Honor. Counsel has framed that
>
> question in such a manner as it unfairly limits the mitigating
>
> circumstances to the fact that he had a tough life and made a
>
> mistake. Under those circumstances -- question's unfair, and

there's only one possible answer that this or any other juror in the

world could give.  RT 6324-6325.

937.  The trial court properly rebuffed this objection and noted that if the prosecutors

were unhappy about the hypotheticals posed by defense counsel, the proper course was to

respond with alternative hypotheticals, when it was their turn to question the juror.  RT 6325.

Defense counsel resumed his questioning and the prosecutor made some argumentative

objections.  RT 6327, lines 9-11, RT 6328, lines 5-8.  Then defense counsel asked a question in

which he noted, "you understand that I'm not saying we'll ever get to the penalty phase of the

trial?" RT 6328.  The prosecutor responded, "Objection to what counsel states or believes or

feels." RT 6328.  Defense counsel answered, "I think the Court said -- the Court said it deals --"

RT 6328.  The judge then said,

> All right.  All right.  This is about the third time today we end up
>
> with comments that are not needed.  The Court has indeed said that
>
> and I also indeed said twice today -- indicated to counsel there
>
> would be no arguments in front of the jurors.  The next time I have
>
> an argument from either side, there are going to be some citations
>
> leveled by this Court.  And can guarantee you there will be action
>
> taken because I am tired of mentioning it.  RT 6328-6329.

938.  Thus, the prosecutor used a pointless objection to provoke defense counsel into

innocuous comments which the judge seemingly seized upon to levy criticism at defense

counsel, when it was the prosecution which had repeatedly disregarded the agreed procedure.

Even if the judge's sharp rebuke can be seen as a direct reaction to the prosecutor's comments,

rather than to defense counsel's response, the fact remains that the court's sharp words were

directed at both sides, even though it was the prosecution that had repeatedly succeeded in ignoring the rules without suffering any meaningful adverse consequence.

939. Subsequently, the prosecution team continued with argumentative objections, drawing no criticism from the judge. See RT 6508, line 27 to RT 6509, line 7. A further indication that the judge's sharpness seemed to be reserved for defense counsel, even though the prosecution was the more frequent and flagrant violator, came soon in another episode of a misguided prosecutorial objection followed by prosecutorial argument:

Q. [by defense counsel:] You indicated it would be difficult --

very difficult to set your feelings aside, correct?

MR. BASS: Objection. Misquotes --

MR. DePAOLI: I'm sorry.

Please look at the top --

MR. BASS: Counsel is arguing.

THE COURT: All right. I don't have the questionnaire, counsel, so I can't tell you whether it --

MR. BASS: Simply skipped a couple of questions in between, and that's what I wanted to make perfectly clear. Perhaps the juror could look at his --

MR. DePAOLI: I'm entitled to take them in the order --

MR. BASS: Not skipping if it comes to a different conclusion or leads to a different result, perhaps.

MR. DePAOLI: Does his Honor want to look at the questionnaire?

THE COURT: Guess I better.

THE DEFENDANT: Do you want to excuse the juror?

THE COURT: Okay.

MR. DePAOLI: Does his Honor wish the juror excused.

THE COURT: No. He can answer the question. RT 6520.

940. The prosecutor followed this with another argumentative objection. See RT 6524, lines 23-27. Next, the prosecutor objected repeatedly to a number of questions posed by defense counsel. RT 6527-6529. Finally, after the prospective juror said he believed he could give the defendant the presumption of innocence even after learning he had spent time in prison as a result of a prior conviction, the following interchange occurred:

> Q. [by defense counsel:] Do you have any doubts about your
>
> ability to do that?
>
> MR. BASS: Objection. Argumentative.
>
> MR. DePAOLI: That's not argumentative, your Honor. We're
>
> looking for jurors' true feelings.
>
> MR. BASS: Counsel is arguing.
>
> MR. DePAOLI: Your Honor, I'm going to ask we take the
>
> argument outside the presence of the jury -- juror.
>
> THE COURT: Well, if you want to do that, maybe you should
>
> request it before you start the argument, that way we won't have
>
> the argument before the juror. RT 6530.

941. The judge then sustained the prosecutor's objection, even though it does not seem that defense counsel's question was in any way argumentative or otherwise improper. Thus, the defense suffered an erroneous adverse ruling and was simultaneously rebuked for suggesting

argument outside the presence of the jury, when the defense had done nothing more than make an innocuous response to an objection that seemed calculated to harass. Meanwhile, as had become common, nothing was said about the more substantial argumentative comments of the prosecutor.

942. As soon as the juror had left the room, defense counsel quickly registered his objection to the fashion in which objections had been raised and the manner in which they were handled. RT 6532, lines 12-15. He pointed out that the answers on the juror's questionnaire should have made it quite clear to the prosecutor that the clarifying questions asked by the defense were appropriate. RT 6532, lines 16-28. Defense counsel expressly noted,

> when I attempt to respond, of course, I'm either criticized by them
> for arguing or by the Court and not ever given a chance to state
> Mr. Price's position on the matter. So I would again ask the Court
> for clarification on how these matters are to be handled and to
> impose sanctions against the prosecutors for their very
> argumentative and unsettling and harassing approach to the
> handling of objections in this case. RT 6533-6534.

943. Although the record as a whole fully bears out the comments of defense counsel, the Court strongly denied criticizing any counsel for asking questions or making objections that afternoon. RT 6534, lines 3-7; but see RT 6530, lines 12-14. The court then dismissed the rest of defense counsel's comments as "balderdash." RT 6534, lines 11-12. However, after a recess the court made the following comment:

> In line with Mr. DePaoli's comments, if there are going to be
> arguments on objections, as they are made the Court will cease the

questioning of the juror. The juror will be removed from the

courtroom. We'll hear the argument. That will increase the time

necessarily. I would hope all parties keep that in mind. RT 6535.

944. This latest judicial repetition of the procedure that was to be followed seemed to

be effective for a couple of days, but the prosecution eventually returned to its custom of

argumentative objections:

> MR. BASS: Object to the question. I think he is picking and
>
> choosing from the large list of aggravating and mitigating
>
> circumstances, and we are getting to the point now where the juror
>
> should be given the instruction by the Court as to all of the things
>
> that can be considered in that penalty phase. RT 7033.

945. Defense counsel then asked to address the matter outside the presence of the juror.

The judge then resolved the issue without further discussion, and gave no indication of

displeasure at the prosecutor's violation of the procedural guidelines. RT 7033-7034.

946. The next incident occurred when defense counsel was questioning a juror about

aggravation and mitigation. Defense counsel noted that if there was a penalty phase of the trial,

the People, if they chose to, might present additional negative facts about the defendant. RT

7159. The prosecutor then offered the following objection:

> MR. DIKEMAN: I am going to object at this point in time. It's
>
> preinstructing. The aggravating factors are limited by statute and
>
> judicial decision. So not all bad things would necessarily come in.
>
> RT 7159.

947. Although what the prosecutor said was true in the abstract, it had nothing to do

with the question asked by defense counsel. The defense in no way suggested that every negative fact about the defendant could or would be introduced in penalty phase evidence. Defense counsel said only that the People might introduce additional evidence of negative facts about the defendant.

948. The prosecutor, in a legally erroneous objection, managed to convey the impression that the defense was doing something improper and made the point that the prosecution was restricted by statutory limitations. This strongly implied that the prosecution had negative evidence about Price which it would be precluded from offering. Rather than rebuke the prosecutor for this argumentative objection, the trial court erroneously agreed with the merits of the objection. RT 7159, line 23.

949. Another incident occurred when defense counsel questioned a prospective juror who was a college student and had just started a new school year, which would be completely lost if that person was selected as a juror. Defense counsel asked whether the prospective juror was sure that her ability to be fair and impartial would not be affected by such interference with her education. Seizing the opportunity to turn the matter into a lecture on reasonable doubt, the prosecutor stated, "I would object. Absolute certainty is never possible, not even in a criminal case where the burden of proof is as high as you can go. Everything is subject to possible or imaginary doubt." RT 7827. Again, the trial court found no reason to criticize the prosecutor's

argumentative objection[159]

950. Soon afterward, defense counsel asked the juror if she could understand his difficulty in having persons on the jury who were not able to focus on the testimony in the case. The prosecutor interrupted: "I'll object to this. This is not a question, and Mr. DePaoli's state of mind is not an issue.... Or are -- or are her abilities to understand his difficulties." RT 7828. Thus, once again a totally innocuous statement by defense counsel was used by the prosecutor as an excuse to attempt to ridicule defense counsel in front of the juror.

951. Later, as the jury selection proceedings moved into the final stages, the trial court set forth procedural rules for the exercise of peremptory challenges. Once again the judge noted that there should be no arguments on any objections in the presence of the jurors. RT 8478. Before long, when defense counsel asked a prospective juror whether he would convict on the testimony of a single eyewitness or would require corroboration, the prosecutor responded, "Objection. He's trying to preinstruct on the law. Corroboration is not required if the testimony of the witness is believable. RT 8613.

952. Defense counsel responded that he was not attempting to preinstruct, so the prosecutor amended his objection to "Argumentative." The judge sustained the objection and stated, "I want to remind counsel of the Court's rule we will not argue the objections in front of the jury." RT 8613.

953. The prosecutor later surpassed all of his earlier efforts at improperly influencing

_____

[159] See also an earlier argumentative objection made during the questioning of this same prospective juror. RT 7825, lines 6-15.

the jury. Questioning a prospective juror <u>in the presence of all other prospective jurors</u>, the prosecutor began a line of questions about violent acts committed by persons in state prison. First, the prosecutor obtained the agreement of the prospective juror with the hypothesis that one reason that violent acts were committed in prison was because violent people were sent to prison. RT 8876. The prosecutor then offered a long and rambling statement describing the different types of violent and non-violent offenses that could result in a prison sentence. The prosecutor then asked the following question:

> Q. Of that group that I've talked about -- and you can add anything
>
> else that comes to mind -- who do you suppose would be more
>
> likely to commit violent acts. Somebody who's in there for
>
> narcotic offenses, theft-related offenses, or somebody who's sent
>
> there because they have been convicted of a violent act against a
>
> fellow human being? RT 8876.

954. Defense counsel's objection to this outrageous question was immediately sustained; the prosecutor made no attempt to justify his question. However, the damage was complete when the words were uttered, and could not be undone merely by sustaining an objection. Knowing that in the penalty trial, if not sooner, the jury would learn of prior violent crimes for which Price had been convicted, the prosecutor made the grossly improper point that persons with convictions for prior violent crimes were more likely to commit additional violent crimes in prison. This proposition was totally without evidentiary support, and the prosecutor must have known that settled rules of law prohibited even attempting to prove such claims, whether in the guilt or the penalty phase of a trial.

955. Later, in a question about a defendant's right to choose not to present a defense,

defense counsel commented, "[t]hen you can understand why a person might just want to rely on the strengths or weaknesses of the prosecution --" RT 9029. The prosecutor interrupted in mid-sentence: "Objection. Calls for an improper speculation. No inference to be drawn. It's irrelevant what a person --" RT 9030. At that point the judge broke in: "Counsel, I don't want any argument from either side. We have that agreement. Lodge your objections. You, please, will not respond from the other side." RT 9030.

956.    That incident was instructive in that it was one of the few examples of any criticism by the court, about argumentative objections, that was actually directed at the prosecutor. Yet even on this occasion, the trial court managed to seem equally critical of defense counsel by telling him not to respond, even though he had not yet said anything at all.[160]

## 2. Conclusions Regarding Misconduct During Jury Selection

957.    Summarizing the misconduct that occurred during jury selection, petitioner has shown that the prosecutors repeatedly disregarded the court's order that there be no argument on objections in the presence of the prospective jurors. This is analogous to intentionally pursuing matters that have been expressly ruled inadmissible; such behavior is not only serious misconduct, but also shows bad faith.

958.    It is true that in most of the instances, the jurors who were exposed to the prosecutor's improper statements did not become actual jurors in either the guilt phase or the

---

[160]    There was one further incident in which the prosecutor objected on the ground of calling for speculation, defense counsel responded that the question went to the juror's state of mind, and the prosecutor started to respond. The judge broke in and said, "Gentlemen, I don't know how many times I've said, we're not going to argue it." RT 9256.

penalty phase. Nonetheless, the defense was prejudiced in several ways. First, the prosecutor's frequent improper interruptions made it difficult for the defense to engage in any coherent questioning of a number of prospective jurors. Second, the defense was undoubtedly forced to seek the excusal (by challenge for cause or by peremptory) of a number of otherwise acceptable jurors who became tainted by their exposure to improper remarks by the prosecutor. This would have seriously distorted the pool of available jurors, and also would have distorted the peremptory challenge process, causing defense counsel to use challenges he should not have had to use. Thus, these repeated voir dire improprieties substantially interfered Price's 5th, 6th, and 14th Amendment rights to a fair trial in accordance with due process, and to trial by an impartial jury.

959.   In any event, totally aside from the degree of prejudice that the defense suffered as a result of the prosecutor's improper practices during jury selection, these incidents also set the stage for the incidents that followed in the rest of the trial. The prosecution practices in the jury selection stage demonstrated a determination to have its own way without regard to clear orders from the trial court. Furthermore, the trial court's failure to take any meaningful action in response to the prosecution improprieties only served to encourage more misbehavior. As will be shown in the next section of this argument, these practices continued unabated throughout the trial.

## C. Numerous Instances of Misconduct Occurred During the Evidentiary Portion of the Guilt Phase of the Trial[161]

### 1. Prosecutorial Disobedience of Direct Court Orders

a. The Prosecutor Intentionally Disregarded a Clear Ruling of the Trial Court and Attempted to Place Before the Jury an Inference That Defense Counsel Improperly Advised a Witness Not to Cooperate With the Police

960. District Attorney Investigator Barry Brown testified that he went to Becky Williams' home and sought to interview her about her contacts with Curtis Price. RT 15517. A hearing was then held outside the presence of the jury and Brown explained that Williams was first reluctant to talk to the officials, then said that she would, but then she decided to make a long-distance call to Price's counsel, Bernard DePaoli. RT 15518-15519. After talking to DePaoli, Williams said that he had explained her rights and she did not wish to talk to the officers. RT 15520.

961. The trial judge ruled the People could bring out <u>the fact</u> Williams refused to give a statement, but very clearly ruled the People <u>should not</u> delve in any way into the involvement of defense counsel in Williams' decision. RT 15521.

962. In front of the jury, the prosecutor then brought out the fact that Williams was unwilling to talk to Brown. RT 15522. On cross-examination Brown stated that he had advised Williams that she did not have to make a statement, that he sometimes advised prosecution

---

[161] The many instances of misconduct which occurred during the evidentiary portion of the guilt phase will be grouped into several broad categories. Inevitably, there will be incidents which could fit into more than one category.

witnesses that they were not required to talk to the defense, and that Williams was approached as a witness, not a suspect. RT 15523-15524.

963.    On redirect-examination, the prosecutor asked,

Before she made her final decision not to be interviewed by a representative of the Humboldt County District Attorney's Office investigating a homicide involving Curtis Price, did she place what appeared to be a long distance telephone call?  RT 15525.

964.    Defense counsel relevance objection was sustained.  The prosecutor had no further questions.  The judge then explained to the jurors at some length that witnesses had a right to decide whether they wanted to talk to representatives of one or both sides and that there was nothing wrong with a witness deciding not to talk to one side.  RT 15525-15526.

965.    In light of the clear and correct ruling that the People could bring out the refusal to make a statement, but could not go into any details that might suggest the involvement of defense counsel in the decision, there is simply no possible justification for the prosecutor's single redirect question about whether a long distance phone call had been made before the decision.  The prosecutor was obviously leading up to a complete disregard of the ruling that had been made moments before, but was cut off before he could get as far as he wanted.  He did get far enough, however, to strongly imply that Williams had called someone connected with the defense.  Such intentional pursuit of a matter ruled inadmissible is serious misconduct and demonstrates bad faith.

966.    The trial court's admonition in this instance may have been sufficient to offset much of the harm.  The jury was not told merely to disregard what had been said, but was also expressly told that the apparent implication was legally wrong.  However, even if much of the

harm was cured in this instance, it remains relevant as a demonstration of the purposeful manner in which the prosecution team was determined to make its points, even in the face of a clear adverse ruling from the trial court.  As will be seen, many more such incidents occurred that were not offset by adequate admonitions.

   b.   The Prosecutor Ignored a Direct Judicial Ruling and Repeated a Question
        to Which an Objection Had Just Been Sustained, Thereby Implying to the
        Jury Both That Mr. Price Had Refused to Consent to a Search of His Car
        and That Defense Counsel Was Trying to Hide That Fact

967.   When the prosecutor asked Detective Freese whether Price voluntarily consented to the search of his car, defense counsel objected on relevance grounds and the objection was sustained.  RT 16011.  The prosecutor asked to be heard on the matter and the court responded, "You may when we get to the break.  Go on and ask him some more questions." RT 16011.  The following exchange then occurred:

   MR. DIKEMAN:  What was Mr. Price's response when he was

   asked to sign the consent --

   MR. DePAOLI:  Same objection.

   MR DIKEMAN:  -- to search his vehicle --

   MR. DePAOLI:  Asked -- asked --

   THE COURT:  Sustained.   RT 16011.

968.   The trial court had just sustained an objection to a question as to whether Mr.

Price had consented, and then postponed any further discussion of the objection.[162] The prosecutor flagrantly failed to abide by a clear judicial ruling. This is serious misconduct and demonstrates bad faith.

969. This type of willful misconduct should not be countenanced in a capital case. No admonition whatsoever was given to the jurors, and none could have negated the misconduct. It was obviously the prosecutor's goal to repeat the point that Price had not consented to the search of his vehicle, and an admonition would have only given the prosecutor exactly what he wanted - further emphasis of the point. As it was, the prosecutor was able to make two strong but improper points - that Price had refused to consent to the search of his car and that defense

---

[162]Later, outside the presence of the jury, the prosecutor attempted to justify his question on several grounds, all of which were rejected by the court. RT 16040-16042. Indeed, his rationales were so weak as to be frivolous. First, he referred back to testimony by Officer Mendosa that an informant had said that a man named Steven Taggart was using drugs, matched the description of the Village Liquors robber, and was trying to obtain a gun. Taggart had been talked to and eliminated as a suspect for several reasons, one of which was his cooperation in consenting to a search of his home. See RT 15767 to 15770-1. The prosecutor's reasoning was that since one officer eliminated Taggart as a suspect because he consented to a search, it was fair to infer that Price should remain a suspect when he refused to consent to a search. RT 16040 to 16040-1. The judge seemed truly astonished at this tortured logic. RT 16040-1, lines 3-4.

The next rationale offered by the prosecutor was that the refusal to consent to the search indicated that Price had something to hide, demonstrating a consciousness of guilt. RT 16041. The judge correctly ruled that the exercise of the right to refuse to consent to a warrantless search could not be used against a defendant. RT 16041; see United States v. Prescott, 581 F.2d 1343, 1350-1353 (9th Cir. 1978).

At no time did the prosecutor even attempt to offer any justification for going back to the same point immediately after the trial court's adverse ruling.

counsel was trying to hide that fact from the jury[163]

    c.   Shortly After the Last Episode, the Prosecutor Again Blatantly Ignored a Clear Ruling of the Court and Improperly Attempted to Elicit Prejudicial Information about Mr. Price's Background

970.    During cross-examination of Detective Freese, defense counsel asked whether he had ever asked other officers to stop and detain Price[164] RT 16044. The prosecutor warned that if defense counsel wanted to go into the reasons why Price was ultimately arrested, then highly prejudicial information about Price's background, known to the arresting officer, would be disclosed. RT 16045-16046. The judge ruled that defense counsel could ask whether Freese did anything to cause Price to be arrested, to which the officer would respond that he did not, and no further details would be brought out. RT 16049. The court made it unmistakably clear that this would not necessarily open the door to prejudicial evidence, because there would still be to consider. RT 16053.

971.    Subsequently, the judge concluded that, without opening the door to other matters, defense counsel could bring out the fact that Freese did not feel that the descriptions he

---

[163] This was not the only incident in which the prosecutor sought to draw improper inferences from the exercise of a constitutional privilege. When John Stinson testified as a defense witness, the prosecutor directly asked him whether he had ever invoked the Fifth Amendment privilege against self-incrimination in response to questions about being a member of the AB. RT 18653. That clearly violated the principles against drawing inferences from the exercise of the privilege, as set forth in . There is no reason why those principles do not apply to witnesses as well as to defendants. This is not raised as a separate example of misconduct only because defense counsel failed to object.

[164] Defense counsel argued it was relevant whether the investigating officer considered Price a suspect, and the prosecutor countered that the validity of the arrest had already been determined. RT 16045.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

received from the Triplex witnesses were strong enough to justify arresting Price. RT 16053-16057, esp. at 16053, line 23 to 16054, line 2; 16055, 11. 15-18. After Freese acknowledged that he did not believe he had enough information to justify arresting Price, and was surprised when he learned that Price had been taken into custody RT 16061, 16083, the prosecutor questioned him as follows:

> Q. [by Deputy District Attorney Dikeman:] Sir, on March the 3rd, 1983, when you formed that opinion, would your opinion have been the same if you were aware that the defendant was --
>
> MR. DePAOLI: I would object, your Honor, based on the fact counsel's testifying, calls for speculation.
>
> MR. DIKEMAN: It's a hypothetical question. He's asked for an opinion. I think I'm allowed to ask him about factors which might change that opinion.
>
> MR. DePAOLI: I don't believe there's been a foundation established for that, your Honor.
>
> THE COURT: Overruled.
>
> MR. DIKEMAN: Would your opinion have been the same if you were aware that Mr. Price --
>
> THE COURT: Wait a minute. Just a minute. Just a minute. Are you going into factors that --
>
> MR. DIKEMAN: I'm going to ask him a hypothetical question, additional factors, that his opinion would be changed. I -- I --

MR. DePAOLI: It's not relevant, your Honor. It didn't happen that way.

MR. DIKEMAN: <u>If Mr. DePaoli's really concerned</u>, I'll withdraw it.

THE COURT: <u>Apparently he is</u>. All right. It's withdrawn. Go ahead. Ask another question. RT 16091-16092; emphasis added.

972. In light of the prior discussion, the prosecutor must have known that it would be improper to go over additional information about Price that was known to other officers. Although the prosecutor was not able to complete his obviously improper question, the damage was done. He made it clear to the jury that there were other factors which they had not heard about. Worse, he forced defense counsel to appear to be hiding information the jury probably wanted to hear. He then reinforced that inference by expressing a willingness to withdraw his question because of defense counsel's great concern.

973. Although no admonition was sought, none could have cured the harm. If the judge had told the jury to ignore the prosecutor's inference that more was known about Price than the jury had been told, that would have merely emphasized the very point the prosecutor was making. Indeed, the judge's "Apparently he is" comment unfairly emphasized the prosecutor's improper remark about defense counsel's concern, adding to the prejudice and making it even less likely that an admonition would have been effective. Thus, the failure to object should not preclude raising this incident on appeal.

**d. The Deputy District Attorney Made a Blatantly Improper Statement in Front of the Jury Calculated to Prejudice Mr. Price, and Continued to Pursue an Irrelevant Area Even After Clear Adverse Rulings**

974. Referring to a suitcase that was in Mrs. Lloyd's garage and which she turned over to the police, the prosecutor asked Mrs. Lloyd if she had ever seen a gun found in the suitcase, People's Exhibit 14-A-5. Mrs. Lloyd replied she had not. RT 16688-16689. The prosecutor then asked, "Would it surprise you to learn that that weapon was reported stolen in Flint, Michigan?" RT 16691. Defense counsel's immediate relevance objection was sustained. RT 16691.

975. Even assuming that this gun had any connection to any of the charged offenses, the fact that it might have been stolen in Flint, Michigan was of no relevance whatsoever. Moreover, the record is clear that the prosecutor knew there was no relevance, since he had just been stopped in his efforts to ask Mrs. Lloyd about a family friend in Flint, Michigan, after admitting he had nothing at all to tie the friend to any of the present crimes. See RT 16687-16688.

976. This demonstrates the prosecutor's reprehensible disregard for the rules of evidence. First, the prosecutor knew the matter was totally irrelevant. Second, it is obvious he calculated the prejudicial impact of implying that Price was in possession of a stolen gun, and that a family friend in Michigan was perhaps somehow involved in the theft. This was an example of an effort at guilt-by-association, and an effort to blacken Price's character with other bad acts not at all relevant or independently admissible. Third, the prosecutor chose to make a statement rather than ask a question, so he effectively told the jury he knew the answer even

though the defense objection was fast enough to prevent any answer.[165]  Fourth, while fully accomplishing his dishonest and prejudicial purpose, the prosecutor also forced defense counsel to seem to be hiding evidence from the jury.  Fifth, the prosecutor persisted in returning to this stolen gun theme in blatant disregard of adverse rulings.

977.  The gun itself was mentioned later in defense counsel's examination of Sergeant Fredrickson, when defense counsel brought out the point that it did not match any of the guns reported as stolen from the Moore or Hickey residences.  RT 17393.  Soon afterward, outside the presence of the jury, the Court questioned whether the defense had opened the door to permitting the prosecution to explain why the officer had seized the gun when it was found in the suitcase.  RT 17400-1.  However, the court also expressed concern about getting back into any testimony about the gun having been stolen.  RT 17400-1.

978.  Defense counsel pointed out that the Charter Arms gun was seized because the officer was looking for any weapon that might have been used in the robberies.  RT 17400-1.  Indeed, the officer did not even know at the time of the seizure of the gun that it had been

---

[165]  Indeed, the prosecutor quickly seemed to realize the effectiveness of this type of "would it surprise you to learn" question, in achieving improper goals.  Moments after the present episode, he asked Mrs. Lloyd about the radio she found in Price's room and turned over to the police.  The radio was also identified as identical to a gift Price received from the Fletcher's and as identical to a radio missing from the Hickey/Petry home.  The prosecutor asked Mrs. Lloyd if it would surprise her to learn that the serial number on the radio she found in Price's room was different from the serial number on the radio purchased by Shari Fletcher.  Once again, a promptly sustained relevance objection could not stop the jury from hearing the prosecutor's statement.  RT 16703.

As fully described in the statement of facts in the AOB, it later turned out that the prosecutor was unable to back up his assertion that the radio purchased by the Fletchers was not the same radio that Mrs. Lloyd found in her son's room.  See AOB, at 96, fn. 175.

reported as stolen in Michigan. RT 17400-1. The prosecutor then stated that the officer seized the gun because he knew that Price was a convicted felon, and the judge said that was fine and would be allowed as the explanation for the seizure. RT 17400-2. Thus, at that point it was unmistakably clear that the prosecutor could bring out the fact that the gun was seized because Price was a known ex-felon, but it was also clear that there was no basis whatsoever for going into the fact that the gun had been reported stolen in Michigan.

979. Nonetheless, shortly after resuming his questioning of the officer, the first question the deputy district attorney asked about the gun was, "Where was the Charter Arms reported stolen out of?" RT 17409. Defense counsel's objection and comment that the matter had already been ruled on was sustained before there was any answer, and the court admonished the jury to disregard the question.[166]

980. Despite the speedy ruling and admonition, the form of the question once more accomplished the improper purpose even without an answer. More importantly, this is another crystal clear example of a prosecutor wilfully disregarding adverse rulings and seizing every

---

[166] Moments later, defense counsel moved for a mistrial because of the blatant misconduct. The prosecutor made a totally incredible claim that he believed the judge had approved his question, but the judge disagreed. RT 17410-1 to 17410-2. The motion for a mistrial was denied, but the judge again admonished the jury to disregard the question. RT 17410-2, 17430-2. Unfortunately, that belated second admonition probably only served to remind the jurors one more time about the allegations that the gun was stolen.

Defense counsel's request for a mistrial was later renewed, based on this incident and a subsequent improper incident. RT 17636. The mistrial was again denied, with the court noting there had been no answer to the improper question, and there had been an admonition to disregard the question. RT 17636. However, the judge conceded, "I suppose truthfully, that the question itself poses such a stigma that they can assume that it was stolen; ..." RT 17636.

opportunity to unfairly prejudice the defense.

     e.   The Deputy Attorney General Once More Ignored an Adverse Ruling and Persisted in Asking Thompson How Long He had Known Price, Thereby Improperly Conveying Prejudicial Information about the Length of Price's Prior Prison Term

981.    Although the nature of the present trial made it inevitable that the jury would learn that Price had been in prison on a prior occasion, his length of imprisonment was irrelevant and deemed to be so by the court. Nonetheless, the prosecution was determined to press this point at every opportunity.

982.    While examining Michael Thompson, Deputy Attorney General Bass asked how long he had known Price. RT 16737. Defense counsel objected on relevance grounds. The objection was sustained and the prosecutor's request for further discussion of the point was deferred until the next break. RT 16737.

983.    At the next break, Thompson said outside the presence of the jury that he had met Price in San Quentin in 1979. RT 16754. The relevance of this was debated in depth. RT 16754 to 16760-1. The court rejected the alleged relevance argued by the prosecution and stated clearly that the jury should not be reminded by Thompson about the length of time Price had spent in prison. RT 16761.

984.    In spite of the clear ruling, the prosecutor waited only a moment or two before asking Thompson, "Can you tell me simply the year that you met the defendant, Curtis Price?" RT 16745. Defense counsel immediately objected and noted this had been ruled on. Inexplicably, the judge responded, "He can ask him how long he's known him." That question was asked and Thompson responded, "Five to six years." RT 16765.

985.    While the prejudice from this incident was slight, this once more illustrates the

determination of the prosecution to make its desired points even in the face of adverse rulings. Although it has been shown in other claims in this petition that the court was quick to react angrily whenever it perceived the defense as doing something wrong, the court did not seem inclined to criticize or otherwise discourage the prosecutors' persistent failure to abide by the court's rulings. See e.g. Claim VII, supra. Worse yet, the court in this instance encouraged such misbehavior by making it clear that if the prosecutor was persistent enough, the court would even give in on occasion, just to keep the trial moving along quickly.

> f. The Deputy Attorney General Once Again Ignored a Clear Court Ruling in Regard to the Sale of a Vehicle by Michelle Scarborough to Tami Shinn, Making Clear His Determination to Have the Final Say as to What Evidence Should Be Heard By the Jury

986. One of the clearest examples of the deputy attorney general's apparent belief that it was up to him, and not the trial court, to determine what evidence should or should not be heard by the jurors, occurred during the testimony of Paul Tulleners. Tulleners discussed various gasoline credit card receipts signed by Price for gas purchases in the Los Angeles area in early 1983. Tulleners also made mention of the registered owner of the vehicles, determined by the vehicle license numbers on the various receipts. RT 19744-19747.

987. Defense counsel asked to approach the bench and then explained that he wanted to ask Tulleners about a vehicle registered to Michelle Scarborough during the relevant time period in early 1983, but he did not want Tulleners to volunteer the irrelevant fact that the vehicle was sold to Tami Shinn in November, 1985. The trial court agreed to defense counsel's request and stated in front of Tulleners that the question would be restricted to 1983 and that the 1985 transfer was not in issue. RT 19749. Neither prosecutor indicated any problem with proceeding in this manner. RT 19747-19749.

988.    Defense counsel then asked Tulleners in front of the jury whether any of the vehicles he checked were registered to Janet Myers or Tami Shinn in 1983, and Tulleners responded negatively.  RT 19749-19750.  However, the very first question asked by Deputy Attorney General Bass was as follows:

> BY MR BASS:   Q.   Agent Tulleners, looking here at 337 --
> People's 337, the one right there on top, talking about the Michelle
> Scarborough's car, I see that was transferred to Tami Shinn.
> RT 19750-1.

989.    Defense counsel's objection was immediately sustained, although even after the objection was made the deputy attorney general continued making comments about a certified record and asked that it be admitted into evidence.  RT 19750-1.

990.    Bass soon went back to the improper matter, asking Tulleners whether he was familiar with people selling or transferring ownership of vehicles.  The trial court interrupted Bass before he could finish his question and had the jurors leave the courtroom.[167]  The judge then explained to Bass that he thought he had made a perfectly clear ruling that there was to be no mention of the transfer to Shinn, but that Bass had twice tried to circumvent the ruling.  The judge then expressed his frustration and urged all parties to get the trial concluded soon.  RT 19751-19753.  At that point the following exchange occurred:

---

[167]  The court reporter stated that she had not gotten then entire question and the judge indicated that was just as well, so it is not clear exactly what the jury had heard.  RT 19752.

MR. BASS: And, your Honor, I can't allow defense counsel's questions to lie to the jury.

THE COURT: He didn't lie to the jury. That transfer is not necessarily relevant, and I ruled, and you knew that.

MR. BASS: Of course I knew it.

THE COURT: I am going to let it go at that. We are not going to have any more argument. RT 19753; emphasis added.

991.    Although the point in dispute was relatively trivial, and Price cannot point to any substantial prejudice as a result of this misconduct, this is nonetheless an important episode. The prosecutor made no claim whatsoever that he had misunderstood the ruling of the court; rather, he acknowledged the ruling was clear and that he understood it, but he made it evident that he would never allow an adverse ruling to stop him from doing what he believed he needed to do.

992.    Of course, an attorney is ethically bound to abide by the court's ruling even if it is incorrect, but in this instance the court's ruling was clearly a correct one and the prosecutor's claim that defense counsel had lied to the jury was indefensible. Thus, the prosecutor, who was determined to be the final arbiter as to what the jury should hear, also displayed remarkably poor judgment about that subject.[168]  This incident should be kept firmly in mind in considering

---

[168]  Indeed, the triviality of the specific point and the prosecutor's patently incorrect assertion that defense counsel was lying to the jury strongly suggest that the prosecutor was determined to place this information before the jury only because defense counsel had made a point of wanting to keep it from the jury. This attitude by the prosecution would explain defense counsel's reluctance to object in every instance where an objection was warranted.
Footnote Continued on Next Page

whether the prosecutor acted in good faith or bad faith in all of the other incidents set forth in this argument, many of which were highly prejudicial.

### 2. Misconduct That Impugned the Integrity or Character or Was Otherwise Likely to Cause the Jury Unfairly to Distrust Mr. Price or His Counsel

#### a. The Prosecutor's Opening Statement Contained an Improper Comment on Non-Testimonial Actions by Mr. Price

993.    At the outset of his opening statement to the jury, Deputy District Attorney Dikeman commented,

"You're going to be spending a good deal of time in Mr. Price's presence while he plays his 'Gee willikers, golly shucks,' role and probably rarely misses a chance to hold Ms. Klay's chair. But during the evidentiary portion of this case, which we will shortly embark upon, you're going to have the opportunity to meet some

---

Here, defense counsel did everything he could, <u>in advance</u>, to avoid putting irrelevant information before the jury, and the judge fully supported defense counsel's position, but the prosecutor nonetheless thwarted the defense. Failures to object in other instances should not be used as a basis for finding appellate review waived, since it was clear that valid, sustained objections would have no impact on the prosecution efforts to put inadmissible information before the jurors. Indeed, they only seemed to <u>encourage</u> the prosecutors.

Here, defense counsel did everything he could, <u>in advance</u>, to avoid putting irrelevant information before the jury, and the judge fully supported defense counsel's position, but the prosecutor nonetheless thwarted the defense. Failures to object in other instances should not be used as a basis for finding appellate review waived, since it was clear that valid, sustained objections would have no impact on the prosecution efforts to put inadmissible information before the jurors. Indeed, they only seemed to <u>encourage</u> the prosecutors.

other people who have had contact with Mr. Price." RT 10124-10125.

994.    This was improper because the non-testimonial behavior of the defendant in the courtroom has no relevance whatsoever, especially where the defendant does not even put his credibility in issue by testifying. Indeed, even if such behavior had any relevance, there was no evidence at all in the present trial that any courtroom behavior by Price was anything other than a sincere manifestation of his personality. Thus, the prosecutor's inference that Price would be faking politeness or otherwise playing a false role for the benefit of the jury had no support in the evidence. It is misconduct to argue or comment on matters not in evidence.

995.    There was no objection to this incident, but this was no simple matter of a witness' answer that could be stricken. Once the prosecutor uttered this comment, no juror could help but wonder if Price was trying to pull the wool over jurors' eyes every time he held the chair for defense counsel Klay, or otherwise acted in a polite and appropriate manner. No admonition could have prevented such thoughts, once the prosecutor had improperly planted this notion.

b.   The Deputy Attorney General Created Great Prejudice to Mr. Price
     By Asking a Witness Whether She Had Ever Seen Mr. Price Angry
     Enough to Kill

996.    During the direct examination of Janet Myers, Deputy Attorney General Bass asked, "Have you ever seen -- personally seen the defendant Curtis Price mad enough to kill somebody?" RT 13867. Defense counsel immediately objected and asked for an admonition: "Objection, your Honor. Irrelevant and beyond the scope of this entire trial and ask it be stricken and the jury told to disregard the question." RT 13867. The judge said only, "Well, sustained."

997.    The prosecutor immediately followed with a similar question: "While the

defendant was staying at your house in Southern California, did you ever see him violently mad?" RT 13867. The defense again objected on relevancy grounds. RT 13867. Both sides approached the bench and in the ensuing discussion the prosecution failed to demonstrate any relevance. RT 13868-13870. After that discussion, the judge finally said to the jury,

> Ladies and gentlemen, Mr. DePaoli asked me to instruct you to
> disregard a question that, I think, you have been instructed
> previously. That any question to which an objection is sustained is
> not to be considered during this trial, because it's not evidence of
> anything. A question obviously unanswered is nothing.
> RT 13871.

998. Although this belated and poorly worded admonition may have been better than nothing, it could not possibly overcome the strong implication planted by the prosecutor that Myers had, in fact, seen Price angry enough to kill, and that the defense was successfully preventing the jury from hearing about it.[169] Even if we assume that Myers had ever witnessed such a display of temper, the veteran deputy attorney general must have known that such an incident could not be used to show a propensity toward violence, and could be admissible only if remarkably similar to the present crime.

999. Furthermore, even if the deputy attorney general could possibly have a good

---

[169] Obviously, such an inference was highly prejudicial in that it reinforced the prosecution theme that Price was the type of person who would have committed the present crimes, aside from inferring that the defense was hiding evidence from the jury.

faith belief that such evidence might be admissible, he surely must have realized that he was treading in a controversial area fraught with dangers of prejudice. In such circumstances, the prosecutor must have realized it was improper to just ask such questions without first discussing them with the court and opposing counsel outside the presence of the jury.

    c. The Deputy Attorney General Improperly Inferred That the Aryan Brotherhood Was Actively Assisting Mr. Price at the Time of His Trial

1000. Deputy Attorney General Bass continued in his relentless effort to prejudice Price while examining Clifford Smith:

> Q. [By Mr. Bass:] Are you personally aware of whether or not the Aryan Brotherhood membership is doing anything right now to assist the defendant Curtis Price in his defense of this case?"
>
> MR. DePAOLI: Your Honor, irrelevant. Ask that it be stricken. The jury admonished. The Court has ruled on that. No discovery that indicates anything like that, nothing like that happened.
>
> THE COURT: Well, we'll take it up at the hearing we have. Sustained. RT 16185-16186.

1001. Even if it could be proved that members of the AB were doing anything to assist Price, the relevance would be questionable. There are many very legitimate things that AB members could have been doing, such as giving truthful testimony, assisting defense counsel in reconstructing dates of key events, or supplying legitimate information that would impeach the credibility of prosecution witnesses Smith and Thompson. Indeed, even if AB members were engaged in any improper activity, such as attempting to intimidate witnesses or hide evidence,

that would not be relevant to show any consciousness of guilt unless it could be shown that Price had authorized the effort.

1002. However, the greatest vice in the prosecutor's question is that he necessarily knew that Smith could not possibly have first hand knowledge of any such activities. Smith had long been locked up in protective custody with no possible means of communicating with anybody who could know what the AB was currently doing. Thus, any information Smith could have had on the subject would have necessarily been hearsay. Clearly, the prosecutor asked his question in bad faith, expecting or hoping that Smith would take advantage of the opportunity to say something based on inadmissible hearsay or rank speculation, but prejudicial nonetheless. As noted earlier, such intentional solicitation of answers that will be inadmissible constitutes misconduct.

1003. The prosecutor clearly implied that he was aware of some sinister effort by the AB to assist Price. Furthermore, while defense counsel expressly requested an admonition, none was given. Perhaps an admonition that echoed the points made by defense counsel - that nothing such as the prosecutor had implied had actually occurred - could have been effective to overcome the prejudice. Here, in contrast, even in sustaining the objection, the court failed to make it clear that the prosecutor did anything improper. Instead, the court deferred the matter, which could have only caused the jury to doubt defense counsel's statement.

1004. When the matter was discussed again, the prosecutor made no effort to defend his conduct. Defense counsel felt the matter was so serious that he sought a mistrial, noting that the prosecution had been expressly directed by the court not to attempt to elicit hearsay information about the alleged conspiracy subsequent to the date of Price's arrest. Despite this blatant disregard of a prior ruling, the court's only response to defense counsel was to note that

no harm could have occurred because the objection was sustained before any answer. RT 16261-16262.

> ### d. The Prosecutor Improperly Referred to Defense Counsel's Tactics as Being Sleazy

1005.    Originally, the investigating officers believed that a wood chip found in Price's car would match wood chips on the floor in the bedroom where Hickey had been killed, but scientific analysis proved the wood did not match anything in the Hickey-Petry home.  RT 15483-15486.   After bringing out these facts, defense counsel asked Sergeant Fredrickson whether there had been any investigation within the police department regarding the possibility that an officer had planted the wood chip in the Price vehicle.  RT 15486.  At the outset of redirect examination by Deputy District Attorney Dikeman, the following exchange occurred:

> MR. DIKEMAN:   Q.   Sergeant Fredrickson, perhaps we can eliminate Mr. DePaoli's sleazy (sic) --
>
> MR. DePAOLI:  I'll --
>
> MR. DIKEMAN:  Information right up front.
>
> MR. DePAOLI:  Object --
>
> MR. DIKEMAN:  Did you put the wood chip --
>
> MR. DePAOLI:  And ask that it be stricken.
>
> THE COURT:    Sustained.    Ladies and gentlemen, you're admonished to disregard Mr. Dikeman's implication that there was anything sleazy (sic).
>
> MR. DIKEMAN:  Sergeant --
>
> THE COURT:  Please refrain from that conduct in the future.

MR. DIKEMAN: Yes, your Honor. RT 15494.

1006. The present record does not demonstrate that there was, indeed, anything "sleazy" or otherwise dishonest or improper in defense counsel's questioning of Fredrickson. The present error was preserved by timely objection. Although an admonition was given, it could not erase the harm. Indeed, the judge failed to tell the jury that defense counsel's questioning was proper; the judge merely criticized the prosecutor for openly referring to it as sleazy. The net result was that the jury knew the judge did not want the prosecutor to say things like that in court, but the jury still knew that the official representative of the State believed that defense counsel's methods were sleazy.[170] Because of the prestige of the prosecutor's office, the damage could not have been negated by an admonition to disregard the remark.

    e. The Prosecutor Further Impugned the Integrity of Defense Counsel
       By Calling Him a Liar in a Bench Conference, in a Voice Loud
       Enough for the Jurors to Overhear

---

[170] Once again, this is the type of misconduct that cannot be cured by an admonition. If the judge tells the jury that something they heard is incorrect or unreliable, that might offset the impact. On the other hand, to conclude that merely telling the jury to forget what they heard will be effective is to ignore human nature.

    The rule that prosecutorial misconduct is preserved as an appellate issue, despite the lack of an objection below, when an admonition could not cure the harm presupposes that some misconduct cannot be cured by an admonition. The present incident was an obvious intentional effort by the prosecutor to convey his personal feelings in a way he must have known was improper. Such deliberate misconduct, especially when it is part of a pattern of deliberate efforts to prejudice the defense, should not be tolerated. Otherwise, prosecutors will know they are free to do whatever they wish to prejudice a defendant, secure in the knowledge that defense counsel must choose between ignoring the misconduct, and waiving the issue, or drawing further attention to the misconduct in order to gain an admonition that is not likely to effectively offset the misconduct. Repeated intentional acts of misconduct merit an appellate response that will actually discourage such misconduct in the future.

1007. During the direct examination of Arcata Police Officer Robison, the prosecutor utilized a card that was marked People's Exhibit 213. Defense counsel noted he had never received a copy of the card, and both counsel approached the bench. RT 15676-15677. At bench, the following exchange occurred:

> MR. DePAOLI: The card shown to the officer, card number 574,
>
> we asked for in motions. We have a motion specifically --
>
> specifically we asked for card number 574.
>
> I can show this Court the transcript where they said it was lost,
>
> looked for, lost, destroyed --
>
> MR. DIKEMAN: Tell them you got it, DePaoli, don't lie to him
>
> anymore. If he says he hasn't had it, that's a fucking lie."
>
> RT 16577; emphasis added.

1008. The judge then insisted that everybody sit down and the jury was removed from the courtroom.[171] RT 15677-15678. The judge told all counsel that he wanted no further outbursts like that from anybody on either side, or there would be contempt citations. RT 15678.

---

[171] After the prosecutor's intemperate outburst, the judge strongly insisted that all counsel calm down and say nothing, precluding any objection. Defense counsel Klay attempted immediately after the outburst and again a few moments later, to inform the court that the prosecutor's comments could be heard by the jury, but she was rudely told to be quiet. The judge subsequently recognized that he had been rude to her and he apologized, but the fact remains that defense counsel did all she could to register an objection, but was effectively told to sit down and shut up. See RT 15677, lines 15-16; RT 15679, lines 2-11; RT 15711, lines 8-20; RT 15712, lines 20-22.

The court criticized the prosecutor, who apologized. RT 15681. The prosecutor maintained that his records showed that a copy of the card had been provided to the defense, but defense counsel insisted it had never been received. RT 15682-15683.

1009.    The jury was recalled and the judge explained they would be going on to another witness, but nothing at all was said in regard to the prosecutor's outburst. RT 15684-15685. Three days later, the judge admonished the jurors that if they had heard the comment made at bench they were to disregard it as it was not evidence. RT 15811. This admonition could not cure the harm for at least two reasons. First, it was not timely since the jurors had been given substantial time, without the benefit of any judicial admonition, to contemplate the prosecutor's assertion that defense counsel was a liar. Second, this was not an admonition that said information given to the jury was incorrect or unreliable; the jury was merely told the prosecutor should not have made such a comment. That did nothing to change the fact that the jury knew the official representative of the People believed defense counsel was a liar.

1010.    It is misconduct to impugn the integrity of defense counsel, regardless of whether he has acted improperly.[172] Although some degree of frustration may be inevitable in a long trial, the fact remains that in this instance, with a clear lack of justification, the prosecutor angrily used strong profanity and called the defense counsel a liar in a voice loud enough for the jurors to hear. Such conduct is totally unprofessional and should not be excused in a trial where the State seeks to deprive the defendant of his life. "The prosecutor should support the authority

---

[172] Even if the prosecutor was correct in asserting that the defense had received the card (which the prosecutor inferred, but never clearly proved - see RT 15712), the record shows nothing worse than an honest mistake by defense counsel.

of the court and the dignity of the trial courtroom by strict adherence to the rules of decorum and by manifesting an attitude of professional respect toward the judge, opposing counsel, witnesses, defendants, jurors and others in the courtroom." <u>ABA Standards for Criminal Justice, Prosecution Function</u>, Section 5.2, subd. (a).

        f.   The Deputy District Attorney Intentionally Sought to Prejudice Mr. Price By Bringing Out Irrelevant Information About Mr. Price's Relationship With His Brother

1011.    In questioning Price's mother, Beverly Lloyd, Deputy District Attorney Dikeman asked, "The reason that Curtis came back to live with you is because Alan and Sherry threw him out of their house, didn't they?"[173] RT 16654. Defense counsel objected that the question was irrelevant and beyond the scope of cross-examination. The judge noted he did not know whether the matter was relevant, but he sustained the objection on the "beyond the scope" ground and admonished the jury to disregard the question. The prosecutor immediately countered by asking, "Mrs. Lloyd, how would you characterize the relationship between your son Alan Fletcher and Curtis Price?" RT 16654. Another "beyond the scope" objection was sustained. RT 16654-16655.

1012.    While it is difficult to see how Price's relationship with other members of his family had anything to do with whether he was guilty of the charged offenses, it is clear that the prosecutor was doing everything he could to cause the jury to think that Price was a person of

---

[173] "Alan and Sherry" referred to Price's brother, Alan Fletcher, and Alan's wife, Sherry. Price lived with them in November and December, 1982. RT 16505.

such bad character that his own brother could not put up with him.[174] Such an inference can be

highly prejudicial. The misconduct was compounded when the prosecutor, undaunted by a

sustained objection, asked a closely related question that would clearly be covered by the same

objection. Once more, the prejudice was complete even without an answer.

g. The Prosecutor Used a Patently Improper Question to Depict
   Defense Counsel as Seeking to Selectively Hide Information
   from the Jurors

1013. During the trial, the prosecution sought to introduce composite photos of the

robbery suspect that had been prepared by several of the victims. The composites had been

prepared on an expensive device, and then copied with a duplicating machine before being

dismantled on the device. The copies did not come out very well, and the prosecution later

reconstructed the composites. The defense objected to the use of the reconstructions as not being

the best evidence. The court ruled that the reconstructions could be admitted, along with a full

explanation of the procedures. RT 15128-15147.

1014. Deputy District Attorney Dikeman then questioned Officer Waters about the

composites. RT 15151-15154. After cross-examination, the prosecutor's first question was,

"Officer Waters, were you aware that the only composites that Mr. DePaoli didn't want the jury

---

[174] This was not the only instance in which the prosecution sought to utilize totally irrelevant family matters in an improper effort to discredit Price or members of his family who testified on his behalf. In questioning Alan Fletcher, the deputy district attorney asked, "Mr. Fletcher, briefly, sir, you remarried about eight months after Shari's death, correct." RT 17258. A relevance objection was sustained before any answer was given, but once more the form of the question accomplished the prosecutor's indefensible purpose even without an answer.

to see were those by Ms. Eiers, Ms. Scheffler and Mr. Dahl?"[175] RT 15178. Thus, the prosecutor told the jurors that the defense had tried to keep relevant evidence from them, and had failed.[176] In essence, the prosecutor tried to testify concerning a ruling of law made outside the presence of the jury. Such an action is blatantly improper.

1015. The lack of an objection to this highly improper tactic should not preclude appellate review, as defense counsel no doubt correctly concluded that an objection would only make matters worse by drawing more attention to the matter, reinforcing the inference of a consciousness of guilt, and inferring that the defense had something to hide. No admonition could have made the jurors forget such prejudicial information.[177] In any event, even if this incident is found to be waived due to the lack of an objection, it remains relevant as further evidence of the prosecutors' pattern of misbehavior.

### 3. Misconduct That Improperly Detracted from the Credibility of Defense Expert Witnesses

---

[175] The officer answered, "No." RT 15178.

[176] In a similar act of misconduct, the prosecutor had previously argued a defense objection in front of the jury and thereby revealed the fact that the defense had unsuccessfully challenged the validity of the arrest. RT 14457. No objection was made to that misconduct.

[177] An admonition to disregard might be effective when jurors are told that inadmissible information was inaccurate or unreliable. However, when information is prejudicial and the jurors are not told that it is inaccurate or unreliable, merely telling them to pretend they never heard it is not likely to be effective. Indeed, Deputy District Attorney Dikeman recognized the problem himself, in an incident when he feared (without any supporting evidence) that defense counsel might place improper information before the jury: "You can't unring the bell. That's the problem. Mr. DePaoli likes to get up and play with his clanger. And once it's done, it's pretty hard to undo it." RT 11013.

### a. The Prosecutor Sought to Discredit an Important Defense Expert Witness By Improperly Bringing Out the Fact That He Was a Defense Witness in the Infamous Dan White Trial

1016.    Dr. Martin Blinder was an important defense witness.  With excellent credentials to back up his expertise in the psychiatric aspects of homicides involving spouses or lovers, he painted a graphic picture of the type of individual likely to be involved in such a homicide.  Petry matched his model in virtually every respect.  RT 18356-18382.  Any juror who accepted the validity of Dr. Blinder's testimony would have inevitably had great difficulty in rejecting a reasonable doubt of Price's guilt, based on a possibility that it was Petry rather than Price who killed Hickey.

1017.    It seems clear that the prosecutor also recognized this problem and became determined to discredit Dr. Blinder by any means available.  The prosecutor began his effort by asking a number of questions about the fee that Dr. Blinder was receiving from the defense for his efforts in the case.  RT 18386-18387.  Of course, the prosecutor himself must have known that the $125 per hour fee was not at all unusual for any medical expert with good credentials consulted in a capital case.  Thus, this fee sheds no light whatsoever on the issue of whether Dr. Blinder's testimony was a product of bias or a perfectly legitimate product of a well-qualified expert.  Obviously, the prosecutor sought to mislead lay jurors as to the importance of the fee paid to the expert witness.

1018.    Even that unfair impeachment of Dr. Blinder, did not satisfy the prosecutor.  In an obvious effort to discredit the witness in the minds of the jurors, for reasons totally irrelevant to the validity of the present testimony, the prosecutor asked, "You were retained by and testified by -- for the defense in the Dan White case?"  RT 18389.  Dr. Blinder answered affirmatively.

The prosecutor never made any effort at all to tie this bit of information to anything else that would in any way indicate any relevance to the present case.

1019. It is obvious that the prosecutor knew that there was great public dissatisfaction with the outcome of the Dan White case, and that connecting Dr. Blinder with that case would be an effective way to discredit the psychiatric evidence offered in the present case. Indeed, the prosecutor shamelessly continued this improper effort in closing argument:

> We heard from Dr. Blinder, the Dan White psychiatrist, the man
>
> behind the 'Twinkie Defense.' Dr. Blinder came here. He brought
>
> his typewritten script and his one hundred twenty-five dollars per
>
> hour meter.   RT 20341.

1020. No objection was made by the defense to this blatantly improper attempt at character assassination, either during the cross-examination of Dr. Blinder or during the closing argument.[178] That should not constitute a waiver, as the prosecutor's question about the Dan White case was one more instance of a question that supplied its own answer, so that a sustained objection, even if it came before an answer, would accomplish nothing except to emphasize the

---

[178] Aside from the lack of any legitimate relevance, this was also misconduct as it referred to facts not in evidence. Dr. Blinder had acknowledged only that he was a defense witness in the Dan White trial; there was no evidence before the jury that he was the "man behind the 'Twinkie Defense.'"

matter.[179]   Similarly, no admonition could have caused the jurors to forget that they were listening to a psychiatrist who had helped Dan White achieve a result popularly viewed as too lenient.

b. The Deputy District Attorney Sought to Discredit the Defense Eyewitness Identification Expert By Improperly Referring to Other Cases in Which His Testimony Had Been Rejected

1021.   Dr. Robert Shomer, a nationally recognized expert on problems pertaining to eyewitness identification, also testified for the defense. RT 19078-19113. In seeking to discredit him, the deputy attorney general again started out by asking how much money he was being paid to assist the defense. RT 19113-19114. The prosecutor also insisted on questioning Dr. Shomer about other cases in which he testified and the jurors nonetheless returned guilty verdicts. RT 19120-1 to 19121.

1022.   It is difficult to imagine a legitimate reason that would justify asking Dr. Shomer about other cases in which he had testified. Such information is utterly irrelevant as each case presents different facts, witnesses, crimes, defendants, etc. Also, the reactions of the jurors in other cases constituted patent hearsay.

1023.   Aside from the hearsay problem, conclusions reached by other juries are irrelevant absent a full understanding of the matters to which Dr. Shomer testified in the other

---

[179] Also, by this point, defense counsel had often seen that repeated objections, even when sustained by the court, had no impact on the prosecutor. It is no wonder that he would eventually decide that it was better to keep quiet and avoid undue emphasis. While that may have been a reasonable tactical decision under the impossible circumstances created by the repeated misconduct, it does not change the fact that a bad faith prosecution deprived Price of any hope for a fair trial consistent with the requirements of due process of law.

cases and of all of the other evidence in those cases.[180]  Even with such information, what other jurors concluded in other circumstances has no relevance to the present case.[181]  The questioning was also improper under California Evidence Code sections 787, 1100, 1101, and 1105, regarding the admissibility of conduct on prior specific occasions.

1024.  Defense counsel did not object to the first questions about Dr. Shomer's testimony in another case, but when the prosecutor went on to a second case defense counsel did object on relevancy grounds and expressly noted the problem of "a whole myriad of facts" that would need to be known about the other cases to allow the drawing of any inferences.  RT 19120-1 to 19121.  The trial court simply side-stepped the objection and told the prosecutor to go on.  RT 19121.  The prosecutor then went on to bring out the fact that jurors in the other cases had returned guilty verdicts.  Obviously, that was not what the trial court had in mind in asking the prosecutor to move along.  In any event, the prosecutor was improperly permitted to discredit a key defense witness.[182]

---

[180]  For example, Dr. Shomer's testimony in other cases may have fully persuaded the jurors that they should distrust the eyewitness identification testimony that they heard, but other evidence connecting those defendants to the crimes charged against them might have persuaded the jurors that they were guilty.

[181]  The other jurors' reactions to Dr. Shomer's testimony tells us nothing about whether the doctor is qualified to render an expert opinion, does not pertain to the subject about which the doctor was testifying, and certainly does not relate to the bases for his opinion testimony in the present case.  See California Evidence Code section 721.

[182]  Shomer was an important witness because identification evidence was crucial to the Triplex Theater conviction.  Because of the prosecution's conspiracy theory and the temporal relationship between the Triplex robbery and the Hickey killing, any error affecting the Triplex count should also be considered prejudicial on the other counts.  Also, while the jury was unable to reach a unanimous verdict on some robbery counts, some jurors were convinced of guilt on those counts.

Footnote Continued on Next Page

### 4. Misconduct That Revealed Inadmissible Evidence To the Jury

a. The Deputy Attorney General Improperly Sought a Speculative Answer Knowing That It Would Prejudice Mr. Price

1025.    When defense counsel cross-examined Smith about the promises made in return for his cooperation with the authorities, Smith was asked whether there had ever been any concern about his mother being prosecuted for smuggling drugs into prison for him. RT 14860. Smith denied ever having such a concern and denied that his mother ever engaged in such smuggling, although he conceded that he might have previously told defense counsel Klay that his mother did engage in such smuggling. RT 14860. A moment later, he changed his mind and stated that he did not ever say that to Klay.[183] RT 14860-1.

1026.    In redirect-examination of Smith, Deputy Attorney General Bass returned to this subject and Smith again denied that his mother ever smuggled in any drugs or that he had ever written a letter to Klay claiming that she had. RT 16173-16174. The following exchange then occurred:

> Q. [By Mr. Bass:]  Where would this come -- where did this come
>
> from.  Do you have any idea at all?
>
> A. Um, come from Curtis Price. Well -- I'm assuming.

---

As to those jurors, belief Price committed other robberies would have added support to the prosecution's conspiracy theory, causing prejudice on other counts.

[183]   Smith also testified that before he started cooperating with the prosecution, he made a number of statements to Klay which were false.  He claimed he tried to tell Klay things he thought might help Price. RT 14779.

THE COURT: Ladies and gentlemen --

MR. DePAOLI: Objection.

THE COURT: <u>That assumption you can understand</u>, but that's to be stricken. It's not to be used by you in any way in deciding this case.

You may proceed, counsel. RT 16174; emphasis added.

1027. The prosecutor knew that after Smith had started cooperating with law enforcement, he was no longer in communication with Price or with any other alleged AB members. The prosecutor must have known that any answer given by Smith would be based on speculation and would probably place the blame on Price. Thus, the question was clearly asked in bad faith in a calculated effort to prejudice Price.

1028. Defense counsel objected in a timely fashion and an admonition to disregard was given. However, that admonition almost certainly did more harm than good. Inexplicably, the judge chose to lend credence to Smith's speculation by commenting, "That assumption you can understand, ..." RT 16174. Thus, even though the judge told the jurors not to use the attack on Price in deciding the case, he offset that by telling the jurors that Price probably was the person responsible for making the allegation against Smith's mother.[184]

---

[184] It is difficult to understand why the judge made this comment, since there is no reason at all to assume that Price really was the source of the allegation. Smith admitted telling many things to Klay which he later claimed were false, and at first he even admitted he may have told her that his mother smuggled drugs. Although he later apparently retracted that statement, the likelihood seems high that he had made some comment along those lines to Klay, and that was what led to defense counsel's questioning at trial.

1029.     In sum, the admonition did not effectively cure the prejudice to Price.  There was no conceivable legitimate reason for the prosecutor's question.  This must be seen as one more intentional effort to prejudice the defense.

> b. The Deputy Attorney General Intentionally Sought to Prejudice Mr.
>    Price By Asking Clearly Improper Questions Regarding Whether
>    Paul Tulleners Was on the Aryan Brotherhood Hit List

1030.     During Deputy Attorney General Bass' examination of Smith, the following exchange occurred:

> Q. [By Mr. Bass:]  Can you tell me now as of the time you left the
>
> organization, how many people are on the Aryan Brotherhood hit
>
> list?  People designated to be killed?
>
> A. A whole lot.
>
> Q. Can you just run me off a couple of names or as many names
>
> as you can think of off the top of your head?
>
> A. MR. DePAOLI:  Objection.  Irrelevant.
>
> THE COURT:  Sustained.
>
> BY MR. BASS:  Do you know whether or not Paul Tulleners is on
>
> the Aryan Brotherhood hit list?
>
> MR. DePAOLI:  Objection.  Irrelevant.  Ask that it be stricken.
>
> MR. BASS:  He hasn't answered.
>
> THE COURT:  Well, he's got a right to object to the answer before
>
> it occurs.  Sustained."  RT 16180 to 16180-1.

1031.     Smith left the AB long after the conspiracy charged against Price had ended.  It

is impossible to discern any relevance in the number of people on an AB hit list, or the names of specific people allegedly on such a list.

1032.     After the first objection was sustained, the prosecutor directly disobeyed the court's ruling and went right ahead with an even more prejudicial and totally irrelevant question about whether prosecution witness and Department of Justice investigator Tulleners was on the list. The prosecutor sought to stimulate an emotional reaction among the jurors, impressing upon them how dangerous the AB was. First, he sought a reminder that the group allegedly kept an extensive hit list. Then he sought to make the point more real by seeking actual names. Then he sought to bring the point closer to home by trying to show that a member of the prosecution team, seen by the jurors on a daily basis, was allegedly on the list.[185]

1033.     The only conceivable reason for this line of questioning was to encourage the jurors to respond emotionally to the AB, in the hope that would cause the jury to want to convict the only alleged AB member whose fate was in their hands. In other words, the prosecutor sought to encourage a conviction not on the basis of evidence of guilt, but on the basis of the type of people with whom Price associated. However, "[g]uilt by association is a thoroughly discredited doctrine; ..." People v. Chambers, 231 Cal. App. 2d 23, 28 (1964).

---

[185] While the objection was sustained before the final question was answered, the harm was already done. The implication was strong that the prosecutor knew that Paul Tulleners name was on the list, so the point was made, and defense counsel was again forced to appear to be trying to keep information from the jury.

### c. The Deputy Attorney General Intentionally Sought to Elicit from Michael Thompson Inadmissible Hearsay Suggesting that Curtis Price Had Admitted Killing Elizabeth Hickey

1034. During a prejudicial exchange between Deputy Attorney General Bass and Thompson, inadmissible hearsay statements were described by Thompson and then stricken by the court. RT 16912-16915. That incident itself is not claimed to constitute prosecutorial misconduct, since the most prejudicial aspects were due to Thompson's answers rather than the prosecutor's questions, and the record does not establish that the prosecutor knew what answers Thompson would give. However, that exchange is quite relevant in that it shows the prosecutor was clearly aware of the court's ruling that any hearsay evidence admitted under the co-conspirator hearsay exception would be limited to statements made by alleged co-conspirators prior to the arrest of Price on March 3, 1983.

1035. Despite the clarity of the court's position, and Thompson's proclivity for giving extremely prejudicial answers at every opportunity, the prosecutor persisted in asking questions with open time frames that invited inadmissible hearsay answers. See RT 16921. Finally, the court asked counsel to approach the bench, repeated its ruling that no co-conspirator hearsay uttered after the March 3, 1983 arrest date was admissible, and instructed the prosecutor, "you have to stop and think about what you're doing when you're asking him these questions." RT 16922-16923.

1036. At this point, Bass ended his direct examination of Thompson. RT 16924. Cross-examination began and was interrupted by a hearing outside the presence of the jury to clarify when Thompson became aware of certain key events. During this hearing, Thompson testified that he first learned about the Hickey killing from John Stinson in May, 1983.

Thompson claimed that Stinson had received the information in a letter from Price.[186]   RT

16943.  At the end of the hearing, the judge ruled very clearly that the prosecution should not go

into any statements by Stinson about Hickey's death.  RT 16951.

　　　　1037.　 Viewed in this context, misconduct occurred when, moments after re-direct

examination began, the prosecutor asked Thompson about finding out that Hickey had been

killed.  RT 17131.  Thompson said he got the information about Hickey's death from Stinson.

RT 17132.  The prosecutor then asked, "And do you know where Stinson got the information?"

RT 17132.  Thompson replied, "Yes, Curtis Price."  RT 17132.  The following exchange then

occurred:

> MR. DePAOLI:  Objection, your Honor.  That calls for hearsay.
>
> He doesn't know that.
>
> BY MR. BASS:  Do you know that personally?  Is that what you
>
> were told, I mean?
>
> A. Yes.
>
> Q. Told by whom?
>
> A. Stinson.

---

[186] This, of course, makes it quite clear that Thompson should have never been allowed to say anything to the jury about any knowledge of Hickey's death or any belief that Price was connected to the death.  Anything Thompson learned from Stinson after March 3, 1983 was clear hearsay and not within any hearsay exception.

THE COURT: Ladies and gentlemen, based on that testimony,

you will disregard the source of Mr. Stinson's representations to

Mr. Thompson, and they are not to be considered by you.

Go ahead, Counsel. RT 17132.

1038.    Thus, the prosecutor intentionally went back into the matter of what Thompson heard about the Hickey murder even though the court had expressly directed him not to do that and even though he obviously knew that the questions he was asking would elicit hearsay that was clearly not covered by the co-conspirator or any other hearsay exception.[187] He continued hammering home his improper point even after defense counsel's objection unmistakably reminded him of the hearsay problem. By this point, he clearly knew exactly what answers Thompson would give to these questions, and he clearly knew the answers would constitute inadmissible hearsay. Such intentional solicitation of answers that will be inadmissible constitutes misconduct.

1039.    The prejudicial impact of this misconduct was enormous and could not possibly be cured by even a strong admonition. In this instance, the judge gave a very weak admonition, that could be interpreted as allowing the jury to consider the information that Stinson passed on to Thompson, but to disregard only the allegation that Price was the source of the information. That, of course, could not cure the problem.

---

[187] Indeed, the prosecution knew well before this that any information Thompson had about the Hickey case consisted of inadmissible hearsay. Thompson had testified at the preliminary examination that he did not learn that Hickey had been killed until May, 1983, well after the arrest date which the trial court had stated marked the termination of any conspiracy. CT 2267.

1040.    The jury was clearly exposed to Thompson's claim that Price was the source of information about Hickey's death.  From the overall context, no juror could have missed the inference that Price had admitted murdering Hickey.  No admonition to disregard this information could be effective, as this was devastating information going to a key issue in the case.

1041.    The evidence as to the two murders was very different in this case.  In regard to the Barnes murder, the jury heard from witnesses who claimed to be directly involved in the conspiracy to kill Barnes.  While their credibility was very poor, the jurors chose to believe them.  Once the jurors decided to believe them, conviction on the Barnes count was assured.

1042.    The Hickey count, however, was very different.  The admissible evidence connecting Price to that killing was all circumstantial and was highly ambiguous.  While it was proved that Price was in possession of guns taken from the Hickey residence, a note in Hickey's handwriting demonstrated that she was voluntarily involved in some effort to utilize Price's assistance in getting money for the guns.  Moreover, extensive evidence about the bizarre relationship between Hickey and Petry, along with Petry's incredible inability to recall simple facts during his testimony, clearly established Petry as a reasonable alternative suspect in the killing of Hickey.

1043.    In this setting, when the jurors heard a witness whom they had chosen to believe claim, in essence, that Price had admitted killing Hickey, it must have suddenly become very easy for the jurors to resolve the close and difficult question of whether Price had been proved guilty of the Hickey murder, or whether there was a reasonable doubt because of the strong possibility that Petry committed that crime.  In this context, no admonition from the court could cause the jurors to forget this crucial information.  Subconsciously, if not consciously, this improper evidence must have played a role in the determination of guilt on the Hickey count.

### d. Although the Trial Court Ruled That Evidence That Efforts Had Been Made to Convert a Gun into an Automatic Weapon Was Too Prejudicial to Be Admitted, the Prosecutor Thwarted the Ruling Even Before It Was Made By an Offer of Proof in Front of the Jurors That Fully Conveyed the Inadmissible Inference

1044.    Bruce Jennings was called as a prosecution witness for the sole purpose of testifying that a gun manufactured by his company was not produced before 1980, contradicting testimony by Becky Williams that she received the gun from her grandfather in 1975.   In questioning Jennings, the deputy district attorney asked him to disassemble the gun.   RT 19782. Defense counsel objected on relevance grounds and the prosecutor responded that there was a modification of the gun that could only be seen after it was taken apart.   RT 19782-19783. Defense counsel asked what was the relevance of that and the prosecutor, without suggesting that the matter should be discussed at bench, replied, "I think he will be able to testify that somebody apparently modified this weapon in the mistaken belief they could turn it into an automatic weapon."   RT 19783.

1045.    Soon after this answer, the judge finally asked counsel to approach the bench and reminded the prosecutor of the limited purpose of the testimony of the witness.   RT 19783. After some discussion the judge noted the prejudice was obvious and ruled that the prosecutor could not go into any speculation about attempts to convert the weapon to an automatic.   RT 19784-19785. Once again, the defense obtained a favorable ruling, the value of which was effectively lost since the prosecutor had already informed the jurors, in his offer of proof, of the

prejudicial fact. No admonition was sought or given, but none could have been effective to erase from the minds of the jurors the prosecutor's statement that someone had tried to convert the weapon to an automatic.[188]

1046.   Respondent might contend that the prosecutor did nothing more than reply to defense counsel's query, "What's the relevance of that?" RT 19783. However, defense counsel had no reason to anticipate the prejudicial nature of the response that would be forthcoming. It would be an unreasonable burden on either counsel, and certainly on the court and the jurors, to expect a demand to approach the bench every time opposing counsel had anything to say that was not a question to a witness. Rather, the only workable procedure is to expect counsel to be aware of when they are about to say something of questionable admissibility, and to initiate the request to approach the bench before making questionable remarks.

### 5.   Miscellaneous Misconduct Further Demonstrating Prosecutorial Bad Faith

#### a. The Deputy District Attorney Clearly Revealed His Bad Faith When He Asserted He Could Demonstrate Relevance and Then Admitted That Was Not True

1047.   One of the clearest instances of bad faith by the prosecutor occurred when he asked Mrs. Lloyd about Mary Markley, a family friend who lived in Michigan. RT 16687. This

---

[188] Another example of the prosecutor's use of an offer of proof to convey improper evidence to the jury occurred in regard to the prosecution's unsuccessful effort to introduce evidence of a highly ambiguous gesture made by Price during testimony by robbery victim Pizzuto. See RT 14223-14231, 17678, 17685. In that incident, the prosecutor claimed in an offer of proof in front of the jury that Price had made an admission, accomplishing his improper purpose even though the evidence was never admitted. RT 14225.

led to the following exchange:

> MR. DePAOLI: I think we have already a court ruling that this is too time consuming and is irrelevant.
>
> MR. DIKEMAN: Now, I think I can tie it to something specifically that Mr. DePaoli asked on cross. I think his objection before was that it was outside the scope.
>
> MR. DePAOLI: It is outside the scope.
>
> THE COURT: Do you want to approach the bench. . . .
>
> (The following was held at bench.)
>
> THE COURT: What is it that you can tie it to?
>
> MR. DIKEMAN: Well, I'm simply curious. She said this lady is a family friend, yet she's indicated that her residence at least or domicile for eighteen years has been Eureka, Humboldt County, California. I -- I find it a little interesting that you've got a family friend when you argue you have never been to Michigan.
>
> THE COURT: What issue does it go to in this case?
>
> MR. DIKEMAN: I can't think of any right now. RT 16688; emphasis added.

1048. Thus, the prosecutor responded to a defense relevance objection by asserting in the jury's presence that the matter was relevant. When he was asked outside the presence of the

jury to explain, he was forced to admit that he had apparently deceived the court and that he had

no idea of any possible relevance; instead, he was asking the question out of idle curiosity.[189]

Although there was no real prejudice to the defense, other than once again forcing defense

counsel to appear to be trying to hide something, this incident is nonetheless highly relevant as it

demonstrates how far the prosecutor was willing to go in order to accomplish his improper goals.

b. The Prosecutors Displayed Bad Faith in Regard to Revealing the
Witnesses Scheduled for the Next Day

1049.    At the end of the court session on Friday, December 6, 1985, defense counsel

noted that there would be no court for the next three days and that it would be helpful to have the

next week's schedule of prosecution witnesses in order to start preparing for them over the

weekend.  RT 11822.  Deputy District Attorney Dikeman and Deputy Attorney General Bass

each simply replied, "no."  RT 11822.  Dikeman then added, "[h]asn't been determined."  RT

11822.  Dikeman said he would provide the information to the defense by 5:00 p.m. on Monday,

the day before the next scheduled court date.  RT 11822.

1050.    The judge noted that Sergeant Ross would have to give additional testimony on

Tuesday morning, and Dikeman was instructed to inform defense counsel by 5 p.m. that day

(Friday) who would testify after Ross.  RT 11822-11823.  Dikeman promptly said, "I think

Pizzuto."  RT 11823.  Bass immediately added, "No question. ... Pizzuto, Stovall. ... Pam

---

[189] Indeed, even his curiosity was poorly based.  Mrs. Lloyd had already explained the preceding day that she first met Markley when the latter came to California in July, 1983, and prior to that she had talked to her on the phone and corresponded with her.  RT 16586-16587.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

Scheffler." RT 11823. Defense counsel asked if they knew any beyond that and Bass responded, "We're working on it." RT 11823.

1051. This episode demonstrates bad faith by the prosecution in two separate ways. First, Dikeman's initial statement that the following week's schedule of witnesses had not been determined was obviously overstated, since the prosecutors were quickly able to name the next three witnesses once the judge made it clear that he expected better cooperation than had been forthcoming. Second, in view of the obvious importance of this case to the prosecution and the great number of witnesses involved, many of whom were from outside the county, it is simply unbelievable that the prosecution did not know a week in advance who were the likely witnesses.

1052. In short, it is apparent that the prosecution had little interest in permitting the defense to make efficient use of its time over the three day weekend. It is beyond dispute that the defense is entitled to know the identities of the prosecution witnesses in advance, so that it can be prepared when they testify. Such a right is meaningless in a long and complex trial, since the defense cannot possibly be prepared at all times for any one of a hundred possible witnesses.[190] The request for the names of the witnesses expected over the next week was a reasonable request, and the only logical explanation for the uncooperative attitude of the two prosecutors is that they felt their chance of prevailing would be increased by making it more

---

[190] If the prosecutor's only duty is to supply an overall list of witnesses before the trial, the irrational result would be that defense attorneys in short and simple trials can prepare effectively while defense attorneys in long and complex cases will be faced with a hopeless task. Since capital trials demand the most thorough preparation, and also tend to be the longest and most complex trials, it seems clear that reasonable steps must be taken to permit effective use of defense counsel's time, so that cross-examination can be meaningful.

difficult for the defense to engage in legitimate preparation.[191]

### D. The Prosecution Continued With Persistent Misconduct Throughout Arguments

1053.   A number of additional instances of misconduct that occurred during the guilt phase arguments by the two prosecutors will be set forth briefly in this section of the argument. There were no objections to any of these incidents.  However, it should be kept in mind that at the outset of argument the judge strongly discouraged all counsel from interrupting the arguments of their opponents with objections.  RT 20318.  Defense counsel obviously respected this judicial admonition and did not make a single objection during the lengthy opening argument by the deputy district attorney.[192]   RT 20320-20553.   Also, these incidents further demonstrate the bad faith of the prosecutors.

1054.   Before argument, the prosecution requested the court to instruct the jury on the principle that flight from the scene of the crime supports an inference of a consciousness of guilt. RT 20019-20020.  The prosecutor based this request on the fact that Price left Los Angeles soon

---

[191] The prosecution attitude toward cooperating with reasonable and legitimate defense efforts to prepare efficiently for trial was also shown in an earlier discovery incident.  On October 21, 1985, as jury selection was nearing completion, defense counsel asked for an updated list of prosecution witnesses.  The response of Deputy District Attorney Dikeman was, "All of our witnesses are identified in the voluminous written discovery that has previously been provided to the defense."  RT 8435.  Obviously, to tell the defense that all the witnesses are included among the many hundreds of names mentioned in several thousand pages of written discovery materials, does nothing to help the defense in its legitimate efforts to prepare for trial.

[192] During closing argument by the deputy attorney general, the judge made it clear that he meant what he had said.  In a rare mid-argument instance where defense counsel asked to approach the bench, the judge simply responded, "No."  RT 20915.

after the time that Barnes was killed. RT 20020. The judge initially took that matter under submission. RT 20020.

1055. When the instruction was discussed again, the defense strenuously objected to it. RT 20070-1. The court questioned the propriety of the instruction in the absence of evidence that Price had any knowledge that he was charged with or suspected of any crime at the time he left Los Angeles. RT 20070-2. The judge suggested that further research should be done on the matter. RT 20072. Apparently the prosecution abandoned its request, since the matter was not brought up again at two subsequent instruction conferences. RT 20191-20198; 20265-20278. The instructions were read to the jury before argument, and no instruction on flight was given. RT 20279-20318.

1056. Despite clear notice that the legitimacy of inferring consciousness of guilt from flight in this case was disputed and not yet determined by the trial court, the deputy district attorney chose to argue that flight from the scene of the crime was evidence of guilt that the jury should consider. RT 20334.

1057. In the next incident, defense witness Wendell Norris was legitimately impeached with evidence that he had suffered prior felony convictions. However, in arguing the relevance of the prior convictions to the assessment of Norris' credibility, the prosecutor stressed the more serious crimes that had been charged against Norris, noting that they had been reduced by a court to the lesser crimes of which he had been convicted. RT 20368. This was misconduct, since impeachment by use of a prior felony conviction must be limited to the fact of conviction and the nature of the crime of which the witness was convicted; it is a basic rule that the prosecutor cannot delve into the details or circumstances of the prior conviction. People v. Schader, 71 Cal.2d 761, 773 (1969).

1058. The prosecutors also knew very well that the reason Price did not appear in court during most of the guilt phase was the trial court order that he be chained to his seat. They also knew that every witness that might possibly have been able to identify Price as the perpetrator of any of the charged crimes had ample opportunities to observe him in person at the live lineup and at the preliminary examination proceedings. Nonetheless, the prosecutors repeatedly argued something they knew to be false, by inferring that Price stopped coming to court in order to deprive witnesses of the opportunity to identify him. RT 20403, lines 15-21; RT 20870, lines 20-22; RT 20902, lines 4-7.

1059. The deputy attorney general noted in argument that originally the prosecution subpoenaed Becky Williams to testify at trial and, "Becky, all of a sudden, comes up sick or something." RT 20825-20826. This was an obvious effort to imply that she was attempting to avoid testifying. This was misconduct since no evidence that this had occurred was admitted during trial. Even if there had been evidence that Williams became sick after receiving a subpoena, that still would not establish that she was attempting to avoid testifying.

1060. In an improper comment on the privilege against self-incrimination, the deputy attorney general informed the jury, "The defense gets everything we have in the way of discovery, police reports. As soon as we get anything, you know, has to go to them. It's a one-way street incidentally. We don't get advance discovery on the defense." RT 20874. Aside from the fact that it was improper for the prosecutor to discuss this aspect of discovery procedure, his statement was not even true, in view of the repeated delays in supplying court-ordered discovery to the defense in this case, and the prosecution's numerous violations of Brady, as alleged in Claim I, supra.

1061. In another improper reference to facts not in evidence, the deputy attorney

general sought to discredit Price's mother by referring to a calendar on which she noted important activities; she agreed on the stand to try to find it and to voluntarily turn it over to the prosecution. The prosecutor argued, "I remember that she was going to bring that in and then refuses to give it to us out in the hallway." RT 20923. Whatever might have happened in the hallway was not in evidence. What was in evidence, after a lengthy discussion in which the judge ruled that anything more was irrelevant (RT 17700-2 to 17700-5), was merely the fact that after Mrs. Lloyd had testified, the police had not been successful in making arrangements to search for the calendar. RT 17701, lines 11-23.

1062. Finally, the Deputy Attorney General violated the very basic principle that a prosecutor is not to state his personal opinion of the credibility of a witness. People v. Perez, 58 Cal.2d 229, 245 (1962). Nonetheless, when discussing the credibility of Smith, the deputy attorney general stated, "God, what a great witness. That's my opinion." RT 20846. Smith was a crucial prosecution witness whose credibility was seriously impeached in many ways. This strong endorsement of his credibility by a representative of the State was very serious misconduct.

## E. Conclusions Regarding Prosecutorial Misconduct

1063. Looking at all of the incidents in the present case combined, it is readily apparent that the prosecutors engaged in a ceaseless battle to win at all costs. The combined impact of the many acts of misconduct were especially prejudicial since they were directed at a very few goals - encouraging unfavorable impressions of the character of Price, his counsel, and most of the witnesses who testified in his behalf. With so many incidents directed at these same few goals in a trial that presented close and difficult credibility determinations, it was very likely

that the acts of misconduct were effective in tipping the balance against the defense on several counts.

1064.    Price's federal constitutional rights were violated in numerous ways.  Many of the incidents resulted in putting inadmissible information before the jury, in a manner in which the defense had no reasonable opportunity to exercise the 6th Amendment right to confront and cross-examine the witnesses.  Incidents that resulted in improper disparagement of defense counsel or defense expert witnesses violated Price's 6th Amendment right to the effective assistance of counsel.  As has been noted, some incidents violated the 5th Amendment privilege against self-incrimination by effectively commenting on Price's silence, either before or during trial.  Also, the combined impact of the errors deprived the guilt and penalty verdicts of the reliability necessary to satisfy the 8th Amendment in a capital case.

1065.    No matter how strongly the prosecutors believed that Price was guilty, that cannot be allowed to substitute for a fair determination of guilt by a jury.  Price was clearly deprived of such a fair determination.  Although the prosecution presented a great <u>quantity</u> of evidence against Price, much of it was of very poor <u>quality</u>, and much of it was offset by extensive defense evidence.  The evidence was clearly not so compelling as to render harmless the combined impact of the prosecutorial misconduct.

# CLAIM XII

## NUMEROUS INSTANCES OF PROSECUTORIAL MISCONDUCT OCCURRED DURING THE PENALTY PHASE

1066. Repeated instances of prosecutorial misconduct at the sentencing phase of petitioner's capital trial resulted in a fundamentally unfair trial in violation of petitioner's rights to due process, a fair trial, the effective assistance of counsel, and his right to be free from cruel and unusual punishment, as guaranteed by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

1067. The instances of prosecutorial misconduct during jury selection, the evidentiary portion of the guilt phase, and arguments to the jury (discussed supra), continued in the penalty phase. In this argument petitioner sets forth that misconduct and explains its prejudicial effect.

1068. The prosecutorial misconduct during the penalty phase violated Mr. Price's right to due process because "it so infected the trial with unfairness as to make [Mr. Price's death sentence] a denial of due process. Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). It also violated Mr. Price's right to be free from cruel and unusual punishment under the Eighth Amendment. See Eddings v. Oklahoma, 455 U.S. 104, 118 (1982) (O'Connor, J., concurring) ("[T]his Court has gone to extraordinary measures to ensure that the prisoner sentenced to be executed is afforded [a sentencing] process that will guarantee, as much as humanly possible, that the sentence was not imposed out of whim, passion, prejudice, or mistake.")(citing numerous capital decisions applying the Eighth Amendment).

### A. The Prosecutor Repeatedly Sought to Elicit Improper Opinions from Victims of Prior Crimes Regarding Whether Curtis Price Should Have Been Paroled in the Past

1069. O'Bresley and Farago were the two sheriff's department officers from Cascade County, Montana who were transporting Price in their patrol vehicle in 1971, when he gained control over them at gunpoint and forced them into the trunk of their car. On redirect examination of O'Bresley, the prosecutor asked, "Now, sometime after that, did you have occasion to draft a letter to the parole authorities recommending that they not release this particular man?" Defense counsel's immediate objection that the matter was beyond the scope of cross-examination was sustained. RT 21608.

1070. The next witness was Farago, whose testimony was cumulative of O'Bresley's. Once again waiting for redirect examination, the prosecutor asked, "...in 1974, did you have occasion to express an opinion to the Board of Pardons concerning whether or not the man who had done this to you should be paroled from the Montana State Prison?" Again, defense counsel's "beyond the scope" objection was sustained. RT 21623.

1071. The prosecutor must have known the first time he asked that question that it was improper. The California Supreme Court has held that, in a penalty phase trial, expert psychiatric witnesses cannot offer an opinion that the defendant is likely to commit violent acts in the future. People v. Mutishaw, 29 Cal.3d 733, 767-775 (1981). The opinion sought in the present case was less reliable; the prosecution was not seeking the objective opinion of an expert on human behavior, but was seeking the emotional reaction of a crime victim. Such an emotional reaction of a present crime victim is both irrelevant and unduly prejudicial. The emotional reaction of a previous crime victim is even less relevant.

1072. Aside from the fact that the prosecutor sought the emotional reaction of a crime victim and an impermissible prediction of future dangerousness, the questions were improper for two more reasons. First, the evidence was especially irrelevant because neither of the options

available to the jury at the penalty phase included the possibility of parole. In other words, even if Price had previously been paroled when parole was not warranted, that had nothing to do with the present choice between death and life without parole. Second, the officers were not qualified to provide an expert opinion on future dangerousness or parole suitability even if such an opinion would have been relevant.

1073. Although neither witness was able to answer the improper question before the objections were sustained, the damage was nonetheless complete. Both questions clearly implied that the prosecutor knew that such letters had been written. Most importantly, the wilful repetition just moments after the first objection was sustained demonstrates unequivocally that the prosecutor knew he would accomplish his improper purpose by repetition of the question.

**B. The Prosecutor Expressed an Improper Opinion After a Defense Objection to a Witness' Characterization of a Killing as a Murder, and Then Responded With Sarcasm After the Defense Objection Was Sustained**

1074. San Quentin Correctional Officer Perryman described the killing of inmate Banks and claimed he saw Price drop a knife while standing near Banks. RT 21811-21825. Perryman referred to the killing as a "murder," and defense counsel objected to the use of the term, "murder." RT 21853-21854. The following exchange then occurred:

MR. BASS: I don't know what else it could be characterized as.

MR. DePAOLI: How about self-defense.

THE COURT: The word 'murder' is stricken, ladies and gentlemen. You'll determine from the facts what occurred on that tier on that date. At this point in time, we'll call it an assault.

RT 21854.

1075. Any experienced prosecutor surely knows that a killing might be characterized

as murder, manslaughter, or justifiable homicide. The proper characterization in front of a jury that has not yet determined the facts is obviously a neutral term, such as "killing" or "homicide." The prosecutor's remark that he did not know what other term could be used was clearly disingenuous and was obviously directed at making an impression on the jury. This incident demonstrates the prosecutor's attitude of repeatedly seeking to prejudice the defense. Also, this incident, while not prejudicial standing alone, set the stage for a further impropriety that soon followed.

1076.   Moments after the objection was sustained, the prosecutor asked Perryman, "can you estimate for me by any method how long the defendant Price and this Carpenter waited for Mr. Banks before this assault as the judge called it?" RT 21860-1. Defense counsel's objection to the question was sustained, but this was not sufficient to negate the prosecutor's deliberate reminder of his dissatisfaction with characterizing the killing as anything other than a murder. The prosecutor's sarcasm must be seen as a wilful refusal to abide by a clear ruling of the court, further demonstrating the prosecutor's bad faith.

**C. The Prosecutor Used a Grossly Improper and Unnecessary Question to Reveal to the Jury Inadmissible and Prejudicial Information About a High Speed Chase**

1077.   In a pre-trial ruling, the trial court found a 1971 Montana attempted robbery conviction was constitutionally invalid; the allegation of the prior as a penalty enhancement was stricken from the information. CT 5602-5603.

1078.   Subsequently, the prosecution sought to use the facts underlying the invalid 1971 conviction as evidence in aggravation. The prosecutor reasoned that these facts constituted evidence of prior violent criminality and were therefore relevant.

1079.   In a written ruling filed between the two trial phases, the court concluded that

there was no basis to preclude use of the underlying facts despite the invalidity of the conviction. However, the court acknowledged a separate issue regarding whether the defense had received proper notice before trial of the prosecution intention to use these facts in aggravation. (See California Penal Code section 190.3.)

1080.    The court noted that the defense was aware, before the trial commenced, of the existence of the prior offense; thus, it should not have come as any surprise.  The court also noted that since the defense had focused all of its efforts on preparation for the guilt phase and had ignored the penalty phase, nothing more would have been done to meet this prior even if there had been clearer advance notice that the facts would be offered in aggravation.  However, in an unmistakably clear ruling, the court ordered the prosecutor to reserve the evidence for rebuttal: "To assure avoidance of error this shall be saved for rebuttal."[193]  CT 10284.

1081.    The prosecution, however, decided not to wait for rebuttal.   During the presentation of the defense evidence at the penalty trial, San Quentin Correctional Officer Rogers Larry testified that he knew Price as a San Quentin inmate for about two or three years during the 1971-1975 time period.  During that time, according to the officer, Price was a quiet, polite, reserved inmate who caused no problems and who treated the officer with respect.  On cross-examination, the witness repeated that he had known Price for two or three years, but he had not checked his work records before testifying to ascertain the precise dates.  RT 22060-3 to 22063.

1082.    The prosecutor then asked what the witness would say if it were proved that Price was paroled from San Quentin in March, 1971, and did not return to that institution until

_____

[193]  The court apparently was mindful of California Penal Code section 190.3 which disallowed the admission of evidence in aggravation absent proper notice before trial, but also provided, "Evidence may be introduced without such notice in rebuttal to evidence introduced by the defendant in mitigation."

1975. The officer responded that he would say that Price must have had a twin if he was not there himself. RT 22065-22066. The prosecutor then posed the following question/statement:

> On April 17th of 1971, in Montana -- Great Falls, Montana, Curtis Floyd Price or at least the guy we have here in this courtroom was arrested with a gun, high speed chase and everything at the time you say he was working in the mess hall in San Quentin. That's where my problem is. I was wondering if you had any way to explain that? RT 22066.

1083. Defense counsel asked to approach the bench, but the judge refused, saying, "Not right now." On redirect examination, the witness said he may have known Price during two separate periods of time, rather than one continuous time. RT 22069.

1084. After a few moments, the judge did invite counsel to approach the bench. The judge indicated that Price's presence in Montana in April, 1971 had some relevance, but the judge noted he had ruled previously that the high speed chase would not come into evidence. The judge offered to give an admonition, but defense counsel moved for a mistrial. The judge refused to grant a mistrial, <u>although he acknowledged that an admonition would do more harm than good</u> since it would reinforce the fact that the reference to a high speed chase was a separate incident from the one in which two officers had been forced into the trunk of their car. RT 22070.

1085. The prosecutor did not perceive any problem with his behavior since he would eventually produce the evidence in his rebuttal case; he stated that he believed he was <u>entitled</u> to raise the matter with Officer Larry. The judge pointed out that the earlier ruling was that the matter could not come in until rebuttal, but that did not mean the evidence would <u>necessarily</u> be

admitted in rebuttal; it would not become admissible unless it properly rebutted something brought up by the defense.[194] Defense counsel asked for further time to decide whether he desired an admonition. RT 22070-1 to 22070-3. No admonition was ever given.

1086. If there was any relevance in the fact that Price was in Montana in April, 1971, it was extremely slight and could not possibly outweigh the prejudicial impact of a reference to an arrest involving a gun and a high speed chase. First of all, the correctional officer plainly knew Price and was merely mistaken about the dates of events that had occurred a decade-and-a-half earlier. Second, the specific date of April 17, 1971 was not even inconsistent with the officer's testimony. The officer merely testified that he knew Price at San Quentin during a two-to-three year period between the years 1971-1975. There was ample time for such a period within the applicable time frame, even if it did not start until 1972.

1087. Most importantly, the prosecution knew precisely when Price was at San Quentin, and it could easily be determined when the officer had worked at there. Thus, if there were a reason to prove the officer was wrong about the dates, there was no need to go into the Montana high speed chase and arrest. Alternatively, any legitimate purpose could have been fully accomplished by simply asking the officer if he would be surprised to learn that Price was in Montana in 1971. In short, the use of this incident to impeach the officer cannot be justified logically or reasonably. The conclusion is inescapable that the prosecutor simply seized the

---

[194] The prosecution never did attempt to prove the matter in rebuttal. However, after Price testified for the defense, the prosecutor did go into the 1971 incident on cross-examination. Defense counsel objected that the incident was beyond the scope of direct examination, but the court ruled simply that Price had testified about so many dates and events that the questioning would be permitted. Price admitted that on April 17, 1971, he had attempted a robbery in Great Falls, Montana and had been pursued by the Highway Patrol, but he did not recall the use of sirens. RT 22419-22420.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

opportunity to put prejudicial information before the jury.

1088.   As far as the prejudice, the prosecutor knew very well that the defense considered the matter highly prejudicial and had gone to great efforts to forestall any mention of the incident before the jury.  Since the court had expressly ruled that the incident should not come in before the rebuttal phase, the prosecutor could not have reasonably believed he was entitled to go into the matter sooner, without any advance notice to the court or the defense.  This can only be seen as direct disobedience of a clear ruling, demonstrating bad faith.

1089.   Because of the wilfulness and harmfulness of the misconduct, a penalty mistrial was warranted.  The judge recognized that an admonition would do more harm than good, but failed to recognize that was the very reason requiring a mistrial.  By denying a mistrial in a situation where an admonition was ineffective, the court left Price to bear the full brunt of the prosecutor's willful misconduct.

**D.   In Several Instances, the Prosecutor Implied Prejudicial Facts in Leading Questions and Then Failed to Ever Prove the Truth of the Implied Facts**

**1.   The Prosecutor Used Leading Questions About a Highly Prejudicial Incident Involving a Fire in the Montana State Prison Library, and Never Attempted to Prove What Had Been Implied**

1090.   Fred Perry testified on behalf of Price in the penalty phase, describing experiences he and Price had as inmates together in prisons in Idaho and Montana.  On cross-examination, the prosecutor brought out the fact that Perry and Price were moved from the Montana State Prison to the Idaho State Prison on the same day, and that two other inmates were also transferred out of the Montana institution that day.

1091.   The prosecutor then asked: "How soon after the fire at Montana State Prison were the four of you moved?"  Defense counsel immediately objected on the ground that the

question was leading and the matter was beyond the scope of the direct examination. The objection was overruled. The prosecutor then asked whether there was a fire in the prison library 8 days before Price, Perry, and two other inmates were moved. Perry acknowledged that there had been a fire; the prosecutor then asked who set the fire. Perry responded, "Whether any of those people you just mentioned had anything to do with that fire is an entirely different matter. We had hashed that out in federal court once." RT 22120 to 22120-1.

1092. It is misconduct to imply a prejudicial fact in a leading question when the prosecutor cannot prove the truth of the implied fact. Here, the prosecutor never made any effort to show that Perry or Price ever had anything at all to do with the fire in question. However, the jury could not help but conclude that the prosecutor possessed information that Price and Perry were involved in a library fire at the Montana state.

1093. Indeed, immediately before asking the first question about when the fire started, the prosecutor asked whether, at the time the four were moved, a statement had been read to them explaining why they were being transferred. RT 22120. Thus, despite the denial by Perry, the jury would conclude the prosecutor possessed a written statement from Montana prison officials, blaming Price and Perry for the Montana prison law library fire. Even if the prosecutor possessed such a written statement, it was inadmissible hearsay, but the prosecutor fully succeeded in putting the prejudicial contents of the statement in front of the jurors. Since the prosecutor never attempted to prove the prejudicial facts he implied, misconduct occurred.

1094. The misconduct was especially prejudicial in that it not only impeached a defense witness, but also left the jury with the impression that Price was directly involved in serious in-custody wrongdoing. In other words, even if there was relevance in showing Perry's alleged involvement in the fire incident, there was no basis for implying Price's involvement.

This incident neither resulted in a felony conviction nor qualified as prior violent criminality since it was apparently a crime against property, not persons. The result of the misconduct was that a defense witness was effectively impeached with inadmissible and impermissible non-evidence which the jury could freely (and improperly) use against Price in aggravation of the penalty.

### 2. The Prosecutor Implied That Curtis Price Was Using Drugs During the Time He Testified

1095. One of the first questions asked of Price on cross-examination was, "What sort of drugs or narcotics are you taking today to control your emotions?" RT 22417. Price denied taking any drugs, but the prosecutor persisted in the same line of questions, asking next whether Price had used marijuana the day he testified or the day before. Price denied using marijuana at those times. RT 22417-22418.

1096. The prosecutor not only asked about marijuana after Price denied using any drugs, but he also asked whether Price was sure after he said he had not used drugs. RT 22417-22418. This persistent questioning implied that the prosecutor had knowledge that Price was using drugs. However, the prosecutor never attempted to prove that any drug use had occurred. No objection was made, but the matter is at least relevant to show the pattern of implying prejudicial facts in leading questions, which could not be proved after denial by the witness.

### 3. The Prosecutor Stated in a Question That Curtis Price Had Shoved a Gun in the Face of a Prior Victim, and Then Failed to Prove Such an Event After Price Denied It

1097. In a question interrupted two times by a defense effort to object (and followed immediately by a third objection), the prosecutor asked Price, "And on April 17th, 1971 ... in Great Falls, you shoved a pistol ... in the face of a man named Barzotti and demanded money

from him?" RT 22419; repeated at RT 22420. Price admitted pointing a gun at the victim, but denied ever shoving it in his face. RT 22420. Although the jury heard the prosecutor's statement that a gun had been shoved in the face of Barzotti, no effort was ever made to prove the truth of that assertion.

1098. Defense counsel's objection, made on the ground that the question was outside the scope of direct examination, was overruled. If it was not adequate to preserve the present point, then the matter is again at least relevant to demonstrate the prosecutor's pattern of similar misbehavior.

### 4. The Prosecutor Used Leading Questions to Tell the Jury that Curtis Price Was Suspected of Engaging in Several Forms of Illegal Activity While He Was a Prisoner in the State of Montana

1099. After Price testified about his transfer from the Montana State Prison, the prosecutor questioned him about the reasons for the transfer. Price acknowledged awareness of a document prepared by Montana prison officials that listed purported reasons for the transfer. The document itself was obviously inadmissible hearsay, but the prosecutor went through item by item, asking such questions as, "If they said you were involved in selling illegal hobby-craft material, that would be a lie?" "If they said you were involved in a drug traffic ring, that would be a lie?" "If they said you were involved in setting a fire in the library facility, that would be a lie?" "If they said you intended to kill a specific staff member, that would be a lie?" "If they said you had seriously assaulted a fellow inmate, that would be a lie?" Finally, the prosecutor asked, "What if the letter said you were a race conscious individual who believes in white supremacy and intimidated Montana State Prison minority group members? Would that be a lie?" RT 22466-22468, 22471.

1100. Most of these incidents were inadmissible aggravation evidence even if properly

proved. Here, the proof was non-existent; after Price denied each accusation, no effort was ever made to prove the truth of the implied facts. Once again, however, the jury could not avoid concluding that the prosecutor had some document from Montana prison officials claiming that Price had committed each of the specified transgressions. The prosecutor accomplished his improper purpose just as thoroughly as if each juror had been given a copy of the hearsay document.

### 5. The Prosecutor Told the Jury That Becky Williams Admitted Lying and That Curtis Price Told Her to Lie, But Neither of These Assertions Was Ever Proved

1101. During the guilt phase of the trial, Becky Williams testified that a gun that she had taken to a repair shop had been a gift to her from her grandfather. Prosecution evidence indicated that the gun had not been manufactured until after the grandfather had died. This supports an inference that Williams was either mistaken or lying about the source of the gun.

1102. During penalty phase cross-examination of Price, the prosecutor asked, "Why did you tell Rebecca Williams to lie about the Jennings .22 caliber semiautomatic pistol?" RT 22487. Defense counsel promptly objected that the question was argumentative and that it assumed facts not in evidence. RT 22487. Defense counsel was correct; no evidence had been introduced indicating that, if Williams did lie, she did so at the request of Price.

1103. The trial court did not rule on the objection, but instead merely told the prosecutor to ask Price whether he had told Williams to lie. The prosecutor did ask that and Price responded negatively. RT 22487-22489. By that point, of course, the negative answers could not change the fact that the jury must have concluded that the prosecutor had evidence that Price had told Williams to lie. At no time, however, did the prosecutor try to prove his assertion.

1104. To make matters worse, after Price had repeatedly denied telling Williams to lie

about the gun, the prosecutor followed with an equally improper question: "So, if she admitted to Agent Tulleners following her testimony here, she admitted that she perjured herself that would be another lie by her?" RT 22489. If any juror remained unconvinced that the prosecutor had evidence that Price told Williams to lie, surely this question convinced such jurors that the prosecutor did have additional evidence. However, the prosecutor never presented such evidence in court.

1105. Indeed, aside from being unsupported by any evidence, the last inference offered by the prosecutor was not even logical. If Williams had admitted perjury to Tulleners, that still would not mean that Price told her to lie. Whether she believed Price was guilty or innocent of the crimes charged against him, she might well have concluded on her own that lying about the gun would benefit Price. Thus, any admission of perjury she may have made would not be enough to establish that Price had any role in suborning perjury. Aside from the absence of logic in the prosecutor's inference, the statement in front of the jury that Williams had admitted perjury to Tulleners constituted flagrant misconduct.

### E. The Prosecutor Used an Offer of Proof to Argue an Inference Which Was Clearly an Improper Subject for a Question

1106. Patricia Sewell testified as a defense witness, describing her friendship with Price while he was an inmate in the Idaho State Prison. While cross-examining Fred Perry about unlawful beatings and other improper prison conditions that he had described, the prosecutor asked if he knew Sewell. Defense counsel objected on relevance grounds, and the prosecutor stated in front of the jury, "I'm going to ask him if he finds it strange that she didn't mention these people ---." RT 22127. After defense counsel objected to the offer of proof in front of the jury, the prosecutor completed his offer at bench:

We've heard from Mrs. Sewell yesterday. She indicated she had

close contact with Mr. Price and these programs during the period

of time she was visiting in Montana State Prison and prior to the

time he was moved. She never indicated that she saw any injuries

to him. She never indicated that he complained about beatings or

abnormal conditions. She never indicated that she went outside

and took steps to publicize these deplorable conditions that Perry

now talks about. I find that strange. RT 22127.

1107. The judge sustained the objection, noting that the prosecutor could argue the point but that it was not something Perry could be expected to explain.

1108. It must have been obvious to the prosecutor from the outset that the question was improper. To ask Perry to explain why Sewell had failed to mention certain facts would have clearly been an improper effort to elicit pure speculation. When defense counsel saw where the prosecutor was going and tried to head him off with a proper objection, the prosecutor utilized an offer of proof in front of the jury to convey the very information the objection was designed to avoid.

1109. This misconduct was especially egregious because the argumentative inference was improperly conveyed, and it was unfair since the obvious reason that Mrs. Sewell did not testify that Price had complained of beatings or abnormal conditions is that such testimony would have been blatant hearsay.

1110. In other words, the prosecutor would have objected strenuously if Mrs. Sewell had been asked, "Did Mr. Price ever complain to you that he had been beaten by prison officials or subjected to other improper conditions?" Belittling the defense for failing to ask an improper

question is misconduct. The prejudice is clear; the prosecutor strongly and improperly implied that one or both of these two important defense witnesses was lying to the jury.

### F. In Direct Defiance of a Court Ruling, the Prosecutor Asked a Question to Which He Knew Curtis Price Would Exercise His Privilege Against Self-Incrimination

1111. The first time the prosecutor tried to ask Price about the Banks killing, defense counsel asked to approach the bench and noted his concern about the fact that Price had never been, but still could be prosecuted for the Banks killing. Accordingly, defense counsel had concluded it was his duty to advise Price to exercise his Fifth Amendment privilege against self-incrimination and refuse to answer any questions about the Banks killing. RT 22430-22431.

1112. Although the only mention of the Banks incident on direct examination had been a brief reference to the fact that Price had not been prosecuted for that offense (RT 22334), the judge initially stated that the mere mention of Banks' name opened up the entire area. RT 22431. However, after extensive debate about the proper scope of cross-examination, the judge ruled that the prosecutor should go into other areas so the court could consider the matter further and decide whether questions about Banks would be allowed, whether Price would be forced to exercise his privilege against self-incrimination in front of the jury, and whether any exercise of the privilege would result in striking Price's previous testimony. RT 22435-22447.

1113. Despite being told to avoid questions about Banks pending a further ruling, the prosecutor took it upon himself to return to the area without any advance notice to the court or defense counsel. In an obvious effort to squeeze in as much prejudicial material as possible before the inevitable objection, the prosecutor asked, "Why did you stab inmate Banks twenty, thirty times to death?" RT 22514. Defense counsel immediately asked to approach the bench and pointed out the earlier order to avoid such questions pending further discussion. After fur-

ther discussion, the prosecutor was again directed to pursue other matters. RT 22514-22518.

1114. The prosecutor did not raise the matter again. The jury was told only that the prosecutor would go into a different area and may or may not return to the subject that had been interrupted. RT 22521. However, by that point, the prosecutor had already accomplished his improper goal, i.e., to ask Price about the Banks killing, in as prejudicial a manner as possible while knowing Price would give no response. The prosecutor's refusal to abide by the clear court order to avoid such questions until the court ruled on the matter was serious misconduct. Since this misconduct allowed the jury to witness Price's silence in the face of an accusation that he brutally murdered Banks, the error was undoubtedly prejudicial.

## G. In Several Instances, the Prosecutor Used Argumentative Questions to Derogate Curtis Price

### 1. Marine Corps Discharge

1115. During his direct examination, Price mentioned that at one point in his life he had planned a career in the Marines. RT 22303. Given the evidence of the years Price had spent in prison, the jury obviously knew a career in the marines did not actually occur. Not satisfied with the obvious, the prosecutor asked Price whether it was true he had been discharged from the Marines. After Price replied affirmatively, the prosecutor responded, "Okay. So your dreams of a career in the Marine Corps were nothing more than just dreams because you didn't complete -- they didn't want you?" RT 22449-22450.

1116. Defense counsel's objection that the question was argumentative, which it surely was. (See Evidence Code section 765), was sustained, but the prosecutor's purpose of improperly focusing on a Marine Corps discharge, irrelevant to any legitimate factor in aggravation, was fully accomplished.

## 2. Source of a Weapon Used in a Prior Crime

1117.    After Curtis Price admitted that he had robbed a market in Arcata in 1971, the prosecutor asked, "Where did you get the pistol that you used to rob the Fourth Street Market in Arcata, September 26th, 1971?" RT 22466.  Defense counsel's objection that the question was argumentative was sustained.  RT 22466.

1118.    This was another clear effort to simply harass Price, rather than to draw out any relevant evidence.  Surely, the source of the pistol used in a 1971 robbery had no bearing whatsoever on any proper aggravating or mitigating factors.  The prosecutor was merely engaging in verbal combat designed to give the jury a negative impression of Price without regard for the rules of evidence.  Once again, the purpose was fully accomplished by the time the objection was made and sustained.

## 3. Possibility of Future Escape

1119.    Price testified that it was not unusual for convicts to think about possible ways to escape.  In response, the prosecutor asked, "So when you are going to San Quentin, you'll be wanting to escape, right?" RT 22524.

1120.    The only purpose in asking such a question was to plant the notion in the minds of the jurors that Price would always be a dangerous escape risk if he was not executed.  However, it is well-settled that speculation on the possibility of a future escape is improper in the penalty phase of a capital trial.  See e.g., Hance v. Zant, 696 F.2d 940, 952 (11th Cir. 1983); People v. White, 69 Cal.2d 751, 761-762 (1968); People v. Bandhauer, Cal.3d 609, 614-616 (1970).

## 4. Unprofessional Arguments Between the Prosecutor and Curtis Price

1121.    During cross-examination, without any justification, the prosecutor stated, "Mr.

Price, in state prison they are not going to take what you get away with up here in our county jail." RT 22533.[195] Even before defense counsel could object, the judge intervened on his own, saying, "Just a minute. This is not an argument. It's a question. Let's ask a question, then he can answer it." RT 22533. Having accomplished his improper purpose, the prosecutor immediately turned to a completely different area of questioning.

1122.   Soon afterward, in response to a question from the prosecutor, Price said he did not agree with the notion that his conduct in the jail justified the order that he be shackled in court. RT 22591-22592.   The prosecutor replied, "Well, you disagree with everything, Price. You don't see things the way anybody else sees them." RT 22592.   Once again, the judge intervened on his own and directed the prosecutor to ask questions and refrain from arguing with Price. RT 22592.

1123.   Although defense counsel did not have a chance object to either of these arguments, the purpose of an objection -- to allow the court to rule -- was accomplished by the judge's preemptive intervention.   An objection would not have accomplished anything further. In both instances, however, the prosecutor accomplished his purpose of derogating Price.   The last incident was especially egregious because it came soon after the prosecutor was directly told not to argue with the witness.

**H.  The Prosecution Misconduct Continued During Penalty Phase Arguments to the Jury**

**1.  Urging Execution for an Uncharged Prior Murder**

1124.   During closing argument, the prosecutor referred to three people allegedly killed

---

[195]  Price replied, "They don't have to.  They don't treat me the way they treat me in state prison." RT 22533.

by Price - Hickey, Barnes, and Banks. The prosecutor then stated, "The defendant should die for anyone [sic] of those murders." RT 23018. Defense counsel immediately objected that the prosecutor had misstated the law. RT 23018-23019. The court responded, "The jury is instructed on the law. They'll follow the law. They know what the facts are." RT 23019.

1125. The prosecutor's argument was a misstatement of the law, because the Banks killing was not charged as capital murder; it was introduced only as evidence in aggravation of the penalty for the Hickey and Barnes murders. However, the prosecutor's argument invited the jury to vote for execution if they believed that was warranted as a punishment for the Banks murder, regardless of whether they believed death was warranted for the Hickey or Barnes murders.

1126. This improper prosecutorial invitation was especially prejudicial because proof of the Banks killing, which consisted of eyewitness testimony from Carpenter and Perryman, was much stronger than the proof of the Hickey or Barnes murders. Thus, the prosecutor's implied argument was that any jurors who had any doubts about whether Price was responsible for the Hickey and/or Barnes killings should vote for execution nonetheless because Price deserved that penalty for the Banks killing.[196]

1127. The judge's response did not cure the harm; by stressing that the jurors knew the facts, the judge only exacerbated the danger that one or more jurors, with lingering doubts about the Barnes or Hickey murders, would nonetheless vote for death only because they were persuaded that death was a proper punishment for the Banks killing. Since this misconduct

_____

[196] Such an improper conclusion was especially likely because the jurors knew that Price had never been prosecuted for the Banks killing and that the only punishment he had suffered as a result of that killing was to spend three years of his prison term in the adjustment center. RT 22334.

carried a high potential for prejudice and the admonition did nothing to alleviate the problem, the penalty verdict was tainted.

### 2. Improper References to Threats That Were Not Shown by the Evidence

1128.    During the final penalty phase argument, Deputy Attorney General Bass referred to a comment that Price made to Humboldt County Jail Correctional Officer Filyau, which Filyau had interpreted as a threat to himself and his family.  Bass then went on to say, "Well, you know, in this business, I've never talked to Mr. Dikeman about it, but we get threatened all the time.  And every time I've been threatened --" RT 23024. The trial court sustained defense counsel's immediate objection on the ground that the prosecutor was arguing facts not in evidence.  RT 23024.

1129.    Defense counsel was correct in asserting there was no evidence Bass had been threatened.  However, there was evidence that the AB commonly did threaten its enemies and retaliated against them.   There was also improperly introduced evidence that Department of Justice Investigator Tulleners had been placed on the AB hit list in connection with this case.  See RT 16180-1, 20847.   In view of this type of evidence, even though Bass' comment was cut off before it was completed, one or more jurors would reasonably understand Bass to mean that he had been threatened by defense sympathizers in this case.   Such evidence is highly prejudicial, and is inadmissible when not connected to the defendant.

1130.    Although the judge sustained the defense objection, no admonition was given.  Even if one had been given, it could not have been effective.  Stressing to the jury that there was no evidence that Bass had been threatened would only cause jurors to conclude that the threat had occurred, but the defense had somehow prevented the introduction of such evidence.  This misconduct must be considered highly prejudicial, since belief by one or more jurors that the

prosecutor had been threatened could clearly be an instrumental factor in deciding to vote for a penalty of death.

### 3. The Prosecutor Asked Curtis Price an Improper Question During Argument, Knowing that Price Could Not Give an Answer

1131.    Commenting on the evidence presented by the defense in mitigation of the penalty, the prosecutor stated that he had never heard any evidence that would justify showing mercy to Price. The prosecutor then stated, "Give me something, Mr. Price, to show this jury why they should not render a verdict of death." RT 23026.   The reporter's transcript indicates that this question was followed by a pause. RT 23026, l. 20.   Obviously, the prosecutor stopped for a dramatic moment, as if waiting for Price to supply an answer, which of course he could not do without breaching courtroom decorum.

1132.    A prosecutor has no right to continue cross-examining a defendant during argument.   What made this question especially egregious is that <u>moments before</u> Price had spoken in response to an unfair comment by the prosecutor, and the judge had promptly told him to keep quiet or he would be removed from the courtroom.   RT 23023.   Thus, the prosecutor <u>knew</u> when he posed his improper question that Price would have little choice but to sit in silence during the prosecutor's dramatic pause, reinforcing the prosecution argument that there were no reasons for granting mercy.   On the other hand, the prosecutor also knew that if Price rose to the bait and attempted to give an answer, the judge was likely to make good on his threat to have Price removed from the courtroom.   Such prosecutorial game-playing is certainly not an appropriate or reliable means of achieving a death verdict.

1133.    The prejudicial impact of this incident is obvious.  To the jury, it undoubtedly looked as if the defendant himself was unable to think of a reason why he deserved mercy.  This could have easily had an adverse impact on the penalty determination.

## I. Conclusions Regarding Penalty Phase Misconduct

1134. The combined impact of the many instances of misconduct set forth in this argument rendered the penalty trial fundamentally unfair, depriving Price of his federal 5th and 14th Amendment right to a fair trial in accordance with due process of law. Donnelly v. DeChristoforo, 426 U.S. 637 (1974). Similarly, the combined impact of these errors on the rendered the penalty determination unreliable, resulting in the need to vacate petitioner's death sentence under the Eighth Amendment. Woodson v. North Carolina, supra, 428 U.S. 304-305. Also, in most of the incidents the impact of the misconduct was to effectively place before the jury "evidence" that was harmful to Price, but was not subject to cross-examination, resulting in a deprivation of the right of confrontation.

1135. Two recurring themes running through the prosecutorial misconduct clearly demonstrate why this court should vacate the penalty verdict in this case. First, almost all of the incidents set forth in this argument impacted directly on the nature of Price's character as it would be perceived by the jury. By distorting the evidence regarding Price's character, the prosecutors repeatedly gave the jurors wrong reasons for voting for a verdict of death. Because it is impossible to determine whether the penalty verdict was based on properly admitted evidence and proper arguments, or whether it was influenced by the results of willful misconduct, reversal is necessary.

1136. Second, the pattern demonstrated by all of the misconduct, throughout jury selection, the guilt trial, and the penalty trial, shows a prosecutorial determination to have its way at every turn, and to prejudice Price whenever possible, by any means, whether proper or not. Such arrogant misconduct should not be rewarded by giving the prosecutors the very prize they fought for so unfairly -- Curtis Price's life.

# CLAIM XIII

## THE TRIAL COURT VIOLATED PETITIONER'S FEDERAL CONSTITUTIONAL RIGHTS TO A FAIR TRIAL AND AN IMPARTIAL JURY BY ERRONEOUSLY DENYING THE MOTION FOR A CHANGE OF VENUE

1137. For a variety of reasons that include a pervasive bias and hostility toward petitioner in Humboldt County before and during his trial, the fact that petitioner's case and trial was a huge event for a very small, closely knit community, and the associated risk of inappropriate contacts between the parties and the jurors during the trial, it was not possible for Curtis Price to receive a fair trial by a fair and impartial jury in this case, and thus the trial court's refusal to change the venue to a more suitable location violated petitioner's right to due process, to a fair trial by a fair and impartial jury in a capital case, and to effective representation, as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

### A. Factual Background

1138. The record in this case contains substantial information demonstrating that the trial should have been moved from Humboldt County. The defense motions demonstrate community bias, the voir dire showed knowledge of and bias against the defendant in the community, and there were numerous ongoing revelations to the court that jurors knew prosecution witnesses and victims in the case despite having denied such on voir dire.

1139. The venue issue in this case, however, requires more than a review of the record. As set forth in several claims in this petition regarding juror/prosecutorial misconduct and juror bias, many problems arose during the trial as a result of the close-knit nature of the community. Even a cursory review of some of these issues leads one to wonder why the trial court did not

change venue in this case. Undoubtedly, in retrospect these issues of juror bias and juror/prosecutorial misconduct could have been completely avoided had this case been moved to a different county where prospective jurors were not so close to the attorneys and the witnesses in the case. Although hindsight is of course 20/20, the trial judge in this case was sufficiently aware of the potential for juror bias from the early proceedings in the case that his failure to change venue denied petitioner his constitutional rights.

1140. This was the biggest, most sensational, and most costly criminal case ever to be tried in Humboldt County. The facts involved allegations of gang-related murders and conspiracies the likes of which Humboldt County had never before encountered. The County had a special metal detection hallway constructed in the courthouse especially for this case. It was only used during petitioner's trial, and has since been dormant. This addition is still referred to as the "Price" detection system in honor of its only beneficiary. There can be no doubt Price's trial was in fact a "big deal" for this small coastal community.

1141. In denying the venue motion, the trial judge made much of the fact that the local media in the case had not been overwhelming. Whether or not the local media's attention to this case can be described as pervasive, in several instances the record reflects that it was in fact particularly negative toward the defendant, and some of the most damaging stories were rather ill-timed with regard to the issue of securing an unbiased jury in this case.

1142. The trial court also relied upon is own calculations about how many jurors had testified on voir dire that they had some knowledge of the case or the individuals involved during voir dire. RT 9801-9806. The court failed to reconsider his decision, when, repeatedly during trial, he received notes from jurors who stated they in fact knew several of the witnesses and victims in this case but did not say so during voir dire.

1143. For all of these reasons, as set forth more fully below, the trial court's failure to grant the defense motion for change of venue denied petitioner a fair trial.

1144. With respect to the issue of media coverage, the defense venue motion contained numerous news articles and transcripts of television and radio news reports about the case. CT 4026-4132. Early reports about Hickey's murder included a statement from the investigating officer that, "I definitely feel this case is solved." CT 4048. Though Price had lived with his family in Eureka, he was identified in a front page headline as an "Oregon man charged in Eureka murder case."[197] CT 4049. Another story headline read "Pathologist says murder victim struck 15 times." CT 4050.

1145. Following the first preliminary examination, eight and one-half months after the crime, a story headline proclaimed, "Murder suspect bound over for trial, could face death penalty."[198] CT 4060. During 1984, news stories about the case continued. One was headlined, "Murder defendant demands better treatment in jail." CT 4061. Another was headlined, "Murder defendant to remain shackled." CT 4062. In February, 1984, a year after the crimes were committed, a front page story was headlined, "DA wants more charges filed against Price." CT 4063. This was the first article to mention Barnes' murder. A subsequent story reported that

---

[197] Price was born in Oregon and had spent some of his childhood years there, although he also spent time in his childhood in the Eureka area.

[198] Notably, the present case is one of only two cases in which a death sentence has been imposed in Humboldt County since the reinstatement of the death penalty in 1977. The other case is People v. Hitchings. The death sentence in that case was imposed on May 6, 1983, just two-and-one-half months after the present crimes were committed. Hitchings' convictions and sentence of death were later set aside by the California Supreme Court, which granted Hitchings state habeas corpus relief for juror misconduct involving the concealment of information during voir dire showing the juror's bias. See In re Hitchings, 6 Cal.4th 97 (1993).

new charges thereon had been filed. CT 4065.

1146. In March, 1984, a story appeared with the headline, "Supervisors refuse funds for Curtis Price murder hearing." CT 4066. The story noted that a new preliminary examination would have to be held because of the charges that had been added, and the supervisors had been asked to appropriate another $50,000 for attorney fees. While recognizing that the county had no choice but to pay the costs, the supervisors took the position that they would prefer to force a court order rather than pay the money voluntarily. One supervisor was quoted as saying, "One hundred grand ($100,000) has already gone down the tubes, and now another 50 grand?" CT 4066. This story generated a letter to the editor that was printed under the headline, "Trial is too expensive." CT 4067.

1147. After the supervisors appropriated the money, another news story about the expense of the prosecution appeared. CT 4067. This time, a supervisor was quoted as saying, "These expenses are absolutely ridiculous." CT 4067.

1148. When the new preliminary examination began in the spring of 1984, there were regular stories about the testimony. One front page story was headlined, "Witness says prison gang chose Price to carry out murder pacts." CT 4069. Prosecution witness Thompson was quoted as describing the Aryan Brotherhood as "just short of being a white supremacist organization." CT 4069. Thompson was also quoted as saying, "It was felt that Curtis Price had the capacity to carry out the contracts in the professional manner that was desired." CT 4069.

1149. In June, 1984, the media reported that Price had been bound over for trial in Superior Court (CT 4072), and another story reported his Superior Court arraignment. CT 4073. In the midst of all this attention to Price and to AB conspiracy allegations, the local paper ran a story in August, 1984 that did not refer specifically to this case, but which was headlined,

"Prison gang at San Quentin linked with organized crime." CT 4074. A sub-headline identified the gang in question as "Aryan Brotherhood."

1150. Also attached to the venue motion as an exhibit was a summary of a public opinion survey conducted in August, 1984, <u>a full eighteen months after the crimes had been committed</u>. CT 4124-4128. Interviewers tried to contact a sample of 344 eligible jurors and questionnaires were actually completed for 282 persons. CT 4124. <u>Fifty-five percent</u> of those persons had some familiarity with the case and another 9 percent were uncertain whether they had heard about the case. CT 4125.

1151. The venue motion was initially argued and submitted on February 20, 1985. RT 620-639. A further hearing was held on March 5, 1985, at which Peter Coyne testified about the defense public opinion survey and Barry Brown testified about the prosecution survey. RT 917-1031. A week later the court denied the motion, commenting that there had been little media attention to the case since June, 1984. RT 1359-1360. The court added that the surveys showed that a large majority of persons interviewed had little or no knowledge of the case. RT 1359.

1152. Jury selection began June 11, 1985 and continued through October 30. RT 1913, 9729. The defense filed further points and authorities in support of the venue motion on August 21, 1985. CT 7394-7537. Exhibits showed that in the summer of 1985, there were numerous broadcast and newspaper articles about the ongoing Price trial. Much attention was focused on the expense to Humboldt County of prosecuting Price. CT 7398, 7425-7428. One of the broadcasts included the fact that the first Price preliminary examination had been the longest and costliest in Humboldt County history. CT 7428.

1153. The renewed defense motion also described in detail the type of contamination of the jury pool, which could be expected in a small community where people know one another

and are familiar with the goings on in the local court system. Id. at 7402-7404. For example, several prospective jurors had to be dismissed after their initial voir dire when they returned to their homes or workplaces and were contaminated with prejudicial information that was clearly biased against the defendant. Id.

1154. Also, during the voir dire prospective jurors talked among themselves about the case in ways that showed clear bias. Id. at 7402.

1155. The defense also cited specific instances where members of the jury pool had been contaminated due to inappropriate statements being made by law enforcement personnel or persons assisting law enforcement in the ongoing case. One good example of this, set forth in Claim V of this petition, concerned juror Debra Kramer, whose husband, Dr. Richard Kramer, had previously consulted with the prosecution to exonerate suspect Berlie Petry after he failed two police administered polygraph examinations. This occurred shortly after the Hickey murder occurred. RT 8003.

1156. For whatever reason, perhaps because he worked with the local parole office and was good friends with law enforcement personnel involved in the Price case, Dr. Kramer formed very clear and distinctly negative opinions of the defendant in this case, Curtis Price. Defense trial counsel Anna Klay filed a declaration in support of a motion for bail on August 16, 1985, in which she related facts of Dr. Kramer's feelings about Mr. Price. CT 7347-7351. In that declaration she described how Mr. DePaoli had asked her to be co-counsel in the case, and about the reaction she received from friends in the community. In particular, she stated that Dr. Richard Kramer had "expressed grave concern to myself and my husband that I should never be alone with Mr. Price as he would surely harm me." Id. When she questioned him about his concern, he said that he based his views on what he had heard from local law enforcement. CT

7349.

1157.   Ms. Kramer was undoubtedly privy not only to her husband's involvement with the prosecution in this case, which she disclosed on voir dire, see RT 7392, but also to her husband's hostile views towards Mr. Price, which she failed to mention.  At the time Dr. Kramer performed his work for the prosecution, and shared his concerns about petitioner's propensity for violence with Ms. Klay, which was years before the trial in this case, there is no question Debra Kramer would have been already aware of the case, given its local notoriety.  More importantly here, given the nature of the case and of Dr. Kramer's connection to it, and given the fact that Debra Kramer was not only his wife, but also his office secretary and assistant, see RT 7392, it is clear that the couple would have spoken to one another about the case and about Dr. Kramer's personal involvement in it and his views about petitioner.  And critically here, at that time, years before the beginning of jury selection, Ms. Kramer would not have known that she was to be called for jury service and would actually serve on the jury in this case.  Such contamination was unavoidable in Humboldt County, yet undoubtedly extremely harmful to the defendant.

1158.   In their renewed motion for a change of venue, the defense also forewarned the court that, given the large number of prosecution witnesses who were members of the local community (66), it was inescapable that many of the jurors would know many of these witnesses in the case.  Indeed, among others, Debra Kramer, who was married to and worked for the psychologist who examined Price for mental competency, consulted with the prosecution about the veracity of the key defense suspect, and did testing on the defendant between the guilt/innocence and sentencing phases of the trial, testified on voir dire that she knew one of the investigating police officers, and had known for a long time and was social friends of one of the officers who arrested Price.  RT 9568-9569.

1159. Similarly, juror Lloyce Stovall had worked with defense suspect Berlie Petry at the Arcata Redwood lumber company, and knew him and knew he was Elizabeth Hickey's boyfriend. RT 3252. He was a significant government witness at the trial, and was subjected to extensive cross examination by the defense. Stovall could not be expected to be impartial toward the defense where their chief suspect was a co-worker.

1160. In fact, as it turned out, although they failed to testify to such on voir dire, many of the jurors in the case did know the prosecution's witnesses. As the trial progressed, one by one, jurors in the case began to reveal to the court that they did in fact know witnesses in the case. For example, on December 2, 1985, after the trial had been underway several weeks, Juror Marcus Gustafson wrote a note to the court that he knew a prosecution witness. See CCT 1731. A few days later, Gustafson revealed that he had also been a college counselor to one of the robbery victims in the case. CCT 1747.[199]

1161. Likewise, juror Nancy Jones revealed after trial was underway that she was a school friend of a prosecution witness, and that her sister's husband was related to him. RT 10043. She testified that she knew this witness in both junior high and high school, and she knew about his private life through her sister. Id.

1162. Later in the trial, other jurors revealed that in fact they knew other witnesses and/or victims in the case. See RT 18211 (Juror Gladden reveals that two of his tenants, who are

---

[199] These notes appear in the Corrected Clerk's Transcript, and were not made a part of the original record in the case. There is no reference to these notes in the trial record itself. Thus it appears the court may have failed even to notify the defense about Gustafson's connection to the prosecution's witnesses. This fact alone is a violation of petitioner's right to a fair trial and to the adequate representation of counsel at a critical stage of the proceedings. See Diaz v. United States, 223 U.S. 442 (1912).

themselves roommates, are prosecution witnesses); RT 18216 (juror Kramer, who already admitted being friends with other prosecution witnesses, as well as being married to Dr. Kramer, reveals that she is a social friend of a witness).

1163. Regardless of the clear evidence demonstrating that the wiser course was to move the trial to another county, the court denied the renewed change of venue motion on October 31, 1985. RT 9800-9806. Ironically, the next day, the local newspaper ran a front page story headlined, "County's costliest trial set to begin." RT 9901. Aside from stressing the cost of the trial, the article also discussed allegations that Price had assaulted officers in the county jail. The article described the AB as a white supremacist prison gang, mentioned Price's 1971 Montana prison escape, and noted that tight security measures were being enforced in the court room. The article continued on another page of the newspaper, and that segment of the article was headlined, "PRICE: Security tight for long murder trial." See Court Exhibit 73.

1164. The twelve jurors and eight alternates were examined about exposure to the article. RT 9923-10008. All but two jurors and two alternates saw or heard about the headline and/or portions of the article. CT 8696. One juror read the entire article, violating the court's admonition, and was excused from further service. RT 9953-9958, 10041.

## B. The Denial of A Change Of Venue Deprived Petitioner Of a Fair Trial by an Unbiased Jury

1165. Most of the traditional factors assessed in determining whether venue should be changed in a criminal case point to the conclusion in this case that the trial court committed error in refusing to do so in this case. Courts are generally required to review the nature and gravity of the offense, the extent of the local media coverage, the size of the county, and the status of the defendant and victim in the community. See Sheppard v. Maxwell, 384 U.S. 333 (1966); Estes

v. Texas, 381 U.S. 532 (1965). In addition, prejudice should be presumed, where, as here, all of the circumstances, such as the overriding hostility in a small community, as well as the overwhelming potential for bias and for inappropriate connections between jurors, parties, attorney, and witnesses, suggest that petitioner cannot receive a fair trial in the local community. See Norris v. Riley, 918 F.2d 828 (9th Cir. 1990); Woods v. Dugger, 923 F.2d 1454 (11th Cir. 1991); Coleman v. Kemp, 778 F.2d 1487 (11th Cir. 1985). In this case, when the traditional factors are combined with a review of other equally-important, but unique factors in this case demonstrating that the local Eureka community was the wrong place for a fair trial, there is no question that venue should have been changed in this case.

1166. Regarding the nature and gravity of the offense, it is obvious that capital murder, especially when it involves multiple victims in separate incidents, is of the utmost gravity.

1167. The news coverage was quite extensive, and was especially prominent in a county which had only one other death penalty verdict in recent years. Furthermore, the coverage was particularly sensational here, since it involved detailed discussions of the allegations that the crimes were the result of a conspiracy by members of a white supremacist prison gang.

1168. Furthermore, this case did not merely involve a gang, but a prison gang. With no state prisons in or near Humboldt County, repeated media stories about the inner workings of an alleged white supremacist prison gang would be even more inflammatory than if such stories appeared in a county such as Marin or Sacramento, where prison gangs problems are more common. The Hickey killing was also very inflammatory for very different reasons, since it involved the brutal slaying of a young mother in her own home during the nighttime, while her two small children were in the home.

1169.   Other aspects of the media coverage that would arouse anger among local citizens were the references to the great cost of the trial proceedings and to the problems allegedly caused by Price in the local jail.

1170.   In addition, this case arose in a small county.  Humboldt County's population in the 1980 census was 108,525.  Humboldt County is also a rural one, not near any major metropolitan area.

1171.   Perhaps the smallness of the Eureka community was one of the most damaging factors undermining petitioner's ability to receive a fair trial in this venue.  It should have been clear from the outset that problems were certain to arise when a case as unusually complex and sensational as this one was tried in a small county.  This case involved two separate defense attorneys, two separate prosecuting attorneys from different agencies, twelve jurors and eight alternate jurors, and numerous local witnesses, in a trial that lasted over a year from the start of jury selection to the verdict.  While it could not be foreseen in advance exactly what problems might develop, the length of the trial and the inevitable problems when so many persons spend so much time together in a small community were foreseeable.  Several examples should be noted here.

1172.   Some of the connections between jurors and witnesses have already been discussed.  In addition, as discussed in a separate claim in this petition (see Claim V, supra), and incorporated herein by express reference, one of the jurors had previously had a romantic affair with one of the attorneys, who had been the prosecuting attorney in her rape trial.  She also received financial assistance from him.  This same juror, again unbeknownst to the defendant, was being assisted by the prosecutor's office in collecting child support payments from her former husband.  Another juror was also receiving child support collection assistance from the

prosecutor's office, and was involved in disputes about this during the trial. RT 12377-12381.

1173. Another juror lied about her alcohol problem on voir dire, and then received two DUI convictions during the trial in which the prosecutor in Price's case had some involvement. See Claim IV, supra. In fact, during guilt-innocence deliberations, this jury received notice that the prosecutor intended to institute probation revocation proceedings against her for her failure to comply with the terms of her probation. Curiously, after the guilty verdict was rendered, and while the sentencing phase was proceeding, the district attorney dropped the probation revocation proceedings against this juror. Id.

1174. And perhaps most harmful here, this same juror was involved in an incident involving unethical behavior by one of the two lead prosecutors in this trial. Neither she nor the prosecutor reported the incident to the court or to the defense. The same juror was seen outside the courtroom one day embracing the district attorney's wife, who had been present at the scene of the prosecutor/juror misconduct. See id. and Claim III, supra.

1175. These clearly prejudicial incidents of inappropriate connection to and contact with jurors would not have occurred had this case not been tried on a county where, almost literally, "everyone knew everyone". The trial court's refusal to change venue is in part responsible for these obvious instances of misconduct and juror bias.

1176. Another critical factor normally assessed in venue claims is the status of the defendant in the community. Here, though Curtis Price had family in the county, the media nonetheless described him as an Oregon man. Also, since he had spent most of his adult life in prison and was reportedly a member of the AB, it seems clear that his status in the county was that of an unwelcome outsider.

1177. Indeed, the voir dire reflects this fact. In the present case, at least forty-two

prospective jurors commented that even without direct knowledge of the prison gang, they associated the mere name "Aryan Brotherhood" with racism and/or Nazism. See RT 2134, 2250, 2254, 2260, 2280-2281, 2296, 2338, 2492, 2558, 2622, 2649, 2724, 2820, 2836, 2853, 2952, 3072, 3096, 3147, 3155, 3185, 3190-3191, 3196, 3223, 3242, 3261, 4666-4668, 5517, 5841, 5889, 6431, 6794, 6842, 6918, 6923, 6938, 6950, 7469, 7473, 7495, 7500, 8137, 8555, 9105. Furthermore, stories regarding his complaints about conditions in the local jail, his alleged assaults on jail officers, the need to shackle him in court, and the great expense of the trial were all factors that would further reduce his status in the community.

1178.    Adding to all of the above factors is the fact that this case becomes embroiled in local politics, which was itself a subject of the local media attention to this case. Here, the media reported when the Board of Supervisors took a temporary stand against voluntarily paying the cost of Curtis Price's legal defense. The prospective jurors were reminded of this by the newspaper headline on the very eve of trial regarding the "County's costliest trial." Since this was a political controversy that went directly to the pocketbooks of the prospective jurors, rather than one which involved a competition between two politicians for a particular office, this should be considered one more strong factor in favor of a change of venue.

1179.    Another problem that certainly affected the fairness of the trial was the complete inability of the small-county jail to deal with the security problems involved in the long-term

housing (3 years) of an alleged important member of the AB.[200]  County jails in urban areas or areas accustomed to state prison inmates could have handled such security challenges without particular difficulty, but the Humboldt County jail could not.  Indeed, that was obvious even before the jurors were sworn.

1180.  This inability of the jail to deal with a prisoner like Price rendered the trial unfair for many reasons.  Price had to spend over three years dealing with constant adverse living conditions while engaged in a complex legal battle for his life.[201]

1181.  The impact of the jail conditions on Price's mental state is set forth in Claim X in this petition.  Defense counsel DePaoli and Klay filed declarations in support of Price's effort to obtain habeas corpus relief, noting that they had to spend so much time combating adverse jail conditions, that serious interference with their ability to prepare for the capital trial occurred.  CT 3846.

1182.  Although Price managed to behave properly for an extended period of time despite the adverse conditions, eventually the stress resulted in assaultive behavior that led to discipline and only worsened the relationship between him and many of his jailors.  These incidents led directly to the shackling order which in turn led to Price's decision to voluntarily

---

[200]  This factor does not require this Court to determine the extent to which Price may have been at fault compared to the extent to which jail officials may have been at fault.  Whoever was at fault, the inescapable fact is that Humboldt County did not have adequate facilities to house the person they perceived Curtis Price to be for over three years.

[201]  Once again, the issue of blame need not be resolved.  Whether it was justified or not, it cannot be denied that three years of living in isolation from other inmates, going for many months at a time without ever being in sunshine, and having to wear chains during virtually every movement outside of one's cell, would not promote a state of mind conducive to withstanding the stress of a capital trial.

absent himself from most of the guilt phase of the trial. In addition to the impact that his absence had on the fairness of his trial, the assaultive jail incidents that occurred after months of oppressive treatment were used during the penalty phase as evidence in aggravation.

1183. In sum, the conditions to which Price was subjected during more than three years of pre-sentence confinement made a fair trial impossible. Most or all of these easily foreseeable problems could have been avoided entirely if venue had been changed to a county where dealing with inmates perceived as high security risks was routine, rather than unprecedented.[202]

1184. In sum, there were compelling reasons requiring a change of venue in this case. The failure to move the venue of petitioner's trial violated petitioner's rights to due process, to a fair trial by a fair and impartial jury in a capital case, and to effective representation, as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution, and entitle him to federal habeas corpus relief on this Claim.

---

[202] Notably, a change of venue to Los Angeles County would have not only resolved the jail security issue, but would have also removed the vicinage problem discussed elsewhere in this petition. (Of course, the motion to change venue out of Humboldt County would have constituted a waiver of any vicinage issue with regard to the offenses that occurred in Humboldt County.)

# CLAIM XIV

## THE TRIAL COURT ABUSED ITS DISCRETION AND VIOLATED MR. PRICE'S CONSTITUTIONAL RIGHTS IN ORDERING THAT HE BE SHACKLED THROUGHOUT THE TRIAL PROCEEDINGS

1185. The trial court's decision to shackle petitioner throughout his trial violated petitioner's rights to due process, a fair trial, the effective assistance of counsel, and his right to be free from cruel and unusual punishment, as guaranteed by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

### A. Factual and Procedural Background

1186. Before the trial court ordered Curtis Price to be chained to a chair while in court, Price had made hundreds of court appearances without the slightest indication of improper courtroom behavior. The case began with an initial complaint alleging only the Pat's Market robbery; Price attended a preliminary examination and 18 Superior Court proceedings without incident. Then a new complaint was filed, adding the Elizabeth Hickey murder allegation. The preliminary examination required 13 court days after 15 miscellaneous Municipal court appearances. Superior Court proceedings included 12 more court appearances. Finally, the last complaint, adding the Richard Barnes homicide, the conspiracy charge, and several new robbery charges, was filed. An 18 day preliminary examination followed 14 other Municipal court appearances, and Price appeared in Superior court on approximately 50 other occasions before the trial began. During jury selection and hearings on various motions, Price made another 60 court appearances without incident.

1187. During these 200 court appearances, the subject of shackling was raised

occasionally, and Price was shackled during some early proceedings with no hearing ever held to justify it. For example, early in the second of the three preliminary examinations, defense counsel noted that Price had caused no problems in court, and he asked that Price be allowed to have both hands free. CT 601. The magistrate's response was to note that he left the matter of courtroom security entirely in the hands on the Marshal's office. CT 602, lines 1-5.

1188. The magistrate set forth some historical facts, noting that Price was handcuffed to a belly chain, with one hand free during court proceedings. The magistrate noted that a leg chain, no longer in use, had been used earlier. The magistrate did not dispute defense counsel's representation that Price had demonstrated throughout the proceedings that he was able to behave appropriately. CT 602.

1189. The subject was raised again early in the Superior Court proceedings on the final Information. On October 30, 1984, the defense filed a motion for reduced security at trial. CT 3609-3618. The motion stated that during the preceding Superior Court proceedings, Price had typically appeared with one hand restrained by a belly chain, and with his feet shackled. On the other hand, it was noted that during the entire last preliminary examination (which lasted eighteen court days), Price's hands and feet were not shackled and no incidents or problems occurred.[203] CT 3610.

1190. The motion also noted that since he was jailed March 3, 1983, Price had cooperated fully with jail officers, courtroom bailiffs, the judge, and other jail inmates. No

---

[203] Defense counsel Klay referred to this as the second preliminary examination. It is obvious she was referring to the second preliminary examination in which defense counsel Klay and DePaoli represented Price, and in which the murder charges were at issue. That was actually the third preliminary examination in which Price had participated.

efforts had been made to escape, although the opportunity had been available and inmates housed next to him had, in fact, escaped. Defense counsel added that Price had undergone a Marin County trial in 1980, which lasted several months and involved many witnesses who were San Quentin inmates; no problems or incidents had occurred. CT 3610-3611.

1191. The trial court eventually responded favorably to this motion. On March 12, 1985, the court ruled that:

> providing Price continues to cooperate, he will appear before the court unshackled, unfettered and in civilian clothing. Obviously, if he is either vocally or physically disruptive during the court proceedings, he will be deprived of the privilege to appear in court until further order. RT 1357-1358.

1192. Subsequently, on June 10, 1985, the prosecution questioned whether the courtroom being used was sufficiently secure. The court raised some concern about the number of expected witnesses who were state prison inmates, but expressly agreed with defense counsel that Price himself had been entirely cooperative. RT 1856. A few days later, the court did issue a ruling moving the trial to a more secure courtroom. CT 6006-6007. The court also instituted stringent electronic screening processes at the entrance to the courtroom, subjecting even prospective jurors and counsel for both sides to thorough searching and electronic screening. RT 2159-2160; see also CT 7757, lines 10-13. These measures are relevant to the propriety of shackling Price in that they provided an extra measure of certainty that no organized effort to escape from or otherwise disrupt the courtroom would be possible.

1193. On June 19, 1985, less than a week after jury selection had begun, the prosecution claimed Price had "engaged in an unprovoked attack" on a correctional officer and another

inmate. The prosecutor urged the court to have Price shackled while in court. Defense counsel countered that Price was being deliberately provoked in an effort to influence what was happening in court. The trial court noted that neither side had supported its claims with evidence. The court admonished the prosecutor to proceed properly by way of a formal written motion, if he could support his claim that Price had to be shackled. RT 2435-2439.

1194. The following day (June 20, 1985), Deputy Attorney General Bass orally requested a hearing, admitting he had nothing new to present and did not want to go to the trouble of putting anything in writing. RT 2475-2476. Thereafter, on July 8, 1985, the prosecution filed a written motion to physically restrain Price, attaching exhibits regarding 16 incidents which occurred between 1975 and 1980, while Price was in state prison in Montana and California. CT 6185-6211. The prosecution's moving papers referred to no incident that had ever occurred in a courtroom, and no incident that had occurred after 1980. The motion also failed to include any legal argument[204]

1195. On November 19, 1985, Price refused to come to court; proceedings began without the jury, with testimony from Lt. Doane, explaining what had happened that morning. Prior to that date, Price had appeared in court completely unrestrained and without courtroom incidents daily for five months of jury selection, opening statements by counsel, and two days of trial testimony.

1196. According to Doane, when he was ready to manacle Price for transport to court,

---

[204] The defense filed an opposition to the motion, also on July 8, 1985. CT 6178-6183. The People's moving papers noticed a hearing for July 19, 1985, but, for reasons never made apparent, no such hearing was held.

Price would not cooperate until receiving a copy of a disciplinary order. Doane obtained a copy for Price, who asked a number of questions that went unanswered. Price was manacled and the transport to the courtroom began. As they proceeded down the hallway, Price complained that the leg irons were too tight. Price was asked to turn and face the wall before the officers would approach to adjust the leg cuffs supporting the leg irons, but he refused; a struggle soon erupted causing the officers to forcibly return Price to his cell. RT 10573-10575.

1197. Both prosecutors promptly urged the court to order that Price be physically restrained in the courtroom. RT 10580, lines 23-28, and 10583, lines 23-28. The court sent Doane back to see if Price had calmed down and was ready to come to court. RT 10585-10587.

1198. Lt. Doane returned and reported that Price was sullen and aggravated, and then became responsive but irritated. He expressed a willingness to come to court, but was concerned about who would be transporting him. The conversation then deteriorated and Price expressed a refusal to go anywhere. Defense counsel Klay, who had accompanied Doane and had talked briefly with her client, expressed the view that in his present state of mind Price was not mentally capable of cooperating with the court or defense counsel. Doane noted his belief that Price would come to court if he was transported by officers other than those involved in the earlier altercation. RT 10590-10594.

1199. After a recess, court convened in the area outside Price's cell. Price said he wanted to come to court, but as he was taken down the hallway, the leg irons started binding up on him; the situation could have been corrected by lowering the pad and shackle about an inch. The officers demanded that he turn around, face the wall, and lift his leg, which would have caused him to lose his balance since he was both shackled and handcuffed. When he asked them to just make the simple adjustment without all the hassle, they grabbed and twisted him, forcing

him to face the wall. RT 10598-10599.

1200. When that occurred, Price objected and struggled, causing the officers to beat him. The judge stated he did not know who was at fault, and expressed concern about the interruption in the trial proceedings. Price explained that the shackles had been caught on a bad spot due to BB's in his legs, which were visible to the judge. Price explained that he experienced such extreme pain when the leg irons slipped off the pads that he could not walk even one more step. He noted that, in contrast to that day, on many similar occasions in the past the officers had immediately made the simple adjustment for him. RT 10599-10600.

1201. Price felt that he should be brought to court by somebody who would not harass, humiliate, and degrade him the way the officers had that morning. He believed the officers intentionally wanted to agitate him so that he would be tense, not relaxed, in front of the jury. The judge said he had been told that Price had bitten Officer St. Denis and Price responded that occurred after St. Denis tried to injure his wrist and arm.[205] RT 10601-10602.

1202. The jail session ended and court reconvened in the courtroom, without Price. The judge decided to review jail reports about recent incidents before determining whether Price should be shackled in the courtroom. RT 10605. The prosecutor asked the court to consider all of the administrative findings on past disciplinary incidents, attached to the motion filed months earlier. He opined that such findings were final and that the defense was estopped from disputing them now. Defense counsel strongly disagreed and noted that the prosecutions' exhibits presented a one-sided view of many of the incidents. RT 10608-10610.

---

[205] In subsequent testimony, St. Denis acknowledged that he had Price in a modified arm bar hold when the biting occurred. The bite did not draw blood. RT 10707.

1203. The following morning Price was brought to court in jail garb and was chained while in court. RT 10615. A hearing was held at which several witnesses testified about jail incidents.

1204. According to Humboldt County Correctional Officer John Sylvia, on October 26, 1985, Price got upset because he believed Sylvia was watching him while he was getting dressed. Price brought his face to within six inches of Sylvia's face and said it was impolite to stare. Price blew cigarette smoke in Sylvia's face and flicked ashes on his leg. Officer Hartson then told Price he owed Sylvia an apology, leading to a harsh verbal exchange, and culminating in Price striking Sylvia once on the left side of his jaw. The incident quickly ended, with Price and Sylvia shaking hands, and Sylvia apologetically stating he would have to report the assault. RT 10619-10622.

1205. A few weeks later, on November 17, 1985, Officer Sylvia went to lock Price down and Price complained that Sylvia had an angry manner. According to Sylvia, Price said that if Sylvia met him with anger, he would react with anger, and if Sylvia pushed him, he would push back. This led to a verbal exchange during which Price told Sylvia that Sylvia "could give me head." RT 10632-10633.

1206. Officer Sylvia's testimony was interrupted when defense counsel started asking him about the timing of the delivery of the notice of disciplinary action to Price. The prosecutor objected to such questions on relevance grounds, and defense counsel responded that the defense position was that the jail officials were trying to provoke Price by intentionally serving him with disciplinary notices just as he was ready to leave for court in the morning. Defense counsel argued this should be considered as a mitigating factor in assessing the significance of Price's reaction. RT 10636-10637.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

- 509

1207. In response, the court noted, "I don't know that I can find any mitigation that would allow a prisoner to hit a jailer." Because the judge rejected the notion that even intentional provocation could excuse an inmate's act of striking a correctional officer, the prosecutor's relevance objection was sustained.[206] RT 10637.

1208. As questioning continued, Sylvia acknowledged that he had never previously testified at any disciplinary hearing about the incident. It was Sylvia's understanding of jail policy that an inmate's refusal to sign the disciplinary notice when it was served on him constituted an admission of guilt, obviating the need for a hearing. RT 10637-10638.

1209. Officer Larry Wolfe testified that between 8 and 9:00 a.m. on November 19, Price started talking to him while in the shower. Unable to hear Price with the water running, he opened the gate area and began talking, whereupon Price clenched his fists, ran at him, and tried to strike him, clipping the officer's chin as he ducked[207] According to Wolfe, Price threw another punch that Wolfe avoided, then backed off as Wolfe regained his balance. RT 10653-10654.

1210. Wolfe's account was contradicted by two inmates. Brian Selby testified that Wolfe walked in on Price while Price was taking a shower and just kept talking while Price

---

[206] The trial court apparently misunderstood the defense position. Regardless of whether such provocation would be a defense in a prosecution for assaulting an officer, it was certainly relevant on the key issue of whether this incident was at all indicative of the behavior that could be expected while Price was in court.
[207] Wolfe noted that before the attack, Price had asked him to get Sgt. Gray and Officer St. Denis. RT 10654. Wolfe was aware of the fact that there had been some type of altercation earlier that day, and acknowledged that Price might have been asking him to get a copy of the latest notice of disciplinary violation from Gray and St. Denis. RT 10674. After the attack, Price said, "Now will you go get Sgt. Gray and St. Denis." RT 10668.

repeatedly asked him to leave. Eventually Price came out of the shower and pushed Wolfe out of the shower area, but did not strike him. RT 10736. Inmate Edward Lee Taylor testified that he heard the officer go into the shower and start talking to Price, who responded, "Do you mind? I am taking a shower." Wolfe then said, "Well, I want to talk to you." Price repeated that he was taking a shower, Wolfe repeated that he wanted to talk to him, and then Price pushed Wolfe. RT 10739-10740.

1211. Wolfe acknowledged entering the maximum security area alone even though policy was not to enter unless at least two officers were present. Wolfe agreed that before the attack Price might have told him to get out of the shower area, but things happened so fast Wolfe was not really sure what had been said. Wolfe conceded he would have been able to hear Price if he had just opened the shower door without actually entering the shower area. RT 10658-10661.

1212. The prosecutor again objected on relevance grounds when defense counsel asked about Price's lack of exercise. RT 10662. Defense counsel repeated his theory that the jail personnel had intentionally provoked Price hoping to interfere with his ability to attend his own trial. Once more, the judge sustained the objection, indicating his belief that all that was relevant was that Price had struck an officer, but then the judge changed his position, noting that when Officer St. Denis testified, he would allow questions about deprivation of exercise. RT 10662-10664.

1213. Wolfe acknowledged that Price made no effort to escape despite the fact that if Price had overpowered him, he could have taken Wolfe's keys and walked out the front of the jail. RT 10671, 10679, 10685. Wolfe understood that Price's behavior must be considered in the context of having spent two-and-one-half years under very adverse conditions. RT 10678-10679. Wolfe believed Price was extremely intelligent and generally rational, but that his state

of mind on the preceding day had been totally irrational. RT 10685-10686.

1214. Officer Brent St. Denis noted that as a result of the incident between Price and Officer Sylvia disciplinary action had been taken and Price had been deprived of exercise since October 29, 1985. RT 10689. St. Denis also reiterated his description of the events of the preceding day, when Price complained his leg irons were too tight, refused to turn and face the wall for the adjustment, and became assaultive when the officers tried to move him forcibly. RT 10690.

1215. St. Denis acknowledged that it may have been as long as two months since Price had been allowed fresh air. RT 10694. The transport of Price that morning had gone smoothly, and when the pads slipped, as they commonly did, St. Denis bent down and replaced them without requiring Price to turn and face the wall. RT 10695. The court then noted for the record that there was no doubt about the fact that Price had BB's imbedded in his leg, and that they were painful. RT 10698.

1216. St. Denis acknowledged that on the morning of November 19, he and Officer Gray had delivered a notice of disciplinary action to Price which had been prepared two days earlier and which pertained to the incident wherein Price had told Sylvia, "If you push me, I will push you." RT 10699-10700. St. Denis believed this constituted a threat, because Price's interpretation of an improper push might not be the same as an officer's interpretation would be. RT 10700-10701.

1217. When defense counsel asked St. Denis if he had ever asked Price what he meant by that statement, the officer responded, "I really don't care what he means by that." RT 10701, line 2. Nonetheless, St. Denis considered this a major violation and made the determination that Price should be punished by fifteen days loss of commissary, visiting, recreation, and phone use,

and that he should be locked down. RT 10701. St. Denis knew that Price had lost these privileges in a previous disciplinary action, and was due to get them back on November 18. St. Denis also acknowledged that exercise benefited maximum security prisoners psychologically and stabilized their ability to get along with others. RT 10703-10704.

1218. St. Denis acknowledged no disciplinary hearing occurred on the incident with Officer Sylvia, or on any of Price's last several disciplinary actions. St. Denis' recommended punishment was put into effect when Price refused to sign because St. Denis believed there was no need for any hearing if the inmate either accepted the action or refused to sign. The court noted that Price had, in fact, signed the form after writing on it, "I wish to read the report. If I am going to sign and check this." RT 10711-10713.

1219. St. Denis considered that the same as a refusal, noting that Price never signed where he was supposed to and liked to play games. St. Denis did not believe he was required to allow an inmate to sign the form in any manner the inmate wished.[208] When defense counsel asked what was wrong with providing the inmate with an opportunity to read the officer's report, St. Denis responded, "It's not our normal procedure." RT 10713. When pressed further for reasons, he explained, "I've never done it. I don't know anybody that -- any classification officer

_____

[208] The form in question was received in evidence as Court Exhibit 86. It noted the date, time, and type of incident, then set forth the recommended punishment, and then limited the inmate to the options of checking one of two boxes and signing the form. The first box was accompanied by the printed statement, "I accept the action to be taken and do not wish to appear before the disciplinary committee for a hearing." The second box was accompanied by the text, "I wish to appear before the disciplinary committee to present a defense to the alleged rule violation."
Apparently, what troubled St. Denis so greatly was Price's position that he should be allowed to review the officer's report first, and then decide whether he wanted to accept the action or request a hearing.

that's ever done that." RT 10714.

1220. Defense counsel continued to probe for some reason behind this policy, and St. Denis explained, "that's my personal -- personal feeling. I'm not going to give them to any inmate, a report." RT 10714. The judge then sustained the prosecutor's objection to further pursuit of this line of questioning, noting that Price might have cause to complain about the jail regulations, but that was not the purpose of the present hearing. RT 10714. St. Denis elaborated that his policy was to give an inmate only one opportunity to sign the form before the recommended punishment was put into effect. RT 10716.

1221. As the hearing ended, the court asked Price what his position would be if ordered restrained in the presence of the jury. Price was not prepared to answer and he would have to seek advice from his attorneys. RT 10746-10747. Defense counsel offered into evidence a three page statement written by Price, and the prosecutor stated he had no objection to the court considering it. RT 10749-10751. The statement, received as Court exhibit 92 (CCT 1718-1720), reasonably explains Price's determination that the jail personnel not "interfere with my making a good showing in front of the jury."

1222. Price believed he did nothing to justify use of the chains on the way to court, and he pleaded for the right to come to court without being chained like an animal. He agreed that if he then acted improperly without provocation, it would be appropriate to shackle him. He displayed a clear understanding of the importance of the impression the jurors received from their observations of him in court. He noted that if his appearance conveyed a positive impression, the jury would be receptive to other positive aspects of the defense position, regardless of whether he testified. He stated he would testify only if the jury was able to see him in court throughout the proceedings, and that he would not leave the courtroom and then return months

later to testify. He reiterated that he would not allow himself to be seen by the jury after being subjected to "manhandling and rough stuff after being triple chained & shackled and defenseless." CCT 1718-1720.

1223.    The following day, November 21, 1985, the trial court ordered Price restrained in court throughout the remainder of the trial. RT 10756-10762.    Expressing a belief that Price was an "intelligent, thoughtful, knowledgeable human being," who "refuses to conduct himself in accordance with the rules and regulations of the jail," the court concluded that Price's problems with jail personnel had caused a disruption in the courtroom proceedings. RT 10758.    The court concluded Price was conducting himself in a threatening and abusive manner toward jail personnel, for the reason that, "he feels he is being treated like a dog and, therefore, he will conduct himself in that fashion apparently." RT 10760.

1224.    The court recognized Price had been allowed to appear in court without restraints since March, 1985, but concluded that his recent behavior in the jail, and his entire record in the jail and during previous prison commitments caused the court "to have immediate concern for the future safety of jail personnel...." RT 10761.    The recent conduct also caused the court to feel "concern for the safety of court attaches, jurors, and witnesses." RT 10761.    The court stated it would no longer rely on promises to behave made in court, and concluded that the recent conduct had "disrupted this court as surely as if Price had attacked someone in this courtroom." RT 10761.

1225.    The actual shackling order was made as follows:

Price will be, from this point forward, shackled to his chair in such

a way that the jury will be unable to see the shackles.    The belly

chain will be locked to the chair.    His hands will be free.    And the

fashion that it will be done will be unable to be observed by the

jury. He will be placed in that position both before the jury comes

in and kept there until they are out so that they will not know.... If

Price physically resists transportation to court, he will have the

choice of either being brought to court in a wheelchair to protect

his body from being harmed and his legs from being pained or if

he resists being seated in that wheelchair, then, the court will

consider that a waiver of his personal presence has been made by

him and that waiver of his right to be present in this court.

RT 10762-10763.

1226. At the same time, the court fully recognized that there had been serious violations

of federal constitutional rights in the manner in which the jail personnel had dealt with allega-

tions of misconduct. The court stated:

All present disciplinary punishment shall cease at this point in

time. The imposition of discipline without a signature waiving a

hearing or without a hearing is simply not due process. If Price

refuses to sign, a hearing should be held. And he is entitled to be

provided copies of the incident reports which cause the institution

of any disciplinary hearing. RT 10766.

1227. The court then asked Price if he would comply with the order. Price responded

that he had not had time to think about it. The court insisted on a yes or no answer, but Price re-

fused to give one without time to reflect. The court then called a forty minute recess to give

Price an opportunity to make his decision. RT 10767, CT 8875-8876.

1228. After the recess, Price stated that he had made "hundreds of court appearances without chains and had never disrupted this court or any other court." He made it very clear that he wanted to be at his own trial, but if he had to appear "in chains, like a slave or an animal, even though I never caused a problem in this court, then you'll have to do that without me." Price believed that to appear under such circumstances would be the same as announcing to the jury that the judge believed he was guilty. RT 10769

1229. The judge stressed his intention to see that the shackles would not be visible unless Price made them visible. Price responded, "By not standing when everyone else does, like I have been all along? There's no way they're not going to know I'm not (sic) chained." The judge offered no response to Price's cogent point, remarking only that Price had not been asked to talk. The court rejected Price's attempt to apologize, stating that such interruptions would result in his removal from the courtroom.[209] RT 10770.

1230. After the exchange with Price, the court called for the jury and told Price he could remain, shackled, or he could leave. Price chose to depart, which the court viewed as a voluntary waiver. RT 10771. However, after Price returned to his cell, the judge noted some concern about proceeding without his presence. The prosecutor opined that in a capital case, the defendant could not voluntarily absent himself; he believed the defendant should be forced to appear in shackles and then could be ordered removed only if he was disruptive. RT 10773.

1231. After some discussion, the court had Price brought back and questioned him to

---

[209] Price subsequently reiterated his belief that the jurors would know he was chained even if they could not see the chains, and that once they knew that, they would blame him for every delay that had occurred in the trial. RT 10779-10780.

find out whether he would disrupt the proceedings if the court forced him to remain in shackles in the presence of the jury. Despite the judge's repeated questioning, Price would only say that he would not voluntarily appear in court in chains, but he declined to take a position on whether or not he would disrupt the proceedings. The court then came to the conclusion that it had no choice but to keep Price in court. RT 10778-10781.

1232. Price was sent back to his cell to dress for the jury, but Lt. Doane reported back that Price was making no effort to dress. RT 10781-10783. The prosecutor urged the court to have Price brought in front of the jury in jail clothes and shackles, but the court concluded that it would be inhumane to force Price to come to court in shackles. RT 10786-10787.

1233. Although the court was still not certain whether it had the power to proceed in Price's absence when his resistance had been only passive, the court elected to proceed.[210] The court stated that Price could return whenever he was willing to submit to the shackling. RT 10787-10788. The jury was told that Price was not present and that they were to draw no inference for or against him due to his absence. RT 10792. The jury did not see Price again until, after seven months of trial, he appeared during the penalty phase.

**B. The Order That Petitioner Wear Shackles In Court Throughout His Capital Trial Proceedings Violated Petitioner's Federal Constitutional Rights**

---

[210] A few days later, the court reiterated its ruling and rationale in a written order. The order noted that Price had apparently determined that his lack of presence was less prejudicial than would be his presence in hidden shackles, and that Price's trial counsel apparently agreed with that position. The court noted that bringing Price to court forcibly would create a risk of injury to Price and to correctional officers. The court concluded Price should not be forced to participate in his capital trial if he chose not to participate. CT 8930-8936.

1234. An unjustified shackling order impinges on several federal constitutional rights protected by the Fifth, Sixth, and Fourteenth Amendments. Because of the interference with the basic fairness of the trial and the dignity rights of the defendant, due process is denied. See e.g., Estelle v. Williams, 425 U.S. 501, 503-04 (1976); Duckett v. Godinez, 67 F.3d 734, 747-48 (9th Cir. 1995). There is also inevitable interference with the exercise of the right to testify in one's own behalf. Because the defendant is made to appear as a violent person likely to commit the offenses with which he is charged, there is interference with the right to be free from conviction except on proof beyond a reasonable doubt. Finally, a shackling order in a capital case violates petitioner's right under the Eighth Amendment to be free from cruel and unusual punishment. See Elledge v. Dugger, 823 F.2d 1439 (11th Cir. 1987) (questioning whether, in a capital case, it can ever be constitutionally consistent with the Eighth Amendment to shackle a defendant in the presence of the jury).

1235. The record clearly reveals that the trial court's shackling order was unjustified. Indeed, it is beyond dispute that, in terms of the actual concerns of the present trial court, the shackling order could only be counter-productive. The record thoroughly establishes that, during his long stay at the Humboldt County jail, when Price was treated in a civil manner, he reacted in a civil manner. On the other hand, when he was treated like an animal, he behaved aggressively. Recognizing this fact does not require making a decision whether Price's misbehavior could or should be condoned. Even if one has no sympathy for Price's plight, the fact remains that the evidence unmistakably demonstrates that on each occasion of an escalation in the harshness or lack of respect with which Price was handled, there was a corresponding escalation in his

reaction[211]

1236. Thus, when Price was transported within the jail without leg irons and belly chains, he never once misbehaved or did anything to take advantage of the situation. When he was shackled, he became irritable and disrespectful toward his jailers. When he was shackled and treated roughly, he became verbally abusive, or occasionally violent. When he perceived shackling as unfair and unwarranted, he became especially sensitive and easily provoked. In such circumstances, an order that he be shackled while in court, when he had never once misbehaved in court, could only increase, not decrease, the probability of inappropriate behavior.

1237. Indeed, the point is even clearer when the precise problem with which the court was concerned is considered. That problem was the lack of cooperation and the violent outbursts by Price while he was being transported to court. But the measures taken by the court did nothing at all to deal with that problem. If Price was determined to be uncooperative or violent on the way to court, ordering that he be shackled in court would not lessen his ability to misbehave on the way to court. The trial court's actions could only add to the frustration that caused Price's unacceptable reaction in the jail.

1238. With regard to Price's likelihood of violence in court, Price's behavior pattern after two-and-one-half years in the county jail suggests his jail behavior was not related to his conduct in court. While in jail or on the way to court, if he (rightly or wrongly) perceived his treatment as too rough or otherwise unreasonable, he reacted sharply. But throughout a long series of such events, he never had any problem making a distinction between events in the jail

---

[211] Importantly, however, even on those occasions when Price reacted angrily to the manner in which he was treated, he still was able to fully control his behavior in the courtroom.

or during the obviously painful (emotionally and physically) march to court, and events in the courtroom.

1239. Indeed, even Deputy Attorney General Bass recognized this. While arguing to the court that Price had no right to voluntarily absent himself from the courtroom, so that he should be forced to appear, Deputy Attorney General Bass stated, "he's too smart to act out in front of the jury. He may stalk out of here with his feelings hurt, but he's not dumb." RT 10775, lines 10-12; emphasis added.)

1240. Notably, Bass' clear concession that Price was "too smart to act out in front of the jury" demonstrates fully that the prosecution knew all along that no necessity for shackling existed; instead, the prosecutors' behavior consistently shows their real purpose in advocating chains was to prejudice Price by having him appear in front of the jurors restrained. When Price's unexpected preference to stay in his cell for the rest of the trial frustrated that goal, the prosecution argued that Price must be forced to appear in court in shackles.

1241. The only problem with which the court was concerned here was Price's poor relationship with his jailers. The unique aspect of the present case is that in regard to the specific incident that sparked the shackling order, the trial court acknowledged there was merit in the claim that Price was in the right and his jailers were in the wrong. This is not to say that Price was necessarily justified in engaging in physical violence, though the record in no way establishes that he, rather than the jailers, should be faulted for the escalating problems. Rather, the point is that the record demonstrates that the frustration which led to the explosion of Price's anger was a direct result of the Humboldt County jail practice of handing him notices of disciplinary action, and then requiring him to either immediately sign the notice and demand a hearing without ever receiving reports supporting the allegations, or admit guilt and waive the

right to any hearing.[212]

1242.  Whether coincidental or intentional, these notices were often served just as Price was about to leave for court, and just as the prior disciplinary punishment was about to expire. Such practices would inevitably provoke any normal person into defiance.[213]  Most importantly, the trial court here <u>fully agreed</u> that the practice of basing a finding of guilt on a refusal to sign the disciplinary notice in the exact manner required by the Sheriff, "is simply not due process." RT 10766.

1243.  Mr. Price was also deprived of most of the opportunities normally available for interaction with other inmates and was forced to don leg irons, handcuffs, and belly chains for every movement inside the jail, for such simple matters as going to the prison commissary, the law library, the exercise room, or the telephone to call his attorney.  These extraordinary actions were originally taken with no advance notice, no explanation, and no opportunity for a hearing or

---

[212] The unfairness of this choice was exacerbated by the indefensible practice of construing any technical divergence as a refusal to sign, even if the divergence was nothing more than writing on the notice the very reasonable request for the supporting reports before making a decision. Any act of defiance or refusal to cooperate with this unreasonable procedure was taken as an irrevocable admission of guilt, leading to the immediate execution of whatever punishment was recommended in the disciplinary notice.

[213] Thus, the Court acted incorrectly in restricting defense questioning regarding whether disciplinary notices were intentionally served on Price at times chosen to maximize the likelihood of an angry response, or at times that would throw him off balance for court appearances.  Similarly, the court improperly restricted examination directed at showing that the jail regulations were unreasonable and even illegal.  Assuming the judge was correct in his repeated assertions that such factors provided no legal excuse for assaulting a guard, Price was not on trial for such assaults.  Instead, the issue was whether his behavior justified shackling him in the courtroom.  Any showing that his behavior was intentionally provoked by the jailers, or was the direct result of unreasonable and illegal jail practices, would have certainly been relevant to the issue of whether courtroom shackling was a reasonable way to discourage such behavior in the future.

defense input. Although fully occupied with preparing the defense of a complex capital case, his trial attorneys were forced to interrupt their preparation and spend considerable time challenging illegal jail practices via a habeas corpus writ before Price gained such benefits as an explanation of his classification status, the right to periodic reviews of his classification status, and the right to the use of leg pads to lessen the physical pain. Even then, the court refused to require the jail to provide any direct explanation for the unprecedented shackling.[214] It is not at all surprising that Price perceived his jailers as unfair and unreasonable.

1244. The record also shows clearly that for every legal victory Price had in court, there was an equal and opposite reaction by the jailers. For example, when the court ordered the jailers to provide Price with a reasonable amount of exercise, they scheduled exercise at the same time as court, and gave Price his choice of one or the other. See RT 4097, lines 7-17, CT 7810, lines 23-26. Indeed, the record reflects several instances prior to the shackling order in which Price waived his right to be present in court in favor of exercise. RT 5348-5350, RT 5354, lines 24-28, RT 5603, lines 4-16.

1245. Just a week before the transport incident that led to the shackling order, the judge recognized Price's plight, noting:

> But I understand Price's predicament that he needs the exercise.
> And I understand that only too well that arthritics need exercise in
> a particular way because of the physical pain that's caused to them
> by the disease. And I can imagine that the stress of being in his

---

[214] See, for example, CT 4018-4020.

position after two and a half years up there -- or nearly two and a

half years has to be more than I can imagine and at times -- I think

counsel know that I have said that <u>I wonder how Price has been

able to last as long as he has in this situation, but he does.</u> In some

ways, he may be stronger than any other person in this courtroom.

RT 10039, line 26 to RT 10040, line 9; emphasis added.

1246. Simultaneously with the exercise scheduling problems, the jailers' game-playing with disciplinary notices deprived Price of any exercise (and of the few other privileges that allowed him to occasionally feel like a human being rather than a caged animal) merely because he would not sign the notices in the manner desired by the jailers - a manner which the court found inconsistent with minimal requirements of due process.

1247. In short, the trial court recognized that (1) Price was exhibiting enormous strength in putting up with two-and-one-half years of debilitating living conditions and actual physical pain, and (2) the jailers were not treating Price in accordance with the requirements of due process of law. Such treatment inevitably makes a prisoner feel like an object or non-person, and it is clear here from Price's own pen that he felt like a caged animal.

1248. Nevertheless, when Price's frustration predictably erupted, the trial court lost all patience with its own inability to solve the ongoing problems, ridiculed Price for concern about his personal problems in the jail instead of the serious charges he faced (RT 10607-10608), and imposed the shackling order. The order was the product of frustration over the problems, rather than a reasoned decision that a "manifest need" existed. Moreover, it was neither fair to Price nor did it solve the articulated problems. Consequently, under the totality of the circumstances, the court's order deprived Price of due process.

1249. The judge expressed a hope that shackling would not be noticed by the jury, but the record does not demonstrate that such a hope was at all realistic. Aside from Price's point that his failure to stand (as he had been doing up to that point) when everyone else in the courtroom stood would be conspicuous, there were other reasons to support his view that the jurors could not be kept unaware of the shackling.

1250. Only a week before the shackling order, in his opening statement to the jury, the prosecutor had unwittingly assured that it would be impossible to disguise the fact of the shackling from the jurors. After a few introductory comments, the deputy district attorney chose to expressly note that Price rarely missed an opportunity to hold the chair for trial counsel Anna Klay. RT 10125, lines 2-3. Regardless of his purpose in making this remark, he insured that the jurors would notice that Price was already seated every time the jurors entered the room, and never once got up to hold the chair for Ms. Klay, or to show respect when the trial judge or the jurors entered or left the courtroom. RT 10770.

1251. On the other hand, if Price had to remain seated at such times when it is normal for everyone in the room to stand out of respect for the court or the jurors, Price would have been affirmatively prejudiced even if the jurors did not realize he was chained to the chair. Without knowledge of why he was not standing, the jurors would have been likely to conclude that Price was declining to stand out of contempt for the jury or the court. If the jury erroneously perceived Price as having a bad attitude, the impact would surely have been prejudicial.

1252. Further, in a short trial, a defendant could perhaps sit in a manner that would hide shackles from the jury, but it strains credulity to think that a defendant could go through seven months in a chair in court all day without making movements that would make it obvious, by

sight or sound, that his freedom of movement was heavily restricted by chains.[215]

1253. Moreover, Mr. Price was seriously prejudiced when the shackling order resulted in his absence from the courtroom until the end of the guilt phase. His conspicuous absence from the courtroom during almost the entire evidentiary portion of the guilt phase necessarily had a severe impact on the jurors. It is no answer to say it was Price's decision to absent himself from the remainder of the guilt phase. Difficult tactical decisions are a routine part of any criminal trial, but this decision was forced on the defense as a direct result of the erroneous shackling order. See Simmons v. United States, 390 U.S. 377 (1968) (defendant cannot be forced to choose one constitutional right over another constitutional right). A defendant may not be entitled to relief every time he is forced to make a difficult decision between unattractive alternatives, but he should certainly be granted relief when the necessity to make the choice was the direct product of an erroneous trial court ruling.

1254. In addition, as the Ninth Circuit has recognized, a trial court's shackling order is a valid ground for habeas corpus relief if the trial court did not first consider "less restrictive alternatives before imposing physical constraints." Duckett, supra, 67 F.3d at 748. In the instant case, the trial court failed adequately to consider such lesser restrictive alternatives, such as having non-uniformed guards present at trial to assure that no violence erupted.

1255. Finally, the court's decision to shackle Price throughout the remainder of the trial, including the sentencing phase of his capital case, violated his Eighth Amendment rights. See

---

[215] Indeed, it would be a serious challenge for any defendant to go through such a long trial, undoubtedly marked by some warm days, with his coat fully buttoned at all times so as to hide the chain around his waist.

Elledge v. Dugger, supra. Such a decision inevitably signals to the jury the judge's belief that the defendant is indeed dangerous, which is one of the factors a jury may consider in determining whether the defendant should live or die.

1256. The order requiring petitioner to wear shackles while in court during his capital case trial proceedings violated petitioner's federal constitutional rights and entitles him to federal habeas corpus relief.

## CLAIM XV

**THE TRIAL COURT ERRONEOUSLY DENIED THE MOTION TO SEVER THE ELIZABETH HICKEY MURDER AND BURGLARY CHARGES FROM THE BARNES MURDER AND CONSPIRACY CHARGES, RESULTING IN A DEPRIVATION OF FUNDAMENTAL DUE PROCESS AS GUARANTEED BY THE UNITED STATES CONSTITUTION**

1257. The trial court's refusal to sever the Hickey murder and burglary charges from the Barnes murder and conspiracy charges resulted in a fundamentally unfair trial in violation of petitioner's rights to due process, a fair trial, the effective assistance of counsel, and his right to be free from cruel and unusual punishment, as guaranteed by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

### A. Procedural Background

1258. Mr. Price filed a pre-trial severance motion. CT 3475-3492. It first contended that the conspiracy count and the Barnes homicide count should be severed from the Hickey homicide count (CT 3483-3487), and second, the robbery counts involving Pat's Market, the Triplex Theater, and the two liquor stores should all be severed from the murder and conspiracy charges. CT 3487-3491. The defense stressed that the prosecution was trying to connect unrelated crimes involving completely different witnesses in order to overcome evidentiary weaknesses with the prejudice that would result from exposing the jury to the facts of so many different crimes.

1259. The prosecution's response (CT 3524-3529) contended that it was permissible to join offenses connected in their commission or of offenses of the same class of crimes. The People argued that all of the offenses shared a common element of substantial importance:

In the instant case the common element of substantial importance

is obviously the fact that the defendant was on a mission for the

Arian (sic) Brotherhood. All of the crimes are inextricably

entwined and were committed for a common purpose, i.e., to kill

Richard Barnes and others as directed by the Arian (sic)

Brotherhood Council. CT 3528-3529.

1260. The People never explained how the Hickey murder and burglary, or the Triplex Theater robbery, which occurred a week _after_ the Barnes murder, had any connection whatsoever to the Barnes murder or to any claimed "mission for the Aryan Brotherhood."

1261. In argument (RT 263-2 to 263-20), the prosecutor repeated his claim that all the crimes were for the common purpose of murdering Barnes. RT 263-11 to 263-12. He pointed to Thompson's testimony that as part of the conspiracy, Price agreed to commit robberies in order to obtain money for weapons. RT 263-12. He noted that each of the separate offenses charged against Price was also listed as an overt act in the conspiracy count. RT 263-12; see also RT 263-14 to 263-15.

1262. The prosecutor noted that Myers had seen Price cleaning a sawed-off shotgun at her residence just before the Barnes murder, a shotgun had been stolen from the Moore home, Barnes had been killed with a .22 caliber weapon, and such a weapon had been stolen from the Moore home. RT 263-13. However, the prosecutor again failed to explain the perceived connection between the Hickey killing and the Barnes killing.

1263. Defense counsel argued that if the murder counts were severed, Thompson's testimony would be inadmissible in a separate trial on the Hickey offenses. RT 263-17 to 263-18. He noted that Myers had described nothing distinctive about the sawed-off shotgun she

claimed to have seen in Price's possession, so there was no evidence that any weapon she saw was the same as any weapon stolen from Moore. RT 263-18 to 263-19.

1264. The court denied the motion to sever apparently finding the most important factor was the question of cross-admissibility in separate trials. To answer that question, the court looked to the conspiracy count, which listed all of the other charged offenses among the specified overt acts. The court reasoned that if the prosecution had filed only a single count charging the conspiracy and listing the same overt acts, there would be nothing to sever even though the evidence that could be produced at trial would be just as prejudicial as the evidence that would be produced at a trial on all counts that had been alleged in the information the defense was attacking. CT 3629-3632.

1265. The court also accepted the theory that the conspiracy to murder Barnes included robberies and burglaries in northern California. The court concluded that the conspiracy did not end with the killing of Barnes; rather, Price was "to continue to amass weapons and money for the Aryan Brotherhood." Thus, the court found that each homicide was an integral part of the conspiracy, so that in separate trials for either homicide, evidence of both homicides would be admissible. CT 3630-3631.

1266. While expressly recognizing its duty to exercise special care in dealing with a severance motion in a capital case, the court viewed itself helpless in protecting Price from prejudicial other-crimes evidence in the event of a severance. On the other hand, the court felt a severance would greatly handicap the prosecution effort to present a coherent factual picture to the jury. CT 3631-3632.

**B. The Denial of Petitioner's Severance Motion Rendered His Capital Trial Fundamentally Unfair**

1267. A state court's denial of a defendant's motion to sever charges is a valid ground for habeas corpus relief if the refusal to sever rendered the trial "fundamentally unfair" and "hence[] a violation of due process." Featherstone v. Estelle, 948 F.2d 1497, 1503 (9th Cir. 1991); see also Panzavecchia v. Wainwright, 658 F.2d 337, 340-42 (5th Cir. 1981).

1268. The trial court erred in concluding evidence pertaining to the Hickey and Barnes offenses would be cross-admissible if tried separately. The court based this conclusion on two related reasons. First, since the Hickey offenses were listed as overt acts in the conspiracy count, the court saw no conceivable way to avoid allowing proof of the Hickey offenses in a trial for the Barnes murder and conspiracy. CT 3630. Second, the court perceived the conspiracy as lasting beyond the Barnes killing, including a continuing effort "to amass weapons and money for the Aryan Brotherhood." CT 3631.

1269. The first error was a product of circular thinking. While it is true that the Hickey offenses could properly be proved as overt acts in the Barnes conspiracy if the Hickey offenses were properly a part of the conspiracy, the trial court's statement of the situation begged the question. The trial court did not first ask whether the Hickey offenses were properly a part of the conspiracy; instead, the court accepted the pleadings without question and then moved inexorably to the conclusion that the prosecution could not be deprived of the right to prove the overt acts set forth in the information.

1270. A proper analysis would have been to first determine whether the Hickey offenses were properly pled as overt acts in the conspiracy count. If there was insufficient evidence at the preliminary examination to include the Hickey offenses within the conspiracy, then the granting

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH
- 531

of a severance motion could have easily been coupled with an order deleting the Hickey offenses from the list of overt acts set forth in the information. Such relief should be deemed implicit in the defense motion for a severance. Thus, the trial court's concern with the overt acts as pled was totally misplaced. The only real question is whether the evidence at the preliminary examination established that the Hickey offenses were in fact part of the same conspiracy as the Barnes offense.

1271. Turning to that question, the trial court concluded that the conspiracy was not limited to the Barnes murder, but included a continuing effort to obtain guns and money for the AB. However, the trial court failed to support such a conclusion with any facts. Not only is there no evidence to support such a conclusion, but the consistent theory of the prosecution was that any conspiracy to obtain weapons or money was for the limited purpose of facilitating the Barnes murder.

1272. The trial court's mistaken interpretation becomes clear in light of Thompson's testimony. Thompson was asked to describe exactly what was discussed when the AB leaders allegedly met with Curtis Price and explained the assignments they wanted him to undertake. Thompson responded initially that the discussion pertained to the "contract of Richard Barnes." CT 2653. When asked to elaborate, he added, "The procuring of weapons." CT 2653. When asked what was said about procuring weapons, Thompson explained:

> Ultimately, that he should go to Northern California and by means
>
> of robbery, burglary or association with drug dealers, procure the
>
> weapons necessary to carry out the contracts in Southern
>
> California. CT 2653; emphasis added.

1273. Defense counsel promptly noted that Thompson had used the word contracts, and asked whether Mr. Price had been given more than one contract that day. Thompson replied in the negative and defense counsel asked why he used the plural. Thompson responded, "Simply that the contract on Richard Barnes was a murder contract. The contract as it relates to the procurement of weapons would be a robbery contract." CT 2654. Thompson also explained that he used the plural term "weapons" because it was normal to have a backup weapon for a murder contract, but he acknowledged that the number of weapons that were to be obtained was left to Price's discretion. CT 2654-2655.

1274. In sum, Thompson referred only to the procurement of weapons and money needed to carry out the Barnes contract. Nowhere in his preliminary examination testimony did Thompson contend that Price was ever a part of any general conspiracy to obtain weapons or money for the on-going benefit of the AB.[216] Notably, neither in their written response nor oral argument in opposition to the defense motion to sever, did the prosecution contend that there was an ongoing contract to obtain weapons or guns, extending beyond the Barnes killing. No ongoing contract was mentioned by anybody until the trial court included it in the ruling denying the motion to sever.

1275. Indeed, the prosecution's evidence at trial verifies that any ongoing conspiracy to obtain weapons and money was not a part of its theory of the case. Certainly, had any evidence to back up such a theory existed, the prosecution would have presented it, especially after the trial court had expressly suggested it. However, no such evidence was offered.

---

[216] At the preliminary examination, Thompson was the only witness who claimed to have any knowledge regarding the scope of any alleged conspiracy.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH
- 533

1276. The only witnesses at the trial who claimed direct knowledge of the scope of the alleged conspiracy were Smith and Thompson. Smith testified that Price was instructed to handle all the preparations for the Barnes killing outside of southern California. RT 16266. Price was to go up north, supply himself with a car and the necessary weapons, and make plans for his getaway. RT 16267. This portion of Smith's testimony referred only to preparations for the Barnes killing, not to any criminal activity beyond that assignment. Subsequently, on cross-examination, Smith testified unequivocally that other than the vote to kill Sue Barnes, he was unaware of any vote by the AB council to have Price do anything.[217] RT 16288.

1277. Thompson's trial testimony was similarly devoid of references to instructions to Price to obtain weapons for any purpose beyond the Barnes killing. When asked what discussions had been held by the AB council concerning weapons, Thompson explained the concern that if Price obtained weapons in southern California, he might come under surveillance by the Department of Corrections Special Services Unit. RT 16804-16805. The council discussed sending Price to northern California to procure weapons through robberies or through drug connections. RT 16805. The context of this testimony fully demonstrates that Thompson was talking only about obtaining weapons in order to carry out the plan to kill Barnes. RT 16804-16806.

1278. In sum, the trial court conclusion that there was an ongoing conspiracy to obtain weapons and money, even after the Barnes killing, was inconsistent with the prosecution theory of the case and unsupported by any evidence. Since the denial of the severance motion was

---

[217] Smith testified that the council voted only to kill Sue Barnes; when she could not be located, Smith and Robert Griffin changed the target to Richard Barnes. RT 14653-14671.

based wholly on this erroneous conclusion, this error alone should be sufficient to require that petitioner's convictions and sentences be vacated.

1279. The arguments made above to demonstrate that the cross-admissibility theory is factually unsupportable apply equally to rebut the prosecution contention that all of the charged crimes were intertwined and committed for the common purpose of killing Barnes. CT 3528-3529. The prosecution never explained how a homicide and burglary, or a theater robbery, a week after the Barnes killing, and hundreds of miles away, could have been committed for the purpose of killing Barnes.

1280. In oral arguments in opposition to the severance motion, the prosecution noted that Janet Myers said she saw Price with a sawed-off shotgun just before the Barnes murder, and a shotgun had been stolen from the Moore residence. RT 263-13. Even assuming that the weapon Myers saw was the same weapon that was stolen from Moore (which was never proven), there is no evidence linking the weapon to the Barnes killing. More importantly, this would only justify trying the Moore and Barnes offenses together because it had nothing to do with the Hickey offenses or the Triplex Theater robbery.

1281. The prosecution argument that Barnes was killed with a .22 caliber weapon, and such a weapon was stolen from Moore adds nothing. Even aside from the speculation involved in any assumption that the weapons were the same, it provides no basis for joining the Hickey offenses. In short, neither the prosecutor's oral nor its written arguments provided any connection between the Hickey and Barnes offenses.

### 1. No Other Theory Supports Cross-Admissibility Of the Barnes and Hickey Offenses

1282. No other theory would permit proof of the Hickey offenses in a separate trial for

the Barnes offenses, or proof of the Barnes offenses in a separate trial for the Hickey offenses.

1283. There are <u>no</u> similarities between the two killings that could support any theory that one offense would be admissible in a trial for the other. Aside from the fact that the two crimes were committed at opposite ends of the state, one was an explosion-of-violence killing committed with a knife and a blunt instrument against a woman found nude while the other was a precise execution-type killing committed with a gun against a fully-clothed man. The Hickey killing was accompanied by ransacking of the room in which the body was found and by theft, while the Barnes killing involved neither ransacking nor theft of household property. In short, <u>nothing</u> about the manner of the killings suggest both were committed by the same person or pursuant to any common plan or scheme.

1284. No other theory has been suggested to make the facts of either of these offenses relevant in a separate trial for the other offense. Proof of the Barnes killing depended entirely on the credibility of Smith, Thompson, and Myers, and nothing about the Hickey offenses added to that credibility in any way. Proof of the Hickey killing was based on Price's possession of the weapons that had belonged to Hickey and Petry. Thompson's preliminary examination testimony demonstrated that he knew nothing of the Hickey killing until May, 1983, months after Price's arrest and the termination of any conspiracy, so that any information Thompson claimed to have about the Hickey offenses constituted inadmissible hearsay. See CT 2267.

1285. In sum, even assuming that Price was guilty of the Hickey offenses, nothing about those offenses is relevant to whether he was the person who killed Barnes. Similarly, even assuming that Price killed Barnes, that in no way would help a jury determine whether he was

also the person who killed Hickey.[218]  Neither the Barnes offenses nor the Hickey offenses has

any legitimate relevance in the proof of the other.

---

[218]  Even assuming that the prosecution theory that the liquor store robberies, the market robbery, and the theft of the Moore guns were all part of an AB conspiracy to obtain weapons and money to carry out the Barnes killing is accepted, then there is arguably a basis for trying all of those crimes together as part of a single conspiracy.  That theory in no way includes the Hickey offenses or the theater robbery, since they were committed <u>after</u> the goal of killing Barnes had been accomplished.

## CLAIM XVI

**THE TRIAL COURT'S ERRONEOUS EVIDENTIARY RULINGS
REGARDING THE IMPEACHMENT OF DEFENSE SUSPECT
BERLIE PETRY DEPRIVED PETITIONER OF A FAIR TRIAL
AND DUE PROCESS BY PREVENTING HIM FROM
PRESENTING A DEFENSE AND FROM CONFRONTING
WITNESSES AGAINST HIM**

### A. Introduction

1286. The trial court refused to allow petitioner to present a defense at his trial by erroneously ruling inadmissible substantial amounts of evidence demonstrating that defense suspect Berlie Petry was lying and was in fact the killer of Elizabeth Hickey, in violation of petitioner's rights to a fair trial, due process, confront the witnesses against him and present a defense, as guaranteed by the Fifth, Sixth Eighth and Fourteenth Amendments to the U.S. Constitution.

1287. The evidence connecting Price to the murder of Hickey was extremely slim. It consisted of a showing that there was some kind of a business or social relationship between Price and Hickey, proof that after the killing Price was in possession of weapons that had been in the Hickey home shortly before she was killed, and testimony from Michael Thompson regarding statements allegedly made by Price.

1288. The defense to the Hickey killing focused on the many reasons to discount the testimony of Thompson, the indications that the weapons were obtained as part of a business arrangement rather than by theft, and the _absence_ of evidence that would be expected if Price had killed Hickey. For example, none of Price's fingerprints were found at the scene, no murder weapon was ever connected to him, no fiber or serological evidence connected him to the crime

scene and no eyewitness placed petitioner at the crime scene on the day of the murder. See RT

11853-11854, 17477-17478, 14505-14506.

1289. Another major aspect of the defense against the Hickey killing was to show that substantial evidence indicated it was far more likely that Petry committed the crime after the guns were already gone from the residence. The evidence presented in that regard, described in detail at pp. 53-67 and 92-97 of the AOB statement of facts, incorporated herein by this express reference[219], can be summarized as follows:

(1) Petry was obsessed with Hickey, had never been intimate with any other woman before or after her death, and he regularly called her from work every hour on the hour, even though his working hours were from midnight to 8:00 a.m.

(2) Hickey regularly engaged in short term intimate relationships with a large number of different men, sneaking out to bars and back home in between Petry's hourly phone calls.

(3) Petry once returned home to find Hickey in bed with another man, and contracted a venereal disease from Hickey on at least two different occasions.

(4) Evidence, consisting of a bizarre diagram drawn by Petry and letters written by him, demonstrated his obsessive preoccupation with problems in his relationship with Hickey.

5) People who knew Hickey and/or Petry believed Petry had beaten Hickey on

_____

[219] A copy of Mr. Price's AOB on file in this matter.

prior occasions.

(6) The relationship between Petry and Hickey displayed in almost every significant respect the classic symptoms of "domestic homicide syndrome," which applies to relationships that end in fatal violence between intimate couples.

(7) When Petry arrived at work hours before Hickey was killed, he was unusually nervous and irritated.

(8) Although Petry's work required him to punch time clocks every few minutes, there was a gap of forty minutes near the time Hickey was killed which could not be accounted for except by Petry's claim of a boiler breakdown, which, in turn, was not recorded on boiler operation records or recalled by the employee who attended to boiler problems.

(9) Petry was the person who reported finding Hickey's body, behaving oddly when he did so: he ran several blocks to a telephone to call the police instead of using a phone in the house, at a neighbor's home, or at a closer store, and he left two small children unattended in the home with their deceased mother's body while he went to make the call.[220]

(10) When Petry was questioned by the police after the killing, he said a number of unusual things.

(11) Weeks after the killing, Petry moved out of state.

---

[220] Indeed, if Petry was not the assailant, for all he knew the assailant was still on the premises when he left the two girls alone there.

(12) When Petry was cross-examined by the defense, he displayed a remarkable inability to recall even simple details or events or his own prior statements and testimony.

1290. Although the defense was able to make this substantial showing that Petry was a more likely suspect than was Price, crucial additional evidence which would have added strongly to the defense effort, and would have demonstrated that Petry's true personality was far different from what he conveyed in the courtroom, was inexplicably excluded. While some examples of Petry's bizarre writings were seen and heard by the jury, the most compelling examples were not. Tape recordings of Petry's detailed interviews with the police were received in evidence, but the jurors were improperly left on their own to determine which portions of the tapes they would hear. Dr. Martin Blinder was allowed to testify in regard to the general indications of domestic homicide syndrome, but he was improperly precluded from expressing his opinion regarding the significance of specific items written by Petry.

1291. Furthermore, the defense was not allowed to show that before her death, Hickey had made reports that Petry had beaten her, that she wanted to leave him, and that she feared he would kill her if she tried to leave him. Although Petry was allowed to portray himself as a devoted and loving common-law husband, the defense was not allowed to show that he permitted Hickey's small children to live in disgustingly unsanitary conditions.

1292. Finally, even though Petry had failed two polygraph examinations administered by prosecution officials, the court refused to allow the defense to even attempt to make a foundation for the reliability of the polygraph evidence.

## B. The Trial Court Erroneously Precluded the Use of Many of Berlie Petry's Prior Writings

### 1. Factual and Procedural Background

1293.   Petry was a most unusual witness who presented the defense with very difficult problems.   Immediately after the discovery of Hickey's body, Petry gave the police extensively detailed statements about that discovery and about his relationship with Hickey.  He also testified at length at two preliminary examinations.  However, when he testified at the trial, he displayed a truly remarkable inability to recall almost anything of significance.   When presented with his own prior statements or testimony in order to refresh his recollection, he generally indicated a total lack of recognition, precluding their use as prior inconsistent statements.[221]

1294.   The defense also wanted to question Petry about his prior writings, many of which were quite bizarre.[222]   The trial court agreed that the writings offered by the defense had indisputably been authored by Petry.  RT 13251.  However, after concluding that the writings constituted hearsay, the court was uncertain whether any hearsay exception would apply.   RT 13251-13252.  The judge instructed defense counsel to seek a hearing before attempting to use any of the writings.  RT 13252.

---

[221]  For example, on one occasion defense counsel asked Petry whether he had told an officer that he tried to hide the boiler problem at work.  Petry first denied, without qualification, ever trying to hide the boiler problem.  Defense counsel then showed Petry a transcript of a statement, made by Petry to an officer, saying that he had tried to hide the boiler problem.  Petry claimed that the transcript did not refresh his recollection at all, but he also changed his testimony to say that he did not recall whether he had ever made such a statement to an officer.  Because Petry did not recall what he may have said to the officer, the trial court concluded that the prior statement could not qualify as a prior inconsistent statement.  RT 13621-13626.

[222]  These writings are reproduced at CCT 1784-1856.

1295. Subsequently, defense counsel showed Petry Court Exhibits 119-A, B, and C, a short story and outlines which Petry recognized as his own handwriting. However, Petry did not recall writing them, and did not remember if he had ever written any short stories. Defense counsel noted they were well-written and should be admitted to prove that Petry was not as dumb as he appeared to be on the stand. RT 13612-13615. The court agreed that the handwritten portions could be admitted to show the capabilities of the writer, but not for the truth of any matter contained in the writings.[223] RT 13631-13635, 13641.

1296. Petry then testified that he had never told Hickey he had stopped loving her, and he did not recall ever giving or sending her a letter saying that. RT 13644-13645. He was shown Court Ex. 119-D (CCT 1825-1832), which he recognized as his own writing, but he was unable to recall writing the words in the documents and could offer no explanation why he might have written them.[224] RT 13651-13654. After Petry testified that Hickey had never bit, kicked or struck him, the court agreed to admit the portion of the writings which said he had been kicked, hit, and bitten. RT 13654, 13662; Court Ex. 119-E at CCT 1833-1835. However, even though Petry denied ever being accused of molesting Hickey's children, the court would not admit the portion which indicated Petry believed he had been accused of such abuse. RT 13656-13661; Court Ex. 119-E. The court explained that it was concerned about the lack of any time reference for Petry's writing. RT 13661-13663.

---

[223]  Thus, a portion of Court Exhibit 119-B was copied, remarked as Exhibit 119-B(1), and admitted (CCT 1795-1812); 119-A and C and the rest of 119-B were not admitted. RT 20222-20223; see CCT 1788-1794, 1813-1824.

[224]  Defense counsel was permitted to read to the jury an excerpt in which Petry wrote to Hickey, "my love for you is gone," because she had chosen to hear sensuous sounds from other men. RT 13653, Court Exhibit 119-D, at CCT 1825-1831.

1297. Petry acknowledged that a list of words and their meanings was in his writing. RT 13682-13683; Court Exhibit 119-F at CCT 1836-1837. He did not recall if he got the definitions from a dictionary and did not recall writing the words. RT 13683-13684. Next, Petry was shown a diagram which he recognized as his own writing. RT 13692; Court Exhibit 119-G at CCT 1838-1845. However, he could not explain what it was or why he had drawn it, and he could not recall diagramming Hickey's life and all the bad points that had caused him pain, suffering, hurt, and sorrow. RT 13691-13692. Petry was questioned further about the diagram outside the presence of the jury, but still could not recall anything about it. RT 13694. The judge then recessed for the evening, strongly admonishing Petry to study the diagram:

> THE COURT:   Well, I would suggest you spend some time studying this and see if you can remember. We are not here to collect 'I don't remember's.' If you drew it, you must remember something about it. I would like you to look at it and spend some time studying it and see if you can't remember why you drew this."   RT 13695; emphasis added.

1298. On the following day, Petry still could not recall anything about the diagram.[225] RT 13700. The judge then decided that the diagram would be admitted to refute Petry's claim

---

[225] Curiously, although he had no recollection of the diagram or Hickey's reaction to it, Petry was somehow able to conclude it did not anger Hickey. RT 13711, 13726, 13731.

that he had never made such a diagram.[226] RT 13703.

1299. Petry was next shown Court Exhibit 119-H, which he acknowledged was his own writing, and which appeared to be a communication between himself and Hickey. RT 13732-13734; CCT 1846-1848. He did not remember when he wrote it or why; the words "automated separator of mind" in the note did not mean anything to him. RT 13733-13734.

1300. Subsequently, Petry testified that he never wrote that he was Hickey's disciplinarian or her guardian. RT 13741. He was shown Court Exhibit 119-I, which he recognized as his own writing, but he claimed it did not refresh his recollection and he could not explain why he had written, "Burlie is your guardian disciplinarian." RT 13741-13742; CCT 1849-1850.

1301. Near the end of the guilt phase of the trial, defense counsel sought admission of all of his writings (Court Exhibits 119-A through 119-I), contending that Dr. Blinder had relied on some of them in his testimony. RT 20210. Regarding portions of Court Exhibit 119-D and E, which the court previously approved, the prosecutor argued that the relevant portions had been read to the jury and were therefore in the record, so the writings themselves were cumulative and hearsay, and should not be admitted. RT 20219.

1302. The judge took the matter under submission, except for Exhibits 119-B(1) and 119-G(1), which had already been admitted. RT 20223; CCT 1813-1820 and 1838-1841. In a

---

[226] At the request of the prosecutor pursuant to Evidence Code section 352, the judge ordered the deletion of a paragraph written on the back of the diagram, described as being slanderous of Hickey's father, Richard Moore. RT 13701, 13703; see CCT 1842-1843. A copy of the diagram was made, without the writing on the back, and was admitted as Court Exhibit 119-G(1) CCT 1838-1841.; defense counsel objected that the copy was not nearly as legible as the original. RT 20220-20221.

written ruling, the court refused to admit any of the other exhibits: "The writings of Petry are

hearsay, and are excluded except for those already in evidence." CT 10138.

## 2. Various Errors Occurred in the Rulings on the Admissibility of Petry's Writings

1303. There were several defects in the overall handling of the issues pertaining to

Petry's writings. First, some that clearly qualified as prior inconsistent statements were still kept

out of evidence. As just noted, some that the court first ruled admissible were later kept out on

the prosecutor's claim that they had been read to the jury, so that the actual writings were

cumulative and hearsay. The hearsay objection, of course, was no barrier since the judge had

already found that the writings constituted prior inconsistent statements. Furthermore, many of

the writings were not offered for the truth of their content, but as evidence of Petry's mental

condition, so they were relevant for non-hearsay purposes. Nonetheless, the judge ruled these

writings out as hearsay, without explanation. This was clearly erroneous.

1304. This error was prejudicial. Contrary to the prosecutor's claims, reading a sentence

to the jury was not a satisfactory substitute for showing them the writing itself. Certainly the

overall context of the prior writings became highly relevant to the jury's determination of Petry's

credibility when he denied any recall of the prior statements. If the jury had been able to see

Petry's bizarre writings in context, it would have been clear that his claim of no recall whatsoever

was completely incredible.[227] This would have demonstrated not only that the prior inconsistent

---

[227] The deliberating jury expressed interest in the writings, sending out a note asking for all of
them. RT 20986. They were given the two items that had been admitted (Court Ex. 119-B(1)
and 119-G(1)), but the jurors thought more writings were in evidence. RT 20986. In response to
Footnote continued on next page.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

- 545

statements had been made, but also that the present testimony was not believable. That would have constituted legitimate impeachment which would have been far more powerful than the verbal impeachment that was permitted.

1305. The next problem with the trial court's handling of this matter was the refusal to allow the prior inconsistent statement regarding accusations of abusing Hickey's children. The only concern expressed by the court was the lack of any time reference for the prior statements. Time reference did not matter, however, as the present statement was that Petry had <u>never</u> been accused of molesting the children. Thus, the prior statement was inconsistent no matter when it was written.

1306. This error was also prejudicial. Had evidence that Petry had been accused of molesting the children been admitted for the truth of the matter, it would have not only impeached the trial testimony, but would have also provided one more motive for Petry, rather than Price, to have committed the crime. Indeed, whether molestation had in fact occurred, or even whether an accusation of molestation had occurred, was unimportant. All that mattered was that Petry <u>believed</u> an accusation of molestation had occurred; clearly the evidence showed that much.

1307. The next problem with the trial court rulings affected <u>all</u> writings that were not admitted. At one point, the trial court expressly recognized that one item, the diagram, was relevant on the issue of credibility and in regard to Petry's overall ability to recall. This rationale

their request, the jurors were told only that some writings were read to Petry as inconsistent statements, but the writings themselves had not been admitted. RT 20995. Such jury interest in the evidence indicates a close case in which the defense position was being seriously considered.

alone was enough to justify the admission of all of Petry's writings. Notably, even the judge found Petry's inability to recall difficult to believe. In regard to the diagram, the judge aptly noted, "If you drew it, you must remember something about it." RT 13695. This applied just as much to all of Petry's writings.

1308. Put differently, a review of all of the bizarre writings (Court Exhibits 119-A through I at CCT 1785-1850 leads inevitably to the conclusion that it is impossible to believe that the person who wrote them could, within the space of a few years, completely forget them. This point cannot be appreciated without examining the contents of these writings; such an examination makes it readily apparent that Petry could not have totally and completely forgotten these writings. This says a great deal about Petry's attitude toward the case as a whole.

1309. Thus, on several legitimate grounds, these writings were highly relevant to Petry's overall credibility. Aside from the diagram (Court Exhibit 119-G(1) at CCT 1838-1841), the only writing admitted (Court Exhibit 119-B(1) at CCT 1813-1820) was relatively innocuous compared to the excluded writings. Consequently, the point that Petry's lack of recall was unbelievable could not be made as effectively as the defense was entitled to make it.

1310. The exclusion of this critical defense evidence violated Price's right to confront the witnesses against him and to present evidence in his own behalf. See Chambers v. Mississippi, 410 U.S. 284 (1973); Crane v. Kentucky, 476 U.S. 683 (1986); Delaware v. Van Arsdall, 475 U.S. 673 (1986).

1311. The trial court's exclusion of this evidence also violated petitioner's 5th and 14th Amendment rights to a fair trial in accordance with Due Process of law. Id.; see also Miller v. Angliker, 848 F.2d 1312, 1323 (2d Cir. 1988). For all of these reasons, the trial court erred in excluding from evidence most of Petry's writings, and the error prejudiced Price by preventing

the defense from exposing the true depth of Petry's lack of credibility.

## C. The Trial Court Erroneously Precluded the Use of Many of Berlie Petry's Prior Statements

### 1. Factual and Procedural Background

1312. In addition to the specific errors set forth in the previous section regarding the admissibility of Petry's writings, the trial court also erred more generally in its refusal to allow many of Petry's prior statements to be introduced <u>for their truth</u>, as prior inconsistent statements. Instead, the trial court blindly accepted Petry's unbelievable claims of an inability to recall and refused to find the obvious evasiveness which rendered the prior statements admissible. The instances in which the defense was improperly precluded from introducing Petry's prior statements for their truth are quite numerous; a number of examples demonstrate the problem.[228]

1313. Interestingly, during a lengthy direct examination, Petry was able to answer the prosecutor's detailed questions with only occasional problems of recall. RT 13283-13404. The situation changed rapidly when defense counsel started asking the questions. First, Petry claimed he never learned the first or last name of the man he once found in bed with Hickey. When shown Court Exhibit 119-A, Petry recognized the letter as his writing, acknowledged that it indicated the man's name was Joe, but maintained that he did not recall the letter, and that the

---

[228] The examples that will be set forth herein include failures to recall matters directly relevant to Petry's discovery of Hickey's body and to Petry's relationship with Hickey, as well as a number of matters that were relevant only for other purposes, such as impeachment. Incidents not directly relevant to the question of Price's guilt or innocence are included in order to demonstrate the depth of the failures to recall and Petry's overall lack of credibility in his claimed inability to recall.

letter did not refresh his recollection. RT 13405-13407.

1314. Next, Petry testified that there were only one or two occasions when Hickey took a cab to a bar while Petry was at home at night. However, he could not recall how long prior to her death the last such incident occurred, or whether it occurred at all during the last two weeks before her death. Then Petry said he thought he and Hickey were getting along well during the last few months before she was killed. He could not recall if she was going out to bars during that time, but he did not think so. RT 13412-13414.

1315. Petry claimed he did not recall that about a month before her death Hickey went out to a bank in the middle of the afternoon and did not return until the next day. He did not recall describing any such incident to Sergeant Fredrickson.[229] He also could not remember calling Hickey's mother, Dottie Moore, a month before the killing, to tell her about problems he was having with Hickey. He claimed he never talked to Mrs. Moore about Hickey using drugs, going to bars, or leaving the children home alone. RT 13415-13417.

1316. Petry claimed he did not recall seeing a transcript of his interview by Fredrickson during his preliminary exam testimony. He did not recall telling Fredrickson, in regard to Hickey, "This time she went too far." Petry did recall that Hickey had a drug problem, but he claimed could not recall what kind of drugs she used. He could not recall telling Fredrickson that Hickey put white powder in her nose. Petry claimed he did not know where Hickey obtained drugs; he did not recall telling an officer she obtained them from her brother, Bill

---

[229] Subsequently, Petry reviewed the transcript of his interview with Fredrickson in which he had made such a statement, but he claimed it did nothing to help him refresh his recollection. RT 13665-13666.

Eaton. RT 13422. He claimed he could not remember if he ever saw Hickey use drugs. RT 13417-13423.

1317.   Remarkably, Petry claimed he could not recall certain basic facts about Hickey or about himself. For example, he testified he could not recall Hickey's age at her death or when he first met her. He even said had no recollection of her birth date or even the month in which she was born. He said he could not recall the age of Hickey's two daughters at the time Hickey was killed. RT 13423-13424.

1318.   Petry, who was 33 when he testified, claimed he could not recall the year he graduated from high school. When asked if he had flunked any classes or was ever held back a grade, he said, "not that I can remember." When asked to look at a transcript of his high school grades, Petry could not recall whether the named classes were ones he took.[230] RT 13424, 13431-13433.

1319.   Following Petry's first day of cross-examination, the defense filed points and authorities in support of the contention that Petry's extensive failures to recall demonstrated evasiveness, thereby rendering the prior statements admissible for their truth. CT 9197-9201.

---

[230] Defense counsel sought to have the transcript (Defense Ex. RR, reproduced at CT 8915) admitted as evidence that Petry was above average as a high school student and earned his diploma, indicating he was not nearly so dumb as he appeared to be on the stand. RT 13434-13435, see also RT 13500. The judge expressed concerns about the relevance of the transcript and the lack of a foundation to have it admitted as a business record, deferring any decision on the matter. RT 13435-13436. The matter was not discussed again until 3 months later, at which time the judge said he would check the transcript of the January 16, 1986 discussion. RT 19934. After checking, the judge said (incorrectly) that the high school transcript had previously been ruled inadmissible, and that there was no reason to change that ruling. RT 19958. Thus, the jurors learned that Petry was a high school graduate (RT 13431), but they never learned what his grades were.

Defense counsel noted that many of the questions for which Petry now responded "I don't recall" had been answered by Petry on prior occasions. Defense counsel argued that the number of failures to recall, combined with Petry's insistence that transcripts of his prior statements or testimony did nothing to refresh his recollection, were not credible and demonstrated deliberate evasiveness.

1320. The matter was debated at some length at the outset of the next court day. Defense counsel noted that there had been 19 instances during direct exam, and at least 56 instances in the cross-examination up to that point, in which Petry failed to recall significant facts that he had recalled in prior testimony.[231] Also, during Petry's initial interviews with police, he had revealed far more information than he was able to relate in his testimony.[232] RT 13479-13481.

1321. Defense counsel complained that the failures to recall were effectively depriving Price of his 6th Amendment right to confront the witness, if he could not exploit the 100 or more inconsistencies between Petry's preliminary exam testimony and his earlier police interviews. He proposed that every time Petry failed to recall an answer, the defense should be permitted to read the prior answer as a prior inconsistent statement. Alternatively, he wanted to have the tapes of Petry's statements to the police played in front of the jury, for the purpose of refreshing

---

[231] Defense counsel also noted that on direct examination Petry had been able to recall some events with great detail, in sharp contrast to his lack of recall on cross-examination. RT 13483.
[232] Indeed, Petry's ability to answer virtually every question put to him by the officers during hours of interrogation stood in remarkable contrast to his inability to answer the simplest questions tendered by defense counsel. This fact, alone, should have been enough to demonstrate Petry's evasiveness on the stand.

Petry's recollection.[233] RT 13482-13485.

1322. The prosecutor responded with the claim that Petry's memory lapses were due to the passage of time and the fact that he was not very bright. The court then concluded it would have to read the prior testimony before being able to rule, and that it would take the high school transcript into consideration in reaching an ultimate conclusion. RT 13487-13492.

1323. The following morning, the court ruled Petry's failures to recall were not deliberately evasive, but were a product of his limited capability. The court also ruled that the defense could not attempt to refresh Petry's recollection by playing the interview tapes in front of the jury; rather, the defense could show him transcripts and, if necessary, tapes would be played outside the presence of the jury. RT 13511-13512.

1324. The trial court acknowledged there had been a number of failures to recall events that Petry had recalled well in earlier statements and testimony, but Petry did recall and testify to facts that cast suspicion on him. RT 13501-13502. Noting the fact that Petry had lost his lover in a violent and bloody manner, was initially considered the suspect, lost his residence, and lost his job, the judge, without the benefit of any expert testimony on the subject, and without any notice to the parties of his intention to rely on his own views in the field of psychology and psycho-dynamics, concluded that Petry's was "a classic case of what I understand to be from my past experience as a trial judge, posttraumatic stress disorder waiting to happen" and that, "one of the situations that occurs with people who have this sort of situation if he suffers from it is

---

[233] This would have been appropriate under the circumstances. Only by hearing the detailed statements could the jurors appreciate how unbelievable it was when Petry claimed they did nothing to refresh his recollection.

psychic numbing and difficulty in remembering." RT 13503. Thus on the basis of an arm-chair diagnosis from the bench about a witness who was the lead defense suspect with motive, opportunity, and reason to kill Elizabeth Hickey, the trial court effectively routed petitioner's entire innocence defense on the Hickey murder.

1325. After the court's ruling, cross-examination of Petry then resumed. He acknowledged that the break in his testimony provided him with time to read more of his preliminary examination testimony, but he had not done so and had not listened to any of his taped interviews because the material was painful for him to review and did not help him recall anything.[234] He also claimed he had no recollection of ever talking to someone at the District Attorney's office for 9 hours over 2 days. RT 13513-13516.

1326. Petry testified that after he found Hickey's body he ran to a phone, and he did not recall telling an officer that he had walked. He acknowledged he was friendly with a woman across the street and that the woman in the adjacent apartment was an occasional visitor, but it did not occur to him after discovering the body to use a neighbor's phone rather than run several blocks to the market. RT 13521-13523. He also did not recall ever telling an officer that he thought about getting rid of Hickey's body. RT 13543.

1327. Petry vaguely recalled the Moore house burglary, but did not recall Dottie Moore ever accusing Hickey of stealing the guns and he did not recall ever so telling the police. RT 13575. Petry could not recall if he had ever been fired from a job for incompetence. He could

---

[234] The following day Petry testified that he had listened to more than two hours of the taped interviews of him by officers and recognized his own voice, but, incredibly, nothing in the tapes refreshed his recollection. RT 13599, 13751-13752.

not recall ever being a construction foreman, but he maintained that if he had listed that on his application for the Wallace Security job, then it must have been true. RT 13584.

1328. Petry said he had viewed a videotape that showed the various key stations at Arcata Redwood which security guards had to check, but the tape did nothing to refresh his recollection about the key stations for which he was responsible. He had also viewed a videotape of the route between Arcata Redwood and the apartment in which he and Hickey had lived, and he looked at a street map of Eureka, but neither the tape nor the map refreshed his recollection of the route he had routinely used to get home from work. RT 13642-13643.

1329. Near the end of the guilt phase, and again without any notice to the defense, the prosecutor arbitrarily announced in front of the jury that he had no objection to letting the jury hear the Petry interview tapes, except for portions discussed previously. Subsequently, a number of tapes were received in evidence, after deletion of references to taking a polygraph exam.[235] CT 10153, RT 19955-19956, 20152-20153; see Court Exhibits 126-A, 130-A and B, and 131-A and B. Although the prosecutor himself then played brief portions for the jury during guilt phase arguments, the jury never listened to the tapes as a whole in court. RT 20474. The jury was clearly interested in their contents, however, because during deliberations, the jury requested the Petry interview tapes. The court, without notifying defense counsel, provided the tapes to the jury, along with a tape player. There is no record of which portions of the tapes the jurors chose

---

[235] A transcript of Petry's taped statement to Sergeant Fredrickson on February 19, 1983, is reproduced at CCT 1969-2014. An unedited transcript of his first polygraph exam, conducted by Officer Jager on February 22, 1983 is reproduced at CCT 1875-1968. There was also another taped polygraph examination, apparently not received in evidence, administered by District Attorney's Investigator Barry Brown on March 9, 1983. See CT 8765-8767.

to play. See CCT 2969, and CT 10204.

### 2. Petry's Taped Statements and Former Testimony Should Have Been Admitted For the Truth of Their Content

1330.   No matter how one looks at the testimony of Berlie Petry in this case, the conclusion is inescapable that he was simply not credible in his assertions that he could not remember so many facts about his own life, that of the deceased, Elizabeth Hickey, and the circumstances surrounding her death and the investigation of him that followed.  The defense was entitled as a matter of fundamental constitutional law to probe his selective memory, and then use his prior statements, some of which was in the form of sworn testimony, not only to show that Petry was lying about his inability to recall, but also to affirmatively present the substance of the prior statements or testimony as evidence that he had in fact murdered the woman whom he had beaten, psychologically dominated, threatened to kill, and instilled mortal fear into, before her death.   The trial court's reliance on the unsubstantiated, un-diagnosed rumination that the witness suffered from a debilitating psychiatric condition which explained his selective memory was not only unwarranted, but it was also unconstitutional.

1331.   Several errors arose from the court's erroneous ruling.  First, while the tapes of Petry's police interviews, which detailed many events which he could not recall during his testimony, eventually were admitted into evidence, there is no way to know which portions were ever heard by the jury.[236]

1332.   Second, petitioner's right to confront the witnesses against him was violated by

---

[236]  The improprieties in the court's sua sponte response to the jurors' request for the Petry tapes are discussed below.

the trial court's refusal to allow effective cross-examination of Petry. As noted, under all the circumstances, the trial court's conclusion that Petry was not being deliberately evasive in claiming a failure to recollect must be rejected. Petry's "failures to recall" were simply too extensive, and too selective to his benefit, to be believable. Indeed, as noted, even the judge became incredulous when Petry claimed that he could not recall writing a bizarre diagram, noting, "If you drew it, you must remember something about it. RT 13695.

1333. In California v. Green, 399 U.S. 149 (1970), the Supreme Court expressly noted that in some circumstances a witness' failures to recall could have such a deleterious effect on the defendant's ability to cross-examine that a deprivation of the right of confrontation could result.[237] While the Court in Green simply noted this problem but had no occasion to resolve the issue, surely if alleged failures to recall on cross-examination ever could result in an effective denial of the right of confrontation, they did so in the present case. This comes sharply into focus when one contrasts the effectiveness of the cross-examination of Petry at the final preliminary examination with the far less effective cross-examination that occurred at the trial.

---

[237] It should also be noted that the confrontation problem at issue in California v. Green, supra, involved the more common situation wherein the prior statements are admitted for the truth of the matter and the defendant complains that the present failure to recall results in an ineffective cross-examination about the contents of the prior statements. In such a situation, the jury hears the prior statements and also sees the witness on the stand, allowing the jury some basis for determining whether the witness is credible, and how much weight should be given to the prior statements. In contrast, here the problem was that many of the prior statements were probably never heard by the jury at all, and many of the statements that were heard were not admitted for the truth of the matter. Thus, even if the jury determined from listening to Petry in court that he was not a believable witness, the jury still did not have all the information necessary to fully appreciate the likelihood that Petry may well have been responsible for the killing, rather than Price.

Compare RT 13404-13753 with CT 1649-1730.[238]

1334.  Third, for all of these same reasons, petitioner's right to present a defense was wholly undermined by the trial court's erroneous ruling on the admission of prior statements and testimony of Berlie Petry.  See Washington v. Texas, 388 U.S. 14, 19 (1967) (criminal defendant has "right to present a defense, the right to present the defendant's version of the facts").  This right guarantees not only that a defendant be present during his trial, see Snyder v. Massachusetts, 291 U.S. 97, 106 (1934), but also that state law rules of evidence not stand in the way of the opportunity to present the defendant's view of the case.  See Chambers v. Mississippi, 410 U.S. 284, 302 (1973) ("where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice.").

1335.  Here, the hearsay rule was not even applied "mechanistically, but rather arbitrarily and without foundational basis.  The trial court's off-the-cuff declaration that the witness suffered from a psychological condition as the basis for his hearsay ruling can in no way suffice to undermine petitioner's basic right to present his case.

1336.  Fourth, even if the trial court was correct in concluding Petry's failures to recall were a result of post-traumatic stress, then at least the prior preliminary hearing examination testimony (including impeachment at the preliminary hearing with prior inconsistent statements to

_____

[238] The contrast between Petry's testimony prior to trial and his testimony during trial is astonishing.  Given the extent to which the prosecution engaged in misconduct in this case, as set forth in various other claims of this petition, Petry's sudden selective memory at trial raises the clear specter that he was coached by the prosecution to avoid any touchy areas with the excuse of failed memory.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH
- 557 -

the police officers) still should have been admissible for the truth of the matter. This necessarily follows because if a mental infirmity caused Petry to be unable to recall critical details, then he was effectively "unavailable" as a witness under California law, allowing the admission of his former testimony pursuant to California Evid. Code sec. 1291 and 240, subd.(a)(3).[239]

1337. The fact that Petry was present at the trial is not determinative. As noted in Mason v. United States, 408 F.2d 903, 906 (10th Cir. 1969), "unavailability" for the purpose of section 1291 means unavailability of the testimony, not physical unavailability of the witness. Thus, the determinative point is that Petry's mental infirmity, induced by stress, rendered him incapable of recalling significant facts, so that his testimony as to those facts was unavailable.

1338. In sum, if Petry's extensive failures to recall were due to deliberate evasiveness, then his prior statements and testimony were admissible as prior inconsistent statements, and the trial court's reliance on the hearsay rule violated petitioner's constitutional rights. Chambers, supra. On the other hand, if, as the trial court concluded, Petry's inability to recall was the product of stress and trauma, then Petry suffered from a mental infirmity that rendered him unavailable as a witness as to those topics for which his lack of recall prevented effective cross-examination. For those topics, his prior testimony should have been admitted under California law. The trial court's refusal to follow California law, itself violated petitioner's federal constitutional rights. Hicks v. Oklahoma, 447 U.S. 343 (1980)

---

[239] California Evidence Code section 1291 provides in part: "Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness ..." Evidence Code sec. 240, subd.(a)(3) defines the term "unavailable as a witness" to include, among other things, a declarant who is "... unable ... to testify at the hearing because of then existing physical or mental illness or infirmity."

### 3. The Failure to Admit Petry's Prior Inconsistent Statements in Evidence Was Highly Prejudicial

1339. As has been noted, Petry's ability to answer question after question when interrogated by the police contrasts sharply to his inability to answer simple questions during trial cross-examination. Thus, jury exposure to the prior statements would have done much to impeach Petry's credibility. Furthermore, in his last taped statements, Petry was able to describe in considerable detail numerous incidents occurring during his relationship with Hickey. Hearing these incidents described in Petry's own voice leaves no doubt that his relationship with Hickey caused him intense frustration over a period of years.

1340. In sum, if all of the prior statements had been admitted for the truth of the matter, three crucial defense goals would have been achieved. First, Petry's claimed inabilities to recall would have been exposed as unbelievable. Second, Petry's claims that he was rarely upset with Hickey would have been exposed as false. Third, the strong proof that Petry denied the years of frustration he endured would have supported Dr. Blinder's testimony about Domestic Homicide Syndrome, so strongly as to provide compelling evidence that Petry, not Price, was more likely to have killed Hickey. Thus, the error went to the heart of the defense efforts and cannot be deemed harmless.

1341. Of course, as has been noted, the tapes themselves were eventually admitted in evidence, but the manner in which the admission and use of the tapes was handled frustrated legitimate defense goals and left a record that offers no indication which portions of the tape were heard by the jurors, or whether they heard more than a few minutes worth of the tapes.

1342. In short, the defense wanted to play part or all of the tapes while Petry testified,

to impeach him and to refresh his recollection. The defense was precluded from using the tapes effectively. Had the court ruled at the outset that the tapes were admissible as prior inconsistent statements, the jury would have heard the immediate contrast between Petry's claimed failures to recall while on the stand, and Petry's own clear answers on tape. Petry would have had to listen to his own voice and explain why it did nothing to refresh his recollection. Instead, Petry was able to survive cross-examination with far less impeachment than was warranted.[240]

### D. Serious Errors Occurred in the Manner in Which the Tape Recordings Were Presented to the Jury

#### 1. Although Tape Recordings of Berlie Petry's Statements to the Police Were Received in Evidence, There is No Record of Which Portions Were Ever Heard by the Jury

1343. In addition to the foregoing problems, serious errors occurred in the use of the tapes. Only brief portions of those tapes were played in open court. While the full tapes were requested by the deliberating jurors and made available to them, they were again not played in open court; instead, the jury, on its own, determined how much of the tapes to play, and no record exists of what they heard.[241]

1344. Especially in a capital case, it is important that the record show that the jury was

---

[240] Portions of the police interviews were <u>read</u> to the jury during defense counsel's guilt argument. RT 20646 <u>et seq</u>. This was no substitute for having the jury hear the tapes during the cross-examination. Hearing selected portions read by trial counsel, or listening during deliberations to unknown portions chosen by the jurors themselves rather than by counsel, could not adequately demonstrate Petry's ability to answer almost every question, one after another.

[241] The record also demonstrates that the trial judge never listened to the full tapes. RT 19956, lines 17-18.

in fact exposed to all the evidence in the case. While a jury surely has the right to decide which items of evidence are worthy of consideration or are _persuasive_, it cannot be permitted to pick which items of evidence are worth seeing or hearing at all. Because the trial court failed to require the jury to be exposed to all of the evidence, Price was denied his rights to a fair trial and a fair jury determination.

### 2. When the Jury Requested the Petry Tapes, the Trial Court Erred By Sending Them into the Jury Room Without Any Notification to Counsel

1345. The record shows that on April 30, 1986, the deliberating jury sent the court a note requesting all of the audio tapes of Petry's police interviews. CCT 2969. The Clerk's minute order for April 30, 1986 lists 5 audio cassettes, by exhibit number, which were "given in response" to the jury's note without counsel being present.[242] Thus, the court responded to the jury's request by sending in the listed exhibits without any consultation with counsel. Indeed, there is no suggestion that counsel was ever notified of the jury's request.[243]

1346. The court's failure to notify counsel of the jury request, and to consult with

---

[242] The minute order does expressly indicate the presence of counsel at the close of the day's session, when the jury was given the standard admonition. CT 10204-10205. The Reporter's Transcript for April 30, 1986 contains no proceedings except for the admonition at the close of the day. RT 20956-20958. During those reported proceedings, nothing was mentioned about the tapes.

[243] This method of handling jury requests for exhibits was consistent with the trial court's response in most other instances. While the court regularly conferred with counsel when the jury asked a question or requested readback of testimony, requests for exhibits routinely resulted in sending in the exhibit without consultation with counsel. See e.g., CCT 2957 and CT 10202; CCT 2965 and CT 10203; CCT 2966 and CT 10203; CCT 2976 and CT 10205; CCT 2991 and CT 10210. Each of these instances itself violated petitioner's rights as set forth in this Claim of the petition.

counsel about the appropriate response, violated petitioner's right to due process and to confront the witnesses against him, a fair trial, and to be present at all critical stages of the proceedings. See U.S. v. DeHernandez, 745 F.2d 1305, 1310 (10th Cir. 1984). The court should have notified counsel before responding to the jury's request for the Petry tapes, thereby providing the opportunity for the defense to correct the trial court's prior error by requesting that the full tapes be played in open court or to at least remind the court of the necessity of providing a record that would show what portions of the tapes the jurors chose to play. What occurred here -- allowing the jury to have tapes, which had not been played in court, without any record of what they heard -- was improper and in violation of petitioner's federal constitutional rights.

### E. Improper Restrictions Were Placed on the Testimony of Dr. Blinder

1347. Dr. Martin Blinder was allowed to testify as a defense expert witness and to discuss generally the concept of domestic homicide syndrome. He described many factors typical of domestic relationships which caused frustrations of the type that commonly exploded in violence by one partner against the other. However, the effectiveness of his testimony was severely diminished because of improper restrictions imposed by the trial court, including a narrow ruling that disallowed testimony regarding the connection between domestic homicide syndrome and Petry's bizarre writings and a very broad ruling that precluded informing the jury of hearsay bases of Dr. Blinder's opinions.

#### 1. The Trial Court Improperly Limited Dr. Blinder's Testimony Regarding the Connection Between the Domestic Homicide Syndrome and the Bizarre Writings of Berlie Petry

1348. During the course of Dr. Blinder's testimony, defense counsel sought permission

from the court to ask the doctor whether certain bizarre writings of Petry were consistent with domestic homicide syndrome. The court disallowed such testimony, noting that Dr. Blinder had already testified that Petry's writings were the type that a person in such a relationship would write. The court also said that this was a matter that should be argued rather than dealt with in the evidence. RT 18379-18380.

1349. The trial court was mistaken. Dr. Blinder had testified only that persons in a domestic homicide syndrome type of relationship were likely to express themselves affectionately and passionately in writing. RT 18378. Dr. Blinder had not yet said anything about the writings to which defense counsel referred in his request to go further. Those writings went well beyond the affectionate and passionate and included expressions of deep hostility and sexual frustration. See RT 18379; see also Court Exhibits 119-D, 119-E, and 119-G, at CCT 1825-1835 and 1838-1845; see also Petry's writings at CT 9855-9863, attached to defense counsel's motion for the admission of Dr. Blinder's testimony. Thus, the doctor had not testified about the types of writings defense counsel wanted to use next.

1350. Dr. Blinder's testimony was very important to the defense efforts to demonstrate a reasonable doubt of guilt based on the possibility that Petry killed Hickey. By not allowing the doctor to testify directly about evidence that powerfully demonstrated the applicability of domestic homicide syndrome to the Petry/Hickey relationship, the court diluted the impact of this important testimony and thereby precluded Price from presenting his defense. The exclusion of this critical defense evidence violated Price's fundamental right to present evidence in his own behalf. See Chambers v. Mississippi, supra, Crane v. Kentucky, 476 U.S. 683 (1986); Delaware v. Van Arsdall, 475 U.S. 673 (1986).

## 2. The Trial Court Improperly Disallowed Any Reference by Dr. Blinder to the Hearsay Bases of His Opinions

1351.   For the reasons set forth above, the trial court erred when it disallowed testimony from Dr. Blinder relating particular writings by Petry to the doctor's conclusions about domestic homicide syndrome.   Aside from the specific reasons given by the court when the particular ruling was made, it is evident that the ruling was also based in part on a broader, but equally erroneous, conclusion reached earlier by the trial court.

1352.   In arguing about the limitations that would be placed on Dr. Blinder's testimony, the prosecutor contended it would be unfair to require him to cross-examine the doctor if his opinions were based in part on inadmissible evidence.   The prosecutor expressly referred to Petry's writings as an example of this perceived problem.   RT 18337-18338.   In an apparent response to this argument, the judge ruled that Dr. Blinder could describe the symptoms of domestic homicide syndrome and could be examined about any specific facts already known to the jury, but "[a]ny of the other hearsay bases are not to be gone into."   RT 18343; see also RT 18345, lines 1-10.   Thus, the trial court clearly believed that it would be improper to reveal to the jury any hearsay bases of Dr. Blinder's opinions.   Obviously this belief affected the ruling that Dr. Blinder could not discuss the relationship between domestic homicide syndrome and writings by Petry which had not been admitted in evidence.

1353.   It is clear that the trial court's belief in this regard was erroneous and ran precisely counter to the very instructions the court gave to the jury concerning expert testimony. As Dr. Blinder's testimony was about to begin, the jurors were instructed that they should

consider the <u>reasons for his opinions</u> in assessing the believability of those opinions.  RT 18355.[244]

1354.  Thus, it was irrational to ask the jury to assess the believability of Dr. Blinder's opinions, while depriving the jury of any exposure to many of the matters upon which the opinions were based.  Under California law, experts may base their opinions on matters such as hearsay that would not be admissible directly, and may explain this hearsay basis for their opinions, so long as they are matters that could reasonably be relied on by an expert in the particular field.  <u>See</u> California Evid. Code sec. 801 subd. (b).  Thus, the defense should have been allowed to go into the bases of Dr. Blinder's conclusions, with a prosecution opportunity to cross-examine in regard to the hearsay bases of the expert opinion, and with admonitions to the jury that any hearsay information mentioned by the doctor was not being admitted for the truth of the matter, but merely as a basis of the expert opinions.

1355.  In sum, it is quite clear that Dr. Blinder should have at least been allowed to refer to the fact that he relied in part on Petry's writings.  Under all the circumstances present here, the defense should have also been allowed to display the writings to the jury, subject to proper limiting instructions.[245]  Both this error and the error set forth in the preceding section of this argument, separately or together, deprived Dr. Blinder's testimony of much of its convincing force and thereby deprived Price of his right to present a defense and his right to a fair trial.  <u>See</u>

_____

[244]  Outside the presence of the jury, the judge had made this point even more clearly: "Opinion is no better than the facts it's based upon." RT 18347.

[245]  As alleged earlier in this Claim, the writings were admissible as prior inconsistent statements by Petry.  There was thus no valid reason for limiting the defense use of the writings in connection with Dr. Blinder's testimony, because they were not inadmissible hearsay.

Chambers v. Mississippi, supra, Crane v. Kentucky, 476 U.S. 683 (1986); Delaware v. Van Arsdall, 475 U.S. 673 (1986).

**F. The Trial Court Erroneously Precluded Evidence That Elizabeth Hickey Had Made Reports That She Wanted to Leave Berlie Petry, And That She Was Afraid He Would Kill Her If She Left Him**

### 1. Factual and Procedural Background

1356.    At petitioner's trial, the defense was allowed to present limited evidence suggesting physical abuse in the relationship between Hickey and Petry. Zelna Hunsinger testified she was a friend of Hickey's and saw her a couple times with bruises and a black eye. RT 18070-3. On another occasion, Hickey seemed scared. RT 18070-2. Susan Ielmorini also recalled seeing Hickey more than once with a black eye and bruises on her face. RT 18446. A neighbor, Lynne Harden, regularly heard loud, angry voices coming from the Petry/Hickey apartment, and once she saw Petry throw a bowl of cereal at Hickey. RT 12704-12710.

1357.    David Boulton described an argument between Petry and Hickey while they were riding home in Boulton's taxi, during the course of which Petry was hitting Hickey in the head and shoulder until Boulton insisted he stop. RT 18119-18130. Leroy Davis recalled a confrontation between Hickey and Petry in a bar; Petry seemed upset and Davis thought there would be trouble, but matters were resolved. RT 19380-2 to 19380-3. Dr. Ken Barney testified that he counseled Hickey during the year before she was killed, and that she stopped coming to see him after Petry picked her up from a counseling session. RT 18218-18221.

1358.    While this evidence suggested that Petry may have physically abused Hickey on occasion, there was much stronger evidence which the defense offered, but which the trial court

erroneously refused to allow.  First, during the defense case, Carrie Jennings of the Humboldt Open Door Clinic testified that Hickey had been seen in February, 1982 by Dr. Massion and Dr. Gavin.  RT 18171-18175.  The witness was asked whether the clinic records showed that Hickey was referred to the battered women's shelter, but the prosecutor's hearsay objection was sustained.[246]  RT 18179-18180.

1359.   Next, Dr. Barney was called to testify about statements made to him by Hickey.  The court responded by stating, "I don't know how I can make it any clearer than I did yesterday that I don't think you can use hearsay statements made by her to impeach what Petry said in this proceeding."[247]  RT 18182.

1360.   Dr. Barney was then questioned outside the presence of the jury.  He saw Hickey three times during 1982, when she was distressed about her relationship with Petry and wanted to get out of the relationship.  She appeared to be in fear of Petry, and was also engaging in highly provocative behavior that she could not control, such as picking up men at bars in order to have sex with them.  Hickey was very concerned that Petry would find out about this.  RT 18184-

---

[246]  The Open Door Clinic file on Hickey included a report that noted, "[Patient] states she has been frequently beaten by her boyfriend.  Boyfriend extremely jealous and will not allow her to talk to other people.  Has plans to leave with her two children, but 'must save enough money.'" (See page 5 of Defense Exhibit IIIIII, marked but not received.)

[247]  The court's reference to "yesterday" was apparently made in regard to a discussion about the admissibility of proposed testimony of Zelda Hunsinger.  However, the court had not ruled Hunsinger's testimony inadmissible; instead, no ruling was made after the court indicated that if Hunsinger were allowed to testify, other prosecution evidence previously ruled inadmissible would also be admitted.  The defense then withdrew its efforts to have Hunsinger's testimony presented.  RT 18091.  The substance of Hunsinger's proposed testimony was that Hickey was terrified of Petry but would never leave him because she feared he would kill her.  Hickey had told Hunsinger that Petry threatened to kill her and that he often came home on breaks to check up on her.  Hunsinger had offered to let Hickey stay with her.  See RT 18074-18085.

18185.

1361. Dr. Barney also explained that Hickey was afraid that if she left Petry, she would certainly be harmed. She appeared to believe that the only way she could end the relationship would be to begin a relationship with a person who was more powerful than Petry and who would rescue her from him. Dr. Barney believed that Hickey never cared that much for Petry to begin with, and that she was bored with the relationship, but also found it to be a very threatening situation. RT 18185-18189.

1362. In argument regarding the admissibility of Dr. Barney's testimony, the trial court conceded it was relevant as a basis for Dr. Blinder's opinion regarding domestic homicide syndrome, and might be admitted subsequently for that purpose. RT 18202. However, as discussed in an earlier section of this Claim, when Dr. Blinder did testify, the trial court ruled that he could be questioned about his opinion and its validity, but that no hearsay bases of his opinion could be revealed to the jury. RT 18343-18353. In making this ruling, the court referred specifically to the statements made by Hickey to her doctors. See RT 18330-3, 18344.

1363. The trial court apparently recognized the strong equities favoring the defense side with regard to this evidence:

> The fact is, she apparently feared, apparently sought help, and the question becomes: How does the defense use that? I think they are entitled to somehow use it, and I don't know how to put limits on it or get around the hearsay rule. RT 18207 (emphasis added).

1364. However, despite having some sympathy for the defense position, the trial court ruled that Dr. Barney could not testify about statements made to him by Hickey; the court concluded such statements were hearsay and were also irrelevant. RT 18213.

1365. The trial court similarly disallowed testimony by Dr. Massion. According to the defense offer of proof, she would have testified that she treated Hickey in February, 1982, and that Hickey spontaneously stated she was very frightened of Petry. Dr. Massion believed the fear was genuine and diagnosed Hickey as suffering from battered women's syndrome. CT 9948-9949. The trial court ruled, "Ms. Hickey's state of mind in February of 1982 is not relevant to any issue in the present case. Her state of mind is not being used to prove her conduct in conformity with that state of mind which existed in February, 1982." CT 9950. The court reiterated its belief that the event, occurring a year before the killing, was remote, and the court concluded that such testimony from Dr. Massion would be merely cumulative of Dr. Blinder's testimony regarding domestic homicide syndrome.[248] CT 9950-9951.

## 2. Elizabeth Hickey's State of Mind Was Relevant to Provide an Explanation for Her Conduct, as Urged By the Defense, in Arranging to Have the Missing Weapons Sold By Curtis Price

1366. This series of trial court rulings, which kept from the jury all of the evidence of Hickey's several reports to authorities of her fear of Petry and her desire to leave him, was er-

---

[248] One more defense witness was apparently affected by the rulings that kept out statements made by Hickey about her fear of Petry. Dr. Pennington, a doctor at the local public health department, testified about her treatment of Petry and Hickey for gonorrhea. RT 19979 et seq. A brief discussion at bench made it clear that the defense was under orders to not ask Dr. Pennington about statements made by Hickey regarding her fear of Petry. RT 19577. The additional testimony that could have been given by Dr. Pennington was disclosed in a transcript of an interview of her by defense investigator Richard DeLong. That transcript was attached as an exhibit to defense points and authorities in support of broader testimony by Dr. Blinder. CT 9864-9873.
In the DeLong interview, Dr. Pennington said that Hickey had told her she was afraid that if Petry found out she was sleeping with other men, he would kill her. When asked why she stayed with Petry, Hickey replied, "I don't love him but he has a job and he's supporting me and my kids." CT 9866.

roneous. The ruling that Dr. Massion's testimony would have been cumulative is the easiest aspect to rebut. This finding by the trial court was just wrong as a matter of fact. Nothing in Dr. Blinder's testimony in any way revealed to the jury that Hickey <u>actually</u> was in fear of Petry; his testimony showed only that Hickey seemed to fit the classic profile of a woman who <u>might</u> be in fear of her partner. Thus, Dr. Massion's testimony would have gone well beyond Dr. Blinder's testimony, and would also have added strong corroboration to Dr. Blinder's opinions, which were heavily attacked by the prosecution. Under these circumstances, such testimony cannot be considered cumulative.

1367. The trial court was also wrong in finding Hickey's state of mind irrelevant, and in finding that evidence of her state of mind a year before her killing was too remote. Under California law, evidence of the victim's state of mind, in the form of his or her statements, is not admissible to prove conduct by another person, but is admissible to prove conduct by the victim in conformity with the expressed state of mind, <u>if</u> that conduct is relevant to a disputed issue. <u>See People v. Ruiz</u>, 44 Cal.3d 589, 607-610 (1988). One example of permissible relevance is that such conduct in conformity with the expressed state of mind corroborates other evidence. <u>People v. Melton</u>, 44 Cal.3d 713, 739-40 (1988).

1368. This is precisely the way in which the evidence of Hickey's state of mind would have been used in the present case, if the defense evidence had been admitted. Undisputed evidence in the present case showed that Price and Hickey may well have been involved in some type of business relationship or negotiation regarding the sale of guns. On the other hand, the prosecution theory of the case was that Price stole the guns from the Hickey/Petry household and killed Hickey in the course of committing the theft. The defense did not dispute that Price possessed these guns after Hickey's death. The key issue in dispute was whether Price gained

possession of the guns by stealing them, or whether Hickey turned the guns over to Price so that he could sell them for her.

1369.   If the jury had a reasonable doubt that Price stole the guns, then little was left the prosecution case against him.[249]   On the other hand, a jury convinced that Hickey and Petry had an unusual, but nonetheless mutually satisfactory relationship, would have wondered why Hickey would ever want to sell the weapons without consulting Petry, or why she would have turned to Price for assistance.   Without a plausible answer to such questions, reasonable jurors could easily have rejected the evidence of a business relationship and concluded that Price stole the weapons.

1370.   Of course, such questions would not have been a problem for the defense if the jury had been told Hickey was not happy in her relationship with Petry, she wanted to end the relationship, she feared he would kill her if he learned of her relationships with other men, and she feared he would kill her if she tried to leave him.   If the jury had been told that Hickey had declared her intention to leave Petry when she was able to raise enough money to do so, and that she believed she could only be rescued by beginning a relationship with someone more powerful than Petry, it would be easy to understand why Hickey would turn to Price to help sell the

---

[249]   Had the jury been so persuaded, then the entire prosecution theory of the case would have been rejected.   Price's possession of the allegedly stolen weapons was the major prosecution evidence used to convict on all counts involving Hickey.

Also, even if the jury could have somehow accepted the defense proposition that Price did not steal the weapons, but still believed that Price killed Hickey, then at the very least the jury would have had to reject the theory that the killing was committed in the course of a burglary or robbery.   This would have negated the proof of the felony-based special circumstance allegations and would have also precluded a first degree murder verdict based on a felony-murder theory.

weapons.

1371.  In short, evidence of Hickey's state of mind was relevant to support the inference that she acted in accordance with that state of mind by turning the weapons over to Price so that he could use them to raise the money Hickey needed to leave Petry.  It would have been very important defense evidence because it strongly corroborated the defense theory of the case and raised a reasonable doubt as to whether Price had stolen the weapons, without being used in an impermissible fashion, i.e., to explain Petry's conduct.

1372.  Admittedly, the bulk of the evidence pertaining to Hickey's state of mind consisted of statements made eight to twelve months before she was killed, and the trial court noted its concern with the remoteness in time of this evidence.  The question, then, is whether it was sufficiently reasonable to infer that Hickey's state of mind several months before she was killed would have reasonably raised any inference explaining conduct in her final days or weeks, that the trial court's prohibition on the defense presentation of such evidence violated due process.  The answer is yes, under the particular circumstances of the present case.

1373.  There is no reason to assume that Hickey's remaining with Petry for a year following her statements of fear meant that she satisfactorily resolved her problems.  As amply demonstrated by Dr. Blinder's testimony, when one partner is dissatisfied but afraid to leave the other partner, it is not unusual for such a relationship to continue "interminably," without resolution of the underlying problems.  RT 18364-18365.  Most importantly here, there was ample testimony from the prosecution's own witnesses, that Hickey continued to sneak out while Petry was at work, in order to engage in relationships with numerous other men in a constant pattern of activity that persisted right up until her death.  See RT 12390-12396, 12404, 12421-12437, 12597.

1374.   In sum, the state of mind evidence showed that a year before her death, Hickey was seriously dissatisfied with her relationship with Petry, but she did not feel she had the financial resources to leave him and she was afraid he would kill her if she tried.   She also had a compulsive need to engage in relationships with numerous other men, even though she knew that Petry would be enraged if he found out what she was doing.   Until her death, she continued to engage in the frequent relationships with other men; Petry, on the witness stand, denied knowledge of that activity.   Hickey's financial situation was still inadequate to allow her to leave Petry without substantial assistance from some other source.

1375.   Thus, it is clear that no agreement was reached between Hickey and Petry under which he would tolerate her relationships with other men.   The undisputed evidence of Hickey's continued provocative behavior and Petry's continued denial of it compels the conclusion that Hickey's state of mind in the time period immediately preceding her death was the same as it had been when the statements offered by the defense were made.   The only reasonable conclusion from these facts is that Hickey was still unhappy with her relationship with Petry, but was also still afraid or otherwise unable to leave him.   In such circumstances, the inference that Hickey would eventually act in conformity with her state of mind remained just as strong as when the statements were uttered.

1376.   In view of the broad use of less reliable hearsay evidence by the prosecution in attempting to prove the alleged conspiracy in the present case, it would be fundamentally unfair to allow the State to now utilize hearsay rules in an effort to justify the rulings that prevented the jury from learning crucial facts about the Hickey/Petry relationship.   In view of the truncated evidence that the jury heard, the finding that Price was guilty of murdering Hickey cannot satisfy reliability requirements and his conviction for that murder must be vacated.

### G. The Trial Court Erroneously Precluded Videotapes and Other Evidence of the Deplorable Conditions in the Hickey Household

1377. During jury selection, the prosecution announced its intent to utilize in evidence a videotape made inside the Hickey/Petry home shortly after the discovery of Hickey's body. The prosecutor moved in limine for omitting, as irrelevant, the last portion of the videotape, which showed the interior of the children's room. Alternatively, the prosecutor argued that the portion showing the children's room had prejudicial impact that outweighed any probative value. The matter was deferred pending the filing of a written motion. RT 7871-7873.

1378. The following week, the People filed their Motion to Exclude Portion of Videotape. CT 8384-8387. The motion noted that the final minute-and-a-half of the videotape showed the children's room, which the prosecutor described thusly:

> The room contains dilapidated mattresses and bedding. The
> mattresses are soaked with urine; fecal material is smeared on the
> walls. A single stuffed animal lays upon one of the mattresses.
> Voices are heard to express disbelief. CT 30:8384.

1379. The People argued this portion of the videotape was not relevant to any disputed issue and was unduly prejudicial.

1380. The defense filed points and authorities in opposition. The defense noted that the videotape included the nude and apparently deceased body of a female lying on a bed, but did not demonstrate the cause of death or the condition of the body or the premises at the time the body was discovered. While questioning the relevance of that portion of the videotape, the defense also argued that the portion showing the children's room was relevant to dispute Petry's

claim of a happy household and a loving family relationship. In addition, defense counsel argued that Petry's status as the original suspect in the case rendered the circumstances of his living conditions and his motives for killing Hickey highly relevant. CT 8388-8392.

1381. Following oral argument on the issue, the judge concluded that the portion of the tape showing the body and the crime scene would probably be admissible. On the other hand, the judge saw no relevance at all in the pictures of the children's room. He determined that neither side should refer to the tape during voir dire, since he had not yet decided whether it would be admitted at all. RT 8453-8454.

1382. The matter re-surfaced just before opening statements to the jury. After extensive discussion, the court let the prosecutor use an edited tape during his opening statement, showing all portions of the apartment except for the children's room. RT 10086-10087, 10095-10096. Thus, during the prosecutor's opening statement, the edited videotape was shown to the jury. RT 10194. During the trial, the portion showing the inside of the children's room was never shown to the jury, and no witness ever described the deplorable conditions in the room.

1383. The trial court erred in rejecting the defense theory of relevance. The defense position was that Price did not kill Hickey, and that Petry was a more likely suspect. The defense, although subject to numerous improper restrictions detailed throughout this Claim, did its best to portray Petry as living in a seriously warped relationship with Hickey, containing all the earmarks of the domestic homicide syndrome described in Dr. Blinder's testimony. The prosecution could not contest the fact that Hickey regularly left her infant children unattended while she spent the hours after midnight seeking men in bars. However, the prosecution did everything possible to portray Petry as a simple man who was ignorant of the extent of Hickey's escapades, and who acted as a kind and loving head of the household. For example, according to

Petry, his habit of phoning Hickey hourly between midnight and 8:00 a.m. was not designed to check up on her, but only to remind her that she was loved. RT 13324.

1384. While Petry's extensive failures to recall and the trial court's adverse evidentiary rulings prevented the defense from showing that Petry was far more obsessed with problems in the relationship than he would admit on the stand, there would have been no credible way for him to explain away the conditions in the children's room. If the jury had been shown the videotape of the inside of the room, it would have been impossible for Petry to claim ignorance or lack of recall. Petry would have been forced in front of the jury to confront the fact that he was knowingly involved in a very warped and bizarre relationship. A jury made aware of the disgusting conditions in which Petry allowed the children in his household to live would have been likely to reject Petry's attempt to portray himself as a loving individual dedicated to the welfare of Hickey and her children. Instead, Petry would have been seen as he was - a sick individual whose unfortunate dependence on Hickey trapped him in a warped relationship.

1385. In sum, if the jury had been allowed to fully understand the conditions in the Hickey/Petry household, then Dr. Blinder's testimony about domestic homicide syndrome would have been not only believable, but compelling. If Petry had denied knowledge of the conditions in the children's room, or claimed he did not recall the conditions, then it would have been obvious that all of his other denials and failures to recall were not sincere but were classic symptoms of domestic homicide syndrome. On the other hand, if Petry had admitted that he knowingly allowed the children to live in such filth, then he could no longer hide the fact that he was a sick individual in a sick relationship, which would have also added credibility to the defense theory of domestic homicide syndrome.

1386. Thus, defense counsel was absolutely correct when he argued that the

circumstances of Petry's living conditions were highly relevant. CT 8391. This evidence was crucial to the defense, especially in light of the many other restrictions that prevented the jury from seeing Petry as he really was. The exclusion of this critical defense evidence violated Price's right to confront the witnesses against him and to present evidence in his own behalf. See Chambers v. Mississippi, supra; Crane v. Kentucky, supra; Delaware v. Van Arsdall, supra.

1387. The trial court's exclusion of this evidence also violated petitioner's 5th and 14th Amendment rights to a fair trial in accordance with Due Process of law. Id.; see also Miller v. Angliker, 848 F.2d 1312, 1323 (2d Cir. 1988).

**H. The Trial Court Improperly Refused to Even Consider the Possibility that Testimony at a Foundational Hearing Could Demonstrate Sufficient Reliability to Permit the Introduction of Evidence That Berlie Petry Failed Two Polygraph Examinations Conducted By Prosecution Officials**

1388. The defense in this case sought a hearing on the admissibility of evidence that Petry had been found deceptive in two separate polygraph exams administered by Officer Jager of the Eureka Police Department and by Barry Brown, an investigator employed by the Humboldt County District Attorney's office. CT8743-8773. A supplemental defense declaration in support of the motion was filed two weeks later. CT8913-8915.

1389. The matter was discussed in court on January 14, 1986. RT 13234 et seq. During the course of the discussion, defense counsel expressly requested a hearing to determine the reliability of the polygraph technique under the circumstances in which Petry was examined. RT 13243. The judge refused even to hold a hearing on the reliability of the police-administered polygraphs in this case, ruling instead from the bench that, in his twenty years of legal experience, polygraph examinations had always been considered unreliable. RT 13247. He also

relied on California Evidence Code section 351.1 as barring such evidence.[250]   Also, even

though the reliability hearing sought by the defense was never held, as noted, the judge ruled that

under California Evidence Code section 352, the prejudicial impact of the polygraph evidence far

outweighed any relevancy.  RT 13251.

1390.    Set forth below are several reasons why the trial court decision to exclude this

evidence from petitioner's trial was erroneous.  First, the provisions of Evidence Code section

351.1 cannot constitutionally be applied to this case because it would be an application of an <u>ex

post facto</u> law and an unlawful retroactive enforcement of the law against petitioner.  Second, as

the defense argued at trial, whether or not section 351.1 is fairly applied in this case, it is a

violation of due process and the Eighth Amendment to prohibit petitioner from presenting such

critical evidence of his innocence in a capital case.  <u>See</u> <u>United States v. Hart</u>, 344 F.Supp. 522

(E.D.N.Y 1971); <u>Rupe v. Wood</u> 93 F.3d 1434 (9th Cir. 1996).[251]

### 1.  Evidence Code Section 351.1 Cannot Be Applied to the Present Case

1391.    The trial court improperly relied upon California Evidence Code sec. 351.1 to

---

[250]  Evidence Code section 351.1, subd. (a) provides: Notwithstanding any other provision of law, the results of a polygraph examination, the opinion of a polygraph examiner, or any reference to an offer to take, failure to take, or taking of a polygraph examination, shall not be admitted into evidence in any criminal proceeding, including pretrial and post-conviction motions and hearings, or in any trial or hearing of a juvenile for a criminal offense, whether heard in juvenile or adult court, unless all parties stipulate to the admission of such results."

[251]  As will be shown later in this Claim, <u>Hart</u> considered the specific situation of the government administering a polygraph exam to its own witness in order to aid prosecutorial assessment of the witness' credibility.  When the government then argued that the tests it administered to its own witness were not relevant to the credibility of the witness, <u>Hart</u> found a serious federal due process problem that required admission of the test results.  <u>Rupe</u> holds that such tests are admissible in any event as mitigating evidence in a capital case.

prohibit any use of the Petry polygraph evidence in this trial. That statute did not become effective until July 12, 1983, months after the commission of the present crimes and after the administration of the polygraph examinations at issue here. California law itself supports the view that the trial court's reliance on section 351.1 was unlawful. See People v. Smith, 34 Cal.3d 251 (1983) (holding that provisions of Proposition 8 should not apply retroactively to make admissible evidence not formerly admissible).[252]

> **2. Regardless of Any Issue of Retroactivity, Application of Evidence Code Section 351.1 Resulted in a Deprivation of Due Process of Law And a Violation of the Eighth Amendment in Petitioner's Capital Trial**

1392. The trial court's ruling, relying upon California Evidence Code section 351.1, violates not only the constitutional prohibition against ex post facto laws, but also violates principles of due process and implicates the Eighth Amendment in a capital case. The defense argued these issues in their memorandum in support of the admission of Petry's polygraph evidence at trial. See CT 8743-8773.

1393. Simply put, if foundational evidence could demonstrate that the polygraph technique had reached a sufficient state of scientific acceptability and reliability, then it would be a denial of the 5th and 14th Amendment due process right to a fair trial to preclude a criminal defendant from ever offering such evidence in his behalf. The blanket prohibition of section 351.1 is thus invalid under the due process clause of the U.S. Constitution and under the Eighth Amendment in a capital case such as this:

---

[252] But see People v. Seldomridge, 154 Cal.App.3d 362 (1984)(holding no ex post facto problem in applying section 351.1 retroactively, but failing to acknowledge holding in Smith).

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

Few rights are more fundamental than that of an accused to present witnesses in his own behalf.... [W]here constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice. Chambers v. Mississippi, supra, 410 U.S. at 302 (1973); see also Green v. Georgia, 442 U.S. 95 (1979) (regarding admission of otherwise inadmissible evidence at sentencing phase of capital trial as mitigating factor).

1394.     Such a mechanistic rejection of potentially relevant evidence is precisely the vice of section 351.1.   Federal case law on this issue supports petitioner's position.   In U.S. v. Hart, supra, the court held that the defense was allowed to admit evidence that government witnesses had failed government-administered polygraph examinations.[253]   In Hart, as in petitioner's case, the government administered the tests to a government witness.   In each case, after the witness failed the exams, the government decided to disregard the results and rely on the witness' testimony.   Hart analogized the resulting unique situation to the "government's duty under Brady v. Maryland, 373 U.S. 83, (1963), to disclose any evidence which may tend to exculpate a defendant."  344 F.Supp. at 523.  Hart concluded,

None of the lie detector cases cited by the government deal with the admissibility of a test administered at government request to a

_____

[253]  The Hart decision was expressly brought to the attention of the trial court in defense counsel's points and authorities in support of admission of the polygraph results.  CT 8747; see also CT 8771-8772 (including Hart decision as exhibit attached to defense points and authorities).

government witness before a trial.  Under the Brady principle, the

burden should be on the government to convince a jury that this

test was of no significance.  344 F.Supp. at 523.

1395.    Hart's reliance on Brady provides a further basis, grounded in due process, that

the trial court erroneously excluded Petry's two failed, government-administered polygraph

examinations in this case.[254]

1396.    The Hart reasoning is, indeed, "convincing."  United States v. Whitt, 718 F.2d

1494, 1501-1502 n. 8 (10th cir. 1983).  In the present case, the authorities obviously felt a

significant degree of confidence in the reliability of polygraph exams and in the ability of their

hand-picked examiners.[255]    The government was apparently prepared to make important

decisions about the direction of its own investigation based on the polygraph exam results.  After

Petry failed the first exam, the government set up a second exam, with a different operator, but

that exam produced precisely the same results as the first one.  As noted elsewhere in this

petition, after Petry failed both exams, the prosecution hired an expert consultant, whose wife

ultimately served as a juror in this case, to figure out how to explain away Petry's failures.  The

fact that the government went to such efforts shows that they were concerned that their own

polygraph results carried a significant degree of reliability.    Where the government has

demonstrated its own willingness to rely on polygraph examinations, it is highly unfair for the

---

[254] It bears noting that Hart has since been cited with approval in other federal courts.  See
United States v. Grant, 473 F.Supp. 720, 725 (D.S.C. 1979); United States v. Estrada-Lucas, 651
F.2d 1261, 1264 (9th Cir. 1980); United States v. Whitt, 718 F.2d 1494, 1501-1502 n. 8.(10th cir.
1983).

[255] Indeed, as noted above, Officer Jager assured Petry that his machine was especially reliable,
due to recent advances in technology.  CCT-7:1875.

government to then reverse itself and claim polygraph results are meaningless, in order to avoid revealing the results to the jury charged with deciding whether a capital defendant should live or die.

1397. Finally, more recently, the Ninth Circuit affirmed the decision of the federal district court holding, consistent with the defense's initial argument in their brief to the trial court on this issue, that it is constitutional error to prohibit a capital defendant from introducing the results of a government-administered polygraph examination of a government witness, at least at the sentencing phase of his trial, and that the state court's refusal to allow such evidence violated the Eighth Amendment at a capital trial. See Rupe v. Wood, supra. So too in petitioner's capital case, the trial court's ruling precluding the defense from introducing Petry's polygraph failures violated petitioner's federal constitutional rights.

1398. Petitioner is entitled to the granting of federal habeas relief on this Claim.

**CLAIM XVII**

**CURTIS PRICE IS INNOCENT OF THE MURDER OF
ELIZABETH HICKEY, AND HIS CONTINUED
INCARCERATION, AND SENTENCE OF DEATH FOR
THAT MURDER VIOLATES THE FIFTH, SIXTH,
EIGHTH AND FOURTEENTH AMENDMENTS TO THE
U.S. CONSTITUTION**

1399.   Curtis Price is innocent of the murder of Elizabeth Hickey, and therefore his conviction and sentence of death must be vacated as obtained in violation of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

1400.   Petitioner alleges in support of his claim for federal habeas corpus relief on the grounds specified above, the following facts, among other facts to be presented after he has access to discovery, to an evidentiary hearing and to adequate funding.

1401.   While the prosecution's evidence established that Price had some relationship with Hickey in the months before her death, and that he ended up in possession of some guns that had belonged to her and Petry, as well as some that belonged to her parents, this evidence falls far short of establishing that he <u>was</u> in fact responsible for Hickey's death.   No eyewitness placed petitioner at or near the Hickey residence at the time she was killed, and petitioner's fingerprints were not found anywhere at the murder scene.  RT 11853-11854.  The fingerprints of an unidentified person were found, however, on various objects at the Hickey murder scene, including on a telephone in her apartment that was found off the hook after her death, and on an empty Pepsi can which was found on the bed-stand of the bed right above her body.  RT 17477-17478, 14505-14506.   Moreover, the record is woefully lacking in any substantiated explanation

for why Curtis Price would have killed Elizabeth Hickey.

1402. In the paragraphs that follow, petitioner recounts a large amount of information that can be gleaned from the fact of the trial record in this case regarding the paucity of hard evidence linking petitioner to the murder of Elizabeth Hickey. That information, with citations to the trial court record, was previously been set forth in detail in the Appellant's Opening Brief (AOB) filed by petitioner in his automatic appeal before the California Supreme Court.[256] See AOB 53-75, 365-440, and 700-708. For the sake of simplicity, petitioner incorporates herein those sections of his AOB and citations to the record therein by this express reference.

1403. True, the evidence did show that Price might have been seen with Hickey in the months preceding her death, and that he might have visited her apartment on several occasions. He possessed a notebook with her phone number, and a notation "Elizabeth, weapons, corner of Simpson and Pine," and she possessed a note with the phone number of a friend of Price's, saying "Call Curt at (916) 885-3319 about money for guns." RT 15436-15437, 15471-15472. From these two notes and Price's possession of the Hickey/Petry and Moore weapons, a wide range of speculative inferences might be drawn.

1404. In an attempt to fill the void in the evidence regarding Price's possible motive for taking Hickey's life, the prosecution suggested at various points that Price might have obtained weapons from Hickey and then killed her because she knew too much or because she might have

---

[256] Mr. Price's AOB was filed as an exhibit to respondent's motion to dismiss for failure to exhaust.

been blackmailing him.[257]

1405. On the other hand, consistent with Price's testimony at the sentencing phase of trial, a more plausible explanation is that the notes and Price's possession of the weapons meant nothing more than the fact that Hickey gave him the weapons to sell for her, in order to raise money so that she could leave Petry – Hickey's abusive and controlling boyfriend. This is precisely what she had confided in other people she intended to do, before her death.

1406. It is also true that there is evidence that, when the body was discovered, the closet in which the Petry/Hickey guns were kept showed signs of forcible entry. The prosecution used this fact to argue that whoever killed Hickey also stole the guns. However, since Hickey and Price apparently had reached some type of business arrangement in regard to the guns, there would have been no reason for him to steal them from her.

1407. On the other hand, if Petry learned or suspected that Hickey had given his guns to another person in order to raise money to leave him, it is easy to envision him prying open the closet door (perhaps in a rage, or because he was unable to locate the key) immediately before or after killing Hickey. Alternatively, Hickey may have pried open the closet door in an effort to make Petry believe the guns had been stolen by a burglar, only to then admit to him that she had sold the guns.[258]

1408. Another reasonable alternative is that Petry killed Hickey in an explosion of anger for any of a number of reasons, and then he rushed back to work to cover himself. In the couple

---

[257] This theory was totally speculative. No evidence was introduced that Hickey actually was blackmailing Price or knew something about him that could cause him any problem.
[258] Indeed, Hickey had engaged in this type of trickery before, where she intentionally made it appear that she had been the victim of a theft crime when that was untrue.

of hours before he returned home to "discover" the body, he could have calmed down enough to realize that he needed an explanation for the killing. He could have then quickly pried open the closet door when he returned home, in order to make it look like Hickey was killed in a burglary.

1409. Petry was in the habit of calling Hickey hourly, throughout the entire night. Hickey regularly taunted and provoked Petry. It is quite reasonable to believe that there could have been a middle-of-the-night call in which Hickey either told Petry in anger that she had sold his guns and was leaving him, or in which she said or did something else that angered Petry enough to cause him to leave his job and rush home, where he could have discovered the guns were missing. If that happened, it would be no surprise if Petry's frustrations, which had been percolating for years, finally boiled over in furious anger, causing him to beat Hickey to death. Nothing makes this latter scenario any less reasonable than the prosecution scenarios.

1410. The only evidence that even approaches connecting Price directly to the Hickey homicide was Michael Thompson's testimony regarding what he allegedly heard about the killing. Thompson testified that he was aware of Hickey's murder and why it occurred. RT 16915. During a hearing outside the presence of the jury, it became clear that all of Thompson's claimed knowledge about the Hickey homicide constituted inadmissible hearsay. Thompson claimed to have gained his knowledge of the Hickey killing in May, 1983, from John Stinson, an alleged member of the AB. RT 16943. According to Thompson, Stinson had been selected as the primary contact for petitioner to use when communicating with people inside prison. Thompson testified that Stinson would have received the information from a "runner." RT 16950. Thompson noted that Myers could visit Stinson to relay messages. RT 16890-16821. Stinson testifying as a defense witness, denied acting as a contact person for Price after his release, and denied ever receiving a visit from Myers. RT 18621-18622, 18668. In any event,

because the alleged communication from Stinson to Thompson occurred well after the arrest of Price and the termination of any alleged conspiracy, the co-conspirator hearsay exception was unavailable and the court ruled that such hearsay could not be admitted. RT 16951.[259]

1411. Aside from being inadmissible multiple-level hearsay, Thompson's evidence about the Hickey murder suffers from significant credibility problems, and, as established in Claim I of this petition, comes from a witness who lied repeatedly, and did so with prosecutorial impunity, throughout petitioner's trial. Moreover, Thompson's account of the Hickey murder was inaccurate in its details. For example, Thompson testified that he understood Hickey died from being stabbed in the back. RT 17156. He also said that he told Detectives Ross and Morck that the guns used to kill Barnes came from Hickey's residence. RT 17086. He acknowledged that he could have told the officers that Hickey was killed before Barnes, claiming that his confusion stemmed from grouping the Moore burglary and the Hickey homicide together. RT 17086-17088.

1412. In sum, an analysis of the value of Thompson's evidence about the Hickey murder, especially in light of the evidence about Thompson's mendacity and his potential for bias, which the prosecution hid from the defense and from the jury, demonstrates that his evidence is entitled to little or no weight and cannot change the fact that the overall evidence of

---

[259] Before it became clear that all of Thompson's claimed information about the Hickey killing consisted of inadmissible hearsay, the prosecution had asked several questions about the matter in front of the jury. First, the prosecutor asked Thompson why Hickey was killed. RT 16898. Defense counsel objected on the ground of lack of personal knowledge, and the prosecutor then asked whether Thompson had talked to other AB members who had talked to Price before Price's arrest. Thompson answered affirmatively, and defense counsel objected on the ground of double hearsay. RT 16898-16899.

guilt was weak.

1413. Aside from all these weaknesses in the prosecution evidence against Price, the evidence presented by <u>both</u> sides established that there was a much likelier suspect than Price, namely, Berlie Petry. There are many reasons to believe that it was Petry, not Price, who killed Hickey, and there are no good reasons to come to a conclusion that Petry did not commit the crime.

1414. As alleged in Claim XVI of this petition, the relationship between Petry and Hickey was most unusual. It is clear that he was obsessed with Hickey to a destructive degree. In the year before her death, Hickey successfully sought short-term relationships with dozens, and perhaps a hundred or more different men. She regularly brought these men home with her at night, while Petry was at work. He came home once and found her in his bed with another man, and he contracted venereal diseases from her on at least two occasions, and her persistent infidelity was no secret from Petry.

1415. From the strange diagram of Hickey's life prepared by Petry, and from the limited portions of his writings that were allowed in evidence, it is clear he was thoroughly preoccupied with the problems in their relationship. Also, he went to the extreme measure of calling her every hour on the hour of every working night, from midnight on, to check up on her.

1416. Petry persistently claimed that he was never angry with Hickey, despite the fact that several witnesses testified that he fought with her and was physically violent towards her. Indeed, this can only be explained by concluding either that Petry was blatantly lying about his feelings, or else Dr. Martin Blinder was one hundred percent accurate in his undisputed expert assessment of Petry as the classic example of a person in a relationship likely to lead to an explosion of fatal violence.

1417. Petry had many unusual things to say to the police just after Hickey was killed, and, on cross-examination before the jury at trial, he displayed an extraordinary inability to recall the simplest details. After Hickey, his guns were probably the most important part of his life.[260] Just before Hickey was killed she was involved in some kind of financial negotiations with Price regarding the guns. As noted, Petry had beaten Hickey on prior occasions. Hickey had expressed her mortal fear of him, but the jury never got to hear that evidence.

1418. There was evidence that Ms. Hickey had purchased a small, concealable, J-frame, .38 caliber chrome Smith and Wesson pistol, apparently for her protection, sometime in the year or so before she was killed. RT 15273. Ms. Hickey's close friends knew about the gun. See e.g. RT 18071-18072. After Ms. Hickey's death, the police found the gun (People's Exh. 6b) inside a glass mirrored box, which was located on the headboard of the bed, just above Ms. Hickey's dead body. RT 12793. The gun was the only intact firearm found during the police search of the Hickey-Petry residence after the crime. RT 15487-15488. Petry testified that he knew nothing about the gun. RT 13399-13401. His lack of knowledge, coupled with the fact that Ms. Hickey kept the gun in a box on the headboard of the bed, suggests that she kept the gun a secret from Petry because she wanted to have a gun in a handy location to protect herself from him. The fact that Exhibit 6(b) was the only intact gun the police found at the crime scene makes it probable

---

[260] Although Petry displayed an extraordinary inability to recall the simplest details, the one thing he did describe in detail was the host of firearms he and/or Ms. Hickey owned, testifying that he personally maintained and cleaned all the firearms he and Hickey owned.

that the existence of the gun was not known to whoever perpetrated the Hickey murder.[261] That

person was Berlie Petry.

1419. When Petry arrived at work just hours before Hickey was killed, the security

guard he relieved, who had seen him regularly over a three-year period, thought that Petry was

strangely nervous, edgy, perturbed, and irritated. See RT 17953-17961. Petry's punch clock tape

for that night showed that he was not performing his regular duties for a 40 minute period that

was very close to the time of Hickey's death. Although Petry claimed he was attending to a

boiler problem, defense evidence indicated no such problem had occurred. That evidence was

disputed, but even so, there is still no affirmative evidence, except Petry's word, to indicate that

there really was a boiler problem. Petitioner would note that Petry's place of employment was

only six to eight minutes away from his home, so that 40 minutes was ample time for him to

drive home in anger, kill Hickey, and drive back to work.[262]

1420. Thus, Petry clearly had the motive and opportunity to commit the murder of

Hickey. He also had the means to commit the murder, namely the crowbar he owned and took

with him when he abruptly moved out of town shortly after Hickey's murder. It should be noted

---

[261] The prosecution contended that petitioner knew about the gun and alleged that he had used it to commit one of the robberies charged against him. After petitioner's trial, the prosecution, acting on behalf of Ms. Hickey's mother, filed a motion in the trial court for the return of the gun to Hickey's mother. Petitioner opposed that motion, and requested that this Court order that all evidence in his case, including the J-frame pistol be preserved until final determination of this habeas corpus proceeding. Finding good cause appearing, this Court granted petitioner's request. See Order re: Custody and Retention of Evidence (filed February 18, 1998).

[262] As has been noted, since Petry regularly called Hickey from work throughout the night, it is quite possible that something was said during a phone conversation that night that caused Petry to rush home. He could have raced home in anger at something Hickey said on the phone, or he could have gone home out of concern and exploded in anger over something he discovered when he arrived, such as his missing weapons.

here that no murder weapon was ever tied to Price. While there was gross speculation that a fish billy found in the trunk of Mrs. Lloyd's car could have been the weapon, Petry's own crowbar was a much likelier murder weapon.[263]

1421. Petry's performance on the witness stand provided many reasons to doubt his credibility as a witness. His alibi had a hole in it large enough to allow him to commit the crime. Indeed, he was the initial police suspect in the case and ceased to be a suspect only when Price became one. This is so despite the fact that Petry flunked the two polygraphs which the police administered to him to ascertain if he was lying. Days later, Petry moved to a different state.

1422. Whether or not Petry would have been found guilty beyond a reasonable doubt in a trial focusing on him, a reasonable juror could easily conclude that Petry had never been satisfactorily eliminated as a suspect. Adding to that is the overall weakness of the evidence against Price.

1423. When the above evidence is supplemented by critical pieces of evidence which were withheld, some from the jury, and some from both the jury and the defense, the picture that emerges is that Berlie Petry was in fact Hickey's murderer, as she feared he would be. As alleged in Claim XVI of this petition, the jury did not hear that in fact Hickey was indeed afraid for her life around Petry. She had confided to several individuals before her death that she needed money to get away from him, and that if she did not do so he would kill her one day.

1424. Another fact that the jury never heard was that Petry flunked two polygraph

---

[263] Petry testified that his crowbar was kept with his tools in the closet under the stairs. RT 13451. However, Officer Olson, who searched the Petry residence looking for anything that could have been used to pry open the closet door, did not see the crowbar inside the apartment. RT 12934.

examinations. The jury also never heard a tape-recording of Petry's call to the police dispatch center to report Hickey's murder. That was relevant and possibly useful evidence for the defense case since it would have shown Petry's tone, demeanor and emotional state shortly after he found Hickey's body and the exact information he provided when he reported her murder.[264]

1425. During the investigation of the Hickey murder, the police found evidence that could potentially have entirely eliminated Price as her killer. There were fingerprints made with Ms. Hickey's wet blood on her naked body. The bloody prints were located a little below her left breast.[265] See RT 12838. These prints may well be those of Ms. Hickey's killer. RT 12998. The potential significance of the prints was obvious. Yet rather than having a qualified expert from the local office of the Department of Justice crime lab brought in to lift such prints from the body, the police only preserved the prints by taking photographs of them. RT 12858-12861; 17509-17514. Even the photographs, however, show that one or more of the prints contains some ridges. The presence of such ridges, if they constitute fingerprint characteristics, can be used for elimination purposes, even if there are an insufficient number of characteristics necessary to make a positive identification. See Exhaustion Petn., Exh. 1 at 7-8. To make that

---

[264] The prosecution and the police claimed that no recording of Petry's call to report the Hickey murder existed due to an alleged malfunction of the recording device, but as petitioner has noted elsewhere in this petition, he was informed of new information during state exhaustion proceedings that puts those claims in doubt. See fn. * supra.

[265] Petry acknowledged during his testimony that he had touched Hickey's nude body, but he claimed he did so after he had returned home from work and found Hickey dead. Petry testified that he touched her only on her left arm and stomach. He stated that he had no blood on his hands when he touched Ms. Hickey's stomach and that she was not bloody in that area. RT 13542, 13602.

determination, it is necessary to have the negatives and utilize photo-enhancement techniques.[266]

Id.

1426. The prosecution sent the negatives of the photographs of the bloody prints to the FBI crime lab for inspection and testing after having sent them to the California Department of Justice lab without conclusive results on the issue of identification. See Exhaustion Petn., Exh. 57. The defense specifically requested disclosure of the report prepared by the FBI crime lab concerning its examination of the bloody fingerprint evidence and the results. The prosecution did not disclose that report to the defense or to the trial court. Instead, the prosecution disclosed only a summary report by the FBI of its conclusions.[267] See Exhaustion Petn., Exh. 57. The prosecution maintained in court that the bloody prints were not useable. See RT 1879, 2176.

1427. The summary report does not contain any data or information about the procedures utilized by the FBI in examining the fingerprints, about what the examination revealed that led to the determination that the prints had no value or about whether the FBI only determined that the prints were of no value for purposes of identification. Petitioner notes that when Eureka transmitted the fingerprint evidence to the FBI, they requested that the bloody prints be compared with petitioner's prints for identification purposes, but they did not request

---

[266] Without access to the negatives of the prints, which are in the possession of the state and are not available to petitioner without a subpoena, petitioner has not been able yet to have the evidence analyzed by a defense expert and to provide a declaration from that expert. Petitioner notes that during the course of preparing his state exhaustion petition, an investigator assisting petitioner's counsel made a number of requests to the Humboldt County authorities to allow petitioner an opportunity to have the negatives copied and enhanced. However, those authorities did not respond to these requests.

[267] The reasons why the prosecution disclosed only the summary report and not the details of the FBI's examination of the bloody fingerprint are not presently available to petitioner.

that the prints also be examined for purposes of elimination.

1428. In Herrera v. Collins, 506 U.S. 390 (1993), the Supreme Court considered the issue of whether the conviction and death sentence of an innocent person would violate the Eighth Amendment. The Court determined that the evidence of innocence in that case was insufficiently strong to warrant such a ruling. However, in reaching that conclusion, the Court assumed for the sake of argument that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief..." Id. at 856. The Court in Herrera did not ultimately set forth an actual innocence standard, because it determined that the evidence was insufficiently persuasive under any reasonable standard. Several years later, in Schlup v. Delo, 513 U.S. 298 (1995), the Court returned to the issue of innocence in the context of determining whether the petitioner had satisfied procedural obstacles which required some showing of factual innocence. In that case, the Court held that "if a petitioner ... presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial...", then he is entitled to a full consideration of his claims regardless of the procedural posture in which they are raised. Id. at 861.

1429. Whatever the appropriate standard, the facts above undermine confidence in the outcome of petitioner's trial. For this reason alone, his convictions and death sentence must be vacated, as obtained in violation of his right to due process, a fair trial, effective representation, and to be free from cruel and unusual punishment, as guaranteed to him under the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

# CLAIM XVIII

## THE TRIAL COURT SERIOUSLY MISINFORMED THE DELIBERATING JURORS WHEN THEY MADE INQUIRIES REGARDING MATTERS NOT IN EVIDENCE, AND THE REVELATION OF THE CRUCIAL MISUNDERSTANDING BY THE JURORS DEMONSTRATES THAT THE GUILT VERDICTS WERE TAINTED AS WELL AS THE PENALTY VERDICT

1430. The trial court's improper and misleading response to a jury question during penalty deliberations regarding a matter which was not in evidence and which the prosecutor had knowingly misled the jury about during the trial, violated petitioner's rights to due process, a fair trial, the effective assistance of counsel, and his right to be free from cruel and unusual punishment, as guaranteed by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

### A. Introduction

1431. As shown below, an unusual and potentially devastating error occurred during the guilt phase of petitioner's trial. However, the nature of the error was not apparent to the trial court or the parties until the penalty phase jury deliberations were underway. When the problem finally did surface, it was not properly remedied.

1432. As alleged in more detail below, D.A.G. Ron Bass asked Michael Thompson and Clifford Smith, two key prosecution information witnesses, a series of questions about the meaning of the phrase, "send or take a girl to the country." The witnesses explained that among AB members that phrase meant to kill someone. The witnesses were also asked whether petitioner had ever used that phrase. Although these questions were asked, neither the answers to them nor any other testimony or physical evidence indicated in any way that petitioner had

ever written or uttered such a phrase.

1433. Nonetheless, it became apparent during penalty deliberations that the jury mistakenly believed there was evidence that petitioner had used the phrase in connection with the Hickey killing. The jury apparently attached great importance to this belief and asked about the "evidence" during a critical stage of penalty phase deliberations. The trial court's response to the jurors' inquiries did not resolve the misunderstanding and, in fact, exacerbated the problem by demonstrating that the judge shared the mistaken belief that such evidence existed.

1434. Due to the nature and the apparent effect of the misunderstanding, petitioner was seriously prejudiced and the penalty verdict cannot stand without violating federal Eighth Amendment requirements of reliability, or federal Fifth, Sixth, and Fourteenth Amendment requirements of due process and a fair jury trial, regardless of whether this is analyzed as judicial error, prosecutorial error, or defense counsel error. See Darden v. Wainwright, 477 U.S. 168, 179-83 (1986) (proceeding at state trial that is "unduly prejudicial" and that "renders the trial fundamentally unfair" violates due process); Eddings v. Oklahoma, 455 U.S. 104, 118-19 (1982) (O'Connor, J., concurring). Also, as petitioner shows below, jury's misunderstanding necessarily tainted the guilt findings on the Hickey crimes, and likely affected the jury's findings of guilt findings on the other crimes as well.

**B. Factual and Procedural Background**

1435. During the prosecution's guilt phase examination of Clifford Smith the following exchange occurred:

> BY MR. BASS:  Q:  What does it mean to 'take someone to the
>
> country', those terms, 'take someone to the country'?

A: Kill.

Q: Where did that saying originate, if you know, or come into being?

A: Just made it some years back. Spider Craig was a member then. He's dead now. He was involved in a killing where he took some female to the country, and we kind of picked up the phrase after that.

Q: Did you ever personally see those words written by Curtis Price?

MR. DePAOLI: Objection, your Honor, calls for hearsay.

MR. BASS: Hearsay?

MR. DePAOLI: Yes.

THE COURT: Well, let's get a time frame once again as to when they were written, if they were written.

MR. BASS: I don't know --

THE COURT: I don't think it's hearsay, but it may not be relevant.

MR. BASS: I would be arguing, of course, an admission if that was -- if he did personally see such a statement.

THE COURT: Depending on when it occurred.

BY MR. BASS: Q: I am talking about February, January and February, '83.

A: No.

Q: March?

A: (Shakes head.)

Q: Did you ever hear of such a statement?

MR. DePAOLI: Objection. Calls for hearsay.

MR. BASS: Statements of co-conspirators.

MR. DePAOLI: The judge has made --

THE COURT: If it's after the arrest, it can't be admitted, I don't

believe, without some further foundation that I am unaware of.

Sustained. RT 14783-14785.

1436. Thus, during that exchange, Smith told the jury that the phrase "take someone to the country" means to kill someone, but he said <u>nothing whatsoever</u> that could properly allow the jurors to infer that Price had <u>ever</u> used the phrase.[268] Unfortunately, the prosecutor's statements and the judge's comments ("Depending on when it occurred", "If it's after the arrest") <u>implied</u> that Price did use the phrase, and that the only issue was when it happened.

1437. Strikingly similar events occurred when Thompson subsequently testified. Bass asked if he had ever received any post cards written by Price and Thompson responded that he

---

[268] Subsequently, <u>outside the presence of the jury</u>, the prosecutor pursued the matter further. Smith explained that at some point Robert Griffin came back from a visit and said, "Baby's been busted. Had to take some bitch to the country. He's in Eureka right now." RT 14795. The judge ruled that this testimony could not be admitted in front of the jury, because the alleged statements occurred after Price had been arrested and were not in furtherance of the conspiracy. RT 14805.

Notably, <u>immediately</u> before the prosecutor had asked Smith the first question about this matter in front of the jury, the judge had made it clear in an unrelated ruling that he would not admit co-conspirator hearsay that occurred after Price's arrest. RT 14783, lines 7-11. This strongly suggests that the prosecutor was not acting in good faith when he asked Smith any questions at all about the meaning of the phrase, "take someone to the country."

had.  RT 16906.  Bass asked what the card said and defense counsel objected on hearsay grounds.  RT 16906.  The judge instructed Bass to set a time frame.  Thompson said he had not been the one to receive the card, but he had seen it.  Thompson believed the card had been postmarked November, 1982.  He was again asked what the card said and defense counsel renewed his objection.  RT 16906.

1438.  The matter was discussed <u>at bench</u>.  The prosecutor's description of the contents made it clear they had nothing to do with the phrase, "sent a girl to the country."  RT 16907, lines 23-25.  Thereafter, the court ruled that questioning about the postcard should be deferred for further discussion later.  RT 16908-16909.  Returning to the presence of the jury, the following exchange occurred:[269]

> BY MR. BASS:  Q:  Do you know what it means to -- what the
> phrase 'sent a girl to the country' means?
>
> A: Yes.
>
> Q: What does it mean?
>
> A: It means that the girl in question has been killed and dumped.
>
> Q: Have you seen that phrase, 'sent somebody to the country,'
> before as a member of the Aryan Brotherhood?  Have you ever
> seen that phrase written?
>
> A: Yes.

---

[269]  In reading this exchange, it should be kept in mind that the <u>last thing heard by the jury</u> was an inquiry into the contents of a postcard written by Price, and an objection by defense counsel.

Q: Before the defendant was arrested, after his release from prison,

did you ever receive, other than the letter you've talked about there,

receive any letters or cards or notes that had been written by him?

A: Yes.

Q: Were they written to you, other than the one, of course, you've

got in front of you now, or to other members of the Aryan

Brotherhood?

A: Both

Q: Who, other than the ones written to yourself? Who else did the

defendant write to while he was out on the streets before being

arrested in March of '82, that you can recall now?    RT 16909-

16910.

1439.    Defense counsel then objected.  The prosecutor explained he only wanted to know whether Thompson had seen the letters.  The judge said Thompson could explain who the letters were addressed to, but not what was contained in the letters.  Thompson then named several recipients of letters that he had seen, and the questioning soon turned to other matters.  Nothing more was said about the phrase "sent a girl to the country."

1440.    Thus, as in Smith's testimony, the phase was defined, but there was not one word of testimony that Price had ever used the words.  Once again, however, the questions about a specific postcard, followed by objections to questions about its contents, followed next by questions about the meaning of the phrase, resulted in the unsupported inference that Thompson had seen those words in a postcard in Price's handwriting.

1441.    No other testimony in the guilt phase of the trial pertained to sending anyone to

the country. The only mention of the term in the penalty phase occurred when Price testified. While cross-examining Price, the prosecutor asked if he had ever written to any convicts about Hickey and said he took her to the country. Price denied ever writing such words. RT 22484-22486.

1442. Thus, when penalty phase jury deliberations began, there was <u>not one shred of evidence</u> that could legitimately support any inference that Price had ever written or uttered anything similar to the phrase, "sent a girl to the country." Even if the jury chose to disbelieve Price's denial, that cannot create an inference that he had written such a card or letter.

1443. Nonetheless, during deliberations, it became apparent that the jury had somehow attached importance to the guilt phase testimony about the phrase and believed testimony linked the phrase to Price. On the morning of the fourth day of penalty phase deliberations, the court notified counsel that a note had been received from the jurors listing various items of evidence they wanted to review or testimony they wanted read back. Among the items were all writings or testimony regarding the statement "Take her to the country or took girl to the country." RT 23062; CCT 11:3102. The court, counsel, and the reporter compiled a list of transcript references to the phrase. RT 23062-23065. In the course of compiling the references, the judge focused on the fact that all that the jury could be told was the testimony about what the phrase meant; anything else had been excluded as hearsay.[270] RT 23066, lines 6-9.

1444. The judge specified that in response to the jury request, the reporter would read

---

[270] However, the judge apparently failed to realize that the testimony about the meaning of the phrase was totally irrelevant in the absence of any evidence that it had ever been used in connection with the present case.

back RT 14783, line 23 through RT 14784, line 3, RT 16909, line 13 through RT 16912, line 5, and RT 22484, line 2 through RT 22485, line 15, RT 23079-23080. In regard to Smith's testimony, this included nothing more than the meaning of the phrase. However, in regard to Thompson's testimony, this included the meaning of the phrase as well as testimony about seeing letters written by Price, even though nothing indicated that any of those letters had contained the phrase in issue.

1445. The designated portions of the transcript were read to the jury. Late that afternoon, the extent of the jury's misunderstanding became even clearer when, at 4:30 p.m., a note was sent to the court asking for <u>the postcard which dealt with the prosecutor's questions about the phrase, "took a girl to the country."</u> RT 23082. The judge proposed that the jury be informed that there was no such postcard "in evidence," though he did not inform counsel of the language he intended to use. RT 23083. The jury was then called into court and the judge explained,

> First, ... to advise you about your last note which speaks of a postcard which gave rise to the prosecution's questions about the phrase 'Take a girl to the country,' everyone here agrees <u>that postcard was never physically present nor marked in this case.</u> <u>We could all speculate,</u> <u>I think,</u> <u>individually and perhaps collectively as to</u> <u>what may have happened to it,</u> but no one here really knows. It's never been before the Court as far as I know and certainly is not marked and is not in evidence. RT 23084; emphasis added.

1446. The words used by the court went well beyond what the court proposed to counsel, clearly implying that the card did exist, but simply had not been admitted in evidence or

was lost or destroyed. However, having just reviewed the matter fully, the judge should have realized there was <u>no evidence</u> that any such writing existed at all, or that the phrase was in any way connected to the crimes charged against petitioner. Defense counsel promptly notified the judge of this problem, explaining at bench, "Excuse me, your Honor, but the way I heard the court reading it, there was such a postcard in existence." RT 23085. The court, still not understanding the problem, asked defense counsel, "Do you want me to tell, 'As far as we know, it's been destroyed'?" RT 23086. Defense counsel explained again that he did not believe it was proper to use words such as "it" or "that," which would imply that such a card did exist. RT 23086. The judge then instructed the jury on the matter once more:

> Ladies and gentlemen, I don't recall the exact wording that I gave
> you about the postcard. Whatever I said is not meant to infer that
> necessarily there was ever such a postcard in existence. All I'm
> trying to convey to you clearly is that there is certainly not one
> marked. There is not one in evidence, and <u>it may be or it may not</u>
> <u>be</u>, and no one here really knows because we -- we haven't seen it,
> and I don't want you to be inferring that there was <u>necessarily</u> one
> in existence at any given time. That's something you should treat
> along with the other evidence and <u>make your determination on if</u>
> <u>there is enough evidence for you to make a determination on that</u>
> <u>issue</u>, if it's important to you.
>
> We do not have one marked. We do not have one in evidence.
> And anything I am saying here is not to infer or cause you to
> believe that I have some inside information that one did indeed

exist at any given time. I don't know that. RT 23086-23087;

emphasis added.

1447. The jury returned the verdict of death at the end of the following day. CT 10781-10782.

**C. Faced with a Clear Demonstration of a Serious Misunderstanding by a Deliberating Jury, the Judge Instructed the Jurors in Language that Only Compounded the Confusion**

1448. If an objection is sustained before a question is even answered, or if an answer is contrary to the interrogator's inference, a reviewing court might be tempted to conclude that the other party was not harmed. The question did not constitute evidence, so if there is no answer and the question is theoretically meaningless. If there is an answer that is contrary to the inference, it is the answer and not the inference that constitutes evidence. However, the California Supreme Court has wisely recognized, in the context of prosecutorial examination, that even in such instances the jury can easily be misled into believing incriminating evidence exists:

> The impropriety of the prosecutor's conduct ... was not cured by
> the fact that his questions elicited negative answers. By their very
> nature the questions suggested to the jurors that the prosecutor had
> a source of information unknown to them which corroborated the
> truth of the matters in question. People v. Wagner, 13 Cal.3d 612,
> 619 (1975) (emphasis added).

1449. The present problem clearly demonstrates the correctness of the Wagner principle. Here, the questions asked by the prosecutor caused the jury to believe that highly

incriminating evidence had been introduced against Price, when in fact the evidence in question was never offered in the presence of the jury, and when, as alleged in Claim I of this petition, the prosecution was on notice that allegations that petitioner had sent a message that he "took the girl to the country" were contrived by informant[s] at the Tehachapi informant unit seeking personal benefits in return for cooperating against petitioner. See Claim I, at paragraphs *-*, incorporated herein expressly by this reference. What makes this case unique is that the deliberating jurors asked questions that clearly disclosed their mistaken view of the state of the evidence. Instead of correcting the jury's misunderstanding, the trial judge made it clear that he shared the jury's erroneous view. Although defense counsel explained the problem to the trial judge, each response by the court made matters worse, until the court's comments implied that the jury could conclude that such a postcard existed. The request from the jury for the postcard demonstrates that, after hearing the actual testimony and then having it read back, the jurors still believed such a postcard existed.

1450. The trial court's duty when the jury makes explicit its difficulties is to "clear them away with concrete accuracy." Bollenbach v. United States, 326 U.S. 607, 612-13 (1946). Here, the judge should have simply told the jury that there was no evidence that such a postcard ever existed, and that the testimony from Smith and Thompson about the phrase was not relevant to the present case. Instead, however, the judge compounded the problem by telling the jurors that it was up to them to decide whether such a postcard existed. This instruction went far beyond what the judge had discussed at bench with counsel, and was completely unjustifiable, especially since immediately before the admonition, the judge had reviewed the testimony on the subject in detail.

1451. The trial court should have easily recognized that the jury was mistaken about the

existence of evidence that was apparently considered important in their deliberations. While the judge "clarified" the matter by telling the jury there was no such postcard in evidence, and that it might or might not exist, the fact remains that the judge also expressly informed the jury that the evidence before them would <u>permit them to determine</u> (i.e., permit an inference) that such a postcard did exist. That advice was wrong and highly prejudicial to the defense.

### D. Curtis Price was Seriously Prejudiced by the Jury's Mistaken Belief and by the Trial Court's Erroneous Instruction After the Problem Became Known

#### 1. The Penalty Verdict Must Be Vacated

1452. The trial court's mistake was particularly prejudicial because the facts that the jury mistakenly thought were in evidence filled a crucial gap in the prosecution evidence in regard to the Hickey crimes. Elsewhere in this petition, petitioner has shown the circumstantial evidence of Price's guilt of the Hickey crimes was extremely thin. Indeed, there were many reasons to conclude that Petry was a more likely suspect than was Price. See Claims XVI and XVII.

1453. The Barnes murder was proved by statements of persons who claimed to have been directly involved in the planning of the crime. Although it has been shown in Claim I of this petition that Thompson, Smith and Myers lied repeatedly during trial and thus there were many reasons to distrust their testimony. Unaware of that information, the jury chose to believe their testimony.

1454. In Claim XVII explaining why the evidence regarding the Hickey crimes must be deemed close, petitioner showed that the only testimony by Thompson about those crimes consisted of ambiguous general statements based on multiple hearsay. Also, the few specific

facts in those general statements were incorrect. Furthermore, as demonstrated earlier, eventually the court and counsel learned that even that weak evidence was based on inadmissible hearsay. As for Smith, he gave no testimony at all connecting Price to the Hickey crimes.

1455. The jury, however, received the erroneous impression that these two witnesses, whom they had chosen to believe, had seen a postcard written by Price in which he confessed to the Hickey killing. Certainly the jury's belief that witnesses they apparently credited had seen such a postcard would substantially increase the likelihood of a conclusion by the jury that Price was guilty, despite other weaknesses in the proof of guilt of the Hickey crimes.

1456. The jury's mistake did not become known until the penalty phase deliberations. It was not until the penalty phase that the jury heard Price testify and deny committing the capital crimes. The mistaken inference therefore was likely to have caused the jury to conclude that Price lied to them in his testimony. That conclusion, of course, would have had an overwhelming influence on the decision to vote in favor of the death penalty. Thus, the judge's error must be deemed prejudicial in regard to the penalty verdict.

1457. The United States Supreme Court has made it quite clear that the prohibition of cruel and unusual punishment gives rise to a special "need for reliability in the determination that death is the appropriate punishment" in a capital case. Gardner v. Florida, 430 U.S. 349, 363-364; Woodson v. North Carolina, 428 U.S. 280, 305. This constitutional requirement was found to mandate reversal of the penalty in a case where "the jury was allowed to consider evidence

that has been revealed to be materially inaccurate."[271]  Johnson v. Mississippi, 486 U. S. 578 (1988).

1458. Although Smith's and Thompson's testimony was directed to guilt, Price did not take the stand and deny commission of the crimes until the penalty phase and it would have been entirely proper for the jury to rely on Price's penalty phase denials to raise a doubt about his guilt. Such doubts are a legitimate basis for declining to impose a death judgment. See Lockhart v. McCree, 476 U.S. 162, 181 (1986).

1459. The simple fact that at the start of the fourth day of penalty deliberations the jury asked questions about the postcard demonstrates beyond dispute that the jury found this matter relevant to the penalty determination. Indeed, the records shows that at the end of three full days of deliberations, at least five jurors had not concluded that death was the appropriate punishment. See RT 23051-23058. In view of the nature of the offenses, and the evidence that had been introduced in the penalty phase regarding Price's past history, it seems a near certainty that doubts about guilt must have been the major factor causing several jurors to conclude that death was not the appropriate punishment.

1460. Clearly, in the present case, the jurors were improperly permitted to infer the existence of evidence which was apparently important to them and which could have been used to unfairly dispel lingering doubts about guilt. The improperly permitted inference also could have persuaded reluctant jurors that Price had lied to them in his penalty phase testimony. Thus, the error created an inaccuracy that had as much or more potential for prejudice, as the prior

---

[271] Put differently, when a sentencer relies on misinformation or assumptions not supported in the record, federal due process is lacking and the sentence must be vacated.

conviction that had been vacated in <u>Johnson v. Mississippi, supra</u>. It cannot be said that the penalty determination meets the standards of reliability essential to satisfy the Eighth Amendment. Therefore, the penalty verdict must be vacated.

### 2. The Guilt Verdicts Were Tainted by the Jury's Misunderstanding And Must Be Vacated

1461. Even though the judicial error in failing to respond adequately when the jury made known its misunderstanding did not occur until the penalty phase, the fact remains that while the jury was deliberating the issue of guilt, it undoubtedly acted under the same mistaken belief that there was evidence before them that Price had written that he had sent the girl to the country. That mistaken belief filled a serious gap in the prosecution's weak case against Price in regard to the Hickey killing.

1462. Indeed, the potential for prejudice was even greater in the guilt phase than in the penalty phase. In the penalty phase, while the judge improperly allowed the jury to infer that the incriminating postcard existed, at least he instructed the jury that the postcard had never been produced in court and might not exist. During the guilt phase, nothing was ever said to weaken the jury's mistaken belief that the postcard existed and was in evidence. Also, during the guilt phase the jury did not hear Price deny the existence of the postcard.

1463. The potential for prejudice resulting from the jury's mistaken and uncorrected belief during the guilt phase that that there was evidence that Price had confessed the Hickey killing to his alleged co-conspirators was so substantial that the fundamental federal due process guarantees of the Fifth and Fourteenth Amendments to the United States Constitution require that the verdicts for the crimes involving Hickey must be vacated. Furthermore, in view of the

prosecution's theory that all of the charged crimes were part of a single conspiracy, an erroneous verdict on the Hickey counts necessarily impacted seriously on the other counts. In other words, once the jury concluded that Price had committed the Hickey offenses, it was far more likely that the jury would conclude he was indeed involved in the alleged conspiracy and was guilty of the other charged crimes.[272] Thus, it is reasonably probable that _all_ of the guilt verdicts in this close case were affected by the jury's misunderstanding of the evidence. Certainly, the state cannot prove the error harmless.

---

[272] On the other hand, if this Court concludes that the Hickey counts must be vacated but that other counts were not affected, then all special circumstance findings would clearly also have to be vacated.

# CLAIM XIX

## MR. PRICE'S LACK OF PRESENCE THROUGHOUT MUCH OF THE GUILT PHASE VIOLATED DUE PROCESS AND REQUIRES THAT HIS CONVICTIONS AND SENTENCE OF DEATH BE VACATED.

1465. Petitioner's absence from his trial, which resulted from the trial court's decision to shackle petitioner and the trial court's refusal to require that he be present at his capital trial, violated petitioner's rights to due process, a fair trial, the effective assistance of counsel, and his right to be free from cruel and unusual punishment, as guaranteed by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

1466. In the preceding claim, petitioner's allegations demonstrated that the trial court erred in ordering that Price be shackled while in court. Price chose to depart, which the court viewed as a voluntary waiver. RT 10771. However, after Price decided to depart, rather than sit chained in court, the judge became concerned about proceeding in his absence. RT 10773. The prosecutor believed that a capital case defendant could not voluntarily absent himself from trial, that defendant should be forced to appear in shackles, and that he could be removed only if he were disruptive. RT 10773.

1467. After some discussion, the court had Price brought back and questioned him. During the ensuing colloquy, Price would only say that he would not voluntarily appear in court in chains, but he declined to take a position on whether or not he would disrupt the proceedings. RT 10780-10781. The judge concluded he had no choice but to keep Price in court. RT 10781. Price was sent back to his cell to dress for trial, but apparently made no effort to dress. RT 10781-10783. The judge rejected the prosecutor's suggestion that Price be brought in front of the

jury in jail clothes and shackles, concluding that forcing Price to come to court in shackles would be inhumane. RT 10786-10787.

1468. The court, uncertain as to its power to proceed in Price's absence, given that his resistance had been only passive, nevertheless elected to proceed.[273] RT 10787-10788. The court stated in Price's absence that he could return if he was willing to submit to the shackling. RT 10788. The jury was told that Price was not present and that they were to draw no inference for or against him due to his absence. RT 10792. The jury did not see Price again until more than six months later, at the penalty phase.

1469. If this Court finds that the shackling order was erroneous under the federal constitution, petitioner presumes that the prejudice resulting from that order is ample to require that the entire judgment be vacated, making the present issue moot. However, <u>even if</u>, for any reason, <u>this Court finds no error in the shackling order</u>, or if this Court finds error but no prejudice, then <u>independent reasons</u> require that the entire judgment be vacated because the guilt trial was held in his absence. Thus, the focus of this Claim will <u>not</u> be on whether the decision to be absent from the trial was a voluntary decision by Price or the result of erroneous rulings by

---

[273] A few days later, the court reiterated its ruling and rationale in a written order. CT 8930-8936. The order noted that Price had apparently determined that his lack of presence was less prejudicial than would be his presence in hidden shackles, and that Price's trial counsel apparently agreed with that position. CT 8933. The court noted that bringing Price to court forcibly would create a risk of injury to Price and to correctional officers. CT 8933. The court concluded Price should not be forced to participate in his capital trial if he chose not to participate. CT 8935.

the trial court because in either event, the absence constituted reversible error.[274]

1470.  Price's position is precisely that of the prosecutor below -- a capital defendant cannot voluntarily absent himself from crucial stages of the trial and can be removed only if he is actually disruptive in court.  RT 10773.  Thus, the court was absolutely correct in its initial belief that it had no choice but to require Price's presence, absent any actual disruption.  RT 10781.  When the judge reconsidered and decided not to force Price to attend, he openly acknowledged his uncertainty over his power to proceed in the absence of the defendant.  RT 10787-10788.  In fact, he did not have such power.

1471.  For over a century, the United States Supreme Court has held that a capital defendant cannot waive his right to be present at trial.  Hall v. Wainwright, 733 F.2d 766, 775 (11th Cir. 1984) ("We read Proffitt to hold that a [capital] defendant may not waive his presence at any critical stage of trial."), citing Proffitt v. Wainwright, 685 F.2d 1227, 1256-58 (11th Cir. 1982), modified on reh'g, 706 F.2d 311, 312 (11th Cir. 1983) ("Early Supreme Court cases held that the right to presence in capital cases is so fundamental that the defendant cannot waive it.") (citing Diaz v. United States, 223 U.S. 442, 455 (1912), and Hopt v. Utah 110 U.S. 574, 579 (1884)); State v. Amaya Ruiz, 800 P.2d 1260, 1283 (Ariz. 1990) ("We recognize that the United States Supreme Court held, more than 100 years ago, that one accused of a capital crime may not constitutionally waive his right to be present. . . . The Eleventh Circuit has [also] held that a [capital] defendant may not waive his right to be present.") (citations omitted.); Near v.

---

[274] It should be noted, however, that Price's waiver was defective.  The lack of a knowing and voluntary waiver of his presence is addressed in Claim XX of this petition, and petitioner incorporates the factual allegations alleged in that claim herein by express reference.

Cunningham, 313 F.2d 929, 931 (4th Cir. 1963) ("So fundamental is the [right to be present] that it may not be waived [by a capital defendant].")

1472.   Although subsequent decisions by the Supreme Court have held that the right to presence may be waived in non-capital cases through disruptive conduct, see,e.g., Illinois v. Allen, 397 U.S. 337 (1970), the older decisions have never been explicitly or implicitly overruled with respect to capital cases.   Although the Supreme Court in 1975 suggested that it may one day reconsider the validity of Diaz's continued application to capital cases, see Drope v. Missouri, 420 U.S. 162, 182 (1975) (citing Diaz); Proffitt, 706 F.2d at 312; until that day in the future, the older cases bind this Court.   Rodriguez de Quijas v. Shearson/American Express, 490 U.S. 477, 484 (1989) ("[I]f a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [lower courts] should follow the decision which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions.") (emphasis added).

1473.   Thus this Court is required to follow Supreme Court precedent and grant petitioner habeas relief and a new trial on this issue.

# CLAIM XX

## THE TRIAL COURT ALSO ERRED IN PROCEEDING IN THE ABSENCE OF MR. PRICE AT A NUMBER OF OTHER PROCEEDINGS IN WHICH SUBSTANTIAL RIGHTS WERE AT ISSUE AND THERE WAS NO WAIVER, OR THERE WAS A WAIVER THAT WAS NOT TRULY VOLUNTARY

1474. The trial court's repeated willingness to proceed despite the fact that petitioner and/or his counsel was not present at several points in the pre-trial and trial proceedings, and despite the lack of a knowing and voluntary waiver, violated petitioner's rights to due process, a fair trial, the effective assistance of counsel, and his right to be free from cruel and unusual punishment, as guaranteed by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

1475. In the preceding claim, it was shown that federal constitutional precedent does not allow a capital defendant to waive presence during trial proceedings. The present claim will focus on a number of absences at proceedings that occurred before the evidentiary portion of the trial began, and absences at trial proceedings which did not involve the taking of evidence before the trier of fact. In some of these instances, there was no waiver at all. In other instances, there was a purported waiver of presence and the issue will involve the validity of the waiver.

1476. If petitioner's position in the preceding claim, regarding his six month absence during the guilt phase of trial is accepted by this Court, the judgment will be vacated and the present claim will be moot. If, for some reason, this Court does not grant relief on the preceding claim and upholds a waiver of presence during a capital trial, then it will be necessary to reach the present separate and independent claim, involving absences with no waiver or with a

seriously defective waiver.

1477. On July 31, 1985, in the middle of jury selection proceedings, after the judge noted that Price had sent word that he did not wish to attend the morning session, defense counsel read Price's note, as follows:

> DePAOLI: I recognize Price's writing. It says, 'Time: seven thirty-one eighty-five a.m. Subject: Recreation and Doctor Fuller and Court trial.
>
> I waive my presence -- which is underlined in red -- in court for the morning session on this day and this day only.
>
> The first reason for this is my court-ordered recreation which the jail and the court itself refuses to give me -- so I'll give it to myself from now on.
>
> The second reason is I have a doctor appointment today at noon and I'm not going to miss it because of any reason like last week when the jail turned him away.
>
> I'll attend the afternoon session upon completion of my recreation and doctor call. I expect the recreation problem to be on-going as in this Friday I'll again have a choice to attend court or recreation and I expect to be allowed to choose myself and not have the court choose for me. It's my health at stake not the court's.
>
> Curtis F. Price. 7/31/85. RT 5349-5350.

1478. The prosecutor opined that California Penal Code section 1043, subd. (b)(2) did not allow proceedings in a capital trial to continue in the defendant's absence, even if voluntary.

RT 5350. Defense counsel Klay replied that Price truly did not feel well, and looked bad. She explained that although jail personnel said exercise periods for Price that did not conflict with court proceedings would be scheduled, weeks had passed without that happening.[275] She also referred to his continuing problems in getting to see a doctor. RT 5352.

1479. The court observed that the jail was supposed to schedule exercise for Price at a time when he was not in court, and if that was not occurring, something should be done. However, the court believed the problem was not a reason for delaying the trial. RT 5355. Through Lt. Doane of the sheriff's office, the court sent a note to Price which said only, "'Mr. Price, you have the statutory right pursuant to Penal Code section 1043 to be personally present at all proceedings. If you wish to waive that right, you may do so by signing below.'" RT 5355-5357. The lieutenant soon reported back that Price had signed the note (RT 5359), and jury

---

[275] The record shows that on June 10, 1985, defense counsel had alerted the court to the fear that the jail personnel would use Price's time in court as an excuse to deprive him of exercise. RT 1865. Two days later, defense counsel notified the court that Price had been allowed only two hours of exercise in the preceding nine days; the court indicated it would deal with the problem later. RT 1996.

On July 17, 1985, defense counsel noted that Price had been informed that day that his outside exercise was scheduled for 10:30 a.m., which conflicted with the court schedule. Defense counsel also noted that Price had received no fresh air in more than two months. RT 4092-4093. In response, the judge stated, "I don't know who told Price that his exercise was going to be at ten-thirty. It's patently ridiculous. It's another irritating factor for both Price and this Court." RT 4097-4098. The court recognized that Price's exercise was "important to both his health and his frame of mind." RT 4097. The court stated that if defense counsel's description was accurate, "Maybe somebody is just trying to raise someone's hackles, if -- if it occurred; and if they're trying to raise someone's hackles, they have raised two people's hackles." RT 4097. Later that day, the court reported that the sheriff's office had indicated that Price would get roof exercise that afternoon, if court was finished in time. RT 4151.

selection proceeded without his presence.[276]   RT 5360.   Price did return to court for the afternoon session.  RT 5434.

1480.   Mr. Price's absence requires that his convictions be vacated.  First, this was part of the trial and no waiver should have been permitted, pursuant to the federal authorities set forth in the preceding claim.  Furthermore, this was not a voluntary waiver.  When a defendant who has spent more than two years in pretrial custody is deprived of any fresh air or exercise unless he agrees to waive his presence at his trial, the waiver can hardly be called voluntary.  Similarly, when a defendant is ill and can only see his doctor by waiving his presence at his trial, the waiver cannot be considered voluntary.

1481.   The trial court had acknowledged that Price's complaints about lack of exercise and fresh air had substance.  At the very least, the judge should have required more information as to what was occurring that day, before allowing a waiver.  If Price was able to appear in court, the judge should have required an appearance, outside the presence of the jury, so that Price's condition could have been observed firsthand.  If Price was not well enough to come to court, then the matter should have been continued, even if that would have resulted in some inconvenience to the court personnel and the prospective jurors.[277]

1482.   The next absence occurred a week later, on August 5, 1985.  The court remarked that Price had sent a signed waiver so that he could get some exercise.  Defense counsel explained that Price had been given no opportunity for exercise over the weekend.  RT 5603.

---

[276]   The prospective jurors were informed that Price was absent because of a doctor's appointment.  RT 5361.

[277]   If the waiver was invalid, the error must be found prejudicial.  Certainly, a defendant's input is important when the jury that will decide whether he lives or dies is selected.

With no further inquiry into jail policies the judge had termed "patently ridiculous" a few weeks earlier (RT 4097-4098), the judge accepted the waiver and proceeded with jury selection. RT 5603. This waiver was defective and the error prejudicial for the same reasons set forth in regard to the previous waiver for exercise.

1483. Price's absences during the taking of evidence in the jury's presence are covered in Claim XIX. However, on February 11, 1986, well into the trial, the judge announced that he received a request from Price asking that his trial counsel be relieved.[278] RT 14903. Although no waiver of presence was made for any hearing on that motion, and although there was no reason why Price should not be present at a hearing outside the presence of the jury, the court proceeded to discuss the merits of the request with trial counsel, but without Price. RT 14904-14907. At the conclusion of the discussion, trial counsel agreed to proceed with the trial and to try to resolve the problem with Price later. RT 14907. Surely Price should have been present in order to provide some input into his motion to have his counsel relieved.[279]

1484. Price's request to have counsel relieved was discussed at length ten days later, again without Price's presence. RT 15712-15742. The record contains neither a waiver nor any reason why he could not be present for a hearing outside the presence of the jury. Although defense counsel Klay drew the court's attention to Rule 2-111 of the California Rules of

---

[278] The request was apparently based on the apparent need for defense counsel Klay to testify in regard to conversations she had with prosecution witness Clifford Smith, in which he made statements that were contrary to his trial testimony. RT 14904-14906.

[279] To make matters worse, the court announced that Price's letter requesting that counsel be relieved was the last item the court would accept from Price that was not a proper legal memorandum prepared by counsel. RT 14903. Of course, it is not fair to force a defendant to rely on counsel to prepare papers seeking the removal of counsel. Without bringing Price to court for input on the matter, the trial court was effectively cutting off any input at all.

Professional Conduct, the court did nothing to comply with that rule.[280]  RT 15724.  Also among the matters discussed in the absence of Price was a threat by the prosecutor, in the event defense counsel Klay chose to testify before the jury, to cross-examine her about the fact that defense counsel costs in the lengthy trial had passed the $200,000 point.  RT 15734.  It is difficult, indeed, to understand how the court could permit this hearing to occur in Price's absence.

1485.  Apparently, whatever efforts were made by defense counsel outside of court to resolve matters with Price were not effective.  On March 6, 1986, defense counsel DePaoli reported that he had received a 3 by 5 card from Price saying only, "You're fired."  RT 16880. The court sent a note to Price saying that he must give reasons if he wanted to relieve his attorneys, and that if he refused to comment or cooperate the court would assume he had no reasons.  RT 16881.  A note from Price was received in response, saying he had no comment and would never set foot inside the court.  Price invited the court to convene outside his cell.  RT 16881.

1486.  The court declined to do so.  RT 16885.  The court said it had been informed that Price had refused to talk to defense counsel Klay for the past six weeks and was now refusing to talk to defense counsel DePaoli.  RT 16891.  The court also said Price refused the offer of a phone that day, so there was no communication at all between the defendant and his counsel.  RT

_____

[280] That rule provides in relevant part: If upon or after undertaking employment, a member of the State Bar knows or should know that the member ought to be called as a witness on behalf of the member's client in litigation concerning the subject matter of such employment, the member may continue employment only with the written consent of the client given after the client has been fully advised regarding the possible implications of such dual role as to the outcome of the client's cause and has had a reasonable opportunity to seek the advice of independent counsel on the matter.

16891. Nonetheless, the court proceeded with the trial.

1487. In the face of such a total breakdown in the attorney-client relationship, the court's decision to continue with trial without resolving the problem is unacceptable. While Price did not want to be brought to court, it would appear that such action was necessary. Assuming that restraints would have been needed at that point, they should have been utilized since the proceedings would not be in the presence of the jury. At the very least, the court should have halted any further trial proceedings pending some preliminary investigation into whether Price was competent to cooperate with counsel in his own defense.

1488. It is true that Price was brought to court the following day and was given another opportunity to state reasons for wanting DePaoli removed. Price refused to state his reasons, though he did state that he needed a dentist and was on codeine for pain and misery. He was then returned to his cell and the trial again proceeded without him. RT 17052-17056. Bringing Price to court the following day in no way cured the error in proceeding without observing him or having him examined the previous day. Even assuming that opportunity to state reasons for wanting counsel removed was sufficient to comply with the requirements of People v. Marsden (1970) 2 Cal.3d 118, that opportunity cannot make up for the several court proceedings held in Price's absence, without waiver, over a period of more than three weeks. The opportunity to assess Price's state of mind by personal observation of his demeanor was lost forever.

1489. Furthermore, even after Price was brought to court, the trial once again proceeded in his absence despite the lack of any resolution of the clear breakdown in the attorney-client relationship, or any determination of whether Price was mentally competent to make the decision to refuse to communicate with counsel or explain his reasons to the court.

1490. This unique situation took an even more bizarre turn the following week, as

shown in an entry in a minute order dated March 14, 1986:

> The portion of the March 13, 1986 transcript which occurs after
> comments about Officer Douglas' testimony and before the days
> (sic) recess; consisting of four (4) pages numbered 17679 to
> 17679-4 is hereby sealed.
>
> The sealing is done at the request of defense counsel and is ordered
> in an attempt to assure that Price, who yesterday cooperated with
> defense counsel, will continue to cooperate. CT 9719.

1491. It is reassuring to know that after a week of apparently not communicating with his attorneys, Price was once again cooperating with them in his own defense. However, the inference is clear that in order to obtain the cooperation, defense counsel found it necessary to enlist the aid of the court in keeping courtroom proceedings secret from Price. While the goal of continued cooperation may have been laudable, this was not an acceptable means of achieving it. If Price was mentally competent, he was entitled to know what was being discussed at his trial, at which his life was at stake. If he was not mentally competent, then the court was obliged to look into his mental competence.

1492. On March 20 and 24, 1986, nearly five hours was spent in court hearing the defense motion for acquittal pursuant to Penal Code section 1118.1 and resolving the admissibility of underlined hundreds of exhibits. CT 9810-9815, 9832-9834. The jury was not present. Nothing in the record explains why Price was not brought to court for these two dates. Similarly, on June 26, 1986, during the penalty phase, another hearing on the admissibility of numerous exhibits was held in Price's absence. RT 22714-22743. Since Price did attend the evidentiary

portions of the penalty trial, it is especially puzzling why he was not present at this proceeding.

1493. Finally, during jury deliberations at both phases of the trial, the jury sought evidence and other guidance from the court on numerous occasions. In many of these instances, neither petitioner nor his counsel was present, and in some of them, defense counsel were present but not petitioner. In all such instances where neither counsel nor defendant were present, the court's unilateral action in responding to the jury without consultation from counsel violated petitioner's right to presence and to the assistance of counsel. In those instances where counsel was present, petitioner's right to be present at critical stages of his trial was violated.

1494. In sum, regardless of how this Court resolves the issues regarding Price's waiver of presence during the evidentiary portion of the guilt trial, there were also a number of other proceedings throughout the trial at which his (or his counsels') absence was not justified. As shown above, many of these were proceedings at which Price's input would have been useful, and in some instances, essential. Thus, the errors were prejudicial and the judgment should be vacated. See Diaz v. U.S., 223 U.S. 442, 455 (1912); Strickland v. Washington, 466 U.S. 668 (1984).