1  KAREN S. SORENSEN (CA Bar #75072)
   ATTORNEY AT LAW
2  PMB 394
3  336 Bon Air Center
   Greenbrae, CA 94904-3017
4  Telephone: (415) 925-1530

5

6  ROBERT L. MCGLASSON (GA. Bar #492638)
   ATTORNEY AT LAW
7  1024 Clairemont Ave.
   Decatur, GA 30030
8  Telephone: (404) 373-9334

9

10  Attorneys for Petitioner

11  CURTIS FLOYD PRICE

12

13              IN THE UNITED STATES DISTRICT COURT

14           FOR THE NORTHERN DISTRICT OF CALIFORNIA

15

16  CURTIS FLOYD PRICE,              ) Case No. C-93-0277-PJH
                                     )
17        Petitioner                 )
                                     )  **DEATH PENALTY CASE**
18        vs.                        )
                                     )
19  ROBERT L. AYERS, Acting Warden of )
20  San Quentin State Prison         )
                                     )
21        Respondent                 )
                                     )
22  _____)

23      FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS

24                      VOLUME IV

25                    (of 4 Volumes)

26

27

28  PRICE v. AYERS, JR.
    FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
    CASE NO. C-93-0277 PJH

RECEIVED
SEP 15 2006
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIF.

# CLAIM XXI

**PETITIONER'S CONVICTION ON THE CONSPIRACY COUNT MUST BE VACATED BECAUSE THE EVIDENCE FAILED TO SUPPORT THE ALLEGATIONS IN THE PLEADING, AND BECAUSE NO OVERT ACTS WERE PROPERLY PLED**

1495.  Petitioner's conviction on the conspiracy count violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution because he was tried and convicted on the basis of an Information which did not conform to the evidence and because there was insufficient evidence to support a guilty verdict on the conspiracy allegations contained in the Information.

1496.  Count thirteen in the Information in this case contained the conspiracy allegation in this case.  It reads as follows:

> The said CURTIS FLOYD PRICE is further accused by the District Attorney of and for the County of Humboldt, State of California, by this Information, of the crime of VIOLATION OF SECTION 182 OF THE PENAL CODE OF CALIFORNIA, a felony, committed as follows:  That the said CURTIS FLOYD PRICE on or about the months of <u>April to September, 1982, at and in the County of Humboldt</u>, State of California, did willfully and unlawfully conspire together with another person and persons whose identity is unknown to commit the crime of Robbery, Grand Theft and Murder, in violation of Sections 211, 487(c) and 187 of the Penal Code, felonies; that pursuant to and for the purposes of

the aforesaid conspiracy, the said defendant committed the
following overt act or acts at and in the Counties of Humboldt and
Los Angeles, State of California, and at and in the County of
Washoe, State of Nevada.  CT 3078-3079 (emphasis added).

1497.   The information went on to list 13 overt acts, each of which occurred on a specific date, with the 13 dates falling between January 15 and February 28, 1983.  CT 3079-3080.

1498.   There are several problems of constitutional significance with the Information in this case.  First, while the Information alleges that the actual conspiracy took place in Humboldt County between April and September, 1982, the prosecution failed to prove that any aspect of the conspiracy actually occurred in Humboldt County during that time.  The evidence showed that any alleged conspiratorial acts during the period between April and September of 1982 occurred in San Bernardino County, where the members of the Aryan Brotherhood who were allegedly a part of the conspiracy were imprisoned.  No evidence existed that any person who was allegedly connected with the conspiracy in any way ever set foot in Humboldt County, or took any action affecting Humboldt County, during the April to September, 1982 time period.

1499.   Second, the Information failed to allege any overt acts which occurred during the pendency of the conspiracy.  Every alleged overt act occurred after the end of the conspiracy as pled.  Under California law, commission of an overt act is an essential element of conspiracy. See People v. Crowson, 33 Cal 3d 623, 630-631 (1983).[281]  To be in furtherance of a conspiracy,

---

[281]   Moreover, the California courts have determined that such defective pleading results in a denial of due process and violates the Sixth Amendment.  See Feagles v. Superior Court, 11 Cal.App.3d 735, 739-740 (1970).

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

- 625 -

an overt act must occur while the conspiracy is pending.  People v. Williams, 97 Cal.App.3d 39 (1979).

1500.  In this case, because of the substantial differences between the crime charged and the facts proven at trial, petitioner was not given sufficient notice of the charges against him.  In addition to many discovery violations, improprieties and misconduct that occurred in this case as alleged in other claims in this petition, which claims are incorporated into this claim by reference, the conspiracy itself here was quite complex and extended over a period of months.  For these reasons, petitioner was not sufficiently on notice regarding the actual conspiracy allegations to comport with fundamental fairness and due process of law.  See Stirone v. United States, 361 U.S. 211 (1960).

1501.  Finally, there was a lack of sufficient evidence to sustain a conviction on the conspiracy count as pled.  The information charged a conspiracy in Humboldt County during specified months, and the evidence clearly did not prove anything close to these allegations.  A verdict that is not supported by sufficient evidence itself violates the federal Due Process Clause.  See Jackson v. Virginia, 443 U.S. 307 (1979).

1502.  The defense did not waive the defects.  Moreover, the record shows that the defense was misled as to the conspiracy allegations in this case.  Thus, as the record fully demonstrates, the defense consistently relied on the dates and location that the prosecution chose to specify in the Information, and at every opportunity sought to raise the issue before the trial court.  For example, at the close of the prosecution case, the defense filed a motion for acquittal pursuant to California Penal Code section 1118.1.  Among other arguments, that motion specifically noted the time and location specified in the pleading of the conspiracy count, and the defense contended that there was no evidence that "Mr. Price on or about the months of April to

September, 1982, conspired with anybody in the County of Humboldt." CT 9754-9755. That motion itself preserves the Fifth, Sixth and Fourteenth Amendment notice issue for review by this Court.

1503. The trial judge denied the defense motion, concluding that the wording of the information was erroneous, but there had been no prejudice. RT 17784-17785. Notably, although the defect was expressly brought to the prosecutors' attention, they did not request to amend the pleadings. This is a further reason for allowing the defense to rely on the language in the Information.

1504. Later, in a discussion of verdict forms, defense counsel asked the court to specify in the verdict form for the conspiracy count that the conspiracy occurred from April to September, 1982, in Humboldt County. RT 20927. At this point the trial judge became more concerned about the issue, and acknowledged that the Information was poorly drafted and that the proper procedure was an amendment to the Information to conform to proof. RT 20929. Finally, for the first time, the prosecutor did move to amend the Information to charge a conspiracy lasting from April, 1982 through March 3, 1983 (the date Mr. Price was arrested), and occurring in the counties of Humboldt, Placer, Los Angeles, San Bernardino, and the State of Nevada. RT 20930.

1505. However, the court never granted the motion to amend the Information. The defense strongly objected to such a late amendment. Evidence was closed and both sides' extensive guilt phase arguments had been completed. Defense counsel contended that an amendment at that point would deprive Mr. Price of the opportunity to fully defend against

conspiracy allegations covering the period from September, 1982 through March, 1983.[282]  RT

20930.   The court then gave the defense the choice of leaving the verdict form and the

Information as they were, or amending the information and then adding the dates and location to

the verdict form.  RT 20931.  Defense counsel responded, "Well, <u>if those are our only choices,</u>

we would prefer to leave it the way it is, your Honor."  RT 20931 (emphasis added).

1506.  Thus, no amendment ever occurred, nor was the jury again informed of the length

of the pleaded conspiracy, despite full recognition of the problem.  The defense had made clear

its belief that an amendment at that point would be prejudicial, and defense counsel made it clear

he was choosing the only option the court allowed which would not result in a post-argument

amendment of the pleadings.   The defense never wavered from the contention that the

conspiracy, as pled, had not been proved, and the information was never amended even though

the court and the prosecution were fully aware of the defense position.

1507.  In a less serious case, it might be tempting to call all this a mere technical defect.

But in a prosecution seeking to end the life of the defendant, it is inappropriate to tolerate

confusing and misleading pleadings.  This was a complicated conspiracy charge even if it had

been properly pled.  The prosecution never presented a clear theory as to how the Hickey murder

fit into the conspiracy, or how all of the robberies in Humboldt County were a part of a

conspiracy the focus of which was allegedly to kill a single person in southern California.  A

---

[282]   Indeed, during argument to the jury, defense counsel expressly relied on the fact that the
conspiracy charged against Mr. Price was alleged to have occurred between April and
September, 1982, and in the County of Humboldt.   RT 20744, line 19-RT 20755, line 13.
Subsequently, he repeated, "The Information against Mr. Price said the conspiracy occurred
April to September."  RT 20782.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH
                                            - 628 -

defendant fighting for his life should not be distracted by an ongoing need to clarify what should have been clear at the outset. The problem was brought to the prosecutors' attention at the close of the People's case and they chose to do nothing. The People had ample opportunity to correct the pleading prior to the defense presentation and chose the wording on which the defense now relies. There is no justification for failing to hold the People to the dates and location they chose.

1508. For all of these reasons, petitioner's conviction on the conspiracy count must be vacated.

# CLAIM XXII

## A SERIES OF ERRONEOUS EVIDENTIARY RULINGS RESULTED IN THE ADMISSION OF IMPROPER PROSECUTION EVIDENCE, WHICH VIOLATED MR. PRICE'S CONSTITUTIONAL RIGHTS

1509.    The trial court's evidentiary rulings in erroneously allowing the admission of substantial prosecution evidence resulted in a fundamentally unfair trial in violation of petitioner's rights to due process, a fair trial, the effective assistance of counsel, and his right to be free from cruel and unusual punishment, as guaranteed by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

### A.  Introduction

1510.    In this Claim, petitioner addresses the errors which resulted in the improper admission of prosecution evidence.   In each instance, petitioner contends the use of irrelevant or otherwise inadmissible evidence deprived him of a fair trial in accordance with the Due Process clause of the 14th Amendment.[283]   A state court's evidentiary rulings will require federal habeas corpus relief "if it renders the state proceeding so fundamentally unfair as to violate due process." Bueno v. Hallahan, 988 F.2d 86, 87 (9th Cir. 1993).

---

[283]   Because of the number and variety of errors covered in this argument, petitioner also relies on the principles that federal due process may be violated by evidentiary rulings that are valid under state law (Bright v. Shimoda (9th Cir. 1987) 819 F.2d 227, 229), as well as by evidentiary rulings that are erroneous under state law. Kealohapauole v. Shimoda (9th Cir. 1986) 800 F.2d 1463.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

## B.  The Prejudicial Impact of Evidence Regarding the October, 1982 Detention of Curtis Price in Lakewood Far Outweighed Any Probative Value

1511.  During Deputy District Attorney Dikeman's opening statement to the jury, he began to discuss an incident that occurred on October 12, 1982, in which Department of Corrections Special investigators persuaded a parolee named Donald Kendricks to purchase guns from Joseph O'Rourke.[284]   RT 10134.   Defense counsel asked to approach the bench and expressed concern that the prosecutor was going to tell the jury that when officers arrested O'Rourke and returned to his residence for a search, they encountered Price, detained him, and then released him.  RT 10136-10137.

1512.  Defense counsel argued orally, and in written points and authorities filed the next morning, that this incident was irrelevant, and, alternatively, any probative value it might have was outweighed by the prejudicial impact.  RT 10136-10137, 10143-10144, CT 8784-8790. Further discussion on the matter was deferred when the prosecutor agreed to say no more about the incident in his opening statement.  RT 10159.  Late in the guilt phase trial the prosecutor requested approval to present evidence about the detention of Price.  RT 17641.  The prosecutor argued that the matter had become relevant because the defense, in cross-examining Janet Myers about her relationship with O'Rourke, had elicited testimony that in October, 1982, Price worked for O'Rourke in a janitorial business, and both of them worked very hard.  RT 17643.  The

---

[284]  Kendricks had been caught using heroin and faced a possible parole violation.  In return for his assistance in setting up O'Rourke, Kendricks was promised that his parole agent would be informed of his cooperation.  RT 10134-10135.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

- 631 -

testimony of Myers to which the prosecutor referred was actually quite limited.  She noted that

O'Rourke had a janitorial business in the Lakewood area, that Price worked for him after getting

out of prison, and that she had thought of working for him herself, but she did not have the

transportation to get back and forth.  Myers knew a few other people who also worked for

O'Rourke, and she knew that Price worked with O'Rourke until Price went back to Eureka in

December.  She then corrected herself and noted that the working relationship between Price and

O'Rourke ended when the Special Services Unit arrested O'Rourke.[285]  RT 13981-13983.

1513.  The prosecutor also noted that Smith had testified about the relationship between

Kendricks and O'Rourke, why the AB had not chosen those people to carry out the Barnes

killing, and why Price had been told to "take his business to the north."  RT 17643-17644.

However, Smith actually testified that Price was specifically directed not to obtain weapons for

the Barnes killing in southern California because there was too much "heat" in that area and

because the AB was suspicious of O'Rourke's loyalty and did not want Price involved with him

at all.[286]  RT 16264-16267.

1514.  The prosecutor asserted, without explanation, that the foregoing testimony by

Myers and Smith made the detention incident relevant.  He wanted to show that a parole search

occurred at the residence and that the police encountered Price, who said he was from out of

---

[285]  Neither side ever clarified whether Myers' self-correction nullified her earlier belief that the relationship ended in December or whether she believed the arrest occurred in December.  In either event, it was clear that she was uncertain about the December timing and had offered it only as an approximate date.

[286]  Thus, Smith's testimony only served to make it clear that any contacts between Price and O'Rourke apparently had nothing at all to do with the charged conspiracy.  The prosecutor never explained what it was about Smith's testimony that added relevance to the detention incident.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

- 632 -

town and was waiting for O'Rourke and Clare Gardner.  He also wanted to produce evidence about the events leading to the arrest of O'Rourke.  RT 17643-17644.

1515.  The court concluded that testimony about the events leading up to O'Rourke's arrest were too prejudicial and would not be allowed, but testimony about the arrest of O'Rourke would be permitted.  The court explained, "the idea that there was some sort of business relationship between Price and O'Rourke is soundly trounced by the arrest of O'Rourke and impeaches that testimony of Ms. Myers."  RT 17651.

1516.  After further discussion the defense offered to stipulate that Price was with O'Rourke and Gardner on October 12, 1982.  The judge wanted the stipulation to include the fact there was no business relationship between Price and O'Rourke after October 12.  RT 17652-17658.

1517.  The judge explained that the only reason this evidence was coming in was to refute the implication that Price and O'Rourke were engaged in a business venture.  If both sides would stipulate that any business relationship ended on October 12, then testimony regarding parole searches and any other potentially prejudicial matters would be unnecessary, but absent such a stipulation, the People would be allowed to show that as of October 12, O'Rourke was in custody.  RT 17659-17660.

1518.  Defense counsel agreed to the suggested stipulation; the prosecutor did not.  The court refused to require a stipulation.  The defense argued unsuccessfully that the parole search of O'Rourke was unduly prejudicial.  RT 17660-1 to 17660-2.

1519.  Thereafter Sergeant Barnett testified that on October 12, 1982, at approximately 6:00 p.m., he witnessed the arrest of O'Rourke and Gardner in Anaheim.  They were then taken to O'Rourke's Lakewood residence for a parole search.  At the residence, the officers

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

- 633 -

encountered another man who "identified himself as Curtis Price to two uniformed deputies who intercepted him in the backyard of the residence up near a wall amongst the bushes." Price said he was there to visit O'Rourke and Gardner and was waiting for them. He was allowed to depart after a brief detention. RT 17661-17662.

1520. The judge then admonished the jury that this testimony was allowed because it might bear on the credibility of witnesses other than Price, that Price's contact with someone arrested on a parole violation was not to be used against Price, and that the release of Price was the best evidence that he was not suspected of wrongdoing "at that point." RT 17663. On redirect examination, Barnett added that he did not know how long O'Rourke was kept in custody after this arrest. RT 17665. No other evidence of the length of O'Rourke's custody was introduced in the guilt phase.

1521. The trial court had no discretion to admit the evidence about O'Rourke's arrest, since it had no tendency whatsoever to prove or disprove any disputed fact that was "of consequence to the action." Cal. Evid. Code section 210. The trial court admitted this evidence on the theory that it rebutted Myers' testimony concerning the business relationship between Price and O'Rourke. There are numerous flaws in the trial court's analysis.

1522. First, it made no difference whether Price worked for O'Rourke in late 1982. Whether he did or did not engage in such work has nothing whatsoever to do with whether he did or did not commit any of the crimes charged against him. Thus, even if Barnett's testimony impeached Myers, it did so on an extremely collateral point.[287] Such impeachment on a collat-

---

[287] Also, Myers was a prosecution witness, so any impeachment of her would have no tendency to prove that Price was guilty.
Footnote Continued on Next Page.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH
- 634 -

eral matter is improper, and is not made proper merely because the collateral subject was mentioned in earlier questioning.

1523.   Second, Barnett's testimony did not impeach Myers.  Myers initially testified that the janitorial work continued until Price returned to Eureka, which she thought occurred in December.  She subsequently corrected this testimony, and other evidence established Price's return to Eureka in late October.  Thus, Myers was not shown to be lying, only mistaken, and that had been shown long before Barnett testified.

1524.   Third, because Barnett did not know how long O'Rourke had remained in custody, the evidence did not even circumstantially prove the prosecutor's point that Price was not working for O'Rourke in December, and in no way precluded the possibility that O'Rourke was released the next day and continued his janitorial business through the end of the year.  In fact, before Barnett testified, Smith testified that O'Rourke was released fairly soon after his arrest, and was out of custody in December, 1982.  Smith explained that O'Rourke "got in and got back out and he got picked up again on something or another, so he was in and out a few times."  RT 16270 to 6270-1.

1525.   Furthermore, even if the termination date of the janitorial business was in any way relevant, no other details were.  The trial court apparently so recognized when it concluded the only relevant point was to show when the janitorial work ended.  That could have been accomplished as well if Barnett had testified only that he was present when O'Rourke was arrested on October 12.  The fact that Curtis Price was encountered that day at a residence where

a parole search took place <u>added nothing at all to the only point the trial court believed was</u> <u>relevant.</u>[288]    Thus, for many reasons, the evidence to which defense counsel objected had no probative value at all and there was no discretion to admit it.

1526.    Moreover, the judge erred in refusing to require the prosecutor to accept the defense offer to stipulate that Price had no further contact with O'Rourke after October 12.  This stipulation fully covered <u>everything</u> the court had ruled relevant and would not have hampered the prosecution in any way; consequently, the court was obliged to compel the stipulation.  The defense offer to stipulate removed any dispute and left the evidence irrelevant and inadmissible even if it initially had any probative value.   Indeed, the refusal to accept the stipulation graphically demonstrates that the prosecutor's goal was to prejudice Price with the details of the incident, not to prove that the janitorial business had come to an end.

1527.    Finally, assuming some marginal relevance, the trial court had a further duty to weigh that relevance against the prejudicial impact of the evidence and to exclude prejudicial portions of the evidence that were extraneous to the relevant ones, or to exclude the evidence entirely if its relevance was outweighed by prejudicial impact.

1528.    Any relevance had to be strong enough to overcome the prejudice that resulted from jury exposure to evidence that Price was present at O'Rourke's residence close to the time

---

[288]    In other words, the trial court was in error when it limited the options to either (1) a stipulation by both sides as to the date of arrest and cessation of business activities, or (2) proof of the details of the arrest, including the fact that a parole search was performed and that Price was detained on the premises.  Assuming there was any relevance in the arrest at all, there was never any explanation for failing to consider the logical third alternative, which was to allow the People to prove only that an arrest occurred and that O'Rourke was then kept in custody, without any mention of Price.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

when O'Rourke was engaged in allegedly illegal activity and that Price was himself detained.[289] It is obvious that the officers in Los Angeles and the prosecutors in the present trial had a bare suspicion, but no proof that Price was involved in O'Rourke's illegal activities. Their clear goal was to plant the same unproven suspicious inference among the jurors.

1529.   The fact that Price was allowed to leave did not preclude the prejudicial impact of this evidence, since it did not negate the possibility that Price was engaged in wrongdoing; it only showed that the police could not then prove what they suspected. Indeed, the court's admonition only told the jury that there was no proof "at that point." That is not at all the same as saying that Price did nothing wrong. While the evidence of the release and the admonition might have had some limited impact in reducing the prejudice, it certainly did not put the defense in as good a position as if the jury had never heard the evidence at all.[290]

1530.   In sum, the evidence of O'Rourke's arrest was relevant at most to an unimportant collateral matter on which the defense offered a fully effective stipulation, and the evidence of the parole search and the encounter with Price had no relevance at all. Alternatively, if there was any relevance in any of this, it was clearly insufficient to outweigh the prejudicial impact of suggesting that Price was involved in additional uncharged wrongdoing, almost immediately after his release from prison. Since the prosecutors were never able to shake their unsupported

---

[289]   Furthermore, Barnett's actual testimony was even more prejudicial than the prosecutor's offer of proof, because the reference to Price being encountered near the wall and in the bushes suggested that he was not only involved with O'Rourke, but was also hiding from the police.

[290]   By way of a simple analogy, if a jury is told that a defendant accused of murder was suspected of three other uncharged murders, the prejudicial impact is high. If the jury is also told that the defendant had never been charged with those other murders due to a lack of evidence, the prejudice is lowered, but is still much greater than if the jury had simply never heard about the uncharged murders.

belief that this incident proved something negative about Price's character, there is no reason to believe the jury was any more likely to be able to hear this evidence and then abide by an admonition not to misuse it.

**C. The Trial Court Erroneously Refused to Exclude or Limit Evidence Pertaining to the January 23, 1983 Field Interrogation of Price by Deputy Walton**

### 1. Factual and Procedural Background

1531.  During the guilt phase, the defense filed points and authorities in support of its contention that the People should not be allowed to introduce evidence about Deputy Walton's January 23, 1983 field interrogation of Price in McKinleyville. CT 9011-9024. The evidence at issue included the fact that Walton approached Price after seeing his car parked in the same location for about half an hour, that binoculars were observed on the front passenger seat, that Price was cooperative, but gave an explanation that did not satisfy Walton, and that Walton suspected that Price was casing two gas station/mini-marts for possible robberies.  CT 9012-9013.

1532.  The defense argued this incident was not relevant to any of the charged offenses, and that the evidence was highly prejudicial in that it encouraged speculation that Price was planning other robberies.  Aside from the fact that this evidence did not prove any casing, but only encouraged improper speculation about casing, the defense argued separately that even if casing had been established, the evidence related only to the impermissible issue of criminal disposition, rather than to any legitimate issue in the present case. CT 9014-9020.

1533.  When the matter was discussed in court, the prosecutor offered several theories of supposed relevance: (1) the incident would place Price in Humboldt County in temporal

proximity to some of the charged offenses; (2) it showed Price in possession of his mother's car, in which incriminating evidence was later found;[291] (3) it showed that Price made false statements to the officer; and (4) evidence that Price was casing an establishment for a robbery was relevant because the Triplex Theater was also cased in advance by its robber.   The prosecutor offered several additional arguments of potential relevancy.  RT 11436-11441.

1534.   The court was dubious about most aspects of the prosecutor's relevance claim, expressly noting the defense made both a relevance and Evidence Code section 352 objection. The court noted that Walton made a lot of assumptions that might be appropriate for an officer to make on the streets, but not for the jury to hear.  The court ruled that the officer's assumptions and conclusions would be excluded.  RT 11442-11448.

1535.   After further discussion, the court ruled that evidence of the stop could be used to prove Price's presence in Humboldt County in January, 1983.  However, the court stated clearly that evidence that Walton believed Price was evasive or was casing any establishment was not admissible.  RT 11463.

1536.   Defense counsel then expressed concern about testimony that would specify the distance between Price's location and any business establishments.  The court agreed that if Walton's conclusions were excluded, the distances that caused those conclusions should also be excluded.  The prosecutor then argued at length that the conclusion of casing was a reasonable one under the circumstances, that it might be too prejudicial if the jurors heard the conclusion from a police officer, but that the jurors should be given all of the facts so that they could draw

---

[291]   However, at no time throughout the entire trial was it ever shown that any item found in Mrs. Lloyd's car had any connection to any of the charged crimes.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

1    the same conclusion themselves.  RT 11466-11472.

2    1537.  The judge finally ruled that the officer could testify as to the character of the
3
     street, but not the exact distance to particular business establishments.  RT 11473.  The prosecu-
4
5    tors made clear their intent to urge the jury to draw the inference of casing, while defense

6    counsel still maintained that any such argument would constitute an improper use of an un-

7    charged act.  RT 11474.  The judge then expressed in a few short sentences the misconceptions
8
     that led directly to what will be shown to be serious error:
9
10       MR. DePAOLI:  . . . you can't bring in evidence of other bad acts.

11       Casing a store is a bad act.

12       THE COURT:  The evidence of a bad act is not there, Mr. DePaoli.

13       The evidence is that Price was parked there on January 23rd
14
         between 4:30 and 5:00 with binoculars and a bag of change, in a
15
16       blue denim jacket.  You can argue that was harmless, that he was

17       looking at Mount Shasta.  They are going to argue that he was

18       casing the Mobil Mini Mart.  <u>I can't stop either one of you from</u>
19
         <u>arguing reasonable inferences from the evidence</u>, which as I see it,
20
21       is not a bad or good act.  It's just an act.[292]   RT 11475 (emphasis

22       added).

23    1538.  The relevance of Price's alleged statements to Walton was debated next.  The
24
     prosecutor argued that anything Price said was an admission; the defense countered that the
25

26   [292]  As will be shown, the prosecutors made clear to the jury that they perceived this as a bad
     act.  However, if the judge were correct in his conclusion that this was not a good act or a bad
27   act, but just an act, a question remains - in what way was it a <u>relevant</u> act?

28

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

prosecutor still had to establish the relevance. The court came to the circular conclusion that the explanation given by Price was relevant so that the jury could determine whether it was reasonable. The court concluded that since there was evidence that Price had given contrary statements to two different officers, the evidence was necessarily relevant to show whether Price was telling the truth.[293] RT 11477-11481.

1539. Finally, the court made a dispositive ruling. The court first expressly noted that the entire matter had "very little to do with any of the crimes charged here." RT 11512.

1540. Nonetheless, the statement to Walton would be admitted because, taken together with the statement to Freese, it showed possible false statements by Price. RT 11513. Walton then testified to the stop, mentioning that it occurred on the fringe of the main business district, but identifying no establishment by name. RT 11520-11526. However, photos were admitted showing the view in different directions from the location of the car. Also, Walton described Price's explanation and Walton's own belief that it was not too windy to drive at that time. RT 11529-11530.

