1

2

3

4                       UNITED STATES DISTRICT COURT

5                     NORTHERN DISTRICT OF CALIFORNIA

6

7    CURTIS FLOYD PRICE,

8                    Petitioner,                Case No.  93-cv-00277-PJH

9            v.                                 **ORDER DENYING CLAIMS XI, XII, XVI,
                                                XVIII, XXII, XXIV, XXV**
10   RON DAVIS[1],

11                   Respondent.

12   _____

13

14        Petitioner Curtis Floyd Price, a California capital prisoner currently incarcerated at

15   San Quentin State Prison, filed a petition for writ of habeas corpus pursuant to 28 U.S.C.

16   § 2254.  On November 11, 2012, through his appointed counsel, Price filed a second

17   amended petition with thirty-five fully exhausted claims.  Respondent Ron Davis filed an

18   answer on January 17, 2014 and Price replied on October 14, 2014.

19        Due to the size of the petition and the voluminous subclaims, the parties agreed to

20   proceed to a merits resolution on twenty-one record-based claims in three rounds of

21   seven claims.  This Order decides the first round of record-based claims.  Price filed his

22   first opening brief, addressing claims XI, XII, XVI, XVIII, XXII, XXIV, and XXV on August

23   24, 2015.  Respondent filed an answer on October 22, 2015, and Price filed a reply on

24   November 6, 2015.  The court determines that these claims are suitable for decision

25

26

27   _____

28   [1] Ron Davis, acting warden of the California State Prison at San Quentin, is substituted
     as Respondent for his predecessor in that position pursuant to Rule 25(d) of the Federal
     Rules of Civil Procedure.

United States District Court
Northern District of California

without oral argument.  Having reviewed the parties' papers and the record, and having carefully considered the relevant legal authorities, the court DENIES claims XI, XII, XVI, XVIII, XXII, XXIV, and XXV.

**BACKGROUND**

I.      **Factual Summary**

    A.      **Facts Relating to Convictions**

The following recitation of the factual background of this case is based on the California Supreme Court's opinion on Price's direct appeal.  *People v. Price*, 1 Cal.4th 324 (1991).  The state court's factual determinations are presumed to be correct pursuant to 28 U.S.C. § 2254(e)(1).

In May 1986, Price was convicted in the Humboldt County Superior Court of the first-degree murders of Elizabeth Ann Hickey and Richard Barnes, whose murder actually occurred in Los Angeles County, and one count each of robbery with the use of a firearm, burglary, receiving stolen property, and conspiracy.  As to the Hickey murder, the jury made special circumstance findings of multiple murders and robbery murder.  The jury further found that Price previously had been convicted twice of felonies and completed two prior separate prison terms.  Price was sentenced to death.

Evidence was presented to show that Price was an active Aryan Brotherhood (AB) member and committed the crimes in furtherance of an AB conspiracy.  The conspiracy was initiated following the testimony of Steven Barnes, another AB member, who testified as a prosecution witness against other AB members and against several non-AB members.  During the summer of 1982, the AB leadership, which included Michael Thompson and Clifford Smith, who later testified against Price at his trial, decided to retaliate.  Prison authorities had placed Steven Barnes in protective custody, so the AB leaders decided to kill members of his immediate family instead.  They selected Price to

2

do the killing.

At the time, Price was serving a sentence in Montana state prison, but was scheduled for release from prison soon without parole supervision.  One of the AB leaders brought Price to the state prison in Chino in August 1982 by subpoenaing him to testify at the leader's trial.  After Price arrived, AB leaders offered him the "contract" to kill Richard Barnes.  Price accepted.  The AB leaders instructed him to procure weapons in Northern California before returning south to kill Richard Barnes.

Testimony established that following his release from prison, Price spent time in Southern California until October 1982, when he returned to Eureka.  On January 23, 1983, the gun collection of Richard Moore disappeared from his residence, apparently having been stolen in a burglary, which included two rifles, three shotguns, and a .22–caliber handgun.  The house had not been ransacked.

In late January 1983, Price returned to Southern California and stayed with several AB "runners," people who relayed messages to and from AB members in prison.  One such runner, Janet Myers, drove Price to different addresses he wanted to see.  One of the addresses was the Temple City residence of Richard Barnes.

On February 12, 1983, at 11 p.m., Price left Myers's house with another AB runner.  He returned early the next morning, collected his belongings, and left.

On February 13, 1983, the body of Richard Barnes was found in his residence. He had been shot in the back of the head three times by a .22-caliber handgun.

Credit card receipts showed that Price had purchased gasoline in Pomona on February 12 and in Anaheim on February 13, 1983.  In the room Price had occupied in his mother's house in Eureka, police found a slip of paper on which Richard Barnes's address had been written, together with the name "Nate," a nickname for Steven Barnes, and the words "send subpoena to him."  Police found a similar note in Price's wallet.

After the murder, Myers brought Smith a note signed by Price. It stated, "That's took care of. Everything went well. I am going back north. I will be in touch with you later."

Six days after Richard Barnes was found, Berlie Petry found the body of his girlfriend, Elizabeth Ann Hickey, in the Humboldt County residence they shared. Hickey was the stepdaughter of burglary victim Moore. She had been beaten to death with a blunt instrument; guns belonging to her and to Petry were missing from their residence. Also missing was a combination radio and tape player that Petry had recently given Hickey. In Hickey's trunk, officers found a note in Hickey's handwriting that said "Call Curt . . . about money for guns."

One of Hickey's neighbors, testified she had seen a man with Hickey on two occasions shortly before Hickey was killed. She identified Price in a photographic lineup.

A subsequent search of Price's automobile yielded a product manual for one of Petry's rifles, a knife that had belonged to Hickey and had the name "Liz" written on it in fingernail polish, and a notebook in which someone had written, "Elizabeth, weapons, corner of Simpson and Pine [the location of Hickey's residence]," as well as Hickey's telephone number. Additional notes with Hickey's contact information were found in Price's wallet and in a suitcase he kept in his mother's garage. Price's mother gave police a combination radio and tape player that had been in Price's room. It was identical to the one taken from the Hickey residence.

The evening of February 19, the same day Elizabeth Hickey had been found murdered, a gunman robbed employees of the Triplex Theater at 6:30 p.m. He had long, thin blond hair and was wearing sunglasses, a watch cap, and gloves. During the movie, he came out into the lobby, pointed a revolver at the manager, and directed him into the office. At the man's direction, the manager put $7,000 in a bag and gave it to the man, who ran out of the theater.

4

United States District Court
Northern District of California

After the robbery, the theater employees assisted the police in preparing a composite sketch of the robber. Five of the employees selected Price's photograph from a photo lineup as being similar to the robber, although none of them made a positive identification.

In a suitcase in Price's mother's garage, the police found a blond wig, black gloves, a watch cap, a handgun, and various items of theatrical makeup (including spirit gum, liquid latex, derma wax, and nose putty). In Price's room in his mother's house, the police found a note that was apparently a list of Price's expenses and debts. On it Price had written "need mucho dinero" and "$1,000.00 I owe Mom means it's all about 'movie time.'" The police also found $400 in cash in a plastic container.

A day or two after Hickey's murder and the Triplex Theater robbery, Price arrived at his stepfather's residence in Reno, Nevada. He had two bundles wrapped in blankets. Price said they were guns that might have been stolen. Price's stepfather gave him permission to leave the guns at the residence. On February 28, 1983, Price returned to Reno and moved the bundles to a mini storage unit.

Price was arrested in Humboldt County for the Triplex Theater robbery on March 3, 1983. His mother visited him in jail on March 27, 1983. Price asked her to move the guns and ammunition from the storage locker in Reno and to dispose of them so they would never be found. He referred to the guns as "Brand business." "The Brand" is another name for the AB.

On March 31, 1983, law enforcement authorities searched the mini storage unit in Reno, Nevada. They found all of the guns taken from the Moore residence except one shotgun (apparently the one found in Price's mother's garage) and the handgun. They also found all the guns belonging to Hickey and Petry, and over 1,000 rounds of various kinds of ammunition. Moore's handgun, which was one of only four makes that could

have fired the bullets that killed Richard Barnes, was never found.

The defense denied that Price had committed any of the offenses. It offered alibi evidence to show that Price was not in Humboldt County at the time of the Hickey killing and the Triplex Theater robbery. It attempted to cast doubt on the identification testimony of the robbery victims and the veracity of the prosecution's AB witnesses, and it sought to cast suspicion on Petry for Hickey's murder.

Additionally, the defense called three prison inmates, Wendell Norris, John Stinson, and Robert Rowland, who testified that the AB existed only as an outlook, a way of life, or a loose social club rather than an organized criminal gang. They also said it was a label that prison authorities used to justify restrictive confinement.

The defense also adduced evidence to show that Petry had the motive and the opportunity to kill Hickey.

### B.    Facts Relating to Penalty

As evidence in aggravation, the prosecution introduced Price's prior criminal history. In 1971, Price violated parole on a California marijuana possession conviction by going to Montana, where he attempted to rob a small grocery store with a gun. Price was placed in a drug program, but he escaped from custody. He was later arrested in Florida and brought back to Montana to complete his sentence.

In December 1971, while being transported in Montana, Price grabbed a gun from one of the two transporting officers. After forcing the officers to drive to a remote location, Price locked them both in the trunk of their patrol car and used the gun to force his way into the car of a passing motorist, John Digalis. Price told Digalis to drive to Idaho. Law enforcement officers stopped the car. Price pointed the gun at Digalis's head and threatened to kill him if the officers approached. At Price's order, Digalis again began to drive, but the officers shot out a tire. Price eventually surrendered. He was

convicted of inmate holding a hostage, a Montana felony.

Price was in San Quentin Prison in May 1978.  He told another prisoner, Ricky Carpenter, that he was going to kill Leroy Banks, an African–American inmate, because Banks had been disrespectful to an AB member.  Carpenter pointed out Banks.  Price stabbed Banks 10 to 15 times in the chest.  Banks died of his wounds.

While in jail awaiting trial in this case, Price struck jail guards on two occasions, and on another occasion he violently resisted being taken to court, hitting and biting the guards who were escorting him.

As part of the defense's mitigation presentation, Price testified on his own behalf. Price said he had not testified at the guilt phase because the trial court had ordered him shackled in the courtroom.  Because he had not yet been convicted, he had refused to appear before the jury in chains.  He denied he was guilty of any of the charged offenses. He admitted that he knew Hickey.  He said Hickey had asked him to sell her guns for her on consignment.  The final arrangements were made during a telephone call from Hickey to the home of an AB runner in Auburn.  He said he received the guns on February 18, 1983, in Lakeport from a man named Kenny.  He claimed to have supported himself between October 1982 and March 1983 by selling marijuana.

The defense presented evidence about the conditions of Price's confinement in jail pending the trial in this case, which a nutritionist, a counselor, and a psychiatrist all testified were unhealthy, humiliating and stressful, and led to anxiety, depression, and hostility.

Price's family members testified that they loved Price and did not want him to die. Four corrections officers testified that Price had been a respectful and cooperative inmate while in custody.

//

United States District Court
Northern District of California

## II.    Procedural History

Price litigated an automatic appeal of these convictions in the California Supreme Court, which affirmed the convictions on December 30, 1991.  The court denied Price's petition for rehearing on February 19, 1992.  Price filed a habeas petition in state court on November 13, 1990 and a supplemental petition and request for consolidation with his appeal on December 12, 1991.  AG043034.  The California Supreme Court denied the initial petition on January 29, 1992.  AG043033.  The supplemental petition was denied on February 12, 1992.  AG043064.

Price filed a request for appointment of counsel and stay of execution in this court on January 25, 1993.  ECF Doc. No. 1.  Counsel were appointed on June 23, 1994.  ECF Doc. No. 23.  Through counsel, Price filed his first petition for writ of habeas corpus on April 21, 1997.  ECF Doc. No. 86.  Respondent subsequently filed a motion to dismiss based on failure to exhaust all of the petition's claims in state court.  ECF Doc. No. 101.  Price opposed the motion and requested a stay of proceedings to return to state court and exhaust any unexhausted claims.  ECF Doc. No. 120.  The Court held a hearing on the matter and ultimately denied respondent's motion to dismiss and granted Price's motion to stay proceedings.  ECF Doc. Nos. 136, 141.

While his state exhaustion petition was still pending, Price moved to temporarily lift the stay in the instant proceedings to file a first amended petition.  ECF Doc. No. 176.  The motion was granted.  ECF Doc. No. 180.

Additionally, while the initial exhaustion petition was pending in state court, which was his third state habeas petition, Price filed a fourth state habeas petition alleging juror misconduct based on evidence discovered during the investigation to prepare the exhaustion petition.  AG047018-69.

The California Supreme Court issued an order to show cause on Price's

United States District Court
Northern District of California

exhaustion petition regarding one claim:  whether the prosecutor improperly tampered with a sitting juror by sending her alcoholic drinks and money, and telling her to return a guilty verdict.  AG045273.

The California Supreme Court denied Price's fourth state habeas petition on June 24, 2009, prior to denying the exhaustion petition.  AG047315.  More than a year and a half later, on February 14, 2011, it denied the claim in the initial exhaustion petition on which it filed an order to show cause and discharged the order to show cause.  AG046994-16.  The remainder of the claims in the exhaustion petition were denied on April 13, 2011.  AG047017.

Price moved to lift the stay and to file an amended petition on January 18, 2012.  ECF Doc. No. 194.  The request was granted on February 2.  ECF Doc. No. 196.

Price filed his second amended petition on November 30, 2012.  ECF Doc. No. 201.  In it, he raised thirty-five claims for relief.  Respondent filed his answer on January 17, 2014.  ECF Doc. No. 210.  Price filed his reply on October 14, 2014.  ECF Doc. No. 220.

Following a meet-and-confer period, the parties identified twenty-one record-based claims that could proceed to briefing without a request for an evidentiary hearing.  ECF Doc. No. 225.  The Court directed the parties to brief those claims in three rounds of seven claims.  ECF Doc. No. 226.

Price filed his first brief on an initial seven claims on August 24, 2015.  ECF Doc. No. 231.  Respondent filed his answer on October 22 and Price filed a reply on November 16.  ECF Doc. Nos. 244 and 248.  The matter is now fully briefed and submitted.

//

//

9

**ISSUES**

In his first round of briefing, Price asserts the following seven claims for relief:

(1)      that his rights to due process, a fair trial, the effective assistance of counsel, and to be free from cruel and unusual punishment under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments were violated by numerous acts of serious prosecutorial misconduct during the guilt phase of trial;

(2)      that his rights to due process, a fair trial, the effective assistance of counsel, and to be free from cruel and unusual punishment under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments were violated by numerous acts of serious prosecutorial misconduct during the penalty phase of trial;

(3)      that the trial court's refusal to allow Price to present a defense at his trial by erroneously ruling inadmissible substantial amounts of evidence that demonstrated that defense suspect Berlie Petry was lying and was in fact the killer of Elizabeth Hickey violated Price's rights to a fair trial, due process, confront the witnesses against him and present a defense, as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments;

(4)      that the trial court's improper and misleading response to a jury question during penalty deliberations regarding a matter which was not in evidence and about which the prosecutor had knowingly misled the jury during the trial, violated Price's rights to due process, a fair trial, the effective assistance of counsel, and his right to be free from cruel and unusual punishment, as guaranteed by the Fourth, Fifth, Eighth and Fourteenth Amendments;

(5)      that the trial court's evidentiary rulings erroneously allowing the admission of substantial prosecution evidence resulted in a fundamentally unfair trial in violation of Price's rights to due process, a fair trial, the effective assistance of counsel, and his right

to be free from cruel and unusual punishment, as guaranteed by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments;

(6)     that the convictions on the Barnes murder and conspiracy counts must be vacated because of a series of errors related to the need for corroboration of accomplice testimony, which violated Price's rights to due process, a fair trial, and his right to be free from cruel and unusual punishment, as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments; and

(7)     that the trial court's denial of Price's motion to prohibit references to the name "Aryan Brotherhood" violated Price's rights to free speech, due process, a fair trial, the effective assistance of counsel, and his right to be free from cruel and unusual punishment, as guaranteed by the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments.

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 407–09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell* ("*Miller-El I*"), 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to

11

that reached by [the Supreme] Court on a question of law or if the state court decides a

case differently than [the Supreme] Court has on a set of materially indistinguishable

facts." *Williams*, 529 U.S. at 412-13.  A state court decision is an "unreasonable

application of" Supreme Court authority, falling under the second clause of § 2254(d)(1),

if it correctly identifies the governing legal principle from the Supreme Court's decisions

but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

The federal court on habeas review may not issue the writ "simply because that court

concludes in its independent judgment that the relevant state-court decision applied

clearly established federal law erroneously or incorrectly." *Id.* at 411.  Rather, the

application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

A state court's determination that a claim lacks merit precludes federal habeas

relief so long as "fairminded jurists could disagree" on the correctness of the state's

decision. *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*,

541 U.S. 652, 664 (2004)).  "[E]valuating whether a rule application [i]s unreasonable

requires considering the rule's specificity.  The more general the rule, the more leeway

courts have in reaching outcomes in case-by-case determinations." *Id.*  "As a condition

for obtaining habeas corpus [relief] from a federal court, a state prisoner must show that

the state court's ruling on the claim being presented in federal court was so lacking in

justification that there was an error well understood and comprehended in existing law

beyond any possibility for fairminded disagreement." *Id.* at 102.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual

determination will not be overturned on factual grounds unless objectively unreasonable

in light of the evidence presented in the state-court proceeding." *Miller-El I*, 537 U.S. at

340.  Review under § 2254(d)(1) is limited to the record that was before the state court

that adjudicated the claim on the merits. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398

(2011).

**DISCUSSION**

I.    **Claim XI - Prosecutorial Misconduct During Guilt Phase**

A.    **Legal Standard**

Prosecutorial misconduct is cognizable in federal habeas corpus.  The appropriate standard of review is the narrow one of due process and not the broad exercise of supervisory power.  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair."  *Id.*; *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor").  Under *Darden*, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness.  *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005); *see also Deck v. Jenkins*, 768 F.3d 1015, 1023 (9th Cir. 2014) (recognizing that *Darden* is the clearly established federal law regarding a prosecutor's improper comments for AEDPA review purposes).  A prosecutorial misconduct claim is decided "'on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995); *see Trillo v. Biter*, 769 F.3d 995, 1001 (9th Cir. 2014) ("Our aim is not to punish society for the misdeeds of the prosecutor; rather, our goal is to ensure that the petitioner received a fair trial.").

The first factor in determining whether misconduct amounted to a violation of due process is whether the trial court issued a curative instruction.  When a curative instruction is issued, a court presumes that the jury has disregarded inadmissible evidence and that no due process violation occurred.  *See Greer v. Miller*, 483 U.S. 756,

766 n.8 (1987); *Darden*, 477 U.S. at 182 (the Court condemned egregious, inflammatory comments by the prosecutor but held that the trial was fair since curative actions were taken by the trial judge); *Trillo*, 769 F.3d at 1000 ("We presume that juries listen to and follow curative instructions from judges."). This presumption may be overcome if there is an "overwhelming probability" that the jury would be unable to disregard evidence and a strong likelihood that the effect of the misconduct would be "devastating" to the defendant. *See Greer*, 483 U.S. at 766 n.8; *Tan*, 413 F.3d at 1115-16 (finding trial fair where jury received instructions five different times to consider only the evidence presented, and not its sympathy for the victim's life story).

Other factors which a court may take into account in determining whether misconduct rises to a level of due process violation are: (1) the weight of evidence of guilt, compare *United States v. Young*, 470 U.S. 1, 19 (1985) (finding "overwhelming" evidence of guilt) with *United States v. Schuler*, 813 F.2d 978, 982 (9th Cir. 1987) (in light of prior hung jury and lack of curative instruction, new trial required after prosecutor's reference to defendant's courtroom demeanor); (2) whether the misconduct was isolated or part of an ongoing pattern, *see Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987); (3) whether the misconduct relates to a critical part of the case*, see Giglio v. United States*, 405 U.S. 150, 154 (1972) (failure to disclose information showing potential bias of witness especially significant because governments case rested on credibility of that witness); and (4) whether a prosecutor's comment misstates or manipulates the evidence, *see Darden*, 477 U.S. at 182.

**B.     State Court Denial of Prosecutorial Misconduct During Guilt Phase Claim**

Prices alleges multiple incidents of prejudicial prosecutorial misconduct that occurred during the guilt phase of his trial. Each was raised on direct appeal and was

either addressed on the merits and denied or found to be precluded due to waiver by the California Supreme Court. *Price*, 1 Cal.4th at 447-462. The California Supreme Court ultimately determined that whether considered individually or collectively, the incidents that were not waived did not amount to prejudicial misconduct. *Id.* at 462. The specific reasons for the state court's denial of each subclaim are set out below.

C.    **Price Has Failed to Show the State Court Unreasonably Denied His Claims or That the Prosecutor Committed Prejudicial Misconduct**

1.    **Subclaims Regarding Alleged Misconduct During Jury Selection**

Price sets out approximately thirty-five actions by the prosecutors during jury selection that he argues constitute prosecutorial misconduct. Sec. Am. Pet. at 339-359.[2] Price argues that the prosecutors committed misconduct by making baseless objections, repeatedly violating the trial court's guideline against argumentative objections, and attempting to impute improper motives to defense counsel. While he admits that most of these instances occurred in front of potential jurors who were not seated, he states that he was prejudiced because his counsel were unable to interview coherently the prospective jurors and were forced to exercise peremptory challenges for otherwise acceptable jurors who had witnessed the improprieties, thereby limiting the potential juror pool. *Id.* at 358-359.

Respondent argues that Price has failed to show any prejudice from any of the cited incidents, only one of which occurred before any juror ultimately seated on the

---

[2] The parties have filed briefs on these claims. *See* ECF Doc. Nos. 231, 244, and 248. However, Price noted in his opening brief that it "summarizes the seven record-based claims and points the Court to the complete arguments and record support for these claims, with appropriate references to the pleadings on file." Op. Br. at 2. Respondent, who objected to Price's summary pleading format, asked the Court to incorporate by reference the answer. Resp. at 1. Since, in most instances, a more detailed discussion of the claims occurs in the Petition and the responsive pleadings to it, the Court will refer primarily to those documents. Where the current briefing is more illuminating, the Court will refer to the newer briefs.

panel.  Ans. at 241-42.  Respondent also argues that Price retained eight of his peremptory challenges at the end of jury selection and that neither the record nor defense counsel's declarations indicate that defense counsel felt compelled to challenge any particular juror on the basis of exposure to the prosecutor's alleged misconduct.  *Id.* at 241.

The California Supreme Court denied this portion of Price's prosecutorial misconduct claim stating that it had reviewed each incident Price cited and found no prejudicial misconduct on the part of the prosecutor.  *Price*, 1 Cal.4th at 448-450.  The court noted that jury selection took four and a half months and "scores of prospective jurors were examined on voir dire."  *Id.* at 448.  It stated:

> During this lengthy process, some deviation from the court's stricture against speaking objections was virtually inevitable. One reason for this, apart from the argumentative propensities of attorneys generally, is that the rules governing voir dire are not as specific or as well established as the rules governing the admissibility of evidence; thus, they do not as readily lend themselves to concise objections.  As defendant notes, the trial court's reminders to avoid speaking objections were invariably effective for a time.  We think that this shows that the prosecutors were striving in good faith to abide by the rule, and that the lapses were inadvertent.

*Id.*

The California Supreme Court also held that Price's argument regarding foundationless objections was not well-taken because a showing of prejudicial misconduct requires a showing that the prosecutor's conduct was likely to persuade to the jury.  *Id.*  The court then went through several incidents of "baseless" objections cited by Price and found that they were well-grounded in the law and did not impute an improper motive to defense counsel.  *Id.* at 449-50.

The Court has reviewed each of the incidents cited by Price and finds that he has failed to show either that the California Supreme Court decision was an unreasonable

United States District Court
Northern District of California

application of clearly established federal law or an unreasonable interpretation of the facts.  28 U.S.C. § 2254(d)(1), (d)(2).

Moreover, even if Price could show that the cited incidents constituted misconduct, he would be unable to show prejudice.  *See Penry v. Johnson*, 532 U.S. 782, 795 (2001) (quoting *Brecht v. Abrahamson,* 507 U.S. 619, 638 (1993)) ("habeas relief is warranted only if the error had a 'substantial and injurious effect or influence in determining the jury's verdict.'").  Price admits that only one of the cited incidents occurred before any potentially seated juror.  Reply at 99.  That particular incident consisted of the prosecutor asking, "[W]ho do you suppose would be more likely to commit violent acts [in prison]. [sic]  Somebody who's in there for narcotic offenses, theft-related offenses, or somebody who's sent there because they have been convicted of a violent act against a fellow human being?"  RT 8876, AG025741.  Defense counsel objected and the trial court sustained the objection.  RT 8876-77, AG025741-2.  The prosecutor moved on to another question.  RT 8877, AG025742.  Price has not shown that this one question, to which an objection was sustained, so biased the one juror against him that it had a "substantial and injurious effect or influence on the jury's verdict."  *Brecht*, 507 U.S. at 638.

