UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CURTIS FLOYD PRICE,

               Petitioner,

    v.

KEVIN CHAPPELL,

               Respondent.

Case No. 93-cv-00277-PJH

**ORDER DENYING CLAIMS XIII, XV, XXI, XXIII, XXVII, XXVIII, XXIX, XXX, XXXI, AND XXXII**

United States District Court
Northern District of California

      Petitioner Curtis Floyd Price, a California capital prisoner currently incarcerated at San Quentin State Prison, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. On November 11, 2012, through his appointed counsel, Price filed a second amended petition with thirty-five fully exhausted claims. Respondent Ron Davis filed an answer on January 17, 2014 and Price replied on October 14, 2014.

      Due to the size of the petition and the voluminous subclaims, the parties agreed to proceed to a merits resolution on twenty-one record-based claims in three rounds of seven claims. An Order denying the first round of seven record-based claims issued on December 1, 2016. In that Order, the court determined that it could proceed to a determination on the remaining fourteen record-based claims without further briefing. Having reviewed the parties' papers and the record, and having carefully considered the relevant legal authorities, the court DENIES the following ten claims: XIII, XV, XXI, XXIII, XXVII, XXVIII, XXIX, XXX, XXXI, and XXXII.

I.    **Factual Summary**

   A.    **Facts Relating to Convictions**

   The following recitation of the factual background of this case is based on the California Supreme Court's opinion on Price's direct appeal. *People v. Price*, 1 Cal.4th 324 (1991). The state court's factual determinations are presumed to be correct pursuant to 28 U.S.C. § 2254(e)(1).

   In May 1986, Price was convicted in the Humboldt County Superior Court of the first-degree murders of Elizabeth Ann Hickey and Richard Barnes, whose murder actually occurred in Los Angeles County, and one count each of robbery with the use of a firearm, burglary, receiving stolen property, and conspiracy. As to the Hickey murder, the jury made special circumstance findings of multiple murders and robbery murder. The jury further found that Price previously had been convicted twice of felonies and completed two prior separate prison terms. Price was sentenced to death.

   Evidence was presented to show that Price was an active Aryan Brotherhood (AB) member and committed the crimes in furtherance of an AB conspiracy. The conspiracy was initiated following the testimony of Steven Barnes, another AB member, who testified as a prosecution witness against other AB members and against several non-AB members. During the summer of 1982, the AB leadership, which included Michael Thompson and Clifford Smith, who later testified against Price at his trial, decided to retaliate. Prison authorities had placed Steven Barnes in protective custody, so the AB leaders decided to kill members of his immediate family instead. They selected Price to do the killing.

   At the time, Price was serving a sentence in Montana state prison, but was scheduled for release from prison soon without parole supervision. One of the AB

United States District Court
Northern District of California

leaders brought Price to the state prison in Chino in August 1982 by subpoenaing him to testify at the leader's trial. After Price arrived, AB leaders offered him the "contract" to kill Richard Barnes. Price accepted. The AB leaders instructed him to procure weapons in Northern California before returning south to kill Richard Barnes.

Testimony established that following his release from prison, Price spent time in Southern California until October 1982, when he returned to Eureka. On January 23, 1983, the gun collection of Richard Moore disappeared from his residence, apparently having been stolen in a burglary, which included two rifles, three shotguns, and a .22–caliber handgun. The house had not been ransacked.

In late January 1983, Price returned to Southern California and stayed with several AB "runners," people who relayed messages to and from AB members in prison. One such runner, Janet Myers, drove Price to different addresses he wanted to see. One of the addresses was the Temple City residence of Richard Barnes.

On February 12, 1983, at 11 p.m., Price left Myers's house with another AB runner. He returned early the next morning, collected his belongings, and left.

On February 13, 1983, the body of Richard Barnes was found in his residence. He had been shot in the back of the head three times by a .22-caliber handgun.

Credit card receipts showed that Price had purchased gasoline in Pomona on February 12 and in Anaheim on February 13, 1983. In the room Price had occupied in his mother's house in Eureka, police found a slip of paper on which Richard Barnes's address had been written, together with the name "Nate," a nickname for Steven Barnes, and the words "send subpoena to him." Police found a similar note in Price's wallet. After the murder, Myers brought Smith a note signed by Price. It stated, "That's took care of. Everything went well. I am going back north. I will be in touch with you later."

Six days after Richard Barnes was found, Berlie Petry found the body of his

3

girlfriend, Elizabeth Ann Hickey, in the Humboldt County residence they shared. Hickey was the stepdaughter of burglary victim Moore. She had been beaten to death with a blunt instrument; guns belonging to her and to Petry were missing from their residence. Also missing was a combination radio and tape player that Petry had recently given Hickey. In Hickey's trunk, officers found a note in Hickey's handwriting that said "Call Curt . . . about money for guns."

One of Hickey's neighbors, testified she had seen a man with Hickey on two occasions shortly before Hickey was killed. She identified Price in a photographic lineup.

A subsequent search of Price's automobile yielded a product manual for one of Petry's rifles, a knife that had belonged to Hickey and had the name "Liz" written on it in fingernail polish, and a notebook in which someone had written, "Elizabeth, weapons, corner of Simpson and Pine [the location of Hickey's residence]," as well as Hickey's telephone number. Additional notes with Hickey's contact information were found in Price's wallet and in a suitcase he kept in his mother's garage. Price's mother gave police a combination radio and tape player that had been in Price's room. It was identical to the one taken from the Hickey residence.

The evening of February 19, the same day Elizabeth Hickey had been found murdered, a gunman robbed employees of the Triplex Theater at 6:30 p.m. He had long, thin blond hair and was wearing sunglasses, a watch cap, and gloves. During the movie, he came out into the lobby, pointed a revolver at the manager, and directed him into the office. At the man's direction, the manager put $7,000 in a bag and gave it to the man, who ran out of the theater.

After the robbery, the theater employees assisted the police in preparing a composite sketch of the robber. Five of the employees selected Price's photograph from a photo lineup as being similar to the robber, although none of them made a positive

identification.

In a suitcase in Price's mother's garage, the police found a blond wig, black gloves, a watch cap, a handgun, and various items of theatrical makeup (including spirit gum, liquid latex, derma wax, and nose putty). In Price's room in his mother's house, the police found a note that was apparently a list of Price's expenses and debts. On it Price had written "need mucho dinero" and "$1,000.00 I owe Mom means it's all about 'movie time.'" The police also found $400 in cash in a plastic container.

A day or two after Hickey's murder and the Triplex Theater robbery, Price arrived at his stepfather's residence in Reno, Nevada. He had two bundles wrapped in blankets. Price said they were guns that might have been stolen. Price's stepfather gave him permission to leave the guns at the residence. On February 28, 1983, Price returned to Reno and moved the bundles to a mini storage unit.

Price was arrested in Humboldt County for the Triplex Theater robbery on March 3, 1983. His mother visited him in jail on March 27, 1983. Price asked her to move the guns and ammunition from the storage locker in Reno and to dispose of them so they would never be found. He referred to the guns as "Brand business." "The Brand" is another name for the AB.

On March 31, 1983, law enforcement authorities searched the mini storage unit in Reno, Nevada. They found all of the guns taken from the Moore residence except one shotgun (apparently the one found in Price's mother's garage) and the handgun. They also found all the guns belonging to Hickey and Petry, and over 1,000 rounds of various kinds of ammunition. Moore's handgun, which was one of only four makes that could have fired the bullets that killed Richard Barnes, was never found.

The defense denied that Price had committed any of the offenses. It offered alibi evidence to show that Price was not in Humboldt County at the time of the Hickey killing

and the Triplex Theater robbery. It attempted to cast doubt on the identification testimony of the robbery victims and the veracity of the prosecution's AB witnesses, and it sought to cast suspicion on Petry for Hickey's murder.

Additionally, the defense called three prison inmates, Wendell Norris, John Stinson, and Robert Rowland, who testified that the AB existed only as an outlook, a way of life, or a loose social club rather than an organized criminal gang. They also said it was a label that prison authorities used to justify restrictive confinement.

The defense also adduced evidence to show that Petry had the motive and the opportunity to kill Hickey.

### B.    Facts Relating to Penalty

As evidence in aggravation, the prosecution introduced Price's prior criminal history. In 1971, Price violated parole on a California marijuana possession conviction by going to Montana, where he attempted to rob a small grocery store with a gun. Price was placed in a drug program, but he escaped from custody. He was later arrested in Florida and brought back to Montana to complete his sentence.

In December 1971, while being transported in Montana, Price grabbed a gun from one of the two transporting officers. After forcing the officers to drive to a remote location, Price locked them both in the trunk of their patrol car and used the gun to force his way into the car of a passing motorist, John Digalis. Price told Digalis to drive to Idaho. Law enforcement officers stopped the car. Price pointed the gun at Digalis's head and threatened to kill him if the officers approached. At Price's order, Digalis again began to drive, but the officers shot out a tire. Price eventually surrendered. He was convicted of inmate holding a hostage, a Montana felony.

Price was in San Quentin Prison in May 1978. He told another prisoner, Ricky Carpenter, that he was going to kill Leroy Banks, an African–American inmate, because

Banks had been disrespectful to an AB member. Carpenter pointed out Banks. Price stabbed Banks 10 to 15 times in the chest. Banks died of his wounds.

While in jail awaiting trial in this case, Price struck jail guards on two occasions, and on another occasion he violently resisted being taken to court, hitting and biting the guards who were escorting him.

As part of the defense's mitigation presentation, Price testified on his own behalf. Price said he had not testified at the guilt phase because the trial court had ordered him shackled in the courtroom. Because he had not yet been convicted, he had refused to appear before the jury in chains. He denied he was guilty of any of the charged offenses. He admitted that he knew Hickey. He said Hickey had asked him to sell her guns for her on consignment. The final arrangements were made during a telephone call from Hickey to the home of an AB runner in Auburn. He said he received the guns on February 18, 1983, in Lakeport from a man named Kenny. He claimed to have supported himself between October 1982 and March 1983 by selling marijuana.

The defense presented evidence about the conditions of Price's confinement in jail pending the trial in this case, which a nutritionist, a counselor, and a psychiatrist all testified were unhealthy, humiliating and stressful, and led to anxiety, depression, and hostility.

Price's family members testified that they loved Price and did not want him to die. Four corrections officers testified that Price had been a respectful and cooperative inmate while in custody.

## II.    Procedural History

Price litigated an automatic appeal of these convictions in the California Supreme Court, which affirmed the convictions on December 30, 1991. The court denied Price's petition for rehearing on February 19, 1992. Price filed a habeas petition in state court on

1  November 13, 1990 and a supplemental petition and request for consolidation with his

2  appeal on December 12, 1991. AG043034. The California Supreme Court denied the

3  initial petition on January 29, 1992. AG043033. The supplemental petition was denied

4  on February 12, 1992. AG043064.

5  Price filed a request for appointment of counsel and stay of execution in this court

6  on January 25, 1993. ECF Doc. No. 1. Counsel were appointed on June 23, 1994. ECF

7  Doc. No. 23. Through counsel, Price filed his first petition for writ of habeas corpus on

8  April 21, 1997. ECF Doc. No. 86. Respondent subsequently filed a motion to dismiss

9  based on failure to exhaust all of the petition's claims in state court. ECF Doc. No. 101.

10  Price opposed the motion and requested a stay of proceedings to return to state court

11  and exhaust any unexhausted claims. ECF Doc. No. 120. The court held a hearing on

12  the matter and ultimately denied respondent's motion to dismiss and granted Price's

13  motion to stay proceedings. ECF Doc. Nos. 136, 141.

