UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CURTIS FLOYD PRICE,

          Petitioner,

    v.

RON DAVIS, Warden, San Quentin
State Prison,

          Respondent.

Case No. 93-cv-00277-PJH

**<u>DEATH PENALTY CASE</u>**

**ORDER DENYING CLAIMS IX, XIV, XIX, AND XX**

Petitioner Curtis Floyd Price, a California capital prisoner currently incarcerated at California State Prison, Corcoran, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. On November 11, 2012, through his appointed counsel, Price filed a second amended petition with thirty-five fully exhausted claims. Respondent Ron Davis filed an answer on January 17, 2014 and Price replied on October 14, 2014.

Due to the size of the petition and the voluminous subclaims, the parties agreed to proceed to a merits resolution on twenty-one record-based claims in three rounds of seven claims. An Order denying the first round of record-based claims issued on December 1, 2016. In that Order, the Court determined that it could proceed to a determination on the remaining fourteen record-based claims without further briefing. Subsequently, the Court denied claims XIII, XV, XXI, XXIII, XXVII, XXIX, XXVIII, XXX, XXXI, and XXXII. Having reviewed the parties' papers and the record, and having

carefully considered the relevant legal authorities, the court DENIES claims IX, XIV, XIX, and XX.

## BACKGROUND

I.  **Factual Summary**

   A.  **Facts Relating to Convictions**

The following recitation of the factual background of this case is based on the California Supreme Court's opinion on Price's direct appeal. *People v. Price*, 1 Cal.4th 324 (1991). The state court's factual determinations are presumed to be correct pursuant to 28 U.S.C. § 2254(e)(1).

In May 1986, Price was convicted in the Humboldt County Superior Court of the first-degree murders of Elizabeth Ann Hickey and Richard Barnes, whose murder actually occurred in Los Angeles County, and one count each of robbery with the use of a firearm, burglary, receiving stolen property, and conspiracy. As to the Hickey murder, the jury made special circumstance findings of multiple murders and robbery murder. The jury further found that Price previously had been convicted twice of felonies and completed two prior separate prison terms. Price was sentenced to death.

Evidence was presented to show that Price was an active Aryan Brotherhood (AB) member and committed the crimes in furtherance of an AB conspiracy. The conspiracy was initiated following the testimony of Steven Barnes, another AB member, who testified as a prosecution witness against other AB members and against several non-AB members. During the summer of 1982, the AB leadership, which included Michael Thompson and Clifford Smith, who later testified against Price at his trial, decided to retaliate. Prison authorities had placed Steven Barnes in protective custody, so the AB leaders decided to kill members of his immediate family instead. They selected Price to do the killing.

At the time, Price was serving a sentence in Montana state prison, but was scheduled for release from prison soon without parole supervision. One of the AB leaders brought Price to the state prison in Chino in August 1982 by subpoenaing him to testify at the leader's trial. After Price arrived, AB leaders offered him the "contract" to kill Richard Barnes. Price accepted. The AB leaders instructed him to procure weapons in Northern California before returning south to kill Richard Barnes.

Testimony established that following his release from prison, Price spent time in Southern California until October 1982, when he returned to Eureka. On January 23, 1983, the gun collection of Richard Moore disappeared from his residence, apparently having been stolen in a burglary, which included two rifles, three shotguns, and a .22–caliber handgun. The house had not been ransacked.

In late January 1983, Price returned to Southern California and stayed with several AB "runners," people who relayed messages to and from AB members in prison. One such runner, Janet Myers, drove Price to different addresses he wanted to see. One of the addresses was the Temple City residence of Richard Barnes.

On February 12, 1983, at 11 p.m., Price left Myers's house with another AB runner. He returned early the next morning, collected his belongings, and left.

On February 13, 1983, the body of Richard Barnes was found in his residence. He had been shot in the back of the head three times by a .22-caliber handgun.

Credit card receipts showed that Price had purchased gasoline in Pomona on February 12 and in Anaheim on February 13, 1983. In the room Price had occupied in his mother's house in Eureka, police found a slip of paper on which Richard Barnes's address had been written, together with the name "Nate," a nickname for Steven Barnes, and the words "send subpoena to him." Police found a similar note in Price's wallet.

After the murder, Myers brought Smith a note signed by Price. It stated, "That's took care of. Everything went well. I am going back north. I will be in touch with you later."

Six days after Richard Barnes was found, Berlie Petry found the body of his girlfriend, Elizabeth Ann Hickey, in the Humboldt County residence they shared. Hickey was the stepdaughter of burglary victim Moore. She had been beaten to death with a blunt instrument; guns belonging to her and to Petry were missing from their residence. Also missing was a combination radio and tape player that Petry had recently given Hickey. In Hickey's trunk, officers found a note in Hickey's handwriting that said "Call Curt . . . about money for guns."

One of Hickey's neighbors, testified she had seen a man with Hickey on two occasions shortly before Hickey was killed. She identified Price in a photographic lineup.

A subsequent search of Price's automobile yielded a product manual for one of Petry's rifles, a knife that had belonged to Hickey and had the name "Liz" written on it in fingernail polish, and a notebook in which someone had written, "Elizabeth, weapons, corner of Simpson and Pine [the location of Hickey's residence]," as well as Hickey's telephone number. Additional notes with Hickey's contact information were found in Price's wallet and in a suitcase he kept in his mother's garage. Price's mother gave police a combination radio and tape player that had been in Price's room. It was identical to the one taken from the Hickey residence.

The evening of February 19, the same day Elizabeth Hickey had been found murdered, a gunman robbed employees of the Triplex Theater at 6:30 p.m. He had long, thin blond hair and was wearing sunglasses, a watch cap, and gloves. During the movie, he came out into the lobby, pointed a revolver at the manager, and directed him into the office. At the man's direction, the manager put $7,000 in a bag and gave it to the man, who ran out of the theater.

4

United States District Court
Northern District of California

After the robbery, the theater employees assisted the police in preparing a composite sketch of the robber. Five of the employees selected Price's photograph from a photo lineup as being similar to the robber, although none of them made a positive identification.

In a suitcase in Price's mother's garage, the police found a blond wig, black gloves, a watch cap, a handgun, and various items of theatrical makeup (including spirit gum, liquid latex, derma wax, and nose putty). In Price's room in his mother's house, the police found a note that was apparently a list of Price's expenses and debts. On it Price had written "need mucho dinero" and "$1,000.00 I owe Mom means it's all about 'movie time.'" The police also found $400 in cash in a plastic container.

A day or two after Hickey's murder and the Triplex Theater robbery, Price arrived at his stepfather's residence in Reno, Nevada. He had two bundles wrapped in blankets. Price said they were guns that might have been stolen. Price's stepfather gave him permission to leave the guns at the residence. On February 28, 1983, Price returned to Reno and moved the bundles to a mini storage unit.

Price was arrested in Humboldt County for the Triplex Theater robbery on March 3, 1983. His mother visited him in jail on March 27, 1983. Price asked her to move the guns and ammunition from the storage locker in Reno and to dispose of them so they would never be found. He referred to the guns as "Brand business." "The Brand" is another name for the AB.

On March 31, 1983, law enforcement authorities searched the mini storage unit in Reno, Nevada. They found all of the guns taken from the Moore residence except one shotgun (apparently the one found in Price's mother's garage) and the handgun. They also found all the guns belonging to Hickey and Petry, and over 1,000 rounds of various

kinds of ammunition. Moore's handgun, which was one of only four makes that could have fired the bullets that killed Richard Barnes, was never found.