### 2. The Prosecutor Should Not Have Been Allowed to Urge the Jurors to Infer that Curtis Price Was Casing Business Establishments for a Possible Robbery

1541. While there may be a general rule allowing the argument of reasonable inferences supported by the evidence, the judge was mistaken in his belief that there could be no exceptions to this rule. Neither the trial court nor the prosecutors cited any authority for the remarkable

---

[293]    However, defense counsel noted that Price's statement to Walton (that he pulled over because it was too windy to drive), was not necessarily inconsistent with the statement to Deputy Freese (that he pulled over to look at the mountains). RT 11490.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

- 641 -

proposition that the rules of evidence, including requirements of relevance and of weighing prejudicial impact against probative value, no longer apply during counsel's argument.

1542.  In this instance, the only aspect of the evidence that had any arguable relevance was the fact that Price was seen in Humboldt County during the month in which some of the charged crimes had occurred.[294]  Every legitimate purpose of the prosecution could have been fully accomplished if the officer had testified that on January 23, 1983 he saw Price in McKinleyville.  No other details were at all relevant.

1543.  On the other hand, the prosecutors were obviously convinced Price was casing a location for a robbery, and wanted the jury to make that same inference.  Although the judge did not allow Walton to testify to such a conclusion, he erroneously permitted the prosecutor to so argue.  Making use of the photographs in evidence that showed two gas stations visible from the location of Price's car, the prosecutor expressly argued to the jury, "Now what could he reasonably be doing there?   That maybe this guy was checking out those two business establishments because he was thinking about another robbery, a robbery in addition to the ones in Arcata, in addition to the Triplex Theater?  It's conceivable." RT 20426-20427.

1544.  Undoubtedly Price was prejudiced by this argument that he was preparing for crimes other than those charged, and by the inference that he had lied to a police officer.  On the other hand, the mere fact that the Triplex robber cased the theater in advance is not sufficient to

---

[294]  Even this aspect of relevance was dubious at best.  The two charged liquor store robberies occurred on January 15, 1983, eight days before the stop by Deputy Walton.  The Moore burglary occurred on January 22, 1983, only one day before the stop, but that charge had been dismissed before the trial began and Price was charged only with receiving the stolen guns on February 28, 1983, some five weeks after the contact with Walton.  CT 3072-3082.

justify admitting evidence that on another occasion Price may have cased business establish-ments for possible robberies.  Casing an establishment before a robbery is common enough that it does not constitute a <u>distinctive</u> similarity.  Also, there are simply too many dissimilarities between the Triplex robbery and the alleged gas station casing to justify any conclusion that this single alleged similarity supported any legitimate inference that the person who might have been casing gas stations on January 23 was the same person who robbed the theater on February 19.

1545.  Without any such meaningful distinctive similarities that could support such a conclusion, it is clear that the evidence of alleged casing was inadmissible.  That is all that was shown here, and <u>that is expressly what the prosecutor used this evidence for in argument</u>.

### 3. The Jurors Should Not Have Been Permitted to Infer That the Different Statements Made By Price to Deputy Walton and to Detective Freese Supported a Finding of a Consciousness of Guilt

1546.  Following Walton's testimony about his field interrogation of Price, the prosecutor asked Detective Freese what Price told him on March 3, 1983 about his earlier conversation with Walton.  Defense counsel objected and argued this was irrelevant because the events at the time of the conversation with Walton had nothing to do with any charged crime.  The judge indicated he had already ruled on the admissibility of the statements and Freese was allowed to respond that Price told him that when he was contacted by Walton he said he had been watching the hillside with binoculars.  RT 16004-16009.

1547.  Clearly, the judge and the prosecutors perceived the differences in the explanations given to Walton and to Freese as supporting an inference of a consciousness of guilt.  It is only reasonable to assume that the untrained jurors would be even more likely to reach that conclusion, especially since the trial court instructed the jury in the language of

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

- 643 -

CALJIC 2.03.[295]  Thus, if it was erroneous to admit this evidence, the prejudicial impact is clear.

1548.  There were several flaws in the reasoning of the trial court.  First, even if it is assumed that the explanation given to Walton was false, neither the prosecution nor the court ever suggested how that might indicate a consciousness of guilt in regard to any of the charged crimes, as opposed to a consciousness of guilt in regard to whatever Price was doing that particular day.  As defense counsel expressly argued, there was never any evidence that Price's activities on January 23, when Walton stopped him, had anything at all to do with any of the charged crimes.  Indeed, the judge had stated that the only reason the evidence was permitted at all was to show Price's presence in the county at that particular point in time.

1549.  It is also noteworthy that, at the time Walton encountered Price, there is no evidence that Price believed he was a suspect in any of the crimes for which he was subsequently tried.  Indeed, many of those crimes had not yet been committed, and even in regard to the liquor store robberies that had occurred, no officer suspected Price of any involvement.  Even if Price made false statements to Walton, they could not support an inference of a consciousness of guilt in the absence of evidence that Price knew he was suspected of any of the crimes for which he was eventually tried.  In regard to any general impeachment of Price's credibility by showing an instance of possible lying, the simplest answer is that Price's credibility was not in issue since he never testified.  Thus, the court allowed him to be "impeached" on an entirely collateral matter, when there was nothing to legitimately impeach.

---

[295]  The jury was instructed:  If you find that before this trial the defendant made willfully false or deliberately misleading statements concerning the charge upon which he is now being charged, you may consider such statement as a circumstance tending to prove a consciousness of guilt; but it is not sufficient of itself to prove guilt.  RT 20290-1.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

1

### 4.  The Admission of the Field Interrogation Evidence Was Prejudicial

2

3

1550.  The evidence of false statements to the officer was irrelevant to any disputed

4

issue, and was very prejudicial in that the jury was instructed to infer a consciousness of guilt as

5

to the murders when there was no basis for one.[296]  RT 20286, 20290-1.  The instruction was

6

especially damaging because it focused solely on the defendant, inviting the jury to infer he

7

knew he was guilty and lied to two police officers.  Furthermore, any inference that Price was

8

casing a gas station on January 23 was also totally irrelevant to the present charges, but was

9

10

highly prejudicial in that it encouraged the jurors to believe that Price had a disposition to

11

commit serious crimes.

12

1551.  In this case, the jurors were faced with difficult questions regarding the

13

ambivalent eyewitness identifications.   They were also faced with difficult credibility

14

15

determinations as to the Barnes homicide, because the entire prosecution case rested on the word

16

of criminals or criminally oriented individuals who stood to gain from their testimony and who

17

made it very clear that the oath to tell the truth had little or no meaning to them.  The jurors were

18

also faced with difficult determinations in regard to whether Hickey was killed by Price or by

19

20

Petry, who closely fit the classic profile of an individual likely to explode in violence directed at

21

the woman he loved but who clearly provoked him far beyond reason.

22

1552.  In such a case, jurors would be easily influenced by evidence that would allow

23

them to conclude that Price was such a bad person that he must have committed the crimes

24

charged against him.  The errors set forth in this section provided just such evidence to the jurors

25

26

[296]  The prosecution also exploited this improperly received evidence in argument, urging it as a

27

basis for rejecting the defense.  RT 20915-20916.

28

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

and must have been highly prejudicial. The resulting verdicts are so heavily tainted that they should not be permitted to stand.

### D. The Trial Court Erroneously Admitted a Statement Taken Out of Context in Which Curtis Price Acknowledged Membership in the Aryan Brotherhood

1553. The defense filed points and authorities arguing against the admission of Price's testimony in a prior unrelated Marin County trial that he was a member of the AB. CT 9618-9626. The defense argued: (1) any probative value of the statement was limited because it had occurred in January, 1981, more than a year and a half before any of the events that were part of the present charged conspiracy; (2) a potential for undue consumption of time and/or confusion of the jury existed, since the testimony would be misunderstood without the proper context; (3) providing that context would involve the presentation of much prejudicial background information about the issues at the prior trial; and (4) under Evidence Code section 352, a danger of great prejudice existed because the jury would learn that Price was previously tried for an in-prison crime.

1554. When the matter was argued in court, defense counsel explained the context problem further, noting that in one portion of the prior trial transcript Price had acknowledged membership and then qualified it by adding, "Yes, in the way that the AB was undertook by myself to be." RT 16862. Defense counsel also noted that it would be necessary to retry much of what had occurred in the prior case in order to explain the difference between what the AB had been in prior years, when Price claimed membership, and what it had later become. RT 16866.

1555.   The trial court reached a conclusion apparently aimed at reducing the potential for bringing out prejudicial details and also preventing any undue consumption of time.[297]  The court acknowledged that in at least one part of the prior trial transcript Price's response about membership had been ambiguous, but the court noted that at another page, Price had been asked if he was a member and had responded, "Yes, sir."  Finding that completely unambiguous, the court concluded that judicial notice would be taken of that question and answer, and that nothing else would be admitted in regard to the nature of the trial or the reason for the testimony.  RT 16866-16871.  This is precisely what was done.  See RT 17280-17281.

1556.   It is true that the jury was never told that Price was a defendant in the 1981 trial, rather than merely a witness, but the prejudicial impact was still strong.  Even if no juror speculated that Price was tried for a prior in-prison offense, they certainly would have assumed that this indicated he had previously been involved in prior AB activity that was serious enough to result in a criminal prosecution.  Thus, Price was prejudiced not only by that improper inference of yet another prior bad act, but also by the jury's exposure to an apparent admission, taken out of context, and the defense was not allowed to prove the context.

1557.   Measured against this high degree of prejudice, the probative value of the prior testimony was inadequate to justify its admission.  Aside from occurring more than two years before the present robberies or murders, the need for such evidence of group membership was dubious at best.  The prosecution was able to present testimony from Smith and Thompson of Price's alleged membership in the AB, corroborated by admissions by Price's own mother that he

---

[297]  Unfortunately, as will be shown, the court accomplished these laudable goals in an improper manner that left the defense in an unfair position.

had discussed "Brand business" with her. There was also undisputed evidence of the fact that, whether he was a member or not, Price had been housed with Smith, Thompson, and other AB members during the crucial times the alleged conspiring occurred.

1558. With all this evidence and no testimony from Price denying AB membership, the People had little, if any, need for Price's prior testimony. Any limited probative value of the evidence was heavily outweighed by the prejudicial impact.

### E. The Jury Improperly Learned that Clifford Smith Had Passed a Polygraph Examination

1559. The defense cross-examined Smith about the events that occurred when Smith decided to aid law enforcement and was moved from San Quentin to Los Angeles County for debriefing. RT 14983. When defense counsel asked if that was when Smith talked to the Special Services Unit, Smith replied, "That's where I done the whole thing. I talked to Tulleners, I talked to Barnett, I took lie detector tests, I talked to the SSU, talked to the Department of Justice." RT 14983-14984.

1560. Moments later the noon recess was taken and defense counsel immediately moved, outside the jury's presence, for a mistrial based on Smith's non-responsive but highly prejudicial reference to polygraph exams. Defense counsel argued that even though the results of the polygraph exam were not mentioned, the jury would assume that Smith must have passed, since he was being used as a prosecution witness. RT 14991.

1561. Defense counsel also noted that the discovery hearing testimony of other witnesses proved that when persons such as Smith left the AB, they received polygraph exams limited to the sincerity of their desire to leave the Brotherhood, and not the substance of any allegation they made about AB activities. However, the jury would not be aware of this and

would wrongly assume that Smith had been tested on the very matters about which he was testifying. RT 14991-14992.

1562. Thus, the defense was doubly harmed. Evidence that Smith passed a polygraph would be inadmissible even if it pertained to the charges against Price. Here, although the jury would believe he passed such a test, it was not even true. Nonetheless, the trial court denied a mistrial, concluding that an admonition to disregard would effectively negate any potential prejudice. Immediately after lunch, the jury was admonished that polygraph exam results were inadmissible in court because they were considered unreliable. RT 14992-14997.

1563. It is well-recognized that evidence of a defendant's refusal to take a polygraph exam is inadmissible and carries a "'horrendous capacity for prejudice.'" People v. Hogan, 31 Cal.3d 815, 847 (1982) (citation omitted). Here, the jury was told that a major witness against the defendant had taken, and presumably passed, such a test. Any conclusion by the jury that Smith should be believed all but assured the conviction of Price. Thus, there is no meaningful difference between the prejudicial impact of the present error and the prejudicial impact of evidence that a defendant refused an exam. Neither the willingness nor the unwillingness of a witness to take a polygraph exam is admissible. Thus, despite the admonition, Smith's improper statement should be deemed prejudicial, especially when considered together with all the other inadmissible evidence to which this jury was exposed, as set forth in other sections of this claim.

**F.    The Jury Was Erroneously Told the Length of Price's Prior Incarceration**

1564. When Detective Freese was questioned by the deputy district attorney about his first post-arrest interview with Price, Freese explained that Price was initially unable to recall his whereabouts on the evening of the Triplex robbery because "most of his days had run together."

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

RT 16002.  The prosecutor asked if Price had explained why the days ran together and Freese responded, "He had indicated -- indicated that he'd been in prison for the past eleven years and had just gotten out in the past October."  RT 16002.

1565.  Moments later, defense counsel moved for a mistrial based on the witness' reference to the fact that Price had been in prison for eleven years.  RT 16007.  Although the jury already knew that Price had been in prison, defense counsel's position was that the length of imprisonment was not relevant, but now there would be inevitable speculation regarding what awful crime he had committed to merit such a lengthy term.[298]

1566.  The trial court saw no likelihood of prejudice based on the length of imprisonment, and said the jury would be admonished to disregard the length.  RT 16007.  However, upon returning to open court, the admonition that was actually given told the jurors that evidence that Price had been in prison was not to be considered as evidence that he was a person of bad character or that he had a disposition to commit crimes.  Nothing was said at all in regard to the length of imprisonment.[299]

1567.  Although it is difficult to conceive of any admonition that could have offset the prejudice here, the admonition given was a classic example of one doing more harm than good.  Without addressing the specific problem that concerned defense counsel, the admonition

---

[298]  This appears to be a well-founded concern.  It is common knowledge that there has been a popular (although inaccurate) belief that, at least in the past, prison terms were much too short and that even murderers were often paroled after serving only seven years.  Jurors, exposed to such popular beliefs, but not to the realities of actual prison term lengths, would certainly think that an 11 year term indicates a very serious commitment offense, or a series of new offenses once in prison.  Either way, Price would have been prejudiced.

[299]  Indeed, even the prosecutors noticed the significance of this distinction.  See RT 16755, lines 9-15.

emphasized the fact of Price's prior incarceration while asking the jury to perform an impossible task. Telling jurors that, when they determine Price's fate, they should not consider the fact of an 11 year imprisonment as indicating he had a disposition to commit crimes is clearly asking them "to obey an instruction that every judge knows cannot be obeyed." People v. Aranda, 63 Cal.2d 518, 526 (1965).

1568. Defense counsel raised this matter again the following day, reiterating his belief that the reference to 11 years imprisonment was highly prejudicial. He requested a further admonition telling the jury that there was no properly admitted evidence that Price's prior imprisonment had extended beyond the dates and times of the specific events that had been described. RT 16244-16246. The court again expressed its belief that the length of imprisonment was irrelevant and therefore not prejudicial; the court declined to give any additional admonition to the jury at that point. RT 16246-16251.

1569. In sum, the jury was improperly exposed to irrelevant but very prejudicial information. They were given an inadequate admonition that probably did more harm than good, and when defense counsel requested a more effective admonition, the court refused. This was a highly prejudicial error in and of itself, and also constitutes one more substantial matter to add to the long list of evidentiary errors which had a cumulative prejudicial impact resulting in the deprivation of a fair trial in accordance with due process of law.

**G. Prosecution Witnesses Were Erroneously Allowed to Exacerbate the Prejudicial References to Other Aryan Brotherhood Activities By Describing Events in Other Parts of the Country That Had No Relationship to the Present Charges**

1570. As noted above, any defendant faced with charges involving an alleged conspiracy by members of a prison gang will have a serious problem defending himself. The

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

- 651 -

relevance of gang-related activities and the broad scope of evidence permitted in a conspiracy case results in so much prejudicial evidence of unlawful or anti-social activity that a defendant will inevitably appear to be of very poor character without regard to whether he is guilty or innocent of the charged offenses.

1571.  It has long been recognized that in conspiracy prosecutions great care is required to avoid a serious threat to the fair administration of justice.  Krulewitch v. United States, 336 U.S. 440, 445-446 (1949).  The California Supreme Court has recognized the great danger that a defendant will be prejudiced by evidence that he is associated with a criminally disposed gang. People v. Cardenas, 31 Cal.3d 897, 904-906 (1982).  In a case involving both a conspiracy and a gang-related crime, a trial court has a heavy responsibility to minimize such prejudicial evidence, and to carefully consider the probative value of all potentially prejudicial evidence of gang activities.  No such evidence should be admitted unless clearly connected to the charged offenses.  However, the trial judge here failed to exercise such care.  He let the prosecution prove almost anything it wished about alleged AB activities.

1572.  A glaring example of the indefensible leeway allowed the prosecutors occurred early in Thompson's testimony.  First, Thompson discussed historical facts about the development of the AB in the California prison system.  RT 16739-16744.  Although there may have been some limited relevance in such background information, defense counsel immediately objected on relevance grounds when Thompson first mentioned any AB activity in prisons outside California.  Inexplicably, the objection was overruled.  The prosecutor seized the opportunity to ask Thompson for more information about the extent of the AB, and Thompson replied there were not only members in California, but also in Arizona, New York, Nevada, Illinois, Michigan, and "[w]herever there's a federal institution anymore there's likely to be an

Aryan Brotherhood member or members." RT 16745.

1573. Defense counsel reiterated his objection, arguing this evidence went beyond the scope of the alleged conspiracy. The judge overruled the objection, noting that Thompson had referred to a vote of the membership that elected a governing council; according to Thompson, individuals from outside California had participated in the vote. RT 16745. What the judge said may have been true, but the fact remains that the institutional origin of the persons who may have participated in the particular vote under discussion had no relevance at all to any charged offense. Rather than analyzing the evidence for probative value, the trial court apparently believed that once a topic was at all mentioned, any evidence thereon was permissible regardless of its connection to the charged offenses.

1574. Taking advantage of the opening, the prosecutor asked several more questions about the mechanics of nationwide votes of prison inmates, even though the topic had nothing to do with Price's guilt or innocence of the charged offenses. RT 16746. What the prosecutor undoubtedly managed to accomplish was to persuade the jurors that the AB was extremely dangerous and extraordinarily threatening because it was carefully organized on a nationwide basis. This was particularly prejudicial. Even though the jurors heard from a number of alleged AB members about a wide variety of violent crimes, there was only one alleged AB member whose fate was in their hands. The danger was great that the natural desire of the jurors to punish the AB would be translated into an overeagerness to convict the only alleged member whom they could convict.

1575. The prosecutor continued to stir up an emotional reaction against the AB, bringing out the fact that the group was affiliated with the Mexican Mafia, the Italian Mafia, and the Hell's Angels. Defense counsel again objected on relevance grounds and asked that the

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH
- 653 -

answers be stricken. RT 16751. The judge sidestepped the matter by asking the prosecutor to move on, without ruling on the objection, striking any answers, or otherwise admonishing the jury. RT 16751.

1576. Thus, as in many other instances throughout this trial, the prosecution was able to bring in one improper factor after another to Price's prejudice. Defense counsel's prompt and legally correct objections were erroneously denied or sidestepped with no effective action taken to reduce the danger of prejudice. Clearly, the court failed to adequately protect Price from serious prejudice.

**H. Several Items of Physical Evidence Were Admitted Over Defense Objection, Despite the Fact That They Had Little or No Probative Value and Were Prejudicial**

**1. The Trial Court Improperly Allowed the Admission of Evidence Pertaining to Ammunition Found in the Reno Storage Locker, Even Though It Had No Relevance to the Present Charges and Was Utilized By the Prosecution Solely for an Emotional Impact**

1577. Sergeant Fredrickson testified that the weapons found in the mini-storage locker in Nevada were loaded when they were seized. RT 17708. The prosecutor then sought to introduce the shells that had been removed from the various weapons and defense counsel immediately objected on relevance grounds, arguing that the prosecution was trying to prejudice Price by showing that he kept loaded guns. RT 17708-17709. Defense counsel pointed out that there was no claim that any of the seized weapons or shells had been used to commit any of the charged offenses. RT 17709. The prosecutor argued that since Moore and Petry had testified their weapons were unloaded, the prosecution should be allowed to demonstrate that the weapons

had been loaded after they were taken.  The prosecutor seemed to feel this was inconsistent with an inference that Price had obtained the weapons to resell them.[300]  RT 17709.

1578.  In a very shallow analysis of prejudicial impact versus probative value, the judge noted that it was a fact that the weapons were loaded.  The judge did not believe the introduction of the ammunition could be any more prejudicial than the testimony that the guns were loaded, although he acknowledged the evidence was cumulative and the relevance was low.  He failed to see any prejudice and allowed them to be admitted "if you don't spend a lot of time going through each one of them.  He can say he took them out"[301]  RT 17710.

1579.  The prosecutor, however, seized the opportunity and proceeded to spend three transcript pages going through the shells weapon-by-weapon.  RT 17710-1 to 17711.  In argument, the prosecutor reminded the jurors that Petry kept his weapons unloaded, but they were found loaded in the Reno storage locker.  RT 20490 to 20490-1.

1580.  In conceding the shells had little probative value, the judge understated the matter.  They had no probative value.  First, whether the weapons were loaded or not tells us nothing about whether Price obtained them peacefully or by killing Hickey.  Second, even if there was any relevance in the fact the guns were loaded, any legitimate prosecution purpose was fully accomplished by testimony that the guns were loaded.  The emphasis of a visual reminder was not needed to help jurors understand the difference between a loaded gun and an unloaded gun.

---

[300]  The prosecutor never explained why loading a stored gun was inconsistent with a desire to sell the gun.  Indeed, it seems likely that a potential customer for an expensive rifle would want to test-fire the weapon before making a purchase.
[301]  The shells were formally received in evidence at RT 17934, with reference to the fact that the defense objected to their receipt.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

See Dean v. Hocker, 409 F.2d 319, 321-322 (9th Cir. 1969), discussed post.  Thus, there was

simply no need for an extended display of the varied ammunition in front of the jurors.

1581.  The prejudicial impact, on the other hand, was much higher than the judge

indicated.  The visual impact of the ammunition, and the emphasis derived from dragging the

matter out over several minutes when one simple question and answer was sufficient, could only

accomplish one purpose.  Clearly the prosecution sought to stir up an emotional reaction among

the jurors, convincing them that the AB in general, and Price in particular, were highly

dangerous and should be dealt with severely.  The Ninth Circuit has so recognized, quoting

comments of C.J. Darling (later Justice Darling), which appeared in Wigmore on Evidence, Sec

1157, at 253 (3d ed. 1942):

> 'What is called "real evidence" - mostly bullets, bad florins, and
>
> old boots - is of much value for securing attention.  This is true
>
> even when these exhibits prove nothing, - as is generally the case.
>
> They look so solid and important that they give stability to the rest
>
> of the story.  The mind in doubt ever turns to tangible objects.'
>
> (Dean v. Hocker, supra, 409 F.2d at 321.)

1582.  The Ninth Circuit added a further relevant quote, directly from Wigmore, supra,

at p. 254:

> 'First, there is a natural tendency to infer from the mere production
>
> of any material object, and without further evidence, the truth of all
>
> that is predicated of it.  Secondly, the sight of deadly weapons or
>
> of cruel injuries tends to overwhelm reason and to associate the

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

accused with the atrocity without sufficient evidence.' (<u>Dean v.</u>

<u>Hocker</u>, <u>supra</u>, 409 F.2d at 321-322.)

1583. Thus, there was a serious prejudicial impact that far outweighed the minimal or non-existent relevance of the actual ammunition. The admission of this evidence was erroneous and added to the cumulative prejudicial impact of all of the items of improperly admitted evidence.

## 2. A Bandolier of Shotgun Shells Was Improperly Admitted

1584. Not content with the emotional impact generated by the irrelevant ammunition from the Reno storage unit, the prosecution also sought admission of a bandolier of shotgun shells that came out of Mrs. Lloyd's garage. Defense counsel objected, noting that it was not related to any of the crimes. Without any explanation by the prosecutor or the court as to what possible relevance the bandolier of shells contained, the court simply ruled it admissible. RT 17922.

1585. This was error since the shells had no relevance whatsoever. The error was prejudicial because this was one more exhibit that could have no conceivable purpose other than to generate an emotional response against Price.

## 3. Photos of the Types of Guns That <u>Could</u> Have Been Utilized to Kill Richard Barnes Were Irrelevant

1586. The actual gun used to kill Richard Barnes was never found, although the prosecution ballistics expert was able to conclude that only four brands of .22 caliber guns could have fired the bullets removed from Barnes' skull. The prosecution sought to introduce a series of photographs of the various guns to which the ballistics expert had referred. The defense objected on relevance grounds and the judge conceded that they had no relevance other than to

illustrate the testimony of the ballistics expert. However, for that purpose, the judge ruled the photos admissible. RT 17856-17858.

1587. It may be true that the photos illustrated the testimony of the ballistics expert, but that does not make them relevant. There was no evidence that Price ever possessed a gun of the type of any of the guns described as possible murder weapons.

> It is an elementary rule that weapons or other articles which might
> have been used in the commission of a crime are inadmissible in
> the absence of evidence tending to prove that the weapon or article
> was in the possession of the defendant.    People v. Lo Cigno 193
> Cal.App.2d 360, 379 (1961).

1588. Seeing photos of the various guns might generate an emotional response, but could not possibly help the jury decide whether Price was the person who killed Barnes. The photos did nothing to resolve any disputed facts and were irrelevant.

### 4. The Trial Court Erroneously Admitted into Evidence a Bloodstained Glove That Was Never Shown to Be Connected to Any of the Charged Crimes

1589. A Department of Justice criminalist testified for the prosecution that he had examined a stain on a woman's fabric glove that had been found in Price's room in the Lloyd home. RT 15316, 15331-15333. Defense counsel objected to any questioning about the glove, arguing that the tests performed by the criminalist were inconclusive and that the glove was not connected to Price. RT 15316. Defense counsel argued that the inconclusive results meant that the probative value of the glove was minimal, and was far outweighed by the danger of prejudice due to inevitable speculation that would result from admitting the evidence. Trial counsel

expressly based his objection on Evidence Code section 352. RT 15317.

1590.  The court allowed further testimony about the glove, which had been marked as People's Exhibit 194.[302]  RT 15317-15318.  The criminalist explained to the jury that he had been asked to check for possible bloodstains, and that he had found one spot that did test positively for human blood, but tests for ABO bloodtype were inconclusive.  RT 15321-15322. He acknowledged that he had no way of determining the age of the stain, and he could not tell whether it originated from inside the glove or from outside.  RT 15345, 15392-15393.  He also noted that the glove was so small that he could not get it on his hand, even though his hands were small.[303]  RT 15364.  The admission of this glove constituted a clear abuse of the discretion.

## I.  The Prosecution Was Erroneously Allowed to Introduce Irrelevant Prior Bad Acts of Defense Witness Stinson

1591.  John Stinson, an alleged AB member, testified on behalf of Price.   Stinson testified he had never claimed to be an AB member, but he had been labeled as such by the CDC. RT 18605.  On cross-examination, he noted that, at the time he testified, he was housed at San Quentin and had been placed in the security housing unit (SHU).  The prosecutor asked whether he was placed there because of some type of problem in prison and Stinson replied that it was because the CDC continued to link him to the AB.  RT 18641.