That Price's counsel had to use peremptory challenges "that he should not have had to use" does not amount to prejudice, either.  Reply at 99.  The right of peremptory challenge is not guaranteed by the United States Constitution.  *See United States v. Martinez-Salazar*, 528 U.S. 304, 311 (2000).  Rather, it is an important statutory right that courts have considered vital to the Sixth Amendment guarantee of an impartial jury trial. *Id.*  It is clear, however, that as long as the jury that sits is impartial, the loss of a peremptory challenge does not violate the Sixth Amendment.  *Martinez-Salazar*, 528 U.S. at 313; *Ross v. Oklahoma*, 487 U.S. 81, 88 (1988).

The purpose of a peremptory challenge is to "help secure the constitutional

guarantee of trial by an impartial jury." *Martinez-Salazar*, 528 U.S. at 316.  Price has shown that counsel used eighteen peremptory challenges, though there is no clear record setting out why counsel chose to exercise such challenges.  Reply at 99.  Regardless, Price has not shown that after using such challenges that he was left with a biased jury as a result of the prosecutor's conduct during the selection process.  Accordingly, he cannot show that he was prejudiced by such conduct and this subclaim is, therefore, DENIED.

### 2. Incidents of Prosecutorial Misconduct Based on Disobedience of Direct Court Orders

For this subclaim, Price identifies six instances wherein he argues that the prosecutor intentionally disregarded trial court orders, thereby committing prejudicial misconduct.

### a. Questioning Witness Becky Williams Regarding Her Attempt to Place a Phone Call Prior to Stating Whether She Would Cooperate with the Prosecutorial Investigator

Price challenges the prosecutor's question to prosecution investigator Barry Brown inquiring whether defense witness Rebecca "Becky" Williams attempted to place a telephone call prior to declining to be interviewed by the investigator.  Sec. Am. Pet. at 359-360.  Price asserts that this question raised the inference that Price's counsel advised Ms. Williams not to cooperate with the prosecution, despite a standing court order directing the prosecutor not to delve into any potential involvement of Price's counsel in Ms. William's decision not to cooperate.  *Id.*  He also states that this incident was part of a pattern and practice of the prosecutors to make their points "even in the face of clear adverse rulings from the court."  *Id.* at 360.

While questioning Investigator Brown, the prosecutor asked about Brown's contacts with Ms. Williams.  RT 15517, AG031819.  Defense counsel objected,

18

concerned that the prosecutor was attempting to offer statements for something beyond the truth of the matter asserted. *Id.* The trial court dismissed the jury and held a hearing on the matter. RT 15517-15522, AG031819-27. The court ruled that the prosecution could elicit testimony that Ms. Williams refused to speak with the prosecution's investigators, but could not elicit information that would imply that defense counsel had instructed her to refuse an interview. RT 15521-22, AG031826-27.

The jury returned the courtroom and the prosecutor resumed questioning Mr. Brown. RT 15522, AG031827. Shortly, the prosecutor asked, "After you explained . . . to Ms. Williams that she had the right not to talk to you if she didn't want to, did she agree to talk to you?" RT 15525, AG031830. Defense counsel immediately objected and the court sustained the objection. RT 15525, AG031830.

The prosecutor then asked, "Before she made her final decision not to be interviewed by a representative of the Humboldt County District Attorney's Office investigating a homicide involving Curtis Floyd Price, did she place what appeared to be a long distance telephone call?" RT 15525, AG031830. The court sustained defense counsel's subsequent objection and the prosecution rested. RT 15525, AG031830.

The trial court issued a lengthy instruction to the jurors explaining that each side can contact the other's witnesses, but no witness is obligated to speak to any representative for the other side. RT 15525, AG031830. The court stated that there was "nothing nefarious about any of this" and that "no one is trying to hide anything by these rules of procedure that we go through in every case." RT 15525-26, AG031830-31.

Price admits that the court's instruction to the jury "may have been sufficient to offset much of the harm." Sec. Am. Pet. at 360. However, he argues that the curative instruction could not cure all of the prejudice because the incident was part of an ongoing

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

pattern by the prosecution.[3]  *Id.*

Respondent restates the California Supreme Court ruling and notes that Price "cites not a single United States Supreme Court case, nor even any case of the circuit courts, which discusses facts similar to the alleged misconduct in this case."[4]  Answer at 256.

The California Supreme Court denied this portion of the claim on the grounds that the defense objection was sustained and that the prosecutor's question "did not suggest who Williams might have called."  *Price*, 1 Cal.4th at 451.

As stated above, when a curative instruction is issued, a court presumes that the jury has disregarded inadmissible evidence and that no due process violation occurred. *See Greer*, 483 U.S. at 766 n.8 (1987); *Trillo*, 769 F.3d at 1000 ("We presume that juries listen to and follow curative instructions from judges.").  Here, the trial court issued a lengthy and detailed curative instruction even after sustaining the defense's objections. Price has failed to show that there is an "overwhelming probability" that the jury would be unable to disregard the implication and a strong likelihood that the effect of the misconduct would be "devastating" to him.  *See Greer*, 483 U.S. at 766 n.8.

As noted by the California Supreme Court, the prosecutor's question did not give any indication as to whom Ms. Williams may have called.  The jury did not have the contextual background to know where the prosecutor was headed with his line of questioning.  When viewed in the context of the entire trial, this question cannot reasonably be viewed as prejudicial.  Price has failed to show that no fairminded jurist

---

[3] Price's "pattern and practice" allegations are addressed at the conclusion of the discussion of Claim XII, which is also a prosecutorial misconduct claim.
[4] Unless otherwise noted, Respondent makes an identical argument for each of the remaining subclaims.  His argument will not be repeated for those subclaims, though it was considered.

could disagree regarding whether such a question is prejudicial.  *Harrington*, 562 U.S. at 101.  Accordingly, he has not shown that the California Supreme Court's denial of this portion of his claim was an unreasonable application of clearly established federal law or an unreasonable interpretation of the facts.  28 U.S.C. § 2254(d)(1), (d)(2).  This portion of the subclaim is DENIED.

### b.     Questioning of Prosecution Witness Detective Freese

Price challenges two separate instances of the prosecutor's questioning of prosecution witness Detective Freese.  The first concerns a question regarding whether Price consented to a warrantless search of his car.  The second involves the prosecutor's attempted questions to Detective Freese about whether additional information would have persuaded him that there was sufficient evidence on which to justify an arrest of Price.  Price argues that both instances constituted a bad faith determination to abridge adverse court rulings and, thus, constituted prejudicial misconduct.  Sec. Am. Pet. at 362-63.  Price also argues that the prosecutor's improper questions raised the inference that defense counsel was trying to hide information from the jurors.  *Id.* at 362.

### i.     Questions Regarding Price's Refusal to Consent to Warrantless Search of Car

Price initially challenges the prosecutor's questions, in violation of a court order prohibiting them, to Detective Freese regarding Price's refusal to allow the police to conduct a warrantless search of his car.  Prior to any ruling on the matter, the prosecutor asked Detective Freese if Price consented to a warrantless search of his car.  RT 16011, AG03236.  Defense counsel objected based on relevance and the objection was sustained.  *Id.*  The prosecutor asked to be heard on the matter and the trial court indicated that it would do so at a later time.  *Id.*  It then directed the prosecutor to ask a new line of questions.  *Id.*

21

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

The prosecutor's next question was, "What was Mr. Price's response when he was asked to sign the consent -- " *Id.* Defense counsel again objected and the trial court again sustained the objection, reminding the prosecutor that the matter would be taken up at a later time. RT 16012, AG032327.

When the prosecutor was given an opportunity to argue the matter outside the presence of the jury, he argued that Price's refusal to consent to a warrantless search of his car justified the officers' continued suspicion of him and evinced a consciousness of guilt. RT 16040-41, AG03253-56. The court disagreed, ruling that there would be no argument "that someone who exercises the right to have his personal property free from government intrusion somehow is guilty or should be considered guilty or should be considered to . . . be uncooperative." RT 16040-1, AG032354.

Price argues that he was prejudiced by this line of questioning because the prosecutor was able to make "two strong but improper points -- that Price had refused to consent to the search of his car and that defense counsel was trying to hide that fact." Sec. Am. Pet. at 362. Respondent does not address this subclaim specifically. Ans. at 256.

The California Supreme Court found the prosecutor's questions to be improper but also found that Price suffered no prejudice as a result because "the questions did not suggest the answers and the defense objections were sustained before the witness could answer." *Price*, 1 Cal.4th 451.

Price has not shown "that the state court's ruling on th[is] claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 102. "For purposes of § 2254(d)(1), 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" *Id.* at 101, quoting *Williams v. Taylor*, 529 U.S. 362,

410 (2000) (emphasis in original).  Fairminded jurists could reasonably disagree about whether the questions asked by the prosecutor suggested the answers.

Moreover, to the extent Price challenges these questions as violative of a court ruling prohibiting them, the questions preceded the order.  Accordingly, this portion of the subclaim is DENIED.

### ii.    Questions Regarding Whether the Detective Believed There Was Sufficient Evidence on Which to Arrest Price for the Triplex Theater Robbery

Price next challenges as prejudicial misconduct the prosecutor's insistence on attempting to ask Detective Freese questions about whether, had the detective known additional facts at the time he stopped Price, he would have thought there was sufficient information to arrest Price.

When defense counsel cross-examined Detective Freese, he asked if the officer had caused or sought an arrest warrant for Price following the administration of photographic line-ups to all witnesses of the Triplex robbery.  RT 16044, AG032359.  The prosecutor objected and the parties engaged in lengthy argument outside the presence of the jury about the relevancy and scope of the questioning.  RT 16044-16057, AG032359-AG032373.  Ultimately, the court ruled that Price's counsel could ask two very limited questions designed to elicit whether the officer felt there was enough evidence on which to base an arrest of Price.  RT 16056-67, AG032372-73.

Defense counsel asked the narrowly tailored questions.  RT 16061, AG032374.  When the prosecutor questioned Detective Freese on re-direct, he asked whether or not the officer felt there was sufficient evidence based on the totality of the investigation to arrest Price for the Triplex robbery, to which the officer responded that he did not.  RT 16091, AG032398.  The prosecutor then asked if the Deputy District Attorney believed there was sufficient evidence on which to arrest Price.  *Id.*  Detective Freese said the

Deputy District Attorney directed him to arrest Price for robbery. *Id.* The prosecutor then returned to Detective Freese's assertion on cross-examination that he did not believe there was sufficient evidence on which to arrest Price for the Triplex Theater robbery:

Prosecution: Sir, on March the 3rd, 1983, when you formed that opinion, would your opinion have been the same if you were aware that the defendant was-

Defense: I would object, your Honor, based on the fact counsel's testifying, calls for speculation.

Prosecution: It's a hypothetical question. He's asked for an opinion. I think I'm allowed to ask him about factors which might change that opinion.

Defense: I don't believe there's been a foundation established for that, your Honor.

The Court: Overruled.

Prosecution: Would your opinion have been the same if you were aware that Mr. Price --

The Court: Wait a minute. Just a minute. Are you going into factors that --

Prosecution: I'm going to ask him a hypothetical question, additional factors which might alter that opinion.

The Court: I assume if he had additional factors, that given enough additional factors, that his opinion would be changed. I -- I --

Defense: It's not relevant, your Honor. It didn't happen that way.

Prosecution: If [the defense attorney is] really concerned, I'll withdraw it.

The Court: Apparently he is. All right. It's withdrawn. Go ahead. Ask another question.

RT 16091-92, AG032398-99.

Price argues that the prosecutor committed misconduct by disobeying a court order preventing him from questioning Detective Freese about additional information regarding Price that was known to other officers. Sec. Am. Pet. at 363. He states that he was prejudiced by this action because the prosecutor made clear to the jury "that there

24

were other factors which they had not heard about" and made it seem as though defense counsel was trying to hide those factors. *Id.* Price says that this problem was reinforced by the prosecutor's willingness to withdraw a question about which defense counsel had expressed great concern. *Id.*

The California Supreme Court denied this portion of the subclaim finding no misconduct or prejudice. *Price*, 1 Cal.4th at 452. The court noted that defense counsel objected to the question before any specifics were asked and the witness did not answer. *Id.* It also stated that it could not find a comment by the trial court that clearly precluded the prosecutor from being able to ask such a question. *Id.* Finally, it found that the line of questioning as to Detective Freese's belief regarding whether sufficient evidence existed to arrest Price for the Triplex robbery was not relevant to any issue before the jury. *Id.*

The passage in the record that Price cites as limiting the prosecutor's ability to ask Detective Freese questions regarding his belief as to the sufficiency of the evidence against Price does not issue the prohibition that Price argues it does. *See* RT 16049, AG032364, lines 15-20. The judge's statements come after a discussion wherein the prosecutor had argued that *any* question regarding Detective Freese's belief about the sufficiency of the evidence upon which to arrest Price was irrelevant because the issue had already been litigated and the trial court had determined that there was sufficient evidence. RT 16046-49, AG032361-64. The statement relied on by Price limits defense counsel's ability to delve into an area the court and the prosecutor believed to be irrelevant. The trial court permitted defense counsel to ask two narrowly tailored questions, but then said, "But I'm not going to allow you to relitigate all the details." RT 16049, AG032364.

The prosecutor then asked if he was allowed to ask about details that might cause the detective to change his mind. RT 16049-50, AG032364-65. The trial court didn't

answer directly.  RT 16050, AG032365.  Instead, the court said, "I told him he's got two questions coming.  That's it."  *Id.*  The trial court made it clear it did not want time and resources spent on an issue that had already been decided.  From the context of the conversation, it could be inferred that any questioning beyond defense counsel's two limited questions would not be permitted.  However, the trial court did not expressly prohibit the prosecutor from asking follow-up questions.  Accordingly, Price cannot show the prosecutor's attempt to ask the hypothetical question constituted misconduct.

Moreover, as the California Supreme Court noted, the issue was not relevant to any issue before the jury and, as such, Price cannot show he was prejudiced by the prosecutor's attempted question.  Thus, Price has not shown that the California Supreme Court's denial of this portion of his claim was an unreasonable application of clearly established federal law or an unreasonable interpretation of the facts.  28 U.S.C. § 2254(d)(1), (d)(2).  Accordingly, this portion of Price's subclaim is DENIED.

### c.    Statements Regarding Stolen Gun

Price challenges two statements made by the prosecutor regarding a Charter Arms gun that was found in a suitcase of his when police searched his mother's home.  He asserts that both statements were irrelevant to the crimes for which he was charged and that the prosecutor clearly intended to put a prejudicial inference before the jury that he was in possession of a stolen gun, despite court orders prohibiting it.  Sec. Am. Pet. at 364, 366.

He first challenges the prosecutor's question to Price's mother, Mrs. Lloyd, "Would it surprise you to learn that that weapon [found inside Price's suitcase] was reported stolen in Flint, Michigan?"  RT 16691, AG032964.  Defense counsel objected to the question as irrelevant before the witness could answer.  *Id.*  The court sustained the objection.  *Id.*

United States District Court
Northern District of California

For this specific question, Price argues that it "demonstrates the prosecutor's reprehensible disregard for the rules of evidence" because the prosecutor knew the matter was irrelevant and he clearly had calculated the "prejudicial impact of implying that [Price] was in possession of a stolen gun. . . ." Sec. Am. Pet. at 364. He also states that the prosecutor's question, which was phrased as a statement, implies that defense counsel was hiding evidence from the jury. *Id.* at 365.

Next, Price challenges the prosecutor's questioning of Sergeant Frederickson about the origin of the Charter Arms gun. Outside the presence of the jury, the court questioned why the officer seized the weapon during a search of Price's home when it was not listed on the warrant. RT 17400-1, AG033692. The prosecutor asserted that Sergeant Frederickson took the gun because it had been reported stolen, but the court noted that the officer did not know that information at the time. *Id.* The prosecutor then said, "Because he knew Mr. Price was a convicted felon and he had information --." *Id.* at 17400-2, AG033693. The court interjected, "That's fine. That's a proper answer. I'll allow that. I think he's entitled to explain why he took it." *Id.* The court then addressed another matter. *Id.*

When Sergeant Frederickson returned to the stand, the prosecutor asked, "Where was the Charter Arms reported stolen out of?" *Id.* at 17409, AG033703. Defense counsel objected, saying, "The court ruled on that." *Id.* The court sustained the objection, stating, "Yes. Sustained." *Id.* The court then directed the jury to disregard the question. *Id.*

After Sergeant Frederickson concluded his testimony, defense counsel moved for a mistrial based on prosecutorial misconduct because the prosecutor had disobeyed the court order not to ask about the gun's origins. *Id.* at 17410-1, AG033705. The prosecutor averred that he believed he had permission to ask about the gun, but had

27

been prohibited from discussing a calendar found in Price's possession.  *Id.* at 17410-1-2, AG033705-06.

The court denied the motion.  It clarified that it had intended that the prosecutor would ask Sergeant Frederickson why he took the gun despite its absence from the warrant and that the response the officer was expected to give was that he seized it because Price was a felon.  *Id.* at 17410-2, AG033706.

When the jury returned, the court issued the following instruction:

> For the record, while the jury is here, I need to tell you there was a question asked before we broke about a gun which was allegedly stolen.

> Whether or not that gun is stolen had nothing to do with this case.  The question wasn't answered.  You're ordered to disregard the question.  There's no answer to it.

> Mr. Price has not been charged with any stolen property and you're not even to consider that gun as stolen.  I don't know whether it is or not because you don't have to answer that question.  It was taken by the officers because they felt that it had some connection to this case, but not because of anything else at the time it was taken.  You're not to consider any implications to the contrary.

*Id.* Price argues that this admonition was insufficient to cure the prejudice because it drew more attention to the prosecutor's improper question.  Sec. Am. Pet. at 366, fn. 181.

The California Supreme Court denied this subclaim, stating that it did not "agree that the prosecutor's question was clearly contrary to the court's ruling." *Price*, 1 Cal.4th at 452.  The court noted that the prosecutor had been attempting to relay information that was cut off and said, "If the officer knew the weapon was stolen when he seized it, it is not clear that the [trial] court's ruling was intended to exclude evidence of this fact." *Id.* The court then found that Price suffered no prejudice because there was no evidence showing that Price had ever been in Flint, MI, or had knowledge that the gun was stolen. *Id.* Moreover, the jury was instructed to disregard the question.  *Id.*

The California Supreme Court's determination that the prosecutor's question was

not in direct contravention of the trial court's ruling is not supported by the record. However, Price has not shown that its determination that he suffered no prejudice was an unreasonable application of clearly established law or of the factual record before it pursuant to 28 U.S.C. § 2254(d)(1) and (d)(2).

Price was found in possession of multiple weapons that had been stolen from both Richard Moore and Elizabeth Hickey.  That he was also in possession of a weapon that, according to the evidence presented, had at one point been stolen in a town he had not visited could not have been that damaging in light of all of the other evidence against him. The trial court clearly instructed the jury that even if the gun was stolen, it had no bearing on the crimes for which Price was being tried.  "A jury is presumed to follow its instructions." *Weeks v. Angelone*, 528 U.S. 225, 234 (2000), citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987).  While the prosecutor's questioning was improper, it did not prejudice Price and, thus, the California Supreme Court denial of this subclaim was not unreasonable.  Accordingly, this subclaim is DENIED.

### d.      Questioning Michael Thompson About How Long He Knew Price

In this subclaim, Price challenges the prosecutor's insistence on asking prosecution witness Michael Thompson, a former AB member, how long he knew Price. The questioning, Price asserts, was designed to get in information regarding how long Price spent in prison, which was irrelevant.  Sec. Am. Pet. 366.

The prosecutor asked Mr. Thompson directly how long he had known Price and defense counsel objected, arguing that it fell outside the scope of the relevant time period for the conspiracy.  RT 16737, AG033000.  The trial court subsequently entertained lengthy argument about the propriety of the question.  RT 16754-60-2; AG033019-27. The prosecutor indicated that establishing the duration of relationship between the two

United States District Court
Northern District of California

1   individuals was important for establishing the reason Price had been selected for the

2   assignments.  RT 16755, AG033020.  The court asked both sides whether it was

3   possible for Mr. Thompson to identify when he met Price without stating where.  RT

4   16758-59, AG033023-24.  Ultimately, the court held:

5           The fact is that Mr. Price was in prison during that period of
            time and the fact is that he had apparently been in prison for

6           some time.  That's obviously known to the jurors to some
            degree at this point, but it does not mean that they need to

7           have reinforced by reiteration by Mr. Thompson the fact that
            Mr. Price had been in prison for a long period of time.

8
            Mr. Thompson can testify that Mr. Price came to California

9           pursuant to the subpoena, as I take it he already has.

10          He can testify that Price accepted the contract, if indeed that's
            what his testimony is going to be.

11
            The reasons for Mr. Price's choice as the person who was

12          brought to Palm Hall to accept this duty are implicit in the task
            dealt to him, his acceptance of that task, and Mr. Thompson's

13          previous testimony this morning about channeling the abilities
            of various prisoners into the task that they are best suited to

14          do.

15  RT 16761, AG033028.

16          The trial court then turned its attention to another matter.  After Mr. Thompson

17  returned to the stand, the prosecutor asked, "Can you tell me simply the year that you

18  met the defendant, Curtis Price?"  RT 16765, AG033032.  The defense objected and the

19
    trial judge overruled the objection stating, "He can ask how long he's known him."
20

21          Price argues that though the prejudice from this incident was "slight," this question

22  constituted another incident in which the prosecutor ignored an adverse ruling from the

23  court in order to make the point he wished to convey.  Sec. Am. Pet. at 367.  Price

24  asserts, that the prosecutor's insistent misbehavior and the court's encouragement of it

25  made clear that if the prosecutor was persistent enough, he would get his way,

26
    regardless of the court's prior ruling.  *Id.*
27

28          The California Supreme Court denied this subclaim, stating that the trial court's

United States District Court
Northern District of California

overruling of defense counsel's objection showed that "the prosecutor had correctly interpreted its somewhat ambiguous ruling." *Price*, 1 Cal.4th at 453. The court then disagreed that this incident showed a disregard of a trial court ruling. *Id.*

Mr. Thompson made no specific reference to having met Price in prison, which was counsel's primary concern. Accordingly, Price has not shown that this line of questioning prejudiced him and, thus, he has not shown that the California Supreme Court's decision denying him relief on this subclaim was an unreasonable application of clearly established federal law or an unreasonable interpretation of the facts. 28 U.S.C. § 2254(d)(1), (d)(2). Accordingly, this subclaim is DENIED.

### e.    Sale of Car from Michelle Scarborough to Tami Shinn

In his next subclaim, Price challenges the prosecutor's attempt to introduce evidence showing that Michelle Scarborough, an AB runner, sold her car to Tami Shinn, another AB runner, after the conclusion of the conspiracy. The trial court had ruled that such evidence was inadmissible because it was irrelevant to the proceedings due to the sale postdating the conspiracy. Price argues that the prosecutor's insistence on introducing the evidence serves as another example of the prosecutor's determination to ignore adverse rulings and get in prejudicial evidence. Sec. Am. Pet. at 369.

During the cross-examination of Special Agent Paul Tulleners, defense counsel asked about license plates and ownership of cars connected to the use of Price's stepfather's gasoline credit cards in an attempt to dispute the prosecution's assertion that Price was near the relevant crime scenes on particular days. RT 19744-19747, AG036205-08. Defense counsel then asked to approach the bench. RT 19747-49, AG036208-10. He explained that he wanted to ask a question about a car owned by Michelle Scarborough, which was later transferred to Tami Shinn, but wanted to be assured that Agent Tulleners would not discuss the subsequent transfer of ownership.

*Id.* The agent agreed that if the question was tailored to ownership in 1983, the year during which the conspiracy occurred, he would not discuss the subsequent transfer. RT 19749, AG036210. Defense counsel asked the question and Agent Tulleners made no mention of the 1985 transfer to Tami Shinn. RT 19750, AG036212.

During re-direct, the prosecutor's first statement was, "Agent Tulleners . . . talking about the [sic] Michelle Scarborough's car, I see that it was transferred to Tami Shinn." RT 19750-1, AG036211. Defense counsel objected and the prosecutor persisted. *Id.* The trial court sustained the objection and the prosecutor asked to have the transfer document admitted into evidence. *Id.* The court indicated that it would rule on the request at a later time and the prosecutor moved on. *Id.*

Later, the prosecutor asked, "Have you heard of people selling -." RT 19752, AG036217. The defense objected and the prosecutor persisted over the defense's objection. *Id.* The trial court sustained the objection and asked the jury to leave the courtroom. *Id.* The trial court then said,

> You don't need to say anything, Mr. DePaoli. Let me handle this. . . .
>
> Yesterday, I read Mr. DePaoli a portion of 7-105, the Rules of Professional Conduct. What is good for the goose is good for the gander.
>
> There is a ruling here at the bench which I thought was clear which said there wasn't going to be any mention made of the transfer to Ms. Shinn. Twice the prosecution has tried to abridge that ruling.
>
> I think the ruling doesn't really have a lot to do with any of the facts in this case, but I don't want to hear any more questions again, and I suggest that both sides read that Code of Professional Responsibility.