14  While his state exhaustion petition was still pending, Price moved to temporarily lift

16  the stay in the instant proceedings to file a first amended petition. ECF Doc. No. 176.

17  The motion was granted. ECF Doc. No. 180.

18  Additionally, while the initial exhaustion petition was pending in state court, which

20  was his third state habeas petition, Price filed a fourth state habeas petition alleging juror

21  misconduct based on evidence discovered during the investigation to prepare the

22  exhaustion petition. AG047018-69.

23  The California Supreme Court issued an order to show cause on Price's

24  exhaustion petition regarding one claim: whether the prosecutor improperly tampered

26  with a sitting juror by sending her alcoholic drinks and money, and telling her to return a

27  guilty verdict. AG045273.

28  The California Supreme Court denied Price's fourth state habeas petition on June

8

24, 2009, prior to denying the exhaustion petition. AG047315. More than a year and a half later, on February 14, 2011, it denied the claim in the initial exhaustion petition on which it filed an order to show cause and discharged the order to show cause. AG046994-16. The remainder of the claims in the exhaustion petition were denied on April 13, 2011. AG047017.

Price moved to lift the stay and to file an amended petition on January 18, 2012. ECF Doc. No. 194. The request was granted on February 2. ECF Doc. No. 196.

Price filed his second amended petition on November 30, 2012. ECF Doc. No. 201. In it, he raised thirty-five claims for relief. Respondent filed his answer on January 17, 2014. ECF Doc. No. 210. Price filed his reply on October 14, 2014. ECF Doc. No. 220.

Following a meet-and-confer period, the parties identified twenty-one record-based claims that could proceed to briefing without a request for an evidentiary hearing. ECF Doc. No. 225. The court directed the parties to brief those claims in three rounds of seven claims. ECF Doc. No. 226. On December 1, 2016, the court issued an Order denying the first seven claims and advising the parties that no further briefing on the remaining fourteen claims would be necessary. ECF Doc. No. 250.

## ISSUES

Price asserts the following ten claims for relief:

(1)     that his rights to receive a fair trial by an impartial jury and effective representation under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated by the trial court's denial of his two motions to change venue due to pervasive bias and hostility toward him in Humboldt County;

(2)     that the trial court's refusal to sever the Hickey murder and burglary charges from the Barnes murder and conspiracy charges resulted in a fundamentally unfair trial

9

in violation of his rights to due process, a fair trial, the effective assistance of counsel, and the right to be free from cruel and unusual punishment as guaranteed by the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments;

(3)    that his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments were violated because he was tried and convicted on a conspiracy count, the basis of information for which did not conform to the evidence and for which there was insufficient evidence to support a conviction;

(4)    that his rights to due process, a fair trial, the effective assistance of counsel, and the right to be free from cruel and unusual punishment as guaranteed by the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments were violated by the trial court's erroneous admission of numerous pieces of prosecutorial evidence at the penalty phase;

(5)    that the trial court's erroneous evidentiary rulings during the penalty phase resulted in a fundamentally unfair trial in violation of his rights to due process, a fair trial, the effective assistance of counsel, and the right to be free from cruel and unusual punishment as guaranteed by the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments;

(6)    that the California statutory scheme under which Price was convicted and sentenced to death, as set forth in California Penal Code section 190, *et. seq.*, violates the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and article 1 sections 1, 7, 15, 16, and 17 of the California Constitution;

(7)    that the trial court's refusal to allow the defense to present, and the jury to consider, relevant mitigating evidence at the penalty phase resulted in a fundamentally unfair trial in violation of Price's rights to due process, a fair trial, the

effective assistance of counsel, and the right to be free from cruel and unusual

punishment as guaranteed by the Fourth, Fifth, Sixth, Eighth, and Fourteenth

Amendments;

(8)     that the trial court's erroneous jury instructions regarding the Banks killing in the

penalty phase resulted in a fundamentally unfair trial in violation of Price's right to

due process, a fair trial, the effective assistance of counsel, and his right to be free

from cruel and unusual punishment as guaranteed by the Fourth, Fifth, Sixth,

Eighth, and Fourteenth Amendments;

(9)     that the trial court's reaction to the jury's report of deadlock at the penalty phase

coerced the death verdict in violation of his rights to due process, a fair trial, the

effective assistance of counsel, and the right to be free from cruel and unusual

punishment as guaranteed by the Fourth, Fifth, Sixth, Eighth, and Fourteenth

Amendments; and

(10)    that his rights to due process, a fair trial, the effective assistance of counsel, and

the right to be free from cruel and unusual punishment as guaranteed by the

Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments were violated by a

variety of errors and flaws in the California capital sentencing procedures.

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence

on the basis of a claim that was reviewed on the merits in state court unless the state

court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined

by the Supreme Court of the United States; or (2) resulted in a decision that was based

on an unreasonable determination of the facts in light of the evidence presented in the

State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions

of law and to mixed questions of law and fact*, Williams v. Taylor*, 529 U.S. 362, 407–09

(2000), while the second prong applies to decisions based on factual determinations,

*Miller-El v. Cockrell* ("*Miller-El I*"), 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under

the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to

that reached by [the Supreme] Court on a question of law or if the state court decides a

case differently than [the Supreme] Court has on a set of materially indistinguishable

facts." *Williams*, 529 U.S. at 412-13. A state court decision is an "unreasonable

application of" Supreme Court authority, falling under the second clause of § 2254(d)(1),

if it correctly identifies the governing legal principle from the Supreme Court's decisions

but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

The federal court on habeas review may not issue the writ "simply because that court

concludes in its independent judgment that the relevant state-court decision applied

clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the

application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

A state court's determination that a claim lacks merit precludes federal habeas

relief so long as "fairminded jurists could disagree" on the correctness of the state court's

decision. *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*,

541 U.S. 652, 664 (2004)). "[E]valuating whether a rule application [i]s unreasonable

requires considering the rule's specificity. The more general the rule, the more leeway

courts have in reaching outcomes in case-by-case determinations." *Id.* "As a condition

for obtaining habeas corpus [relief] from a federal court, a state prisoner must show that

the state court's ruling on the claim being presented in federal court was so lacking in

justification that there was an error well understood and comprehended in existing law

12

beyond any possibility for fairminded disagreement." *Id.* at 102.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El I*, 537 U.S. at 340. Review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

## DISCUSSION

## I. Claim XIII - Erroneous Denial of Motion for Change of Venue

Price argues that the trial court's denial of his two motions for change of venue based on juror bias due to pretrial publicity regarding the case and the nature of the small community in which the case was tried denied him a fair trial. Price filed the first motion prior to voir dire. The trial court denied it without prejudice to renewal should voir dire show an insufficient venire of unbiased jurors. Price filed the second motion following the impaneling of the jury, which the trial court also denied.

### A. Legal Standard

A criminal defendant facing trial by jury is entitled to be tried by "a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Bias or prejudice on the part of even one juror would violate Price's right to a fair trial. *See*, *e.g.*, *United States v. Hendrix*, 549 F.2d 1225, 1227 (9th Cir.1977).

Accordingly, a trial judge must grant a motion for a change of venue if prejudicial pretrial publicity makes it impossible to seat an impartial jury. *See Gallego v. McDaniel*, 124 F.3d 1065, 1070 (9th Cir. 1997). A defendant must demonstrate one of two different types of prejudice in support of a motion to transfer venue: presumed or actual. *See id.*

Prejudice is presumed when the record demonstrates that the community where

13

the trial was held was "saturated" with prejudicial and inflammatory media publicity about the crime. *See id.* However, "[p]rominence does not necessarily produce prejudice, and juror impartiality. . . does not require ignorance." *Skilling v. United States*, 561 U.S. 358, 381 (2010) (citing *Irvin*, 366 U.S. at 722).

"A presumption of prejudice attends only the extreme cases." *Id.* The publicity must be so pervasive and inflammatory that the jurors cannot be believed when they assert that they can be impartial. *See United States v. Croft*, 124 F.3d 1109, 1115 (9th Cir. 1997). Prejudice is rarely presumed because "saturation" defines conditions found only in extreme situations. *See Gallego*, 124 F.3d at 1070.

To establish actual prejudice, the defendant must demonstrate that the jurors exhibited actual partiality or hostility that could not be laid aside. *See Gallego*, 124 F.3d at 1070. The focus must be on the jurors who were actually seated on the petit jury and it is not enough that some of them had some prior knowledge of the case. *See id.* at 1071-72 (only publicity that operates to deprive defendant of a fair trial may cause prejudice). *See*, *e.g.*, *Hayes*, 632 F.3d at 511-12 (no actual prejudice shown where there was "no evidence here that any member of the empaneled jury was influenced by press coverage, let alone convinced by it that Hayes was guilty"). A defendant's decision to neither challenge any juror for cause nor exercise all peremptory challenges indicates satisfaction with the jury and suggests a lack of actual prejudice due to pretrial publicity. *See Fetterly*, 163 F.3d at 1148.

When evaluating actual prejudice in a situation where "pretrial publicity is at issue, 'primary reliance on the judgment of the trial court makes [especially] good sense' because the judge 'sits in the locale where the publicity is said to have had its effect'" and is better able to assess the extent to which publicity may have influenced a juror. *Skilling*, 561 U.S. 358, 386 (alteration in original); *see Hayes*, 632 F.3d at 510, 511-12.

A state trial court's finding of juror impartiality is presumed to be correct. *See Ybarra v. McDaniel*, 656 F.3d 984, 992-94 (9th Cir. 2011) (applying presumption of correctness to state court factual findings of no juror partiality where petitioner presented no clear and convincing evidence to the contrary); *Ainsworth*, 138 F.3d at 796.

## B.   State Court Denial

Under California law, a motion to change venue should be granted if a defendant shows that a fair trial cannot be held in the county of original venue. *Price*, 1 Cal.4th at 390, citing *People v. Coleman*, 48 Cal.3d 112, 133 (1989). The trial court should consider the following factors: "the gravity and nature of the crime, the size and nature of the community, the extent and nature of the publicity concerning the crime, the status of the victim, the status of the accused, and 'any indication from the voir dire of prospective and actual jurors that the publicity did in fact have prejudicial effect.'" *Id.*

The California Supreme Court found that the first two factors weighed in favor of granting the change of venue motion, but that upon consideration of the other factors and a review of the voir dire, Price had failed to show a reasonable likelihood that a fair trial was not obtainable in Humboldt County. *Id.*

Specifically, the California Supreme Court found that when viewed as a whole, "the media coverage was restrained and balanced, prominently featuring the defense evidence and arguments, and it abated almost entirely after the preliminary hearings." *Id.* at 392. In its denial, the court noted that publicity began in April 1983 with a story stating that Price had been charged with the Hickey murder. That particular story identified Hickey as a twenty-two-year-old mother and mentioned that her two children were asleep in a nearby bedroom when she was murdered by several blows to the head. There was no further media coverage until October 1983, when the first preliminary hearing took place. Media coverage picked back up during the first preliminary hearing and continued

15

through the second preliminary hearing in April and May 1984.  Topics covered included testimony that the AB was both a gang and a social organization or way of life; that AB leadership gave the murder contracts to Price because of his disposition and criminal history; defense theories about Berlie Petry and evidence regarding Hickey's promiscuity; and the fact that two council members had voted against funding for the prosecution of this case because it was slated to be the most expensive in the county's history.  *Id.* at 391-92.  During an almost two-year period, ten television segments aired regarding the trial and the length of those segments averaged less than one minute.  *Id.* at 392.