The defense denied that Price had committed any of the offenses. It offered alibi evidence to show that Price was not in Humboldt County at the time of the Hickey killing and the Triplex Theater robbery. It attempted to cast doubt on the identification testimony of the robbery victims and the veracity of the prosecution's AB witnesses, and it sought to cast suspicion on Petry for Hickey's murder.

Additionally, the defense called three prison inmates, Wendell Norris, John Stinson, and Robert Rowland, who testified that the AB existed only as an outlook, a way of life, or a loose social club rather than an organized criminal gang. They also said it was a label that prison authorities used to justify restrictive confinement.

The defense also adduced evidence to show that Petry had the motive and the opportunity to kill Hickey.

### B.    Facts Relating to Penalty

As evidence in aggravation, the prosecution introduced Price's prior criminal history. In 1971, Price violated parole on a California marijuana possession conviction by going to Montana, where he attempted to rob a small grocery store with a gun. Price was placed in a drug program, but he escaped from custody. He was later arrested in Florida and brought back to Montana to complete his sentence.

In December 1971, while being transported in Montana, Price grabbed a gun from one of the two transporting officers. After forcing the officers to drive to a remote location, Price locked them both in the trunk of their patrol car and used the gun to force his way into the car of a passing motorist, John Digalis. Price told Digalis to drive to Idaho. Law enforcement officers stopped the car. Price pointed the gun at Digalis's head and threatened to kill him if the officers approached. At Price's order, Digalis again

6

began to drive, but the officers shot out a tire. Price eventually surrendered. He was convicted of inmate holding a hostage, a Montana felony.

Price was in San Quentin Prison in May 1978. He told another prisoner, Ricky Carpenter, that he was going to kill Leroy Banks, an African–American inmate, because Banks had been disrespectful to an AB member. Carpenter pointed out Banks. Price stabbed Banks 10 to 15 times in the chest. Banks died of his wounds.

While in jail awaiting trial in this case, Price struck jail guards on two occasions, and on another occasion he violently resisted being taken to court, hitting and biting the guards who were escorting him.

As part of the defense's mitigation presentation, Price testified on his own behalf. Price said he had not testified at the guilt phase because the trial court had ordered him shackled in the courtroom. Because he had not yet been convicted, he had refused to appear before the jury in chains. He denied he was guilty of any of the charged offenses. He admitted that he knew Hickey. He said Hickey had asked him to sell her guns for her on consignment. The final arrangements were made during a telephone call from Hickey to the home of an AB runner in Auburn. He said he received the guns on February 18, 1983, in Lakeport from a man named Kenny. He claimed to have supported himself between October 1982 and March 1983 by selling marijuana.

The defense presented evidence about the conditions of Price's confinement in jail pending the trial in this case, which a nutritionist, a counselor, and a psychiatrist all testified were unhealthy, humiliating and stressful, and led to anxiety, depression, and hostility.

Price's family members testified that they loved Price and did not want him to die. Four corrections officers testified that Price had been a respectful and cooperative inmate while in custody.

## II.   Procedural History

Price litigated an automatic appeal of these convictions in the California Supreme Court, which affirmed the convictions on December 30, 1991.  The court denied Price's petition for rehearing on February 19, 1992.  Price filed a habeas petition in state court on November 13, 1990 and a supplemental petition and request for consolidation with his appeal on December 12, 1991.  AG043034.  The California Supreme Court denied the initial petition on January 29, 1992.  AG043033.  The supplemental petition was denied on February 12, 1992.  AG043064.

Price filed a request for appointment of counsel and stay of execution in this court on January 25, 1993.  ECF Doc. No. 1.  Counsel were appointed on June 23, 1994.  ECF Doc. No. 23.  Through counsel, Price filed his first petition for writ of habeas corpus on April 21, 1997.  ECF Doc. No. 86.  Respondent subsequently filed a motion to dismiss based on failure to exhaust all of the petition's claims in state court.  ECF Doc. No. 101.  Price opposed the motion and requested a stay of proceedings to return to state court and exhaust any unexhausted claims.  ECF Doc. No. 120.  The Court held a hearing on the matter and ultimately denied respondent's motion to dismiss and granted Price's motion to stay proceedings.  ECF Doc. Nos. 136, 141.

While his state exhaustion petition was still pending, Price moved to temporarily lift the stay in the instant proceedings to file a first amended petition.  ECF Doc. No. 176.  The motion was granted.  ECF Doc. No. 180.

Additionally, while the initial exhaustion petition was pending in state court, which was his third state habeas petition, Price filed a fourth state habeas petition alleging juror misconduct based on evidence discovered during the investigation to prepare the exhaustion petition.  AG047018-69.

United States District Court
Northern District of California

The California Supreme Court issued an order to show cause on Price's exhaustion petition regarding one claim: whether the prosecutor improperly tampered with a sitting juror by sending her alcoholic drinks and money, and telling her to return a guilty verdict. AG045273.

The California Supreme Court denied Price's fourth state habeas petition on June 24, 2009, prior to denying the exhaustion petition. AG047315. More than a year and a half later, on February 14, 2011, it denied the claim in the initial exhaustion petition on which it filed an order to show cause and discharged the order to show cause. AG046994-16. The remainder of the claims in the exhaustion petition were denied on April 13, 2011. AG047017.

On January 18, 2012, Price moved to lift the stay in this Court and to file an amended petition. ECF Doc. No. 194. The request was granted on February 2. ECF Doc. No. 196.

Price filed his second amended petition on November 30, 2012. ECF Doc. No. 201. In it, he raised thirty-five claims for relief. Respondent filed his answer on January 17, 2014. ECF Doc. No. 210. Price filed his reply on October 14, 2014. ECF Doc. No. 220.

Following a meet-and-confer period, the parties identified twenty-one record-based claims that could proceed to briefing without a request for an evidentiary hearing. ECF Doc. No. 225. The Court directed the parties to brief those claims in three rounds of seven claims. ECF Doc. No. 226.

Price filed his first brief on an initial seven claims on August 24, 2015. ECF Doc. No. 231. Respondent filed his answer on October 22 and Price filed a reply on November 16. ECF Doc. Nos. 244 and 248.

In the Order denying that round of claims, the Court advised the parties it would rely on the petition, the answer, and the reply to resolve the remaining fourteen claims for which Price did not intend to seek an evidentiary hearing.  ECF Doc. No. 250 at 126.  The Court subsequently denied an additional ten claims.  ECF Doc. No. 253.  Four claims remain and are ready for adjudication.

## ISSUES

Price asserts the following four claims for relief:

(1)    that the trial court violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to a full and fair hearing on the issue of whether he was competent to stand trial by failing to hold a competency hearing with the assistance of an independent, unbiased expert once a *bona fide* doubt as to Price's competency was raised;

(2)    that his rights to due process, a fair trial, the effective assistance of counsel, and his right to be free from cruel and unusual punishment as provided by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments were violated by the trial court's decision to shackle him during trial;

(3)    that the trial court's refusal to require Price's presence for the trial violated his Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights to due process, a fair trial, the effective assistance of counsel, and to be free from cruel and unusual punishment; and

(4)    that the trial court's refusal to require Price's presence for other key proceedings violated his Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights to due process, a fair trial, the effective assistance of counsel, and to be free from cruel and unusual punishment.