---

[302]   Initially, the judge ruled that the criminalist could testify about the stain, but that the jury would not be told that the glove had been found in Price's room in the Lloyd residence unless the judge decided the glove should be admitted in evidence.  RT 15317-15318.  Soon afterward, the judge overruled the defense objection, received the glove in evidence, and approved the admission of evidence that the glove was found in Price's room.  RT 15331-15333.

[303]   After the glove was admitted in evidence, Mrs. Lloyd testified that it looked like a glove that belonged to her and that she wore while gardening.  RT 16602.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH
- 659 -

1592.  On later cross-examination, the prosecutor again brought up Stinson's remark that his placement in SHU was because he was linked to the AB. RT 18684-18685.  The prosecutor then asked, "Do you think that any of your lockdowns had anything to do with the fact that on September 2nd, 1980, you swung at or hit a deputy sheriff's officer?"  RT 18685.  Defense counsel immediately objected on relevance grounds, but the judge overruled the objection, stating, "If he's indicated the <u>sole</u> reason for lockdown was his association with the A.B., he's entitled to go into that." RT 18685; emphasis added.

1593.  Following this, Stinson replied to continued questioning on the subject by admitting involvement in the 1980 incident.  Stinson also explained that the incident did not cause his lockdown because he was already on lockdown when it occurred.  Following this, and despite continued defense objections, the prosecutor proceeded to ask Stinson about one incident after another - a 1980 incident involving a hacksaw blade, a 1980 stabbing incident, a 1981 stabbing incident, and a 1981 possession of a knife incident.  RT 18685-18689.

1594.  The trial court's rationale for permitting this evidence was flawed for at least two reasons.  First, Stinson never claimed that alleged AB membership was the <u>only</u> reason for his secured housing status.  He said only that it caused his secured housing placement during his most recent arrival at San Quentin.  Since he was in Palm Hall at Chino during most of 1982 (RT 18596), his San Quentin arrival occurred well after whatever incidents may have occurred in 1980 or 1981.  Thus, those incidents were not the cause of the lockdown status during the most recent stay at San Quentin.

1595.  The other error in the trial court's rationale was that this was an entirely collateral matter.  Whatever caused Stinson to be placed in security housing any time in his prison history had nothing to do with whether Price had committed any of the crimes with which he was

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH
- 660 -

charged.  Thus, the prosecutor had no legitimate reason initially to ask Stinson whether he was in secured housing because of some problem in prison.  "A party may not cross-examine a witness upon collateral matters for the purpose of eliciting something to be thereafter contradicted." People v. St. Andrew 101 Cal.App.3d 450, 461 (1980).

1596.  Clearly the prosecutor was determined to bring out these incidents one way or another.  He improperly asked Stinson whether he had had a problem in prison, and when this did not produce the answer the prosecutor wanted, he utilized one more inadequate excuse to prove the incidents in another manner.  The State's goal was to improperly impeach the defense witness by showing a series of prior bad acts that had no purpose except to emphasize the improper point of a criminal disposition.

**J.    The Trial Court Erroneously Admitted a Prejudicial Letter Written by Robert Griffin Even Though He Was Not A Witness and the Letter Constituted Gross Hearsay**

1597.  The prosecutor also cross-examined John Stinson about whether he had ever discussed plans for the killing of Steven "Loser" Clark by Clifford Smith.  Stinson denied involvement in any such discussions, but acknowledged that he had felt that Clark should be killed.  The prosecutor then asked why Stinson and Blinkey Griffin wrote to Bobby Crane explaining that every brother at Palm Hall had agreed that the Clark killing was necessary.  The prosecutor produced the purported letter and had it marked as People's Exhibit 316 (reproduced at CCT 676-677 and again, more clearly, at CCT 714-715).  RT 18709-18712.  Stinson did not recall the letter, but admitted he might have written part of it.  The prosecutor described the letter as written by Griffin, with a portion added at the end by Stinson.  Stinson looked at the letter but could not read most of it as it was illegible.  He did acknowledge that the portion on the back

looked like his own writing, and he was able to read some of the words. RT 18712-18716.

Stinson later clarified this, stating he believed he had written the last half of the last page of the

letter. RT 18724.

1598.   Defense counsel asked that only the portion written by Stinson be admitted, since

he could not testify as to the portion written by Griffin. RT 18725. Before the judge ever ruled,

the prosecutor asked Stinson further questions about the portion of the letter written by Griffin,

paraphrasing parts of the letter in his questions.  Defense counsel objected as the prosecutor

asked Stinson what Griffin meant in parts of the letter.  The court failed to rule on the objection

and Stinson replied that he had never previously read the portion written by Griffin, but had only

added to the end of it. RT 18737.

1599.   Soon a recess was taken and the matter was discussed outside the presence of the

jury.  Stinson was questioned by the court and maintained that he did not recognize the writing

for the first page and a half of Exhibit 316, and he had never read it before seeing it in court.  The

matter was then deferred because the prosecutor said he was not yet asking that the letter be

introduced.   RT 18741-18742.   Nonetheless, the prosecutor continued asking questions that

paraphrased the contents of Griffin's portion of the letter. RT 18856.

1600.   Later, the prosecutor did seek admission of the letter, and the entire letter was

admitted over further defense objection.  The prosecutor ultimately read the letter line-by-line,

asking Clifford Smith what he believed each line meant.  Defense counsel complained again that

the prosecutor was using portions that did not impeach Stinson at all, but concerned only Griffin.

Defense counsel pointed out that it would have been improper to have Stinson testify about what

Griffin wrote, so it was now improper to try to impeach Stinson with Griffin's writings.  RT

19665-19671.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

1601.  The trial court then came to the inexplicable conclusion that the contents of the letter written by <u>Griffin</u> and augmented by <u>Stinson</u> impeached witness <u>Wendall Norris</u> and the entire letter was admitted since it spoke for itself.  RT 19672, 20000.  Subsequently, the prosecutor exploited the letter even further, <u>reading every word</u> of it during argument, offering editorial comments, and arguing that it could be used to impeach <u>any</u> witness who gave testimony that was contradicted by anything in the letter.  RT 20373-20377.

1602.  The People used the letter for the truth of matters asserted by Griffin, and yet no hearsay exception was ever offered to justify the admission of Griffin's portion of the letter.  Stinson's portion may have been admissible to impeach him, to the extent that it contained anything inconsistent with his trial testimony, but Griffin's portion could not impeach Stinson, and neither portion could be properly used to impeach any other witness.  This was highly prejudicial as it was offered for the purpose of impeaching <u>several</u> defense witnesses, and was also prejudicial in that it gave the prosecutor one more opportunity to spend substantial time emphasizing how dangerous the AB was.  In effect, the People used Griffin as a witness against Price while denying Price his federal 6th Amendment right of confrontation.  <u>United States v. McClintock</u>, 748 F.2d 1278 (9th Cir. 1984).

**K.  The Trial Court Erred on Several Grounds in Allowing the Prosecution to Impeach Defense Witness Robert Rowland With Numerous Irrelevant Prior Bad Acts**

1603.  Robert Rowland testified as a defense witness.  He described an incident at San Quentin in which he had been given a zip gun by Thompson and Smith; two days later Thompson left the AB and told authorities that Rowland was in possession of a zip gun.  RT 18980 to 18980-4.  The defense theory was that Thompson had intentionally set Rowland up in

advance in order to make his departure from the AB seem more convincing. See RT 19684-19685. This, in turn, supported the defense position that Thompson similarly set up Price because it served his own purpose of gaining benefits from law enforcement.

1604. The prosecution's ensuing barrage of impeachment of Rowland was largely improper. The very first question asked of Rowland was, "Mr. Rowland, Michael Thompson didn't give you that hacksaw blade you had in your upper lip yesterday, did he?" Defense counsel immediately objected on relevance grounds and the prosecutor argued this was relevant to show Rowland's "attitude toward the action in which he is testifying." The court failed to rule on the objection, but did tell the prosecutor to go on to something else. RT 18983.

1605. The prosecutor then proceeded to impeach Rowland with several prior felony convictions. Next, Rowland was asked about the place where he hid the gun obtained from Thompson, and then the prosecutor asked, "Why don't you hide it the same place you hide your knives?" Defense counsel objected, but the court allowed the question. Rowland then denied ever having a knife and the prosecutor asked whether he had a knife in his rectum on March 25, 1986, or a handcuff key in a cigar on March 28, or a hacksaw blade in his mouth on the preceding day. Rowland denied knowledge of these incidents. RT 18983-18988.

1606. Soon afterward, the prosecutor asked Rowland whether he had stabbed Bob Basey. Defense counsel objected on relevance grounds, but the court found this relevant to show Rowland's connection to the AB. Next, the prosecutor asked about an alleged stabbing of inmate Corky. This was followed with questions about the alleged stabbing of Lucky Harris. Rowland denied involvement in these stabbings. RT 19006-19010.

1607. The prosecutor later returned to Rowland when questioning Smith. Smith fully acknowledged that two days before Thompson left the AB, Thompson and Smith gave Rowland

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

- 664 -

a .22 caliber shell and the zip gun, and just after Thompson left the AB the first thing he told authorities about was the gun. RT 19678-19679, 19684-19685; see also RT 14919-14920, 19684-19685. Smith testified in detail about the alleged AB assignment Rowland was supposed to carry out with the zip gun. Smith was asked whether Rowland had been given other AB assignments, and defense counsel's relevance objections were overruled on the ground that this evidence would dispute Rowland's denial of involvement in several stabbings. RT 19680-19681.

1608. The prosecution's relentless efforts to discredit Rowland continued with testimony, outside the jury's presence, by Correctional Officers Michael Fitts, Linda Brandt, David Aggio, and Joseph Mackenzie, all of whom described incidents involving Rowland and the possession of knives, handcuff keys, and a hacksaw blade. RT 19821-19837. After this extensive offer of proof, the court ruled out some episodes as cumulative, but ruled that testimony could be presented regarding the handcuff key and the hacksaw blade. RT 19840-3. The prosecution repeated its argument that these incidents were relevant impeachment, demonstrating Rowland's "attitude toward the action," since these incidents occurred in the days immediately before Rowland's transportation to court to testify in this trial. The prosecutor maintained that this could be used "to evaluate Rowland's believability or demeanor." RT 19845-19846.

1609. As arguments continued over how much of this testimony should be presented to the jury, the court recognized that,

> We are all arguing about something that's a collateral matter to the
> issue involved in this case, and that's the guilt or innocence of Mr.
> Price. Mr. Rowland came here and the jury, I think, probably

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

- 665 -

without anybody from the state prison system could assess his truthfulness without any assistance. RT 19847.

1610. Inexplicably, this correct statement by the court did nothing to deter the court or the prosecution from proceeding with this astounding episode of collateral impeachment. Correctional Officer Mackenzie was allowed to testify that on September 12, 1983, the zipgun was found in Rowland's cell. RT 19849-19853. Correctional Officer David Aggio was allowed to testify that on April 2, 1986, he recovered a hacksaw blade from Rowland's mouth. RT 19859. Correctional Officer Linda Brandt was allowed to testify that on March 28, 1986, she found a handcuff key in a cigar in Rowland's cell. RT 19879-19881. Correctional Officer Demoine Brittenum was allowed to testify, over defense counsel's renewed relevance objection, that on March 25, 1986, he recovered a stabbing instrument from Rowland's rectum. RT 20165-20167.

1611. As if all of this impeachment was not enough, the prosecutor exploited the matter even further in argument, spending more than four transcript pages discussing each of these incidents. RT 20364-20368.

1612. Bringing four separate correctional officers from San Quentin to Humboldt County for no purpose other than to discuss incidents involving Rowland would have been a classic case of overkill even if this impeachment had been otherwise proper. In this case, however, the impeachment was not proper. The prosecutor explored these incidents under the guise of showing Rowland's attitude toward the action. However, he never explained how they demonstrated Rowland's "attitude toward the action," as opposed to his attitude toward incarceration. Perhaps the fact that he was to be transported out to court provided Rowland with some new opportunities for misbehavior, but nobody ever explained how that related to whether

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

- 666 -

1  he told the truth about the zip gun.

2       1613.    Thus, Rowland's denial and the prosecutor's subsequent action of offering

3  evidence contradicting Rowland's denials is the classic example of improper initial questioning

4  and subsequent impeachment on a wholly collateral matter.  The trial judge so recognized.  RT

5  
6  19847.  Similarly, the questions about three alleged AB stabbings were completely collateral to

7  the issue of Rowland's veracity about the gun.

8       1614.    However, the most amazing factor in this entire extraordinary and improper

9  method of impeachment was that <u>the prosecution was not even disputing the truth of the only</u>

10  
11  <u>relevant testimony Rowland gave</u>!    Prosecution witnesses Smith and Thompson fully

12  acknowledged giving the zip gun to Rowland just before Thompson left the AB.    The

13  prosecution never contested that event, yet still felt compelled to impeach Rowland in every way

14  
15  possible.  Thus, not only were the recent San Quentin incidents and the earlier alleged stabbings

16  improperly used to impeach, but even Rowland's prior felony convictions should not have been

17  admitted in this instance <u>because there was nothing to impeach</u>.  The prosecution did not use this

18  evidence to prove Rowland was untruthful.    This was compounded with highly prejudicial

19  evidence of numerous prior bad acts that did not amount to prior felony convictions.    The

20  
21  prosecution used yet another improper opportunity to emphasize negative facts about the AB.

22  Thus, the error in allowing this completely unnecessary impeachment was highly prejudicial.

23       **L.   The Prosecution Was Erroneously Permitted to Use the Fact That**
         **a Defense Expert Had Been Appointed But Had Not Testified as**
24       **Affirmative Evidence Against the Defense**

25  

26       1615.    Prosecution ballistics expert Robert Christiansen testified to his opinion that the

27  bullets recovered from Richard Barnes' skull were not fired from the gun that Barnes' widow

28  

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH
                                          - 667 -

obtained from Rubin Baca and turned over to the police. In questioning Christiansen, the defense had sought to show that he may not have performed his tests properly and could have reached an erroneous conclusion. RT 19470-19480. In an effort to rehabilitate Christiansen, the prosecutor wanted to show in the rebuttal portion of the guilt trial that a defense expert examined the bullet fragments but was never called as a witness. From this, the prosecutor inferred that the defense expert would have corroborated Christiansen. RT 19758.

1616. Defense counsel objected to this procedure. The court agreed with the prosecutor that this would rebut the implication that Christiansen did an inadequate job. RT 19759.

1617. The prosecutor was then allowed to ask the district attorney's office investigator, Barry Brown, about his presence at the Department of Justice laboratory when Christiansen and Chuck Morton examined the bullet fragments and other evidence under a microscope. RT 19760-2 to 19670-3. Based on this testimony one of the prosecutors argued as follows:

> But interestingly enough, there was a defense expert, a guy by the name of Chuck Morton, who got those things and spent three hours looking at them under a microscope at the College of the Redwoods Laboratory, and we never heard from Mr. Morton. What can you reasonably infer from that? Do you think his opinion was any different than Sergeant Christiansen or can you reasonably infer that after he completed his examination, he concurred with Sergeant Fredrickson -- or Christiansen, and therefore there was no need to call him? RT 20447-20448.

1618.    The second prosecutor repeated the point in his argument:

> But remember also that their expert Chuck -- Chuck Morton or whatever that there was evidence that he was here. And I think on the same plane with Christiansen when he came up. And somebody testified that they went over these bullets together for three, four -- two, three hours. And Morton never testified. So it can only be assumed that there was no discrepancy or anything that he could find because I'm sure he would have been called if he did find anything to cast doubt on Christiansen's testimony. RT 20873-20874.

1619.    There were several problems with the prosecutors' use of this evidence. First, Brown said only that a person named Chuck Morton was present at the laboratory, but never said that Morton was a defense expert. Thus, when both prosecutors referred to Morton in argument as a defense expert, they were referring to facts not in evidence, constituting prosecutorial misconduct. Second, the inference argued by the prosecutors is not a reasonable one. The defense could have many different reasons for wanting an independent expert present at ballistics analyses. The fact that the defense expert does not testify does not necessarily mean that he agreed with the prosecution expert.

1620.    The largest problem with this evidence and argument, however, is that the People should never be permitted to make such use of the defendant's own expert against the defendant. If the defense-hired expert reaches conclusions harmful to the defense, the defense is not obligated to call him as a witness and the People cannot do so. Therefore they should not be able to do indirectly what they cannot do directly.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

- 669 -

1621.    The prosecution's actions were indistinguishable from calling Morton as the state's own witness and asking him whether Christiansen's analyses were performed and interpreted properly.  Of course, Morton was not present at the testing for the purpose of being an impartial observer available as a witness for either side.  Instead, he was present in order to assist defense counsel in his efforts to effectively represent Price.   Both the federal 6th Amendment and state constitutional right to counsel presume the right to <u>effective</u> counsel, which in turn includes the right to use experts necessary to assist counsel in preparing a defense.

1622.    In other words, when an expert is hired by the defense for the purpose of assisting defense counsel in dealing with highly technical evidence, the services of that expert are an inseparable aspect of the 6th Amendment right to the effective assistance of counsel. When the prosecution makes affirmative use of such a defense expert, such as by using Morton's presence to impliedly vouch for the accuracy of the prosecution expert's conclusions, it is equivalent to using the defendant's own counsel against the defense.  Morton's presence during Christiansen's analyses was a direct exercise of the 6th Amendment right to the effective assistance of counsel.  By commenting on the exercise of that right in a manner that bolstered the prosecution case, the prosecutor made assertion of that right costly.

1623.    Another way to look at this is to consider the limited options available to the defense.   Theoretically, the defense should have an opportunity to confidentially examine evidence without the prosecution's presence or awareness of the examination.  On the other hand, the reality of the need to preserve the integrity of evidence, and the fact that the evidence must be obtained from the prosecution's custody, makes it impractical for the defense to work in such a confidential manner.

1624.    It is simply unfair to leave defendants with the option of foregoing any

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

independent testing of prosecution evidence, or engaging in the tests with the knowledge that if they do not find impeaching information their efforts will be used by the prosecution as affirmative evidence against them.

1625.    If the present jurors had doubts about the testimony of Sergeant Christiansen, they could have easily had a reasonable doubt as to whether Price was the person who killed Barnes.    The error in allowing the prosecution to use Price's expert against him substantially reduced the likelihood that the jury would doubt the testimony of Christiansen.    Thus, the error must be deemed prejudicial.

1626.    For the reasons set forth above, the violation of petitioner's federal constitutional rights from the erroneous evidentiary rulings by the trial court require that petitioner's convictions and sentences be vacated.

# CLAIM XXIII

## THROUGH CROSS-EXAMINATION OF DEFENSE WITNESSES AND THE INTRODUCTION OF REBUTTAL EVIDENCE, THE PEOPLE WERE ERRONEOUSLY ALLOWED TO PRESENT IMPROPER MATTERS TO THE JURY

1627. The trial court's admission of numerous pieces of prosecutorial evidence at the sentencing phase of petitioner's trial violated petitioner's rights to due process, a fair trial, the effective assistance of counsel, and his right to be free from cruel and unusual punishment, as guaranteed by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

1628. The Ninth Circuit has repeatedly held that a state court's evidentiary rulings may be so erroneous to require habeas corpus relief "if [they] render[] the state proceeding so fundamentally unfair as to violate due process." Bueno v. Hallanah, 988 F.2d 86, 87 (9th Cir. 1993). In this case, that standard can be met, and petitioner is therefore entitled to a new trial.

### A. While Cross-Examining Price's Sister, The Prosecution Was Given Overly Broad Leeway to Delve into Rumors Based on Multiple Levels of Hearsay

#### 1. The Probative Value of Rumors Allegedly Heard By Sheila Yates Was Far Outweighed By the Prejudicial Effect

1629. Sheila Yates, called as a defense witness, briefly testified on direct examination on a limited topic. She testified that Price was her brother and was seven years older than she was. Her two children cared very much for their Uncle Curt, and she loved her brother. She described the limited contacts she had with her brother while he was in prison. She felt her brother's life was worth saving because she did not think he was guilty; also, she believed he

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

- 672 -

could be helpful to younger prison inmates by encouraging them not to make the same mistakes he had made. RT 22009-22012.

1630. Yates described the friendship between her disabled husband and Price, and stated that her children would suffer if their uncle were put to death. RT 22012-22013.

1631. On cross-examination, the prosecutor began by asking about a conversation she had with Sgt. Fredrickson. Defense counsel objected that the question called for hearsay and was beyond the scope of direct examination. In a discussion at bench, the prosecutor explained that, among other things, he wanted to bring out the fact that Yates had told Fredrickson that she had heard that Price had bragged to Alan and Shari Fletcher that he had killed six people. The prosecutor argued such evidence would not be admitted for the truth of the matter, but simply to contradict Yates' present testimony about her state of mind in regard to her brother. RT 22013-22015.

1632. Defense counsel responded that the witness had not been asked any questions about her feelings regarding violence. However, the judge indicated his belief that if the witness really did suspect that her brother had committed six murders, that would be inconsistent with the state of mind she had expressed in her testimony. RT 22015-22016.

1633. The judge then decided to have the attorneys question Yates outside the presence of the jury. Yates denied ever saying that she had heard from the Fletchers that Price had bragged about killing six people.[304] She said that the day or two after Price's arrest was a

---

[304]   Yates acknowledged it had been three years since she had given the statement to Fredrickson, she did not recall her statement clearly, and it was possible she had said things then which she no longer recalled. RT 22020-5.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

confusing time, and she had received information from her sister, who had in turn received it from their sister-in-law. RT 22017 to 22020-5.

1634. Yates described the initial contacts with Fredrickson, whose family had known her family for generations. He told the family everything he believed Price had done, telling a very disturbing story and sounding as though his tale was absolutely true. When he left, Fredrickson suggested the family buy a shotgun to protect themselves from Price. RT 22021-22024.

1635. Later, after the family was finally able to talk to Price, Yates realized Fredrickson had exaggerated considerably in order to frighten the family into cooperating with the police. After getting involved in the trial proceedings, Yates became quite skeptical about the truth of the claim that her brother had ever bragged about killing six people. RT 22024-22026.

1636. After this testimony outside the presence of the jury, the court and counsel engaged in further discussions regarding the proper extent of cross-examination. The court still believed the views about Price expressed by Yates in front of the jury were inconsistent with Yates' suspicion that Price killed six people. The judge believed that indicated Yates had unusual views about when the death penalty would be appropriate, and the jury was entitled to hear those views. RT 22032.

1637. Defense counsel responded that the statement given to Fredrickson showed only that Yates had <u>heard</u> rumors originating from Shari Fletcher, but nothing in the statement indicated that she <u>believed</u> the rumors she had heard. The court responded that Yates' entire testimony was apparently premised on a belief that her brother was not guilty. Defense counsel reiterated his objection to this triple hearsay and added an objection under California Evidence Code section 352. RT 22033-22037.

1638.  The judge provided a detailed final ruling.  He summarized Yates' statements before the jury as testimony that she wanted her brother to live because she believed he could offer counseling to younger inmates, he could write a book, and because her children loved him. The judge believed this testimony was representative of an opinion that was different from the opinion of a lack of trust impliedly contained in her early statement to Fredrickson; that the People were entitled to explore the witness' opinions and her knowledge of what crimes her brother had committed in the past, so that the jury could determine whether the statements she was now making were true; and that without such cross-examination, the People would be left with "no ability to attack her opinion offered here today."  The Court ruled that objections would be handled on a question-by-question basis.  RT 22041-22042.

1639.  There were serious flaws in the judge's determination.  First, the judge was seriously mistaken in his expressed belief that, absent broad cross-examination about Price's rumored past misdeeds, the People would be helpless and unable to attack Yates' testimony.  The jury would certainly understand the natural protective instincts that a family member possesses toward another family member in trouble –a point in fact made by the prosecutor in penalty phase argument.  See RT 22885.  Thus, the jury knew that Yates was not an uninvolved citizen expressing objective views about Price's character; her relationship with Price would certainly be taken into account.

1640.  Second, Yates had told the jury she did not believe Price was guilty.  RT 22012. The jury had already come to a different conclusion.  Thus, the prosecutor could certainly argue that the jury should discount Yates' feelings because they were based on a belief in innocence which the jury had rejected.  In sum, the danger that the jury would give undue weight to the views expressed by Yates was simply non-existent.

### 2. The Trial Court Failed to Demonstrate on the Record that the Danger of Prejudice Had Been Weighed Against the Probative Value of the Evidence

1641.  An even more serious problem with the trial court's analysis is that the record fails to indicate an adequate weighing of the opposing interests, as is required in an California Evidence Code section 352 analysis.  Here, the judge first overstated the probative value of the contested evidence, and then completely failed to consider the prejudicial impact of exposing the jury to rumors of other uncharged murders.

1642.  The People could have adequately cross-examined Yates without exploring rumors she might have heard.  The probative value was also low because the testimony taken outside the presence of the jury fully established that there was no inconsistency between Yates' testimony and any rumors she might have heard three years earlier.

1643.  First, it was not clear that she had ever heard the rumor about six killings.  Second, she gave a reasonable and <u>uncontradicted</u> explanation as to why she might have expressed mistrust of her brother soon after his arrest, when she had been scared by Fredrickson's accusations.  It was clear that any expression soon after Price's arrest of a feeling of lack of trust did not mean that Yates was insincere in the feelings she expressed to the jury three years later.

1644.  On the other hand, the danger of prejudice was very great.  The prosecution and the court conceded that the rumors about six murders were hearsay and inadmissible for the truth of the matter stated, but no limiting admonition could effectively prevent the prejudice that would necessarily follow if the specter of several more murders was presented.  It is difficult to imagine evidence that is more prejudicial and less reliable, in the context of a penalty phase of a capital trial.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

1645. The problem was greatly exacerbated by the trial court's refusal to make any clear ruling as to what was or was not admissible. Instead, the court was determined to rule on the objections one-by-one, as they arose in front of the jury. The predictable result was that the prosecutor asked some very prejudicial questions to which objections were sustained _after_ the harm was done. Although the prosecution never fully brought out the rumor about six killings, it did bring out enough to cause considerable prejudice to the defense.

1646. First, the prosecutor asked, "had you discussed with other family members of yours acts of violence that Curtis had bragged about." RT 22043. Defense counsel's hearsay objection was promptly sustained, but the damage was done as the jury would have clearly concluded that the prosecution possessed evidence that Price had bragged about acts of violence.[305] Indeed, the danger of such a conclusion by the jury was heightened even more when the prosecutor was allowed to elicit that Yates _initiated_ the contact with Fredrickson because of information received from other family members. RT 22043.