RT 19752-53, AG036217-18.

After a few more comments from the court, the following exchange occurred:

> Prosecution: And, your Honor, I can't allow defense counsel's questions to lie to the jury.

The Court:   He didn't lie to the jury.  That transfer is not necessarily relevant, and I ruled, and you knew that.

Prosecution:  Of course I knew it.

RT 19753, AG036218.

Price argues that though the prejudicial impact of the prosecutor's questioning was minimal, this particular instance shows his determination to "never allow an adverse ruling to stop him from doing what he believed he needed to do."  Sec. Am. Pet. at 369.

The California Supreme Court denied this subclaim on the ground that Price was not prejudiced by it because the transfer of ownership had little to no relevance to the issues in the case.  *Price*, 1 Cal.4th at 453.  Price has not shown that this holding was an unreasonable application of clearly established federal law or an unreasonable determination of the facts on the record before the court.  28 U.S.C. § 2254(d)(1), (d)(2).  He has not even tried to argue prejudice, aside from this serving as an example of the prosecutor's systematic attempts to avoid adverse rulings from the trial court.

This particular line of questioning and insistence on disregarding a court ruling was the first one that brought such a response from the court.  While the court's reprimand of the prosecutor made clear that both sides had exhibited less-than-decorous behavior on multiple occasions, it was the first time it had stated that there had been a clear ruling and the prosecutor had abridged it.  This lends credence to the California Supreme Court's interpretation of several of the challenged questions as being either non-problematic or not clearly in violation of an adverse ruling.

More importantly, Price has not shown that this course of conduct, even when considered cumulatively, prejudiced him.  As noted, many of the disputed questions pertained to issues irrelevant to those before the jury.  Accordingly, he has failed to show

33

1   that he is entitled to relief.  As such, this subclaim also will be DENIED.

2   **3.      Attempts to Impugn the Integrity of Mr. Price or His Counsel**

3       Price cites seven instances in which he alleges that the prosecutor committed

4   misconduct by attempting to impugn his integrity or that of his counsel.  Each is

5   addressed in turn below.

6   **a.      Comments During the Opening Statement About Price's
7            Non-Testimonial Actions**

8       During his opening statement, the prosecutor said, "You're going to be spending a

9   good deal of time in Mr. Price's presence while he plays his 'Gee willikers, golly shucks,'

10  role and probably rarely misses a chance to hold Ms. Klay's chair."  RT10126,

11  AG026980.  Price argues that this statement constitutes prosecutorial misconduct

12  because it comments on a non-testifying defendant's courtroom behavior and ridicules

13  Price for holding the chair for his female counsel.  Sec. Am. Pet. at 370.

14  

15      The California Supreme Court denied this subclaim, saying,

16          The prosecutor's remark did not urge the jury to draw any
            adverse inference from defendant's courtroom behavior.  On
17          the contrary, it advised the jury, in effect, to ignore defendant's
            courtroom behavior and to determine his guilt or innocence on
18          the basis of the evidence.  The comment was not improper.

19  *Price*, 1 Cal.4th at 454.

20      Price has not cited nor has the Court found any cases from the United States

21  Supreme Court that require reversal when the prosecutor comments on a nontestifying

22  defendant's courtroom behavior.  The Ninth Circuit has, however, held that comments on

23  a non-testifying defendant's behavior can violate his Fifth Amendment due process rights.

24  *See United States v. Schuler*, 813 F.2d 978, 981 (9th Cir. 1987).  In *Schuler*, the court of

25  appeals ordered reversal because the prosecutor during closing argument commented

26  on the fact the defendant had laughed when his statements to the police were read back

United States District Court
Northern District of California

in court.  *Id.* at 981-82.  Critical to the court's decision was that defense counsel had objected and the district court had overruled, stating that the prosecutor's argument was proper; the behavior directly pertained to the crime charged; and that, in light of a prior hung jury, the court could not say that the error was harmless beyond a reasonable doubt.  *Id.*

*Schuler* is distinguishable.  Here, Price admits that counsel did not object.  Sec. Am. Pet. at 370.  Moreover, the conduct at issue, holding a chair for his female attorney, does not directly relate to any of the crimes for which he was charged.  Also, as noted by the California Supreme Court, the prosecutor was not commenting on the behavior to imply that it implicated Price, but rather was advising the jury not to pay attention to Price's courtroom behavior.

Even if this instance fell squarely within the confines of *Schuler*, Price would not be entitled to relief because that decision does not constitute "clearly established Federal law, as determined by the Supreme Court of the United States."  *Pinholster*, 563 U.S. at 181.  Accordingly, the California Supreme Court's ruling is not contrary to clearly established federal law.  28 U.S.C. § 2254(d)(1).  This subclaim is DENIED.

**b.** **Question Whether Witness Had Seen Price "Angry Enough to Kill"**

Price challenges two questions the prosecutor asked during the direct examination of Janet Myers.  The prosecutor first asked Ms. Myers, "Have you ever seen -- personally seen the defendant Curtis Price mad enough to kill somebody."  RT 13867, AG030278.  Defense counsel objected, asked that the question be stricken, and that the jury be admonished to disregard it.  *Id.*  The court sustained the objection, but did not make any further statement on the matter.  *Id.*

The prosecutor's next question was, "While the defendant was staying at your

United States District Court
Northern District of California

house in Southern California, did you ever see him violently mad?" *Id.* Defense counsel

again objected and the court invited both sides to the bench. *Id.* The court then heard

argument regarding whether the questions were relevant. RT 13868-13870, AG030279-

81. Ultimately, it was determined that, if relevant, the issue would come up again on re-

direct. RT 13870, AG030281. When the jury returned, the court issued the following

instruction:

> Ladies and gentlemen, Mr. DePaoli asked me to instruct you
> to disregard a question that, I think, you have been instructed
> previously.    That any question to which an objection is
> sustained is not to be considered during this trial, because it's
> not evidence of anything. A question obviously unanswered is
> nothing.

RT 13871, AG030282.

Price asserts that these questions constitute prosecutorial misconduct because

they were geared to show that Price had a propensity for violence. Sec. Am. Pet. at 371.

Even if the prosecutor had a good faith reason for asking the questions, Price argues, he

should have sought a bench conference in which to discuss the issue prior to asking the

questions in front of the jury. *Id.* Price also states that the "belated and poorly worded"

admonition "could not possibly overcome the strong implication planted by the prosecutor

that Myers had, in fact, seen [Price] angry enough to kill, and that the defense was

successfully preventing the jury from hearing about it." *Id.*

The California Supreme Court denied the subclaim simply stating, "We find no

misconduct and no prejudice." *Price*, 1 Cal.4th at 454.

In his argument, Price overlooks the context in which the questions occurred.

Prior to asking the two challenged questions, the prosecutor asked Ms. Myers, "Did you

at any time tell Special Agent Tulleners that you were afraid of Curtis Price?" RT 13867,

AG030278. Defense counsel objected on relevancy grounds and the prosecutor said

36

that Ms. Myers's fear of Price was relevant to her motive for testifying.  *Id.*  The court

sustained the objection because the prosecution had failed to lay the requisite foundation

that would make the question relevant.  *Id.*

During the bench argument, it became clear that the prosecutor had not

understood that to lay the proper foundation, he needed to establish a time frame in

which any violent actions Ms. Myers witnessed could have impacted her desire or

willingness to testify.  RT 13868, AG030279.  Within this context, Price has not shown

that these comments were improper.

Price also has failed to show prejudice.  On cross-examination, defense counsel

got Ms. Myers to admit that she had received no actual threats to herself or her children.

RT 13878, AG030289.  He also got Ms. Myers to admit that it had been a long time since

she'd participated in the witness protection program and that she had not changed her

name or used a pseudonym for her protection.  RT 13915-16, AG03027-28.

More damaging for Price was that on re-direct, the prosecutor elicited testimony

from Ms. Myers that when Price was staying in her house, she saw him cleaning a

sawed-off shotgun and a "cowboy-type" pistol in her bathroom.  RT 13940, AG030352.

She also testified to witnessing Price slap another man with a gun because that man was

disrespecting an associate's girlfriend.  RT 13953, AG030369.  Even with a limiting

instruction, this testimony is far worse for Price than two asked, but unanswered

questions that the jury was instructed to disregard.

Price has failed to show that the California Supreme Court denial of this subclaim

was an unreasonable application of clearly established federal law or an unreasonable

determination of the facts on the record before the court.  28 U.S.C. § 2254(d)(1), (d)(2).

Accordingly, this subclaim is DENIED.

//

c.      **Improper Implication that AB Assisting Price at Time of Trial**

Price next challenges a question to Mr. Smith as an improper attempt to get before the jury prohibited hearsay evidence of a continuing post-arrest conspiracy between Price and the AB.  Sec. Am. Pet. 373.  The prosecutor asked Mr. Smith, "Are you personally aware of whether or not the Aryan Brotherhood membership is doing anything right now to assist the defendant Curtis Price in his defense of this case?"  RT 16185, AG032504.  Defense counsel objected, asked that the question be stricken, and that the jury be admonished to disregard it.  RT 16186, AG032505.  During his objection, defense counsel noted that the discovery had produced no evidence to indicate any such assistance was being provided.  *Id.*  The trial court sustained the objection.  *Id.*

Later, defense counsel orally made a motion for mistrial based on the question.  RT 16261, AG032571.  The court noted that the objection had been sustained and that there had been no answer.  *Id.*  In addition to requesting a mistrial, defense counsel again asked that the court admonish the jury.  *Id.*  In denying the motion for mistrial, the court said:

> Mistrial is not going to be granted, because there's no evidence it was admitted before the jury that harmed anyone. I sustained your objection, so the mistrial is denied.

> The fact there was a question asked that was sustained, they'll be instructed time and again throughout this trial they're not to draw any inference from that . . . .

RT 16261-62, AG032571-72.

The California Supreme Court denied this subclaim, holding that the only harm that could have come from the question was an implication that Price was a member of the AB, which the jury had already heard through Price's own prior testimony in another matter.  *Price*, 1 Cal.4th at 454.

Again, Price has failed to show that the California Supreme Court's denial here

38

was an unreasonable application of clearly established federal law or an unreasonable

determination of the facts on the record before the court.  28 U.S.C. § 2254(d)(1), (d)(2).

Price has not shown that even if this question amounted to misconduct that it prejudiced

him, particularly in light of the court's regular admonishments that unanswered questions

and argument by the attorneys do not constitute evidence.  Accordingly, this subclaim is

DENIED.

### d.    Reference to Defense Counsel's "Sleazy" Tactics

In this subclaim, Price argues that the prosecutor's characterization of one of

defense counsel's questions to Sergeant Frederickson as a "sleazy tactic," impugned the

integrity of defense counsel.  During defense counsel's cross-examination, he asked

Sergeant Frederickson if a police officer had planted a wood chip inside a gun pamphlet

in Price's car.  RT 15486, AG031796.  Police found a "considerable amounts of wood

chips" inside Ms. Hickey's bedroom.  RT 15485, AG031795.  The implication of wood

chips inside Price's car and inside a pamphlet for a type of gun that was stolen from the

Hickey residence was that he had been present at the murder scene.  However, the chip

found inside the gun pamphlet did not match those from Ms. Hickey's bedroom.  RT

15483, AG031793.

When the prosecutor began his re-direct of Sergeant Frederickson, the following

exchange took place:

> Prosecution:  Sergeant Fredrickson, perhaps we can eliminate
> Mr. DePaoli's sleazy -- [sic]
>
> Defense:      I'll --
>
> Prosecution:  Information right up front.
>
> Defense:      Object --
>
> Prosecution:  Did you put the wood chip --
>
> Defense:      And ask that it be stricken.

1

| The Court: | Sustained. Ladies and gentlemen, you're admonished to disregard Mr. Dikeman's implication that there was anything sleezy. [sic] |
| --- | --- |

2

3

| Prosecution: | Sergeant -- |
| --- | --- |

4

| The Court: | Please refrain from that conduct in the future. |
| --- | --- |

5

| Prosecutor: | Yes, your Honor. |
| --- | --- |

6    RT 1594, AG031802.

7        The California Supreme Court found this remark to be improper, but held that

8    Price suffered no prejudice because it was an isolated incident in a very long trial and the

9    trial court issued a "prompt and vigorous" admonition.  *Price*, 1 Cal.4th at 455.  Price

10   argues that the admonition was insufficient to cure the prejudice because it did not advise

11   the jury that defense counsel's line of questioning was proper.  Sec. Am. Pet. at 374.

12   Moreover, Price says that there are necessarily some instances for which an instruction

13   could never cure the prejudice created by an act of prejudicial misconduct and that such

14   a prospect is presupposed by the doctrine itself.  *Id.*

15

16       The prosecutor's statement undoubtedly was improper; however, Price has not

17   shown prejudice.  It was clear from the framing of the question and the fact the next

18   question was an unadorned, "Did you place the wood chip . . . inside the AR-7 pamphlet"

19   that the "sleazy information" to which the prosecutor had referred to previously was the

20   implication that the police had planted the wood chip in an attempt to frame Price.  Price

21   has not shown that such a narrow reference to questioning by defense counsel, even

22   though it was improper and a mischaracterization, so infected his trial as to render it

23   "fundamentally unfair."  *Darden*, 477 U.S. at 181.

24

25

26       As such, he has failed to show that the California Supreme Court's decision

27   denying his subclaim was an unreasonable application of clearly established federal law

28   or an unreasonable determination of the facts on the record before the court.  28 U.S.C.

United States District Court
Northern District of California

40

§ 2254(d)(1), (d)(2).  This subclaim is DENIED.

### e. Loudly Calling Defense Counsel a Liar in the Presence of the Jury

During the testimony of Officer Jim Robison, a discovery dispute erupted between the parties, wherein defense counsel asserted that they had not been provided with a copy of a document about which they had filed several motions.  The parties approached the bench to discuss the matter.  RT 15677, AG031986.

Following lead defense counsel's assertion that he had never received the document, the prosecutor said, "Tell them you got it, DePaoli, don't lie to him anymore.  If he says he hasn't had it, that's a fucking lie."  *Id.*  The trial court ordered the attorneys to take their seats and excused the jurors.  *Id.*

Once the jury left the courtroom, the court admonished both parties to maintain proper decorum befitting an officer of the court.  RT 15678, AG031987.  During that process, defense attorney Klay tried to get the court's attention and the court cut her off, saying, "Ms. Klay, there will be no more."  *Id.*

After a brief recess, the court reconvened with the attorneys to hear argument on the discovery matter.  RT 15681-84, AG031989-92.  Unable to resolve the issue, the court released Officer Robison with the understanding he would resume testimony in the future, ordered the jury to return, and proceeded with the next witness's testimony.  RT 15684-85, AG031992-93.

That afternoon, the court realized that Attorney Klay had attempted to raise the issue that the jury may have heard the prosecutor's accusation that defense counsel was lying and issued an apology to her outside the presence of the jury.  RT 15711, AG032015.  The court then heard more argument on the discovery matter, moved on to argument on an unrelated matter, and then adjourned for the day.  RT 15711-42,

AG032015-45.

The next Monday, just before a morning recess, the court issued an admonishment to the jurors:

> Ladies and gentlemen, before we take that recess, last Friday morning there was during the conference at the bench a comment made by an attorney. Immediately thereafter, the Court recessed to deal with that particular comment.
>
> Some of you may have heard the comment. If you did hear it, you're cautioned that the comment is not evidence in this case and must be disregarded by you.
>
> The Court, I believe, has made it eminently clear to the attorneys that comments along that line are not going to be accepted from this date forward. This is perhaps a product that, including the jury selection process, we've been at this case seven and a [sic] three-quarters months now . . . .

RT 15811, AG032103. The court went on to say, that after having considered the matter over the weekend, it would increase the amount of time during the week that trial was scheduled. RT 15811-12, AG032103-04.

The California Supreme Court found the comment to be inexcusable misconduct. *Price*, 1 Cal.4th 455. It stated, however, that it could find no prejudice resulting from the comment. *Id.* The court said:

> Assuming that the jury was able to overhear the prosecutor's remark, the trial court's prompt and forceful response was sufficient to prevent any reasonable juror from being influenced by the remark in a manner adverse to defendant or his trial counsel. The evidence that prompted the dispute was excluded, and there were no further incidents of this kind.

*Id.*

Price argues that the trial court's admonition could not cure the harm because it was untimely and because it failed to say that the information given to the jury was incorrect or unreliable. Sec. Am. Pet. at 375. Price says that the admonition "did nothing to change the fact that the jury knew the official representative of the People believed defense counsel was a liar." *Id.*

42

"Absent specific evidence in the record, defense counsel should not be maligned." *Williams v. Borg*, 139 F.3d 737, 745 (9th Cir. 1998) (citing *United States v. Frederick*, 78 F.3d 1370, 1380 (9th Cir.1996)).  As concluded by the California Supreme Court, the comment constituted misconduct.  However, Price has failed to show that the state court's finding of lack of prejudice was unreasonable.

The Ninth Circuit has declined to find prejudice in similar circumstances.  *See Sassounian v. Roe*, 230 F.3d 1097, 1106 (9th Cir. 2000) (declining to find prejudice where the prosecutor implied that defense counsel fabricated evidence, the judge sustained objections to the misconduct and instructed the jury that the attorneys' arguments did not constitute evidence, and the misconduct was limited to a few incidents during trial).  While Price takes issue with the trial court's delay in admonishing the jury and the language it used to do so, those concerns do not render the court's admonishment ineffective.  The court could not assume that any juror did hear the statement and would, thus, need to craft a statement that clearly explained that the type of comment made was inappropriate and unacceptable without drawing undue attention to the matter.  Additionally, it is clear that the court's comments came when they did because, after using the weekend to deliberate, the court chose to expand the trial schedule to five days a week to resolve the case before any other similar issues could arise.

Price thus has failed to show that the California Supreme Court's denial of this subclaim was an unreasonable application of clearly established federal law or an unreasonable determination of the facts on the record before the court.  28 U.S.C. § 2254(d)(1), (d)(2).  Accordingly, this subclaim is DENIED.

//

//

43

**f.     Price's Relationship with His Brother**

Price's next subclaim seeks redress for questions the prosecutor asked Price's mother, Mrs. Lloyd, regarding the nature of the relationship between Price and his brother.  These questions, Price argues, constitute prosecutorial misconduct because the prosecutor was attempting to use irrelevant information about family relationships to "cause the jury to think that [Price] was of such bad character that his own brother could not put up with him."  Sec. Am. Pet. at 376-77.  Price claims that the impropriety and prejudice were compounded by the fact that the prosecutor asked two very closely related questions that would have been covered by the same defense objection.  *Id.*

During the re-direct examination of Price's mother, the prosecutor asked her several questions about the Sampo radio Price owned that was listed on the search warrant.  RT 16648-54, AG032927-31.  After discussing Mrs. Lloyd's delivery of the radio to the police following their search of the house, the prosecutor asked, "The reason that Curtis came back to live with you is because Alan and Sherry threw him out of their house, didn't they?"  RT 16654, AG032931.  Defense counsel objected initially on the ground that the question was irrelevant, to which the court explained that it was unsure at that moment whether or not the issue was relevant.  *Id.*  Defense counsel then objected based on the fact the question exceeded the scope of the cross-examination.  *Id.*  The court sustained the objection, saying, "It's certainly hearsay at this point."  *Id.*  Defense counsel asked that the question be stricken, to which the court responded:

> Well, there was no answer. The jury's been instructed all along to disregard any questions to which there's no answer.
>
> You'll draw no inference from that question at this point in time, ladies and gentlemen.

*Id.*

The prosecutor next asked, "Mrs. Lloyd, how would you characterize the

44

relationship between your son Alan Fletcher and Curtis Price?"  *Id.*  Defense counsel

again objected on the basis that the question was beyond the scope of the cross-

examination and the prosecutor tried to establish a relevant timeline for the question.  *Id.*

Defense counsel objected, arguing that the question called for hearsay and was beyond

the scope of the cross-examination.  RT 16655, AG032932.  The court sustained the

objection, noting that it may not call for hearsay but was beyond the scope of the cross-

examination.  *Id.*

The California Supreme Court denied this subclaim finding no misconduct.  *Price*,

1 Cal.4th at 455-56.  Specifically, it found that the nature of Price's relationship to his

brother was a relevant inquiry in light of the fact Price's brother testified that the two had

been living together but Price left after a disagreement and Price's brother purchased the

radio for him as a peace offering.  *Id.* at 456.  The radio was identical to one reported

stolen from Ms. Hickey's house, so the possibility that Price's brother might be angry

enough not to make such an expensive purchase for Price "was a legitimate subject of

inquiry."  *Id.*

Price has failed to show that the California Supreme Court decision denying his

subclaim was an unreasonable application of clearly established federal law or an

unreasonable determination of the facts on the record before the court.  28 U.S.C.

§ 2254(d)(1), (d)(2).  The court sustained the objection to the prosecutor's initial question

by saying, "It's certainly hearsay at this point."  RT 16654, AG032931.  The prosecutor's

next question attempted to elicit the information sought in a way that would not constitute

hearsay.  *Id.*  When the court sustained the defense objection to the second question, it

noted that the question may not have elicited hearsay, but was outside the scope of the

cross-examination.  RT 16655, AG032932.  The record supports an inference that the

prosecutor was seeking to establish a relevant fact, was denied on hearsay grounds,

tried to reframe the question, and then was denied on the basis that the subject matter fell outside the scope of the cross-examination.  Since Price has not shown that it was unreasonable for the California Supreme Court to find no misconduct, this subclaim is DENIED.

### g.      Implying Defense Counsel Sought to Hide Information

This subclaim challenges the prosecutor's questioning of one of the officers who investigated the Triplex Theater robbery.  Price argues that one particular question regarding eyewitness photo composites made it look as though defense counsel was attempting to hide evidence from the jury of witness identifications of Price, when defense counsel was attempting to raise a legitimate evidentiary concern.

During the robbery investigation, the police used a device called "Identi-Kit" that allowed the witnesses to produce a composite photograph of the suspect by using photograph overlays.  RT 15136, AG031510.  The composite was then photocopied and the pieces comprising it were taken apart.  RT 15136-37, AG031510-11.  When the initial composites for witnesses Eiers, Scheffler, and Dahl were done, the photocopy quality was poor and rendered them unusable at trial.  RT 15146-47, AG031521-22.

Reproductions of these three composites were made and, at a later date, the prosecution introduced those into evidence.  RT 15128, AG031503.  Defense counsel objected on the ground that the reproductions were not the best evidence and, therefore, should not be used.  RT 15133, AG031507.  The trial court held a hearing on the matter to understand the reproduction process and the purpose of admitting the composites.  RT 15128-47, AG031503-22.  Ultimately, the trial court allowed admission.  RT 15147, AG031522.

When Officer Waters, the police officer who created the reproductions, re-took the stand following the bench conference, he testified at length on both direct and cross-

46

examination about the process of creating the original Identi-Kit composites, the process of creating the reproductions, and the problems inherent in attempting to reproduce the original composites.  RT 15151-78, AG031523-46.  On re-direct, the prosecutor asked, "Officer Waters, were you aware that the only composites that Mr. DePaoli didn't want the jury to see were those by Ms. Eiers, Ms. Scheffler, and Mr. Dahl?"  RT 15178, AG031546.  Defense counsel did not object.  *Id.*

Price argues that this question constituted prosecutorial testimony "concerning a ruling of law made outside the presence of the jury" and that it made it appear as though defense counsel was seeking to hide information from the jury.  Sec. Am. Pet. at 377. The California Supreme Court held that this claim was waived because trial counsel failed to object to it or request an admonition.  *Price*, 1 Cal.4th at 456.  Price argues that the procedural bar should not hold because counsel would have made matters worse by drawing attention to the matter and no admonition could cure the prejudice.  Sec. Am. Pet. at 377-78.