In evaluating the remaining factors, the California Supreme Court determined that the relative esteem with which the community regarded Price, Hickey, and Barnes was not so disproportionate that it necessitated a change of venue.  While initial media reports described Price as an Oregon resident, subsequent stories noted that he had lived with his mother in Eureka.  Richard Barnes was an unknown in the community.  And Elizabeth Hickey's status as a young mother "undoubtedly [made her] a sympathetic figure;" however, the record did not contain any evidence that her death stirred any particular emotion within the community.  *Id.*

Finally, according to a defense analysis of potential jurors' responses to a questionnaire, seventy-six percent of those who answered had not heard of Price, seventy-eight percent had not heard of Hickey, ninety-four percent had not heard of Barnes, and seventy-eight percent indicated they had learned nothing of the case through the media.  *Id.* at 393.

The California Supreme Court also noted that Price agreed upon a jury while still retaining eight peremptory challenges to jurors and two peremptory challenges to potential jurors.  Under California law, "the failure to exhaust peremptories is a strong indication 'that the jurors were fair, and that the defense itself so concluded.'"  *Id.* at 393,

16

citing *People v. Balderas*, 41 Cal.3d 144, 180 (1985).

In reviewing Price's specific bias claims regarding Jurors Southworth and Kramer, the court determined that Price had not asserted these grounds in his motions for change of venue and that those allegations did not alter the conclusion that the trial court had not erred in denying either motion for change of venue. *Id.* at 394.

### C.    State Court Denial Was Not Unreasonable

Price has failed to show either actual or presumed prejudice by the trial court's denial of his two venue motions. As an initial matter, when the jury was impaneled, Price had eight peremptory challenges left that he could have used against any regular juror and two peremptory challenges he could have used against any alternate. This suggests a lack of actual prejudice. *See Fetterly*, 163 F.3d at 1148. Moreover, the issue of whether the jury held any bias against a petitioner is a factual one and the trial court's "finding that the jury was not biased is entitled to the usual presumption of correctness." *Leavitt v. Arave*, 383 F.3d 809, 826 (9th Cir. 2004), citing *Jeffries v. Blodgett*, 5 F.3d 1180, 1189 (9th Cir. 1993).

In evaluating Price's second motion for a change of venue, the trial court specifically outlined nineteen jurors who had been dismissed for cause and cited the reasons said jurors could not be impartial. RT 9805, AG026658. The trial court held that a change of venue was not warranted because only nine to ten percent of the jury venire was excused for cause and eighty-nine to ninety percent of the venire either had no knowledge of the case whatsoever or had some knowledge but indicated they could be fair. RT 9804, AG026657. The court also noted that the regular and alternate jurors had been approved by both sides. RT 9801, AG026654. Price has failed to show any actual bias. His specific arguments regarding bias by Jurors Southworth and Kramer will be addressed when those claims are ripe for adjudication; however, the fact remains that he

17

1    failed to use his remaining peremptory challenges to remove jurors whom he knew or

2    believed had contact with someone else related to the case due to the small nature of the

3    community.

4        Price also argues the court should presume bias.  He has not provided the court

5    with any clearly established federal law that would entitle him to a presumption of bias.

6    The United States Supreme Court has found presumed bias based on pretrial publicity in

7    only three cases:  *Sheppard v. Maxwell*, 384 U.S. 333 (1966); *Estes v. Texas*, 381 U.S.

8    532 (1965); and *Rideau v. Louisiana*, 373 U.S. 723 (1963).  *See Bolin v. Chappell*, 2016

9    WL 3213551 *13 (E.D. Cal., June 9, 2016).  The pretrial publicity in Price's trial falls far

10    short of what the Supreme Court found prejudicial in those three cases.  In *Rideau*, which

11    also involved a small town, the media aired petitioner's videotaped confession to the

12    crimes for which he was charged three times and tens of thousands of people saw it each

13    time.  373 U.S. at 724-27.  *See also Skilling*, 561 U.S. at 379.  In *Estes* and *Sheppard*,

14    the media presence within the courtroom became disruptive to the actual proceedings.

15    *See, Estes*, 381 U.S. at 536; *Sheppard*, 384 U.S. at 358.  By contrast, here there were a

16    limited number of media reports about the case on varied topics, including defense

17    theories, that were viewed by a small fraction of the jury venire.  At no time in Price's

18    preliminary hearings did the media interrupt or intrude on the proceedings.

19        This case is more analogous to *Leavitt*, cited above.  There, the petitioner

20    committed a brutal stabbing.  The Ninth Circuit denied relief for his claim that pretrial

21    publicity warranted a change of venue, noting that even though Blackfoot, ID, the

22    community in which the crime occurred, was a small one and the crime was "vile," the

23    media accounts were "essentially factual in nature, and the testimony showed that the

24    community was not inflamed against [the petitioner]."  *Id.*  Like in *Leavitt*, the media

25    coverage of Price's trial "was not such a barrage of inflammatory publicity as would lead

to a presumption of prejudice." *Id.*

Price has not provided, nor has the court found, any clearly established federal law that would entitle him to relief based on the size of Humboldt County and the likelihood of jurors knowing witnesses. While the California Supreme Court considered the size and nature of the county as weighing in favor of a venue transfer, those comprised only one factor of a number to consider in making the ultimate determination. Price has not shown that the California Supreme Court's denial of this claim was an unreasonable application of clearly established federal law or an unreasonable interpretation of the facts. Accordingly, this claim is DENIED.

## II.     Claim XV - Erroneous Denial of Motion to Sever Hickey and Barnes Charges

In claim XV, Price argues that the trial court violated his constitutional rights by denying his motion to sever the Hickey murder and burglary charges from the Barnes murder charges. Price asserts that the trial court's denial of the severance motion on the ground that the conspiracy extended beyond Richard Barnes's murder was factually inaccurate because no evidence supported such a conclusion and because the prosecution's theory of the case was inconsistent with that premise.

### A.     Legal Standard

A joinder, or denial of severance, of counts or codefendants, may prejudice a defendant sufficiently to render his trial fundamentally unfair in violation of due process. *Grisby v. Blodgett*, 130 F.3d 365, 370 (9th Cir. 1997).

A federal court reviewing a state conviction under 28 U.S.C. § 2254 does not concern itself with state law governing severance or joinder in state trials. *Grisby*, 130 F.3d at 370. Its inquiry is limited to the petitioner's right to a fair trial under the United States Constitution. *Grisby*, 130 F.3d at 370. To prevail, therefore, the petitioner must demonstrate that the state court's joinder or denial of his severance motion resulted in

19

prejudice great enough to render his trial fundamentally unfair. *Id.* In addition, the impermissible joinder must have had a substantial and injurious effect or influence in determining the jury's verdict. *Sandoval v. Calderon*, 241 F.3d 765, 772 (9th Cir. 2000).

There is a "high risk of undue prejudice whenever . . . joinder of counts allows evidence of other crimes to be introduced in a trial of charges with respect to which the evidence would otherwise be inadmissible." *United States v. Lewis*, 787 F.2d 1318, 1322 (9th Cir. 1986). This risk is especially great when the prosecutor encourages the jury to consider the two sets of charges in concert, *e.g.*, as reflecting a modus operandi even though the evidence is not cross-admissible, and when the evidence of one crime is substantially weaker than the evidence of the other crime. *Bean v. Calderon*, 163 F.3d 1073, 1084-85 (9th Cir. 1998). But joinder generally does not result in prejudice if the evidence of each crime is simple and distinct (even if the evidence is not cross-admissible), and the jury is properly instructed so that it may compartmentalize the evidence. *Id.* at 1085-86. Similarly, joinder generally does not result in prejudice if the jury did not convict on all counts because it presumably was able to compartmentalize the evidence. *Park v. California*, 202 F.3d 1146, 1149-50 (9th Cir. 2000).

### B. State Court Denial

The California Supreme Court denied this claim, finding that evidence of the Barnes murder would have been cross-admissible in a trial on the Hickey murder and robbery "to confirm the existence of the conspiracy and [Price's] participation in it." *Price*, 1 Cal.4th at 389. Additionally, evidence of the Barnes murder could have been admissible in a separate trial regarding the Hickey offenses to show motive for the Hickey murder. *Id.* The court noted that the evidence showed that while the AB gave Price the directive to obtain guns and money to execute the contract on Richard Barnes, they subsequently had given Price additional murder contracts following his release from

20

prison that extended the conspiracy. *Id.*

The California Supreme Court further held that even if Price had shown that the evidence on the two murder charges would not have been cross-admissible under California law, he had failed to show that he had been prejudiced by the trial court's denial of his severance motion. *Id.* at 389-90. Specifically, the court determined that neither murder was more inflammatory than the other and that no one murder was supported by substantially stronger evidence. *Id.* at 389.

### C. State Court Denial Was Not Unreasonable

The state court determined as a matter of state law that the evidence of the two murders would have been cross-admissible if the trial court had granted the motion to sever. That determination binds this court. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (a state court's interpretation of state law binds a federal court on habeas review).

The record supports the California Supreme Court's conclusion that evidence supported the continuation of the conspiracy beyond the Barnes murder. At the preliminary hearing, Michael Thompson testified that following Price's discharge from prison, the AB leadership council voted to give him two additional murder contracts that were delivered to him by courier. CT 2672, AG002796. Additionally, Thompson testified that the council directed Price to procure weapons in Northern California to complete the Barnes contract, "amongst others," and noted that the AB was always planning for future contracts. CT 2656-57, AG002780-81.

As noted by Davis, cross-admissibility "dispels the prejudicial impact of joining all counts in the same trial." *Sandoval*, 241 F.3d at 772. Moreover, the jury's acquittal of Price on the charges stemming from the Triplex Theater robbery shows its ability to compartmentalize evidence. *See Park*, 202 F.3d at 1149-50. Because Price has been unable to show that the California Supreme Court denial of this claim was an

1    unreasonable interpretation of the facts or an unreasonable application of clearly

2    established federal law, it is DENIED.

3    **III.    Claim XXI - Insufficient Evidence to Support Conspiracy Conviction**

4            In this claim, Price argues that his conviction on the conspiracy count violates his

5    right to be tried and convicted of an information that conformed to the evidence.  Price

6    states that the charging information stated that the conspiracy occurred between April

7    and September 1982 in Humboldt County, yet the prosecution never adduced any

8    conspiracy evidence during those dates in Humboldt County.  Further, he says that the

9    evidence showed that "any alleged conspiritorial [sic] acts during the period between April

10   and September of 1982 occurred in San Bernardino County" and that every alleged overt

11   act enumerated in the information occurred after the conclusion of the stated conspiracy

12   duration.  Pet. at 526.  Alternatively, Price states that his conspiracy conviction is

13   unconstitutional because it is not supported by sufficient evidence.

14           **A.  Charging Information Subclaim**

15                 **1.      Legal Standard**

16           It is clearly established federal law that a criminal defendant has a Sixth

17   Amendment right to be informed of any charges against him, and that a charging

18   document, such as an information, is the means by which such notice is provided.  *Gautt*

19   *v. Lewis*, 489 F.3d 993, 1004 (9th Cir. 2007) (citing *Cole v. Arkansas*, 333 U.S. 196, 201

20   (1948)).  The Supreme Court "has never held that non-charging document sources can

21   be used to satisfy the Constitution's notice requirement" where the defendant claims that

22   he never received sufficient notice of the underlying charge.  *Id.* at 1009 (defendant

23   charged with a sentence enhancement under one subsection of a statute could not be

24   sentenced under another subsection that had more requirements and carried a stiffer

25   penalty).  However, the habeas court can look to sources other than the information for

evidence that the defendant did receive adequate notice of the theory of a case (*e.g.*, felony murder).  *See id.* at 1009.