//

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that the state court reviewed on the merits unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 407–09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell* ("*Miller-El I*"), 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. A state court decision constitutes an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's

decision. *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "[E]valuating whether a rule application [i]s unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id.* "As a condition for obtaining habeas corpus [relief] from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 102.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El I*, 537 U.S. at 340. Review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

## DISCUSSION

### I.    Claim IX - The Trial Court Failed to *Sua Sponte* Order a Competency Hearing

Price argues that the trial court's failure to conduct *sua sponte* a competency hearing following the trial judge's assertion of a *bona fide* doubt as to Price's competency violated his rights. Price also argues that the prosecutor and defense counsel raised concerns about his mental health and Price's continued disruptive conduct at trial warranted an evaluation.

Before trial, Price filed motions to remove his court-appointed attorneys and the trial judge. During this time, Price became increasingly agitated in court. When the trial court called Price before it to discuss the motions, Price's behavior prompted the prosecutor to request that his demeanor be documented for the record.

The court agreed and said, "Mr. Price is upset, extremely upset. Irritated with the whole process and I guess particularly, as his comments indicate, with this Court. Earlier there were noises of banging from the holding cell." RT 7585, AG024448. The prosecutor went on to stress that Price's voice had been shaking, as had his body and legs. RT 7586, AG024449. Defense counsel raised concerns regarding Price's capacity and defense attorney Klay speculated that it was possible that Price was suffering a psychotic episode and stated that she, based on her experience as a state-certified social worker, believed he was suffering from delusions. RT 7586-87, AG024449-50. The prosecution suggested that Price was filled with rage as opposed to unstable. RT 7587, AG024450.

To address the concerns regarding Price's disposition, the trial court ordered clinical psychologist Dr. Richard Kramer to evaluate Price. In doing so, the trial court noted that it was "unclear" whether there was a competency issue or not. RT 7585, AG024448. The court expounded by saying:

> I'm not at this point expressing a 1368[1] doubt, but the conduct of the last couple of weeks and particularly in the last three or

[1] California Penal Code section 1368, which provides, in pertinent part:

> (a) If, during the pendency of an action and prior to judgment . . . a doubt arises in the mind of the judge as to the mental competence of the defendant, he or she shall state that doubt in the record and inquire of the attorney for the defendant whether, in the opinion of the attorney, the defendant is mentally competent. . . . At the request of the defendant or his or her counsel or upon its own motion, the court shall recess the proceedings for as long as may be reasonably necessary to permit counsel to confer with the defendant and to form an opinion as to the mental competence of the defendant at that point in time.

> (b) If counsel informs the court that he or she believes the defendant is or may be mentally incompetent, the court shall order that the question of the defendant's mental competence is to be determined in a hearing . . . . If counsel informs the court that he or she believes the defendant is mentally competent, the court may nevertheless order a hearing. . . .

> four days certainly gives the Court reason to want to find out about that. And I will consider that along with what course we should take as a result of this predicament.

*Id.*

Kramer examined Price at the county jail. Price had refused to be examined alone in a jury room or at Kramer's office, so a third attorney, John Young, who had been appointed by the trial court to represent Price in the proceedings to remove his court-appointed counsel, was also present. E-134, AG042940. Kramer found Price to be well-groomed with normal speech and recent memory intact. *Id.* He assessed Price's anxiety as mild to moderate and noted both a depressed affect and also the availability of humor. E-135, AG042941. Price's thought processes appeared logical and without delusions or hallucinations. *Id.*

Price clearly requested psychological support to assist him with the anxiety created by stressful conditions within the jail. E-136, AG042942. What remained less clear was to what extent Price's lack of cooperation with counsel, emotional outbursts, and demands of the court were caused by a mental health condition or were, in fact, "willful and staged reaction[s] to stall proceedings." *Id.* Kramer suggested a more detailed evaluation without the presence of an attorney.

Kramer did note, however, that Price did "seem grossly conversant with the charges against him, his standing before the court and possible pleas and dispositions to both the charges and the incompetency proceedings." *Id.* Kramer went on to say that Price had diagnosable anxiety but was also "competent enough to comport himself in court at this time." *Id.* Kramer said he needed more information to make a determination regarding Price's ability to communicate with current counsel, the attorneys Price at that time had been seeking to have removed from his case. E-137, AG042943. Kramer ended his report by suggesting that the trial court appoint a person to provide

14

psychological support to Price because Price's adjustment was "tenuous." *Id.* Kramer also suggested that the court order that the substance of the conversations between Price and the mental health care provider be kept confidential.

### A.    Legal Standard

A criminal defendant may not be tried unless he is competent and he may not waive his right to counsel or plead guilty unless he does so competently and intelligently. *Godinez v. Moran*, 509 U.S. 389, 396 (1993). The conviction of a defendant while legally incompetent violates due process. *Cacoperdo v. Demosthenes*, 37 F.3d 504, 510 (9th Cir. 1994).

The test for competence to stand trial is whether the defendant demonstrates the ability "to consult with his lawyer with a reasonable degree of rational understanding" and a "rational as well as factual understanding of the proceedings against him." *Godinez*, 509 U.S. at 396; *Douglas v. Woodford*, 316 F.3d 1079, 1094 (9th Cir. 2003). The question "is not whether mental illness substantially affects a *decision*, but whether a mental disease, disorder or defect substantially affects the prisoner's *capacity* to appreciate his options and make a rational choice." *Dennis v. Budge*, 378 F.3d 880, 890 (9th Cir. 2004).

Due process requires a trial court to order a psychiatric evaluation or conduct a competency hearing *sua sponte* if the court has a good faith doubt concerning the defendant's competence. *Pate v. Robinson*, 383 U.S. 375, 385 (1966); *Cacoperdo*, 37 F.3d at 510. This responsibility continues throughout trial. *Drope v. Missouri*, 420 U.S. 162, 181 (1975).

A good faith doubt about a defendant's competence arises if "'a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand

trial.'" *Maxwell v. Roe*, 606 F.3d 561, 568 (9th Cir. 2010) (quoting *de Kaplany v. Enomoto*, 540 F.2d 975, 983 (9th Cir. 1976) (en banc)); *see, e.g., Stanley v. Cullen*, 633 F.3d 852, 860-61 (9th Cir. 2011) (not unreasonable for trial court to conclude there is not enough evidence before it to raise a doubt about defendant's competence such that it should have held a hearing *sua sponte* where, on the one hand, defendant made some questionable choices in strategy and acted oddly but, on the other hand, defense counsel specifically informed trial court several times that they had no doubt about defendant's competency to assist them, defendant was coherent in his testimony and colloquies with the court, state court judges indicated his demeanor in courtroom did not raise a doubt about his competency, and the trial court had very little clinical or psychiatric evidence regarding defendant's mental health history).

Several factors are relevant to determining whether a hearing is necessary, including evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial. *Drope*, 420 U.S. at 180. Even one of these factors standing alone may, in some circumstances, be sufficient to create a reasonable doubt regarding the defendant's competence. *Id.* The failure of petitioner or his attorney to request a competency hearing is not a factor in determining whether there is a good faith doubt in the defendant's competency. *Maxwell*, 606 F.3d 574 (trial judge has an "independent duty" to hold competency hearing if there is a good faith doubt).