1647. The prosecutor soon asked another question regarding information received from other family members about acts of violence in which Price had been involved. RT 22045. Subsequently, the prosecutor returned to this topic and the following exchange occurred:

> BY MR. DIKEMAN: Q Mrs. Yates, prior to the time that you
>
> talked to Sergeant Fredrickson, you talked to your sister, Sandra,

---

[305] Such a conclusion by the jurors could have prejudiced Price in either or both of two ways. Jurors could have thought the prosecutor had evidence that Price had bragged about the present crimes, thereby improperly negating any lingering doubts about guilt, or jurors could have thought the prosecutor possessed evidence that Price had committed other acts of violence beyond the acts that had been disclosed by the evidence.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

and she told you that Curtis had bragged about acts of violence against human beings?

MR. DePAOLI: Objection. Beyond -- that's beyond the scope. Based upon hearsay.

THE COURT: Did she have information previous to that that caused you some concern before you talked to Sergeant Fredrickson?

THE WITNESS: Just my -- my sister had called me that our sister-in-law had called her.

THE COURT: I don't want the statement.

THE WITNESS: Nothing else other than that. Other than that phone call, there was nothing.

THE COURT: Answer my question. Did it cause you concern?

THE WITNESS: Concern enough that -- yes -- that conversation did cause me concern." RT 22058.

1648. Thus, the jury repeatedly heard that there were family rumors that Price had bragged about violence against human beings. These rumors originated from a sister-in-law who had never testified and could not be cross-examined because she died before trial. The examination of Yates about these rumors did little or nothing to rebut the feelings she had expressed in favor of her brother, but they were highly prejudicial. Although the jury already knew that Price had been accused of a number of prior acts of violence against other human beings, this was the only time the jury learned, possibly inaccurately, that Price had bragged about them.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

1649.  A jury deciding whether a man convicted of murder should live or die would necessarily be greatly swayed by knowledge that he <u>bragged</u> to family members about acts of violence.  This information was never <u>properly</u> before the jury, and its improper presence in the trial was clearly prejudicial, far outweighing any probative value, if there was any, in the People's use of this information.  The erroneous failure to engage in the required on-the-record section 352 weighing process, and/or the erroneous admission of evidence that Price may have bragged to family members about acts of violence against human beings, requires that the penalty verdict be vacated.

**B.  A Statement Made During Curtis Price's Direct Examination Was Taken Out of Context and Used to Justify Impermissibly Broad Cross-Examination and Rebuttal Evidence**

1650.  Very early in his direct examination testimony, Price was asked whether he had killed Hickey.  In response, he said:

> In the first place, I -- I was trying to help Elizabeth.  I wasn't trying to hurt her.  I liked her personally.  I -- <u>I'm not personally capable of doing what -- whoever did that to Elizabeth</u>.  I couldn't have done that.  And because Liz was my -- I can't think of any better words to put it.  She was -- she was worth more to me alive than she was dead because she was my bill of sale for the guns that she gave me to sell for.  RT 22280-1 to 22280-2; emphasis added.

1651.  As will be seen, despite the considerable ambiguity in the underlined words just quoted, the trial court seized on those words, made no effort at all to clarify what was meant, and used those words to allow the prosecution to cross-examine Price and introduce rebuttal evidence

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

1    in many areas the court had previously indicated would be disallowed.

2        1652.  On cross-examination, the prosecution began asking about an uncharged early

3    1970's Arcata robbery in which Price had been a suspect.  Defense counsel objected that the

4

5    matter was irrelevant and beyond the scope of direct examination.  RT 22421.  The court

6    responded:

7            I would find it hard to think of anything that's beyond the scope of

8

9            cross-examination after the dates testified to that he put in when he

10           took the stand and within ten minutes of anything stated that he

11           could not ever kill Elizabeth Hickey because he was personally

12           incapable of it.  Every act of violence that they can bring up that

13           he's connected with is certainly within the scope of examination.

14

15           RT 22421-22422.

16       1653.  The court cut off defense counsel each time he tried to explain his position (RT

17   22422), and insisted the defense had created a classic situation in which the widest possible

18   cross-examination must now be permitted.  RT 22422.

19       1654.  Price was then fully examined about the 1971 Arcata robbery and he admitted his

20   involvement.  RT 22422-22423.  Next, the prosecutor asked about the Banks killing.  Defense

21

22   counsel promptly objected that there had been no direct examination about the Banks incident,

23   except for a brief mention of the fact that Price had never been prosecuted for that killing.[306]

24

25   _____

26   [306]  The full extent of the direct examination of Price regarding the Banks incident consisted of
27   bringing out the fact that Price had not been charged with the offense in court, that he had been
     Footnote Continued on Next Page.

28   PRICE v. AYERS, JR.
     FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
     CASE NO. C-93-0277 PJH
                        - 680 -

Defense counsel was especially concerned because Price could still be subjected to a future prosecution for the Banks killing, so he had advised his client not to answer any questions about that incident. The court's response to the objection was, "Jesus." RT 22430-22431.

1655.   The court then noted that <u>once Banks' name had been mentioned</u> on direct examination, the incident was fully opened up for cross-examination.   By asking the single question about Price's attorneys' advice not to testify, the defense <u>also</u> waived all protection of the attorney-client privilege in regard to discussions about the Banks case.  RT 22431.

1656.   The judge returned to his belief that in light of Price's testimony that he was not capable of committing such acts against Hickey, any act of violence he had ever perpetrated became "fair game on impeachment."   Defense counsel responded that by saying he was incapable of killing Hickey, Price had not in any way claimed that he was incapable of killing in self-defense, or that he was incapable of committing any violence toward any individual. Defense counsel pointed out that there was no evidence that Price had ever committed a battery against a female, and that all Price meant was that he could have never done anything to a woman like what had been done to Hickey.  RT 22439-22440.

1657.   The judge rejected defense counsel's points and told the prosecutors to get Carpenter ready, as he could obviously testify now.[307]   However, the judge did caution the prosecutor not to ask the defendant about the Banks killing until the judge could reach a decision

---

placed in the adjustment center for three years because of the incident, and that his attorneys had advised him that they did not want him to discuss the matter. RT 22334.

[307]   Earlier, the court had ruled that, because of untimely notice to the defense, Carpenter could not testify about the Banks killing in the People's case-in-chief.   The judge left open the possibility of allowing Carpenter to testify in rebuttal, if called for by any cross-examination or defense evidence.  RT 21505-21506.

whether Price should be forced to claim his 5th Amendment privilege against self-incrimination in front of the jury. RT 22439-22446. Nonetheless, before obtaining any further approval from the court, the prosecutor asked Price why he had stabbed Banks twenty or thirty times. RT 22513. Price said nothing in response and defense counsel's objection was handled at the bench. RT 22514. After some discussion, the jury was told that the prosecutor would move to another area and might or might not be allowed to return to this area later. RT 22521. Consequently, Price was subjected to the prejudice resulting from his awkward silence in reaction to the prosecution question about the Banks killing. Further, it must have been obvious to the jurors that Price was going to great lengths to avoid answering questions about Banks.

1658. After Price's testimony, there was a further discussion about calling Carpenter to testify in rebuttal about the Banks killing. Defense counsel continued his argument that nothing the defense brought out about the Banks incident should justify allowing the prosecution to use Carpenter in rebuttal. Defense counsel took the position that Carpenter had no knowledge of Price's propensity to commit violent acts against women, so nothing he could say would rebut the claim that Price was not capable of doing what was done to Hickey. RT 22612-22615. The judge responded, "I am not making a distinction between men and women. I am talking about human beings."[308] RT 22614.

------------------------------------------

[308] Notably, even if it had been fair to construe Price's statement as meaning he was not capable of brutally beating to death <u>any</u> person, the judge's ruling was still overbroad. The judge said several times that <u>any act of violence ever committed</u> by Price had become fair game. However, there is no basis in logic for concluding that a person capable of some violence is therefore capable of beating to death another person.

For example, among the claimed acts of violence which the judge went on to allow, over defense
Footnote Continued on Next Page.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

1659. Defense counsel countered that Price had never claimed he was incapable of killing a human being, but the judge believed his testimony was broad enough to indicate that. The judge also concluded that the defense cross-examination of Correctional Officer Perryman was designed to cast doubt on Perryman's claimed observations and thereby infer that Price did not participate in the crime against Banks. The combination of Perryman's cross-examination plus Price's testimony that he had never been charged with the Banks killing and that he was incapable of committing the acts against Hickey, caused the judge to conclude that Carpenter's testimony was relevant to impeach the statement about capability and to rebut the effort to discredit Perryman. RT 22614-22615. Carpenter was then allowed to testify fully regarding the Banks incident. RT 22620 et seq.

1660. Although the court below referred to Perryman's cross-examination, the record shows that it was primarily Price's testimony about being incapable of doing what was done to Hickey that caused the court to allow the Carpenter testimony. Indeed, the cross-examination of Perryman had been quite limited. Nothing in the cross-examination disputed Price's involvement in the Banks incident; the defense explored only undisputed facts, such as the lack of any mention in Perryman's contemporaneous incident report, of having seen Price with a weapon. RT 22830-4. In other words, the defense fairly tested the accuracy of Perryman's observations, but did not otherwise imply that he had wrongly identified Price as a participant.

---

objection, was the alleged incident in which Price had angrily caused some damage to the trailer and garage owned by Allen and Shari Fletcher. RT 22462. During the guilt phase, the court had severely restricted questioning about this totally irrelevant subject. See RT 17163 et seq and 17260-3 et seq. However, it is not at all apparent how the act of breaking items of personal property in any way impeaches the claim that Price was incapable of doing what was done to Hickey.

1661. As for Price's own testimony, the trial court unfairly used the most extreme possible meaning of the words Price uttered. Once defense counsel explained that Price meant only that he could not have done something like that to a woman, the court should have given the defense an opportunity to make such a clarification in front of the jury. Alternatively, the court should have required the prosecution to question Price about the meaning of his statement of incapability, in order to clarify that meaning before determining the latitude that would be allowed in rebutting the meaning.[309]

1662. It is axiomatic that once a defendant waives his privilege against self-incrimination and testifies, he may be cross-examined regarding any matter as to which he has testified expressly or impliedly. However, there is no principle of law that provides that the scope of cross-examination (or rebuttal evidence) is to be measured by speculating as to the broadest possible meaning of a single ambiguous statement. Reason and fairness clearly dictate that, rather than basing the extent of cross-examination and rebuttal on such speculation, the party seeking to cross-examine should have the initial burden of clarifying the meaning of the statement to be impeached.

1663. Aside from any ambiguity as to the meaning of Price's comment, the trial court's

---

[309] This would have been fair to the prosecution. If the prosecutor had first been required to ask Price whether he meant he was incapable of committing any act of violence against any person, and Price had answered affirmatively, the prosecution would have then been justified in pursuing the broad cross-examination and rebuttal that was allowed here. On the other hand, if Price had answered by limiting his statement, then the prosecution would still have the benefit of an admission by the defendant that he was capable of killing men, or capable of killing under specified circumstances, or capable of violence less than murder. Such an admission would have been of substantial value to the prosecution and the remaining cross-examination and rebuttal could have then been properly limited to whatever was relevant to rebut Price's clarified meaning.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH
- 684 -

conclusion that Price could be impeached by proof of specific incidents of violent behavior was wrong. While the jury would still have heard Perryman's description of the events, even if Carpenter's testimony had been disallowed (as the court had ruled initially), Perryman did not see the attack and did not know how it started. Carpenter, in contrast to Perryman, was able to magnify Price's culpability far beyond the scope of Perryman's testimony. The Banks incident, involving a <u>custodial homicide</u>, was obviously highly damaging evidence on the question of whether a life without parole sentence was suitable for Price. Thus, Carpenter's testimony was prejudicial to Price well beyond what would have been the case if the jury had heard only Perryman's description.

### C. The Prosecution Was Improperly Allowed to Question Price About His Possession of a Stolen Gun, Despite the Lack of any Connection Between the Gun and the Charged Crimes

1664. During cross-examination of Price, the prosecutor referred to the Jennings .22 caliber semiautomatic pistol which had apparently been stolen some time before Becky Williams had taken it to a shop to be repaired. The prosecutor asked Price where he had obtained the weapon, even though there had never been any showing that the weapon had any connection to any charged crimes. Defense counsel objected that the question exceeded the scope of direct examination, and that it did not go to any violent criminal act that would be admissible in aggravation under Penal Code section 190. RT 22486.

1665. The prosecutor responded that the court had already ruled that possession of any dangerous or deadly weapon constituted at least an implied threat to use force. RT 22487. The prosecutor was apparently referring to the ruling allowing evidence in aggravation of instances of possession of a deadly weapon <u>by a state prison inmate</u>. See CT 10280-10281. A prison

inmate has no legal right to possess a deadly weapon under any circumstances, and it is logical to infer that any inmate who does possess such a weapon is impliedly threatening to use it in a violent criminal manner.   However, in the case of a person who is not incarcerated in an institution, there are non-criminal uses for a gun.   Thus, by such possession of a gun a person does not necessarily imply any threat to use the gun in a violent and criminal manner.

## D.   Conclusions Regarding Improper Cross-Examination and Rebuttal

1666.  As shown above, the jury was improperly exposed to several forms of impermissible evidence.   These errors certainly affected the reliability of the penalty determination, which requires that the death judgment against petitioner be vacated.   In the instances where hearsay was improperly admitted, Price was denied his 6th Amendment right to confront the witnesses against him.   United States v. McClintock, 748 F.2d 1278 (9th Cir. 1984). Finally, the use of evidence that was irrelevant, or had limited relevance that was outweighed by the danger of prejudice, was fundamentally unfair and resulted in the deprivation of the due process right to a fair trial.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

- 686

# CLAIM XXIV

**PETITIONER'S CONVICTIONS ON THE BARNES MURDER AND CONSPIRACY COUNTS MUST BE VACATED BECAUSE OF A SERIES OF ERRORS RELATED TO THE NEED FOR CORROBORATION OF ACCOMPLICE TESTIMONY**

## A. Introduction

1667.  Almost all of the evidence against Price on the counts alleging a conspiracy and the murder of Barnes came from the testimony of Thompson and Smith.  These men were clearly accomplices as a matter of law, and the jury was so instructed.[310]  Pursuant to Penal Code section 1111, this meant that no proper conviction could be had on these two counts unless there was sufficient evidence to corroborate the accomplice testimony.[311]

1668.  The crucial evidence offered to satisfy the corroboration requirement was the testimony of Janet Myers.  The defense argued that this was not proper corroborative evidence since Myers was also an accomplice as a matter of law.  The trial court refused to instruct that Myers was an accomplice as a matter of law, but conceded that the jury could find that she was an accomplice.  The jury was instructed pursuant to CALJIC 3.19 that it must determine whether Myers was an accomplice (RT 20296-20297); if they found that she was, then they were implicitly told that they must find sufficient corroboration independent of the testimony of

---

[310]  The jury was told, "If the crimes alleged in the Information were committed by anyone, the witnesses Clifford Smith and Michael Thompson were accomplices as a matter of law and their testimony is subject to the rule requiring corroboration."  RT 20295.

[311]  The jury was instructed pursuant to CALJIC 3.12 regarding the type of evidence that could corroborate an accomplice.  RT 20295-20296.

Myers, Thompson, and Smith.[312]

1669. This argument involves several closely related issues concerning the status of Myers, and the extreme weakness of the corroborative evidence. First, appellant shows that the court's instructions defining an accomplice were erroneous, so that the jury could not possibly make a proper determination as to whether Myers was an accomplice. Second, the trial court erred in failing to instruct the jury that Myers was an accomplice as a matter of law. Third, if Myers was an accomplice as a matter of law, then the evidence was insufficient to satisfy the Penal Code section 1111 requirement of corroboration of accomplice testimony. That insufficiency should have resulted in granting the defendant's Penal Code section 1118.1 motion for acquittal, made at the conclusion of the prosecution case, and should now result in an order vacating the convictions on the counts alleging the murder of Barnes and the conspiracy.

1670. Most important, even if this Court concludes that the trial court correctly left the question of Myers' status to the jury to determine, there was one final serious problem. The jury may very well have found that Myers was an accomplice, but convicted on the mistaken belief that sufficient corroborating evidence existed independent of Myers' testimony. Since there is no way of knowing whether the jury found that Myers was an accomplice, it must be determined whether there was sufficient corroborating evidence independent of her testimony. If there was not, the convictions for conspiracy and for the murder of Barnes must be vacated, since the jury may have decided the factual issues in favor of Price but erred in resolving the legal question of

---

[312]  The jurors were not specifically told what to do in the event they found Myers to be an accomplice, but they were generally instructed, "The required corroboration of the testimony of an accomplice may not be supplied by the testimony of any or all of his accomplices, but must come from other evidence." RT 20296.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

- 688 -

the sufficiency of the corroborating evidence.

### B. Inadequate Instructions Made It Impossible for the Jury to Properly Determine Whether Janet Myers Was an Accomplice

1671.  Pursuant to Penal Code section 1111, Myers was an accomplice in the crimes of conspiracy and murder if she was liable to prosecution for those offenses.  Under California law, in order to be guilty of <u>any</u> conspiracy, Myers must have intended to conspire or agree with other persons, and must have intended to commit an offense that was the object of the conspiracy. <u>People</u> v. <u>Backus</u> (1979) 23 Cal.3d 360, 390.  If those elements were shown, then Myers was <u>also</u> vicariously liable for prosecution for any other offense that was a natural and reasonable consequence of the conspiracy.[313]  <u>People</u> v. <u>Garewal</u> (1985) 173 Cal.App.3d 285, 296-302; <u>People</u> v. <u>Luparello</u> (1986) 187 Cal.App.3d 410, 435-445.  To be guilty of a conspiracy on an accomplice theory, it need not be shown that Myers specifically intended to commit the particular crime; it is enough that she intended to aid in a crime, and that the particular crime was a reasonably foreseeable consequence of whatever crime she intended to aid.  <u>People</u> v. <u>Croy</u> (1985) 41 Cal.3d 1, 12, fn. 5; <u>People</u> v. <u>Bunyard</u> (1988) 45 Cal.3d 1189, 1231-1232.  Thus, all that need be shown is that Myers knew that the AB was involved in illegal activity, that she intended to aid in that illegal activity, and that the death of Barnes was a reasonably foreseeable consequence of the illegal activity she intended to aid.  However, the instructions given to the jury were much narrower, requiring a finding that Myers have <u>actual knowledge</u> that Barnes

---

[313]  Phrased differently, "[a] coconspirator is guilty of any crime committed by his confederate which is a natural or probable act committed in furtherance of the conspiracy or any crime which is one of natural and probable consequence of the object of the conspiracy. (Citation.)" <u>In re Martin</u> (1983) 150 Cal.App.3d 148, 164.

would be killed and that she intended to aid in the killing of Barnes:

> To be an accomplice, the person must have aided, promoted, encouraged, or instigated by act or advice the commission of such offense with knowledge of the unlawful purpose of the person who committed the offense and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense. RT 20295.
>
> Merely assenting to or aiding or assisting in the commission of a crime without knowledge of the unlawful purpose of the perpetrator is not criminal, and a person so assenting to or aiding or assisting in the commission of a crime without such knowledge is not an accomplice in the commission of such crime." RT 20296.

1672.    The error in giving this inadequate instruction was seriously compounded by the prosecution argument to the jury:

> They're going to have to prove that Janet Myers knew that Curtis Price was there to kill Richard Barnes and knowing that -- knowing that, she helped him.  And if he can prove that, then Janet Myers is an accomplice. RT 20347.

1673.    After repeating this point in regards to Michele Scarborough, the prosecutor continued:

> Of course, he's not going to be able to do that because he's not going to be able to show that either one of those women had the requisite knowledge that they knew up here (indicating).  They

may have suspected that something wasn't quite crooked.   They

may have suspected that something was not quite right; but <u>he's</u>

<u>going to have to prove that they actually knew</u>.   RT 20347;

emphasis added.

1674.   Thus, in the present case, the jury could well have believed that Myers knew that the AB was involved in a variety of illegal activities and that she knowingly and intentionally aided the group in such activities.   Clearly, if her testimony is believed, she aided in the killing of Barnes.   However, the jury might have also concluded that Myers did not necessarily have actual advance knowledge, or any intent, that Barnes was to be killed.[314]   Under the instructions given, and the prosecutor's argument, if the jury believed that Myers did not have specific advance knowledge of any plan to kill Barnes, the jury would have necessarily and wrongly concluded Myers was not an accomplice.   However, the jury could also have decided that the killing of the father of an AB member who defected and gave information to the authorities was a reasonably foreseeable consequence of the group's illegal activities.   A <u>properly instructed</u> jury that reached such a decision would have found that Myers was an accomplice even if she had no specific knowledge or intent that Barnes was to be killed.

1675.   A similar problem was discussed in <u>People</u> v. <u>Rodriguez</u> (1986) 42 Cal.3d 730, 761-762, wherein it was argued that the trial court had a <u>sua sponte</u> obligation to instruct on the liability of an aider or abettor "'for natural and reasonable or probable consequences of any act

---

[314]   Myers testified that she was not aware that Barnes had been killed until September, 1983, some seven months after the event.   RT 13835-13836.

that he knowingly aided or encouraged.'"  The California Supreme Court concluded that in the circumstances of Rodriguez, such an instruction would not have helped the defendant because the jury could not find that the witness was an accomplice under such a theory without also finding that the defendant was guilty as a principal.  That problem, which was crucial to the absence of prejudice in Rodriguez, does not arise in the present case, for at least two reasons.

1676.  First, in Rodriguez, independent evidence corroborated the witness.  For example, defendant made damaging admissions to persons who were clearly not accomplices.  Id. at 745.  Also, the defendant's temporary driver's license was found on the ground very near the murder scene, as were footprints that could have come from his boots.  Id. at 744.  Thus, if the jury had concluded that Rodriguez was guilty as a principal, but that witness was an accomplice who needed corroboration, ample corroboration was available.  In the present case, if the jury believed that Myers was an accomplice, sufficient corroborating evidence did not exist to permit a conviction of Price.  Consequently, even if the jury believed Price was guilty, guilty verdicts on the conspiracy and Barnes homicide counts would not have been proper.[315]

1677.  Furthermore, unlike Rodriguez, a properly instructed jury could have found Myers was an accomplice without necessarily concluding that Price was guilty as a principal.  Unlike Rodriguez, no independent evidence tied Price to the murder scene.  A properly instructed jury could very well have concluded that the AB was involved in the killing of Barnes, and that Myers was an accomplice to the killing, but at the same time the jury could have had

---

[315]  In a later section of this claim, it will be shown in detail that if Myers was an accomplice the remaining evidence was insufficient to corroborate Price's involvement in the Barnes murder or the conspiracy.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH
- 692 -

enough doubts about the credibility of Smith, Thompson, and Myers to lead to a conclusion that the accomplice witnesses could have been lying about the killer's identity. In other words, the jury could have believed there had been an AB conspiracy to kill Barnes, and that Myers was sufficiently involved to be an accomplice, but one or more jurors could have still had a reasonable doubt as to whether Price was involved.

1678. In sum, the present case contains none of the factors that made a similar error harmless in Rodriguez. Here, the failure to instruct sua sponte on the liability of an aider and abettor for reasonably foreseeable consequences of their acts precluded a proper determination of Myers' status.[316] By making it less likely that the jury would find Myers was an accomplice, the defective instructions lightened the State's burden of proof in violation of the federal 5th and 14th Amendment Due Process Clause. Francis v. Franklin (1985) 471 U.S. 307. Price was also denied his 6th Amendment right to a fair jury determination of this crucial issue. United States v. Unruh (9th Cir. 1988) 855 F.2d 1363, 1372. Under the present facts, the error was clearly prejudicial, since a properly instructed jury could have found Myers was an accomplice and that there was insufficient corroborating evidence. Therefore, the convictions for conspiracy and for the murder of Barnes must be vacated.

---

[316] Another error that may have added further to the likely confusion among the jurors was committed when the court garbled the language of an instruction regarding the status of a co-conspirator who joins a conspiracy some time after it is already in progress. See RT 20303, lines 10-15. The instruction as read was so unintelligible as to leave the jury without guidance in this situation.

**C. The Trial Court Erred In Failing To Instruct <u>Sua Sponte</u> that Janet Myers Was an Accomplice as a Matter of Law in the Crimes of Murder of Richard Barnes and Conspiracy**

### 1. Factual Background

1679.    Myers' own testimony established the following facts:

1680.    Myers had heard of the AB and she knew who Steve Barnes was.    RT 13803-13804.    She had seen Steve Barnes in a courtroom testifying against AB member Blinkey Griffin.    RT 13829.

1681.    Myers had met Michael Thompson in 1981 and had become good friends with him.    She knew Thompson murdered people.    Thompson's wife lived with Myers for a period of time.    Myers regularly visited Smith in Palm Hall, and knew that Palm Hall was a part of the prison in which gang members were housed.    Before she started visiting Smith, she regularly visited Junior Snyder.    RT 13831-13835.    Myers helped persons immediately after their release from prison whenever Smith or Snyder told her to do so.    RT 13973-13974.

1682.    Myers was a runner for the AB.    RT 13840.    That included running "messages and contraband, dope, things like that."    RT 13843.    She often received messages from persons in prison and relayed them to other persons.    RT 13814.    She admitted that she had smuggled knives into prison for Thompson more than once.    RT 13931.    She also admitted smuggling weapons and drugs into prison for Smith and Griffin.    RT 13953-13955.

1683.    Myers first met Price when he came to her house and stayed a few hours the day

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

he was released from prison in 1982.[317]   Tami Shinn brought him over and he stayed until O'Rourke picked him up. Myers knew O'Rourke before that. RT 13789-13791.

1684.   Myers saw Price cleaning a sawed-off shotgun in her home. RT 13787. She also saw him with a revolver he kept in a blue airline bag in her home while he stayed there for 2 weeks in February, 1983. Between February 7 and 11, 1983, he asked her to drive him by locations of 2 or 3 addresses, which she did. RT 13792-13800. He was looking for the home of Tommy Lamb's cousin. After Myers had taken him to one address, he mentioned that the home belonged to the Barnes family. RT 13829.

1685.   Myers acknowledged that as a result of her activities, she feared that she would be charged with conspiracy and would be sentenced to ten years in prison. RT 13879-13880.

1686.   Myers used heroin since 1979. In 1981 she was convicted of grand theft, forgery, and burglary. RT 13816-13819.

1687.   In sworn testimony outside the presence of the jury, Myers admitted the following additional facts:

1688.   In 1981, Snyder, Griffin, Smith, and several other people all told Myers they were members of the AB. RT 13966, 13971-13972. After Steve Barnes testified in Griffin's trial,

---

[317]   In other testimony offered by the prosecution, Smith said that he instructed Myers that Price was a brother and she should take care of him after his release.  She was told to show him around Los Angeles, drive him where he wanted to go, and do whatever he asked her to do, within reason.  RT 14682-14683.  Smith explained that he did not mean she should take care of Price sexually, but she was to help him do whatever he asked her to do. (RT 14683.)  Smith also said that Myers visited him several times while Price was on the streets, and that she relayed several messages from Price.  RT 14687-14691.  As noted above, merely relaying such messages was enough to involve Myers in illegal activity that was a part of the alleged conspiracy. (Penal Code sec. 4570.)