A federal court will not review questions of federal law decided by a state court if the decision also rests on a state law ground that is independent of the federal question and adequate to support the judgment.  *See Coleman v. Thompson*, 501 U.S. 722, 729–30 (1991).  In cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred.  *See id.* at 750.  The rule cited here by the California Supreme Court, specifically, that a defendant must make a contemporaneous objection at trial in order to preserve an issue on appeal, has been found to be a sufficiently independent and adequate procedural rule to support the denial of a federal petition on grounds of procedural default.  *See Inthavong v. Lamarque*, 420 F.3d 1055, 1058 (9th Cir. 2005); *Paulino v. Castro*, 371 F.3d 1083, 1092–93 (9th Cir.2004); *Vansickel v. White*,

47

166 F.3d 953, 957-58 (9th Cir. 1999).  The subclaim is, therefore, procedurally defaulted.

To overcome the state procedural bar, Price must make a showing that there was cause for and prejudice from the failure to object, or that imposition of the procedural bar would result in a fundamental miscarriage of justice.  *Sawyer v. Whitley*, 505 U.S. 333, 338-40 (1992).  The cause standard requires the petitioner to show that "'some objective factor external to the defense impeded counsel's efforts'" to construct or raise the claim." *McClesky v. Zant*, 499 U.S. 467, 493 (1991) (citing *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).  Objective factors that constitute cause include interference by officials that makes compliance with the state's procedural rule impracticable, and a showing that the factual or legal basis for a claim was not reasonably available to counsel.  *See id.* at 493-94.

A petitioner may show cause by establishing constitutionally ineffective assistance of counsel, but attorney error short of constitutionally ineffective assistance of counsel does not constitute cause and will not excuse a procedural default.  *See McCleskey*, 499 U.S. at 494; *Carrier*, 477 U.S. at 486-88.  To establish good cause on the ground of ineffective assistance of counsel, a petitioner must show that (1) counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment, and (2) the deficient performance prejudiced the defense.  *Loveland v. Hatcher*, 231 F.3d 640, 644 (9th Cir. 2000) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

"[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Strickland*, 466 U.S. at 689 (citation omitted).  Price does not argue that trial counsel was ineffective for failing to object.  Rather, he argues

48

that an objection would have drawn more attention to the matter.  Even if he had argued the failure to object constituted ineffective assistance, within the context of the trial, this decision would have been a reasonable trial tactic.  Thus, Price has not shown cause for his default.

If a state prisoner cannot meet the cause and prejudice standard, a federal court may still hear the merits of the successive, abusive, procedurally defaulted or untimely claims if the failure to hear the claims would constitute a "miscarriage of justice."  *See McQuiggin v. Perkins*, 133 S. Ct. 1924, 1931-32 (2013) (holding that miscarriage of justice (actual innocence) showing applies to claims filed after the AEDPA statute of limitations has run, as well as to successive, abusive and procedurally defaulted claims). By the traditional understanding of habeas corpus, a "miscarriage of justice" occurs whenever a conviction or sentence is secured in violation of a constitutional right.  *See Smith v. Murray*, 477 U.S. at 543-44.  However, the Supreme Court limits the "miscarriage of justice" exception to habeas petitioners who can show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent."  *Schlup v. Delo*, 513 U.S. 298, 327 (1995)

Price has not argued that a fundamental miscarriage of justice would result upon imposition of the bar and has not come close to the requisite showing.  Accordingly, he has not met one of the exceptions to overcome the imposition of the procedural bar.

Even if Price had not defaulted this claim, he cannot prevail because he has failed to show that he was prejudiced by the statement.  The jury was aware that defense counsel did not want those specific composite reproductions entered into evidence because he objected to their admission based on the best evidence rule.  After the court permitted their admission, defense counsel cross-examined Officer Waters at length about their reliability.  Price has not shown that this particular question infected his trial

with unfairness.  *Tan*, 413 F.3d at 1112.  Accordingly, this subclaim is DENIED.

### 4.        Damaging Credibility of Defense Expert Witnesses

Price argues that the prosecutor committed misconduct by attempting to discredit two key defense experts by inappropriate means.

### a.        Revealing Expert's Testimony in Dan White Trial

Price first challenges several questions the prosecutor asked of defense psychiatric expert Dr. Martin Blinder about his hourly rate, his prior testimony in the Dan White trial, and a statement the prosecutor made in closing argument that characterized Dr. Blinder as the creator of the "Twinkie defense."  Price argues that the questions and, more particularly the reference during closing argument, were designed to prejudice the jury against Dr. Blinder, particularly in light of the general public dissatisfaction with the verdict in the Dan White trial.  Sec. Am. Pet. at 378-79.

The defense called Dr. Blinder to testify about domestic homicide syndrome and the psychological profile of someone who might commit a murder under those circumstances.  RT 18362-93, AG034766-800; *see also* RT 18341-43, AG034743-45.  He testified that Mr. Petry exhibited characteristics that lent an inference that Mr. Petry fit that profile and may have, in fact, been the one who murdered Ms. Hickey.

On cross-examination, the prosecutor asked Dr. Blinder several questions about his payment as a defense expert, including how frequently he was paid, his hourly rate, and whether he was paid for his testimony in court.  RT 18387, AG034793.  He also asked Dr. Blinder about whether he had testified in the Dan White trial and whether that case was discussed in Dr. Blinder's recently published book, *Lovers, Killers, Husbands, and Wives*.  RT 18389, AG034795.  Dr. Blinder answered that the case was discussed in the book and the prosecutor then asked if Dan White was "one of those people that [the doctor] would consider to fall into the pattern of the domestic homicide syndrome . . . ."

*Id.* Dr. Blinder answered in the negative. *Id.* The prosecutor moved on to other questions designed to elicit information about scenarios in which a murder has the hallmarks of being committed out of passion, but the killers and victims are not part of a domestic relationship. RT 18389-93, AG034795-800.

During closing argument, the prosecutor said, "We heard from Dr. Martin Blinder, the Dan White psychiatrist, the man behind the 'Twinkie Defense.' . . . . He brought his type-written script and his one hundred twenty-five dollar per hour meter." RT 20341, AG036911. Defense counsel did not object to any of the above-listed questions during the prosecutor's cross-examination or to his statements during closing argument.

Price argues that asking about Dr. Blinder's fee was "unfair impeachment" and that the prosecutor tried to bias the jury against Dr. Blinder based on his participation in the Dan White trial. Sec. Am. Pet. at 378-79. Moreover, Price asserts that the mention of the "Twinkie Defense" referenced facts not in evidence because, while Dr. Blinder testified as to having participated as an expert in the Dan White trial and discussing the case in his book, he never testified as to his participation in the development of that particular defense. *Id.* at 379 n.193.

Price acknowledges that defense counsel failed to make any objections. *Id.* at 379. He argues that the failure to make a contemporaneous objection should not be treated as a waiver of the claim because "the prosecutor's question about the Dan White case was one more instance of a question that supplied its own answer," rendering any sustained objection valueless. *Id.* Moreover, he says that no admonition could have made the jurors forget the prejudicial information they heard. *Id.* at 378-79.

The California Supreme Court denied this subclaim on the merits and as procedurally barred as to the portion of the subclaim regarding Dr. Blinder's participation in the Dan White trial based on the failure to make a contemporaneous objection. *Price*,

United States District Court
Northern District of California

1 Cal.4th at 456.  This denial was not unreasonable.

As noted above, application of the contemporaneous objection procedural bar would prohibit review of a portion of this subclaim.  Even if it did not, Price has failed to show that he prevails on the merits.

It is well-established that a prosecutor may not make arguments calculated to arouse the passions or prejudices of the jury.  *Viereck v. United States*, 318 U.S. 236, 247–48 (1943).  However, "counsel are given latitude in the presentation of their closing arguments, and courts must allow the prosecution to strike hard blows based on the evidence presented and all reasonable inferences therefrom."  *Ceja v. Stewart*, 97 F.3d 1246, 1253–54 (9th Cir.1996).  This wide latitude afforded to prosecutors in arguing reasonable inferences from the evidence extends to attacks on a witness's credibility.  *See Turner v. Marshall*, 63 F.3d 807, 818 (9th Cir.1995) (stating that a prosecutor is permitted to go so far as to "label a witness's testimony as lies or fabrication").

As noted by the California Supreme Court, "an expert's testimony in prior cases involving similar issues is a legitimate subject of cross-examination."  *Price*, 1 Cal.4th at 457.  The information went to Dr. Blinder's credibility as a witness.  To the extent that the prosecutor mentioned that Dr. Blinder created the "Twinkie Defense" in his closing argument, which was not in evidence, any error in presenting facts not in evidence was cured by the trial court's instruction that attorney argument did not constitute evidence.

Moreover, Price cannot show that these references to the Dan White trial rendered his trial so unfair as to violate due process.  Dr. Blinder did testify at the Dan White trial and then wrote about it in the book on which he based much of his testimony in Price's case.

Regarding the prosecutor's questions about Dr. Blinder's rate and method of payment, Price has again failed to show either misconduct or prejudice as a result.  Dr.

United States District Court
Northern District of California

Blinder's rate also goes to his credibility or bias and the questioning was proper.  In

discussing the exact same issue in regards to another of Price's experts, Dr. Shomer, the

California Supreme Court said, "[I]t is not misconduct to question an opponent's expert

witness about payment for services or about the expert's testimony in prior cases

involving similar issues."  *Id.*

Price has not shown that the California Supreme Court's denial of this subclaim

was an unreasonable application of clearly established federal law or an unreasonable

application of the facts.  28 U.S.C. § 2254 (d)(1), (d)(2).  Accordingly, the subclaim is

DENIED.

### b.    Referencing Cases in Which Expert's Testimony Rejected

Price raises similar challenges to the prosecution's question of Dr. Shomer, a

defense expert on eyewitness identifications.  On cross-examination, the prosecutor

asked Dr. Shomer several questions about his rate of pay, whether he received that rate

for any given task, and how many hours he had spent preparing for his testimony.  RT

19113-14, AG035520-21.  Defense counsel did not object to any of these questions.

The prosecutor then asked Dr. Shomer questions about other cases in which he

testified, which side he testified for, and whether he would be surprised to learn that in

cases in which he testified for the defense, that the jurors returned guilty verdicts.  RT

19120-21; AG035527.  The defense objected after the prosecutor asked a second

question about guilty verdicts returned in specific cases.  RT 19121, AG035529.

Price argues that "[i]t is difficult to imagine a legitimate reason that would justify

asking Dr. Shomer about other cases in which he testified" because such information is

"utterly irrelevant" given the different facts and elements of crimes in each case.  Sec.

Am. Pet. at 381.  The California Supreme Court denied the bulk of this subclaim as

procedurally barred based on trial counsel's failure to contemporaneously object.  *Price*,

1 Cal.4th at 457.  As noted above, it also found no misconduct.

For the reasons stated in the above subclaim, Price has failed to show that he is entitled to relief.  Accordingly, this subclaim is DENIED.

### 5.  Revealing Inadmissible Evidence to the Jury

#### a.  Seeking Prejudicial Speculative Answer

Price's next prosecutorial misconduct subclaim asserts prejudice from a question the prosecutor asked former AB member Clifford Smith about who provided defense attorney Anna Klay with information that government officials agreed not to prosecute Mr. Smith's mother for smuggling drugs into prison for him in exchange for Mr. Smith's testimony in Price's trial.  Price says the prosecutor knew this question would prompt Mr. Smith to speculate that Price was the source of the information and that such speculation was prejudicial.  Sec. Am. Pet. at 382.

Prior to agreeing to testify against Price as a prosecution witness, Mr. Smith had cooperated with the defense and even testified for Price at his preliminary hearing. During the course of his cooperation with the defense, Mr. Smith wrote several letters to defense attorney Klay.  A significant number of those letters were not found and produced at trial.

During Mr. Smith's cross-examination, defense counsel inquired into what promises the prosecution had made in exchange for Mr. Smith's testimony, including possible protections that had been put in place for Mr. Smith's family.  RT 14860-60-1, AG031250-51.  When Price's trial counsel asked about whether the prosecution had agreed not to prosecute Mr. Smith's mother in exchange for his testimony, he responded, "No one's mentioned nothing to me about it.  There's nothing to prosecute her for."  RT 14860, AG031250.

The following exchange then took place:

| | |
|---|---|
| Defense: | She ever smuggle dope into the prison for you? |
| Mr. Smith: | No, she has not. |
| Defense: | Ever told the woman there, the lawyer there, she did? |
| Prosecutor: | Indicating Anna Klay? |
| Defense: | Right. |
| Mr. Smith: | I don't believe so, no. |
| Defense: | All right. |
| Mr. Smith: | I may have.  I can't recall. |
| Defense: | Did you ever write a letter saying that? |
| Mr. Smith: | Did I ever write my mother? |
| Defense: | No.  Ms. Klay. |
| Mr. Smith: | No, sir. |
| Defense: | Sure? |
| Mr. Smith: | Yes, sir.  I never wrote no one a letter saying, "Yeah, my mom smuggled me some dope." |
| Defense: | Why would you have told Ms. Klay that if you did? |
| Prosecutor: | Objection.  Assumes facts not in evidence.  Argumentative. |
| Defense: | Said he doesn't remember. |
| The court: | He said he doesn't remember.  I don't know if he told her that.  Just ask him if he recalls the statement to be more specific, but he doesn't recall it at this point. |
| Defense: | Let me ask you that again.  Do you recall whether or not you told Ms. Klay -- |
| Mr. Smith: | I'm sure I didn't. |
| Defense: | Sure you didn't? |
| Mr. Smith: | I'm sure I didn't. |

RT 14860-60-1, AG031250-51.

On re-direct, the prosecutor returned to the issue of whether Mr. Smith ever had

represented to defense attorney Klay that his mother had smuggled drugs into prison on his behalf.  RT 16173-74, AG032490-01.

| | |
|---|---|
| Prosecutor: | You mentioned that . . . now that you've been testifying here, the first time you've been telling the truth in ten years? |
| Mr. Smith: | Well, to law enforcement.  Yeah.  And any court situation, probations reports, investigation reports. |
| Prosecutor: | And Mr. DePaoli was asking you about something about your mother smuggling dope into the prison to you.  Do you know anything at all about this? |
| Mr. Smith: | No, sir. |
| Prosecutor: | Do you think that you could have put it in one of those other ten letters or how many other letters that we haven't seen that you wrote to Anna Klay? |
| Mr. Smith: | No, sir.  My mother never smuggled me no drugs. |
| Prosecutor: | Where would this come -- where did this come from?  Do you have any idea at all? |
| Mr. Smith: | Um, from Curtis Price.  Well -- I'm assuming. |
| The court: | Ladies and gentlemen -- |
| Defense: | Objection. |
| The court: | That assumption you can understand, but that's to be stricken.  It's not to be used by you in any way in deciding this case.  You may proceed, counsel. |

RT 16173-74, AG032490-91.

Price argues that the exchange between the prosecutor and Mr. Smith constitutes prosecutorial misconduct because the prosecutor "must have known that any answer given by Smith would be based on speculation and would probably place the blame on Price."  Sec. Am. Pet. at 382.  Thus, Price concludes, "the question was clearly asked in bad faith in a calculated effort to prejudice Price."  *Id.*  Price adds that the curative

instruction issued by the judge did more harm than good because "the judge chose to lend credence to Smith's speculation by commenting, 'That assumption you can understand . . . .'" *Id.*

The California Supreme Court denied this subclaim finding that Price was not prejudiced by the incident because "[t]he point was peripheral at best, the witness admitted he was speculating, and the court instructed the jury not to use the testimony in any way in deciding the case." *Price*, 1 Cal.4th at 457. Price has failed to show that this denial was unreasonable.

On cross-examination, Mr. Smith admitted that he had lied under oath "maybe three times." RT 14858, AG031248. When defense counsel asked about whether Mr. Smith had told Ms. Klay that his mother had smuggled drugs into prison for him, he was initially equivocal, saying, "I may have. I can't recall." RT 14860, AG031250. Price has not shown that admitted speculation on a tangential point by a self-professed perjurer so infected his trial with unfairness as to violate due process. Additionally, he has failed to show that the trial court's instruction did not cure whatever harm may have resulted from the statement. The jurors were instructed that they were not to use the statement in any way in deciding the case. RT 16174, AG032491.

The trial court's statement, "That assumption you can understand," did not vitiate the effect of the instruction. The testimony regarding Mr. Smith's mother smuggling drugs into prison on his behalf was intended to show that Mr. Smith was predisposed to testify against Price in part to procure some prosecutorial protection for his mother, to whom he was quite close according to his testimony. The person with the most interest in showing Mr. Smith's bias was Price. Therefore, it was understandable that Mr. Smith would turn to Price as the source of the information. However, the trial court's statement did not in any way indicate that the speculation was correct and was followed by strong

57

language about the jury's inability to even consider the statement.  Because Price has failed to show that the California Supreme Court's denial of this subclaim was an unreasonable application of clearly established federal law or an unreasonable application of the facts, it is DENIED.  28 U.S.C. § 2254 (d)(1), (d)(2).

### b.    Questions Regarding Whether Paul Tulleners Was on the AB Hit List

Price next challenges the prosecutor's question to Mr. Smith about whether prosecutorial investigator Paul Tulleners was on the AB hit list.  Price says this question prejudiced him because it was designed to evoke an emotional response from the jury. Sec. Am. Pet. at 383-84.

During the prosecutor's re-direct examination, Mr. Smith testified regarding the fact that he had to be housed in segregation indefinitely following his withdrawal from the AB. RT 16180, AG032497.  Mr. Smith stated that he hoped that after a few years the members of the AB would forget about him and he could be released to the general population.  *Id.*  The prosecutor asked if the members of the organization had long memories, to which Mr. Smith agreed.  *Id.*  The following exchange then took place:

> Prosecution:   Can you tell me now as of the time you left the organization, how many people are on the Aryan Brotherhood hit list?  People designated to be killed?
>
> Mr. Smith:      A whole lot.
>
> Prosecution:   Can you just run me off a couple of names or as many names as you can think of off the top of your head?
>
> Defense:        Objection. Irrelevant
>
> The Court:      Sustained.
>
> Prosecution:   Do you know whether or not Paul Tulleners is on the Aryan Brotherhood hit list?
>
> Defense:        Objection.  Irrelevant.  Ask that it be stricken.

Prosecution: He hasn't answered.

The Court:   Well, he's got a right to object to the answer before it occurs. Sustained.

RT 16180-80-1; AG032497-98.

Price argues that this line of questioning constitutes prosecutorial misconduct because the prosecutor was clearly trying to obtain a conviction based on the jury's emotional response to the answers to these questions and to the AB itself.  Sec. Am. Pet. at 383-84.  Price states that "the prosecutor sought to encourage a conviction not on the basis of evidence of guilt, but on the basis of the type of people with whom Price associated." *Id.*

The California Supreme Court denied this subclaim finding that the prosecutor's line of questioning served a legitimate purpose. *Price*, 1 Cal.4th at 458.  Specifically, the court said:

> The danger the AB posed to witnesses testifying against an AB member had a significant bearing on the credibility and motives of those witnesses. . . . The prosecutor could reasonably conclude that the trial court sustained the first defense objection because the names of persons unconnected with this case would have no relevancy. Because Tulleners had testified, the prosecutor could have believed that inquiry about his status as an AB target would be permitted as bearing on his credibility. Although Smith had defected from the AB, he had done so only after the preliminary hearing in this case, and thus he possessed reasonably current information on the decisions of the AB leadership.  No misconduct is shown.

*Id.*

Price has failed to show that this denial was an unreasonable application of clearly established federal law or an unreasonable interpretation of the facts. 28 U.S.C. § 2254(d)(1), (d)(2).  In light of the more specific evidence regarding AB hit lists and the murder of Richard Barnes, the father of Steven Barnes, an AB member who testified against another AB member, it is hard to see how this particular line of questioning prejudiced Price.  Accordingly, this subclaim is DENIED.

59

### c.   Hearsay Suggesting Price Admitted to Murdering Elizabeth Hickey

Price next challenges the prosecutor's solicitation from Michael Thompson,

another former AB member who testified for the prosecution, information regarding where

a third party, John Stinson, got information about Ms. Hickey's murder.  Price argues that

this questioning constituted prejudicial misconduct.  Sec. Am. Pet. at 386.  Prior to the

challenged questions, the court had ruled that statements from Mr. Stinson regarding Ms.

Hickey's death were hearsay, unless the prosecution came up with additional evidence to

support them.  RT 16951, AG033215.  Price asserts that the prosecutor knew the

information was prohibited and yet sought to introduce it anyway.  He adds that the

information prejudiced him because the inference from the testimony was that Price

admitted to Mr. Stinson that he had killed Ms. Hickey.  Sec. Am. Pet. at 386.

Early in the re-direct examination of Mr. Thompson, the following exchange

occurred:

> Prosecution: You, in your mind, upon finding out that Elizabeth Hickey had been killed, upon finding out her guns had been stolen, her father's guns had been stolen, did you say you linked all of those incidents together?
>
> Thompson: Well, there was a point in time when I initially -- when I talked to Jimmy Hahn, for instance.  I linked them together.  When I talked to Morse and Rock -- what is it -- I keep getting those names confused.
>
> Prosecution: Ross and Morck?
>
> Thompson: Thank you.  When I talked to them, I grouped them together.  They weren't interested in Elizabeth Hickey. To me, Hahn wasn't interested in Elizabeth Hickey. They were interested in Richard Barnes.  It wasn't until I talked to Brown and Moench that I was asked specific questions about that, and it was at that time that we got into it, and then there is no confusion. There was no linking together. There was no grouping together.  I made the distinction that Mr. Moore had been burglarized and Elizabeth Hickey had

United States District Court
Northern District of California

|  |  |
|---|---|
|  | been killed after Richard Barnes. |
| Prosecution: | How did you get all this information? |
| Thompson: | John Stinson. |
| Prosecution: | And do you know where Stinson got the information? |
| Thompson: | Yes, Curtis Price. |
| Defense: | Objection, your Honor.  That calls for hearsay. He doesn't know that. |
| Prosecution: | Do you know that personally?  Is that what you were told, I mean? |
| Thompson: | Yes. |
| Prosecution: | Told by whom? |
| Thompson: | Stinson. |
| The court: | Ladies and gentlemen, based on that testimony, you will disregard the source of Mr. Stinson's representations to Mr. Thompson, and they are not to be considered by you.  Go ahead, Counsel. |

RT 17131-32, AG033397-98.

The California Supreme Court denied this subclaim, holding that the incident did not amount to prejudicial misconduct because "[n]o reasonable juror would interpret the statement [that Stinson got his information from Price] as an implied confession to the Hickey murder." *Price*, 1 Cal.4th at 458.  The court found that at most it showed that Price "was aware of the crime, had some knowledge of the circumstances, and realized that the police had or might connect it to the AB." *Id.* at 459.  It also noted that even if Price had been innocent of the murder, at the time in question, he would have been aware of its occurrence. *Id.*

Price has failed to show that this is an unreasonable application of clearly established federal law or an unreasonable application of the facts.  28 U.S.C. § 2254(d)(1), (d)(2).  According to Mr. Thompson, the only information Price passed on to

61

United States District Court
Northern District of California

Mr. Stinson was the timeline of Ms. Hickey's murder.  An inference could be reached that such information came in the form of a confession; however, the California Supreme Court's holding that no reasonable juror would reach that conclusion is not one with which every fair-minded jurist would disagree.  *See, Harrington*, 562 U.S. at 101.  Accordingly, this subclaim is DENIED.

### d.    Offer of Proof Regarding Converted Gun

The next subclaim challenges the prosecutor's statement in front of the jury that he wanted Bruce Jennings, owner of the Jennings Firearm Company, to dismantle a gun manufactured by his company and owned by defense witness Becky Williams and testify to markings that showed it had been modified in an attempt to convert it into an automatic weapon.  Price argues the prosecutor's response to the defense's question as to the relevance of dismantling the gun on the stand constituted prejudicial misconduct because defense counsel was unable to anticipate the prejudicial nature of the prosecutor's response.  Sec. Am. Pet. at 388.  Price states that it is unreasonable and unworkable to expect defense counsel to have to demand an opportunity to approach the bench each time the prosecutor says something that is not a direct question to a witness.  *Id.*

The prosecution called Mr. Jennings to impeach Ms. Williams's testimony regarding a gun she said she had inherited from her grandfather in 1975 and that she claimed to not know how to operate.  RT 19780, AG036242; RT 19781, AG036249.  The prosecutor asked Mr. Jennings if he would disassemble the weapon on the stand.  RT 19782, AG036250.  Defense counsel objected on relevancy grounds.  *Id.*  The prosecutor indicated that were markings on the inside that could help establish the timeframe of manufacture, as well as an attempted modification to the weapon that could be seen only when the handles were removed.  RT 19782-83, AG036250-51.  Defense counsel again objected, saying, "And what's the relevance of that?"  RT 19783, AG036251.  The

following exchange then took place:

> Prosecution: I think he will be able to testify that somebody apparently modified this weapon in the mistaken belief they could turn it into an automatic weapon.
>
> Defense: And what's the relevance of that? Same objection.
>
> Prosecution: Certainly explains why it needed to be repaired.
>
> Defense: This weapon --
>
> The Court: Just a minute. Do you want to come to the bench, please.

*Id.*

The court then held a bench conference wherein the attorneys discussed the probative versus prejudicial impact of having Mr. Jennings testify to the modification. The court ultimately ruled that Mr. Jennings could disassemble the gun and testify as to the markings that established the date of manufacture, which Mr. Jennings placed at late 1981 or early 1982, and the fact the gun had been rendered inoperable, which necessitated repair, but that he could not testify as to the attempted modification to make the weapon automatic. RT 19784, AG036252.