A habeas petitioner may claim a divergence between what he was alleged to have done in the information and what the jury convicted him of doing.  The success of such a claim will turn on whether the discrepancy constituted a variance or an amendment, often called a "constructive amendment."  A variance occurs when the proof introduced at trial differs materially from the facts alleged in the information.  In contrast, an amendment involves a change, whether literal or in effect, in the terms of the information, *i.e.*, a change in the crime(s) charged.  *Jones v. Smith*, 231 F.3d 1227, 1232-33 (9th Cir. 2001).  If the discrepancy is a mere variance, then it is subject to the harmless error rule.  By contrast, if the discrepancy constitutes an amendment, then it may be prejudicial per se.  *Id.*  As the Supreme Court indicated in *Stirone v. United States*, 361 U.S. 212, 218 (1960), where a defendant is convicted of a crime and where the grand jury never charges the defendant with an essential element of the crime, a constructive amendment has occurred and reversal is warranted.  *Id.*

A variance requires reversal only when the defendant was prejudiced thereby.  *Jones*, 231 F.3d at 1238.  "The key question . . . is whether an error or omission in an indictment [or information] worked to the prejudice of the accused."  *United States v. Normandeau*, 800 F.2d 953, 958 (9th Cir. 1986).  Defects of form, as opposed to substance, will generally not constitute prejudice to the accused.  *See*, *e.g.*, *Echavarria-Olarte v. Reno*, 35 F.3d 395, 398-99 (9th Cir. 1994) (indictment citing only conspiracy statutes sufficient to inform drug defendant not only of elements of crime, but also of underlying substantive offenses; error, if any, was defect of form rather than of substance).

In addition, a defendant may be adequately notified of the nature and cause of the

23

accusation by means other than the indictment/information in advance of trial, *see*, *e.g.*, *Jones*, 231 F.3d. at 1238-39 (even though the information did not allege premeditation, it was clear from record that petitioner was on notice well before trial that the prosecution sought to prove that he attempted to commit murder deliberately and with premeditation), or even by the prosecutor's statements during trial, *see*, *e.g.*, *Stephens v. Borg*, 59 F.3d 932, 934-36 (9th Cir. 1995) (even though information charged defendant with murder and did not state theory of case was felony murder, defendant had constitutionally adequate notice of felony murder charge from prosecution's production of proposed felony murder instructions during defendant's case-in-chief and presentation of evidence of underlying felony that laid foundation for felony murder instruction); *Calderon v. Prunty*, 59 F.3d 1005, 1009-10 (9th Cir. 1995) (even if information was not sufficient, defendant had adequate notice of nature of accusation against him from statements made by prosecutor during opening statement and during motion for acquittal at close of prosecution's case).

### 2. State Court Denial of Information Subclaim

The California Supreme Court denied this subclaim, finding that Price had received ample notice of the allegations against him through the preliminary hearing evidence. *Price*, 1 Cal.4th at 398. Additionally, the court noted that any discrepancy in the conspiracy dates was corrected on the verdict form. *Id.*

### 3. State Court Denial Was Not Unreasonable

Price has failed to show that the California Supreme Court denial of this claim was an unreasonable application of clearly established federal law or an unreasonable interpretation of the facts. The issues with the information of which Price complains constitute a variance. Price had been charged with all of the essential elements of conspiracy. *See Stirone*, 361 U.S. at 218 (granting relief where variance, in the sense of a variation between pleading and proof, . . . destroyed the defendant's

substantial right to be tried only on charges presented in an indictment returned by a grand jury).

Time is not an element of the crime of conspiracy under California law. *People v. Griffin*, 98 Cal.App.2d 1, 44 (App. 3 Dist. 1950), disapproved of on other grounds by *People v. Weiss*, 50 Cal.2d 535, 566 (1958). "The law fixes no time in which [a conspiracy] must have been entered into and it does not provide that it have any particular duration. It is sufficient if in any manner the conspirators tacitly come to a mutual understanding to commit a crime." *Id.* (citation omitted). Nor is location an element of conspiracy. Rather, the issue of where the conspiracy was formed and where overt acts were carried out goes to the issue of venue. *See People v. Jones*, 288 Cal.App.2d 74, 86-87 (1st Dist. 1964) (venue is proper in county where agreement reached or an overt act in furtherance of the conspiracy occurred). Because the prosecution incorrectly identified the dates of the conspiracy and location of the commencement of the conspiracy, but neither of those constitute an element of the crime, the mistake is a variance, which is subject to harmless error review.

As noted by the California Supreme Court, Price received notice of the exact dates and locations of the alleged conspiracy at the preliminary hearing. As in *Calderon*, *supra*, the prosecution laid out its theory behind the conspiracy charge in its opening statement. Price had ample notice of the conspiracy allegations and the evidence the prosecution intended to adduce to support them. Accordingly, he has not met his burden for this subclaim and it is DENIED.

**B. Sufficiency of the Evidence Subclaim**

Price argues that the prosecution failed to present sufficient evidence to support a conspiracy conviction as pled in the information.

//

### 1. Legal Standard

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, *see Jackson v. Virginia*, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief, *see id.* at 324.

The Supreme Court has emphasized that "*Jackson* claims face a high bar in federal habeas proceedings . . . ." *Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (per curiam) (finding that the 3rd Circuit "unduly impinged on the jury's role as factfinder" and failed to apply the deferential standard of *Jackson* when it engaged in "fine-grained factual parsing" to find that the evidence was insufficient to support petitioner's conviction). A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992), *cert. denied*, 510 U.S. 843 (1993); *see*, *e.g.*, *Coleman*, 132 S. Ct. at 2065 ("the only question under *Jackson* is whether [the jury's finding of guilt] was so insupportable as to fall below the threshold of bare rationality"). The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Payne*, 982 F.2d at 338 (quoting *Jackson*, 443 U.S. at 319). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, has there been a due process violation. *Jackson*, 443 U.S. at 324.

//

### 2. State Court Denial of Information Subclaim

In denying this subclaim, the California Supreme Court noted that the correct conspiracy dates appeared on the verdict form and that "substantial evidence" supported the guilty verdict "entered on this form." *Price*, 1 Cal.4th at 398. As support, the court specifically noted the testimony of AB member Michael Thompson, who described the rationale for the determination to kill Richard Barnes and for awarding the assignment to Price. Thompson also discussed the directions to Price that he needed to procure weapons to carry out the task. The court noted that the "prosecution introduced other evidence to show that [Price] committed various acts in Humboldt County in January and February of 1983 to achieve the objectives of the conspiracy." *Id.*

### 3. State Court Denial Was Not Unreasonable

In viewing the evidence in the light most favorable to the prosecution, sufficient evidence supported Price's conspiracy conviction because at least one rational trier of fact could have found him guilty. *See Jackson*, 443 U.S. at 319. Price only disputes the evidence as to the charging information, not as to how the charge appeared on the verdict form. Because there was sufficient evidence to support his conviction as the information appeared on the verdict form, the California Supreme Court denial of this subclaim was not unreasonable and it is, accordingly, DENIED.

## IV. Claim XXIII - The Prosecution Introduced Improper Evidence Through the Cross- Examination of Defense Witnesses and Through Rebuttal Witnesses

In this claim, Price challenges as violative of his constitutional rights the court's admission of three items of prosecutorial evidence in the penalty phase: (1) rumors that Sheila Yates, Price's sister, had allegedly heard from family about Price and how many people he had killed, (2) impermissibly broad rebuttal evidence following Price's statement that he was not "personally capable" of killing Elizabeth Hickey, and (3)

27

impermissible questions about Price's possession of a stolen gun.

### A.    Legal Standard

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process.  *See Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999).  The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ."  *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established Supreme Court precedent  under § 2254(d)); *see*, *e.g.*, *Zapien v. Martel*, 805 F.3d 862, 869 (9th Cir. 2015) (because there is no Supreme Court case establishing the fundamental unfairness of admitting multiple hearsay testimony, *Holley* bars any such claim on federal habeas review).

Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds.  *See Henry*, 197 F.3d at 1031; *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991).  While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial even when state standards are violated; conversely, state procedural and evidentiary rules may countenance processes that do not comport with fundamental fairness.  *See id.* (citing *Perry v. Rushen*, 713 F.2d 1447, 1453 (9th Cir. 1983), cert. denied, 469 U.S. 838 (1984)).  The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair.  *Walters v.*

28

*Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995); *Colley*, 784 F.2d at 990. But note that only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process. *See Jammal*, 926 F.2d at 920.

The United States Supreme Court has left open the question of whether admission of propensity evidence violates due process. *Estelle v. McGuire*, 502 U.S. 62, 75 n. 5 (1991). Based on the Supreme Court's reservation of this issue as an "open question," the Ninth Circuit has held that a petitioner's due process right concerning the admission of propensity evidence is not clearly established as required by AEDPA. *Alberni v. McDaniel*, 458 F.3d 860, 866-67 (9th Cir. 2006); *accord Mejia v. Garcia*, 534 F.3d 1036, 1046 (9th Cir. 2008), reaffirming *Alberni*. *See*, *e.g.*, *Larson v. Palmateer*, 515 F.3d 1057, 1066 (9th Cir. 2008) (because Supreme Court expressly reserved the question of whether using evidence of prior crimes to show propensity for criminal activity could ever violate due process, state court's rejection of claim did not unreasonably apply clearly established federal law).

**B. Yates Testimony**

When interviewed by Sgt. Frederickson in March 1983 following Price's arrest, Yates said that "she believed [Price] was 'up to no good,' that she did not trust him, and that she had heard he had bragged to her sister-in-law about killing six people." *Price*, 1 Cal.4th at 473. During the penalty phase of Price's trial, Yates asked the jury to spare Price's life because, in part, she believed he was not guilty and that he could be a positive role model to newer prisoners. The prosecution sought to impeach Yates with her statement to Sgt. Frederickson and the trial court held a hearing outside the presence of the jury. The trial court ultimately allowed the prosecution to introduce the statement over the defense's objections. Price argues that the admission was improper because the trial court failed to demonstrate on the record that the danger of prejudice to Price

outweighed the probative value of the statement.  He notes that the prosecution had

other means with which to impeach Yates, namely that she was a family member and,

therefore, biased.

The California Supreme Court held that the admission of Yates's March 1983

statement to Sgt. Frederickson that a family member had told her that Price had killed six

people was suitable impeachment evidence because it expressed an opinion different

than the one she had testified to on the stand, specifically that she believed Price was not

guilty.  *Id.* at 473-74.  The court noted that while defense counsel objected to the

admission of the statement on a number of grounds, counsel failed to object on the

ground of undue prejudice.  *Id.* at 474.

Because Price has failed to show that the jury could draw no impermissible

inferences from Yates's testimony, he has failed to show that the California Supreme

Court denial of this subclaim was an unreasonable application of clearly established

federal law or an unreasonable application of the facts on the record before the state

court.  *See Jammal*, 926 F.2d at 920.  Accordingly, this subclaim is DENIED.

**C.  Broad Impeachment Evidence**

In this subclaim, Price challenges the trial court's admission of two pieces of

evidence the prosecution introduced to counter Price's direct testimony that he was "not

personally capable" of killing Elizabeth Hickey:  questioning regarding an uncharged

robbery from the early 1970's and Carpenter's testimony regarding the Banks killing.