Courts generally have found sufficient evidence of incompetence in lengthy histories of acute psychosis and psychiatric treatment, *see, e.g., Moore v. United States*, 464 F.2d 663, 665 (9th Cir. 1972) (defendant repeatedly hospitalized for acute mental illness and hallucinations), or extremely erratic and irrational behavior during the course of the trial, *see, e.g., Tillery v. Eyman*, 492 F.2d 1056, 1057-58 (9th Cir. 1974) (defendant screamed throughout nights, laughed at jury, made gestures at bailiff, disrobed in

16

courtroom and butted his head through glass window), or both, *see Maxwell*, 606 F.3d at 569-70 (defendant's attempted suicide, strained communication with defense counsel, mental health problems, violent outbursts in courtroom, antipsychotic medications, and psychiatric detentions would have raised a doubt in a reasonable judge and warranted a second follow-up competency hearing even though petitioner had been found competent in an earlier hearing prior to trial). A defendant's disagreement with his attorneys and inability to control his temper in the courtroom are not enough to create *bona fide* doubt as to defendant's competence. *United States v. White*, 670 F.3d 1077, 1084-85 (9th Cir. 2012) (judge did not abuse discretion in failing to hold second competency hearing *sua sponte*, despite report that defendant suffered from delusions, had angry outbursts, and refused to communicate with attorneys, because judge presented with certification of competency from doctors as well as opinion of defendant's attorney that defendant was competent to stand trial).

A state court's finding of competency to stand trial (as well as to plead guilty) is presumed correct if fairly supported by the record. *Deere v. Cullen*, 718 F.3d 1124, 1145 (9th Cir. 2013). No formal evidentiary hearing is required for the presumption to apply. *Id.* at 1144. Petitioner must come forward with clear and convincing evidence to rebut the presumption. *Id.* at 1145.

### B.    State Court Denial of *Sua Sponte* Competency Evaluation Claim

The California Supreme Court denied this claim, finding that the trial judge had said specifically that he was not saying he had any doubts as to Price's competence. *Price*, 1 Cal.4th at 396. The court held that the law did not support Price's argument that the trial court should have initiated competency proceedings based on an initial concern. The trial court ordered an expert to examine Price, who "found no impairment of [Price's] ability to think logically, to understand the case against him, or to express his views." *Id.*

at 397.  The expert did suggest the appointment of a counselor to assist Price in dealing with his depression and anxiety, which the trial court agreed with and consequently ordered.  Thus, the California Supreme Court found that the trial court proceeded "reasonably and in accordance with the law."  *Id.*

### C. Price Has Failed to Show the State Court Unreasonably Denied His Claim or That the Trial Court Should Have Ordered a Competency Evaluation

Price argues that the California Supreme Court's decision constitutes an unreasonable determination of the facts on the record before it, which contained "[c]oncerns expressed before and during trial with respect to Price's mental state" and evidence of Price's self-destructive behavior.  Pet. at 297.  Price says that Kramer's report indicated questions as to Price's competence that required follow-up, a step the trial court failed to take.  *Id.* at 299-300.  Price also argues that the denial constituted an unreasonable application of clearly established federal law.  *Id.* at 297.  Price, however, has failed to show that at any time during the trial that the trial court should have entertained a good faith doubt regarding his competency.

#### i. Initial "Doubt" and Evaluation

Price's basic premise, that the trial court entertained a *bona fide* doubt as to his competency, is flawed.  As noted by the California Supreme Court, the trial court explicitly stated that it was not expressing such a doubt as to Price's competence.  It appointed Kramer to determine to what extent Price could assist his trial counsel and to assist in a determination as to whether a "1368 doubt should be expressed on the record."  RT 7585, AG024448; RT 7600, AG024463.

Price argues that Kramer's report raised "serious open questions" as to his competency, Reply at 91, questions the court never sought to answer despite ongoing problems with Price's behavior both inside and out of the courtroom.  Moreover, Price

18

argues that the trial court should have known that Kramer held a preexisting bias against Price and, therefore, was inappropriate to serve as a neutral evaluator of his mental health. Pet. at 305-06.

In *Godinez*, the Supreme Court set out a two-prong test for competence: whether the defendant demonstrates (1) the ability "to consult with his lawyer with a reasonable degree of rational understanding" and (2) a "rational as well as factual understanding of the proceedings against him." 509 U.S. at 396. Kramer's report stated that Price met the second prong and it was unclear whether he met the first. However, Price demonstrated his desire and ability to cooperate with court-appointed counsel the next day.

The day before Kramer's evaluation, the trial court held a closed session with Price to determine the nature of his conflict with trial counsel. RT 7611, AG024474. Price indicated that some of the trial court's rulings made him believe that his counsel were incompetent and he asked for new attorneys. As noted, the trial court appointed attorney John Young to represent Price through those proceedings.

Two days later, the day after Kramer's evaluation, Price appeared in court with attorneys DePaoli and Klay and indicated that he did have confidence in them and wished to retain them as counsel, though he still sought to have the trial court removed. RT 7611-12, AG024474-5. DePaoli agreed to stay on so long as Price consented to a thirty-day delay during which DePaoli could attend to a pressing medical issue. Klay indicated she, too, was willing to stay on as counsel. She said that she had prepared and was submitting a short declaration that noted that she and Price had "several productive communications during the last week" and that he had consented to counseling. RT 7614, AG024477. She said the counseling had yet to happen because the jail refused to allow a confidential meeting between Price and the counselor. She then added, "But it's my belief at this time that Mr. Price is sincerely attempting to comply with Mr. DePaoli's

and my reasonable requests and to re-establish working communications with us." RT 7614-15, AG024477-78. She later reiterated that point and underscored her belief in Price's ability to consult with her and DePaoli with a reasonable degree of rational understanding, saying, "At this point, I am willing to continue to represent Mr. Price and I do believe that Mr. Price and I have been able to re-establish our lines of communication so that we are able to work on the defense at this point." RT 7616, AG024479.

The trial court then entered a discussion with Price regarding the possibility of DePaoli needing to take a temporary leave from the case or be removed as counsel altogether for health reasons. The court recognized Price's entitlement to a physically and mentally competent attorney. The following exchange took place:

> Court: Mr. Price, do you understand that? That I have -- the doctors can't predict what may happen to Mr. DePaoli. . . . If you proceed with Mr. DePaoli at this point, you are assuming certain risks.
>
> Price: Yes, I understand that.
>
> Court: Okay. And whatever the breakdown in communication or problem was between Ms. Klay and yourself, it's your opinion now that the matter is solved and that you will be able to work with her and she will be able to assist you effectively?
>
> Price: Yes, sir.
>
> Court: Okay. Mr. DePaoli indicated that you would be willing, should it become necessary in the Court's opinion upon further talk with his doctors, that he receive some sort of a continuance, that you would be willing to waive up to thirty days at least or perhaps more for him to . . . gain control of the blood pressure problem; is that correct?
>
> Price: Yes, sir.
>
> * * *
>
> Court: What I'm indicating to you, I don't know what affect it may have on Mr. DePaoli, but you need to be aware that [he may not be able to control his medical condition] is a possibility. And now that I've told you, do you still wish him to remain as your attorney if that's a possibility.
>
> Price: Yes.

> Court: Okay. So at least up to this point, you are indicating to me that you would waive any problems that have been created due to the illness and medication, whatever happens in the future, no one can predict, but you understand that's a risk you're going to assume to some degree?
>
> Price: Yes. We think the risk will be lessened by the -- his vacation.

RT 7618-19, AG024281-82.

The court then engaged Price in detailed conversation about his options for retaining his attorneys. In response to all of the court's questions, Price indicated he understood the questions and indicated his assent to a time waiver, which he previously was unwilling to provide, so that he could retain his counsel. Price presented himself before the court as articulate and cooperative. The trial court would have had no reason based on those interactions to conclude that Price lacked the reasonable degree of rational understanding in working with his attorneys as required by *Godinez*, 509 U.S. at 396. Thus, the open question could have been deemed resolved satisfactorily at that time.