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

Myers realized that the AB wanted him killed because of his testimony.  That had not been openly discussed, but she knew he was not well-liked.  Smith and Griffin talked about Steve Barnes being a rat and Myers knew that such people got killed.  She assumed that he was a target.  RT 13860-13862.

### 2. The Facts Known to the Trial Court Established That Janet Myers Was an Accomplice as a Matter of Law

1689.  The facts known to the trial court, as summarized in the preceding subsection of this argument, showed clearly that, under the prosecution theory of the case, Myers knowingly and intentionally engaged in a series of illegal acts on behalf of the AB, including smuggling deadly weapons, unlawful drugs, and unauthorized messages into state prisons for AB members. Indisputably, Myers knew that the AB was involved in illegal activity, and she intentionally aided that illegal activity.  Indisputably, she conspired to commit serious felonies with persons known to her to be AB members.

1690.  Myers knew that the people she was aiding were murderers and that people who testified against them were targeted for death.  She knew that Steve Barnes had testified against a member and she assumed he was a target.  With this knowledge, she admittedly followed, without question, Smith's instructions to assist an inmate after his release from prison.  Even if she did not know exactly what plans had been made, she must have known that there was a reasonable probability she would be assisting in the commission of illegal acts.[318]

---

[318]  Indeed, she knew anyone just released from prison was not permitted to possess concealable firearms (Penal Code sec. 12021), yet she testified that she allowed an inmate who had just been released to keep a revolver in her home.  She also allowed him to keep a sawed-off shotgun in her home; such a weapon could not be legally possessed by anybody, even if they had never been
Footnote Continued on Next Page.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

1691.  Myers had been specifically instructed that the released inmate would want to be driven by some locations, and she aided him in that activity.  When she drove a man, who had spent his recent free time in her home cleaning illegal firearms, and whom she believed to be an AB member, to an address which he allegedly told her was the home of the family of a man she believed to be an AB target, she must have realized there was a reasonable probability that someone in that home would be killed.  She nonetheless continued to allow him to use her home as a base of operations, to illegally pass messages from him to Smith, and to cooperate with him in whatever he was planning.

1692.  Under Myers' own testimony, Barnes' death was a reasonably foreseeable consequence of the illegal activity she knowingly and intentionally aided.  As shown earlier in this argument, that was all that was needed to establish that Myers was an accomplice as a matter of law.  Thus, the trial court was obligated to instruct sua sponte that Myers was an accomplice as a matter of law, so that she could not be the source of the corroboration needed for the testimony of Thompson and Smith.  Once again, the error resulted in the violation of the 5th, 6th, and 14th Amendment due process rights to a fair trial and to a fair jury determination of crucial facts.

**D.  If Janet Myers Was an Accomplice as a Matter of Law, the Remaining Evidence Was Insufficient to Corroborate the Accomplice Testimony**

1693.  It has been shown in a preceding section of this argument that Myers was an

---

convicted of a felony. (Penal Code sec. 12020, subd. (a).)  At any rate, merely delivering unauthorized messages to or from Smith was unlawful. (Penal Code sec. 4570.)

accomplice as a matter of law.  The only evidence independent of Smith and Thompson that arguably tied Price to the murder of Barnes was Myers' testimony that, within the few days before Barnes was killed, she drove Price to the Barnes home.  However, it is well-established that one accomplice cannot be used to corroborate another accomplice.  (People v. Mardian (1975) 47 Cal.App.3d 16.)    Without the testimony of Myers, Thompson, or Smith, the prosecution evidence showed only that Price had claimed membership in the AB in January, 1981 (more than two years before the Barnes killing), and that he was in the Los Angeles area at the time Barnes was killed.

1694.  Absent accomplice testimony, the evidence does not show that Steve Barnes had testified against any AB member,[319] or that the AB had any policy of targeting the families of persons who testified against members.  Indeed, absent accomplice testimony, the evidence shows very little about the AB and supplies no motive whatsoever for Price (or the AB) to kill Barnes.  Absent accomplice testimony, the evidence does not show that Price possessed any weapons while in Los Angeles, or that he knew who Richard Barnes was.

1695.  The standard a reviewing court must apply to determine whether sufficient

---

[319]  Sergeant Ross did testify that in the course of his investigation he learned from the sheriff's Prison Gang Unit and from the Special Services Unit that Steve Barnes had testified against various alleged AB members.  RT 11748.  However, as soon as it was apparent that the officer was not speaking from personal knowledge, defense counsel made a hearsay objection.  RT 11749.  The trial court did not actually rule on the objection, but did agree that the witness was getting too narrative.  RT 11750.  At any rate, the hearsay objection was made and the testimony was indisputably hearsay, so it should not be considered in determining whether there was corroboration of the accomplice testimony.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH
- 698 -

evidence corroborated an accomplice was fully set forth in People v. Szeto (1981) 29 Cal.3d 20, 27:

> "'To corroborate the testimony of an accomplice, the prosecution must produce independent evidence which, without aid or assistance from the testimony of the accomplice, tends to connect the defendant with the crime charged. (Citation.) "The evidence need not corroborate the accomplice as to every fact to which he testifies but is sufficient if it does not require interpretation and direction from the testimony of the accomplice yet tends to connect the defendant with the commission of the offense in such a way as reasonably may satisfy a jury that the accomplice is telling the truth; it must tend to implicate the defendant and therefore must relate to some act or fact which is an element of the crime but it is not necessary that the corroborative evidence be sufficient itself to establish every element of the offense charged." (Citations.) "Although the corroborating evidence must do more than raise a conjecture or suspicion of guilt, it is sufficient if it tends in some degree to implicate the defendant." (Citation.)    "[T]he corroborative evidence may be slight and entitled to little

consideration when standing alone." (Citation.)' (Citation.)"

(Emphasis added.) [320]

1696.   Under this standard, evidence that Price was a member of the AB in early 1981 does nothing to connect him (or even the AB) to the commission of the crime.  Without the "aid or assistance from the testimony of the accomplice," mere membership in the AB does not provide any motive to kill Barnes.[321]  Without "aid or assistance" from Smith and Thompson's testimony about the alleged conspiracy, all we know from Price's once claimed membership is that he apparently associated with some of the people who were allegedly involved in the conspiracy.  However, without consideration of the testimony of Smith and Thompson, there would not even be any evidence as to who was involved in the conspiracy, or even that there was a conspiracy.  Moreover, mere association with alleged co-conspirators is insufficient to corroborate: "... it is insufficient corroboration merely to connect a defendant with the accomplice or other persons participating in the crime. '"It is not with the thief that the connection must be had but with the commission of the crime itself."'" (People v. Robinson

---

[320]  Szeto, supra, at p. 44 also cited with approval People v. Reingold (1948) 87 Cal.App.2d 382; Reingold, at p. 406-407 explains that "[t]he connection required to be established by section 1111 of the Penal Code cannot be accomplished by piling suspicious circumstance upon suspicious circumstance, nor by building up conjecture upon conjecture." Reingold, supra, at 407 also noted that the corroborating evidence "must be held insufficient unless it tends to connect the accused with the specific crime for which he is on trial."

[321]  Even if there was such general motive evidence, it would not be very meaningful without something specific to tie Price to the Barnes killing.  This is especially true because the evidence shows that during the time Steve Barnes was testifying against AB members and almost all of the alleged conspiring took place, Price was imprisoned in Montana, far from any of the alleged co-conspirators.

(1964) 61 Cal.2d 373, 400 ...)"; (In re Ricky B. (1978) 82 Cal.App.3d 106, 111.)

1697. Similarly, without "aid or assistance" of accomplice testimony, evidence that Price was in the Los Angeles area around the time of the crime does not connect him with the crime. Approximately ten million other people were in the Los Angeles area at that time. Indeed, Myers' home, where Price was staying, was 18 miles away from the Barnes residence. RT 20184-20185. Excluding Myers' testimony, there is no evidence that Price was ever any closer to the Barnes residence than that. This Court has noted that a defendant's presence at a party with two murder victims on the very same night that they were murdered is not, in and of itself, sufficient to corroborate accomplice testimony. (People v. Hathcock (1973) 8 Cal.3d 599, 618, and cases cited therein.) Clearly, then, mere presence in the same large metropolitan area as the victim cannot suffice.

1698. At various times during the trial proceedings, the prosecutors and the trial court suggested evidence they believed was corroborative, but none of the facts they specified properly corroborated the accomplices. In his argument to the jury, the deputy district attorney contended that Thompson and Smith were corroborated by Department of Corrections housing records which showed that during the time in which the alleged conspiring took place, the persons named by Smith and Thompson were, in fact, at Palm Hall in a position to participate in the conspiracy. He also noted that Price was there from August 26, 1982, until his release on September 14, 1982. RT 20357-20358.

1699. That, of course, does not connect Price to the murder of Barnes in any way. After all, Price was a prison inmate and had no control over where he was housed. Also, this in no way helps to "satisfy a jury that the accomplice is telling the truth..." (Szeto, supra, 29 Cal.3d at p. 27.) Smith and Thompson were both in Palm Hall during this period of time and the fact that

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

they could accurately recall the names of other prisoners they knew were there does not help us

determine whether Smith and Thompson were being truthful about what those other prisoners

were saying or doing; it certainly sheds no light on whether these witnesses were truthful in their

claims of Price's alleged involvement.[322]

1700.  In denying the defense motion for acquittal, made pursuant to Penal Code section

1118.1 at the close of the prosecution case, the trial court referred to the testimony of Myers and

Scarborough, which put Price in Los Angeles at the correct time.  RT 17785.  As discussed

above, Myers' testimony cannot be considered.  Even assuming that Scarborough was not an ac-

complice and that her testimony was available to put Price in Los Angeles during the first half of

February, 1983, it has already been shown that mere presence in one of the largest metropolitan

areas in the world is not very meaningful.

1701.  The court also referred to the Humboldt County robberies as evidence

corroborating Smith and Thompson.  RT 17786.  However, without the "interpretation and

direction" provided by the testimony of Smith and Thompson, there is not the slightest shred of

evidence that any of the Humboldt County crimes had anything at all to do with killing Barnes or

with any conspiracy.  Other "corroborating" facts identified by the trial court were either

dependent on Myers' testimony, or pertained only to the Humboldt County crimes.  RT 17786-

17787.

1702.  It has long been said that if the corroborating evidence fails to connect the

_____

[322]  In fact, while they were able to name other individuals who were in Palm Hall at relevant
times, they were not able to maintain any consistency when they listed purported members of the
AB ruling commission.

accused to the crime, it makes no difference that the accomplice is corroborated in regard to numerous other facts.[323] (People v. Morton (1903) 139 Cal. 719, 724; People v. Braun (1939) 31 Cal.App.2d 593, 600; People v. Lohman (1970) 6 Cal.App.3d 760, 766.)    Although the corroborative evidence must do more than merely cast grave suspicion on the accused (see People v. Braun, supra, 31 Cal.App.2d at p. 601, and cases cited therein), in the present case it does much less.

1703.    Thus, none of the bases cited by the court in denying the section 1118.1 motion sufficiently corroborated the accomplice testimony of Thompson, Smith, and Myers.    Therefore, the trial court erred in denying the motion to acquit Price of the conspiracy and Barnes murder counts.    Similarly, the evidence was insufficient to sustain the jury's verdict as to these two counts.    On either or both of these theories, this Court must vacate the judgment as to these two counts.[324]

### E.    Even if the Issue of Janet Myers' Status as an Accomplice Was Correctly Left to the Jury, the Strong Possibility Remains That the Jury Decided the Case on an Invalid Theory

1704.    Pursuant to a well-established rule:

---

[323]   This makes sense.   One of the most serious problems with accomplice testimony is that while such witnesses often have considerable reason to lie, they also have enough knowledge about the crime and the defendant to sound convincing. (People v. Tewksbury (1976) 15 Cal.3d 953;, 967.)   Thus, "the chance of successful perjury is increased by the fact that the accomplice, completely familiar with the events of the crime, can fabricate a believable story which can withstand cross-examination." (Note (1954) 54 Colum.L.Rev. 219;, 234.)

[324]   Also, since the evidence was insufficient to support the conviction on these counts, the federal 5th and 14th Amendment due process clauses require that the judgment on those counts be vacated. Jackson v. Virginia (1979) 443 U.S. 307.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

- 703 -

"when the prosecution presents its case to the jury on alternate theories, some of which are legally correct and others legally incorrect, and the reviewing court cannot determine from the record on which theory the ensuing general verdict of guilt rested, the conviction cannot stand." (People v. Green (1980) 27 Cal.3d 1, 69; see also Mills v. Maryland (1988) 486 U.S. ___, 100 L.Ed.2d 384, 395, 108 S.Ct. ___.)

1705.  In the present case, there are two different theories under which the jury could have concluded that the accomplice testimony was sufficiently corroborated.  First, the jury could have determined that Myers was not an accomplice and that her testimony corroborated the testimony of Smith and Thompson.  Second, the jury could have determined that Myers was an accomplice, but that there was sufficient evidence independent of her testimony to corroborate the testimony of all the accomplices.  Analyzing the instructions given the jurors and the verdicts returned by them, there is no way of knowing which of these two theories was utilized by any juror.[325]

1706.  As shown above, the trial court should have instructed that Myers was an accomplice as a matter of law.  If that argument is accepted by this Court, the convictions on Counts 11 and 12 will necessarily be vacated and this argument will be moot.  However, if that

_____

[325]  The jury was not required to unanimously agree on which of these theories to apply.  Thus, it is quite possible that each theory was accepted by some of the jurors.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH
- 704 -

argument is rejected for any reason, that would mean this Court believes the trial court correctly allowed the jury to determine whether Myers was an accomplice.

1707. Any such jury determination was greatly distorted by the instructions and the prosecution argument, which told the jury that Myers could not be an accomplice unless she had specific knowledge that Barnes was to be killed. But even under the inadequate instructions given to the jury, Myers' claim that she did not know that Barnes had been killed until months later could have been disbelieved by one or more jurors. Notably, Myers never denied having advance knowledge of the alleged plan to kill Barnes; she merely denied knowing that the plan had been carried through to completion. RT 13835-13836.

1708. Myers herself described her activities on behalf of the AB, illegally passing messages and smuggling drugs and weapons. She also described her knowledge that Steve Barnes had testified against Griffin, her knowledge that Price unlawfully possessed guns in her home in the early part of February, 1983, and her act of driving Price to a residence which he allegedly described as the Barnes family home. That testimony from Myers could have cumulatively persuaded one or more jurors that she did understand that a member of the Barnes family was likely to be killed, and that she nonetheless continued to intentionally aid and encourage the commission of the crime and was a party to the underlying conspiracy.[326]

1709. Thus, one or more jurors could have concluded that Myers was an accomplice. If

---

[326] Myers could have been a party to the conspiracy even if she never openly discussed the plan to kill Barnes with any other member of the conspiracy. The agreement necessary to make her a part of the conspiracy could have been circumstantially established merely by her intentional conduct in furtherance of the objective of the conspiracy. (People v. Cockrell (1965) 63 Cal.2d 659;, 667-668; People v. Fitzwater (1968) 260 Cal.App.2d 478;, 488.)

so, as shown in section D of this argument, there was insufficient corroborating evidence. However, such jurors might have easily made the same mistake made by the trial court and by the prosecutor and concluded that evidence such as Price's 1981 claim of AB membership, or his presence in the Los Angeles area in early February, 1983, was enough to corroborate the testimony of Thompson, Smith, and Myers. Since we cannot rule out the possibility that one or more jurors relied on such a legally incorrect theory, the verdicts on the Barnes murder count and the conspiracy count cannot stand.[327] Mills v. Maryland, supra, 100 L.Ed.2d at 395-396.

---

[327] This error, as well as each of the other errors set forth in this argument, renders the guilt verdicts on these two counts unreliable. Thus, if any one of these arguments is found meritorious, federal 8th Amendment reliability requirements mandate that the judgment on those counts be vacated. Moreover, since all other counts were tried on a theory that they were part of the same conspiracy, erroneous conviction on these two counts might well have contributed to the convictions on other counts. Therefore, 8th Amendment; reliability concerns and 5th, 6th, and 14th Amendment; Due Process and fair jury determination principles mandate that the judgment on every count be vacated.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

# CLAIM XXV

**THE TRIAL COURT'S DENIAL OF MR. PRICE'S
MOTION TO PROHIBIT REFERENCES TO THE NAME
"ARYAN BROTHERHOOD" VIOLATED MR. PRICE'S
RIGHTS UNDER THE FIRST, EIGHTH, AND
FOURTEENTH AMENDMENTS**

1710.  The trial court's denial of petitioner's motion to prohibit references to the name "Aryan Brotherhood" violated petitioner rights to free speech, due process, a fair trial, the effective assistance of counsel, and his right to be free from cruel and unusual punishment, as guaranteed by the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

## A. Factual and Procedural Background

1711.  On June 10, 1985, defense counsel orally moved for an in limine protective order to preclude the prosecution from referring to the name "Aryan Brotherhood." RT 1885.  Defense counsel relied on, and argued that "the probative value is outweighed by its prejudicial effect ...." RT 1885.

1712.  The following day, the trial court stated that it had weighed the matter and had considered substituting the term "prison gang" for "Aryan Brotherhood."  RT 1909.  The court acknowledged that either term was prejudicial, but the court saw no way to avoid the fact that the case involved a prison gang.  The defense motion was denied, with the court explaining only, "This prison gang in this case calls itself the 'Aryan Brotherhood.'  The name is part of the case.

The philosophy and operation of that particular organization forms part of the case."[328]    RT

1909.

1713.    On July 15, 1985, the defense sought a protective order by formal written motion, based on the jurors' reactions during voir dire.  CT 6254.  Defense counsel noted that the voir dire, started after the oral motion, demonstrated that the mere mention of the term "Aryan Brotherhood" commonly provoked a sharply negative reaction from the prospective jurors.  CT 6256-6260.  Although the defense also argued for preclusion of any references to prison gangs or prior imprisonment, the major focus of the motion was against the use of the term "Aryan Brotherhood."  See CT 6261, lines 16-21.

1714.    During a hearing on the renewed defense motion, the trial court sought to clarify whether the defense was seeking only to preclude use of the term "Aryan Brotherhood," or was seeking to preclude all evidence pertaining to imprisonment or prison gangs.  RT 4372, lines 16-20.  The court questioned whether the use of any other name for the group would make any difference in regard to the prejudicial impact.  RT 4372, lines 18-20.  Defense counsel made it clear that the defense position was that there should be no references at all to prison gangs or prior imprisonment, but that a ruling preventing the prosecution's use of the term "Aryan Brotherhood" would certainly reduce, though not eliminate, the prejudice.  RT 4373, esp. lines 15-16.

1715.    In an unusually caustic written ruling, the court again denied the defense request for a protective order.  CT 6487.  Noting that the defense wanted the deletion of any reference to

---

[328]  The trial court never explained why the proof of any relevant aspects of the "philosophy and operation" of the group required reference to the name of the group.  The name implies to many people a racist philosophy which clearly had nothing whatsoever to do with the present crimes.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

- 708 -

the Aryan Brotherhood, the court concluded, "[t]his demand, made in a trial where the Aryan Brotherhood is the organization which conspires to kill people, is quite an amazing request." CT 6498-6499. The court expressed its conclusion that, "regardless of the name of the organization, the evidence to be presented in this trial will cause prejudice ..." CT 6500. The court acknowledged that "[t]he name Aryan Brotherhood may cause confusion to some jurors because of anti-Semitic or neo-nazi overtones. . . ." CT 6500.

> B. The Trial Court's Ruling Admitting Evidence That Petitioner Was A Member of the "Aryan Brotherhood" Violated Petitioner's Constitutional Rights.

1716. The trial court's admission of evidence that Mr. Price was a member of the "Aryan Brotherhood"--as opposed to a member of "prison gang"--violated Mr. Price's rights under the First, Eighth, and Fourteenth Amendments. See Bueno v. Hallahan, 988 F.2d 86, 87 (9th Cir. 1993) (state court's admission of prejudicial evidence mandates habeas corpus relief if "it renders the state proceeding so fundamentally unfair as a violate due process"); see also Gregg v. Georgia, 428 U.S. 153, 203-04 (1976) (permitting a "wide scope of evidence in capital case, save evidence that unduly "prejudice[s] a capital defendant); cf. Dawson v. Delaware, 503 U. S. 159 (1992 (First Amendment violated when evidence of capital defendant's gang affiliation admitted at trial).

1717. Assuming the nature of the present case made it necessary for the jury to learn that Price had been in prison and was an alleged member of a violent prison gang, it has never been explained why the jury also needed to know that the gang in question was called the Aryan Brotherhood. If the prosecution evidence would have shown that the present crimes were motivated by reasons of race, religion, or national origin, and that the Aryan Brotherhood

committed crimes for such reasons, then the term "Aryan Brotherhood" might have had potential relevance. However, no such evidence was presented, and the prosecutor expressly disavowed any such theory. RT 4380.

1718. The prosecution theory was that the present crimes occurred because one member of the group provided information to authorities about other members of the group. All that was relevant was that the persons involved were members of the same group, and that the group believed in retaliating violently against defecting members or their families. As long as the prosecution was permitted to prove that much, its case would have been intact no matter what the group was called.

1719. Thus, the term "Aryan Brotherhood" was not relevant at all, as it did not relate to any contested issue in the trial. Witnesses such as Thompson and Smith would have been just as effective if they had testified only that they, Price, and Steve Barnes all belonged to the same gang, that the leadership of the gang decided that Barnes' father should be killed, and that Price had agreed to carry out that task. Thompson and Smith could have described the organization of the group and any of its activities relevant to taking revenge against defecting members, without describing alleged historical facts about the group that included the use of violence against members of another race.

1720. In contrast to the lack of probative value, the prejudicial impact of the words "Aryan Brotherhood" was indisputably considerable. At least 42 prospective jurors expressly commented that, even without knowing anything about the group, the name "Aryan Brotherhood" caused them to assume that its members were racists, white supremacists, Neo-Nazis, or anti-Semitic. RT 2134, 2250, 2254, 2260, 2280-2281, 2296, 2338, 2492, 2558, 2622, 2649, 2724, 2820, 2836, 2853, 2952, 3072, 3096, 3147, 3155, 3185, 3190-3191, 3196, 3223,

3242, 3261, 4666-4668, 5517, 5841, 5889, 6431, 6794, 6842, 6918, 6923, 6938, 6950, 7469, 7473, 7495, 7500, 8137, 8555, 9105.

1721.  Ironically, the prosecutor himself identified the problem, apparently without realizing it.  As noted above, he recognized that some jurors would associate the term "Aryan Brotherhood" with Nazism, but since that had nothing at all to do with the case, the prosecutor believed there would be no harm because, "if they have a prejudice, it's an inaccurate one."  RT 4380.  However, contrary to the prosecutor's conclusion, petitioner contends that such inaccurate prejudices are especially unfair.

1722.  If it were true that the Aryan Brotherhood believed in Nazism, and if such beliefs were relevant to the present case, the name "Aryan Brotherhood" would have still been prejudicial, but in that situation the probative value might well be great enough to permit the prejudice.  If the Aryan Brotherhood believed in Nazism, but such beliefs were not relevant to the case, then the prejudice would be the same but the probative value would be reduced to little or nothing.  In that situation, the prejudice would no longer be permissible; instead, it would be undue prejudice that should be avoided, even if it resulted in a fair picture of Price's beliefs.

1723.  In the present situation, where the prosecutor apparently agreed that the group was not involved in Nazism, and where Nazism had nothing at all to do with the case, the prejudice was not only undue, it was also unfair, because no probative value attached to the group's name, and it carried a special danger of distorting the verdict on penalty as well as on guilt.  It would be bad enough if the jury voted for guilt or voted for death because Price was a Nazi, but it is even worse if they did so because they incorrectly believed he was a Nazi.  Certainly, such an incorrect belief does nothing whatsoever to lessen the prejudice associated with the name.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH
- 711 -

1724.  The fact that there was no evidence showing that the group believed in Nazism, or was otherwise anti-Semitic, did nothing to lessen the danger of undue prejudice.  As shown above, many prospective jurors openly admitted that the mere mention of the name was enough to cause them to believe the worst.  It seems likely that many other jurors who were not asked the question or who did not openly admit such a reaction did react negatively.  Although the evidence did not affirmatively show that the assumptions made by these jurors were warranted, the evidence also did not disprove such assumptions.

1725.  Nor did the judge's solution, to remove all prospective jurors who equated the name "Aryan Brotherhood" with Nazism, solve the problem.  Despite the fact that the judge suggested this answer, he was unwilling to automatically excuse prospective jurors merely because they equated the term "Aryan" with white supremacy.  See, for example, RT 2338-2339, 2952-2953, 3155-3158; CT 6250, 7469-7474.  Indeed, actual Juror Ina Clark stated expressly she associated the Aryan Brotherhood with Germany and World War II.  RT 8555; CT 8499.

1726.  Another flaw in the judge's proposed solution was that it was never clear that <u>any</u> prospective jurors failed to equate the name "Aryan Brotherhood" with Nazism or white supremacy.  Questions about the name were asked primarily of prospective jurors who volunteered on their written questionnaires that the name meant something to them.  However, it seems likely that most people would connect the group name with Nazism or white supremacism, even if they did not go to the effort of expressly saying so on the written questionnaire.

1727.  In conclusion, the trial court's denial of Mr. Price's motion both violated Mr. Price's constitutional rights and severely prejudiced him at trial.

# CLAIM XXVI

**BECAUSE THE EVIDENCE WAS NOT SUFFICIENT TO ESTABLISH THAT HICKEY'S KILLER HAD AN INTENT TO STEAL AT THE TIME OF ENTRY INTO THE HICKEY RESIDENCE, THE BURGLARY CONVICTION CANNOT BE UPHELD CONSISTENTLY WITH FEDERAL DUE PROCESS REQUIREMENTS; ALSO THE ERROR REQUIRES THAT THE CONVICTION ON THE HICKEY MURDER COUNT, THE JURY'S FINDINGS THAT BOTH SPECIAL CIRCUMSTANCE ALLEGATIONS WERE TRUE, AND THE DEATH SENTENCE MUST BE VACATED**

1728.    The evidence supporting the conviction for burglary was insufficient to support the verdict, and therefore petitioner's rights to due process, a fair trial, the effective assistance of counsel, and his right to be free from cruel and unusual punishment, as guaranteed by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution were violated.

1729.    Burglary consists of an entry into a structure listed in California Penal Code section 459, accompanied by the intent to commit theft or any felony.    The requisite intent must exist at the time of the entry; such an intent formed after the entry is insufficient to support a burglary conviction.    The only theory of burglary that was set forth in the information and in the instructions in the present case was entry with the intent to commit theft.    CT 3077; RT 20299. The only items allegedly taken from the Hickey residence were the guns owned by Petry and Hickey, Hickey's knife, and a Sampo radio.    There was no evidence at all that the person who committed the crimes ever had any intent to steal any other property; indeed, more than a hundred dollars in cash was left lying on the floor of Hickey's bedroom.    RT 12821-12822, 12905.