The California Supreme Court denied this subclaim finding that there was no misconduct because evidence that someone had tampered with the weapon was relevant to contradict Ms. Williams's testimony that she did not understand how guns worked and had never fired one. *Price*, 1 Cal.4th at 459. The court added, "Although the apparent purpose of the modification may have been irrelevant, the court's action in sustaining the objection was sufficient to avert any possible prejudice on this minor point." *Id.*

Price has failed to show that this denial was an unreasonable application of clearly established federal law or an unreasonable interpretation of the facts. 28 U.S.C. § 2254(d)(1), (d)(2). While he says that it was prejudicial, he fails to argue how the

63

response prejudiced him.  He has not shown the remark infected his trial with unfairness.  Accordingly, this subclaim is DENIED.

### 6.      Miscellaneous Misconduct

Price's next two subclaims assert that the prosecution was willing to violate court orders and unwilling to cooperate with the defense in a way that would render Price's trial fair.  Because Price either concedes a lack of prejudice or fails to assert concrete prejudice resulting from the incidents, the following subclaims are denied.

### a.      Prosecutor's Inability to Demonstrate Relevancy of Question After Attesting He Could Do So

Price challenges the prosecutor's response to a defense objection during the cross-examination of Mrs. Lloyd about a family friend who lived in Michigan.  Specifically, the following occurred:

> Prosecution: How is it that you had contact with Ms. Markley in Flint, Michigan?
>
> Defense:     I think we have already a court ruling that this is too time consuming and is irrelevant.
>
> Prosecution: Now, I think I can tie it to something specifically that Mr. DePaoli asked on cross. I think his objection before was that it was outside the scope.
>
> Defense:     It is outside the scope.
>
> The Court:   Do you want to approach the bench?
>
> (The following was held at the bench.)
>
> The Court:   What is it that you can tie it to?
>
> Prosecution: Well, I'm simply curious. She says this lady is a family friend, yet she's indicated that her residence at least or domicile for eighteen years has been Eureka, Humboldt County, California. - I -- I find it a little interesting that you've got a family friend when you argue you have never been to Michigan.
>
> The Court:   What issue does it go to in this case?

Prosecution:  I can't think of any right now.

The Court:     Curiosity is not going to kill the cat then.

RT 16687-88, AG032961-62.

Price admits that he was not prejudiced by this exchange.  Sec. Am. Pet. at 389. He states that the prosecutor's false assertion of relevancy made it seem to jurors as though the defense was again hiding something from them and "demonstrates how far the prosecutor was willing to go in order to accomplish his improper goals."  *Id.*

The California Supreme Court denied this subclaim based on Price's own admission of lack of prejudice resulting from the incident.  *Price*, 1 Cal.4th at 460. Prejudice is a required component in showing an entitlement to relief on a prosecutorial misconduct claim.  *Johnson*, 63 F.3d at 929.  Price has conceded that he cannot show an essential element of his claim, thus he cannot show that the California Supreme Court's denial of this subclaim was unreasonable in any respect.  Accordingly, this subclaim is DENIED.

### b.    Prosecution's Lack of Cooperation in Timely Revealing Witnesses Scheduled for Following Trial Day

The next subclaim asserts that the prosecutors acted in bad faith when they advised defense counsel that they were not prepared to disclose the list of witnesses scheduled for the next trial day so that defense counsel could prepare over the weekend.

At the close of testimony on a Friday, prior to a three-day weekend, defense counsel requested a list of witnesses for the upcoming week, to which both prosecutors responded, "No."  RT 11822, AG028424.  Mr. Dikeman then took over the discussions saying that they had yet to determine the week's line-up and said they would advise defense counsel of the witness list on Monday by 5:00 p.m.  *Id.*

After some argument back and forth about who might have that information, the

court directed the prosecution to have "something" to defense counsel by 5:00 p.m. that day. RT 11823, AG028425. The court then began discussions about who might be next to testify based on the need to bring a particular witness back to conclude his testimony. *Id.* Mr. Dikeman offered that he thought that witness Pizzuto would follow Sargeant Ross. *Id.* Mr. Bass then stepped in and said, "No question. I'm sorry, I wasn't listening. Pizzuto, Stovall. . . . Pam Scheffler." *Id.*

The court concluded that those witnesses would consume the entirety of the trial time on Tuesday. *Id.* The prosecution asserted that they were unable to advise the defense of the rest of their witness list at that point. *Id.*

Price asserts that this incident is another example of the prosecution acting in bad faith, as evidenced by counsel's ability to quickly name the next three witnesses. Sec. Am. Pet. at 389-90. He adds that because so many prosecution witnesses were from out of town that it was simply unbelievable that they would not know who was testifying when. *Id.*

The California Supreme Court denied this claim finding "no inconsistency" in the prosecutors' statement that they could not advise the defense at that time of the next week's line-up. *Price*, 1 Cal.4th at 460. "The prosecutors apparently knew the witnesses they intended to call first, but not the witnesses for the full week." *Id.* The court also found that no prejudice resulted. *Id.*

Price does not allege any prejudice resulted from this incident. Again, prejudice is a required component of showing eligibility for relief on a prosecutorial misconduct claim. He, thus, cannot show that the California Supreme Court denial of his claim was an unreasonable application of clearly established federal law or an unreasonable application of the facts. 28 U.S.C. § 2254(d)(1), (d)(2). Accordingly, this subclaim is DENIED.

7.     **Closing Arguments**

Price cites seven comments made during the prosecution's closing arguments that he asserts constitute misconduct.  Sec. Am. Pet. at 390-93.  Each of these claims was deemed by the California Supreme Court to be waived because defense counsel failed to contemporaneously object and seek an admonition, which the court said would have cured any prejudice.  *Price*, 1 Cal.4th at 460.  Price argues that defense counsel failed to object because they were following the trial court's instruction "discourag[ing] all counsel from interrupting the arguments of their opponents with objections."  Sec. Am. Pet. at 390.

The trial court instructed the attorneys as follows:

> . . . I'm hoping that since I've given the instructions beforehand, we can get through without interruptions unless there's some gross misstatement of the law.
>
> I would ask that if there's some problem that can't be solved by waiting, that you ask to approach the bench so that we don't get into some big hassle.
>
> I am trying to prevent either side from being interrupted and losing their train of thought.
>
> I can tell you that as to factual differences, I would probably simply tell the jury that they will be the judge of whether or not what you're arguing is correct or not so that the main thing I would be concerned about is misstatements of the law.
>
> Since I've just given the law, I would hope that there will be no misstatements.

RT 20318-19, AG036884-85.

During the prosecution's rebuttal to the defense's closing argument, the defense requested to approach the bench, to which the trial court responded, "No."  RT 20915, AG037505.  Price cites this as confirmation that the judge "meant what he said" in his order directing the attorneys not to interrupt each other's argument.  Sec. Am. Pet. at 391 n.207.  The defense did not renew its request to approach the bench following the

67

conclusion of the prosecution's rebuttal.

However, this was not the only time that defense counsel requested an opportunity to approach the bench to challenge something the prosecutor said. For example, during the prosecution's initial closing, the defense requested to approach the bench and that request was granted. RT 20876, AG037466. Defense counsel challenged the prosecution's reference to a creed written by one of the witnesses about the AB. *Id.* The prosecution believed that the creed had been entered into evidence and the defense thought it had been excluded. RT 20876-77, AG037466-47.

Because the trial court was unclear what had happened with the admission of the creed and thought it possible it had been entered into evidence erroneously, it instructed counsel to move on to another area and noted that it would investigate the matter over the lunch recess. RT 20877, AG037467. The trial court then went on to instruct the jurors that it had asked "Mr. Bass to go on to another area because the Court's record may be in error." *Id.* This shows that the trial court did not have a clear zero-tolerance policy to objections during closing arguments and defense counsel clearly raised more than one objection during the prosecution's closing. Thus, Price has failed to show cause and prejudice sufficient to overcome the imposition of the procedural bar and these subclaims are, therefore, defaulted.[5]

However, even if the subclaims were not defaulted, Price has failed to show that he is entitled to relief on any of them. Thus, they will be denied for the following reasons.

### a.      Discussion of Flight as Consciousness of Guilt

Price asserts that the prosecutor committed misconduct by discussing in closing argument evidence of consciousness of guilt when the jury had received no instruction on

---

[5] The adequacy and independence of California's contemporaneous objection bar is discussed in section 1.C.3.g, above.

United States District Court
Northern District of California

the legal theory and defense counsel had objected to such an instruction.

During a conference on jury instructions, the prosecutor requested that CALJIC 2.52, an instruction on flight as consciousness of guilt, be given.  RT 20070-1, AG036599.  The defense objected.  *Id.*  The parties then discussed whether or not there was sufficient evidence of flight following the Richard Barnes murder to warrant the instruction.  RT 20070-1-72, AG036599-603.  The court took the matter under submission and agreed to deal with it at a later time following further research.  RT 20072, AG036603.

The record does not reflect that the court ever took up the matter again and the instruction was not read to the jury.  Despite the fact no agreement appears to have been reached on the matter and the instruction was not read to the jury, during closing argument the prosecutor said, "Flight, running away, leaving -- you know -- the scene of a crime right after a crime has been committed, that's another kind of negative evidence." RT 20334, AG036905.  The prosecutor went on to tie this principle to the robbery, as opposed to the Barnes murder for which he originally requested the instruction.  RT 20334-35, AG036905-06.  Price has not argued nor shown that the prosecutor's statement regarding the consciousness of guilt arising from flight prejudiced him.

At the beginning of his argument, the prosecutor said:

> If anything that I say about the law which you're to apply in this case differs from the law that Judge Buffington just gave you, disregard what I say about the law or, for that matter, what Mr. DePaoli or Ms Klay might say about the law, because the only law in this case is the law as the judge gave it to you.

RT 20320-1, AG036887.

While the prosecutor did speak to an instruction that was not given, he explicitly told the jury to disregard anything he said that did not comport

United States District Court
Northern District of California

1  with the instructions provided by the trial court.  Thus, Price has failed to

2  show an entitlement to relief and this subclaim is DENIED.

3        **b.**    **Discussion of Charges Against Wendell Norris**

4        The next subclaim challenges the prosecutor's improper use as impeachment

5  evidence of felony charges against defense witness Wendell Norris that were ultimately

6  reduced by the court wherein the convictions occurred.  Specifically, the prosecutor said,

7  "The murder second was reduced by the court from murder first. And the escape was, I

8  think, a kidnapping for ransome [sic] that was also reduced by the court."  RT 20368,

9  AG036934.  Price argues that this constituted misconduct, though he does not argue that

10  such misconduct prejudiced him.

11        Under California law, use of prior felony convictions for impeachment purposes

12  "must be limited to identification of the conviction."  *People v. Schader*, 71 Cal.2d 761,

13  773 (1969).  Price has not argued nor shown that the prosecutor's remarks prejudiced

14  him.  More damaging to Mr. Norris's credibility than improper mention of his felony

15  charges being reduced by the trial court was the testimony and supporting evidence that

16  Mr. Norris was a leader of the AB, which directly contradicted his testimony that the AB

17  was a social group with no formal structure.  Additionally, the jury was instructed that

18  "statements made by the attorneys during trial are not evidence."  RT 20282, AG036844.

19  Because Price has failed to show any prejudice resulting from the prosecutor's argument,

20  this subclaim is DENIED.

21        **c.**    **Comments on Price's Absence from Trial**

22        Price cites three statements made by the prosecutor during closing arguments

23  about Price's absence from trial as prejudicial misconduct.  The first statement occurred

24  in the following context:

25        And when asked to look around the courtroom and see if he

saw anyone who appeared similar to the robber, he did.  And he identified somebody in the courtroom as being similar to the robber.  And that was the defendant, Curtis Floyd Price.

*Thereafter, we didn't have the pleasure of Mr. Price's company in this courtroom.*

RT 20403, AG036966 (emphasis added).

The second such statement occurred during this portion of the argument:

None of these people could say, "No, that's not him." *That's until he stopped bothering to drop by the courtroom.*  None of them could say that, but then again, none of them could say positively -- positively, one hundred percent positive that it's him.  And how could you say that about me?

RT 20870, AG037460 (emphasis added).

The final statement was, "Height, weight, build, facial structure, everything. People coming off the witness stand looking at Price right in the face *before he stopped dropping by* and saying, 'I can't see any difference.'"  RT 20902, AG037492 (emphasis added).

Price argues that through these statements, the prosecutor implied that Price had stopped coming to trial "in order to deprive witnesses of the opportunity to identify him," though the prosecutors knew the true reason why Price refused to attend the guilt phase of his trial.  Sec. Am. Pet. at 392.  He has not carried his burden.  Price does not argue how this prejudiced him or cite any authority to support his entitlement to relief on this point.

As noted in the analysis of subclaim 1.C.3.a., above, there is no clearly established federal law that would entitle Price to relief on this claim.  *See Pinholster*, 563 U.S. at 181 (2011) ("clearly established federal law" is that determined by the United States Supreme Court).

Again, as noted, the Ninth Circuit has held that comments on a non-testifying defendant's behavior can violate his Fifth Amendment due process rights.  *See Schuler*,

71

813 F.2d at 981.  Price has not argued that his case fits within the framework of *Schuler*, nor does the Court so find.  Price was not denied a curative instruction by the trial court.  Rather, he failed to seek one.  Had Price's counsel objected in the first instance to the prosecutor's comments, he could have prevented any further such statements.  He also could have requested a curative instruction.

While the prosecutor's comments were improper, the Court cannot say that they so infected Price's trial with unfairness as to violate due process.  Each of these statements occurred within the context of the prosecutor's discussion of positive identifications that had been made.  More than any statement about Price's decision to abstain from attending the remainder of his trial, the positive identifications of Price that were made point to his guilt of the crimes for which he was charged.  Because Price has failed to show prejudice as a result of these statements, this subclaim is DENIED.

### d.     Comments on Becky Williams's Illness

Price next challenges the prosecutor's reference to Ms. Williams's absence from trial due to illness.  In his initial closing argument, the prosecutor said, "We had subpoenaed Becky Williams to testify.  Becky, all of a sudden, comes up sick or something."  RT 20826, RT 037415.  Price argues that this constitutes misconduct because it improperly refers to facts not in evidence and "was an obvious effort to imply that she was attempting to avoid testifying during trial."  Sec. Am. Pet. at 392.

The fact of Ms. Williams's illness was in evidence before the jury.  During her cross-examination, the following exchange took place:

> Prosecution: You received a subpoena from the People to come to this court and testify in this case?
>
> Ms. Williams: Yes, I did.
>
> Prosecution: And you were unable to attend because you had taken ill; is that correct?

Ms. Williams: That is correct.

RT 19300-1-19300-2, AG035699-700.

This exchange was followed by the prosecution's questioning Ms. Williams about how many times she had spoken with defense attorney DePaoli in 1984 and 1985 and whether, shortly after she had taken ill and was unable to testify in the prosecution's case-in-chief, arrangements had been made to have her testify as a defense witness.  RT 19300-2, AG035700.

In addition to being in evidence, the matter goes to Ms. Williams's credibility and bias.  There was no misconduct.  Accordingly, this subclaim is DENIED.

### e.    Discussion of Discovery Rules

The next subclaim concerns the prosecutor's assertion that the defense received all of the evidence the prosecution had; however, the defense was not obligated to perform a similar exchange of discovery.  Specifically, the prosecutor said, "The defense gets everything we have in the way of discovery, police reports. As soon as we get anything, you know, has to go to them. It's a one-way street incidentally. We don't get advance discovery on the defense."  RT 20874, AG037464.  Price asserts that this is an "improper comment on the privilege against self-incrimination" and was untrue in light of the prosecution's failure to turn over evidence to the defense.  Sec. Am. Pet. at 392.

The prosecutor's comment did not address Price's decision not to testify.  It preceded a discussion about Ms. Williams's failure to testify at the preliminary hearing to the exonerating information she had.  RT 20874, AG037464.  The prosecutor noted that if she had testified, they could have investigated and discovered sooner impeachment evidence such as the manufacture date of the gun she claimed to have inherited from her grandfather.  *Id.*  It is clear from the context of the prosecutor's statement that he was not commenting on Price's Fifth Amendment rights.

Price has offered no legal authority to support his entitlement to relief on this subclaim, nor has the Court found any.  The prosecutor's comment, when viewed in context, does not constitute misconduct.  Additionally, Price has failed to argue or show any prejudice resulting from the statement.  Accordingly, this subclaim is DENIED.

### f.    Discussion of Mrs. Lloyd's Calendar

In this subclaim, Price challenges as misconduct the prosecutor's disclosure that Price's mother, Mrs. Lloyd, refused to hand over her calendar to the prosecution after initially agreeing to do so.  Mrs. Lloyd had attempted to provide some alibi information for Price and claimed to have written pertinent notes about dates he was with her in her calendar.  During his rebuttal argument, the prosecutor said, "I remember that she was going to bring that in and then refuses to give it to us out in the hallway."  RT 20923, AG037513.  Price argues that this constitutes prejudicial misconduct because it refers to facts not in evidence.  Sec. Am. Pet. at 392-93.

Price is correct that whatever occurred in the hallway was not put before the jury. What the jury did hear was the following exchange with Inspector Brown:

> Prosecution: You were in court the other day when Mrs. Lloyd indicated that she would be willing to go with you and Mr. DeLong and look for some calendars from 1981 and 1982, I believe; is that correct?
>
> Insp. Brown: Yes, that's correct.
>
> Prosecution: Since that time, have you tried both in person and by telephone to make arrangements with Mrs. Lloyd to conduct that particular search?
>
> Insp. Brown: Yes, I have.
>
> Prosecution: And have you been at all successful in making any arrangements with Mrs. Lloyd to conduct that search?
>
> Insp. Brown: No, I have not.

RT 17701, AG034056.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Price has failed to show how the hallway comment prejudiced him.  The jury was already aware of Mrs. Lloyd's lack of cooperation with the prosecution regarding searching for or surrendering any additional calendars that she may have had in her possession.  The statement amounted to one passing comment in what was a substantial argument in both the initial and rebuttal closing arguments about the problems with the quality and credibility of the calendar she did produce.  Accordingly, this subclaim is DENIED.

### g.    Vouching for the Credibility of Clifford Smith

The final subclaim for this prosecutorial misconduct claim asserts that the prosecutor committed misconduct during the closing argument by vouching for prosecution witness Clifford Smith.  The prosecutor said:

> God, what a great witness.  That's my opinion.  If you don't feel that way, you think that Clifford Smith was a lying whatever, that's fine because you are now the judges.  You can throw his whole testimony out.  Thompson's, everything because you have all the power to do whatever you want; but [don't] do it arbitrarily.

RT 20847, AG037437.

Price argues that the first two sentences constitute improper vouching for the credibility of the witness.  Sec. Am. Pet. at 393.

As a general rule, "a prosecutor may not express his opinion of the defendant's guilt or his belief in the credibility of [government] witnesses."  *United States v. McKoy*, 771 F.2d 1207, 1211 (9th Cir. 1985).  Improper vouching for the credibility of a witness occurs when the prosecutor places the prestige of the government behind the witness or suggests that information not presented to the jury supports the witness's testimony. *United States v. Young*, 470 U.S. 1, 7 n.3, 11-12 (1985).

In this instance, while the prosecutor did express an opinion that Mr. Smith was a

75

"great" witness, he then went on to direct the jury to make their own determination about Mr. Smith's credibility. Following the passage quoted above, the prosecutor said, "Look at the facts. Look at what was said and then do what your common sense and the law and everything else tells you to do . . . ." RT 20847, AG037437. The prosecutor thus directed the jury to evaluate Mr. Smith's credibility based on the factors on which they should base such a determination, not based on his opinion. Moreover, the prosecutor never intimated that there were facts beyond the jury's knowledge that supported Mr. Smith's testimony. Accordingly, Price has failed to show that the prosecutor committed prejudicial misconduct and this subclaim is, therefore, DENIED.

## II.      Claim XII - Prosecutorial Misconduct During Penalty Phase

As with Claim XI, Prices alleges multiple incidents of prejudicial prosecutorial misconduct that occurred, this time during the penalty phase of his trial. Each was raised on direct appeal and was either addressed on the merits and denied or found to be precluded due to waiver by the California Supreme Court. *Price*, 1 Cal.4th at 479-485. The specific reasons for the state court's denial of each subclaim are set out below.

### A.      Questions of Previous Victims of Price's Crimes Regarding Parole

Price argues that the prosecutor's questions to two sheriff's department officers from Montana regarding their opposition to Price's parole from a Montana state prison for a crime he committed against them constituted prejudicial misconduct because the questioning (1) called for a prediction of future dangerousness, (2) sought the emotional reaction of a previous crime victim, (3) was irrelevant because Price's suitability for parole was not an issue before the jury, and (4) was irrelevant because the officers were not experts on Price's parole suitability. Sec. Am. Pet. at 395-396. The first officer, Gerald O'Bresley, testified that in December 1971, while transporting Price in Montana with other prisoners, Price disarmed Officer O'Bresley and his colleague, William Farago, and

76

forced them into the trunk of their car.  On re-direct, the prosecutor asked Officer

O'Bresley, "[D]id you have occasion to draft a letter to parole authorities in Montana

recommending that they not release this particular man?"  RT 21608, AG037907.

Defense counsel's objection on the ground the question exceeded the scope of cross-

examination was sustained.  *Id.*

Officer Farago, Officer O'Bresley's colleague, testified next.  On re-direct, the

prosecutor asked him if he had written to the Montana Board of Pardons regarding

whether Price should receive parole.  RT 21623, AG037925.  Price's counsel again

objected on the ground the question exceeded the scope of cross-examination, which

was sustained.  *Id.*  In addition to the claims noted above, Price argues that the

prosecutor should have been on notice during Officer Farago's re-direct that such a

question was improper because the court sustained an objection to an identical question

during Officer O'Bresley's re-direct.  Sec. Am. Pet. at 396.

The California Supreme Court held that the questioning was "not so plainly

improper as to constitute misconduct."  *Price*, 1 Cal. 4th at 479.  It noted that evidence of

the "emotional effect of defendant's prior violent criminal acts on the victims of those acts"

was admissible under state law.  *Id.*  Moreover, it found that the questions were not

necessarily a prediction of future dangerousness, as Price asserts, but could be

construed as an assessment of the seriousness of Price's past criminal conduct.  *Id.*

Lastly, the court held that the sustained objection to the first question did not put the

prosecution on notice that they could not ask the same question to a different witness

subjected to different cross-examination.  *Id.*

Price has failed to show that this decision is unreasonable.  Even if the questions

constituted misconduct, he has not shown that he was prejudiced by them.  Both

witnesses were not given the opportunity to answer the questions because the trial court

sustained the relevant objections.  As noted in the analysis of Claim XI, above, the trial court instructed the jury that a question to which an objection is sustained and no answer is given does not constitute evidence and is not to be considered by the jury.  The jury is presumed to have followed that instruction.  *Greer*, 483 U.S. at 766 n.8.  Accordingly, this subclaim is DENIED.

B.      **Prosecution's Reference to the Banks Killing as "Murder"**

In this subclaim, Price challenges the prosecutor's characterization of Price's prior killing of a fellow prisoner, Leroy Banks, as "murder."  Sec. Am. Pet. at 397.  He argues that the prosecutor should have used a neutral term such as "killing" or "homicide" in front of the jury.  *Id.*  More problematic, Price asserts, was the prosecutor's subsequent sarcastic reference to the incident as an assault.  *Id.* at 397-98.

Officer Perryman, who worked as a correctional officer at San Quentin while Price was incarcerated there, testified on direct that he witnessed Price stabbing Mr. Banks.  RT 21822, AG038150.  On re-direct, the prosecutor asked about racial tension on the tier following the stabbing of Mr. Banks.  RT 21853, AG038912.  Officer Perryman responded, "[T]here was tension just because there was a murder in that housing unit."  RT 21854, AG038913.  Defense counsel objected to the use of the word "murder" and asked that it be stricken.  *Id.*  The prosecution replied, "I don't know what else it could be characterized as."  *Id.*  The court sustained the objection and struck the word murder, stating that for the time being it would be referred to as an assault.  *Id.*

Later, the prosecutor referred to the killing as "this assault as the judge called it."  RT 21860-1, AG038200.  Defense counsel's objection was sustained.  Price argues that this statement was a willful refusal to abide by the court's earlier instruction to refer to the killing as an assault.  Sec. Am. Pet. at 398.

The California Supreme Court stated that the prosecutor's suggestion that the

United States District Court
Northern District of California

1    Banks killing could only be characterized as murder was premature because the

2    prosecution had failed to establish all the elements of murder. *Price*, 1 Cal.4th at 480.