Price argues that the trial court improperly took the broadest view of that statement

without attempting to clarify its meaning and admitted the evidence despite the fact that

the prejudice to Price far outweighed the probative value.

The California Supreme Court held that both were proper impeachment evidence.

*Price*, 1 Cal.4th 476-77.  The court stated that Price's statement that he was incapable of

the Hickey murder sufficiently opened the door to cross-examination regarding prior

violent acts. *Id.* And while, "robbery is admittedly violence of a different order than brutal

murder," the court determined that went to the weight accorded the evidence as opposed

to its admissibility. *Id.* at 477.

The state court denied the portion of this subclaim related to Carpenter's testimony

regarding the Banks killing on different grounds than the challenge presented in the

petition. The decision laid out the history of the prosecution's attempt to procure

Carpenter's testimony for the penalty phase pursuant to Cal. Pen. Code section 190.3,

which allows evidence in aggravation at the penalty phase. *Id.* at 475-76. Because the

prosecution did not timely identify Carpenter as a witness, the trial court barred the

prosecution from presenting his testimony in its case-in-chief, but allowed for Carpenter

to be called on rebuttal should it become appropriate to do so. RT 21505, AG037802.

The trial court ultimately permitted Carpenter to testify on rebuttal because it served two

purposes: to impeach Price's statement that he was incapable of killing Hickey and to

rehabilitate prosecution witness Perryman, who had been a correctional officer who

responded to the scene of Banks's killing. RT 22615, AG039057.

The California Supreme Court determined that the trial court erred in precluding

Carpenter's testimony from the prosecution's case-in-chief and held that this error did not

prejudice Price. *Price*, 1 Cal.4th at 476. It found that the defense had sufficient notice

under section 190.3 to be able to respond to the testimony. *Id.*

Price has not provided, nor has the court found, any clearly established federal law

that entitles him to questioning by a trial court judge to attempt to determine the meaning

of his own testimony and a narrowly tailored evidentiary ruling in response. The

California Supreme Court found the evidence was admitted properly as a matter of state

law. That determination binds this court. *See Bradshaw*, 546 U.S. at 76. The jury could

31

use the evidence to reach a permissible inference, thus its admission did not violate due process. *See Jammal*, 926 F.2d at 920. Accordingly, this subclaim is DENIED.

### D. Testimony Regarding Stolen Gun

As discussed in detail in the court's Order Denying Claims XI, XII, XVI, XVIII, XXII, XXIV, XXV, the prosecution called a gun manufacturer as a witness in the guilt phase to impeach defense witness Rebecca Williams's testimony that she did not know how to operate a gun by describing that modifications that necessitated repair had been made to a weapon she claimed to have inherited from her grandfather. Order at 63. The gun had been found in Price's possession. During the penalty phase, the prosecutor asked Price where he had obtained the gun. Price argues that the trial court erred in allowing this line of questioning because the prosecution had failed to show a connection between the gun and any of the crimes for which Price had been charged and convicted, it exceeded the scope of direct examination, and it was irrelevant to any aggravating factor.

The California Supreme Court denied this subclaim, holding that it was relevant to impeach Price's claims on direct that he was innocent of the crimes charged, including the conspiracy with the AB to accumulate guns. *Price*, 1 Cal.4th at 477. The court also noted that Price's possession of the weapon as a felon was illegal under state law and countered his claims of rehabilitation. *Id.*

Price has failed to show that he was prejudiced by this line of questioning in light of the fact that a significant amount of evidence about the gun was presented to the same jury in the guilt phase. Additionally, he has failed to show that this denial was unreasonable. As with the evidence challenged above, there was a permissible inference the jury could draw from the testimony. Thus, this subclaim is DENIED.

//

//

V.    **Claim XXVII - The Court Improperly Restricted Petitioner's Cross-Examination of Prosecution Witnesses and Made Erroneous Evidentiary Rulings**

In this claim, Price challenges the exclusion of documents he wrote, which he says would have shown his ability to express himself in writing, and the trial court's restriction of the cross-examination of Ricky Carpenter, which Price says prevented him from showing Carpenter's bias.

### A. Legal Standard

A person in custody pursuant to the judgment of a state court can obtain a federal writ of habeas corpus only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). A state court's evidentiary ruling therefore is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process. *See Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Jammal*, 926 F.2d at 919-20; *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985), *cert. denied*, 478 U.S. 1021 (1986).

"[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (alteration in original) (internal quotation marks omitted); *see also Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) (holding that due process does not guarantee a defendant the right to present all relevant evidence). This latitude is limited, however, by a defendant's constitutional rights to due process and to present a defense, rights originating in the Sixth and Fourteenth Amendments. *See Holmes*, 547 U.S. at 324. "While the Constitution prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are

asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Id.* at 325-26; see *Egelhoff*, 518 U.S. at 42 (holding that the exclusion of evidence does not violate the Due Process Clause unless "it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."). But "at times a state's rules of evidence cannot be mechanistically applied and must yield in favor of due process and the right to a fair trial." *Lunbery v. Hornbeak*, 605 F.3d 754, 762 (9th Cir. 2010) (finding California's application of its evidentiary rules to exclude hearsay testimony that bore persuasive assurances of trustworthiness and was critical to the defense violated right to present evidence).

The defendant, not the state, bears the burden to demonstrate that the principle violated by the evidentiary rule "is so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Egelhoff*, 518 U.S. at 47 (internal quotation marks omitted).

Even if an evidentiary error is of constitutional dimension, the court must consider whether the error was harmless under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *Dillard v. Roe*, 244 F.3d 758, 767 n.7 (9th Cir. 2001).

## B. Exclusion of Price's Writings

### 1. State Court Denial of Claim

Price sought to introduce a number of different writings at the penalty phase to show his "sensitivity, compassion, and writing ability." *Price*, 1 Cal.4th at 487. To these ends, the trial court admitted:

> (1) a 2-page short story entitled "Shorty and the Apple Orchard" about a child's experience with a horse; (2) a 17-page description of life in prison, entitled "Chapter Two: San

Quentin State Prison 1970-1971"; (3) a 3-page essay entitled "A Boxcar Realization" discussing how prison inmates repress their emotions to avoid appearing vulnerable and how this causes them to dismiss or ignore the emotional trauma suffered by crime victims; (4) a 2-page letter of apology, apparently addressed to the defense investigator; (5) a 7-page letter of advice to a friend facing imprisonment for the first time; (6) a 5-page autobiographical sketch, entitled "Incorrigible," about defendant's experiences with the juvenile justice system in Oregon; [and] (7) a 5-page essay entitled "The Kind of Juror I Would Like"[.]

*Id.* at 485-86. The trial court denied admission, however, of twenty-three pages of "notes and letters addressed to the trial judge protesting the shackling order and jail conditions during the trial" on the grounds that the documents constituted hearsay and were an "incomplete and misleading account" of the reasons for the shackling order. *Id.* at 486.

On appeal, Price challenged the trial court's exclusion of the twenty-three pages of notes arguing that they were not presented for the truth of the matter asserted and, therefore, were excluded improperly. *Id.* The California Supreme Court denied the subclaim finding that the documents properly were excluded because they were cumulative of the other admitted documents on the issue of Price's ability to express himself in writing.

## 2. State Court Decision Not Unreasonable

Price has failed to show that the state court denial of this subclaim was an unreasonable application of clearly established federal law or an unreasonable application of the facts. Price has failed to identify any clearly established federal law that would entitle him to relief on this claim. The three United States Supreme Court cases he cites in the petition and reply are all inapposite and his primary challenge is to the trial court's purported violation of the California Evidence Code. Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds. *See Jammal*, 926 F.2d at 919.

To support his argument that the trial court violated his constitutional rights by refusing to admit certain documents he authored, Price cites to *Woodson v. North Carolina*, 428 U.S. 280 (1976); *Green v. Georgia*, 442 U.S. 95 (1979); and *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007). *See* Pet. at 605; Reply at 156. *Woodson*, he argues, mandates that the jury be allowed to consider evidence of Price's unique character. Pet. at 605. *Woodson* found unconstitutional North Carolina's law mandating the death penalty for any first-degree murder conviction and it was within that context that the Supreme Court discussed the need for a particularized consideration of the relevant facets of a defendant's character (428 U.S. at 304). Moreover, the excluded documents were not the only evidence of Price's "ability to express his feelings in writing," which he argues is a unique personality aspect that demonstrates his life is worth saving (Pet. at 606). The trial court, as noted by the California Supreme Court, entered into evidence seven other examples of Price's writings, ranging from a children's story, to a sample chapter of the book he testified he intended to write, to an apology letter to the defense investigator. By contrast, *no* evidence of the defendant's particularized characteristics was presented in *Woodson*.

Price next relies on *Green* for the proposition that the trial court improperly excluded the documents on hearsay grounds. In *Green*, the Supreme Court found that the exclusion of a witness's testimony that the co-defendant in the case confessed that he committed the murder alone after sending petitioner to run an errand for him, violated due process because it was "highly relevant to a critical issue in the punishment phase of trial." 442 U.S. at 96-97. The "critical issue" in *Green* was whether the petitioner was present when the murder occurred. The only evidence that the co-defendant committed the murder by himself was the excluded testimony. *Green* is inapposite. As noted, Price's excluded evidence was cumulative.

Finally, Price cites *Abdul-Kabir* as requiring the presentation of *all* mitigating evidence that might provide a basis for not imposing the death penalty. Reply at 156 (emphasis in original). The Supreme Court granted relief in *Abdul-Kamir* because the jury had not been instructed to give "meaningful effect or a 'reasoned moral response' to [the] defendant's mitigating evidence." 550 U.S. at 264 (citation omitted). Again, the circumstances presented in the case vary greatly from those present in Price's trial. The defense produced and the trial court admitted ample evidence of Price's ability to express himself in writing, thus the jury was not precluded from considering that aspect of Price's character. Accordingly, even if the exclusion constituted error, it did not prejudice Price. This subclaim is DENIED.

### C. Limitation on Carpenter Cross-Examination

#### 1. State Court Denial of Claim

The defense sought to impeach Ricky Carpenter, who testified regarding Price's stabbing of another San Quentin prisoner, Leroy Banks, by asking his probation officer on cross-examination about the fact she had been unable to confirm Carpenter's reported recent employment. *Price*, 1 Cal.4th at 708. The trial court excluded the evidence as irrelevant because it had no impeachment value. RT 22810, AG039288.

The California Supreme Court denied this subclaim because the issue of Carpenter's employment was irrelevant to his parole status because Carpenter's parole conditions did not require him to maintain employment. *Price*, 1 Cal.4th at 708. "Thus, the proposed testimony had no value for impeachment." *Id.*

#### 2. State Court Decision Not Unreasonable

Price argues that the evidence about the parole agent's inability to confirm Carpenter's employment was "highly relevant as a factor in the parole department's determination whether Carpenter should be returned to custody because of his parole

violation" wherein he tested positive for drug use. Pet. at 607. By excluding the evidence, the court prevented jurors from having all of the information they needed to understand Carpenter's vulnerability and to assess the likelihood of a revocation. *Id.* at 608. In his reply, Price acknowledges that Carpenter's parole officer testified outside the presence of the jury that Carpenter's employment would have no bearing on a determination regarding revocation; however, he argues that if the purported employment turned out to be a lie, it could have added an additional ground for revocation. Reply at 157. Additionally, Price argues that defense counsel should have been allowed to explore the potential lie to show Carpenter's "mendacity." *Id.*

To support his argument, Price cites *Davis v. Alaska*, 415 U.S. 308 (1974). *Davis* generally provides that a defendant should be able to cross-examine a prosecution witness about probationary status, be it a juvenile adjudication or otherwise, to show the witness's potential vulnerability to pressure by the prosecution. 415 U.S. at 318. Here, the trial court allowed Price to question Carpenter about his parole status and examine the parole agent regarding Carpenter's failed drug tests in April, May, and June 1986, which contradicted Carpenter's testimony that he stopped taking drugs after February 1986. Additionally, on cross-examination, Carpenter testified that he had received a grant of immunity for a crime about which he testified and also received $800 from the prosecution to relocate his family.