Price spends multiple pages in his petition documenting bias against him by Kramer. *See* Pet. at 305-07. However, Price does not challenge any particular finding in the report as a result of the bias and, instead, asks the Court at several points to credit the report's findings. *See, e.g.,* Pet. at 299. He has not shown the appointment of Kramer resulted in a violation of his rights.

### ii. Refusal to Attend Court

Price next cites his November 19, 1985 refusal to come to court as evidence of possible incompetency that the trial court failed to explore. Pet. at 300. That, in two separate incidents, Price hit one correctional officer and bit another. One of these occurred in the hallway of the courthouse. As a result, Price did not appear in court that day. The trial court raised the issue of Price's failure to attend with both the prosecution

and defense teams, noting that Price needed to be present for the trial to proceed but also questioning whether Price would voluntarily come to court. RT 10593, AG027449.

In response to the trial court Klay said:

> Your Honor, Mr. DePaoli and I both strongly feel Mr. Price is just simply not capable mentally of cooperating at this time. . . . [W]e just both feel from his words and conduct, he's certainly not capable of cooperating with defense counsel now. . . . He's not lucid with us. He is not willing to or able -- competent to articulate sensibly to Mr. DePaoli and myself right now.

RT 10593-94, AG027449-50. The trial court then asked if defense counsel intended to make those statements to advise him formally of a competency doubt, to which they requested time to confer amongst themselves. RT 10594, AG027450. They never came back to the court with any formal expression of concerns about Price's competency.

Price states that defense counsel maintained significant concerns regarding his competency that day and throughout the trial; however, they made a strategic decision to withhold such concerns from the court. Pet. at 300, fn 151. Both DePaoli and Klay submitted declarations during Price's state habeas proceedings advising the California Supreme Court that Price seemed to them incompetent at various points. *See* E-37-44, AG042843-50; E53-61, AG042859-67. Defense counsel's belatedly expressed concerns do not entitle him to relief, nor do they indicate that the trial court should have entertained a good faith doubt as to his competency. "In reviewing whether a state trial judge should have conducted a competency hearing, we may consider only the evidence that was before the trial judge." *McMurtrey v. Ryan*, 539 F.3d 1112, 1119 (9th Cir. 2008). If defense counsel had strategic reasons for keeping their concerns to themselves, that cannot be held against the trial court.

Moreover, following Klay's assertion that Price did not seem lucid, the trial court, both attorney teams, and the court reporter went to Price's holding cell to ask him

whether he intended to cooperate with transport to court and, if not, why. Due to security concerns and outbursts, jail personnel shackled Price during transport to court including the use of leg irons. Price explained cogently that the issue in coming to court resulted when the pad protecting his leg from the shackles slipped. RT 10598, AG027454. He stopped moving and asked the correctional officers escorting him to fix the problem. Price has subcutaneous pellets in his legs from an old twelve-gauge shotgun wound he sustained during a prior prison term and he said the shackles caused him significant pain if not placed or padded properly. The officers directed Price to face the wall, which he refused to do because he said it would result in more pain. He then said the officers beat him as a result of his objection. RT 10599, AG027455.

Price later explained his second violent incident of the day in which he hit Officer Wolfe. He claimed that Wolfe entered the shower area while Price was using it and leered at him inappropriately. RT 10603, AG027459. Price "threw him out" when the officer refused to leave. *Id.*

Following all of this and upon return to the courtroom, the trial court said:

> At this point in time, I want to touch on the 1368 query I made earlier. And my main purpose in going to the jail was to try to make an assessment as to whether or not Mr. Price appeared to be incompetent. . . . I don't feel that I, at this point, have the right to step in and interfere because the responses I got today were by and large pretty direct responses and correct responses, at least from his viewpoint, to my questions.

> One may quarrel with his position, but certainly it was a reasonable position from his place in this system. So I don't find at this point that I have cause to express a doubt about his competency. I would indicate for the record that if we continue to have interruptions on the basis of jail-related problems, that I might come to a position where I would consider someone who continually denies the fact that they are faced with a very serious charge to -- on the other hand become involved with what are to them personal problems, no doubt, but are minutia in comparison. It might cause me some concerns, but not today.

RT 10607-08, AG027463-64. Thus, even after his attorney sounded the competency alarm for the second time, the trial court expressly stated it did not have a *bona fide* doubt as to Price's competency after speaking with him.

As a result of the violent incidents with correctional staff, the trial court ordered Price shackled in court as well, discussed in detail below. Following imposition of this order, Price refused to attend to trial at all. Price argues that the trial court should have inquired into his competency at that point. Pet. at 301. However, around the same time, a doctor, Dr. Baird, evaluated Price based on his physical ailments and issued a report that largely underscored the trial court's belief that Price refused to comply with court directives not because he lacked the capacity to do so, but because he lacked the desire.

### iii.    Competency Concerns Raised in Dr. Baird's Report

Price cites the Baird report to support his position that the trial court should have entertained a *bona fide* doubt as to his competency because it indicated that Price suffered at that time from malnutrition, chronic pain, depression, and "personality deterioration." Pet. at 302; *see* RT E-165, AG042971. Noting Price's deep depression and personality disintegration, Baird recommended that the trial court have Price undergo a psychiatric or psychological evaluation. RT E-167, AG042973. Notably, Baird recommended that Kramer perform the evaluation. However, Price argues, the trial court only addressed the issue Baird raised regarding insufficient dentures and failed to order the psychological examination. Pet. at 303.

The trial court stated that its order for a new partial plate for Price would solve "part of the problem." RT 15226, AG031587. It went on to note that Price had been attempting to "control the proceedings" with his demands and refusals to cooperate with court efforts to get him involved in the trial. RT 15227, AG031588. This sentiment echoed Baird's assessment that Price's refusal to be transported to trial in shackles was

24

not a product of actual physical pain but rather of Price's "pride and self-respect." RT E-166, AG042972. "The emergence of genuine doubt in the mind of a trial judge necessarily is the consequence of his total experience and his evaluation of the testimony and events of the trial." *de Kaplany*, 540 F.2d at 983. The record supports the reasonable conclusion drawn by the trial judge and medical professionals that while Price indeed suffered from significant stress due to his lack of dentures, the poor nutritional content of his diet, and restrictive security measures, Price's outbursts and refusals to cooperate stemmed from his desire to bend the proceedings and participants to his will as opposed to from any lack of competency.

### iv. Refusal to Speak to Defense Attorneys and Investigator

Price next argues that the trial court should have entertained a *bona fide* doubt as to competency when the following month, during the cross-examination of key prosecution witness Michael Thompson, defense counsel alerted the trial court that Price had refused to speak to Klay for going on six weeks and had stopped speaking to DePaoli for a week. Price asserts that Kramer had predicted the possibility of such an occurrence and, despite being forewarned that Price's competency might degrade to the point he would be unable to work with counsel, the trial court chose to treat the matter as solely a request for the removal of counsel. Pet. at 304.

DePaoli advised the trial court that Price attempted to fire DePaoli by passing him an index card on which Price had written, "You're fired." RT 16880, AG033150. The trial court directed DePaoli to ask Price the following morning whether he still wished to relieve DePaoli as counsel and Price refused to answer. *Id.* Thus, the trial court sent Price a note asking whether he wished to relieve his attorneys. RT 16881, AG033151. The court noted that if Price indicated in the affirmative, he would be required to provide reasons for removing his defense attorneys and that if he did not provide any comments,

25

the trial court would assume he had no complaint. *Id.* Price responded with his own note saying that he had no comment and then said, "If you have now or anytime in the future have need of one, please feel free to, as you have in the past, set up court on my tier in front of my cell. I will never set foot in your court, jury or not, ever again of my own free will. That is no problem, though, because you can come to me with no problem and no danger." *Id.*

In a discussion with defense counsel and the prosecution, the court said, "My only reason for sending him the note this morning was to attempt to get what he wants to do. He has refused to cooperate. I assume that's intentional . . . ." RT 16885, AG033155. The court later stated for the record that Price had not spoken to Klay for six weeks, though he had communicated with the defense investigator up until the day before and had similarly stopped speaking to DePaoli in the very recent past. RT 16891, AG033157.