1730.    Thus, in order to establish that the crime of burglary was committed, there must

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

be evidence that, at the time of entry, Hickey's killer already intended to steal the guns.[329]  The

defense evidence indicated that the guns had been removed from the Hickey/Petry residence well

in advance of the killer's entry, but even when the defense evidence is totally disregarded, the

most that can be said is that evidence exists that could support a conclusion that the killer took

the guns near the time of the killing.  Petitioner contends that no evidence whatsoever supports

the further conclusion that the killer had the necessary intent to steal at the time of the entry.

1731.  The simple fact is that the evidence fails to disclose the events that led up to the

killing.  The evidence showed that something was going on between Price and Hickey prior to

the killing, and it apparently involved some discussion of money for guns.  There was no sign of

a forced entry into the Hickey residence, indicating a likelihood that Hickey herself consented to

the entry of the person who subsequently ended her life.  Although several different possible

scenarios as to how the killing itself occurred exist, there is no basis for accepting any one of

them over the others.

1732.  The theory that the prosecutor set forth in closing argument was that Hickey lent

her .38 caliber pistol to Price and that she later read about the Arcata robberies in the newspaper

and suspected that he used her gun to commit them.  RT 20496.  The prosecutor also theorized

that Hickey would have suspected that Price was responsible for stealing the guns from her step-

father's home.  RT 20496.  The prosecutor continued this scenario, suggesting that Hickey

encountered Price during the early morning hours of February 19, told him what she suspected,

and sought money in return for her silence.  RT 20498.  Finally, the prosecutor suggested that

---

[329]  As noted, the only other items allegedly missing were the Sampo radio and the knife.
Clearly, however, there is not a shred of evidence (or even a reason to speculate) that the killer
had an intent to steal the radio or the knife at the time of entry.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

1    Price came to Hickey's home later that night to get her guns, and he killed her because she knew

2    too much. RT 20499.

3       1733. The prosecutor's theory was based on considerable speculation. There was no

4    evidence at all that Hickey loaned her .38 caliber gun to Price or that he used it in any of the Ar-

5    cata robberies or that she suspected that he did. Indeed, the jury that heard all of the evidence

6    and saw all of the witnesses failed to convict Price of any of the Arcata robberies. There is also

7    no evidence that Hickey ever sought to blackmail Price. However, if we are to assume (as the

8    jury found) that Price killed Hickey, then the prosecutor's speculation offers as good a starting

9    point as any other theory. From the ideas he offered, together with the few other facts that were

10    established by the evidence, a number of possibilities emerge:

> (1) Hickey could have been blackmailing Price, causing him to decide to enter
> her home, steal her guns, and kill her.
>
> (2) Hickey could have been blackmailing Price, causing him to decide to enter
> her home and kill her. Once that was accomplished, he could have decided
> that he might as well steal her guns while he could.
>
> (3) Hickey could have been blackmailing Price, causing him to decide to enter
> her home and kill her. He might have then stolen the guns in order to make it
> look like she had been killed by a stranger committing a burglary, rather than
> by a person who knew her.
>
> (4) Hickey could have been blackmailing Price, causing him to go to her
> residence to discuss the situation. If the discussion did not go well, he could
> have decided after the entry to kill her and take her guns.
>
> (5) There could have been no blackmail at all, but only discussions about Price
> selling the Hickey/Petry guns so that Hickey could raise money to leave Petry.
> On the night of the killing, Price could have gone to the residence intending to
> steal the guns and kill Hickey, so that he could keep all of the proceeds of any
> gun sales, or so he could have the guns for his own use.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

(6) There could have been discussions about selling the guns and such discussions might have continued at Hickey's residence on the night she was killed. Something might have come up during the discussion that caused Price to conclude the financial arrangements would not work out, so he might have then decided to kill her and take the guns.

(7) There may have been discussions about selling guns, but that was not necessarily the purpose of any visit Price might have made the residence on February 19. Instead, they may have been involved in a sexual relationship which ended in an argument that night. That argument could have led to the killing of Hickey, with the theft of guns as an afterthought.

1734. In addition to these possible scenarios, many other variations could be set forth.[330] For the present purpose, it is sufficient to note two key points. First, of the seven scenarios set forth above, only the first and the fifth support a finding of an intent to steal at the time of entry. Second, there is nothing in the evidence that supports a finding beyond a reasonable doubt as to which particular scenario actually occurred. In sum, there is no basis at all, outside of pure speculation, to conclude that the events that led to Hickey's death included an entry by the killer with an intent to steal.

1735. To satisfy federal 5th and 14th Amendment due process standards, "the relevant question is whether, after reviewing the evidence in the light most favorable to the prosecution,

---

[330] The possible variations fall into three basic groupings. The first grouping consists of entries with the intent to commit theft, constituting burglary. The second grouping consists of entries for a criminal purpose other than theft (such as murder), with a decision to take the guns made after the entry. The third grouping consists of entries for a totally innocent purpose, with a decision after the entry to both kill Hickey and steal the guns. In view of the absence of any evidence of a forced entry, and the apparent pre-existing relationship between Hickey and Price, the second and third groupings are quite reasonable possibilities that are completely consistent with all of the prosecution evidence.

any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Under this standard, the evidence is insufficient to support the jury's guilty verdict. Jackson v. Virginia, 443 U.S. 307, 318-319 (1979).

### A. In View of the Insufficiency of the Evidence of Intent to Steal at the Time of Entry, It Was Error to Instruct the Jury on a Felony-Murder Theory in Regard to the Hickey Killing

1736. The jury was instructed that a willful, deliberate, and premeditated murder constitutes murder of the first degree. RT 20307. The jury was also instructed that that any unlawful killing, whether it be intentional, unintentional, or accidental, constitutes first degree murder if it was committed as a result of the commission or attempted commission of the crime of burglary. RT 20309. In its verdict, the jury found the killing of Hickey to be murder in the first degree, but the verdict gave no indication whatsoever whether the jury relied on a felony-murder theory or a premeditation-deliberation theory. CT 10232.

1737. It has been shown earlier in this claim that the evidence was insufficient to sustain a burglary conviction. Thus, it was error to instruct the jury in regard to the theory of first degree murder based on a burglary felony-murder theory. Assuming arguendo the evidence was sufficient to sustain a first degree murder finding based on the premeditation-deliberation theory, the fact remains that we have no way of knowing whether the present jury ever did find premeditation and deliberation.

> In these circumstances the governing rule on appeal is both settled
> and clear: when the prosecution presents its case to the jury on
> alternate theories, some of which are legally correct and others
> legally incorrect, and the reviewing court cannot determine from

1
2
3
4

the record on which theory the ensuing general verdict of guilt

rested, the conviction cannot stand." <u>People v. Green</u>, 27 Cal.3d 1,

69 (1979).

5
6
7
8
9
10

1738.  <u>Green</u> also noted that this rule of California law "is perhaps most commonly

invoked when the alternate theory is legally erroneous." <u>Id.</u> at 69.  However, "[t]he same rule

applies when the defect in the alternate theory is not legal but factual, i.e., when the reviewing

court holds the evidence insufficient to support the conviction on that ground." <u>Id.</u> at 70.

11
12
13
14

1739.  In applying the rule to the present facts, this Court cannot determine from the

record on which theory the jury relied.  If anything, the erroneous burglary conviction implies

that the jury did rely on the improper felony-murder theory.  If so, the jury would have had no

reason to even consider the alternate premeditation-deliberation theory.

15
16
17
18

1740.  Although in connection with the special circumstances, the jury unanimously

found that the killer acted with the specific intent to kill Elizabeth Hickey, a finding of a specific

intent to kill does not establish that the jury also found premeditation and deliberation:

19
20
21
22
23
24

In <u>Carlos v. Superior Court,</u>(1983) 35 Cal.3d 131, 153 ... this court

construe this provision to require that the trier of fact also find

that the accused intended to kill or aid in a killing, <u>a requirement</u>

<u>short of premeditation and deliberation.</u>

<u>People v. Memro</u>, 38 Cal.3d 658, 696, n. 43 (1985)

25
26
27
28

1741.  A killing can be intentional and not even constitute murder at all, let alone murder

in the first degree.  An intentional killing without malice aforethought constitutes voluntary

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

manslaughter.  People v. Campbell, 193 Cal.App.3d 1653, 1671-1673 (1987).  In the present case, the jury was also instructed that the killing could be found to be murder if there was malice or if the killing occurred in the commission of a burglary.  RT 20306-20307.  Thus, if the jury relied on the felony-murder theory (as seems likely), there was no need to ever determine whether the killing was committed with malice.

1742.  In sum, all indications point to jury reliance on the burglary felony-murder theory as the basis for a finding of first degree murder.  Nothing indicates that the jury necessarily made any findings at all with regard to the issues of malice, premeditation, or deliberation.  Since the felony-murder theory was unsupported, settled rules of appellate review require that petitioner's conviction on the Hickey murder count be vacated.

**B.  The Lack of Evidence to Support the Burglary Conviction Requires that Both of The Special Circumstance Findings and the Penalty Verdict Be Vacated.**

1743.  If the evidence was insufficient to support the burglary conviction, then the special circumstance finding of murder during the commission of a burglary must also be set aside.  In addition, vacating the conviction on the Hickey murder count would leave only one murder conviction, so it is also necessary to set aside the multiple murder special circumstance.  Without any valid special circumstance findings, the penalty verdict must also be set aside to comport with due process and the Eighth Amendment.

1744.  Furthermore, in the event that for any reason this court concludes that the burglary conviction must be vacated, but that the Hickey murder conviction can somehow be upheld, it would still be necessary to vacate the penalty verdict.  Although such a disposition would leave the multiple murder special circumstance finding intact, the fact remains that at the penalty phase

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH
- 719 -

1 | the jury was instructed that <u>both</u> the multiple murder and the murder-during-burglary special

2 | circumstances constituted factors in aggravation.    Thus, even if it was somehow proper to

3 | proceed to a penalty trial, 5th and 14th Amendment Due Process concerns and 8th Amendment

4 | reliability requirements could not be satisfied in a trial tainted by the improper consideration in

5 | aggravation of the invalid special circumstance. <u>See</u> <u>Zant v. Stephens</u>, 456 U.S. 410 (1982).

# CLAIM XXVII

## ERRONEOUS EVIDENTIARY RULINGS UNFAIRLY RESTRICTED THE DEFENSE IN CROSS-EXAMINATION AND IN THE PRESENTATION OF EVIDENCE DURING THE PENALTY PHASE IN VIOLATION OF THE UNITED STATES CONSTITUTION

1745.  The trial court's erroneous evidentiary rulings during the sentencing phase of petitioner's trial resulted in a fundamentally unfair trial in violation of petitioner's rights to due process, a fair trial, the effective assistance of counsel, and his right to be free from cruel and unusual punishment, as guaranteed by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

### A.  The Trial Court Erroneously Refused to Admit Several Documents Written by Mr. Price

1746.  Near the conclusion of the penalty phase, the defense offered into evidence a series of 13 documents written by Price while he was in the Humboldt County Jail.  These documents were marked collectively as Defense Exhibit FFFFFFF.  CCT 19:5497-5519.  The prosecutor objected to the documents as hearsay, but defense counsel indicated they were not being offered for the truth of the matter.  Instead, they were being offered to demonstrate Price's ability to express his thoughts in writing.  RT 22732-22733.

1747.  Defense counsel argued that these writings were relevant in mitigation because they demonstrated Price's ability to communicate and showed that his hope of writing a book was not unrealistic.  Thus, the writings showed that Price's life was worth saving.  RT 22733-22734.

1748.  The writings pertained to Price's feelings about the actions of the court which had

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

caused him to refuse to come to court during the guilt phase. The court expressed some concern that these selected items would not disclose to the jury the complete facts necessary to understand why the court ruled in favor of having Price shackled. RT 22735.

1749. The court stated it would have no problem giving the jury everything Price had written, as that would present a balanced picture. Defense counsel asked if the court was offering evidence against Price and the court insisted that was not being contemplated. RT 22734-22735. The court wanted the defense to offer the total package of writings; the court explained,

> What you want to do is take half the evidence and present it. And, you know, that's not the way the law works. That's not the way the Evidence Code works. That's not the way the criminal law works. You don't put on half the case. You don't tell half of the case, but that's what you want to do. RT 22735-22736.

1750. The prosecution made no effort to offer any of the additional items used by the court, and defense counsel did not act on the judge's suggestion of offering all of the writings. The judge expressly noted that the People had not moved to admit additional items, so the court would issue a ruling based only on what the defense had submitted. RT 22736.

1751. Soon afterward, the court issued a written order excluding the writings in Defense Exhibit FFFFFFF. The ruling stated,

> These documents are excluded because they are hearsay and because they fail to present the complete picture. There is no mention of the 230 pages of testimony on November 19, 20, and

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

21, 1985; the daily waiver sheets sent to Price each day thereafter nor all of the preceding evidence which constitutes the totality of the situation re: Price's custodial status. To allow this selection of documents to be presented to the Jury would place the Jury in a position of being mislead. (sic) RT 10709.

1752. Thus, the writings were disallowed for two reasons. The judge believed they constituted hearsay and he also believed they failed to present a complete picture to the jury. Of course, the letters would have been hearsay if offered for the truth of the matters expressed, but defense counsel's rationale for admitting the documents did not depend on the truth of the matters expressed. It is axiomatic that when not offered for the truth of its contents, a writing is not hearsay. The writings were proffered not to prove the truth of the matter asserted, but instead were offered as a quintessential piece of mitigating evidence--evidence of Mr. Price's unique character. See Woodson v. North Carolina, 428 U.S. 280 (1976).

1753. Moreover, even if these writings were hearsay, it was improper for the trial court to exclude them on that basis at the sentencing phase of petitioner's capital trial. See Green v. Georgia, 442 U.S. 95 (1979).

1754. Thus the trial court's hearsay justification was not an adequate basis for precluding the use of these writings in evidence. The other justification - failure to present a balanced picture - was even more flawed.

1755. First, the entire concept of a "balanced picture" was based on the incorrect assumption that the writings would be used for the truth of their content. That was not the defense purpose. Any "balance" concerns would have been fully allayed by instructing the jury

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

that the writings were not being admitted for the <u>truth</u> of their content, but only to demonstrate Price's writing abilities. If the writings were not admitted for their truth, no need to "balance" them with other writings existed.

1756. There was an even greater flaw in the trial court's reasoning. The judge's concern with "balance" was simply inconsistent with the adversary nature of the criminal justice system. His lecture about how the Evidence Code or the criminal law "works" was quite puzzling. While the <u>overall</u> goal of an adversary system is to achieve balance by allowing the jury to hear both views of the facts, no rule of procedure requires a single party to present both positions.

1757. In other words, it is entirely appropriate for one side to present the evidence most favorable to that side. If the opposing side believes that an incomplete picture has been presented to the jury, then it is up to that side to present additional evidence in order to "balance" the picture.

1758. This principle is given full recognition in California Evidence Code section 356, which provides in part that, "[w]here part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; ...." This statute would be superfluous if the first party were required to introduce the entire writing, act, etc. The Legislature expressly recognized that one party might offer evidence beneficial to that side only, and the other side might then have to offer additional evidence on the subject to complete the picture.

1759. Thus, it was error for the trial court to place full responsibility for balancing the evidence on the defense. This error resulted in depriving the jury of substantial mitigation evidence of Price's writing ability. The defense contended that Price's ability to express his feelings in writing constituted a unique aspect of his personality that demonstrated his life was

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

- 724

worth saving.  This preclusion of mitigating evidence was federal constitutional error and cannot

be deemed harmless.  See Eddings v. Oklahoma, 455 U.S. 104 (1982).

**B.  The Trial Court Improperly Restricted the Cross-Examination of Ricky Carpenter, Precluding the Defense from Showing Matters Relevant to the Bias of the Witness**

1760.  Ricky Carpenter testified as a prosecution witness in the penalty phase, admitting

his own participation in the Leroy Banks killing in San Quentin and placing the responsibility for

the killing on Price.  RT 22620 to 22630-2.  Carpenter admitted that he was on parole at the time

he testified, and would be for 6 or 7 more months.  He claimed he had been promised nothing for

his testimony, but then agreed that he had received immunity for any matter about which he

testified, and that approximately $800 had been allocated for relocating his family.  RT 22620-1

to 22621.

1761.  Carpenter testified that he had used heroin and other drugs in the past, but had not

used any illegal substances since February, 1986.  RT 22651.  He claimed he was testifying for

the prosecution because he had become a Christian ninety days before his June 25, 1986

testimony, and he believed testifying was the right thing to do.  RT 22657.

1762.  Carpenter's parole agent was called as a defense rebuttal witness and initially

testified outside the presence of the jury.  She explained that Carpenter had been regularly tested

for the use of narcotics, and his test results in April, May, and June, 1986 had all been positive

for the use of morphine and codeine.  She also noted Carpenter told her he was employed, but

she had been unable to verify that.  Carpenter claimed his employer knew he was on parole, but

Carpenter still did not want the parole office to contact the employer because of some

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

- 725

undisclosed problem; he told his parole agent only that he was doing construction work. He failed, as promised, to supply a pay stub or some other form of verification. RT 22794-22800.

1763. The trial court ruled that Carpenter could be impeached with the results of the narcotics tests, but that there was no impeachment value in the information about Carpenter's alleged employment. RT 22809 to 22810-1. The parole agent then testified about the narcotics tests in front of the jury, and stated that no decision had yet been made as to whether Carpenter should be returned to custody or allowed to remain on parole. RT 22814. Defense counsel asked whether Carpenter had provided the parole agent any other unverifiable information, but the judge interrupted, stating he had already ruled on that matter. RT 22818.

1764. As a result of the trial court rulings, the jury never heard that Carpenter had given vague information about his alleged employment, and that the parole office had been unable to verify the same. Such evidence was highly relevant as a factor in the parole department's determination whether Carpenter should be returned to custody because of his parole violation. The likelihood of Carpenter's return to prison was directly related to the pressure to please the prosecution by supplying testimony damaging to Price. Thus, the precluded evidence was directly relevant to the degree of Carpenter's bias.

1765. In Davis v. Alaska, 415 U.S. 308 (1974), the United States Supreme Court held that the mere fact of probationary status placed a witness in a vulnerable situation from which it could be inferred that he was biased in favor of the prosecution. Pursuant to the right to confront witnesses, the defense is entitled to cross-examine in regard to any such bias. The Court explained, "defense counsel should have been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." Davis, supra, 415 U.S. at 318.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

1766.   In the present case, the jury knew of Carpenter's parole status, but the crucial factor in determining the amount of pressure he would feel was the likelihood that his parole would be violated.   By depriving the jurors of information that would have allowed them to evaluate the likelihood of a revocation, the trial court prevented the defense from fully and fairly impeaching Carpenter.   Since Carpenter was such an important penalty phase witness for the People, this interference with full impeachment must be deemed prejudicial on the penalty issue.

# CLAIM XXVIII

## IN VIOLATION OF THE FEDERAL CONSTITUTION, THE DEFENSE WAS IMPROPERLY PRECLUDED FROM PRESENTING SOME EVIDENCE IN MITIGATION THAT SHOULD HAVE BEEN RECEIVED

1767.  The trial court's refusal to allow the defense to present, and the jury to consider, relevant mitigating evidence at the sentencing phase of his trial, resulted in a fundamentally unfair trial in violation of petitioner's rights to due process, a fair trial, the effective assistance of counsel, and his right to be free from cruel and unusual punishment, as guaranteed by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

### A. The Defense Was Improperly Restricted in it's Efforts to Explain Why Curtis Price Did Not Appear in Court During Most of the Guilt Phase

1768.  During the penalty trial, the defense presented the testimony of Pat Manuel, a dietician who had interviewed Price and conferred several times with jail officials in efforts to improve the nutritional value of Price's meals.  The prosecutor sought an offer of proof regarding the relevance of her testimony.  Defense counsel explained that the witness would discuss the impact of nutritional deficiencies on the nervous system, and the effect that stress has on dietary needs.  The witness would explain the impact of dietary problems on Price's decision to remain away from the court during the guilt phase, and would also provide evidence in mitigation in regard to the assaults on jail officials.  RT 21873-21874.

1769.  The judge ruled that she could testify in regard to the jail assault allegations, but "whether he came to court is irrelevant."  RT 21874.  Manuel testified about very serious nutritional shortcomings in Price's jail diet and explained that malnutrition was causing him to

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH
- 728 -

undergo anxiety and disorientation, but she never explained how these problems related to Price's absence from court. See RT 21875-21904. During her testimony, the court disallowed as irrelevant an explanation of Price's reasons for being a vegetarian. RT 21885-21886.

1770. These restrictions on the testimony of Manuel were inconsistent with the Eighth Amendment principles of <u>Lockett v. Ohio</u>, wherein the Court concluded that, "in all but the rarest kind of capital case" the sentencing jury should not be precluded from considering as a mitigating factor "<u>any</u> aspect of the defendant's character or record." <u>Lockett v. Ohio</u>, 438 U.S. 586, 604 (1978).  Under <u>Lockett</u>, testimony regarding Price's reasons for being a vegetarian would have similarly showed his sensitivity and the uniqueness of his character.  Thus, it was error to summarily preclude such evidence.  Similarly, the extent to which jail nutritional deficiencies contributed to the state of mind that caused Price to remain away from court during most of the guilt phase was highly relevant to provide the jurors with a fairly balanced view of the "whole being."

1771. Indeed, it is quite difficult to understand the trial court's conclusion that reasons for Price's lack of appearance during the guilt trial were irrelevant.  The reasons may well have been irrelevant to the issue of guilt or innocence, but they were certainly relevant in many ways to the issue of whether Price deserved to live or die.  For example, jurors might well have thought that Price's absence from court during the guilt trial was simply a manifestation of an inappropriate attitude.  Such jurors may have consciously or subconsciously allowed such perceptions to influence their decision as to what type of person Price would be if sentenced to life without possibility of parole. A more complete understanding of the full combination of conditions that led to Price's decision to remain away from court would necessarily increase a juror's willingness to be compassionate and spare Price's life.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

1772. Clearly, the prosecution did not perceive Price's reasons for not coming to court as being irrelevant. The Deputy District Attorney argued <u>during the penalty phase</u> that Price stayed away from court in order to prevent prosecution witnesses from identifying him and in order to prevent the jury from seeing his reaction to the evidence presented against him. RT 22880-22882. Certainly, the defense should have been given the opportunity to offset the impact of such speculative <u>arguments</u> by testimony from disinterested witnesses that there were different reasons for the absence during the guilt phase. More particularly, the exclusion of evidence combined with the prosecutor's argument violated the federal due process requirement of <u>Gardner v. Florida</u>, 430 U.S. 349, 362 (1977), that the defendant be given the opportunity to rebut evidence which is used against him to obtain a death sentence.

1773. It is true that when Price testified himself, some explanations were given for his earlier absence from court. However, Price's testimony in this regard would have certainly been far more effective if it had been supported by the more objective testimony of expert witnesses, such as Manuel. The United States Supreme Court has so recognized:

> We think, however, that characterizing the excluded evidence as
> cumulative and its exclusion as harmless is implausible on the facts
> before us. The evidence petitioner was allowed to present on the
> issue of his conduct in jail was the sort of evidence that a jury
> naturally would tend to discount as self-serving. The testimony of
> more disinterested witnesses ... would quite naturally be given
> much greater weight by the jury.

<u>Skipper v. South Carolina</u>, 476 U.S. 1, 90 L.Ed.2d 1, 9 (1986).

1774. Thus, as in <u>Skipper</u>, the strong prejudice stemming from the error was not erased by Price's testimony.

1775. The error in precluding Manual's testimony explaining Price's reasons for failing to appear during most of the guilt phase, as well as his reasons for being a vegetarian, significantly handicapped the defense penalty presentation. The void was exploited by unfair prosecution argument, speculating on different reasons for Price's absence.

**B. The Defense Was Improperly Precluded from Presenting Evidence That Counselor Helen Vatcher Had Seen Curtis Price Crying**

1776. Helen Vatcher was a licensed counselor who had been appointed by the trial court to assist Price in relieving the stress caused by his long and heavily restrictive pretrial county jail custody. RT 21922-21923. She testified about various ways in which the conditions of Price's confinement could have impacted his behavior in jail.

1777. At one point she was asked whether she had ever seen Price cry. The prosecution objection that this was irrelevant was sustained. RT 21933-21934. This, too, was error under the principles discussed above, as set forth in Lockett, supra. If a capital defendant's poetry is relevant to show his sensitivity, then surely his tears are also relevant for that purpose, and as part of the effort to portray the "whole being."

1778. The State cannot show the above-described errors were harmless on the penalty determination.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

- 731

# CLAIM XXIX

**THE TRIAL COURT ERRONEOUSLY LEFT THE JURY
WITH NO OPTION OTHER THAN TO CONCLUDE THAT
THE BANKS HOMICIDE WAS FIRST DEGREE MURDER
IF IT WAS A CRIME AT ALL, AND THE ERROR WAS
EXACERBATED BY ALLOWING THE JURY TO FIND
FIRST DEGREE MURDER BASED ON AN INAP-
PLICABLE FELONY-MURDER THEORY**

1779.    The trial court erroneously left the jury with no option other than to conclude that the Banks homicide was first degree murder if it was a crime at all, and the error was exacerbated by allowing the jury to find first degree murder based on an inapplicable felony-murder theory, resulting in a fundamentally unfair trial in violation of petitioner's rights to due process, a fair trial, the effective assistance of counsel, and his right to be free from cruel and unusual punishment, as guaranteed by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

1780.    The jury was instructed that any criminal acts by the defendant involving force or violence could be used in aggravation if found true beyond a reasonable doubt.  RT 22861-22862.  The court explained that evidence had been offered for the purpose of proving several violent criminal acts, including murder.  RT 22861.  The court described homicide as unlawful (murder or manslaughter), or lawful (excusable or justifiable homicide.)    RT 22862.  Manslaughter was never mentioned again in the instructions.  The jury was told that murder was an unlawful killing with malice <u>or an unlawful killing that occurred during the commission or attempt to commit an inherently dangerous felony</u>.  RT 22862.  The court also defined first degree murder as including premeditation and deliberation, <u>but second degree murder was never mentioned</u>.  RT 22863.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH
- 732 -

1781. By never mentioning second degree murder, and by not defining manslaughter, the court left the jury with the impression that if Price had killed Banks, then the killing was either first degree murder or no crime at all (i.e., justifiable homicide). Of course, if the jury accepted all of the testimony of Carpenter, then first degree murder would have been a logical choice. However, there were several important reasons for the jury to be skeptical of Carpenter's testimony.

1782. Carpenter's own parole agent gave testimony proving Carpenter had lied to the jury. Also, Carpenter received immunity from prosecution for the Banks killing in return for his cooperation. In addition, Carpenter must have realized that he faced the possibility of a parole violation, so he had great incentive to testify in a manner that would please the prosecutors who might be able to help Carpenter avoid a return to prison.