3    The court ultimately held that Price had failed to show prejudice because there was

4    sufficient evidence supporting a finding of murder based on the testimony of Officer

5    Perryman and that of Ricky Carpenter, a fellow prisoner at San Quentin who testified that

6    Price told Mr. Carpenter that he intended to kill Mr. Banks and asked Mr. Carpenter to

7    point out Mr. Banks. *Id.* Moreover, the court found that Price failed to offer any evidence

8    that would demonstrate that the killing should be mitigated to any lessor homicide. *Id.*

9

10        The California Supreme Court's denial of this subclaim was not unreasonable.

11   Petitioner failed to establish prejudice from these incidents. The trial court instructed the

12   jury that it was to determine from the facts what actually had occurred. RT 21854,

13   AG038193. The jury is presumed to have followed that instruction. *Greer*, 483 U.S. at

14   766 n.8. This subclaim is, therefore, DENIED.

15        **C.    Prosecutor's Questioning Regarding Price's 1971 Montana Conviction**

16

17        Next, Price argues that the prosecutor improperly abridged a court ruling not to

18   discuss the specifics of Price's 1971 Montana conviction until rebuttal when he cross-

19   examined a defense witness about the incident in an attempt to impeach that witness's

20   testimony about the time frame in which he knew and interacted with Mr. Price. Sec. Am.

21   Pet. 398-401. Price asserts that this willful misconduct warranted a mistrial. *Id.* at 401.

22        The trial court excluded statements relating to Mr. Price's 1971 Montana robbery

23   conviction, finding the conviction constitutionally infirm. CT 5602-03, AG005353-54.

24   However, the court ruled that the facts of the violent acts underlying the conviction could

25   be used on rebuttal. CT 10284, AG009586

26

27        The defense brought forward a San Quentin correctional officer to testify as to

28   Price's good behavior in prison. During cross-examination, the prosecution asked the

79

United States District Court
Northern District of California

guard if he knew that "the guy we have here in this courtroom was arrested with a gun, high-speed chase and everything at the time you say he was working in the mess hall in San Quentin." RT 22066, AG038427. Defense counsel objected and at a subsequent bench conference requested a mistrial. *Id.*; RT 22070, AG038431. The court denied the motion and offered to issue an admonishment, though it noted that doing so might draw undue attention to the issue. RT 22070, AG038431. No admonishment was ever given.

During cross-examination of Mr. Price, the prosecutor asked if on April 17, 1971, Mr. Price had robbed a grocery store by pointing a gun at the clerk. RT 22419, AG038823. The defense objected and the court allowed the questioning. *Id.* The prosecutor then went on to ask detailed questions about the robbery and the high-speed chase that ensued. RT 22420-20-4, AG038824-28.

The California Supreme Court held that mention of the Montana conviction during cross-examination of the San Quentin guard was not improper because the state trial court's ruling "did not bar reference to the incident during otherwise proper cross-examination of defense witnesses, as shown by the court's later ruling during cross-examination of defendant." *Price*, 1 Cal.4th at 481. The court added that even if the question was improper, Price was not prejudiced by the questioning of Correctional Officer Larry because Price himself later offered a more detailed account of the events surrounding the conviction. *Id.*

Price argues that the California Supreme Court's "conclusion was based on unreasonable determinations and assumptions." Op. Br. at 9. Price states that "the introduction of this (then inadmissible) evidence through a defense witness was obviously prejudicial." *Id.* He makes no mention of which determinations and assumptions he considers unreasonable. Moreover, Price does not address the California Supreme Court's holding that the state court ruling did not bar reference to the 1971 Montana

80

incident during proper cross-examination of a defense witness.  *Id.*; *Price,* 1 Cal.4th at 481.

Price has failed to show that the California Supreme Court's decision was unreasonable.  Even if the question had constituted misconduct, he could not have been prejudiced by it because he himself gave a much more detailed account of the events. Accordingly, this subclaim is DENIED.

### D.    Questioning of Witnesses Leading to Introduction of Inadmissible Facts

In this subclaim, Price challenges five incidents in which he asserts that the prosecutor committed prejudicial misconduct by implying facts in his questions to witnesses that the prosecution later failed to prove.  The California Supreme Court found four of these incidents waived for failure to object or to object on the grounds asserted in the appeal.  *Price*, 1 Cal.4th at 482.  As Price has not made cause and prejudice or fundamental miscarriage of justice arguments to overcome the imposition of the procedural bars, these subclaims are procedurally defaulted.  However, as with the defaulted subclaims in Claim XI, above, the Court will consider the merits.

### 1.    Questions Regarding Price's Transfer from Montana State Prison After a Fire

Price called Fred Perry, a fellow inmate from his time in Montana State Prison, to testify regarding the conditions of confinement there.  During cross-examination, the prosecutor asked how soon after a fire there had Perry, Price, and a few others been transferred to Idaho State Prison and whether Perry had been read a statement explaining the purpose of the transfer.  Price argues that this constituted misconduct because the prosecutor was implying a fact not in evidence: namely, the existence of a written statement from Montana Prison officials blaming Price and Perry for the library fire.  Sec. Am. Pet. at 401.  He further argues that these questions left the jury with the

United States District Court
Northern District of California

implication that Price was involved in a series of in-custody wrongdoings. *Id.* at 402.

During the questioning of Mr. Perry, the following exchange took place:

Prosecution: How soon after the fire at Montana State Prison were the four of you moved?

Defense: Objection your Honor. That's beyond the scope of cross-examination. There's -- I've got an objection. Leading the witness. There's never been any disciplinary findings for a fire or anything like that.

The Court: Overruled. First of all, was there a fire before you were moved?

Mr. Perry: Was there a fire before?

The Court: Someplace in Montana State Prison?

Prosecution: Was there a fire in the library August 21st, 1975, approximately eight days prior to the time that you Mr. Price, Mr. Broderick, and Mr. Wilkins were transferred out of the Montana State Prison system?

Mr. Perry: Yes, sir. There was a fire.

Prosecution: Who set it?

Mr. Perry: Whether any of those people you just mentioned had anything to do with that fire is an entirely different matter. We hashed it out in federal court once.

RT 22120-20-1, AG038494-95.

Assuming this line of questioning constituted misconduct, Price has failed to show that it prejudiced him. The jury was already aware of several other in-custody wrongdoings committed by Price, most notably the Banks killing. Significant testimony established violent, criminal acts committed while he was on parole. If the jury did conclude that Price was involved in a fire at the Montana State Prison, such an act would be cumulative of the evidence presented during the penalty phase of Price's inability to adhere to prison or parole strictures. This portion of the subclaim is, therefore, DENIED.

//

### 2.     Implication that Price was Using Drugs During his Testimony

Price next challenges the prosecutor's questions of Mr. Price during cross-examination regarding any prescription or illegal drug use the day of or day before his testimony.  Price argues that the prosecutor's insistence on inquiring about sedative or marijuana use in the face of Mr. Price's assertions that he was not under the influence of anything other than his own "mental control" implied that the prosecution had extra testimonial knowledge of Price's inebriation the day of the trial.  Sec. Am. Pet. at 402-03.  Respondent argues that Price's assertion is not supported by the record and that the questions were relevant and minor.  Ans. at 263.

Price has failed to show how this line of questioning either implied that the prosecutor had knowledge outside the evidence offered to the jury or how it prejudiced him.  After he denied taking any drugs or narcotics to control his emotions, Price advised the prosecutor that he was exercising his own mental control.  RT 22417, AG038821.  The prosecutor then referenced a statement by the defense's psychiatric expert that Price was taking tranquilizers and asked if the expert was lying.  *Id.*  Price's mental status had been described at great length by defense experts to try to explain some of the difficulties that he had while incarcerated due to the conditions of his confinement.  Dr. Rosenthal's testimony regarding Price's need for tranquilizers was placed before the jury and was relevant to their ability to assess Price's demeanor and the quality of his testimony.

The subsequent question about marijuana use did not imply that the prosecutor had particular knowledge that Price had used it in the past two days.  Even if it did, in light of all of the evidence presented, this exchange cannot have prejudiced Price.  Accordingly, this portion of the subclaim is DENIED.

//

83

### 3.    Question Whether Price Shoved a Gun in the Face of a Prior Victim

Price's next challenge is to the prosecutor's characterization of the armed robbery Price committed in Montana on April 17th, 1971.  During Price's cross-examination, the prosecutor asked, "[Y]ou shoved a pistol into the face of a man named Barzotti in Great Falls, Montana and demanded money from him, didn't you?"  RT 22420, AG038824. Price responded, "I don't quite agree with your representation that I shoved it in his face." *Id.*

Price argues that this question implies the prosecutor's knowledge that Price did shove a gun in a prior victim's face, and that this question was improper and prejudicial. Sec. Am. Pet. at 403.  Respondent notes that Price admits he did point a gun at the victim and that the distinction between pointing a gun at someone and shoving it in their face is too subtle to make the trial patently unfair.  Ans. at  263.

Price agreed with the prosecutor's subsequent characterization that he pointed the gun at the store clerk and demanded the money in the till.  RT 22420, AG038824.  He later admitted the gun was loaded.  RT 22420-2, AG038826.  The difference between pointing a loaded a gun in the general direction of a store clerk and being close enough to demand that the clerk hand money over and "shoving a gun" in his face is slight.  Price admitted to the basic facts underlying the armed robbery and noted that he disagreed only with that characterization.  Price has failed to show how he was prejudiced by this exchange.  Accordingly, this portion of the subclaim is DENIED.

### 4.    Questions Implying Evidence of Illegal Activity During Montana State Prison Incarceration

In this portion of the subclaim, Price challenges six questions asked by the prosecutor about why Price was transferred out of Montana State Prison.  Sec. Am. Pet. at 403-04.  These questions, which were based on the alleged document prepared by the

prison explaining the reason for the transfer that the prosecutor asked Mr. Perry about,

were inadmissible aggravation evidence if proved, according to Price, which would make

them problematic enough.  *Id.* at 404.  Worse, Price argues, the document was never

entered into evidence and the foundation for the prosecutor's questions was never

shown, nor were the incidents proven.  *Id.*  Respondent argues that none of the questions

asked ever drew an objection from defense counsel and proffers several reasons why

defense counsel might have opted not to object.  Ans. at 264-265.

The questions, which asked Price whether it was true he was being transferred

because he (1) was shot with a homemade weapon, (2) was "supportive of a major

institutional plan," (3) sold "illegal hobby-craft material," (4) was involved in drug

trafficking, (5) was involved in setting a fire in the library, (6) seriously assaulted a fellow

inmate, and (7) was a "race conscious individual who believes in white supremacy and

intimidated Montana State Prison minority group members" were all supposed to have

come from the letter from prison officials detailing the rationale for Price's prison transfer.

RT 22466-68, AG038882-84; RT 22471, AG038888.  While the prosecutor never

proffered the letter as evidence, Price acknowledged having seen it and read it.  RT

22466-67, AG038882-83.  Specifically, the prosecutor asked, "You said you've seen the

document, correct?" and Price replied, "Yes."  RT 22467, AG038883.  The prosecutor

then asked if the document "followed" Price and he said it had.  *Id.*  Price's admission to

having seen and read the document, as well as it being a part of his prison file, obviates

any prejudice from the prosecutor's failure to prove the existence of the letter.

Accordingly, this portion of the subclaim is DENIED.

### 5.    Asking Price if He Asked Becky Williams to Lie

Finally, Price challenges the prosecutor's questions to him about whether and why

he asked Becky Williams to lie about the Jennings .22 caliber semiautomatic pistol.  Sec.

United States District Court
Northern District of California

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Am. Pet. 404-05.  The prosecutor initially asked Price why he told Ms. Williams to lie about the gun.  RT 22487, AG038909.  Defense counsel objected that the question was argumentative and assumed facts not in evidence.  *Id.*  Impliedly sustaining the objection, the trial court directed the prosecutor to ask Price if he had told Ms. Williams to lie.  *Id.*  Price denied doing so, "but his answers effectively admitted that he had invented the false story that the gun was a gift from a grandfather and that he had urged Ms. Williams to use the story when she retrieved the gun from the gunsmith."  *Price*, 1 Cal.4th at 482; *see*  RT 22488-89. AG038910-11.

The California Supreme Court held that there was no prosecutorial misconduct because the trial court sustained the only defense objection and Price effectively admitted to encouraging Williams to lie about the gun.  *Price*, 1 Cal.4th at 482.  Price argues that this decision was unreasonable because "[t]he fact that Mr. Price may have later 'admitted' facts, after the cat was out of the bag because the People had already improperly elicited the evidence, does not absolve the prosecution's improper actions."  Op. Br. at 10.

Price has not shown, however, that the prosecutor's conduct rendered his trial fundamentally unfair.  The testimony from Mr. Jennings, owner of the company that manufactured the Jennings .22 caliber semiautomatic pistol, established that Ms. Williams had lied as to when the gun came into her possession.  Price was given the opportunity to rehabilitate his witness's credibility by explaining the origin of that lie.  Thus, he has not shown that the California Supreme Court denial of this portion of his subclaim was unreasonable.  Accordingly, it is DENIED.

### E.      Improper Offer of Proof

In this subclaim, Price challenges the prosecutor's attempt to ask Inmate Perry if he knew why another defense witness, Patricia Sewell, did not testify that she had seen

indications that Price had suffered beatings and the prosecutor's offer of proof in front of the jury to support the relevancy of asking why Mr. Perry knew Ms. Sewell. Sec. Am. Pet. at 405-06. Price argues that the prosecutor's offer of proof improperly conveyed an "argumentative inference" and that doing so was unfair in light of the fact Ms. Sewell could not testify to such matters because they would be hearsay. *Id.* at 406.

The prosecution's specific offer of proof as to the relevance of Mr. Perry knowing Ms. Sewell that was said in front of the jury was, "I'm going to ask him if he finds it strange that she didn't mention that these people . . ." RT 22127, AG038503. Defense counsel interjected and asked that the offer of proof be made away from the jury. *Id.* The prosecutor then told the trial court that he intended to ask if it was strange that Ms. Sewell had never mentioned having seen any injuries on Price, never mentioned him complaining of assaults by staff, and never took steps to publicize the deplorable conditions inside the prison. *Id.* The trial court sustained the relevancy objection. *Id.*

The California Supreme Court held that the prosecution's proposed questions were improper, but not prejudicial because the trial court sustained the objection and, thus, the questions were never asked. *Price*, 1 Cal.4th at 483. The court also held that the prosecutor's attempted offer of proof in front of the jury was neither improper nor prejudicial, reasoning that the trial court did not ask for the offer to be made outside of the jury's presence and the portion of the offer the jury did hear was an incomplete sentence that contained nothing prejudicial to the defense. *Id.*

Price argues that this denial is unreasonable because the California Supreme Court's decision "defies logic and fact and lacks any basis in the record." Op. Br. at 10. He offers no specifics to support this conclusion. Price has failed to show that the incomplete sentence the jury heard as an offer of proof, which did not even specify whom the prosecutor was talking about, rendered his trial fundamentally unfair. Accordingly, he

87

has not shown that the California Supreme Court denial was unreasonable.  This subclaim is, therefore, DENIED.

### F.       Failure to Delay Questioning on the Banks Killing

Price argues that the prosecutor's insistence on questioning him about the Banks killing abridged a court order directing the prosecutor to wait until a final ruling on the matter had been made and allowed the prosecutor to ask about the incident in as prejudicial a manner as possible knowing that Price would not be able to answer the question.  Sec. Am. Pet. at 407-08.

On direct examination, Price testified that he was not prosecuted for the killing of Leroy Banks.  RT 22334, AG038736.  Immediately before that, he answered in the affirmative his own counsel's question that they had advised him not to discuss the matter during trial.  *Id.*

During cross-examination, the prosecution asked Price if he stabbed Banks because Banks made disparaging remarks about another inmate.  RT 22430, AG038839. The defense objected and a hearing was held away from the jury.  RT 22430-33; AG038839-AG038842.  The court held that it needed additional time to consider the issue and asked the prosecutor to continue cross-examination "with the exception of that area."  RT 22446-47; AG038855-AG038856.  Five days later during continued cross-examination of Price, the prosecution asked, "Let's talk about the Banks incident.  May 29th, 1978, in San Quentin Prison.  Why did you stab inmate Banks twenty, thirty times to death?"  Defense counsel requested a hearing at the bench, wherein counsel explained that Price could still be prosecuted for the Banks killing and they would advise him not to answer any questions regarding the killing.  RT 22514-18; AG038942-46.  The court advised the jury that it was directing the prosecutor to move on, but that Price may be called back to answer more questions.  RT 22518, AG038946.  Price was not

subsequently called back to answer these questions.

The California Supreme Court held that the prosecutor did not appear intentionally to have abridged the court's order to delay questioning because he thought the delay was to allow defense counsel to confer with Price as to whether he should answer the question or assert his Fifth Amendment right against self-incrimination and have the entirety of his testimony stricken as a result. *Price*, 1 Cal.4th at 484. The state court held that Price was not prejudiced by the prosecutor's second question because Price had explained on direct examination that he was not discussing the Banks incident on advice of counsel and the prosecutor's question did nothing more than illustrate that fact. *Id.*

The record supports the California Supreme Court's denial of this subclaim. To the extent Price argues that he was prejudiced by the way the prosecutor asked him why he killed Mr. Banks, the fact that Mr. Banks had been stabbed twenty to thirty times was a part of the record and, thus, the form of the question could not have prejudiced him. This subclaim is, therefore, DENIED.

### G.    Use of Argumentative Questions to Derogate Price

Price argues that on multiple occasions, the prosecutor used argumentative questions to derogate him. Sec. Am. Pet. at 407-09. The California Supreme Court denied all of these subclaims in one paragraph, stating that Price did not suffer prejudice from any of them because "[N]one of the argumentative questions stated or implied the existence of facts not otherwise before the jury. None of the arguments contained in the questions would have been improper if made to the jury at the appropriate time." *Price*, 1 Cal.4th at 484. Price has failed to show that this denial of any of these subclaims was unreasonable.

#### 1.    Marine Corps Discharge

Price first challenges the prosecutor's improper focus on Price's Marine Corps

discharge because he said it was irrelevant to any factor in aggravation.  Sec. Am. Pet. at

408.  Price had testified on direct that he and Ms. Hickey had discussed his military

service and his aspirations.  RT 22283, AG038681.  During cross-examination, the

prosecutor asked Price if the Marines had discharged him.  RT 22449-22450, AG038858-

59.  After Price said that this was true, the prosecutor responded, "Okay.  So your

dreams of a career in the Marine Corps were nothing more than just dreams because you

didn't complete -- they didn't want you?"  RT 22450, AG038859.  Defense counsel's

objection that the question was argumentative was sustained.  *Id.*

      Price's argument that the question was improper and irrelevant does not assert

that it rendered his trial unfair, nor has he shown such to be true.  Accordingly, this

portion of his subclaim is DENIED.

### 2.        Source of a Weapon Used in a Prior Crime

      Price admitted that he robbed an Arcata market in 1971.  The prosecutor asked,

"Where did you get the pistol that you used to rob the Fourth Street Market in Arcata,

September 26th, 1971?"  RT Appeal 22466, AG038882.  The trial court sustained

defense counsel's objection that the question was argumentative.  *Id.*

      Price has again failed to show how this question prejudiced him.  The objection

was sustained and Price did not have to answer the question.  As noted, the jury was

instructed to disregard any unanswered questions and that such questions did not

constitute evidence.  The jury is presumed to have followed that instruction.  *Greer*, 483

U.S. at 766 n.8.  Accordingly, this portion of the subclaim is DENIED.

### 3.        Possibility of Future Escape

      Price next challenges the prosecutor's question during cross-examination, "So

when you are going to San Quentin, you'll be wanting to escape, right?"  RT 22524,

AG038950.  Price states that the only purpose of such a question would be to convince

United States District Court
Northern District of California

the jury that if Price was not executed, he would pose an unreasonable escape risk. Sec. Am. Pet. at 408.

No objection was made and the California Supreme Court noted that it was waived under the contemporaneous objection rule. *Price*, 1 Cal.4th at 484. It also denied the claim on the merits. *Id.*

Price has failed to show that the denial was unreasonable. Other testimony established that Price had previously escaped from police custody and had attempted to escape from prison. Thus, this question could not have rendered his trial fundamentally unfair. Accordingly, this portion of the subclaim is DENIED.

### 4.   Unprofessional Arguments with Price

#### a.   Comment to Price About the Differences Between State Prison and County Jail

During cross-examination the prosecutor said, "Mr. Price, in state prison they are not going to take what you get away with up here in our county jail." RT 22533, AG038958. *Sua sponte* the judge stated, "Just a minute. This is not an argument. It's a question. Let's ask a question, then he can answer it." *Id.* The prosecutor moved on to another area of questioning. Price argues that this statement derogated him. He has not, however, argued or shown that the California Supreme Court denial of this portion of the subclaim was unreasonable and it is, thus, DENIED.

#### b.   Statement that Price Doesn't See Things the Way Other People Do

Price also challenges the prosecutor's reply to one of his answers on cross-examination wherein the prosecutor said, "Well, you disagree with everything, Price. You don't see things the way anybody else sees them." RT 22592, AG039030. The judge intervened and directed the prosecutor to ask a question and to refrain from arguing with Price.

As with the other element of this subclaim, Price has not shown that he was prejudiced by the prosecutor's statement and, thus, has not shown that the California Supreme Court denial was unreasonable.  Accordingly, this portion of the subclaim is DENIED.

### H.   Closing Argument Errors

In this subclaim, Price challenges three incidents that occurred during the closing arguments.

#### a.   Urging Execution for an Uncharged Murder

Price argues that the prosecutor asserted that he could be executed for the Hickey, Barnes or Banks killing, which was a misstatement of the law and could have invited jurors who had doubts about the Hickey or Barnes murders to nonetheless vote for the death penalty because they felt it was the proper punishment for the Banks killing. Sec. Am. Pet. at 410.

During arguments to the jury, after referring to the Hickey, Barnes, and Banks killings the prosecutor said, "The defendant should die for any one of those murders."  RT 23018, AG039508.  The court responded to defense's objection that the prosecutor made a misstatement of law by saying that the jury had been instructed on what the law was, would follow the law, and knew what the facts were.  RT 23019, AG039509.

The California Supreme Court denied the claim, finding that a reasonable jury would not consider the statement an invitation to impose the death penalty for any one of the crimes to the exclusion of the others and that the jury was "entitled to consider the seriousness of each of those crimes in determining penalty."  *Price*, 1 Cal. 4th at 484.

As noted by the trial court, the jury had been instructed on what bases they could base a death sentence.  The jury is presumed to have followed that instruction.  *Greer*, 483 U.S. at 766 n.8.  Price has not shown that the California Supreme Court denial was

92

unreasonable.  Accordingly, this portion of the subclaim is DENIED.

**b.      Reference to Threats**

Correctional Officer Fred Filyau, who worked at the Humboldt County jail, testified for the prosecution in the penalty phase.  He testified that Price threatened to "visit" him once he got out.  RT 21709, AG038025.  During closing argument, the prosecutor referenced this threat and then said, "Well, you know, in this business, I've never talked to Mr. Dikeman about it, but we get threatened all the time.  Every time I've been threatened --"  RT 23024, AG039514.  Defense counsel objected on the ground that it assumed facts not in evidence and the trial court sustained the objection.  *Id.*  Price argues that this statement implied that the prosecutor had been threatened by defense sympathizers in this case and that such a concern could be instrumental in jurors voting for the death penalty.  Sec. Am. Pet. at 411.

The California Supreme Court found this portion of the subclaim waived under the contemporaneous objection rule because defense counsel failed to seek an admonition.  *Price*, 1 Cal.4th at 485.  Price does not argue cause and prejudice or a fundamental miscarriage of justice to overcome the imposition of the bar.  The subclaim is, thus, defaulted.

Even if the claim were not defaulted, it lacks merit.  The prosecutor's statement suggested that threats were a routine matter.  He made no mention of a threat having been made during the course of the trial.  The objection was sustained and, as noted, the jury had been instructed at various points that argument by counsel did not constitute evidence.  Thus, Price has not shown that this statement rendered his trial fundamentally unfair.  Accordingly, this portion of the subclaim is DENIED.

//

//

United States District Court
Northern District of California

### c.   Asking Price a Question During Argument Knowing He Could Not Answer

Later in the closing, the prosecutor said, "Give me something, Mr. Price, to show this jury why they should not render a verdict of death."  RT 23026, AG039516.  The transcript shows that he paused after this statement.  *Id.*  Price argues that this statement constitutes an unfair attempt to continue cross-examination during the closing argument and it prejudiced Price because it looked to the jury as though Price himself was unable to think of a reason why he deserved mercy.  Sec. Am. Pet. at 412.