The trial court's exclusion of the employment verification testimony and the California Supreme Court's denial of this subclaim did not abridge *Davis.* Price showed Carpenter's vulnerability and bias by introducing testimony about Carpenter's parole status; the positive drug tests, which demonstrated Carpenter's willingness to lie on the stand; the receipt of a prosecutorial immunity grant in another case; and the money provided by the prosecution to relocate Carpenter's family. Price has provided no

evidence to support his assertions that the employment issue would have factored in a revocation decision and there is evidence in the record to support the state courts' determinations that Carpenter's employment was irrelevant to any such decision. Accordingly, the California Supreme Court denial of this claim is not an unreasonable determination of clearly established federal law or the facts and this subclaim is DENIED.

## VI.    Claim XXVIII - California's Death Penalty Statutory Scheme is Unconstitutional

Price argues that the California Death Penalty statutory scheme violates the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, as well as various provisions of the California Constitution, because it fails to adequately narrow the class of offenders eligible for the death penalty.  Pet. at 611-12.  To the extent Price raises an argument about the constitutionality of the scheme under state law, such argument is not cognizable on federal habeas.  *Estelle*, 502 U.S. at 68.  The California Supreme Court denied this claim on the merits on habeas.  *See* En Banc California Supreme Court Opinion, *In re Curtis F. Price*, Case No. S069685 (Filed Apr. 13, 2011).

The United States Supreme Court has held California's death penalty scheme does appropriately narrow the class of death-eligible defendants and does not apply to every defendant convicted of murder.  *See Tuilaepa v. California*, 512 U.S. 967, 972 (1994) (holding that to pass constitutional muster, state's death penalty scheme "may not apply to every defendant convicted of murder; it must apply only to a subclass of defendants convicted of murder").  As noted, Price was death-eligible because the jury found true the multiple murder and robbery-murder special circumstances as to the Hickey murder.  Price has not shown that the special circumstances were not sufficiently narrowing.

Price supports this claim by drawing upon data compiled by Dr. Steven Schatz

("Schatz"). Price states that "at least 84% of first-degree murders were special circumstances murders" in 1987. Pet. at 612. However, only "10% of convicted first degree murders were sentenced to death." *Id.* at 611. "As a result, only approximately 12% of the statutorily death-eligible class of first degree murderers were in fact being sentenced to death." *Id.* at 612. Thus, according to Price, California's death penalty scheme "fails to adequately narrow the class of individuals eligible for the death penalty" and creates "across-the-board eligibility for the death penalty." *Id.* at 609, 612.

The Ninth Circuit considered and rejected a substantially similar "failure to narrow" claim in *Karis v. Calderon*, 283 F.3d 1117, 1141 n.11 (9th Cir. 2002). As the *Karis* court observed, "[t]he California [death penalty] statute satisfies the narrowing requirement set forth by [the U.S. Supreme Court.]" *Id.* "The special circumstances in California apply to a subclass of defendants convicted of murder and are not unconstitutionally vague. . . . California has identified a subclass of defendants deserving of death and by doing so, it has narrowed in a meaningful way the category of defendants upon whom capital punishment may be imposed." *Id.* (internal quotation marks omitted).

Likewise, in *Mayfield v. Woodford*, 270 F.3d 915, 924 (9th Cir. 2001), the Ninth Circuit denied a certificate of appealability on a "failure to narrow" argument. As the court noted, "[a] defendant is eligible for the death penalty under the 1978 statute [as enacted in Cal. Penal Code § 190.2] only if, at the guilt phase, the jury finds him guilty of first degree murder and finds to be true a statutorily defined special circumstance." *Id.* That finding narrows the total set of murderers to a more limited set of defendants eligible for the death penalty. "At the penalty phase, the class of defendants eligible for death is again narrowed by the jury's application of a series of statutorily enumerated aggravating or mitigating factors," which are listed in Cal. Penal Code § 190.3. *Id.* Thus, a "reasonable jurist could not debate . . . that the 1978 California [death penalty] statute,

40

which narrowed the class of death-eligible defendants at both the guilt and penalty phases, was constitutional." *Id.*

Furthermore, several district courts have specifically rejected "failure to narrow" arguments that draw upon Schatz's analysis of criminal convictions from 1987. In *Ayala v. Wong*, 2009 WL 1357416, *6 (S.D. Cal. May 13, 2009), for instance, the district court acknowledged that petitioner had "presented his [failure to narrow] argument to the Court accompanied by the declaration of Professor Steven F. Schatz." The *Ayala* court found this argument unavailing and explained that "[section] 190.2[ ] performs a genuine narrowing function and thus fulfills the constitutional requirement imposed by [the U.S. Supreme Court] to distinguish between those murderers who are and are not eligible for the death penalty." *Id.* at *7; *see also Hawkins v. Wong*, 2013 WL 3422701, *3 (E.D. Cal. July 8, 2013) ("The supplemental evidence [based on Schatz's data] does not provide a basis for deviating from the magistrate judge's recommendation[ ]" to deny habeas relief). Taken together, these cases—*Karis*, *Mayfield*, *Ayala*, and *Hawkins*—demonstrate that Price's arguments regarding § 190.2's constitutionality are not well taken. Accordingly, this claim is DENIED.

## VII.   Claim XXIX - The Trial Court Improperly Precluded Petitioner from Presenting Mitigation Evidence

This claim challenges the trial court's exclusion of particular testimony by dietician Pat Manuel and counselor Helen Vatcher as mitigation evidence at the penalty phase. Price argues that Manuel should have been able to testify that Price's diet directly impacted his decision not to attend his own trial and explain the reasons why Price chose to be vegetarian. Vatcher, he says, should have been allowed to testify that she had seen Price crying, which would have shown his sensitivity.

//

### A. Legal Standard

The sentencer in a death penalty case may not be prevented from considering "as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (emphasis and footnotes omitted); *see also Hitchcock v. Dugger*, 481 U.S. 393, 394 (1987).

### B. State Court Denial

The trial court excluded Manuel's testimony about the impact of Price's diet on his decision to attend trial, noting that whether Price came to trial was irrelevant to the dietician's testimony. The California Supreme Court found the trial court's ruling proper, noting that Price himself testified as to why he skipped much of the guilt phase proceedings and that the trial court had permitted Manuel to testify to Price's "diet during trial and to explain its probable effect on [his] emotional and physical health." *Price*, 1 Cal.4th at 487. The court held that the impact of Price's diet on any particular decision he made was beyond Manuel's expertise, would require her reliance on some level of hearsay from Price, and, thus, was not appropriate questioning for that particular witness. *Id.* at 488.

The California Supreme Court made a similar ruling as to the desired testimony by Manuel regarding Price's reasons for becoming a vegetarian. The trial court had allowed Manuel to testify that Price was a vegetarian and to detail the inadequacy of the diet provided by the jail and the effects of such on Price's health. However, the trial court held that Manuel was not the proper witness to explain Price's reasons for becoming a vegetarian. The trial court did allow Price, himself, to testify to that issue. The California Supreme Court affirmed the decision and the reasoning behind it. *Id.* at 488.

As to Vatcher's testimony, the California Supreme Court held that Price was not

prejudiced by the trial court's ruling sustaining the prosecution's objection to Vatcher's response to defense counsel's question whether she had ever seen Price cry. *Id.* at 487. While the trial court did sustain the objection, the witness answered, "Yes, I did," and the court did not strike her answer. RT 21933-34, AG038282-83. Moreover, when asked if she had ever seen Price "express extreme emotional pain," she answered, "Yes. He cried with me." RT 21934, AG038283. Thus, the jury heard the evidence Price sought to have introduced.

### C. State Court Denial Was Reasonable

To support his argument that Manuel should have been able to testify to the role of Price's diet in his determination not to attend trial, Price relies on *Tennard v. Dretke*, 542 U.S. 274, 284-85 (2004). *Tennard* overturned a Fifth Circuit practice of determining the constitutional relevance of a particular piece of evidence prior to allowing its admission for mitigation purposes. *Id.* at 283-84. *Tennard* reiterated the standard of relevancy, noting that good character evidence would always be relevant because it might "'serve as a basis for a sentence less than death.'" *Id.* at 285, citing *Lockett*, 438 U.S. at 604. As noted by the California Supreme Court, Price was not precluded from presenting any of the evidence in mitigation he sought to introduce. The two pieces of testimony he sought from Manuel were best and most reliably testified to by Price himself, and he was allowed to testify to those issues. Price has not provided any clearly established federal law that would entitle him to the testimony of an expert witness regarding Price's reasons for his own decisions.

The challenged Vatcher testimony that she had witnessed Price cry was heard by the jury, more than once during her questioning. As such, Price has been unable to show that the California Supreme Court's denial of this claim was an unreasonable application of clearly established federal law or an unreasonable application of the facts.

43

Accordingly, this claim is DENIED.

## VIII.    Claim XXX - The Jury Was Left No Choice But to Conclude the Banks Killing Was Murder

In this claim, Price raises two challenges to the trial court's instructions to the jury in the penalty phase regarding the Banks killing.  First, Price argues that the trial court's instructions on first-degree murder and assault with a deadly weapon left the jury with no choice but to conclude that the Banks killing was either first-degree murder or a legally justifiable killing because the trial court excluded instructions on second-degree murder and manslaughter.  Price states that the failure to instruct on those alternative theories prejudiced him because the focus on first-degree murder exaggerated the seriousness of Price's prior violent, criminal behavior and deprived the jury of the opportunity of finding it less culpable criminal conduct.

Second, Price argues that the trial court's erroneous inclusion of felony-murder instructions further complicated the matter because the prosecution presented no evidence on which to base a determination that the Banks killing constituted a first-degree murder based on felony-murder.  Thus, Price says, there is no basis for knowing whether the jury determined that Price had committed first-degree murder based on an invalid legal theory.

Respondent asserts that the trial court was not obligated to instruct on theories not requested by the defense because the prosecution only needed to show that the Banks killing was "criminal" and "violent" for it to be considered an aggravating factor under Cal. Pen. Code section 190.3 (b).  Ans. at 371-72.  Respondent notes that defense counsel requested that the jury be required to find the prosecution's first-degree murder theory to be true before they could consider the event an aggravating factor, hence the need for instruction on first-degree murder.  *Id.*

**A. Legal Standard**

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings. *See Estelle*, 502 U.S. at 71-72. To obtain federal habeas relief for instructional error, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. *See id.* at 72; *Cupp v. Naughten*, 414 U.S. 141, 147 (1973). *See also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("it must be established not merely that the instruction is undesirable, erroneous or even 'universally condemned,' but that it violated some [constitutional right]") (citation and quotation marks omitted). The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. *See Estelle*, 502 U.S. at 72. In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. *United States v. Frady*, 456 U.S. 152, 169 (1982) (citing *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)); *Prantil v. California*, 843 F.2d 314, 317 (9th Cir.1988). *See also Middleton v. McNeil*, 541 U.S. 433, 434–35 (2004) (per curiam) (no reasonable likelihood that jury misled by single contrary instruction on imperfect self-defense defining "imminent peril" where three other instructions correctly stated the law). If an error is found, the court also must determine that the error had a substantial and injurious effect or influence in determining the jury's verdict, *Brecht*, 507 U.S. at 637, before granting relief in habeas proceedings. *See Calderon v. Coleman*, 525 U.S. 141, 146–47 (1998).