Subsequently, the trial court ordered Price to appear to discuss the matter of relieving his attorneys. Price told the trial court he would refuse to cooperate until he was seen by a dentist and that he had only come to court because the correctional officers who escorted him threatened bodily harm if he did not. RT 17053, AG033309. Price refused to give his reasons for wanting to fire DePaoli unless the trial court appointed a third attorney for him. RT 17055, AG033311. Price argues that his statements to the court were "rambling, confused" and "paranoid" and constituted the type of "unusual and self-defeating behavior in the courtroom" that suggests the need for further inquiry into the defendant's mental status. Pet. at 304, citing *Torres v. Prunty*, 223 F.3d 1103, 1109 (9th Cir. 2000).

In *Torres*, the defendant sought removal of his attorney because he believed she was part of a very elaborate conspiracy against him by the hospital where he had shot several doctors. 223 F.3d at 1109. Torres's attorney believed he needed a competency

evaluation.  *Id.*  Prior to trial, Torres had been evaluated by a psychologist appointed by the court who diagnosed Torres with a "severe delusional (paranoid)" disorder, and stated that "Torres registered 'one of the most disturbed profiles on this instrument seen by this evaluator, pointing clearly to the presence of psychotic delusional ideation.'"  *Id.* at 1105.  It is against this backdrop that the Court of Appeals found Torres's later insistence on wearing his jail attire to trial, his threat to assault his attorney, his insistence on being handcuffed after being ordered shackled, and his continuous disruptions in the courtroom that forced his removal to be sufficient to raise a good faith doubt as to his competency.  *Id.* at 1109.

Here, Price had no such serious or longstanding mental health diagnosis.  His attorneys, as discussed above and unlike Torres's, did not raise a *bona fide* doubt on the record as to his competency, despite being given multiple opportunities to do so.  And while Price believed the trial court wished to see him "beat up, bloodied, and bowed in submission," RT 17054, AG033310, he did not hold longstanding delusions that his counsel and the trial court worked in conjunction with each other or any other entity in an effort to see him convicted.

"In cases finding sufficient evidence of incompetency, the petitioners have been able to show either extremely erratic and irrational behavior during the course of the trial, *e.g.*, *Tillery v. Eyman*, 492 F.2d 1056, 1057-58 (9th Cir.1974) (defendant screamed throughout the nights, laughed at the jury, made gestures at the bailiff, disrobed in the courtroom and butted his head through a glass window), or lengthy histories of acute psychosis and psychiatric treatment, *e.g.*, *Moore v. United States*, 464 F.2d 663, 665 (9th Cir.1972) (defendant repeatedly hospitalized for acute mental illness and hallucinations)." *Boag v. Raines*, 769 F.2d 1341, 1343 (9th Cir. 1985).  Price has shown neither.

The trial court and at least one doctor concluded that Price's refusal to cooperate with counsel and court orders resulted from an unwillingness, as opposed to an inability, to do so. The record supports such a conclusion. *See*, *e.g.*, CT 3988, AG004031 (Price testified that when jail staff refused to honor his request to be transferred to another cell, he "knocked a hole clear through a wall in the cell, big enough to crawl through, in about ten minutes time and generally ruined the cell for human occupation in order to force them to move [him]."). Price has not provided any clearly established federal law that would support relief for his claim that the trial court should have held a good faith doubt as to his competency. Thus, he has failed to show that the California Supreme Court's denial of this claim was unreasonable. Accordingly, Claim IX is DENIED.

## II.   Claim XIV - Shackling Claim

In this claim, Price challenges the trial court's decision to shackle him during trial proceedings, stating that it violated his rights to due process, a fair trial, the effective assistance of counsel, and his right to be free from cruel and unusual punishment as provided by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments. Price argues that the shackling order was not warranted, that the trial court failed to consider less restrictive alternatives than confining him to a chair by belly chain, and that the decision to extend the shackling order to the sentencing proceedings prejudiced him because it indicated to the jury that the court thought Price was violent. Pet. at 440, 445-46; Reply at 117-18.

Following the November 19 assaults, discussed in connection with Claim IX above, the trial court held a hearing regarding whether Price should be shackled in the courtroom. As noted, one of the assaults happened within the courthouse itself. The prosecutor stated for the record his personal fear of being in the courtroom with Price and requested that Price be secured to the table. RT 10580, AG027436. The court took

28

testimony from the correctional officers involved in the altercations, defense attorney Klay, and visited Price at his cell to take his statement. At the conclusion of the hearing, the trial court ordered Price shackled.

In its order, the trial court noted that the frequency of the assaults had increased in the prior thirty days and that the court now had cause to fear for the safety of court attachés, jurors, and witnesses, not to mention correctional staff and Price himself. RT 10760-61, 10764; AG027619-20, 027623. The court also noted Price's regular disruptions of proceedings and refusal to comply with requirements of him unless his demands were met as a reason for imposing shackling. RT 10761-62, AG027620-21.

The court ordered that Price be restrained with a belly chain that would keep him in his chair, though Price's hands would be free. RT 10762, AG027621. To prevent the jury from being aware of Price's physical restraints, the court further ordered that no one would stand at the beginning and ending of proceedings. RT 10770-71, AG027629-30. Moreover, the chair had been specially altered to prevent the jury from seeing the chain attachment. RT 10771, AG027630. Price decided to leave the courtroom as opposed to be shackled and he did not return until the penalty phase.

### A. Legal Standard

The Constitution forbids the use of shackles (or other physical restraints) visible to the jury absent a trial court determination, in the exercise of its discretion, that the use is justified by an essential state interest—such as the interest in courtroom security—specific to the defendant on trial. *Deck v. Missouri*, 544 U.S. 622, 624 (2005). Generally, the defendant's right to due process is violated if the trial court fails to make a finding on the record justifying the necessity of physical restraints, and the absence of such a finding cannot be cured by the reviewing court's after-the-fact justifications. *Larson v. Palmateer*, 515 F.3d 1057, 1063 (9th Cir. 2008).

The Ninth Circuit has held that due process requires the trial court to engage in an analysis of the security risks posed by the defendant and to consider less restrictive alternatives before permitting a defendant to be restrained. *Rhoden v. Rowland*, 172 F.3d 633, 636 (9th Cir. 1999) ("*Rhoden II*"). But Supreme Court precedent only explicitly recognizes the first requirement. *See Deck*, 544 U.S. at 624, 633 (only requiring essential state interests such as special security needs or escape risks specifically related to defendant on trial before shackles may be used); *see also Hedlund v. Ryan*, 815 F.3d 1233, 1242 (9th Cir. 2016) (finding state court decision affirming use of leg brace was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent where ordering the leg brace was justified by an essential state interest).

Shackling therefore is proper where there is a serious threat of escape or danger to those in and around the courtroom, *see Hedlund*, 815 F.3d at 1243 (threat of escape based on deputy's testimony regarding prior escape attempt); or where disruption in the courtroom is likely in the absence of shackles*, see Wilson v. McCarthy*, 770 F.2d 1482, 1485 (9th Cir. 1985).