1783. Thus, the jury could reasonably have found Carpenter's testimony was of little value. Nonetheless, Perryman's testimony could have still convinced the jury that Price was involved in the altercation ending in Banks' death. This would have left the jury with a difficult decision, since Perryman's testimony told them almost nothing about the circumstances of the altercation. The lack of any evidence that Banks was armed might have caused the jury to reject the possibility of justifiable homicide in self-defense, but a jury fully instructed on the definitions of second degree murder, voluntary manslaughter, and involuntary manslaughter might well have rejected Carpenter's testimony and concluded that Price was guilty of a criminal homicide, but not first degree murder.

1784. In sum, the jury was artificially forced into a choice between first degree murder or nothing in circumstances which allowed reasonable jurors to believe there was criminal responsibility, but at a lower level than first degree murder. This could be very prejudicial, since

it is well-recognized that a jury which believes the defendant is guilty of some wrongdoing might well find that he had committed a more serious crime than they believed had been proved, if the only other option is to conclude he committed no crime at all.

1785. By focusing the jury solely on first degree murder, the court prejudiced Price by exaggerating the seriousness of prior violent criminal behavior which a properly instructed jury could well have classified in a lower range of seriousness. Such an exaggeration of the seriousness of the prior crime distorts the process of determining the penalty and undermines the reliability of the ensuing judgment, rendering Mr. Price's death sentence unconstitutional under the Eighth Amendment. Beck v. Alabama, 447 U.S. 625 (1980).

1786. The danger that the jury would improperly classify the seriousness of the crime was greatly increased by the puzzling inclusion of felony-murder instructions. RT 22862. The only homicide for which the jury had to make a determination during the penalty phase was the Banks killing, and no proper felony-murder theory could apply to that charge.

1787. While no proper felony-murder theory applied, the jury might very well have relied on an improper theory. In the course of the penalty phase instructions, the court also defined the crimes of assault with a deadly weapon and possession of a deadly weapon by an inmate.[331] RT 22866, 22868. The jury could have easily concluded that Price had committed one or both of these crimes, and that the killing occurred in the commission thereof. This would have led the jury directly to the first degree murder classification which had been improperly emphasized by the court.

---

[331] The possession of a weapon by an inmate offense was expressly described as a felony. RT 22868, line 21. Although assault with a deadly weapon was not expressly described as a felony, it seems all but certain that most, if not all, jurors would assume that such a serious crime was a felony.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

- 734 -

1788.    Of course, it would have been improper for the jury to base <u>any</u> felony-murder theory on such felonies.  <u>People v. Ireland</u>, 70 Cal.2d 522, 537-540 (1969)(assault with a deadly weapon cannot provide predicate for felony-murder liability); <u>People v. Satchell</u>, 6 Cal.3d 28, 40-41 (1971)(same with respect to possession of a sawed-off shotgun and possession of a concealable weapon by a felon).

1789.    The jury was instructed on both proper and improper theories of finding the Banks killing constituted first degree murder.  It cannot be determined from the verdicts whether the jury relied on a proper or an improper theory.   Under well-settled principles of law, petitioner's penalty verdict cannot stand.  <u>People v. Green</u>, 27 Cal.3d 1, 69; <u>Mills v. Maryland</u>, 486 U.S. 367; 100 L.Ed. 2d 384, 395 (1988).

# CLAIM XXX

### AFTER THE JURY REPORTED A DEADLOCK DURING THE PENALTY PHASE DELIBERATIONS, THE TRIAL COURT'S REACTION RESULTED IN A COERCED PENALTY VERDICT

1790.   The trial court's reaction to the jury's several reports of a deadlock at the penalty phase coerced the death verdict, in violation of petitioner's rights to due process, a fair trial, the effective assistance of counsel, and his right to be free from cruel and unusual punishment, as guaranteed by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

1791.   In this Claim, petitioner will show that when the penalty jury reported itself deadlocked, a series of interrelated errors violated petitioner's constitutional right to an uncoerced, reliable penalty verdict by a fair and impartial jury, in accordance with due process of law.   First, the court lacked any legitimate basis for rejecting the jury's declaration of a 7-5 deadlock, unequivocally voiced by 11 of the 12 jurors.   Second, the court misled the jury by strongly implying that a verdict would have to be obtained at some point in order to bring the case to a conclusion.   Finally, the court erred in refusing to permit a juror to ask a question.

## A.  Procedural Background

1792.   The jury began its penalty deliberations at 10:41 a.m. on Tuesday, July 1, 1986[332] Two and one-half days later, at 1:55 p.m., the foreperson sent the judge a note stating that the jury was apparently at an impasse.   CT 10777; RT 23050.   At 2:33 p.m., after the arrival of Price

---

[332]   Deliberations continued until 5:00 a.m.   CT 10745-10746.   The jury returned at 9:00 a.m. on Wednesday, July 2, and deliberated until 4:38 p.m.   CT 10775.   On Thursday, July 3, deliberations again began at 9:00 a.m.   CT 10777.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

and all counsel, the matter was discussed with the jury. The foreperson stated that since she had written the note, another vote had been taken and the numbers had changed; she was not certain if the jury was still at an impasse. Without discussing the matter with counsel or making any inquiry of any other jurors, the court directed the jury to continue deliberating. RT 23050.

1793. Less than an hour later, at 3:30 p.m., the foreperson sent the court another note saying that the jury was deadlocked. CT 10778. Another 33 minutes passed before Price and all counsel were present. The jury came into the courtroom and the judge asked the foreperson if she thought there was any probability that further deliberations might lead to a verdict. The foreperson responded, "No, I don't." The judge then asked whether there was anything he could do to assist, such as reread any instructions or testimony. The foreperson responded unequivocally:

> I think the convictions to the opinions that have been expressed in the votes are hard and fast. I don't think any amount of evidence that's available or discussion will change those opinions. RT 23051.

1794. The judge then asked for a numerical breakdown of the vote and the foreperson responded that 7 ballots had been taken and the vote had remained at 7-5 for the last 4 ballots. RT 23052. The judge then asked each of the other 11 jurors whether they agreed with the foreperson's assessment. Ten replied unequivocally, "Yes." One juror replied, "I believe so." The judge asked, "Unclear?" and the juror explained, "Well, yeah, a bit unclear. But I believe -- I wonder if -- maybe if I were to meditate on it, if I would have any change, but --." The judge simply responded, "Okay," and said nothing more to that juror. RT 23053.

1795. After this inquiry, the judge conferred with counsel at bench. He noted that Penal

Code section 190.4 provided that if the jury was unable to reach a unanimous penalty verdict, there <u>shall</u> be a new jury impaneled. The judge believed this meant he had no choice but to order a penalty retrial if the prosecutors desired one. The judge then stated,

> I'm wondering if we're not better off -- everybody -- letting them go home for the weekend, bring them back Monday and see if they want to -- if there's anything -- if they can't do it by Monday morning, let them go. Because <u>if they decide to try it again, we're tied up here again for months</u>. RT 23054; emphasis added.

1796. Defense counsel DePaoli opposed further deliberations, noting the jurors had expressed themselves very clearly. Defense counsel Klay added that the 7-5 split meant that even if the 1 juror who expressed some uncertainty changed his vote, it would make no difference. The prosecutor favored further deliberations and agreed with the judge that the jury should be sent home for the weekend and asked to return on Monday morning to see whether any positions had altered; if none had altered, he would then agree that a mistrial might be merited. Defense counsel DePaoli argued that such a course would put undue pressure on the jury. RT 23055. The judge then explained to the jury that the law was clear that no force or coercion could be applied to the jurors, but that he was sure that everybody had a desire to conclude the matter once and for all. While assuring the jurors that he was not attempting to change anyone, he then reminded them that they had "been here for the last year struggling with everyone else to get through the case." RT 23056. He repeated that, "everyone here would like to see it over with. . . . we would all like to see it end today, of course." RT 23057. He then announced that he would recess until Monday, let the jury meet again to discuss the matter, and if they still felt the same way they would reassemble in court. RT 23057.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

- 738 -

1797. The jury was then given the standard admonition, and the judge once again assured them nobody would force them to do anything. One juror then stated, "I presume I can't ask a question?" Without consulting counsel, the judge simply responded, "Please, not now." The jury was then sent home for the 3-day July 4th weekend. RT 23058.

1798. On Monday, July 7, the jury resumed deliberating at 9:30 a.m., without being asked if any jurors believed that the weekend of contemplation would make a verdict more likely. The jury deliberated until 4:56 p.m., still without reaching a verdict. CT 10779-10780. The jury returned once more on Tuesday, July 8, at 9:00 a.m. and deliberated until 4:15 p.m., at which time they finally returned a verdict of death. CT 10781-10782.

**B. Under All the Circumstances, the Actions of the Trial Court Coerced the Jurors into Reaching a Verdict**

1799. A state trial court denies a criminal defendant due process of law when the court "coerces" the jury's verdict after a deadlock has been reported by jurors. See, e.g., Jiminez v. Myers, 40 F.3d 976 (9th Cir. 1993) (granting habeas corpus relief after finding that jury's guilty verdict was coerced by state trial court). The Supreme Court has specifically noted the coercive effect of a trial court's inquiry into the numerical division of a deadlocked jury. See Brasfield v. United States, 272 U.S. 448 (1926), and Jenkins v. United States, 380 U.S. 445 (1965); see also Romine v. Georgia, 484 U.S. 1048, 1049 (1988) (Marshall, J., dissenting from denial of rehearing) (discussing Lowenfield). The Ninth Circuit has held that an inquiry into a deadlocked jury's numerical division is "per se coercive." United States v. Ajiboye, 961 F.2d 892, 893-94 (9th Cir. 1992).

1800. After 3 days of deliberations on the single question of whether Price should be punished by death or life without parole, and 4 consecutive 7-5 ballots, 11 of the 12 jurors were

absolutely unequivocal in their belief that further deliberations would not result in unanimity. The judge cut off the remaining juror's attempt to explain his view of further deliberations, in mid-sentence.  As defense counsel pointed out, even if that juror changed his vote, the jury would still be far from unanimous.  The court's actions here violated the above-cited principles of law.  The judge should have ended the proceedings at that point.  The jury had worked long and hard, having participated in 4-1/2 months of jury selection, and 7 months of trial.  The jurors must have known each other very well by the time penalty deliberations began, especially since they shared the experience of deliberating at the guilt phase for 11 court days.  Thus, these jurors were well aware of the magnitude of the trial and the nature of the deliberative process.  They were in an excellent position to know when they had reached the point when further deliberations were no longer appropriate.

1801.    Instead of accepting the judgment of a jury well-qualified to know when it was time to end the effort, the judge seemed overly concerned with the prospect of a penalty retrial[333]  Although the judge tried to assure the jurors he was not trying to coerce them, he tempered that with reminders that the trial had lasted a year and that everyone wanted the trial to reach a final conclusion.  Indeed, the judge's words must have reminded the jurors of the newspaper headline that had appeared at the outset of the trial - "County's Costliest Trial Set to

---

[333]  It should be noted that the judge's apparent belief that the prosecution was likely to insist on a costly penalty retrial was not necessarily correct.  Had a mistrial been declared, a responsible prosecutor might well have respected the fact that after all that time and effort, at least 5 and perhaps 7 jurors, who had found Price guilty of the substantive crimes, did not believe death was an appropriate punishment.  If the prosecutor had accepted that and decided not to seek a retrial, there would have been no further expenditure of judicial resources.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH
- 740

Begin.[334]   It is difficult to conceive of any legitimate purpose for reminding the jurors of the length of the trial while urging them to continue deliberations despite their certainty that continuing was pointless.

1802.   After the judge flatly refused to even hear the question that one juror wanted to ask, (RT 23058), and rejected their assessment of the situation by refusing to allow the jurors to put the case behind them before the 3-day holiday weekend, the jurors must have returned on Monday knowing that the judge would not be satisfied until they reached a verdict.  Even at that point, it took 2 more full court days to reach a verdict.  Indeed, these additional 2 full days of deliberations with no further effort to report a deadlock indicate that the jurors did not believe they could stop if they still did not agree on Monday.

1803.   In sum, the trial court committed a multitude of errors in insisting on further deliberations.  The court had no valid basis on which to reject the jury's own determination.  The judge sought a numerical breakdown even though it has long been recognized that such inquiries are generally coercive.   The coercive impact was heightened when the judge improperly

---

[334]   That newspaper article was received in evidence as Court Exhibit 73, during the defense motion for a mistrial that followed its publication.  When voir dired about the article, some jurors denied reading it but failed to make clear whether they had seen the headline.  RT 9928 et seq.  Juror Crane did read the headline.  RT 9948.  Alternate Juror Spitzer recalled that while he was in the jury room, he overheard a juror refer to the headline.  RT 9935-9936.  Juror Gustafson said his mother started reading the article to him, but he told her to stop.  RT 9961.  Juror Miles saw the headline.  RT 9967.  However, Juror Miles was later excused for unrelated reasons before he ever participated in deliberations.  Juror Enright read the entire article (RT 9953-9954) and was removed for this act of misconduct.  RT 10042.  Juror Shoemaker acknowledged that his wife read part of the article to him, including the headline.  RT 9980-9981.  However, Shoemaker was removed during the penalty trial for unrelated reasons.  Alternate juror Kenyon, who later became a regular juror, participated in both guilt and penalty deliberations, and served as the jury foreman during the guilt phase deliberations, saw the headline and scanned the article until he saw the name "Price."  RT 9986.  Alternate juror Mathison, who later became a regular juror and participated in both guilt and penalty deliberations, saw the headline.  RT 9988.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

reminded the jury of the length of the trial and the desire to avoid a retrial.  Finally, the judge improperly refused to answer a juror's question, and would not even let him ask the question. While such errors would be serious if committed during deliberations directed at a guilt determination, they must be considered especially serious during penalty phase deliberations in a capital case.

# CLAIM XXXI

## THE CALIFORNIA STATUTORY SCHEME UNDER WHICH PETITIONER WAS SENTENCED TO DEATH IS UNCONSTITUTIONAL

1804. The California statutory scheme under which petitioner was convicted and sentenced to death, as set forth in California Penal Code § 190 et. seq., violates the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and article 1 sections 1, 7, 15, 16 and 17 of the California Constitution. These constitutional defects, whether considered separately or in total, require that Mr. Price's sentence of death be vacated. In support of this claim, petitioner alleges as follows:

### A.    Failure to Perform Constitutionally Mandated Narrowing Function

1805. The California death penalty statute under which Mr. Price was convicted and sentenced to death fails to adequately narrow the class of individuals eligible for the death penalty and creates a substantial likelihood that the death penalty will be imposed in capricious and arbitrary fashion. Furman v. Georgia, 408 U.S. 238, 313 (1972) (death penalty statute must provide a meaningful basis for distinguishing the cases in which the death penalty is imposed from the many cases in which it is not) (conc. opn. White, J.).[335] A capital murder statute must take into account the Eighth Amendment principles that death is different (California v. Ramos,

---

[335] In Furman v. Georgia, supra, the Supreme Court, for the first time, invalidated a state's entire death penalty scheme because it violated the Eighth Amendment. Because each of the justices in the majority wrote his own opinion, the scope of, and rationale for, the decision was not determined by the case itself. Justices Stewart and White concurred on the narrowest ground, arguing that the death penalty was unconstitutional because a handful of murderers were arbitrarily singled out for death from the much larger class of murderers who were death-eligible. (Id. at pp. 309-310 (Stewart, J. concurring) and at 313-14 (White, J. concurring). In Gregg v. Georgia, 428 U.S. 153 (1976), the plurality understood the Stewart and White view to be the ''holding'' of Furman (id. at pp. 188-189), and in Maynard v. Cartwright, 486 U.S. 356 (1988), a unanimous Court cited to the opinions of Stewart and White as embodying the Furman holding. (Id. at p. 362).

463 U.S. 992, 998-99,(1983)), and that the death penalty must be reserved for those killings which society views as the most grievous . . . affronts to humanity." <u>Zant v. Stephens</u>, 462 U.S. 862, 877 n. 15 (1983).  See also <u>Adamson v. Rickens</u>, 856 F.2d 1011, 1025 (9th Cir. 1988) (blanket eligibility for death sentence may violate the Fifth and Fourteenth Amendment due process guarantees as well as Eighth Amendment).

1806.  California's death penalty statute, which was enacted by a popular initiative, violates the Eighth Amendment by multiplying the "few" cases in which the death penalty is possible into the many. As of the date of the offenses charged against petitioner, twenty-seven "special" circumstances existed under California Penal Code § 190.2, embracing every type of murder likely to occur.[336] The over-inclusive nature of the death penalty law in California means that death eligibility is the rule, not the exception, as required by the Eighth Amendment.

1807.  At the time of the decision in <u>Furman</u>, the evidence before the court established, and the justices understood, that approximately 15-20% of those convicted of capital murder were actually sentenced to death.  Chief Justice Burger so stated for the four dissenters (408 U.S. at 386, n. 11), and Justice Stewart relied on Justice Burger's statistic when he said: "[I] it is equally clear that these sentences are 'unusual' in the sense that the penalty of death is infrequently imposed for murder . . . (408 U.S. at 309, n. 10).[337]  Thus, while Justice Stewart and

---

[336] The number of special circumstances has continued to grow, and is now thirty.

[337] In <u>Gregg</u>, the plurality reiterated this understanding: ''It has been estimated that before <u>Furman</u> less than 20% of those convicted of murder were sentenced to death in those states that authorized capital punishment.'' (428 U.S. at 182 n. 26, citing <u>Woodson v. North Carolina</u>, 428 U.S. 280, 295-96 n. 31).

The pre-<u>Furman</u> experience in California was consistent with the Court's understanding. Evidence before the Court for the years 1964, 1967 and 1968 indicated that approximately 16% of California's first degree murderers were being sentenced in death.  <u>Aikens v. California</u>, 406 U.S. 813 (1972).

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

White did not address precisely what percentage of statutorily death-eligible defendants would have to receive death sentences in order to eliminate the constitutionally unacceptable risk of arbitrary capital sentencing. Furman, at a minimum, must be understood to have held that any death penalty scheme under which less than 15-20% of statutorily death-eligible defendants are sentenced to death permits too great a risk of arbitrariness to satisfy the Eighth Amendment. In order to meet the concerns of Furman, the states were required to genuinely narrow, by rational and objective criteria, the class of murderers eligible for the death penalty.

> Our cases indicated, then, that statutory aggravating circumstances play a constitutionally necessary function at the state of legislative definition; they circumscribe the class of persons eligible for the death penalty.
>
> Zant v. Stephens, 462 U.S. 862, 878 (1983).

1808. It was the Court's understanding that, as the class of death-eligible murders was narrowed, the percentage of those in the class receiving the death penalty would go up and the risk of arbitrary imposition of the death penalty would correspondingly decline.

> As the type of murders for which the death penalty may be imposed become more narrowly defined and are limited to those which are particularly serious or for which the death penalty is peculiarly appropriate . . . it becomes reasonable to expect that juries — even given discretion not to impose the death penalty — will impose the death penalty in a substantial portion of the cases so defined. If they do, it can no longer be said that the penalty is being imposed wantonly and freakishly or so infrequently that it loses its usefulness as a sentencing device.
>
> Gregg v. Georgia, 428 U.S. at p. 222 (White, J. concurring).

1809. Based on the declaration of Professor Steven P. Shatz filed in the California Supreme Court as an exhibit to the petition for writ of habeas corpus in In re Teddy Brian

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

Sanchez, No. S049502,)[338] petitioner is informed and believes that in 1987, approximately 10% of convicted first degree murderers were sentenced to death in California.[339]  Under the California scheme, the class of first degree murderers is narrowed to a statutorily death-eligible class by the special circumstances set forth in California Penal Code section 190.2(a).  People v. Bacigalupo, 6 Cal. 4th 457, 467-468 (1993).[340]

1810.  For the California scheme to achieve a level of rationality and non-arbitrariness greater than that found unconstitutional in Furman — i.e., a level where more than 20% of those statutorily death-eligible were sentenced to death — the special circumstances would have to narrow the death-eligible class to less than 50% of first degree murders generally.[341]

1811.  Under the death penalty scheme in effect in 1987, at least 84% of first degree murders were special circumstances murders.  As a result, only approximately 12% of the statutorily death-eligible class of first degree murderers were in fact being sentenced to death.[342]  Thus, the risk of arbitrariness in California's death penalty scheme is even greater than the risk found unconstitutional in Furman, and the scheme is likewise unconstitutional.

---

[338] Professor Shatz' declaration was filed as Exhibit 143 in support of Mr. Sanchez' state habeas corpus petition.

[339] Professor Shatz's data and analysis were based on the statutory listing of special circumstances in 1987, the time of the crime charged against Mr. Sanchez. (Shatz Decl. at paragraph 6). The only relevant difference between the 1987 statute and the law applicable to this case is that California Penal Code §189 did not have language making any murder by means of armor piercing ammunition murder in the first degree.  Professor Shatz' data show that this difference is without significance. (See Schatz Decl., Exhibit AAA, paragraph 11.b)

[340] In fact, there is some slight additional narrowing as a result of the exclusion of accomplices who neither killed nor intended to kill (California Penal Code § 19). 2(d) and minors (California Penal Code § 190.5).

[341] The Ninth Circuit reached this same conclusion, albeit apparently without considering any statistical evidence, when it stated that the special circumstances would have to reduce the class to less than a majority (of first degree murderers). See Wade v. Calderon, 29 F. 3d 1312, 1319 (9th Circ. 1994) cert den ___ U.S. ___ (1995), 115 S. Ct. 923 (1995).

[342] These data are set forth in Exhibit AAA to the Shatz Declaration at paragraphs 26 & 35.

1812.   The across-the-board eligibility for the death penalty provided by the California statutory scheme fails to account for the different degrees of culpability attendant to different types of murders, enhancing the possibility that a death sentence will be imposed arbitrarily, without regard for the blameworthiness of the particular defendant or the acts at issue.

# CLAIM XXXII

## A VARIETY OF ADDITIONAL ERRORS AND FLAWS IN THE CALIFORNIA CAPITAL SENTENCING PROCEDURES ALSO MANDATE THAT THE DEATH JUDGMENT BE VACATED

1813.   A variety of errors and flaws in the California capital sentencing procedures mandate that the death judgment be vacated in this case because they resulted in a fundamentally unfair trial in violation of petitioner's rights to due process, a fair trial, the effective assistance of counsel, and his right to be free from cruel and unusual punishment, as guaranteed by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

1814.   In addition to the many errors that have been set forth in this petition, the present death judgment is also flawed because of a number of substantive and procedural defects in the California capital sentencing law.

1815.   First, evidence of unadjudicated prior crimes at the penalty phase, admitted in aggravation, violated Fifth, Sixth, Eighth and Fourteenth Amendment requirements of a fair trial in accordance with due process of law, trial by an impartial jury, a speedy trial, and reliability in the penalty determination, as well as the prohibition against being placed twice in jeopardy for the same offense.  See State v. McCormick, 397 N.E.2d 276 (Ind. 1979); State v. Bobo 727 S.W.2d 945, 952-953 (Tenn. 1987); Miranda v. California, 100 L.Ed.2d 613 (1988) (Marshall, J., dissenting from denial of cert).

1816.   Second, CALJIC 8.84.1 (see CT 10890) encouraged the jury to double count circumstances of the present crimes, using them to support both the "circumstances of the crime" aggravating factor and the "other criminal activity" aggravating factor, violating the right to a fair

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

- 748 -

and reliable sentencing determination. See United States v. McCullah, 87 F.3d 1136 (10th Cir. 1996) (on rehearing) (such double-counting of aggravating factors held to violate Eighth Amendment).

1817. Third, prior to denying the automatic motion for modification (California Penal Code section 190.4), the trial court considered irrelevant material, to wit, the probation officer's report.[343]  RT 23123-23124; see People v. Jennings, 46 Cal.3d 963, 994 (1988) ("the evidence that the court is to review is only that which was before the jury.").  Also, before pronouncing sentence, the trial court improperly considered a highly emotional statement from the mother of victim Hickey.  RT 23145-23146.  Finally, the denial of the motion for modification and the pronouncement of the death judgment were further tainted by the trial court's exposure throughout the trial proceedings, in numerous in camera hearings, to many documents never revealed to the defense but which presumably contained prejudicial hearsay and speculation about petitioner and/or people with whom he associated.  These errors violated Fifth, Sixth, Eighth and Fourteenth requirements of due process, confrontation of witnesses, and reliability in sentencing.

---

[343]  The report contains information never revealed to the jury, regarding juvenile offenses, family problems, and drug usage. (See probation department letter filed 7/8/86, contained in the augmented record on appeal as a standalone document.)

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

# CLAIM XXXIII

## THE ACTIONS OR INACTIONS OF TRIAL AND APPELLATE COUNSEL DEPRIVED PETITIONER OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL

1818.   Trial and appellate counsel failed to provide effective representation to petitioner in a number of respects throughout the pre-trial, trial, direct appeal and state post-conviction proceedings in this case, which prejudiced the outcome of those proceedings, in violation of petitioner's rights to due process, a fair trial, the effective assistance of counsel, and his right to be free from cruel and unusual punishment, as guaranteed by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

1819.   There were numerous constitutional flaws in petitioner's trial, in his direct appeal and related state habeas corpus proceeding, some of which emanated from constitutionally inadequate representation at each phase of those proceedings.   Petitioner asks this Court to rule on the merits of all of the claims set forth in this petition.

1820.   It is possible, however, that this Court will determine that some of the claims contained herein are subject to a procedural default because of a ruling by the California Supreme Court that either trial or appellate counsel failed to raise the issue in accordance regularly applied state procedural rules.   See Wainwright v. Sykes, supra.   Petitioner does not intend to comment in this petition on whether any such possible defaults should be honored by this Court, although, it should be noted that, if respondent seeks to rely on any such default in its answer to this petition, then petitioner intends to assert that no default in the state court system is valid.   See e.g., Harris v. Reed, supra.; Ake v. Oklahoma, supra.   If this Court were to conclude, however, that a default should apply to any specific claim or sub-claim in this case, then prior

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJ

- 750 -

counsels' failure to comply with state procedural rules means that petitioner was deprived of the effective assistance of counsel as guaranteed by the Sixth Amendment to the U.S. Constitution.

1821.  Obviously, if this Court determines that but for the alleged default, petitioner would have been entitled to a new trial or to a new appeal, then petitioner is also clearly prejudiced by counsels' acts of omission.  Prior counsel had no reasonable strategic or tactical reason for not complying with the state's procedural rules and/or for not developing and presenting all reasonably available claims for relief in prior proceedings before the state courts, and any such failure to comply with such rules prejudiced petitioner.  See Strickland v. Washington, 466 U.S. 668 (1984); Evitts v. Lucey, 469 U.S. 387 (1985); Cuyler v. Sullivan, supra.