The California Supreme Court held that this statement was not prejudicial because the jury understood the statement to be a rhetorical device.  *Price*, 1 Cal.4th at 485.  Moreover, it found the claim was waived by failure to object or seek an admonition.  *Id.*

Price claims that this decision was made with no supporting reasoning and based on unreasonable factual determinations and assumptions.  Op. Br. at 11.  As Price noted in his petition, shortly before this incident, Mr. Price interrupted the prosecutor's closing argument and asked to read a statement to prove that the prosecutor was a liar.  RT 23023, AG039513.  The judge told Mr. Price that if he was not silent, he would be removed from the courtroom.  *Id.*  Since the jury witnessed this only a few minutes before the statement challenged in this subclaim, they knew that Price was unable to respond to any comment made by the prosecutor and such a comment, therefore, must be a rhetorical device.  Price has, therefore, failed to show that the California Supreme Court denial of this portion of his subclaim was unreasonable and it is, accordingly, DENIED.

## III.   Claim XVI - Erroneous Evidentiary Rulings Regarding Berlie Petry

### A.   Legal Standard

A person in custody pursuant to the judgment of a state court can obtain a federal writ of habeas corpus only on the ground that he is in custody in violation of the

94

Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a).  A state court's evidentiary ruling, therefore, is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process.  *See Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985), cert. denied, 478 U.S. 1021 (1986).

"[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials."  *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (alteration in original) (internal quotation marks omitted); *see also Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) (holding that due process does not guarantee a defendant the right to present all relevant evidence).  This latitude is limited, however, by a defendant's constitutional rights to due process and to present a defense, rights originating in the Sixth and Fourteenth Amendments.  *See Holmes*, 547 U.S. at 324.  "While the Constitution prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury."  *Id.* at 325-26; *see Egelhoff*, 518 U.S. at 42 (holding that the exclusion of evidence does not violate the Due Process Clause unless "it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.").  But "at times a state's rules of evidence cannot be mechanistically applied and must yield in favor of due process and the right to a fair trial."  *Lunbery v. Hornbeak*, 605 F.3d 754, 762 (9th Cir. 2010) (finding California's application of its evidentiary rules to exclude hearsay testimony that bore

persuasive assurances of trustworthiness and was critical to the defense violated right to present evidence).

The defendant, not the state, bears the burden to demonstrate that the principle violated by the evidentiary rule "is so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Egelhoff*, 518 U.S. at 47 (internal quotation marks omitted).

The due process and Sixth Amendment limitations on the exclusion of critical corroborative defense evidence are clearly established federal law under AEDPA. *See Chia*, 360 F.3d at 1003; *DePetris v. Kuykendall*, 239 F.3d 1057, 1062 (9th Cir. 2001). The exclusion of evidence that another person may have committed the crime violates due process and the Sixth Amendment. *See Chambers v. Mississippi*, 410 U.S. 284, 302-03 (1972); *Lunbery v. Hornbeak*, 605 F.3d 754, 760 (9th Cir. 2010) (exclusion of critical hearsay testimony pointing to another killer was an unreasonable application of *Chambers*). The Supreme Court's decision in *Chambers* "clearly established that the exclusion of trustworthy and necessary exculpatory testimony at trial violates a defendant's due process right to present a defense." *Cudjo v. Ayers*, 698 F. 3d 752, 754 (9th Cir. 2012).

Even if an evidentiary error is of constitutional dimension, the court must consider whether the error was harmless under *Brecht*, 507 U.S. at 619. *Dillard v. Roe*, 244 F.3d 758, 767 n.7 (9th Cir. 2001).

## B.     State Court Denial

Price argues that the trial court's exclusion of several pieces of evidence in regards to witness Berlie Petry violated his Fifth, Sixth, and Fourteenth Amendment rights to confront the witnesses against him and to present evidence on his own behalf. The specific items excluded that Price challenges are: (1) writings made by Petry; (2)

statements Petry made to police investigators that would show inconsistencies with Petry's testimony on the stand; (3) opinions by Dr. Blinder that would connect domestic homicide syndrome with Petry's writings and the hearsay bases for Dr. Blinder's testimony; (4) evidence that Elizabeth Hickey wanted to leave Petry and was afraid of him; (5) evidence of deplorable and unsanitary conditions in the children's bedroom in the Petry/Hickey house; and (6) the exclusion of Petry's two polygraph test results.  Price asserts that these items are evidence that support the conclusion that Petry, not Price, killed Elizabeth Hickey.  The California Supreme Court evaluated each item of excluded evidence and determined the exclusions were proper under California law.  *Price*, 1 Cal.4th at 411-19.  The specific reasons for the state court's denial of each subclaim are set out below.

### 1.      Writings Made By Petry

Price challenges the trial court's exclusion of several writings made by Berlie Petry on multiple grounds.

### a.      Exclusion of Prior Inconsistent Statements

To begin with, Price argues that the trial court erred in failing to admit several writings as prior inconsistent statements.  Sec. Am. Pet. at 461.  Price's attorneys had questioned Petry about the inconsistencies between writings found in his house and his testimony on the stand and were only permitted to read the statements verbatim.  Price argues that this exclusion was prejudicial because reading a statement was not "a satisfactory substitute for showing the jury the writing itself."  *Id.*  Moreover, Price says that if the jury had been able to view the writings in context, Mr. Petry's claim of not recalling most of the writings would have been incredible.  *Id.* at 461-62.  Price says that the prejudice is clear because the jury sent a note asking for all of Petry's writings and thought there had been more than the two items that had been received into evidence.

*Id.* at 461, fn 241.  This request, Price argues, shows the jury was seriously considering the defense's proposition that Mr. Petry killed Ms. Hickey.  *Id.*

The California Supreme Court found that the trial court had erred in failing to admit the writings.  *Price*, 1 Cal.4th at 411.   However, it found the error harmless because all of the statements had been read before the jury, so the jury was aware of them.  *Id.*  The state court held that it was not reasonably likely that admission of the writings containing the inconsistent statements would have resulted in a more favorable verdict.  *Id.*

Price has failed to show that this denial was unreasonable.  While the jury did request writings from Ms. Hickey to Mr. Petry and from Mr. Petry to Ms. Hickey, they were advised that many of the statements they heard had been read into testimony as prior inconsistent statements and that they could request a readback of that testimony if they so desired.  RT 20992, AG037605.  Price cannot show that the failure to admit the writings into evidence had a "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 627.  As such, he has not shown the California Supreme Court denial of this portion of his subclaim to be unreasonable and it is, therefore, DENIED.

### b.      Exclusion of Statement About Molestation

There was one statement about which defense counsel was prohibited from asking Mr. Petry.  One of his writings directed to Ms. Hickey implied that at some point she had accused him of molesting her daughters.  The trial court excluded the evidence on the grounds that the defense had failed to establish the relevant timeframe.  RT 13663, AG030092.  The California Supreme Court found that the trial court properly could have excluded the statement as cumulative and collateral impeachment evidence.  *Price*, 1 Cal.4th at 412.  The court went on to say that Price suffered no prejudice as the writing did not indicate that this allegation was particularly upsetting to Petry, particularly in light

98

of the many other grievances he had with her.  *Id.*

Price argues that this exclusion was prejudicial because it would have both impeached Mr. Petry's trial testimony and provided a further motive for him to kill Ms. Hickey.  Sec. Am. Pet. at 462.  The trial court's exclusion of the evidence was without prejudice to defense counsel establishing a relevant timeframe.  RT 13663, AG030092. Moreover, the California Supreme Court's statement that the exclusion was proper as a matter of state law is entitled to deference.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court on habeas review).  Thus, Price has failed to show that the California Supreme Court denial of this portion of his subclaim to be unreasonable and it is, therefore, DENIED.

### c.    Writings as Evidence of Mental Condition

Finally, Price challenges the exclusion of Petry's various writings because he argues that Petry's statements that he could not recall having written them, particularly in light of the subject matter of the writings and the voluminous amount of facts to which Petry averred no recollection, was patently incredible.  Sec. Am. Pet. at 463.  He argues that if the jury had been able to review all of the bizarre writings it would have been impossible to believe that the author could forget them in the span of a few years.  *Id.*

The California Supreme Court was not persuaded by Price's argument that the writings showed such intense emotion and morbid preoccupation that it would be impossible to forget having written them.  *Price*, 1 Cal.4th at 413.  It held that it was just as possible to forget traumatic events as it was to remember them and that ultimately Petry's credibility was a matter for the jury to determine.  *Id.*

Price has not shown that this determination was unreasonable.  As such, this portion of his subclaim is DENIED.

United States District Court
Northern District of California

### 2.    Petry's Statements to the Police

In this subclaim, Price challenges the trial court's refusal to admit Berlie Petry's prior statements to police, which were recorded, and the transcript of his preliminary hearing testimony for the truth of the matter asserted therein.  Sec. Am. Pet. at 469.  On the stand during cross-examination, Petry claimed an inability to recall many of the statements that he made to the detectives during those interviews.  RT 13481, AG029939.  Price argues that the trial court's finding that Petry's forgetfulness was genuine and its determination to exclude prior inconsistent statements, particularly those contained in the police interviews, was incorrect.  Sec. Am. Pet. at 469.

The California Supreme Court denied this portion of the claim and gave deference to the trial court's factual findings.  *Price*, 31 Cal.4th at 413-414.  The state court noted that by the end of the trial both tapes had been entered into evidence and when the jury requested the opportunity to listen to the tapes, both tapes and a tape recorder were provided.  *Id.* at 414.  The Supreme Court found that the trial court did fail to notify defense counsel immediately of the jury's request for the tapes, but did notify counsel the following morning.  *Id.*  Because counsel failed to contemporaneously object to the failure to notify, the California Supreme Court held that any challenge to the failure to notify was waived.  *Id.*

A district court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  A petitioner must present clear and convincing evidence to overcome the presumption of correctness; conclusory assertions will not do.  *Taylor v. Maddox*, 366 F.3d 992, 999-1000 (9th Circ. 2004); *Avila v. Galaza*, 297 F.3d 911, 918-20 (9th Cir. 2002) (declaring clearly erroneous a state court referee's factual finding that lack of cooperation from potential witnesses prevented attorney from

presenting actual innocence defense at trial, where there was clear and convincing evidence that the attorney's failure to conduct an adequate pretrial investigation caused the lack of the evidence); *id.* at 922 nn.12-14 (declaring clearly erroneous a state court referee's factual findings that witnesses' testimony was not credible, where the referee cited allegedly impeaching facts that had no support in the record).  While Petry's memory lapses were notable, Price has presented no clear and convincing evidence to rebut the trial court's credibility determination.

Moreover, Price has failed to show that any prejudice has ensued.  The trial court ultimately admitted both tapes into evidence.  While it is true that neither the court nor counsel knew precisely which sections of the tapes the jury chose to listen to, defense counsel called Officer Frank Jager to the stand as a witness for the defense.  Officer Jager had conducted one of the interviews with Petry.  Defense counsel questioned Officer Jager extensively about statements that Petry made during the interview that Petry stated he could not recall during trial.  RT 19594-19617, AG 036032-54.  During closing argument, Price's counsel gave the jury an answer-by-answer comparison that clearly set out what Petry had told investigators, via the testimony of Officer Jager, and contrasted it with Petry's trial testimony claiming he could not recall what he had said during his interviews with the police.  RT 20645-62, AG 037221-45.  Price's counsel gave the jury specific citations within the trial transcripts and then admonished the jury to listen to the tapes.  The jury then requested the tapes.

Based on his failure to rebut the state court's credibility determination and his failure to show prejudice for this portion of the claim, Price has not shown that the state court's decision on this matter was unreasonable.  Accordingly, this subclaim is DENIED.

### 3.   Dr. Blinder's Testimony

Next, Price challenges the limitations the trial court placed on defense expert Dr.

Blinder's testimony that Mr. Petry fit the profile of someone who would commit a domestic homicide and the inability of Dr. Blinder to testify to the hearsay bases on which he formed his opinions.  Sec. Am. Pet. at 475-77.  Price argues that these limitations denied him the right to present a defense and to a fair trial.  *Id.* at 477.

The California Supreme Court denied this claim finding that the trial court did not abuse its broad discretion to "control the form in which the expert is questioned to prevent the jury from learning of incompetent hearsay."  *Price*, 1 Cal.4th at 416.  It also found that Price was not denied a fair trial nor the right to present a defense.  *Id.*

Price has not shown that this denial was unreasonable.  Price's ability to present expert testimony supporting the theory that Mr. Petry was responsible for Ms. Hickey's murder was not completely abridged.  *See Chambers v. Mississippi*, 410 U.S. 284 302-03 (1972) (The exclusion of evidence that another person may have committed the crime violates due process and the Sixth Amendment.).  Rather it was constrained in a manner consistent with state evidentiary laws.  The California Supreme Court's statement that the exclusion was proper as a matter of state law is entitled to deference.  *See Bradshaw,* 546 U.S. at 76 (a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court on habeas review). Accordingly, this subclaim is DENIED.

### 4.    Evidence that Elizabeth Hickey Was Afraid of Mr. Petry

During trial, the defense attempted to introduce several statements made by Ms. Hickey to third parties, including to a therapist, in which she expressed fear of Mr. Petry. Many of those statements were excluded as inadmissible hearsay.  Price challenges these exclusions on the ground that they were admissible to show Ms. Hickey's state of mind at the time of her death and that she acted in conformity therewith by giving her guns to Mr. Price to sell so that she could raise enough money to leave Mr. Petry and

start a new life with her children.  Sec. Am. Pet. at 482.  Price also argues that it was

unfair to exclude this evidence when less reliable hearsay was admitted in the

prosecution's case.  *Id.* at 483.

The California Supreme Court denied this claim finding that Ms. Hickey's state of

mind in regards to whether she voluntarily surrendered her guns to Mr. Price was not at

issue.  *Price*, 1 Cal.4th at 417.  The court summarized the prosecution's position on the

matter as theorizing that Price never intended to pay for the guns and killed Ms. Hickey to

avoid having her challenge the lack of payment or testify to his possession of the

weapons.  *Id.*

Price has not shown that this denial was unreasonable.  He relies on California

case law regarding the admissibility of the evidence, but does not cite any clearly

established federal law that would entitle him to relief.  *See* Op. Br. at 16.  This subclaim

is, therefore, DENIED.

**5.      Evidence of the Condition of the Children's Bedroom**

Shortly following the discovery of Ms. Hickey's body, the police made a videotape

of the crime scene that included footage of the entire house.  The video segment of Ms.

Hickey's children's room showed a urine-soaked mattress and fecal matter on the walls.

CT 8384, AG008004.  The trial court excluded as irrelevant this portion of the video.  RT

8453-54, AG025317-18.  Price argues that this evidence provided significant support for

the defense's domestic homicide theory and, thus, was improperly excluded.  Sec. Am.

Pet. at 485-86.

The California Supreme Court denied this claim noting that the trial court's

exclusion ruling was made without prejudice and the defense never raised the issue

again.  *Price*, 1 Cal.4th at 418.  The court also highlighted that the defense "amply

established, and the prosecution effectively conceded, that the relationship between

United States District Court
Northern District of California

Petry and Hickey was marked by deep conflicts and unhappiness on both side." *Id.* at 418-19.

Price has failed to show that the initial exclusion had a "substantial and injurious effect or influence on the jury's verdict." *Brecht*, 507 U.S. at 638.  He could have renewed the request for introduction of the video segment if needed.  And, as noted by the California Supreme Court, the defense had already established deep rifts and a disturbing relationship between Ms. Hickey and Mr. Petry.  This subclaim, therefore, is DENIED.

### 6.    Results of Two Polygraph Tests

During the investigation into Elizabeth Hickey's murder, the police administered two polygraph tests to Berlie Petry.  CT 8743-8773, AG008334-64.  Both times, the results indicated that Petry had been deceptive in his responses, including when he gave a negative response after being asked if he had killed Hickey.  *Id.*  Price sought to have the test results admitted.  The trial court denied the request under Cal. Evid. Code § 351.1, which renders polygraph results inadmissible unless the parties stipulate to the admission, and Cal. Evid. Code § 352, which gives the trial court discretion to exclude evidence if its probative value is outweighed by the potential prejudice or undue consumption of time.  RT 13247-48, AG029731-32.

The California Supreme Court denied Price's challenges to the trial court's denial of admission of the polygraph results.  *Price*, 1 Cal.4th 419-420.  The court stated that because Price had failed to proffer evidence that the scientific community had accepted the polygraph as "a reliable technique," the exclusion was proper as a matter of state law. *Id.* at 419.  The court also found no due process violation because "[a] party has no due process right to present evidence of test results if the tests used scientific techniques not generally accepted as reliable in the scientific community."  *Id.* at 420.

104

The state court's determination that there was no state law violation is binding on this court. *Bradshaw*, 546 U.S. at 76; *Hicks v. Feiock*, 485 U.S. 624, 629 (1988).

As for Price's due process claim, due process does give an accused the right to present a defense. However, "a defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions." *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *see Washington v. Texas*, 388 U.S. 14, 19 (1967). A defendant "does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissable under standard rules of evidence." *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) (quoting *Taylor v. Illinois*, 484 U.S. 400, 410 (1988)). State rules excluding evidence from criminal trials "do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *Scheffer*, 523 U.S. at 308 (quoting *Rock v. Arkansas*, 483 U.S. 44, 56 (1987)).

In *Scheffer*, the United States Supreme Court recognized that "there is simply no consensus that polygraph evidence is reliable. To this day, the scientific community remains extremely polarized about the reliability of polygraph techniques." *Id.* at 309. Price has not shown that there is any clearly established federal law that would entitle him to the admission of polygraph results in the absence of an argument for their scientific validity. Accordingly, he has not shown that the state court's decision on this matter was unreasonable. This subclaim is DENIED.

## IV.    Claim XVIII - Trial Court Response to Jury Question

### A.    Legal Standard

"When a jury makes explicit its difficulties, a trial judge should clear them away with concrete accuracy." *Bollenbach v. United States*, 326 U.S. 607, 612-13 (1946). The trial judge has a duty to respond to the jury's request for clarification with sufficient

105

specificity to eliminate the jury's confusion.  *See Beardslee v. Woodford*, 358 F.3d 560, 574-75 (9th Cir. 2004) (harmless due process violation occurred when, in responding to request for clarification, court refused to give clarification and informed jury that no clarifying instructions would be given); *United States v. Frega*, 179 F.3d 793, 808-11 (9th Cir. 1999) (trial judge's confusing response to jury's questions raised possibility that verdict was based on conduct legally inadequate to support conviction).

A trial judge enjoys "wide discretion" in responding to a question from the jury. *Arizona v. Johnson*, 351 F.3d 988, 994 (9th Cir.2003), cert. denied, 543 U.S. 836 (2004). A jury is presumed to understand the judge's answer to its question.  *Weeks*, 528 U.S. at 234.

To be entitled to relief on an instructional error claim, a petitioner must show that (1) the instruction or judicial response was an incorrect or inaccurate application of state law, (2) a constitutional error resulted from the incorrect or inaccurate instruction, and (3) the error was not harmless.  *See Morris v. Woodford*, 273 F.3d 826, 833 (9th Cir.2001). A petitioner is not entitled to relief unless the instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'"  *Brecht*, 507 U.S. at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).  In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted in "actual prejudice."  *Id.*; *see*, *e.g.*, *Coleman v. Calderon*, 210 F.3d 1047, 1051 (9th Cir. 2000) (finding *Brecht* error where "at the very least, we 'cannot say with fair assurance . . . that the judgment was not substantially swayed by the [instructional] error.'").

## B.    State Court Denial

In this claim, Price challenges the judge's response to the jury's request during penalty phase deliberations to see all "writings or testimony regarding the statement,

106

United States District Court
Northern District of California

'Take her to the country or took a girl to the country.'"  Sec. Am. Pet. at 507.  During the

penalty phase, the prosecutor asked Price, "What does the phrase 'took her to the

country' mean to you, sir?"  RT 22484, AG038906.  The following exchange then

occurred:

| | |
|---|---|
| Price: | To me? |
| Prosecution: | Yes |
| Price: | It depends on what the context would be. |
| Prosecution: | How about referring to Elizabeth Hickey or Elizabeth Hickey's death? |
| Price: | Then, it would be -- it would depend on whose words and -- and -- |
| Prosecution: | Do you remember writing to convicts who were still in custody about Elizabeth Hickey and advise (sic) them that you took her to the country? |
| Price: | I surely don't. |
| Prosecution: | Did you write to convicts who were still in custody after Elizabeth Hickey's death and advise them that you took her to the country? |

*Id.* Price and the prosecutor then engaged in discussion about the relevant time period

for the question, concluding with Price stating, "I never wrote to any person anywhere

about Elizabeth Hickey in any context except after I was in jail.  I wrote Mike Thompson a

letter to let him know what my conditions were because at that time I thought he was a

friend."  RT 22485, AG038907

During deliberations, the jury sent a note to the judge, asking for, among other

items, a postcard that prompted the prosecutor's questions about the phrase "Took a girl

to the country."  RT 23082, AG039572.  The court discussed the matter with counsel for

both sides and all parties agreed that no such postcard had been entered into evidence.

The judge subsequently advised the jurors:

107

> First, before I get to the issue of giving you the admonition, to advise you about your last note which speaks of a postcard which gave rise to the prosecution's questions about the phrase "Take a girl to the country," everyone here agrees that postcard was never physically present or marked in this case. We could all speculate, I think, individually and perhaps collectively as to what may have happened to it, but no one here really knows. It's never been before the Court as far as I know and certainly is not marked and is not in evidence.

RT 23084, AG039574.

Price argues that this question showed that the jurors mistakenly believed there was evidence that Price used that phrase in connection with the Hickey murder and the judge's response to the jury failed to clear up any confusion they had about the matter. Sec. Am. Pet. at 503. Price argues that the jury's mistaken belief in the penalty phase also shows that their confusion on the matter prejudiced Price in the guilt phase and led to his conviction on the Hickey murder count and possibly other convictions as well. *Id.*

The California Supreme Court denied the claim, holding that Price had failed to provide the court with any authority that "a jury's inquiries at the penalty phase may be used to attack the verdict it rendered at the guilt phase." *Price*, 1 Cal.4th at 470. Even if such authority existed, the court determined that Price was not entitled to relief because the jury's request showed that the phrase took on significance only at the penalty phase of the trial, despite Price's assertions to the contrary. *Id.*

C.   **Conclusionary Statement**

After the trial court responded to the jury's question, defense counsel objected to the fact the court had made it sound as though such a postcard had been in existence. RT 23085, AG039575. Ultimately, the court called the jurors back and instructed them not to infer that a postcard ever did exist and that the court had no knowledge whether one did exist or not. RT 23086-97, AG039576-77. To the extent Price argues that the trial court's response prejudiced him by implying the existence of a postcard that said

108

"Took a girl to the country," the court's subsequent instruction to the jury obviated any issue the initial answer raised.

Price has not shown that the California Supreme Court's denial of this claim on the grounds that the phrase "Took a girl to the country" only took on significance in the penalty phase and that he failed to cite any authority showing that a jury's penalty-phase inquiry could be used to attack a guilt-phase conviction as unreasonable.  The prosecutor's questioning of Mr. Thompson in the guilt phase regarding that phrase and his questioning regarding any letters sent by Price show that that the prosecutor never asked nor implied that Price had sent a letter to Mr. Thompson using that phrase.  RT 16909, AG033176.  Thus, there is no record support for the guilt-phase confusion Price asserts occurred.  Accordingly, this claim is DENIED.

## V.    Claim XXII - Erroneous Evidentiary Rulings During Guilt Phase

In this claim, Price challenges as violative of his constitutional rights the court's admission of fourteen items of prosecutorial evidence.  These are set out in the following eleven subclaims.

### A.    Legal Standard

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process.  *See Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999).  The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ."  *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established Supreme Court

precedent  under § 2254(d)); *see*, *e.g.*, *Zapien v. Martel*, 805 F.3d 862, 869 (9th Cir. 2015) (because there is no Supreme Court case establishing the fundamental unfairness of admitting multiple hearsay testimony, *Holley* bars any such claim on federal habeas review).

Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds.  *See Henry*, 197 F.3d at 1031; *Jammal*, 926 F.2d at 919.  While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial even when state standards are violated; conversely, state procedural and evidentiary rules may countenance processes that do not comport with fundamental fairness.  *See id*. (citing *Perry v. Rushen*, 713 F.2d 1447, 1453 (9th Cir. 1983), cert. denied, 469 U.S. 838 (1984)).  The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair.  *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995); *Colley*, 784 F.2d at 990.  But note that only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process.  *See Jammal*, 926 F.2d at 920.

The United States Supreme Court has left open the question of whether admission of propensity evidence violates due process.  *Estelle v. McGuire*, 502 U.S. 62, 75 n. 5 (1991).  Based on the Supreme Court's reservation of this issue as an "open question," the Ninth Circuit has held that a petitioner's due process right concerning the admission of propensity evidence is not clearly established as required by AEDPA.  *Alberni v. McDaniel*, 458 F.3d 860, 866-67 (9th Cir. 2006); *accord Mejia v. Garcia*, 534 F.3d 1036, 1046 (9th Cir. 2008), reaffirming *Alberni*.  *See*, *e.g.*, *Larson v. Palmateer*, 515 F.3d 1057, 1066 (9th Cir. 2008) (because Supreme Court expressly reserved the question of

110

whether using evidence of prior crimes to show propensity for criminal activity could ever violate due process, state court's rejection of claim did not unreasonably apply clearly established federal law).