The omission of an instruction is less likely to be prejudicial than a misstatement of the law. *See Walker v. Endell*, 850 F.2d at 475-76 (citing *Henderson*, 431 U.S. at 155). Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an "'especially heavy burden.'" *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir.

45

1997) (quoting *Henderson*, 431 U.S. at 155). The significance of the omission of such an instruction may be evaluated by comparison with the instructions that were given. *Murtishaw v. Woodford*, 255 F.3d 926, 971 (9th Cir. 2001) (quoting *Henderson*, 431 U.S. at 156); *see id.* at 972 (due process violation found in capital case where petitioner demonstrated that application of the wrong statute at his sentencing infected the proceeding with the jury's potential confusion regarding its discretion to impose a life or death sentence).

### B. State Court Denial

The California Supreme Court denied the first subclaim finding that state law did not require the trial court to instruct on any theories for which the defense did not specifically request an instruction. *Price*, 1 Cal.4th at 489. This rule allows the defense the opportunity to minimize the amount of instructions should it decide that instructions on all elements of all offenses could cause the jury to place undue significance on the crimes presented as aggravating factors and not on the central question of whether a defendant should live or die. *Id.*

With regard to the second subclaim, the California Supreme Court found the inclusion of the felony-murder instruction to be erroneous because Banks was not killed during the commission or attempted commission of an inherently dangerous felony. *Id.* However, the state court determined that the inclusion was not prejudicial because the instructions only fully defined first-degree murder with premeditation and deliberation, which was supported by witness Ricky Carpenter's testimony. *Id.* Thus, the court concluded that if the jurors believed Carpenter's testimony, Price necessarily committed a premeditated and deliberated first-degree murder of Banks. *Id.* If they did not believe Carpenter's testimony, the instructions became "irrelevant" because there were no definitions for less culpable forms of homicide and it fell within the province of the jury to

46

determine the aggravating force of the event without regard to its legal label. *Id.*

## C. State Court Denial Was Reasonable

Price has failed to show that the California Supreme Court denial of this claim was an unreasonable application of clearly established federal law or an unreasonable application of the facts on the record before it. Price provides no clearly established federal law to support his claim for relief. The case he cites for the proposition that the jury should have been instructed on lesser-included offenses, *Beck v. Alabama*, 447 U.S. 625 (1980), holds that such instructions are required in the guilt phase "when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense." *Id.* at 637. That case has not been extended to apply to the presentation of evidence under Cal. Penal Code section 190.3(b) in the penalty phase. That it deals with instructions for murder in a capital case is not sufficient. *See Woods v. Donald*, 135 S. Ct. 1372, 1377 (2015) (If the circumstances of a case are only "similar to" Supreme Court precedents, then the state court's decision is not "contrary to" the holdings in those cases.).

Additionally, Price has failed to show that the California Supreme Court's finding that the inclusion of the erroneous felony-murder instructions did not violate his due process rights was unreasonable. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as "'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 131 S.Ct. at 786 (quoting *Yarborough*, 541 U.S. at 664). A petitioner must show the state court's decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87. Price has fallen far short of showing that all fairminded jurists would agree that he was

prejudiced by the inclusion of the erroneous instructions. The felony-murder instructions constituted one line in the middle of a massive instruction about the requirements for finding first-degree murder. Additionally, as noted by the California Supreme Court, Carpenter's testimony supported a finding of first-degree murder, and the jurors did not evidence any confusion with the instructions. Accordingly, this claim is DENIED.

## IX. Claim XXXI - The Trial Court Coerced the Jury into Rendering a Verdict After It Had Reported a Deadlock

Price challenges as coercion the trial court's instruction to the jury that it continue deliberating following the jury's report of a deadlock. Price argues that three interrelated errors regarding the court's instruction violated his rights: (1) the trial court lacked any legitimate basis to reject the jury's declaration of deadlock, (2) the court misled the jury by "strongly implying that a verdict would have to be obtained at some point in order to bring the case to a conclusion," and (3) the court refused to allow a juror to ask a question. Pet. at 621-22.

### A. Legal Standard

"Any criminal defendant . . . being tried by a jury is entitled to the uncoerced verdict of that body." *Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988). Thus, an instruction is unconstitutionally coercive if it denies the defendant the due process right to a trial by a fair and impartial jury. *DeWeaver v. Runnels*, 556 F.3d 995, 1007 (9th Cir. 2009). The use of a supplemental jury charge given by the court to encourage a jury to reach a verdict after the jury has been unable to agree for some period of deliberation has long been sanctioned. *See Allen v. United States*, 164 U.S. 492, 501–02 (1896).

The Ninth Circuit has said that in a habeas case involving a state conviction the questions for the court are (1) whether the applicable state court looked at the totality of the circumstances in determining if the instruction was coercive; and (2) whether that

court's determination on the coercion question was reasonable. *Parker v. Small*, 665 F.3d 1143, 1148 (9th Cir. 2011); *DeWeaver*, 556 F.3d at 1007 (state appellate court's holding that supplemental jury instruction containing a hypothetical mildly slanted in favor of the prosecution was not coercive was not contrary to *Lowenfield*).

Federal courts reviewing an *Allen* charge given by a state court must consider the supplemental instruction "'in its context and under all circumstances,'" *Lowenfield*, 484 U.S. at 237 (citation omitted); *Jiminez v. Myers*, 40 F.3d 976, 980 (9th Cir. 1993); *Locks v. Sumner*, 703 F.2d 403, 406–07 (9th Cir. 1983). Whether the comments and conduct of the state trial judge violated due process ultimately turns on whether "'the trial judge's inquiry would be likely to coerce certain jurors into relinquishing their views in favor of reaching a unanimous decision.'" *Jiminez*, 40 F.3d at 979 (quoting *Locks*, 703 F.2d at 406). Relief will not be granted "unless it is 'clear from the record' that an *Allen* charge had an impermissibly coercive effect on the jury." *Rodriguez v. Marshall*, 125 F.3d 739, 750 (9th Cir. 1997).

Because an *Allen* charge carries the potential for jury coercion, the trial judge using the charge should instruct jurors not to surrender their sincere convictions when they reassess their positions. *See United States v. Bonam*, 772 F.2d 1449, 1451 (9th Cir. 1985); *cf. Rodriguez*, 125 F.3d at 750 (no coercion where judge not only advised jurors not to surrender their sincerely held beliefs but 1) made no comment on numerical split, 2) did not know whether the majority favored conviction or acquittal, and 3) did not know the identity of the holdouts; fact that the jury deliberated for four more days and called for a reading of testimony indicated that there had been no coercion). This assures that the "integrity of individual conscience in the jury deliberation process . . . not be compromised." *United States v. Mason*, 658 F.2d 1263, 1268 (9th Cir. 1981).

//

**B. State Court Denial**

The California Supreme Court decision denying this claim details the factual

background underlying it:

> The jury began its penalty deliberations at 10:41 a.m. on
> Tuesday, July 1, 1986. It deliberated until 4:55 p.m. that day
> and from 9 a.m. until 4:38 p.m. on the following day. On
> Thursday, July 3, the jury again began deliberating at 9 a.m.
> At 1:55 p.m., the foreperson sent the court a note that stated:
> "We seem to have reached an impasse in making a
> unanimous decision. Any suggestions?" In the courtroom, at
> 2:33 p.m., the court asked whether there was a reasonable
> probability that further deliberations would produce a verdict.
> The foreperson replied: "When I wrote the note, I was not
> sure. Since sending the note, we have taken another vote and
> the numbers have changed. So we may not be at an
> impasse." The jury returned to the jury room and deliberations
> continued.
>
> Less than an hour later, the foreperson sent the court a note
> stating that the jury was deadlocked. The jury returned to the
> courtroom at 4:03 p.m. In response to the court's inquiries, the
> foreperson said that the vote was seven to five, that it had not
> changed during the last four ballots, and that she did not think
> the votes were likely to change. Asked whether they shared
> the view that further deliberations would probably not result in
> a verdict, 10 of the 11 remaining jurors responded in the
> affirmative. The 11th juror was unsure. The court then
> consulted briefly with counsel at the bench. The prosecution
> favored further deliberations; defense counsel said they were
> satisfied there was a deadlock.
>
> The court addressed the jury: "Ladies and gentlemen, at a
> time like this, the law is in an odd position in a way. The law's
> clear that there can be no force or coercion applied to a jury to
> reach a verdict. You're asked to give your individual opinion
> and, apparently, you certainly have. And, of course, on the
> other side of that coin, there's a desire of everyone, I'm sure
> yourselves, to conclude this once and for all.
>
> "So, my comments at this point are not to be in any way an
> attempt to change anyone. All I'm saying, at this point in time,
> everyone here-I think everyone who hasn't been in the jury
> room can't imagine what you've struggled with. We know
> you've been here for the last year struggling with everyone
> else to get through the case.
>
> "And on the other hand, everyone here would like to see it
> over with. I think they would also like to see-well, without
> going any more, we would all like to see it end today, of
> course. I think what I'd like to do, although I have reservations,
> I see things both ways.

> "I think what I'll do is recess until Monday and let you meet again Monday morning and discuss it. And if you feel the same way you feel now, then we'll reassemble just like we are now. So at this point I'm going to give you the admonition. [Court gives usual admonition not to discuss the case.]
>
> "If you can, please have a pleasant Fourth of July weekend. Try to forget about the problem that faces you. And please do not take my continuing this to Monday as any attempt to coerce you in any way. I just want to give you time to get away from it for a while, come back and approach it fresh. If you still have the same mind, there's no one here going to force you to do anything you don't want to abide by."
>
> A juror then inquired, "I presume I can't ask a question?" The court replied, "Please, not now."
>
> The jury resumed deliberations at 9:30 a.m. on July 7. At 10 a.m., the foreperson sent the court a note requesting seven items of evidence. During the remainder of that day and the next, the jurors requested several additional items of evidence, which were provided to them. At 3:40 p.m. on July 8, the jury announced it had reached a verdict. On being polled, each juror affirmed unequivocally that the verdict imposing the death penalty was the individual verdict of that juror.

*Price*, 1 Cal.4th 465-66.

Under California law, a trial judge can discharge a deadlocked jury that has no reasonable probability of reaching agreement "at the expiration of such time as the court may deem proper." Cal. Penal Code § 1190. In making that determination, the trial court may consider the length of time the jury has deliberated. *Price*, 1 Cal.4th at 467, citing *People v. Haskett*, 52 Cal.3d 210, 241 (1990).

The California Supreme Court denied this claim finding that the trial court had not abused its discretion in determining that the jury had not deliberated sufficiently. *Id.* At the time the jury declared an impasse, they had deliberated for two and a half days, whereas the penalty phase of the trial had lasted three weeks and the guilt phase took more than seven months. *Id.*

The California Supreme Court also found that the instruction itself was not coercive because the trial court made it clear that if the weekend break did not allow the

51

jurors to resolve the impasse, they should again report a deadlock. *Id.* It held that the jurors' requests for additional evidence following their return to deliberations the next week indicated they understood they were not to abandon their individual judgment for the sake of agreement. *Id.* Finally, the court held that the trial court's response to the juror who sought to ask a question following the instruction to rest over the holiday weekend and the admonition to not discuss the case was not in error. *Id.* The ruling stated that both the question posed and the court's response indicated that the court took issue with the timing of the question, not the desire to inquire itself. *Id.*

### C. State Court Denial Was Not Unreasonable

Price has failed to show that the trial court's charge to the jury violated clearly established federal law. At the outset of the instruction to take the weekend to rest and deliberate, the trial court said, "So, my comments at this point are not to be in any way to attempt to change anyone." RT 23056, AG039546. After explaining that the jury had spent a year struggling with the case and understanding that some would want it to be over, the court then said:

> I think what I'd like to do, although I do have reservations, I see things both ways.
>
> I think what I'll do is recess until Monday and let you meet again Monday morning and discuss it. And if you feel the same way you feel now, then we'll reassemble just like we are now.