### B. State Court Denial of Shackling Claim

The California Supreme Court held that the record clearly showed a "manifest need" for shackling Price. *Price*, 1 Cal.4th at 403. Thus, it determined that the trial court did not abuse its discretion in issuing the order. *Id.* The court went on to detail four incidents that had occurred between Price and correctional officers in the month before the shackling order, three of which involved violence and one of which happened in the court hallway. *Id.* at 403-04.

//

//

**C.    Price Has Failed to Show the State Court Denial Was Unreasonable**

Price argues that the trial court's decision to shackle him was incorrect because Price's outbursts were a response to the decompensating relationship between him and jail staff, not an indication of threats to anyone in the courtroom and because it would have been impossible to sit still for months on end without causing the belly chain to make any sound that alerted the jury to his restraints.  Pet. at 440-445.  The order, Price argues, prejudiced him because it resulted in his absence from the courtroom during his trial and other key proceedings (claims related to that issue are discussed below).  *Id.* at 445.  Price also asserts that the order was erroneous because the trial court "failed to consider less restrictive alternatives before imposing physical constraints."  *Id.*, citing *Duckett*, 67 F.3d at 748.  Price posits that the Court should review this claim de novo because the California Supreme Court's denial of it was both an unreasonable application of clearly established federal law and an unreasonable determination of the facts.  Reply at 115.

Price has not shown the California Supreme Court denial of this claim was unreasonable.  As Davis notes, no clearly established federal case law required the trial court to evaluate lesser restrictive alternatives to shackling.  See *Deck*, 544 U.S. at 624, 633; *Hedlund*, 815 F.3d at 1242.  Even if it was required, the trial court had tried less restrictive measures prior to instituting the shackling order.  The prosecutor had filed a motion eight months prior seeking to have Price shackled, which the trial court denied at that time.  Price's increasing use of violence and his close proximity to several court personnel left the trial court with the conclusion it must restrict his movement within the courtroom, though it ordered Price's hands to be free.

To be consistent with clearly established federal law, the only thing the trial court needed to evaluate was whether the "use [of restraints visible to the jury] [wa]s justified

by an essential state interest—such as the interest in courtroom security—specific to the defendant on trial." *Id.* at 624. The trial court conducted an extensive hearing on the matter and detailed the escalation in Price's behavior, including the increased frequency and recency of his physical altercations with jail staff. The most recent altercation happened in the courthouse. Thus, Price caused a security issue "around the courtroom," as noted by *Hedlund*, 815 F.3d at 1243, and the judge believed Price would likely cause further disruption in the courtrooom in the absence of shackles, *see Wilson*, 770 F.2d at 1485.

Further, Price cannot show that he was prejudiced by the trial court's decision to order him shackled during the proceedings because the jurors never saw Price shackled. *See Rich*, 170 F.3d at 1240 (when a defendant's shackling was not actually seen by the jury in the courtroom, no error results). His decision to leave the courtroom instead of remain shackled was a volitional and voluntary one. Accordingly, Price has failed to show that he is entitled to relief on this claim. It is, therefore, DENIED.

## IV. Claims XIX and XX - Price's Absence from Much of Trial and Other Key Proceedings Violated His Rights

Claim XIX challenges the trial court's refusal to require Price to be present for his capital trial and Claim XX raises a similar challenge for Price's absences from other "key" proceedings in the trial. Price argues the trial court's failure to require his presence violated his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments. As discussed above, once the trial court ordered Price shackled, he refused to attend the trial. Subsequent to that, the trial court ordered that Price dress for court and be transported, but he refused to comply. Price argues that he could not voluntarily waive his presence from his trial because he was a capital defendant and, thus, is entitled to relief. He also challenges his absence from several key proceedings before the

32

evidentiary stage of his trial began on this basis. Some of those absences he admits to waiving. Others, he argues, no waiver existed whether valid or not.

### A. Legal Standard

The Supreme Court has recognized that "the right to personal presence at all critical stages of the trial . . . [is a] fundamental right[] of each criminal defendant." *Rushen v. Spain*, 464 U.S. 114, 117 (1983). This right derives from the Confrontation Clause of the Sixth Amendment and the Due Process Clauses of the Fifth and Fourteenth Amendments. *Campbell v. Wood*, 18 F.3d 662, 671 (9th Cir. 1994) (en banc). The Confrontation Clause protects a defendant's right to face his accusers and applies to every stage of a trial. *See Illinois v. Allen*, 397 U.S. 337, 338 (1970).

The Sixth Amendment also protects an individual's right to be present at his sentencing. *United States v. Napier*, 463 F.3d 1040, 1042 (9th Cir. 2006) (finding constitutional error in the district court's inclusion in the written judgment nonstandard conditions of supervised release which were not included in defendant's oral sentence).

Due process, on the other hand, protects a defendant's right to be present "at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987). "'[A] defendant charged with a felony has a fundamental right to be present during voir dire.'" *United States v. Reyes*, 764 F.3d 1184, 1193 (9th Cir. 2014) (alteration in original) (quoting United States v. Sherman, 98 F.3d 402, 407 (9th Cir. 1996)). A defendant has a "right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings," *Reyes*, 764 F.3d at 1194 (quotation marks omitted), but he is not required to be present when his "presence would be useless, or the benefit but a shadow." *Id.* at 1193 (quotation marks omitted); *see id.* at 1193, 1194 (concluding no constitutional violation when defendant was excluded from side bar

conference between court, counsel, and prospective juror because defendant's absence did not frustrate the fairness of the proceedings).

A defendant can waive the right to personal presence provided he does so voluntarily, knowingly and intelligently. *Wood*, 18 F.3d at 671. Such a waiver need not be express; it may be implied, *e.g.*, by a showing that the defendant "knowingly and voluntarily fail[ed] to appear for trial." *United States v. Houtchens*, 926 F.2d 824, 827 (9th Cir. 1991). A defendant must personally waive his right to be present; that counsel is notified is irrelevant. *See Turner v. Marshall*, 63 F.3d 807, 815 (9th Cir. 1995) (readback of testimony), overruled on other grounds by *Tolbert v. Page*, 182 F.3d 677, 685 (9th Cir. 1999) (*en banc*).

The Supreme Court has never held that exclusion of a defendant from a critical stage of the trial is a structural error. *Campbell v. Rice*, 408 F.3d 1166, 1172 (9th Cir. 2005) (en banc). The rights to be present at all critical stages and to be represented by counsel, like most constitutional rights, are subject to harmless error analysis "'unless the deprivation, by its very nature, cannot be harmless.'" *Id.* (quoting *Rushden v. Spain*, 464 U.S. 114, 117 n.2 (1983) (per curiam)). Nevertheless, a defendant's absence from certain stages of a criminal proceeding may so undermine the integrity of the trial process that the error will fall within the category of cases requiring automatic reversal. *Hegler*, 50 F.3d at 1476. This was recognized as to sentencing in *Hays v. Arave*, 977 F.2d 475, 479-81 (9th Cir. 1992).

### B. State Court Denial of Claims

The California Supreme Court denied Price's claim that he could not waive his presence at the guilt phase of his trial following the shackling order by noting that the United States Supreme Court had never "held that a defendant cannot waive the constitutional right to be present at critical stages of even a capital trial," and that the

California Supreme Court affirmatively had determined in prior cases that as a matter of state and federal constitutional law that a capital defendant could waive his right to be present at critical stages of the trial. *Price*, 1 Cal.4th at 405.