1822.  Petitioner will turn first to the ineffective assistance of petitioner's trial counsel, Bernard DePaoli and Anna Klay.  Petitioner's prior appellate counsel, Mark Cutler, raised various instances of ineffective assistance of trial counsel in the state habeas petitions he filed on Mr. Price's behalf and in limited respects in his direct appeal pleadings.  See e.g. Claims I, IV and V of initial state petition for writ of habeas corpus (CSC case no. S018328), Claim I of supplemental state petition for writ of habeas corpus (CSC case no. S023791) and Appellant's Opening Brief at pp 124-126; 524, n. 470.[344]  Rather than repeat those assertions here, petitioner incorporates those allegations of ineffective assistance of trial counsel herein by express reference.

1823.  Petitioner also alleges that trial counsel were also ineffective in numerous other

---

[344] Mr. Price's AOB and the state habeas petitions filed on his behalf by Mr. Cutler are part of the record in this federal habeas proceeding, having been filed as an exhibit to respondent's motion to dismiss for failure to exhaust.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJ

- 751 -

respects, including, but not limited to, the following:

(a) Bernard DePaoli had a conflict of interest with regard to juror Debra Kramer that deprived petitioner of his right to conflict-free and/or effective representation. See Strickland, supra; Cuyler v. Sullivan, 446 U.S. 335 (1980); see also claims V and VI of this petition, incorporated herein by express reference.

(b) Bernard DePaoli and Anna Klay had a conflict of interest due to the trial court's bias against them and to the threats of contempt used by the trial court against them during the trial, and their conflict of interest deprived petitioner of the effective assistance of counsel. See claim VII of this petition, incorporated herein by express reference.

(c) Bernard DePaoli had a serious alcohol problem which undermined his judgment throughout the trial of this case, and contributed to a complete breakdown in the adversarial process, as well as depriving petitioner of the effective assistance of counsel. See U.S. v. Cronic, 466 U.S. 648 (1984), Strickland, supra; and Exhaustion Petn., Exh. 8 at 1-4, and Exh. 9 at 9-12.

(d) Bernard DePaoli and Anna Klay failed to adequately prepare, investigate, and present, through the testimony of family members and others who knew petitioner as a child and who were aware of the circumstances of his earlier years (see Exhaustion Petn., Exhs. 12 and 13), substantial relevant evidence pointing toward his lack of mental competency at the trial. See Pate v. Robinson, 383 U.S. 375 (1966); Dusky v. U.S., 362 U.S. 402 [1960]. Trial counsel likewise failed to adequately prepare, investigate and present, through the testimony of petitioner's family members, a wealth of mitigating evidence for use at sentencing, regarding petitioner's impoverished childhood, the abuse he suffered at the hands of his father and adult caretakers, and the mental and emotional problems that he suffered from, partly as a result of his

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJ

upbringing, and partly as a result of organic brain impairment and/or other psychiatric illnesses.

See Eddings v. Oklahoma, 455 U.S. 104 (1982); Lockett v. Ohio, 438 U.S. 586 (1978).    Trial

counsels' failures in those regards deprived Mr. Price of the effective assistance of counsel at all

stages of the trial proceedings. See Strickland, supra.

1824. Petitioner notes that with respect to the ineffective assistance of trial counsel

alleged in subparagraph a, b and c above, trial counsel did attempt to raise their concerns

regarding these issues to the trial judge. See claim VII supra, incorporated herein by express

reference; see Exhaustion Petn., Exh. 8 at 4-6. To the extent the trial court was responsible for

failing to correct the errors, such failure standing alone denied petitioner a fair trial. See claim

VII, supra, incorporated herein by express reference. Should this Court determine, however, that

trial counsel was responsible for failing to do more to correct the problems noted in

subparagraphs a-c above, no reasonable strategic justification exists for such failing. Also, with

respect to subparagraph d above, trial counsel's failure to investigate, develop and present this

evidence had no valid strategic justification.

1825. Finally, each of these failings on the part of trial counsel, whether taken

individually or viewed as a whole, prejudiced the outcome of the trial. Had counsel not failed in

the manners specified above, there is a reasonable probability the outcome of petitioner's guilt

and penalty phase trials would have been different. Strickland, supra.

1826. Petitioner was also deprived of the effective assistance of appellate counsel by

attorney Mark Cutler's failure to raise claims on direct appeal that were readily discernable from

the face of the trial court record. Specifically, as alleged in Claim VII of this petition, which

petitioner incorporates herein by this express reference, the record showed that the trial court

acted in ways that were not fair or impartial and failed to act in ways that were necessary to

ensure that petitioner received a fair trial, and thereby deprived petitioner of his right to federal due process of law. Tumey v. Ohio (1927) 237 U.S. 510, 532. Petitioner would note here that Cutler did not receive the previously sealed transcripts of certain hearings that Judge Buffington held during the trial until approximately one year after he filed his opening brief. It was during one of those hearings, at which only the judge and court reporter were present, that the trial judge revealed that 1) he had personally undertaken an investigation into whether defense counsel DePaoli had altered subpoenas, 2) he concluded that DePaoli had engaged in misconduct and had probably committed a crime, and 3) he shared that that information with the prosecutors handling the case against petitioner, but not with petitioner or with his trial counsel. It was during another hearing that the trial judge revealed that he had used the district attorney's investigator, who was assisting in the investigation and prosecution of petitioner's case, to investigate other case-related conduct by Mr. DePaoli. Under the circumstances, as with the other claims in this petition, petitioner believes that the litigation of this claim is timely in the current petition.

1827. However, if this Court determines that Mr. Cutler should have raised the trial court's bias and lack of partiality, then Cutler was ineffective for failing to perceive and litigate this claim in prior state court proceedings. Reasonably competent appellate counsel exercising due diligence would have raised the federal due process violation that resulted from the trial judge's lack of impartiality as an issue on direct appeal in petitioner's case. No reasonable tactical justification existed for not raising the issue on appeal, and Cutler does not claim otherwise. Instead, his failure is raise the claim is primarily attributable to his negligence in failing to discern the importance of the facts which, though he was late in receiving, were at some point disclosed to him when the sealed transcripts were unsealed. Because a trial held before a partial judge requires the reversal on appeal of the defendant's convictions no matter

how strong the evidence is against that defendant, see Tumey, supra; e.g. Edwards v. Balisok, 520 U. S. 641 117 S.Ct 1584 at 1588 (1997), and is a "structural" error which requires the granting of federal habeas corpus relief without any showing of prejudice, see e.g. Sullivan v. Louisiana 508 U.S. 275, 279 (1993), Cutler's failure to raise it necessarily deprived petitioner of his federal constitutional rights to the effective assistance of counsel on appeal. Evitts v. Lucey, 469 U.S. 387 (1985).

1828.   In addition to the facts in the trial court record showing that the trial court was not impartial, at least some of the other information presented in Claim VII of this petition was also contained in the trial record itself.  As noted therein, throughout the trial there are on-the-record references to DePaoli's alcohol problem.  The trial judge's inappropriate gender-biased treatment of Ms. Klay and hostility towards her, Mr. DePaoli and Mr. Price, can readily be discerned from the face of the record as well.  The same is true with respect to the trial court's failure to take appropriate steps to ensure the fairness of the proceedings against petitioner.  In addition, some of the prosecution's game-playing with discovery was also discernible from the record.  Mr. Cutler lacked any strategic justification for failing to perceive and litigate those aspects of Claim VII that were based on facts contained in the trial court record.  His failure to have litigated those aspects of Claim VII on the direct appeal further deprived petitioner of his federal constitutional right to the effective assistance of appellate counsel.  See Evitts, supra.

1829.   With respect to Claims I, III, and the misconduct section of claim IV of this petition, petitioner believes that responsibility for any prior failure to litigate these claim falls squarely on the shoulders of the prosecution due to their affirmative concealment of discoverable evidence and evidence of prosecutorial misconduct that forms the basis of these claims. Moreover, with respect to claim I, the California Supreme Court failed to provide Mr. Cutler

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJ

access to relevant sealed trial documents which could have led to the discovery of at least some of the factual information set forth in this claim.  Finally, Mr. Cutler did not have subpoena power, or court ordered discovery in either the direct appeal or the state habeas corpus process; hence, he was precluded from obtaining the relevant information necessary to develop and litigate any of these claims.  See Exhaustion Petn., Exh. 5.  However, to the extent this Court determines that he could or should have been able to obtain any part of the factual information that provides the basis for these claims, he was ineffective for failing to have done so, and he lacked any strategic reason for failing to discover the information.

1830.  Moreover, with respect to the misconduct portions of claims III and IV of this petition, throughout the time he represented Mr. Price, Mr. Cutler failed to discover that Ron Bass had inappropriate contacts with juror Southworth during the Price trial.  Id. at 1-2.  If it is determined that failure to learn of these facts is the fault of counsel, then Cutler was ineffective in his handling of the state habeas corpus petition.  His failure to discover the factual basis of these claims can only then be attributed to his woefully lacking investigation in the state habeas corpus process.  He did not hire an investigator to assist him during the time he represented Mr. Price.  Id. at 1-2.  He did not conduct an independent investigation as to juror Southworth's DUI problems while she sat on the jury in the Price trial.  Id. at 1.  Apparently, he never spoke with Southworth, as she died before he contacted some of the other jurors by telephone.  Id.  Again, lacking any reasonable strategic justification for such failure, he was ineffective in his state habeas representation in this regard.

1831.  With respect to claim II, again, if it determined that Mr. Cutler should have discovered the factual basis for this claim earlier, then he was ineffective for failing to do so.  As with other claims, on this claim too he did not conduct an independent investigation into the

murder of Richard Barnes. He did not attempt to interview the primary witness on this claim, Salvador Buenrostro, nor any member of the Mexican Mafia or the Aryan Brotherhood about the Barnes murder. Id. at 2. Nor did he hire an investigator to assist him on this or any other aspect of the case. Id.

1832. With respect to claims V and VI of this petition, petitioner believes that trial counsel DePaoli's prior failure to tell the truth to Mr. Cutler regarding his relationship with juror Debra Kramer, see id. at 2, combined with Ms. Kramer's misrepresentations on voir dire, prevented Cutler from developing and litigating these claims in prior state court proceedings. However, should this Court determine otherwise, then Cutler was ineffective for failing to discover and present the factual and legal bases for these claims in those proceedings. As with other claims in this petition, such failure can only be attributable to Mr. Cutler, if at all, because of his failure to fully investigate the facts that form the basis for these claims. Having no strategic reason for such failure, he was ineffective in this regard.

1833. With respect to claim XVII of this petition[345], Mr. Cutler litigated most of the contents of this claim in his opening brief. See Appellant's Opening Brief at 365-440, 694-708, incorporated herein by express reference. However, he did not conduct an independent investigation into the bloody fingerprints found on the body of the deceased, Exhaustion Petn., Exh. 5 at 2, nor did he hire an investigator to assist him on this or any other claim in this petition. Id. at 1-2. Thus any failure of Cutler's which this Court finds as the basis for procedurally barring any of this claim can only be attributable to his ineffective representation. Having no tactical reason for such failure, he was ineffective in his representation in this regard.

---

[345] In the state exhaustion petition, this claim was enumerated as Claim VIII.

1834. With respect to claim XXVIII of this petition,[346] Mr. Cutler failed either to perceive or litigate this claim, and was ineffective in that failure. Having no reasonable strategic basis for such failure, he was ineffective in his representation in this regard.

1835. Obviously, if this Court determines that any of the above-mentioned claims has merit, then prejudice is thereby established, and petitioner is entitled to a new direct appeal and/or state habeas corpus proceeding. See Evitts, supra.

1836. In addition to all of the above aspects of Mr. Cutler's direct appeal/state habeas representation, he was also ineffective in several additional respects. First, as noted, as a general matter his investigation was woefully lacking and rendered him ineffective at that stage of the proceedings. He conducted only minimal investigations, on his own and without the aid of an investigator, even though he was hundreds of miles from the scene of the trial and the crimes. An example of the cursory nature of his "investigation" is the fact that he merely called jurors by phone, rather than seeking to interview them (or other critical witnesses) in person. See Exhaustion Petn., Exh. 5 at 1. This inadequate investigation compromised the effectiveness of Cutler's representation in general and, as noted, prevented him from learning of several important facts which form the basis of many of the claims in this petition.

1837. Moreover, Mr. Cutler failed to present available, or readily discoverable evidence regarding Price's emotional and mental problems in support of the claims that he did raise on habeas and direct appeal, including petitioner's lack of mental competency, his alleged "voluntary" absence from most of the guilt-innocence phase of the trial, the shackling issue, and the ineffective assistance of trial counsel in their handling of these and other issues in the case.

---

[346] In the state exhaustion petition, this claim was enumerated as Claim IX.

See Exhaustion Petn., Exhs. 12 & 13. The information contained in these declarations, which was either available to Mr. Cutler or readily discoverable through even minimal investigation, provides substantial support to each of the claims contained in the initial state proceedings that revolve around Mr. Price's mental and emotional disabilities. Importantly too, this is information that would have made a difference. Thus Cutler's failures in this regard prejudiced the outcome of Mr. Price's direct appeal/state habeas proceeding: had he conducted a reasonable investigation into these and other facts, and had he presented that evidence in support of these claims and those he raised in the direct appeal/state habeas proceeding, this Court would have been duty-bound to grant relief under applicable state and federal law.

1838. With respect to each of the perceived failings of Mr. Cutler set forth above, he had no valid or reasonable tactical or strategic justification for such failures. As his declaration makes clear, he just did not do the investigative work necessary to develop and present these claims in Mr. Price's initial state proceedings.

1839. Finally, if the California Supreme Court decides that Cutler could or should have raised the above and foregoing habeas claims on state habeas, and in the event this court upholds that court's determination, then Cutler's failure to raise those claims deprived petitioner of his state law entitlement to competent representation on state habeas (see e.g. In re Sanders, 21 Cal.4th 697 (1999) and in turn to federal due process. Hicks v. Oklahoma, 447 U. S. 343 (1980).

# CLAIM XXXIV

## PETITIONER WAS DEPRIVED OF HIS FEDERAL CONSTITUTIONAL RIGHTS BY THE CALIFORNIA SUPREME COURT'S FAILURE AND REFUSAL TO ALLOW APPELLATE COUNSEL TO REVIEW THE NUMEROUS SEALED FILES FROM THE TRIAL RECORD IN THIS CASE

1840. Petitioner was deprived of his federal constitutional rights as a result of the California Supreme Court's failure and refusal to allow appellate counsel to review the numerous sealed files from the trial record in this case. This violated petitioner's rights to a meaningful direct appeal from his capital case, to the effective assistance of appellate counsel, and to the effective assistance of trial counsel who had no access to the sealed records either, to due process, a fair trial, and petitioner's right to be free from cruel and unusual punishment, as guaranteed by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

1841. The trial court held numerous in-camera hearings with the prosecution, during which claims of privilege were resolved (almost always in favor of the prosecution) and during which the court worked with the prosecution in determining what evidence to turn over to the defense and what to withhold. The defense was always excluded from these hearings, and the recorded transcript of the proceeding, if any was made, was sealed. Any documents which the trial court determined should remain concealed were also sealed in the court record, even those containing information the trial court determined to be relevant to this case but intertwined with information as to which the court sustained a claim of privilege under California Evidence Code section 1040.

1842.   During the direct appeal of this case, appellate counsel Mark Cutler filed several pleadings with the California Supreme Court regarding these issues, aimed at protecting petitioner's constitutional rights, both to a fair trial, and to a meaningful appellate review of that trial.

1843.   Thus on September 19, 1989, Cutler filed a "Motion to Have the Court Review Sealed Materials and Determine Whether They Should Remain Sealed" [hereinafter "Motion to Review"].   In the Motion to Review, Cutler spelled out in some detail his understanding of the state of the record regarding these sealed transcripts and documents, and asked the California Supreme Court to unseal all hearing transcripts, documents, or other matters previously sealed, to ensure a full and thorough review of his client's case.   Rather than repeat the detail asserted in the Motion to Review, it is hereby incorporated herein by express reference.

1844.   The California Supreme Court issued a ruling on this Motion on April 25, 1990, ordering the release of previously sealed reporter's transcripts of 19 separate hearings.   The unsealed transcripts consisted of approximately 400 pages.   Despite the unsealing of such a large amount of material, substantial other materials remained sealed.   In a letter dated June 26, 1990, Cutler sought clarification of several aspects of the court's ruling, noting that a variety of crucial questions were left in a state of such uncertainty that it would not be possible for Price to receive adequate appellate review in his case.   The uncertainty stemmed from several unresolved issues which the California Supreme Court did not address in its earlier ruling.   These included the fact that: thousands of pages of documents which were the subject of review at the in camera hearings had not been disclosed, or ordered disclosed, to the defense by the Supreme Court; the Court failed to resolve several particular issues regarding whether a recorded transcript of certain in camera hearings had been made; the Court failed to indicate what documents and/or hearing

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

transcripts it had reviewed in reaching its decision; and the Court failed to resolve whether hearings were held for which no transcript was made. The contents of Cutler's letter requesting clarification is hereby incorporated herein by express reference.

1845. In an order dated August 15, 1990, the California Supreme Court deemed Cutler's letter of request for clarification a motion for reconsideration, and summarily denied it.

1846. Thereafter, Cutler filed a supplemental brief with the California Supreme Court arguing that the Court's refusal to disclose substantial volumes of material to the defense that was the subject of discovery litigation at trial but was kept sealed from the defense by the trial court, and remains so to this day, and the Court's failure to resolve all of the other issues left open by the voluminous sealed trial record in the case, denied petitioner any meaningful appellate review of issues in the case regarding discovery, prosecutorial misconduct, restrictions of confrontation and cross-examination, effective representation at critical points of his trial, or any other possible claims arising from these matters.

1847. In its direct appeal opinion denying relief in this case, the California Supreme Court rejected petitioner's argument, declaring that it had reviewed some of the materials noted above and that it saw no need to reveal their contents to Price or his attorney. Notably, the Court did not resolve the issues raised by Cutler in his previous briefing.

1848. Petitioner hereby incorporates into this petition by express reference all of the arguments and facts set forth in the aforementioned motions, requests, and supplemental briefing. For all of the reasons set forth in those documents, petitioner hereby asserts that he was denied his right to "meaningful appellate review", due process, effective representation, and his right to be free from cruel and unusual punishment in his capital case, and as such was deprived of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

The United States Supreme Court has "emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally." Parker v. Dugger, 498 U.S. ___, 112 L.Ed.2d 812 (1991) (citations omitted). The heightened need for reliability in capital cases requires that a full and meaningful review of all phases of a capital trial, pre-trial, guilt-innocence, and sentencing, be thoroughly reviewed by an appellate court with adequate counsel representing the capital appellant. Woodson v. North Carolina, 428 U.S. 280 (1976). Thus the trial court's actions in sealing such voluminous material in this case, and the appellate court's failure to correct the error and open up the proceeding, raise numerous constitutional issues in this case, each of which requires a new trial and a new appeal.

1849. California law entitles an appellant in a criminal case a complete record of the proceedings below. See Rule 39.5, California Rules of Court; California Penal Code Section 190.7. The state court's failure to follow its own rules in petitioner's case violates due process. See Hicks v. Oklahoma, supra.

1850. Additionally, the availability of a full and accurate record for appellate review is mandated under the due process clause of Fifth and Fourteenth Amendments to the U.S. Constitution. Thus, "the procedures used in deciding appeals must comport with the demands of the Due Process and Equal Protection Clauses of the Constitution." See Evitts v. Lucey, 469 U.S. 387 (1985). Without access to his complete trial record, petitioner was and is unable to make full use of the record in identifying and arguing issues on appeal. In addition to these issues, the lack of a complete record, and the ambiguities in the California Supreme Court's ruling on petitioner's appellate motions and briefs, made it impossible for appellate counsel to determine the extent to which Mr. Price's trial did not comport with federal guarantees of due process and fair jury trial. For example, without knowing what the records and information the

prosecution provided to the trial court for its review during the ex parte, in-camera proceedings, appellate counsel could not determine whether the trial court erroneously withheld information from the defense that the defense was entitled to have. For the same reason, appellate counsel could not assess whether the prosecution might have been withholding evidence even from the trial court that the defense had subpoenaed.[347] Thus petitioner's Sixth Amendment rights are implicated because he was unable to determine whether any of the materials that remain sealed could support an argument that there was a violation of his right to a speedy and public trial, or his right to confront and cross-examine the witnesses against him. See Evitts, supra. Also, of course, the Sixth Amendment right to the effective assistance of counsel is implicated when trial counsel is not permitted to participate in in-camera hearings.

1851. An additional problem in the present case is caused by the sheer volume of documents that remain sealed, and the likelihood that many of them caused the trial court to be exposed to highly prejudicial information, not admissible in evidence, about petitioner or about the AB. Such information, which petitioner had no opportunity to dispute, could have influenced the trial court in rulings against him, and could have even impacted on the trial court's denial of the California Penal Code Section 190.4 automatic motion for modification of the death sentence. Also, the trial court's continuous exposure to the details of the ongoing prosecution investigation may well have placed the court in a position in which it was impossible to retain judicial detachment. The facts of Judge Buffington's problems in this regard are set forth

---

[347]    Access to what the prosecution turn over for the trial court's review might have alerted appellate counsel to the need to conduct an independent factual investigation of issues such as the prosecution's suppression of evidence and knowing use of perjured testimony, assuming appellate counsel had such a duty under California law as it existed at the time appellate counsel was appointed to prepare the direct appeal and during the appellate proceedings.

elsewhere in this petition, and are incorporated herein by express reference.  These dangers posed a great threat to the possibility of a fair trial in accordance with federal Fifth and Fourteenth Amendment Due Process requirements.

1852.  Finally, because the prosecution engaged in such serious and overwhelming misconduct regarding discovery and its informant witnesses in this case, as set forth in elsewhere in this petition and incorporated herein by express reference, their judgments about what was or was not discoverable thus cannot be trusted in any manner.

1853.  For these reasons, it is critical that petitioner now have an opportunity to review all of the sealed information in this case, to provide further support to his claims, and to determine if his trial was infected by yet additional instances of unconstitutional unfairness.

# CLAIM XXXV

## CUMULATIVELY, THE ERRORS SET FORTH IN THIS PETITION, AND THE PREJUDICE THAT RESULTED FROM THESE ERRORS, DENIED PETITIONER A FUNDAMENTALLY FAIR TRIAL

1854. Cumulatively, all of the errors set forth in this amended petition that were included in the initial petition and the prejudice that resulted from these errors, denied petitioner a fundamentally fair trial, in violation of petitioner's rights to due process, a fair trial, the effective assistance of counsel, and his right to be free from cruel and unusual punishment, as guaranteed by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

1855. All of the aforementioned claims for relief are incorporated herein by express reference. Even if none individually requires a new trial in this case, when viewed in combination, the cumulative effect was that petitioner's trial was fundamentally unfair. For this reason, this Court should grant petitioner a new trial. See Mak v. Blodgett, 970 F.2d 614 (9th Cir. 1992).

Dated: August 31, 2006

Respectfully submitted,

KAREN S. SORENSEN

ROBERT L. MCGLASSON

Attorneys for Petitioner Curtis F. Price

By: _Karen S. L_____

KAREN S. SORENSEN

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

- 766 -

# **PRAYER FOR RELIEF**

WHEREFORE, petitioner Curtis F. Price prays that this Court:

1856.  Issue a writ of habeas corpus to have petitioner brought before it, to the end that he might be discharged from his unconstitutional confinement and restraint, and/or relieved from his unconstitutional sentence of death;

1857.  Order Respondent to Answer this Petition by specifically admitting or denying each allegation and claim made herein;

1858.  Conduct an evidentiary hearing at which proof may be offered concerning the allegations in this Petition or any affirmative defenses presented by Respondents;

1859.  Permit petitioner, who is indigent to proceed without prepayment of costs and continue the appointment of counsel to represent him, grant him authority to obtain subpoenas without fee for witnesses and documents necessary to prove the facts alleged in this petition, and grant him sufficient funds to secure the additional expert testimony and investigative assistance necessary to prove the facts alleged in this petition;

1860.  Require the Respondents to bring forth the entire state court record, including all exhibits filed by the parties in petitioner's state habeas proceedings, so that this Court can review those parts of the record that are relevant to the issues and defenses raised in this proceedings;

1861.  In accordance with the court's order of February 18, 1998, permit petitioner to file an amended finalized federal petition for writ of habeas corpus after the completion of state court proceedings in his pending state exhaustion case (California Supreme Court case number S069685) and his pending 4th state habeas case (California Supreme Court case number S139574);

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

1862.  Permit petitioner to supplement the record in this matter;

1863.  Grant and order discovery on any and all claims requiring further factual development after petitioner has had sufficient time to prepare and file a thorough motion for discovery; and thereafter grant an opportunity to develop new facts in light of said discovery, with sufficient investigative funds for such factual development;

1864.  Before proceeding on any further substantive litigation in this case, grant petitioner's pending motion to disqualify the California Attorney General's Office as counsel for the respondent in this matter, and hold a hearing to determine the appropriate course for appointing a legal representative for Respondent;

1865.  Stay petitioner's execution during the pendency of this proceeding, and grant such other and further relief as may be appropriate and necessary to dispose of the matter, as justice may require.

Dated:  August 31, 2006.


KAREN S. SORENSEN

ROBERT L. MCGLASSON

Attorneys for Petitioner


By: _____

Karen S. Sorensen


PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH

**VERIFICATION**

I, KAREN S. SORENSEN, declare as follows:

I am an attorney licensed to practice law in the State of California and before the United States District Court for the Northern District of California. I am appointed co-lead counsel for petitioner, Curtis F. Price.

I make this verification as Mr. Price's behalf because (1) the factual matters presented in this petition are more within my knowledge than within Mr. Price's knowledge; (2) I am authorized by Mr. Price to file this amended petition for writ of habeas corpus; and (3) 28 U.S.C. section 2242 authorizes this verification.

I have prepared the foregoing first amended petition for writ of habeas corpus and declare that the contents of the petition are true and that as to those facts alleged in this petition on information and belief, I believe those facts to be true and correct.

Signed under penalty of perjury under the laws of the United States of America on this 31st day of August 2006, in Kentfield, California.

KAREN S. SORENSEN

**CERTIFICATE OF SERVICE**

**Re: CURTIS FLOYD PRICE v. ROBERT L. AYERS, JR., C-93-0277-PJH**

I, the undersigned declare under penalty of perjury that:

I am a citizen of the United States, over the age of 18, and not a party to the within cause.

My business mailing address is PMB 394, 336 Bon Air Center, Greenbrae, CA 94904.

On September 5, 2006, I served true copies of the below specified documents:

FOUR VOLUMES OF FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS (Lodged Pursuant to Civil L. R. 1-5 (m))

on the following party in said action, by placing a true copy thereof, enclosed in sealed

container, and by causing said container to be personally hand-delivered on said party as follows:

**DAVID H. ROSE**
**Deputy California Attorney General**
**455 Golden Gate Ave., #11000**
**San Francisco, CA 94102-3664**

Executed on September 5, 2006 in Marin County, California.

I declare under penalty of perjury that the foregoing is true and correct.

**KAREN S. SORENSEN**

PRICE v. AYERS, JR.
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. C-93-0277 PJH