### B.    State Court Denial

The California Supreme Court denied all of Price's claims of wrongfully admitted prosecutorial evidence, finding either no error and/or no prejudice from the admission. *Price*, 1 Cal.4th at 424-440.  The specific reasons for the state court's denial of each subclaim are set out below.

### 1.    Price's October 1982 Detention

Price challenges the admission of evidence showing that his business partner, Joseph O'Rourke, was arrested in a parole search in October 1982 and that Price was detained briefly at the scene and then released.  Sec. Am. Pet. at 531-536.  The trial court allowed the evidence for the purpose of impeaching Ms. Myers's testimony that Price worked for Mr. O'Rourke until December 1982.  The court admonished the jury,

> [T]estimony has been allowed because it may or may not, depending on your assessment of the facts, bear upon the credibility and believability of other people who have testified in this case.
>
> The fact that Mr. Price was found where he was found on the date of October 12th, 1982, with someone who was arrested on a parole violation is not to be used against Mr. Price.
>
> He was released.
>
> That's the best evidence of the fact that the officers had no reason to believe he was involved in any criminal activity at that point.
>
> So therefore his presence there may or may not be relevant to the believability of some of the other people that testified.
>
> It does not in this case necessarily prove any fact that would be necessary to incriminate Mr. Price in any way.

RT 17663-64, AG034005-06.

United States District Court
Northern District of California

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The California Supreme Court held that the introduction of this evidence with the limiting instruction constituted neither error nor prejudice. *Price*, 1 Cal.4th at 425. The court found that the evidence was relevant to corroborate Ms. Myers's testimony regarding Price's business relationship with Mr. O'Rourke and to clarify the time frame for such a relationship. *Id.*

Price has not shown that the admission of this evidence caused a substantial and injurious effect on his trial. *Brecht*, 507 U.S. at 637. Nor has he shown any clearly established federal law that would entitle him to relief on his claim. 28 U.S.C. § 2254(d)(1). As such, he has not shown the California Supreme Court denial of this subclaim was unreasonable and it is DENIED.

### 2.    Evidence of January 23, 1983 Field Interrogation of Price

Price argues that the trial court's admission of testimony by Deputy Walton detailing a field interview he conducted with Price after he observed Price sitting in his vehicle for thirty minutes with binoculars on the edge of a business area was prejudicial. Sec. Am. Pet. at 536-542. Price also challenges the trial court's allowing the prosecutor to argue that such evidence showed that Price was casing establishments for robberies. *Id.* at 539. He further argues that the court's allowing statements by Detective Freese as to what Deputy Walton told him in regards to the field interrogation further underscored that inference. *Id.* at 540-541.

The California Supreme Court denied this subclaim, finding that the evidence was relevant to show Price's presence in Humboldt County during late January 1983 and was relevant to support the conspiracy charge since the AB leadership had instructed Price to go to the northern part of the state and gather weapons and money. *Price*, 1 Cal.4th at 426-27. Price's contradictory statement to Detective Freese was admissible to show consciousness of guilt. *Id.* at 427.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Price has not shown that this denial was unreasonable.  The California Supreme Court's finding that the evidence was relevant to the pending charges is entitled to deference.  *See Bradshaw*, 546 U.S. at 76 (a state court's interpretation of state law binds a federal court on habeas review).  Even if the evidence was not relevant, there is no clearly established federal law that would entitle Price to relief on this subclaim.  Accordingly, it is DENIED.

### 3.    Price's Admission of AB Membership

Price next challenges as prejudicial the trial court's admission of a year-and-a-half old trial transcript in which Price admitted he was an AB member.  Sec. Am. Pet. at 542-44.  Price argues that the admission of this evidence would allow the jury to conclude that he previously was involved in AB business serious enough to warrant prosecution and that other, more contemporaneous evidence provided proof of Price's AB membership.  *Id.* at 543-44.

The California Supreme Court denied this claim, finding that the jury would not engage in improper speculation as to the nature of the prior proceeding and that the trial court specifically limited the amount of the transcript that could be read in order to prevent undue prejudice to Price.  *Price*, 1 Cal.4th at 427.  Moreover, the court found the evidence had significant probative value because Price's own admission was stronger evidence than the other forms of evidence available and the admission was not remote in time.  *Id.*

As with the other subclaims, Price has failed to show how this denial was unreasonable.  Accordingly, this subclaim is DENIED.

### 4.    Clifford Smith Polygraph

While being cross-examined about his interactions with the Special Services Unit, Clifford Smith included in his answer that he had taken a polygraph test.  RT 14983-94,

AG031374-75.  Defense counsel moved for a mistrial, which was denied.  The trial court, however, did admonish the jury to disregard the statement regarding Smith's having taken a lie detector test, noting that the state of California considered polygraph examinations to be unreliable.  RT 14996-97, AG031386-87.  The court directed the jurors to form opinions regarding Mr. Smith's credibility based on his appearance in court.  RT 14997, AG031387.  Price argues that Mr. Smith's statement unfairly bolstered the testimony of a main prosecution witness.  Sec. Am. Pet. at 545.

The California Supreme Court denied this claim, noting that the mention was brief and nonresponsive.  *Price*, 1 Cal.4th at 428.  It held that the admonition was "thorough and forceful" and sufficient to prevent any prejudice.  *Id.*

Price has not shown that this denial was unreasonable.  The California Supreme Court's characterization of the admonition was accurate.  "A jury is presumed to follow its instructions."  *Weeks*, 528 U.S. at 234.  Accordingly, this subclaim is DENIED.

### 5.    Length of Price's Prior Incarceration

During his testimony, Detective Freese testified that Price told him that he had been incarcerated for the past eleven years.  RT 16002, AG032318.  Defense counsel asked for a bench conference and sought a mistrial, arguing that the length of the imprisonment was unduly prejudicial.  RT 16007, AG032323.  The court denied the motion, but agreed to admonish the jury to disregard it.  *Id.*  When the jury returned, the court said, in part, "Such evidence was received and may be considered by you for limited purposes in this case. . . .  I want to caution you now that the fact that Mr. Price may or may not have been in prison is not to be considered by you in determining his guilt in this particular trial or to determine that he's a bad person."  RT 16007-08, AG032323-34.  Price argues that the admonishment did more harm than good.  Sec. Am. Pet. at 546.

The California Supreme Court denied this claim holding that the admonition cured any prejudice that may have resulted. *Price*, 1 Cal.4th at 431. It noted that Price's concern that the admonition was ineffective because it did not specifically direct jurors to disregard the length of Price's imprisonment was actually addressed by the court's direction that jurors not consider Price's prior imprisonment to prove his guilt or that he was a bad person. *Id.*

Again, Price has failed to show that this conclusion was unreasonable. The admonishment was more inclusive than that requested by Price's counsel. "A jury is presumed to follow its instructions." *Weeks*, 528 U.S. at 234. Accordingly, this subclaim is DENIED.

### 6.    AB Activities in Other Parts of the Country

Next, Price challenges Mr. Thompson's testimony as to AB activities outside the state of California. Sec. Am. Pet. at 547-49. Price argues that this testimony and the prosecutor's linking of the AB to other dangerous prison gangs, such as the Mexican Mafia, persuaded jurors that the AB was "extremely dangerous and extraordinarily threatening because it was carefully organized on a nationwide basis." *Id.* at 548-49.

The California Supreme Court found the testimony irrelevant, but held that Price had failed to show prejudice. *Price*, 1 Cal.4th at 433. It also noted that while the trial court did not strike the testimony, as requested by defense counsel, it did advise the jury that the information "had nothing to do with the facts of this case." *Id.* This decision was reasonable. Price has not shown an entitlement to relief. *See Holley*, 568 F.3d at 1101. Accordingly, this subclaim is DENIED.

### 7.    Admission of Physical Evidence

In this subclaim, Price challenges as irrelevant and prejudicial the admission of several items of physical evidence: (1) ammunition found in his Reno storage locker, (2)

a shotgun bandolier, (3) photographs of the types of guns that could have been used to kill Mr. Barnes, and (4) a bloodstained glove not shown to be connected to any of the crimes. Sec. Am. Pet. at 549-553. Price argues that the admission of these items was designed to generate a strong emotional response from the jury. *Id.*

The California Supreme Court denied each of these subclaims, finding that each item, save for the bloodstained glove, was relevant. *Price*, 1 Cal.4th at 433-435. And while the court found the probative value of the glove minimal since the blood type of the blood on it could not be determined, it held that the evidence was not unduly prejudicial and was unlikely to inflame the jury. *Id.* at 435.

Price has not shown that any of these denials were unreasonable. As noted by the California Supreme Court, the ammunition was relevant to show that the arms seized from the storage locker were loaded and, therefore, more likely to be put to use for the AB as opposed to sold. *Id.* at 433-43. The bandolier served a similar purpose, albeit as weaker evidence of such. *Id.* at 434. The gun photographs supported the testimony of a Los Angeles County sheriff's deputy regarding the Barnes murder. *Id.* Price has not shown an entitlement to relief. *See Holley*, 568 F.3d at 1101. Accordingly, this subclaim is DENIED.

### 8.     Prior Bad Acts of Defense Witness Stinson

On cross-examination, defense witness John Stinson testified that he was in the Secured Housing Unit because the Department of Corrections and Rehabilitation determined that he was an active member of the AB. RT 18641, AG035051. Later, the prosecution returned to the issue and asked if Mr. Stinson's SHU placement had anything to do with his assault on a deputy sheriff. RT 18685, AG035089. The court overruled defense counsel's objection on the ground that it could be used as impeachment since Mr. Stinson testified that he had been on lockdown because of his AB connections. *Id.*

United States District Court
Northern District of California

1  Price argues that this ruling was incorrect because Mr. Stinson never testified that

2  the AB was the sole reason he was placed on lockdown.  Sec. Am. Pet. at 554.  Price

3  also asserts that the evidence was irrelevant and had nothing to do with the charges

4  pending against him and, thus, should not have been admitted.  *Id.*  He argues that the

5  prosecutor's purpose was to show a series of bad acts to emphasize the improper point

6  of Mr. Stinson's criminal disposition.  *Id.*

7  The California Supreme Court denied this claim finding that the questions were

8  proper cross-examination in light of Mr. Stinson's testimony on direct that prison officials

9  used his alleged AB membership to justify the restrictions placed on him.  *Price*, 1 Cal.4th

10  at 436.  The evidence was also admissible to challenge Mr. Stinson's broader claim that

11  the AB did not exist as an organization.  *Id.*

12  Price has not shown that this decision was unreasonable.  Even if the evidence

13  was irrelevant and the prosecution was attempting to use it show a propensity for criminal

14  behavior by Mr. Stinson, there is no clearly established federal law entitling Price to relief

15  on this point.  *See Estelle*, 502 U.S. at 75 n. 5 (The United States Supreme Court has left

16  open the question of whether admission of propensity evidence violates due process.).

17  Thus, this subclaim is DENIED.

18  ### 9.    Letter by Robert Griffen

19  Price next challenges the introduction of a letter written primarily by Blinkey Griffen

20  and augmented by Mr. Stinson.  The prosecutor initially asked Mr. Stinson questions

21  about the letter, including questions regarding Mr. Griffen's portion of the letter.  RT

22  18712-17, AG035116-21.  The letter purported to advocate the killing of Loser Clark.  RT

23  18712, AG035116.  Following the questioning of Mr. Stinson, the prosecutor moved to

24  introduce the letter.  RT 18723, AG035124.  Defense counsel objected on the ground that

25  Mr. Stinson could not testify to the part of the letter written by Mr. Griffen and the court

deferred ruling on the matter.  *Id.*, RT 18725, AG035126.

During the testimony of Clifford Smith, the prosecutor again began asking questions about the letter.  RT 19666, AG036112.  Defense counsel ultimately objected arguing that the questions were based on the part of the letter written by Mr. Griffen, who had not appeared in court to testify.  RT 19671, AG036117.  The trial court allowed admission of the letter to impeach both Mr. Stinson and the testimony of another witness, Wendell Norris, who testified about the AB's interactions with other prison gangs.  RT 19672, AG036118.  Price argues that the admission of the letter into evidence allowed Mr. Griffen to serve as a witness against Price without requiring him to testify and it was prejudicial because it was used to impeach several defense witnesses and emphasize the dangerousness of the AB.  Sec. Am. Pet. at 556.

The California Supreme Court denied this claim on the ground that it was not hearsay because it was not offered for the truth of the matters asserted therein, namely why Mr. Clark was killed and what had happened at Folsom State Prison with another prison gang.  *Price*, 1 Cal.4th at 437.

Price has not shown that this denial was unreasonable.  To the extent he argues that the admission violated his rights under the Confrontation Clause, there is no merit to his claim.  The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with the witnesses against him."  U.S. Const. amend. VI.  The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee.  *Crawford v. Washington*, 541 U.S. 36, 61 (2004)

The Confrontation Clause applies to all "testimonial" statements.  *See Crawford*, 541 U.S. at 50-51.  "Testimony . . . is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact."  *Id.* at 51 (internal quotation and

citation omitted).  "An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."  *Id.*  The Confrontation Clause applies not only to in-court testimony but also to out-of-court statements introduced at trial, regardless of the admissibility of the statements under state laws of evidence.  *Id.* at 50-51.  Hearsay that is not testimonial, "while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause."  *Davis v. Washington*, 547 U.S. 813, 821 (2006); see also *Whorton v. Bockting*, 549 U.S. 406, 420 (2007) (noting that under *Crawford*, "the Confrontation Clause has no application to [nontestimonial] statements and therefore permits their admission even if they lack indicia of reliability.").

The letter was not testimonial.  When the primary purpose of taking an out-of-court statement is to create an out-of-court substitute for trial testimony, the statement is testimonial hearsay and *Crawford* applies.  *Michigan v. Bryant*, 562 U.S. 344, 358-59 (2011).  When that was not the primary purpose, "the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause."  *Id.* at 359. A letter between AB members regarding the killing of another person would not have been created for the purpose of making an out-of-court substitute for trial testimony. Thus, Price's confrontation rights were not implicated by the introduction of the letter.

Price has not otherwise shown an entitlement to relief.  *See Holley*, 568 F.3d at 1101.  Accordingly, this subclaim is DENIED.

### 10.   Robert Rowland's Prior Bad Acts

In this subclaim, Price challenges the prosecution's presentation of multiple prior bad acts of defense witness Robert Rowland during cross-examination.  Sec. Am. Pet. at 557-560.  These acts included violent assaults and the concealment of weapons.  *Id.* Price argues that the introduction of these incidents constituted improper impeachment

119

because they included acts that did not result in felony convictions and because the evidence was not used to show that Mr. Rowland was untruthful during his direct testimony. *Id.* Finally, Price asserts that the introduction of this evidence further fueled undue emphasis of negative facts about the AB. *Id.* at 560.

The California Supreme Court denied this claim finding the impeachment evidence proper and relevant. *Price*, 1 Cal.4th at 438-39. Specifically, the court found that Mr. Rowland had been called to impeach the testimony of Michael Thompson and much of the impeachment evidence of Mr. Rowland supported the testimony of Mr. Thompson. *Id.* at 439.

Price has not shown that this denial was unreasonable. *See Holley*, 568 F.3d at 1101. Accordingly, this subclaim is DENIED.

### 11.    Comment on Failure to Call Defense Expert

Price next challenges the prosecutor's comments on the defense ballistics expert's failure to testify and the prosecution investigator's testimony that said expert was present during testing of bullet fragments that ultimately ruled out a third party's gun as the Barnes murder weapon.

The prosecution called a ballistics expert to present evidence that a gun recovered from a third party by Ms. Barnes could not have been the murder weapon. During the cross-examination, defense counsel tried to address possible shortcomings in the tests performed by Sergeant Christensen. On re-direct, the prosecutor sought to show that a defense expert went with Sgt. Christensen and observed the performance of the tests and did not testify that he observed any issues. Defense counsel argued that the absence of a defense ballistics expert was not appropriate rebuttal testimony and the court ruled that it could be introduced to rebut the implication that Sgt. Christensen did not do an adequate job. RT 19759, AG036224.

United States District Court
Northern District of California

United States District Court
Northern District of California

The testimony that a defense ballistics expert was present during the performance of Sgt. Christensen's tests came from prosecution investigator Barry Brown.  RT 19760-2, AG036227.  Mr. Brown testified that Chuck Morton accompanied him to the lab where Sgt. Christensen was performing his tests and was given the opportunity to examine bullet fragments and other materials collected at the scene.  *Id.*  Mr. Brown testified that Mr. Morton used a comparison microscope and was given access to whatever instruments he needed to examine the bullets.  RT 19760-2-60-3, AG036227-28.  Price argues that the introduction of this evidence was problematic because Mr. Brown never identified Mr. Morton as an expert, the prosecution assumed that the defense's failure to call Mr. Morton as an expert meant that the defense expert agreed with their expert, and Mr. Brown's testimony combined with the prosecutor's comments on the matter amounted to using the defense expert against the defense and was equivalent to calling Mr. Morton as a state witness.  Sec. Am. Pet. at 560-62.

The California Supreme Court denied this claim as waived because defense counsel failed to object or seek an admonition at trial.  *Price*, 1 Cal.4th at 440.  The court further held that trial counsel did not render ineffective assistance by failing to object at trial.  *Id.*  As such, this claim is procedurally defaulted.

Even if it wasn't, it lacks merit.  Price has cited no authority to support his proposition that the comments and testimony violated his Sixth Amendment right to counsel.  The argument that Mr. Brown never identified Mr. Morton as an expert fails in light of the testimony that Mr. Morton undertook his own evaluation of the bullet fragments, including using sophisticated equipment.  Price has not shown any other entitlement to relief.  *See Holley*, 568 F.3d at 1101.  Accordingly, this subclaim is DENIED.

//

**VI.    Claim XXIV - Corroboration of Accomplice Testimony**

**A.    Legal Standard**

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings.  *See Estelle*, 502 U.S. at 71-72. To obtain federal habeas relief for instructional error, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.  *See id.* at 72; *Cupp v. Naughten*, 414 U.S. 141, 147 (1973).  *See also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("it must be established not merely that the instruction is undesirable, erroneous or even 'universally condemned,' but that it violated some [constitutional right]") (citation and quotation marks omitted). The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.  *See Estelle*, 502 U.S. at 72. In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process.  *United States v. Frady*, 456 U.S. 152, 169 (1982) (citing *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)); *Prantil v. California*, 843 F.2d 314, 317 (9th Cir.1988).  *See also Middleton v. McNeil*, 541 U.S. 433, 434–35 (2004) (per curiam) (no reasonable likelihood that jury misled by single contrary instruction on imperfect self-defense defining "imminent peril" where three other instructions correctly stated the law). If an error is found, the court also must determine that the error had a substantial and injurious effect or influence in determining the jury's verdict, *Brecht*, 507 U.S. at 637, before granting relief in habeas proceedings.  *See Calderon v. Coleman*, 525 U.S. 141, 146–47 (1998).

The omission of an instruction is less likely to be prejudicial than a misstatement of the law.  *See Walker v. Endell*, 850 F.2d at 475-76 (citing *Henderson v. Kibbe*, 431 U.S. at 155).  Thus, a habeas petitioner whose claim involves a failure to give a particular

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

instruction bears an "'especially heavy burden.'"  *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977)).  The significance of the omission of such an instruction may be evaluated by comparison with the instructions that were given.  *Murtishaw v. Woodford*, 255 F.3d 926, 971 (9th Cir. 2001) (quoting *Henderson*, 431 U.S. at 156); *see id.* at 972 (due process violation found in capital case where petitioner demonstrated that application of the wrong statute at his sentencing infected the proceeding with the jury's potential confusion regarding its discretion to impose a life or death sentence).

### B.    State Court Denial

Price argues that his conviction on the Richard Barnes murder must be overturned because the primary evidence against him on that count was the testimony of accomplices Mr. Thompson and Mr. Smith, which was corroborated improperly by the testimony of Janet Myers, who Price asserts was also an accomplice as a matter of law. Sec. Am. Pet. at 576.  Price raises four interrelated subclaims:  (1) the trial court's accomplice instructions were erroneous because they failed to include instructions on vicarious liability, so the jury could not evaluate properly whether Ms. Myers was an accomplice; (2) the trial court erred in failing to instruct that Ms. Myers was an accomplice as a matter of law; (3) if Ms. Myers was an accomplice, there was insufficient evidence on which to satisfy the corroboration requirement under California law; and (4) because it is unclear whether the jury considered Ms. Myers to be an accomplice, it must be determined whether there was sufficient corroborating testimony independent of her testimony.  Sec. Am. Pet. at 577.

The California Supreme Court found that the murder of Mr. Barnes was not a "natural and probable consequence" of Ms. Myers allowing Mr. Price to stay in her home following his release from prison and, thus, there was no duty to instruct on the principal

of vicarious criminal liability.  *Price*, 1 Cal.4th at 443.  Because the evidence did not prove this theory as a matter of law, the California Supreme Court found that the trial court did not err in failing to give the instruction *sua sponte*.  *Id.*  Moreover, the court concluded that there was sufficient evidence to corroborate the testimony of Ms. Myers, Mr. Smith, and Mr. Thompson.  *Id.*  Specifically, the court pointed to Price's physical movements around the state during the relevant time frame; the fact that the Barnes killing was a professional, execution style killing and nothing was taken from the home, thus financial gain was not the motive; Mr. Barnes's address was found among Price's personal effects; and Price told his mother that the guns in his possession were "Brand business," "Brand" being another name for the Aryan Brotherhood.  *Id.* at 444.  The latter piece of evidence supported the conspiracy conviction.  *Id.*

## C.    Conclusionary Statement

Petitioner has not shown that the denial of this claim by the California Supreme Court was unreasonable.  As noted by the state court, sufficient evidence corroborated the accomplice testimony outside of Ms. Myers's testimony.  The findings that Ms. Myers was not an accomplice as a matter of law under California law and that the instructions were correct as a matter of state law are entitled to deference.  *See Bradshaw*, 546 U.S. at 76 (a state court's interpretation of state law binds a federal court on habeas review).  As such, this claim is DENIED.

## VII.   Claim XXV - Admission of "Aryan Brotherhood" Evidence

Price claims that the trial court violated his due process right by allowing reference to the Aryan Brotherhood, as opposed to identifying Price as a member of a prison gang, because the name itself was too inflammatory and prejudicial.  Sec. Am. Pet. at 595.  Price moved twice under Cal. Evid. Code § 352 to prevent the prosecution from using the name Aryan Brotherhood.  Both times, the trial court denied the motions finding that the

probative value outweighed any prejudice.  RT 1909-1910, AG0919068-69; 4367-4381, AG021171-85; CT 6498-6500, AG006157-59.

The California Supreme Court denied the claim on appeal finding that voir dire provided an adequate means of removing jurors who would have been prejudicially influenced by the name.  *Price*, 1 Cal.4th at 398.  The state court also held that Price's challenge to the existence of the Aryan Brotherhood as a gang, which he instead described as a loosely held social club, and his membership in it would have been "a practical impossibility" without naming the organization.  *Id.* at 397-98.  Moreover, the jury might speculate about why the name had been withheld.  *Id.*

The prosecution accused Price of committing the crimes for which he was on trial as part of a conspiracy in furtherance of the Aryan Brotherhood, a prison gang.  Price challenged the prosecution's assertion in part on the ground that the Aryan Brotherhood was a social club or a way of life, not an actual gang.  The jury, after listening to all of the testimony, including the name of the organization, could have drawn the permissible inference that the Aryan Brotherhood was, in fact, a gang for which Price conducted business.  Since there is a permissible inference to be drawn from the evidence, its inclusion does not violate due process.  *See Jammal*, 926 F.2d at 920 (Only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process.).  Accordingly, Price has not shown that the state court's decision was unreasonable.  This claim is, therefore, DENIED.

## CONCLUSION

For the reasons set forth above, Claims XI, XII, XVI, XVIII, XXII, XXIV, and XXV are DENIED.

//

//

1
2
3
4
5
6
7
8
9

The supplemental briefing on these claims was not only not helpful, it contributed to significant delay in adjudicating the petition.  The briefing was repetitive and duplicative and did not offer any new authority or insight.  As such, the Court will not repeat the supplemental briefing process.  Between the petition, the answer, and the reply, the Court has 1279 pages of briefing, which is more than enough on which to render a decision on the remaining claims in the petition.  The Court will determine in what order the remaining claims shall be adjudicated and an order will issue following its review of the next group of claims.

10

**IT IS SO ORDERED.**

11
12

Dated: December 1, 2016

13
14

_____
PHYLLIS J. HAMILTON
United States District Judge

15
16
17
18
19
20
21
22
23
24
25
26
27
28