RT 23057, AG039547. The trial court clearly stated its ability to see both options: requiring the jurors to continue deliberating and declaring a mistrial due to impasse. The court then asked them to take the weekend, meet the following Monday, and stated unequivocally that if they remained deadlocked, he would address the matter then. Thus, not only did the trial court advise jurors not to surrender their individual opinions on the matter, but he also stated that if the impasse still existed following the weekend, he would

resolve the matter.  *See Rodriguez*, 125 F.3d at 750.

Price's contentions that the trial court improperly inquired into the division of the jurors do not afford him relief.  While the judge did know there was a seven-to-five split, he specifically stated that he did not want to know which way the split went and the jurors did not tell him that.  RT 23052, AG039542.

Price relies on *Brasfield v. United States*, 272 U.S. 448 (1926); *Jenkins v. United States*, 380 U.S. 445 (1965); and *United States v. Ajiboye*, 961 F.2d 892 (9th Cir. 1992) for the proposition that inquiring into the numerical split between the jury is per se coercive.  Those cases, however, are distinguishable.  Those cases apply specifically to federal proceedings and "[t]he Federal Courts of Appeals have uniformly rejected the notion that *Brasfield's* per se reversal approach must be followed when reviewing state proceedings on habeas corpus."  *Lowenfield*, 484 U.S. at 240, n. 3; *see also Locks v. Sumner*, 703 F.2d 403, 405 (9th Cir. 1983) ("*Brasfield*. . ., however, involved the propriety of making this inquiry in federal trials.  Neither the Supreme Court nor this circuit has held that the rule in *Brasfield* is a necessary component of one's Sixth Amendment right to an impartial jury, applicable to the state courts by virtue of the Fourteenth Amendment.).  An inquiry into the numerical divide would only violate Price's rights "if the trial judge's inquiry would be likely to coerce certain jurors into relinquishing their views in favor of reaching a unanimous decision." *Locks*, 703 F.2d at 406.  The circumstances surrounding the court's instruction do not lend themselves to an interpretation of coercion.

As noted, the jurors were not sent back to continue deliberations.  Rather, the trial court released them for the holiday weekend.  Following the weekend break, the jury continued deliberating for two more days, nearly as long as they had when they were instructed to resume deliberations on Monday if possible, and reviewed several pieces of evidence prior to reaching a verdict. *Cf. Rodriguez*, 125 F.3d at 750.  They did not report

1   an issue of deadlock again to the trial court.

2         Price has failed to show that the California Supreme Court's denial of this claim

3   was an unreasonable application of clearly established federal law or an unreasonable

4   interpretation of the facts. He also has failed to meet his burden under AEDPA regarding

5   the denial of the subclaim regarding the juror's last-minute question. No reasonable juror

6   would have concluded that the judge was prohibiting them from asking any questions.

7   Accordingly, this claim is DENIED.

8

9   **X.    Claim XXXII - Additional Errors in Sentencing Procedures Mandate Vacating
          the Judgment**

10        This claim challenges a number of "errors and flaws" in California's sentencing

11  scheme that he says mandate a reversal of the death judgment because they violated his

12  rights to due process, a fair trial, the effective assistance of counsel, and his right to be

13  free from cruel and unusual punishment, as guaranteed by the Fourth, Fifth, Sixth,

14  Eighth, and Fourteenth Amendments. Specifically, Price argues: (1) the jury instructions

15  encouraged the jury to "double count" the circumstances of the crimes for which he was

16  convicted as aggravating factors; (2) Cal. Penal Code section 190.3(a) is vague and

17  standardless, which allows for unreliable and arbitrary determinations about the

18  appropriateness of the death penalty; (3) the jury was not required to be unanimous in its

19  determination about which circumstance of a crime constituted an aggravating factor; (4)

20  the jury was not required to find "circumstances of the crime" that constituted aggravating

21  factors beyond a reasonable doubt; (5) the jury was not required to unanimously agree as

22  to whether conduct they were considering under Cal. Penal Code section 190.3(b)

23  occurred; (6) the admission of evidence of prior uncharged criminal conduct; (7) the jury

24  was not instructed that it must unanimously decide whether Price suffered prior

25  convictions beyond a reasonable doubt; (8) the failure to require written findings by the

26

27

28

54

jury as to aggravating and mitigating factors; (9) the jury instructions failed to inform

jurors that if they found the mitigating factors outweighed the aggravating factors that

they must return a sentence of life without the possibility of parole; (10) the instruction

that jurors may impose a death sentence only if the aggravating factors are "so

substantial" in comparison to the mitigating circumstances that death is warranted

creates an unconstitutionally vague standard; (11) the trial court improperly considered

the probation officer's report prior to denying the automatic motion for modification; (12)

before pronouncing sentence, the trial court improperly considered a highly emotional

statement from Elizabeth Hickey's mother; and (13) the trial court was exposed to

documents through in camera hearings that were not provided to the defense, "which

presumably contained prejudicial hearsay and speculation about [Price] and/or people

with whom he associated" and which may have tainted the trial court's ruling on the

motion for modification and pronouncement of the death judgment.  Pet. at 627-30.

### A.  State Court Denial

The California Supreme Court denied this claim noting that Price acknowledged

that the court previously had rejected each of the subclaims relating to the validity of

California's death penalty statute in prior rulings and that Price had failed to provide

persuasive reasoning to reconsider.  *Price*, 1 Cal.4th at 490.  Specifically, it held:  the jury

may consider a defendant's prior unajudicated criminal activity as evidence in

aggravation at the penalty phase; the prosecution may rely on evidence of such activity

even though the statute of limitations may have expired; the jury is not required to use a

reasonable doubt standard when evaluating whether aggravating circumstances other

than criminal conduct exist "or whether death is the appropriate penalty;" "[t]he jury is not

required to make written findings or to agree uanimously on the presence of individual

aggravating circumstances;" the trial court is not required to clarify CALJIC No. 8.84.1 to

explain that section 190.3(a) ("the circumstances of the crime in the present proceeding") and 190.3(b) ("criminal activity involving violence") considerations are mutually exclusive; and the jury "may use [a] defendant's commission of a felony to elevate a killing to first degree murder, to find a special circumstance, and as factor in aggravation." *Id.*

Petitioner raised subclaims 11, 12, and 13 in the California Supreme Court in a challenge to the trial court's denial of his automatic motion to modify the penalty verdict. The California Supreme Court held that Price was not entitled to relief on his subclaim that the trial court improperly considered the presentence report in denying the verdict modification motion because the trial court "did not allude to the report or its contents, or to anything not presented to the jury, during the detailed explanation it gave in denying the modification motion." *Id.* at 491. Thus, the California Supreme Court concluded that the trial court must have only considered the presentence report for sentencing on the noncapital offenses. *Id.*

Price's subclaim that the trial court improperly denied the modification motion after considering testimony from Elizabeth Hickey's mother was denied because the victim's mother made her statement following the trial court's denial of the motion. *Id.* Finally, the court denied the subclaim alleging that the trial court was improperly influenced by documents and testimony that were not admitted into evidence because "the record does not rebut the presumption that the court understood and fulfilled its obligation to decide the modification motion solely on the basis of the evidence presented to the jury." *Id.*

### B. State Court Denial Was Not Unreasonable

#### 1. Challenges to Cal. Penal Code section 190.3

Price cannot show that the state court's reasoned opinion is contrary to, or an unreasonable application of, clearly established United States Supreme Court law. Price also fails to demonstrate that the state court's opinion relied on an unreasonable

determination of the facts. Tellingly, he does not—and cannot—cite a single decision in support of his argument that the California death penalty statutes are unconstitutional under federal law. Without any citation to mandatory or persuasive authority in support of his argument, Price cannot demonstrate that the state court's denial of this claim was objectively unreasonable.

Indeed, the state court's reasoned decision was consonant with clearly established federal law. For example, Price alleges that the penalty phase jury instructions are deficient because they do not designate mitigating and aggravating factors. In *Tuilaepa*, however, the United States Supreme Court held that giving a penalty phase jury a unitary list of sentencing factors that does not designate which factors are mitigating and which are aggravating does not violate the Constitution. 512 U.S. at 978–79. Moreover, our Court of Appeals has found that California's "death penalty statute's failure to label aggravating and mitigating factors is constitutional." *Williams v. Calderon*, 52 F.3d 1465, 1484 (9th Cir.1995) (citations omitted). The *Williams* court also held that California's death penalty statute "offers constitutionally-sufficient guidance to jurors to prevent arbitrary and capricious application," "ensures meaningful appellate review," and "need not require written jury findings in order to be constitutional." *Id.* (citations omitted). The court also held that "the failure of the statute to require a specific finding that death is beyond a reasonable doubt the appropriate penalty does not render it unconstitutional." *Id.* Price's citation to *Ring v. Arizona*, 536 U.S. 584, 609 (2002) is unavailing. *Ring* overruled a practice that allowed a judge, as opposed to a jury, to find elements in aggravation. The finding of any aggravating elements here was within the sole province of the jury. Because Petitioner is unable to show an entitlement to relief on this set of subclaims, they are DENIED.

//

1

2

### 2. General Challenges to the Death Penalty

As noted by Price in his reply, his general challenges to California's death penalty statutes, specifically the claims regarding the statute's failure to narrow the class of defendants eligible for a capital sentence and failure to require an intercase proportionality review, are addressed by Claim XXVIII. *See* Reply at 168. Price has not provided the Court with any reason to revisit the discussion above, thus it declines to do so. All subclaims regarding the constitutionality of California's death penalty scheme are DENIED.

### 3. Subclaims Regarding Consideration of Improper Evidence

Regarding Price's subclaims 11, 12, and 13, he has not shown that the California Supreme Court's denial was unreasonable. While the trial court did indicate it had read and considered the probation report, as noted by the California Supreme Court, it did not rely on any evidence within the probation report when it denied Price's motion for a new trial. Following the court's statement that it had read the probation report, it entertained argument from defense counsel as to why it should not consider what the report contained. RT 23131-33, AG039621-23. The trial court then cited several pieces of admitted evidence to support its denial of Price's motion. RT 23134-43, AG039624-33. Following that ruling, the trial court took Hickey's mother's statement. RT 23134, AG039634. Price has failed to show that the trial court used any improperly received evidence to support its rulings. Accordingly, these subclaims are also DENIED.

### CONCLUSION

For the reasons set forth above, Claims XIII, XV, XXI, XXIII, XXVII, XXVIII, XXIX, XXX, XXXI, and XXXII are DENIED.

//

//

58

A subsequent Order resolving Claims IX, XIV, XIX, and XX shall issue. That Order shall set forth a schedule for the motion for evidentiary hearing on the remaining fourteen claims.

**IT IS SO ORDERED.**

Dated: September 25, 2017

_____

PHYLLIS J. HAMILTON
United States District Judge