As for the other proceedings, the California Supreme Court determined that Price had either waived his presence or that his presence was not required. *Id.* at 406-408. Specifically, the state court found that Price waived his presence for the two days of voir dire that he missed so that he could attend a doctor's appointment and obtain his court-ordered recreation and exercise time. The California Supreme Court noted that Price had not advised the trial court that the jail's compliance with the court's order that Price be provided exercise time and timely medical appointments interfered with his court appearances and, thus, he did not exhaust his remedy and could not argue his waiver was involuntary. *Id.* at 406.

Regarding the proceedings held following defense counsel's advisement that Price had discontinued speaking with them and had attempted to fire DePaoli by note, the California Supreme Court determined both that Price had waived his presence when he failed to show despite daily notes requesting his presence and that his presence was unnecessary. *Id.* at 407-08. The court noted that because Price refused to respond the trial court's request for reasons as to why he wanted to discharge his counsel, Price's presence at the discussions on the matter would not have assisted the defense. *Id.* at 408.

Finally, the California Supreme Court determined that Price had failed to show that his physical presence would have "substantially benefitted the defense" at a hearing on the defense's motion for acquittal and another hearing on the admissibility of penalty phase exhibits. *Id.* He, thus, failed to show that the trial court erred in holding the hearings in his absence.

**C. Price Has Failed to Show the State Court Denials of His Claims Regarding His Absence from Trial and Other Key Proceedings Were Unreasonable**

Price argues that the California Supreme Court denial of his claim regarding the trial court's failure to require his presence at trial constituted an unreasonable application of clearly established federal law because the Supreme Court has held that a capital defendant cannot waive his presence at trial. Reply at 131, citing *Hall v. Wainwright*, 733 F.2d 766, 775 (11th Cir. 1984). Price asserts that the Supreme Court decided in *Diaz v. United States*, 223 U.S. 442, 445 (1912), and *Hopt v. Utah*, 110 U.S. 574, 579 (1884), that a capital defendant can never waive his right to be present at trial and that, while the Court subsequently allowed that a noncapital defendant can waive his right to appear, it has not done so for capital defendants. Reply at 132. However, this does not appear to be the clear rule Price asserts.

As the Supreme Court later noted, *Diaz* expressly rejected the "broad dicta" in *Hopt* and earlier cases that an obstreperous criminal defendant could not be forcibly removed from his own trial. *Illinois v. Allen*, 397 U.S. 337, 342 (1970). In doing so, the *Diaz* court discussed the holding in *Hopt* in context. The Court stated, "[A] part of the trial was had in [the defendant's] absence notwithstanding the territorial statute declared that he '*must* be personally present.'" *Diaz*, 223 U.S. at 458 (emphasis in original). Thus, the *Diaz* court noted that the *Hopt* court's ruling, specifically that what "the law makes essential in proceedings involving the deprivation of life or liberty cannot be dispensed with or affected by the consent of the accused," directly related to the territorial statute requiring the defendant's presence. *Id.* To state that *Hopt* requires a capital defendant's presence at trial under any and all circumstances stretches the holding beyond the facts and limited ruling of the case, which the *Illinois* court stated *Diaz* had meant to correct. The rule Price cites that a capital defendant cannot waive his right to be present at trial is

not clearly established federal law. *See Williams*, 529 U.S. at 412 ("Clearly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.").

Price argues that the Supreme Court indicated in *Drope* that it might revisit the holding in *Diaz* that a capital defendant cannot waive his presence during critical proceedings. Reply at 132. However, this mischaracterizes the Court's statements in both *Diaz* and *Drope*. The *Drope* court said, "Our resolution of the first issue raised by petitioner makes it unnecessary to decide whether, as he contends, it was constitutionally impermissible to conduct the remainder of his trial on a capital offense in his enforced absence from a self-inflicted wound. *See* [*Diaz*, 223 U.S. at 445]. However, even assuming the right to be present was one that could be waived, what we have already said makes it clear that there was an insufficient inquiry to afford a basis for deciding the issue of waiver." The Court, thus, indicated that the issue remained an open question, not one of settled law. "If Supreme Court cases 'give no clear answer to the question presented,' the state court's decision cannot be an unreasonable application of clearly established federal law." *Ponce v. Felker*, 606 F.3d 596, 604 (9th Cir. 2010) (quoting *Wright v. Van Patten*, 552 U.S. 120, 126 (2008)).

Courts of appeals have disagreed about the import of *Hopt* and to what extent *Diaz* abridged or limited that ruling, further underscoring the lack of clearly established federal law on this issue. *Compare Amaya-Ruiz v. Stewart*, 121 F.3d 486, 496 (9th Cir. 1997), overruled on other grounds by *United States v. Preston*, 751 F.3d 1008 (9th Cir. 2014), and *Wood*, 18 F.3d at 672 *with Hall v. Wainwright*, 733 F.2d 766, 775 (11th Cir. 1984). Circuit decisions can be relevant to assess what law is "clearly established." *Clark v. Murphy*, 331 F.3d 1062, 1070-71 (9th Cir. 2003). Our own has stated that

"[t]here is no principled basis for limiting to noncapital offenses a defendant's ability knowingly, voluntarily, and intelligently to waive the right of presence. Nor do we find logic in the proposition that a right that may be waived by disruptive behavior cannot be waived by an affirmative petition freely made and based on informed judgment." *Wood*, 18 F.3d at 672.

Moreover, Price exhibited the exact sort of behavior that *Diaz* discussed as warranting removal from the courtroom. The *Diaz* court quoted the Georgia Supreme Court:

> The question is one of broad public policy, whether an accused person, placed upon trial for crime, and protected by all the safeguards with which the humanity of our present criminal law sedulously surrounds him, can with impunity defy the processes of that law, paralyze the proceedings of courts and juries, and turn them into a solemn farce, and ultimately compel society, for its own safety to restrict the operation of the principle of personal liberty. Neither in criminal nor in civil cases will the law allow a person to take advantage of his own wrong.

*Diaz*, 223 U.S. at 458.

Price's actions upon learning of the shackling order were nearly identical to that in *Amaya-Ruiz*, where the Ninth Circuit upheld a capital defendant's waiver of presence when he left the courtroom rather than be shackled. There, the Ninth Circuit found that his waiver, which was based solely on his refusal to remain in the courtroom while shackled, was made "voluntarily, knowingly, and intelligently." *Amaya-Ruiz*, 121 F.3d at 496. Price, similarly, had been made aware of his rights to be present in the courtroom, was sent a daily note by the trial court requesting his presence, and refused to come because of the shackling order. The record is replete with examples of Price obstructing or derailing the proceedings when he did not get his way. The trial court could not continue to allow Price to take advantage of his own wrong behavior and forestall the trial indefinitely. It had an obligation to continue the proceedings.

Price does not show that the California Supreme Court's determination that he did not suffer prejudice from the absences he did not waive was unreasonable. Accordingly, Claims XIX and XX are DENIED.

**CONCLUSION**

For the reasons set forth above, Claims IX, XIV, XIX, and XX are DENIED.

Within sixty (60) days of the filing date of this Order, Price shall file a motion for evidentiary hearing on the remaining fourteen claims in the petition. If there are any claims for which Price does not seek an evidentiary hearing, he shall note that in the motion. The Court will rely on the briefing it already has to resolve the remaining claims; the briefing shall address only whether an evidentiary hearing is required. Davis shall file an answering brief within thirty (30) days of the filing date of Price's opening brief. The reply is due within fifteen (15) days of the filing date of the answering brief.

**IT IS SO ORDERED.**

Dated: June 6, 2018

_____

PHYLLIS J. HAMILTON
United States District Judge